APPEAL,TYPE–E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:22–cv–00058–CRC</u>
### *Internal Use Only*

| | |
|---|---|
| AMAPLAT MAURITIUS LTD. et al v. ZIMBABWE MINING DEVELOPMENT CORPORATION et al<br>Assigned to: Judge Christopher R. Cooper<br>Cause: 09:0202 Award under Convention on Foreign Arbitral Awards | Date Filed: 01/10/2022<br>Jury Demand: None<br>Nature of Suit: 896 Arbitration<br>Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **AMAPLAT MAURITIUS LTD.** | represented by | **Joseph Myer Sanderson**<br>STEPTOE LLP<br>1114 Avenue of the Americas<br>New York, NY 10036<br>212–378–7615<br>Fax: 212–506–3950<br>Email: <u>josanderson@steptoe.com</u><br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Niyati Ahuja**<br>STEPTOE & JOHNSON LLP<br>1114 Avenue of the Americas<br>New York, NY 10036<br>510–570–5831<br>Email: <u>nahuja@steptoe.com</u><br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Steven K. Davidson**<br>STEPTOE LLP<br>1330 Connecticut Avenue, NW<br>Washington, DC 20036<br>202–429–8077<br>Fax: 202–429–3902<br>Email: <u>sdavidson@steptoe.com</u><br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **AMARI NICKEL HOLDINGS ZIMBABWE LTD.** | represented by | **Joseph Myer Sanderson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Niyati Ahuja** |

1

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven K. Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ZIMBABWE MINING**
**DEVELOPMENT CORPORATION**

represented by **Rodney Quinn Smith , II**
GST LLP
1111 Brickell Avenue
Suite 2715
Miami, FL 33131
305–856–7723
Email: quinn.smith@gstllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bethel Kassa**
GST LLP
2600 Virginia Avenue
Suite 205
Washington, DC 20037
202–848–2166
Email: bethel.kassa@gstllp.com
*ATTORNEY TO BE NOTICED*

**Katherine A. Sanoja**
GST LLP
Florida
1111 Brickell Avenue
Suite 2715
Miami, FL 33131
305–856–7723
Email: katherine.sanoja@gstllp.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHIEF MINING COMMISSIONER,**
**MINISTRY OF MINES OF**
**ZIMBABWE**

represented by **Rodney Quinn Smith , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bethel Kassa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine A. Sanoja**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**REPUBLIC OF ZIMBABWE**        represented by   **Rodney Quinn Smith , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bethel Kassa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine A. Sanoja**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/10/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number ADCDC–8969833) filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Civil Cover Sheet, # 9 Summons of Chief Mining Commissioner, # 10 Summons of Zimbabwe Mining Development Corporation, # 11 Summons of Republic of Zimbabwe)(Davidson, Steven) (Entered: 01/10/2022) |
| 01/10/2022 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMAPLAT MAURITIUS LTD. (Davidson, Steven) (Entered: 01/10/2022) |
| 01/10/2022 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMARI NICKEL HOLDINGS ZIMBABWE LTD. (Davidson, Steven) (Entered: 01/10/2022) |
| 01/10/2022 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Joseph M. Sanderson, Filing fee $ 100, receipt number BDCDC–8970331. Fee Status: Fee Paid. by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Declaration of J. Sanderson in Support of Motion for Admission Pro Hav Vice, # 2 Text of Proposed Order)(Davidson, Steven) (Entered: 01/10/2022) |
| 01/11/2022 |  | Case Assigned to Judge Christopher R. Cooper. (zsb) (Entered: 01/11/2022) |
| 01/12/2022 |  | MINUTE ORDER granting 4 Motion for Leave to Appear Pro Hac Vice of Joseph M. Sanderson. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Christopher R. Cooper on 1/12/2022. (lccrc2) (Entered: 01/12/2022) |
| 01/13/2022 | 5 | NOTICE of Appearance by Joseph Myer Sanderson on behalf of All Plaintiffs (Sanderson, Joseph) (Entered: 01/13/2022) |
| 01/19/2022 | 6 | SUMMONS (3) Issued Electronically as to CHIEF MINING COMMISSIONER MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, |

| | | |
|---|---|---|
| | | ZIMBABWE MINING DEVELOPMENT CORPORATION. (Attachments: # 1 Notice and Consent)(rj) . (Entered: 01/19/2022) |
| 03/08/2022 | 7 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Republic of Zimbabwe)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 03/08/2022) |
| 03/08/2022 | 8 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Zimbabwe Mining Development Corporation)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 03/08/2022) |
| 03/08/2022 | 9 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Ministry of Mines of Zimbabwe)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 03/08/2022) |
| 03/08/2022 | 10 | REQUEST from Plaintiffs for the Clerk to effect service of one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (See Docket Entries 7 8 9 to view document) (zjf) (Entered: 03/08/2022) |
| 03/08/2022 | 11 | CERTIFICATE OF CLERK of mailing one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state on Defendants, by registered mail, return receipt requested, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (Attachments: # 1 Postal Receipts) (zjf) (Entered: 03/08/2022) |
| 06/10/2022 | 12 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Zimbabwe Mining Development Corporation* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 06/10/2022) |
| 06/10/2022 | 13 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Ministry of Mines of Zimbabwe)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 06/10/2022) |
| 06/10/2022 | 14 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Republic of Zimbabwe)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 06/10/2022) |
| 06/13/2022 | 15 | REQUEST from AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD. for the Clerk to effect service of one copy of the notice of suit, summons and complaint, together with a translation of each into the official language of the foreign state, by DHL, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. 1608(b)(3)(B). (zeg) (Entered: 06/13/2022) |
| 06/13/2022 | 16 | REQUEST from AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD. for the Clerk to effect service of one copy of the notice of suit, summons and complaint, together with a translation of each into the official language of the foreign state, by DHL, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. 1608(b)(3)(B). (zeg) (Entered: 06/13/2022) |
| 06/13/2022 | 17 | REQUEST from AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD. for the Clerk to effect service of one copy of the notice of suit, summons and complaint, together with a translation of each into the official language of the foreign state, by DHL, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. 1608(b)(3)(B). (zeg) (Entered: 06/13/2022) |

| 06/13/2022 | 18 | CERTIFICATE OF CLERK of mailing one copy of the notice of suit, summons and complaint, together with a translation of each into the official language of the foreign state on 6/13/2022, by DHL, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. 1608(b)(3)(B). (Attachment: # 1 Waybill 1, # 2 Waybill 2, # 3 Waybill 3) (zeg) (Entered: 06/13/2022) |
|---|---|---|
| 06/23/2022 | 19 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to REPUBLIC OF ZIMBABWE served on 6/20/2022, answer due 8/19/2022. (Attachments: # 1 Exhibit 1 (DHL waybill, the tracking receipt, and the proof of delivery))(Davidson, Steven) (Entered: 06/23/2022) |
| 06/23/2022 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE served on 6/20/2022, answer due 8/19/2022. (Attachments: # 1 Exhibit 1 (DHL waybill, the tracking receipt, and the proof of delivery))(Davidson, Steven) (Entered: 06/23/2022) |
| 08/18/2022 | 21 | NOTICE of Appearance by Rodney Quinn Smith, II on behalf of CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE (Smith, Rodney) (Entered: 08/18/2022) |
| 08/19/2022 | 22 | NOTICE of Appearance by Katherine A. Sanoja on behalf of CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE (Sanoja, Katherine) (Entered: 08/19/2022) |
| 08/19/2022 | 23 | MOTION to Dismiss *the Complaint* by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE. (Attachments: # 1 Exhibit 1–1998 ICC Arbitration Rules, # 2 Exhibit 2–Notice of Registration by the Zambian High Court, # 3 Exhibit 3– Likando Kalaluka SC Expert Report, # 4 Text of Proposed Order)(Smith, Rodney) (Entered: 08/19/2022) |
| 08/19/2022 | 24 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to ZIMBABWE MINING DEVELOPMENT CORPORATION served on 8/10/2022, answer due 10/9/2022. (Sanderson, Joseph) (Entered: 08/19/2022) |
| 08/19/2022 | 25 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Bethel Kassa, Filing fee $ 100, receipt number ADCDC–9457255. Fee Status: Fee Paid. by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE. (Attachments: # 1 Declaration in support of the motion for admission pro hac vice, # 2 Exhibit Certificate of good standing, # 3 Text of Proposed Order)(Sanoja, Katherine) (Entered: 08/19/2022) |
| 08/22/2022 | | MINUTE ORDER: The Court denies without prejudice the 25 Motion for Admission of Attorney Pro Hac Vice as to Bethel Kassa. It appears from the filing that Attorney Kassa practices law from an office located in the District of Columbia. Under this Court's rules, any attorney who practices law from an office located in the District of Columbia must be a member of the Bar of this Court to submit papers to this Court. See LCvR 83.2(c)(2) & Comment to LCvR 83.2(c)(2). Accordingly, Attorney Kassa is ineligible for admission pro hac vice, and must instead apply for admission to the Bar of this Court. But Attorney Kassa may renew her pro hac vice motion once she notifies the Court that her application for admission to the Bar of this Court has been submitted and is pending. So Ordered. Signed by Judge Christopher R. Cooper on 8/22/2022. (lccrc2) (Entered: 08/22/2022) |
| 08/24/2022 | 26 | |

| | | |
|---|---|---|
| | | Consent MOTION for Briefing Schedule *(Joint)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 08/24/2022) |
| 08/25/2022 | | MINUTE ORDER granting 26 Motion for Briefing Schedule. Plaintiffs' opposition brief is now due September 20, 2022 and Defendants' reply brief is now due October 6, 2022. Signed by Judge Christopher R. Cooper on 8/25/2022. (lccrc2) (Entered: 08/25/2022) |
| 09/19/2022 | 27 | Consent MOTION for Briefing Schedule by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 09/19/2022) |
| 09/19/2022 | | MINUTE ORDER granting the parties' 27 Motion for Briefing Schedule. Accordingly, Plaintiffs will file their Opposition to Defendants' Motion to Dismiss by September 23, 2022 and Defendants will file their Reply by October 11, 2022. Signed by Judge Christopher R. Cooper on 9/19/2022. (lccrc2) (Entered: 09/19/2022) |
| 09/23/2022 | 28 | Memorandum in opposition to re 23 Motion to Dismiss, filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Declaration Declaration of John Sangwa, S.C., # 2 Declaration Declaration of Michael M. Mundashi, S.C., # 3 Declaration Declaration of Steven Davidson, # 4 Exhibit Exhibits 1−3 in Support of Steve Davidson's Declaration, # 5 Text of Proposed Order Proposed Order)(Davidson, Steven) (Entered: 09/23/2022) |
| 10/11/2022 | 29 | REPLY to opposition to motion re 23 MOTION to Dismiss filed by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE. (Attachments: # 1 Exhibit 1. Declaration of Tinashe Chiparo, # 2 Exhibit 2. Declaration of Jacob Mutevedzi, # 3 Exhibit 3. Zimbabwe Mining Development Corporation Act, # 4 Exhibit 4. Zimbabwe Mines and Mineral Act, # 5 Exhibit 5. Funnekotter−Motion)(Smith, Rodney) Modified on 10/12/2022 to correct docket link/ text (zjm). (Entered: 10/11/2022) |
| 10/11/2022 | 30 | MOTION to Dismiss by ZIMBABWE MINING DEVELOPMENT CORPORATION. (Attachments: # 1 Exhibit 1. Declaration of Tinashe Chiparo, # 2 Exhibit 2. Declaration of Jacob Mutevedzi, # 3 Text of Proposed Order)(Smith, Rodney) (Entered: 10/11/2022) |
| 10/24/2022 | 31 | Consent MOTION for Briefing Schedule *(Joint)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 10/24/2022) |
| 10/25/2022 | | MINUTE ORDER granting the parties' 31 Motion for Briefing Schedule. Plaintiffs shall file their opposition by November 1, 2022 and Defendants shall file their reply by November 15, 2022. Signed by Judge Christopher R. Cooper on 10/25/2022. (lccrc2) (Entered: 10/25/2022) |
| 11/01/2022 | 32 | Memorandum in opposition to re 30 Motion to Dismiss filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Declaration of Michael M. Mundashi, # 2 Declaration of Steven K. Davidson, # 3 Exhibit 1−3 in Support of Declaration of Steven K. Davidson)(Davidson, Steven) (Entered: 11/01/2022) |
| 11/07/2022 | 33 | NOTICE of Appearance by Bethel Kassa on behalf of All Defendants (Kassa, Bethel) (Entered: 11/07/2022) |
| 11/15/2022 | 34 | |

| | | |
|---|---|---|
| | | REPLY to opposition to motion re 30 MOTION to Dismiss filed by ZIMBABWE MINING DEVELOPMENT CORPORATION. (Smith, Rodney) (Entered: 11/15/2022) |
| 12/05/2022 | 35 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Niyati Ahuja, Filing fee $ 100, receipt number ADCDC–9712916. Fee Status: Fee Paid. by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Declaration Declaration of Niyati Ahuja In Support of Motion, # 2 Text of Proposed Order Proposed Order)(Davidson, Steven) (Entered: 12/05/2022) |
| 12/05/2022 | | NOTICE OF ERROR re 35 Motion for Leave to Appear Pro Hac Vice; emailed to sdavidson@steptoe.com, cc'd 6 associated attorneys –– The PDF file you docketed contained errors: 1. **Please note the following deficiency and file/refile document as instructed**, 2. Declaration must have an original, ink signature; refile using the event **Declaration**, 3. Pro Hac Vice motion must be accompanied by a Certificate of Good Standing issued within the last 30 days (LCvR 83.2(c)(2)). Please file certificate as an Errata (zjm, ) (Entered: 12/05/2022) |
| 12/09/2022 | 36 | DECLARATION by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD. re 35 MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Niyati Ahuja, Filing fee $ 100, receipt number ADCDC–9712916. Fee Status: Fee Paid. filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Errata Certificate of Good Standing)(Davidson, Steven) (Entered: 12/09/2022) |
| 12/12/2022 | | MINUTE ORDER granting Plaintiffs' 35 Motion for Leave to Appear Pro Hac Vice for Attorney Niyati Ahuja. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Christopher R. Cooper on 12/12/2022. (lccrc2) (Entered: 12/12/2022) |
| 12/20/2022 | 37 | NOTICE of Appearance by Niyati Ahuja on behalf of AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD. (Ahuja, Niyati) (Entered: 12/20/2022) |
| 03/22/2023 | 38 | MEMORANDUM OPINION AND ORDER granting in part and denying in part 23 the Republic of Zimbabwe's and Chief Mining Commissioner's Motion to Dismiss; and granting 30 Zimbabwe Mining Development Corporation's Motion to Dismiss. See full Memorandum Opinion and Order for details. Signed by Judge Christopher R. Cooper on 3/22/2023. (lccrc1) (Entered: 03/22/2023) |
| 03/23/2023 | | Set/Reset Deadlines: Amended Complaint due by 4/24/2023. (lsj) (Entered: 03/23/2023) |
| 04/19/2023 | 39 | Consent MOTION for Extension of Time to *File Amended Complaint* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Text of Proposed Order)(Davidson, Steven) (Entered: 04/19/2023) |
| 04/20/2023 | | MINUTE ORDER granting Plaintiffs' 39 Consent Motion for Extension. Plaintiffs' amended complaint is due by May 24, 2023. Signed by Judge Christopher R. Cooper on 4/20/2023. (lccrc1) (Entered: 04/20/2023) |
| 05/24/2023 | 40 | AMENDED COMPLAINT against CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Exhibit A – |

| | | |
|---|---|---|
| | | Final Arbitration Award, # 2 Exhibit B – Amari Memorandum of Understanding, # 3 Exhibit C – Amari Novation Deed, # 4 Exhibit D – Amaplat Memorandum of Understanding, # 5 Exhibit E – Zambian Judgment On Award, # 6 Exhibit F – January 12, 2021 Letter from Titan Law to Government, # 7 Exhibit G – December 17, 2021 Letter from Titan Law to Government, # 8 Exhibit H – U.S. State Department Zimbabwe Investment Climate Report 2022, # 9 Exhibit I – Chitando appoints new boards for parastatals – Newsday Zimbabwe, # 10 Exhibit J – Workers Union Welcomes Tagwirei Take Over Of Govt–Owned Gold Mines – New Zimbabwe, # 11 Exhibit K – Zim govt is plotting to strip state mine assets to hide from US$467m in legal claims, but there's resistance from within – newZWire, # 12 Exhibit L – Tycoon Seen Scoring From Zimbabwes $3.4 Billion Off Budget Debt – 360Mozambique, # 13 Exhibit M – Govt to offset debt with diamonds – Business Times, # 14 Exhibit N – Mugabe lifts lid on arms–for–minerals deal with China – New Zimbabwe, # 15 Exhibit O – Ownership Issues and International Sanctions in Marange – The Case of Anjin – Rough Polished, # 16 Exhibit P – Zim army firm own 40 pc stake in Anjin diamond mine – report – Rough Polished)(Davidson, Steven) (Entered: 05/24/2023) |
| 06/06/2023 | 41 | MOTION for Extension of Time to *Respond to the Amended Complaint* by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION. (Attachments: # 1 Text of Proposed Order)(Smith, Rodney) (Entered: 06/06/2023) |
| 06/07/2023 | | MINUTE ORDER granting Defendants' 41 Unopposed Motion for Extension of Time. Defendants shall answer or otherwise respond to the Amended Complaint by July 6, 2023. Signed by Judge Christopher R. Cooper on 6/7/2023. (lccrc1) (Entered: 06/07/2023) |
| 07/06/2023 | 42 | MOTION to Dismiss *Amended Complaint* by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION. (Attachments: # 1 Affidavit Second Declaration of Tinashe Chiparo)(Sanoja, Katherine) (Entered: 07/06/2023) |
| 07/18/2023 | 43 | Consent MOTION for Briefing Schedule *re Defendants' Pending Motion to Dismiss* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Text of Proposed Order)(Davidson, Steven) (Entered: 07/18/2023) |
| 07/18/2023 | | MINUTE ORDER granting the parties' 43 Motion for Briefing Schedule. Plaintiffs shall file their opposition to Defendants' 42 motion to dismiss by August 3, 2023 and Defendants shall file their reply by August 17, 2023. Signed by Judge Christopher R. Cooper on 7/18/2023. (lccrc2) (Entered: 07/18/2023) |
| 08/02/2023 | 44 | Consent MOTION for Briefing Schedule *(Revised)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Text of Proposed Order)(Davidson, Steven) (Entered: 08/02/2023) |
| 08/02/2023 | | MINUTE ORDER granting Plaintiffs' 44 Motion for Briefing Schedule. Plaintiffs shall respond to Defendants' 42 Motion to Dismiss by August 10, 2023 and Defendants shall file any reply by August 28, 2023. Signed by Judge Christopher R. Cooper on 8/2/2023. (lccrc2) (Entered: 08/02/2023) |
| 08/10/2023 | 45 | Memorandum in opposition to re 42 Motion to Dismiss, *the Amended Complaint* filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Declaration of Sternford Moyo and Exhibits A–C, # 2 |

<table>
<tr><td></td><td></td><td>Declaration of Steven K. Davidson, # <u>3</u> Exhibit A–U.S. International Trade Administration Country Commercial Guide Zimbabwe, # <u>4</u> Exhibit B–Zimbabwe Mining Development Corporation Act 1983, # <u>5</u> Exhibit C–Mines and Minerals Act 1961, # <u>6</u> Exhibit E–Nyamunda & Mukwambo Article, # <u>7</u> Exhibit F–2017 Zimbabwean Parliament Portfolio Committee on Mines and Energy Report, # <u>8</u> Exhibit G–Mawowa Article, # <u>9</u> Exhibit H–Nehanda Radio, Mpofu appoints Masimirembwa to chair CMED, # <u>10</u> Exhibit I–Bulawayo24, Obert Mpofu, Masimirembwa, strange bedfellows, # <u>11</u> Exhibit J–The Zimbabwean, ZANU PF Infighting Blamed for the Suspension of Top Mining Officials, # <u>12</u> Exhibit K–The Citizen News Article, # <u>13</u> Exhibit L–Murombo Article, # <u>14</u> Exhibit M–Mubayiwa v. ZMDC Judgment, # <u>15</u> Exhibit N–Judgment Dismissing Criminal Charges, # <u>16</u> Exhibit O–International Crisis Group Report, # <u>17</u> Exhibit P–October 19, 2010 Letter from Amari to ZMDC, # <u>18</u> Exhibit Q–October 25, 2010 Letter from Amari to ZMDC, # <u>19</u> Exhibit R–October 25, 2010 Letter from Nunn to ZMDC, # <u>20</u> Exhibit S–Affidavit of Mark Summers, # <u>21</u> Exhibit T–November 10, 2010 Letter from ZMDC to Amari, # <u>22</u> Exhibit U–2013 Parliamentary Committee Report, # <u>23</u> Exhibit V–The Herald, 3 Mining State Firms Boards Dissolved, # <u>24</u> Exhibit W–Kubatana Article, # <u>25</u> Exhibit X–Russians start $3bn mine in Zimbabwe, # <u>26</u> Exhibit Y–Moscow Times, Russian Companies Buy Into Zimbabwe Platinum Field, # <u>27</u> Exhibit Z–Peoples Dispatch, The Zimbabwean army expands its influence, # <u>28</u> Exhibit AA–Executive Order 13469, # <u>29</u> Exhibit BB–July 25, 2008 Treasury Department Press Release, # <u>30</u> Exhibit CC–December 12, 2022 Treasury Department Press Release, # <u>31</u> Exhibit DD–September 30, 2009 Treasury Department Remarks, # <u>32</u> Exhibit EE–September 15, 2022 State Department Press Release, # <u>33</u> Exhibit FF–State Department 2023 Investment Climate Statement for Zimbabwe, # <u>34</u> Exhibit GG–State Department 2022 Investment Climate Statement for Zimbabwe, # <u>35</u> Exhibit HH–State Department 2021 Investment Climate Statement for Zimbabwe, # <u>36</u> Exhibit II–State Department 2020 Investment Climate Statement for Zimbabwe, # <u>37</u> Exhibit JJ–State Department 2019 Investment Climate Statement for Zimbabwe, # <u>38</u> Exhibit KK–State Department 2018 Investment Climate Statement for Zimbabwe, # <u>39</u> Exhibit LL–State Department 2017 Investment Climate Statement for Zimbabwe, # <u>40</u> Exhibit MM–July 18, 2013 Congressional Testimony, # <u>41</u> Exhibit NN–Mining Zimbabwe Article, # <u>42</u> Exhibit OO–April 14, 2022 Memorandum re Transfer of ZMDC Shareholding to Defold, # <u>43</u> Text of Proposed Order)(Davidson, Steven) (Entered: 08/10/2023)</td></tr>
<tr><td>08/10/2023</td><td><u>46</u></td><td>Cross MOTION for Discovery <i>Conditional Cross–Motion for Jurisdictional Discovery</i> by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 08/10/2023)</td></tr>
<tr><td>08/25/2023</td><td><u>47</u></td><td>Unopposed MOTION for Extension of Time to File Response/Reply by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION. (Attachments: # <u>1</u> Exhibit A. Proposed Order)(Smith, Rodney) (Entered: 08/25/2023)</td></tr>
<tr><td>08/28/2023</td><td></td><td>MINUTE ORDER granting <u>47</u> Defendants' Motion for Extension of Time to File Response/Reply in support of <u>42</u> Defendants' Motion to Dismiss. Defendants' reply shall be submitted by September 5, 2023. Signed by Judge Christopher R. Cooper on 8/28/2023. (lccrc2) (Entered: 08/28/2023)</td></tr>
<tr><td>09/05/2023</td><td><u>48</u></td><td>REPLY to opposition to motion re <u>42</u> MOTION to Dismiss <i>Amended Complaint</i> filed by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT</td></tr>
</table>

9

| | | |
|---|---|---|
| | | CORPORATION. (Attachments: # 1 Affidavit Declaration of Quinn Smith, # 2 Affidavit Declaration of Dominic Muzawazi, # 3 Exhibit A. UK Sanctions, # 4 Exhibit B. EU Sanctions, # 5 Exhibit C. Amari Registration Info, # 6 Exhibit D. Amaplat Registration Info, # 7 Exhibit E. Article on Kropz, # 8 Exhibit F. Application before Ontario Court, # 9 Exhibit G. Belgium Court Judgment, # 10 Exhibit H. ZMDC 2012 Annual Report, # 11 Exhibit I. ZMDC Webpage, # 12 Exhibit J. STF Webpage, # 13 Exhibit K. STF Statement in TMR Energy, # 14 Exhibit L. Declaration in TMR Energy Case, # 15 Exhibit M. GAO Report, # 16 Exhibit O. UK Regulations on BVI, # 17 Exhibit P. Study on State Ownership of Minerals commissioned by World Bank, # 18 Exhibit Q. Form 10K filed by Fannie Mae, # 19 Exhibit R. ZMDC 2019 Annual Report, # 20 Exhibit S. ZMDC 2020 Annual Report, # 21 Exhibit T. US Report on EU Sanctions, # 22 Exhibit U. Zimbabwe Evidence Act, # 23 Exhibit V. Zimbabwe Corporate Governance Act, # 24 Exhibit W. Zimbabwe Procurement Act, # 25 Exhibit X. Zimbabwe Joint Ventures Act, # 26 Exhibit Y. ZIDA Act, # 27 Exhibit Z. Zimbabwe Public Finance Mgmt Act, # 28 Exhibit AA. Zimbabwe Public Debt Mgmt Act)(Smith, Rodney) (Entered: 09/05/2023) |
| 09/05/2023 | 49 | Memorandum in opposition to re 46 Motion for Discovery filed by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION. (Smith, Rodney) (Entered: 09/05/2023) |
| 09/12/2023 | 50 | REPLY to opposition to motion re 46 Cross MOTION for Discovery *Conditional Cross−Motion for Jurisdictional Discovery* filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 09/12/2023) |
| 02/09/2024 | 51 | MEMORANDUM OPINION AND ORDER denying 42 the Republic of Zimbabwe and Zimbabwe Mining Development Corporation's Motion to Dismiss and denying as moot 46 Plaintiffs' Cross−Motion for Jurisdictional Discovery. The 40 Amended Complaint shall be the operative complaint in this case, and all Defendants shall file an answer to the Amended Complaint by March 11, 2024. See full Memorandum Opinion and Order for details. Signed by Judge Christopher R. Cooper on 2/9/2024. (lccrc3) (Entered: 02/09/2024) |
| 03/08/2024 | 52 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 51 Order on Motion to Dismiss, Order on Motion for Discovery , Set/Reset Deadlines, 38 Order on Motion to Dismiss by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION, REPUBLIC OF ZIMBABWE. Filing fee $ 605, receipt number ADCDC−10743723. Fee Status: Fee Paid. Parties have been notified. (Smith, Rodney) Modified on 3/8/2024 to add docket link/correct docket text (zjm). (Entered: 03/08/2024) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **Amaplat Mauritius Ltd,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:22-cv-00058 (CRC)** |
| | ) | |
| **Zimbabwe Mining Development** | ) | |
| **Corporation,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**NOTICE OF APPEAL**

Pursuant to Rule 4(a)(1)(A) of the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit, Defendants, Zimbabwe Mining Development Corporation ("ZMDC"); Chief Mining Commissioner, Ministry of Mines of Zimbabwe (the "Commissioner"); and the Republic of Zimbabwe ("Zimbabwe") hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Memorandum Opinion and Order [ECF No. 51] denying the Motion to Dismiss filed by Defendants, and the Memorandum Opinion and Order [ECF No. 38] denying the Motion to Dismiss filed by Zimbabwe and the Commissioner.

Dated: March 8, 2024

Respectfully submitted,
/s/      *Quinn Smith*
**GST LLP**
Quinn Smith
DCD Bar No. FL0027
quinn.smith@gstllp.com
Katherine Sanoja
DC Bar No. 1019983

1

katherine.sanoja@gstllp.com
1111 Brickell Avenue
Suite 2715
Tel. (305)-856-7723

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2024, I electronically filed this document with the Clerk of the Court of the U.S. District Court of the District of Columbia by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel off record. I further certify that I am unaware of any parties who will not receive such notice.

By:     <u>*/s/ Quinn Smith*</u>
          Quinn Smith

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMAPLAT MAURITIUS LTD.** *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 22-cv-58 (CRC) |
| **ZIMBABWE MINING DEVELOPMENT CORPORATION** *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this case, two Mauritian mining companies seek recognition of a foreign court judgment enforcing an arbitral award against the Republic of Zimbabwe, the Chief Mining Commissioner of the Zimbabwean Ministry of Mines, and the Zimbabwe Mining Development Corporation ("ZMDC"), a corporation that is majority-owned by the government of Zimbabwe. All three Defendants have moved to dismiss the complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. The Court will grant the motions as to ZMDC and the Republic. Plaintiffs' theory for the Court's subject matter jurisdiction over the Republic and their theory for personal jurisdiction over ZMDC are both premised on the allegation that ZMDC is the Republic's alter ego. But, for the reasons explained below, the Court is not convinced that Plaintiffs have adequately pleaded that alter ego relationship. Because Plaintiffs might remedy that omission with more developed factual allegations, the Court will permit them to amend their complaint accordingly. As for the claims against the Chief Mining Commissioner, the Court concludes that it has jurisdiction and will deny the Commissioner's motion to dismiss.

### I.    Background

Plaintiffs Amaplat Mauritius Ltd. and Amari Nickel Holdings Zimbabwe Ltd. (collectively, "Plaintiffs") are two mining companies incorporated under the laws of the nation of Mauritius.  Compl. ¶¶ 13–14.  In 2007 and 2008, Plaintiffs each entered into memorandums of understanding ("MOUs") with Defendant ZMDC, which is majority-owned by the Republic of Zimbabwe ("the Republic"), to incorporate as joint ventures to prospect for nickel and platinum deposits and develop mines.  Id. ¶¶ 18–22.  Both MOUs included arbitration clauses, which provided that the parties must submit disputes arising out of or in relation to the MOUs to the ICC International Court of Arbitration in Paris for final and binding arbitration.  Id. ¶¶ 24–25.

In 2010, ZMDC purported to cancel the MOUs.  Id. ¶ 23.  In 2011, Plaintiffs initiated arbitration proceedings consistent with the MOU arbitration clauses, and the ICC Court determined that arbitration would occur in Zambia.  Id. ¶ 28; Compl. Ex. A (ICC Arbitral Award) ¶¶ 8–9.  Plaintiffs named both ZMDC and the Chief Mining Commissioner of the Zimbabwean Ministry of Mines (the "Commissioner") as respondents in the arbitration. Compl. Ex. A ¶ 2.  The parties participated in the arbitration proceedings for about a year and a half, during which they filed amended pleadings, conducted discovery, prepared expert reports, served various written submissions, and otherwise prepared for arbitration.  Id. ¶¶ 12–46.  The parties also signed Terms of Reference which, among other things, provided that the parties "acknowledge[d] that they agree to submit to this arbitration and expressly waive any procedural objections they may have with respect to known events."  Declaration of John Peter Sangwa ISO Pls' Opp. ("Sangwa Decl.") Ex. 1 § 8.1.  At multiple points during this time period, ZMDC and the Commissioner asked the panel to hear a challenge to its jurisdiction as a preliminary matter, but the panel deferred hearing the jurisdictional challenge on the ground that it was inextricably

linked to the merits.  Compl. Ex. A ¶¶ 28, 45.  In August 2012, the arbitral panel began hearing

evidence, including testimony from a number of witnesses for Plaintiffs, and ZMDC and the

Commissioner cross-examined at least one of Plaintiffs' witnesses.  Id. ¶¶ 47–51.

    After that cross examination, however, ZMDC and the Commissioner indicated that they

wished to challenge the arbitral tribunal under Article 11 of the ICC International Court of

Arbitration Rules and applied for the arbitration to be adjourned in the interim.  Id. ¶ 51.  The

panel denied that request, at which point the respondents sought a short adjournment and, shortly

thereafter, withdrew from the proceedings, although the panel continued to provide them with

submissions and transcripts of the proceedings.  Id. ¶ 51–56.  After ZMDC and the

Commissioner withdrew from the arbitration, their appointed arbitrator likewise tendered his

resignation.  Id. ¶ 57.  Proceedings continued through October 2012, when the now-absent

respondents obtained an ex parte order from the Zambian High Court temporarily enjoining the

proceeding.  Id. ¶¶ 58–67.  Eventually, the arbitration panel was reconstituted, and after some

further delays and changes of personnel (which were challenged by the respondents), the panel in

January 2014 issued an award ordering ZMDC and the Commissioner to pay damages, costs, and

expenses, totaling about $50 million.  Id. ¶¶ 68–88, 227.[1]

    After post-award litigation in Zambian courts, in which ZMDC and the Commissioner

again challenged the composition and authority of the panel, the High Court of Zambia issued a

judgment in Plaintiffs' favor in August 2019.  Compl. ¶ 34 & Ex. E (Ex Parte Order for Leave to

Register and Enforce the Final Arbitration Award).  The Judgment provided that ZMDC and the

---

[1] A few months later, in June 2014, the Zambian High Court issued an opinion stating
that ZMDC and the Chief Mining Commissioner had "suppressed material facts and laws" in
their ex parte injunction application, concluding that the court lacked jurisdiction, and dissolving
the injunction that had stayed the arbitration proceedings.  Sangwa Decl. Ex. 3 at R24–R25.

Commissioner had 30 days after service to move to set aside the Judgment.  Id. ¶ 35.  Plaintiffs allege that they served the Judgment on October 23, 2019.  Id.[2]  The parties negotiated for a time, but after Defendants refused to pay the Judgment, Plaintiffs filed their complaint in this Court against ZMDC, the Commissioner, and the Republic of Zimbabwe.  Id. ¶¶ 38–40.

The complaint alleges a cause of action under the D.C. Uniform Foreign-Country Money Judgments Recognition Act, D.C. Code § 15-361 et seq., and asks this Court to enter an order recognizing and enforcing the Judgment, finding that the Republic of Zimbabwe is the alter ego of ZMDC and the Commissioner, and entering a money judgment against Defendants.  Id. at 10.

Defendants have filed two separate motions to dismiss—one by the Republic and the Commissioner, and the other by ZMDC.  The Republic and Commissioner contend that the Court lacks subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") because the Republic did not sign the MOUs containing an arbitration agreement, did not participate in the Zambian arbitration, is not an alter ego of ZMDC, and therefore retains its sovereign immunity.  See Zimbabwe MTD at 6–12.  The motion also maintains that the Court lacks jurisdiction as to the claims against the Commissioner because he is an individual, not an agency or instrumentality of Zimbabwe.  Id. at 8–9.  In any event, the Republic and the Commissioner further contend that neither the FSIA's waiver exception nor arbitration exception to sovereign immunity applies in this case.  Id. at 9–12.  Next, the motion contends that the Court

_____

[2] Defendants contend that they were never served with the Zambian judgment, citing an expert declaration from a Zambian lawyer stating that there is no evidence from the Zambian court docket that Plaintiffs sought leave of the court to serve documents outside the jurisdiction.  See Zimbabwe Motion to Dismiss ("Zimbabwe MTD") at 18–19; Expert Declaration of Likando Kalaluka ISO Zimbabwe MTD ("Kalaluka Decl.") ¶¶ 27–30, ECF No. 23-3.  In their opposition, Plaintiffs state that they served Defendants' Zambian counsel in Zambia, explaining why they did not need to serve elsewhere.  Opp. to Zimbabwe MTD at 31; Sangwa Decl. ¶¶ 23–25, ECF No. 28-1.  In any event, the complaint pleads that Plaintiffs served the Zambian judgment on Defendants.

lacks personal jurisdiction over both the Republic and the Commissioner.  Id. at 13–14.  Finally, the Republic and Commissioner maintain (1) that Plaintiffs have failed to state a claim because they are seeking to enforce the arbitration award judgment past the three-year statute of limitations under the New York Convention, (2) that Plaintiffs have failed to allege sufficient facts to support their claim that ZMDC is an alter ego of the Republic, (3) that Plaintiffs have not pleaded an entitlement to fees and interest, and (4) that the Zambian High Court lacked jurisdiction to issue the Judgment.  Id. at 15–25.  In addition to reiterating many of the same arguments raised by the Republic and the Commissioner, ZMDC separately maintains that it was not properly served under the FSIA and that the Court lacks personal jurisdiction over it because the complaint does not allege minimum contacts with the District of Columbia.  ZMDC MTD at 7–9.

Both motions are fully briefed and ripe for decision.

## II.   Legal Standards

On a motion to dismiss for lack of subject matter jurisdiction or lack of personal jurisdiction, "[t]he plaintiff bears the burden of establishing, by a preponderance of the evidence, that the court has jurisdiction."  Cause of Action Inst. v. IRS, 390 F. Supp. 3d 84, 91 (D.D.C. 2019) (quoting Whiteru v. Wash. Metro. Area Transit Auth., 258 F. Supp. 3d 175, 182 (D.D.C. 2017)); see Burman v. Phoenix Worldwide Indus., Inc., 437 F. Supp. 2d 142, 147 (D.D.C. 2006).  Because this suit involves claims against a foreign nation, the FSIA provides the framework for determining subject matter jurisdiction.  Creighton Ltd. v. Gov't of State of Qatar, 181 F.3d 118, 121 (D.C. Cir. 1999).  Under the FSIA, federal district courts "have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state" as defined by the FSIA "with respect to which the foreign state is not entitled to immunity" under the statute.

5

28 U.S.C. § 1330(a).  As the statute's text suggests, "the FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies."  Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  Once the plaintiff has made that threshold showing, however, "the sovereign bears the ultimate burden of persuasion to show that the exception does not apply."  Id.; accord Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000) ("'In accordance with the restrictive view of sovereign immunity reflected in the FSIA,' the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." (quoting Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998, 1002 (D.C. Cir. 1985))).

If, on the one hand, "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff."  Phoenix Consulting, 216 F.3d at 40.  On the other hand, if the motion to dismiss presents "a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA" by contesting a jurisdictional fact or raising a "mixed question of law or fact," such as whether the "person alleged to have harmed [the] plaintiff was [an] agent of [the] sovereign," then "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged" but instead "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  Id. (citing Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 448–49 (D.C. Cir. 1990)).

Defendants also move to dismiss under Rule 12(b)(6).  In reviewing a motion to dismiss for failure to state a claim, the Court must "accept all the well-pleaded factual allegations of the

complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," however, nor does the Court "assume the truth of legal conclusions." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Iqbal, 556 U.S. at 678).

## III.  Analysis

District courts have jurisdiction over "any nonjury civil action against a foreign state as defined in" 28 U.S.C. § 1603(a) as to any claim "with respect to which the foreign state is not entitled to immunity" under §§ 1605–07 of the FSIA or an international agreement.  28 U.S.C. § 1330(a).  For purposes of the FSIA, § 1603(a) defines a foreign state as a state, any political subdivision of a state, or an agency or instrumentality of a state.  Id. § 1603(a).  The statute defines agency or instrumentality, in turn, as "any entity" which "is a separate legal person, corporate or otherwise," "is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," and "which is neither a citizen of a State of the United States . . . nor created under the laws of any third country."  Id. § 1603(b).

Section 1605 of the FSIA sets forth general exceptions to foreign sovereign immunity. Plaintiffs assert that either of two possible exceptions apply in this case.  First, Plaintiffs point to § 1605(a)(1)—the waiver exception—which divests a sovereign of immunity when "the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms

of the waiver." Id. § 1605(a)(1).  Alternatively, Plaintiffs rely on § 1605(a)(6), which, as

relevant here, waives sovereign immunity when an "action is brought, either to enforce an

agreement made by the foreign state with or for the benefit of a private party to submit [certain

disputes] to arbitration" or "to confirm an award made pursuant to such an agreement to

arbitrate" if "the agreement or award is or may be governed by a treaty or other international

agreement in force for the United States calling for the recognition and enforcement of arbitral

awards." Id. § 1605(a)(6).

Plaintiffs maintain that ZMDC waived its sovereign immunity under §§ 1605(a)(1) and

(a)(6) by agreeing to arbitrate disputes in the 2007 and 2008 MOUs and that the Commissioner,

although not a party to those agreements, waived immunity by participating in the Zambian

arbitration and by signing Terms of Reference agreeing to submit to the arbitration.  As for the

Republic, Plaintiffs allege that ZMDC is the Republic's alter ego under First National City Bank

v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611 (1983), and that ZMDC's

actions relating to the arbitration and MOUs are therefore attributable to the Republic.  In turn,

Plaintiffs maintain that personal jurisdiction exists over ZMDC, despite the absence of any

alleged minimum contacts with the United States, because ZMDC is the Republic's alter ego,

and under the FSIA, "subject matter jurisdiction plus service of process equals personal

jurisdiction." GSS Grp. Ltd. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting

Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002)).  With

these frameworks for analysis in mind, the Court will proceed to assess the motions to dismiss as

to each defendant, beginning with the Republic.

A.  The Republic

Plaintiffs contend that ZMDC's agreement to arbitrate disputes in the 2007 and 2008 MOUs, combined with the fact that Zimbabwe, Zambia, and the United States are all signatories to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), satisfies either the waiver exception or arbitration exception to sovereign immunity under § 1605(a).  But ZMDC's conduct is relevant for jurisdiction over the Republic only if ZMDC is the Republic's alter ego, such that the company's actions may be attributed to the Republic.  Accordingly, the Court begins by addressing Plaintiffs' central contention that ZMDC is the Republic's alter ego.

"A government instrumentality 'established as [a] juridical entit[y] distinct and independent from [its] sovereign should normally be treated as such,'" and therefore such entities are "presumed to have legal status separate from that of the sovereign."  Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 847 (D.C. Cir. 2000) (alterations in original) (quoting Bancec, 462 U.S. at 627).[3]  "That presumption can be overcome," however, "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or "where recognition of the instrumentality as an entity apart from the state 'would work fraud or injustice.'"  Id. at 847–48 (quoting Bancec, 462 U.S. at 629).  The existence of those conditions serves as an "exception[] to the rule that a foreign sovereign is not amenable to suit based upon the acts of such an instrumentality."  Id. at 848.

---

[3] Plaintiffs maintain, and Defendants do not dispute, that ZMDC is an "agency or instrumentality" of the Republic of Zimbabwe as that term is defined in the FSIA.  See Compl. ¶ 15 (alleging that the Republic owns a majority of ZMDC); see 28 U.S.C. § 1603(b) (defining "agency or instrumentality of a foreign state" as any entity "which is a separate legal person, corporate or otherwise," "a majority of whose shares or other ownership interest is owned by a foreign state," and "which is neither a citizen of a State of the United States . . . nor created under the laws of any third country").

9

Whether a state instrumentality is so closely tied to the sovereign that it may be the state's alter ego depends on a number of factors, including the level of the government's economic control over the entity, whether the entity's profits go to the government, the degree to which government officials manage the entity or its daily affairs, whether the government is the real beneficiary of the entity's conduct, and whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.  Rubin v. Islamic Republic of Iran, 138 S. Ct. 816, 823 (2018) (quoting Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines, 965 F.2d 1375, 1380 n.7 (5th Cir. 1992)).  The sovereign's degree of control over the instrumentality must, however, "significantly exceed[] the normal supervisory control exercised by any corporate parent over its subsidiary." Transamerica, 200 F.3d at 848. Under such circumstances, the sovereign and the instrumentality are "not meaningfully distinct entities; they act as one." Id.; see also id. at 849 ("[C]ontrol is relevant when the sovereign exercises its control in such a way as to make the instrumentality its agent. . . . The relationship of principal and agent depends, however, upon the principal having 'the right to control the conduct of the agent with respect to matters entrusted to [the agent].'" (last alteration in original) (quoting Restatement (Second) of Agency § 14 (1958))).

Plaintiffs offer two grounds for finding that ZMDC is the Republic's alter ego.  First, they rely on the allegations in the complaint, which in relevant part state that ZMDC "was created by the Zimbabwe Mining Development Corporation Act, and by law the Republic of Zimbabwe appoints its Board of Directors, approves significant actions, has the power to direct its actions, [sic] pays the debts of the Republic of Zimbabwe, and must be majority-owned by the Republic of Zimbabwe."  Compl. ¶ 15; Opp. to Zimbabwe MTD at 9.  Second, Plaintiffs maintain that the Southern District of New York's decision in Funnekotter v. Agricultural

10

Development Bank of Zimbabwe, No. 13 CIV.1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015), which found that ZMDC was the Republic's alter ego, is dispositive here under the doctrine of issue preclusion.  Opp. to Zimbabwe MTD at 9–10, 21–23.  The Court concludes that neither of these theories suffices to show that ZMDC is the Republic's alter ego.

First, the single paragraph of alter ego allegations in Plaintiffs' complaint is inadequate to displace the presumption of juridical separateness.  Plaintiffs allege that the Republic, by law, must be a majority owner of ZMDC and is empowered to appoint ZMDC's Board of Directors.  But "[a] sovereign does not create an agency relationship merely by owning a majority of a corporation's stock or by appointing its Board of Directors."  Transamerica, 200 F.3d at 849; accord Foremost-McKesson, 905 F.2d at 448 ("Majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA.").  Moreover, the fact that ZMDC was created by Zimbabwean statute does not distinguish it from what Bancec described as the "typical government instrumentality" entitled to separate juridical status, which is "created by an enabling statute that prescribes the powers and duties of the instrumentality."  462 U.S. at 624; see also Transamerica, 200 F.3d at 846 (describing instrumentality there as a state-owned shipping company created by the sovereign).  The complaint further alleges that the Republic approves or has the power to direct "significant actions" by ZMDC.  But "it is not uncommon for a government—as regulator, not as shareholder—to require approval for certain transactions" in certain sectors.  Transamerica, 200 F.3d at 851.  The complaint does not describe what "significant actions" the Republic must approve, how extensive that alleged approval authority is, or whether that authority "represents the exercise of [the Republic's] authority as shareholder rather than its exercise of governmental power in the ordinary course of regulation."  Id.; see id. at 849 ("[T]he parent [must] exercise[]

its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.").

That leaves the complaint's allegation that ZMDC pays the Republic's debts.  Compl. ¶ 15.  Plaintiffs attempt to bolster their argument of financial interdependence with a few news articles appended to their briefing, which suggest that ZMDC has had some involvement in a joint venture with a Russian military-industrial firm and that ZMDC has sold off mineral rights to the Zimbabwean military and other entities.  See Declaration of Steven K. Davidson ISO Opp. to Zimbabwe MTD ("Davidson Decl."), Exs. 1–3.  Although these allegations are relevant to the extent that they suggest some share of ZMDC's profits may go to the Republic, the complaint and Plaintiffs' handful of news articles do not support the inference that ZMDC's and the Republic's finances are "so intermingled that no distinct corporate lines are maintained."  See Transamerica, 200 F.3d at 849 (quoting NLRB v. Deena Artware, Inc., 361 U.S. 398, 403 (1960)); id. at 848 (noting that a separate entity may functionally be "operated as a division of another" if the subsidiary does "not handle any funds" and pays "all profits to parent" (citing Joseph R. Foard Co. v. Maryland, 219 F. 827, 829 (4th Cir. 1914))); see also Bancec, 462 U.S. at 614 (observing that Cuba's government "supplied all of [Bancec's] capital and owned all of its stock," and that the "General Treasury of the Republic received all of Bancec's profits, after deduction of amounts for capital reserves").  In short, the sparse allegations in Plaintiffs' complaint, combined with a few newspaper articles, are insufficient to overcome the presumption that ZMDC has "legal status separate from that of the sovereign."  Transamerica, 200 F.3d at 847.[4]

--------

[4] Although Plaintiffs emphasize that "*either* extensive control *or* fraud or injustice will suffice" to displace the presumption, they do not elaborate on a theory of fraud or injustice beyond asserting that one of the newspaper articles shows that ZMDC "may dissolve" and

Aside from the allegations in the complaint, Plaintiffs largely rely on the Southern District of New York's decision in Funnekotter.  Funnekotter concerned a declaratory judgment action brought by Dutch nationals seeking to satisfy a judgment against the Republic of Zimbabwe with the assets of several Zimbabwean corporations, including ZMDC.  2015 WL 9302560, at *1.  Ruling on the plaintiffs' motion for summary judgment, the court concluded that ZMDC, as well as the other corporations, were sufficiently dominated by the Republic to be considered its alter egos under Bancec.  Id. at *5–6.  Plaintiffs here, who were not a party to that case, contend that the Court should apply the doctrine of offensive non-mutual collateral estoppel to give Funnekotter preclusive effect concerning ZMDC's alter ego status in this case.  Opp. to Zimbabwe MTD at 21–23; Opp. to ZMDC MTD at 22–23.

"Under the doctrine of offensive collateral estoppel, or issue preclusion, a defendant may be prevented from relitigating identical issues that the defendant litigated and lost against another plaintiff."  Hurst v. Socialist People's Libyan Arab Jamahiriya, 474 F. Supp. 2d 19, 31 (D.D.C. 2007).  A district court, "in its discretion, may only apply preclusive effect to a judgment if (1) the issue was actually litigated, that is, contested by the parties and submitted for determination by the court; (2) the issue was actually and necessarily determined by a court of competent jurisdiction in the first trial; and (3) preclusion in the second action would not work an unfairness."  Id. at 31–32 (citing Jack Faucett Assocs., Inc. v. AT&T, 744 F.2d 118, 125 (D.C. Cir. 1984)); see Smith v. District of Columbia, 387 F. Supp. 3d 8, 21 (D.D.C. 2019) ("[T]he party against whom estoppel is [offensively] asserted [must] ha[ve] litigated and lost in an earlier action." (alterations in original) (quoting Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329

---

"transfer its assets to a different state-owned entity."  Opp. to Zimbabwe MTD at 10, 20.  This allegation is not enough to satisfy Plaintiffs' burden of establishing jurisdiction.

(1979))).  "The doctrine is detailed, difficult, and potentially dangerous," and "[w]here offensive estoppel is involved, the element of 'fairness' gains special importance."  Jack Faucett, 744 F.2d at 124–25.

For several reasons, the Court will not exercise its discretion to give Funnekotter preclusive effect here.  First, although the Republic was a named defendant in Funnekotter, Defendants point out that the Republic itself never actually made an appearance in the case.  See Zimbabwe Reply at 12; see also Docket, Funnekotter v. Agric. Dev. Bank of Zimbabwe, No. 13-cv-1917 (S.D.N.Y.); Funnekotter v. Agric. Dev. Bank of Zimbabwe, No. 13 CIV. 1917 CM, 2015 WL 3526661, at *2 (S.D.N.Y. June 3, 2015).  To be sure, as a named party, the Republic had the opportunity to litigate the alter ego issue in Funnekotter.  Jack Faucett, 744 F.2d at 127 (issue preclusion applies only against a party who had "a 'full and fair' opportunity to litigate the issue to be precluded").  But the fact that the Republic did not, in fact, participate in the Funnekotter litigation makes the Court hesitate to give Funnekotter preclusive effect here.

Even if the Republic's prior opportunity to litigate alone was sufficient, it is unclear whether the question decided in Funnekotter is sufficiently "identical" to the one here.  Id. at 124.  For instance, there may be "a lack of total identity between the matters involved" in two proceedings when "the events in suit took place at different times."  Restatement (Second) of Judgments § 27 cmt. c (Am. L. Inst. 1982).  Here, the question relevant to subject matter jurisdiction is whether ZMDC was the Republic's alter ego either when it entered into the MOUs with Plaintiffs in 2007 and 2008 or when it actually participated in the Zambian arbitration starting in 2011.  It is not apparent during what time period the Funnekotter court determined ZMDC was functionally the Republic's alter ego.  The Funnekotter decision was rendered in 2015, and the conduct that gave way to the underlying arbitration in Funnekotter occurred

14

between 1992 and 2001, when the Zimbabwean government expropriated a number of commercial farms in which the plaintiffs held investments.  Funnekotter, 2015 WL 9302560, at *1.  If, as appears to be the case, Funnekotter may have addressed ZMDC's relationship with the Republic at a different period of time than the period relevant here, there may be "a difference in pertinent facts" here "sufficient to substantially change the issue" and "render[] the doctrine of issue preclusion inapplicable."  Safadi v. Novak, 574 F. Supp. 2d 52, 55–56 (D.D.C. 2008) (quoting 18 James W. Moore, et al., Moore's Federal Practice § 132.02[2][3], at 27–29 (3d ed. 2008)).  In light of these considerations, the Court is not convinced that this is an appropriate case for the application of non-mutual offensive collateral estoppel.[5]

Because Plaintiffs' allegations that the Republic has waived its sovereign immunity are premised on the allegation that ZMDC acted as the Republic's alter ego, and because the complaint lacks sufficient factual allegations to overcome the presumption of juridical separateness between the Republic and ZMDC, the Court accordingly concludes that Plaintiffs

---

[5] Additionally, although not dispositive, the Republic correctly observes that the decision in Funnekotter was based partially on that court's application of adverse-inference discovery sanctions against ZMDC and the other defendants in that case.  Funnekotter, 2015 WL 9302560, at *5.  Because the defendants there failed to produce certain documents in response to discovery orders, specifically "minutes and resolutions of their boards of directors," the court drew an "adverse inference about the contents" of those documents to support the plaintiffs' argument that the defendants there were alter egos of the Republic.  Id. at *3, *5.  To be sure, this is not a situation in which issue preclusion is inappropriate because the defendant "was unable to engage in full scale discovery" in the prior proceeding.  Parklane Hosiery, 439 U.S. at 331 n.15.  But at least when combined with the other considerations just discussed, the fact that adverse-inference discovery sanctions apparently played an important role in the Funnekotter decision gives the Court pause about the fairness of applying non-mutual issue preclusion here.  Restatement (Second) of Judgments § 29 cmt. g (Am. L. Inst. 1982) ("The circumstances attending the determination of an issue in the first action may indicate that it could reasonably have been resolved otherwise if those circumstances were absent.");  cf. Jack Faucett, 744 F.2d at 126 (preclusion inappropriate where "important, material evidence can be introduced in the current trial that was unavailable in the previous trial");  but see id. (noting that this factor is most relevant when evidence was not previously available to party "without fault of his own" (quoting Blonder-Tongue Lab'ys v. Univ. of Ill. Found., 402 U.S. 313, 333 (1971))).

have not met their burden of establishing that one of FSIA's exceptions to sovereign immunity applies in this case.  See Foremost-McKesson, 905 F.2d at 447 (explaining that plaintiff "bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship").  Plaintiffs ask for leave to amend their complaint so that they may bolster their alter ego allegations.  See Opp. to Zimbabwe MTD at 36–37; Opp. to ZMDC MTD at 4 n.1. Leave to amend should be freely granted when justice requires it, provided that amendment would not be futile.  Wilson v. Geithner, 968 F. Supp. 2d 275, 280 (D.D.C. 2013).  Plaintiffs propose that they could amend their complaint to include the facts identified in Funnekotter as well as other developments that reinforce their theory of financial interdependence between ZMDC and the Republic.  See Opp. to Zimbabwe MTD at 36.

As described above, Plaintiffs proposed amendment would need to do more than show merely that the Republic owns a majority of ZMDC, appoints its Board of Directors, regulates its activities, and created it by statute.  See Transamerica, 200 F.3d at 847–53.  The Court could, nevertheless, envision factual allegations that might tip the balance in Plaintiffs' favor.  The current pleadings, for example, offer no factual allegations to support or describe the extent to which the Republic "approves significant actions" of ZMDC or requires ZMDC to function as its piggy bank.  See Compl. ¶ 15.  But if Plaintiffs can plead non-conclusory factual allegations that the Republic has exercised "day-to-day" control over ZMDC's operations above and beyond its role as a regulator or that the affairs of the two entities are "so intermingled that no distinct corporate lines are maintained," then the Court may yet find a basis to conclude that ZMDC's actions here were attributable to the Republic.  Transamerica, 200 F.3d at 849–51 (quoting Deena Artware, 361 U.S. at 403).  The Court therefore will dismiss Plaintiffs' complaint as to the

Republic without prejudice so that Plaintiffs may have the opportunity to bolster their factual allegations along the lines described in this opinion.[6]

B.  ZMDC

The Court's conclusion that the complaint's alter ego allegations are insufficient also warrants dismissal as to ZMDC, although for a different reason: personal jurisdiction.  See Forras v. Rauf, 812 F.3d 1102, 1105 (D.C. Cir. 2016) (explaining that a court may "turn[] directly to personal jurisdiction" when that issue is "straightforward" and "present[s] no complex question" but resolving subject matter jurisdiction would be complicated (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 588 (1999))).

"Whenever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none."  GSS, 680 F.3d at 815.  In that situation, the personal jurisdiction rule that applies to sovereigns applies to the instrumentality as well—"subject matter jurisdiction plus service of process equals personal jurisdiction."  Id. at 811 (quoting Price, 294

---

[6] Although they rely heavily on Funnekotter, the Court reminds Plaintiffs that they must heed this Circuit's explanations in Foremost-McKesson, Transamerica, and other cases concerning what allegations are sufficient and insufficient to displace the presumption of juridical separateness.  Additionally, the Court acknowledges Plaintiffs' request for jurisdictional discovery on ZMDC's alter ego status.  See Opp. to ZMDC MTD at 21 n.8.  "[C]arefully controlled and limited" jurisdictional discovery along the lines set forth in that request may well be appropriate after Plaintiffs have had the opportunity to amend their complaint.  Phoenix Consulting, 216 F.3d at 40.  Whether to permit such discovery now is a close question.  But the "court should allow for limited jurisdictional discovery" only if "a plaintiff shows a nonconclusory basis for asserting jurisdiction and a likelihood that additional supplemental facts will make jurisdiction proper."  Intelsat Glob. Sales & Mktg., Ltd. v. Comm'ty of Yugoslav Posts Tels. & Tels., 534 F. Supp. 2d 32, 34 (D.D.C. 2008).  Because in its present form, the complaint does not allege sufficient facts "upon which jurisdiction could be found after discovery is completed," id. (citation omitted), the Court will refrain from imposing the burden of jurisdictional discovery until after Plaintiffs have filed amended pleadings, should they so choose.

F.3d at 95).  "On the other hand, if an instrumentality does not act as an agent of the state, and separate treatment would not result in manifest injustice" under Bancec, then "the instrumentality will enjoy all the due process protections available to private corporations," including the requirement of "minimum contacts" with the relevant forum.  Id. at 815, 817. Plaintiffs' theory for personal jurisdiction over ZMDC is premised on their alter ego theory. That is, because ZMDC is the Republic's alter ego, Plaintiffs assert, no showing of minimum contacts is necessary.

For the reasons just explained, the Court cannot say that Plaintiffs' current complaint adequately alleges the existence of an alter ego relationship between ZMDC and the Republic. Because the complaint includes no other allegations to support personal jurisdiction over ZMDC, see Compl. ¶ 11, the Court must dismiss the complaint against it as well.  As with the Republic, however, the Court will dismiss the complaint as to ZMDC without prejudice, with the understanding that more fulsome alter ego allegations may create a basis to conclude that ZMDC was, in fact, the Republic's alter ego.[7]

C.  The Chief Mining Commissioner

Last, the Court comes to the allegations against the Chief Mining Commissioner. Because the Commissioner actually participated in the arbitration against Plaintiffs in Zambia, Plaintiffs' subject matter jurisdiction theory as to the Commissioner does not turn on whether ZMDC was the Commissioner's alter ego.  The Court, therefore, will begin by deciding whether an exception to sovereign immunity under the FSIA applies to the Commissioner and will then address Defendants' arguments concerning personal jurisdiction and failure to state a claim.

---

[7] Although unlike the Republic, ZMDC did actually litigate the alter ego issue in Funnekotter, the Court still declines to give that decision preclusive effect here, for the other reasons discussed above.

### 1. *The Commissioner's Governmental Status*

As a preliminary matter, the Court must determine how to characterize the Chief Mining Commissioner's status and relationship to the sovereign in this case—the Republic of Zimbabwe.  The Commissioner contends that it is an individual, not a state entity, and thus falls entirely outside the scope of the FSIA's definition of a "foreign state" under § 1603(a), which does not include individuals sued in their personal capacity.  See Samantar v. Yousuf, 560 U.S. 305, 319 (2010); see also Zimbabwe MTD at 8–9.  Plaintiffs, in contrast, maintain that the "Commissioner is an office in the Ministry of Mines and Mining Development" and that under Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1994), which sets out the test for distinguishing between a foreign state (and its political subdivisions) and the state's agencies or instrumentalities, the Commissioner "*is* the foreign state—a political organ like a ministry—rather than a commercial agency or instrumentality."  Opp. to Zimbabwe MTD at 24–25.  The Commissioner responds that the Transaero test, which asks whether an entity's "core functions" are inherently governmental or commercial, does not apply and that the Court should instead analyze this question under the Bancec framework.  Zimbabwe Reply at 4–5, 15.

Whether the Transaero "core functions" test or the Bancec framework applies here is a somewhat murky question.  On the one hand, the Court disagrees with the Commissioner that the Transaero test is limited strictly to interpreting the FSIA's service of process provisions.  Zimbabwe Reply at 4–5.  Transaero "interpreted the FSIA's *general definition* of 'agency or instrumentality,'" Jacobsen v. Oliver, 451 F. Supp. 2d 181, 196 (D.D.C. 2006) (quoting Crist v. Republic of Turkey, 107 F.3d 922, 1997 WL 71739, at *2–3 (D.C. Cir. 1997)), and the D.C. Circuit has since applied Transaero to determine "the legal status" of foreign government ministries, such as Iran's Ministry of Foreign Affairs, under other provisions of the FSIA,

19

Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234–35 (D.C. Cir. 2003).  What's more, by its own terms, the Bancec analysis seems intended to apply only to "government instrumentalities" that exist outside of the government itself.  Bancec, 462 U.S. at 623; see id. (describing the entities at issue there as "separately constituted juridical entities" with "independent status"). Unlike a government itself or one of its political subdivisions, the instrumentalities to which Bancec accorded a presumption of juridical separateness are government-controlled commercial organizations "run as a distinct economic enterprise," "created by an enabling statute," "managed by a board selected by the government," "with the powers to hold and sell property," and "primarily responsible for [their] own finances."  Id. at 624.  In other words, the government instrumentalities discussed in Bancec appear to overlap with the "public commercial enterprises" that Transaero held are separate from "the state itself."  Transaero, 30 F.3d at 152–53.  It would thus seem appropriate to ask first whether, under Transaero, the Commissioner is a political subdivision of the Republic—and thus part of "the state itself"—and then, only if the answer to that first question is no, to ask whether the presumption of juridical separateness set forth in Bancec applies.  See Foremost-McKesson, 905 F.2d at 446 (explaining that the "FSIA applies to instrumentalities and agencies of the foreign sovereign, as well as to the state itself," but that "instrumentalities and agencies are accorded a presumption of independent status" under Bancec).

Although this approach seems sensible, there is some basis to believe that the Bancec framework should govern.  The Commissioner maintains, for instance, that it is a person with separate legal status who receives due process protections for purposes of personal jurisdiction, Zimbabwe MTD at 13–14, and the Circuit has explained that Bancec, not Transaero, "guides our way" in determining whether an entity "is a 'person' within the meaning of the due process

clause." TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 301 (D.C. Cir. 2005).

Additionally, some courts in this district have applied the Bancec analysis to determine whether

an entity is entitled to a presumption of separateness from the sovereign even with regard to

cabinet-level ministries which, under Transaero, would appear to be political subdivisions of the

state.  See Entes Indus. Plants, Constr. & Erection Contracting Co. Inc. v. Kyrgyz Republic, No.

CV 18-2228 (RC), 2020 WL 1935554, at *2–6 (D.D.C. Apr. 22, 2020) (applying Bancec

analysis to Kyrgyz Ministry of Transport and Communications).

Here, the Court believes that the correct framework is likely the Transaero "core

functions" test, as the heart of the parties' dispute is whether the Commissioner falls within a

component of § 1603's definition of "foreign state."  Transaero, 30 F.3d at 151 (asking whether

the Bolivian Air Force was a "separate legal person, corporate or otherwise,"  under

§ 1603(b)(1)).  But, in any event, the Court is confident both that the Commissioner is a

"political subdivision" of the Republic, and thus a component of the state itself under Transaero,

and that the Bancec presumption of juridical separateness does not apply to the Commissioner.

To determine whether an entity "counts as a 'foreign state' or rather as an 'agency or

instrumentality'" under the FSIA, Transaero took a categorical approach of asking "whether the

core functions of the foreign entity are predominantly governmental or commercial."  Id.  This

approach requires the Court to ask whether the entity "is an integral part of a foreign state's

political structure" or, instead, "an entity whose structure and function is predominantly

commercial."  Id. (quoting Segni v. Com. Off. of Spain, 650 F. Supp. 1040, 1041–42 (N.D. Ill.

1988)).  Citing the Zimbabwe Mines and Minerals Act of 1961, which governs the office of the

Commissioner, Plaintiffs maintain that the Chief Mining Commissioner has "broad

administrative duties, including registering mining claims, issuing regulations, and inspecting

mines, and even judicial or quasi-judicial duties, including resolving mining disputes and issuing injunctions enforceable by contempt." Opp. to Zimbabwe MTD at 25. The statute bears out Plaintiffs' characterization of the Commissioner's functions. Section 343 of the statute creates a "Chief Mining Commissioner" as well as mining commissioners for each mining district in the country. See Zimbabwe Mines and Minerals Act of 1961, Ch. 21:05 § 343 (updated Dec. 31, 2017), https://zimlii.org/akn/zw/act/1961/38/eng%402016-12-31#. Commissioners are supervised by the Secretary of the Ministry of Mines and are charged with carrying out the Mines and Minerals Act. See id. § 341. According to other provisions of the Act, commissioners may, among other things, hold court and exercise judicial powers, levy fines and jail sentences for contempt, investigate and adjudicate claims and disputes arising under the statute, order parties to conduct surveys of mining areas, issue injunctions, approve applications to prospect land for mining, register and reserve land against mining, and approve and revoke mining licenses. See, e.g., id. §§ 15, 20, 35, 52, 177, 346, 354, 359.

    In light of these duties, which include acting as a governmental administrator, investigator, and adjudicator, the Court concludes the Commissioner is properly understood as a political subdivision of the Republic. "Any government of reasonable complexity must act through men [and women] organized into offices and departments," Transaero, 30 F.3d at 153, and the Commissioner is just one such office. Commissioners are appointed by the Secretary of the Ministry of Mines and fall neatly within "the governmental hierarchy." de Csepel v. Republic of Hungary, 10-cv-1261 (ESH), 2020 WL 2343405, at *9 (D.D.C. May 11, 2020). Although the Commissioner's duties unquestionably touch upon commercial activity—namely mining—the office does so as a government regulator and adjudicator, not as a market participant or commercial entity. See Republic of Argentina v. Weltover, Inc., 504 U.S. 607,

614–15 (1992) ("[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA. . . . Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party.").  The Commissioner's authority to approve licenses, assess fines, order jail terms, and issue injunctions are all powers "so closely bound up with the structure of the state" that the Commissioner must be considered "as the 'foreign state' itself." Transaero, 30 F.3d at 153.

For similar reasons, the Commissioner is not entitled to a presumption of juridical separateness under Bancec.  To determine whether that presumption applies, the Court asks whether the Commissioner bears "the hallmarks of independent instrumentalities identified by the Supreme Court in Bancec," namely "creation by an enabling law that prescribes the instrumentality's powers and duties; establishment as a separate juridical entity with the capacity to hold property and to sue and be sued; management by a government-selected board; primary responsibility for its own finances; and operation as a distinct economic enterprise that often is not subject to the same administrative requirements that apply to government agencies."  DRC, Inc. v. Republic of Honduras, 71 F. Supp. 3d 201, 209 (D.D.C. 2014); accord Entes, 2020 WL 1935554, at *3.  What distinguishes independent instrumentalities under Bancec from the state itself is that instrumentalities are empowered "to manage their operations on an enterprise basis" with "a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies."  Bancec, 462 U.S. at 624–25.

Here, although the office of the Commissioner was created by the Mines and Minerals Act, "the specific text of that enabling law [is] what matter[s]."  Entes, 2020 WL 1935554, at *4;

see id. at *3 ("[T]he Court does not think that an 'enabling law that prescribes the instrumentalit[y's] powers and duties' counts for much if that establishing law prescribes powers and duties that are strictly controlled by the Government.").  The Commissioner does not have its own "legal personality, its own patrimony and . . . administrative, technical, and financial autonomy."  Id. (quoting DRC, 71 F.3d at 210).  Rather, it is an office appointed by and subject to the close supervision of the Secretary of the Ministry of Mines; under the statute, the Secretary is "vested with authority generally to supervise and regulate the proper and effectual carrying out of this Act by mining commissioners" and "may at his discretion assume all or any of the powers, duties and functions by this Act vested in any mining commissioner, and may lawfully perform all such acts and do all such things as a mining commissioner may perform or do."  Zimbabwe Mines and Minerals Act of 1961, Ch. 21:05 § 341.  The Commissioner is not managed by a government-selected board, like a corporation, but rather directly supervised by the Secretary of the Ministry of Mines.  Far from being free to manage its own operations "on an enterprise basis," the Commissioner lacks any "independence from close political control."  Bancec, 462 U.S. at 624–25.  Although the Mines and Minerals Act does not specify how Commissioners are paid or funded, there has been "no suggestion that the [Commissioner] raises funds on its own."  Entes, 2020 WL 1935554, at *5.  And, although the Commissioner has the power to sue for license fees, royalties, fines, and other duties payable to the office, and to be sued, Zimbabwe Mines and Minerals Act of 1961, Ch. 21:05 § 366, as with other governmental subdivisions, that fact alone, in the face of close supervision by the Secretary of the Ministry of Mines and an entire statute setting forth in detail the Commissioner's duties and authority, "adds little, if anything, when it comes to the [Commissioner's] autonomy or degree of separation from the state," Entes, 2020 WL 1935554, at *4.  In view of the Commissioner's duties and close

24

supervision by the state, the Court concludes that, under either <u>Transaero</u> or <u>Bancec</u>, the Commissioner is a political subdivision of the Republic, not an agency or instrumentality entitled to the presumption of juridical separateness.[8]

The foregoing analysis largely forecloses the Commissioner's argument that it is an individual, not a state entity, and thus falls entirely outside the scope of the FSIA's definition of a "foreign state" under § 1603(a).  <u>See</u> Zimbabwe MTD at 8–9.  The Commissioner's argument in this respect is based on <u>Samantar v. Yousuf</u>, 560 U.S. 305 (2010).  There, the Supreme Court held that "[r]eading the FSIA as a whole, there is nothing to suggest we should read 'foreign state' in § 1603(a) to include an official acting on behalf of the foreign state, and much to indicate that this meaning was not what Congress enacted."  <u>Id.</u> at 319.  The Court observed, however, that notwithstanding that rule, "it may be the case that some actions against an official *in his official capacity* should be treated as actions against the foreign state itself, as the state is the real party in interest."  <u>Id.</u> at 325 (emphasis added).  Accordingly, although a plaintiff may not under the FSIA sue a foreign official in his personal capacity "and seek damages from his own pockets," <u>id.</u>, the Court may look to whether the foreign state itself, and not the official personally, is "the real party in interest" and, in that case, apply the FSIA, <u>Odhiambo v. Republic of Kenya</u>, 930 F. Supp. 2d 17, 34–35 (D.D.C. 2013); <u>see</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit

---

[8] In their reply, Defendants assert that the argument that the Commissioner is a part of the state itself is inconsistent with Plaintiffs' complaint, citing paragraph six, which describes the Commissioner as "an agency or instrumentality of, and an alter ego of, the Republic of Zimbabwe."  Compl. ¶ 6.  But the complaint's description of the Commissioner elsewhere, in the "parties" section of the complaint, alleges also that the Commissioner "is a governmental office or governmental corporation sole existing under the laws of the Republic of Zimbabwe."  Compl. ¶ 16.

against the entity. . . . It is *not* a suit against the official personally, for the real party in interest is the entity.").

Especially in light of the Court's conclusion that the Commissioner is an office established as a political subdivision of the Republic, the Court reads Plaintiffs' claims against the Commissioner not as a suit against a particular commissioner in his personal capacity but rather as a suit against the office.  In fairness to the Commissioner, the complaint does not, in so many words, expressly state that the Commissioner is sued in its official capacity.  But the complaint identifies no particular individual being sued; instead, it identifies the defendant as the office of the "Chief Mining Commissioner, Ministry of Mines of Zimbabwe," and locates the Commissioner at the address of the Ministry of Mines and Mining Development, not the address of any particular mining commissioner.  See Compl. at 1; Ministry of Mines Directory, https://www.miningrb.co.zw/business-directory/industry-bodies/regulatory-stautory-bodies/ministry-of-mines-hq.html (last visited Mar. 22, 2023); see Nnaka v. Fed. Republic of Nigeria, 238 F. Supp. 3d 17, 30–31 (D.D.C. 2017) (treating suit containing allegations "concerning the conduct of at least three different Nigerian Attorneys General" during different time periods as brought against the office, not any individual, under Samantar).  Plaintiffs also explain in their briefing that they seek money out of the public fisc, not out of a particular commissioner's pocket.  See Samantar, 560 U.S. at 325.  Because, as just explained, the office of the Commissioner is a political subdivision of the Republic and thus a component of the state itself, and because the complaint identifies no individual to be held personally liable, the Court construes Plaintiffs' suit as not brought against the Commissioner personally but rather against the governmental office of Chief Mining Commissioner.

26

2.   *Subject Matter Jurisdiction*

Having concluded that the Commissioner falls within § 1603's definition of a foreign state, the Court will have subject matter jurisdiction only if one of the FSIA's exceptions to sovereign immunity applies.  28 U.S.C. § 1330(a).  Citing the Commissioner's active participation in the Zambian arbitration and agreement to the arbitrators' Terms of Reference, which confirmed its submission to the arbitration, Plaintiffs contend that either § 1605(a)(1)'s waiver exception or § 1605(a)(6)'s arbitration exception applies here.  The waiver exception applies when "the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver."  Id. § 1605(a)(1).  The arbitration exception applies when an "action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit [certain disputes] to arbitration" or "to confirm an award made pursuant to such an agreement to arbitrate" if "the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."  Id. § 1605(a)(6).  The Court will begin by addressing the applicability of the arbitration exception but will ultimately apply the waiver exception.

a.   The Arbitration Exception

At first blush, § 1605(a)(6)'s arbitration exception seems like a prime candidate for establishing subject matter jurisdiction in this case.  Plaintiffs' claims arise from their enforcement of the arbitration agreements contained in the MOUs signed with ZMDC in 2007 and 2008.  The Zambian judgment they seek to enforce under the D.C. Judgments Recognition Act was made "pursuant to [the parties'] agreement to arbitrate," 28 U.S.C. § 1605(a)(6), and

27

both sides agree that the Zambian arbitration and award were governed by the New York Convention, an international treaty that applies "to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought," New York Convention, art. I(1); <u>see</u> <u>id.</u> art. III (signatory states "shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the" Convention). All three countries implicated in this case—Zimbabwe, Zambia, and the United States—are signatories to the New York Convention. <u>See</u> Contracting States, New York Arbitration Convention, https://www.newyorkconvention.org/countries (last visited Mar. 22, 2023).

Plaintiffs' invocation of the arbitration exception runs into a textual roadblock, however. As the Commissioner points out, § 1605(a)(6) covers only actions brought "either to enforce an agreement" to arbitrate or "to confirm an award made pursuant to such an agreement." 28 U.S.C. § 1605(a)(6). But Plaintiffs' action is not one to enforce the MOUs or to confirm the Zambian arbitral award through the relevant provision of the Federal Arbitration Act ("FAA"), which implements the New York Convention and permits the filing of applications to confirm arbitral awards falling under it. <u>See</u> 9 U.S.C. § 207. Rather, Plaintiffs have brought an action under the D.C. Judgments Recognition Act to recognize and enforce the Zambian judgment, which itself confirms the underlying arbitral award.

Although this may seem like a fine distinction, the D.C. Circuit has held otherwise. <u>See</u> <u>Commissions Import Export S.A. v. Republic of the Congo (Comimpex)</u>, 757 F.3d 321 (D.C. Cir. 2014). In <u>Comimpex</u>, the court held that the three-year statute of limitations on bringing actions to confirm arbitral awards under Chapter 2 of the FAA did not preempt the longer statute

28

of limitations of the D.C. Judgments Recognition Act to recognize a foreign court judgment.  Id. at 333.  In so holding, Comimpex repeatedly emphasized that courts "have long recognized the conceptual difference between arbitral awards and foreign court judgments on arbitral awards." Id. at 330.  "Although an arbitral award and a court judgment enforcing an award are 'closely related,'" the Court explained, "they are nonetheless 'distinct' from one another," as are the causes of action relating to them.  Id.  While actions to confirm arbitral awards and actions to enforce foreign judgments that themselves confirm arbitral awards both advance the "federal policy in favor of arbitral dispute resolution," id. (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985)), the court concluded that the "text of the Foreign Arbitral Awards Convention Act and the circumstances of its enactment" indicated that "Congress did not intend to speak beyond the recognition and enforcement of arbitral awards," leaving judgment recognition actions untouched, id. at 329.  Here, although the Court is interpreting § 1605(a)(6), not § 207 of the FAA, both provisions refer only to actions to "confirm" arbitral awards, not to a distinct cause of action to recognize foreign judgments.  For the reasons explained in Comimpex, the Court cannot cast aside the distinction between those two types of actions merely because they involve a similar subject matter.[9]

Plaintiffs provide no basis to disregard Comimpex.  Instead, they cite only one case to support their argument that the FSIA's arbitration exception covers the recognition of foreign judgments—Continental Transfer Technique Ltd. v. Federal Government of Nigeria, 697 F. Supp. 2d 46 (D.D.C. 2010)—which they contend held that § 1605(a)(6) provided jurisdiction in

---

[9] The potential applicability of the arbitration exception did not come up in Comimpex because the defendant there has issued commitment letters that "contained an irrevocable waiver of immunity from legal proceedings" and a "commitment to submit all disputes to ICC arbitration in Paris."  757 F.3d at 324–25.

an action under the D.C. Judgments Recognition Act, Opp. to Zimbabwe MTD at 12.

Continental Transfert, however, did not hold that § 1605(a)(6) provides jurisdiction for a claim

solely to enforce a foreign judgment.  Rather, the complaint there included both a claim to

confirm an arbitral award under the FAA—which plainly falls within the text of § 1605(a)(6)—

and a separate claim to enforce a foreign judgment on the same underlying arbitral award.

Cont'l Transfert, 697 F. Supp. 2d at 53–54.  In a single paragraph concerning § 1605(a)(6), in the

portion of the opinion concerning the FAA claim, the court stated that Nigeria could not "invoke

the defense of sovereign immunity to prevent the enforcement of the arbitral award," citing a

decision concerning an action to enforce an arbitral award.  Id. at 56 (citing Creighton Ltd. v.

Government of the State of Qatar, 181 F.3d 118, 123–24 (D.C. Cir. 1999)).  The court did not

separately address whether the arbitration exception independently applied to the D.C.

Judgments Recognition Act claim.  Indeed, on appeal, the D.C. Circuit, while agreeing with the

district court that § 1605(a)(6) supplied jurisdiction over the plaintiff's FAA claim, noted that it

did not need to "decide whether Section 1605(a)(6) or some other provision of law also provides

jurisdiction over" the Recognition Act claim, as the court lacked appellate jurisdiction over that

claim.  Cont'l Transfert Technique Ltd. v. Fed. Government of Nigeria, 603 F. App'x 1, 3 n.2

(D.C. Cir. 2015) (unpublished).  The Circuit's express reservation of that question, although not

precedential, at least casts some doubt about whether the arbitration exception applies to

judgment recognition claims.

        In light of Comimpex, and without any countervailing authority to suggest that an action

to enforce a foreign judgment falls within the text of § 1605(a)(6), the Court concludes that the

arbitration exception does not apply in this case.

b.   The Waiver Exception

Alternatively, Plaintiffs rely on the FSIA's waiver exception, which provides an exception to sovereign immunity in any case "in which the foreign state has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1); see Creighton, 181 F.3d at 122 (waiver must be intentional).

As Plaintiffs note, this Court in another case has endorsed the theory that a foreign sovereign's entry into the New York Convention, "combined with its agreement to arbitrate in the territory of another Convention signatory," may suffice to make out an intentional, implicit waiver of sovereign immunity under § 1605(a)(1).  Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria (P&ID I), No. 18-CV-594 (CRC), 2020 WL 7122896, at *7–8 (D.D.C. Dec. 4, 2020) (Cooper, J.), aff'd on other grounds, 27 F.4th 771 (D.C. Cir. 2022).  In P&ID I, this Court adopted the Second Circuit's reasoning in Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572 (2d Cir. 1993), which held that Navimpex, a company owned by the Romanian government, had implicitly waived its immunity under the FSIA because—"knowing that Romania, France, and the United States were all New York Convention signatories—it agreed to an arbitration clause with a German company, then participated in the arbitration in France," P&ID I, 2020 WL 7122896, at *7 (citing Seetransport, 989 F.2d at 574–76, 578–79).  Seetransport reasoned that "when Navimpex entered into a contract with" the plaintiff "that had a provision that any disputes would be submitted to arbitration, and then participated in an arbitration in which an award was issued against it, logically, as an instrumentality or agency of the Romanian Government—a signatory to the Convention—it had to have contemplated the involvement of

31

the courts of any of the Contracting States in an action to enforce the award." Seetransport, 989 F.2d at 578–79.

Although the D.C. Circuit had not (and still has not) expressly adopted Seetransport's holding as binding Circuit law, this Court noted in P&ID I that it "has come close," referring to Seetransport's reasoning as "correct[]" in dicta in one case and concluding in an unpublished disposition that Ukraine had waived its immunity "from arbitration-enforcement actions in other" New York Convention signatory states by signing the Convention. P&ID I, 2020 WL 7122896, at *7–8 (first citing Creighton, 181 F.3d at 123; and then quoting Tatneft v. Ukraine, 771 F. App'x 9, 10 (D.C. Cir. 2019) (per curiam)). And this Court further explained why recognizing an implicit waiver when a New York Convention signatory has agreed to arbitrate disputes in another signatory would support the fundamental policy of the New York Convention, noting that the "Convention's effectiveness as a stimulant for international commerce would be reduced if states could avail themselves of the Convention's benefits, then assert immunity from award-enforcement actions that the Convention expressly contemplates." Id. at *9; see also id. at *9–10 (explaining why applying Seetransport would not be inconsistent with Supreme Court and Circuit precedent[10] and would not render the arbitration exception superfluous). Accordingly, this Court held that Nigeria had waived its sovereign immunity under § 1605(a)(1) by signing the New York Convention and subsequently agreeing to arbitrate within the territory of another Convention signatory. Id. at *11.

---

[10] For instance, this Court explained why Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428 (1989), did not preclude the Seetransport theory, because, "[i]n contrast to the agreements at issue" there, the "New York Convention does contemplate the availability of a cause of action in U.S. courts," a difference the D.C. Circuit recognized in Creighton. P&ID, 2020 WL 7122896, at *9.

In response to Plaintiffs' reliance on P&ID I, Defendants (fairly) observe that the D.C.
Circuit indicated some caution about the Seetransport theory on appeal in Process & Industrial
Developments Ltd. v. Federal Republic of Nigeria (P&ID II), 27 F.4th 771 (D.C. Cir. 2022).
Specifically, the assigned panel "requested additional briefing by the United States as amicus
curiae, inviting it to provide its views on whether the United States, as a party to the New York
Convention, impliedly waives sovereign immunity from actions seeking recognition and
enforcement of foreign arbitral awards in the courts of other New York Convention states by
becoming a party to the Convention and agreeing to arbitrate a dispute in a Convention state."
27 F.4th at 775 n.3.  The United States responded with an amicus brief arguing that, because the
more specific arbitration exception applied in P&ID, applying the more general waiver exception
would run counter to canons of statutory construction and could render superfluous subparagraph
(D) of the arbitration exception, which permits application of the arbitration exception in cases to
confirm arbitral awards in which the waiver exception "is otherwise applicable."  Brief of the
United States as Amicus Curiae at 10–11, P&ID II, 27 F.4th 771 (D.C. Cir. 2022) (No. 21-7003),
2022 WL 190972, at *10–11; see id. at 13 (theorizing that one "plausible construction" of
§ 1605(a)(6)(D) "is that it reflects Congress' intent to require that a court exercising jurisdiction
to enforce an arbitration agreement or arbitral award on the basis of implied or express waiver do
so only where the threshold requirements of the arbitration exception have been met").  As to the
possible implications of the Seetransport implicit-waiver rule, the United States acknowledged
its "interest in the vitality of the New York Convention and in the ability of its courts to enforce
covered arbitral awards" but expressed some concern that not all foreign courts might "exercise
restraint in construing implied waivers."  Id. at 14–15.  Noting these concerns "and the ready
applicability of the arbitration exception" in that case, the Circuit found "it unnecessary to wade

into the murky waters of the waiver exception" and affirmed on the basis of the arbitration

exception alone.  P&ID II, 27 F.4th at 775 n.3.

The Court acknowledges the concerns of the United States expressed in P&ID II and

therefore wades into the waiver exception's murky waters with due caution.  But here, because

the Court has concluded that Plaintiffs' claim falls outside the arbitration exception, many of the

statutory interpretation concerns raised by the United States in P&ID, which were premised on

the overlapping availability of the arbitration exception there, are not present.  For instance, the

United States voiced a concern that "[t]raditional canons of statutory construction suggest that

the arbitration exception was intended to displace the waiver exception" as to "arbitration

agreements and arbitral awards *that come within its ambit*."  Brief of the United States as Amicus

Curiae at 10, 2022 WL 190972, at *10 (emphasis added).  If the Court is correct that judgment-

recognition actions, as a rule, fall outside the arbitration exception's ambit, then this statutory

construction problem is avoided.  Additionally, although P&ID II opted to apply the arbitration

exception rather than the waiver exception, nothing in that decision purported to abandon the

Circuit's favorable citations to Seetransport in other cases.  See Creighton, 181 F.3d at 123;

Tatneft, 771 F. App'x at 10.

Accordingly, the Court sees no present impediment to concluding that the waiver

exception applies here.  As in Seetransport, the Republic of Zimbabwe, of which the

Commissioner is a political subdivision, is a signatory to the New York Convention.  And

although the Commissioner did not sign the 2007 and 2008 MOUs which contained an

arbitration agreement, the Commissioner subsequently "participated in an arbitration in which an

award was issued against it" in another New York Convention signatory, Zambia.  Seetransport,

989 F.2d at 579.  And, if the Commissioner's participation in the arbitration alone was

insufficient, Plaintiffs add that the Commissioner also agreed to the Terms of Reference governing the arbitration, acknowledging that it "agree[d] to submit to this arbitration and expressly waive any procedural objections [it] may have with respect to known events, including the appointment of the Tribunal."  Sangwa Decl., Ex. 1 § 8.1.  Lest there be any doubt, the Terms of Reference themselves state that "[e]ach original of the Terms of Reference forms an original arbitration agreement for the purposes of Articles II and IV(1) of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards."  Id. § 10.3.  The Commissioner's agreement to arbitrate in the territory of another Convention signatory, combined with Zimbabwe's entry in the Convention, "is strong evidence that [the Commissioner] intended to subject itself to the jurisdiction of U.S. courts in an action such as this one."  P&ID I, 2020 WL 7122896, at *8.  The Court therefore holds that it has subject matter jurisdiction under the FSIA's waiver exception.

Defendants briefly contend that the waiver exception does not apply because "the New York Convention governs enforcement of arbitration awards, not enforcement of foreign judgments," citing Comimpex.  Zimbabwe MTD at 11.  Although that distinction was sufficient to take this case outside of the arbitration exception, which is expressly limited to cases brought to enforce arbitration agreements or confirm arbitral awards, it does not preclude the application of the waiver exception.  Indeed, Seetransport applied under exactly these circumstances. Although Seetransport involved both a claim to enforce an arbitration award and a claim to recognize a foreign judgment enforcing the award, 989 F.2d at 575, the court determined that the claim seeking enforcement of the award under FAA § 207 was time-barred, id. at 581.  Even after the § 207 claim was dismissed, however, the court held that it had subject matter jurisdiction over the judgment-recognition claim under the FSIA's waiver exception.  Id. at 582–

83.  The court noted "that unlike the recognition of arbitral awards, which is governed by federal law, the recognition of foreign judgments is governed by state law" at least "as to most substantive aspects."  Id. at 582.  The "cause of action to enforce the foreign judgment" nevertheless fell "within the scope of Navimpex's implicit waiver of sovereign immunity" because "the cause of action is so closely related to the claim for enforcement of the arbitral award."  Id. at 582–83.

That the waiver exception might capture a cause of action to enforce a foreign judgment, even if the arbitration exception does not, makes sense.  Although Plaintiffs bring a claim to enforce a foreign judgment, this is a "case . . . in which the foreign state has waived its immunity . . . by implication" by being a New York Convention signatory and agreeing to arbitrate in the territory of another signatory.  28 U.S.C. § 1605(a)(1).  The arbitration exception's textual limit to actions "to enforce an" arbitration agreement "or to confirm an award made pursuant to such an agreement" is absent.  Id. § 1605(a)(6).

In sum, although the arbitration exception to sovereign immunity does not apply in this case to enforce a foreign judgment, the Court concludes that the waiver exception of § 1605(a)(1) does apply.  Because the Commissioner waived its sovereign immunity, the Court has subject matter jurisdiction over Plaintiffs' claims against it pursuant to the FSIA.[11]

---

[11] The Court observes that this conclusion, combined with the conclusion that the Commissioner is a political subdivision, and thus a part of, the Republic itself, might suggest an alternate theory for finding subject matter jurisdiction over the Republic.  If there is no presumption of juridical separateness between the Commissioner and the Republic, then perhaps the Commissioner's conduct supporting a waiver of sovereign immunity might also be attributed to the Republic.  For whatever reason, however, Plaintiffs premised their argument for subject matter jurisdiction over the Republic exclusively on the Republic's alleged alter ego relationship with ZMDC, discussed above.  Because it is Plaintiffs' burden to plead subject matter jurisdiction, and because the parties have not briefed this question, the Court will not sua sponte find subject matter jurisdiction over the Republic based on its relationship with the Commissioner.

### 3.  Personal Jurisdiction

Having found that the Commissioner is not entitled to a presumption of juridical separateness from the Republic, and having found subject matter jurisdiction under § 1605(a)(1), the Court also necessarily has personal jurisdiction over the Commissioner.  As already explained, in the context of foreign sovereigns and their political subdivisions, "subject matter jurisdiction plus service of process equals personal jurisdiction."  GSS, 680 F.3d at 811 (quoting Price, 294 F.3d at 95).  Here, Plaintiffs served the Commissioner pursuant to 28 U.S.C. § 1608(a)(3) by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state," by international carrier "to the head of the ministry of foreign affairs of the foreign state concerned."[12]  The Court rejects Defendants' contention that the Commissioner must have minimum contacts with this forum, as that argument is premised on the idea, rejected above, that the Commissioner is a person rather than a governmental entity.

### 4.  Failure to State a Claim

Finally, the Court will briefly address Defendants' arguments that the complaint fails to state a claim as to the Commissioner under Rule 12(b)(6).

First, Defendants maintain that Plaintiffs are bound by the New York Convention's three-year statute of limitations under the FAA because the theory for Defendants' waiver of sovereign immunity is in part premised on their New York Convention membership.  Zimbabwe MTD at

---

[12] Defendants suggest this service was improper because the affidavit of service was addressed to "the Ministry of Mines" rather than the Chief Mining Commissioner.  Zimbabwe MTD at 14.  But Plaintiffs' affidavit of service shows that the service was made to the Ministry of Mines "c/o Chief Mining Commissioner" to the address of the Zimbabwean Foreign Minister.  See Return of Service Ex. 1, ECF No. 20-1.  That was sufficient to effect proper service on the Commissioner.

15–19.  This argument fails in light of <u>Comimpex</u>.  There, as discussed above, the D.C. Circuit

held that the FAA's three-year statute of limitations for bringing an action to confirm an arbitral

award under 9 U.S.C. § 207 does not preempt the longer limitations period to recognize a foreign

judgment under the D.C. Judgments Recognition Act.  <u>Comimpex</u>, 757 F.3d at 333; <u>see also</u>

<u>Seetransport</u>, 989 F.2d at 582–83 (permitting judgment recognition action to go forward after

dismissing related FAA § 207 action as time-barred).  Accordingly, Defendants' contention that

if "Plaintiffs seek this Court's jurisdiction under the New York Convention, then they get all of

it, including section 207," is plainly incorrect.  Zimbabwe MTD at 16.  Defendants attempt to

distinguish <u>Comimpex</u> on the grounds that the foreign state there expressly, rather than

implicitly, waived its sovereign immunity and that the arbitral award there had been subjected to

scrutiny in other New York Convention jurisdictions as well.  But those considerations had no

bearing on the Circuit's conclusion that neither the text nor the legislative history of FAA § 207

"indicate that Congress intended Chapter 2 of the FAA to govern not only arbitral awards but the

recognition of judgments as well."  <u>Comimpex</u>, 757 F.3d at 328.

 Next, Defendants maintain that Plaintiffs have failed to plead entitlement to post-

judgment interest at the Zambian statutory rate and entitlement to attorneys' fees.  Zimbabwe

MTD at 21–23.  Plaintiffs addressed only Defendants' arguments regarding entitlement to

attorneys' fees in their opposition.  Opp. to Zimbabwe MTD at 37.  Defendants may be correct

that, if Plaintiffs prevail, the Zambian statutory post-judgment interest rate will not apply here.

<u>See</u> <u>Cont'l Transfert Technique Ltd. v. Fed. Government of Nigeria</u>, 850 F. Supp. 2d 277, 286–

87 (D.D.C. 2012) (applying rate set forth in 28 U.S.C. § 1961(a)); <u>see also</u> D.C. Code §§ 15-367,

28-3302 (stating that a foreign judgment recognized under the D.C. Code is enforceable in the

same manner as a judgment rendered in the District of Columbia, and setting forth the District of

38

Columbia post-judgment interest rate).  But the Court has identified some contrary authority as well.  See BCB Holdings Ltd. v. Government of Belize, 110 F. Supp. 3d 233, 251 (D.D.C. 2015) (awarding post-judgment interest at rate specified by foreign judgment); United Steelworkers, Loc. 1-1000 v. Forestply Indus., Inc., No. 2:08-CV-281, 2011 WL 1210131, at *1 (W.D. Mich. Apr. 1, 2011) (applying post-judgment interest rate specified in Canadian judgment in Michigan Judgments Recognition Act case).  There is also at least some support for Plaintiffs' contention that they should be entitled to attorneys' fees, which were incorporated into the arbitral award underlying the Zambian judgment.  See Tahan v. Hodgson, 662 F.2d 862, 867 n.20 (D.C. Cir. 1981) (enforcing a foreign judgment that included an award of attorneys' fees); D'Amico Dry D.A.C. v. Primera Mar. (Hellas) Ltd., 433 F. Supp. 3d 576, 578 (S.D.N.Y. 2019) (permitting award of attorneys' fees in judgment recognition action because fees were provided for in the English judgment being recognized).

In any event, the Court declines to rule definitively on these issues at this stage.  Whether Plaintiffs are entitled to attorneys' fees and/or post-judgment interest at all may depend on other factors to be determined later, such as the validity and enforceability of the Zambian judgment.  See Harpole Architects, P.C. v. Barlow, 668 F. Supp. 2d 68, 80 (D.D.C. 2009) (noting that "[a]t this early stage of the litigation, [defendant's] motion to strike [plaintiffs'] attorneys' fees request is premature, as later developments may provide a legitimate basis for an attorneys' fees award." (alterations in original) (quoting Pinnacle Airlines, Inc. v. Nat'l Mediation Bd., No. 03–1642, 2003 WL 23281960, at *3 (D.D.C. Nov. 5, 2003))).

Last, Defendants maintain that the Zambian High Court, which issued the judgment enforcing the arbitral award in Plaintiffs' favor, did not have personal or subject matter jurisdiction over Defendants.  Zimbabwe MTD at 23–25.  For instance, they assert that Plaintiffs

have not sufficiently alleged that the Commissioner had minimum contacts with Zambia and that there is insufficient evidence that the Commissioner was served.  Id.  Citing an expert report, they also maintain that, had Defendants contested the Zambian judgment, the Zambian court likely would have found that the Commissioner was immune there.  Id. at 24.  Based on the argument that the Zambian High Court lacked jurisdiction, Defendants also maintain that enforcement would be repugnant to D.C. public policy.  Id. at 24–25.

These contentions are inappropriate for resolution at this stage.  To state a claim under the D.C. Judgments Recognition Act, Plaintiffs must plead—and here have pleaded—that the foreign country judgment grants or denies recovery of a sum of money and, under the law of that country, is final, conclusive, and enforceable.  D.C. Code § 15-363(a); see Compl. ¶¶ 35–37, 41–46.  Defendants' arguments that the foreign court lacked personal or subject matter jurisdiction over the controversy or that the judgment is repugnant to public policy are affirmative defenses, on which Defendants bear the burden of proof.  D.C. Code 15-364(b)–(d); see also Mohammad Hilmi Nassif & Partners v. Republic of Iraq, No. 117CV02193KBJGMH, 2021 WL 6841848, at *22 (D.D.C. July 29, 2021) (explaining that repugnancy to public policy is an affirmative defense).  A plaintiff is "not required to anticipatorily negate" affirmative defenses in its pleadings.  McNamara v. Picken, 866 F. Supp. 2d 10, 17 (D.D.C. 2012).  Rather, "[a]n affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint."  Greer v. Bd. of Trs. of Univ. of D.C., 113 F. Supp. 3d 297, 306 (D.D.C. 2015) (quoting Smith–Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998)).  That is, the "face of the complaint must conclusively indicate" that the affirmative defense applies.  Newland v. Aurora Loan Servs., LLC, 806 F. Supp. 2d 65, 70 (D.D.C. 2011).

40

The complaint in this case alleges that the Zambian judgment is final, valid, and enforceable and that it was served on Defendants on October 23, 2019.  Compl. ¶¶ 35–37. Defendants' arguments about the propriety of service abroad go beyond the face of the complaint and are based on conjecture that Plaintiffs never sought leave to serve Defendants with the Zambian High Court's judgment outside of the country.  Kalaluka Decl. ¶ 15. (Plaintiffs, for their part, reply that service was made *inside* the country to Defendants' Zambian counsel. Sangwa Decl. ¶¶ 23–24.)  And Defendants' conclusory arguments that the Zambian court lacked personal and subject matter jurisdiction both go beyond the face of the complaint and misunderstand that Defendants, not Plaintiffs, bear the burden of showing that the foreign court lacked jurisdiction under the D.C. Code.  See D.C. Code § 15-364(b)–(d).  These arguments, if they have any merit, are better addressed at summary judgment, "after further briefing and development of the record." Mohammad, 2021 WL 6841848, at *23 n.18.[13]

---

[13] Kaupthing ehf. v. Bricklayers & Trowel Trades International Pension Fund Liquidation Portfolio, 291 F. Supp. 3d 21 (D.D.C. 2017), does not require a contrary conclusion.  There, the court granted a motion to dismiss a D.C. Judgments Recognition Act claim partially on the basis that the foreign court lacked personal jurisdiction over the defendant.  Id. at 30–33.  The plaintiff objected that it did not need to plead with specificity the foreign court's jurisdiction, but based on cases interpreting a similar New York statute, the court concluded that the party seeking enforcement of the judgment "bears the burden of making a *prima facie* showing that the mandatory grounds for nonrecognition" such as lack of personal jurisdiction "do not exist." Id. at 32–33 (quoting Wimmer Canada, Inc. v. Abele Tractor & Equipment Co., 750 N.Y.S.2d 331, 332 (2002)).  But Plaintiffs here correctly point out that the D.C. Judgments Recognition Act expressly places on the party resisting enforcement the burden of proving that the foreign court lacked jurisdiction, and the New York statute, at the time of the cases cited in Kaupthing, lacked such an allocation of burden (which has since been added).  See Opp. to Zimbabwe MTD at 30 n.9; N.Y. C.P.L.R. § 5304(c); 2021 N.Y. Sess. Laws Ch. 127 (McKinney) (adding burden provision).  Kaupthing, therefore, is not persuasive.

41

## IV.   Conclusion

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 23] Defendant Chief Mining Commissioner and Defendant Republic of Zimbabwe's Motion to Dismiss is GRANTED as to the Republic of Zimbabwe and DENIED as to the Chief Mining Commissioner.  It is further

**ORDERED** that [Dkt. No. 30] Defendant ZMDC's Motion to Dismiss is GRANTED.  It is further

**ORDERED** that the Complaint is DISMISSED WITHOUT PREJUDICE as to Defendants ZMDC and the Republic of Zimbabwe.  It is further

**ORDERED** that Plaintiffs are granted leave to file an amended complaint by April 24, 2023.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>March 22, 2023</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMAPLAT MAURITIUS LTD.** *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 22-cv-58 (CRC) |
| **ZIMBABWE MINING DEVELOPMENT CORPORATION,** *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Mining companies Amaplat Mauritius Ltd. and Amari Nickel Holdings Zimbabwe Ltd. ("Plaintiffs") filed suit under the D.C. Uniform Foreign-Country Money Judgments Recognition Act. The suit seeks recognition of a foreign court judgment enforcing an arbitral award against the Republic of Zimbabwe, the Chief Commissioner of the Zimbabwean Ministry of Mines, and the Zimbabwe Mining Development Corporation ("ZMDC"). The Court has already ruled on one round of motions to dismiss. Teed up now are the Republic and ZMDC's ("Defendants") motion to dismiss the amended complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. All three grounds for dismissal turn on whether the Republic and ZMDC can be considered alter egos under the Foreign Sovereign Immunities Act ("FSIA"). Finding that Plaintiffs have established an alter-ego relationship between the Republic and ZMDC, the Court denies the motion to dismiss.

### I.    Background

The Court's previous opinion detailed the facts and procedural history of this case so the Court will pick up the thread where that opinion left off. See Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp., 663 F. Supp. 3d 11, 16–18 (D.D.C. 2023). After the Court

dismissed the original complaint without prejudice, Plaintiffs filed an amended complaint and

included new allegations detailing the Republic and ZMDC's purported alter-ego relationship.

Am. Compl. ¶¶ 41–80.  In turn, the Defendants moved to dismiss the amended complaint,

contending that the Court lacks both subject matter and personal jurisdiction over them and that

the complaint fails to state a claim.  Plaintiffs also filed a conditional cross-motion for

jurisdictional discovery, requesting an opportunity to explore the Republic and ZMDC's

relationship should the Court find Plaintiffs' alter-ego allegations inadequate.  Both motions are

fully briefed.

## II.    Legal Standards

On a motion to dismiss for lack of subject matter jurisdiction or lack of personal

jurisdiction, "[t]he plaintiff bears the burden of establishing, by a preponderance of the evidence,

that the court has jurisdiction."  Cause of Action Inst. v. Internal Revenue Serv., 390 F. Supp. 3d

84, 91 (D.D.C. 2019) (quoting Whiteru v. Wash. Metro. Area Transit Auth., 258 F. Supp. 3d

175, 182 (D.D.C. 2017)).  Because this suit involves claims against a foreign nation, the FSIA

provides the framework for determining subject matter jurisdiction.  Creighton Ltd. v. Gov't of

State of Qatar, 181 F.3d 118, 121 (D.C. Cir. 1999).  Under the FSIA, a federal district court has

original jurisdiction over a civil suit against a foreign state only if the foreign state is not entitled

to immunity under the statute.  28 U.S.C. § 1330(a).  "[T]he FSIA begins with a presumption of

immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an

exception applies."  Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175,

1183 (D.C. Cir. 2013).  Once the plaintiff has made that threshold showing, however, "the

sovereign bears the ultimate burden of persuasion to show that the exception does not apply."

Id.; accord Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000)

("'In accordance with the restrictive view of sovereign immunity reflected in the FSIA,' the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." (quoting Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998, 1002 (D.C. Cir. 1985))).

If, on the one hand, "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." Phoenix Consulting, 216 F.3d at 40.  On the other hand, if the motion to dismiss presents "a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA" by contesting a jurisdictional fact or raising a "mixed question of law and fact," such as whether the "person alleged to have harmed [the] plaintiff was [an] agent of [the] sovereign," then "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged" but instead "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." Id. (citing Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 448–49 (D.C. Cir. 1990)).

Defendants also move to dismiss under Rule 12(b)(6) for failure to state a claim.  In reviewing a Rule 12(b)(6) motion, the Court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," however, nor does the Court "assume the truth of legal conclusions." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  Accordingly, "[t]o survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Iqbal, 556 U.S. at 678).[1]

## III.  Analysis

Defendants' twin jurisdictional arguments—that the Court lacks subject matter and personal jurisdiction over them—overlap and both hinge on whether ZMDC is the Republic's alter ego.  The two involve other considerations as well, but the Court will begin by conducting its alter-ego analysis in the context of the Republic's claim that the Court lacks subject matter jurisdiction over it.

### A.  Subject Matter Jurisdiction

Unless one of the FSIA's exceptions to sovereign immunity applies, the FSIA bars suit against foreign sovereigns.  Plaintiffs rely on two such exceptions: § 1605(a)(1)'s waiver exception and § 1605(a)(6)'s arbitration exception.  The Court has already rejected the application of the arbitration exception in this case, leaving just the waiver exception at issue. See Amaplat, 663 F. Supp. 3d at 31–33.  Section 1605(a)(1) divests a sovereign of immunity when "the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver."  28 U.S.C. § 1605(a)(1).  Plaintiffs maintain, and ZMDC does not dispute, that ZMDC waived its sovereign immunity under § 1605(a)(1) by agreeing to arbitrate disputes in the 2007 and 2008 Memoranda of Understanding ("MOUs") between Plaintiffs and ZMDC and by participating in the arbitration in Zambia.  Am. Compl. ¶

---

[1]  As Plaintiffs' conditional cross-motion for jurisdictional discovery is moot in light of the Court's opinion, the Court need not address the standard for jurisdictional discovery.

10.  Plaintiffs allege that ZMDC's waiver is attributable to the Republic because the two are alter egos.

### 1.  Alter-Ego Relationship

"A government instrumentality 'established as [a] juridical entit[y] distinct and independent from [its] sovereign should normally be treated as such,'" and therefore such entities are "presumed to have legal status separate from that of the sovereign."  Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 847 (D.C. Cir. 2000) (alterations in original) (quoting First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611, 627 (1983)).  "That presumption can be overcome," however, if the plaintiff demonstrates that the sovereign and instrumentality are alter egos.  Id. at 847–48.  The two are deemed alter egos in either of two circumstances: (1) the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) "recognition of the instrumentality as an entity apart from the state 'would work fraud or injustice.'"  Id. at 848 (quoting Bancec, 462 U.S. at 629).

To assess the presence of both circumstances, courts have "coalesced around [] five factors," dubbed the Bancec factors: (1) whether the government exercises economic control over the entity, (2) whether government officials manage the entity or its daily affairs, (3) whether the entity's profits go to the government, (4) whether the government is the sole beneficiary of the entity's conduct, and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.  Rubin v. Islamic Republic of Iran, 583 U.S. 202, 210 (2018) (cleaned up).[2]

---

[2]  The parties' briefing reflects understandable confusion about how the five Bancec factors fit into the two alter-ego inquiries, namely the principal-agent and fraud-or-injustice

The first step in the alter-ego analysis is to define the relevant time period, which the parties dispute.  See Mot. Dismiss at 16–17; Pls.' Opp'n at 29; Defs.' Reply at 4–5.  Defendants urge the Court to consider only events that occurred between ZMDC's signing of the MOUs with Plaintiffs (2007 and 2008) and ZMDC's participation in the arbitration (2011).  Mot. Dismiss at 16.  Plaintiffs counter that the Court should also consider facts that post-date the commencement of the arbitration, including, for example, information in a 2017 Zimbabwe Parliamentary report.  Pls.' Opp'n at 29–31, Third Declaration of Steven K. Davidson ("Third Davidson Decl.") Ex. F.  The Court's approach falls somewhere between the parties' positions.

For the principal-agent analysis (roughly mapping onto Bancec factors one through four), the Court will consider only facts that bear on whether ZMDC was Zimbabwe's alter ego from 2007 to 2011.  Of course, events that occurred soon before or after this period may be relevant to whether ZMDC acted as Zimbabwe's agent within this timeframe.  But the pertinent question is whether ZMDC was Zimbabwe's agent between 2007 and 2011.  This approach accords with the D.C. Circuit's guidance that jurisdiction over a sovereign cannot "necessarily" be maintained just because "a state and a state-owned corporation may in some circumstances be, respectively, principal and agent."  Transamerica, 200 F.3d at 850.  "[T]he agent's actions [must be] related to

_____

inquiries.  See Pls.' Opp'n at 28–29; Defs.' Reply at 21–22.  In Rubin, the Supreme Court suggested that the Bancec factors apply to both.  538 U.S. at 210.  But the fit isn't perfect.  Factors one through four bear more on the principal-agent inquiry.  The fifth Bancec factor— whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations—does capture notions of fraud and injustice.  But it is narrower than what courts have found relevant to the fraud-or-injustice prong.  For example, the Supreme Court in Bancec, as well as the D.C. Circuit in subsequent cases, considered as part of the fraud-or-injustice analysis whether the state had undercapitalized the instrumentality or transferred money to avoid debtors.  See Bancec, 462 U.S. at 633; Transamerica, 200 F.3d at 854.  The Court will therefore use the framework of the five Bancec factors but incorporate other considerations into the equity factor.  This flexible approach hews to the Supreme Court's guidance that the Bancec factors do not supply a "mechanical formula" for determining judicial separateness.  Rubin, 583 U.S. at 210 (quoting Bancec, 462 U.S. at 633).

the substance of plaintiff's cause of action."  Id. (cleaned up); see also TIG Ins. Co. v. Republic of Argentina, No. 18-mc-00129 (DLF), 2022 WL 1154749, at *9 (D.D.C. Apr. 18, 2022), order corrected and superseded, No. 18-mc-00129 (DLF), 2022 WL 3594601 (D.D.C. Aug. 23, 2022) (defining the "relevant time" for the principal-agent analysis as "when the contracts 'were made.'").

Events that pre- or post-date 2007 to 2011 are relevant, however, to the fraud-or-injustice prong.  The Supreme Court adopted this approach in Bancec by considering the Cuban government's conduct after the plaintiff filed suit.  462 U.S. at 615–16.  Namely, the Court found that because the government dissolved Bancec and transferred its assets to other entities, in order to insulate those assets from possible counterclaims, "adher[ing] blindly to the corporate form" "would cause [] an injustice."  Id. at 632.  The Court will therefore follow suit and assess the Republic's conduct beyond 2011 as part of the fraud-or-injustice inquiry.

With these guideposts in place, the Court now turns to the Bancec factors.

a.  Economic Control and Day-to-Day Management

Plaintiffs have demonstrated that the Republic exercised significant economic control over ZMDC.  ZMDC's organic statute, the ZMDC Act, vests the Republic with control over the instrumentality.  Under the act, the government's Minister of Mines appoints ZMDC's board members.  Third Davidson Decl., Ex. B ("ZMDC Act") § 5(1).[3]  The act also mandates that the

---

[3]  Defendants submit a declaration from Dominic Muzawazi, a Zimbabwean lawyer, explaining that subsequent legislation has superseded some of the ZMDC Act's provisions. Defs.' Reply, Declaration of Dominic Muzawazi ("Muzawazi Decl.") ¶ 3.2.  Of relevance to the section cited above, Mr. Muzawazi notes that the Corporate Governance Act now requires the Minister of Mines to consult with the president before appointing or terminating ZMDC's board members.  Id. ¶ 4.1 ("[T]he President now has a close control on [Board] appointments.").  The Corporate Governance Act went into effect only in 2018, however, and therefore would not have impacted the Republic's authority over ZMDC during the relevant period.  See Date of

Republic hold at least fifty-one percent of ZMDC's shares and conditions the sale of other shares on government ministers' approval.  Id. §§ 27(2), (5).  And from ZMDC's founding until at least September 2023, the Republic has owned 100 percent of ZMDC's shares.  Am. Compl ¶ 45; Muzawazi Decl. ¶ 4.  These factors alone do not establish an alter-ego relationship.  See Foremost-McKesson, 905 F.2d at 448 ("Majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA.").  But the ZMDC Act also grants the Minister of Mines authority to give ZMDC "directions of a general character relating to the exercise . . . of its functions, duties and powers," and ZMDC is required, "with all due expedition, [to] comply with [these] direction[s]."  ZMDC Act § 25.  Moreover, under Zimbabwe's Public Finance Management Act, ZMDC must notify and seek approval from the government before "the acquisition or disposal of a significant asset," "the commencement or cessation of a significant business activity," or "participation to a significant extent . . . in a partnership, trust, unincorporated joint venture or similar arrangement."  Defs.' Reply, Declaration of Quinn Smith ("Smith Decl."), Ex. Z ("PFM Act") § 48(3).[4]

The Republic's control is also "not merely aspirational."  See OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela, 73 F.4th 157, 172 (3d Cir. 2023) (finding Venezuela exercised economic control over a national oil company because "statements of authority [we]re not merely aspirational.")  A 2010 news article documented that the Minister of Mines "brought in" a new chairperson for ZMDC's Board, and then "at the instigation of [the] Mines Minister"

---

Commencement: Public Entities Corporate Governance Act (Jun. 8, 2018), https://perma.cc/9AV8-PLSJ.

[4]  The Public Finance Management Act went into effect April 2, 2010.  See PFM Act at 1.

ZMDC's senior executives were placed on forced leave.  Third Davidson Decl., Ex. J at 1.[5]  But see Transamerica, 200 F.3d at 851 (finding no alter-ego relationship even when the Venezuelan government appointed members of an instrumentality's Board and "exercis[ed] its influence, through the Board of Directors, to put its own chosen manager in charge of a corporation.").

Plaintiffs have also submitted evidence that the Republic was involved in the "day-to-day operations" of ZMDC and its subsidiaries.  McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346, 352 (D.C. Cir. 1995).  In 2008, the U.S. Treasury Department's Office of Foreign Asset Controls ("OFAC") imposed sanctions against ZMDC and numerous other companies that supported the regime of former Zimbabwean President Robert Mugabe.  Third Davidson Decl., Ex. BB (OFAC press release) at 2.  In so doing, OFAC described ZMDC as "planning, coordinating and implementing mining projects on behalf of the Government of Zimbabwe."  Id. at 1.  And a 2013 Zimbabwe Parliamentary report noted that the Minister of Mines, not ZMDC's Board, controlled appointments to the boards of ZMDC's subsidiaries.  See Third Davidson Decl., Ex. U at 15 ("The ZMDC Board was rendered powerless when it came to the selection and appointment of members who sit on its subsidiary companies.  It[]s only function is to regulari[z]e [] appointments made by the Minister.").  Though a government's appointment of members to an instrumentality's board does not alone create an alter-ego relationship, see

---

[5]  The Court hesitates to rely on unsubstantiated newspaper articles, but Defendants themselves cite to this 2010 article as evidence that ZMDC had a board.  See Defs.' Reply at 19.  Moreover, though courts must rely only on "evidence satisfactory to the court" in deciding motions for default judgment under the FSIA, see 28 U.S.C. § 1608(e), and courts in this district have therefore rejected inadmissible hearsay when ruling on those motions, see, e.g., Strange v. Islamic Republic of Iran, No. 14-cv-435 (CKK), 2017 WL 11670394, at *1 (D.D.C. Feb. 8, 2017), the same standard does not apply to evidence used to establish subject matter jurisdiction.  In TJGEM LLC v. Republic of Ghana, for example, the D.C. Circuit considered information in "an internet news story" when analyzing the FSIA's commercial activity exception.  No. 14-7036, 2015 WL 3653187, at *1 (D.C. Cir. June 9, 2015) (ultimately concluding the allegations in the news story did not establish subject matter jurisdiction).

Transamerica, 200 F.3d at 851, the report found the Republic used board appointments to exercise control over ZMDC's subsidiaries.  As a result, the ZMDC Board "ha[d] little control and information over its subsidiary companies."  Id. at 15–16.[6]

### b.   Profits and Beneficiaries

Plaintiffs have also shown that the Republic took ZMDC's profits and was the beneficiary of its conduct during the relevant time period.  The Republic owns ZMDC shares (indeed, all of its shares) and therefore receives profits in the form of dividends.  Again, stock ownership does not alone create an alter-ego relationship.  See Transamerica, 200 F.3d at 849 ("A sovereign does not create an agency relationship merely by owning a majority of a corporation's stock. . . .").  But Plaintiffs have also offered evidence that, as early as 2008, government officials illegally diverted ZMDC's revenue to their own coffers.  OFAC placed ZMDC on its sanctions list that year because "Robert Mugabe, his senior officials, and regime cronies ha[d] used [ZMDC and other] entities to illegally siphon revenue and foreign exchange from the Zimbabwean people."  Third Davidson Decl., Ex. BB at 1.  And, in 2013, the State Department's Acting Assistant Secretary in the Bureau of African Affairs testified before Congress about similar misuse of mining funds.  Third Davidson Decl., Ex. MM (June 18, 2013 testimony).  He stated that the State Department was "concerned about ongoing reports that

---

[6]  Plaintiffs also cite a 2017 Zimbabwe Parliamentary report about Zimbabwe's diamond industry.  Pls.' Opp'n at 25.  The Court will not rely on the report because, as it describes, the Republic's level of control over the diamond industry shifted in 2015.  Previously, the Republic had "issue[d] multiple licenses to various investors."  Third Davidson Decl., Ex. F at 5.  In 2015, however, the government "centrali[zed] all diamond mines" in the Zimbabwe Consolidated Diamond Company, a subsidiary of ZMDC.  Id. at 5–6.  Analysis in the 2017 report therefore has limited relevance to the 2007 to 2011 time period.  Likewise, the Court will not rely on the 2017 to 2023 State Department Investment Climate Impact Reports cited by Plaintiffs.  See Third Davidson Decl. Exs. FF–LL.  The 2017 to 2022 reports all noted that "recent[ly]" the "government allow[ed] [ZMDC] to function without [a] board[]."  See, e.g., Third Davidson Decl. Ex. LL at 13.  Recently is likely not 2011.

diamond mining entities in Zimbabwe [we]re being exploited by people in senior government and military positions for personal gain, that revenues from those enterprises [we]re being diverted for partisan activities that undermine democracy, and that proceeds from diamond sales [we]re enriching a few individuals and not the Treasury and people of Zimbabwe." Id. at 2.

As other courts have found, officials' use of an instrumentality's funds for personal gain or policy goals contributes to the creation of an alter-ego relationship.  In Transamerica, the D.C. Circuit held that an alter-ego relationship exists when the "affairs of the [instrumentality] [are] so intermingled that no distinct corporate lines are maintained" and cited as an example a company's use of its subsidiary's "profits for its own purposes."  200 F.3d at 849 (cleaned up). Likewise, in OI Eur. Grp. B.V., the Third Circuit held that Venezuela and a state instrumentality were alter egos because, among other things, Venezuela "committed [the instrumentality] to sell oil to [] allies at steep discounts" and senior officials used the instrumentality's "aircraft[s] for state purposes."  73 F.4th at 173.  See also McKesson, 52 F.3d at 352 (finding an alter-ego relationship because the instrumentality's "policy was not commercial" and instead was guided by "government representatives").  Plaintiffs' evidence here is of a similar vein.

### c.   Fraud and Injustice

Under a narrow application of the fifth Bancec factor—whether adherence to separate identities would entitle the foreign state to benefits in U.S. courts while avoiding its obligations—Plaintiffs have not demonstrated that the Republic seeks any benefits from the U.S. legal system.  But, more broadly, "recognition of [ZMDC] as an entity apart from the state 'would work fraud or injustice.'"  Transamerica, 200 F.3d at 848 (quoting Bancec, 462 U.S. at 629).  When a government shields its instrumentality from creditors—for example, by "thinly

11

capitaliz[ing]" the instrumentality or transferring its "assets to separate juridical entities"—this conduct supports an alter-ego finding.  See id. at 854; Bancec, 462 U.S. at 633.

And there is evidence that the Republic did exactly that.  According to a 2022 Zimbabwean news article, as legal judgments against ZMDC began to pile up, the Republic started "selling off parts" of the company.  Third Davidson Decl., Ex. NN at 3.  In 2018, the Republic issued a tender offer for six mines held by ZMDC.  Id.  In early 2022, the Minister of Mines then ordered that two of ZMDC's few remaining assets—the Kamativi and Todal mining projects—"be spirited away into a new government company, Defold," even though ZMDC's board expressed concern that the asset transfer was "illegal and against [ZMDC's] interest."  Id. at 2–3.  According to the article, the government made the transfer to "stave off US$467 million in claims from [ZMDC's] creditors."  Id. at 1.[7]  In April of that year, the Secretary for Finance and Economic Development approved the transfer of ZMDC's shares to Defold.  Third Davidson Decl., Ex. OO (April 14, 2022 approval letter).  The fraud-or-injustice inquiry therefore supports a finding that the Republic and ZMDC are alter egos.

In light of Plaintiffs' evidence, the Court finds that the Republic was ZMDC's alter ego and can therefore be subject to this Court's jurisdiction.  Moreover, because Plaintiffs seek to take jurisdictional discovery only "to prove that the Amended Complaint's alter ego allegations are true," the Court denies that motion as moot.  Pls.' Opp'n at 31.

---

[7]  Again, the Court is cautious not to put too much stock in news articles.  But Plaintiffs' other evidence—namely, the record indicating that the government authorized ZMDC to sell its shares in the Kamativi and Todal mining projects to Defold—substantiates the 2022 article.  Third Davidson Decl., Ex. OO.  And, though Defendants take issue with Plaintiffs' citations to news articles and the government record, they do not deny that ZMDC's assets were diverted to Defold or offer countervailing evidence.  See Defs.' Reply at 22.

## 2.   *Remaining Subject Matter Jurisdiction Arguments*

The subject matter jurisdiction analysis does not end with the alter-ego determination. Defendants suggest that, even if ZMDC is the Republic's alter ego, § 1605(a)(1)'s implied-waiver exception is still not satisfied.  See Mot. Dismiss at 24–27; Defs.' Reply at 22–23. Defendants offer two supporting theories, but neither is availing.  First, Defendants contend that a foreign state that "was not a party to the arbitration agreement" could not have impliedly waived its immunity to suit.  Mot. Dismiss at 25; Defs.' Reply at 23.  But the D.C. Circuit has rejected this argument; indeed, that is the whole point of the alter-ego exception.  See Transamerica, 200 F.3d at 848 (the principal-agent and fraud-or-injustice alter-ego theories are "exceptions to the rule that a foreign sovereign is not amenable to suit based upon the acts of such an instrumentality").

Second, Defendants renew their argument that the waiver exception does not apply because the New York Convention governs enforcement of arbitration awards, not enforcement of foreign judgments confirming arbitral awards.  Mot. Dismiss at 26–27.  This theory would deprive the Court of jurisdiction over both the Republic and ZMDC, but the Court has already rejected it.  See Amaplat, 663 F. Supp. 3d at 35–36.  When a sovereign (or its instrumentality) waives immunity by signing on to the New York Convention and agreeing to arbitrate in another signatory's jurisdiction, "the cause of action to enforce [a] foreign judgment is within the scope of [that] implicit waiver of sovereign immunity."  Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 582 (2d Cir. 1993).[8]  "The cause of action is within the scope of the waiver because

---

[8]  Although the Court adopted Seetransport's implicit-waiver rule in its ruling on Defendants' prior motion to dismiss, it cautioned that a panel of the D.C. Circuit recently

the cause of action is so closely related to the claim for enforcement of the arbitral award." Id. at 583.[9]

The Court finds, accordingly, that it has subject matter jurisdiction over the Republic and ZMDC.

B.   Personal Jurisdiction

   1.   The Republic

Under the FSIA, personal jurisdiction exists over a foreign state if the district court has subject matter jurisdiction and service has been effected.  28 U.S.C. § 1330(b).  In other words, a simple equation governs:  "[S]ubject matter jurisdiction plus service of process equals personal jurisdiction."  GSS Grp. Ltd. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002)).

The Republic does not dispute that it was properly served.  Thus, because the Court may exercise subject matter jurisdiction over the Republic, it also has personal jurisdiction.

   2.   ZMDC

The personal jurisdiction analysis is a bit more complicated for ZMDC.  "Whenever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship

_____

signaled concerns about the rule's application.  Amaplat, 663 F. Supp. 3d at 33–35; see also Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria, 27 F.4th 771 (D.C. Cir. 2022).

   [9] Defendants' Reply also seems to suggest that ZMDC could not have waived its immunity to suit because it was improperly served in the Zambian award enforcement proceeding.  Defs.' Reply at 23.  Putting aside whether Zambian service issues are properly considered at this stage of proceedings, see Amaplat, 663 F. Supp. 3d at 39–40, as the Second Circuit explained in Seetransport, it was ZMDC's agreement to arbitrate and its participation in the arbitration proceeding—not its participation in the Zambian award proceeding—that waived its immunity in this suit, see Seetransport, 989 F.2d at 582 ("Navimpex, a Romanian agency or instrumentality, had implicitly waived its sovereign immunity because it was a signatory to the Convention and had proceeded to arbitration in the I.C.C.").

arises between them, the instrumentality receives the same due process protection as the sovereign: none." GSS, 680 F.3d at 815.  In that situation, the simple equation for personal jurisdiction over a state—"subject matter jurisdiction plus service of process equals personal jurisdiction"—also applies to the instrumentality.  But, when an instrumentality is not the sovereign's alter ego, "the instrumentality [] enjoy[s] all the due process protections available to private corporations," including the requirement of "minimum contacts" with the relevant forum. Id. at 815, 817.  Plaintiffs have opted for the alter-ego route, contending that ZMDC is not entitled to due process protections due to the Republic's substantial control over it.  The Court agrees.  Since ZMDC and the Republic are alter egos, personal jurisdiction over ZMDC is satisfied by subject matter jurisdiction and service.[10]  As the Court has already concluded it may exercise subject matter jurisdiction over ZMDC, all that is left to consider is service.[11]  And the Court finds service was proper:  Plaintiffs served ZMDC pursuant to the "special arrangement" in the 2007 and 2008 MOUs.  See 28 U.S.C. § 1608(b)(1).

The FSIA creates a "hierarchical regime for the appropriate methods of service" on agencies or instrumentalities of a foreign state.  Est. of Hartwick v. Islamic Republic of Iran, No. 18-cv-1612, 2021 WL 6805391, at *8 (D.D.C. Oct. 1, 2021).  The first-choice method in the

---

[10]  Defendants claim Plaintiffs "cannot rely on contradictory arguments" to establish jurisdiction and therefore cannot contend ZMDC is an "instrumentalit[y] [or] agenc[y]" after arguing it is Zimbabwe's "alter ego."  Defs.' Reply at 24.  The two theories offered by Plaintiffs are not contradictory:  ZMDC can be both an instrumentality and an alter ego of the Republic.  In fact, the D.C. Circuit defined the alter-ego doctrine as applying to a "sovereign" that dominates its "instrumentality."  See Transamerica, 200 F.3d at 848 ("A sovereign is amenable to suit based upon the actions of an instrumentality it dominates because the sovereign and the instrumentality are in those circumstances not meaningfully distinct entities; they act as one.").

[11]  As noted above, Defendants made, and the Court rejected, the contention that subject matter jurisdiction over ZMDC does not lie because service in the Zambian award proceedings was allegedly improper and because ZMDC's waiver does not extend to this suit.

hierarchy, and the one Plaintiffs used, allows a party to effect service by "deliver[ing] [] a copy of the summons and complaint in accordance with [a] special arrangement for service between the plaintiff and the agency or instrumentality." 28 U.S.C. § 1608(b)(1). The MOUs contain the following "special arrangement":

> The Parties choose the following physical addresses at which documents in legal proceedings or any written notices in connection with this MOU may be served. . . . Any notice given in terms of this MOU shall be in writing and shall if delivered by hand to a responsible person during ordinary business hours at the physical address chosen as its *domicilium citandi et executandi* be deemed to have been duly received by the addressee.

Am. Compl. Ex. B §§ 12.8.1–2 (emphasis added); Am. Compl. Ex. D §§ 10.9.1–2 (emphasis added). The MOUs further provide that "a written notice or communication actually received by one of the Parties from the other Party shall be adequate written notice or communication to such Party." Am. Compl. Ex. B § 12.8; Am. Compl. Ex. D § 10.9.

Plaintiffs complied with the special arrangement in the MOUs: They hand delivered copies of the summons, complaint, and notice of suit to Theresa Kanengoni, "a secretary for Zimbabwe Mining Development Corporation," who "stated that she was authorized to accept service" for ZMDC. Return of Service [ECF No. 24] ¶¶ 2–4.[12]

---

[12] As Plaintiffs acknowledge, they hand delivered the papers to a different address than the one listed for ZMDC in the MOUs. See Pls.' Opp'n at 37; Return of Service ¶ 3. ZMDC does not suggest that this change rendered service improper, and, in any event, service was still proper for several reasons. First, prior to the date of service, ZMDC notified Plaintiffs that its address had changed. See Second Declaration of Steven K. Davidson, Ex. 1 [ECF No. 32–2]. And, as other courts have noted, it would be "senseless" to attempt service at a location plaintiffs know the defendant does not occupy. Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo, 131 F. Supp. 2d 248, 251 (D.D.C. 2001). Second, the MOUs allow some wiggle room; they provide that "a written notice or communication *actually received* by one of the Parties from the other Party shall be adequate written notice or communication to such Party." Am. Compl. Ex. B § 12.8 (emphasis added); Am. Compl. Ex. D § 10.9 (emphasis added). Finally, 28 U.S.C. § 1608(b) also permits some flexibility: "[S]ection 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state." Transaero, Inc. v.

ZMDC contends that Plaintiffs cannot rely on the MOUs' special service provision for two reasons:  (1) the MOUs were terminated as a result of the arbitration proceedings and (2) even if the MOUs' service provisions survived contract termination, they do not apply in a proceeding to enforce an arbitration award.  Defs.' Reply at 24–25.

As to the first contention, other district courts, including at least one in this district, have held that service under the FSIA can be effected pursuant to a special service provision in a terminated contract.  In <u>G.E. Transp. S.P.A. v. Republic of Albania</u>, for example, petitioners sought confirmation of an arbitral award against the Republic of Albania.  693 F. Supp. 2d 132, 133 (D.D.C. 2010).  Even though the arbitral tribunal determined the underlying contract was no longer in effect (in fact, the tribunal determined the contract never "enter[ed] into force" because Albania "prevented [its] reali[z]ation"), the district court still held the petitioners could rely on the contract's special service provision.  <u>Id.</u> at 136–37; Petition, Ex. A at 60, <u>G.E. Transp. S.P.A. v. Republic of Albania</u>, 693 F. Supp. 2d 132, 133 (D.D.C. 2010) (No. 08-cv-2042), ECF No. 1–1.  Likewise in <u>Arbitration Between Space Systems/Loral, Inc. v. Yuzhnoye Design Office</u>, the court found "[t]he fact that [the plaintiff] purported to terminate the contract at some point before serving its petition [did] not prohibit it from using the special arrangement established" in the contract. 164 F. Supp. 2d 397, 403 (S.D.N.Y. 2001).

This view—that special service provisions can survive contract termination—accords with the Supreme Court's holding in <u>Nolde Brothers, Inc. v. Local No. 358, Bakery and Confectionary Workers Union</u>.  430 U.S. 243 (1977).  There, the Supreme Court considered whether a mandatory arbitration clause (and not a special service provision) survived contract

---

<u>La Fuerza Aerea Boliviana</u>, 30 F.3d 148, 153 (D.C. Cir. 1994); <u>see also</u> <u>Agudas Chasidei Chabad of U.S. v. Russian Fed'n</u>, 798 F. Supp. 2d 260, 267 (D.D.C. 2011) (applying a "substantial compliance" standard to service of agencies or instrumentalities under § 1608(b)).

17

termination and therefore governed the parties' dispute over severance pay.  Id. at 244.  The arbitration clause at issue provided that "'any grievance' arising between the parties was subject to binding arbitration."  Id. at 245.  The Supreme Court found the arbitration clause governed:  A contract provision "survive[s] contract termination when the dispute [i]s over an obligation arguably created by the expired agreement."  430 U.S. 243, 252 (1977) (citing John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 552 (1964)); see also Livingston, 376 U.S. at 553 (a provision requiring arbitration for any disputes "arising out of or relating to [the] agreement, or its interpretation or application, or enforcement" survived termination).

The same is true here for MOUs' special service provisions.  Though the arbitral panel considered a number of arguments, the core of the dispute was whether ZMDC illegally cancelled the MOUs.  See Am. Compl. Ex. A ¶¶ 7–8, 92, 179.  A dispute about whether a contract can be cancelled—or, put differently, whether a contract remains binding—is a dispute "over an obligation [] created" by the contract.  The special service provision therefore survived contract termination.

Second, ZMDC contends that the service provisions do not cover actions to enforce arbitral judgments.  This comes down to contract interpretation.  As noted above, the MOUs' service provisions provide (1) that "documents in legal proceedings or any written notices in connection with this MOU may be served" at listed addresses and (2) that "[a]ny notice given in terms of this MOU . . . shall[,] if delivered by hand to a responsible person . . . at the physical address chosen as its *domicilium citandi et executandi*[,] be deemed to have been duly received."  Am. Compl. Ex. B §§ 12.8.1–2 (emphasis added); Am. Compl. Ex. D §§ 10.9.1–2 (emphasis added).

18

The MOUs' service provisions extend to the current case.  *Domicilium citandi et executandi* is a term in Zimbabwean and South African law that refers to the address for service of process.  See Pls.' Opp'n at 36; Christian Schulze, Practical Problems Regarding the Enforcement of Foreign Money Judgments, 17 S. Afr. Mercantile L. J. 125, 131 (2005) ("[A] domicilium citandi et executandi" refers to a "domicile for the purpose of facilitating service of process and levying execution.").  Because the MOUs used this term of art, it is clear the parties intended for hand-delivery to the chosen location to satisfy service of process in legal proceedings.

Defendants nevertheless contend that the service provisions' phrase "in connection with this MOU" renders the provisions inapplicable to actions to enforce arbitral judgments.  See Defs.' First Reply [ECF No. 34] at 9–10 ("Under section 12.8 and section 10 of MOUs, ZMDC only agreed to accept service of 'documents in legal proceedings or any written notices in connection with the' MOUs . . . .  Plaintiffs are not seeking relief under the MOUs, such as a finding of a breach of the MOUs.  Rather, the Complaint is connected to the Zambian High Court's order.").  Yet the D.C. Circuit has held that the phrase "in connection with" is "quite broad."  Azima v. RAK Inv. Auth., 926 F.3d 870, 877 (D.C. Cir. 2019).  It is equivalent to the phrase "in relation to," and a dispute arises "in relation to" an agreement so long as "the origin of the dispute is related to that agreement, meaning it has some logical or causal connection to the agreement."  Id. (cleaned up).  Applying these definitions, the D.C. Circuit rejected the notion that a claim "is 'in connection with' a contract only when 'the dispute occurs as a fairly direct result of the performance of contractual duties.'"  Id. at 878.  Though the current suit is now several steps removed from the original arbitration, it still has a direct "logical or causal connection" to the MOUs.  Plaintiffs won an arbitration award finding Defendants illegally

19

terminated the MOUs, a Zambian court confirmed that award, and now Plaintiffs seek to have it enforced.

Moreover, the MOUs specifically contemplated that the parties might dispute the confirmation or enforcement of awards. See Am. Compl. Ex. B § 11 ("[A]ny Party may submit [a] dispute to ICC International Court of Arbitration in Paris for arbitration . . . , the award of which shall be final and binding upon all Parties."); Am. Compl. Ex. D § 9 (same). See also Yuzhnoye Design Off., 164 F. Supp. 2d at 403 (finding a special service provision applied to arbitration enforcement actions because the parties' contract "specifically contemplate[d] that 'disputes between the [p]arties arising out of [the contract]' [would] be submitted to arbitration and that the parties [could] apply for judicial confirmation of an arbitration award"). "If [ZMDC] had wished to mark a narrower boundary for th[e] [service] clause[s], [it] could have easily done so." Azima, 926 F.3d at 878.. It did not, so it cannot now claim that service pursuant to the special arrangements was improper.

The personal jurisdiction equation is therefore solved:  The Court has subject matter jurisdiction over ZMDC and Plaintiffs properly served ZMDC, ergo the Court has personal jurisdiction over ZMDC.

   C.  Failure to State a Claim

Finally, Defendants contend that Plaintiffs have failed to plead facts sufficient to establish an alter-ego relationship.  As Defendants acknowledge, however, the standard under Rule 12(b)(6) is "more forgiving than that applicable to allegations for establishing personal and subject-matter jurisdiction." Mot. Dismiss at 31.  See also Citizens for Resp. & Ethics in Washington v. Pruitt, 319 F. Supp. 3d 252, 256 (D.D.C. 2018) ("The standard to survive a motion to dismiss under Rule 12(b)(1) is less forgiving" than Rule 12(b)(6)'s standard.)  Thus,

20

for the reasons explained above, the Court finds Plaintiffs have pled facts sufficient to establish that the Republic and ZMDC are alter egos.

The Court therefore denies Defendants' motion to dismiss.  To avoid juggling two complaints and because the Amended Complaint reincorporates the original complaint's allegations against the Chief Mining Commissioner, the Amended Complaint shall be the operative complaint for all three defendants.

**IV.   Conclusion**

For these reasons, it is hereby

**ORDERED** that [ECF No. 42] Defendants' Motion to Dismiss is DENIED.  It is further

**ORDERED** that [ECF No. 46] Plaintiffs' Cross-Motion for Jurisdictional Discovery is DENIED as moot.  It is further

**ORDERED** that the Amended Complaint shall be the operative complaint in this case.  It is further

**ORDERED** that the Republic, ZMDC, and the Chief Mining Commissioner are directed to file an answer to Plaintiffs' Amended Complaint by March 11, 2024.

**SO ORDERED**.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>February 9, 2024</u>

21

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| Amaplat Mauritius Ltd., *et al*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:22-cv-00058-CRC |
| | ) | |
| Zimbabwe Mining Development Corporation, *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' CONDITIONAL**
**CROSS-MOTION FOR JURISDICTIONAL DISCOVERY**

Defendants, the Chief Mining Commissioner of the Ministry of Mines of Zimbabwe (the "Commissioner"), Republic of Zimbabwe ("Zimbabwe"), and Zimbabwe Mining Development Corporation ("ZMDC), by and through their undersigned counsel, hereby file their Opposition to Plaintiffs' Conditional Cross-Motion for Jurisdictional Discovery, and in support thereof, state as follows:

**INTRODUCTION**

Over nine years after Plaintiffs first lost on their *alter ego* theory, and fourteen years after Plaintiffs decided to transact with an SDN, Plaintiffs would like broad-reaching discovery to confirm media reports and the nationalities of contracting parties with mining rights in Zimbabwe. Jurisdictional discovery is improper because the evidence does not suggest a reasonable likelihood that jurisdictional discovery will evince the basis for jurisdiction. *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 (1983). Plaintiffs rely largely on overstated terms of the ZMDC Act, unsupported conjecture and assumptions from their supposed expert, and contradictory documents that undermine their case. This is insufficient to order jurisdictional discovery, and the Court should instead grant Defendants' motion to dismiss.

**RELEVANT BACKGROUND**

**A.  Plaintiffs transacted with ZMDC when it was under UK, EU and US sanctions**

1.  Plaintiffs entered into two separate MOUs with ZMDC (not Zimbabwe) and continued to transact business with ZMDC under those MOUs until they were terminated on January 14, 2011, by ZMDC, not Zimbabwe. *See* ECF 40-1 at ¶¶ 3-9.

2.  The United States announced sanctions against Zimbabwe in July 2008, and added ZMDC to the SDN list on July 25, 2008. D.E. 40, ¶ 62. Prior to that, both the EU and UK had announced financial sanctions against Zimbabwe, and in January 2009 ZMDC was added to the list

1

of sanctioned entities and remained there until 2013. *See* ECF No. 48-4, Ex. B EU Council Regulation, Annex III; *See* ECF No. 48-3, Ex. A, UK Zimbabwe Financial Regulations 2009. These regulations bind every EU national and UK national or subject, and also affect actions by a non-EU national within the EU.  *See,* ECF No. 48-3, Ex. A at 1(2) and ECF No. 48-4, Ex. B at Art. 13.

3.      These regulations prevent any financial dealings between the sanctioned entity, in this case ZMDC, and EU, UK or US nationals. *Id.* In other words, any person that is either an EU, UK or US national or transacts business in the EU is prohibited from investing in/partnering with ZMDC in any venture. *Id.* The UK sanctions also extend to the BVI because it is an overseas British territory.  ECF No. 48-17, Ex. O, Applicable UK Regulations-Legislative Framework in VI.

4.      Plaintiffs are both Mauritian companies, but their apparent holding company, Amari Holdings Ltd is a BVI entity. Michael Nunn, the director for both these companies, appears to be a British national or subject. *See* ECF No. 48-5, Ex. C; ECF No. 48-6, Ex. D, Mauritian company records; *see also,* ECF No. 48-7, Ex. E, an article with information on Mr. Nunn. Nunn appears to have significant and strong ties to the UK and has operated a number of businesses in the UK, including TanzaniteOne (which he founded in 2001 and was listed in the UK's Alternative Investment Market)[1] and Kropz.[2] As a British citizen or subject, Nunn would have likely been subject to the UK/EU sanctions. *See* ECF No. 48-3 at Art. (1)2.

5.      While these sanctions were in place, Plaintiffs indisputably transacted with ZMDC until at least 2011 through the MOUs, and then sought damages that arose out of that partnership before an ICC arbitral tribunal. *See generally,* ECF No. 40-1.

6.      Now, Plaintiffs are seeking to enforce a judgment recognizing an award based on

---

[1] https://www.miningmx.com/news/markets/31319-31319/

[2] https://www.kropz.com/about-us/board

what was likely a prohibited transaction.

**B. Plaintiffs fully litigated the issue of alter ego in Belgium and lost**

7.     After obtaining the underlying Award, Plaintiffs tried to enforce the Award by seizing assets belonging to two of ZMDC's subsidiaries before the Belgian courts. *See* ECF No. 48-9, Judgment of the Court of First Instance in Antwerp, dated December 4, 2014. In those proceedings, Plaintiffs were parties and claimed that the assets had been rightfully seized because they belonged to ZMDC through a veil-piercing/alter ego theory. *Id.*

8.     Separately, the Funnekotter claimants also appeared in the case as intervenor to seize the diamonds on a claim that they belonged to Zimbabwe who was the award-debtor of an ICSID award rendered in 2009. *Id.* at 3-4.

9.     Plaintiffs brought evidence before the Belgian court, but it rejected the argument that the assets belonging to some of ZMDC's subsidiaries were attachable under an *alter ego* theory as to either ZMDC or Zimbabwe. *Id.* at 5-6. The Belgian court therefore lifted the attachment order. *Id.* at 7.

10.     Almost a decade later, Plaintiffs are now seeking to hold Zimbabwe liable for ZMDC's debts under the same *alter ego* theory that failed previously. *See* ECF No. 40.

**I.     Jurisdictional discovery is not warranted in this case**

In its Opinion, this Court stated that any jurisdictional discovery depended on whether "a plaintiff shows a nonconclusory basis for asserting jurisdiction and likelihood that additional supplemental facts will make jurisdiction proper." ECF No. 38, Court Order at 17, fn 6. This makes sense. In the context of sovereign states, the courts must treat a foreign state as presumptively immune from the jurisdiction of the United States courts. *See* 28 U.S.C. § 1604; *see also, Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993). This immunity is not simply immunity from liability,

3

but also immunity from the burdens of litigation, including discovery. *Foremost-McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 443 (D.C. Cir. 1990).

Moreover, a plaintiff seeking jurisdictional discovery under the FSIA bears the burden of demonstrating the need for such discovery. *See Crist v. Republic of Turkey,* 995 F. Supp. 5, 12-13 (D.D.C. 1998). The "inability to obtain jurisdictional facts alone is not sufficient to mandate jurisdictional discovery" and such discovery "should be permitted *only* to verify allegations of specific facts." *Id.* (emphasis added) Thus, "[j]urisdictional discovery . . . is justified only if the plaintiffs reasonably demonstrate that [he] can supplement [his] jurisdictional allegations through discovery" and "mere conjecture or speculation is not enough." *Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.,* 638 F. Supp. 2d 1, 11-12 (D.D.C. 2009); *see also Crist,* 995 F. Supp. at 13.

## A. This Court should first resolve whether service was proper before ordering jurisdictional discovery

In order to avoid unnecessarily burdening a sovereign, the D.C. Circuit has determined that jurisdictional discovery "should not be authorized at all if the defendant raises either a different jurisdictional or an 'other non-merits grounds' such as . . . personal jurisdiction, the resolution of which would impose a lesser burden upon the defendant." *See Phoenix Consult. Inc. v. Republic of Angola,* 216 F. 3d 36 (2000).

Here, the Court has yet to resolve whether ZMDC has been properly served. Until this question has been properly determined, this Court should defer ruling on any request for jurisdictional discovery.

## B. Granting jurisdictional discovery is unnecessary because it will be futile

When a plaintiff makes conclusory assertions or offers only speculation regarding the grounds for jurisdiction, the court can deny jurisdictional discovery. *Dever v. Hentzen Coatings, Inc.,* 380 F.3d 1070, 1074 (8th Cir. 2004); *Boschetto v. Hansing,* 539 F.3d 1011, 1020 (9th Cir. 2008).

Moreover, where the evidence does not suggest a reasonable likelihood that jurisdictional discovery will evince the basis for jurisdiction, jurisdictional discovery is not warranted. *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n.17 (1983) (explaining the court "retain[s] the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed"). In other words, a party must demonstrate that it can supplement its jurisdictional allegations through discovery. *See Medical Solutions, Inc. v. C. Change Surgical LLC*, 468 F. Supp. 130, 135-136 (D.D.C. 2006) (denying jurisdictional discovery where there is no showing of how jurisdictional discovery would help plaintiff discover anything new).

The focus here is the *alter ego* argument, and Plaintiffs have done little to merit jurisdictional discovery. Instead of bringing concrete allegations, Plaintiffs have relied on a series of news articles that have nothing more than vague comments and poorly sourced "findings." Plaintiffs' "expert," Sternford Moyo, with the benefit of litigating against ZMDC and practicing in Zimbabwe for decades, provided nothing more than conjecture, relying apparently on his memory or speculation and not documents. D.E. 48-1, ¶¶ 4.4, 5, 6, 8, and 10-11. Plaintiffs' only meaningful allegation, the finding of the U.S. Department of the Treasury that ZMDC has no board of directors, is contradicted by Plaintiffs' evidence and everyone else who has had the opportunity to analyze the *alter ego* argument or ZMDC's relation to its shareholder. *See, e.g.*, ECF No. 45-7, Ex. F, ECF No. 45-9, Ex. H, ECF No. 45-10, Ex. I, ECF No. 45-11, Ex. J, ECF No. 45-15, Ex. N, ECF No. 45-22, Ex. U. No further discovery is necessary to prove what Plaintiffs' exhibits show—that ZMDC operated under the guidance of its board of directors.

And this is not the first time Plaintiffs have failed. The Belgian courts rejected the *alter ego* theory in 2014 (a fact not brought to this Court's attention by Plaintiffs), and after waiting almost a decade, while undertaking little to no fact discovery on their own, Plaintiffs decided to again bring

their *alter ego* allegations to the United States, but not Canada, Zambia, or the arbitration tribunal. *See* ECF No. 40-1, Award; ECF No. 48-8, Ex. F; ECF No. 48-9, Ex. G; Plaintiffs chose to contract with ZMDC, and while they are free to litigate against ZMDC, the campaign to convert ZMDC's debt into an obligation of the Republic needs to end.

### C.  The Discovery sought by Plaintiffs is duplicative and unduly burdensome

Any jurisdictional discovery needs to be "carefully controlled or limited." *See Foremost-McKesson,* 905 F.2d at 449. Given that presumptive immunity applies in this case, Plaintiffs are not entitled to broad jurisdictional discovery. Rather, jurisdictional discovery is permitted "only to verify the allegations of *specific* facts *crucial* to an immunity determination." *Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 849 (5th Cir. 2000) (citing to *Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528, 534 (5th Cir. 1992) (emphasis added). It, thus, must be limited to "the essentials necessary to determining the preliminary question of jurisdiction." *Gould, Inv. v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 451 (6th Cir. 1988).

Plaintiffs have failed to show how the discovery they are seeking will support *specific* allegations concerning the *alter ego* claim and have indicated broad areas of discovery that are likely to unduly burden the Defendants. Response at 31-32. Plaintiffs are also seeking documents and deposition testimony from both ZMDC and Zimbabwe, which is not only duplicative, but also unduly burdensome. Response at 32. At its core, Plaintiffs want to go searching for anything that might be somehow sensitive, even if it is irrelevant for any *alter ego* analysis. For example, Plaintiffs want to know about any grants of concessions to or joint ventures with Russian or Chinese companies. This is irrelevant to the *alter ego* analysis. ZMDC cannot grant concessions or ultimately approve joint ventures as indicated in the ZMDC Act. And the nationality of the contracting party or concession holder proves nothing about an *alter ego*. Other subjects are overly broad and vague. For

6

example, Plaintiffs are seeking "[t]he truth of other allegations in government and media reports regarding ZMDC . . ." Response at 32. Defendants should not be forced to prove the truth of reporting done by others. This is a map for a fishing expedition that will overburden Defendants with an inordinate amount of discovery requests.

### D.   If jurisdictional discovery is ordered, Defendants should be equally permitted to seek limited discovery against Plaintiffs

There is no rule prohibiting a defendant from also seeking discovery relevant to jurisdiction. To the contrary, courts have recognized the right of either party to seek jurisdictional discovery. *See, e.g., Budde v. Ling-Temco Vought, Inc.,* 511 F.2d 1033, 1035 (10th Cir. 1975).

No viable reason exists to order discovery from Defendants, but in the unlikely event that the Court is so inclined, then Defendants need discovery to determine if Plaintiffs are seeking to convert a contract that was illegal under U.S. law into a debt that U.S. courts should now enforce. As a matter of public policy, courts are generally precluded from enforcing illegal contracts. *See, e.g., Jackson Purchase Rural Elec. Co-op Assn'n v. Local Union 816, Intern. Borth. Of Elec.,* 646 F.2d 264 (6th Cir. 1981) ("recognizing that one who has himself participated in an illegal act cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transactions") (internal citations omitted). This is not only an affirmative defense. Courts have found that they are "without jurisdiction" to entertain a suit that seeks to enforce an illegal contract that violates U.S. law. *Haley v. Sohio Natural Resources Co.,* No. 81-1922, 1983 WL 1114, *1 (D.D.C. July 26, 1983).

Knowing that ZDMC remained an SDN, Plaintiffs continued to transact with ZMDC under the MOUs and eventually sought damages against ZMDC on the basis of the MOUs, which were entered into and carried out with ZMDC, an SDN. While Plaintiffs are purported Mauritian companies, their shareholders/directors include EU/UK persons or subjects who were likely prohibited from transacting with ZMDC during the period that followed the execution of the MOUs.

7

In light of this, Zimbabwe is entitled to discover whether in fact the underlying transaction out of which the award, and subsequent judgment arose, is a prohibited transaction under the relevant sanctions at the time. Specifically, it seeks to obtain information regarding the status of persons and entities involved with Plaintiffs at the time of the relevant transactions, any links to the U.S. banking system, any use of U.S. vendors or suppliers, and any other information that would show if the underlying transaction violated the sanctions in place at the time against ZMDC.

### CONCLUSION

For the foregoing reasons, Zimbabwe and ZMDC request that the Court deny the Conditional Cross-Motion for Jurisdictional Discovery and grant any additional relief the Court considers just and proper.

Respectfully submitted,

/s/ Quinn Smith
GST LLP
Quinn Smith
DCD Bar No. FL0027
quinn.smith@gstllp.com
Katherine Sanoja
DC Bar No. 1019983
katherine.sanoja@gstllp.com
1111 Brickell Avenue
Suite 2715
Tel. (305) 856-7723

8

**CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2023, I electronically filed this document with the Clerk of the Court of the U.S. District Court of the District of Columbia by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel off record. I further certify that I am unaware of any parties who will not receive such notice.

By: /s/ Quinn Smith
Quinn Smith