**TABLE OF CONTENTS**

District Court Civil Docket in Case 1:22-cv-0058……………...…………...JA001

Complaint (ECF No. 1).………………………………………..….....…...JA011

Ex Parte Order for Leave to Register and Enforce the Final Arbitration Award (ECF No. 1-5)…………………………………………………….......…..JA22

Affidavit Requesting Foreign Mailing – ZMDC (ECF No. 12)……………......JA26

Affidavit Requesting Foreign Mailing – Ministry of Mines (ECF No. 13).......JA27

Affidavit Requesting Foreign Mailing – Zimbabwe (ECF No. 14)……….......JA28

Request to Clerk re Foreign Mailing (ECF No. 15) (Minute Entry found at JA004)

Request to Clerk re Foreign Mailing (ECF No. 16) (Minute Entry found at JA004)

Request to Clerk re Foreign Mailing (ECF No. 17) (Minute Entry found at JA004)

Certificate of Clerk (ECF No. 18)……………………......…………………JA29

Return of Service (ECF No. 19)……………………………….......………JA30

Return of Service (ECF No. 20)……………………......……………....……..JA33

Motion to Dismiss the Complaint by the Chief Mining Commissioner, Ministry of Mines of Zimbabwe, and the Republic of Zimbabwe (ECF No. 23)…………………………………………………………....…………..JA36

Return of Service (ECF No. 24)…………………………….....……………JA63

Declaration of John Sangwa, S.C. and Exhibits (ECF 28-1)…………………JA66

Declaration of Michael Mundashi, S.C. and Exhibits (ECF 29-2)………......JA128

Motion to Dismiss the Complaint by ZMDC (ECF No. 30)…..…....……….JA134

Declaration of Jacob Mutevedzi (ECF No. 30-2)…………………….......…JA150

Declaration of Steven K. Davidson (ECF. No. 32-2)…………………..……JA156

Exhibit 1-3 in support of Declaration of Steven K. Davidson (ECF No. 32-3)...............................................................................................................JA158

Memorandum Opinion and Order dated March 22, 2023 (ECF No 38).……………………………………………………………........….JA165

Amended Complaint (ECF No. 40)……………………………….…………JA207

Arbitration Award (ECF No. 40-1)…………………….………………..….JA228

Memorandum of Understanding (ZMDC and Amari Holdings Limited) (ECF No. 40-2).……………………………………………………..…...……..JA268

Memorandum of Understanding (ZMDC and Amaplat (Mauritius) Limited) (ECF No. 40-4)………………..………………………......………..…….JA284

Letter from Titan Law to Zimbabwe, dated Jan. 12, 2021 (ECF No. 40-6)....JA301

Letter from Titan Law to Zimbabwe, dated Dec. 17, 2021 (ECF No. 40-7)...JA305

Motion to Dismiss by Defendants (ECF No. 42)..........................................JA308

Memorandum in Opposition to Motion to Dismiss (ECF No. 45).................JA343

Declaration of Sternford Moyo and Exhibits (ECF No. 45-1).........................JA392

Declaration of Steven K. Davidson (ECF No. 45-2)......................................JA464

U.S. International Trade Administration Country Commercial Guide Zimbabwe (ECF No. 45-3)...........................................................................................JA471

Zimbabwe Mining Development Corporation Act (ECF No. 45-4)................JA478

Mines and Minerals Act, 1961 (ECF No. 45-5)..............................................JA493

Nyamunda & Mukwambo Article (ECF No. 45-6)........................................JA664

2017 Zimbabwean Parliament Report (ECF No. 45-7)..................................JA688

Mawowa Article (ECF No. 45-8).................................................................JA710

Nehanda Radio Article (ECF No. 45-9)........................................................JA728

Bulawayo24 Article (ECF No. 45-10)..........................................................JA732

The Zimbabwean Article (ECF No. 45-11)....................................................JA746
..
The Citizen News Article (ECF No. 45-12)...................................................JA750

Murombo Article (ECF No. 45-13)..............................................................JA756

Mubayiwa v. ZMDC Judgment (ECF No. 45-14)..........................................JA791

Judgment Dismissing Criminal Charges (ECF No. 45-15)............................JA801

International Crisis Group Report (ECF No. 45-16).....................................JA815

Letter from Amari to ZMDC, dated October 19, 2010 (ECF No. 45-17)........JA825

Letter from Amari to ZMDC, dated October 25, 2010 (ECF No. 45-18.........JA828

Letter from Nunn to ZMDC (ECF 45-19).......................................................JA833

Affidavit of Mark Summers (ECF No. 45-20)................................................JA841

Letter from ZMDC to Amari, dated November 10, 2010 (ECF No. 45-21)....JA871

2013 Parliamentary Committee Report (ECF No. 45-22)..............................JA874

The Herald Article (ECF No. 45-23).............................................................JA903

Kubatana Article (ECF No. 45-24)...............................................................JA913

Article re Russian Investment in Mine (ECF No. 45-25)...............................JA920

Moscow Times Article (ECF No. 45-26)........................................................JA925

Peoples Dispatch Article (ECF No. 45-27).....................................................JA929

Executive Order 13469 (ECF No. 45-28)......................................................JA939

Treasury Department Press Release, dated July 25, 2008 (ECF No. 45-29)...JA941

Treasury Department Press Release, dated December 12, 2022 (ECF No. 45-30)..............................................................................................................JA944

Treasury Department Remarks, dated July 25, 2008 (ECF No. 45-31)...........JA948

State Department Press Release, dated September 14, 2022 (ECF No. 45-32)..............................................................................................................JA954

State Department 2023 Investment Climate Statement for Zimbabwe (ECF No. 45-33)..............................................................................................................JA958

State Department 2022 Investment Climate Statement for Zimbabwe (ECF No. 45-34)..............................................................................................................JA987

State Department 2021 Investment Climate Statement for Zimbabwe (ECF No. 45-35)............................................................................................................JA1015

State Department 2020 Investment Climate Statement for Zimbabwe (ECF No. 45-36)............................................................................................................JA1041

State Department 2019 Investment Climate Statement for Zimbabwe (ECF No. 45-37)............................................................................................................JA1063

State Department 2018 Investment Climate Statement for Zimbabwe (ECF No. 45-38)............................................................................................................JA1086

State Department 2017 Investment Climate Statement for Zimbabwe (ECF No. 45-39)............................................................................................................JA1110

Congressional Testimony, dated July 18, 2013 (ECF No. 45-40)................JA1133

Mining Zimbabwe Article (ECF No. 45-41)................................................JA1137

Memorandum re Transfer of ZMDC Shareholding to Defold, dated April 14, 2022 (ECF No. 45-42).................................................................................JA1142

Reply to Opposition to Motion Dismiss (ECF No. 48)................................JA1144

Memorandum Opinion and Order dated February 9, 2024 (ECF No. 51).....JA1172

Notice of Appeal (ECF No. 52)....................................................................JA1193

APPEAL,TYPE-E

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:22-cv-00058-CRC

AMAPLAT MAURITIUS LTD. et al v. ZIMBABWE MINING DEVELOPMENT CORPORATION et al
Assigned to: Judge Christopher R. Cooper
Case in other court: USCA, 24-07030
Cause: 09:0202 Award under Convention on Foreign Arbitral Awards

Date Filed: 01/10/2022
Jury Demand: None
Nature of Suit: 896 Arbitration
Jurisdiction: Federal Question

**Plaintiff**

**AMAPLAT MAURITIUS LTD.** represented by

**Joseph Myer Sanderson**
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
212-378-7615
Fax: 212-506-3950
Email: josanderson@steptoe.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Niyati Ahuja**
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
510-570-5831
Email: nahuja@steptoe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven K. Davidson**
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
202-429-8077
Fax: 202-429-3902
Email: sdavidson@steptoe.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AMARI NICKEL HOLDINGS ZIMBABWE LTD.** represented by

**Joseph Myer Sanderson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Niyati Ahuja**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven K. Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ZIMBABWE MINING DEVELOPMENT CORPORATION** represented by

**Rodney Quinn Smith , II**
GST LLP
1111 Brickell Avenue
Suite 2715
Miami, FL 33131
305-856-7723
Email: quinn.smith@gstllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bethel Kassa**
GST LLP
2600 Virginia Avenue
Suite 205
Washington, DC 20037
202-848-2166
Email: bethel.kassa@gstllp.com
*TERMINATED: 05/14/2024*
*ATTORNEY TO BE NOTICED*

**Katherine A. Sanoja**
GST LLP
Florida
1111 Brickell Avenue
Suite 2715
Miami, FL 33131
305-856-7723
Email: katherine.sanoja@gstllp.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE** represented by

**Rodney Quinn Smith , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bethel Kassa**
(See above for address)
*TERMINATED: 05/14/2024*
*ATTORNEY TO BE NOTICED*

**Katherine A. Sanoja**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**REPUBLIC OF ZIMBABWE** represented by **Rodney Quinn Smith , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bethel Kassa**
(See above for address)
*TERMINATED: 05/14/2024*
*ATTORNEY TO BE NOTICED*

**Katherine A. Sanoja**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/10/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number ADCDC-8969833) filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Civil Cover Sheet, # 9 Summons of Chief Mining Commissioner, # 10 Summons of Zimbabwe Mining Development Corporation, # 11 Summons of Republic of Zimbabwe)(Davidson, Steven) (Entered: 01/10/2022) |
| 01/10/2022 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMAPLAT MAURITIUS LTD. (Davidson, Steven) (Entered: 01/10/2022) |
| 01/10/2022 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMARI NICKEL HOLDINGS ZIMBABWE LTD. (Davidson, Steven) (Entered: 01/10/2022) |
| 01/10/2022 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Joseph M. Sanderson, Filing fee $ 100, receipt number BDCDC-8970331. Fee Status: Fee Paid. by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Declaration of J. Sanderson in Support of Motion for Admission Pro Hav Vice, # 2 Text of Proposed Order)(Davidson, Steven) (Entered: 01/10/2022) |
| 01/11/2022 | | Case Assigned to Judge Christopher R. Cooper. (zsb) (Entered: 01/11/2022) |
| 01/12/2022 | | MINUTE ORDER granting 4 Motion for Leave to Appear Pro Hac Vice of Joseph M. Sanderson. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Christopher R. Cooper on 1/12/2022. (lccrc2) (Entered: 01/12/2022) |
| 01/13/2022 | 5 | NOTICE of Appearance by Joseph Myer Sanderson on behalf of All Plaintiffs (Sanderson, Joseph) (Entered: 01/13/2022) |
| 01/19/2022 | 6 | SUMMONS (3) Issued Electronically as to CHIEF MINING COMMISSIONER MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION. (Attachments: # 1 Notice and Consent)(rj) . (Entered: 01/19/2022) |

| | | |
|---|---|---|
| 03/08/2022 | 7 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Republic of Zimbabwe)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 03/08/2022) |
| 03/08/2022 | 8 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Zimbabwe Mining Development Corporation)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 03/08/2022) |
| 03/08/2022 | 9 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Ministry of Mines of Zimbabwe)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 03/08/2022) |
| 03/08/2022 | 10 | REQUEST from Plaintiffs for the Clerk to effect service of one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (See Docket Entries 7 8 9 to view document) (zjf) (Entered: 03/08/2022) |
| 03/08/2022 | 11 | CERTIFICATE OF CLERK of mailing one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state on Defendants, by registered mail, return receipt requested, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (Attachments: # 1 Postal Receipts) (zjf) (Entered: 03/08/2022) |
| 06/10/2022 | 12 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Zimbabwe Mining Development Corporation* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 06/10/2022) |
| 06/10/2022 | 13 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Ministry of Mines of Zimbabwe)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 06/10/2022) |
| 06/10/2022 | 14 | AFFIDAVIT REQUESTING FOREIGN MAILING *(Republic of Zimbabwe)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 06/10/2022) |
| 06/13/2022 | 15 | REQUEST from AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD. for the Clerk to effect service of one copy of the notice of suit, summons and complaint, together with a translation of each into the official language of the foreign state, by DHL, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. 1608(b)(3)(B). (zeg) (Entered: 06/13/2022) |
| 06/13/2022 | 16 | REQUEST from AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD. for the Clerk to effect service of one copy of the notice of suit, summons and complaint, together with a translation of each into the official language of the foreign state, by DHL, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. 1608(b)(3)(B). (zeg) (Entered: 06/13/2022) |
| 06/13/2022 | 17 | REQUEST from AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD. for the Clerk to effect service of one copy of the notice of suit, summons and complaint, together with a translation of each into the official language of the foreign state, by DHL, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. 1608(b)(3)(B). (zeg) (Entered: 06/13/2022) |
| 06/13/2022 | 18 | CERTIFICATE OF CLERK of mailing one copy of the notice of suit, summons and complaint, together with a translation of each into the official language of the foreign state on 6/13/2022, by DHL, to the agency or instrumentality of the foreign state, pursuant to 28 |

| | | |
|---|---|---|
| | | U.S.C. 1608(b)(3)(B). (Attachment: # 1 Waybill 1, # 2 Waybill 2, # 3 Waybill 3) (zeg) (Entered: 06/13/2022) |
| 06/23/2022 | 19 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to REPUBLIC OF ZIMBABWE served on 6/20/2022, answer due 8/19/2022. (Attachments: # 1 Exhibit 1 (DHL waybill, the tracking receipt, and the proof of delivery))(Davidson, Steven) (Entered: 06/23/2022) |
| 06/23/2022 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE served on 6/20/2022, answer due 8/19/2022. (Attachments: # 1 Exhibit 1 (DHL waybill, the tracking receipt, and the proof of delivery))(Davidson, Steven) (Entered: 06/23/2022) |
| 08/18/2022 | 21 | NOTICE of Appearance by Rodney Quinn Smith, II on behalf of CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE (Smith, Rodney) (Entered: 08/18/2022) |
| 08/19/2022 | 22 | NOTICE of Appearance by Katherine A. Sanoja on behalf of CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE (Sanoja, Katherine) (Entered: 08/19/2022) |
| 08/19/2022 | 23 | MOTION to Dismiss *the Complaint* by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE. (Attachments: # 1 Exhibit 1-1998 ICC Arbitration Rules, # 2 Exhibit 2-Notice of Registration by the Zambian High Court, # 3 Exhibit 3- Likando Kalaluka SC Expert Report, # 4 Text of Proposed Order)(Smith, Rodney) (Entered: 08/19/2022) |
| 08/19/2022 | 24 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to ZIMBABWE MINING DEVELOPMENT CORPORATION served on 8/10/2022, answer due 10/9/2022. (Sanderson, Joseph) (Entered: 08/19/2022) |
| 08/19/2022 | 25 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Bethel Kassa, Filing fee $ 100, receipt number ADCDC-9457255. Fee Status: Fee Paid. by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE. (Attachments: # 1 Declaration in support of the motion for admission pro hac vice, # 2 Exhibit Certificate of good standing, # 3 Text of Proposed Order)(Sanoja, Katherine) (Entered: 08/19/2022) |
| 08/22/2022 | | MINUTE ORDER: The Court denies without prejudice the 25 Motion for Admission of Attorney Pro Hac Vice as to Bethel Kassa. It appears from the filing that Attorney Kassa practices law from an office located in the District of Columbia. Under this Court's rules, any attorney who practices law from an office located in the District of Columbia must be a member of the Bar of this Court to submit papers to this Court. See LCvR 83.2(c)(2) & Comment to LCvR 83.2(c)(2). Accordingly, Attorney Kassa is ineligible for admission pro hac vice, and must instead apply for admission to the Bar of this Court. But Attorney Kassa may renew her pro hac vice motion once she notifies the Court that her application for admission to the Bar of this Court has been submitted and is pending. So Ordered. Signed by Judge Christopher R. Cooper on 8/22/2022. (lccrc2) (Entered: 08/22/2022) |
| 08/24/2022 | 26 | Consent MOTION for Briefing Schedule *(Joint)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 08/24/2022) |
| 08/25/2022 | | MINUTE ORDER granting 26 Motion for Briefing Schedule. Plaintiffs' opposition brief is now due September 20, 2022 and Defendants' reply brief is now due October 6, 2022. Signed by Judge Christopher R. Cooper on 8/25/2022. (lccrc2) (Entered: 08/25/2022) |

| | | |
|---|---|---|
| 09/19/2022 | 27 | Consent MOTION for Briefing Schedule by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 09/19/2022) |
| 09/19/2022 | | MINUTE ORDER granting the parties' 27 Motion for Briefing Schedule. Accordingly, Plaintiffs will file their Opposition to Defendants' Motion to Dismiss by September 23, 2022 and Defendants will file their Reply by October 11, 2022. Signed by Judge Christopher R. Cooper on 9/19/2022. (lccrc2) (Entered: 09/19/2022) |
| 09/23/2022 | 28 | Memorandum in opposition to re 23 Motion to Dismiss, filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Declaration Declaration of John Sangwa, S.C., # 2 Declaration Declaration of Michael M. Mundashi, S.C., # 3 Declaration Declaration of Steven Davidson, # 4 Exhibit Exhibits 1-3 in Support of Steve Davidson's Declaration, # 5 Text of Proposed Order Proposed Order)(Davidson, Steven) (Entered: 09/23/2022) |
| 10/11/2022 | 29 | REPLY to opposition to motion re 23 MOTION to Dismiss filed by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE. (Attachments: # 1 Exhibit 1. Declaration of Tinashe Chiparo, # 2 Exhibit 2. Declaration of Jacob Mutevedzi, # 3 Exhibit 3. Zimbabwe Mining Development Corporation Act, # 4 Exhibit 4. Zimbabwe Mines and Mineral Act, # 5 Exhibit 5. Funnekotter-Motion)(Smith, Rodney) Modified on 10/12/2022 to correct docket link/ text (zjm). (Entered: 10/11/2022) |
| 10/11/2022 | 30 | MOTION to Dismiss by ZIMBABWE MINING DEVELOPMENT CORPORATION. (Attachments: # 1 Exhibit 1. Declaration of Tinashe Chiparo, # 2 Exhibit 2. Declaration of Jacob Mutevedzi, # 3 Text of Proposed Order)(Smith, Rodney) (Entered: 10/11/2022) |
| 10/24/2022 | 31 | Consent MOTION for Briefing Schedule *(Joint)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 10/24/2022) |
| 10/25/2022 | | MINUTE ORDER granting the parties' 31 Motion for Briefing Schedule. Plaintiffs shall file their opposition by November 1, 2022 and Defendants shall file their reply by November 15, 2022. Signed by Judge Christopher R. Cooper on 10/25/2022. (lccrc2) (Entered: 10/25/2022) |
| 11/01/2022 | 32 | Memorandum in opposition to re 30 Motion to Dismiss filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Declaration of Michael M. Mundashi, # 2 Declaration of Steven K. Davidson, # 3 Exhibit 1-3 in Support of Declaration of Steven K. Davidson)(Davidson, Steven) (Entered: 11/01/2022) |
| 11/07/2022 | 33 | NOTICE of Appearance by Bethel Kassa on behalf of All Defendants (Kassa, Bethel) (Entered: 11/07/2022) |
| 11/15/2022 | 34 | REPLY to opposition to motion re 30 MOTION to Dismiss filed by ZIMBABWE MINING DEVELOPMENT CORPORATION. (Smith, Rodney) (Entered: 11/15/2022) |
| 12/05/2022 | 35 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Niyati Ahuja, Filing fee $ 100, receipt number ADCDC-9712916. Fee Status: Fee Paid. by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Declaration Declaration of Niyati Ahuja In Support of Motion, # 2 Text of Proposed Order Proposed Order)(Davidson, Steven) (Entered: 12/05/2022) |
| 12/05/2022 | | NOTICE OF ERROR re 35 Motion for Leave to Appear Pro Hac Vice; emailed to sdavidson@steptoe.com, cc'd 6 associated attorneys -- The PDF file you docketed contained errors: 1. **Please note the following deficiency and file/refile document as instructed**, 2. Declaration must have an original, ink signature; refile using the event **Declaration**, 3. Pro Hac Vice motion must be accompanied by a Certificate of Good |

| | | |
|---|---|---|
| | | Standing issued within the last 30 days (LCvR 83.2(c)(2)). Please file certificate as an Errata (zjm, ) (Entered: 12/05/2022) |
| 12/09/2022 | 36 | DECLARATION by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD. re 35 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Niyati Ahuja, Filing fee $ 100, receipt number ADCDC-9712916. Fee Status: Fee Paid. filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Errata Certificate of Good Standing)(Davidson, Steven) (Entered: 12/09/2022) |
| 12/12/2022 | | MINUTE ORDER granting Plaintiffs' 35 Motion for Leave to Appear Pro Hac Vice for Attorney Niyati Ahuja. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Christopher R. Cooper on 12/12/2022. (lccrc2) (Entered: 12/12/2022) |
| 12/20/2022 | 37 | NOTICE of Appearance by Niyati Ahuja on behalf of AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD. (Ahuja, Niyati) (Entered: 12/20/2022) |
| 03/22/2023 | 38 | MEMORANDUM OPINION AND ORDER granting in part and denying in part 23 the Republic of Zimbabwe's and Chief Mining Commissioner's Motion to Dismiss; and granting 30 Zimbabwe Mining Development Corporation's Motion to Dismiss. See full Memorandum Opinion and Order for details. Signed by Judge Christopher R. Cooper on 3/22/2023. (lccrc1) (Entered: 03/22/2023) |
| 03/23/2023 | | Set/Reset Deadlines: Amended Complaint due by 4/24/2023. (lsj) (Entered: 03/23/2023) |
| 04/19/2023 | 39 | Consent MOTION for Extension of Time to *File Amended Complaint* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Text of Proposed Order)(Davidson, Steven) (Entered: 04/19/2023) |
| 04/20/2023 | | MINUTE ORDER granting Plaintiffs' 39 Consent Motion for Extension. Plaintiffs' amended complaint is due by May 24, 2023. Signed by Judge Christopher R. Cooper on 4/20/2023. (lccrc1) (Entered: 04/20/2023) |
| 05/24/2023 | 40 | AMENDED COMPLAINT against CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Exhibit A - Final Arbitration Award, # 2 Exhibit B - Amari Memorandum of Understanding, # 3 Exhibit C - Amari Novation Deed, # 4 Exhibit D - Amaplat Memorandum of Understanding, # 5 Exhibit E - Zambian Judgment On Award, # 6 Exhibit F - January 12, 2021 Letter from Titan Law to Government, # 7 Exhibit G - December 17, 2021 Letter from Titan Law to Government, # 8 Exhibit H - U.S. State Department Zimbabwe Investment Climate Report 2022, # 9 Exhibit I - Chitando appoints new boards for parastatals - Newsday Zimbabwe, # 10 Exhibit J - Workers Union Welcomes Tagwirei Take Over Of Govt-Owned Gold Mines - New Zimbabwe, # 11 Exhibit K - Zim govt is plotting to strip state mine assets to hide from US$467m in legal claims, but there's resistance from within - newZWire, # 12 Exhibit L - Tycoon Seen Scoring From Zimbabwes $3.4 Billion Off Budget Debt - 360Mozambique, # 13 Exhibit M - Govt to offset debt with diamonds - Business Times, # 14 Exhibit N - Mugabe lifts lid on arms-for-minerals deal with China - New Zimbabwe, # 15 Exhibit O - Ownership Issues and International Sanctions in Marange - The Case of Anjin - Rough Polished, # 16 Exhibit P - Zim army firm own 40 pc stake in Anjin diamond mine - report - Rough Polished)(Davidson, Steven) (Entered: 05/24/2023) |
| 06/06/2023 | 41 | MOTION for Extension of Time to *Respond to the Amended Complaint* by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF |

| | | |
|---|---|---|
| | | ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION. (Attachments: # 1 Text of Proposed Order)(Smith, Rodney) (Entered: 06/06/2023) |
| 06/07/2023 | | MINUTE ORDER granting Defendants' 41 Unopposed Motion for Extension of Time. Defendants shall answer or otherwise respond to the Amended Complaint by July 6, 2023. Signed by Judge Christopher R. Cooper on 6/7/2023. (lccrc1) (Entered: 06/07/2023) |
| 07/06/2023 | 42 | MOTION to Dismiss *Amended Complaint* by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION. (Attachments: # 1 Affidavit Second Declaration of Tinashe Chiparo)(Sanoja, Katherine) (Entered: 07/06/2023) |
| 07/18/2023 | 43 | Consent MOTION for Briefing Schedule *re Defendants' Pending Motion to Dismiss* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Text of Proposed Order)(Davidson, Steven) (Entered: 07/18/2023) |
| 07/18/2023 | | MINUTE ORDER granting the parties' 43 Motion for Briefing Schedule. Plaintiffs shall file their opposition to Defendants' 42 motion to dismiss by August 3, 2023 and Defendants shall file their reply by August 17, 2023. Signed by Judge Christopher R. Cooper on 7/18/2023. (lccrc2) (Entered: 07/18/2023) |
| 08/02/2023 | 44 | Consent MOTION for Briefing Schedule *(Revised)* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Text of Proposed Order)(Davidson, Steven) (Entered: 08/02/2023) |
| 08/02/2023 | | MINUTE ORDER granting Plaintiffs' 44 Motion for Briefing Schedule. Plaintiffs shall respond to Defendants' 42 Motion to Dismiss by August 10, 2023 and Defendants shall file any reply by August 28, 2023. Signed by Judge Christopher R. Cooper on 8/2/2023. (lccrc2) (Entered: 08/02/2023) |
| 08/10/2023 | 45 | Memorandum in opposition to re 42 Motion to Dismiss, *the Amended Complaint* filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Attachments: # 1 Declaration of Sternford Moyo and Exhibits A-C, # 2 Declaration of Steven K. Davidson, # 3 Exhibit A-U.S. International Trade Administration Country Commercial Guide Zimbabwe, # 4 Exhibit B-Zimbabwe Mining Development Corporation Act 1983, # 5 Exhibit C-Mines and Minerals Act 1961, # 6 Exhibit E-Nyamunda & Mukwambo Article, # 7 Exhibit F-2017 Zimbabwean Parliament Portfolio Committee on Mines and Energy Report, # 8 Exhibit G-Mawowa Article, # 9 Exhibit H-Nehanda Radio, Mpofu appoints Masimirembwa to chair CMED, # 10 Exhibit I-Bulawayo24, Obert Mpofu, Masimirembwa, strange bedfellows, # 11 Exhibit J-The Zimbabwean, ZANU PF Infighting Blamed for the Suspension of Top Mining Officials, # 12 Exhibit K-The Citizen News Article, # 13 Exhibit L-Murombo Article, # 14 Exhibit M-Mubayiwa v. ZMDC Judgment, # 15 Exhibit N-Judgment Dismissing Criminal Charges, # 16 Exhibit O-International Crisis Group Report, # 17 Exhibit P-October 19, 2010 Letter from Amari to ZMDC, # 18 Exhibit Q-October 25, 2010 Letter from Amari to ZMDC, # 19 Exhibit R-October 25, 2010 Letter from Nunn to ZMDC, # 20 Exhibit S-Affidavit of Mark Summers, # 21 Exhibit T-November 10, 2010 Letter from ZMDC to Amari, # 22 Exhibit U-2013 Parliamentary Committee Report, # 23 Exhibit V-The Herald, 3 Mining State Firms Boards Dissolved, # 24 Exhibit W-Kubatana Article, # 25 Exhibit X-Russians start $3bn mine in Zimbabwe, # 26 Exhibit Y-Moscow Times, Russian Companies Buy Into Zimbabwe Platinum Field, # 27 Exhibit Z-Peoples Dispatch, The Zimbabwean army expands its influence, # 28 Exhibit AA-Executive Order 13469, # 29 Exhibit BB-July 25, 2008 Treasury Department Press Release, # 30 Exhibit CC-December 12, 2022 Treasury Department Press Release, # 31 Exhibit DD-September 30, 2009 Treasury Department Remarks, # 32 Exhibit EE-September 15, 2022 State Department Press Release, # 33 Exhibit FF-State Department 2023 Investment Climate Statement for Zimbabwe, # 34 Exhibit GG-State Department 2022 Investment Climate Statement for Zimbabwe, # 35 |

| | | |
|---|---|---|
| | | Exhibit HH-State Department 2021 Investment Climate Statement for Zimbabwe, # 36 Exhibit II-State Department 2020 Investment Climate Statement for Zimbabwe, # 37 Exhibit JJ-State Department 2019 Investment Climate Statement for Zimbabwe, # 38 Exhibit KK-State Department 2018 Investment Climate Statement for Zimbabwe, # 39 Exhibit LL-State Department 2017 Investment Climate Statement for Zimbabwe, # 40 Exhibit MM-July 18, 2013 Congressional Testimony, # 41 Exhibit NN-Mining Zimbabwe Article, # 42 Exhibit OO-April 14, 2022 Memorandum re Transfer of ZMDC Shareholding to Defold, # 43 Text of Proposed Order)(Davidson, Steven) (Entered: 08/10/2023) |
| 08/10/2023 | 46 | Cross MOTION for Discovery *Conditional Cross-Motion for Jurisdictional Discovery* by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 08/10/2023) |
| 08/25/2023 | 47 | Unopposed MOTION for Extension of Time to File Response/Reply by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION. (Attachments: # 1 Exhibit A. Proposed Order)(Smith, Rodney) (Entered: 08/25/2023) |
| 08/28/2023 | | MINUTE ORDER granting 47 Defendants' Motion for Extension of Time to File Response/Reply in support of 42 Defendants' Motion to Dismiss. Defendants' reply shall be submitted by September 5, 2023. Signed by Judge Christopher R. Cooper on 8/28/2023. (lccrc2) (Entered: 08/28/2023) |
| 09/05/2023 | 48 | REPLY to opposition to motion re 42 MOTION to Dismiss *Amended Complaint* filed by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION. (Attachments: # 1 Affidavit Declaration of Quinn Smith, # 2 Affidavit Declaration of Dominic Muzawazi, # 3 Exhibit A. UK Sanctions, # 4 Exhibit B. EU Sanctions, # 5 Exhibit C. Amari Registration Info, # 6 Exhibit D. Amaplat Registration Info, # 7 Exhibit E. Article on Kropz, # 8 Exhibit F. Application before Ontario Court, # 9 Exhibit G. Belgium Court Judgment, # 10 Exhibit H. ZMDC 2012 Annual Report, # 11 Exhibit I. ZMDC Webpage, # 12 Exhibit J. STF Webpage, # 13 Exhibit K. STF Statement in TMR Energy, # 14 Exhibit L. Declaration in TMR Energy Case, # 15 Exhibit M. GAO Report, # 16 Exhibit O. UK Regulations on BVI, # 17 Exhibit P. Study on State Ownership of Minerals commissioned by World Bank, # 18 Exhibit Q. Form 10K filed by Fannie Mae, # 19 Exhibit R. ZMDC 2019 Annual Report, # 20 Exhibit S. ZMDC 2020 Annual Report, # 21 Exhibit T. US Report on EU Sanctions, # 22 Exhibit U. Zimbabwe Evidence Act, # 23 Exhibit V. Zimbabwe Corporate Governance Act, # 24 Exhibit W. Zimbabwe Procurement Act, # 25 Exhibit X. Zimbabwe Joint Ventures Act, # 26 Exhibit Y. ZIDA Act, # 27 Exhibit Z. Zimbabwe Public Finance Mgmt Act, # 28 Exhibit AA. Zimbabwe Public Debt Mgmt Act)(Smith, Rodney) (Entered: 09/05/2023) |
| 09/05/2023 | 49 | Memorandum in opposition to re 46 Motion for Discovery filed by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION. (Smith, Rodney) (Entered: 09/05/2023) |
| 09/12/2023 | 50 | REPLY to opposition to motion re 46 Cross MOTION for Discovery *Conditional Cross-Motion for Jurisdictional Discovery* filed by AMAPLAT MAURITIUS LTD., AMARI NICKEL HOLDINGS ZIMBABWE LTD.. (Davidson, Steven) (Entered: 09/12/2023) |
| 02/09/2024 | 51 | MEMORANDUM OPINION AND ORDER denying 42 the Republic of Zimbabwe and Zimbabwe Mining Development Corporation's Motion to Dismiss and denying as moot 46 Plaintiffs' Cross-Motion for Jurisdictional Discovery. The 40 Amended Complaint shall be the operative complaint in this case, and all Defendants shall file an answer to the Amended Complaint by March 11, 2024. See full Memorandum Opinion and Order for |

| | | |
|---|---|---|
| | | details. Signed by Judge Christopher R. Cooper on 2/9/2024. (lccrc3) (Entered: 02/09/2024) |
| 03/08/2024 | 52 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 51 Order on Motion to Dismiss, Order on Motion for Discovery , Set/Reset Deadlines, 38 Order on Motion to Dismiss by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION, REPUBLIC OF ZIMBABWE. Filing fee $ 605, receipt number ADCDC-10743723. Fee Status: Fee Paid. Parties have been notified. (Smith, Rodney) Modified on 3/8/2024 to add docket link/correct docket text (zjm). (Entered: 03/08/2024) |
| 03/08/2024 | 53 | Transmission of the Notice of Appeal, Memorandum and order Appealed and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 52 Notice of Appeal to DC Circuit Court,. (zjm) (Entered: 03/08/2024) |
| 03/11/2024 | | USCA Case Number 24-7030 for 52 Notice of Appeal to DC Circuit Court, filed by CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION, REPUBLIC OF ZIMBABWE. (znmw) (Entered: 03/11/2024) |
| 05/14/2024 | 54 | NOTICE OF WITHDRAWAL OF APPEARANCE as to CHIEF MINING COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE, REPUBLIC OF ZIMBABWE, ZIMBABWE MINING DEVELOPMENT CORPORATION. Attorney Bethel Kassa terminated. (Kassa, Bethel) (Entered: 05/14/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/13/2024 22:20:48 | | | |
| **PACER Login:** | GSTLLP2018 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00058-CRC |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Amaplat Mauritius Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius;
and

Amari Nickel Holdings Zimbabwe Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius,

Plaintiffs,

v.

Zimbabwe Mining Development Corporation,
90 Mutare Road, Msasa, Harare, Zimbabwe;

The Chief Mining Commissioner, Ministry of
Mines of Zimbabwe,
6th Floor, ZIMRE Centre, Cnr. Leopold
Takawira Street/Kwame Nkrumah Avenue,
Private Bag 7709, Causeway, Harare,
Zimbabwe;

and the Republic of Zimbabwe,
c/o Head of the Ministry of Foreign Affairs,
Ministry of Foreign Affairs, P.O. Box 4240,
Munhumutapa Building, Cnr. Samora Machel
Avenue/Sam Nujoma Street, Harare,
Zimbabwe

Defendants.

Civil Action No.

**COMPLAINT**

Plaintiffs Amaplat Mauritius Ltd. (“Amaplat”) and Amari Nickel Holdings Zimbabwe Ltd. (“Amari,” and together with Amaplat, “Plaintiffs”), by their attorneys, Steptoe & Johnson LLP, allege upon personal knowledge as to their own acts and upon information and belief as to all other acts, as follows:

## I.      NATURE OF THE ACTION

1.      This is an action to recognize and enforce the judgment of the High Court of

Zambia, at the Commercial Registry at Lusaka, dated August 9, 2019, No. 2019/HPC/ARB/No.

0337 (the "Judgment"), in favor of Plaintiffs and against Defendants Zimbabwe Mining

Development Corporation ("ZMDC") and the Chief Mining Commissioner, Ministry of Mines of

Zimbabwe (collectively, "Judgment Defendants"), pursuant to the Uniform Foreign-Money

Judgments Recognition Act, D.C. Code § 15-361, *et seq.*  The Judgment recognized and

enforced an arbitral award entered in favor of Plaintiffs and against Judgment Defendants, which

are instrumentalities of and alter egos of the Republic of Zimbabwe, under the terms of two

arbitration agreements that provided in each instance for final and binding resolution of disputes

by international commercial arbitration under the ICC International Court of Arbitration Rules

(the "ICC Rules"), in which the ICC International Court of Arbitration set the location of the

arbitration as Zambia.

2.      The arbitral award concerns Defendants' breaches of two memoranda of

understanding concerning mining concessions in Zimbabwe ("MOUs").  The arbitral tribunal

found the Defendants breached those MOUs by, inter alia, expropriating the concessions causing

millions of dollars in damages being awarded to the Plaintiffs.  The arbitral tribunal found in

favor of the Plaintiffs and ordered the Judgment Defendants to pay approximately $50 million

plus interest.

3.      Defendants failed to pay the amounts due under the arbitration award and have

similarly failed to satisfy the Judgment that the Zambian court issued based on the award.

Following issuance of the award, Plaintiffs engaged in extensive negotiations with Defendants,

through the Zimbabwean government, in an effort to seek an amicable resolution in their

compliance with the award. Defendants' representatives in the Zimbabwean government

repeatedly represented that they would pay the amounts due and recognized the award sum as a public debt.  They even represented that specific assets of the Republic of Zimbabwe would be set aside to ensure payment of the liability owing to the Plaintiffs.  But despite aiming to finalize these amicable negotiations by the end of 2021, Defendants never made good on their promises. As such, Plaintiffs now seek to enforce their rights in this Court.

## II.   JURISDICTION AND VENUE.

4.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1330(a) because this is a "nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement."

5.     ZMDC is a foreign state within the meaning of 28 U.S.C. § 1603(a) because it is an agency or instrumentality of, and an alter ego of, the Republic of Zimbabwe.

6.     The Chief Mining Commissioner, Ministry of Mines of Zimbabwe, is a foreign state within the meaning of 28 U.S.C. § 1603(a) because it is an agency or instrumentality of, and an alter ego of, the Republic of Zimbabwe.

7.     The Republic of Zimbabwe is a foreign state within the meaning of 28 U.S.C. § 1603(a).

8.     Defendants are not entitled to immunity under the Foreign Sovereign Immunities Act or any applicable international agreement because the exceptions to foreign sovereign immunity set forth in 28 U.S.C. §§ 1605(a)(1) and 1605(a)(6) are satisfied.

9.     As set forth more fully below, the Judgment arises from an arbitration governed by the New York Convention, which is in force in all countries relevant to this action including

Zambia, Zimbabwe, and the United States, under arbitration agreements made by the foreign

state with Plaintiffs.

10.     As set forth more fully below, Defendants waived sovereign immunity by

agreeing to arbitrate under the ICC Rules, and by agreeing to and participating in arbitration

governed by the New York Convention in Zambia, which, like Zimbabwe, is and was a party to

the New York Convention.  Zimbabwe thereby contemplated enforcement of any arbitral award

in any of the other signatory states and waived sovereign immunity.  It is settled law that an

action to recognize a foreign judgment based upon an arbitral award is within the scope of such a

waiver because the cause of action is so closely related to the enforcement of an arbitral award.

11.     This Court has personal jurisdiction over the Defendants under 28 U.S.C.

§ 1330(b), because the requirements of 28 U.S.C. § 1330(a) are satisfied and service has or will

be made under 28 U.S.C. § 1608.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(f)(4), which provides for

venue in this Court for an action "brought against a foreign state or political subdivision thereof."

## III.     THE PARTIES

13.     Plaintiff Amari Nickel Holdings Zimbabwe Ltd. is a Company incorporated under

the laws of Mauritius.

14.     Plaintiff Amaplat Mauritius Ltd. is a Company incorporated under the laws of

Mauritius.

15.     Defendant ZMDC is a corporation incorporated under the laws of the Republic of

Zimbabwe, an agency or instrumentality of the Republic of Zimbabwe, and an alter ego of the

Republic of Zimbabwe.  It was created by the Zimbabwe Mining Development Corporation Act,

and by law the Republic of Zimbabwe appoints its Board of Directors, approves significant

actions, has the power to direct its actions, pays the debts of the Republic of Zimbabwe, and must be majority-owned by the Republic of Zimbabwe.

16. Defendant The Chief Mining Commissioner, Ministry of Mines of Zimbabwe is a governmental office or a governmental corporation sole existing under the laws of the Republic of Zimbabwe, an agency or instrumentality of the Republic of Zimbabwe, and an alter ego of the Republic of Zimbabwe.

17. Defendant Republic of Zimbabwe is a foreign state.

## IV. GENERAL ALLEGATIONS

### A. The Memoranda of Understanding and the Joint Venture.

18. As explained in greater detail in the underlying arbitral award, a true and correct copy of which is attached hereto as **Exhibit A**, on November 22, 2007, ZMDC and Amari Holdings Ltd. (“Amari BVI”) entered into a Memorandum of Understanding (the “Nickel MOU”), a true and correct copy of which is attached hereto as **Exhibit B**.

19. Under the Nickel MOU, Amari BVI and ZMDC agreed to incorporate a joint venture company called Zimari Nickel (Pvt.) Ltd., to prospect for nickel and develop a mine.

20. On June 6, 2008, Amari, Amari BVI, and ZMDC entered into a Deed of Novation, whereby Amari replaced Amari BVI as the counterparty to the Nickel MOU. A true and correct copy of the Deed of Novation is attached hereto as **Exhibit C**.

21. Similarly, on July 25, 2008, ZMDC and Amaplat entered into a Memorandum of Understanding (the “Platinum MOU”), a true and correct copy of which is attached hereto as **Exhibit D**.

22. Under the Platinum MOU, Amaplat and ZMDC agreed to incorporate a joint venture company called Zimari Platinum (Pvt.) Ltd., to prospect for metals including platinum and develop a mine.

**B.      The Dispute and Arbitration.**

23.      ZMDC purported to cancel the MOUs in November 2010.

24.      Both the Nickel MOU (Ex. B), at Article 11, and the Platinum MOU (Ex. D), at

Article 9, contained identical arbitration clauses providing that:

> In the event of a dispute or disputes arising, such disputes, controversies or differences between the Parties, which may arise out of or in relation to the MOU and which cannot be settled by the Board, the parties shall first try to resolve it amicably through negotiation. In the event that no settlement can be reached through negotiation in reasonable time, any Party may submit the dispute to the ICC International Court of Arbitration in Paris for arbitration in accordance with the procedural rules of arbitration of the said Arbitration Court in effect at the time of apply arbitration, the award of which shall be final and binding upon the Parties. The language in Arbitration shall be in English.

25.      The Nickel MOU and Platinum MOU thus constituted an agreement to resolve

disputes by "final and binding" commercial arbitration under the ICC Rules.

26.      Zimbabwe acceded to the New York Arbitration Convention on the Recognition

and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention") on

September 29, 1994.

27.      Zambia had acceded to the New York Convention on March 14, 2002.

28.      The arbitration was constituted under the applicable regime of the ICC Rules

following determination by the ICC Court that the arbitration would occur in Lusaka, Zambia.

29.      The Judgment Defendants participated actively in the highly contested

proceedings before the arbitral tribunal.

30.      However, on the third day of the hearing, the arbitrator who had been nominated

by the Judgment Defendants resigned and the Judgment Defendants refused to appoint a

replacement arbitrator.

31.      After contentious litigation before the Zambian courts and the ICC Court of

Arbitration over the composition of the panel, a reconstituted panel scheduled a continuation of the hearing.

32. On August 27, 2013, without any explanation, the Judgement Defendants indicated to the arbitral tribunal that they refused to further participate in the proceedings.

33. The arbitral tribunal issued a final award on January 12, 2014, finding that it continued to have jurisdiction over the dispute despite the Judgment Defendant's boycott of the remainder of the hearing. The tribunal found that the Plaintiffs successfully demonstrated their claims. It ordered US$42,882,000 in damages to Amaplat and US$3,900,000 in damages to Amari. The tribunal also ordered the Judgment Defendants to pay costs and expenses in the amount of US$2,220,583.74 and US$900,000 in tribunal costs of the arbitration, and interest. Ex. A at 36.

**C. The Zambian Judgment.**

34. After post-award proceedings in Zambian courts, in which Zimbabwe challenged the composition of the tribunal and its authority to issue an award, were resolved in Plaintiffs' favor, on August 9, 2019, the High Court for Zambia at the Commercial Registry at Lusaka issued the Judgment—formally, an Ex Parte Order for Leave to Register and Enforce the Final Arbitration Award, No. 2019/HPC/ARB/No. 0337, under Section 18 of the Arbitration Act, No. 19 of 2000, and Rules 15 and 16 of the Arbitration (Court Proceedings) Rules, 2001. A true and correct copy of the Judgment is attached hereto as **Exhibit E.**

35. The Judgment directed "that the Plaintiffs be at liberty to enforce in the same manner as a judgment or order to the same effect the Final Award dated 12th January 2014, of the Arbitrators: Stuart Isaacs QC, Chairman; Professor Doug Jones AO, as Co-Arbitrator; and Chikwendu Madumere as Co-Arbitrator appointed pursuant to Clause 11 of the Nickel Memorandum of Understanding dated 22nd November 2007, and Clause 9 of the Platinum

Memorandum of Understanding dated 25th July 2007, made between the Plaintiffs and the Defendants." Ex. E at 1-2. Plaintiffs served the Judgment on Defendants on 23 October 2019. Under Zambian law, the Judgment was stayed for 30 days or until the disposition of a timely proceeding to set aside the Judgment. No party filed a proceeding to set aside the Judgment and it became final.

36. Zambian law provides for a 12 year statute of limitations for an action on a judgment, which accrues on the date that the judgment becomes enforceable.

37. Accordingly, the Judgment is valid and enforceable in Zambia.

**D. Failed Negotiations between the Parties**

38. The parties participated in settlement discussions after the issuance of the Judgment, including two years of negotiations with the Reserve Bank of Zimbabwe, the Permanent Secretary of the Ministry of Mines & Mining Development, and the Attorney General.

39. On 12 January 2021, the Plaintiffs sent a letter to the Defendants highlighting their failure to pay the amounts due under the award and Judgment and noting that the arbitral award is a public debt has been acknowledged as such by the Attorney-General and the Minister of Mines & Mining Development. A copy of that letter is attached hereto as **Exhibit F**. The Defendants failed to make any payment.

40. Another letter later that year produced similar results. A copy of that letter is attached hereto as **Exhibit G**. Accordingly, Plaintiffs are forced to pursue this action to enforce the Judgment.

## V. CLAIM FOR RELIEF

**COUNT I**
**D.C. UNIFORM FOREIGN-COUNTRY MONEY JUDGMENTS RECOGNITION ACT**
**D.C. CODE § 15-361 *ET SEQ.***

41. Plaintiffs repeat and reallege each allegation contained in Paragraphs 1 through 40 above as if fully set forth herein.

42. The Judgment is a foreign money judgment under the Uniform Foreign-Country Money Judgments Recognition Act, D.C. Code § 15-361, *et seq*.

43. By providing "that the Plaintiffs be at liberty to enforce in the same manner as a judgment or order to the same effect the Final Award dated 12th January 2014," the Judgment granted recovery of a sum of money as provided in the Final Award. Ex. E. at 1.

44. The High Court for Zambia had jurisdiction over the Judgment Defendants and the subject-matter.

45. The Judgment is final, conclusive, and enforceable under the laws of Zambia.

46. The Judgment is not for taxes, fines, penalties, divorce, support, maintenance, or other domestic relations matters.

47. Plaintiffs are accordingly entitled to an order recognizing the Judgment and entering a judgment of this Court thereon that is conclusive and enforceable in the same manner and to the same extent as a judgment of this Court.

48. Plaintiffs are further entitled to an order recognizing that the Republic of Zimbabwe is the alter ego of the Judgment Defendants and is liable on the Judgment to the same extent as the Judgment Defendants.

49. Plaintiffs are further entitled to their reasonable attorneys' fees and costs, consistent with the Award's finding that the prevailing party was entitled to recovery of legal expenses and the law of the Republic of Zimbabwe, which is the chosen law of the parties'

agreements.

## VI.   PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs request entry of an order and judgment:

(a)   Recognizing and enforcing the Judgment;

(b)   Finding that the Republic of Zimbabwe is the alter ego of the Judgment Defendants;

(c)   Entering judgment against Defendants as provided by the Award, specifically:

    (i)   Against ZMDC and the Republic of Zimbabwe and in favor of Amaplat in the amount of US$42,882,000 in damages;

    (ii)   Against ZMDC and the Republic of Zimbabwe and in favor of Amari in the amount of US$3,900,000 in damages;

    (iii)   Against all Defendants jointly and severally and in favor of Plaintiffs jointly in the amount of US$2,220,583.74;

    (iv)   Against all Defendants jointly and severally and in favor of Plaintiffs jointly in the amount of US$900,000;

In each case, with post-award interest at 5% per annum from January 12, 2014 through the date of entry of the Judgment and post-Judgment interest at the Zambian statutory rate;

(d)   Awarding post-judgment interest at the Zambian statutory rate;

(e)   Awarding costs of this action and reasonable attorneys' fees; and

(f)   Awarding such other and further relief as this Court may deem just, proper, and equitable.

Dated: January 10, 2022

Respectfully submitted,

*/s/ Steven K. Davidson*

Steven K. Davidson (D.C. Bar No. 407137)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795
Telephone: 202 429 3000
Facsimile: 202 429 3902
sdavidson@steptoe.com

Robert W. Mockler
(application for admission pending)
Joseph M. Sanderson
(*pro hac vice* forthcoming)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Telephone: 212 506 3900
Facsimile: 212 506 3950
rmockler@steptoe.com
josanderson@steptoe.com

*Attorneys for Plaintiffs*

# Exhibit E



2019/HPC/ARB/No. 0337

IN THE HIGH COURT FOR ZAMBIA
AT THE COMMERCIAL REGISTRY
AT LUSAKA
(Civil Jurisdiction)

IN THE MATTER OF SECTION 18 OF THE ARBITRATION ACT No. 19 OF 2000

AND

IN THE MATTER OF ARBITRAL AWARD IN CASE No. 17720/ARP/MD/ TO THE ICC INTERNATIONAL COURT OF ARBITRATION

BETWEEN:

| | |
|---|---|
| AMAPLAT MAURITIUS LIMITED | FIRST PLAINTIFF |
| AMARI NICKEL HOLDINGS ZIMBABWE LIMITED | SECOND PLAINTIFF |
| AND | |
| ZIMBABWE MINING DEVELOPMENT CORPORATION | FIRST DEFENDANT |
| THE CHIEF MINING COMMISSIONER MINISTRY OF MINES OF ZIMBABWE | SECOND DEFENDANT |

---

EX PARTE ORDER FOR LEAVE TO REGISTER AND ENFORCE THE FINAL ARBITRATION AWARD

Pursuant to Section 18 of the Arbitration Act, No. 19 of 2000 and Rules 15 and 16 of the Arbitration (Court Proceedings) Rules, 2001

---

UPON HEARING Counsel for the Plaintiffs

AND UPON reading the Affidavit of one IAN SMALL-SMITH

IT IS HEREBY ORDERED pursuant to Section 18 of the Arbitration Act No. 19 of 2000, that the Plaintiffs be at liberty to enforce in the same manner as a judgment or order to the same effect the Final Award dated 12th January 2014, of the Arbitrators: Stuart Isaacs QC, Chairman; Professor Doug Jones AO, as Co-Arbitrator; and Chikwendu

Madumere as Co-Arbitrator appointed pursuant to Clause 11 of the Nickel Memorandum of Understanding dated 22nd November 2007, and Clause 9 of the Platinum Memorandum of Understanding dated 25th July 2008, made between the Plaintiffs and the Defendants.

AND that the Plaintiffs do bear the costs of and occasioned by this application.

PROVIDED THAT within 30 days after service of this Order on them, the Defendants may apply to set aside this Order and the award shall not be enforced until after the expiration of that period or if the Defendants apply within that period to set aside, until the application is finally disposed of.

Dated the ---------9th--------- day of ---------August--------- 2019.

-----------------------------------------------------------

THE HONOURABLE REGISTRAR

This Order was drawn by:

**SIMEZA, SANGWA & ASSOCIATES**

-----------------------------------------

Advocates for the Plaintiffs

Suite C, The Coliseum

Bwinjimfumu Road

Rhodes Park

LUSAKA

Tel.: 211 227484/227574

Fax No.: 211 220568

Email: info@simezasangwa.co.zm

2019/HPC/ARB/No. 0337

IN THE HIGH COURT FOR ZAMBIA

AT THE COMMERCIAL REGISTRY

AT LUSAKA

(Civil Jurisdiction)

IN THE MATTER OF SECTION 18 OF THE ARBITRATION ACT No. 19 OF 2000

AND

IN THE MATTER OF ARBITRAL AWARD IN CASE No. 17720/ARP/MD/ TO THE ICC INTERNATIONAL COURT OF ARBITRATION

BETWEEN:

| | |
|---|---|
| AMAPLAT MAURITIUS LIMITED | FIRST PLAINTIFF |
| AMARI NICKEL HOLDINGS ZIMBABWE LIMITED | SECOND PLAINTIFF |
| AND | |
| ZIMBABWE MINING DEVELOPMENT CORPORATION | FIRST DEFENDANT |
| THE CHIEF MINING COMMISSIONER MINISTRY OF MINES OF ZIMBABWE | SECOND DEFENDANT |

---

EX PARTE ORDER FOR LEAVE TO REGISTER AND ENFORCE THE FINAL ARBITRATION AWARD

Pursuant to Section 18 of the Arbitration Act, No. 19 of 2000 and Rules 15 and 16 of the Arbitration (Court Proceedings) Rules, 2001

---

**SIMEZA, SANGWA & ASSOCIATE**

Advocates for the Plaintiffs

Suite C, the Coliseum

Bwinjimfumu Road

Rhodes Park

LUSAKA

Tel.: 211 227484/227574

Fax No.: 211 220568

Email: info@imezasangwa.co.zm

CO 226
Rev. 6/2018

**UNITED STATES DISTRICT AND BANKRUPTCY COURTS**
**FOR THE DISTRICT OF COLUMBIA**

Amaplat Mauritius Ltd. and Amari Nickel Holdings Zimbabwe Ltd.

Plaintiff(s)

vs.

Civil Action No.: 1:22-cv-00058

Zimbabwe Mining Development Corporation,The Chief Mining Commissioner, Ministry of Mines oZimbabwe,

Defendant(s)

**AFFIDAVIT REQUESTING FOREIGN MAILING**

I, the undersigned, counsel of record for plaintiff(s), hereby request that the Clerk mail a copy of the summons and complaint (and notice of suit, where applicable) to (list name(s) and address(es) of defendants):

Zimbabwe Mining Development Corporation
90 Mutare Road,
MsasaHarare, Zimbabwe

by: (check one)

- ☐ certified or registered mail, return receipt requested
- ☑ DHL
- ☐ Fed Ex

pursuant to the provisions of: (check one)

- ☐ FRCP 4(f)(2)(C)(ii)
- ☐ 28 U.S.C. § 1608(a)(3)
- ☑ 28 U.S.C. § 1608(b)(3)(B)
- ☐ 28 U.S.C. § 1608(a)(4)

I certify that this method of service is authorized by the domestic law of (name of country): ZIMBABWE, and that I obtained this information by contacting the Overseas Citizens Services, U.S. Department of State.

/s/ Steven K. Davidson
(Signature)

Steven K. Davidson
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

(Name and Address)

CO 226
Rev. 6/2018

# UNITED STATES DISTRICT AND BANKRUPTCY COURTS
# FOR THE DISTRICT OF COLUMBIA

Amaplat Mauritius Ltd. and Amari Nickel Holdings Zimbabwe Ltd.

Plaintiff(s)

vs.

Civil Action No.: 1:22-cv-00058

Zimbabwe Mining Development Corporation,The Chief Mining Commissioner, Ministry of Mines of Zimbabwe,

Defendant(s)

## AFFIDAVIT REQUESTING FOREIGN MAILING

I, the undersigned, counsel of record for plaintiff(s), hereby request that the Clerk mail a copy of the summons and complaint (and notice of suit, where applicable) to (list name(s) and address(es) of defendants):

Ministry of Mines of Zimbabwe
c/o Ministry of Foreign Affairs for Zimbabwe
P.O. Box 4240
Munhumutapa Building Samora
Machel Avenue/ Sam Nujoma Street
Harare, Zimbabwe

by: (check one)

- ☐ certified or registered mail, return receipt requested
- ☑ DHL
- ☐ Fed Ex

pursuant to the provisions of: (check one)

- ☐ FRCP 4(f)(2)(C)(ii)
- ☑ 28 U.S.C. § 1608(a)(3)
- ☐ 28 U.S.C. § 1608(b)(3)(B)
- ☐ 28 U.S.C. § 1608(a)(4)

I certify that this method of service is authorized by the domestic law of (name of country): ZIMBABWE, and that I obtained this information by contacting the Overseas Citizens Services, U.S. Department of State.

/s/ Steven K. Davidson
(Signature)

Steven K. Davidson
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

(Name and Address)

CO 226
Rev. 6/2018

# UNITED STATES DISTRICT AND BANKRUPTCY COURTS
# FOR THE DISTRICT OF COLUMBIA

Amaplat Mauritius Ltd. and Amari Nickel Holdings Zimbabwe Ltd.

Plaintiff(s)

vs.

Civil Action No.: 1:22-cv-00058

Zimbabwe Mining Development Corporation,The Chief Mining Commissioner, Ministry of Mines of Zimbabwe,

Defendant(s)

## AFFIDAVIT REQUESTING FOREIGN MAILING

I, the undersigned, counsel of record for plaintiff(s), hereby request that the Clerk mail a copy of the summons and complaint (and notice of suit, where applicable) to (list name(s) and address(es) of defendants):

REPUBLIC OF ZIMBABWE
c/o Ministry of Foreign Affairs for Zimbabwe
P. O. Box 4240
Munhumutapa Building Samora
Machel Avenue/ Sam Nujoma Street
Harare, Zimbabwe

by: (check one)

- ☐ certified or registered mail, return receipt requested
- ☑ DHL
- ☐ Fed Ex

pursuant to the provisions of: (check one)

- ☐ FRCP 4(f)(2)(C)(ii)
- ☑ 28 U.S.C. § 1608(a)(3)
- ☐ 28 U.S.C. § 1608(b)(3)(B)
- ☐ 28 U.S.C. § 1608(a)(4)

I certify that this method of service is authorized by the domestic law of (name of country): ZIMBABWE, and that I obtained this information by contacting the Overseas Citizens Services, U.S. Department of State.

/s/ Steven K. Davidson
(Signature)

Steven K. Davidson
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

(Name and Address)

CO 939
Rev. 12/2020

**UNITED STATES DISTRICT AND BANKRUPTCY COURTS**
**FOR THE DISTRICT OF COLUMBIA**

AMAPLAT MAURITIUS LTD. et al
Plaintiff(s)

vs. Civil Action No.: 22-cv-00058-CRC

ZIMBABWE MINING DEVELOPMENT
Defendant(s)

**CERTIFICATE OF MAILING**

I hereby certify under penalty of perjury, that on the 13th day of June, 20 22, I mailed:

1. ☐ One copy of the summons and complaint by registered mail, return receipt requested, to the individual of the foreign state, pursuant to the provisions of FRCP 4(f)(2)(C)(ii).

2. ☐ One copy of the summons, complaint and notice of suit, together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested, to the head of the ministry of foreign affairs, pursuant to the provisions of 28 U.S.C. § 1608(a)(3).

3. ☐ Two copies of the summons, complaint and notice of suit, together with a translation of each into the official language of the foreign state, by certified mail, return receipt requested, to the U.S. Department of State, CA/OSC/L, SA-17, 10th Floor, Washington, DC 20522-1710, ATTN: Director of Overseas Citizens Services, pursuant to the provisions of 28 U.S.C. § 1608(a)(4).

4. ☒ One copy of the summons, complaint and notice of suit, together with a translation of each into the official language of the foreign state, by DHL, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. § 1608(b)(3)(B).

ANGELA D. CAESAR, CLERK

By: /s/ Erica Garmendez
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Amaplat Mauritius Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius;
and

Amari Nickel Holdings Zimbabwe Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius,

Plaintiffs,

v.

Zimbabwe Mining Development Corporation,
90 Mutare Road, Msasa, Harare, Zimbabwe;

The Chief Mining Commissioner, Ministry of
Mines of Zimbabwe,
6th Floor, ZIMRE Centre, Cnr. Leopold
Takawira Street/Kwame Nkrumah Avenue,
Private Bag 7709, Causeway, Harare,
Zimbabwe;

and the Republic of Zimbabwe,
c/o Head of the Ministry of Foreign Affairs,
Ministry of Foreign Affairs, P.O. Box 4240,
Munhumutapa Building, Cnr. Samora Machel
Avenue/Sam Nujoma Street, Harare,
Zimbabwe

Defendants.

Civil Action No. 1-22-cv-0058

**RETURN OF SERVICE**

On June 10, 2022, Plaintiffs filed an affidavit requesting foreign mailing to the Ministry of Foreign Affairs of the Republic of Zimbabwe via DHL. (Dkt. 14). On June 13, Plaintiffs requested that the Clerk effect service of one copy of the Summons, Complaint with Exhibits A

through G, Notice of Suit and all other papers thus far electronically filed on this Docket via DHL to the Ministry of Foreign Affairs of the Republic of Zimbabwe pursuant to 28 U.S.C. § 1608(a)(3). (Dkts. 15-17). The Clerk effected service via DHL and entered the Certificate of Mailing into the record. (Dkt. 18). No translations were required because English is an official language of Zimbabwe.

I HEREBY CERTIFY that, pursuant to 28 U.S.C. § 1608(a)(3), I caused a copy of the Summons, Complaint with Exhibits A through G, Notice of Suit and all other papers thus far electronically filed on this Docket to be served on the Ministry of Foreign Affairs of the Republic of Zimbabwe, by mailing the aforesaid documents to the said entity, addressed to the Republic of Zimbabwe, Ministry of Foreign Affairs, P.O. Box 4240 Munhumutapa Building, Samora Machel Avenue/ Sam Nujoma Street, Harare, Zimbabwe, which were delivered on June 20, 2022. True and correct copies of the DHL waybill, the tracking receipt, and the proof of delivery are attached as Exhibit 1. An individual named “KATSIKA” signed for the receipt of the package.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct.

Dated: June 23, 2022

Respectfully submitted,

*/s/ Steven K. Davidson*

Steven K. Davidson (D.C. Bar No. 407137)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795
Telephone: 202 429 3000
Facsimile: 202 429 3902
sdavidson@steptoe.com

Joseph M. Sanderson (admitted *pro hav vice*)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Telephone: 212 506 3900
Facsimile: 212 506 3950
josanderson@steptoe.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Amaplat Mauritius Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius;
and

Amari Nickel Holdings Zimbabwe Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius,

Plaintiffs,

v.

Zimbabwe Mining Development Corporation,
90 Mutare Road, Msasa, Harare, Zimbabwe;

The Chief Mining Commissioner, Ministry of
Mines of Zimbabwe,
6th Floor, ZIMRE Centre, Cnr. Leopold
Takawira Street/Kwame Nkrumah Avenue,
Private Bag 7709, Causeway, Harare,
Zimbabwe;

and the Republic of Zimbabwe,
c/o Head of the Ministry of Foreign Affairs,
Ministry of Foreign Affairs, P.O. Box 4240,
Munhumutapa Building, Cnr. Samora Machel
Avenue/Sam Nujoma Street, Harare,
Zimbabwe

Defendants.

Civil Action No. 1-22-cv-0058

**RETURN OF SERVICE**

On June 10, 2022, Plaintiffs filed an affidavit requesting foreign mailing to the Ministry of Mines of Zimbabwe via DHL. (Dkt. 13). On June 10, Plaintiffs requested that the Clerk effect service of one copy of the Summons, Complaint with Exhibits A through G, Notice of Suit

and all other papers thus far electronically filed on this Docket via DHL to the Ministry of Mines of Zimbabwe pursuant to 28 U.S.C. § 1608(a)(3). (Dkts. 15-17). The Clerk effected service via DHL and entered the Certificate of Mailing into the record. (Dkt. 18). No translations were required because English is an official language of Zimbabwe.

I HEREBY CERTIFY that, pursuant to 28 U.S.C. § 1608(a)(3), I caused a copy of the Summons, Complaint with Exhibits A through G, Notice of Suit and all other papers thus far electronically filed on this Docket to be served on the Ministry of Mines of Zimbabwe, by mailing the aforesaid documents to the said entity, addressed to the Ministry of Mines of Zimbabwe, Chief Mining Commissioner, P.O. Box 4240 Munhumutapa Building, Samora Machel Avenue/ Sam Nujoma Street, Harare, Zimbabwe, which were delivered on June 20, 2022. True and correct copies of the DHL waybill, the tracking receipt, and the proof of delivery are attached as Exhibit 1. An individual named “CHRISTINE” signed for the receipt of the package.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct.

Dated: June 23, 2022

Respectfully submitted,

*/s/ Steven K. Davidson*

Steven K. Davidson (D.C. Bar No. 407137)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795
Telephone: 202 429 3000
Facsimile: 202 429 3902
sdavidson@steptoe.com

Joseph M. Sanderson (admitted *pro hav vice*)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Telephone: 212 506 3900
Facsimile: 212 506 3950
josanderson@steptoe.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **Amaplat Mauritius Ltd., *et al*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**Zimbabwe Mining Development Corporation, *et al*,**<br><br>**Defendants.** | ) | **Civil Case No. 1:22-cv-00058-CRC** |

**MOTION TO DISMISS THE COMPLAINT BY THE CHIEF MINING COMMISIONER, MINISTRY OF MINES OF ZIMBABWE, AND THE REPUBLIC OF ZIMBABWE**

Defendants, the Chief Mining Commissioner, Ministry of Mines of Zimbabwe (the "Commissioner"), and the Republic of Zimbabwe ("Zimbabwe"), by and through their undersigned counsel, hereby submit their Motion to Dismiss (the "Motion") the Complaint filed by Amaplat Mauritius Ltd. ("Amaplat") and Amari Nickel Holdings Zimbabwe Ltd. ("Amari"), and in support thereof, state as follows:

**INTRODUCTION**

When Zimbabwe Mining Development Corporation ("ZMDC") and Plaintiffs executed two Memorandum of Understanding (the "MOUs"), they likely contemplated many things, such as two mines, one platinum and the other nickel, or the resolution of their disputes according to the International Chamber of Commerce (the "ICC") Rules of Arbitration. ZMDC received neither, but the Commissioner and Zimbabwe, who never signed the MOUs, certainly had no reason to expect this case: a judgment enforcement proceeding in the United States eight years after the arbitration concluded and more than two years after a Zambian court issued a conditional

order to register an arbitration award. Plaintiffs should not be allowed to shield the courts from an infirmed arbitration award through an *ex parte* order never served on the Commissioner and Zimbabwe.

This case should be dismissed with prejudice for the following reasons:

- The Commissioner, as a foreign official, has not waived, nor is there any basis to waive, his immunity from suit.

- The Commissioner and Zimbabwe never signed the agreement to arbitrate, and where Plaintiffs only rely on the MOUs and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), neither of which contains a waiver of immunity, Plaintiffs cannot make out a case for an implied waiver of immunity.

- The Commissioner and Zimbabwe are immune from this Court's jurisdiction because Plaintiffs claim not to be seeking to enforce an arbitration award.

- Plaintiffs have failed to plead any minimum contacts between the Commissioner and this District, and where Zimbabwe otherwise is immune, there is no personal jurisdiction over either Defendant. Plaintiffs have also not served the Commissioner.

- Plaintiffs have not stated a claim upon which relief can be granted because they invoke this Court's jurisdiction under the New York Convention, but they failed to comply with the three-year time bar that comes with the treaty.

- Plaintiffs have fallen far short of their obligation to plead facts showing that ZMDC or the Commissioner are an *alter ego* of Zimbabwe.

- As supported by the Expert Opinion of Mr. Likando Kalaluka, QC, the former Attorney General of Zambia, the Zambian court did not have jurisdiction over the Commissioner and Zimbabwe, and Plaintiffs never served either defendant or even applied for permission to do so.

For these reasons and those set forth in greater detail below, Zimbabwe requests that this Court grant the Motion.

## RELEVANT BACKGROUND

Amaplat and Amari signed the MOUs with ZMDC in 2007 and 2008. *See* ECF No. 1-1 at ¶¶ 3-4. Neither Zimbabwe nor the Commissioner were parties to the MOUs. *See id.*, ¶ 6.

In 2011, Plaintiffs initiated arbitration proceedings pursuant to the arbitration clauses in the MOUs. *See id.*, ¶ 8. Plaintiffs did not raise claims based on a mine they built or operated. Rather, in the arbitration, Plaintiffs alleged that the breaches of the MOUs deprived them of future value in the event that a mine was built.

Despite not being a party to the MOUs, the Commissioner was named a respondent in the arbitration proceedings. *See id.*, ¶ 39. Plaintiffs amended their claim five times. *See id.*, ¶¶ 21, 23, 26, 34, and 39. After those amendments, Plaintiffs did not allege that the Commissioner was responsible for the breach of the MOUs or any of the damages. Plaintiffs did not argue that ZMDC was an *alter ego* of the Commissioner, and there was no argument that either ZMDC or the Commissioner was an *alter ego* of Zimbabwe. Notably, Zimbabwe was not a party to the proceedings. *See generally,* ECF No. 1-1.

The arbitration included a challenge to the Tribunal on day two of the hearing on the merits. *See id.*, ¶ 51. Applying Article 11 of the ICC Rules, the governing rules of the arbitration, the Tribunal dismissed the challenge. Article 11 does not provide for the Tribunal to decide on a challenge to itself. *See* **Exhibit 1**, ICC Rules, 1998. After the challenge was rejected by the Tribunal, ZMDC and the Chief Mining Commissioner refused to participate. ECF No. 1-1 at ¶ 52. The Tribunal then decided to remove as evidence the witness statements submitted by ZMDC and the Chief Mining Commissioner. *See id.*, ¶ 55.

At the beginning of day three, or the day following the dismissed challenge, the arbitrator appointed by ZMDC and the Commissioner, Mr. Mutizwa, tendered his resignation and left the hearing. *See id.*, ¶ 57. The remaining members of the Tribunal decided to continue in light of Article 12(5). *See id.*, ¶ 58. Similar to Article 11, Article 12(5) does not grant this power to the Tribunal. *See* **Exhibit 1**, ICC Rules, 1998. Notably, Article 12(5) only applies after the closing of

the proceedings. *Ibid*. There is no evidence that the proceedings were closed. The hearing on the merits continued, concluding on August 20, 2012. ECF No. 1-1 at ¶ 61.

Around five weeks later, on September 27, 2012, the ICC Court accepted the resignation of Mr. Mutizwa and rejected the challenge to two of the members of the Tribunal: Judge Joffe and Mr. Isaacs QC. *See id*., ¶ 65. The ICC Court invited ZMDC and the Commissioner to name a replacement arbitrator. The request was not answered, and the ICC Court named a replacement. *See id*., ¶66.

On October 15, 2012, ZMDC and the Commissioner obtained an *ex parte* order from the Zambian courts restraining Judge Joffe and Mr. Isaac QC from continuing. *See id*., ¶ 67. Plaintiffs applied to vacate the order, but as of the date of the Award, there was no evidence that the order had been vacated. *See id*., ¶74. Judge Joffe resigned (*id*. at ¶ 73), Plaintiffs appointed a new arbitrator (*id*. at ¶ 75), and the reconstituted tribunal held a hearing to receive oral statements from the parties.

On January 12, 2014, an award was issued ordering ZMDC, but not the Commissioner, to pay Plaintiffs damages and awarding costs and legal fees against both the Commissioner and ZMDC (the "Award"). *See id*., ¶ 39. The Award also ordered only ZMDC to pay interest on the amounts at the rate of 5% per annum. *See ibid*. The Award made no finding of joint and several liability nor any finding that the parties are one and the same or that they acted as *alter egos* of Zimbabwe or each other. *See generally,* ECF No. 1.

Since the issuance of the Award in 2014 and until 2019, there appear to be no attempts by Plaintiffs to have the Award recognized and enforced in any other jurisdiction besides Zambia.

On July 19, 2019, Plaintiffs applied to register and enforce the Award *ex parte,* and the Zambian Court issued an "*ex parte* Order for leave to Register and Enforce the Final Arbitration

Award" against the Commissioner and ZMDC (the "Order") on August 9, 2019. *See* ECF No. 1-5. Defendants did not participate in these proceedings. The Order specifically limits the enforcement of the Award on the occurrence of certain conditions, including "within 30 days after service of this Order on [Defendants], the Defendant may apply to set aside this Order and the award shall not be enforced until after the expiration of that period or if the Defendants apply within that period to set aside, until the application is finally disposed of." ECF No. 1-5, ¶ 2. This same language is echoed in the Notice of Registration of Award issued on August 19, 2019. *See* **Exhibit 2**, Notice of Registration of the Award, ¶ 4. While the Zambian Court proceeded to register the Award, the enforcement of such Award was subject to the expiration of a 30-day period from service. In order for that time period to transpire, ZMDC and the Commissioner would have had to be served with the Judgment and Notice. Defendants were never served with the Notice of Registration or the Judgment. *See* Expert Opinion of Likando Kalaluka, QC, pp. 6-7, a true and correct copy attached as **Exhibit 3**.

Since Defendants were not served with the Notice of Registration or the Order, they did not have the opportunity to present any grounds against recognition or enforcement of the Award or request the set aside of the Order within the 30-day period established by the Zambian Court. *See* ECF No. 1-5 at ¶ 3. Zimbabwe is not listed as a party in the Zambian proceedings. *See* ECF No. 1-5.

Almost two and half years later, and eight years after the issuance of the Award, Plaintiffs filed the instant action seeking to enforce the Order under the D.C. Foreign-Country Money Judgments Recognition Act (the "D.C. Code") against not only the ZMDC and the Commissioner, but also against Zimbabwe as an *alter ego* of the other defendants. *See* ECF No. 1. Plaintiffs request a judgment against <u>all Defendants</u> holding them jointly and severally liable for the costs and fees

ordered in the Award, even though the Award is largely only against ZMDC. Similarly, Plaintiffs request that post-award interest and post-judgment interest be awarded against all Defendants at the Zambian statutory rate. *See id.*, p. 10.

In their Complaint, Plaintiffs routinely mention the New York Convention, citing it five times, including as the basis for subject matter jurisdiction. *See id.*, p.4.

Since the issuance of the Award, there have been no enforcement proceedings whereby the Award was subject to the scrutiny of Article 5 of the New York Convention or any other provision of law applicable to arbitration awards.

## ARGUMENT

### I. Plaintiffs have failed to plead subject matter jurisdiction

On a Fed. Civ. P. Rule 12(b)(1) motion to dismiss, the petitioner "bears the burden of establishing [subject matter] jurisdiction by a preponderance of the evidence." *Dvorak v. U.S. Dep't of Homeland Sec.*, No. 18-CV-1941 (DLF), 2019 WL 1491743, at *1 (D.D.C. Apr. 3, 2019) (quoting *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011)) (internal quotation marks omitted). Because a Rule 12(b)(1) motion challenges the court's subject-matter jurisdiction, the court "will subject a plaintiff's complaint to 'closer scrutiny' than on a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Ware El v. Soc. Sec. Admin.*, No. 19CV01684TNMGMH, 2019 WL 5811299, at *2 (D.D.C. Nov. 7, 2019); *An v. Mayorkas*, No. CV 21-385 (EGS), 2022 WL 522970, at *1 (D.D.C. Feb. 22, 2022) (same). Where the defendant challenges the plaintiff's "factual basis for jurisdiction the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant," the court must more. *See Erby v. United States*, 424 F. Supp. 2d 180, 183 (D.D.C. 2006) (internal quotation marks omitted). The court "must go beyond the pleadings and resolve

any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Ibid*.

The Foreign Sovereign Immunities Act ("FSIA") provides the only basis for assuming jurisdiction over foreign states, including their instrumentalities. *See Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 443 (1989). Under the FSIA, foreign states are presumed to be immune from suit unless the plaintiff proves that one of the enumerated exceptions in the statue applies. *See* 28 U.S.C.A. § 1604; *see also Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013) ("FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies.").

The "basic objective of foreign sovereign immunity is to free a foreign sovereign from suit." *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020) (citing *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co*., 137 S.Ct. 1312, 1317 (2017)) (internal quotation marks omitted). Courts must therefore decide on issues of immunity "as near to the outset of the case as is reasonably possible" and "before the sovereign is required to defend on the merits." *Ibid*.; *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 494 (1983) (holding that questions regarding immunity must be decided "[a]t the threshold of every action."); *Denegri v. Republic of Chile*, No. CIV. A. 86-3085, 1992 WL 91914, at *2 (D.D.C. Apr. 6, 1992) (same); *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) ("to preserve the full scope of that immunity, the district court must make the critical preliminary determination of its own jurisdiction as early in the litigation as possible; to defer the question is to frustrate the significance and benefit of entitlement to immunity from suit.") (internal quotation marks omitted).

Invoking the immunity exceptions under 28 U.S.C. §§ 1605(a)(1) and 1605(a)(6) of the FSIA, Plaintiffs argue that the Commissioner and Zimbabwe are subject to the jurisdiction of this Court. *See* ECF No. 1, ¶¶ 4, 8. But for the reasons set forth below neither of the exceptions apply in the present case.

**A. This Court cannot assume subject matter jurisdiction over the Commissioner based on 28 U.S.C. § 1330(a)**

District courts have original jurisdiction over "any nonjury civil action against a foreign state as defined in section 1603(a)..." 28 U.S.C. §1330(a). According to section 1603(a), a "foreign state…includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." Section 1603 further defines "agency or instrumentality of a foreign state" as "any entity (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country." 28 U.S.C.A. § 1603(b) (emphasis added).

Plaintiffs argue that the Commissioner qualifies as a foreign state because "it is an agency, instrumentality of, and alter ego of…Zimbabwe." *See* ECF No. 1, ¶ 6. The argument ignores the clear wording of section 1603. As noted by the Supreme Court and applied by this Court, "there is nothing [in the FSIA] to suggest that 'foreign state' should be read to include an official acting on behalf of that state." *Samantar v. Yousuf*, 560 U.S. 305 (2010); *Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 34 (D.D.C. 2013), *aff'd*, 764 F.3d 31 (D.C. Cir. 2014). Section 1603(a) only refers to entities which "typically refers to an organization, rather than an individual." *See id*., at 315; *see also id*., at 316 (citing *Dole Food Co. v. Patrickson,* 538 U.S. 468, 474) (2003) ("1603(a) indicates that "Congress had corporate formalities in mind.").

There is one possible scenario where a suit against a foreign official can fall under the FSIA. According to the Supreme Court, "some actions against an official in his official capacity" can be "treated as actions against the foreign state" if "the state is the real party in interest." *Samantar* 560 U.S. at 325. But this is not the case here. Plaintiffs' actions are based on their contracts with ZMDC and alleged appearance of the Commissioner in the arbitration. Zimbabwe was not a party to the arbitration or the MOUs, hence, it is not "the real party in interest." *See Angellino v. Royal Fam. Al-Saud*, 688 F.3d 771, 775, n.6 (D.C. Cir. 2012) (holding that Saudi Arabia is not the "real party in interest" because Angellino's breach of contract claim against the defendants "does not allege an act of state"). Accordingly, this Court cannot assume subject matter jurisdiction over the Commissioner based on 28 U.S.C. §1330(a).

**B. <u>This Court cannot assume subject matter jurisdiction under the waiver exception in 28 U.S.C. §1605(a)(1)</u>**

Section 1605(a)(1) permits a suit against a foreign state where it "has waived its immunity either explicitly or by implication." An implied waiver exists where "there has been an intentional and knowing relinquishment of the legal right" by the sovereign. *Denegri v. Republic of Chile*, No. CIV. A. 86-3085, 1992 WL 91914, at *3 (D.D.C. Apr. 6, 1992) (citing *Castro v. Saudi Arabia*, 510 F.Supp. 309, 312 (W.D.Tex. 1980) (internal quotation marks omitted). Reading 1605(a)(1) narrowly, "courts have been reluctant to recognize implied waivers" unless a foreign state: (1) "agrees to arbitrate in the United States;" (2) "agrees its contract will be governed by United States law; and" (3) "files a responsive pleading with a United States court without asserting sovereign immunity." *Denegri*, 1992 WL 91914, at *3; *Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 24 (D.D.C. 2013), *aff'd*, 764 F.3d 31 (D.C. Cir. 2014) (describing these three situations as "accepted example of implied waiver"); *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir.1985) ("most courts have refused to find an implicit waiver of immunity to suit

in American courts from a contract clause providing for arbitration in a country other than the United States."); *Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018, 1022 (9th Cir.1987) *cert. denied*, 108 S. Ct. 1077 (1988)); *see also Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 443 (1989) (holding that a foreign sovereign does not waive its immunity by "signing an international agreement that contains no mention of a waiver of immunity to suit in the United States courts or even the availability of a cause action in the United States."); *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1017 (2d Cir. 1993) (quoting *Zernicek v. Petroleos Mexicanos,* 614 F.Supp. 407, 411 (S.D.Tex.1985), *aff'd,* 826 F.2d 415 (5th Cir.1987), *cert. denied,* 484 U.S. 1043, 108 S. Ct. 775, 98 L.Ed.2d 862 (1988)) ("most courts have refused to find an implicit waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States.") (internal quotation marks omitted).

Here, the grounds for finding waiver of immunity are not present. Plaintiffs argue that Defendants waived their immunity by i) agreeing to arbitrate under ICC Rules; and ii) participating in an arbitration governed by the New York Convention in Zambia—a signatory of the New York Convention. *See* ECF No. 1, ¶ 10. The argument is misplaced. First, as noted by the Supreme Court and affirmed by several courts, an agreement to arbitrate outside the United States does not indicate amenability to suit in the United States.

Second, neither Zimbabwe nor the Chief Mining Commissioner was a party to the arbitration agreement—the sole basis of the Arbitration. *See* ECF No. 1-2, ¶ 11, ECF No. 1-4, ¶ 9. Hence, even under Plaintiffs' theory, Defendants cannot be deemed to have waived their immunity. *See Cargill Int'l S.A.* 991 F.2d at 1017 (holding that courts rarely find that a party's "waiver of immunity under a contract extends to third parties not privy to the contract.").

Third, it is irrelevant that the Arbitration is governed under the New York Convention. Plaintiffs contend that because the Arbitration is governed by the New York Convention Zimbabwe could have "contemplated enforcement of any arbitral award in any of the other signatory states." *See* ECF No. 1, ¶10. The argument, again, is misguided. A foreign state does not waive its immunity by "signing an international agreement that does not mention a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States." *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 430, 109 S. Ct. 683, 686, 102 L. Ed. 2d 818 (1989). This Court has recognized that ratifying treaties similar to the New York Convention does not constitute waiver of immunity under 1605(a)(1). *See Turan Petroleum, Inc. v. Ministry of Oil & Gas of Kazakhstan*, 406 F. Supp. 3d 1, 12-13 (D.D.C. 2019), *aff'd*, No. 21-7023, 2022 WL 893011 (D.C. Cir. Mar. 25, 2022), and *aff'd,* No. 21-7023, 2022 WL 893011 (D.C. Cir. Mar. 25, 2022) (holding that Kazakhstan did not waive its immunity by ratifying the Convention on Settlement of Investment Disputes). Plaintiffs have provided no reason to deviate from this conclusion.

In addition, the New York Convention governs enforcement of arbitration awards, not enforcement of foreign judgments. And "[a]lthough an arbitral award and a court judgment enforcing an award are 'closely related,' they are nonetheless 'distinct' from one another, and that distinction has long been recognized." *Commissions Imp. Exp. S.A.*, 757 F.3d 321, 330 (D.C. Cir. 2014). Plaintiffs cannot have it both ways, invoking the New York Convention for a supposed waiver but then denying that they are enforcing an arbitral award or that the Federal Arbitration Act (the "FAA") would apply. Stated simply, Plaintiffs have no basis to claim that either the Commissioner or Zimbabwe waived their immunity because Zimbabwe ratified the New York Convention.

**C. This Court cannot exercise subject matter jurisdiction under 28 U.S.C. §1605(a)(6) because Plaintiffs are not seeking enforcement of an arbitration agreement or an arbitration award**

Pursuant to 28 U.S.C. §1605(a)(6), a foreign state is subject to the jurisdiction of U.S. courts where "the action is brought, either to enforce an agreement made by the foreign state…or to confirm an award made pursuant to such an agreement to arbitrate, if…the agreement or award is governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. §1605(a)(6) (emphasis added). Adhering to the unambiguous text, courts have limited this exception to actions to enforce an arbitration agreement or an award which stems from such agreement. *See Hirsh v. State of Israel*, 962 F. Supp. 377, 384–85 (S.D.N.Y.), *aff'd*, 133 F.3d 907 (2d Cir. 1997) (noting that "section 1605(a)(6) is facially inapplicable to the instant action, as Plaintiffs do not seek to enforce an agreement to arbitrate, nor to enforce an outstanding arbitral award."). Courts have also held that this exception only applies "the parties that formed or made the agreement," and not to "parties that merely obtained liability under it." *TIG Ins. Co. v. Republic of Argentina*, No. 18-MC-00129 (DLF), 2022 WL 1154749, at *7 (D.D.C. Apr. 18, 2022) (emphasis added); *see also ibid* ("because Argentina did not make the contracts at issue here, the arbitration exception does not authorize suit against Argentina."); *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 50 (2d Cir. 2021) (holding that Section 1605(a)(6) does not extend to the Republic of Moldova because "the Republic was not a party to the underlying arbitration agreement.").

The arbitration exception is simply inapplicable in the present case. Plaintiffs are not seeking enforcement of an arbitration agreement or an arbitration award. *See* ECF No. 1, p. 9. Also, neither Zimbabwe nor the Commissioner is a party to the arbitration agreement that resulted in the Award. *See id.*, ¶¶18-23. Accordingly, this Court cannot assume jurisdiction pursuant to section 1605(a)(6).

## II. Plaintiffs have failed to plead personal jurisdiction

To withstand a motion to dismiss for lack of personal jurisdiction, "the plaintiff must make *prima facie* showing of the pertinent jurisdictional facts." *Johnson v. BAE Sys*., Inc., No. 11-CV-2172 (RLW), 2012 WL 13055684, at *1 (D.D.C. Oct. 23, 2012) (internal quotation marks omitted). In deciding on such motion, "the [c]ourt is not bound to treat all of the plaintiff's allegations as true, but instead may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts." *Ibid* (internal quotation marks omitted); *see also Thompson Hine LLP v. Smoking Everywhere Inc.*, 840 F. Supp. 2d 138, 141 (D.D.C. 2012), *aff'd sub nom. Thompson Hine, LLP v. Taieb*, 734 F.3d 1187 (D.C. Cir. 2013) (same).

### A. <u>This Court cannot exercise personal jurisdiction on the basis of the FSIA</u>

A court can exercise personal jurisdiction over a foreign state if one of the immunity exceptions provided in 28 U.S.C. §§ 1605–07 applies and the state is served pursuant to 28 U.S.C. § 1608. *See TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 299 (D.C. Cir. 2005); *see also Practical Concepts, Inc. v. Republic of Bolivia,* 811 F.2d 1543, 1548 n. 11 (D.C.Cir.1987) ("under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction").

Here, the Court lacks personal jurisdiction under the FSIA because neither of the FSIA immunity exceptions applies. *See* Section I(B)(C).

### B. <u>The Court also lacks personal jurisdiction over the Commissioner because there is no proof that the Commissioner has minimum contacts within the Court's forum and that he was properly served</u>

Under the Fourteenth Amendment's Due Process Clause, a court can exercise personal jurisdiction over a nonresident if: 1) the nonresident has minimum contacts with the forum state and 2) extending jurisdiction over the nonresident is "consistent with the traditional notions of fair

play and substantial justice." *See Kroger v. Legalbill.com LLC*, No. CIV A 04-2189 ESH, 2005 WL 4908968, at *4 (D.D.C. Apr. 7, 2005).

Here, the Commissioner is a foreign resident so this Court can only exercise personal jurisdiction if he has minimum contacts in the District of Columbia. To surpass this hurdle, Plaintiffs describe the Commissioner as an agency or instrumentality of Zimbabwe. *See* ECF No. 1, ¶¶ 11, 16. On its own, this is plainly insufficient. Agencies and instrumentalities "retain their status as separate legal persons [under section 1603(b)(1)] and receive protection from the exercise of personal jurisdiction under the Due Process Clause." *Gater Assets Ltd.,* 2 F.4th at 49 (internal quotation marks omitted). Plaintiffs must do much more than a conclusory allegation that the Commissioner is an agency or instrumentality.

The Court also lacks jurisdiction because Plaintiffs have not served the Commissioner. Fed. Civ. P. Rule 4(f) "governs service of process of an individual located outside of the United States." *Angellino*, 688 F.3d at 775. Unless there is an "internationally agreed means of service," Rule 4(f) instructs a plaintiff to serve a foreign defendant "(A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction; (B) as the foreign authority directs in response to a letter rogatory or letter of request; or (C) unless prohibited by the foreign country's law, by: (i) delivering a copy of the summons and of the complaint to the individual personally; or (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt." Fed. Civ. P. Rule 4(f)(2).

Plaintiffs "served the Ministry of Mines," an entity not a party to this case, on June 20, 2022. *See* ECF No. 20, p. 2. But they have not served the Commissioner pursuant to any of the means of service under Rule 4. Hence, this Court cannot exercise personal jurisdiction over the Commissioner.

**III.    Plaintiffs have failed to state a claim upon which relief can be granted**

"A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to 'assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint." *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Ibid.* "To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Ibid.*  (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Moreover, where there is a contradiction between the allegations in the complaint and the exhibits attached, the exhibit generally controls. *See Regan v. Spicer, HB, LLC,* 134 F. Supp. 3d 21, 26 (D.D.C. 2015) (citing 5A Charles Wright & Arthur Miller, *Federal Practice and Procedure: Civil 3d* § 1327, 450–451 (3d ed. 2004) ("It appears to be well settled that when a disparity exists between a written instrument annexed to the pleadings and the allegations in the pleadings, the terms of the written instrument will control, particularly when it is the instrument being relied upon by the party who made it an exhibit.").

    **A.    Plaintiffs are unable to state a claim for enforcement of the Award under the DC Code, and their ability to enforce the Award under the New York Convention expired years ago**

While Plaintiffs entitle their Claim for Relief as one of enforcement of a foreign money judgment, that does not change the underlying claim. Plaintiffs have invoked the New York Convention as a basis for jurisdiction, but in order to circumvent the three-year statute of limitations under the FAA they attempt to enforce the award as a foreign judgment. They cannot have it both ways.

As explained above, the Complaint's basis for jurisdiction is that "Defendants waived sovereign immunity by agreeing to arbitrate under the ICC Rules" and "by agreeing to and participating in arbitration governed by the New York Convention in Zambia." ECF No. 1, p. 4. There is no allegation of a special arrangement whereby Defendants would have otherwise explicitly waived their immunity to these legal proceedings. *See, e.g., Commissions Import Export S.A.*, 757 F.3d at 324 (citing to evidence that Congo had an irrevocable waiver of immunity from legal proceedings or execution allowing for enforcement of the foreign judgment). Yet, Plaintiffs' claim is not through the New York Convention, but through a separate mechanism for enforcement of foreign judgments under the D.C. Code. *See* ECF No. 1, p. 9. For many reasons, the two cannot simultaneously apply to this case.

As plead, the Complaint seeks jurisdiction over the Commissioner and Zimbabwe based on a waiver derived from the New York Convention, but Plaintiffs' claim then would necessarily fall under the New York Convention and be subject to the requirements set forth in Chapter 2 of the FAA that codify the Convention. *See, e.g., Belize Soc. Dev. Ltd. v. Gov't of Belize,* 668 F.3d 724, 727 (D.C. Cir. 2012) (finding that "when exercising its original jurisdiction pursuant to section 203 of the FAA, a court shall confirm the award unless one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention"). If Plaintiffs seek this Court's jurisdiction under the New York Convention, then they get all of it, including section 207, which requires a party has to seek confirmation of the award "within three years after an arbitral award falling under the Convention is made." 9 U.S.C. § 207. The Award is more than three years old, and Plaintiffs would be unable to state a claim upon which relief can be granted.

There are other compelling reasons this Court should reject Plaintiffs' approach. The New York Convention provides parties with grounds by which a court can refuse to enforce an award.

*See* NY Convention, Article V. By circumventing the New York Convention, a plaintiff would deprive a defendant from being able to raise any of the grounds enumerated in Article V of the New York Convention and incorporated into the FAA. 9 U.S.C. § 207. Those grounds include a number of challenges to the award and arbitration procedure, including if "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration;" issues related to the appointment of the arbitrators, and disputes related to "[t]he composition of the arbitral authority" or the arbitral procedure. These same explicit grounds are not available under the D.C. Code allowing for enforcement of foreign judgments. *See* D.C. § 15–364. A foreign judgment can, therefore, wrongly deprive a party from raising any ground under Article V of the Convention. This is more so the case where the Award was never subject to scrutiny in another jurisdiction under Article V of the New York Convention.

Here, Plaintiffs are also attempting to circumvent the protections afforded by the New York Convention by enforcing an *ex parte* order eight years after the Award and more than two years after failing to serve the Commissioner and Zimbabwe. ECF No. 1-1, p. 4 (showing that the Award was rendered on January 12, 2014). Not only is their claim time-barred under the provisions of the FAA, but also Defendants have never before had the opportunity to invoke the grounds under the New York Convention because they were never served in the Zambian proceedings. By attempting to simply enforce the foreign judgment, Plaintiffs are depriving Zimbabwe and the Award Defendants of challenging the Award under Article V.

Plaintiffs are likely to invoke the holding in *Commissions Import Export S.A.,* 757 F.3d at 324. But there are key differences that make that case inapplicable here. Not only did the State in that case expressly waive immunity to the legal proceedings enforcing the award allowing that as

a basis to pursue the foreign judgment enforcement, but that award had also been subjected to scrutiny in at least three separate jurisdictions under the New York Convention, including Belgium, Sweden, and the UK, giving Congo numerous opportunities to raise Article V challenges. *Commissions Import Export S.A,* 757 F.3d at 325. In none of those three challenges was there a recorded issue with service.

In contrast, under the unique circumstances present here, Plaintiffs are relying on the New York Convention for jurisdiction while skirting the mandatory requirements of the same treaty, made applicable through the FAA. This is not like *Commissions Import Export* where an award creditor demonstrated in multiple jurisdictions that the award is enforceable. Rather, there are serious issues with the Award, including exceeding the scope of the parties' agreements, disregarding the arbitral procedure regarding the composition of the tribunal, and attempting to ignore a court order to halt the arbitration. Instead of dealing with these issues or giving the Commissioner a chance to avail himself of the treaty-based defenses to the Award, Plaintiffs registered the Award on an *ex parte* basis, obtained the Order, and never served the Commissioner or Zimbabwe.

In any event, Plaintiffs cannot make out a claim under the DC Code. The Order is not final and binding because, based on the Order's text, the underlying Award cannot be enforced. The Order provides that "the award shall not be enforced" until the expiration of a 30-day period <u>after</u> service of the Judgment on ZMDC and the Commissioner. *See* ECF No. 1-5, p. 3. The 30-day period to set aside the Judgment presumably only begins to run once service is made. Plaintiffs fail to allege that the Defendants were properly served in accordance with the conditions set forth in the Judgment, and Mr. Kalaluka confirms there was no service or any the preparatory steps to attempt service. *See* Expert Opinion of Likando Kalaluka, QC, pp. 6-7, a true and correct copy

attached as **Exhibit 3**. This necessarily means that the 30-day period has not expired, making the underlying Award unenforceable on its own terms.

**B. <u>Plaintiffs have failed to allege any facts supporting their various claims of an *alter ego*</u>**

A plaintiff does not establish an *alter ego* through a conclusory allegation. Following the dictates of the Supreme Court's well-known *Iqbal* standard, a court must parse the complaint for "sufficient factual matter" that if accepted as true, to "state a claim for relief that is plausible on its face. *Ashcroft,* 556 U.S. at 678. Therefore, "threadbare recitals of elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss. *Id.* In other words, a court need not accept a plaintiff's legal conclusions as true nor must the court presume the veracity of legal conclusions that are couched as factual allegations. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

To make a case of *alter ego* under the *Iqbal* standard requires more than merely conclusory statements. *Ashcroft,* 556 U.S. at 678. There must be facts that tend to show that an *alter ego* relationship exists. *See, e.g., Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446 (D.C. Cir. 1990). This is because there is "a baseline rule 'that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 814 (D.C. Cir. 2012). This "presumption of the juridical separateness of entities also applies to jurisdictional issues." *Foremost-McKesson, Inc*, 905 F.2d at 446.

The presumption of juridical separateness can only "be overcome where the foreign state so extensively controlled the instrumentality 'that a relationship of principal and agent is created,' or where . . . 'adhering blindly to the corporate form would cause injustice.'" *TMR Energy Ltd*, 411 F.3d at 301. Moreover, this Court's long-standing precedent places the burden squarely on

plaintiff's shoulders to assert facts sufficient to establish either an agency relationship or fraud or injustice. *Foremost-McKesson*, 905 F.2d at 447; *see also, Estate of Heiser v. Islamic Republic of Iran*, 885 F. Supp. 2d 429, 435 (D.D.C. 2012).

In the absence of facts supporting a finding of an *alter-ego* relationship, a foreign judgment may only be enforced in D.C. "between the parties." D.C. Code § 15–363. This has been interpreted by this Court to mean it "applies only as between the identical parties to the judgment which transfer and enforcement is sought." *See Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation Portfolio*, 291 F. Supp. 3d 21, 30 (D.D.C. 2017)(finding that Act may only be used to enforce a judgment "between the parties" actually named in it warranting the dismissal of the complaint against the non-named parties); *see also SerVaas Inc. v. Republic of Iraq*, 540 Fed.Appx. 38, 40–41 (2d Cir. 2013) (holding that a foreign judgment against the Ministry of Industry of Iraq is enforceable against Iraq because the foreign court "viewe[d] the Ministry and Iraq as indistinguishable" or "as the same entity").

Plaintiffs have failed to allege any facts to overcome the presumption of juridical separateness. Zimbabwe is neither a party to the underlying Award[1] nor the Order, yet Plaintiffs seek to obtain a judgment against Zimbabwe for the amounts awarded on a conclusory allegation that Zimbabwe is the *alter ego* of the original defendants. There is no indication in the Order that the Zambian court treated either ZMDC or the Commissioner as being "indistinguishable" or the "same" as that of Zimbabwe. *Id.* The same observation can be made of the Award. *See* ECF 1-1.

In the Complaint, Plaintiffs allege that the Republic of Zimbabwe is an *alter ego* of the other two defendants in order to seek an entry of judgment against Zimbabwe for *all* the amounts

[1] The Tribunal ordered damages (other than costs) against ZMDC (not the Commissioner) and there were no findings of wrongdoing from the Tribunal with regards to any alleged actions taken by the Commissioner. ECF No. 1-1, ¶ 277.

issued under the Award. The allegations attempt to assert an *alter ego* status merely by alleging that the Defendants are an "agency or instrumentality of the Republic of Zimbabwe." ECF No. 1, pp. 3-5. There is no attempt to allege any facts to support an *alter ego* relationship. On this basis, this Court should dismiss any claims requesting that judgment be entered against Zimbabwe.

**C. Plaintiffs have failed to plead entitlement to post-judgment interest at the Zambian statutory rate**

The default rule of federal courts is that the post-judgment rate applicable is the one set forth § 1961, unless the parties unambiguously express their intent to replace the federal rate for post-judgment interest. *See, e.g., OI European Group B.V. v. Bolivarian Republic of Venezuela,* Case No. 16-cv-1533, 2019 WL 2185040, * 6 (D.C.C. May 21, 2019); *see, e.g., Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 456–60 (5th Cir. 2013) (observing that "the circuits have unanimously agreed that 'an arbitration panel may not establish a post-judgment interest rate itself'" unless the parties have indicated their intent with clear, unambiguous and unequivocal language"). Similarly, in cases involving the recognition of a foreign judgment, courts have applied the federal statutory rate. *Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C.) (applying the federal statutory post-judgment rate to a judgment issued on the basis of recognition of a UK judgment that confirmed the award as final and enforceable). Even in cases where the foreign judgment has indicated the post-judgment interest rate, courts have proceeded to apply § 1961 for post-judgment once the judgment is converted to a federal court judgment. *See, e.g., Mezu v. Progress Bank of Nigeria, PLC,* Case No. 12-cv-2865, 2013 WL 6531626, at *2 (D. Md. Dec. 11, 2013) (finding that the court was not beholden to apply the 21% post-judgment rate awarded by the foreign judgment in a diversity case). This approach is also consistent with § 15-367 which establishes that once the foreign judgment is recognized it is "[e]nforceable in the same manner and to the same extent as a judgment rendered in the District

of Columbia." D.C. Code § 15-367 (2). A court, therefore, should apply the federal statutory rate once the foreign judgment or award becomes a judgment of a federal court.

Plaintiffs are requesting that this Court displace the mandatory federal statutory rate in favor of Zambia's rate without providing any basis to do so. Since there is no basis alleged in the Complaint, this Court should dismiss any request to apply the Zambian statutory rate for post-judgment interest.

### D. <u>Plaintiffs have failed to plead entitlement to attorneys' fees</u>

Absent a bad faith exception, the "American Rule" that parties generally bear their own attorney's fees applies. *See Harford Mut. Ins. Co. v. New Ledroit Park Bldg. Co., LLC*, 313 F. Supp. 3d 40, 48 (D.D.C. 2018). Moreover, the general rule is that attorney's fees must be brought by motion, unless substantive law requires those fees to be proved at trial as an element of damages. *See ibid.*

Where a party claims attorney's fees without a basis, a court may dismiss the claim. *See ibid* (dismissing the defendant's counterclaim for attorney's fees because it failed to "state a valid claim for relief"). Even if the claim for attorney's fees is not a stand-alone claim, a court may strike or dismiss the claim. *See, e.g., Hill v. Performa Entertainment LLC,* No. 09-CIV-02662, 2010 WL 446888, at *2 (W. D. Tenn. Feb. 1, 2010) (dismissing attorney's fees stated in the prayer of relief pursuant to a 12(b)(6) motion); *see also, In re Paulsboro Derailment Cases,* No. 13-3724, 2013 WL 5530058, at * 4-5 (D.N.J. Oct. 4, 2013) (dismissing attorney's fees for failure to cite any authority to support a claim for attorney's fees in response to a motion to dismiss).

In the Complaint, Plaintiffs seek an award of costs in addition to "reasonable attorneys' fees." ECF No. 1, p. 10. There is no basis provided for attorney's fees. Neither the underlying Award nor the judgment awarded attorney's fees, and Claimants' failure to identify a basis is fatal

to their request based on this and other courts' long-standing precedent on the issue. *See* ECF No. 1-1; ECF No. 1-5.

## IV. The Judgment is ineligible for recognition under the D.C. Uniform Foreign-Country Money Judgments Recognition Act

### A. The Zambian High Court had no jurisdiction over the Commissioner or Zimbabwe

Under the D.C. Code, a court "may not recognize a foreign country judgment if" the foreign court lacked personal or subject matter jurisdiction over the defendant or if it "was rendered under a judicial system that does not provide…procedures compatible with the requirements of due process of law." D.C. Code §§ 15-364(b). As noted by this Court, these are mandatory exceptions to recognition. *Commissions Imp. Exp., S.A.*, 118 F. Supp. 3d at 224.

Before enforcing a foreign judgment, the enforcing court must determine if the foreign court had jurisdiction. *Kaupthing ehf.*, 291 F. Supp. 3d at 33 ("A court entering a default judgment may assume that it has jurisdiction over the defendant[,] ... but that assumption does not preclude the defendant from later contesting jurisdiction in the enforcing court."). Under the D.C. Code, a foreign court is said to have personal jurisdiction if the exercise of such jurisdiction "comports with both the Constitution's Due Process Clause and D.C.'s long-arm statute." *Id.* at 31. The Due Process Clause "protects a party from being subject to personal jurisdiction in a state court if it does not have "minimum contacts" with the forum state." *Gater Assets Ltd.*, 2 F.4th at 54. When it comes to personal jurisdiction over foreign states, courts undertake a different analysis. In such instances, courts compare the procedures used before the foreign court and the grounds for exercising jurisdiction over foreign states under the FSIA. *See Commissions Imp. Exp., S.A*, 118 F. Supp. 3d at 227.

A party moving to enforce under the DC Code, "bears the burden of making *prima facia* showing that the mandatory grounds for nonrecognition—*i.e.*, due process and personal jurisdiction—do not exist." *Kaupthing ehf.*, 291 F. Supp. 3d at 33 (quoting *Wimmer Canada, Inc. v. Abele Tractor & Equipment Co., Inc*., 299 A.D.2d 47, 750 N.Y.S.2d 331, 332 (2002). Plaintiffs have made no such showing.

Plaintiffs allege that the "High Court of Zambia had jurisdiction over the Judgment Defendants and the subject-matter," but fail to identify the basis of the jurisdiction. *See* Complaint, para 44; *see also* ECF No. 1-5. For instance, Plaintiffs have not alleged nor proved that the Commissioner had minimum contacts with Zambia. *See* ECF No. 1, ¶ 44. Nor is there any evidence in the Order or other exhibits filed by Plaintiffs, indicating that the Commissioner was not served either before or after the issuance of the Order. *See* ECF No. 1-5. And as stated by Mr. Kalaluka, there could be no jurisdiction over the Commissioner since a Zambian court would likely find that the Commissioner is immune from jurisdiction in Zambia. *See* Expert Opinion of Likando Kalaluka, QC, ¶ 26, a true and correct copy attached as **Exhibit 3**. In addition, and as conceded by Plaintiffs, the High Court did not exercise jurisdiction over Zimbabwe because it was not a party to the case. *See* Section I (B)(C)

**B. The Order is repugnant to the public policy of the District of Columbia and the United States**

The D.C. Code also permits a court to refuse recognition of a foreign judgment where the "judgment or cause of action on which the judgment is based is repugnant to the public policy of the District of Columbia or of the United States." D.C. Code § 15-364. Even prior to the passing of this Act, this Court and the D.C. Circuit have refused recognition of foreign judgments on public policy grounds. *See Matusevitch v. Telnikoff,* 877 F. Supp. 1, 3 (D.D.C. 1995), *aff'd sub nom. Matusevitch v. Telnikoff*, 159 F.3d 636 (D.C. Cir. 1998).

A cause of action or a judgment is repugnant to the public policy of this state and that of the United States where it ignores "basic underpinnings of common contractual law." *See Mulugeta v. Ademachew*, 407 F. Supp. 3d 569, 586 (E.D. Va. 2019); *see also Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion*, 832 F.3d 92, 107-108 (2d Cir. 2016) (noting that the "high hurdle of the public policy exception is surmounted by vindication of contractual undertakings" and refusing to recognize to a Mexican judgment that set aside an arbitration award in disregard of the parties' arbitration agreement).

Here, the Tribunal had no jurisdiction over the Commissioner because it was not a party to the MOUs—the sole basis of the Tribunal's jurisdiction. As Plaintiffs rightly pointed out, the MOUs only instruct the contracting parties, *i.e.*, Plaintiffs and ZMDC, to arbitrate "disputes arising…out of or in relation to the" MOUs. *See* ECF No.1, ¶ 24 (emphasis added). By nonetheless registering the Award against the Commissioner, the Zambian High Court ignored the parties' arbitration agreement. Enforcing such judgment will be repugnant to the public policy of the District of Columbia and the United States, hence, this Court should refuse recognition of the Judgment.

## CONCLUSION

For the foregoing reasons, the Commissioner and Zimbabwe requests that the Court grant the Motion to Dismiss and grant whatever additional relief it considers just and proper.

Respectfully submitted,

/s/ Quinn Smith
**GST LLP**
Quinn Smith
DCD Bar No. FL0027
quinn.smith@gstllp.com
Katherine Sanoja
DC Bar No. 1019983
katherine.sanoja@gstllp.com

1111 Brickell Avenue
Suite 2715
Tel. (305) 856-7723

Bethel Kassa
*Pro hac vice pending*
bethel.kassa@gstllp.com
2600 Virginia Avenue, Suite 205
Washington D.C., 20037

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2022, I electronically filed this document with the Clerk of the Court of the U.S. District Court of the District of Columbia by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel off record. I further certify that I am unaware of any parties who will not receive such notice.

By: /s/ *Quinn Smith*
Quinn Smith

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Amaplat Mauritius Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius;
and

Amari Nickel Holdings Zimbabwe Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius,

Plaintiffs,

v.

Zimbabwe Mining Development Corporation,
90 Mutare Road, Msasa, Harare, Zimbabwe;

The Chief Mining Commissioner, Ministry of
Mines of Zimbabwe,
6th Floor, ZIMRE Centre, Cnr. Leopold
Takawira Street/Kwame Nkrumah Avenue,
Private Bag 7709, Causeway, Harare,
Zimbabwe;

and the Republic of Zimbabwe,
c/o Head of the Ministry of Foreign Affairs,
Ministry of Foreign Affairs, P.O. Box 4240,
Munhumutapa Building, Cnr. Samora Machel
Avenue/Sam Nujoma Street, Harare,
Zimbabwe

Defendants.

Civil Action No. 1-22-cv-0058

**RETURN OF SERVICE**

1. I am not a party to this action, I am over 18 years of age, and I am employed as an independent legal consultant to a law firm, BE Law AG.

2. On August 10, 2022 at approximately 14:40 Zimbabwe time, which was during normal business hours, I served true copies of the Summons, Complaint with Exhibits A through G, Notice of Suit, and all other papers thus far electronically filed on the docket in this action, on Zimbabwe Mining Development Corporation, No. 6 Constantia Road, Strathaven, Harare, Zimbabwe.

3. I made such service by personally hand delivering the aforementioned documents to Theresa Kanengoni, at Zimbabwe Mining Development Corporation, ZMDC Building, 6 Constantia Road, Strathaven, Harare, Zimbabwe.

4. Since there was noone at the reception, the security personnel called for Theresa Kanengoni, who was a secretary for Zimbabwe Mining Development Corporation and stated that she was authorized to accept service for Zimbabwe Mining Development Corporation and appeared to be a responsible person at Zimbabwe Mining Development Corrporation.

I declare under penalty of perjury pursuant under the laws of the United States of America that the foregoing is true and correct.

Dated: August 19, 2022

________________________________
Anja Doncaster
Legal Consultant
BE Law AG



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Amaplat Mauritius Ltd.,<br>c/o CKLB International Management Ltd., P.O. Box 80, Felix House, 24 Dr. Joseph Riviere Street, Port Louis 11602, Mauritius; and<br><br>Amari Nickel Holdings Zimbabwe Ltd.,<br>c/o CKLB International Management Ltd., P.O. Box 80, Felix House, 24 Dr. Joseph Riviere Street, Port Louis 11602, Mauritius,<br><br>Plaintiffs,<br><br>v.<br><br>Zimbabwe Mining Development Corporation,<br>90 Mutare Road, Msasa, Harare, Zimbabwe;<br><br>The Chief Mining Commissioner, Ministry of Mines of Zimbabwe,<br>6th Floor, ZIMRE Centre, Cnr. Leopold Takawira Street/Kwame Nkrumah Avenue, Private Bag 7709, Causeway, Harare, Zimbabwe;<br><br>and the Republic of Zimbabwe,<br>c/o Head of the Ministry of Foreign Affairs, Ministry of Foreign Affairs, P.O. Box 4240, Munhumutapa Building, Cnr. Samora Machel Avenue/Sam Nujoma Street, Harare, Zimbabwe<br><br>Defendants. | Civil Action No. 1-22-cv-0058-CRC |

I, JOHN PETER SANGWA, declare under the penalty of perjury under the laws of the United States of America as follows:

1.      I am an Advocate of the Superior Courts for Zambia and founding partner in the Firm of Simeza, Sangwa & Associates in Zambia.

2.      I hold a Bachelor of Laws degree (LLB) and a Master of Laws degree (LLM) from the University of Zambia. I was admitted to the Zambian Bar in 1990. I also hold a Diploma in Trial Advocacy from the National Institute of Trial Advocacy, Southern California Reginal Programme, Los Angeles.

3.      In 1994, my partner and I established the Firm of Simeza, Sangwa & Associates. Between 1990 to 1994, I served as Assistant Lecturer at the University of Zambia, School of Law. From 1994, until 2010, when I resigned to concentrate on my work with the Firm, I served as a full-time lecturer, teaching Constitutional Law and Administrative Law.

4.      In recognition my loyalty, integrity, ability and contribution to the law and the legal profession in Zambia, on 2 May 2013, by Letters Patent, the President of the Republic of Zambia thought it fit to constitute and appoint me to be State Counsel (SC).

5.      I have taken the liberty to refer to the Zimbabwe Mining Development Corporation and the Chief Mining Officer of the Republic of Zimbabwe as the "Judgment Debtors", while Amaplat Mauritius Limited and Amari Nickel Holdings Zimbabwe Limited are referred to as the "Judgment Creditors", unless the context dictates otherwise.

6.      I have been asked by Steptoe & Johnson LLP., who represent the Judgment Creditors to provide a declaration regarding the factual circumstances surrounding the service of the Notice of Registration of the ICC Arbitration Award in 2019, (hereinafter referred to as the "Notice") on the Judgment Debtors.

7.  My Firm represented and continue to represent the Judgment Creditors in a number of proceedings in the Zambian courts related to their arbitration with the Judgment Debtors. I am the lawyer in the firm that has been in charge of these cases and as such, I am familiar both with the Zambian proceedings and with the arbitration proceedings to which they related.

8.  By way of background, the Judgment Creditors initiated arbitration against the Judgment Debtors before the International Chamber of Commerce's International Court of Arbitration in Paris, which issued a Ruling directing that the arbitration be seated in Zambia.

9.  In connection with that arbitration, the Judgment Creditors and Judgment Debtors signed Terms of Reference under the ICC's Rules, which unequivocally provided that the Arbitrators would have the power to rule on the Judgment Debtors' jurisdictional defences. A true and correct copy of the Terms of Reference is attached hereto as **Exhibit 1**.

10. It was the Judgment Debtors rather than the Judgment Creditors who first availed themselves of the Zambian Courts by filing proceedings in the Zambian High Court. In October 2012, the Judgment Debtors filed Cause 2012/HP/1213, in the High Court, seeking to enjoin the arbitration.

11. The Judgment Debtors initially obtained an *ex parte* temporary restraining order, which the Court eventually discharged after *inter-partes* hearing. One of the reasons for discharging the injunction was that, material facts were withheld from the Court at the time of seeking the *ex-parte* injunction A true and correct copy of the restraining order is attached hereto as **Exhibit 2**, and a true and correct copy of the later ruling vacating it is attached hereto as **Exhibit 3**.

**12.** The Arbitral Tribunal proceeded with the arbitration and delivered its Final Award in January 2014.[1]

**13.** A few days later, the Judgment Debtors again made an application to the Zambian High Court in Cause No. 2014/HP/ARB/ 002, to set aside the Final Award. Again, they made an *ex parte* application, which briefly led to an *ex parte* order staying execution of the award. Thereafter the Judgment Creditors moved to dismiss the proceedings in the ground that they were improperly commenced, and the action was withdrawn without prejudice, thereby terminating the *ex parte* order staying execution of the award.

**14.** The Judgment Debtors then commenced a third action under Cause No. 2014/HP/ARB/ 011, in May 2014 to set aside the award.

**15.** Between 2014 and 2018, there was litigation all the way up to the Supreme Court of Zambia regarding whether Causes 2014/HP/ARB/011 and 2012/HP/1213 should be consolidated. Judgment Creditors opposed the consolidation and ultimately prevailed in the Supreme Court.

**16.** The Judgment Creditors then applied to dismiss Cause No. 2012/HP/1213 for failure to disclose a reasonable cause of action. The High Court granted this application and dismissed the action on 25 January 2019. The Judgment Debtors appealed, and that appeal was eventually dismissed in August 2021. No further appeal is currently pending.

**17.** Similarly, the Judgment Creditors applied to dismiss Cause No. 2014/HP/ARB/011 on the ground that it was not commenced within the three-month limitation period for an application to set aside an arbitral award. The Court granted that application on 26

---

[1] Judgment Debtors contended that this was a violation of the temporary restraining order and moved to initiate contempt proceedings, but the Court's later finding that the *ex parte* order was issued without jurisdiction (and thus void) mooted this application.

April 2019, and dismissed the action. While a notice of appeal has been filed, the Judgment Debtors have taken no steps to prosecute their appeal.

**18.** With no pending proceedings in the High Court seeking to enjoin enforcement of the Award, on 19 July 2019, the Judgment Creditors moved the High Court to register the arbitration award as a judgment. The application was heard *ex parte*, consistent with the usual procedure for registering arbitration awards in Zambia.

**19.** On 12 August 2019, the Registrar of the High Court signed an Order registering the Final Award (hereinafter referred to as the "Order") thereby giving the Judgment Creditors the right to enforce the Final Award dated 12 January 2014, in the same manner as a judgment or order of the High Court for Zambia. A true and correct copy of the Order registering the Final Award is attached hereto as **Exhibit 4.**

**20.** The Final Award was registered in the Register of Arbitration Awards in the High Court for Zambia at the Commercial Registry at Lusaka on 12 August 2019, and on 19 August 2019, the Notice as required by the Rules, was filed with the Court. A true and correct copy of the Notice is attached hereto as **Exhibit 5.**

**21.** According to the Order the Judgment Debtors had the right to apply to set aside the Order of 12 August 2014, within 30 days from the date of service. The Award was, therefore, not open to enforcement in Zambia until after the expiration of the 30 days from the date of service of the Order.

**22.** With the Order signed, on 20 August 2019, my Firm proceeded to serve the Order and the Notice on the Judgment Debtors through their Advocates Messrs Ranchhod Chungu – Advocates, who have been representing the Judgment Debtors throughout the proceedings in Zambia, under cover of the letter dated 19 August 2019. According to the said letter Messrs Ranchhod Chungu – Advocates were required to acknowledge receipt of the Order and Notice by signing a copy of the letter of 19 August 2019,

which they did by stamping and signing a copy of the letter. A true and correct copy of the letter dated 19 August 2019, signed, and stamped by Messrs Ranchhod Chungu – Advocates is attached hereto as **Exhibit 6**.

**23.** Before serving the Order and Notice under cover of the letter of 19 August 2019, on the Judgment Debtors through the Advocates, specifically, my Associate, Leah Musenge contacted a lawyer in the firm of Ranchhod Chungu - Advocates by the name of Ms Dinah Nundwe who had conduct of the matters on behalf of the Judgment Debtors to confirm whether her firm had instructions to receive the Order and Notice on behalf of their clients. Ms Nundwe confirmed that her Firm had instructions to accept the service of the Order and the Notice.

**24.** It was only after receiving the confirmation from Ms Nundwe, did my Firm send the letter of 19 August 2019, accompanied with the Notice and Order. With the confirmation from Messrs Ranchhod Chungu - Advocates that they had instructions to receive the Order and Notice on behalf of the Judgment Debtors, no application for leave to serve outside the jurisdiction was necessary. The service occurred within the jurisdiction.

**25.** Service on a party's Advocates is a recognised mode of service of Court documents on a party to the High Court proceedings in Zambia. This is provided for under Order 10, rule 5 of the High Court Rules, which reads: "Personal service of the writ on the defendant shall not be required where the defendant's advocate undertakes in writing to accept service on behalf of the defendant."

**26.** Furthermore, under Zambian law, where service of the Court documents has not been effected according to the Court rules, and therefore irregular, the right course of action is not to ignore the service of the documents but to move the Court to set aside the service. No such application has been made by the Judgment Debtors.

**27.** No steps have been taken by the Judgment Creditors to vacate or set aside the registration of the Final Award. Furthermore, Messrs Ranchhod Chungu – Advocates have not returned the Order or the Notice on the premise that they had misrepresented that they had instructions to receive these documents on behalf of the Judgment Debtors or for any other reason.

**28.** Under Zambian law, service is effective regardless of whether an affidavit of service has been filed with the Court. It is only when a judgment creditor wishes to issue a writ of execution against a judgment debtor that the judgment creditor must present an affidavit of service to establish that the Order and Notice were served the Notice.

**29.** Before the writ of execution can issue against the assets of the Judgment Debtors in Zambia, an affidavit of service will have to be filed with the Court first to prove that the Order and Notice were served on the Judgment Debtors. However, because Judgment Creditors have not identified any assets of the Judgment Debtors in Zambia against which they could issue a writ of execution, no affidavit of service has been filed with the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 20th September 2022, at Lusaka, Zambia.

[signature]

JOHN PETER SANGWA, SC

# EXHIBIT 1

"Exhibit 1"

ICC
INTERNATIONAL COURT OF ARBITRATION®
INTERNATIONAL CENTRE FOR ADR
LEADING DISPUTE RESOLUTION WORLDWIDE

# TERMS OF REFERENCE

**INTERNATIONAL CHAMBER OF COMMERCE (ICC)**
**INTERNATIONAL COURT OF ARBITRATION**

33-43 avenue du Président Wilson, 75116 Paris, France
**T** +33 (0)1 49 53 29 05 **F** +33 (0)1 49 53 29 33
**E** arb@iccwbo.org www.iccarbitration.org

**ICC INTERNATIONAL COURT OF ARBITRATION**

**CASE No. 17720/ARP/MD/TO**

1. AMAPLAT MAURITIUS LTD

(Mauritius)

2. AMARI NICKEL HOLDINGS ZIMBABWE LTD

(Mauritius)

**vs/**

1. ZIMBABWE MINING DEVELOPMENT CORPORATION

(Zimbabwe)

2. THE CHIEF MINING COMMISSIONER, MINISTRY OF MINES, ZIMBABWE

(Zimbabwe)

This document is a certified true copy of the original of the Terms of Reference established in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

**IN THE MATTER OF AN INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION CASE NO. 17720/ARP**

**BETWEEN:**

1. **AMAPLAT MAURITIUS LIMITED**
2. **AMARI NICKEL HOLDINGS ZIMBABWE LIMITED**

**Claimants**

- and –

1. **ZIMBABWE MINING DEVELOPMENT CORPORATION**
2. **THE CHIEF MINING COMMISSIONER, MINISTRY OF MINES, ZIMBABWE**

**Respondents**

## TERMS OF REFERENCE

### 1. PARTIES

1.1 The First Claimant is Amaplat Mauritius Limited (**"Amaplat"**), a company incorporated under the laws of Mauritius. The Second Claimant is Amari Nickel Holdings Zimbabwe Limited (**"Amari"**), also a company incorporated under the laws of Mauritius. Amari is a wholly-owned subsidiary of Amari Resources International Limited, an international resource investment company focused on exploration and mining in sub-Saharan Africa. The Claimants have their principal place of business at Amari, 3rd Floor, Melrose Boulevard, Melrose Arch, Johannesburg, South Africa.

1.2 The First Respondent is Zimbabwe Mining Development Corporation (**"ZMDC"**), a body corporate established under the Zimbabwe Mining Development Corporation Act (Cap. 21:08) of the Republic of Zimbabwe (**"the Act"**) having its address at Ground Floor, MMCZ Building, 90 Mutare Road, Msasa, Harare, Zimbabwe. ZMDC's business includes investing in mining and mining development on behalf of the Government of Zimbabwe.

1.3 The Second Respondent is The Chief Mining Commissioner, Ministry of Mines, Zimbabwe, having his address at 7th Floor, Zimre Centre, Private Bag CY 7709, Causeway, Harare, Zimbabwe.

### 2. ADDRESSES FOR PURPOSES OF NOTIFICATION

2.1 The addresses of the parties to which notifications or communications arising in the course of the arbitration may validly be made are:

(1) **The Claimants:** To their lawyers, Advocate Neil Lazarus SC and Advocate Courtenay Wright, Group One, Sandown Chambers, Sandown Village, Maude Street

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

CERTIFIED TRUE COPY OF THE ORIGINAL
PARIS, 20 March 2014
Andrea CARLEVARIS
Secretary General

corner Gwen Lane, Sandown, South Africa. Telephone **+27 11 290 4000**; fax **+27 11 783 6331/4**; email neill@blts.co.za; courtenay.wright@gmail.com; *and* David H Botha, Du Plessis & Kruger Attorneys (Ref: P J Du Plessis/ss), 4th Floor National Bank Building, 84 Market Street corner Simmonds, PO Box 8013 Johannesburg 2000, South Africa. Telephone **+27 11 838 1214**; fax **+27 11 836 8740**; email pdp@bdk.co.za.

(2) **The Respondents:** To their lawyers, Mutamangira & Associates, 2nd Floor Travel Plaza, Cnr Mazoe and J Chinamano, Harare, Zimbabwe. Telephone **+263 799249/702436**; fax **+263 799249**; email jacob@mutamangira.co.zw.

2.2 Any change to the Claimants' principal place of business or the Respondents' addresses or the contact details of their respective lawyers listed in this section must be immediately notified to all the parties, each member of the Arbitral Tribunal (**"the Tribunal"**) and the Secretariat of the International Court of Arbitration of the ICC (**"the Secretariat"**). Otherwise, any communication or notification sent to the addresses specified in this section will be regarded as valid.

2.3 All written communications or notifications to or by the parties (including pleadings, submissions, witness statements and exhibits) shall be valid if sent by email to the parties' representatives to the email addresses shown in this section (with PDF or Word attachments, unless the documents in question are too big to be attached to the email).

2.4 Apart from short or routine correspondence, which may be set out in the body of an email, letters should be attached as a PDF to the email.

2.5 With the exception of correspondence from or to the Tribunal or between the representatives of the parties, confirmation paper copies of documents (including pleadings, submissions, witness statements and exhibits) sent by email should, unless requested otherwise by the parties or the Tribunal, be provided and sent by courier or post to the other party and the Tribunal.

2.6 Notifications or communications shall be deemed to be received on a day if received by email before 18.00 hours local time on that day, provided this is a business day in the place of receipt.



2.7 A copy of any communication by any party to the Tribunal shall be sent simultaneously and by the same means to the other parties and to the Secretariat at ICC International Court of Arbitration (**"the Court"**), 38 Cours Albert 1[er], 75008 Paris, France. Telephone **+33 1 49 53 28 36**; fax **+33 1 49 53 57 78**; email: ica4@iccwbo.org.

## 3. RELEVANT BACKGROUND

3.1 ZMDC hold 45% of the shares in Zimari Nickel (Pvt) Ltd (**"Zimari Nickel"**), a joint venture company incorporated by those parties to prospect for nickel and develop a mine pursuant to a Memorandum of Understanding between Amari Holdings Ltd (**"Amari BVI"**), a company incorporated in the British Virgin Islands, and ZMDC dated 22 November 2007 (**"the Nickel MOU"**). According to the Claimants, Amari holds 55% of the shares in Zimari Nickel but this is disputed by the Respondents.

3.2 By a Deed of Novation dated 6 June 2008 between Amari BVI, Amari and ZMDC, with effect from 1 May 2008 Amari BVI was released and discharged from its rights and obligations pursuant to the Nickel MOU upon Amari's undertaking to Amari BVI and ZMDC to perform Amari BVI's obligations pursuant to the Nickel MOU and be bound by its terms and conditions as if Amari had been the original party to the Nickel MOU in place of Amari BVI. By clause 3.1 of the Deed of Novation, Amari BVI and ZMDC acknowledged that Amari would be solely entitled to the entire rights and benefits under the Nickel MOU as if Amari were the original party to it in place of Amari BVI.

3.3 ZMDC holds 50% of the shares in Zimari Platinum (Pvt) Ltd (**"Zimari Platinum"**), a joint venture company incorporated by those parties to prospect for various metals and develop a mine pursuant to a Memorandum of Understanding between Amaplat and ZMDC dated 25 July 2008 (**"the Platinum MOU"**). According to the Claimants, Amaplat holds 50% of the shares in Zimari Platinum but this is disputed by the Respondents.

3.4 The Nickel and the Platinum MOUs (together **"the MOUs"**) were concluded by Mr M J Nunn on behalf of the Amari BVI's and Amaplat respectively and by Mr Dominic Mubayiwa, ZMDC's General Manager, on ZMDC's behalf.

3.5 By a letter dated 10 November 2010 from ZMDC to the Claimants, ZMDC *inter alia* noted that there was "*a corrupt relationship which unduly influenced the signing of the* [Platinum MOU]"; stated that there was "*no Joint Venture Agreement regulating our relationship*"; and concluded that:



> *"As a result of the above, we advise you that your conduct is unacceptable, improper and directly undermines the basic tenets of corporate governance principles which we so cherish and adhere to. It contravenes the Zimbabwean laws and we reserve the right to report you for prosecution. Your conduct goes to the core of our relationship and as such we are no longer prepared to engage yourselves for negotiations to the next stage of a Joint Venture Agreement. In fact out relationship terminated for both platinum and nickel properties."*

3.6 By a letter dated 22 November 2010 in reply, the Claimants *inter alia* disputed ZMDC's allegations and its entitlement to terminate the MOUs and maintained that those agreements were legally binding and of full force and effect.

3.7 By letters dated 14 January 2011, ZMDC reiterated its position that the MOUs had been "*cancelled*".

## 4. SUMMARY OF THE PARTIES' RESPECTIVE CLAIMS AND RELIEF SOUGHT

4.1 The purpose of the summaries set out below is to fulfil the requirements of Article 18(1)(c) of the ICC Rules of Arbitration in force as from 1 January 1998 (**"the Rules"**), without prejudice to any further allegations, arguments or contentions contained in the pleadings or submissions filed to date or to be filed.

4.2 No factual or legal statement or omission in the summary of either party is to be interpreted as a waiver of any issue of fact or law. By signing these Terms of Reference, neither party subscribes to, or acquiesces in, the summary of the other party's position set out below.

### The Claimants

4.3 The Claimants' contentions appear from the Request for Arbitration and attached Statement of Claim dated 31 January 2011 (**"the Request"**); the Notice of Amendment to the Statement of Claim dated 12 May 2011; the Amended Statement of Claim dated 25 May 2011; the Replication (**"the Reply"**) and Notice of Amendment to the Statement of Claim each dated 29 August 2011; and the Notice of Amendment to the Statement of Claim dated 9 November 2011.

4.4 The Claimants contend that:

(1) The Tribunal has jurisdiction to hear and determine the dispute.



(2) The MOUs remain valid and binding.[1]

(3) The Respondents have waived any right that they might otherwise have had or else are estopped from contending that the MOUs are not valid and binding as, with knowledge of the purported invalidities on which they now rely, they gave effect to and implemented the MOUs in various respects.[2]

(4) Contrary to the Respondents' allegations, the necessary board and shareholders approval was secured in respect of the Nickel MOU. Alternatively, ZMDC is estopped from relying on any failure to secure such approval as a result of its failure to use its best endeavours to procure it;[3] and the Respondents have waived any right that they may otherwise have had or else are estopped from contending that such approval was not obtained.[4] Also, the Deed of Novation constituted an express or implied renewal of the Nickel MOU such that a new agreement on identical terms to the Nickel MOU (as supplemented by the Deed of Novation) came into existence.[5]

(5) Contrary to the Respondents' allegations:

(a) the Minister's approval in terms of the Act was not a term of the MOUs and the absence of such approval does not have the legal effect for which the Respondents contend;

(b) such approval was in fact obtained;

(c) the Respondents are estopped from contending that such approval was not obtained.[6]

[1] Reply §15.

[2] *Ibid.*, §4, 5 and 16.

[3] *Ibid.*, §8.

[4] *Ibid.*, §9 and 10.

[5] *Ibid.*, §11.

[6] *Ibid.*, §12 to 14.

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

(6) Contrary to the Respondents' allegations, there was no corrupt relationship between ZMDC's General Manager and the Claimants entitling ZMDC to repudiate the MOUs or at all.[7]

(7) In the event that the Amari is not a shareholder in Zimari Nickel and/or that Amaplat is not a shareholder in Zimari Platinum or the MOUs are for any reason invalid or unenforceable, ZMDC has been unjustly enriched at Amaplat's expense in an amount of US$574,000,000 alternatively US$287,500,000 and at Amari's expense in an amount of US$55,000,000 alternatively US$27.500,000 or such other amounts as the Tribunal may determine.[8]

4.5 In the above circumstances, the Claimants seek:

(1) a declaration that the MOUs are valid and binding;

(2) a declaration that ZMDC is bound to continue to give effect to and implement the MOUs;[9]

(3) damages in the sums of US$287,500,000 and US$27,500,000, in the event that ZMDC fails to give effect to or implement the MOUs;[10]

(4) restitution to the Claimants of the sums referred to in paragraph 4.4(7) above;[11]

(5) interest at the rate of 15.5% from the date of any award until the date of payment;

(6) an order that the Respondents pay the Claimants' legal and other costs of the arbitration.

---

[7] *Ibid.*, §19 and 20.

[8] Notice of Amendment to the Statement of Claim dated 9 November 2011 §12.

[9] *Ibid.*, §13.

[10] Notice of Amendment to the Statement of Claim dated 12 May 2011; the Amended Statement of Claim §26 to 28; Notice of Amendment to the Statement of Claim dated 29 August 2011.

[11] Notice of Amendment to the Statement of Claim dated 9 November 2011 §14.

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

**The Respondents**

4.6 The Respondents' contentions appear from the "*First and Second Respondent's* [sic] *Statement of Opposition* dated March 2011 (**"the Answer"**) sent to the Secretariat by email on 22 March 2011 (under cover of a letter 17 March 2011).

4.7 The Respondents contend that:

(1) The Tribunal lacks jurisdiction to determine the present dispute because:

(a) the Nickel MOU lapsed on 31 December 2007 pursuant to Article 9 thereof and became of no force or effect; and the arbitration provisions in Article 11 thereof are an integral part of the Nickel MOU which also lapsed and consequently became of no force or effect.[12]

(b) The MOUs are invalid and tainted with illegality under the laws of Zimbabwe for non-compliance with the mandatory provisions of the Act which required that any agreement entered into by ZMDC must be approved by the Minister of Mines and Mining Development (**"the Minister"**). To give effect to the arbitration clause of an agreement tainted with illegality is to grant specific performance of the illegal agreement and it is contrary to the public policy of the Republic of Zimbabwe effectively to grant such specific performance.[13]

The remainder of the Respondents' contentions are without prejudice to their challenge to the Tribunal's jurisdiction.

(2) A condition precedent to the Nickel MOU was not fulfilled since the necessary board and shareholders' written approval on or before 31 December 2007 was not secured for it. Consequently, the Effective Date (as defined therein) of the Nickel MOU never arose and the Nickel MOU never became operative or else lapsed after that date.[14]

---

[12] Answer §9.

[13] *Ibid.*, §10.

[14] *Ibid.*, §11 to 16.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

(3) The MOUs were repudiated by ZMDC on the grounds that they were procured by reason of a corrupt relationship between its General Manager and the Claimants. This position is not saved in respect of the Nickel MOU by the Deed of Novation.[15]

(4) Since ZMDC failed to obtain the Minister's approval for its acquisition of shares in Zimari Nickel and Zimari Platinum as required by paragraphs 20 and 21 of the Schedule to the Act:

(a) ZMDC lacked the capacity to enter into the MOUs, which are accordingly null and void; and

(b) the MOUs are tainted with illegality and the Claimants cannot seek specific performance thereof.[16]

(5) No joint venture agreement as contemplated by the MOUs was ever entered into.[17]

(6) The Claimants are not shareholders in Zimari Nickel and Zimari Platinum.[18]

(7) There is no basis for and the Claimants are not entitled to restitution of the sums claimed or to any sums on the ground of unjust enrichment or otherwise.

4.8 In the above circumstances, the Respondents seek[19]:

(1) A declaration that the Tribunal lacks jurisdiction in respect of the dispute.

(2) Alternatively, if the Tribunal has jurisdiction, the dismissal of the Claimants' claims.

(3) An order that the Claimants shall pay their legal and other costs.

[15] *Ibid.*, §17 to 24 and 35.

[16] *Ibid.*, §25 to 28.

[17] *Ibid.*, §29 to 31.

[18] *Ibid.*, §32 and 33.

[19] *Ibid.*, §50.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

5. **THE ARBITRATION CLAUSES**

5. Article 11 of the Nickel MOU and Article 9 of the Platinum MOU provide that:

> "*In the event of a dispute or disputes arising, such disputes, controversies or differences between the Parties, which may arise out of or in relation to the MOU, and which cannot be settled by the Board, the parties shall first try to resolve it amicably through negotiation. In the event that no settlement can be reached through negotiation in reasonable time, any Party may submit the dispute to the ICC International Court of Arbitration in Paris for arbitration in accordance with the procedural rules of arbitration of the said Arbitration Court in effect at the tine of applying arbitration, the award of which shall be final and binding upon the Parties. The language in Arbitration shall be in English.*"

6. **ISSUES TO BE DETERMINED**

6.1 The issues to be determined shall be those resulting from the parties' submissions, statements and pleadings which are relevant to the determination of the parties' respective claims and defences and any further questions of fact or law which the Tribunal, in its own discretion, may deem necessary or appropriate to decide upon, after hearing the parties, for the purpose of resolving the present dispute.

6.2 The issues which may have to be determined (but not necessarily all of these and not necessarily in the following order) are:

(1) Does the Tribunal have jurisdiction to hear and determine the dispute?

(2) Are the MOUs valid and binding? In that regard:

(a) Did the Nickel MOU ever become operative and, if so, did it lapse after 31 December 2007 on the grounds that the necessary board and shareholder approvals was not secured in respect of it?

(b) If any necessary board and shareholder approval was not secured in respect of the Nickel MOU:

(i) is ZMDC estopped from relying on any failure to secure such approval?

(ii) have the Respondents waived any right they may otherwise have had or else are estopped from contending that such approval was not obtained?



(iii) is the effect of the Deed of Novation to bring into existence a new agreement on identical terms to the Nickel MOU (as supplemented by the Deed of Novation?

(c) was the Minister's approval in terms of the Act in fact obtained in respect of the MOU?

(d) if not, are the Respondents estopped from contending that such approval was not obtained?

(e) Was ZMDC entitled to terminate the MOUs on the grounds that they were procured by reason of a corrupt relationship between its General Manager and the Claimants?

(f) What is the effect, if any, of ZMDC's failure to obtain the Minister'a approval for its acquisition of shares in Zimari Nickel and Zimari Platinum as required by paragraphs 20 and 21 of the Schedule to the Act?

(g) Was no joint venture agreement as contemplated by the MOUs ever entered into; and, if that is the case, what are the consequences in the context of the present dispute?

(h) Have the Respondents waived any right that they might otherwise have had or else are they estopped from contending that the MOUs are not valid and binding as, with knowledge of the purported invalidities on which they now rely, they gave effect to and implemented the MOUs in various respects?

(3) Are the Claimants shareholders in Zimari Nickel and Zimari Platinum?

(4) If the MOUs are valid and binding, are the Claimants entitled to a declaration to that effect?

(5) If the MOUs are valid and binding, are the Claimants entitled to a declaration that ZMDC is bound to continue to give effect to and implement the MOUs?



(6) Are the Claimants entitled to damages in the event that ZMDC fails to give effect to or implement the MOUs and, if so, in what amount?

(7) In the event that the Amari is not a shareholder in Zimari Nickel and/or that Amaplat is not a shareholder in Zimari Platinum or the MOUs are for any reason invalid or unenforceable, has ZMDC has been unjustly enriched at the Claimants' expense and, if so, is ZMDC liable to make restitution to the Claimants and, if so, in what amounts?

(8) If the MOUs are not valid and binding, are the Respondents entitled to have the Claimants' claim dismissed?

(9) What is the incidence and amount of any interest which should be awarded to the Claimants?

(10) What is the incidence and amount of legal and other costs?

## 7. THE ARBITRATION

7.1 The arbitration clauses did not specify the number of arbitrators.

7.2 By paragraph 9 of the Request, the Claimants requested the appointment of a Sole Arbitrator.

7.3 By a letter dated 10 March 2011 from Mutamangira & Associates, the Respondents stated that they objected to the appointment of a Sole Arbitrator and requested the appointment of three arbitrators.

7.4 The parties were unable to agree on the number of arbitrators.

7.5 The parties were also unable to agree on the place of the arbitration.

7.6 On 12 May 2011, the Court decided *inter alia*:

(1) pursuant to Article 8(2) of the Rules that the matter would be submitted to three arbitrators;



(2) pursuant to Article 14(1) of the Rules to fix Lusaka, Zambia, as the place of the arbitration.

7.7 On 27 September 2011, the Secretary General of the Court, pursuant to Article 9(2) of the Rules, confirmed Judge Meyer Joffe as co-arbitrator upon the joint nomination of the Claimants and confirmed Mr James Prince Mutizwa as co-arbitrator upon the joint nomination of the Respondents.

7.8 On 27 October 2011, pursuant to Article 9(3) of the Rules the Court appointed Mr Stuart Isaacs QC then of 3-4 South Square, Gray's Inn, London WC1R 5HP and now of Berwin, Leighton Paisner, Adelaide House, London Bridge, London EC4R 9HA as Chairman of the Tribunal, upon the proposal of the United Kingdom National Committee.

7.9 In accordance with the Court's decision taken on 12 May 2011 pursuant to Article 14(1) of the Rules, the place of the arbitration is Lusaka, Zambia.

7.10 The applicable procedural rules which govern the proceedings before the Tribunal shall be those resulting from the Rules. Where the Rules are silent, the applicable procedural rules shall be such rules as may be agreed upon from time to time by and between the Tribunal and the parties; and, failing such agreement, as may be determined by the Tribunal.

7.11 In accordance with the arbitration clauses, the language of the arbitration is English.

7.12 In accordance with Article 12.7 of the Nickel MOU and Article 10.8 of the Platinum MOU, the present dispute is to be determined under the laws of Zimbabwe.

7.13 If either party fails within the prescribed time to present its case or comply with any direction of the Tribunal at any stage of the proceedings, the Tribunal may, of its own volition or at the other party's request, after reasonable notice to the parties, proceed with the arbitration and make an award.

8. **ACKNOWLEDGMENT OF THE PARTIES**

8.1 By signing these Terms of Reference, the parties acknowledge that they agree to submit to this arbitration and expressly waive any procedural objections they may have with respect to known events, including the appointment of the Tribunal.



8.2 The Tribunal's role and function includes (with the parties' agreement) assisting the parties to resolve their dispute at any stage of the proceedings and by any means, including a negotiated settlement. If the parties request such assistance from the Tribunal, it will be on the basis that the parties expressly agree that the provision of such assistance shall not disqualify the Tribunal from continuing to serve. Such express agreement shall be considered to be an effective waiver of any potential conflict of interest that may arise from the Tribunal's participation in such process or from information which the Tribunal may learn in the process. If the assistance by the Tribunal does not lead to final settlement of the dispute, the parties remain bound by their waiver. However, notwithstanding such agreement, the Tribunal shall resign if, as a consequence of its involvement in the settlement process, it develops doubts as to its ability to remain impartial or independent in the future course of the arbitration proceedings.

8.3 A party shall inform the Tribunal, the ICC and the other parties about any direct or indirect relationship between the party (or a company in the same group as the party or a company in which a party has a material interest) and the Tribunal. The party shall provide this information on its own initiative as soon as the party becomes aware of such relationship.

## 9. CONFIDENTIALITY

9. Unless disclosure is required by (1) statute, ordinance or regulation or (2) to protect or pursue a legal right of the parties, the parties and the Tribunal undertake as a general principle to preserve the private and confidential nature of this arbitration and, in particular, all the documents produced by the other party in the proceedings not otherwise in the public domain.

## 10. AGREEMENT TO TERMS OF REFERENCE

10.1 The Terms of Reference are signed in seven originals on the dates as shown below by the legal representatives of the parties hereto, who hereby represent that they have the authority to execute this document on behalf of their respective party.

10.2 Without prejudice to the provisions of Articles 18(3) and 24(1) of the Rules, the date of the Chairman's signature on the Terms of Reference shall be for all purposes the date of the Terms of Reference.



10.3 Each original of the Terms of Reference forms an original arbitration agreement for the purposes of Articles II and IV(1) of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

**Signed and dated in Johannesburg, Republic of South Africa on 28 November 2011**

**David H Botha, Du Plessis & Kruger for and on behalf of the Claimants**

**Mutamangira & Associates for and on behalf of the Respondents**

**Judge Meyer Joffe, co-arbitrator**

**James Prince Mutizwa, co-arbitrator**

**Stuart Isaacs QC, chairman**

CERTIFIED TRUE COPY OF THE ORIGINAL
PARIS, 20 March 2014

Andrea CARLEVARIS
Secretary General
ICC International Court of Arbitration

# EXHIBIT 2

"Exhibit 2"

IN THE HIGH COURT FOR ZAMBIA
AT THE PRINCIPAL REGISTRY
HELD AT LUSAKA
(Civil Jurisdiction)

2012/HPC/ 1213

HIGH COURT OF ZAMBIA 08 OCT 2012 PRINCIPAL REGISTRY

In the matter of : **Section 10 & 11 of the Arbitration Act, No. 19 of 2000**

and

In the matter of: **An Application by Zimbabwe Mining Development Corporation for the removal of Stuart Isaacs, SC and Mr. Justice Meyer Joffe as Arbitrators**

Between

| | |
|---|---|
| **Zimbabwe Mining Development Corporation** | Applicant |
| and | |
| **Amaplat Mauritius Limited** | 1st Respondent |
| **Amari Nickel Holdings Zimbabwe Limited** | 2nd Respondent |
| **Stuart Isaacs, SC** | 3rd Respondent |
| **Mr. Justice Meyer Joffe** | 4th Respondent |
| **The Chief Mining Officer of the Republic of Zimbabwe (N.O)** | 5th Respondent |

**EX PARTE ORDER OF INTERIM INJUNCTION PURSUANT TO ORDER XXVII OF THE RULES OF THE HIGH COURT, CHAPTER 27 OF THE LAWS OF ZAMBIA AS READ WITH ORDER 29 OF THE RULES OF THE SUPREME COURT PRACTICE, 1999 EDITION**

**UPON READING** the Affidavit of **JACOB MUTEVEDZI.**

**AND UPON HEARING** Counsel for the Applicant.

**AND UPON** the Applicant by its Counsel undertaking to abide by any Order that the Court may make as to damages in case the Court shall hereafter be of the opinion that the Applicant shall have sustained any loss by reason of this Order which the Applicant's ought to pay:

**IT IS HEREBY ORDERED AND DIRECTED THAT** the 3rd and 4th Respondents whether by themselves, servants or agents, howsoever otherwise be restrained, and an injunction is hereby granted restraining them from acting as Arbitrators in the dispute between the Applicant and the 1st and 2nd Respondents **AND** from continuing the said arbitral proceedings until further Order if at all

**AND** that the Inter Parte hearing of this matter will be before the Honorable ~~Mr/Mrs.~~ Lady Justice F. M. Lengalenga on the 18th day of November 2012 at 10 - 00 hours in the Fore noon.

PENAL NOTICE

**TAKE NOTICE** that if you the within named Respondents or your Agents/Servants disobey this injunction Order, you will be liable to imprisonment and/or fine for contempt of Court.

Dated at Lusaka the 18th day of October 2012.

JUDGE

Per:

**Messrs Ranchhod, Chungu Advocates**
Plot 11058, Zimbabwe House
Haile Selasie Avenue
Longacres
P.O Box FW 235
LUSAKA
ADVOCATES FOR THE APPLICANT

# EXHIBIT 3

Exhibit 3

**IN THE HIGH COURT FOR ZAMBIA** **2012/HP/1213**
**HOLDEN AT LUSAKA**
(Civil Jurisdiction)

**IN THE MATTER OF:** SECTION 10 & 11 OF THE ARBITRATION ACT № 19 OF 2000

and

**IN THE MATTER OF:** AN APPLICATION BY ZIMBABWE MINING DEVELOPMENT CORPORATION FOR THE REMOVAL OF STUART ISAACS, SC AND MR JUSTICE MEYER JOFFE AS ARBITRATORS

**BETWEEN:**

**ZIMBABWE MINING DEVELOPMENT CORPORATION** — **Applicant**

**and**

**AMAPLAT MAURITIUS LIMITED** — **1st Respondent**

**AMARI NICKEL HOLDINGS ZIMBABWE LIMITED** — **2nd Respondent**

**STUART ISAACS, SC** — **3rd Respondent**

**MR JUSTICE MEYER JOFFE** — **4th Respondent**

**THE CHIEF MINING OFFICER OF THE REPUBLIC OF ZIMBABWE** — **5th Respondent**

**Coram:** Honourable Lady Justice F. M. Lengalenga in chambers at Lusaka.

| | | |
|---|---|---|
| **For the applicant** | **:** | Mr. P. Chungu – Messrs Ranchhod Chungu Advocates |
| **For the 1st and 2nd respondents** | **:** | Mr. A. Dudhia – Messrs Musa Duhia & Company |

## RULING

**CASES REFERRED TO:**

1. **AMERICAN CYNAMID COMPANY v ETHICON LTD (1975) AC 396.**
2. **PRESTON v LUCK (1884) 27 CH D 492.**
3. **SHELL & BP (ZAMBIA) LTD v CONIDARIS & OTHERS (1975) ZR 174.**
4. **ZAMBIA STATE INSURANCE CORPORATION v DENNIS MULUKELELA (1990-1992) ZR 18 (SC).**
5. **ZIMCO PROPERTIES LTD v LAPCO (1988-89) ZR 93.**
6. **ALBON (t/a N. A. CARRIAGE COMPANY) v NAZA MOTOR TRADING SDN BHD (2005) 1 ALL ER 351**
7. **HILARY MUKOSA v MICHEAL RONALDSON (1993-94) ZR 26.**
8. **HINA FURNISHING LUSAKA LTD v MWAISENI PROPERTIES LTD (1983) ZR 42.**

This is the applicant's application for an order of interim injunction to restrain the 3rd and 4th respondents from continuing to act as Arbitrators in the dispute between the applicant and the 1st and 2nd respondents and from continuing the arbitral proceedings or at all. The application which is made pursuant to Order 27 of the Rules of the High Court, Chapter 27 of



the Laws of Zambia as read with Order 29 of the Rules of the Supreme Court Practice, 1999 Edition, is supported by an affidavit sworn by one Jacob Mutevedzi, a Zimbabwean national and Attorney at Law practicing in the firm of Mutamangira and Associates and the applicants appointed legal representative. He deposed that he had been verily informed by the advocates acting on the applicant's behalf in these proceedings, Messrs Ranchhod Chungu Advocates that there were presently before this court, proceedings to impugn the independence and impartiality of the 2nd and 3rd respondents in relation to the arbitral proceedings aforementioned. He deposed further that the applicant is a body corporate established in terms of the Zimbabwe Mining Development Corporation Act (Chapter 21:08) of the Republic of Zimbabwe **("the Act")** whose business includes, *inter alia,* investing in mining and mining development on behalf of the Government of Zimbabwe. He further deposed that on or around the 22nd November, 2007, ZMDC, and Amari Holdings Limited **("Amari BV1")** concluded a Memorandum of Understanding for joint prospecting for Nickel and the development of a Nickel mine **("the Nickel MOU").**

Jacob Mutevedzi also deposed that by a Deed of Novation **("the Deed")** dated 6th June, 2008 between Amari BV1, Amari and ZMDC, with effect from 1st May, 2008 Amari BV1 was released and discharged from its rights and obligations pursuant to the Nickel MOU upon Amari's undertaking to Amari BV1 and ZMDC to perform Amari BV1's obligations pursuant to the Nickel MOU and be bound by its terms and conditions as if Amari had been the original party to the Nickel MOU in place of Amari BV1.



He added that by Clause 3.1 of the Deed of Novation, Amari BV1 acknowledged that Amari would be solely entitled to the entire rights and benefits under the Nickel MOU as if Amari were the original party to it in place of Amari BV1.

In paragraph 7 of his affidavit, Jacob Mutevedzi deposed that on or about the 25th July, 2008 ZMDC and Amaplat concluded a Memorandum of Understanding to prospect for platinum and related metals and to develop a mine **("The Platinum MOU").** He deposed further that the Nickel and Platinum MOUs (together **"the MOUs"**) were concluded by Mr. M. J. Nunn **("Nunn")** on behalf of Amari BV1 and Amaplat respectively and by Mr. Dominic Mubaiwa **("Mubaiwa"),** the ZMDC's General Manager, on ZMDC's behalf.

Further in paragraph 9, the deponent herein stated that by a letter dated 10th November, 2010 from ZMDC to the respondents, the ZMDC unequivocally resiled from the MOUs and *inter alia* noted that there was **"a corrupt relationship which unduly influenced the signing of the Platinum MOU,"** stated that there was **"no Joint Venture Agreement regulating our relationship."** Further on in the ZMDC expressed their displeasure at the respondent's conduct which was described as unacceptable, improper and as directly undermining the basic tenets of corporate governance principles and their relationship was declared as terminated for both platinum and nickel properties. A copy of the said letter was annexed and exhibited as **"JM1."**

Jacob Mutevedzi stated that, therefore, in terms of the arbitration clauses of the MOUs, the respondents declared a dispute and referred the matter to the International Court of Arbitration **("the ICA").** He added that the ICA duly set up an arbitral Tribunal in terms of its Rules of Court **("the Rules")** to hear the matter and he attached and exhibited as **"JM2,"** a copy of the Tribunal's Terms of Reference. He deposed that the Tribunal was constituted as follows:

> **"13.1 Stuart Isaacs QC of the United Kingdom nominated by the United Kingdom ICC National Committee (Chairman);**
>
> **13.2 Judge Meyer Joffe of South Africa and respondent's nominee (co-arbitrator); and**
>
> **13.3 Mr. James Prince Mutizwa of Zimbabwe and applicant's nominee (co-arbitrator)."**

The deponent herein stated further that the arbitral proceedings in issue were commenced on 14th August, 2012 and hearings were actually concluded in Cape Town, South Africa on 14th and 15th August, 2012 when the applicant mounted a challenge against the 3rd and 4th respondents on the basis that they were biased. He deposed in paragraph 13 of the affidavit that the applicant's contention and apprehension with regard to the impartiality of the Arbitrators arose out of the proceedings on 15th

August, 2012. He added that the applicant raised concerns on that issue and wrote to the International Chamber of Commerce International Court of Arbitration to that effect in accordance with arbitration agreement. He further deposed that following the request for the Arbitrators to recuse themselves from continuing to preside over the arbitral proceedings, the International Chamber of Commerce International Court of Arbitration responded to the applicant's request in a ruling dated 27th September, 2012 and denied the request for recusal and he attached and exhibited it as **"JM3."**

Jacob Mutevedzi also deposed that the applicant and the 2nd and 3rd respondents had entered into a validly binding Arbitration Agreement and had, by consent appointed Zambia as the seat of arbitration and he annexed and exhibited as **"JM4"** and **"JM5"** respectively, the Arbitration Agreement and evidence of appointment of Zambia as the seat of arbitration.

He deposed further that on the basis of the agreement/s of the parties, the applicant commenced proceedings to impugn the independence and impartiality of the 2nd and 3rd respondents and seeks their removal from the proceedings. The deponent added that at the last hearing of the proceedings presided over by the 2nd and 3rd respondents and in accordance with the ruling exhibited as **"JM3,"** the hearings are expected to reconvene after a 3rd Arbitrator is appointed. He stated further that should the proceeding be convened and the hearings

conducted, the applicant will be prejudiced as it has mounted a challenge against the 2nd and 3rd respondents in this court and that it is in the interest of justice that they be restrained from continuing to act until the issues in this action are concluded and determined.   Jacob Mutevedzi further stated that he verily believes that the applicant has an arguable claim with high chances of success once the issues are determined and that if the 2nd and 3rd respondents are not restrained, they will convene the hearings and determine the dispute despite the applicant's challenge and that such as event would gravely and adversely affect the applicant's position and interests and rights and occasion damage that cannot be atoned for in damages.

After the 1st and 2nd respondents' affidavit in opposition to application for injunction filed into court on 7th November, 2012 was expunged from the court record on account of containing extraneous matter and, therefore, considered to be scandalous and defective in its content, a further affidavit in opposition was filed into court on 16th November, 2012.  The said affidavit in opposition was sworn by Ian Small Smith, a South African national who deposed that he is a Director of both the 1st and 2nd respondents and that he is also a practicing attorney and consultant at BDK Attorneys, situated at 84 Market Street, Marshall town, Johannesburg.  He added that he has also been the legal advisor to the Board of the 1st and 2nd respondents from time to time and attended all the hearings in the arbitral proceedings between the parties.  He deposed

further that he is duly authorised to represent the 1st and 2nd respondents in these proceedings and he exhibited **"ISS1,"** a copy of the Resolutions which confirm his authority.  Ian Small Smith further deposed that the Nickel MOU and Platinum MOU were the product of fair and honest negotiations which were free of corruption and he added that he had been advised by Counsel that this is not an issue which this court is required to investigate as the same would be determined by the arbitral tribunal.  He also confirmed that the applicant wrote to the 1st and 2nd respondents purporting to resile from the said MOUs and the issue was referred to the International Court of Arbitration **(the "ICA")** which duly set up an arbitral tribunal to hear the dispute and he added that the parties signed the submission to the arbitration and the terms of reference of the arbitration. He deposed that the arbitral tribunal comprised of Judge Meyer Joffe, Mr. James Prince Mutiziwa and Mr. Stuart Isaacs, QC who he described respectively as a distinguished retired South African judge of considerable experience, applicant's appointed arbitrator and a distinguished international Queen's Counsel.

Ian Small Smith stated that the applicant renewed its jurisdictional challenge against the appointed arbitrators as a preliminary point at the arbitration proceedings and the Tribunal ruled that it was not appropriate to determine the jurisdictional challenge as a preliminary point and that it would be determined as part of the final award and he exhibited **"ISS2,"** copies from pages 42 to 43 of the record.  He stated further that under the Rules to which the arbitration was subject, there can be no further

challenge by the applicant until after the award is delivered.  The deponent further stated that despite the Rules prohibiting the challenge, the applicant proceeded to commence this action before the High Court for Zambia.

He deposed further that the applicant in this matter is seeking the same reliefs that it had already earlier sought before the ICA and the Tribunal and which reliefs have already been refused by both forums.  He also stated that he believes that the applicant is forum shopping as it seeks a lengthy court litigation in order to illegally derail the Tribunal from adjudicating the merits of the dispute between the applicant and the 1st and 2nd respondents.

Ian Small Smith further stated that he had been advised by Counsel that the Arbitration Act does not permit a party to an international arbitration to obtain an injunction restraining arbitrators from acting as such and from continuing the arbitration proceedings.  He added that the 3rd and 4th respondents are obliged to continue with the arbitration and to make an award in terms of both the Rules of the ICA and Arbitration Act.

The deponent of the affidavit in opposition stated in paragraph 28 thereof that he had been advised by Counsel and verily believes that the injunction restraining the 3rd and 4th respondents from sitting in the arbitral proceedings offends the basic principles of international arbitration law including the Arbitration Act.   He stated that the 1st and 2nd

despite the fact that they proceeded in isolation and without a third arbitrator. He also deposed that the applicant disclosed in its application that the challenge was mounted relating to the impartiality of the 3rd and 4th respondents and that the ICA reached a decision on that question and it did not hide any material facts and he added that the allegation that it did so in unfounded and baseless.

Jacob Mutevedzi stated further that the response made by the 3rd and 4th respondents to the challenge does not contain any material facts which would have influenced the court to make a contrary decision on the grant of the ex-parte order. He clarified that those responses deal with the impartiality or otherwise of the tribunal and will be determined in the substantive hearing and they were not a factor in the grant of the order of injunction.

The deponent herein concluded by stating that the bias of the 3rd and 4th respondents is evident in the manner that they elected to respond to these proceedings when they indicated that they do not intend to participate in the proceedings and that they would leave it to the 1st and 2nd respondents to defend the claims by the applicant and he attached and exhibited as **"JM2"** a copy of a letter dated 26th October, 2012 to that effect.

The parties herein also filed into court written submissions, skeleton arguments and list of authorities to support their respective positions in the matter.

Counsel for the applicant, Mr. Paulman Chungu submitted that the applicant's application is made pursuant to Order 29, Rule 1 of the Rules of the Supreme Court Rules (1999 Edition). He submitted further that the principles and guidelines to be followed by the court on the hearing of the application for grant of interlocutory applications for grant of an injunction were laid down in the renowned case of **AMERICAN CYANAMID COMPANY v ETHICON LTD[1].** Counsel for the applicant further submitted that in **PRESTON v LUCK[2]** it was held that the following guidelines are to be considered before granting an injunction:

(i) **Whether there is a serious question of law to be determined at trial**

(ii) **Whether the applicant will suffer irreparable damage if the injunction is not granted**

(iii) **Whether the balance of convenience lies in favour of granting the injunction.**

He added that these principles were adopted with approval by the Supreme Court of Zambia in the case of **SHELL & BP (ZAMBIA) LTD v**

**CONIDARIS & OTHERS**[3] and he submitted that the applicant's case is fully captured under the principles outlined above.

Mr. Paulman Chungu argued on behalf of the applicants that there is a clear right to relief in that the impartiality of the 3rd and 4th respondents have been called into question and they would like the question to be determined whether the 3rd and 4th respondents have conducted themselves in a manner that tends to compromise their impartiality and independence. He added that if the respondents are allowed to continue the proceedings they may render a decision and make an award to the detriment of the applicant and that the court ought to interfere to preserve the status quo without waiting for the right to be finally established at trial.

He relied on Order 29 Rule 1(4) of the Rules of the Supreme Court, 1999 which states that all that needs to be seen is whether the applicant has prospects of success which substance and reality exist odds against success do not defeat him and that that may also be referred to as serious issues to be tried. Counsel for the applicant contended that at this stage, the need only show that there is an uncertainty at the interlocutory stage and he relied on the case of **PRESTON v LUCK** which was approved in the case of **ZAMBIA STATE INSURANCE CORPORATION v DENNIS MULUKELELA**[4]**.** He contended further that the assertion that the arbitrators were both individually and collectively biased is indisputable and he submitted that it is dear that the 3rd respondent and his mindset were

predisposed from the beginning to perceive the applicant as running a strategy to prevent the rendering of an award.

Mr. Paulman Chungu submitted that the challenge against the 4th respondent cannot be faulted as the 4th respondent demonstrated a clear lack of impartiality when he persistently passed prejudicial and biased commentaries against Zimbabwe and the applicant as epitomised in his perception of a propensity to lawless expropriation on the part of Zimbabwe. He submitted that there are serious matters to be tried and that the applicant opines that no reasonable court applying its mind to the challenge against the 3rd and 4th respondents would have dismissed it and that in the circumstances, in the quest for recourse, the applicant is left with no option but to turn to the supervisory jurisdiction of the court of the seat of arbitration.

It was submitted on behalf of the applicant that the injury to be suffered would be irreparable and cannot be atoned for in damages and that the recourse which a party has to an arbitral processes as provided in section 17 of the Arbitration Act № 19 of 2000, particularly section 17(2)(a)(i) to (v) does not permit for a challenge of the impartiality of the arbitrators. Counsel for the applicant argued that if the applicant is not granted a remedy at this stage and the award is permitted to be delivered, the applicant will have no opportunity under the law to impugn the impartiality and assert the bias of the 3rd and 4th respondents and that that would result in irreparable injury which is permanent and cannot be compensated in damages or at all. He submitted further that Order 29

Rule 1(5) of the Rules of the Supreme Court provides that the governing principle is that the court should first consider whether, if the plaintiff succeeds at trial, he will be adequately compensated by damages for any loss caused by the refusal to grant an interlocutory injunction.

Mr. Paulman Chungu submitted further that the applicant will suffer irreparable damage if the 3rd and 4th respondents are allowed to continue acting as Arbitrators and that the loss will be more than a mere inconvenience and that the balance should be interpreted in favour of the applicant. He relied on the case of **ZIMCO PROPERTIES LTD v LAPCO[5]** where the Supreme Court stated:

> **"We must make it clear that the question of balance of convenience between the parties only arises if the harm done will be irreparable and damages will not suffice..."**

In the present case, Counsel for the applicant submitted that in those circumstances, the balance of convenience weighs more in favour of the court granting an order for injunction and that the respondents will not be prejudiced by the granting of an injunction. He submitted further that inspite of the principle of non-interference in arbitrations, in some circumstances, the courts have granted an injunction to restrain the commencement of an arbitration or to continue a foreign arbitration. He added that some of the reasons that have been cited for the exercise of this power by the courts have been instances where there is oppressive,

vexatious or unconscionable conduct.   Counsel for the applicant further submitted that the clear bias and impartiality shown by the 3rd and 4th respondents amounts to unconscionable conduct warranting the court to restrain them from continuing the arbitration until the questions are determined by the court in the substantive proceedings in the matter.   He relied on the case of **ALBON (T/A N A CARRIAGE COMPANY) v NAZA MOTOR TRADING SDN BHD[6].**

Further, on the issue of disclosure of material facts, Mr. Paulman Chungu submitted that the applicant made full and frank disclosure of all relevant facts.   He submitted further that this requirement for disclosure does not presuppose that all facts should be necessarily disclosed even if those facts are irrelevant and that the fact of the objection raised by the 3rd and 4th respondents is not material for consideration when granting an injunction.   He added that those facts will be relevant, if at all, at the stage that the court is called upon to consider the substantive claims in this action.

Counsel for the applicant also referred to section 28 of the Arbitration Act, № 19 of 2000 which provides that an arbitrator is not liable for anything done or committed to be done in good faith in the discharge of his functions.   He submitted that where it can be shown that the act or omission was in bad faith then the arbitrator is liable for that act.   In this case, the applicant contends that the bias and impartiality are acts in bad

faith and that for that reason the 3rd and 4th respondents would not be immune to suit according to Counsel's submission.

The applicant contended further that the affidavit in opposition sworn by Ian Small Smith is defective in form and content and that the authority of Ian Small Smith is purportedly derived from his position as Director of the 1st and 2nd respondents and that the resolution he exhibited as **"ISS1"** and that exhibited document was purportedly extracted from a resolution of the 1st respondent made on 13th November, 2013 and the resolution was signed off on 16th November, 2012.   Counsel for the applicant argued further that it is evident that the Clerk of Court who commissioned the affidavit in Zambia did not see the certified copy of the extract of the resolution and it further does not bear any stamp or mark of nay officer in South Africa where it was extracted and that it is not in compliance with section 3(d) of the Authentication of Documents Act, Chapter 75 of the Laws of Zambia.  He submitted that if the contents of the affidavit in opposition are disregarded the only evidence which will be available for the court to consider will be that of the applicant.

The applicant, therefore, prayed that the order for interim injunction that was granted by this court be extended and the injunction be confirmed.

Counsel for the 2nd and 3rd respondents began by submitting on the principles of injunction law which I will not restate to avoid repetition as

the same has already been submitted on by Counsel for the applicant. He argued that firstly, the applicant has no cause of action to support the injunction or the originating summons as the applicant made its challenge against the 3rd and 4th respondents under the Rules of the International Court of Arbitration and lost and he added that under those Rules, there is no right of appeal against the challenge. He submitted further that the arbitrators have immunity under the Arbitration Act № 19 of 2000 and cannot be sued and that as such the entire action is misconceived in law.

Secondly, it is contended that the applicant submitted to the arbitral proceedings and participated in it by agreeing to and signing the terms of reference with the arbitrators and that the applicant has not shown that it has suffered or is likely to suffer irreparable injury in doing what it agreed to do. Counsel for the 1st and 2nd respondents submitted that the allegation of bias on the part of the 3rd and 4th respondent is completely baseless and untrue and that under the Arbitration Act the applicant can challenge the award after it is delivered. They contended that as such no irreparable injury will be suffered by the applicant if the injunction is not granted.

Thirdly, it was submitted that in view of the fact that the applicant has a statutory right to challenge the award after it is delivered, then the court is being invited to find that the balance of convenience lies in favour of vacating the injunction. Counsel for the 2nd and 3rd respondents submitted further that unless the arbitral proceedings are allowed to

proceed it will make a mockery of arbitration as an alternative dispute resolution process since under the Arbitration Act and its First Schedule (the "Model Law") arbitrators are allowed to rule on their own jurisdiction and control their own process.  He strongly urged the court not to allow the applicant to subvert the entire purpose of arbitration by allowing it to sue arbitrator and to injunct existing arbitral proceedings, which were voluntarily entered into.

Counsel for the 1st and 2nd respondents on this issue finally contended that the applicant omitted material facts from this court when it applied *ex-parte* and that therefore, the applicant had not come to court with **"clean hands"** as the entire purpose of this application is to derail the arbitration.

With regard to the issue of the right to relief, he submitted that the issue that the applicant seeks to have determined by this court in the originating summons has already been determined by the International Court of Arbitration (ICA) and that the matter is *res judicata*.  He added that a decision having been rendered by the arbitrators and the matter being *res judicata,* there cannot be any clear right to relief for the applicant in these proceedings.  He further contended that based on article 13(3) of the Model Law this court has no power to grant the injunctive relief sought by the applicant and that, therefore, the applicant has no clear right to the relief sought in its originating summons.  He also noted that the applicant brought its application under sections 10 and 11 of the Arbitration Act and

he submitted that section 10 only applies where proceedings were commenced in court and the court finds that there was an arbitration agreement. Counsel for the 1st and 2nd respondents submitted that, therefore, section 10(1) of the Arbitration Act cannot apply to these proceedings and that as such the originating summons have no legal basis. He submitted that based on the foregoing this court has no power to grant the injunction herein or even to hear the originating summons.

Thirdly, Counsel for the 1st and 2nd respondents submitted that an applicant must also demonstrate that he has reasonable prospects of success in the action as was held in the case of **HILARY MUKOSA v MICHAEL RONALDSON**[7] before he can be granted an injunction. He submitted further that the challenge against the 4th respondent was based on a fundamental misunderstanding of the import and purpose of the questions put to Mr. Mark Summers by the 4th respondent and that they accordingly maintained that there was no reasonable prospects of success for the applicant herein.

It was further contended that the Arbitration Act does not permit a party to an international arbitration to obtain an injunction restraining arbitrators from acting as such and from continuing the arbitration proceedings and it was submitted that, therefore, this action is misconceived in law. Counsel for the 1st and 2nd respondents submitted that the grounds upon which the Zambian courts are entitled to refuse to recognise the arbitral award are governed by section 17 of the Arbitration

Act which includes the right to challenge the independence of the arbitrators. He submitted further that the applicant has no legal basis under Zambian law to make this application to remove the arbitrators and that any challenge it wants to make can only be made after the final award has been delivered. On the issue of immunity of the arbitrators, namely the 3rd and 4th respondents he relied on section 28 of the Arbitration Act which provides:

> **"28(1) An arbitrator, an arbitral or other institution or a person authorised by or under this Act to perform any function in connection with arbitral proceedings is not liable for anything done or omitted in good faith in the discharge or purported discharge of that function."**

He further submitted from the foregoing, that this court action is misconceived in law and that to allow the applicant to personally sue the arbitrators is highly irregular in law.

The fifth issue raised by the 1st and 2nd respondents is that of balance of convenience and prejudice to the 1st and 2nd respondents and it was submitted that where any doubt exists as to plaintiff's rights or if the violation of an admitted right is denied, the court takes into consideration the balance of convenience to the parties. Counsel for the 1st and 2nd respondents submitted that the burden of showing the greater inconvenience is on the plaintiff as was established in the **SHELL & BP**

**(ZAMBIA) LTD** case. He submitted that the applicant will not suffer if the arbitration proceedings continue and are finally determined by the tribunal. He added that the applicant has a remedy as it can challenge the award under section 17 of the Arbitration Act and that the 3rd and 4th respondents are obliged in terms of both the Rules of the ICA and the Zambian Arbitration Act to continue with the arbitration and to make an award.

With respect to the issue of failure to disclose, Counsel for the 1st and 2nd respondents contended that there was no basis for the applicant not to have given the respondents notice of its intention to approach this court for relief and that the only reason why it did not give notice is because it wanted to ambush the 1st and 2nd respondents. He submitted that the applicant misled this court by not disclosing material and relevant facts at the time it sought and obtained the *ex parte* order; and further by not drawing the court's attention to the express provisions of the Act which stipulate that this court has no power to grant injunctive relief restraining the continuation of the arbitration process. Counsel for the 1st and 2nd respondents argued that had proper disclosure been made this court would not have granted the order and he relied on the case of **HINA FURNISHING LUSAKA LTD v MWAISENI PROPERTIES LTD**[8] wherein this court held that he who comes to equity must come with clean hands or else the court may not exercise its discretion to grant the remedy he seeks.

In conclusion, Counsel for the 1st and 2nd respondents submitted that the application for the injunction is misconceived in law and that this court has no jurisdiction to grant the injunction. He further submitted that the applicant suppressed material facts and laws from this court and are merely trying to frustrate the arbitral proceedings means that they have not come to court with clean hands and that as such the applicant does not deserve the exercise of this court's equitable jurisdiction in its favour. He finally submitted that no irreparable injury will be suffered by the applicant if the arbitral proceedings that the applicant submitted to proceeds and he reiterated that the balance of convenience is in favour of vacating the injunction and he urged the court to discharge the *ex parte* injunction that was granted on 15th October, 2012.

I have carefully considered the application for an injunction to restrain the 3rd and 4th respondents from continuing to act as Arbitrators in the dispute between the 1st and 2nd respondents and from continuing the arbitral proceedings or at all. The affidavit evidence in support of the application, in opposition and in reply is quite comprehensive and I will not go into it. The law relating to the granting of injunction has also been adequately stated so it only remains for this court to determine whether this is a proper case in which to grant this discretionary remedy. What emerged from the arguments before this court is that the applicant having submitted to the arbitral proceedings and participated in it by agreeing to and signing the terms of reference with the arbitrators could not turn around and challenge the arbitral process before the conclusion. Further, it is clear under the provisions of the Arbitration Act that the applicant can

challenge the award after it is delivered so that no irreparable injury would be suffered if the injunction is not granted.

Another issue that arose is that the applicant having challenged the 3rd and 4th respondents under the Rules of the International Court of Arbitration and lost had no right of appeal against the challenge. The action by the applicant is perceived as being misconceived in law as the abitrators have immunity under the Arbitration Act No. 19 of 200.

There was also an allegation that the applicant had not come to court with "clean hands" as the purpose of this application was to derail the arbitration process.

Learned Counsel for the 1st and 2nd respondents raised the issue of sections 10, and 11 of the Arbitration Act which only apply where proceedings were commenced in court and the court finds that there is an arbitration agreement. However, this was not the position in this case which was brought under sections 10 and 11 of the Act, and as such the question of jurisdiction comes in. It was further contended that the Arbitration Act does not permit a party to an international arbitration to obtain an injunction restraining arbitrators from acting as such and from continuing the arbitration proceedings and that this action is misconceived in law.

Having considered the issues raised in this application, I am satisfied upon perusal of the provisions of the Arbitration Act, particularly sections 10, 11, 13 and 17 that this matter is not properly before this court in terms of jurisdiction and the fact that the applicant can challenge the award after it is made. To restrain the arbitrators from acting as such and from

continuing the arbitration proceeding is contrary to the spirit of the provisions of the Arbitration Act and is intended to subvert the arbitral process thereby making a mockery of the same.

It also has become apparent that the applicant suppressed material facts and laws from this court thereby misleading it to grant the ex-parte order of injunction. Clearly, from the aforestated, not only is this matter improperly before this court but the applicant has failed to demonstrate that his is likely to suffer irreparable injury or damage, as he has recourse to challenging the final arbitral award.

In conclusion, I find that this court has no jurisdiction to deal with this matter under sections 10 and 11 of the Arbitration Act No 19 of 2000 and I, accordingly decline to confirm the order of interim injunction granted ex-parte on 18th October, 2012. I, hereby, accordingly discharge the said injunction with costs. Leave to appeal is granted.

DATED this ......19th...... day of June, 2014 at Lusaka.

..................................
F. M. LENGALENGA
JUDGE

# EXHIBIT 4

"Exhibit 4"

2019/HPC/ARB/No. 0337

IN THE HIGH COURT FOR ZAMBIA
AT THE COMMERCIAL REGISTRY
AT LUSAKA
(Civil Jurisdiction)

IN THE MATTER OF SECTION 18 OF THE ARBITRATION ACT No. 19 OF 2000

AND

IN THE MATTER OF ARBITRAL AWARD IN CASE No. 17720/ARP/MD/ TO THE ICC INTERNATIONAL COURT OF ARBITRATION

BETWEEN:

| | |
|---|---|
| AMAPLAT MAURITIUS LIMITED | FIRST PLAINTIFF |
| AMARI NICKEL HOLDINGS ZIMBABWE LIMITED | SECOND PLAINTIFF |
| AND | |
| ZIMBABWE MINING DEVELOPMENT CORPORATION | FIRST DEFENDANT |
| THE CHIEF MINING COMMISSIONER MINISTRY OF MINES OF ZIMBABWE | SECOND DEFENDANT |

---

EX PARTE ORDER FOR LEAVE TO REGISTER AND ENFORCE THE FINAL ARBITRATION AWARD

Pursuant to Section 18 of the Arbitration Act, No. 19 of 2000 and Rules 15 and 16 of the Arbitration (Court Proceedings) Rules, 2001

---

UPON HEARING Counsel for the Plaintiffs

AND UPON reading the Affidavit of one IAN SMALL-SMITH

IT IS HEREBY ORDERED pursuant to Section 18 of the Arbitration Act No. 19 of 2000, that the Plaintiffs be at liberty to enforce in the same manner as a judgment or order to the same effect the Final Award dated 12th January 2014, of the Arbitrators: Stuart Isaacs QC, Chairman; Professor Doug Jones AO, as Co-Arbitrator; and Chikwendu

Madumere as Co-Arbitrator appointed pursuant to Clause 11 of the Nickel Memorandum of Understanding dated 22nd November 2007, and Clause 9 of the Platinum Memorandum of Understanding dated 25th July 2008, made between the Plaintiffs and the Defendants.

AND that the Plaintiffs do bear the costs of and occasioned by this application.

PROVIDED THAT within 30 days after service of this Order on them, the Defendants may apply to set aside this Order and the award shall not be enforced until after the expiration of that period or if the Defendants apply within that period to set aside, until the application is finally disposed of.

Dated the ------------9th------------ day of ------------August------------ 2019.

------------------------------------------------------------

THE HONOURABLE REGISTRAR

This Order was drawn by:

**SIMEZA, SANGWA & ASSOCIATES**

Advocates for the Plaintiffs

Suite C, The Coliseum

Bwinjimfumu Road

Rhodes Park

LUSAKA

Tel.: 211 227484/227574

Fax No.: 211 220568

Email: info@simezasangwa.co.zm

# EXHIBIT 5

"Exhibit 5"

2019/HPC/ARB/NO. 0337

IN THE HIGH COURT FOR ZAMBIA
AT THE COMMERCIAL REGISTRY
HOLDEN AT LUSAKA
(Civil Jurisdiction)

IN THE MATTER OF SECTION 18 OF THE ARBITRATION ACT No. 19 OF 2000

AND

IN THE MATTER OF ARBITRAL AWARD IN CASE No. 17720/ARP/MD/ TO THE ICC INTERNATIONAL COURT OF ARBITRATION

BETWEEN:

| | |
|---|---|
| AMAPLAT MAURITIUS LIMITED | FIRST PLAINTIFF |
| AMARI NICKEL HOLDINGS ZIMBABWE LIMITED | SECOND PLAINTIFF |
| AND | |
| ZIMBABWE MINING DEVELOPMENT CORPORATION | FIRST DEFENDANT |
| THE CHIEF MINING COMMISSIONER MINISTRY OF MINES OF ZIMBABWE | SECOND DEFENDANT |

---

NOTICE OF REGISTRATION OF AN AWARD

Pursuant to Rule 19(1) of the Arbitration (Court Proceedings) Rules, 2001

---

To:

(a) ZIMBABWE MINING DEVELOPMENT CORPORATION, Ground Floor, MMCZ Building, 90, Mutare Road, Msasa, Harare, Zimbabwe; and

(b) THE CHIEF MINING COMMISSIONER, MINISTRY OF MINES, ZIMBABWE, Seventh Floor, Zimre Centre, Private Bag CY 7709, Causeway, Harare, Zimbabwe.

TAKE NOTICE that the Final Arbitration Award dated 12th January 2014, rendered by the Arbitrators: Stuart Isaacs QC, Chairman; Professor Doug Jones AO, as Co-Arbitrator; and Chikwendu Madumere as Co-Arbitrator appointed pursuant to Clause 11 of the Nickel Memorandum of Understanding dated 22nd November 2007, and Clause 9 of the Platinum Memorandum of Understanding dated 25th July 2008, made between the Plaintiffs and the Defendants has been registered in the Register of Arbitration Awards in the High Court for Zambia at the Commercial Registry at Lusaka on 12th August 2019.

PARTICULARS

**1. Description of the Award Registered and Order for Registration**

**[1]** In the matter of an International Chamber of Commerce Arbitration Case No. 17720/ARP/MD/TO in the case of *Amaplat Mauritius Limited and Amari Nickel Holdings Zimbabwe Limited v Zimbabwe Mining Development Corporation and the Chief Mining Commissioner, Ministry of Mines, Zimbabwe*, the Tribunal comprising Stuart Isaacs QC, Chairman; Professor Doug Jones AO, as Co-Arbitrator; and Chikwendu Madumere as Co-Arbitrator, on 12th January 2014, ordered:

(a) the First Defendant, Zimbabwe Mining Development Corporation to pay Amaplat Mauritius Limited damages in the sum of US$42,882,000;

(b) the First Defendant, Zimbabwe Mining Development Corporation to pay Amari Nickel Holdings Zimbabwe Limited damages in the sum of US$3,900,000;

(c) the Defendants, Zimbabwe Mining Development Corporation and the Chief Mining Commissioner, Ministry of Mines, Zimbabwe to pay the legal and other costs and expenses incurred by Amaplat Mauritius Limited and Amari Nickel Holdings Zimbabwe Limited in the sum of US$2,220,583.74;

(d) the Defendants, Zimbabwe Mining Development Corporation and the Chief Mining Commissioner, Ministry of Mines, Zimbabwe to pay the costs of the arbitration incurred by Amaplat Mauritius Limited and Amari Nickel Holdings Zimbabwe Limited in the sum of US$900,000; and

(e) the First Defendant, Zimbabwe Mining Development Corporation to pay interest on the damages referred to (a) and (b) above and on the legal and other costs and expenses referred to in (c) above and on the costs of the arbitration referred to in (d) above incurred by Amaplat Mauritius Limited and Amari Nickel Holdings Zimbabwe Limited at the rate of 5% per annum from the date of the Final Award until the date of payment.

**[2]** The Final Arbitration Award was registered in the High Court for Zambia at Lusaka, on 12th August 2019, in the Register of Arbitration Awards as Final Arbitration Award No. 001 of 2019.

**2. Name and Address of the Judgment Debtors and/ or Advocates on Whom Documents May be Served:**

(a) The Judgment Debtors are: ZIMBABWE MINING DEVELOPMENT CORPORATION of Ground Floor, MMCZ, Building, 90, Mutare Road, Msasa, Harare, Zimbabwe and THE CHIEF MINING COMMISSIONER, MINISTRY OF MINES, ZIMBABWE of Seventh Floor, Zimre Centre, Private Bag CY 7709, Causeway, Harare, Zimbabwe; whose advocates

(b) RANCHOD CHUNGU ADVOCATES of Zimbabwe House, Plot No. 11058, Haile Selassie Avenue, LUSAKA.

**3. Name and Address of the Judgment Creditors' Advocates on Whom Documents May be Served is:**

**SIMEZA, SANGWA & ASSOCIATES** whose address for service is Suite C, The Coliseum, Bwinjimfumu Road, Rhodes Park, Tel: +260-211-227574, Fax: +260-211-220568, email: info@simezasangwa.com, P.O Box 36824, Lusaka, Zambia.

NOTES:

1. The Judgment Debtor has a right to apply to have the registration set aside.

2. The application to set aside registration of an award must be made within the period of 30 days from the date of service of this Notice, which is the period stated in the Order granting leave to register the Final Arbitration Award dated 12th August 2019.
3. The Award shall not be enforced until after the expiration of that period or if the Defendants apply within that period to set aside, until the application is finally disposed of.

Dated the ----19th---- day of----August---- 2019.

**Endorsement to be made within three days after service**

THIS Notice was served by me ----------

at ----------

----------

----------

----------

----------

on the ---------- day of ---------- 2019.

Endorsed the ---------- day of ---------- 2019.

This Notice was filed by:

**SIMEZA, SANGWA & ASSOCIATES**

Simeza, Sangwa & Associates

Advocates for the Plaintiffs

Suite C, The Coliseum

Bwinjimfumu Road

Rhodes Park

LUSAKA

Tel.: +211 227 484/227 574

Fax No.: +260 211 220568

Email: info@simezasangwa.com

# EXHIBIT 6

"Exhibit 6"

Simeza | Sangwa
AND ASSOCIATES

Our Ref.: A55/JPS/2019

19th August 2019

Ranchhod Chungu Advocates
Zimbabwe House
Plot No. 11058
Haile Selassie Avenue
LUSAKA

Dear Sirs

**Amaplat Mauritius Limited and Another v Zimbabwe Mining Development Corporation and Another – 2019/HPC/0337**

Further to the telephone conversation of Friday 16th August 2019, in the afternoon between our Miss Nkonde and your Ms Dinah Nundwe in which you confirmed that you have instructions to receive the Order granting leave to register and enforce, and the Notice of Registration of the Final Arbitral Award, on behalf of your clients Zimbabwe Mining Development Corporation and the Chief Mining Commissioner of the Ministry of Mines of Zimbabwe, find attached, by way of service on you, the Order and Notice of Registration of the Final Arbitral Award.

Kindly acknowledge receipt of the same by signing and returning copy of the letter.

Yours faithfully

Simeza, Sangwa & Associates

RANCHHOD, CHUNGU ADVOCATES
20 AUG 2019
RECEIVED
Email: info@ranchhodchungu.com

Lubinda

The Colosseum, Bwinjimfumu Road, Rhodespark
Block C, Stand No. F/284a/157
P.O. Box 36824 Lusaka, Zambia
Tel: +260 211 227484/227574, Fax: +260 211 220568
E-mail: info@simezasangwa.com

Robert M. Simeza S.C.
John P. Sangwa S.C.
Patricia Simeza-Nkhoma
Luckson Mwamba
Elizabeth S. Chungu
Nkhumbwizya Alikipo
Christine C. Lundu
Jeffrey Chimankata
Musenge L. Nkonde
Mwenya Nalusenga
Kashinga Kaoma
Chimwemwe Ngoma
Chawezi Ngoma
Mandela Nkunika
Mwila Balungu
Watopa Chingela

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**Amaplat Mauritius Ltd., *et al*,**

**Plaintiffs,**

**v.**

**Zimbabwe Mining Development Corporation, *et al*,**

**Defendants.**

**Civil Case No. 1:22-cv-00058-CRC**

**DECLARATION OF JACOB MUTEVEDZI**

I, Jacob Mutevedzi, make this Declaration based on my personal knowledge and my relevant experience, and state as follows:

1. My name is Jacob Mutevedzi. I am a partner at Mutamangira & Associates ("Mutamangira"), which is part of Clairwood Chambers. In the Zimbabwean market, our firm is known as Mutamangira.

2. I am a Partner with the firm. My matters include international law, which involves public international law matters, litigation, and dispute resolution. These matters also include mining disputes. I have represented clients in matters proceeding before the General Court of the European Community and the ICC International Court of Arbitration.

3. In my commercial law practice, I work with most aspects of company and commercial law, including corporate start-ups, reorganizations and the drafting of all commercial agreements. I have drafted and advised on share purchase agreements, business purchase agreements, share subscription agreements, due diligence reports, facility agreements,

compromise agreements, settlement agreements, and distribution agreements. I am admitted to practice in Zimbabwe and have also been previously registered to practice in Mauritius as a foreign lawyer.

4.      Zimbabwe Mining Development Corporation ("ZMDC") retained Mutamangira to represent it in an ICC arbitration filed by Amaplat Mauritius Ltd. ("Amaplat") and Amari Nickel Holdings Zimbabwe Ltd. ("Amari").

5.      I was lead counsel in the arbitration.

6.      Mutamangira was retained by ZMDC alone. One of the issues to be determined was the approval of the joint venture agreements. Because the Chief Mining Commissioner had a common interest in defending this issue, my firm signed the Terms of Reference on behalf of both ZMDC and the Chief Mining Commissioner. But I did not understand the Chief Mining Commissioner to have undertaken any contractual obligations in relation to Amaplat and Amari or to have any broad exposure in the arbitration. Indeed, the Award found ZMDC liable for damages, not the Chief Mining Commissioner, and there was no argument that the two respondents were jointly and severally liable for the damages sought. Amaplat and Amari did not request damages from the Chief Mining Commissioner. The role of the Chief Mining Commissioner was minimal and largely limited to this one issue of approval.

7.      Mutamangira did not send invoices to the Chief Mining Commissioner or communicate with the Office of the Attorney General, which is the office that represents the government in its disputes.

8.      My firm has represented the Republic of Zimbabwe and its agencies and instrumentalities in various different disputes. I am thus quite familiar with the contracting process.

**The authorization of Ranchhod Chungu Advocates to accept service on behalf of ZMDC**

9. As a part of Mutamangira's contract with ZMDC, my firm was given the authority to retain lawyers to defend ZMDC in other jurisdictions. Mutamangira retained, on behalf of ZMDC, Ranchhod Chungu, a law firm in Lusaka, Zambia, to represent ZMDC before the Zambian courts.

10. ZMDC did not have a contract directly with Ranchhod Chungu. The contract was between Mutamangira and Ranchhod Chungu.

11. As part of my representation of ZMDC, I managed the relationship with Ranchhod Chungu.

12. Mr. Paulman Chungu from Ranchhod Chungu would contact me to seek instructions on all important matters, including any decision to file a lawsuit, defend a lawsuit, or accept service.

13. I have reviewed the declaration of John Peter Sangwa (the "Sangwa Declaration") and the Declaration of Tinashe C. Chiparo (the "Chiparo Declaration"). I do not intend to comment on every point made in the two declarations but make some observations, as described below.

14. In paragraph 10 of the Sangwa Declaration, Mr. Sangwa states that the "Judgment Debtors" first filed a lawsuit in Zambia. This is incorrect. At that time, there was no judgment, and only ZMDC filed a lawsuit. Indeed, the applicant in the referenced lawsuit is ZMDC, and the Chief Mining Commissioner is a respondent. I remember this lawsuit, and I recall that I gave the instruction to Ranchhod Chungu to file the lawsuit. Mr. Chungu would update me on the lawsuit, and I would then communicate with Mr. Chiparo and ZMDC. I have not seen any indication that the Chief Mining Commissioner gave any instruction to file a lawsuit. I did not speak to the Office of the Attorney General regarding this lawsuit.

15. In paragraph 13, Mr. Sangwa states that the "Judgment Debtors" filed a lawsuit in 2014. This incorrect. There was no judgment, and ZMDC filed a lawsuit. The Sangwa Declaration does not include the filings from this case, but I have reviewed them. I gave the instruction to Ranchhod Chungu to file the lawsuit. Mr. Chungu would update me on the lawsuit, and I would then pass along the information to Mr. Chiparo at ZMDC. The Chief Mining Commissioner was not the applicant, and I have not seen any indication that the Chief Mining Commissioner gave any instruction to file a lawsuit. I did not speak to the Office of the Attorney General regarding this lawsuit.

16. I first learned about the purported judgment in June 2022 in the context of this lawsuit. I recall that I learned from Mr. Chiparo. Before then, I was unaware of Exhibits 4 and 5 of the Sangwa Declaration.

17. I have reviewed Exhibit 6 of the Sangwa Declaration. I never instructed Ranchhod Chungu to accept service of Exhibits 4 and 5.

18. I have reviewed my emails from August to October of 2019, and I have found no record of any request for instruction regarding the acceptance of service of process of Exhibits 4 and 5 or any other documents related to lawsuits filed by Amaplat and Amari in Zambia.

19. I do not recall instructing anyone to accept service of process of Exhibits 4 and 5.

20. I can affirm that I did not authorize anyone to accept service of process of Exhibits 4 and 5.

21. Normally, when ZMDC has a new matter, its internal policies require the decisionmaker at ZMDC to travel to the location where the lawyers are, negotiate a separate agreement, and participate in setting the strategy. This process was followed with the lawsuit filed

in 2012 and the lawsuit filed in 2014. I was involved in both lawsuits and participated in the meetings.

22. There was no visit to Zambia in 2019 to discuss the lawsuit represented by Exhibits 4 and 5, and there was no separate fee agreement with my firm or discussion of strategy.

23. Part of my duties includes reviewing invoices submitted by Ranchhod Chungu. I have reviewed the invoices from 2019, and I did not find any time invoiced by Ranchhod Chungu for receiving Exhibits 4 and 5, reviewing these documents, or notifying Mutamangira of the documents.

24. Had I received Exhibits 4 and 5, I would have advised ZMDC before conveying any instruction to Ranchhod Chungu. My firm does not have authority to direct Ranchhod Chungu to accept service of process without written instructions from ZMDC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct

Dated:

Jacob Mutevedzi

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **Amaplat Mauritius Ltd., *et al*,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Case No. 1:22-cv-00058-CRC** |
| **Zimbabwe Mining Development Corporation, *et al*,** | ) | |
| **Defendants.** | ) | |

**<u>MOTION TO DISMISS THE COMPLAINT BY ZIMBABWE MINING DEVELOPMENT CORPORATION</u>**

Defendant, Zimbabwe Mining Development Corporation ("ZMDC"), by and through its undersigned counsel, hereby submits its Motion to Dismiss (the "Motion") the Complaint filed by Amaplat Mauritius Ltd. ("Amaplat") and Amari Nickel Holdings Zimbabwe Ltd. ("Amari"), and in support thereof, state as follows:

## INTRODUCTION

As a separate company with its own defenses, ZMDC has two distinct bases to dismiss the Complaint against it:

- Plaintiffs failed to serve ZMDC in compliance with Section 1608(b) because they opted to effect service by "personally hand delivering" the Summons and the Complaint on "Theresa Kanengoni" who allegedly "<u>was</u> a secretary of" ZMDC. *See* ECF 24 at ¶¶ 2-4 (emphasis added). This method of service does not comply with 28 U.S.C. § 1608(b)(3)(B) or any of the provisions under section 1608(b). *See Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 416 (S.D.N.Y. 1998) (holding that service through personal delivery is incompatible with 28 U.S.C. § 1608(b)(3)).
- Plaintiffs have not come close to alleging personal jurisdiction over ZMDC, which has no contacts with this District.

Plaintiffs have also failed to allege subject matter jurisdiction and personal jurisdiction as well as not stating a claim for enforcement of their purported judgment. ZMDC is aware that some of the facts alleged and defenses raised have similar qualities with the Motion to Dismiss filed by the Chief Mining Commissioner (the "Commissioner") and the Republic of Zimbabwe ("Zimbabwe") and the Reply to Plaintiff's Opposition to the Motion to Dismiss (the "Reply"). To assist the Court and reduce unnecessary duplication, ZMDC has made the arguments specific to it and incorporated by reference any other defenses. ZMDC should not be forced to litigate a sur-reply to the Reply. To that end, where the arguments overlap, ZMDC has incorporated in the text references to the Motion to Dismiss and Reply filed by the Commissioner and Zimbabwe.

## RELEVANT BACKGROUND

Amaplat and Amari signed MOUs with ZMDC in 2007 and 2008. *See* ECF 1-1 at ¶¶ 3-4. Pursuant to the arbitration clauses in the MOUs, Plaintiffs initiated arbitration proceedings against ZMDC before the ICC International Court of Arbitration ("ICC Court") on February 2, 2011. *See id*. at ¶ 12.

On August 14, 2012, ZMDC challenged the Tribunal and sought the stay of the proceedings until such time the challenge had been determined by the ICC Court. *See id*. at ¶ 51. Under Article 11 of the ICC Rules only the ICC Court has the authority to decide such challenge, but the Tribunal took it upon itself to consider and reject the challenge. *See* ECF 1-1 at ¶ 52; ECF 23-1. Thereafter, ZMDC refused to participate in the proceedings. *See* ECF 1-1 at ¶ 52. The Tribunal then decided to remove as evidence the witness statements submitted by ZMDC. *See id*. at ¶ 55.

On August 15, 2017, ZMDC's appointed arbitrator, Mr. James Mutizwa, tendered his resignation and left the hearing. *See id*. at ¶ 57. In such a situation, Article 12(1) of the ICC

Rules instructs the ICC Court to appoint a replacement. *See* ECF 23-1. Instead of waiting for a replacement, the remaining members of the Tribunal continued with the proceedings, citing to Article 12(5). *See id*. at ¶ 58. But Article 12(5) only applies after the closing of the proceedings which, in this case, occurred on December 4, 2013. *See* ECF 23-1; ECF 1-1 at ¶ 87.

On September 27, 2012, the ICC Court accepted Mr. Mutizwa's resignation, and the ICC Court invited ZMDC to name a replacement arbitrator. *See* ECF 1-1 at 65. The request was unanswered, and the ICC Court appointed a replacement on behalf of ZMDC. *See* ECF 1-1 at ¶¶ 66, 69.

On October 15, 2012, ZMDC obtained an *ex parte* order from the Zambian courts restraining Mr. Issac QC, Plaintiffs' appointed arbitrator, and Mr. Isaac QC, the jointly appointed arbitrator, from proceeding with the Arbitration. *See id*. at ¶ 67. Plaintiffs applied to vacate the order, but as of the date of the Award, there was no evidence that the order has been vacated. *See id*. at ¶ 74.

In June 2013, Judge Joffe, Petitioners' appointed arbitrator, resigned. *See id*. at ¶ 72. A few days later, Plaintiffs appointed a new arbitrator, and the reconstituted tribunal held a hearing to receive oral statements from the parties. *See id*. at ¶ 75.

On January 12, 2014, the Tribunal issued an award against ZMDC and in favor of Plaintiffs. It ordered ZMDC to pay for damages, costs, and legal fees incurred by Plaintiffs. *See id*. at ¶ 227. Despite amending their claims five times, Plaintiffs never alleged that ZMDC is an *alter ego* of Zimbabwe, and the Tribunal made no such ruling. *See id*. at ¶¶ 21, 23, 26, 34, and 39.

On July 19, 2019, Plaintiffs applied to register and enforce the Award *ex parte,* and the Zambian Court issued an "*ex parte* Order for leave to Register and Enforce the Final Arbitration

Award" against the Commissioner and ZMDC (the "Order") on August 9, 2019. *See* ECF 1-5. Defendants did not participate in these proceedings.

The Order specifically limits the enforcement of the Award on the occurrence of certain conditions, including "within 30 days after service of this Order on [Defendants], the Defendants may apply to set aside this Order and the award shall not be enforced until after the expiration of that period or if the Defendants apply within that period to set aside, until the application is finally disposed of." ECF 1-5 at ¶ 2. This same language is echoed in the Notice of Registration of Award issued on August 19, 2019. *See* ECF 23-2 at ¶ 4. In order for the 30-days period to transpire, ZMDC would have to be served with the Judgment and Notice. ZMDC was never served with the Notice of Registration or the Judgment. *See* ECF 23-3 at 6-7; *see also* **Exhibit 1**, Declaration of Tinashe C. Chiparo ("Chiparo Decl."), ¶¶ 42-47; **Exhibit 2,** Declaration of Mutevedzi, ¶¶ 17-20.

Since ZMDC was not served with the Notice of Registration or the Order, it did not have the opportunity to present any grounds against recognition or enforcement of the Award or request the set aside of the Order within the 30-day period established by the Zambian Court. *See* ECF 1-5 at ¶ 3. To date, there have been no enforcement proceedings whereby the Award was subject to the scrutiny of Article 5 of the New York Convention or any other provision of law applicable to arbitration awards.

Almost two and half years later, and eight years after the issuance of the Award, Plaintiffs filed the instant action seeking to enforce the Order under the D.C. Foreign-Country Money Judgments Recognition Act (the "D.C. Code") against ZMDC, the Chief Commissioner of the Ministry of Mines, and the Republic of Zimbabwe. *See* ECF 1 at ¶ 1. Plaintiffs further

request that post-award interest and post-judgment interest be awarded against all Defendants at the Zambian statutory rate. *See id*. at 10.

On August 19, 2022, Plaintiffs filed an affidavit of service, certifying to have served ZMDC on August 10, 2022 "by personally hand delivering" the "Summons, Complaint with Exhibits" to "Theresa Kanengoni." *See* ECF 24 at ¶¶ 2-3.

## ARGUMENT

### I. Plaintiffs have failed to plead subject matter jurisdiction

To withstand a Fed. Civ. P. Rule 12(b)(1) motion to dismiss, a plaintiff must establish subject jurisdiction by a preponderance of the evidence. *See* Motion to Dismiss ECF 23 at 6-7. Plaintiffs have not met their burden. They claim that this Court has subject matter jurisdiction over ZMDC "because the exceptions under 28 U.S.C. §§ 1605(a)(1) and 1605(a)(6) are satisfied." *See* ECF 1 at ¶ 8. This is incorrect. As elaborated further below, Plaintiffs have not made and could not make such a showing.

#### A. This Court cannot exercise subject matter jurisdiction based on 28 U.S.C. §1605(a)(1) because ZMDC has not waived its immunity from suit in U.S. courts

Subject matter jurisdiction under Section 1605(a)(1) exists where the foreign state "has waived its immunity either explicitly or by implication." *See* 28 U.S.C. §§ 1605(a)(1). A foreign state implicitly waives its immunity where the foreign state "indicated its amenability to suit" in the United States and the state "subjectively intended to do so." *See TIG Ins. Co. v. Republic of Argentina*, No. 18-MC-00129 (DLF), 2022 WL 3594601, at *5 (D.D.C. Aug. 23, 2022); *Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193, 201 (2d Cir. 1999). The Supreme Court, D.C. Circuit, and other sister circuits have all stressed that a foreign state cannot be deemed to have waived its immunity by merely agreeing to arbitrate in a foreign jurisdiction governed under a foreign law. *See* Motion to Dismiss, ECF 23 at 9-10.

Plaintiffs' waiver argument solely relies on the New York Convention. They argue that ZMDC waived its immunity "by agreeing to arbitrate under the ICC Rules, and by agreeing to and participating in arbitration governed by the New York Convention." *See* ECF 1 at ¶ 10. For reasons stated in the Motion to Dismiss, ECF 23 at 11, and Section I(B) of the Reply, ECF 29 at 5, the New York Convention is not a basis for an implicit waiver.

**B. This Court cannot exercise subject matter jurisdiction based on 28 U.S.C. §1605(a)(6) because Plaintiffs are not seeking enforcement of an arbitration agreement or an arbitration award**

The arbitration exception is similarly inapplicable. Under Section 1605(a)(6), a court can exercise subject matter jurisdiction over a foreign state if "the action is brought, either to enforce an agreement made by the foreign state…or to confirm an award made pursuant to such an agreement to arbitrate, if…the agreement or award is governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. §1605(a)(6) (emphasis added). Courts have, therefore, refused to assume jurisdiction under this exception where the plaintiff is not seeking to enforce an arbitration agreement or an arbitration award. *See* Motion to Dismiss, ECF 23 at 12. Plaintiffs have otherwise shown no basis to apply Section 1605(a)(6), based on the arguments raised in the Reply, Section I(C), ECF 29 at 8.

**II. Plaintiffs have failed to plead personal jurisdiction**

In a motion to dismiss for lack of personal jurisdiction, "the plaintiff must make *prima facie* showing of the pertinent jurisdictional facts." *Johnson v. BAE Sys*., Inc., No. 11-CV-2172 (RLW), 2012 WL 13055684, at *1 (D.D.C. Oct. 23, 2012) (internal quotation marks omitted). In deciding on such motion, "the [c]ourt is not bound to treat all of the plaintiff's allegations as true,

but instead may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts." *Ibid* (internal quotation marks omitted).

To exercise personal jurisdiction over ZMDC, the following elements must be present. First, this Court must have subject matter jurisdiction pursuant to the immunity exceptions provided in 28 U.S.C. §§ 1605–07. Second, ZMDC must be served in strict compliance with the FSIA. Third, ZMDC must have minimum contacts with the District of Columbia. *See Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 49-50 (2d Cir. 2021). None of the conditions for assuming personal jurisdiction are present in this case.

**A. This Court lacks personal jurisdiction because it does not have subject matter jurisdiction and ZMDC was not served**

A court cannot exercise personal jurisdiction under the FSIA unless one of the immunity exceptions provided in 28 U.S.C. §§ 1605–07 applies and the foreign state is served pursuant to 28 U.S.C. § 1608. *See* Motion to Dismiss, ECF 23 at 13. Here, none of the FSIA immunity exceptions applies, hence, this Court cannot exercise personal jurisdiction over ZMDC. *See* ECF 29, Reply at Section I(A)-(B).

The Court also lacks jurisdiction because Plaintiffs have not served the Summons and Complaint on ZMDC. 28 U.S.C. § 1608(b) "provides the exclusive means by which service of process may be effectuated." *Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 415–17 (S.D.N.Y. 1998). If there are no special arrangement for service between the foreign state agency and the plaintiff and if the agency does not have any person authorized to receive service of process in the United States, the plaintiff must serve the agency pursuant to section 1608(b)(3). *See* 28 U.S.C. § 1608. According to section 1608(b)(3)(B), a plaintiff can serve an agency "by any form of mail requiring a signed receipt, to be address and dispatched by the clerk of the court to the agency…to be served." 28 U.S.C. § 1608 (b)(3)(B) (emphasis added). A plaintiff must strictly

comply with the requirements under section 1608(b) because failing to do so would render "the purpose of the [FSIA] and of numerous international conventions…meaningless." *Daly*, 30 F. Supp. 2d at 416.

Plaintiffs failed to serve ZMDC in compliance with Section 1608(b). On June 10, 2022, Plaintiffs requested the Clerk of this Court to mail through DHL a copy of the Summons and Complaint to ZMDC "pursuant to…28 U.S.C. § 1608(b)(3)(B)." ECF 12. On June 13, 2022, the Clerk certified to have mailed the documents to ZMDC in accordance with Plaintiffs' request and attached a DHL receipt of shipment. *See* ECF 18-3. But Plaintiffs have not filed a proof of service. Instead, they filed an affidavit of service on August 18, 2022, indicating that they effected service on ZMDC by "personally hand delivering" the Summons and the Complaint on "Theresa Kanengoni" who allegedly "was a secretary of" ZMDC. *See* ECF 24, ¶¶ 2-4 (emphasis added). This method of service does not comply with 28 U.S.C. § 1608(b)(3)(B) or any of the provisions under section 1608(b). *See Daly*, 30 F. Supp. 2d at 416 (holding that service through personal delivery is incompatible with 28 U.S.C. § 1608(b)(3)). Accordingly, this Court lacks personal jurisdiction over ZMDC.

**B. The Court lacks personal jurisdiction because there is no allegation that ZMDC has minimum contacts within the District**

Foreign sovereign states "are not 'persons" for the purposes of the Due Process Clause." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002). But agencies and instrumentalities "retain their status as separate legal persons [under section 1603(b)(1)] and receive protection from the exercise of personal jurisdiction under the Due Process Clause." *Gater Assets Ltd. v. AO Moldovagaz,* 2 F.4th 42, 49 (2d Cir. 2021) (internal quotation marks omitted). Under the Due Process Clause, a court can exercise personal jurisdiction over a nonresident if: 1) the nonresident has minimum contacts with the forum state

and 2) extending jurisdiction over the nonresident is "consistent with the traditional notions of fair play and substantial justice." *See Kroger v. Legalbill.com LLC*, No. CIV A 04-2189 ESH, 2005 WL 4908968, at *4 (D.D.C. Apr. 7, 2005).

Here, Plaintiffs have neither alleged nor proved that ZMDC has any contact in the United States and particularly in the District of Columbia. Nor can they. ZMDC was established in Zimbabwe by the Zimbabwe Mining Development Corporation Act (the "ZMDC Act"). *See* Chiparo Decl., ¶ 6. As noted by Mr. Chiparo, "ZMDC has no contacts with the United States." *Id*. at ¶ 24. Its "Board is based in Zimbabwe and hold its meetings in Zimbabwe." *Id*. In addition, all the board members, including "the chairman, deputy chairman," and the executive team" reside in Zimbabwe. *Id*. at ¶ 25. ZMDC also "has no property in the United States." *Id*. at ¶ 28. Aside "from retaining counsel to defend this lawsuit, ZMDC has no financial or contractual relationship with any natural or legal person in the United States." *Id*. at ¶ 26. Finally, "ZMDC has not conducted any promotional activities." *Id*. at ¶ 29. While it maintains a website, "it does not target any investors or potential partners in the United States with that website." *Id*. at ¶ 30.

This Court therefore cannot exercise personal jurisdiction as it will be contrary to ZMDC's due process rights under the Due Process Clause.

## III.   Plaintiffs have failed to state a claim upon which relief can be granted

"A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to 'assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint." *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017). "But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Id.* "To survive a motion to dismiss, a complaint must

have 'facial plausibility,' meaning it must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Moreover, where there is a contradiction between the allegations in the complaint and the exhibits attached, the exhibit generally controls. *See Regan v. Spicer, HB, LLC,* 134 F. Supp. 3d 21, 26 (D.D.C. 2015).

**A. <u>Plaintiffs are unable to state a claim for enforcement of the Award under the DC Code, and their ability to enforce the Award under the New York Convention expired years ago</u>**

While Plaintiffs entitle their Claim for Relief as one of enforcement of a foreign money judgment, that does not change the underlying claim. Plaintiffs have invoked the New York Convention as a basis for jurisdiction, but in order to circumvent the three-year statute of limitations under the FAA they attempt to enforce the award as a foreign judgment. For the reasons stated in the Motion to Dismiss, ECF 23 at 15-18, and the Reply, Section III(D), Plaintiffs cannot invoke the New York Convention to enforce a judgment against ZMDC.

**B. <u>Plaintiffs have failed to allege any facts supporting their various claims of an *alter ego*</u>**

To make a case of *alter ego* under the *Iqbal* standard requires more than merely conclusory statements. *Ashcroft,* 556 U.S. at 678; see also Motion to Dismiss, ECF 23 at 19. There must be facts that tend to show that an *alter ego* relationship exists. *See, e.g., Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446 (D.C. Cir. 1990). This is because there is "a baseline rule 'that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 814 (D.C. Cir. 2012).

The presumption of juridical separateness, which also applies to jurisdictional issues, can only "be overcome where the foreign state so extensively controlled the instrumentality 'that a

relationship of principal and agent is created,' or where . . . 'adhering blindly to the corporate form would cause injustice.'" *TMR Energy Ltd*, 411 F.3d at 301; *see also* ECF 23 at 19-20. This Court's long-standing precedent places the burden squarely on plaintiff's shoulders to assert facts sufficient to establish either an agency relationship or fraud or injustice. *See* Motion to Dismiss, ECF 23 at 19-20.

Plaintiffs have failed to allege any facts to overcome the presumption of juridical separateness. They claim that ZMDC is "an *alter ego* of the Republic of Zimbabwe," but aside from making such conclusory allegations Plaintiffs have not alleged any facts which show an *alter ego* relationship. *See* ECF 1 at ¶¶ 5, 15. As shown by the facts in the Chiparo Declaration, ZMDC is not an *alter ego* of Zimbabwe, and Plaintiffs have not stated a claim upon which relief can be granted for the reasons stated in the Reply, Sections III(A)-(C). *See* ECF 29 at 11-18.

### C. Plaintiffs have failed to plead entitlement to post-judgment interest at the Zambian statutory rate

The default rule of federal courts is that the applicable post-judgment rate is the one set forth § 1961, unless the parties unambiguously express their intent to replace the federal rate for post-judgment interest. *See* Motion to Dismiss, ECF 23 at 21. Courts have applied the federal statutory rates in cases involving the recognition of a foreign judgment. *See id*. Aside from aligning with the default rule, this approach is also consistent with § 15-367 which establishes that once the foreign judgment is recognized it is "[e]nforceable in the same manner and to the same extent as a judgment rendered in the District of Columbia." D.C. Code § 15-367 (2).

Plaintiffs request this Court to award them "post-judgment interest at Zambian's statutory rate." *See* ECF 1 at 10. They provided no basis for this Court to disregard the mandatory federal statutory rate and apply the Zambian rate. This Court should deny their request for this reason and for the reasons stated in the Reply, Section III(E). *See* ECF 29 at 21.

**D. <u>Plaintiffs have failed to plead entitlement to attorneys' fees</u>**

An application for attorney's fees "must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." *Harford Mut. Ins. Co. v. New Ledroit Park Bldg. Co., LLC*, 313 F. Supp. 3d 40, 49 (D.D.C. 2018) (*citing* Fed. R. Civ. P. 54(d)(2)(A). A party moving for attorney's fees must state the basis for its claim. *Ibid*. Failing to request attorneys' fees through a motion or state the basis for such claim often result in the dismissal of the clam. *See id*, 48-49 (denying the defendant's attorney's fees because it was not "sought by a motion" and defendant failed to establish the basis for its claim); *see also* Motion to Dismiss, ECF 23 at 22.

The "American Rule" is that parties generally bear their own attorney's fees, absent a bad faith exception. *See id.* at 48. Here, Plaintiffs seek an award of costs in addition to "reasonable attorneys' fees," but they presented no basis for their request. *See* ECF 1 at 10. Neither the underlying Award nor the judgment awarded attorney's fees. *See* ECF 1-1 at 38; ECF 1-5. This Court should therefore reject Plaintiffs' request for attorneys' fees for this reason and the reasons stated in the Reply, Section III(F). *See* ECF 29 at 21.

**IV. The Judgment is ineligible for recognition under the DC. Code**

**A. <u>The Zambian High Court had no jurisdiction over ZMDC</u>**

A party seeking to enforce a foreign judgment under the Act "bears the burden of making *prima facia* showing" that the foreign court had subject matter jurisdiction and personal jurisdiction over the defendant. *See Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation Portfolio,* 291 F. Supp. 3d 21, 33 (D.D.C. 2017); *see also* Motion to Dismiss, ECF 23 at 21-22.

The D.C. Code provides a list of grounds for establishing personal jurisdiction. *See* D.C. Code § 15–365(a). This list is not exhaustive. A court "may recognize other basis of jurisdiction…if the asserted jurisdiction comports with both the Constitution's Due Process Clause and D.C.'s long-arm statute." *Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation Portfolio,* 291 F. Supp. 3d 21, 31 (D.D.C. 2017); *Commissions Imp. Exp., S.A.*, 118 F. Supp. 3d at 227 (D.D.C. 2015) ("a court considering recognition under a statute like the Act should normally ask (1) whether the foreign court's assertion of personal jurisdiction satisfies federal constitutional due process and (2) whether the assertion of personal jurisdiction is cognizable under the state's internal law.").

Courts can exercise general jurisdiction or specific jurisdiction depending on the defendant's level of contact with the forum state. General jurisdiction exists where the defendant's "affiliations with the State are so continuous as to render [it] essentially at home in the forum State." *Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation Portfolio*, 291 F. Supp. 3d 21, 31 (D.D.C. 2017) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 134 S.Ct. 746, 754, 187 L.Ed.2d 624 (2014)) (internal quotation marks omitted). In the District of Columbia, a court can also exercise specific jurisdiction where: 1) it has basis for such jurisdiction under the D.C. long-arm statute, and ii) the exercise of such jurisdiction "would not offend traditional notions of fair play and substantial justice" because the "defendant had minimum contacts with the District of Columbia." *See Mills v. Anadolu Agency NA, Inc.*, No. CV 19-3061(EGS), 2022 WL 2374669, at *3, 67 (D.D.C. Apr. 28, 2022).

Plaintiffs have neither alleged nor established that the Zambian High Court's exercise of jurisdiction comports with the above requirements. They claim that the High Court had jurisdiction over ZMDC but do not claim or prove that its exercise of jurisdiction is consistent

with the Due Process Clause and D.C.'s long-arm statute. *See* Complaint, ¶ 44; *see also* ECF 1-5. There is no evidence that ZMDC had minimum contacts with Zambia or that it was served with the process either before or after the issuance of the Order. *See* ECF 1-5. The Zambian High Court also had no jurisdiction for the reasons stated in the Reply, Section IV(A). ECF 29 at 23.

### B. <u>The Order is repugnant to the public policy of the District of Columbia and the United States</u>

The D.C. Code also permits a court to refuse recognition of a foreign judgment where the "judgment or cause of action on which the judgment is based is repugnant to the public policy of the District of Columbia or of the United States." D.C. Code § 15-364.

A cause of action or a judgment is repugnant to the public policy of this state and that of the United States where it ignores "basic underpinnings of common contractual law." *See Mulugeta v. Ademachew*, 407 F. Supp. 3d 569, 586 (E.D. Va. 2019); *see also Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion*, 832 F.3d 92, 107-108 (2d Cir. 2016) (noting that the "high hurdle of the public policy exception is surmounted by vindication of contractual undertakings" and refusing to recognize to a Mexican judgment that set aside an arbitration award in disregard of the parties' arbitration agreement).

Here, the Tribunal repeatedly ignored the parties' arbitration agreement. According to the ICC Rules—the governing rule selected by the parties—only the ICC Court can hear and resolve a challenge against an arbitrator or a tribunal. *See* ECF 1 at ¶¶ 24, 51; ECF 23-1, Article 11. The Tribunal failed to adhere to this rule. On August 14, 2012, ZMDC challenged the Tribunal. *See* ECF 1 at ¶ 51. Instead of deferring to the Secretary, the Tribunal dismissed the challenge. *Id.*

The Tribunal also ignored Article 12 of the ICC Rules. Where an arbitrator resigns, Article 12 instructs the ICC Court to find a replacement. *See* ECF 23-1. On August 15, 2012,

ZMDC's appointed arbitrator, Mr. James Mutizwa, tendered his resignation and left the proceedings. *See* ECF 1-1 at ¶ 57. Instead of waiting for the ICC Court to find a replacement, the Tribunal continued with the arbitration proceedings citing to Article 12(5) of the ICC Rules. But Article 12(5) was inapplicable. Under Article 12(5), a tribunal can continue with the arbitration proceedings if a member of the tribunal resigns "subsequent to the closing" of the arbitration proceedings and if the ICC Court permits the continuation of the proceedings. *See* ECF 23-1 at 11. Here, the proceedings were not closed until December 2013 and the Tribunal never obtained permission to continue with the proceedings. *See* ECF 1-1 at ¶¶ 58, 87.

In August 2019, the Zambian High Court ordered the registration of the Award even though it was rendered in clear disregard of the parties' arbitration agreement. Enforcing such an order will be repugnant to the public policy of the District of Columbia and the United States, hence, this Court should dismiss the Complaint. ZMDC also incorporates those arguments made in the Reply, Section IV(B). ECF 29 at 25.

## CONCLUSION

For the foregoing reasons, ZMDC requests that the Court grant the Motion to Dismiss and grant whatever additional relief it considers just and proper.

Respectfully submitted,

/s/ Quinn Smith
**GST LLP**
Quinn Smith
DCD Bar No. FL0027
quinn.smith@gstllp.com
Katherine Sanoja
DC Bar No. 1019983
katherine.sanoja@gstllp.com
1111 Brickell Avenue
Suite 2715
Tel. (305) 856-7723

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2022, I electronically filed this document with the Clerk of the Court of the U.S. District Court of the District of Columbia by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel off record. I further certify that I am unaware of any parties who will not receive such notice.

By:    /s/ *Quinn Smith*
Quinn Smith

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **Amaplat Mauritius Ltd., *et al*,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Case No. 1:22-cv-00058-CRC** |
| **Zimbabwe Mining Development Corporation, *et al*,** | ) | |
| **Defendants.** | ) | |

**DECLARATION OF JACOB MUTEVEDZI**

I, Jacob Mutevedzi, make this Declaration based on my personal knowledge and my relevant experience, and state as follows:

1. My name is Jacob Mutevedzi. I am a partner at Mutamangira & Associates ("Mutamangira"), which is part of Clairwood Chambers. In the Zimbabwean market, our firm is known as Mutamangira.

2. I am a Partner with the firm. My matters include international law, which involves public international law matters, litigation, and dispute resolution. These matters also include mining disputes. I have represented clients in matters proceeding before the General Court of the European Community and the ICC International Court of Arbitration.

3. In my commercial law practice, I work with most aspects of company and commercial law, including corporate start-ups, reorganizations and the drafting of all commercial agreements. I have drafted and advised on share purchase agreements, business purchase agreements, share subscription agreements, due diligence reports, facility agreements,

compromise agreements, settlement agreements, and distribution agreements. I am admitted to practice in Zimbabwe and have also been previously registered to practice in Mauritius as a foreign lawyer.

4.      Zimbabwe Mining Development Corporation ("ZMDC") retained Mutamangira to represent it in an ICC arbitration filed by Amaplat Mauritius Ltd. ("Amaplat") and Amari Nickel Holdings Zimbabwe Ltd. ("Amari").

5.      I was lead counsel in the arbitration.

6.      Mutamangira was retained by ZMDC alone. One of the issues to be determined was the approval of the joint venture agreements. Because the Chief Mining Commissioner had a common interest in defending this issue, my firm signed the Terms of Reference on behalf of both ZMDC and the Chief Mining Commissioner. But I did not understand the Chief Mining Commissioner to have undertaken any contractual obligations in relation to Amaplat and Amari or to have any broad exposure in the arbitration. Indeed, the Award found ZMDC liable for damages, not the Chief Mining Commissioner, and there was no argument that the two respondents were jointly and severally liable for the damages sought. Amaplat and Amari did not request damages from the Chief Mining Commissioner. The role of the Chief Mining Commissioner was minimal and largely limited to this one issue of approval.

7.      Mutamangira did not send invoices to the Chief Mining Commissioner or communicate with the Office of the Attorney General, which is the office that represents the government in its disputes.

8.      My firm has represented the Republic of Zimbabwe and its agencies and instrumentalities in various different disputes. I am thus quite familiar with the contracting process.

**The authorization of Ranchhod Chungu Advocates to accept service on behalf of ZMDC**

9. As a part of Mutamangira's contract with ZMDC, my firm was given the authority to retain lawyers to defend ZMDC in other jurisdictions. Mutamangira retained, on behalf of ZMDC, Ranchhod Chungu, a law firm in Lusaka, Zambia, to represent ZMDC before the Zambian courts.

10. ZMDC did not have a contract directly with Ranchhod Chungu. The contract was between Mutamangira and Ranchhod Chungu.

11. As part of my representation of ZMDC, I managed the relationship with Ranchhod Chungu.

12. Mr. Paulman Chungu from Ranchhod Chungu would contact me to seek instructions on all important matters, including any decision to file a lawsuit, defend a lawsuit, or accept service.

13. I have reviewed the declaration of John Peter Sangwa (the "Sangwa Declaration") and the Declaration of Tinashe C. Chiparo (the "Chiparo Declaration"). I do not intend to comment on every point made in the two declarations but make some observations, as described below.

14. In paragraph 10 of the Sangwa Declaration, Mr. Sangwa states that the "Judgment Debtors" first filed a lawsuit in Zambia. This is incorrect. At that time, there was no judgment, and only ZMDC filed a lawsuit. Indeed, the applicant in the referenced lawsuit is ZMDC, and the Chief Mining Commissioner is a respondent. I remember this lawsuit, and I recall that I gave the instruction to Ranchhod Chungu to file the lawsuit. Mr. Chungu would update me on the lawsuit, and I would then communicate with Mr. Chiparo and ZMDC. I have not seen any indication that the Chief Mining Commissioner gave any instruction to file a lawsuit. I did not speak to the Office of the Attorney General regarding this lawsuit.

15.     In paragraph 13, Mr. Sangwa states that the "Judgment Debtors" filed a lawsuit in 2014. This incorrect. There was no judgment, and ZMDC filed a lawsuit. The Sangwa Declaration does not include the filings from this case, but I have reviewed them. I gave the instruction to Ranchhod Chungu to file the lawsuit. Mr. Chungu would update me on the lawsuit, and I would then pass along the information to Mr. Chiparo at ZMDC. The Chief Mining Commissioner was not the applicant, and I have not seen any indication that the Chief Mining Commissioner gave any instruction to file a lawsuit. I did not speak to the Office of the Attorney General regarding this lawsuit.

16.     I first learned about the purported judgment in June 2022 in the context of this lawsuit. I recall that I learned from Mr. Chiparo. Before then, I was unaware of Exhibits 4 and 5 of the Sangwa Declaration.

17.     I have reviewed Exhibit 6 of the Sangwa Declaration. I never instructed Ranchhod Chungu to accept service of Exhibits 4 and 5.

18.     I have reviewed my emails from August to October of 2019, and I have found no record of any request for instruction regarding the acceptance of service of process of Exhibits 4 and 5 or any other documents related to lawsuits filed by Amaplat and Amari in Zambia.

19.     I do not recall instructing anyone to accept service of process of Exhibits 4 and 5.

20.     I can affirm that I did not authorize anyone to accept service of process of Exhibits 4 and 5.

21.     Normally, when ZMDC has a new matter, its internal policies require the decisionmaker at ZMDC to travel to the location where the lawyers are, negotiate a separate agreement, and participate in setting the strategy. This process was followed with the lawsuit filed

in 2012 and the lawsuit filed in 2014. I was involved in both lawsuits and participated in the meetings.

22. There was no visit to Zambia in 2019 to discuss the lawsuit represented by Exhibits 4 and 5, and there was no separate fee agreement with my firm or discussion of strategy.

23. Part of my duties includes reviewing invoices submitted by Ranchhod Chungu. I have reviewed the invoices from 2019, and I did not find any time invoiced by Ranchhod Chungu for receiving Exhibits 4 and 5, reviewing these documents, or notifying Mutamangira of the documents.

24. Had I received Exhibits 4 and 5, I would have advised ZMDC before conveying any instruction to Ranchhod Chungu. My firm does not have authority to direct Ranchhod Chungu to accept service of process without written instructions from ZMDC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct

Dated:

______________________

Jacob Mutevedzi

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Amaplat Mauritius Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph Riviere Street, Port Louis 11602, Mauritius; and

Amari Nickel Holdings Zimbabwe Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph Riviere Street, Port Louis 11602, Mauritius,

Plaintiffs,

v.

Zimbabwe Mining Development Corporation,
90 Mutare Road, Msasa, Harare, Zimbabwe;

The Chief Mining Commissioner, Ministry of Mines of Zimbabwe,
6th Floor, ZIMRE Centre, Cnr. Leopold Takawira Street/Kwame Nkrumah Avenue, Private Bag 7709, Causeway, Harare, Zimbabwe;

and the Republic of Zimbabwe,
c/o Head of the Ministry of Foreign Affairs,
Ministry of Foreign Affairs, P.O. Box 4240, Munhumutapa Building, Cnr. Samora Machel Avenue/Sam Nujoma Street, Harare, Zimbabwe

Defendants.

Civil Action No. 1:22-cv-00058-CRC

**DECLARATION OF STEVEN K. DAVIDSON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS CHIEF MINING COMMISSIONER AND REPUBLIC OF ZIMBABWE'S MOTION TO DISMISS**

I, Steven K. Davidson, do declare as follows:

1. I am an attorney at Steptoe & Johnson LLP, admitted to practice in this Court, and the counsel of record for Plaintiffs.

2. I make this Declaration based on my review of publicly-available records and of Plaintiffs' correspondence file in this matter to place before the Court certain materials that are relevant to Plaintiffs' opposition to the motion to dismiss.

3. Attached hereto as Exhibit 1 is a true and correct copy of a letter from Zimbabwe Mining Development Corporation to Plaintiffs' Zimbabwean Counsel, Titan Law dated May 14, 2022.

4. Attached hereto as Exhibit 2 is a true and correct copy of Internet Archive pages from ZMDC's website dated 13 July 2020.

5. Attached hereto as Exhibit 3 is a true and correct copy of Internet Archive pages from ZMDC's website dated 19 October 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: November 1, 2022
Washington, D.C.

*/s/ Steven K.Davidson*
STEVEN K. DAVIDSON

# EXHIBIT 1



ZMDC
ZIMBABWE MINING
DEVELOPMENT CORPORATION
"Unearthing the future"

Telephone : 0242-487014-20
Fax : 0242-487022 / 159

No. 6 CONSTANTIA AVENUE
STRATHAVEN,
HARARE,
P.O.BOX 4101, HARARE

Our ref:

Your ref: E-letter/GNM/VMH/ZTW002

14 May 2021

Titan Law
Cnr. Piers Road & Fisher Avenue
Borrowdale
Harare

TITAN LAW
14 MAY 2021
TIME: 15:34
BY: Virginia

**Attention: Mr GN Mlotshwa**

**RE: AMAPLATS MAURITIUS LIMITED & ANOTHER / ZIMBABWE MINING DEVELOPMENT CORPORATION, CHIEF MINING COMMISSIONER**

We refer to the above and to our recent engagements on the same.

Further to your letter of 22 October 2020 and subsequent letter of demand dated 12 January 2021, we have now received Treasury's substantive comments on the matter. ZMDC has been asked by Treasury to develop modalities and structures to pay the Amari debt from its internally generated resources.

In order for ZMDC to proceed with its processes, which might necessitate the disposal of already identified assets, we must restart our engagement with the Creditor. We are however aware that in the period before and since your letters under reference, numerous approaches have been made to our Ministry and Treasury by parties purporting to represent Amari, a situation that makes it difficult to proceed on so strategic a matter of national interest.

As such, the secondary purpose of this letter (besides notifying you of Treasury's position as aforesaid) is to advise that in proceeding as directed by Treasury we will only discuss this matter through Amari's authorized local legal representatives and, to this end we ask that you confirm definitively that you still have the mandate to represent the creditor.

As we have resolved to address this matter without further delay, your kind and urgent attention to this matter will be appreciated.

Yours faithfully

B. Chitambira
**General Manager**

Cc Hon. W. Chitando, Minister of Mines and Mining Development
Cc Hon. Prof. M. Ncube, Minister of Finance and Economic Development
Cc Dr. M. J. M. Sibanda, Chief Secretary to the President and Cabinet
Cc Mr. O. M. Moyo, Secretary for Mines and Mining Development
Cc Mr. G. T. Guvamatanga, Secretary for Finance and Economic Development
Cc Mr. A. N. Bvumbe, Head, Zimbabwe Public Debt Management Office
Cc Mr. E. M. Zvandasara, Acting Accountant General

DIRECTORS: P. CHIMBOZA (CHAIRMAN), C. TAWHA, W. PASIPAMIRE, R. JAURE, R. MANDIMUKA, S. CHELLA, B. CHITAMBIRA (GENERAL MANAGER)

# EXHIBIT 2

INTERNET ARCHIVE

http://www.zmdc.co.zw/contact
Go
33 captures
15 Jan 2015 - 22 Oct 2021
MAY JUL OCT
2018 13 2021
2020
About this capture

HOME ABOUT US OPERATIONS SUSTAINABILITY MEDIA & GALLERY NEWS INVESTMENT OPPORTUNITIES CONTACT

## Contact

ADDRESS:
MMCZ Building
90 Mutare Road
Msasa
Harare
Zimbabwe

TELEPHONE:
+263 (4) 487014-20
+263 772 165 525-7

FAX:

+263 (4) 487022

EXHIBIT 3

INTERNET ARCHIVE WaybackMachine
https://zmdc.co.zw/contact
Go
33 captures
15 Jan 2015 - 22 Oct 2021
JUL OCT NOV
19
2020 2021 2022
About this capture

ZMDC ZIMBABWE MINING DEVELOPMENT CORPORATION

HOME ABOUT US OPERATIONS SUSTAINABILITY MEDIA & GALLERY TENDERS INVESTMENT OPPORTUNITIES CONTACT

## Contact

Name *

Surname *

Email *

Phone Number

Location

Message *

Math question *
5 + 5 =
Solve this simple math problem and enter the result. E.g. for 1+3, enter 4.

ADDRESS:
ZMDC Head Office
6 Constantia Avenue
Strathaven
Harare
Zimbabwe
TELEPHONE:
+263 (24) 2487014/5/8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMAPLAT MAURITIUS LTD. *et al.*,**<br><br>Plaintiffs,<br><br>v.<br><br>**ZIMBABWE MINING DEVELOPMENT CORPORATION *et al.*,**<br><br>Defendants. | Case No. 22-cv-58 (CRC) |

**MEMORANDUM OPINION AND ORDER**

In this case, two Mauritian mining companies seek recognition of a foreign court judgment enforcing an arbitral award against the Republic of Zimbabwe, the Chief Mining Commissioner of the Zimbabwean Ministry of Mines, and the Zimbabwe Mining Development Corporation ("ZMDC"), a corporation that is majority-owned by the government of Zimbabwe. All three Defendants have moved to dismiss the complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. The Court will grant the motions as to ZMDC and the Republic. Plaintiffs' theory for the Court's subject matter jurisdiction over the Republic and their theory for personal jurisdiction over ZMDC are both premised on the allegation that ZMDC is the Republic's alter ego. But, for the reasons explained below, the Court is not convinced that Plaintiffs have adequately pleaded that alter ego relationship. Because Plaintiffs might remedy that omission with more developed factual allegations, the Court will permit them to amend their complaint accordingly. As for the claims against the Chief Mining Commissioner, the Court concludes that it has jurisdiction and will deny the Commissioner's motion to dismiss.

## I.    Background

Plaintiffs Amaplat Mauritius Ltd. and Amari Nickel Holdings Zimbabwe Ltd. (collectively, "Plaintiffs") are two mining companies incorporated under the laws of the nation of Mauritius.  Compl. ¶¶ 13–14.  In 2007 and 2008, Plaintiffs each entered into memorandums of understanding ("MOUs") with Defendant ZMDC, which is majority-owned by the Republic of Zimbabwe ("the Republic"), to incorporate as joint ventures to prospect for nickel and platinum deposits and develop mines.  Id. ¶¶ 18–22.  Both MOUs included arbitration clauses, which provided that the parties must submit disputes arising out of or in relation to the MOUs to the ICC International Court of Arbitration in Paris for final and binding arbitration.  Id. ¶¶ 24–25.

In 2010, ZMDC purported to cancel the MOUs.  Id. ¶ 23.  In 2011, Plaintiffs initiated arbitration proceedings consistent with the MOU arbitration clauses, and the ICC Court determined that arbitration would occur in Zambia.  Id. ¶ 28; Compl. Ex. A (ICC Arbitral Award) ¶¶ 8–9.  Plaintiffs named both ZMDC and the Chief Mining Commissioner of the Zimbabwean Ministry of Mines (the "Commissioner") as respondents in the arbitration. Compl. Ex. A ¶ 2.  The parties participated in the arbitration proceedings for about a year and a half, during which they filed amended pleadings, conducted discovery, prepared expert reports, served various written submissions, and otherwise prepared for arbitration.  Id. ¶¶ 12–46.  The parties also signed Terms of Reference which, among other things, provided that the parties "acknowledge[d] that they agree to submit to this arbitration and expressly waive any procedural objections they may have with respect to known events."  Declaration of John Peter Sangwa ISO Pls' Opp. ("Sangwa Decl.") Ex. 1 § 8.1.  At multiple points during this time period, ZMDC and the Commissioner asked the panel to hear a challenge to its jurisdiction as a preliminary matter, but the panel deferred hearing the jurisdictional challenge on the ground that it was inextricably

linked to the merits. Compl. Ex. A ¶¶ 28, 45. In August 2012, the arbitral panel began hearing evidence, including testimony from a number of witnesses for Plaintiffs, and ZMDC and the Commissioner cross-examined at least one of Plaintiffs' witnesses. Id. ¶¶ 47–51.

After that cross examination, however, ZMDC and the Commissioner indicated that they wished to challenge the arbitral tribunal under Article 11 of the ICC International Court of Arbitration Rules and applied for the arbitration to be adjourned in the interim. Id. ¶ 51. The panel denied that request, at which point the respondents sought a short adjournment and, shortly thereafter, withdrew from the proceedings, although the panel continued to provide them with submissions and transcripts of the proceedings. Id. ¶ 51–56. After ZMDC and the Commissioner withdrew from the arbitration, their appointed arbitrator likewise tendered his resignation. Id. ¶ 57. Proceedings continued through October 2012, when the now-absent respondents obtained an ex parte order from the Zambian High Court temporarily enjoining the proceeding. Id. ¶¶ 58–67. Eventually, the arbitration panel was reconstituted, and after some further delays and changes of personnel (which were challenged by the respondents), the panel in January 2014 issued an award ordering ZMDC and the Commissioner to pay damages, costs, and expenses, totaling about $50 million. Id. ¶¶ 68–88, 227.[1]

After post-award litigation in Zambian courts, in which ZMDC and the Commissioner again challenged the composition and authority of the panel, the High Court of Zambia issued a judgment in Plaintiffs' favor in August 2019. Compl. ¶ 34 & Ex. E (Ex Parte Order for Leave to Register and Enforce the Final Arbitration Award). The Judgment provided that ZMDC and the

[1] A few months later, in June 2014, the Zambian High Court issued an opinion stating that ZMDC and the Chief Mining Commissioner had "suppressed material facts and laws" in their ex parte injunction application, concluding that the court lacked jurisdiction, and dissolving the injunction that had stayed the arbitration proceedings. Sangwa Decl. Ex. 3 at R24–R25.

Commissioner had 30 days after service to move to set aside the Judgment. Id. ¶ 35. Plaintiffs allege that they served the Judgment on October 23, 2019. Id.[2] The parties negotiated for a time, but after Defendants refused to pay the Judgment, Plaintiffs filed their complaint in this Court against ZMDC, the Commissioner, and the Republic of Zimbabwe. Id. ¶¶ 38–40.

The complaint alleges a cause of action under the D.C. Uniform Foreign-Country Money Judgments Recognition Act, D.C. Code § 15-361 et seq., and asks this Court to enter an order recognizing and enforcing the Judgment, finding that the Republic of Zimbabwe is the alter ego of ZMDC and the Commissioner, and entering a money judgment against Defendants. Id. at 10.

Defendants have filed two separate motions to dismiss—one by the Republic and the Commissioner, and the other by ZMDC. The Republic and Commissioner contend that the Court lacks subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") because the Republic did not sign the MOUs containing an arbitration agreement, did not participate in the Zambian arbitration, is not an alter ego of ZMDC, and therefore retains its sovereign immunity. See Zimbabwe MTD at 6–12. The motion also maintains that the Court lacks jurisdiction as to the claims against the Commissioner because he is an individual, not an agency or instrumentality of Zimbabwe. Id. at 8–9. In any event, the Republic and the Commissioner further contend that neither the FSIA's waiver exception nor arbitration exception to sovereign immunity applies in this case. Id. at 9–12. Next, the motion contends that the Court

[2] Defendants contend that they were never served with the Zambian judgment, citing an expert declaration from a Zambian lawyer stating that there is no evidence from the Zambian court docket that Plaintiffs sought leave of the court to serve documents outside the jurisdiction. See Zimbabwe Motion to Dismiss ("Zimbabwe MTD") at 18–19; Expert Declaration of Likando Kalaluka ISO Zimbabwe MTD ("Kalaluka Decl.") ¶¶ 27–30, ECF No. 23-3. In their opposition, Plaintiffs state that they served Defendants' Zambian counsel in Zambia, explaining why they did not need to serve elsewhere. Opp. to Zimbabwe MTD at 31; Sangwa Decl. ¶¶ 23–25, ECF No. 28-1. In any event, the complaint pleads that Plaintiffs served the Zambian judgment on Defendants.

lacks personal jurisdiction over both the Republic and the Commissioner.  Id. at 13–14.  Finally,

the Republic and Commissioner maintain (1) that Plaintiffs have failed to state a claim because

they are seeking to enforce the arbitration award judgment past the three-year statute of

limitations under the New York Convention, (2) that Plaintiffs have failed to allege sufficient

facts to support their claim that ZMDC is an alter ego of the Republic, (3) that Plaintiffs have not

pleaded an entitlement to fees and interest, and (4) that the Zambian High Court lacked

jurisdiction to issue the Judgment.  Id. at 15–25.  In addition to reiterating many of the same

arguments raised by the Republic and the Commissioner, ZMDC separately maintains that it was

not properly served under the FSIA and that the Court lacks personal jurisdiction over it because

the complaint does not allege minimum contacts with the District of Columbia.  ZMDC MTD at

7–9.

   Both motions are fully briefed and ripe for decision.

## II.   Legal Standards

   On a motion to dismiss for lack of subject matter jurisdiction or lack of personal

jurisdiction, "[t]he plaintiff bears the burden of establishing, by a preponderance of the evidence,

that the court has jurisdiction."  Cause of Action Inst. v. IRS, 390 F. Supp. 3d 84, 91 (D.D.C.

2019) (quoting Whiteru v. Wash. Metro. Area Transit Auth., 258 F. Supp. 3d 175, 182 (D.D.C.

2017)); see Burman v. Phoenix Worldwide Indus., Inc., 437 F. Supp. 2d 142, 147 (D.D.C. 2006).

Because this suit involves claims against a foreign nation, the FSIA provides the framework for

determining subject matter jurisdiction.  Creighton Ltd. v. Gov't of State of Qatar, 181 F.3d 118,

121 (D.C. Cir. 1999).  Under the FSIA, federal district courts "have original jurisdiction without

regard to amount in controversy of any nonjury civil action against a foreign state" as defined by

the FSIA "with respect to which the foreign state is not entitled to immunity" under the statute.

28 U.S.C. § 1330(a).  As the statute's text suggests, "the FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies."  Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  Once the plaintiff has made that threshold showing, however, "the sovereign bears the ultimate burden of persuasion to show that the exception does not apply."  Id.; accord Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000) ("'In accordance with the restrictive view of sovereign immunity reflected in the FSIA,' the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." (quoting Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998, 1002 (D.C. Cir. 1985))).

If, on the one hand, "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff."  Phoenix Consulting, 216 F.3d at 40.  On the other hand, if the motion to dismiss presents "a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA" by contesting a jurisdictional fact or raising a "mixed question of law or fact," such as whether the "person alleged to have harmed [the] plaintiff was [an] agent of [the] sovereign," then "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged" but instead "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  Id. (citing Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 448–49 (D.C. Cir. 1990)).

Defendants also move to dismiss under Rule 12(b)(6).  In reviewing a motion to dismiss for failure to state a claim, the Court must "accept all the well-pleaded factual allegations of the

complaint as true and draw all reasonable inferences from those allegations in the plaintiff's

favor." Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

"[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice," however, nor does the Court "assume the truth of legal conclusions."

Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  Accordingly, "[t]o survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  Id. (quoting Iqbal, 556 U.S. at 678).

## III.  Analysis

District courts have jurisdiction over "any nonjury civil action against a foreign state as

defined in" 28 U.S.C. § 1603(a) as to any claim "with respect to which the foreign state is not

entitled to immunity" under §§ 1605–07 of the FSIA or an international agreement.  28 U.S.C.

§ 1330(a).  For purposes of the FSIA, § 1603(a) defines a foreign state as a state, any political

subdivision of a state, or an agency or instrumentality of a state.  Id. § 1603(a).  The statute

defines agency or instrumentality, in turn, as "any entity" which "is a separate legal person,

corporate or otherwise," "is an organ of a foreign state or political subdivision thereof, or a

majority of whose shares or other ownership interest is owned by a foreign state or political

subdivision thereof," and "which is neither a citizen of a State of the United States . . . nor

created under the laws of any third country."  Id. § 1603(b).

Section 1605 of the FSIA sets forth general exceptions to foreign sovereign immunity.

Plaintiffs assert that either of two possible exceptions apply in this case.  First, Plaintiffs point to

§ 1605(a)(1)—the waiver exception—which divests a sovereign of immunity when "the foreign

state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal

of the waiver which the foreign state may purport to effect except in accordance with the terms

of the waiver." Id. § 1605(a)(1).  Alternatively, Plaintiffs rely on § 1605(a)(6), which, as

relevant here, waives sovereign immunity when an "action is brought, either to enforce an

agreement made by the foreign state with or for the benefit of a private party to submit [certain

disputes] to arbitration" or "to confirm an award made pursuant to such an agreement to

arbitrate" if "the agreement or award is or may be governed by a treaty or other international

agreement in force for the United States calling for the recognition and enforcement of arbitral

awards."  Id. § 1605(a)(6).

Plaintiffs maintain that ZMDC waived its sovereign immunity under §§ 1605(a)(1) and

(a)(6) by agreeing to arbitrate disputes in the 2007 and 2008 MOUs and that the Commissioner,

although not a party to those agreements, waived immunity by participating in the Zambian

arbitration and by signing Terms of Reference agreeing to submit to the arbitration.  As for the

Republic, Plaintiffs allege that ZMDC is the Republic's alter ego under First National City Bank

v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611 (1983), and that ZMDC's

actions relating to the arbitration and MOUs are therefore attributable to the Republic.  In turn,

Plaintiffs maintain that personal jurisdiction exists over ZMDC, despite the absence of any

alleged minimum contacts with the United States, because ZMDC is the Republic's alter ego,

and under the FSIA, "subject matter jurisdiction plus service of process equals personal

jurisdiction."  GSS Grp. Ltd. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting

Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002)).  With

these frameworks for analysis in mind, the Court will proceed to assess the motions to dismiss as

to each defendant, beginning with the Republic.

A. The Republic

Plaintiffs contend that ZMDC's agreement to arbitrate disputes in the 2007 and 2008 MOUs, combined with the fact that Zimbabwe, Zambia, and the United States are all signatories to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), satisfies either the waiver exception or arbitration exception to sovereign immunity under § 1605(a). But ZMDC's conduct is relevant for jurisdiction over the Republic only if ZMDC is the Republic's alter ego, such that the company's actions may be attributed to the Republic. Accordingly, the Court begins by addressing Plaintiffs' central contention that ZMDC is the Republic's alter ego.

"A government instrumentality 'established as [a] juridical entit[y] distinct and independent from [its] sovereign should normally be treated as such,'" and therefore such entities are "presumed to have legal status separate from that of the sovereign." Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 847 (D.C. Cir. 2000) (alterations in original) (quoting Bancec, 462 U.S. at 627).[3] "That presumption can be overcome," however, "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or "where recognition of the instrumentality as an entity apart from the state 'would work fraud or injustice.'" Id. at 847–48 (quoting Bancec, 462 U.S. at 629). The existence of those conditions serves as an "exception[] to the rule that a foreign sovereign is not amenable to suit based upon the acts of such an instrumentality." Id. at 848.

[3] Plaintiffs maintain, and Defendants do not dispute, that ZMDC is an "agency or instrumentality" of the Republic of Zimbabwe as that term is defined in the FSIA. See Compl. ¶ 15 (alleging that the Republic owns a majority of ZMDC); see 28 U.S.C. § 1603(b) (defining "agency or instrumentality of a foreign state" as any entity "which is a separate legal person, corporate or otherwise," "a majority of whose shares or other ownership interest is owned by a foreign state," and "which is neither a citizen of a State of the United States . . . nor created under the laws of any third country").

Whether a state instrumentality is so closely tied to the sovereign that it may be the state's alter ego depends on a number of factors, including the level of the government's economic control over the entity, whether the entity's profits go to the government, the degree to which government officials manage the entity or its daily affairs, whether the government is the real beneficiary of the entity's conduct, and whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations. Rubin v. Islamic Republic of Iran, 138 S. Ct. 816, 823 (2018) (quoting Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines, 965 F.2d 1375, 1380 n.7 (5th Cir. 1992)). The sovereign's degree of control over the instrumentality must, however, "significantly exceed[] the normal supervisory control exercised by any corporate parent over its subsidiary." Transamerica, 200 F.3d at 848. Under such circumstances, the sovereign and the instrumentality are "not meaningfully distinct entities; they act as one." Id.; see also id. at 849 ("[C]ontrol is relevant when the sovereign exercises its control in such a way as to make the instrumentality its agent. . . . The relationship of principal and agent depends, however, upon the principal having 'the right to control the conduct of the agent with respect to matters entrusted to [the agent].'" (last alteration in original) (quoting Restatement (Second) of Agency § 14 (1958))).

Plaintiffs offer two grounds for finding that ZMDC is the Republic's alter ego. First, they rely on the allegations in the complaint, which in relevant part state that ZMDC "was created by the Zimbabwe Mining Development Corporation Act, and by law the Republic of Zimbabwe appoints its Board of Directors, approves significant actions, has the power to direct its actions, [sic] pays the debts of the Republic of Zimbabwe, and must be majority-owned by the Republic of Zimbabwe." Compl. ¶ 15; Opp. to Zimbabwe MTD at 9. Second, Plaintiffs maintain that the Southern District of New York's decision in Funnekotter v. Agricultural

Development Bank of Zimbabwe, No. 13 CIV.1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015), which found that ZMDC was the Republic's alter ego, is dispositive here under the doctrine of issue preclusion.  Opp. to Zimbabwe MTD at 9–10, 21–23.  The Court concludes that neither of these theories suffices to show that ZMDC is the Republic's alter ego.

First, the single paragraph of alter ego allegations in Plaintiffs' complaint is inadequate to displace the presumption of juridical separateness.  Plaintiffs allege that the Republic, by law, must be a majority owner of ZMDC and is empowered to appoint ZMDC's Board of Directors.  But "[a] sovereign does not create an agency relationship merely by owning a majority of a corporation's stock or by appointing its Board of Directors."  Transamerica, 200 F.3d at 849; accord Foremost-McKesson, 905 F.2d at 448 ("Majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA.").  Moreover, the fact that ZMDC was created by Zimbabwean statute does not distinguish it from what Bancec described as the "typical government instrumentality" entitled to separate juridical status, which is "created by an enabling statute that prescribes the powers and duties of the instrumentality."  462 U.S. at 624; see also Transamerica, 200 F.3d at 846 (describing instrumentality there as a state-owned shipping company created by the sovereign).  The complaint further alleges that the Republic approves or has the power to direct "significant actions" by ZMDC.  But "it is not uncommon for a government—as regulator, not as shareholder—to require approval for certain transactions" in certain sectors.  Transamerica, 200 F.3d at 851.  The complaint does not describe what "significant actions" the Republic must approve, how extensive that alleged approval authority is, or whether that authority "represents the exercise of [the Republic's] authority as shareholder rather than its exercise of governmental power in the ordinary course of regulation."  Id.; see id. at 849 ("[T]he parent [must] exercise[]

its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.").

That leaves the complaint's allegation that ZMDC pays the Republic's debts. Compl. ¶ 15. Plaintiffs attempt to bolster their argument of financial interdependence with a few news articles appended to their briefing, which suggest that ZMDC has had some involvement in a joint venture with a Russian military-industrial firm and that ZMDC has sold off mineral rights to the Zimbabwean military and other entities. See Declaration of Steven K. Davidson ISO Opp. to Zimbabwe MTD ("Davidson Decl."), Exs. 1–3. Although these allegations are relevant to the extent that they suggest some share of ZMDC's profits may go to the Republic, the complaint and Plaintiffs' handful of news articles do not support the inference that ZMDC's and the Republic's finances are "so intermingled that no distinct corporate lines are maintained." See Transamerica, 200 F.3d at 849 (quoting NLRB v. Deena Artware, Inc., 361 U.S. 398, 403 (1960)); id. at 848 (noting that a separate entity may functionally be "operated as a division of another" if the subsidiary does "not handle any funds" and pays "all profits to parent" (citing Joseph R. Foard Co. v. Maryland, 219 F. 827, 829 (4th Cir. 1914))); see also Bancec, 462 U.S. at 614 (observing that Cuba's government "supplied all of [Bancec's] capital and owned all of its stock," and that the "General Treasury of the Republic received all of Bancec's profits, after deduction of amounts for capital reserves"). In short, the sparse allegations in Plaintiffs' complaint, combined with a few newspaper articles, are insufficient to overcome the presumption that ZMDC has "legal status separate from that of the sovereign." Transamerica, 200 F.3d at 847.[4]

[4] Although Plaintiffs emphasize that "*either* extensive control *or* fraud or injustice will suffice" to displace the presumption, they do not elaborate on a theory of fraud or injustice beyond asserting that one of the newspaper articles shows that ZMDC "may dissolve" and

Aside from the allegations in the complaint, Plaintiffs largely rely on the Southern District of New York's decision in Funnekotter. Funnekotter concerned a declaratory judgment action brought by Dutch nationals seeking to satisfy a judgment against the Republic of Zimbabwe with the assets of several Zimbabwean corporations, including ZMDC. 2015 WL 9302560, at *1. Ruling on the plaintiffs' motion for summary judgment, the court concluded that ZMDC, as well as the other corporations, were sufficiently dominated by the Republic to be considered its alter egos under Bancec. Id. at *5–6. Plaintiffs here, who were not a party to that case, contend that the Court should apply the doctrine of offensive non-mutual collateral estoppel to give Funnekotter preclusive effect concerning ZMDC's alter ego status in this case. Opp. to Zimbabwe MTD at 21–23; Opp. to ZMDC MTD at 22–23.

"Under the doctrine of offensive collateral estoppel, or issue preclusion, a defendant may be prevented from relitigating identical issues that the defendant litigated and lost against another plaintiff." Hurst v. Socialist People's Libyan Arab Jamahiriya, 474 F. Supp. 2d 19, 31 (D.D.C. 2007). A district court, "in its discretion, may only apply preclusive effect to a judgment if (1) the issue was actually litigated, that is, contested by the parties and submitted for determination by the court; (2) the issue was actually and necessarily determined by a court of competent jurisdiction in the first trial; and (3) preclusion in the second action would not work an unfairness." Id. at 31–32 (citing Jack Faucett Assocs., Inc. v. AT&T, 744 F.2d 118, 125 (D.C. Cir. 1984)); see Smith v. District of Columbia, 387 F. Supp. 3d 8, 21 (D.D.C. 2019) ("[T]he party against whom estoppel is [offensively] asserted [must] ha[ve] litigated and lost in an earlier action." (alterations in original) (quoting Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329

---

"transfer its assets to a different state-owned entity." Opp. to Zimbabwe MTD at 10, 20. This allegation is not enough to satisfy Plaintiffs' burden of establishing jurisdiction.

(1979))). "The doctrine is detailed, difficult, and potentially dangerous," and "[w]here offensive estoppel is involved, the element of 'fairness' gains special importance." Jack Faucett, 744 F.2d at 124–25.

For several reasons, the Court will not exercise its discretion to give Funnekotter preclusive effect here. First, although the Republic was a named defendant in Funnekotter, Defendants point out that the Republic itself never actually made an appearance in the case. See Zimbabwe Reply at 12; see also Docket, Funnekotter v. Agric. Dev. Bank of Zimbabwe, No. 13-cv-1917 (S.D.N.Y.); Funnekotter v. Agric. Dev. Bank of Zimbabwe, No. 13 CIV. 1917 CM, 2015 WL 3526661, at *2 (S.D.N.Y. June 3, 2015). To be sure, as a named party, the Republic had the opportunity to litigate the alter ego issue in Funnekotter. Jack Faucett, 744 F.2d at 127 (issue preclusion applies only against a party who had "a 'full and fair' opportunity to litigate the issue to be precluded"). But the fact that the Republic did not, in fact, participate in the Funnekotter litigation makes the Court hesitate to give Funnekotter preclusive effect here.

Even if the Republic's prior opportunity to litigate alone was sufficient, it is unclear whether the question decided in Funnekotter is sufficiently "identical" to the one here. Id. at 124. For instance, there may be "a lack of total identity between the matters involved" in two proceedings when "the events in suit took place at different times." Restatement (Second) of Judgments § 27 cmt. c (Am. L. Inst. 1982). Here, the question relevant to subject matter jurisdiction is whether ZMDC was the Republic's alter ego either when it entered into the MOUs with Plaintiffs in 2007 and 2008 or when it actually participated in the Zambian arbitration starting in 2011. It is not apparent during what time period the Funnekotter court determined ZMDC was functionally the Republic's alter ego. The Funnekotter decision was rendered in 2015, and the conduct that gave way to the underlying arbitration in Funnekotter occurred

between 1992 and 2001, when the Zimbabwean government expropriated a number of commercial farms in which the plaintiffs held investments. Funnekotter, 2015 WL 9302560, at *1. If, as appears to be the case, Funnekotter may have addressed ZMDC's relationship with the Republic at a different period of time than the period relevant here, there may be "a difference in pertinent facts" here "sufficient to substantially change the issue" and "render[] the doctrine of issue preclusion inapplicable." Safadi v. Novak, 574 F. Supp. 2d 52, 55–56 (D.D.C. 2008) (quoting 18 James W. Moore, et al., Moore's Federal Practice § 132.02[2][3], at 27–29 (3d ed. 2008)). In light of these considerations, the Court is not convinced that this is an appropriate case for the application of non-mutual offensive collateral estoppel.[5]

Because Plaintiffs' allegations that the Republic has waived its sovereign immunity are premised on the allegation that ZMDC acted as the Republic's alter ego, and because the complaint lacks sufficient factual allegations to overcome the presumption of juridical separateness between the Republic and ZMDC, the Court accordingly concludes that Plaintiffs

[5] Additionally, although not dispositive, the Republic correctly observes that the decision in Funnekotter was based partially on that court's application of adverse-inference discovery sanctions against ZMDC and the other defendants in that case. Funnekotter, 2015 WL 9302560, at *5. Because the defendants there failed to produce certain documents in response to discovery orders, specifically "minutes and resolutions of their boards of directors," the court drew an "adverse inference about the contents" of those documents to support the plaintiffs' argument that the defendants there were alter egos of the Republic. Id. at *3, *5. To be sure, this is not a situation in which issue preclusion is inappropriate because the defendant "was unable to engage in full scale discovery" in the prior proceeding. Parklane Hosiery, 439 U.S. at 331 n.15. But at least when combined with the other considerations just discussed, the fact that adverse-inference discovery sanctions apparently played an important role in the Funnekotter decision gives the Court pause about the fairness of applying non-mutual issue preclusion here. Restatement (Second) of Judgments § 29 cmt. g (Am. L. Inst. 1982) ("The circumstances attending the determination of an issue in the first action may indicate that it could reasonably have been resolved otherwise if those circumstances were absent."); cf. Jack Faucett, 744 F.2d at 126 (preclusion inappropriate where "important, material evidence can be introduced in the current trial that was unavailable in the previous trial"); but see id. (noting that this factor is most relevant when evidence was not previously available to party "without fault of his own" (quoting Blonder-Tongue Lab'ys v. Univ. of Ill. Found., 402 U.S. 313, 333 (1971))).

have not met their burden of establishing that one of FSIA's exceptions to sovereign immunity applies in this case.  See Foremost-McKesson, 905 F.2d at 447 (explaining that plaintiff "bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship").  Plaintiffs ask for leave to amend their complaint so that they may bolster their alter ego allegations.  See Opp. to Zimbabwe MTD at 36–37; Opp. to ZMDC MTD at 4 n.1.  Leave to amend should be freely granted when justice requires it, provided that amendment would not be futile.  Wilson v. Geithner, 968 F. Supp. 2d 275, 280 (D.D.C. 2013).  Plaintiffs propose that they could amend their complaint to include the facts identified in Funnekotter as well as other developments that reinforce their theory of financial interdependence between ZMDC and the Republic.  See Opp. to Zimbabwe MTD at 36.

        As described above, Plaintiffs proposed amendment would need to do more than show merely that the Republic owns a majority of ZMDC, appoints its Board of Directors, regulates its activities, and created it by statute.  See Transamerica, 200 F.3d at 847–53.  The Court could, nevertheless, envision factual allegations that might tip the balance in Plaintiffs' favor.  The current pleadings, for example, offer no factual allegations to support or describe the extent to which the Republic "approves significant actions" of ZMDC or requires ZMDC to function as its piggy bank.  See Compl. ¶ 15.  But if Plaintiffs can plead non-conclusory factual allegations that the Republic has exercised "day-to-day" control over ZMDC's operations above and beyond its role as a regulator or that the affairs of the two entities are "so intermingled that no distinct corporate lines are maintained," then the Court may yet find a basis to conclude that ZMDC's actions here were attributable to the Republic.  Transamerica, 200 F.3d at 849–51 (quoting Deena Artware, 361 U.S. at 403).  The Court therefore will dismiss Plaintiffs' complaint as to the

Republic without prejudice so that Plaintiffs may have the opportunity to bolster their factual allegations along the lines described in this opinion.[6]

B. ZMDC

The Court's conclusion that the complaint's alter ego allegations are insufficient also warrants dismissal as to ZMDC, although for a different reason: personal jurisdiction. See Forras v. Rauf, 812 F.3d 1102, 1105 (D.C. Cir. 2016) (explaining that a court may "turn[] directly to personal jurisdiction" when that issue is "straightforward" and "present[s] no complex question" but resolving subject matter jurisdiction would be complicated (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 588 (1999))).

"Whenever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none." GSS, 680 F.3d at 815. In that situation, the personal jurisdiction rule that applies to sovereigns applies to the instrumentality as well—"subject matter jurisdiction plus service of process equals personal jurisdiction." Id. at 811 (quoting Price, 294

[6] Although they rely heavily on Funnekotter, the Court reminds Plaintiffs that they must heed this Circuit's explanations in Foremost-McKesson, Transamerica, and other cases concerning what allegations are sufficient and insufficient to displace the presumption of juridical separateness. Additionally, the Court acknowledges Plaintiffs' request for jurisdictional discovery on ZMDC's alter ego status. See Opp. to ZMDC MTD at 21 n.8. "[C]arefully controlled and limited" jurisdictional discovery along the lines set forth in that request may well be appropriate after Plaintiffs have had the opportunity to amend their complaint. Phoenix Consulting, 216 F.3d at 40. Whether to permit such discovery now is a close question. But the "court should allow for limited jurisdictional discovery" only if "a plaintiff shows a nonconclusory basis for asserting jurisdiction and a likelihood that additional supplemental facts will make jurisdiction proper." Intelsat Glob. Sales & Mktg., Ltd. v. Comm'ty of Yugoslav Posts Tels. & Tels., 534 F. Supp. 2d 32, 34 (D.D.C. 2008). Because in its present form, the complaint does not allege sufficient facts "upon which jurisdiction could be found after discovery is completed," id. (citation omitted), the Court will refrain from imposing the burden of jurisdictional discovery until after Plaintiffs have filed amended pleadings, should they so choose.

F.3d at 95).  "On the other hand, if an instrumentality does not act as an agent of the state, and

separate treatment would not result in manifest injustice" under Bancec, then "the

instrumentality will enjoy all the due process protections available to private corporations,"

including the requirement of "minimum contacts" with the relevant forum.  Id. at 815, 817.

Plaintiffs' theory for personal jurisdiction over ZMDC is premised on their alter ego theory.

That is, because ZMDC is the Republic's alter ego, Plaintiffs assert, no showing of minimum

contacts is necessary.

For the reasons just explained, the Court cannot say that Plaintiffs' current complaint

adequately alleges the existence of an alter ego relationship between ZMDC and the Republic.

Because the complaint includes no other allegations to support personal jurisdiction over ZMDC,

see Compl. ¶ 11, the Court must dismiss the complaint against it as well.  As with the Republic,

however, the Court will dismiss the complaint as to ZMDC without prejudice, with the

understanding that more fulsome alter ego allegations may create a basis to conclude that ZMDC

was, in fact, the Republic's alter ego.[7]

C.  The Chief Mining Commissioner

Last, the Court comes to the allegations against the Chief Mining Commissioner.

Because the Commissioner actually participated in the arbitration against Plaintiffs in Zambia,

Plaintiffs' subject matter jurisdiction theory as to the Commissioner does not turn on whether

ZMDC was the Commissioner's alter ego.  The Court, therefore, will begin by deciding whether

an exception to sovereign immunity under the FSIA applies to the Commissioner and will then

address Defendants' arguments concerning personal jurisdiction and failure to state a claim.

---

[7] Although unlike the Republic, ZMDC did actually litigate the alter ego issue in
Funnekotter, the Court still declines to give that decision preclusive effect here, for the other
reasons discussed above.

1. *The Commissioner's Governmental Status*

As a preliminary matter, the Court must determine how to characterize the Chief Mining Commissioner's status and relationship to the sovereign in this case—the Republic of Zimbabwe. The Commissioner contends that it is an individual, not a state entity, and thus falls entirely outside the scope of the FSIA's definition of a "foreign state" under § 1603(a), which does not include individuals sued in their personal capacity. See Samantar v. Yousuf, 560 U.S. 305, 319 (2010); see also Zimbabwe MTD at 8–9. Plaintiffs, in contrast, maintain that the "Commissioner is an office in the Ministry of Mines and Mining Development" and that under Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1994), which sets out the test for distinguishing between a foreign state (and its political subdivisions) and the state's agencies or instrumentalities, the Commissioner "*is* the foreign state—a political organ like a ministry—rather than a commercial agency or instrumentality." Opp. to Zimbabwe MTD at 24–25. The Commissioner responds that the Transaero test, which asks whether an entity's "core functions" are inherently governmental or commercial, does not apply and that the Court should instead analyze this question under the Bancec framework. Zimbabwe Reply at 4–5, 15.

Whether the Transaero "core functions" test or the Bancec framework applies here is a somewhat murky question. On the one hand, the Court disagrees with the Commissioner that the Transaero test is limited strictly to interpreting the FSIA's service of process provisions. Zimbabwe Reply at 4–5. Transaero "interpreted the FSIA's *general definition* of 'agency or instrumentality,'" Jacobsen v. Oliver, 451 F. Supp. 2d 181, 196 (D.D.C. 2006) (quoting Crist v. Republic of Turkey, 107 F.3d 922, 1997 WL 71739, at *2–3 (D.C. Cir. 1997)), and the D.C. Circuit has since applied Transaero to determine "the legal status" of foreign government ministries, such as Iran's Ministry of Foreign Affairs, under other provisions of the FSIA,

Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234–35 (D.C. Cir. 2003).  What's more, by its

own terms, the Bancec analysis seems intended to apply only to "government instrumentalities"

that exist outside of the government itself.  Bancec, 462 U.S. at 623; see id. (describing the

entities at issue there as "separately constituted juridical entities" with "independent status").

Unlike a government itself or one of its political subdivisions, the instrumentalities to which

Bancec accorded a presumption of juridical separateness are government-controlled commercial

organizations "run as a distinct economic enterprise," "created by an enabling statute," "managed

by a board selected by the government," "with the powers to hold and sell property," and

"primarily responsible for [their] own finances."  Id. at 624.  In other words, the government

instrumentalities discussed in Bancec appear to overlap with the "public commercial enterprises"

that Transaero held are separate from "the state itself."  Transaero, 30 F.3d at 152–53.  It would

thus seem appropriate to ask first whether, under Transaero, the Commissioner is a political

subdivision of the Republic—and thus part of "the state itself"—and then, only if the answer to

that first question is no, to ask whether the presumption of juridical separateness set forth in

Bancec applies.  See Foremost-McKesson, 905 F.2d at 446 (explaining that the "FSIA applies to

instrumentalities and agencies of the foreign sovereign, as well as to the state itself," but that

"instrumentalities and agencies are accorded a presumption of independent status" under

Bancec).

      Although this approach seems sensible, there is some basis to believe that the Bancec

framework should govern.  The Commissioner maintains, for instance, that it is a person with

separate legal status who receives due process protections for purposes of personal jurisdiction,

Zimbabwe MTD at 13–14, and the Circuit has explained that Bancec, not Transaero, "guides our

way" in determining whether an entity "is a 'person' within the meaning of the due process

clause." TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 301 (D.C. Cir. 2005).

Additionally, some courts in this district have applied the Bancec analysis to determine whether

an entity is entitled to a presumption of separateness from the sovereign even with regard to

cabinet-level ministries which, under Transaero, would appear to be political subdivisions of the

state.  See Entes Indus. Plants, Constr. & Erection Contracting Co. Inc. v. Kyrgyz Republic, No.

CV 18-2228 (RC), 2020 WL 1935554, at *2–6 (D.D.C. Apr. 22, 2020) (applying Bancec

analysis to Kyrgyz Ministry of Transport and Communications).

      Here, the Court believes that the correct framework is likely the Transaero "core

functions" test, as the heart of the parties' dispute is whether the Commissioner falls within a

component of § 1603's definition of "foreign state."  Transaero, 30 F.3d at 151 (asking whether

the Bolivian Air Force was a "separate legal person, corporate or otherwise,"  under

§ 1603(b)(1)).  But, in any event, the Court is confident both that the Commissioner is a

"political subdivision" of the Republic, and thus a component of the state itself under Transaero,

and that the Bancec presumption of juridical separateness does not apply to the Commissioner.

      To determine whether an entity "counts as a 'foreign state' or rather as an 'agency or

instrumentality'" under the FSIA, Transaero took a categorical approach of asking "whether the

core functions of the foreign entity are predominantly governmental or commercial."  Id.  This

approach requires the Court to ask whether the entity "is an integral part of a foreign state's

political structure" or, instead, "an entity whose structure and function is predominantly

commercial."  Id. (quoting Segni v. Com. Off. of Spain, 650 F. Supp. 1040, 1041–42 (N.D. Ill.

1988)).  Citing the Zimbabwe Mines and Minerals Act of 1961, which governs the office of the

Commissioner, Plaintiffs maintain that the Chief Mining Commissioner has "broad

administrative duties, including registering mining claims, issuing regulations, and inspecting

mines, and even judicial or quasi-judicial duties, including resolving mining disputes and issuing injunctions enforceable by contempt."  Opp. to Zimbabwe MTD at 25.  The statute bears out Plaintiffs' characterization of the Commissioner's functions.  Section 343 of the statute creates a "Chief Mining Commissioner" as well as mining commissioners for each mining district in the country.  See Zimbabwe Mines and Minerals Act of 1961, Ch. 21:05 § 343 (updated Dec. 31, 2017), https://zimlii.org/akn/zw/act/1961/38/eng%402016-12-31#.  Commissioners are supervised by the Secretary of the Ministry of Mines and are charged with carrying out the Mines and Minerals Act.  See id. § 341.  According to other provisions of the Act, commissioners may, among other things, hold court and exercise judicial powers, levy fines and jail sentences for contempt, investigate and adjudicate claims and disputes arising under the statute, order parties to conduct surveys of mining areas, issue injunctions, approve applications to prospect land for mining, register and reserve land against mining, and approve and revoke mining licenses.  See, e.g., id. §§ 15, 20, 35, 52, 177, 346, 354, 359.

In light of these duties, which include acting as a governmental administrator, investigator, and adjudicator, the Court concludes the Commissioner is properly understood as a political subdivision of the Republic.  "Any government of reasonable complexity must act through men [and women] organized into offices and departments," Transaero, 30 F.3d at 153, and the Commissioner is just one such office.  Commissioners are appointed by the Secretary of the Ministry of Mines and fall neatly within "the governmental hierarchy."  de Csepel v. Republic of Hungary, 10-cv-1261 (ESH), 2020 WL 2343405, at *9 (D.D.C. May 11, 2020).  Although the Commissioner's duties unquestionably touch upon commercial activity—namely mining—the office does so as a government regulator and adjudicator, not as a market participant or commercial entity.  See Republic of Argentina v. Weltover, Inc., 504 U.S. 607,

614–15 (1992) ("[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA. . . . Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party."). The Commissioner's authority to approve licenses, assess fines, order jail terms, and issue injunctions are all powers "so closely bound up with the structure of the state" that the Commissioner must be considered "as the 'foreign state' itself." Transaero, 30 F.3d at 153.

For similar reasons, the Commissioner is not entitled to a presumption of juridical separateness under Bancec. To determine whether that presumption applies, the Court asks whether the Commissioner bears "the hallmarks of independent instrumentalities identified by the Supreme Court in Bancec," namely "creation by an enabling law that prescribes the instrumentality's powers and duties; establishment as a separate juridical entity with the capacity to hold property and to sue and be sued; management by a government-selected board; primary responsibility for its own finances; and operation as a distinct economic enterprise that often is not subject to the same administrative requirements that apply to government agencies." DRC, Inc. v. Republic of Honduras, 71 F. Supp. 3d 201, 209 (D.D.C. 2014); accord Entes, 2020 WL 1935554, at *3. What distinguishes independent instrumentalities under Bancec from the state itself is that instrumentalities are empowered "to manage their operations on an enterprise basis" with "a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies." Bancec, 462 U.S. at 624–25.

Here, although the office of the Commissioner was created by the Mines and Minerals Act, "the specific text of that enabling law [is] what matter[s]." Entes, 2020 WL 1935554, at *4;

see id. at *3 ("[T]he Court does not think that an 'enabling law that prescribes the instrumentalit[y's] powers and duties' counts for much if that establishing law prescribes powers and duties that are strictly controlled by the Government.").  The Commissioner does not have its own "legal personality, its own patrimony and . . . administrative, technical, and financial autonomy."  Id. (quoting DRC, 71 F.3d at 210).  Rather, it is an office appointed by and subject to the close supervision of the Secretary of the Ministry of Mines; under the statute, the Secretary is "vested with authority generally to supervise and regulate the proper and effectual carrying out of this Act by mining commissioners" and "may at his discretion assume all or any of the powers, duties and functions by this Act vested in any mining commissioner, and may lawfully perform all such acts and do all such things as a mining commissioner may perform or do." Zimbabwe Mines and Minerals Act of 1961, Ch. 21:05 § 341.  The Commissioner is not managed by a government-selected board, like a corporation, but rather directly supervised by the Secretary of the Ministry of Mines.  Far from being free to manage its own operations "on an enterprise basis," the Commissioner lacks any "independence from close political control." Bancec, 462 U.S. at 624–25.  Although the Mines and Minerals Act does not specify how Commissioners are paid or funded, there has been "no suggestion that the [Commissioner] raises funds on its own."  Entes, 2020 WL 1935554, at *5.  And, although the Commissioner has the power to sue for license fees, royalties, fines, and other duties payable to the office, and to be sued, Zimbabwe Mines and Minerals Act of 1961, Ch. 21:05 § 366, as with other governmental subdivisions, that fact alone, in the face of close supervision by the Secretary of the Ministry of Mines and an entire statute setting forth in detail the Commissioner's duties and authority, "adds little, if anything, when it comes to the [Commissioner's] autonomy or degree of separation from the state," Entes, 2020 WL 1935554, at *4.  In view of the Commissioner's duties and close

supervision by the state, the Court concludes that, under either Transaero or Bancec, the Commissioner is a political subdivision of the Republic, not an agency or instrumentality entitled to the presumption of juridical separateness.[8]

The foregoing analysis largely forecloses the Commissioner's argument that it is an individual, not a state entity, and thus falls entirely outside the scope of the FSIA's definition of a "foreign state" under § 1603(a). See Zimbabwe MTD at 8–9. The Commissioner's argument in this respect is based on Samantar v. Yousuf, 560 U.S. 305 (2010). There, the Supreme Court held that "[r]eading the FSIA as a whole, there is nothing to suggest we should read 'foreign state' in § 1603(a) to include an official acting on behalf of the foreign state, and much to indicate that this meaning was not what Congress enacted." Id. at 319. The Court observed, however, that notwithstanding that rule, "it may be the case that some actions against an official *in his official capacity* should be treated as actions against the foreign state itself, as the state is the real party in interest." Id. at 325 (emphasis added). Accordingly, although a plaintiff may not under the FSIA sue a foreign official in his personal capacity "and seek damages from his own pockets," id., the Court may look to whether the foreign state itself, and not the official personally, is "the real party in interest" and, in that case, apply the FSIA, Odhiambo v. Republic of Kenya, 930 F. Supp. 2d 17, 34–35 (D.D.C. 2013); see Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit

[8] In their reply, Defendants assert that the argument that the Commissioner is a part of the state itself is inconsistent with Plaintiffs' complaint, citing paragraph six, which describes the Commissioner as "an agency or instrumentality of, and an alter ego of, the Republic of Zimbabwe." Compl. ¶ 6. But the complaint's description of the Commissioner elsewhere, in the "parties" section of the complaint, alleges also that the Commissioner "is a governmental office or governmental corporation sole existing under the laws of the Republic of Zimbabwe." Compl. ¶ 16.

against the entity. . . . It is *not* a suit against the official personally, for the real party in interest is the entity.”).

Especially in light of the Court’s conclusion that the Commissioner is an office established as a political subdivision of the Republic, the Court reads Plaintiffs’ claims against the Commissioner not as a suit against a particular commissioner in his personal capacity but rather as a suit against the office. In fairness to the Commissioner, the complaint does not, in so many words, expressly state that the Commissioner is sued in its official capacity. But the complaint identifies no particular individual being sued; instead, it identifies the defendant as the office of the “Chief Mining Commissioner, Ministry of Mines of Zimbabwe,” and locates the Commissioner at the address of the Ministry of Mines and Mining Development, not the address of any particular mining commissioner. See Compl. at 1; Ministry of Mines Directory, https://www.miningrb.co.zw/business-directory/industry-bodies/regulatory-stautory-bodies/ministry-of-mines-hq.html (last visited Mar. 22, 2023); see Nnaka v. Fed. Republic of Nigeria, 238 F. Supp. 3d 17, 30–31 (D.D.C. 2017) (treating suit containing allegations “concerning the conduct of at least three different Nigerian Attorneys General” during different time periods as brought against the office, not any individual, under Samantar). Plaintiffs also explain in their briefing that they seek money out of the public fisc, not out of a particular commissioner’s pocket. See Samantar, 560 U.S. at 325. Because, as just explained, the office of the Commissioner is a political subdivision of the Republic and thus a component of the state itself, and because the complaint identifies no individual to be held personally liable, the Court construes Plaintiffs’ suit as not brought against the Commissioner personally but rather against the governmental office of Chief Mining Commissioner.

*2. Subject Matter Jurisdiction*

Having concluded that the Commissioner falls within § 1603's definition of a foreign state, the Court will have subject matter jurisdiction only if one of the FSIA's exceptions to sovereign immunity applies. 28 U.S.C. § 1330(a). Citing the Commissioner's active participation in the Zambian arbitration and agreement to the arbitrators' Terms of Reference, which confirmed its submission to the arbitration, Plaintiffs contend that either § 1605(a)(1)'s waiver exception or § 1605(a)(6)'s arbitration exception applies here. The waiver exception applies when "the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." Id. § 1605(a)(1). The arbitration exception applies when an "action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit [certain disputes] to arbitration" or "to confirm an award made pursuant to such an agreement to arbitrate" if "the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." Id. § 1605(a)(6). The Court will begin by addressing the applicability of the arbitration exception but will ultimately apply the waiver exception.

a. The Arbitration Exception

At first blush, § 1605(a)(6)'s arbitration exception seems like a prime candidate for establishing subject matter jurisdiction in this case. Plaintiffs' claims arise from their enforcement of the arbitration agreements contained in the MOUs signed with ZMDC in 2007 and 2008. The Zambian judgment they seek to enforce under the D.C. Judgments Recognition Act was made "pursuant to [the parties'] agreement to arbitrate," 28 U.S.C. § 1605(a)(6), and

both sides agree that the Zambian arbitration and award were governed by the New York

Convention, an international treaty that applies "to the recognition and enforcement of arbitral

awards made in the territory of a State other than the State where the recognition and

enforcement of such awards are sought," New York Convention, art. I(1); see id. art. III

(signatory states "shall recognize arbitral awards as binding and enforce them in accordance with

the rules of procedure of the territory where the award is relied upon, under the conditions laid

down in the" Convention).  All three countries implicated in this case—Zimbabwe, Zambia, and

the United States—are signatories to the New York Convention.  See Contracting States, New

York Arbitration Convention, https://www.newyorkconvention.org/countries (last visited Mar.

22, 2023).

Plaintiffs' invocation of the arbitration exception runs into a textual roadblock, however.

As the Commissioner points out, § 1605(a)(6) covers only actions brought "either to enforce an

agreement" to arbitrate or "to confirm an award made pursuant to such an agreement."  28

U.S.C. § 1605(a)(6).  But Plaintiffs' action is not one to enforce the MOUs or to confirm the

Zambian arbitral award through the relevant provision of the Federal Arbitration Act ("FAA"),

which implements the New York Convention and permits the filing of applications to confirm

arbitral awards falling under it.  See 9 U.S.C. § 207.  Rather, Plaintiffs have brought an action

under the D.C. Judgments Recognition Act to recognize and enforce the Zambian judgment,

which itself confirms the underlying arbitral award.

Although this may seem like a fine distinction, the D.C. Circuit has held otherwise.  See

Commissions Import Export S.A. v. Republic of the Congo (Comimpex), 757 F.3d 321 (D.C.

Cir. 2014).  In Comimpex, the court held that the three-year statute of limitations on bringing

actions to confirm arbitral awards under Chapter 2 of the FAA did not preempt the longer statute

of limitations of the D.C. Judgments Recognition Act to recognize a foreign court judgment. Id. at 333. In so holding, Comimpex repeatedly emphasized that courts "have long recognized the conceptual difference between arbitral awards and foreign court judgments on arbitral awards." Id. at 330. "Although an arbitral award and a court judgment enforcing an award are 'closely related,'" the Court explained, "they are nonetheless 'distinct' from one another," as are the causes of action relating to them. Id. While actions to confirm arbitral awards and actions to enforce foreign judgments that themselves confirm arbitral awards both advance the "federal policy in favor of arbitral dispute resolution," id. (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985)), the court concluded that the "text of the Foreign Arbitral Awards Convention Act and the circumstances of its enactment" indicated that "Congress did not intend to speak beyond the recognition and enforcement of arbitral awards," leaving judgment recognition actions untouched, id. at 329. Here, although the Court is interpreting § 1605(a)(6), not § 207 of the FAA, both provisions refer only to actions to "confirm" arbitral awards, not to a distinct cause of action to recognize foreign judgments. For the reasons explained in Comimpex, the Court cannot cast aside the distinction between those two types of actions merely because they involve a similar subject matter.[9]

Plaintiffs provide no basis to disregard Comimpex. Instead, they cite only one case to support their argument that the FSIA's arbitration exception covers the recognition of foreign judgments—Continental Transfert Technique Ltd. v. Federal Government of Nigeria, 697 F. Supp. 2d 46 (D.D.C. 2010)—which they contend held that § 1605(a)(6) provided jurisdiction in

[9] The potential applicability of the arbitration exception did not come up in Comimpex because the defendant there has issued commitment letters that "contained an irrevocable waiver of immunity from legal proceedings" and a "commitment to submit all disputes to ICC arbitration in Paris." 757 F.3d at 324–25.

an action under the D.C. Judgments Recognition Act, Opp. to Zimbabwe MTD at 12. Continental Transfert, however, did not hold that § 1605(a)(6) provides jurisdiction for a claim solely to enforce a foreign judgment. Rather, the complaint there included both a claim to confirm an arbitral award under the FAA—which plainly falls within the text of § 1605(a)(6)—and a separate claim to enforce a foreign judgment on the same underlying arbitral award. Cont'l Transfert, 697 F. Supp. 2d at 53–54. In a single paragraph concerning § 1605(a)(6), in the portion of the opinion concerning the FAA claim, the court stated that Nigeria could not "invoke the defense of sovereign immunity to prevent the enforcement of the arbitral award," citing a decision concerning an action to enforce an arbitral award. Id. at 56 (citing Creighton Ltd. v. Government of the State of Qatar, 181 F.3d 118, 123–24 (D.C. Cir. 1999)). The court did not separately address whether the arbitration exception independently applied to the D.C. Judgments Recognition Act claim. Indeed, on appeal, the D.C. Circuit, while agreeing with the district court that § 1605(a)(6) supplied jurisdiction over the plaintiff's FAA claim, noted that it did not need to "decide whether Section 1605(a)(6) or some other provision of law also provides jurisdiction over" the Recognition Act claim, as the court lacked appellate jurisdiction over that claim. Cont'l Transfert Technique Ltd. v. Fed. Government of Nigeria, 603 F. App'x 1, 3 n.2 (D.C. Cir. 2015) (unpublished). The Circuit's express reservation of that question, although not precedential, at least casts some doubt about whether the arbitration exception applies to judgment recognition claims.

In light of Comimpex, and without any countervailing authority to suggest that an action to enforce a foreign judgment falls within the text of § 1605(a)(6), the Court concludes that the arbitration exception does not apply in this case.

b.  The Waiver Exception

Alternatively, Plaintiffs rely on the FSIA's waiver exception, which provides an exception to sovereign immunity in any case "in which the foreign state has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1); see Creighton, 181 F.3d at 122 (waiver must be intentional).

As Plaintiffs note, this Court in another case has endorsed the theory that a foreign sovereign's entry into the New York Convention, "combined with its agreement to arbitrate in the territory of another Convention signatory," may suffice to make out an intentional, implicit waiver of sovereign immunity under § 1605(a)(1).  Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria (P&ID I), No. 18-CV-594 (CRC), 2020 WL 7122896, at *7–8 (D.D.C. Dec. 4, 2020) (Cooper, J.), aff'd on other grounds, 27 F.4th 771 (D.C. Cir. 2022).  In P&ID I, this Court adopted the Second Circuit's reasoning in Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572 (2d Cir. 1993), which held that Navimpex, a company owned by the Romanian government, had implicitly waived its immunity under the FSIA because—"knowing that Romania, France, and the United States were all New York Convention signatories—it agreed to an arbitration clause with a German company, then participated in the arbitration in France," P&ID I, 2020 WL 7122896, at *7 (citing Seetransport, 989 F.2d at 574–76, 578–79).  Seetransport reasoned that "when Navimpex entered into a contract with" the plaintiff "that had a provision that any disputes would be submitted to arbitration, and then participated in an arbitration in which an award was issued against it, logically, as an instrumentality or agency of the Romanian Government—a signatory to the Convention—it had to have contemplated the involvement of

the courts of any of the Contracting States in an action to enforce the award." Seetransport, 989 F.2d at 578–79.

Although the D.C. Circuit had not (and still has not) expressly adopted Seetransport's holding as binding Circuit law, this Court noted in P&ID I that it "has come close," referring to Seetransport's reasoning as "correct[]" in dicta in one case and concluding in an unpublished disposition that Ukraine had waived its immunity "from arbitration-enforcement actions in other" New York Convention signatory states by signing the Convention. P&ID I, 2020 WL 7122896, at *7–8 (first citing Creighton, 181 F.3d at 123; and then quoting Tatneft v. Ukraine, 771 F. App'x 9, 10 (D.C. Cir. 2019) (per curiam)). And this Court further explained why recognizing an implicit waiver when a New York Convention signatory has agreed to arbitrate disputes in another signatory would support the fundamental policy of the New York Convention, noting that the "Convention's effectiveness as a stimulant for international commerce would be reduced if states could avail themselves of the Convention's benefits, then assert immunity from award-enforcement actions that the Convention expressly contemplates." Id. at *9; see also id. at *9–10 (explaining why applying Seetransport would not be inconsistent with Supreme Court and Circuit precedent[10] and would not render the arbitration exception superfluous). Accordingly, this Court held that Nigeria had waived its sovereign immunity under § 1605(a)(1) by signing the New York Convention and subsequently agreeing to arbitrate within the territory of another Convention signatory. Id. at *11.

[10] For instance, this Court explained why Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428 (1989), did not preclude the Seetransport theory, because, "[i]n contrast to the agreements at issue" there, the "New York Convention does contemplate the availability of a cause of action in U.S. courts," a difference the D.C. Circuit recognized in Creighton. P&ID, 2020 WL 7122896, at *9.

In response to Plaintiffs' reliance on P&ID I, Defendants (fairly) observe that the D.C. Circuit indicated some caution about the Seetransport theory on appeal in Process & Industrial Developments Ltd. v. Federal Republic of Nigeria (P&ID II), 27 F.4th 771 (D.C. Cir. 2022). Specifically, the assigned panel "requested additional briefing by the United States as amicus curiae, inviting it to provide its views on whether the United States, as a party to the New York Convention, impliedly waives sovereign immunity from actions seeking recognition and enforcement of foreign arbitral awards in the courts of other New York Convention states by becoming a party to the Convention and agreeing to arbitrate a dispute in a Convention state." 27 F.4th at 775 n.3. The United States responded with an amicus brief arguing that, because the more specific arbitration exception applied in P&ID, applying the more general waiver exception would run counter to canons of statutory construction and could render superfluous subparagraph (D) of the arbitration exception, which permits application of the arbitration exception in cases to confirm arbitral awards in which the waiver exception "is otherwise applicable." Brief of the United States as Amicus Curiae at 10–11, P&ID II, 27 F.4th 771 (D.C. Cir. 2022) (No. 21-7003), 2022 WL 190972, at *10–11; see id. at 13 (theorizing that one "plausible construction" of § 1605(a)(6)(D) "is that it reflects Congress' intent to require that a court exercising jurisdiction to enforce an arbitration agreement or arbitral award on the basis of implied or express waiver do so only where the threshold requirements of the arbitration exception have been met"). As to the possible implications of the Seetransport implicit-waiver rule, the United States acknowledged its "interest in the vitality of the New York Convention and in the ability of its courts to enforce covered arbitral awards" but expressed some concern that not all foreign courts might "exercise restraint in construing implied waivers." Id. at 14–15. Noting these concerns "and the ready applicability of the arbitration exception" in that case, the Circuit found "it unnecessary to wade

into the murky waters of the waiver exception" and affirmed on the basis of the arbitration exception alone.  P&ID II, 27 F.4th at 775 n.3.

The Court acknowledges the concerns of the United States expressed in P&ID II and therefore wades into the waiver exception's murky waters with due caution.  But here, because the Court has concluded that Plaintiffs' claim falls outside the arbitration exception, many of the statutory interpretation concerns raised by the United States in P&ID, which were premised on the overlapping availability of the arbitration exception there, are not present.  For instance, the United States voiced a concern that "[t]raditional canons of statutory construction suggest that the arbitration exception was intended to displace the waiver exception" as to "arbitration agreements and arbitral awards *that come within its ambit*."  Brief of the United States as Amicus Curiae at 10, 2022 WL 190972, at *10 (emphasis added).  If the Court is correct that judgment-recognition actions, as a rule, fall outside the arbitration exception's ambit, then this statutory construction problem is avoided.  Additionally, although P&ID II opted to apply the arbitration exception rather than the waiver exception, nothing in that decision purported to abandon the Circuit's favorable citations to Seetransport in other cases.  See Creighton, 181 F.3d at 123; Tatneft, 771 F. App'x at 10.

Accordingly, the Court sees no present impediment to concluding that the waiver exception applies here.  As in Seetransport, the Republic of Zimbabwe, of which the Commissioner is a political subdivision, is a signatory to the New York Convention.  And although the Commissioner did not sign the 2007 and 2008 MOUs which contained an arbitration agreement, the Commissioner subsequently "participated in an arbitration in which an award was issued against it" in another New York Convention signatory, Zambia.  Seetransport, 989 F.2d at 579.  And, if the Commissioner's participation in the arbitration alone was

insufficient, Plaintiffs add that the Commissioner also agreed to the Terms of Reference governing the arbitration, acknowledging that it "agree[d] to submit to this arbitration and expressly waive any procedural objections [it] may have with respect to known events, including the appointment of the Tribunal."  Sangwa Decl., Ex. 1 § 8.1.  Lest there be any doubt, the Terms of Reference themselves state that "[e]ach original of the Terms of Reference forms an original arbitration agreement for the purposes of Articles II and IV(1) of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards."  Id. § 10.3.  The Commissioner's agreement to arbitrate in the territory of another Convention signatory, combined with Zimbabwe's entry in the Convention, "is strong evidence that [the Commissioner] intended to subject itself to the jurisdiction of U.S. courts in an action such as this one."  P&ID I, 2020 WL 7122896, at *8.  The Court therefore holds that it has subject matter jurisdiction under the FSIA's waiver exception.

Defendants briefly contend that the wavier exception does not apply because "the New York Convention governs enforcement of arbitration awards, not enforcement of foreign judgments," citing Comimpex.  Zimbabwe MTD at 11.  Although that distinction was sufficient to take this case outside of the arbitration exception, which is expressly limited to cases brought to enforce arbitration agreements or confirm arbitral awards, it does not preclude the application of the waiver exception.  Indeed, Seetransport applied under exactly these circumstances.  Although Seetransport involved both a claim to enforce an arbitration award and a claim to recognize a foreign judgment enforcing the award, 989 F.2d at 575, the court determined that the claim seeking enforcement of the award under FAA § 207 was time-barred, id. at 581.  Even after the § 207 claim was dismissed, however, the court held that it had subject matter jurisdiction over the judgment-recognition claim under the FSIA's waiver exception.  Id. at 582–

83. The court noted "that unlike the recognition of arbitral awards, which is governed by federal law, the recognition of foreign judgments is governed by state law" at least "as to most substantive aspects." Id. at 582. The "cause of action to enforce the foreign judgment" nevertheless fell "within the scope of Navimpex's implicit waiver of sovereign immunity" because "the cause of action is so closely related to the claim for enforcement of the arbitral award." Id. at 582–83.

That the waiver exception might capture a cause of action to enforce a foreign judgment, even if the arbitration exception does not, makes sense. Although Plaintiffs bring a claim to enforce a foreign judgment, this is a "case . . . in which the foreign state has waived its immunity . . . by implication" by being a New York Convention signatory and agreeing to arbitrate in the territory of another signatory. 28 U.S.C. § 1605(a)(1). The arbitration exception's textual limit to actions "to enforce an" arbitration agreement "or to confirm an award made pursuant to such an agreement" is absent. Id. § 1605(a)(6).

In sum, although the arbitration exception to sovereign immunity does not apply in this case to enforce a foreign judgment, the Court concludes that the waiver exception of § 1605(a)(1) does apply. Because the Commissioner waived its sovereign immunity, the Court has subject matter jurisdiction over Plaintiffs' claims against it pursuant to the FSIA.[11]

[11] The Court observes that this conclusion, combined with the conclusion that the Commissioner is a political subdivision, and thus a part of, the Republic itself, might suggest an alternate theory for finding subject matter jurisdiction over the Republic. If there is no presumption of juridical separateness between the Commissioner and the Republic, then perhaps the Commissioner's conduct supporting a waiver of sovereign immunity might also be attributed to the Republic. For whatever reason, however, Plaintiffs premised their argument for subject matter jurisdiction over the Republic exclusively on the Republic's alleged alter ego relationship with ZMDC, discussed above. Because it is Plaintiffs' burden to plead subject matter jurisdiction, and because the parties have not briefed this question, the Court will not sua sponte find subject matter jurisdiction over the Republic based on its relationship with the Commissioner.

*3. Personal Jurisdiction*

Having found that the Commissioner is not entitled to a presumption of juridical separateness from the Republic, and having found subject matter jurisdiction under § 1605(a)(1), the Court also necessarily has personal jurisdiction over the Commissioner. As already explained, in the context of foreign sovereigns and their political subdivisions, "subject matter jurisdiction plus service of process equals personal jurisdiction." GSS, 680 F.3d at 811 (quoting Price, 294 F.3d at 95). Here, Plaintiffs served the Commissioner pursuant to 28 U.S.C. § 1608(a)(3) by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state," by international carrier "to the head of the ministry of foreign affairs of the foreign state concerned."[12] The Court rejects Defendants' contention that the Commissioner must have minimum contacts with this forum, as that argument is premised on the idea, rejected above, that the Commissioner is a person rather than a governmental entity.

*4. Failure to State a Claim*

Finally, the Court will briefly address Defendants' arguments that the complaint fails to state a claim as to the Commissioner under Rule 12(b)(6).

First, Defendants maintain that Plaintiffs are bound by the New York Convention's three-year statute of limitations under the FAA because the theory for Defendants' waiver of sovereign immunity is in part premised on their New York Convention membership. Zimbabwe MTD at

[12] Defendants suggest this service was improper because the affidavit of service was addressed to "the Ministry of Mines" rather than the Chief Mining Commissioner. Zimbabwe MTD at 14. But Plaintiffs' affidavit of service shows that the service was made to the Ministry of Mines "c/o Chief Mining Commissioner" to the address of the Zimbabwean Foreign Minister. See Return of Service Ex. 1, ECF No. 20-1. That was sufficient to effect proper service on the Commissioner.

15–19. This argument fails in light of Comimpex. There, as discussed above, the D.C. Circuit held that the FAA's three-year statute of limitations for bringing an action to confirm an arbitral award under 9 U.S.C. § 207 does not preempt the longer limitations period to recognize a foreign judgment under the D.C. Judgments Recognition Act. Comimpex, 757 F.3d at 333; see also Seetransport, 989 F.2d at 582–83 (permitting judgment recognition action to go forward after dismissing related FAA § 207 action as time-barred). Accordingly, Defendants' contention that if "Plaintiffs seek this Court's jurisdiction under the New York Convention, then they get all of it, including section 207," is plainly incorrect. Zimbabwe MTD at 16. Defendants attempt to distinguish Comimpex on the grounds that the foreign state there expressly, rather than implicitly, waived its sovereign immunity and that the arbitral award there had been subjected to scrutiny in other New York Convention jurisdictions as well. But those considerations had no bearing on the Circuit's conclusion that neither the text nor the legislative history of FAA § 207 "indicate that Congress intended Chapter 2 of the FAA to govern not only arbitral awards but the recognition of judgments as well." Comimpex, 757 F.3d at 328.

Next, Defendants maintain that Plaintiffs have failed to plead entitlement to post-judgment interest at the Zambian statutory rate and entitlement to attorneys' fees. Zimbabwe MTD at 21–23. Plaintiffs addressed only Defendants' arguments regarding entitlement to attorneys' fees in their opposition. Opp. to Zimbabwe MTD at 37. Defendants may be correct that, if Plaintiffs prevail, the Zambian statutory post-judgment interest rate will not apply here. See Cont'l Transfert Technique Ltd. v. Fed. Government of Nigeria, 850 F. Supp. 2d 277, 286–87 (D.D.C. 2012) (applying rate set forth in 28 U.S.C. § 1961(a)); see also D.C. Code §§ 15-367, 28-3302 (stating that a foreign judgment recognized under the D.C. Code is enforceable in the same manner as a judgment rendered in the District of Columbia, and setting forth the District of

Columbia post-judgment interest rate).  But the Court has identified some contrary authority as

well.  See BCB Holdings Ltd. v. Government of Belize, 110 F. Supp. 3d 233, 251 (D.D.C. 2015)

(awarding post-judgment interest at rate specified by foreign judgment); United Steelworkers,

Loc. 1-1000 v. Forestply Indus., Inc., No. 2:08-CV-281, 2011 WL 1210131, at *1 (W.D. Mich.

Apr. 1, 2011) (applying post-judgment interest rate specified in Canadian judgment in Michigan

Judgments Recognition Act case).  There is also at least some support for Plaintiffs' contention

that they should be entitled to attorneys' fees, which were incorporated into the arbitral award

underlying the Zambian judgment.  See Tahan v. Hodgson, 662 F.2d 862, 867 n.20 (D.C. Cir.

1981) (enforcing a foreign judgment that included an award of attorneys' fees); D'Amico Dry

D.A.C. v. Primera Mar. (Hellas) Ltd., 433 F. Supp. 3d 576, 578 (S.D.N.Y. 2019) (permitting

award of attorneys' fees in judgment recognition action because fees were provided for in the

English judgment being recognized).

      In any event, the Court declines to rule definitively on these issues at this stage.  Whether

Plaintiffs are entitled to attorneys' fees and/or post-judgment interest at all may depend on other

factors to be determined later, such as the validity and enforceability of the Zambian judgment.

See Harpole Architects, P.C. v. Barlow, 668 F. Supp. 2d 68, 80 (D.D.C. 2009) (noting that "[a]t

this early stage of the litigation, [defendant's] motion to strike [plaintiffs'] attorneys' fees request

is premature, as later developments may provide a legitimate basis for an attorneys' fees award."

(alterations in original) (quoting Pinnacle Airlines, Inc. v. Nat'l Mediation Bd., No. 03–1642,

2003 WL 23281960, at *3 (D.D.C. Nov. 5, 2003))).

      Last, Defendants maintain that the Zambian High Court, which issued the judgment

enforcing the arbitral award in Plaintiffs' favor, did not have personal or subject matter

jurisdiction over Defendants.  Zimbabwe MTD at 23–25.  For instance, they assert that Plaintiffs

have not sufficiently alleged that the Commissioner had minimum contacts with Zambia and that there is insufficient evidence that the Commissioner was served. Id. Citing an expert report, they also maintain that, had Defendants contested the Zambian judgment, the Zambian court likely would have found that the Commissioner was immune there. Id. at 24. Based on the argument that the Zambian High Court lacked jurisdiction, Defendants also maintain that enforcement would be repugnant to D.C. public policy. Id. at 24–25.

These contentions are inappropriate for resolution at this stage. To state a claim under the D.C. Judgments Recognition Act, Plaintiffs must plead—and here have pleaded—that the foreign country judgment grants or denies recovery of a sum of money and, under the law of that country, is final, conclusive, and enforceable. D.C. Code § 15-363(a); see Compl. ¶¶ 35–37, 41–46. Defendants' arguments that the foreign court lacked personal or subject matter jurisdiction over the controversy or that the judgment is repugnant to public policy are affirmative defenses, on which Defendants bear the burden of proof. D.C. Code 15-364(b)–(d); see also Mohammad Hilmi Nassif & Partners v. Republic of Iraq, No. 117CV02193KBJGMH, 2021 WL 6841848, at *22 (D.D.C. July 29, 2021) (explaining that repugnancy to public policy is an affirmative defense). A plaintiff is "not required to anticipatorily negate" affirmative defenses in its pleadings. McNamara v. Picken, 866 F. Supp. 2d 10, 17 (D.D.C. 2012). Rather, "[a]n affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint." Greer v. Bd. of Trs. of Univ. of D.C., 113 F. Supp. 3d 297, 306 (D.D.C. 2015) (quoting Smith–Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998)). That is, the "face of the complaint must conclusively indicate" that the affirmative defense applies. Newland v. Aurora Loan Servs., LLC, 806 F. Supp. 2d 65, 70 (D.D.C. 2011).

The complaint in this case alleges that the Zambian judgment is final, valid, and enforceable and that it was served on Defendants on October 23, 2019. Compl. ¶¶ 35–37. Defendants' arguments about the propriety of service abroad go beyond the face of the complaint and are based on conjecture that Plaintiffs never sought leave to serve Defendants with the Zambian High Court's judgment outside of the country. Kalaluka Decl. ¶ 15. (Plaintiffs, for their part, reply that service was made *inside* the country to Defendants' Zambian counsel. Sangwa Decl. ¶¶ 23–24.) And Defendants' conclusory arguments that the Zambian court lacked personal and subject matter jurisdiction both go beyond the face of the complaint and misunderstand that Defendants, not Plaintiffs, bear the burden of showing that the foreign court lacked jurisdiction under the D.C. Code. See D.C. Code § 15-364(b)–(d). These arguments, if they have any merit, are better addressed at summary judgment, "after further briefing and development of the record." Mohammad, 2021 WL 6841848, at *23 n.18.[13]

[13] Kaupthing ehf. v. Bricklayers & Trowel Trades International Pension Fund Liquidation Portfolio, 291 F. Supp. 3d 21 (D.D.C. 2017), does not require a contrary conclusion. There, the court granted a motion to dismiss a D.C. Judgments Recognition Act claim partially on the basis that the foreign court lacked personal jurisdiction over the defendant. Id. at 30–33. The plaintiff objected that it did not need to plead with specificity the foreign court's jurisdiction, but based on cases interpreting a similar New York statute, the court concluded that the party seeking enforcement of the judgment "bears the burden of making a *prima facie* showing that the mandatory grounds for nonrecognition" such as lack of personal jurisdiction "do not exist." Id. at 32–33 (quoting Wimmer Canada, Inc. v. Abele Tractor & Equipment Co., 750 N.Y.S.2d 331, 332 (2002)). But Plaintiffs here correctly point out that the D.C. Judgments Recognition Act expressly places on the party resisting enforcement the burden of proving that the foreign court lacked jurisdiction, and the New York statute, at the time of the cases cited in Kaupthing, lacked such an allocation of burden (which has since been added). See Opp. to Zimbabwe MTD at 30 n.9; N.Y. C.P.L.R. § 5304(c); 2021 N.Y. Sess. Laws Ch. 127 (McKinney) (adding burden provision). Kaupthing, therefore, is not persuasive.

## IV. Conclusion

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 23] Defendant Chief Mining Commissioner and Defendant Republic of Zimbabwe's Motion to Dismiss is GRANTED as to the Republic of Zimbabwe and DENIED as to the Chief Mining Commissioner. It is further

**ORDERED** that [Dkt. No. 30] Defendant ZMDC's Motion to Dismiss is GRANTED. It is further

**ORDERED** that the Complaint is DISMISSED WITHOUT PREJUDICE as to Defendants ZMDC and the Republic of Zimbabwe. It is further

**ORDERED** that Plaintiffs are granted leave to file an amended complaint by April 24, 2023.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: March 22, 2023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Amaplat Mauritius Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius;
and

Amari Nickel Holdings Zimbabwe Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius,

Plaintiffs,

v.

Zimbabwe Mining Development Corporation,
90 Mutare Road, Msasa, Harare, Zimbabwe;

The Chief Mining Commissioner, Ministry of
Mines of Zimbabwe,
6th Floor, ZIMRE Centre, Cnr. Leopold
Takawira Street/Kwame Nkrumah Avenue,
Private Bag 7709, Causeway, Harare,
Zimbabwe;

and the Republic of Zimbabwe,
c/o Head of the Ministry of Foreign Affairs,
Ministry of Foreign Affairs, P.O. Box 4240,
Munhumutapa Building, Cnr. Samora Machel
Avenue/Sam Nujoma Street, Harare,
Zimbabwe

Defendants.

Civil Action No. 1:22-cv-00058-CRC

**AMENDED COMPLAINT**

Plaintiffs Amaplat Mauritius Ltd. (“Amaplat”) and Amari Nickel Holdings Zimbabwe Ltd. (“Amari,” and together with Amaplat, “Plaintiffs”), by their attorneys, Steptoe & Johnson LLP, allege upon personal knowledge as to their own acts and upon information and belief as to all other acts, as follows:

## I. NATURE OF THE ACTION

1. This is an action to recognize and enforce the judgment of the High Court of Zambia, at the Commercial Registry at Lusaka, dated August 9, 2019, No. 2019/HPC/ARB/No. 0337 (the "Judgment"), in favor of Plaintiffs and against Defendants Zimbabwe Mining Development Corporation ("ZMDC") and the Chief Mining Commissioner, Ministry of Mines of Zimbabwe (collectively, "Judgment Defendants," and, together with the Republic of Zimbabwe, "Defendants'"), pursuant to the Uniform Foreign-Money Judgments Recognition Act, D.C. Code § 15-361, *et seq*. The Judgment recognized and enforced an arbitral award entered in favor of Plaintiffs and against Judgment Defendants, which are instrumentalities of and alter egos of the Republic of Zimbabwe (the "Republic"), under the terms of two arbitration agreements. The arbitration agreements provided for final and binding resolution of all disputes by international arbitration under the ICC International Court of Arbitration Rules (the "ICC Rules"), in which the ICC International Court of Arbitration set the place of the arbitration as Zambia.

2. The arbitral award concerns Defendants' breaches of two memoranda of understanding concerning mining concessions in Zimbabwe ("MOUs"). The arbitral tribunal found that the Judgment Defendants breached those MOUs by, inter alia, expropriating the concessions causing millions of dollars in damages to the Plaintiffs. The arbitral tribunal found in favor of the Plaintiffs and ordered the Judgment Defendants to pay approximately US$50 million plus interest.

3. Defendants failed to pay the amounts due under the arbitral award and have similarly failed to satisfy the Judgment that the Zambian court issued based on the arbitral award. Following the issuance of the arbitral award, Plaintiffs engaged in extensive negotiations with Defendants, through the Zimbabwean government, with the aim of achieving a mutually agreeable resolution regarding the Defendants' compliance with the arbitral award. Defendants'

representatives in the Zimbabwean government repeatedly represented that they would pay the amounts due and recognized the award sum as a public debt.  They even represented that specific assets of the Republic of Zimbabwe and ZMDC would be designated to guarantee the debt owed to the Plaintiffs.  But despite aiming to finalize these amicable negotiations by the end of 2021, Defendants never failed to fulfill their commitments. As such, Plaintiffs now seek to enforce their rights in this Court.

## II.   JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1330(a) because this is a "nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement."

5.     ZMDC is a foreign state within the meaning of 28 U.S.C. § 1603(a) because it is an agency or instrumentality of, and an alter ego of, the Republic of Zimbabwe.

6.     The Chief Mining Commissioner, Ministry of Mines of Zimbabwe, is a foreign state within the meaning of 28 U.S.C. § 1603(a) because it is an agency or instrumentality of, and an alter ego of, the Republic of Zimbabwe.

7.     The Republic of Zimbabwe is a foreign state within the meaning of 28 U.S.C. § 1603(a).

8.     Defendants are not entitled to immunity under the Foreign Sovereign Immunities Act or any applicable international agreement because the exceptions to foreign sovereign immunity set forth in 28 U.S.C. §§ 1605(a)(1) and 1605(a)(6) are satisfied.

9.     As set forth more fully below, the Judgment arises from an arbitration governed by the New York Convention, which is in force in all countries relevant to this action including

Zambia, Zimbabwe, and the United States, under arbitration agreements made by the foreign state with Plaintiffs.

10. As set forth more fully below, Defendants waived sovereign immunity by agreeing to arbitrate under the ICC Rules, and by agreeing to and participating in an arbitration governed by the New York Convention in Zambia, which, like Zimbabwe, is and was a party to the New York Convention. Zimbabwe thereby contemplated enforcement of any arbitral award in any of the other signatory states and waived sovereign immunity. It is settled law that an action to recognize a foreign judgment based upon an arbitral award is within the scope of such a waiver because the cause of action is so closely related to the enforcement of an arbitral award.

11. This Court has personal jurisdiction over the Defendants under 28 U.S.C. § 1330(b) because the requirements of 28 U.S.C. § 1330(a) are satisfied and service has or will be made under 28 U.S.C. § 1608.

12. Venue is proper in this Court under 28 U.S.C. § 1391(f)(4), which provides for venue in this Court for an action "brought against a foreign state or political subdivision thereof."

**III. THE PARTIES**

13. Plaintiff Amari Nickel Holdings Zimbabwe Ltd. is a company incorporated under the laws of Mauritius.

14. Plaintiff Amaplat Mauritius Ltd. is a company incorporated under the laws of Mauritius.

15. Defendant ZMDC is a corporation incorporated under the laws of the Republic of Zimbabwe, an agency or instrumentality of the Republic of Zimbabwe, and an alter ego of the Republic of Zimbabwe. It was created by the Zimbabwe Mining Development Corporation Act, and by law, the Republic of Zimbabwe appoints its Board of Directors, approves significant

actions, has the power to direct its actions, pays the debts of the Republic of Zimbabwe, and must be majority-owned by the Republic of Zimbabwe.

16.     Defendant Chief Mining Commissioner, Ministry of Mines of Zimbabwe is a governmental office or a governmental corporation sole existing under the laws of the Republic of Zimbabwe, an agency or instrumentality of the Republic of Zimbabwe, and an alter ego of the Republic of Zimbabwe.

17.     Defendant Republic of Zimbabwe is a foreign state.

## IV.     GENERAL ALLEGATIONS

### A.     The Memoranda of Understanding and the Joint Venture

18.     As explained in greater detail in the underlying arbitral award, a true and correct copy of which is attached hereto as **Exhibit A**, on November 22, 2007, ZMDC and Amari Holdings Ltd. ("Amari BVI") entered into a Memorandum of Understanding (the "Nickel MOU"), a true and correct copy of which is attached hereto as **Exhibit B**.

19.     Under the Nickel MOU, Amari BVI and ZMDC agreed to incorporate a joint venture company called Zimari Nickel (Pvt.) Ltd., to prospect for nickel and develop a mine.

20.     On June 6, 2008, Amari, Amari BVI, and ZMDC entered into a Deed of Novation, whereby Amari replaced Amari BVI as the counterparty to the Nickel MOU.  A true and correct copy of the Deed of Novation is attached hereto as **Exhibit C**.

21.     Similarly, on July 25, 2008, ZMDC and Amaplat entered into a Memorandum of Understanding (the "Platinum MOU"), a true and correct copy of which is attached hereto as **Exhibit D**.

22.     Under the Platinum MOU, Amaplat and ZMDC agreed to incorporate a joint venture company called Zimari Platinum (Pvt.) Ltd., to prospect for metals including platinum, and develop a mine.

**B.     The Dispute and Arbitration**

23.     ZMDC purported to cancel the MOUs in November 2010.

24.     Both the Nickel MOU (**Exhibit B**), at Article 11, and the Platinum MOU

(**Exhibit D**), at Article 9, contained identical arbitration clauses providing that:

> In the event of a dispute or disputes arising, such disputes, controversies or differences between the Parties, which may arise out of or in relation to the MOU and which cannot be settled by the Board, the parties shall first try to resolve it amicably through negotiation. In the event that no settlement can be reached through negotiation in reasonable time, any Party may submit the dispute to the ICC International Court of Arbitration in Paris for arbitration in accordance with the procedural rules of arbitration of the said Arbitration Court in effect at the time of apply arbitration, the award of which shall be final and binding upon the Parties. The language in Arbitration shall be in English.

25.     The Nickel MOU and Platinum MOU thus constituted an agreement to resolve

disputes by "final and binding" arbitration under the ICC Rules.

26.     Zimbabwe acceded to the New York Arbitration Convention on the Recognition

and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention") on

September 29, 1994.

27.     Zambia acceded to the New York Convention on March 14, 2002.

28.     The arbitration tribunal was constituted under the applicable regime of the ICC

Rules following determination by the ICC Court that the place of the arbitration would be

Lusaka, Zambia.

29.     The Judgment Defendants participated actively in the highly contested arbitration

proceedings before the arbitral tribunal.

30.     However, on the third day of the hearing, the arbitrator who had been nominated

by the Judgment Defendants resigned and the Judgment Defendants refused to appoint a

replacement arbitrator.

31. After contentious proceedings before the Zambian courts and the ICC Court of Arbitration over the composition of the panel, a reconstituted arbitral tribunal determined in accordance with the ICC Arbitration Rules to continue with the proceedings after deliberation on the issue.

32. On August 27, 2013, without any explanation, the Judgement Defendants indicated to the arbitral tribunal that they refused to further participate in the proceedings.

33. The arbitral tribunal issued a final award on January 12, 2014, finding that it continued to have jurisdiction over the dispute despite the Judgment Defendant's boycott of the remainder of the hearing. The tribunal found that the Plaintiffs successfully demonstrated their claims. It ordered US$42,882,000 in damages to Amaplat and US$3,900,000 in damages to Amari. The arbitral tribunal also ordered the Judgment Defendants to pay costs and expenses in the amount of US$2,220,583.74 and US$900,000 in tribunal costs of the arbitration, and interest. **Exhibit A** at 36.

**C. The Zambian Judgment**

34. Following the resolution of the post-award proceedings in Zambian courts, in which Zimbabwe challenged the composition of the tribunal and its authority to issue an award, in Plaintiffs' favor, the High Court for Zambia at the Commercial Registry at Lusaka issued the Judgment on August 9, 2019—formally, an Ex Parte Order for Leave to Register and Enforce the Final Arbitration Award, No. 2019/HPC/ARB/No. 0337, under Section 18 of the Arbitration Act, No. 19 of 2000, and Rules 15 and 16 of the Arbitration (Court Proceedings) Rules, 2001. A true and correct copy of the Judgment is attached hereto as **Exhibit E.**

35. The Judgment directed "that the Plaintiffs be at liberty to enforce in the same manner as a judgment or order to the same effect the Final Award dated 12th January 2014, of the Arbitrators: Stuart Isaacs QC, Chairman; Professor Doug Jones AO, as Co-Arbitrator; and

Chikwendu Madumere as Co-Arbitrator appointed pursuant to Clause 11 of the Nickel Memorandum of Understanding dated 22nd  November 2007, and Clause 9 of the Platinum Memorandum of Understanding dated 25th July 2007, made between the Plaintiffs and the Defendants." **Exhibit E** at 1-2.  Plaintiffs served the Judgment on Defendants on 23 October 2019.  Under Zambian law, the Judgment was stayed for 30 days or until the disposition of a timely proceeding to set aside the Judgment.  As no party initiated a proceeding to set aside the Judgment, it became final.

36.     Zambian law provides for a 12-year statute of limitations for an action on a judgment, which accrues on the date that the judgment becomes enforceable.

37.     Accordingly, the Judgment is valid and enforceable in Zambia.

**D.     Failed Negotiations between the Parties**

38.     The parties participated in settlement discussions after the issuance of the Judgment, including two years of negotiations with the Reserve Bank of Zimbabwe, the Permanent Secretary of the Ministry of Mines & Mining Development, and the Attorney General.

39.     On 12 January 2021, the Plaintiffs sent a letter to the Defendants highlighting their failure to pay the amounts due under the award and Judgment and noting that the arbitral award is a public debt has been acknowledged as such by the Attorney-General and the Minister of Mines & Mining Development.  A copy of that letter is attached hereto as **Exhibit F**.  The Defendants failed to make any payment.

40.     Another letter later that year produced similar results.  A copy of that letter is attached hereto as **Exhibit G**.  Accordingly, Plaintiffs are forced to pursue this action to enforce the Judgment.

**E. ZMDC and the Republic Are Alter Egos**

41. As set out at length below, ZMDC and the Republic are alter egos under the longstanding test set forth in *First National City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611 (1983), commonly known as *Bancec*, ZMDC is completely dominated by the Republic—it is wholly owned and managed by the Republic, its profits go to the Republic, it is required to pursue government policy, and it is frequently used for plainly sovereign purposes such as financing weapons deals. Similarly, treating the Republic and ZMDC as separate would result in fraud and injustice, because, among other things, the Republic has been playing a shell game, moving ZMDC's assets to other state-owned entities to try to make it harder for creditors to identify and collect, taking assets out of ZMDC when it sees fit for its own purposes even though ZMDC is not satisfying its debts as they come due, and giving away ZMDC's assets at below value for sovereign purposes such as funding military expenditures.

**1. Under the ZMDC Act, ZMDC is Completely Controlled and Owned by the State and Must Pursue Government Policy**

42. ZMDC is, by design, completely controlled by the Republic and required by law to do whatever the Republic deems to be in its national interest, even where that is contrary to its own financial or other interests or the interests of its creditors.

43. Under the Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 ("ZMDC Act"), which has long governed and continues to govern ZMDC's existence, the Government completely controls ZMDC and it must pursue Government policy as dictated by the Government. The purpose of ZMDC as well as the legislation have been unaltered since the Court examined the provisions of the ZMDC Act and held that it is an alter ego of the Republic. *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, No. 13 CIV.1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015). Defendant ZMDC was structured to be dominated and controlled by

the Republic.

44. Indeed, at one point in 2022, the U.S. State Department's Investment Climate Statement for Zimbabwe indicated that the Republic was directly running ZMDC without any board at all. **Exhibit H** ("SOEs should have independent boards, but in some instances such as the recent case of the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards."). The State Department also observed that state-owned enterprises in Zimbabwe have limited financial data available. *Id.* As here, that allows their assets to be fraudulently transferred to evade their debts.

45. The ZMDC Act mandates that the Republic is to own no less than 51% of the shareholding in ZMDC and cannot divest more than 49% of its shareholdings. ZMDC Act § 27(5). Even if such a divestiture of a minority interest occurred, which it has not, it would require the approval of both the Minister for Mines and the Minister for Finance. ZMDC Act § 27(2) & (5).

46. The ZMDC Act emphatically states that the purpose of ZMDC is to act on behalf of the State. Its "functions and duties" are "to invest in the mining industry in Zimbabwe on behalf of the State," "to plan, co-ordinate and implement mining development projects on behalf of the State," "to engage in prospecting, exploration, mining and mineral beneficiation programmes," "to encourage and undertake the formation of mining co-operatives," "to render assistance to persons engaged in or about to engage in mining," "to review annually the general economic conditions and prospects of the mining industry and in particular investment schemes," "to advise the Minister on all matters connected with corporate investments in the mining industry and make recommendations for the proper co-ordination of all investment

programmes," and "to carry out any other functions and duties which may be imposed upon the Corporation by any enactment." ZMDC Act § 20.

47. ZMDC is explicitly an organ of Government policy and was created to pursue the government's goals regardless of commercial sense. Section 23 of the Act provides that "[i]t shall be the duty of the Corporation so to exercise—(a) that every application or proposal dealt with by it is considered strictly in accordance with Government economic policy; (b) that all matters relating to the mining industry are carefully reviewed in the national interest; and (c) that generally the activities of the Corporation referred to in section twenty are directed towards implementing Government mining development policy."

48. Thus, ZMDC is a vehicle for the Government of Zimbabwe to pursue policy goals—central ones for Zimbabwe, whose principal economic resource is its mineral deposits—and it operates as such rather than as a conventional commercial entity.

49. The ZMDC Act also provides that the Mining Development Board that controls ZMDC "shall consist of not less than five and not more than nine members who shall be appointed by the Minister [of Mines] after consultation with the President and in accordance with any directions the President may give him . . . ." ZMDC Act § 5(1). The Minister appoints one member as chairman and another as deputy chairman. ZMDC Act § 5(2). The Minister also appoints alternates. ZMDC Act § 5(3).

50. The ZMDC Act ensures that the Government, through the Minister, dictates every aspect of ZMDC's management, including the terms of appointment of the Board members. ZMDC Act § 6(1). There are no specific terms for appointment to the ZMDC Board and indeed a Board member holds office on conditions determined by the Minister, ZMDC Act § 6(2), meaning that the members serve at the pleasure of the Minister. That is reinforced by Section 9

of the ZMDC Act, which provides that the "Minister may require a member to vacate his office if the Minister is satisfied that the member" has committed "improper conduct," "has failed to comply with the conditions of his office fixed by the Minister," or is "mentally or physically incapable of efficiently performing his duties as a member."

51. The Government routinely exercises this power. And as the Minister for Mines has recognized when making appointments to ZMDC's board, ZMDC, and other similar parastatal entities' "boards will be seized with executing key government objectives". *Chitando appoints new boards for parastatals*, NewsDay, (June 1, 2018) (**Exhibit I)**.

52. The Ministry of Mines has explicitly stated that any appointment to the Board of ZMDC or its subsidiaries other than by the Minister is void. The current Board includes multiple individuals who have previously served as the Government's designees for the boards of other parastatals and a current employee of the Ministry of Mines. Previous boards have included a member of the ruling party's Politburo and the Minister for Mines' permanent secretary.

53. Under the ZMDC Act, the officers of the Public Service designated by the Minister are entitled to attend meetings and to take part in the proceedings of the Board or of a committee . . . as if they were members thereof, without voting rights. ZMDC Act § 14.

54. The Minister has the power to require the ZMDC to submit any report the Minister wishes, which may be laid before Parliament. ZMDC Act § 21. The Minister also has the absolute right to overrule any decision of the Board based on the Minister's view of the public interest. Section 25(1) of the ZMDC Act provides that "[t]he Minister may, after consultation with the Board, give to the Corporation such directions of a general character relating to the exercise by it of its functions, duties, and powers as appear to the Minister to be

requisite in the national interest." ZMDC "shall, with all due expedition, comply with any direction" given by the Minister. ZMDC Act § 25(2).

55.     The Minister has broad investigative powers into ZMDC's affairs and the power to obtain court orders compelling compliance with the ZMDC Act. ZMDC Act §§ 42-43. The Minister must approve ZMDC's General Manager. ZMDC Act § 24(1)(a).

56.     By statute, ZMDC must declare a dividend to pay the Republic any surplus funds. ZMDC Act § 33(2). In some instances, it must pay the Republic a dividend out of gross revenues. ZMDC Act § 33(3). The Accountant-General, "on behalf of the Treasury," and the "Governor of the Reserve Bank" has the power to issue certain "instructions" and "directives" to ZMDC, and the Corporation must comply with such instructions or directives. ZMDC Act § 33(5)-(7). Violation of certain of these provisions is a criminal offense. ZMDC Act § 33(8)-(9).

57.     A Schedule to the Act provides that numerous basic aspects of ZMDC's governance, including asset dispositions or leases, agreements with other government entities, issuing debt, issuing bonuses, creating or acquiring subsidiaries, providing financial assistance, and creating training or research schemes require approval from the Minister for Mines, and in some cases the Minister for Finance.

58.     In summary, The Republic's control of ZMDC is thus total. Every member of the Board is appointed and can be removed by the Minister and the General Manager is approved by the Minister, and all of them are expressly charged with pursuing government policy and must follow directions from the Minister. Indeed, directors of ZMDC or its subsidiaries have frequently also held senior positions in Zimbabwe's governing party or the Ministry of Mines. That control is routinely exercised in practice. For example, in 2018 and 2020, ZMDC's professional management opposed selling certain mines partially or wholly owned, but the

Government required it to do so.

59. In 2020, the Government announced the acquisition of State-run gold mines by one of President Emmerson Mnangagwa's advisors, Kuda Tagwirei. Tagwirei also bought several gold mines owned by the government through the ZMDC. *Workers Union Welcomes Tagwirei Take Over Of Govt Owned Gold Mines*, NewsZimbabwe, (July 6, 2020) (**Exhibit J**).

60. The Government has also repeatedly directed ZMDC to strip the concessions of joint venture partners who have fallen out of political favor, including Plaintiffs.

61. Furthermore, on numerous occasions, the Government has exercised its control over ZMDC to pay sovereign debts as detailed below.

**2. The United States' Zimbabwe Sanctions Regulations Make ZMDC an SDN Precisely Because It Is The Republic's Pocket Book**

62. Since July 25, 2008, ZMDC has been classified as a Specially Designated National ("SDN") under the Zimbabwe Sanctions Regulations. *See* 31 C.F.R. Part 541 and Executive Orders 13,288, 13,391, and 13,469.[1]

63. The U.S. Department of the Treasury identified ZMDC as a "parastatal" in its press release announcing the designation.

64. The Press Release stated that:

> Today's designations include a number of Zimbabwean parastatals and entities that are owned or controlled by the Government of Zimbabwe. Robert Mugabe, his senior officials, and regime cronies have used these entities to illegally siphon revenue and foreign exchange from the Zimbabwean people. Treasury's designations today include . . . the Zimbabwe Mining Development Corporation (a.k.a. ZMDC), involved in investment in the mining industry in Zimbabwe, and in planning, coordinating and implementing mining projects on behalf of the Government of Zimbabwe.

[1] Plaintiffs and their counsel have given notice to OFAC of this suit to comply with those regulations.

65. Thus, the United States' foreign policy recognizes that ZMDC is the Republic's pocket book.

66. And as noted above, the State Department's 2022 Investment Climate Report for Zimbabwe stated that the Republic for some time directly ran ZMDC without a board.

**3. ZMDC's Assets Are Used To Pay the Republic's Debts and For Plainly Sovereign Purposes Like Military Funding and Procurement, Even As It Fails To Satisfy Its Own Debts**

67. ZMDC has a history of nonpayment of its debts stretching back decades, including the failure of most of its mines in the early 2000s. In addition to the Award, it has judgments against it domestically for unpaid obligations. Numerous of its mines are idle due to undercapitalization. Its defaults have been bad enough to require repeated discussions with the Public Debt Management Office. In short, it has consistently failed to meet its financial obligations, neglecting to make timely payments for debts, both during the pendency of the arbitration and after the arbitral award was issued.

68. The Republic has nevertheless directed ZMDC to repay a loan owed by the Republic using its share of proceeds from a mining project, including during times when ZMDC has not been paying its debts as they fall due.

69. Most recently, the Government has developed a plan to shift valuable assets from ZMDC to a different state-owned company, Defold, in order to shield them from creditors. The Treasury approval stated that the assets, including shareholdings in subsidiaries and joint venture companies, would be "transferred," apparently for no value. News reports indicate that the express intention of the transfer was to protect the assets from ZMDC's creditors including Plaintiffs.

70. News reports from Zimbabwe indicate a blatant scheme to transfer ZMDC's assets to defraud its creditors: "the Zimbabwe government plans to strip assets from its state-

owned mining company to stave off US$467 million in claims from creditors." The reports describe the mining assets as being held by the government "through" ZMDC, and that "the government is shifting some of the company's remaining assets into another vehicle, Defold Mine, hoping to escape legal trouble." As the report puts it, "unable to hive off the debts to the taxpayer, the Ministry of Mines has hatched a new plan; Mines Minister Winston Chitando has ordered that ZMDC's assets be spirited away into a new government company, Defold." The article specifically names Plaintiffs as among the creditors the Government seeks to defraud. **Exhibit K**.

71.     Notably, the Ministry of Mines and the Treasury pushed for this plan despite being advised by ZMDC's board that the transfer would be "illegal" and made clear that the plan was a fraudulent transfer while ZMDC was insolvent: "It is highly unlikely that disposing of the corporation's (or subsidiary's) assets for no consideration and the benefit of another company when it has debts of its own which have not been satisfied can be said to be in its best interests. In fact, the indications appear to be that the corporation's liabilities exceed its assets. This simply means that the corporation is not in a financially viable enough position to make a donation of such magnitude." *Id.*

72.     While taking and using ZMDC's assets, the Republic has repeatedly refused to take on ZMDC's liabilities, making clear that it is defrauding ZMDC's creditors by transferring ZMDC's assets and leaving its liabilities behind.

73.     Additionally, the Republic has several times in the past taken ZMDC's dividends from its joint ventures directly rather than allowing them to go to ZMDC, where creditors could reach them.

74.     News also emerged in 2022 that mining rights in government-owned mines may

have been arbitrarily awarded to an advisor to Zimbabwe's president. Bloomberg, *Tycoon Seen Scoring From Zimbabwe's $3.4 Billion Off-Budget Debt*, 360 Mozambique, (March 24, 2022) (**Exhibit L)**.

75. In 2019, the Ministry of Mines directed ZMDC to award a diamond mining concession to a company in the United Arab Emirates in partial satisfaction of a government debt. *Govt to offset debt with diamonds*, BusinessTimes, (March 14, 2019) (**Exhibit M)**.

76. In 2018, reports indicate that, amid a large-scale sell-off of ZMDC assets, the government "sold" mining rights to the Zimbabwean military.

77. News reports suggest that the Republic may have conducted numerous other arms-for-mining rights deals with, among others, Russia and China over the last decade and also granted mining rights to the right-hand man of Belarus's dictator to curry favor with Belarus and Russia. In 2017, the Republic directed ZMDC to participate in another arms-for-minerals deal whereby ZMDC gave platinum mining rights to a Chinese company in exchange for weapons from China. *Mugabe lifts lid on arms-for-minerals deal with China*, New Zimbabwe, (February 22, 2017) (**Exhibit N)**. The Republic has also repeatedly used ZMDC as a tool of its foreign relations, including, around the same time as Zimbabwe was litigating over the Award, granting mineral rights to a group of Russian investors in return for weapons from the Russian state-owned arms conglomerate Rostec in 2014. Dkt. 28-4 at Ex. 1 ("Arms deal behind platinum project")

78. The Republic has also directed ZMDC to turn over its interests in a diamond mining joint venture to the Zimbabwe National Army, including during times when ZMDC has not been paying its debts as they fall due. Dkt. 28-4 at Ex. 2 (discussing the purported tender process that awarded mining assets to the Army and "there is no detail given as to the structure

of the ZMDC deals" and "[t]he ZDF's role at Kamativi is also not made clear").

79.     The revenues diverted from ZMDC while ZMDC was not paying its debts were used, among other things, to finance a new National Defence College in Zimbabwe; additionally, ZMDC has on a number of occasions awarded concessions to companies owned by senior government figures, effectively transferring ZMDC's own assets to the private benefit of regime figures. *See, e.g.*, **Exhibit O** (indicating that the Secretary of Defence, Police Commissioners, ruling party members, the director of Zimbabwe's geological survey, and senior army officers held stakes in a mining concession); **Exhibit P** (indicating that ZMDC awarded a concession to "Zimbabwe Defence Industry (ZDI), a company owned by the country's army").

80.     Thus, the Republic has continually treated ZMDC's revenues as if they were its profits, leaving nothing to pay creditors, and has similarly continually diverted ZMDC's revenues to shell companies controlled by political and military figures.

## V.     CLAIM FOR RELIEF

### COUNT I
### D.C. UNIFORM FOREIGN-COUNTRY MONEY JUDGMENTS RECOGNITION ACT
### D.C. CODE § 15-361 *ET SEQ.*

81.     Plaintiffs repeat and reallege each allegation contained in Paragraphs 1 through 40 above as if fully set forth herein.

82.     The Judgment is a foreign money judgment under the Uniform Foreign-Country Money Judgments Recognition Act, D.C. Code § 15-361, *et seq.*

83.     By providing "that the Plaintiffs be at liberty to enforce in the same manner as a judgment or order to the same effect the Final Award dated 12th January 2014," the Judgment granted recovery of a sum of money as provided in the Final Award. **Exhibit E** at 1.

84.     The High Court for Zambia had jurisdiction over the Judgment Defendants and the subject matter.

85.     The Judgment is final, conclusive, and enforceable under the laws of Zambia.

86.     The Judgment is not for taxes, fines, penalties, divorce, support, maintenance, or other domestic relations matters.

87.     Plaintiffs are accordingly entitled to an order recognizing the Judgment and entering a judgment of this Court thereon that is conclusive and enforceable in the same manner and to the same extent as a judgment of this Court.

88.     Plaintiffs are further entitled to an order recognizing that the Republic of Zimbabwe is the alter ego of the Judgment Defendants and is liable on the Judgment to the same extent as the Judgment Defendants.

89.     Plaintiffs are further entitled to their reasonable attorneys' fees and costs, consistent with the Award's finding that the prevailing party was entitled to recovery of legal expenses and the law of the Republic of Zimbabwe, which is the chosen law of the parties' agreements.

## VI.    PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs request entry of an order and judgment:

(a)     Recognizing and enforcing the Judgment;

(b)     Finding that the Republic of Zimbabwe is the alter ego of the Judgment Defendants;

(c)     Entering judgment against Defendants as provided by the Award, specifically:

(i)     Against ZMDC and the Republic of Zimbabwe and in favor of Amaplat in the amount of US$42,882,000 in damages;

(ii)    Against ZMDC and the Republic of Zimbabwe and in favor of Amari in the amount of US$3,900,000 in damages;

(iii)     Against all Defendants jointly and severally and in favor of Plaintiffs jointly in the amount of US$2,220,583.74;

(iv)     Against all Defendants jointly and severally and in favor of Plaintiffs jointly in the amount of US$900,000;

In each case, with post-award interest at 5% per annum from January 12, 2014 through the date of entry of the Judgment and post-Judgment interest at the Zambian statutory rate;

(d)     Awarding post-judgment interest at the Zambian statutory rate;

(e)     Awarding costs of this action and reasonable attorneys' fees; and

(f)     Awarding such other and further relief as this Court may deem just, proper, and equitable.

Dated: May 24, 2023

Respectfully submitted,

*/s/ Steven K. Davidson*

Steven K. Davidson (D.C. Bar No. 407137)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795
Telephone: 202 429 3000
Facsimile: 202 429 3902
sdavidson@steptoe.com

Robert W. Mockler
Joseph M. Sanderson
(*pro hac vice*)
Niyati Ahuja
(*pro hac vice*)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Telephone: 212 506 3900
Facsimile: 212 506 3950
rmockler@steptoe.com
josanderson@steptoe.com
nahuja@steptoe.com

*Attorneys for Plaintiffs*

# Exhibit A



**International Court of Arbitration • Cour internationale d'arbitrage**

# AWARD

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

**ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI**
38 Cours Albert 1er, 75008 Paris, France
Tel +33 (0)1 49 53 28 28 Faxes +33 (0)1 49 53 29 29 / +33 (0)1 49 53 29 33
E-mail arb@iccwbo.org Website www.iccarbitration.org

**ICC INTERNATIONAL COURT OF ARBITRATION**

**CASE No. 17720/ARP/MD/TO**

1. AMAPLAT MAURITIUS LIMITED

(Mauritius)

2. AMARI NICKEL HOLDINGS ZIMBABWE LIMITED

(Mauritius)

vs/

1. ZIMBABWE MINING DEVELOPMENT CORPORATION

(Zimbabwe)

2. THE CHIEF MINING COMMISSIONER, MINISTRY OF MINES, ZIMBABWE

(Zimbabwe)

This document is an original of the Final Award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

**IN THE MATTER OF AN INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION CASE NO. 17720/ARP/MD/TO**

**UNDER THE ICC RULES OF ARBITRATION 1998**

**BETWEEN:**

1. **AMAPLAT MAURITIUS LIMITED**
2. **AMARI NICKEL HOLDINGS ZIMBABWE LIMITED**

**Claimants**

- and –

1. **ZIMBABWE MINING DEVELOPMENT CORPORATION**
2. **THE CHIEF MINING COMMISSIONER, MINISTRY OF MINES, ZIMBABWE**

**Respondents**

# FINAL AWARD

**Place of arbitration: Lusaka, Zambia**

**Tribunal:**
**Mr Chikwendu Madumere**
**Professor Doug Jones**
**Mr Stuart Isaacs QC**

**12 January 2014**

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

# INDEX

| | | Paragraphs |
|---|---|---|
| **I.** | **THE PARTIES AND THEIR LEGAL REPRESENTATIVES** | **1-4** |
| **II.** | **BACKGROUND** | **5-9** |
| **III.** | **ARBITRATION CLAUSE AND PROPER LAW** | **10-11** |
| **IV.** | **PROCEDURAL HISTORY** | **12-88** |
| **V.** | **THE TRIBUNAL'S JURISDICTION** | **89-91** |
| **VI.** | **LIABILITY** | **92-182** |
| 1. | The Claimants are not shareholders in Zimari Nickel and Zimari Platinum | 93-104 |
| 2. | Absence of ZMDC board approval for the conclusion of the MOUs | 105-123 |
| 3. | Absence of ministerial approval for the conclusion of the MOUs | 124-145 |
| 4. | Failure to comply with condition precedent in Article 9 of the Nickel MOU | 146-151 |
| 5. | Illegality | 152-175 |
| 6. | Absence of any joint venture agreement | 176-178 |
| 7. | Cancellation of the MOUs | 179-182 |
| **VII.** | **THE RELIEF CLAIMED** | **183-212** |
| 1. | Platinum claim | 186-203 |
| 2. | Nickel claim | 204-212 |
| **VIII.** | **INTEREST** | **213-216** |
| **IX.** | **COSTS** | **217-226** |
| **X.** | **AWARD** | **227** |

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

**IN THE MATTER OF AN INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION CASE NO. 17720/ARP/MD/TO**

**BETWEEN:**

**1. AMAPLAT MAURITIUS LIMITED**
**2. AMARI NICKEL HOLDINGS ZIMBABWE LIMITED**

**Claimants**

- and –

**1. ZIMBABWE MINING DEVELOPMENT CORPORATION**
**2. THE CHIEF MINING COMMISSIONER, MINISTRY OF MINES, ZIMBABWE**

**Respondents**

# FINAL AWARD

## I. THE PARTIES AND THEIR LEGAL REPRESENTATIVES

1. The First Claimant is Amaplat Mauritius Limited **("Amaplat")**, a company incorporated under the laws of Mauritius. The Second Claimant is Amari Nickel Holdings Zimbabwe Limited **("Amari")**, also a company incorporated under the laws of Mauritius. Amari is a wholly-owned subsidiary of Amari Resources International Limited, an international resource investment company focused on exploration and mining in sub-Saharan Africa. The Claimants have their principal place of business at Amari, 3rd Floor, Melrose Boulevard, Melrose Arch, Johannesburg, South Africa. The Claimants are represented in these proceedings by Advocates Neil Lazarus SC and Saul Miller and by Bernadt Vukic Potash & Getz Attorneys **("BVPG")**, 11th Floor No. 1 Thibault Square, Cape Town 8001, Republic of South Africa.

2. The First Respondent is Zimbabwe Mining Development Corporation **("ZMDC")**, a body corporate established under the Zimbabwe Mining Development Corporation Act (Cap. 21:08) of the Republic of Zimbabwe **("the Act")** having its address at Ground Floor, MMCZ Building, 90 Mutare Road, Msasa, Harare, Zimbabwe. ZMDC's business includes investing in mining and mining development on behalf of the Government of Zimbabwe. The Second Respondent is The Chief Mining Commissioner **("the Chief Mining Commissioner")**, Ministry of Mines, Zimbabwe, having his address at 7th Floor, Zimre Centre, Private Bag CY 7709, Causeway, Harare, Zimbabwe. The Respondents are represented in these proceedings by Mutamangira & Associates (Mr Jacob Mutevedzi) Clairwood Chambers, 38 Clairwood Road, Alexandra Park, Harare, Zimbabwe.

## II. RELEVANT BACKGROUND

3. ZMDC hold 45% of the shares in Zimari Nickel (Pvt) Ltd **("Zimari Nickel")**, a joint venture company incorporated by those parties to prospect for nickel and develop a mine pursuant to a Memorandum of Understanding between Amari Holdings Ltd **("Amari BVI")**, a company incorporated in the British Virgin Islands, and ZMDC dated 22 November 2007 **("the Nickel MOU")**. According to the Claimants, Amari holds 55% of the shares in Zimari Nickel but this is disputed by the Respondents.

4. By a Deed of Novation dated 6 June 2008 between Amari BVI, Amari and ZMDC **("the Deed of Novation")**, with effect from 1 May 2008 Amari BVI was released and discharged from its rights and obligations pursuant to the Nickel MOU upon Amari's undertaking to Amari BVI and ZMDC to perform Amari BVI's obligations pursuant to the

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

Nickel MOU and be bound by its terms and conditions as if Amari had been the original party to the Nickel MOU in place of Amari BVI. By clause 3.1 of the Deed of Novation, Amari BVI and ZMDC acknowledged that Amari would be solely entitled to the entire rights and benefits under the Nickel MOU as if Amari were the original party to it in place of Amari BVI.

5. ZMDC holds 50% of the shares in Zimari Platinum (Pvt) Ltd **("Zimari Platinum")**, a joint venture company incorporated by those parties to prospect for various metals and develop a mine pursuant to a Memorandum of Understanding between Amaplat and ZMDC dated 25 July 2008 **("the Platinum MOU")**. According to the Claimants, Amaplat holds 50% of the shares in Zimari Platinum but this is disputed by the Respondents.

6. The Nickel and the Platinum MOUs (together **"the MOUs"**) were concluded by Mr Michael Nunn on behalf of Amari BVI and Amaplat respectively and by Mr Dominic Mubayiwa, at the time ZMDC's Chief Executive Officer, on ZMDC's behalf.

7. By a letter dated 10 November 2010 from ZMDC to the Claimants, ZMDC *inter alia* noted that there was "*a corrupt relationship which unduly influenced the signing of the* [Platinum MOU]"; stated that there was "*no Joint Venture Agreement regulating our relationship*"; and concluded that:

> "*As a result of the above, we advise you that your conduct is unacceptable, improper and directly undermines the basic tenets of corporate governance principles which we so cherish and adhere to. It contravenes the Zimbabwean laws and we reserve the right to report you for prosecution. Your conduct goes to the core of our relationship and as such we are no longer prepared to engage yourselves for negotiations to the next stage of a Joint Venture Agreement. In fact out relationship terminated for both platinum and nickel properties.*"

8. By a letter dated 22 November 2010 in reply, the Claimants *inter alia* disputed ZMDC's allegations and its entitlement to terminate the MOUs and maintained that those agreements were legally binding and of full force and effect. By a letter dated 13 January 2011, the Claimants informed ZMDC that it would have no choice but to enforce their legal rights in the continuing absence of any undertaking from ZMDC that it would take no steps to prejudice the Claimants' rights pending the final determination of arbitration proceedings.

9. By letters dated 14 January 2011, ZMDC reiterated its position that the MOUs had been "*cancelled*" and notified the Claimants forthwith to stop any exploration activities and to vacate the site.

## III. ARBITRATION CLAUSE AND PROPER LAW

10. Article 11 of the Nickel MOU and Article 9 of the Platinum MOU provide that:

> "*In the event of a dispute or disputes arising, such disputes, controversies or differences between the Parties, which may arise out of or in relation to the MOU, and which cannot be settled by the Board, the parties shall first try to resolve it amicably through negotiation. In the event that no settlement can be reached through negotiation in reasonable time, any Party may submit the dispute to the ICC International Court of Arbitration in Paris for arbitration in accordance with the procedural rules of arbitration of the said Arbitration Court in effect at the time of applying arbitration, the award of which shall be final and binding upon the Parties. The language in Arbitration shall be in English.*"

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

11. In accordance with Article 12.7 of the Nickel MOU and Article 10.8 of the Platinum MOU, the present dispute is to be determined under the laws of Zimbabwe.

## IV. PROCEDURAL HISTORY

12. On 2 February 2011, the Secretariat of the International Court of Arbitration **("the Secretariat")** received from the Claimants a Request for Arbitration and attached a Statement of Claim dated 31 January 2011 **("the Request")**. On 15 February 2011, the Secretariat served the Request on the Respondents.

13. The arbitration clauses did not specify the number of arbitrators. By paragraph 9 of the Request, the Claimants requested the appointment of a Sole Arbitrator.

14. By a letter dated 2 March 2011, the Claimants requested that the arbitration take place in Gabarone, Botswana.

15. By a letter dated 10 March 2011 from Mutamangira & Associates, the Respondents stated that they objected to the appointment of a Sole Arbitrator and requested the appointment of three arbitrators.

16. On 22 March 2011, the Respondents sent by email to the Secretariat the "*First and Second Respondent's* [sic] *Statement of Opposition* dated March 2011 **("the Answer")**, together with a covering letter dated 17 March 2011. The Answer was a revised version of a document previously emailed to the Secretariat on 18 March 2011.

17. On 29 March 2011, the Secretariat invited the Respondents to comment on the Claimants' proposal that the place of arbitration be Gabarone.

18. On 31 March 2011, the Respondents "*recommended*" that the place of arbitration be Namibia and stated that, in the absence of agreement between the parties on that issue, the place of arbitration should be determined by the International Court of Arbitration of the ICC **("the Court")**.

19. In circumstances where the parties were unable to agree on the number of arbitrators and on the place of the arbitration, on 12 May 2011, the Court decided *inter alia*:

> (1) pursuant to Article 8(2) of the Rules of Arbitration in force as from 1 January 1998 **("the Rules")**, that the matter would be submitted to three arbitrators;
>
> (2) pursuant to Article 14(1) of the Rules to fix Lusaka, Zambia, as the place of the arbitration.

20. Also on 12 May 2011, the Claimants served a Notice of Amendment to the Statement of Claim.

21. On 25 May 2011, the Claimants served the Amended Statement of Claim dated 25 May 2011.

22. In May 2011 (the precise date in May 2011 is unclear), the Respondents served an Amended Statement of Opposition (the **"Amended Answer"**).

23. On 29 August 2011, the Claimants served a Replication **("the Reply")** and Notice of Amendment to the Statement of Claim each dated 29 August 2011.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

24. On 27 September 2011, the Secretary General of the Court, pursuant to Article 9(2) of the Rules, confirmed Judge Meyer Joffe as co-arbitrator upon the joint nomination of the Claimants and confirmed Mr James Prince Mutizwa as co-arbitrator upon the joint nomination of the Respondents.

25. On 27 October 2011, pursuant to Article 9(3) of the Rules, the Court appointed Mr Stuart Isaacs QC then of 3-4 South Square, Gray's Inn, London WC1R 5HP and now of Berwin Leighton Paisner LLP, Adelaide House, London Bridge, London EC4R 9HA as Chairman of the Tribunal, upon the proposal of the United Kingdom National Committee.

26. The Amended Statement of Claim was further amended on 9 November 2011.

27. On 28 November 2011, a procedural meeting was held at the offices of Edward Nathan Sonnenburgs, 150 West Street, Sandown, Sandton, South Africa attended by Mr Lazarus SC and Mr Ian Small-Smith of the Claimants' then attorneys, together with Mr Mark Robert Summers, for the Claimants; and by Mr Itayi Ndudzo and Mr Erik William Morris SC for the Respondents and by the Tribunal as then constituted. The Terms of Reference were signed at that meeting.

28. At the meeting, the Respondents submitted that the Tribunal should deal with the issue of its jurisdiction as a preliminary issue. That submission was opposed by the Claimants. After deliberation, the Tribunal decided that because the basis for that submission was inextricably linked to the issue of the Respondents' liability, the appropriate course was to decide the issue of jurisdiction at the same time as the substance of the case.

29. Having taken into account the parties' respective written and oral submissions at the meeting, the Tribunal made Procedural Order 1 of that date which gave directions for the future conduct of the proceedings in accordance with the Procedural Timetable laid down by the Tribunal.

30. On 15 February 2012, the Claimants served their first memorial.

31. On 29 March 2012, the Respondents served their defence memorial.

32. On 15 May 2012 and 21 June 2012, the Tribunal gave its rulings on the Claimants' request for document production made in accordance with paragraph 7 of Procedural Order 1. There was no necessity for the Tribunal to make any ruling on the Respondents' request for document production made in accordance with those provisions.

33. On 28 May 2012, the Claimants served their reply to the defence memorial.

34. On 20 June 2012, the Claimants further amended the Amended Statement of Claim.

35. On 30 June 2012, the Tribunal made Procedural Order 2 which gave further directions for the future conduct of the proceedings.

36. On 18 and 19 July 2012, a meeting of experts was held in Johannesburg attended by Mr Thomas Alexander Wixley, Mr Philip Le Roux and Mr Henrik Frederik Johannes Theart for the Claimants and Mr René Carlo Hochreiter and Mr Shepherd Alexander Gaihai for the Respondents at which the experts prepared a joint report **("the Joint Report")**.

37. On 21 July 2012, the Tribunal directed that supplementary experts' reports be dispensed with.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

38. On 23 July 2012, a procedural meeting was held by conference call to consider the future conduct of the proceedings.

39. By a letter dated 24 July 2012 from the Claimants' attorneys, the Claimants' claim was further amended as follows:

(1) The principal amount of Amaplat's main claim was reduced from US$127,000,000 to US$37,659,000;

(2) The principal amount of Amari's main claim was reduced from US$9,400,000 to US$3,900,000;

(3) In the event that it is found that the Platinum MOU is invalid for any reason or that ZMDC was entitled to terminate it, Amaplat seeks payment of the principal sum of US$4,498,190 and interest by way of restitutionary relief (being the amount invested by Amaplat in the platinum assets owned by Zimari Platinum);

(4) In the event that it is found that the Nickel MOU is invalid for any reason or that ZMDC was entitled to terminate it, Amari seeks payment of the principal sum of US$578,559 and interest by way of restitutionary relief (being the amount invested by Amari in the platinum assets owned by Zimari Nickel).

40. By Procedural Order 3 dated 24 July 2012, the Tribunal gave directions relating to the preparation for and conduct of the hearing of the arbitration.

41. On 3 August 2012, after considering the parties' written submissions, the Tribunal directed that written closing submissions should be exchanged simultaneously by 4pm on Tuesday 21 August 2012.

42. On 6 August 2012, the Claimants served their written opening submissions.

43. On 7 August 2012, the Respondents served their written opening submissions.

44. Pursuant to paragraph 8.1 of Procedural Order 1, the hearing of the arbitration took place at the Taj Hotel, Cape Town, Republic of South Africa between 13 and 20 August 2012. The Claimants were represented by Mr Lazarus SC and Advocate Saul Miller and BVPG. The Respondents were represented by Mutamangira & Associates.

45. On 13 August 2012, the first day of the hearing, the Respondents renewed their submission that the Tribunal should deal with the issue of jurisdiction as a preliminary issue, on the basis that the circumstances had changed since its previous ruling now that it was clear that certain witnesses, namely Mr Amos Midzi, the Minister of Mines and Mining Development at the material times, and Ms Caroline Sandura, the chairperson of ZMDC at the material times, would not be giving evidence at the hearing. That submission was opposed by the Claimants. After deliberation, the Tribunal determined that those circumstances did not justify a departure from its previous ruling that the issue of jurisdiction should be decided at the same time as the substance of the case.[1]

46. By a letter dated 15 August 2012, Amaplat revised its main claim upwards to US$42,882,000, based on the latest consensus forecast metal prices as at 31 July 2012 and the latest forecast ZAR/USD exchange rates (from the Economist Intelligence Unit).

[1] Transcript 13/8/12 p. 38 line 12 to p. 39 line 5.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

47. At the hearing, oral evidence of fact was given on the Claimants' behalf in the following order by the following persons, each of whom had made an undated statement (and, in the case of Mr Mubayiwa, two undated statements:

(1) Richard Charles Macdonald Napier, who until March 2011 was the managing director of Amari Resources Holdings Ltd (**"Amari Resources Holdings"**), a holding company of Amaplat and Amari, and a director of Zimari Nickel and Zimari Platinum. Amari Resource Holdings' principal shareholder is Amari BVI.

(2) Thabani Ndlovu, who between August 2005 and June 2008 was the Permanent Secretary at the Ministry of Mines.

(3) Janet Sakuerwa Mutasa, a chartered accountant and a director of JSM Consulting Private Ltd (**"JSM"**), a company that offers professional services for the maintenance of companies' statutory records.

(4) Beauty Hwindizi, a consultant employed by JSM since 5 May 2008.

(5) Mr Summers, Amari Resource Holdings' group financial director.

(6) Tichaona John Muhonde, a qualified lawyer practising in Zimbabwe who was employed at ZMDC in January 2007 as an assistant company secretary and legal advisor and who, in about June 2008, was made ZMDC's company secretary and legal advisor.

(7) Mr Mubayiwa. Prior to being sent on forced leave in July 2010, Mr Mubayiwa had held the post of ZMDC's Chief Executive Officer since May 2003. Before that, he had been ZMDC's internal auditor between 1985 and 1987, the mine secretary between 1987 and 1989 and had then held positions as the corporate accountant, group chief accountant and finance director/financial controller until his appointment as the Chief Executive Officer.

(8) Mr Nunn, the executive chairman and a director of Amari BVI, the ultimate holding company of the Amari Group.

(9) Mr Rhys Ralph, Mr Nunn's personal assistant from March to October 2008 in Amari Services (Pty) Ltd (**"Amari Services"**), a company owned by Mr Nunn and Mr Summers through family trusts which became part of the Amari Group in 2009.

48. The oral expert evidence followed and was given on the Claimants' behalf by the following persons, of whom each made an undated statement:

(1) Mr Theart, an economic geologist employed by SRK Consulting (South Africa) (Pty) Ltd (**"SRK"**) who co-authored a report commissioned by Zimari Platinum dated 6 October 2010. Mr Theart's statement exhibited that report.

(2) Mr Clarkson Mafirakureva Kamurai, a consultant financial mining engineer and the Amari Group's country manager in Zimbabwe between June 2008 and about June 2010. Mr Kamurai gave both factual and expert evidence. He made an undated factual statement and an undated expert's report which was only signed on 15 August 2012 during the course of his oral evidence

(3) Mr Neale Goddard, a mechanical engineer employed by DRA Mineral Projects (Pty) Ltd (**"DRA"**) who, together with Ms Michelle Schroder, a process

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

engineer employed by DRA, prepared the DRA scoping study report on the Serui platinum mine dated October 2010.

(4) Ms Schroder, who prepared the DRA Serui Pre-feasibility Study **[6/p.192]**.

(5) Mr Le Roux, an exploration geologist who until the end of 2010 was employed in the Amari Group and who was involved in the exploration and pre-feasibility studies in relation to the nickel and platinum joint ventures pursued by the Amari Group with ZMDC. Mr Le Roux gave both factual and expert evidence.

(6) Mr Wixley, a chartered accountant with extensive experience of the provision of auditing and consulting services. Mr Wixley made statements signed on 15 August 2012.

49. The witnesses all affirmed to the truth of their evidence.

50. The parties were unable to agree a timetable for the oral evidence as requested by the Tribunal. The Tribunal afforded the Respondents considerable latitude to extend the time proposed by the Claimants for cross-examination by the Respondents of the Claimants' witnesses, so as to ensure that the Respondents had sufficient opportunity to put their case to those witnesses.

51. On the morning of the second day of the hearing, 14 August 2012, following the conclusion of Mr Summers' cross-examination, the Respondents intimated that they intended to make a challenge to the Tribunal under Article 11 of the Rules and applied for the proceedings to be adjourned until that challenge had been determined by the Court. The application was opposed by the Claimants. Having carefully considered the parties' submissions on the application, the Tribunal dismissed the application, for the reasons given at the time.[2]

52. The Respondents then requested a short adjournment to consider their position and the Tribunal granted that request. Following that adjournment, the Respondents then took the decision to withdraw from the proceedings with immediate effect.

53. The Tribunal, having deliberated, determined in accordance with Article 6(3) of the Rules to continue with the proceedings in the Respondents' absence.

54. The hearing then continued with the evidence of Mr Muhonde and the subsequent factual and expert witnesses referred to above. For the reason just mentioned, their evidence was not the subject of cross-examination by the Respondents.

55. Also, for the same reason, no witnesses were called on behalf of the Respondents. In those circumstances, pursuant to paragraph 6 of Procedural Order 1, the witness statements served on behalf of the Respondents were not in evidence before the Tribunal.

56. Following their decision to withdraw from the proceedings, the Respondents continued to be provided by the Tribunal and the Claimants with the transcripts of the proceedings, the Claimants' written closing submissions and all other documents supplied by the Claimants to the Tribunal and were at all times invited by the Tribunal to participate in the proceedings.

57. At the start of the third day of the hearing, 15 August 2012, Mr Mutizwa made a statement to the effect that he had tendered his resignation as an arbitrator and that, while he

[2] Transcript 14/8/12 p. 263 line 13 to p. 264 line 10.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

recognised that he remained a member of the Tribunal until such time as the Court might accept his resignation, he did not wish to participate in the remainder of the hearing. He therefore left the hearing.

58. After hearing submissions from the Claimants, and having deliberated, the remaining members of the Tribunal decided, in particular in the light of Article 12(5) of the Rules, that the hearing should proceed.

59. The Tribunal then proceeded to hear the evidence of Mr Theart and the following witnesses mentioned above.

60. Pending a decision by the Court on Mr Mutizwa's resignation as an arbitrator, and at his request, he continued to be provided with the transcripts of the proceedings, the Claimants' written closing submissions and all other documents supplied by the Claimants to the Tribunal.

61. In addition to the written and oral evidence adduced by the parties, the Tribunal also considered the parties' respective memorials and written opening submissions. Following the conclusion of the evidence, on 20 August 2012 the Claimants served written closing submissions and the Tribunal heard oral closing submissions from the Claimants.

62. At the Tribunal's request, the Claimants provided the Respondents with a copy of their written closing submissions and the transcript of the hearing on 20 August 2012.

63. The Respondents were invited by the Tribunal to respond to those submissions by 10 September 2012, without prejudice to their challenge to the Tribunal's jurisdiction and to the Tribunal itself, but they did not do so.

64. On 28 August 2012, the Claimants served an updated schedule of costs which took into account certain costs and expenses not included in the schedule of costs given to the Tribunal on 20 August 2012. On the same date, the Tribunal invited the Respondents to comment on the Claimants' updated schedule of costs. However, the Respondents did not do so.

65. On 27 September 2012, the Court decided:

(1) pursuant to Article 12(1) of the Rules to accept the resignation of Mr Mutizwa;

(2) pursuant to Article 11(3) of the Rules, to reject the challenges to Judge Joffe and Mr Isaacs QC;

(3) to invite the Respondents to nominate a co-arbitrator in replacement of Mr Mutizwa within 15 days from 28 September 2012.

66. The Respondents failed to nominate a co-arbitrator in replacement of Mr Mutizwa within that period, that is, by 12 October 2012.

67. On 15 October 2012, in proceedings brought against the Claimants, Mr Isaacs QC and Judge Joffe, the Respondents obtained *ex parte* from the Zambian High Court an order restraining Mr Isaacs QC and Judge Joffe from proceeding with the arbitration until further order.

68. On or about 7 November 2012, the Claimants applied *inter partes* to the Zambian High Court to discharge the *ex parte* order made on 15 October 2012.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

69. On 31 January 2013, pursuant to Article 12(4) of the Rules, the Court appointed directly as co-arbitrator on behalf of Respondents Mr Chikwendu Madumere of Madumere & Madumere, 79 Adetokumbo Ademola Crescent Suite 5B, Wuse II, Abuja, Nigeria (tel: +234-8033303677; email: cm@madumereandco.com).

70. On 10 March 2013, the newly constituted Tribunal, after inviting the parties' submissions, decided to stay the arbitration proceedings until whichever was the earlier of (a) two weeks after the judgment of the Zambian High Court was given on the Claimants' application to discharge the *ex parte* order and (b) 11 May 2013, at which time the Tribunal would review the position.

71. On 8 May 2013, the Tribunal, having noted with regret that the Zambian Court had yet to give judgment in respect of the Claimants' application to discharge the *ex parte* order, decided to extend the stay until whichever was the earlier of (a) two weeks after the judgment of the Zambian High Court was given on that application and (b) 11 July 2013, after which the Tribunal would review the position.

72. On 21 June 2013, Judge Joffe tendered his resignation as the co-arbitrator on the Claimants' behalf.

73. On 4 July 2013, the Court decided pursuant to Article 12(1) of the Rules to accept Judge Joffe's resignation.

74. On 11 July 2013, the stay of the proceedings came to an end, without the Zambian High Court having given judgment on the Claimants' application to discharge the *ex parte* order. At the time of this Final Award, the Zambian High Court has, so far as the Tribunal is aware, still not given judgment on the Claimants' application to discharge the *ex parte* order.

75. On 12 July 2013, pursuant to Article 9(2) of the Rules, the Secretary General confirmed Professor Douglas Jones of Clayton Utz, Level 15, 1 Bligh Street, Sydney NSW 2000, Australia (tel: +61 2 9353 4120; fax +61 2 8220 6700; email: *djones@claytonutz.com*) as co-arbitrator in replacement of Mr Joffe, upon the Claimants' joint nomination.

76. On 14 July 2013, the Respondents pursuant to Article 14(1) of the Rules challenged the appointment of Professor Jones.

77. On 25 July 2013, the Court decided pursuant to Article 11(3) of the Rules to reject the challenge to Professor Jones as co-arbitrator and also decided pursuant to Article 12(2) of the Rules not to initiate replacement proceedings against Mr Madumere.

78. On 27 July 2013, the Tribunal invited submissions from the parties on the future conduct of the proceedings.

79. On 24 August 2013, following consideration of written submissions from the parties contained in a letter dated 1 August 2013 sent on the Claimants' behalf and an email dated 29 July 2013 sent on the Respondents' behalf, the Tribunal informed the parties *inter alia* that:

(1) the arbitration proceedings would continue;

(2) its provisional view was that the proceedings should be conducted on the basis of the existing record of the proceedings at the August 2012 hearing and without the need for the oral evidence given at that hearing to be reheard but that it wished to have the benefit of further oral submissions from the parties' counsel, in particular so that those members of the Tribunal who were not present at the previous

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

hearing would have the opportunity to clarify directly with the parties any matters relating to the evidence given and legal submissions made and to afford the Respondents the opportunity to make submissions on the substance of the case;

(3) it required the Claimants to prepare a full hearing bundle for the hearing;

(4) it proposed to hold a hearing in London on 4 and 5 November 2013 and requested the parties to confirm their availability for that hearing and, if not convenient to them, to propose alternative dates/venue for the hearing.

The Tribunal requested the parties to provide their comments on its proposals by 2 September 2013.

80. By a letter dated 27 August 2013, the Respondents stated that they intended to take no part in the proceedings.

81. By a letter dated 28 August 2013, the Claimants confirmed their availability for a hearing in London on 4 and 5 November 2013 and that they would provide a full hearing bundle for the hearing to the Respondents, should they require it. On the same day, the Tribunal directed that the Claimants should provide a full hearing bundle to the Respondents in any event.

82. On 4 September 2013, the Tribunal gave directions in relation to the hearing in London on 4 and 5 November 2013. In particular, the Tribunal requested that, as the hearing, the parties should identify in their submissions the materials in the record of the previous hearing on the basis of which the Tribunal was being ask to determine the case; and update the Tribunal on matters since the August 2012 hearing and on any aspects of their respective cases which required to be updated.

83. On 30 October 2013, the Tribunal confirmed that it looked forward to meeting with the parties at the hearing fixed to start on 4 November 2013. The Claimants confirmed their participation in the proceedings; the Respondents confirmed that their position to the effect that they would be taking no part in the proceedings because they regarded them as a nullity remained unchanged.

84. The hearing of the arbitration took place on 4 November 2013 at the International Dispute Resolution Centre, 70 Fleet Street, London EC4Y 1EU. The Claimants were represented by Mr Lazarus SC and Mr Miller. Mr Nunn was also present. The Respondents did not appear and were not represented. The hearing was transcribed and a copy of the transcript was emailed to the Respondents by the Tribunal the same evening.

85. Following the hearing, and as directed by the Tribunal at the hearing, on 18 November 2013 the Claimants provided to the Tribunal and the Respondents their written submissions in response to queries from the Tribunal during the hearing and an updated summary of legal expenses.

86. On the same day, the Tribunal afforded the Respondents the opportunity by 3 December to respond to the materials provided by the Claimants. However, no response was received from the Respondents.

87. On 4 December 2013, pursuant to Article 22 of the Rules, the Tribunal declared the proceedings closed. On 12 December 2013, the Tribunal reopened the proceedings for the limited purpose of address the specific issue whether the Claimants, as they submitted in their letter of 12 December 2013, should be entitled to recover the

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

additional sum of US$45,000 in respect of the final tranche of the advance of costs which the Respondents had failed to pay and which the Claimants have paid in substitution; and requested the Respondents to provide any reply submissions by no later than midday Johannesburg time on 16 December 2013. No such submissions were received. On 16 December 2013, the Tribunal again declared the proceedings closed.

88. The time limit for rendering the Final Award is 28 February 2014, in accordance with the Court's decision on 12 September 2013 pursuant to Article 24(2) of the Rules to extend the time limit to that date.

## V. THE TRIBUNAL'S JURISDICTION

89. At all material times, the Respondents maintained that the Tribunal lacks jurisdiction to determine the dispute between the parties.

90. The grounds for the Respondents' submission that the Tribunal lacks substantive jurisdiction are that:

(1) The Nickel MOU lapsed on 31 December 2007 pursuant to Article 9 thereof and became of no force or effect; and the arbitration provisions in Article 11 thereof are an integral part of the Nickel MOU which also lapsed and consequently became of no force or effect.[3]

(2) The MOUs are invalid and tainted with illegality under the laws of Zimbabwe for non-compliance with the mandatory provisions of the Act which required that any agreement entered into by ZMDC must be approved by the Minister of Mines and Mining Development (**"the Minister"**). To give effect to the arbitration clause of an agreement tainted with illegality is to grant specific performance of the illegal agreement and it is contrary to the public policy of the Republic of Zimbabwe effectively to grant such specific performance.[4]

(3) Clause 5 of the Deed of Novation confers exclusive jurisdiction on the courts of England and Wales in respect of disputes or claims arising out of or in connection with the subject matter of the Deed of Novation.[5]

91. For the reasons set out below in Section VI, which deals with liability, and for those given at the time of the previous hearing,[6] the Tribunal rejects the Respondents' submission and determines that it has substantive jurisdiction to determine the present dispute.

## VI. LIABILITY

92. The Respondents disputed liability under the MOUs on seven grounds:

(1) the Claimants are not shareholders in Zimari Nickel and Zimari Platinum;

(2) the absence of ZMDC board approval for the conclusion of the MOUs;

---

[3] Amended Answer §9.

[4] *Ibid.*, §10.

[5] Transcript 13/8/12 p. 30 line 14 to p. 31 line 16.

[6] *Ibid.*, p.38 line 12 to p. 39 line 5.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

(3) the absence of ministerial approval for the conclusion of the MOUs;

(4) the failure to comply with the condition precedent in Article 9 of the Nickel MOU;

(5) illegality;

(6) the absence of any joint venture agreement;

(7) the MOUs were validly cancelled.

93. The Claimants submitted that the MOUs remain valid and binding.[7] Alternatively, they submitted that the Respondents have waived any right that they might otherwise have had or else are estopped from contending that the MOUs are not valid and binding as, with knowledge of the purported invalidities on which they now rely, they gave effect to and implemented the MOUs in various respects.[8]

94. It is convenient to consider each of those grounds in turn.

**1. The Claimants are not shareholders in Zimari Nickel and Zimari Platinum**

95. At the outset, it is necessary to determine whether the Claimants are shareholders in Zimari Nickel and Zimari Platinum since the Respondents disputed that they are.

96. The Claimants rely on the respective share certificates and the share register documentation as establishing their respective shareholdings. They point to the fact that two of the four active directors of Zimari Platinum were appointed by Amaplat; and that three of the five active directors of Zimari Nickel were appointed by Amari. They rely on the evidence of Ms Mutasa, who describes in detail in her statement how the Claimants came to acquire their respective shareholdings in Zimari Nickel and Zimari Platinum. In particular, she describes why all the documents relating to those companies of which the authenticity is challenged by the Respondents are in fact authentic. The also rely on the evidence of Ms Hwindizi.

97. The Respondents' submission, set out in paragraph 33 of the Amended Answer, is that no allotment of shares was ever made and that, in consequence, only the initial subscribers hold shares. The basis for that submission is to be found in affidavits dated 21 January 2011 and 3 February 2011 of Tinashe Collins Chiparo, ZMDC's company secretary and legal advisor, which were served on behalf of the Respondents. Although, for the reason already mentioned, those affidavits were not in evidence before the Tribunal, Mr Chiparo deposes to the fact that he was advised by JSM that there never was any allotment of shares and that the only registered shareholders are the initial subscribers. He alleges that the register of allotments for the two companies and the information recorded in them and the relevant share certificates are fabricated. The Respondents submitted that without the production of public documents bearing the seal of the Registrar of Companies the Claimants cannot establish their status as shareholders and that their claims must therefore fail.

98. When the Respondents' allegations were put to Ms Mutasa in her oral evidence in chief, she took issue with them. She stated that the share certificates were issued in the

[7] Reply §15.

[8] *Ibid.*, §4, 5 and 16.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

Claimants' favour and in ZMDC's favour were issued "*in line with the Zimbabwean Investment Licences that were presented to us*"[9] and denied that the share register was the product of any fraudulent conspiracy between the Amari Group and JSM, stating that "*we simply prepared the share registers at each point that the share register had to be updated ... so we didn't like prepare it in retrospect, we prepared it as we prepared returns that had to be submitted to the Registrar of Companies*".[10] Her evidence to the above effect was maintained in cross-examination.

99. In her witness statement, Ms Hwindizi states that she told Mr Chiparo that the Claimants had not been allotted shares in Zimari Nickel and Zimari Platinum because the shares had been *transferred* to them (and to ZMDC). She denied having ever advised him that the initial subscribers were the only, or remaining shareholders in those companies. She also confirmed the authenticity of all the documents relating to them. In her oral evidence in chief, she elaborated on the circumstances of Mr Chiparo's inspection of the companies' files which were under her custody and control. She confirmed that, contrary to Mr Chiparo's position, the documents were not missing from the companies' files at the time of the inspection and only subsequently created.[11] She repeated that evidence in cross-examination.[12]

**Tribunal's discussion and conclusion**

100. Based on the evidence of Ms Mutasa and Ms Hwindizi, which the Tribunal accepts, the Tribunal finds by a majority that the share certificates and the share registration documentation adduced on the Claimants' behalf are authentic and establish the Claimants' respective shareholdings in Zimari Nickel and Zimari Platinum respectively. The evidence contradicts the Respondents' position that only the initial subscribers for the shares in those companies hold shares.

101. There is no basis for the Respondents' submission that the documentation was fabricated – a most serious allegation which would place JSM as a co-conspirator with the Claimants in an attempt to mislead the Tribunal. In the light of the evidence, the Tribunal has no hesitation in rejecting it. The submission is based on Mr Chiparo's position that the documentation in question must have been created after the event since it was not to be found when he inspected the companies' files. However, the Tribunal accepts the evidence that the documentation was in the companies' files at the time of his inspection and so finds. Therefore, there is no factual basis for the Respondents' submission.

102. The Tribunal also rejects the Respondents' submission that the Claimants' status as shareholders cannot be established without the production of public documents bearing the seal of the Registrar of Companies. No authority was put forward in support of that submission and the available evidence referred to above is, in the Tribunal's view, conclusive.

103. However, a minority of the Tribunal does not accept Ms Mutasa's and Ms Hwindizi's evidence as establishing that the share certificates tendered before the Tribunal are indeed those of the two companies or that the requirements of the Zimbabwe Companies Act relating to the issue of share certificates have been fulfilled. The minority therefore considers that the Claimants have not, on the evidence, proved their respective shareholdings in Zimari Nickel and Zimari Platinum.

---

[9] Transcript 13/8/12 p. 150 lines 8-11.

[10] Transcript 13/8/12 p. 150 line 12 to p. 151 line 1.

[11] *Ibid.*, p. 173 line 2 to p. 176 line 24.

[12] *Ibid.*, p. 184 line 2 to p. 185 line 20; p.194 lines 17-25.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

104. The Tribunal therefore concludes by a majority that Amari holds 55% of the shares in Zimari Nickel; and that Amaplat holds 50% of the shares in Zimari Platinum.

**2. Absence of ZMDC board approval for the conclusion of the MOUs**

105. The Respondents submitted that the ZMDC board did not approve the conclusion of the MOUs. The basis for that submission is to be found in Mr Chiparo's affidavit dated 21 January 2011, where he deposes that he did not find amongst the board minutes for the years 2006 to 2010 any board resolution authorising the signing of the MOUs.

106. However, the Claimants rely on the minutes of the relevant ZMDC board meetings produced by them and the evidence of Mr Mubayiwa and Mr Muhonde to demonstrate that board approval was given for the conclusion by ZMDC of the MOUs.

107. On 1 November 2007, the ZMDC board resolved to conclude the Nickel MOU. The minutes of the board meeting on that date, at which Mr Mubayiwa was present and Mr Muhonde was in attendance, record a discussion about the Nickel MOU which concluded in a resolution:

> "*THAT the MOU be and is hereby approved subject to management renegotiating the shareholding structure giving ZMDC a minimum of 40% and a maximum of 50%*"

It is common ground that ZMDC did acquire a 45% shareholding.

108. On 25 July 2008, the ZMDC board resolved, at an extraordinary meeting called for the purpose, to conclude the Platinum MOU. The minutes of the board meeting on that date, at which again Mr Mubayiwa was present and Mr Muhonde was in attendance, record a discussion about the Platinum MOU after which the board resolved that:

> "*1. ... authority for ZMDC to enter into a Platinum Joint Venture Agreement with Amaplat be and is hereby granted.*
>
> *2. The Chief Executive Officer, Mr. Dominic L. Mubayiwa be and is hereby authorized to negotiate, conclude and sign the said Joint Venture Agreement.*
> "

109. In this context, on 15 May 2012 the Tribunal *inter alia* ordered the production by ZMDC of all agendas and minutes of ZMDC's board meetings between 1 January 2006 and 31 December 2010. On 21 June 2012, the Tribunal confirmed its previous order, except in relation to the board minutes already exhibited to Mr Muhonda's statement. On 27 June 2012, the Respondents stated that there were no further minutes capable of being produced pursuant to the Tribunal's order.

110. Mr Mubayiwa was the person responsible at ZMDC for overseeing all of its joint ventures. As the minutes show, he attended the relevant board meetings. In his first witness statement, Mr Mubayiwa states that, following the grant of ministerial approval:

> "*15. ... the board resolved to conclude the Nickel MOU ... and authorised me to execute the Nickel MOU on its* ZMDC's] *behalf.*
>
> *16. I signed the Nickel MOU on 22 November 2007 and Nunn signed the MOU on behalf of Amari Holdings Limited on the same date.*
>
> *17. The approval required by the board of the ZMDC as contemplated in article 9.1.1 of the Nickel MOU was obtained prior to 31 December 2007.*
>
> *18. The ZMDC board approved the Platinum MOU in the same manner as it approved the Nickel MOU. The following occurred:*

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

...

> 18.5 *After having received the Minister's approval as required by law, the ZMDC board resolved to conclude the Platinum MOU and authorised me to do so on behalf of the ZMDC.*
>
> 19. *On 25 July 2008 I signed the Platinum MOU on behalf of the ZMDC and Nunn signed this agreement on behalf of Amaplat... .*"

111. In his oral evidence, Mr Mubayiwa confirmed that evidence.[13]

112. Mr Muhonde was also in attendance at the relevant board meetings. In his witness statement, he refers to the fact that, like Mr Muhonda, he was sent on forced leave from ZMDC in July 2010 and subsequently had the laptop belonging to ZMDC which he had used while working there removed from his home by a security officer. He says that when the laptop was returned to him, the contents of the hard drive had been wiped but that he had previously backed up its contents to an external hard drive which he had at home. It was from that external hard drive that he was able to produce copies of the agenda for the ZMDC board meeting on 25 July 2008 and the minutes of the ZMDC board meetings that were in evidence before the Tribunal, together with other documents sent to or by him or on which he had worked.

113. Mr Muhonde substantially corroborated Mr Mubayiwa's evidence. In particular, with regard to paragraphs 5 and 6 of the minutes of the 1 November 2007 board meeting concerning the Nickel MOU, he says in his witness statement:

> "22. *... The ZMDC board expressed their reservations regarding Morgan Hill obtaining a stake in the venture, which did not appear appropriate to the ZMDC board. The ZMDC board approved the conclusion of the MOU subject to management renegotiating the shareholding structure in terms of which the ZMDC obtained a minimum of 40% shareholding and a maximum 45% shareholding in the joint venture entity.*
>
> 23. *Subsequent to this meeting, Mubayiwa told me that the ZMDC's shareholding had to be 45%.*
>
> 24. *I made the changes to the draft MOU presented to the board. I removed the references to Morgan Hill and changed the shareholding that ZMDC was to receive to 45%, with Amari to receive the remaining 55%.*
>
> 25. *I wrote a letter to Cockhead* [Amari's in-house legal representative] *in which I informed her of the outcome of the ZMDC board meeting on 1 November 2007.*"

114. With regard to the 25 July 2008 board meeting concerning the Platinum MOU, Mr Muhone produced with his witness statement the agenda for the meeting and the minutes of it which he took. His evidence, in paragraph 35 of his witness statement, is that, as set out in the minutes, the board resolved to approve the conclusion of the Platinum MOU and authorised Mr Mubayiwa to conclude it on ZMDC's behalf.

115. Mr Muhone confirmed and elaborated on that evidence in his oral evidence. In particular, he described the process for minute taking; the procedure once board minutes were

[13] Transcript 14/8/11 p. 312 line 6 to p. 313 line 11.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
19th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

signed, which included the pasting of a copy of the signed minutes into the minute book, which was left behind by him at ZMDC when he was suspended from his employment; and the documents stored on and deleted from his laptop and the back up on his external hard drive. In particular, he confirmed that he printed the minutes of the relevant board meetings from his back up and was satisfied that they were an accurate record of what took place at those meetings. [14]

116. There is other evidence, for example in Mr Summers' and Mr Muhonde's evidence, that the ZMDC board approved the conclusion of the MOUs. By way of illustration, the Nickel MOU was referred to in a number of subsequent board meetings on 22 November 2007, 7 March 2008, 13 June 2008 and 11 September 2008. Also, the ZMDC board meeting at which the Platinum MOU was approved was followed by a signing ceremony and lunch at which the board and representatives of the Amari Group were present.

**Tribunal's discussion and conclusion**

117. The Tribunal finds Mr Mubayiwa's and Mr Muhonde's evidence compelling and accepts it.

118. The Tribunal prefers that evidence over Mr Chiparo's position that no board minutes authorising the conclusion of the MOUs existed because none could be found in the Ministry's records. Having wiped Mr Muhonde's laptop and having taken the position in these proceedings that there was no relevant documentation to be produced, the Respondents did not anticipate that Mr Muhonde would have been able to print copies of the relevant documentation from the documents backed up on his external hard drive.

119. There is no reason to conclude that Mr Mubayiwa and Mr Muhonde were not telling the truth and they are to be commended for having done so in the circumstances of this case. Their evidence is consistent with ZMDC's conduct following the conclusion of the MOUs referred to above, which is documented and the evidence about which the Tribunal accepts.

120. The Tribunal also cannot ignore that Mr Chiparo's evidence in the Zimbabwe High Court Proceedings involved repeated and, in the Tribunal's view, unconvincing denials of the existence of documents which plainly do exist and challenges to the authenticity of documentation, the existence of which the Respondents are unable to deny.

121. Therefore, the Tribunal finds that ZMDC board approval for the MOUs was given.

122. It is unnecessary for the Tribunal to rest its conclusion on any adverse inference from the Respondents' failure to produce the originals of the relevant board minutes. The Tribunal is satisfied on the materials which are before it that ZMDC board approval was given.

123. In the light of the Tribunal's finding that ZMDC board approval was given, it is also unnecessary to consider the Claimants' alternative arguments based on estoppel and waiver.

**3. Absence of ministerial approval for the conclusion of the MOUs**

124. Section 22 of the Act provides that "*Subject to this Act, the Corporation shall, for the better exercise of its functions, have power to do or cause to be done, either by itself or through its agents, all or any of the things specified in the Schedule, either absolutely or conditionally and either solely or jointly with others.*" The Schedule to the Act sets out ZMDC's powers and identifies which of those powers require the approval of the Minister. The Schedule confers on ZMDC power *inter alia*:

[14] *Ibid.*, p. 274 line 9 *et seq.*

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

> "20. *With the approval of the Minister, to promote, establish or acquire companies or other undertakings and, in connexion with any such company or other undertaking-*
>
> (a) *to manage it and act as secretary thereof;*
>
> (b) *to appoint any person to act on behalf of the Corporation as a director thereof or in any other capacity in relation thereto.*
>
> 21. *With the approval of the Minister, to acquire an interest in, to provide any underwriting or otherwise to assist in the subscription of capital or to guarantee the obligations of a company, whether promoted by the Corporation or otherwise, engaged in or proposing to establish, expand or modernise any undertaking relating to the production, refining, smelting or processing of minerals.*"

125. The Respondents submitted that there was no ministerial approval for the conclusion by ZMDC of the MOUs. In paragraph 27 of the Amended Answer, it is stated that ZMDC "*has had occasion to enquire from the Minister of Mines and Mining Development whether he, at any time, approved the acquisition of shares in the Respondent companies by the Corporation. The Corporation has established that no such approval was given by the Minister. Written confirmation of this fact, from the Minister of Mines, will be furnished*". The Respondents submitted that ZMDC lacked the capacity to enter into the MOUs, which are accordingly null and void; and that the MOUs are tainted with illegality and the Claimants cannot seek specific performance thereof.[15]

126. The basis for the Respondents' submission is to be found in an affidavit dated 31 January 2011 of Mr Chiparo which again, for the reason already mentioned, was not in evidence before the Tribunal, and his affidavit dated 3 February 2011. They disclose that the basis for the Respondents' submission is a letter received from the Minister confirming that the MOUs were not approved.

127. The Claimants submitted that the Minister's approval was obtained; and that the Respondents are in any event estopped from contending that such approval was not obtained.[16] The Claimants did not pursue at the hearing on 4 November 2013 an argument which they originally advanced in paragraphs 75 and 76 of their written closing submissions that the Minister's approval was not required and were prepared to proceed on the assumption that such approval was required.[17]

128. The Claimants rely on the evidence of Mr Mubayiwa to demonstrate that shareholder approval was given for the conclusion by ZMDC of the MOUs.

129. In his first witness statement, Mr Mubayiwa states:

> "14. *In accordance with the standard procedures followed at the ZMDC relating to the conclusion of joint venture agreements which I outlined previously, the board authorised Caroline Sandura ('Sandura'), the Chairperson of the ZMDC, to seek permission of the Minister of Mines and Mining Development, Amos Midzi at that time, for the ZMDC to conclude the Nickel MOU and hence for the ZMDC to acquire shares in the intended joint venture company.*

[15] Reply §25 to 28.

[16] *Ibid.*, §12 to 14.

[17] Transcript 4/11/13 p. 37 lines 11-17.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

> *15. The Minister granted the ZMDC the required approval. I was informed of this decision in a letter from the Minister. This letter was sent to me by Thabani Ndlovu ('Ndlovu'), the then Permanent Secretary in the Ministry of Mines and Mining Development on behalf of the Minister. ...*
>
> ...
>
> *18. The ZMDC board approved the Platinum MOU in the same manner as it approved the Nickel MOU. The following occurred:*
>
> ...
>
> *18.3 The ZMDC board authorised Sandura to seek the approval of the Minister to conclude the Platinum MOU and hence to acquire shares in the intended joint venture vehicle.*
>
> *18.4 The Minister granted the ZMDC the required approval. I was informed of this decision in a letter from the Minister. This letter was sent to me by Ndlovu, the then Permanent Secretary in the Ministry of Mines and Mining Development... ."*

130. In his oral evidence, Mr Mubayiwa confirmed that evidence.[18]

131. Mr Muhonde substantially corroborated Mr Mutayiwa's evidence.

132. The Claimants also rely in this context on Mr Ndlovu's evidence. In paragraph 3 of his affidavit in the Zimbabwe High Court proceedings, he states in terms that Mr Midzi "*approved in his official capacity the two MOUs in terms of the law and instructed me to communicate the approvals in writing to ZMDC, which I did and such written communication is in the relevant files at the Ministry*". He therefore expresses surprise at the statement in a letter dated 28 January 2011 from the Acting Secretary of Mines that no record had been found in the Ministry of Mines and Mining Development of any such approvals and that consequently the Ministry's view was that such approval was never granted. According to Mr Ndlovu, "*at the time I left the Ministry, the approvals were certainly in the ZMDC file. I would expect these files to be still at the Ministry. If nothing unprocedural and irregular happened to those files they should certainly be at the Ministry. Be that as it may, I do confirm again that the then Minister approved the MOUs in terms of the law and accordingly the conclusion reached by the acting Permanent Secretary is actually incorrect. I confirm also that the written approvals were sent to ZMDC's Chief Executive Officer, Mr Dominic Mubawiya at the relevant time and he did receive them*".

133. In his oral evidence, Mr Ndlovu stated, in relation to the Nickel MOU, that:

> "*The Minister told me to write a letter to the ZMDC and I wrote a letter to the effect that the Minister had approved the MOU for the joint venture between ZMDC and Amari, and I did that and sent the letter to ZMDC and then gave a copy to the Minister and kept another copy in my office ... in the file that was marked ZMDC Correspondence. ... What I wrote in the letter was to the effect that in terms of the ZMDC Charter* [the Act], *the Minister had approved of the joint venture between ZMDC and Amari. And therefore they could proceed and put all the processes in place.*"[19]

---

[18] Transcript 14/8/12 p. 312 line 6 to p. 313 line 11.

[19] Transcript 13/8/12 p. 112 line 9 to p. 114 line 15.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

He further stated that the same was done in relation to the Platinum MOU.[20] In cross-examination, he also referred to an affidavit by Mr Mutzi made in the Zimbabwe High Court Proceedings, of which a copy was in the hearing bundles in the present proceedings, in which Mr Mutzi himself expressly confirmed that he approved the MOUs.

**Tribunal's discussion and conclusion**

134. The Tribunal again finds the evidence of Mr Mubayiwa and Mr Muhonde and that of Mr Ndlovu compelling and accepts it.

135. The Tribunal prefers that evidence over Mr Chiparo's position which, in the light of the other evidence, is not credible. The Tribunal is unable to accept that the documentation relating to the grant of ministerial approval for the MOUs is not, or was not at one time, retained at the Ministry.

136. The Respondents sought to rely on the fact that the Claimants have adduced no evidence from Mr Mitzi that he authorised the conclusion of the MOUs. It is perhaps unsurprising that Mr Mitzi did not give evidence before the Tribunal on the Claimants' behalf but it does not follow that, in his absence and that of Ms Sandura as witnesses, the Claimants are incapable of establishing that ministerial approval was given on the basis of the evidence referred to above.

137. The Respondents submitted that the evidence relied on by the Claimants was inadmissible hearsay in terms of the Zimbabwean Civil Evidence Act (**"the CEA"**). Section 27 is concerned with first hand hearsay evidence. Under section 27(1) of the CEA, subject to the provisions of the section evidence of a statement made by any person, whether orally or in writing or otherwise, is admissible in civil proceedings as evidence of any fact mentioned in the statement if direct oral evidence by that person of any fact would be admissible in those proceedings. Under section 27(3)(a) of the CEA, if such a statement is not contained in a document, no evidence of it is admissible unless given by a person who saw, heard or otherwise perceived the statement being made; under section 27(3)(b), if such a statement is contained in a document, no evidence of it is admissible except the document itself, or a copy of the document if such copy is itself admissible. Under section 27(4) of the CEA, in estimating the weight, if any, to be given to evidence of such a statement, the court must have regard to all the circumstances affecting its accuracy and, in particular, to whether or not the statement was made at a time when the facts contained in it were or may reasonably be supposed to have been fresh in the mind of the person who made the statement and whether or not that person had any incentive or might have been affected by the circumstances, to conceal or misrepresent any fact. Under section 27(5) of the CEA, the section is not to be construed as limiting any provision of the CEA or any other law providing for the admissibility of statements made by persons who are not called as witnesses to testify to such statements.

138. Assuming for present purposes in the Respondents' favour that the CEA has any application to the present arbitration proceedings, the Tribunal is satisfied that the evidence relied on by the Claimants is admissible under section 27 of the CEA. Mr Ndlovu is a person who heard Mr Midzi approve the MOUs and instruct Mr Ndlovu to communicate those approvals in writing to ZMDC. Section 27(3)(a) of the CEA therefore applies. Mr Ndlovu's evidence that he did comply with the Minister's instructions by writing to the ZMDC in the terms stated and that the letters were in the ZMDC file at the Ministry at the time he left is direct evidence by Mr Ndlovu and not therefore evidence to which section 27 of the CEA applies at all. The same is true in respect of Mr Mubayiwa's evidence that he received the letters from Mr Ndlovu.

---

[20] *Ibid.*, p. 114 line 16 to p. 114 line 13.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

139. The Tribunal is also satisfied that full weight should be attributed to the hearsay evidence of Mr Ndlovu. There is no reason to doubt its accuracy. In particular, applying the considerations expressly referred to in section 27(4) of the CEA, the statement was plainly made at a time when the facts contained in it were fresh in the Minister's mind and the Minister had no incentive or other reason to conceal or misrepresent any fact. Mr Ndlovu was, as the permanent secretary, the person whose job it was to communicate with third parties on the Minister's behalf. Also, Mr Midzi had, in earlier proceedings in the Zimbabwe High Court, made an affidavit in which he had expressly confirmed that he authorised the conclusion of the MOUs.

140. The Tribunal must, however, express its view that the CEA has no application to the present arbitration proceedings. Under section 2(1) of the CEA itself, "*civil proceedings*" are defined to mean "*proceedings which are not criminal in nature and which are before the Supreme Court, the High Court, a magistrates court or any other court to which the strict rules of evidence apply*". The definition of civil proceedings therefore does not include the present arbitration proceedings. Also, section 27(4) of the CEA is concerned with the weight to be afforded by the "*court*" to hearsay evidence falling within section 27(1). Although the expression "*court*" is defined in section 2(1) of the CEA to include a tribunal, on the proper construction of those provisions the Tribunal considers that the expression "*tribunal*" does not extend to an arbitral tribunal, in particular one dealing with an international commercial arbitration such as the present arbitration. Further, even if, contrary to that view, the Tribunal were a "*court*", it would not be one to which the strict rules of evidence apply, for the reason mentioned next.

141. In accordance with paragraph 5 of Procedural Order 1, the Tribunal adopted the IBA Rules on the Taking of Evidence in International Commercial Arbitration 2010 (**"the IBA Rules"**) as general guidelines in this arbitration. Under Article 9(1) of the IBA Rules, it is for the Tribunal to determine *inter alia* the admissibility and weight of evidence, unconstrained by the procedures which may govern domestic litigation in any jurisdiction. Also, paragraph 7.10 of the Terms of Reference provides *inter alia* that where the Rules are silent, the applicable procedural rules to be followed in these proceedings shall be such rules as may be agreed on from time to time by and between the Tribunal and the parties and, failing such agreement, as may be determined by the Tribunal. It follows from those provisions that the strict rules of evidence and the CEA do not apply to the present proceedings.

142. In short, whether in application of the CEA or by virtue of its own powers under the IBA Rules and pursuant to the Terms of Reference, the Tribunal determines that the hearsay evidence relied on by the Claimants is admissible in these proceedings and that full weight should be given to it.

143. Therefore, the Tribunal finds that the Minister's approval for the MOUs was given.

144. It is unnecessary for the Tribunal to rest its conclusion on any adverse inference from the absence of the letters written by Mr Ndlovu on the Minister's instructions. The Tribunal is satisfied on the materials which are before it that ministerial approval was given.

145. In the light of the Tribunal's finding that ministerial approval was given, it is also unnecessary to consider the Claimants' alternative arguments based on estoppel and waiver.

**4. Failure to comply with the condition precedent in Article 9 of the Nickel MOU**

146. The Nickel MOU provided *inter alia*:

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

> "*8. DATE OF COMMENCEMENT AND DURATION*
> *This MOU shall commence on the Effective Date and supercedes* [sic] *any other prior documents relating to the matters specified herein and shall, subject to the provisions of this MOU:*
>
> *8.1 be binding on the Parties upon signature hereof by each of the Parties; and*
>
> *8.2 be superseded by comprehensive subscription and shareholder/joint venture agreements which shall incorporate the terms and conditions contained herein.*
>
> *9. CONDITION PRECEDENT*
>
> *9.1 This MOU excluding 9 and 11, is subject to fulfilment or waiver of the following condition precedent;*
>
> *9.1.1 the Parties obtaining necessary board and/or shareholder approval to this MOU.*
>
> *9.2 The parties shall use their best endeavours to fulfil or waive the above conditions precedent on or before 31 December 2007 in full, or such later date as the Parties may agree in writing, failing which the MOU will lapse and be of no force and effect and no Party shall have a claim against the other as a result of the failure of such condition precedent.*"

147. The Respondents submitted, in reliance on Mr Chiparo's affidavit evidence given in the Zimbabwe High Court proceedings, that the condition precedent in Article 9 was not fulfilled since the necessary board and shareholder written approval on or before 31 December 2007 was not secured for it. Consequently, the Effective Date of the Nickel MOU never arose and the Nickel MOU never became operative or else lapsed after that date.[21] By Article 1 of the Nickel MOU, the "*Effective Date*" was defined to mean "*3 business days after fulfilment or waiver of the condition precedent as contemplated in 9*".

148. The Respondents also submitted that the Deed of Novation did not change that position since it purported to supplement the Nickel MOU which, at the time the Deed of Novation was executed, had already lapsed or become void.

149. The Claimants submitted that the necessary board and shareholder approval was secured in respect of the Nickel MOU. Alternatively, ZMDC is estopped from relying on any failure to secure such approval as a result of its failure to use its best endeavours to procure it;[22] and the Respondents have waived any right that they may otherwise have had or else are estopped from contending that such approval was not obtained.[23] Also, the Deed of Novation constituted an express or implied renewal of the Nickel MOU such that a new agreement on identical terms to the Nickel MOU (as supplemented by the Deed of Novation) came into existence.[24]

---

[21] Amended Answer §11 to 16.

[22] Reply §8.

[23] *Ibid.*, §9 and 10.

[24] *Ibid.*, §11.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

150. As the Tribunal has already concluded, the necessary board and shareholder approval to the Nickel MOU was given.

151. It is, in those circumstances, unnecessary to consider the Claimants' alternative arguments based on estoppel, waiver and the Deed of Novation.

**5. Illegality**

152. The Respondents submitted that ZMDC was entitled to repudiate the MOUs on the ground of illegality since they were procured by reason of a corrupt relationship between its General Manager and the Claimants. They submitted that this position is not saved in respect of the Nickel MOU by the Deed of Novation.[25]

153. The allegation of corruption, of which the burden of proof rests on the Respondents, is based on email correspondence between Mr Ralph and Mr Mubayiwa and concerns the purchase and transportation for Mr Mubayiwa by Amari Services of a quantity of Italian tiles and toys for his children prior to Mr Mubayiwa signing the Platinum MOU on ZMDC's behalf, without the knowledge or approval of the ZMDC board or the Minister. The Respondents allege that Mr Mubayiwa has since been dismissed from his post following a disciplinary proceedings at which he was found guilty of misconduct. Mr Mubayiwa gave written and oral evidence about his suspension and the disciplinary proceedings. In relation to the latter, his evidence is that following a successful application by him to the Labour Court in Zimbabwe for a review of the disciplinary proceedings on the grounds of substantive irregularity, which was not opposed by ZMDC, he was ordered to be reinstated but that the Labour Court's decision was being appealed by ZMDC.

154. The Claimants submitted that there was no corrupt relationship between ZMDC's General Manager and the Claimants which entitled ZMDC to repudiate the MOUs.[26] They rely on the facts that they were not a party to and were unaware at the time of the assistance given by Mr Nunn (through Amari Services) to Mr Mubayiwa; that such assistance was in any event entirely proper and not attributable to the Claimants; that it played no role in the conclusion of the MOUs; and that the decisions by ZMDC to conclude the MOUs were taken by its board and shareholders and not by Mr Mubiyiwa.

155. Mr Mubayiwa wholeheartedly refuted the allegation that there existed any corrupt relationship between him and either the Amari Group or Mr Nunn, which Mr Mubayiwa considered was being made in bad faith against him. In view of the seriousness of the allegation, it is important to set out in some detail Mr Mubayiwa's answer to it.

156. In relation to the tiles, Mr Mubayiwa's evidence in his first witness statement is that:

> "*37.1 With a board approved loan from the ZMDC, I was building a new house in Zimbabwe. The loan was approved because it was thought that it would be more appropriate for the CEO of the ZMDC to live in a better area than the area in which I was previously living.*
>
> *37.2 I needed to purchase tiles for my new house and could not find tiles that I liked in Zimbabwe. As I was travelling frequently to South Africa, I thought I would look for tiles in South Africa.*

[25] Amended Answer §17 to 24 and 35.

[26] Reply §19 and 20.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

*37.3* *Whilst I was on a business trip to Johannesburg in May 2008, I told Nunn that I wanted to look for tiles for my house. Nunn said I could phone Rhys Ralph, his personal assistant, to drive me around to look for the tiles.*

*37.4* *I contacted Ralph and made arrangements to meet him.*

*37.5* *I met up with Ralph and we went to Union Tiles and to CTM. I could not find tiles that I liked at either of these places. Ralph then telephoned his mother to ask for suggestions of other places to source tiles. She suggested Italtile, where I found Fabian Bianco tiles that I liked.*

*37.6* *I was unable to purchase the tiles there and then. I only had with me US$9000 and a relatively small amount of South African Rands. I was under time pressure to get to the airport and did not have time to exchange these dollars for rands. Furthermore, Italtile could not tell me whether they had stock of the 200 square meters I required. They said that they would have to try and source these tiles from their other stores. The price that I would have to pay would obviously depend on the quantity of tiles* [that] *were available. Italtile said that they would contact Ralph and tell him whether they could successfully source the tiles.*

*37.7* *Before I left Johannesburg, I explained to Nunn what had happened at Italtile. I gave him the US$9000 to cover the cost of the tiles and the R25 000.00 that he had advanced to me.*

*37.8* *Ralph later informed me that Italtile had sourced the quantity of tiles that I wanted.*

*37.9* *Nunn said to me not to worry about the transport of the tiles because he was sending a container to Zimbabwe in any event.*

*37.10* *The price of the tiles was R41 819.05 from Italtile.* "

157. In relation to the toys for his children, his evidence in his first witness statement is that:

"*38.1* *After I had found the tiles and subsequent to meeting with Nunn, I was being taken to the airport by Ralph. I wanted to purchase a present for my daughter and Ralph took me to a doll shop where I bought a doll for my daughter. The doll was called Dindy and it came with a birth certificate. I paid for the doll with Rands that I had on me.*"

158. Mr Mubayiwa expanded on that evidence in his oral evidence, during which he explained the contents of his email exchanges with Mr Ralph from which the Respondents' allegation of corruption derives.[27] In answer to questions from the Tribunal, it was highlighted to Mr Mubayiwa that he appears to have slightly overpaid Mr Nunn by handing him US$9,000 but Mr Mubiyawa was untroubled, first because their relationship was based on trust and, second, because he had made provision in his own mind for there being a cost involved in the transportation of the tiles to Zimbabwe.[28]

[27] Transcript 14/8/12 p. 314 line 10 to p. 323 line 23.

[28] *Ibid.*, p. 323 line 25 to p. 326 line 12.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

159. Mr Mubayiwa's evidence, in so far as it related to Mr Ralph, was confirmed by Mr Ralph in his witness statement and in his oral evidence.[29]

160. Mr Mubayiwa, in paragraph 39 of his first statement, drew attention to the fact that at the time of his purchases, the Nickel MOU had long been signed and that the only outstanding matter in respect of the Platinum MOU was the grant of ministerial approval.

161. In paragraphs 5 and 6 of his witness statement and in his oral evidence,[30] Mr Nunn confirms that he had instructed Mr Ralph to assist Mr Mubayiwa in the purchase of the tiles. He says that it was Amari Services which provided this assistance; that the Amari Group, of which Amari Services was not at the time a part, was unaware of the assistance; that the assistance was unconnected with the conclusion of the MOUs; and that the Nickel MOU had long been concluded by the time the assistance was given. His understanding at the time was that the ZMDC board had already approved the conclusion of the Platinum MOU and that only the formal ministerial approval was awaited.

162. Mr Summers gave oral evidence in chief about Italtile's quotation dated 28 May 2008 for the tiles in the sum of ZAR 41,819.05 addressed to Mr Ralph to which Mr Summers and Mr Nunn has affixed their signatures and about the extract from Amari Services' ledger relating to the purchase of the tiles. When asked how their signatures came to be on the quotation, Mr Summers said that the approval process for all payments required both signatures. A discussion took place between them in which Mr Nunn indicated that the company was assisting Mr Mubayiwa with the purchase and transport of the tiles and that he, Mr Nunn, would take care of the arrangements for paying for the tiles and for obtaining repayment from Mr Mubayiwa. Following their approval of the payment, Mr Summers gave the quotation to his bookkeeper to do the electronic payment to Italtiles, which was done on 30 May 2008. The copy of the electronic payment transfer before the Tribunal included a manuscript annotation made on 30 May 2008 by Mr Summers asking Mr Nunn "*Mike, how do I account for this?*" and a manuscript response the following week by Mr Nunn stating "*I will get cash from him* [Mr Mubayiwa] *(or debit my L/A* [loan account] *in interim).*" A few days later, Mr Nunn gave Mr Summers the sum of US$9,000 which Mr Nunn had received from Mr Mubayiwa. That sum is the equivalent of ZAR 69,210 at the then prevailing exchange rate, which is the amount shown in the entry dated 5 June 2008 under the description "*Goods Received Voucher*" in the Amari Services' ledger. Against the ledger entry is a manuscript annotation showing the exchange rate, which Mr Summers said was made in October 2010 when he was asked by the Claimants' attorneys to prove the receipt of the US$9,000.[31]

163. The Respondents appeared to take the view that the Amari Services' ledger was capable of "*manipulation and creation*"[32] but it was not alleged or put to Mr Summers in cross-examination that the ledger was not an authentic record of the transactions shown on the relevant extract and, in particular, the entry pertaining to the US$9,000.

164. In cross-examination, Mr Summers denied that there was anything improper in providing Mr Mubayiwa with assistance in the purchase of the tiles since Mr Mubayiwa was going to repay the monies advanced. He also denied that there was anything improper about

---

[29] *Ibid.*, p. 349 line 8 to p. 352 line 2.

[30] *Ibid.*, p. 334 line 5 *et seq.*

[31] *Ibid.*, p. 216 line 12 to p. 219 line 3.

[32] *Ibid.*, p. 251 line 25 to p. 252 line 9.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

the tiles being transported to Zimbabwe in a container which contained goods being transported for the Amari Group, since Amari Services provided logistical services for all the Amari Group companies and sent one container a week to Zimbabwe in return for a handling fee from the companies in question.[33] He also pointed out that the ledger formed part of Amari Services' accounts which were subject to an external audit and a clean audit report.[34]

165. In paragraphs 8 to 17 of his witness statement, Mr Napier describes how, at a meeting on 20 October 2010 at ZMDC's offices with Mr Godwills Masimirembwa, the then chairperson of the ZMDC, and others, he first became aware of the allegation of corruption resulting from the ZMDC's internal investigations. He records that he told the ZMDC representatives that the Amari Group was unaware of the alleged arrangement between Amari Services and Mr Mubayiwa and that there was no connection at that time between Amari Services and the Amari Group. The meeting ended with him and Mr Nunn, who was also present, agreeing to provide a formal response to the allegations. On 25 October 2010, Mr Napier formally wrote to ZMDC denying any involvement of the Amari Group in the alleged corruption. ZMDC's letter in response dated 10 November 2010 reiterated the allegation of corruption and advised the Amari Group that it should consider the relationship between the parties under the MOUs terminated.

**Tribunal's discussion and conclusion**

166. The Tribunal has considered carefully the evidence of Mr Mubayiwa, Mr Nunn, Mr Ralph and Mr Summers on this important aspect of the case. The Tribunal bears in mind that sections 3(1) and 4 of the Zimbabwe Prevention of Corruption Act (Chapter 9:16) make it an offence *inter alia* for any public officer to engage in a wide range of corrupt practices; and that section 170 of the Zimbabwe Criminal Law (Codification and Reform) Act (Chapter 9:23) makes it an offence *inter alia* for any public officer to obtain a bribe.

167. The question for the Tribunal is whether the MOUs are, by reason of the alleged corrupt relationship between Mr Mubayiwa and the Claimants, tainted with illegality such as to entitle the Respondents to repudiate the MOUs.

168. In the Tribunal's view, the allegation of corruption is not well-founded and the Respondents, on whom the burden of proof lies, have failed to establish it.

169. In the first place, the Tribunal is not satisfied that there was anything improper in the events relied on by the Respondents. Based on the evidence referred to above, which – with the qualification mentioned below - the Tribunal accepts, the Tribunal finds that Amari Services was simply assisting Mr Mubayiwa in the purchase of the tiles and in the advance of Rands 25,000 made to Mr Mubayiwa, without either he or Amari Services having any improper ulterior motive or reason for doing so and, in particular, without any intention to induce or solicit Mr Mubayiwa to act in a way which would or might influence the conclusion of the MOUs. The Tribunal accepts that the tiles (and the toys) were paid for by Mr Mubayiwa and that Amari Services did no more than facilitate their purchase, as a favour to a trusted partner, in circumstances where Mr Mubayiwa was not in possession of sufficient Rands to complete the purchase of the tiles while in Johannesburg, and arrange their transportation to Zimbabwe. The Tribunal also finds that the sum of Rands 25,000 was repaid by Mr Mubayiwa.

170. In the second place, the events relied on by the Respondents are irrelevant to the conclusion of the Nickel MOU since those events post-dated by a long time the conclusion of

---

[33] *Ibid.*, p. 224 line 22 to p. 227 line 6.

[34] *Ibid.*, p. 236 pp. 2-5.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

the Nickel MOU. The Tribunal observes in this context that, in paragraphs 5 and 17 of the Amended Answer, the allegation of illegality was confined to the Platinum MOU, although in paragraphs 25 to 28 and 43 of the Amended Answer the allegation extends to the Nickel MOU as well.

171. In the third place, the Tribunal finds that, at the time of the events in question, Amari Services was unconnected with the Amari Group and that Amari Services' actions are not attributable to the Amari Group. The Tribunal also accepts Mr Napier's evidence that the Amari Group was not at any material time aware of the events relied on by the Respondents.

172. In the fourth place, the Tribunal finds that there was no causal link between the events relied on by the Respondents and the conclusion of the Platinum MOU. Even if, contrary to the Tribunal's findings, Mr Mubayiwa had improperly been assisted in the manner alleged by the Respondents, the decision to conclude the Platinum MOU was not that of Mr Mubayiwa, who did not even have a vote on the ZMDC board, but that of the ZMDC board and ZMDC's shareholders. The assistance afforded to Mr Mubayiwa played no role in ZMDC's decision to conclude the MOUs.

173. In the fifth place, the Tribunal rejects the Respondents' submission that the Amari Services' ledger which showed the credit of the Rand equivalent of US$9,000 was in any way fabricated. The Tribunal accepts Mr Summers' evidence concerning the ledger and, in particular, that the ledger formed part of Amari Services' accounts which were subject to an external audit and a clean audit report.

174. The qualification referred to in paragraph 169 above is that there are two respects of Mr Nunn's evidence which the Tribunal finds unsatisfactory and is unable to accept. First, Mr Nunn's manuscript note on the Italtile quotation gives the clear impression that he was not then in possession of the US$9,000 which in fact had already been handed to him by Mr Mubayiwa. To that extent, it was misleading. Mr Nunn's explanation, in response to questions from the Tribunal, that he had written the note in those terms because he wanted the option to keep the US$9,000 for himself and to have his loan account with the company debited with that amount instead of paying it into Amari Services' account[35] does not adequately explain the note. Second, there appears never to have been an accounting to Mr Mubiyawa for the overpayment which he made by paying the US$9,000 to Amari Services, about which Mr Nunn had little or no recollection.[36] Mr Nunn's lack of recollection of these events is, in the Tribunal's view, surprising and the apparent absence of any repayment of the difference having been tendered or made to Mr Mubayiwa is not excused by the fact that the amount of the overpayment is relatively small. However, for present purposes, nothing turns on either of those points.

175. For all those reasons, the Tribunal finds that the allegation that the MOUs are illegal is not established.

**6. Absence of any joint venture agreement**

176. The Respondents submitted that Article 8 of each of the MOUs envisaged that the parties were obliged to enter into joint venture agreements which incorporate the terms and conditions of the respective MOUs. Article 8 of the Nickel MOU has been quoted in paragraph 146 above. Article 8 of the Platinum MOU is in materially identical terms, except that it also contains a provision in Article 8.3 whereby the Platinum MOU shall "*continue to be of full force and effect and binding on all Parties hereto until such time as the more comprehensive Agreements referred to in 8.2 are concluded*". The Respondents submitted

[35] *Ibid.*, p. 338 line 11 to p. 340 line 16.

[36] *Ibid.*, p. 342 line 9 to p. 344 line 4.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

that the MOUs do not themselves constitute the joint venture agreements referred to and that no joint venture agreement as contemplated by the MOUs was ever entered into.[37]

177. It is not in dispute that no joint venture agreement as contemplated by the MOUs was ever concluded. However, the question is whether the absence of any such joint venture agreement is of any consequence to the present claims.

178. In the Tribunal's view, the absence of any joint venture agreement is irrelevant to the present claims. Article 8 of each of the MOUs provided expressly for each to be binding upon signature by the parties and, in due course, to be superseded by a joint venture agreement. In the case of the Platinum MOU, the provisions of Article 8.3 make express that which is implicit in the case of the Nickel MOU, namely that the absence of a joint venture agreement does not render the MOUs invalid or ineffective for the failure of a condition subsequent or for any other reason.

### 7. Cancellation of the MOUs

179. The Respondents submitted that, by reason of the matters referred to above, they were entitled to cancel the MOUs. For their part, the Claimants submitted that the purported cancellation of the MOUs was invalid and a repudiatory breach of the MOUs which they accepted as bringing the MOUs to an end.

180. In the light of the conclusions reached by the Tribunal on the matters referred to above, the Tribunal concludes that the Respondents were not entitled to cancel the MOUs and that, in purporting to cancel them, the Respondents were in repudiatory breach of the MOUs.

181. The Tribunal further concludes that it was clear from the Respondents' conduct referred to in paragraphs 7 and 9 above that the MOUs were at an end and that the Claimants would not be either required or permitted to perform their obligations under them. To the extent that there was any obligation on the Claimants in those circumstances to accept the Respondents' conduct as bringing the MOUs to an end, that occurred when, in the light of the Respondents' position, the Claimants initiated the present arbitration by the issue of the Request.

182. In the result, ZMDC is liable to the Claimants for breach of the MOUs.

## VII. THE RELIEF CLAIMED

183. The Tribunal next turns to consider the relief to which the Claimants may be entitled. The issues of interest and costs are considered separately in Sections VIII and IX below respectively.

184. The Claimants submitted that the purpose of the joint ventures was to prospect for PGMs, base metals and ancillary metals in respect of the Platinum MOU and for nickel in respect of the Nickel MOU, and subject to successful feasibility studies, develop a mine in the area. Accordingly, the Claimants seek damages against ZMDC as the direct and natural consequence of the repudiation of the MOUs as follows: (1) US$42,882,000 for breach of the Platinum MOU, calculated using a DCF valuation model and based on Amaplat's proposed equity holding of 50% in Zimari Platinum; and (2) US$3,900,000 for breach of the Nickel MOU, calculated using the "ounce in the ground" valuation method and based on Amari's proposed equity holding of 55% in Zimari Nickel.

---

[37] Amended Answer §29 to 31.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

185. In the alternative to their damages claim, the Claimants claim that ZMDC has been unjustly enriched at their expense and that ZMDC is liable to make restitution to Amaplat in the sum of US$4,498,190 and to Amari Nickel in the sum of US$578,559, based on the amounts advanced to Zimari Platinum and Zimari Nickel respectively.

**1. Platinum Claim**

186. The Claimants relied on Mr Wixley's expert evidence. He utilises a DCF model to value the Platinum Project. He gave his opinion that the information provided by Mr Kamurai, Mr Le Roux, SRK Consulting, DRA, BBE Consulting and Fraser Alexander constitute sufficient reliable information and data to permit the use of the DCF valuation methodology.[38]

187. The Respondents submitted that any award of prospective damages would be speculative because the classification of the minerals does not provide a firm basis for valuation and pre-feasibility reports were not completed. Therefore, the central contention between the Parties was whether the mineral resources can be valued sufficiently to employ a DCF valuation model. Further, the Respondents submitted that the presence of talc and mining on an apparent dip presented additional safety and costs concerns, and that a discount rate of 14% is not appropriate.

188. Before turning to these contentions in turn, the Tribunal notes that in relation to *application* of the DCF model, a number of matters were agreed between the Claimants' experts and the Respondents' experts. The experts accepted the parameters of the DCF model, including the modifying factors set out in the DRA Mine Scoping Study (except for the error in the grade as reported),[39] mining costs of R424/tonne (subject to the concern regarding talc and dip outlined below),[40] the geological loss,[41] and the prill splits.[42]

**Classification of the Platinum resources**

189. The Claimants submitted that the DCF valuation model can be used. Mr Theart, as co-author of the SRK Consulting Report, gave evidence that the platinum mineral resources could be classified as "indicated" for zones A and B and "inferred" in respect of zone C.[43] Mr Theart also testified that these deposits could actually qualify as "measured resources" but adopted these classifications as a conservative measure.[44] Mr Kamurai, a mining engineer, gave evidence that notwithstanding that the project was stopped before the pre-feasibility study was completed, there is sufficient information and data to justify the use of DCF valuation methodology.[45]

190. The Respondents submitted that based on the amount of drilling performed by the Claimants, the Claimants were unable to prove that the platinum resources fell for categorisation either as "indicated" or "measured" resources, and at best, can only be

---

[38] Wixley §2.2.

[39] Joint Report, §1.

[40] *Ibid.*, § 4

[41] *Ibid.*, § 5

[42] *Ibid.*, § 5.

[43] Section 9, SRK Consulting Serui Project Resource Statement October 2010.

[44] Transcript 15/8/12, p. 377 line 12 to p. 378 line 3.

[45] Further Witness Statement for Clarkson Kamurai § 5.1.8.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

categorised as "inferred". Rene Hochreiter, the Respondents' quantum expert, gave evidence that DCF valuations should not be performed on inferred mineral resources.[46] The Respondents submitted that as the platinum tonnage, grade and mineral content have not been verified geologically, there is no basis upon which a valuation of inferred resources can be made.

191. The Tribunal has noted that Mr Hochreiter had not viewed the SRK report when he had formed his opinion provided in his report. The Claimants referred to the Joint Report as recording Mr Hochreiter's change in position after viewing the SRK report. In particular, the Claimants' position is that the Respondents' experts agreed with the SRK report in relation to the classification of the reserves as "indicated" rather than "inferred", subject only to the concern expressed that the geological loss was 20% rather than 15% before recognising that an additional 5% geological loss was provided by DRA Report.[47]

192. Mr Goddard, the author of the DRA Scoping Study Report, stated that the step room and pillar was the preferred mining method. Mr Goddard explained that his results could not be reported as a "reserve" because certain work remained incomplete at the time of termination. However based on the work already completed, his experience of other work in the Great Dyke area and his professional skill and knowledge, Mr Goddard gave evidence 'with confidence' that DRA "*would have been in a position to report the results...as a probable mineral reserve (ie a reserve relating to indicated resources in due course*" on completion of his work.[48] The Respondents' contention is that the work which remained incomplete when the project stopped precludes the employment of the DCF valuation methodology. There is otherwise agreement between the Parties' experts that the modifying factors set out in the DRA Mine Scoping Study are adequate.[49]

**Presence of Talc and Apparent Dip**

193. The Respondents submitted that the presence of talc and mining on an apparent dip would create additional costs. This submission was based on the Respondents' experts' concern about the effect on the unit working cost of the presence of talc both in the metallurgical and the mining aspects, as well as the additional costs associated with mining on apparent dip.

194. The Claimants submitted that the evidence of Mr Goddard demonstrates that the issue of talc would be overcome by employing the appropriate mining method, being the step room and pillar recommended by Mr Goddard. Mr Goddard noted that where talc was encountered, it was at another mine in the Great Dyke area which had different geology and where a conventional mining method was used.

195. The Claimants submitted that, based on the evidence of Mr Goddard, Mr Kamurai and Mr Le Roux, apparent dip is not a factor and has no bearing on costs. In particular, Mr Goddard gave evidence that mining was occurring on reef and Mr Le Roux testified that this phase of mining was chosen specifically as the dip would not have a big influence.[50]

---

[46] Response to Claimants' Witness Statement of Thomas Wixley and Further Witness Statements by Philip Le Roux and Clarkson Kamurai by Rene Hochreiter § 4.1.

[47] Transcript 4/11/13 p. 116 line 14 to p. 119 line 3; Joint Report § 1 and 5.

[48] Witness Statement for Neale Goddard § 9.

[49] Joint Report §1.

[50] Evidence of Mr Kamurai, Transcript 15/08/12 p. 401 line 22 to p. 402 line 9; Evidence of Mr Goddard, Transcript 15/08/12, p. 426 line 21 to p. 427 line 9; Evidence of Mr Le Roux, Transcript 15/08/12 p. 460 lines 5 to 15.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

**Discount Rate**

196. The Claimants' position is that a discount rate of 14% calculated by Mr Wixley is appropriate. The Claimants submitted this presents a conservative approach at the top end of the 10%-14% range calculated by Mr Wixley.

197. The Respondents do not view a discount rate of 14% to be appropriate. The Respondents' experts submitted the appropriate discount rate for a platinum mining operation in Zimbabwe is at least 15% in real terms to take into account the greater country risk of Zimbabwe compared to other mining investment countries such as South Africa.[51] Though 15% is the lower limit, Mr Hochreiter recommended a discount rate of 18%-20% to be appropriate.[52] Further, Shepherd Gaihai provided his opinion that the discount rate should be inflated due to Zimbabwean country risk, noting a discount factor of at least 19% is estimated for Zimbabwe by the Fraser Institute of Annual Survey.[53]

198. In justifying a lower discount rate, the Claimants relied on the evidence given by Mr Kamurai that there was a consistent supply of power for mining businesses in the Great Dyke area and access to a stable workforce of skilled labour.[54] Mr Wixley presented evidence that government risk had been eliminated as a consequence of the Claimants' joint venture with the Zimbabwean Government and that the Claimants were also effectively exempt from indigenisation laws as a result.[55] Mr Wixley also incorporated equity risk with regard to the fact that this was a green field business venture, took into account the business circumstances in Zimbabwe and had regard to the discount rate applicable to a mining venture of this nature in South Africa.

**Tribunal's discussion and conclusion**

199. The Tribunal finds that the information relied on by Mr Wixley in his DCF model is credible and his methodology is reliable. The breadth and credibility of the Claimants' evidence combined with the conservative approaches adopted by the Claimants' experts leads the Tribunal to accept the classification of the Platinum resources classified as "indicated" for zones A and B and "inferred" for zone C. The Tribunal places some weight on the Claimants' submission that the Respondents' experts agreed to the contents of the SRK report subject to the qualifications regarding geological loss, though it remains mindful that there was no explicitly recorded agreement by the Respondents' experts and no further submissions by the Respondents. Accordingly, the Tribunal finds that the DCF model is appropriate to value the platinum resources.

200. The Tribunal notes the risks raised by the Respondents regarding mining investment in Zimbabwe. Notwithstanding this, in the Tribunal's view, a discount rate of 14% is sufficient in these circumstances. In particular, the Tribunal finds it significant that the Claimants had formed a joint venture directly with the Zimbabwean Government itself. With the Government as a party to these mining arrangements, the Tribunal accepts that

---

[51] Joint Report § 3.

[52] Response to Claimants' Witness Statement of Thomas Wixley and Further Witness Statements by Philip Le Roux and Clarkson Kamurai by Rene Hochreiter § 4.4.3.

[53] Response to Claimants' Witness Statement of Thomas Wixley and Further Witness Statements by Philip Le Roux and Clarkson Kamurai by Shepherd Gaihai §17.

[54] Transcript 15/8/12, p. 390 line 6 to p. 394 line 17.

[55] Transcript 15/8/12, p. 498 line 22 to p. 502 line 4.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

government risk relating to this venture was eliminated. Risk was further mitigated through the evidence of a consistent power supply and access to a reliable workforce.

201. The Tribunal is satisfied that there would not be additional cost implications arising from the presence of talc or mining on an apparent dip. In the Tribunal's view, the step room and pillar mining method would overcome the problem of talc, if any, and accepted the Claimants' experts' evidence that mining was not occurring on a dip in this part of the project.

202. Based on these considerations above, Mr Wixley calculated a total DCF value of US$85,765,000 for the Platinum Project. Based on Amaplat's proposed 50% equity interest in Zimari Platinum, the Tribunal finds by a majority that Amaplat is entitled to US$42,882,000 in damages for ZMDC's repudiation of the Platinum MOU.

203. However, the minority of the Tribunal considers that, in circumstances where the Claimants have not, on the evidence, proved their respective shareholdings in Zimari Nickel and Zimari Platinum, the Claimants are not entitled to recover damages for breach of the MOUs and that their remedy is confined to payment by ZMDC of the sums invested by them in Zimari Platinum and Zimari Nickel respectively. The minority would therefore have determined that ZMDC was only liable to pay Amaplat the sum of US$4,498,190.

## 2. Nickel Claim

**Valuation Method**

204. The Claimants' relied on Mr Wixley's "ounce in the ground" valuation in respect of the nickel claim. Provided the nickel resources could be measured at an inferred level, both the Claimants' experts and the Respondents' experts agreed Mr Wixley's valuation methods are appropriate, being the ounce in the ground method and the historical cost method (provided the exploration cost estimates can be substantiated).[56]

205. The central issue of contention between the parties was whether the nickel resources can be classified as inferred. The Respondents' experts noted that the resource statement on the Nickel Hill project was completed by a reputable company, but that the verification process had not been completed. Therefore the Respondents' experts explained that the nickel resources do not qualify as inferred resources and accordingly, no value can be assigned to those resources.[57]

206. The Claimants submitted that the nickel resources can be classified as inferred. The Claimants referred to the evidence of Mr Le Roux who relied on the underlying data provided by Prospecting Ventures. Mr Le Roux undertook his own drilling and constructed a three-dimensional model which confirmed the quantum and the grades in the Prospecting Ventures reports. Mr Le Roux gave evidence that the nickel resources could be classified higher, but commented that:[58]

> *"If one looked at the drilling spacing and information, this resource would have been able to be classified at a much higher level of confidence, most probably at least at an indicated level but we only to classify it as inferred because the information available is old information and we didn't do all the necessary work to date to verify the old information although all the information that - all the additional that we did proved*

---

[56] Joint Report §17.

[57] *Ibid.*, paragraph 16.

[58] Transcript 15/8/12, p. 481 lines 3 to 12.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

*that the information is correct, we needed to do additional work to prove that. So I will be happy that this resource is an inferred resource."*

207. Mr Wixley relied on the tonnage and grades presented in the evidence of Mr Le Roux. Mr Le Roux testified that the total tonnage was 23.85 tonnes and the grade was 0.4% for Nickel Hill and 0.5% for Woodridge. Mr Wixley used a value per tonne of US$329 ounce in the ground.

208. Mr Wixley's approach involved benchmarking the value of the nickel resources against a recent PolyMet Mining Corporation transaction as it contained a similar type of nickel deposit. From there, Mr Wixley applied a 50% discount because the Poly Met asset was a measured and indicated resource, compared to an inferred resource in this instance.[59]

209. Turning to the alternative present value of historical costs valuation method proposed by the Claimants, Mr Wixley produced a value of between US$4.5 million and US$6 million which is in the ballpark range of the ounce in the ground method, based on Amari's proposed 55% equity interest in Zimari Nickel.[60] The Claimants seek the ounce in the ground method of US$3.9 million, being the lesser of the two valuation methods, based on recommendation of their experts[61] and that it is conservative and reasonable.[62]

**Tribunal's discussion and conclusion**

210. Having carefully reviewed the submissions of the Claimants and the Respondents, the Tribunal finds that the nickel resources can be classified as inferred. The Tribunal accepts Mr Le Roux's verification of the Prospecting Ventures report and his own drilling and investigations undertaken.

211. In accordance with Mr Le Roux's evidence[63] and the subsequent agreement of the parties' experts,[64] the Tribunal considers that the "ounce in the ground" method is the appropriate valuation method where the resource is inferred. Accordingly, based on Amari's proposed 55% equity interest in Zimari Nickel, the Tribunal finds by a majority that Amari Nickel is entitled to US$3.9 million in damages for ZMDC's repudiation of the Nickel MOU.

212. However, for the reasons already stated in paragraph 203 above, the minority of the Tribunal considers that Amari Nickel is not entitled to recover damages and that its remedy is confined to payment by ZMDC of the sum invested by Amari Nickel in Zimari Nickel. The minority would therefore have determined that ZMDC was only liable to pay Amari Nickel the sum of US$578,559.

## VIII. INTEREST

213. Section 16(6) of the Zambian Arbitration Act 2000 provides that, unless otherwise agreed between the parties, an arbitral tribunal may, in an international arbitration such as the

---

[59] Claimants' Opening Submissions § 42.

[60] Transcript 15/8/12, p. 610 line 18 to p. 612, line 8.

[61] *Ibid.*, p. 485 lines 13 to 21.

[62] Claimants' Closing Submissions § 146.

[63] Further Witness Statement of Philip Le Roux § 30.

[64] Joint Report §17.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

present, award simple or compound interest in accordance with the law applicable to the arbitration.

214. On the basis that the law applicable to the arbitration is Zimbabwean law, the Claimants seek an award of simple interest at the rate of 5% *per annum* applicable to judgment debts in accordance with the Prescribed Rate of Interest Notice 2009 and the Prescribed Rate of Interest Act in force in Zimbabwe from the date of this Final Award until payment. In their closing submissions, the Claimants did not advance any claim for interest prior to the date of the award.[65] They also made it clear that they did not seek any higher rate of interest to which they might have been entitled under Zambian law.[66]

215. The Respondents made no submissions on the question of interest.

216. The Tribunal thus has a broad discretion with regard to the applicable rate of interest and period for which interest is to run. In its view, the 5% rate of interest claimed by the Claimants and the period for which it is to run are entirely reasonable. In the exercise of its discretion, the Tribunal determines that the principal amounts awarded to the Claimants shall bear simple interest at 5% *per annum* from the date of this award until payment.

## IX. COSTS

217. The Claimants seek an order that the Respondents pay the Claimants' legal and other costs of the arbitration.

218. The total sum claimed in respect of the Claimants' costs and expenses is US$2,220,583.74 as set out in their original summary of legal expenses and as updated by the Claimants on 18 November 2013.

219. The Respondents made no submissions on the question of the Claimants' costs.

220. The award of costs is governed by Article 31 of the Rules, which provides so far as material:

> "***Decision as to the Costs of the Arbitration***
>
> *1. The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.*
>
> ...
>
> *3. The final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.*"

221. Accordingly, under Article 31 of the Rules, the Tribunal has broad discretion to allocate costs as it considers appropriate in the circumstances of this case.

---

[65] Claimants' Closing Submissions §158, 159, 162.2 and 162.3; Submissions in response to queries from the Tribunal §11 and 12.

[66] Submissions in response to queries from the Tribunal §10.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

222. The Claimants have succeeded in their claims and the Tribunal considers that the general rule that costs follow the event should be applied.

223. With regard to the amount of the costs claimed, the Tribunal is satisfied that they are reasonable in amount and have been reasonably incurred. In that regard, the Tribunal has taken into account not only the factual and legal complexity of the issues which the parties had to address but also the fact that the Respondents' conduct referred to earlier in this award has led to greater costs being incurred by the Claimants than would otherwise have been the case. In particular, the 4 November 2013 hearing in London and the work involved in preparing for that hearing would not have arisen had the Respondents decided to continue to participate in the arbitration proceedings and have the issue of the Tribunal's jurisdiction determined in accordance with the Rules and the directions given by the Tribunal.

224. The total advance on costs fixed by the Court is US$900,000, which has been paid in full by the Claimants.

225. At its session of 19 December 2013, the Court fixed the costs of the arbitration in a total sum of US$900,000 as follows: the ICC's administrative expenses at US$87,918 and the fees and expenses of the Tribunal at US$812,082.

226. Having regard to the considerations referred to above these costs of the arbitration must also follow the event and, accordingly, be borne by the Respondents.

## X. AWARD

**227. In conclusion, for the reasons stated and having given due consideration to the evidence and the submissions of the parties, the Tribunal:**

**(1) declares that it has jurisdiction over the parties' dispute;**

**(2) orders ZMDC to pay Amaplat damages in the sum of US$42,882,000;**

**(3) orders ZMDC to pay Amari damages in the sum of US$3,900,000;**

**(4) orders the Respondents to pay the Claimants' legal and other costs and expenses in the sum of US$2,220,583.74;**

**(5) orders the Respondents to pay the Claimants the costs of the arbitration referred to in paragraph 225 above in the sum of US$900,000;**

**(6) orders ZMDC to pay interest on the damages referred to in (2) and (3) and on the Claimants' legal and other costs and expenses referred to in (4) above and the costs of the arbitration referred to in (5) above at the rate of 5% *per annum* from the date hereof until payment;**

**(7) dismisses all other claims and counterclaims.**

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

**Date: 12 January 2014**

**Place of arbitration: Lusaka, Zambia**

.........................................

**Chikwendu Madumere**
**Co-arbitrator**

.........................................

**Professor Doug Jones AO**
**Co-arbitrator**

.........................................

**Stuart Isaacs QC**
**Chairman**

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

.........................................

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

# Exhibit B



# MEMORANDUM OF UNDERSTANDING





# MEMORANDUM OF UNDERSTANDING

BETWEEN

ZIMBABWE MINING DEVELOPMENT CORPORATION

A body corporate established in terms of the Zimbabwe Mining Development Corporation Act [Chapter 21:08] of the Republic of Zimbabwe

(hereinafter referred to as "ZMDC")

And

AMARI HOLDINGS LIMITED

A company incorporated in the British Virgin Islands

Registration number: 1007239

(hereinafter referred to as "Amari")





1. DEFINITIONS

In this MOU, unless the context clearly requires otherwise, the following words and expressions shall have the meanings ascribed to them below:

| | |
|---|---|
| Business Day | means any day other than a Saturday, Sunday or public holiday in Zimbabwe; |
| Company | means a company to be incorporated by the Parties in accordance with the laws of Zimbabwe to house the joint venture; |
| Effective Date | means 3 business days after fulfilment or waiver of the condition precedent as contemplated in 9; |
| Force Majeure | means any act, event or cause, whether foreseeable or unforeseeable, not within the reasonable control of the Party affected by an event of Force Majeure ("Affected Party") including acts of God, strikes, stoppages, restraints of labour, wars whether declared or undeclared, blockades and insurrections, sabotage and civil disturbance, accident, the adverse application of any laws or enforcement actions of any court or governmental agency (including legal or illegal expropriation) not resulting from any wrongful act or omission of the Affected Party, the refusal of or delay in obtaining any necessary consents from any government agency, provided that the Affected Party has acted in a timely manner in endeavouring to secure them. |
| MOU | means this memorandum of understanding including any annexure hereto; |
| Nickel Claims | means the nickel claims held by PV as listed in the Option Agreement over which ZMDC has an option and Nickel Claim means any one of the Nickel Claims; |
| Nickel Claims Areas | means areas covered by the Nickel Claims; |

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



| | |
|---|---|
| Parties | means the parties to this MOU and "Party" means one of them; |
| PV | means Prospecting Ventures (Pvt) Ltd a corporation incorporated in Zimbabwe; |
| Option | means the option granted to ZMDC in terms of the Option Agreement to purchase the Nickel Claim; |
| Option Agreement | means the Memorandum of an Option Agreement entered into between ZMDC and PV on 3 August 2005 as extended in writing by the Parties; |
| Signature Date | means the date upon which this MOU is signed by the Party signing last in time; |
| Zimbabwe | means the Republic of Zimbabwe; |

2. INTERPRETATION

2.1 A reference to a Party includes that Party's successors and permitted assigns.

2.2 Words importing –

2.2.1 any one gender includes the other two genders;

2.2.2 the singular includes the plural and *vice versa*;

2.2.3 natural persons include created entities (corporate or unincorporated) and *vice versa*.

2,3 The headings to the paragraphs of this MOU are included for reference purposes only and shall not in any way affect or govern the interpretation or construction of this MOU.

2.4 If any provision in this MOU is a substantive provision conferring rights or imposing duties on any Party, notwithstanding that it is only in the definition or introduction clause, effect shall be given to it as if it were a substantive provision in the operative part of this MOU;

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG

62

2.5 When any period is prescribed in this MOU, that period shall be reckoned exclusively of the first and inclusively of the last day unless the last day falls on a day other than a Business Day, in which case the last day shall be the next succeeding Business Day;

2.6 Where words have been defined in the body of this MOU, such words will, unless otherwise required by the context, have the meanings so assigned throughout this MOU.

3. PREAMBLE

Whereas:

3.1 ZMDC is a body corporate established in terms of the Zimbabwe Mining Development Corporation Act [Chapter 21:08] whose main business is *inter alia* investing in mining and mining development on behalf of the Government of Zimbabwe.

3.2 Amari is a resource investment company focused on exploration and mining in sub-Saharan Africa.

3.3 PV is the owner of the Nickel Claims.

3.4 ZMDC has been granted the Option and wishes to exercise the Option as soon as possible.

3.5 ZMDC and Amari wish to incorporate a joint venture company to exploit the Nickel Claims.

3.6 Following the exercise of the Option by ZMDC and the purchase of the Nickel Claims the Company wishes to prospect for nickel on the Nickel Claims Areas and subject to successful feasibility study/ies develop mines on the Nickel Claims Areas.

3.7 The Parties wish to enter into this MOU to formalise the relationship between the Parties relating to the above matters.

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



4. EXERCISE OF OPTION

4.1 ZMDC shall, immediately after the Signature Date, exercise the Option and execute a purchase agreement with PV to purchase the Nickel Claims in accordance with the terms of the Option Agreement.

4.2 The Company, as the ZMDC nominee, shall fund payment of the purchase price of up to a maximum of Zim$39 billion (thirty nine billion Zimbabwe dollars) for the Nickel Claims purchased in terms of the purchase agreement executed by ZMDC with PV upon the Option being exercised.

4.3 ZMDC shall procure that the purchase agreement with PV provides for the following:

4.3.1 payment of the purchase price referred to in 4.2 shall be paid directly by the Company to PV; and

4.3.2 the Nickel Claims shall be transferred directly from PV to the Company as the ZMDC nominee.

5. JOINT VENTURE COMPANY

5.1 The Parties shall incorporate the Company as soon as possible after the Signature Date.

5.2 The issued share capital in the Company shall be 1000 ordinary shares to be issued at Zim$300, 000. 00 (three hundred thousand Zimbabwe dollars) each.

5.3 The initial shareholding in the Company shall be:

| | |
|---|---|
| ZMDC | 450 shares |
| Amari | 550 shares |

5.4 The subscription price for the shares shall be as follows:

5.4.1 ZMDC: Zim$135, 000, 000. 00; and

5.4.2 Amari: Zim$165, 000, 000. 00;





and each shareholder shall pay such respective subscription price in cash on date of subscription.

5.5 The Parties record, in the event that ZMDC is required in terms of legislation in Zimbabwe relating to indigenisation to hold a majority interest in the Company, that ZMDC shall have an option to increase its shareholding in the Company to 51%. Such option shall be exercised in writing and shall be purchased at market value as determined by an independent third party agreed by the shareholders. The exercise of the option shall not have any other material impact on any of the other terms of the shareholders agreement at the time.

5.6 The shareholders shall have pre-emptive rights in respect of the disposal of any shareholder's shareholding and loan account in the Company ("interest") in that a shareholder shall first offer its interest in writing to the other shareholders pro rata to their respective shareholdings in the Company prior to offering its interest to any third party. The offeree shareholders shall further have the right to match any third party offer.

5.7 ZMDC shall ensure that it retains its indigenous status as required in terms of any Zimbabwe government policy or legislation for as long as it is a shareholder in the Company and subject to the provisions of 5.6 shall only dispose of its shareholding to other indigenous groupings as required in terms of government policy or legislation.

5.8 The Company's purpose shall be to hold the Nickel Claims, undertake exploration and subject to successful bankable feasibility studies develop and operate mines on the Nickel Claims Areas.

5.9 The overall management of the Company shall vest in the board of directors.

5.10 The board shall appoint Amari or its designate to manage the day to day affairs of the Company and any exploration and mining programmes and a management agreement on commercial terms between the Company and Amari shall be concluded upon incorporation of the Company. Amari in its capacity as manager shall report to the board.

5.11 The initial board shall consist of five directors, two directors appointed by ZMDC and three directors appointed by Amari

NOTARY PUBLIC SOUTH AFRICA GAUTENG



5.12 The directors shall jointly appoint a chairman.

5.13 Questions arising at meetings of directors shall be decided by a simple majority of votes. Each board member shall have one vote.

5.14 Questions arising at meetings of shareholders shall, subject to the provisions of 5.15, be decided by a simple majority of votes.

5.15 Notwithstanding the provisions of 5.14 the Parties agree that certain decisions of the shareholders of the Company shall require a 70% majority vote. These will include but may not be limited to:

5.15.1 The disposal of the whole or substantially of the whole of the undertaking of the Company, or the whole or greater part of the assets of the Company;

5.15.2 Dividend policy;

5.15.3 Determination of strategy, capital expenditure and annual budgets of the Company;

5.15.4 The provision of security against the Company's assets;

## 6. CONTRIBUTION OF PARTIES TO THE JV

6.1 ZMDC shall

6.1.1 procure that all the Nickel Claims are transferred directly from PV to its nominee, the Company, as soon as the Option has been exercised and the purchase agreement executed and obtain all statutory and government approvals in respect thereof.

6.1.2 provide technical, financial and legal advice to the Company as required from time to time;

6.1.3 subject to any other obligations, allow the Company to use any infrastructure owned by ZMDC including but not limited to roads, rail, power and water supply and warehouses necessary for the Company's activities at market related rates and shall maintain such infrastructure in good working order;

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



6.1.4 in the event that the Company requires the use of infrastructure owned by the government of Zimbabwe, ZMDC shall assist the Company in obtaining the right to use such infrastructure;

6.1.5 use its best endeavours to ensure that the Company obtains fiscal, foreign exchange, social, export/import, environment and labour dispensations from the Zimbabwe government;

6.1.6 assist the Company in obtaining all necessary licences and permits to undertake exploration and operate any mine once developed;

6.1.7 assist the Company with lobbying government and/or statutory bodies when required; and

6.2 Amari shall:

6.2.1 provide expertise to the Company including but not limited to funding, listing, technical, exploration, financial, structuring, investor relations, corporate marketing; and legal as required from time to time;

6.2.2 manage the affairs of the Company as contemplated in 5.7;

6.2.3 perform the structuring and facilitation of a public listing of the Parties' interests in the Company in the event that the Parties elect to list their interests in the Company on an internationally recognised stock exchange;

6.2.4 procure that the Company obtains non recourse funding from a Zimbabwean entity to enable the Company to fulfil its obligations contemplated in 4.2; and

6.2.5 facilitate funding for the Company as contemplated in 7.1 and 7.2.

6.3 The Parties shall jointly work together to obtain any necessary statutory approvals to incorporate the Company including obtaining the necessary approvals for a foreign company to invest in Zimbabwe, obtaining Zimbabwean Reserve Bank approval and to undertake exploration and subsequently develop any mines to operational status.

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



## 7. COMPANY FUNDING

7.1 Amari shall provide funding of up to USD5 million to the Company to undertake exploration of the Nickel Claims and any feasibility study/ies.

7.2 Once a decision has been made by the Company to exploit a Nickel Claim and commence production thereon the activities of the Company in respect of development of such Nickel Claim from time to time shall be funded:

(i) firstly by its internal resources; and

(ii) otherwise by third party funding; and

(iii) failing that by shareholders loans pro rata to shareholders shareholding. In the event that any shareholder does not provide such pro rata shareholder funding such shareholder's shareholding shall be diluted accordingly. In the event any shareholder elects to provide the funding required in terms of this clause on behalf of a non funding shareholder, the funding shareholder may elect that such funding shall be in the form of a loan granted at commercial rates to the non funding shareholder shall be set off against any dividends due to the non funding shareholder until such time as the funding is paid in full. Notwithstanding the aforementioned it is recorded that ZMDCs shareholding shall not be diluted to below 26% as a consequence of a failure to fund in terms of this clause.

7.3 In the event that the activities of the Company are funded by third party funding as contemplated in 7.2(ii) all shareholders shall provide any necessary guarantees or pledge shares in the Company as required to raise such third party funding.

7.4 The funding provided by Amari in terms of 7.1 shall be provided either on loan account at commercial interest rates to the Company or via third party funding at Amari's option.

7.5 Shareholder loans provided in terms of this clause shall rank above any payments due by the Company, (other than in the ordinary course of business)

CELESTE KEART NOTARY PUBLIC SOUTH AFRICA GAUTENG



including dividends and any other distributions to shareholders, and shall be repaid at commercial interest rates to the respective shareholder.

7.6 All US dollar loans to the Company for funding purposes shall be repaid in US dollars and shall be repatriated subject to exchange control approvals. Such repayments shall be on terms no less favourable than those currently offered to other Nickel mining operators in Zimbabwe.

## 8. DATE OF COMMENCEMENT AND DURATION

This MOU shall commence on the Effective Date and supercedes any other prior documents relating to the matters specified herein and shall, subject to the provisions of this MOU:

8.1 be binding on the Parties upon signature hereof by each of the Parties; and

8.2 be superseded by comprehensive subscription and shareholder/joint venture agreements which shall incorporate the terms and conditions contained herein.

## 9. CONDITION PRECEDENT

9.1 This MOU excluding 9 and 11, is subject to fulfilment or waiver of the following condition precedent:

9.1.1 the Parties obtaining necessary board and/or shareholder approval to this MOU.

9.2 The Parties shall use their best endeavours to fulfil or waive the above conditions precedent on or before 31 December 2007 in full, or such later date as the Parties may agree in writing, failing which this MOU will lapse and be of no force and effect and no Party shall have a claim against the other as a result of the failure of such condition precedent.

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



## 10. CESSION AND ASSIGNMENT

The Parties shall not be entitled to cede and assign their rights and obligations arising out of this MOU to a third party other than a cession and assignment of their rights and obligations to a company which is held at least 75% by the same ultimate shareholders of the respective Party without the prior written consent of the other Parties, which consent shall not be unreasonably withheld.

## 11. DISPUTE RESOLUTION

In the event of a dispute or disputes arising, such disputes, controversies or differences between the Parties, which may arise out of or in relation to MOU, and which cannot be settled by the board, the Parties shall first try to resolve it amicably through negotiation. In the event that no settlement can be reached through negotiation in reasonable time, any Party may submit the dispute to ICC International Court of Arbitration in Paris for arbitration in accordance with the procedural rules of arbitration of the said Arbitration Court in effect at the time of applying arbitration, the award of which shall be final and binding upon all Parties. The language in Arbitration shall be in English.

## 12. GENERAL PROVISIONS

### 12.1 Further assurance

Each Party shall execute all documents promptly and do all things that the other Party may from time to time reasonably require of it to effect, perfect or complete the provisions of this MOU.

### 12.2 Entire contract and variation

This MOU constitutes the entire contract between the Parties with regard to the matters dealt with herein. There are no terms, conditions or warranties, express or implied, other than those contained in this MOU and there have been no prior representations made by the Parties or any agent or other person purporting to act for the Parties. No variation of the terms of this MOU, or consensual cancellation of this MOU, shall be effective unless reduced to writing and signed by or on behalf of the Parties.

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



12.3 Counterparts

This MOU may be concluded by the Parties signing separate counterparts, which shall together constitute the MOU.

12.4 Confidentiality

Except where such disclosure is required by law, an order of a court of competent jurisdiction or by stock exchange rules, no Party may make a public announcement relating to this MOU without first getting the written consent of the other Parties who may not withhold their consent unreasonably.

12.5 Good faith

The Parties undertake to act in the utmost good faith to each other in giving effect to this MOU.

12.6 Force Majeure

An Affected Party will be excused from performance of and will not be liable to the other Party for any failure to carry out its obligations under this MOU if, and only to the extent of and for the time that it is prevented or delayed in whole or in part from doing so by Force Majeure and any time within which the Affected Party is required to perform any obligation under this MOU will be extended to that extent.

12.7 Applicable law

This MOU shall be governed by, construed and interpreted in accordance with the laws of Zimbabwe.

12.8 Notices and domicilia

12.8.1 The Parties choose the following physical addresses at which documents in legal proceedings or any written notices in connection with this MOU may be served:

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



12.8.1.1 ZMDC

Ground floor

MMCZ Building

90 Mutare Road

Msasa

Harare

Zimbabwe

12.8.1.2 Amari

c/o DF Management

Le Montaigne

7 Avenue de Grande Bretagne

Monte Carlo

MC 98000

Monaco

or at such other address (not being a post office box or *poste restante)* of which the Party concerned may notify the other Party in writing.

12.8.2 Any notice given in terms of this MOU shall be in writing and shall if delivered by hand to a responsible person during ordinary business hours at the physical address chosen as its domicilium citandi et executandi be deemed to have been duly received by the addressee on the date of delivery unless the contrary is proved.

Notwithstanding anything to the contrary contained or implied in this MOU, a written notice or communication actually received by one of the Parties from the other Party shall be adequate written notice or communication to such Party.

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG

72

Signed at HARARE on 22nd November 2007

As Witnesses: -

______________________

______________________

______________________
For ZMDC
Name: I. L. MUBAYIWA.
Capacity: CEO
Who warrants his/her authority

Signed at HARARE on 22nd November 2007

As Witnesses: -

______________________

______________________

______________________
for: AMARI
Name: M. J. NUNN
Capacity: CEO
Who warrants his/her authority

CELESTE KEARTLAND
NOTARY
PUBLIC
SOUTH AFRICA
GAUTENG

# Exhibit D



71

# MEMORANDUM OF UNDERSTANDING





MEMORANDUM OF UNDERSTANDING

BETWEEN

ZIMBABWE MINING DEVELOPMENT CORPORATION

A body corporate established in terms of the Zimbabwe Mining Development Corporation Act [Chapter 21:08] of the Republic of Zimbabwe

(hereinafter referred to as "ZMDC")

And

AMAPLAT (MAURITIUS) LIMITED

A company incorporated in Mauritius with company number 079678

(hereinafter referred to as "Amari")





1. DEFINITIONS

In this MOU, unless the context clearly requires otherwise, the following words and expressions shall have the meanings ascribed to them below:

| | |
|---|---|
| Affiliate | any entity which is directly or indirectly controlled by or in control of a shareholder. For the purposes of this definition, "control" means the ownership of a majority of the voting shares or interest in the entity; |
| Base Metals | oxide and sulphide compounds of nickel (Ni), copper (Cu) and cobalt (Co); |
| Business Day | any day other than a Saturday, Sunday or declared public holiday in terms of Zimbabwean law in force from time to time; |
| Claims | the claims held by ZMDC listed in Annexure 1 hereto which claims comprise approximately 10 million platinum ounces; |
| Commercial Production | mine production of at least one million tons of run of mine ore per annum to be processed by a concentrator at the mine with sufficient concentrating capacity; |
| Company | A company to be incorporated by the Parties in accordance with the laws of Zimbabwe to house the joint venture to be called 'ZIMARI Platinum (Pvt) Ltd; |
| Exploration Program | exploration program as described in sections 4.1, 4.2 and 4.3 of Annexure 2 hereto; |
| Force Majeure | any act, event or cause, whether foreseeable or unforeseeable, not within the reasonable control of the Party affected by an event of Force Majeure ("Affected Party") including acts of God, strikes, stoppages, restraints of labour, wars whether declared or |

CELESTE KEARTON NOTARY PUBLIC SOUTH AFRICA GAUTENG



undeclared, blockades and insurrections, sabotage and civil disturbance/unrest, accident, the adverse application of any laws or enforcement actions of any court or governmental agency (including legal or illegal expropriation) not resulting from any wrongful act or omission of the Affected Party, the refusal of or delay in obtaining any necessary consents from any government agency, provided that the Affected Party has acted in a timely manner in endeavouring to secure them.

| | |
|---|---|
| Feasibility Study | the feasibility study as described in section 4.4 of Annexure 2 hereto; |
| MOU | this memorandum of understanding including any annexure hereto; |
| PGMs | platinum group metals being platinum (Pt), palladium (Pd), rhodium (Rh) and gold (Au) in concentrate or metal form; |
| Parties | the parties to this MOU and "Party" means one of them; |
| Shareholder | shareholder in the Company; |
| Signature Date | The date upon which this MOU is signed by the Party signing last in time; |
| Zimbabwe | Republic of Zimbabwe; |

2. INTERPRETATION

2.1 A reference to a Party includes that Party's successors and authorised assignees.

2.2 Words importing –

2.2.1 any one gender includes the other two genders;

2.2.2 the singular includes the plural and *vice versa*;





2.2.3 natural persons include created entities (corporate or unincorporated) and *vice versa*.

2.3 The headings to the paragraphs of this MOU are included for reference purposes only and shall not in any way affect or govern the interpretation or construction of this MOU.

2.4 If any provision in this MOU is a substantive provision conferring rights or imposing duties on any Party, notwithstanding that it is only in the definition or introduction clause, effect shall be given to it as if it were a substantive provision in the operative part of this MOU;

2.5 Where any period is prescribed in this MOU, that period shall be reckoned exclusively of the first and inclusively of the last day unless the last day falls on a day other than a Business Day, in which case the last day shall be the next succeeding Business Day;

2.6 Where words have been defined in the body of this MOU, such words will, unless otherwise required by the context, have the meanings so assigned throughout this MOU.

## 3. INTRODUCTION

Whereas:

3.1 ZMDC is a body corporate established in terms of the Zimbabwe Mining Development Corporation Act [Chapter 21:08] whose main business is *inter alia* investing in mining and mining development on behalf of the Government of Zimbabwe.

3.2 Amari is a wholly owned subsidiary of Amari Resources International Limited, an international resource investment company focused on exploration and mining in sub-Saharan Africa.

3.3 ZMDC is the beneficial owner of 100% of the Claims and has provided Amari with technical information in respect of the Claims.

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



3.4 ZMDC and Amari wish to enter into a joint venture to prospect for PGMs, Base Metals and ancillary metals on the Claims area and subject to a successful Feasibility Study develop a mine on the Claims area.

3.5 The Parties wish to enter into this MOU to formalise the relationship between the Parties relating to the above matters.

4. JOINT VENTURE COMPANY

4.1 The Parties shall incorporate the Company within a reasonable period of time from the Signature Date.

4.2 The initial shareholding in the Company shall be:

| | |
|---|---|
| ZMDC | 50% |
| Amari | 50% |

and shall comprise such initial capital contributions as agreed by the Parties.

4.3 The Parties record, in the event that ZMDC is required in terms of legislation in Zimbabwe relating to indigenisation to hold a majority interest in the Company, that ZMDC shall have an option to increase its shareholding in the Company to 51%. Such option shall be exercised in writing and shall be purchased at market value as determined by an independent third party agreed by the Shareholders. The exercise of the option shall not have any other material impact on any of the other terms of the Agreement between Shareholders at the time.

4.4 Subject to the provisions of Clause 4.5, the Company shall hold the Claims, undertake the Exploration Program and Feasibility Study and subject to a successful Feasibility Study develop and operate a mine on the Claims area. The Company shall use its best endeavours to complete the Feasibility Study within 24 months of the Claims being transferred to the Company.

4.5 The Company shall procure the requisite regulatory/statutory authorisations specifically the investment licence from the Zimbabwe Investment Authority and exchange control authority where applicable.

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



4.6 In the event that Amari elects to list its interests in the Company on an internationally recognised stock exchange, ZMDC shall have a right of first refusal on such listing to take up shares at the listing price and furthermore will be entitled to exchange part or all of its shareholding in the Company at the time with shares in the listed entity for value as determined by the initial public offering in the listed entity. ZMDC shall support and assist with such listing in the event Amari elects to proceed with such listing.

4.7 The overall strategic management of the Company shall vest in the Board of Directors.

4.8 The initial Board shall consist of five directors, two directors appointed by ZMDC, two directors appointed by Amari of which one will be the managing director of the Company and an independent director appointed jointly by ZMDC and Amari who shall act as the chairperson. The quorum shall be three directors provided that at least one director is from each shareholder. The number of directors on the Board may be increased at any time by agreement between the Shareholders.

4.9 Questions arising at meetings of directors shall, subject to the provisions of 4.11 shall be decided firstly by consensus and failing consensus by a simple majority of votes cast by directors present thereat.

4.10 Questions arising at meetings of Shareholders shall, subject to the provisions of 4.11, be decided by a simple majority of votes.

4.11 Notwithstanding the provisions of 4.9 and 4.10 the Parties agree that certain decisions of the Board and/or the Shareholders of the Company shall require a 75% majority vote. These will include but may not be limited to:

4.11.1 The disposal of the whole or substantially of the whole of the undertaking of the Company, or the whole or greater part of the assets of the Company;

4.11.2 The borrowing of funds, once the mine is developed and operating, from outside sources in excess of USD5 million (or such other amount as the shareholders may unanimously agree);

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG

4.11.3 The variation of any rights attaching to any shares in the issued share capital of the Company;

4.11.4 Determination or variation of the dividend policy of the Company

4.11.5 The provision of security against the Company's assets in excess of USD5 million or such other amount as the Shareholders may unanimously agree;

4.11.6 A change in the Company's financial year end;

4.11.7 The winding-up of the Company; or

4.11.8 An amendment to the provisions of the Memorandum and Articles of Association of the Company.

4.12 In the event that the Company is finally liquidated by a third party ZMDC shall have a first call against the Company in respect of the Claims in a manner and form agreed with the liquidator at the time.

5. CONTRIBUTION OF PARTIES TO THE JOINT VENTURE

5.1 ZMDC shall:

5.1.1 transfer all the Claims to the Company and obtain all statutory and government approvals in respect thereof within a reasonable period of time from the date of incorporation of the Company;

5.1.2 provide technical, financial and legal advice to the Company on the Exploration Program, Feasibility Study and development of a mine/s on the Claims area;

5.1.3 as required from time to time;

5.1.4 allow the Company use of any infrastructure owned by ZMDC including but not limited to roads, rail, power and water supply and warehouses necessary for the Company's activities at market related rates and shall maintain such infrastructure in good working order;

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



5.1.5 in the event that the Company requires the use of infrastructure necessary for its business of exploration and/or mining owned by the government of Zimbabwe, ZMDC shall assist the Company in obtaining the right to use such infrastructure;

5.1.6 use its best endeavours to ensure that the Company obtains fiscal, foreign exchange, social, export/import, environment and labour dispensations from the Zimbabwe government on no less favourable terms than those currently granted in terms of special mining leases to existing platinum producers in Zimbabwe;

5.1.7 assist the Company in obtaining all necessary licences and permits to undertake the Exploration Program, Feasibility Study and operate the mine once developed; and

5.1.8 assist the Company with lobbying government and/or statutory bodies in respect of the needs of the Company as and when requested.

5.2 Amari shall:

5.2.1 Through the Board in liaison with ZMDC, manage the Exploration Program, Feasibility Study and development of a mine/s on the Claims area on behalf of the Company;

5.2.2 provide equity and/or loan funding to the Company for the purposes of funding for:

5.2.2.1 the Exploration Program;

5.2.2.2 the Feasibility Study; and

5.2.2.3 mine development of a mine on the Claims area until such time as the mine reaches Commercial Production

in full as and when required by the Company.

Any funding provided by Amari in terms of this 5.2.2 shall be credited to its loan account or equity respectively in a ratio agreed at the time by the Shareholders and ZMDC shall be credited, at such time, with the same

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



amount of loan or equity respectively in the same ratio of loan to equity as Amari;

5.2.3 facilitate and/or secure the raising of any third party funding referred to in 6.1.1 and 6.1.2 for additional exploration, mine development and expansion including the sourcing and provision of foreign currency for such purposes if required;

5.2.4 source and arrange required equipment, machinery and technology for the activities of the Company;

5.2.5 provide expertise to the Company including but not limited to funding, listing, technical, exploration, financial, structuring, investor relations, corporate marketing; and legal as required from time to time;

5.2.6 perform the structuring, engineering and facilitation of a public listing of Amari's interests on an internationally recognised stock exchange in the event that Amari elects to list it's interests in the Company;

5.2.7 use its best endeavours to ensure that the phase 1 of the Exploration Program is completed within 6 months of the Claims being transferred to the Company and the requisite statutory authorisations being granted to the Company.

5.3 The Parties shall jointly:

5.3.1 work together to assist the Company to obtain any necessary statutory approvals to incorporate the Company including obtaining the necessary approvals for a foreign company to invest in Zimbabwe, obtaining Zimbabwean exchange control approval and to undertake the Exploration Program and subsequently develop the mine on the Claims area to operational status;

5.3.2 liaise with the relevant statutory bodies regarding environmental, social fiscal and other regulatory matters relevant to the future operations of the Company;

5.3.3 procure that the Company does all that is necessary to undertake the Exploration Program and subsequent bankable feasibility study; and

CELESTE KLARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



5.3.4 ensure that all US dollar loans to the Company for funding purposes are repaid in US dollars.

5.4 In the event that the Parties elect not to proceed with the development of a mine on the Claims area as a result of an unsuccessful Feasibility Study, the Claims shall be returned to ZMDC for a nominal value as shall be agreed to by and between the Parties. In such case the Shareholders shall write off any Shareholder loans made by them to the Company until date of such decision.

## 6. FUNDING

6.1 Subject to the provisions of 5.2.2 once a mine has been developed on the Claims area and reached Commercial Production the activities of the Company from time to time shall be funded in the following order:

6.1.1 cash flows from the Company, if any;

6.1.2 third party non recourse funding, in which case Shareholders shall pledge shares as security or provide guarantees as required;

6.1.3 third party recourse funding, in which case Shareholders shall pledge shares as security or provide guarantees as required; and thereafter

6.1.4 by Shareholder loans pro rata to Shareholders shareholding. In the event that any Shareholder does not provide such pro rata Shareholder funding such Shareholder's shareholding shall be diluted accordingly. Notwithstanding the aforementioned a Shareholder may elect to provide the funding required in terms of this clause on behalf of a non funding Shareholder in the form of a loan granted on commercial terms to the non funding Shareholder which loan may be secured by a pledge of the non funding Shareholders shares in the Company and may be set off against any dividends due to the non funding Shareholder until such time as the funding is paid in full. Notwithstanding the aforementioned it is recorded that ZMDC's shareholding shall not be diluted to below 26% as a consequence of a failure to fund in terms of this clause.

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG



6.2 Shareholder loans provided in terms of this clause shall rank above any payments due by the Company (other than in the ordinary course of business) including dividends and any other distributions to Shareholders.

7. PRE EMPTIVE RIGHTS

7.1 A Shareholder ("the Offeror") shall not be entitled to transfer its shares and Shareholder loans in the Company ("Interest") (other than to an Affiliate) unless the Interest has first been offered in writing ("the Offer") to the other Shareholder ("the Offeree") at a price for the Interest stated by the Offeror in the Offer and on the terms of payment required by the Offeror. The Offer shall be open for acceptance by the Offeree/s for a period of 45 (forty five) days after making the Offer. If the Offeree does not accept the Offer, by stating so in writing within the aforementioned period the Offeror shall be entitled to offer such Interest to a third Party on terms no more favourable than those stated in the Offer.

8. DURATION

This MOU shall commence on the Signature Date and supersede any other prior documents relating to the matters specified herein and shall, subject to the provisions of this MOU:

8.1 be binding on the Parties upon signature hereof by each of the Parties; and

8.2 be superseded by a comprehensive shareholder/joint venture agreement which shall incorporate the terms and conditions contained herein; and

8.3 continue to be of full force and effect and binding on all Parties hereto until such time as the more comprehensive Agreements referred to in 8.2 are concluded.

9. DISPUTE RESOLUTION

In the event of a dispute or disputes arising, such disputes, controversies or differences between the Parties, which may arise out of or in relation to MOU, and which cannot be settled by the Board, the Parties shall first try to resolve it amicably through negotiation. In the event that no settlement can be reached

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG

through negotiation in reasonable time, any Party may submit the dispute to ICC International Court of Arbitration in Paris for arbitration in accordance with the procedural rules of arbitration of the said Arbitration Court in effect at the time of applying arbitration, the award of which shall be final and binding upon all Parties. The language in Arbitration shall be in English.

## 10. MISCELLANEOUS

### 10.1 Cession and Assignment

The Parties shall not be entitled to cede and assign their rights and obligations arising out of this MOU to a third party other than a cession and assignment of their rights and obligations to an Affiliate or a company controlled by the same ultimate shareholders as the respective Party without the prior written consent of the other Party.

### 10.2 Further assurance

Each Party shall execute all documents promptly and do all things that the other Party may from time to time reasonably require of it to effect, perfect or complete the provisions of this MOU.

### 10.3 Entire contract and variation

This MOU constitutes the entire contract between the Parties with regard to the matters dealt with herein. There are no terms, conditions or warranties, express or implied, other than those contained in this MOU and there have been no prior representations made by the Parties or any agent or other person purporting to act for the Parties. No variation of the terms of this MOU, or consensual cancellation of this MOU, shall be effective unless reduced to writing and signed by or on behalf of the Parties.

### 10.4 Counterparts

This MOU may be concluded by the Parties signing separate counterparts which shall together constitute the MOU.

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG

92

10.5 **Confidentiality**

Except where such disclosure is required by law, an order of a court of competent jurisdiction or by stock exchange rules, no Party may make a public announcement relating to this MOU without first obtaining the written consent of the other Parties, which consent shall not be unreasonably withheld..

10.6 **Good faith**

The Parties shall at all times act in the utmost good faith to each other in giving effect to this MOU.

10.7 **Force Majeure**

A Party affected by an event of Force Majeure ("Affected Party") will be excused from performance of and will not be liable to the other Party for any failure to carry out its obligations under this MOU if, and only to the extent of and for the time that it is prevented or delayed in whole or in part from doing so by Force Majeure and any time within which the Affected Party is required to perform any obligation under this MOU will be extended to that extent.

10.8 **Applicable law**

This MOU shall be governed by, construed and interpreted in accordance with the laws of Zimbabwe.

10.9 **Notices and domicilia**

10.9.1 The Parties choose the following physical addresses at which documents in legal proceedings or any written notices in connection with this MOU may be served:

CELESTE KEARTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG

95

10.9.1.1 ZMDC Ground floor
MMCZ Building
90 Mutare Road
Msasa
Harare
Zimbabwe

10.9.1.2 Amari Le Montaigne
7 Avenue de Grande Bretagne
Monte Carlo
MC 98000
Monaco

or at such other address (not being a post office box or *poste restante)* of which the Party concerned may notify the other Party in writing.

10.9.2 Any notice given in terms of this MOU shall be in writing and shall if delivered by hand to a responsible person during ordinary business hours at the physical address chosen as its domicilium citandi et executandi be deemed to have been duly received by the addressee on the date of delivery unless the contrary is proved.

Notwithstanding anything to the contrary contained or implied in this MOU, a written notice or communication actually received by one of the Parties from the other Party shall be adequate written notice or communication to such Party.





Signed at Harare on 25 July 2008

As Witnesses: -

1 ______________________

2 ______________________

______________________
for ZMDC
Name: Dominic Mubayiwa
Who warrants his/her authority

Signed at Harare on 25 July 2008

As Witnesses: -

1 ______________________

2 ______________________

______________________
for: AMAPLAT MAURITIUS
Name: MIKE NUNN
Who warrants his/her authority

CELESTE KEI RTLAND NOTARY PUBLIC SOUTH AFRICA GAUTENG

# Exhibit F



**Harare:** Cnr. Piers Road & Fisher Avenue, Borrowdale. P.O. Box CY 1497 Causeway. Phones: +263 4 851440-42, +263 4 851566-9, +263 777 505 256-9
**Bulawayo:** Napier Office Park, 1 Napier Avenue, Hillside. Phones: +263 9 881 425, +263 778 920 295, +263 778 920 296
**Email:** legal@titanlaw.co.zw
www.titanlaw.co.zw

IN REPLY PLEASE QUOTE

Our Ref : E-Letter/GNM/VMH/ZTW002
Your Ref : Mr. Moyo

12th January, 2021

The Permanent Secretary
Ministry of Mines and Mining Development
7th Floor, ZIMRE Centre
Cnr L. Takawira/Kwame Nkrumah Ave
**HARARE**

Dear Sir,

**RE: AMAPLATS MAURITIUS LIMITED & ANOTHER AND ZIMBABWE MINING DEVELOPMENT CORPORATION AND THE CHIEF MINING COMMISSIONER.**

We make reference to your correspondence of 18th November, 2020 advising us that a technical committee had been put into place to URGENTLY attend to our clients' claim, above.

Regrettably, notwithstanding numerous attempts at follow up, it appears that there is no real focus or desire to conclude this matter in an amicable and expeditious manner. Indeed, our clients have questioned the sincerity of the entire process given the unseeming delays experienced thus far.

It should be noted that on 20th February, 2020, our clients demanded full settlement of the arbitral award, being the amount of US$67 544 846.65 inclusive of interest as at 31st January, 2020.

**In order to expediate settlement of the award, our clients then offered to discount this amount by writing off total legal fees, awarded in their favour, in the amount of US$3 120 583; and SIGNIFICANTLY,**

Mlotshwa & Maguwudze
Legal Practitioners

**Partners:** G. N. Mlotshwa, *LLB (Hons) (London)*; T. Maguwudze, *LLB (Hons) (UZ)*; V. Madzima, *LLB (Hons) (Lond Guildhall), LLM (Lond Met)*
C.Dzinamarira, *LLB (Hons)(Fort Hare)*; I. T. Chingarande, *LLB (UCT)*; V. Mhungu, *LLB (Hons)(WSU), LLM (UKZN)*
**Associates:** P. C. Nyatsanga, *LLB (UCT), LLM (London)*; N. P. M. Sandi, *LLB(Hons)(Northampton)*;T. Makamure *LLB (Hons)(UZ)*; T. H. Nyabeze *LLB (Hons)(UZ)*

**writing off approximately US$17 million in accrued interest to arrive at the full and final settlement figure of US$50 MILLION.**

Our clients' reasonable expectation was that this discount would serve as an incentive to rapid settlement and closure of this matter.

It is unfortunate that this discount does not appear to have been taken seriously at all, let alone even acknowledged.

Consequently, our instructions are to advise you that should a settlement commitment not be concluded, in writing, by the parties before 31st January, 2021, our client will proceed to register in the High Court of Zimbabwe the international arbitration award granted in its favour.

In terms thereof, our clients will seek to enforce the ENTIRE amount so granted including interest accrued on the award of **US$49 902 583.74** at an interest rate of 5% per annum as reckoned from 12th January, 2014 to date of payment in full in ADDITION to the legal costs also awarded in favour in the amount of US$3 120 583 aforesaid.

**For the avoidance of doubt, this amount, inclusive of the legal fees aforesaid, amounts to US$70 489 071 as at 12th January, 2021.**

As you may be aware, Zimbabwe is a signatory to the Model Law on International Commercial Arbitration adopted by the United Nations Commission on International Trade Law on 21st June, 1985 giving effect to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards adopted in New York on 10th June, 1958.

Article 35 of the Model Law, as legislated for in our Arbitration Act, obliges the Government of Zimbabwe to recognize as binding the arbitration award in favour of clients, notwithstanding the country in which it was granted.

The registration of the award in our High Court commences the formal process for the enforcement of the award as against the Respondents cited therein, in particular the assets of ZMDC.

In this respect, we highlight the fact that the arbitral award is a 'Public Debt' in terms of the Public Debt Management Act, and has been acknowledged as such by the Attorney-General.

Further, the Minister of Mines & Mineral Development has, in writing, recommended the settlement of the discounted debt by Treasury.



The sentiment that Zimbabwe *must* honour its international obligations, particularly international arbitral awards of this nature,  should be a demonstrable example of its mantra that "Zimbabwe is Open for Business".

In the circumstances we look forward to settlement of this matter by the date aforesaid, failure of which our instructions are to proceed to enforce the entire award without further reference to yourselves.

Please be guided accordingly,

Yours sincerely,

**G N Mlotshwa**
**SENIOR PARTNER**
**TITAN LAW**

Cc:  The Permanent Secretary
     Finance & Economic Development

     The General Manager, ZMDC

     Client



# Exhibit G

17th December, 2021

The Chief Secretary
Office of the President & Cabinet
Munhumutapa Building
Samora Machel Avenue
**HARARE**

Dear Chief Secretary,

**Re: AMAPLATS MAURITIUS LIMITED & ANOTHER AND ZIMBABWE MINING DEVELOPMENT CORPORATION AND THE CHIEF MINING COMMISSIONER**

Further to previous communication in this matter from ourselves, as well as directly from our client, we are instructed to write as follows:-

1. Our clients wish to place on record the assistance that they have received from your good office in the various attempts made to try and ensure for an amicable resolution of the obligations owed to our client by ZMDC and the Government in terms of an international arbitration awards handed in their favour.

2. Further acknowledged is the cooperation and professionalism of the Governor of the Reserve Bank as well as that of the Attorney-General in engaging our clients in attempts to resolve this matter.

3. Our clients note with regret, however, the inability, for unspoken reasons, of the Permanent Secretary for Finance to engage with our clients or indeed, with ourselves, as the legal advisors thereof – requests for appointments have simply been ignored, and letters addressed to his office equally ignored.

4. All of our clients' intimations have been spurned, in certain instances, the indifference to its advances has bordered on the contemptuous. It is not our clients expectation that the chairman of the country's debt management committee, a statutory position, treat significant creditors, who also happen to be investors, in this manner.

5. The debt owed to our clients is a decision of an international tribunal. It has never been disputed by Government, and has indeed been confirmed as a 'Public Debt' by the country's Attorney-General, in writing.

6. For close to seven years, our client has hesitated in enforcing the decision of the tribunal in the various international fora available to it for the simple reason that it has desired to maintain the cordial relationships it has established in Zimbabwe, more so, as it has sought not to prejudice Government's *'Zimbabwe is Open For Business'* investment drive.

7. This goodwill appears to have been taken for granted.

8. We write to advise, as a matter of courtesy to your good self, that our clients have initiated enforcement and other complementary actions internationally, through two global law firms.

9. Our clients wish to state unequivocally that they will vociferously seek to protect their interests, and will not relent in enforcing the tribunal's decision, which inclusive of interest, presently stands in excess of US$72 million.

It is extremely regretful that matters have come to this stage, whereas they could have been prevented by a simple meeting with the Secretary for Finance to agree on a solution that takes into account the financial circumstances of the Country.

Please be advised accordingly,

**Yours sincerely,**

**G N Mlotshwa**
**SENIOR PARTNER**

Cc:      *Minister of Finance & Economic Development*
            *Minister of Mines & Mineral Development*
            *Governor of the Reserve Bank*
            *The Attorney-General*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **Amaplat Mauritius Ltd., *et al*,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Case No. 1:22-cv-00058-CRC** |
| **Zimbabwe Mining Development Corporation, *et al*,** | ) | |
| **Defendants.** | ) | |

**MOTION TO DISMISS BY THE CHIEF MINING COMMISSIONER OF THE MINISTRY OF MINES, THE REPUBLIC OF ZIMBABWE, AND ZIMBABWE MINING DEVELOPMENT CORPORATION**

Defendants, the Chief Mining Commissioner of the Ministry of Mines of Zimbabwe (the "Commissioner"), Republic of Zimbabwe ("Zimbabwe"), and Zimbabwe Mining Development Corporation ("ZMDC), by and through their undersigned counsel, hereby moves to dismiss the Amended Complaint filed by Amaplat Mauritius Ltd. ("Amaplat") and Amari Nickel Holdings Zimbabwe Ltd. ("Amari"), and in support thereof, state as follows:

## INTRODUCTION

Despite having another opportunity to make their claims, Plaintiffs have chosen to rely largely on their own interpretation of the relevant Zimbabwean statutes, news articles devoid of facts, and contradictory allegations. Other new allegations are bare assertions with no support or fall outside the relevant time period for the *alter ego* analysis. Given the extensive time taken to prepare the Amended Complaint and the guidance provided by this Court, it is increasingly obvious that there is no substance to Plaintiffs' allegations. This Court should therefore dismiss the Amended Complaint with prejudice.

## RELEVANT BACKGROUND

In 2007 and 2008, Plaintiffs, Amaplat and Amari each concluded a memorandum of understanding (the "MOUs") with ZMDC to incorporate joint ventures to prospect nickel and platinum deposits and develop mines. *See* ECF No. 1-1 at ¶¶ 3-4.  The MOUs include arbitration clauses which permit a party to submit a dispute to the ICC International Court of Arbitration ("ICC").

Invoking the arbitration clauses, Plaintiffs initiated arbitration proceedings against ZMDC on February 2, 2011. They claimed that ZMDC breached its allegations by attempting to terminate the MOUs on the grounds of corruption in their making. *See id.*, ¶7. Although the Commissioner

was not a party to the MOUs, and Plaintiffs made no claim against the Commissioner, it was named a respondent in the arbitration proceedings. *See id*., ¶ 2.

Between September 2011 to October 2011, the ICC constituted an arbitration tribunal composed of Judge Meyer Joffe, Mr. James Prince Mutizwa, and Mr. Stuart Issacs QC (the "Tribunal").

On January 12, 2014, the Tribunal issued an award in favor of Plaintiffs (the "Award"). It held that ZMDC's purported cancellation of the MOUs amounts to a repudiatory breach of the MOUs, which came to an end with Plaintiffs' initiation of the arbitration. *See id*., ¶181. The Tribunal then ordered ZMDC to pay Plaintiffs damages in the sum of $46,782,000 and interest on these damages. *See id*., ¶227. Although the Tribunal did not find the Commissioner liable for the breach of the MOUs, it ordered it, together with ZMDC, to pay Plaintiffs' legal costs, expenses, and arbitration costs in the amount of $3,120,583.74.

On July 19, 2019, Plaintiffs sought to register and enforce the Award before the Zambian High Court against ZMDC and the Commissioner. *See* ECF No. 1-5. The following month, the High Court issued an *ex parte* "Order for leave to Register and Enforce the Final Arbitration Award" (the "Order"). The High Court prohibited Plaintiffs from enforcing the Award until they served the Order on ZMDC and the Commissioner within 30 days from its issuance. *See* ECF 1-5 at ¶ 2. To date, Plaintiffs have served neither ZMDC nor the Commissioner.

On January 10, 2022, Plaintiffs filed a complaint, seeking to enforce the Order under the D.C. Foreign-Country Money Judgments Recognition Act (the "D.C. Code") against ZMDC, the Commissioner, and Zimbabwe (the "Complaint"). They requested this Court: i) to hold all Defendants jointly and severally liable for the legal costs, expenses, and arbitration fees ordered in the Award; ii) find ZMDC and Zimbabwe liable for the damages awarded to Plaintiffs in the

Award; and iii) order "post-award interest at 5% per annum from January 12, 2014, through the date of entry of the Judgment and post-Judgment interest at the Zambian statutory rate." ECF No. 1, p. 10.

Although Zimbabwe was not a party to the MOUs, the arbitration, or the enforcement proceedings before the Zambian High Court, Plaintiffs argued that the Court should assume jurisdiction over Zimbabwe and enforce the Order against it because it was ZMDC's *alter ego*. Their submission predominantly rested on the Southern District Court of New York's decision in *Funnekotter v Agricultural Development Bank*, No. 13 CIV.1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015), which found ZMDC to be Zimbabwe's *alter ego*. Plaintiffs argued that the Court should give *Funnekotter* preclusive effect under the collateral estoppel doctrine. *See* ECF No. 28, pp. 21-23. They also insisted that the Court should find an *alter ego* because Zimbabwe: i) is the majority owner of ZMDC; ii) has the power to appoint ZMDC's Board of Directors; ii) "has the power to direct ZMDC's actions;" and iii) "uses ZMDC to pay [its] debts." *See id.*, p. 9. Finally, they requested leave to amend the Complaint should the Court find their allegations insufficient to establish *alter ego*. *See id.*, p. 36.

Defendants moved to dismiss the Complaint on different grounds. They argued that the Court lacks subject matter jurisdiction because neither the waiver nor the arbitration exceptions under the Foreign Sovereign Immunities Act ("FSIA") apply to actions to enforce a foreign judgment confirming an arbitration award. *See* ECF No. 34, pp. 4-8; ECF No. 29, pp. 5-8. Defendants also made specific objections to each of them. Zimbabwe disputed the Court's subject matter jurisdiction on the ground that it was not a party to the MOUs or an *alter ego* of ZMDC. The Commissioner in turn argued that the Court cannot assume subject matter jurisdiction under the FSIA because it was an individual, not a foreign state. *See* ECF No. 29, pp. 3-5, 11-20.

Defendants then challenged the Court's personal jurisdiction. They insisted that the Court cannot exercise personal jurisdiction over them because the FSIA immunity exceptions do not apply. ZMDC and the Commissioner further submitted that the Court cannot assume personal jurisdiction because they were not served with the Complaint, and Plaintiffs have not established that they have minimum contacts with the District of Columbia. Finally, Defendants argued that Plaintiffs, *inter alia*, failed to allege sufficient facts to support their claim that Zimbabwe is an *alter ego* of ZMDC and *vice versa*.

On March 22, 2023, the Court denied the motion to dismiss as to the Commissioner but granted the motion to dismiss as to Zimbabwe and ZMDC (the "Court's Order"). *See* Court Order, ECF No. 38, p. 42. It held that the FSIA applies to the Commissioner because it is a "political division" of Zimbabwe and, thus, "a component of the state." *See id.* at 26. The Court next held that it has subject matter jurisdiction and personal jurisdiction over the Commissioner. While it agreed with Defendants that the arbitration exception under Section 1605(a)(6) does not apply to actions to recognize foreign judgment confirming an arbitration award, it assumed jurisdiction over the Commissioner under the waiver exception in Section 1605(a)(1) because the Commissioner was a party to the arbitration and Zimbabwe is a state party to the New York Convention. *See id*., pp. 27-30, 35.

On the other hand, the Court held that it lacks jurisdiction over ZMDC and Zimbabwe because Plaintiffs did not demonstrate that Zimbabwe was ZMDC's *alter ego* and *vice versa*. Aside from refusing to give preclusive effect to *Funnekotter*, it found none of Plaintiffs' allegations adequate to establish *alter ego*. *See id.,* pp. 9-18. But the Court granted Plaintiffs leave to file an amended complaint. *See id*., p. 42.

On May 24, 2023, Plaintiffs filed an amended complaint seeking to enforce the Order against Zimbabwe, ZMDC, and the Commissioner (the "Amended Complaint").

Defendants now file this Motion to Dismiss the Amended Complaint along with the Second Declaration of Mr. Tinashe C. Chiparo, attached hereto as **Exhibit 1** ("Chiparo Second Decl.").

## ARGUMENT

### I. Plaintiffs have failed to establish subject matter and personal jurisdiction by a preponderance of the evidence

On a Fed. Civ. P. Rule 12(b)(1) motion to dismiss, the petitioner must establish the court's jurisdiction "by a preponderance of the evidence." *See* Court Order at 5; *see also Dvorak v. U.S. Dep't of Homeland Sec.*, No. 18-CV-1941 (DLF), 2019 WL 1491743, at *1 (D.D.C. Apr. 3, 2019) (quoting *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011)) (internal quotation marks omitted). Because a Rule 12(b)(1) motion challenges the court's jurisdiction, the court "will subject a plaintiff's complaint to 'closer scrutiny' than on a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Ware El v. Soc. Sec. Admin.*, No. 19CV01684TNMGMH, 2019 WL 5811299, at *2 (D.D.C. Nov. 7, 2019). If the defendant challenges the factual basis of the court's jurisdiction, "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged but instead must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." Court Order, at 6 (*quoting Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)) (internal quotation marks omitted); *see also Johnson v. BAE Sys*., Inc., No. 11-CV-2172 (RLW), 2012 WL 13055684, at *1 (D.D.C. Oct. 23, 2012) ("the [c]ourt is not bound to treat all of the plaintiff's allegations as true, but instead may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts.").

The Foreign Sovereign Immunities Act ("FSIA") provides the only basis for assuming jurisdiction over foreign states, including their instrumentalities. *See Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 443 (1989); Court Opinion at 5. Under the FSIA, foreign states are presumed to be immune from suit unless the plaintiff proves that one of the enumerated exceptions in the statue applies. *See* 28 U.S.C.A. § 1604; *see also Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013) ("FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies.").

The "basic objective of foreign sovereign immunity is to free a foreign sovereign from suit." *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020) (*citing Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co*., 137 S.Ct. 1312, 1317 (2017)) (internal quotation marks omitted). Courts must therefore decide on issues of immunity "as near to the outset of the case as is reasonably possible" and "before the sovereign is required to defend on the merits." *Ibid*.; *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 494 (1983) (holding that questions regarding immunity must be decided "[a]t the threshold of every action."); *Denegri v. Republic of Chile*, No. CIV. A. 86-3085, 1992 WL 91914, at *2 (D.D.C. Apr. 6, 1992) (same); *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) ("to preserve the full scope of that immunity, the district court must make the critical preliminary determination of its own jurisdiction as early in the litigation as possible; to defer the question is to frustrate the significance and benefit of entitlement to immunity from suit.") (internal quotation marks omitted).

Invoking the immunity exceptions under 28 U.S.C. §§ 1605(a)(1) and 1605(a)(6) of the FSIA, Plaintiffs argue that Defendants are subject to the jurisdiction of this Court. *See* Am. Compl., ¶ 8. For the reasons set forth below, the Court should dismiss the Amended Complaint.

**A. Plaintiffs cannot overcome the presumption of juridical separateness and therefore cannot establish that Zimbabwe and ZMDC are *alter egos* of each other**

Where a party alleges that an instrumentality is an *alter ego* of a State, a court first assesses whether the instrumentality is the "sort of entity to which the presumption of separation applies,"[1] and, if it is, it then determines if "sufficient grounds exist to disregard [its] presumptive separateness from the" State. *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 209 (D.D.C. 2014). That presumption can only be displaced by showing that (1) "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) "where recognition of the instrumentality as an entity apart from the state would work fraud or injustice." *See, e.g.,* Court Order at 5-6, (*citing Transamerica Leasing Inc. v. La Republica de Venezuela,* 200 F.3d 843, 847 (D.C. Cir. 2000).

Neither of these two scenarios is present here. Despite obtaining a second opportunity, Plaintiffs have failed to prove that Zimbabwe and ZMDC were *alter egos* during the relevant period, *i.e.*, at the conclusion of the MOUs or during the arbitration. *See* Court Order at 14; *see also TIG Ins. Co. v. Republic of Argentina*, No. 18-MC-00129 (DLF), 2022 WL 1154749, at *8 (D.D.C. Apr. 18, 2022), *order corrected and superseded*, No. 18-MC-00129 (DLF), 2022 WL 3594601 (D.D.C. Aug. 23, 2022) (assessing if Caja (Argentina's instrumentality) was an *alter ego* of Argentina when the underlying contracts between the plaintiff and Caja were made).

---

[1] This Court has already determined that the presumption applies. *See* Court's Memorandum Opinion and Order issued on March 22, 2023, ECF No. 38 ("Court Order").

Zimbabwe and ZMDC have organized their arguments on the issue of *alter ego* below to address the two paths identified by this Court for establishing an *alter ego* relationship despite Plaintiffs' failure to do the same in their Complaint. The manner in which Plaintiffs set out their allegations forced Zimbabwe and ZMDC to speculate, at times, as to which allegations pertained to either the principal-agent or the fraud and injustice prong of the *alter ego* claim.

1. <u>Plaintiffs cannot show that a relationship of principal and agent exists between Zimbabwe and ZMDC</u>

As noted by the D.C. Circuit and repeated by this Court, there is no principal and agent relationship unless the parent has shown this intent, the subsidiary has consented, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and "the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." *DRC, Inc.*, 71 F. Supp. 3d at 216; *see also GSS Group Ltd. v. Nat'l Port Authority of Liberia,* 822 F.3d 598, 605-606 (D.C.C. 2016).

This Court has also made other observations relevant to an *alter ego* analysis that are particular to sovereign-owned entities. First, the fact that a state-owned entity may assist in carrying out "policies and goals" on behalf of the sovereign does not establish an *alter ego* relationship. *See, e.g., Gater Assets Ltd. v. AO Moldovagaz,* 2 F.4th 42, 55 (2d. Cir. 2021). Second, when determining whether "extensive control" exists in the case of a state entity, "a government can wield power not only as [a] shareholder but also as [a] regulator" without erasing the juridical boundaries that exist between the two. *Transamerica Leasing Inc.,* 200 F.3d at 851. Third, it is only when a government exercises control above and beyond its role as a regulator that it has exercised "day-to-day" control over an entity's operations that the separate corporate form can be disregarded. *See id.* To that end, the exercise of a power that is incidental to ownership is not synonymous with control over the

instrumentality's day-to-day operations. Showing control over day-to-day operations is necessary to establish the "extensive control" prong.

In line with the above test, this Court has reiterated the requirements for determining whether the control is so extensive to show that a principal-agent relationship exists, in this case, such that the presumption of separateness is overcome. Court Order at 9. This Court has accepted that the degree of control over the instrumentality must "significantly exceed []the normal supervisory control exercised by any corporate parent over its subsidiary;" that both State and instrumentality act as one, and more importantly, that the relationship of principal-agent is one where the principal has "the right to control the conduct of the agent with respect to matters entrusted to [the agent]." *Id.* at 10 (internal citations omitted). This Court has also reiterated the long-standing position that the control must be more direct beyond "voting a majority of the stock in the subsidiary" or "making appointments to the subsidiary's Board of Directors." *Id.* at 11.

This Court has found that the allegations of the original complaint concerning that ZMDC "was created by the Zimbabwe Mining Development Corporation Act, and by law the Republic of Zimbabwe appoints its Board of Directors, approves significant actions, has the power to direct its actions, [sic] pays the debts of the Republic of Zimbabwe, and must be majority-owned by the Republic of Zimbabwe" to be insufficient to show that ZMDC is the Republic's *alter ego*. *Id.* at 11. The Court noted that "[t]he complaint does not describe what "significant actions" the Republic must approve, how extensive that alleged authority is, or whether that authority "represents the exercise of [the Republic's] authority as shareholder rather than its exercise as a governmental power in the ordinary course of regulation." *Id.* at 11.

Plaintiffs' second attempt to establish an *alter ego* relationship fails for similar reasons set forth in this Court's decision of March 22, 2023. Plaintiffs' additional allegations continue to fail

to show that a principal-agent relationship exists. While the allegations have increased beyond a single paragraph, they are more of the same in substance and fail to show that the Republic exercises day-to-day control over ZMDC.

For a majority of the new allegations concerning this element of *alter ego*, Plaintiffs have relied almost entirely on cherry-picking the provisions of the ZMDC Act[2] to allege that the "Government completely controls ZMDC. . ." *See* Am. Compl. at ¶¶ 42-61. None of these are facts that satisfy the legal standard, and all of the allegations fall flat. Many are based on self-serving interpretations or assumptions of the provisions of the ZMDC Act, intentionally ignoring those provisions that defeat their argument. Other allegations simply reiterate actions that are inherent in a relationship between a state-owned entity and the sovereign or pertain to issues that do not concern or identify the relevant time period (*e.g.*, the time of execution of the MOUs or the arbitration proceedings). Plaintiffs also make several allegations that the Republic instructed or directed ZMDC, without confirming whether ZMDC acted as a result of those alleged instructions or directions. *See, e.g.,* Am. Compl. ¶ 60.[3] Lastly, Plaintiffs rely on contradicting evidence and allegations based on speculation as to a future event. *See, e.g.,* Am. Compl. at ¶ 44, 69-71. In sum, none of the allegations demonstrate any day-to-day control or control so extensive as to show the existence of the principal-agent relationship.

---

[2] Plaintiffs have not included the ZMDC Act as an Exhibit to their Amended Complaint. For purposes of this Motion, the Defendants have relied on Exhibit 3 attached to their Reply in Support of their Motion to Dismiss. *See* ECF No. 29-3.

[3] As to any allegations concerning the termination of Plaintiffs' alleged "joint venture," this is contradicted by the underlying Award which finds that there was an absence of a joint venture agreement between ZMDC and Plaintiffs. Am. Compl. ECF No. 40-1 at 177. Further, there is no allegation in the Award that the Government, rather than ZMDC, terminated the contracts at issue further contradicting the allegation in the Amended Complaint. *See generally,* Am. Compl., ECF No. 40-1.

Plaintiffs continue to harp on the ownership structure of ZMDC (Am. Compl. ¶ 45) and the appointment and composition of board members to argue "complete" government control. Am. Compl. ¶¶ 49-52. This Court has already discarded that the majority ownership of a state entity by the government, a key feature of a state-owned entity, and the appointment of board members by the government are insufficient to overcome the presumption of separateness. ECF No. xxx at x. While the Ministry of Mines appoints members of the Board, this does not change the legal independence bestowed on ZMDC through the ZMDC Act. *See DRC, Inc.*, 71 F. Supp. 3d at 212. These types of allegations do not further Plaintiffs' claim, because as this Court has already noted, "[a] sovereign does not create an agency relationship merely by owning a majority of a corporation's stock or by appointing its Board of Directors." *Transamerica Leasing, Inc. v. Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000); *see also TIG Ins. Co*, 2022 WL 1154749 at 9; *DRC, Inc.*, 71 F. Supp. 3d at 215.

Moreover, while Plaintiffs attempt to argue that the board members "serve at the pleasure of the Minister" (ECF 40 at ¶ 50), this is nothing more than a conclusory statement contradicted by the text of the ZMDC Act. Plaintiffs ignore the express limitations on the Minister's power of removal. Specifically, Section 9 specifies that the Minister may remove a board member only in three scenarios: (a) if they are guilty of improper conduct as member; (2) have failed to comply with the conditions of office or (c) if mentally or physically incapable of efficiently performing their duties as a member. *See also,* Chiparo Second Decl. at ¶ 8. There are also limitations on whom the Minister can appoint as Board members (ZMDC Act, Section 7), and no Board member can serve for a period exceeding three years. ZMDC Act ¶ 6(1). Citations to the ZMDC Act are plainly insufficient, and the power over the board members is not absolute as Plaintiffs wrongly attempt to portray. Am. Compl. at ¶ 50-54.

The allegations that the current Board has members that have served on other government boards or that officers of the Public Service can attend meetings or join the Board are irrelevant for an *alter ego* analysis. *See* Am. Compl. at ¶¶ 52-53. There is no allegation that the Board is completely composed of government employees such that its separate function should be disregarded or that officers of the Public Service vote and can override the decision of the Board. *See id.* Indeed, the officers of the Public Service have no voting rights. ZMDC Act §14. In sum, there is nothing in the power of appointment or the board composition as pled in the Amended Complaint that supports an *alter ego* relationship. Court Order at 11.

Plaintiffs also resort to making contradictory allegations concerning the Board. Despite citing an article that shows the appointment of individuals to the Board of ZMDC (Ex. I), Plaintiffs also rely on a State Department article to claim that Zimbabwe has allowed ZMDC to function without boards. Am. Compl. at ¶ 44, citing to Ex. H, ECF No. 40-8. This Court should disregard these contradictory allegations. *See, e.g., Nehbor v. Yahoo!, Inc.,* 391 F. Supp. 2d 181, 187 (D.C.C 2005) (dismissing claims based on contradictory statements).

Plaintiffs make a series of allegations concerning the Minister's power, including that the Minister has the power to investigate and order reports from ZMDC. Am. Compl. at 54-55. Neither of these actions establishes extensive control. *See, e.g., Gater Assets Ltd.,* 2 F.4th at 57-58 (declining to find that the government's investigations were sufficient to establish extensive control since a government's power to investigate "is not remarkable"). Plaintiffs have failed to cite any investigation or request for a report, let alone any action in this regard that goes beyond the government's role as a regulator. *Transamerica Leasing Inc.,* 200 F.3d at 851. Plaintiffs also allege that the Minister must approve ZMDC's General Manager but fail to allege that the Minister

exercises any further control over the General Manager, besides appointment approval that would support a showing of excessive control or day-to-day control over ZMDC's operations.

In an attempt to bolster their arguments, Plaintiffs resort to misconstruing the ZMDC Act to claim that the "Minister [has] the absolute right to overrule any decision of the Board based on the Minister's view of the public interest." Am. Compl. at 54. There is no provision that supports this interpretation. To the contrary, Section 25(1), which Plaintiffs cite, only allows the Minister, "*after* consultation with the Board to give the Corporation such directions of *general* character relating to the exercise by it of its functions, duties and powers as appear to the Minister to be in requisite in the national interest." ZMDC Act, Section 25(1)(emphasis added). In any event, Plaintiffs have not cited a single instance of the Minister overriding a Board decision, even for reasons of public interest.

Plaintiffs' reliance on the Schedule to the ZMDC Act is equally unavailing. The ZMDC Act expressly provides that that "operations of the Corporation shall, subject to the Act, be controlled by a board . . ." ZMDC Act § 4. While the Minister has approval power for certain actions, Plaintiffs fail to allege, even in a conclusory fashion, that the power goes beyond approval to govern ZMDC's day-to-day operations.

The Schedule (Section 22) of the ZMDC Act outlines the "powers of the corporation," which Plaintiffs conveniently ignore. Am. Compl. at ¶ 57. The corporate powers identified in Schedule 22 show that ZMDC is an independent entity. ZMDC is "capable of suing and being sued" and is further allowed under the Act to alienate property, execute any "negotiable or transferable instruments," make or modify "contracts and enter into suretyships or give guarantees," "associate with, participate in or enter into joint or other ventures with individuals, associations…corporations in the development of the mining industry in Zimbabwe,  and exercise and control issues pertaining to its employees, including employing individuals, suspending or discharging such employees,

selling, constructing, purchasing or leasing dwelling houses and land for purposes of housing employees, among other powers, . ZMDC Act, Schedule, Section 22. Finally, ZMDC is a distinct economic enterprise that is not subject to the same administrative requirements that apply to governmental agencies. ZMDC does not receive any budget from Zimbabwe and "[u]nlike government employees, ZMDC employees are not governed by the Public Service Act 1995" but through other instruments such as the Mining Industry Employment Code. *See* Chiparo Second Decl., ¶ 12. To the extent that certain actions require the approval of the Minister or the Minister of Finance, Plaintiffs have failed to show how those actions demonstrate complete control such that the government exercises day-to-day control over ZMDC's operations.

Like other corporations, ZMDC is responsible for its finances. Its capital consists of "the share capital of the Corporation; and any other moneys or assets that may vest in or accrue to the Corporation as capital." ZMDC Act, §31. Its revenue includes any other cash that "accrues to the Corporation, whether in the course of its operations or otherwise." *See id.*, § 32. At the end of each fiscal year, ZMDC is audited by independent auditors registered as public auditors in terms of the Public Accountants and Auditors Act. *See id.*, Art. 40(1)(2). Plaintiffs cite to several provisions purported to be in Section 33 of the ZMDC Act, which Defendants are unable to locate in the ZMDC Act, except a provision set forth in Article 33 which confirms Plaintiffs' allegation that "ZMDC must declare a dividend to pay the Republic any surplus funds." Am. Compl. at ¶ 56 (citing to subsections of ZMDC Act §33 which do not appear in the text of ZMDC Act). In light of this contradiction between the allegations and the text of the ZMDC Act, this Court should disregard those allegations. It is also irrelevant if Zimbabwe allegedly used the dividends it obtained from ZMDC to pay its debts. As a shareholder, Zimbabwe is entitled to dividends if the revenue in a financial year is enough to cover certain expenses. *See* ZMDC Act, Art. 33.

Plaintiffs then turn their focus on the policy reasons for establishing ZMDC and its stated purpose in the ZMDC Act to claim that they show "complete control." *See* Am. Compl., at ¶ 47-48. Plaintiffs go as far as baselessly alleging that "ZMDC is explicitly an organ of Government policy and was created to pursue government's goals regardless of commercial sense" based on the fact that ZMDC, as is the case with State-owned entities, was set up to carry out certain government policy objectives. Am. Compl. at ¶ 47, 48. But the fact that ZMDC is set up to further the Republic's mining policies or goals is not sufficient to overcome the presumption of separateness. *See, e.g., Gater Assets Ltd.,* 2 F.4th at 55. For similar reasons, Plaintiffs' reliance on a 2018 article citing the Minister as stating that the "boards" are executing "key government objectives" is unavailing and irrelevant to the time period at issue. *See* Am. Compl. at ¶ 51 and Ex. I to Am. Compl., ECF No. 40-9 at 3.

Equally irrelevant is any allegation pertaining to an alleged sale of certain mines in 2018 or 2020 or a future plan to transfer or sell ZMDC's assets. *See, e.g.,* Am. Compl. ¶¶ 58-59 (citing to Ex. J, ECF No. 40-10) and ¶¶ 69-71; *see also,* Court Order at 14 (dismissing allegations outside of the relevant time period for the determination of *alter ego* in this case). In any event, the articles cited cast doubt on whether the alleged actions were completed or occurred. *See* Ex. J, Am. Compl., ECF No. 40-10 at 3 (claiming that "[t]he said mines are part of the ZMDC stable and were under judicial management. In is far [sic] as I am aware, this process is yet to be finalized"); *see also,* Ex. K, Am. Compl., ECF No. 40-11 (discussing a plan to allegedly shift ZMDC's assets to "Defold").

To the extent that Plaintiffs rely on allegations concerning ZMDC's SDN designation by OFAC, those allegations fail to support a finding of *alter ego* under the "principal-agent" factor. The SDN designation itself is insufficient to support a finding of *alter ego*. *See e.g., In re 650 Fifth Ave.* (*650 Fifth*), No. 08 CIV. 10934, 2013 WL 2451067 (S.D.N.Y. June 6, 2013). Even if the Court is to

consider the press release[4] Plaintiffs cite, the allegations concerning ZMDC are vague and not specific. *See* Am. Compl. at ¶ 64. There are no details contained in the press release as to how, when, what and where to allow Defendants to understand the allegations against them. In any event, evidence exists to rebut OFAC's press release on this point. In September 2013, EU delisted ZMDC from its list of sanctioned entities.[5] Moreover, ZMDC is subject to not only an internal, but also external audit by the Office of Comptroller & Auditor General, which in 2011 attained autonomous status from the government.[6] *See* Chiparo Second Decl. ¶ 20.

Lastly, Plaintiffs point to the Republic's alleged use of ZMDC's assets to pay sovereign debt. *See* Am. Compl. ¶ 60 (presumably referring to ¶¶ 67 et. seq.). Plaintiffs' allegations on this point are convoluted. They make a vague reference to the Republic ordering ZMDC to pay off a loan using "its share of the proceeds from the mining project." It is unclear from the allegation whether it is referring to ZMDC or the Republic's share of the proceeds. Whether Plaintiffs are referring to ZMDC or Zimbabwe's share of the proceeds, those allegations fail to support a finding of *alter ego*. There is no relevant time period indicated to allow the Court to consider such an allegation (¶ 68), and even if the transaction refers to the one specified in paragraph 75, that transaction occurred in 2019 and falls outside the relevant time period for the determination of the relevant *alter ego* relationship. Court Order at 14 (identifying the relevant period as either when ZMDC entered into the MOUs with Plaintiffs in 2007 and 2008 or when it actually participated in the Zambian arbitration in 2011). For the same reason, this Court should disregard the allegations contained in paragraphs 78-80.

---

[4] Plaintiffs fail to include the press release as an exhibit to the Complaint, providing the Court only with an excerpt as part of their Amended Complaint.

[5] https://2009-2017.state.gov/j/inl/rls/nrcrpt/2016/vol2/253441.htm

[6] https://www.auditorgeneral.gov.zw/about-us/history

Plaintiffs have demonstrated none of the conditions necessary for finding a principal and agent relationship between Zimbabwe and ZMDC. There is no allegation that Zimbabwe instructed ZMDC to conclude the MOUs on its behalf nor is there any claim that ZMDC entered into the MOUs on Zimbabwe's behalf. *See* ECF No. 1, ¶¶ 18-22. Aside from making conclusory assertions of Zimbabwe's involvement in certain "decisions" or "actions" taken by ZMDC, Plaintiffs have also not alleged or proved that Zimbabwe exerted control over ZMDC's day-to-day operations during the critical time, *i.e*., the conclusion of the MOUs. *See* ECF 28 at 17; *see also TIG Ins. Co*, 2022 WL 1154749 at 9. This is not unexpected. As noted by Mr. Chiparo, ZMDC largely operates without the approval of Zimbabwe or the Minister. *See* Chiparo Second Decl., ¶ 16.

For the above reasons, this Court should find that Plaintiffs have fail to show the existence of an alter-ego relationship between ZMDC and Zimbabwe that would support a finding of jurisdiction in this case.

2. Plaintiffs have not shown that respecting ZMDC's separate corporate personality would result in fraud or injustice

Plaintiffs have also failed to establish *alter ego* under the fraud or injustice prong. To pierce an instrumentality's corporate veil under this prong, there must be proof that the sovereign abused the instrumentality's corporate form "to perpetrate fraud or injustice" during the relevant period. *See Alkanani v. Aegis Def. Servs., LLC,* 976 F. Supp. 2d 1, 8 (D.D.C. 2013)*; see also TIG Ins. Co.*, 2022 WL 1154749, at *10 (refusing to find *alter ego* under the second prong because the plaintiff presented no evidence that, at the time of the relevant period, Argentina manipulated its state-owned company, Caja, to obtain a benefit without risk); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 417 (5th Cir. 2006) (finding fraud or injustice where Turkmenistan, during the relevant period, dissolved a state-owned company that was a party to a joint venture agreement with plaintiff

and replaced it with another state-owned company with small initial capital and immunity from seizure.). Here, there is none.

Lacking evidence, Plaintiffs resort to hyperbole and conclusory allegations. They allege that ZMDC is "undercapitalized" and that Zimbabwe "has been playing a shell game," moving ZMDC's assets to "defraud its creditors," and using ZMDC's assets "as it sees fit." *See* Am. Compl., ¶ 41. To make their case, Plaintiffs point to allegations in news articles that allegedly occurred between 2017-2022. *See e.g.*, ECF No. 28-4, Ex. 2 (referring to alleged bid for sale of ZMDC's mine assets in 2018); ECF No. 28-4, Ex. 3 (referring to alleged sale of ZMDC's assets in 2022); Am. Compl., ECF No. 40-10 (referring to Landela Investment Ltd.'s alleged assessment of the Jena Mine in 2020); Am. Compl., ECF No. 40-11 (referring to Zimbabwe's alleged plan in 2022 to transfer ZMDC's interest in Kamativi Tine Mines.); Am. Compl., ECF No. 40-12 (referring to alleged transfer of treasury bills to Sakunda Holdings Ltd. and Landela Investments Ltd. in 2019); Am. Compl., ECF No. 40-13 (referring to the Ministry of Mines' alleged decision in 2019 to settle ZCDC's debt); Am. Compl., ECF No. 40-14 (referring to alleged arms-for-minerals deal between Zimbabwe's military and China in 2017). These allegations are irrelevant as they fall outside the relevant period.

Plaintiffs' allegations also fail for the following four separate reasons that are further elaborated below. First, the allegation that ZMDC is undercapitalized is conclusory and immaterial as this alone does not prove that Zimbabwe abused ZMDC's corporate form to commit fraud or injustice. There are also no facts to support this bare assertion. Second, there is no evidence that Zimbabwe planned to move ZMDC's assets to another company or that it crafted such a plan to defraud creditors. Again, these are nothing more than empty statements with no support. Third, a disregard of an instrumentality's corporate formality without the intention to commit fraud or injustice is insufficient to establish the second element. In any event, there no evidence that

Zimbabwe improperly used ZMDC's assets. Fourth, and finally, the allegation that ZMDC awarded mining concessions to senior government officials and the claim that President Emmerson Mnangagwa's advisor, Mr. Kuda Tagwirei, "may have been arbitrarily awarded" mining rights in state-owned mines are, aside from being false, irrelevant because they do not prove that Zimbabwe abused ZMDC's corporate form.

*a. Undercapitalization and past payment defaults are irrelevant for the purpose of establishing the second prong*

Plaintiffs have presented no evidence that ZMDC is undercapitalized, but even if that is the case, it is insignificant. "Inadequate capitalization after incorporation" is only relevant "if the capital was removed as part of a fraudulent conveyance scheme." Even "[i]n such a scheme, the inappropriate transfer of assets and not the level of capitalization would be the prevailing factor in determining whether to pierce the corporate veil." *See Gater Assets Ltd.*, 2 F.4th at n. 16 (*citing NLRB v. Bolivar-Tees, Inc.*, 551 F.3d 722, 730 n.7 (8th Cir. 2008). Although Plaintiffs claim that ZMDC is "undercapitali[zed]," and has "consistently failed to meet its financial obligations…both during the pendency of the arbitration and after the arbitral award was issued," there is no allegation, let alone proof, that this was a result of a fraudulent transfer of assets. *See* Am. Compl., , ¶ 67.

*b. There is no evidence that Zimbabwe moved ZMDC's assets to Defold Mine or that it moved those assets to shield them from creditors*

Plaintiffs have again failed to substantiate their claims that Zimbabwe abused ZMDC's corporate form to defraud creditors. Citing to a news article, Plaintiffs argued in their Complaint that the Court should treat Zimbabwe as an *alter ego* of ZMDC because it "may dissolve ZMDC and transfer its assets to a different state-owned entity." ECF No. 28, p. 10. The Court ruled that the allegation is insufficient to establish *alter ego* under the fraud or injustice theory. *See* ECF No. 38, p. 13, n.4. Plaintiffs then reiterate their claim in the Amended Complaint without much more support.

Turning to another news article, they insist that Zimbabwe has a "scheme" to move ZMDC's assets to Defold Mine to defraud ZMDC's creditors. *See* Am. Compl., ¶ 70.

Zimbabwe would have no incentive of taking such measure as only ZMDC is responsible to its creditors. It is thus unsurprising that Plaintiffs, beyond citing to inadmissible hearsay statements in a news article, present no evidence that Zimbabwe planned to transfer ZMDC's interests in Kamativi Tin Mines (Pvt) Ltd and Todal (Pvt) Ltd to Defold Mine to defraud its creditors. *See* Am. Compl., ECF No. 40-11, p.3; *Welborn v. Internal Revenue Serv*., 218 F. Supp. 3d 64, 80 (D.D.C. 2016) ("when considering a motion to dismiss for lack of subject matter jurisdiction, a court cannot rely on conclusory or hearsay statements contained in the affidavit."); *see also Beydoun v. Wataniya Restaurants Holding, Q.S.C.,* 768 F.3d 499, 506 (6th Cir. 2014) ("[i]n general, it is improper for a court to consider hearsay statements when ruling on a motion to dismiss."). There is also no proof that Zimbabwe executed the alleged plan to transfer the assets. Rather, the news article suggests that ZMDC, exercising its autonomy, strongly rejected the alleged plan. *See* Am. Compl., ECF 40-11, pp.3, 5-6.

*c. Plaintiffs cannot satisfy the second element by merely alleging breach of corporate formalities*

"Proof of the first element [of *alter ego*] is not proof of the second." *Fed. Trade Comm'n v. Noland*, No. CV-20-00047-PHX-DWL, 2021 WL 289659, at *4 (D. Ariz. Jan. 28, 2021). A disregard of corporate formality, in the absence of a fraudulent or wrongful intent, is not sufficient to establish the second element. *See Bd. of Trustees, Sheet Metal Workers' Loc. Union 102 Health Ben. Fund v. Gibson Bros*., No. 820329, 1982 WL 2079, at *6 (D.D.C. Oct. 27, 1982) (holding that CGI's failure to respect GBI's corporate formalities is not sufficient to prove "fraud or injustice on the part of CGI."); *see also Fed. Trade Comm'n v. Noland*, 2021 WL 289659, at *4 (noting that disregard of corporate

formalities and commingling of funds "shed no light on the second element," which requires a showing that observing the entity's corporate personality would "result in fraud or injustice.").

Plaintiffs claim that Zimbabwe allegedly disregarded ZMDC's corporate form on several occasions. Particularly, they submit that Zimbabwe: i) "directed ZMDC to repay a loan owed by the Republic using its share of proceeds from a mining project," ii) took "ZMDC's dividends from its joint ventures directly rather than allowing them to go to ZMDC," iii) "diverted ZMDC's revenues to shell companies controlled by political and military figures," iv) "repeatedly directed ZMDC to strip the concessions of joint venture partners who have fallen out of political favor, including Plaintiffs," and v) directed ZMDC to conclude mining concession agreements with the Zimbabwe National Army and foreign companies. *See* Am. Compl., pp. 68, 73, 75, 77-78, 80. These allegations are insufficient to satisfy the second element as there is no claim or proof that these measures were taken to defraud Plaintiffs or other creditors.

There is also no evidence to support either claim. Citing to news articles, they allege that Zimbabwe instructed ZMDC to conclude arms-for-minerals deals with Chinese and Russian companies. *See id*., ¶ 77. Plaintiffs mischaracterize the articles. Exhibit N does not state that ZMDC, with or without Zimbabwe's direction, concluded arms-for-mineral deals with Chinese companies. Rather, it identifies China North Industries Group Corporation ("Norinco"), which has a joint venture with ZMDC, as the entity that has in the past "been accused of quarterbacking China's arms-for-resources deals" with Iraq and South Sudan. *See* Am. Compl., ECF No. 40-14, p.1. The other appended news article also fails to support the claim that Zimbabwe directed ZMDC to conclude arms-for-minerals deals with Russian investors and Russian state-owned company, Rostec. *See* Am. Compl., ¶ 77. The article, deceivingly titled "arms deal behind platinum project," does not report of any arms-for-minerals deals between ZMDC and the Russian entities. *See* ECF No. 28-4, Ex.1. It instead

speculates of "secret arms deal hidden behind" Great Dyke Investments—a joint venture between Pen East mining company and a Russian consortium composed of Rostec, VI Holdings, and Vnesheconombank. *See id*., p. 2. But even that assumption is not based on evidence but on Zimbabwe representatives' alleged participation in an "arms expo" held in South Africa and Mr. Denis Mantrouv's involvement in the joint venture as the chairperson of Rostec supervisory board. *See id*., pp 2-3.

Similarly, there is no evidence that Zimbabwe directed ZMDC to sell its interests in the Kamativi lithium concession to the Zimbabwe National Army or to "award a diamond mining concessions to a company in the United Arab Emirates ("UAE")." *See* Am. Compl., ¶¶ 75, 78. As Mr. Chiparo noted, ZMDC still maintains its interest in Kamativi Tin Mines and the Kamativi dump. *See* Chiparo Second Decl. at ¶ 22. The article cited by Plaintiff does not refute Mr. Chiparo's declaration. Even if there was a plan to dispose these assets, the article notes that it was aborted because it did "not attract [] enough quality bids." ECF No. 28-4, Ex.2, p. 1. Plaintiffs' claim with respect to ZMDC's deal with a UAE company also lacks any support. Contrary to their allegation, the appended article only claims that the Ministry of Mines, not ZMDC, "committed" to satisfy Zimbabwe Consolidated Diamond Company's ("ZCDC") debt to a UAE company by selling a diamond parcel. *See* Am. Compl., Ex. N ECF No. 40-13, p.1.

Finally, there is no evidence that Zimbabwe improperly transferred ZMDC's revenues. Plaintiffs refer to the Department of Treasury's press release of July 25, 2008, which alleges that "Robert Mugabe and his senior officials" have used ZMDC to "illegally siphon revenue and foreign exchange from the Zimbabwean people." The allegation is vague and disputed by other evidence. *See* Motion to Dismiss, pp.15-16. Its relevance is also questionable because there is no indication in the press release that the Treasury's findings were based on facts existing during the relevant period.

      *d. The rest of the allegations are irrelevant as they do not establish an abuse of ZMDC's corporate form*

The other allegations in the Amended Complaint are immaterial for proving the second prong. Plaintiffs claim that: i) ZMDC "on a number of occasions awarded concessions to companies owned by senior government figures," and ii) Mr. Tagwieri "may have been arbitrarily awarded" mining rights in State-owned mines. *See* Am. Compl., ¶¶ 74, 79. The Court should disregard these allegations because they do not prove an abuse of ZMDC's corporate form. *See Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 713 F. Supp. 2d 267, 283 (S.D.N.Y. 2010) ("abuse of the corporate form must be clearly demonstrated to justify holding the subsidiary liable for the debts of its sovereign parent.").

It should also dismiss the allegations because they are inaccurate. ZMDC cannot and has not granted mining concessions to any entity. *See* Chiparo Second Decl. at ¶ 21. Such authority lies with the Ministry of Mines. Plaintiffs cite two news articles discussing Anjin Investment ("Anjin") to argue otherwise. Exhibit O describes Anjin as "a joint venture company incorporated by Chinese construction giant Anhui Foreign Economic Construction Group (AFECC) and Matt Bronze Enterprises (Pvt)." Am Compl., ECF No. 40-15, p.3. It notes that ZMDC has no relation to Anjin. *See id*., p. 2 ("Anjin is not related to the ZMDC"). Contradicting Exhibit O, Exhibit P alleges that ZMDC and the Zimbabwe Defence Industry ("ZDI") have some stake in Anjin. *See* ECF Am. Compl., ECF No. 40-16, p. 1. But neither of the articles suggests that ZMDC awarded mining concessions to Anjin. Nor do they claim that Anjin is owned by "senior government figures." While Exhibit O alleges that Zimbabwe government officials are board members of Anjin, it does not claim that these officials own the entity. Am. Compl., ECF No. 40-15, p.5, Table 1 (describing certain government officials as "members" of Anjin).

For a similar reason, the Court should ignore Plaintiffs' claim with respect to President Emmerson Mnangagwa's advisor, Mr. Kuda Tagwirei. Plaintiffs have presented nothing that supports their speculation that Mr. Tagwieri "may have been arbitrarily awarded" mining rights.

**B. This Court cannot assume subject matter jurisdiction under the waiver exception in 28 U.S.C. §1605(a)(1)**

Section 1605(a)(1) allows a court to assume jurisdiction over a foreign sovereign where the sovereign waives its immunity explicitly or implicitly. The D.C. Circuit and other sister circuit courts have construed the implied waiver exception narrowly. *See Khochinsky v. Republic of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 771 (2022); *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 691 (D.C. Cir. 2022) ("this circuit has followed the virtually unanimous precedents construing the implied waiver provision narrowly.") (internal quotation marks omitted); *Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193, 201 (2d Cir. 1999). To assume jurisdiction under the waiver exception, "the waiver must be clear and unambiguous." *TIG Ins. Co. v. Republic of Argentina*, No. 18-MC-00129 (DLF), 2022 WL 3594601, at *5 (D.D.C. Aug. 23, 2022)

An implied waiver under 28 U.S.C. §1605(a)(1) exists where the foreign sovereign "indicated its amenability to suit" in the United States and the sovereign "subjectively intended" to waive its immunity. *See ibid*; *see also Khochinsky*, 1 F.4th at 8; *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 105 (D.D.C. 2005); *Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193, 201 (2d Cir. 1999); *Haven v. Rzeczpospolita Polska*, 68 F. Supp. 2d 947, 953 (N.D. Ill. 1999), *aff'd sub no. Haven v. Polska*, 215 F.3d 727 (7th Cir. 2000); *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985) ("courts rarely find that a nation has waived its sovereign immunity…without strong evidence that this is what the foreign state intended.").

The Amended Complaint provides no evidence of subjective or objective implied waiver. Plaintiffs argue that Defendants waived their immunity by "agreeing to and participating in an

arbitration governed by the New York Convention in Zambia, which, like Zimbabwe, is and was a party to the New York Convention." Am. Compl., ¶ 10. The Court should reject their claim and find that it lacks jurisdiction over Defendants for the following two reasons. First, Zimbabwe was not a party to the arbitration agreement. Second, neither of Defendants could be deemed to have waived their immunity from the present action because the New York Convention, the foundation of Plaintiffs' implied waiver claim, does not apply to enforcement of a foreign judgment confirming an arbitration award.

**1. <u>The implied waiver exception does not apply to Zimbabwe because it was not a party to the MOUs</u>**

The waiver exception in Section 1605(a)(1) cannot serve as a basis for assuming jurisdiction against a foreign state that was not a party to the arbitration agreement. *See Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1017 (2d Cir. 1993) ("an agreement to arbitrate in a foreign country, without more, ought not to operate as a waiver of sovereign immunity in United States courts, especially in favor of a non-party to the agreement."); *see also ibid* ("[w]hen the case involves an implied waiver, we think that a court should be even more hesitant to extend the waiver in favor of third parties."); *Zernicek v. Petroleos Mexicanos (Pemex)*, 614 F. Supp. 407, 411 (S.D. Tex. 1985), *aff'd sub nom. Zernicek v. Brown & Root, Inc*., 826 F.2d 415 (5th Cir. 1987) (*citing Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1100 n. 10 ("courts rarely find that a nation has waived its sovereign immunity, particularly with suits brought by third parties, without strong evidence that this is what the foreign state intended."). Since Zimbabwe was not a party to the MOUs this Court lacks jurisdiction over it.

2. **The implied waiver exception does not extend to either ZMDC or Zimbabwe because the New York Convention only applies to enforcement of foreign arbitration awards**

Plaintiffs do not allege that ZMDC and Zimbabwe subjectively intended to waive their immunity from the present action by participating in an arbitration in Zambia—a party to the New York Convention.[7] To the extent that they are claiming objective intent of waiver, Plaintiffs have presented no action by these entities that can objectively be seen as an intent to waive immunity. They submit that Defendants could have foreseen the present action because an action to enforce a foreign judgment on an arbitral award is "so closely related" to an action to enforce an arbitral award. Am. Compl., ¶ 10. While these actions are indeed related, "they are nonetheless distinct from one another," (*Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 330 (D.C. Cir. 2014)) "as are the causes of action relating to them." *See* ECF No. 38, p. 29. The United States has noted, and the D.C. Circuit has affirmed that the New York Convention, which is at the core of Plaintiffs' implied waiver claim, does not govern a "foreign court judgment confirming an arbitral award." *Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 330 (D.C. Cir. 2014) (*quoting* Amicus United States Brief, p. 14, *Commissions Imp. Exp. S.A*, 757 F.3d 321 (D.C. Cir. 2014) (No. 13-7004). This Court has also recently held that US "courts are not required to accord preclusive effect to foreign judgments in petitions pursuant to the New York Convention." *Blasket Renewable Invs., LLC v. Kingdom of Spain*, No. CV 21-3249 (RJL), 2023 WL 2682013, at *5 (D.D.C. Mar. 29, 2023).

If Plaintiffs admit, as they must, that the New York Convention does not apply to a foreign judgment confirming an arbitration award, their implied waiver claim should be rejected. Neither of

[7] This Court has determined that it can exercise jurisdiction over the Commissioner pursuant to the waiver exception. The Commissioner respectfully disagrees and maintains its right to appeal the decision.

the state parties to the New York Convention could have foreseen waiving their immunity against an action to enforce a foreign judgment on an arbitration award by ratifying a convention that does not apply to such an action. This view is consistent with the Supreme Court's decision in *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 430 (1989) in which it held that "[a] foreign state cannot waive its immunity under § 1605(a)(1) by signing an international agreement that does not mention a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States." *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 430 (1989).

Although this Court, as noted in the Order, has previously held that *Argentine Republic v. Amerada Hess Shipping* does not preclude a finding of waiver of immunity in actions to enforce an arbitral award against a foreign state that is a party to the New York Convention, the same cannot be said here. *See* Court Order at 2, n.2 (*citing Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 506 F. Supp. 3d 1, 9 (D.D.C. 2020) *aff'd on other grounds*, 27 F.4th 771 (D.C. Cir. 2022)). In *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, this Court found that Nigeria, a party to the New York Convention, waived its immunity from arbitral award enforcement actions governed under the Convention because the Convention "contemplates the availability" of such actions in the United States. *Ibid*. The Convention requires "each Contracting State [to] recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." *Id*., at 8 (internal quotation marks omitted). Relying on this obligation imposed on state parties, the Court held that "Convention signatories presumably know that, under the Convention, arbitral awards will be judicially enforced if they are 'rendered in a state party to the Convention'" *Id*., at n.4. No such conclusion can be drawn here because State parties to the Convention are not obliged to enforce a foreign judgment of an arbitration award.

**C. This Court cannot exercise subject matter jurisdiction under 28 U.S.C. §1605(a)(6) because Plaintiffs are not seeking enforcement of an arbitration agreement or an arbitration award**

Section 1605(a)(6), known as the "arbitration exception," is also inapplicable. Under Section 1605(a)(6), a court can exercise subject matter jurisdiction over a foreign state only if "the action is brought, either to enforce an agreement made by the foreign state…or to confirm an award made pursuant to such an agreement to arbitrate." 28 U.S.C. §1605(a)(6) (emphasis added). Since Plaintiffs are seeking to enforce the Zimbabwe High Court Judgment and not the MOUs containing the arbitration agreement or the Award, this Court, as it previously noted, cannot assume subject matter jurisdiction based on Section 1605(a)(6). *See* ECF No. 38, pp. 28-29.

**D. The Court lacks personal jurisdiction over Defendants because none of the FSIA immunity exceptions applies**

A court cannot exercise personal jurisdiction over a foreign state unless one of the immunity exceptions provided in 28 U.S.C. §§ 1605–07 applies. *See TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 299 (D.C. Cir. 2005) (citing 28 U.S.C. § 1604. As Defendants earlier explained, none of the immunity exceptions apply so this Court lacks personal jurisdiction over Defendants. *See* Section I(B) and (C).

**1. <u>The Court cannot exercise personal jurisdiction over ZMDC because there is no allegation that it has minimum contacts with the District</u>**

Because a state's agencies and instrumentalities are "persons" for the purpose of the Due Process Clause, a court cannot assume personal jurisdiction over such entities where they lack minimum contacts with the forum. *See* ECF No. 38, p. 18 (*citing GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 815 (D.C. Cir. 2012)).

Plaintiffs have neither alleged nor proved that ZMDC has any contact with the District of Columbia. While they attempt to surpass the minimum contacts requirement by alleging that ZMDC

is Zimbabwe's *alter ego*, they have presented no basis for such a conclusion. There is no allegation or proof that ZMDC exercised extensive control over Zimbabwe or that it abused Zimbabwe's corporate form to commit fraud or injustice.

**2. <u>The Court also cannot assume personal jurisdiction over ZMDC because it was not served with the Complaint or Amended Complaint</u>**

Section 1608(b) provides the exclusive methods for serving an agency or instrumentality of a foreign state. *See, e.g., Seramur v. Saudi Arabian Airlines*, 934 F. Supp. 48, 51-52 (E.D.N.Y. 1996). Section 1608(b) sets up a "hierarchical regime for the appropriate methods of service," requiring that a plaintiff attempt the first method or show its unavailability before moving on to the next. *See, e.g., Estate of Hartwick v. Islamic Republic of Iran*, No. 18-cv-1612, 2021 WL 6805391, *8 (D.C.C. Oct. 1, 2021) (identifying a hierarchy in the methods available for service under § 1608(b)). If there is no special arrangement for service between the foreign state agency and the plaintiff, and if the agency does not have any person authorized to receive service of process in the United States, the plaintiff must serve the instrumentality through either one of the following three methods of service: (i) letter rogatory; (ii) "any form of mail requiring a signed receipt;" or (iii) "as directed by order of the court consistent with the law of the place where service is to be made." 28 U.S.C.A. § 1608(b)(3).

Plaintiffs have served neither the Complaint nor the Amended Complaint on ZMDC in accordance with Section 1608(b). On June 10, 2022, they requested the Clerk of this Court to mail through DHL a copy of the Summons and Complaint to ZMDC "pursuant to…28 U.S.C. § 1608(b)(3)(B)." ECF No. 12. On June 13, 2022, the Clerk certified to have mailed the documents to ZMDC in accordance with Plaintiffs' request and attached a DHL receipt of shipment. See ECF 18-3. But Plaintiffs have not filed proof of service. Instead, they filed an affidavit of service on August 18, 2022, indicating that they effected service on ZMDC by "personally hand delivering"

the Summons and the Complaint on "Theresa Kanengoni" who allegedly "was a secretary of" ZMDC. *See* ECF 24, ¶¶ 2-4 (emphasis added).

Service through personal delivery is not permitted under Section 1608(b), thus, the Court cannot exercise personal jurisdiction over ZMDC. *See Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 416 (S.D.N.Y 1998) (holding that service through personal delivery is incompatible with 28 U.S.C. § 1608(b)(3)); *McNeil v. United States*, 508 U.S. 106, 113 (1993) (*quoting Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) ("in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law."); *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152, 104 S. Ct. 1723, 1726, 80 L. Ed. 2d 196 (1984) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.").

## II. Plaintiffs have failed to state a claim upon which relief can be granted[8]

This Court has already set forth the applicable standard for reviewing a motion to dismiss for failure to state a claim. *See* Court Order at 6-7. In summary, this Court has reiterated the long-held position that "[t]o survive a motion to dismiss [on the basis of Rule 12(b)(6) motion], a complaint must have sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* This Court has reiterated, however, that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," nor does the Court "assume the truth of legal conclusions." *Id.*

[8] The Defendants by filing this Motion to Dismiss do not waive any arguments made in the previously filed Motion to Dismiss (ECF No. 23 and 30), but reserve them based on the text of this Court's Opinion issued on March 22, 2023.

In deciding a motion for failure to state a claim, courts may only consider the allegations in the complaint and exhibits. *United States ex rel. Jenkins v. Sanford Cap., LLC*, No. CV 17-239, 2020 WL 5440551, at *5 (D.D.C. Sept. 10, 2020). Where there is a contradiction between the allegations in the complaint and the exhibits attached, the exhibit generally controls. *See Regan v. Spicer, HB, LLC,* 134 F. Supp. 3d 21, 26 (D.D.C. 2015) (citing 5A Charles Wright & Arthur Miller, *Federal Practice and Procedure: Civil 3d* § 1327, 450–451 (3d ed. 2004).

**A. The Amended Complaint fails to plead facts sufficient to establish an *alter ego* relationship involving Zimbabwe**

While the standard outlined above is more forgiving than that applicable to allegations for establishing personal and subject-matter jurisdiction, Plaintiffs are still unable to properly allege that Zimbabwe is ZMDC's *alter ego*.

Under the principal-agent theory of *alter ego*, Plaintiffs have failed to allege any facts that support a finding that the government controls ZMDC's day-to-day operations. The allegations as to the Minister's power largely rest on the government's power as a regulator and shareholder. *See* Am. Compl. at ¶¶ xx. To the extent that the allegations purport that the Minister may override the Board's decisions, those allegations are contradicted by the cited articles of the ZMDC Act. *See* ZMDC Act, Section 22. The Minister's approval power, as explained above, is limited only to certain types of transactions and Plaintiffs have not shown that the Board is failing to oversee the operations of ZMDC. To the extent that Plaintiffs allege that ZMDC was operated without a Board, that allegation is contradicted by Plaintiffs' other allegations concerning the Board's composition and should be disregarded. Plaintiffs' allegations concerning the government's transfer or sale of assets or payment of loans fall outside of the relevant period established by this Court in its March Order and therefore are insufficient to support a claim of *alter ego*. Plaintiffs' reliance on the OFAC Press Release provides nothing more than a conclusory allegation that Zimbabwe used entities, including ZMDC,

to "illegally siphon revenue and foreign exchange" without specifying anything further, including the relevant period to which those acts occurred making it difficult for the Court to determine whether those allegations are relevant to the *alter ego* analysis here. As to Plaintiffs' remaining allegations, the Defendants, for the sake of efficiency, refer the Court to their arguments above concerning those allegations.

The alleged facts are also insufficient to establish *alter ego* under the fraud or injustice theory. In its Order, this Court held that the allegation that Zimbabwe "may" transfer ZMDC's assets to another state-owned company is inadequate to establish *alter ego* under the fraud or injustice theory. *See* ECF No. 38, p. 12, n. 4. While Plaintiffs restate this allegation in their Amended Complaint, they have presented nothing to persuade the Court to reach a different conclusion. To the contrary, the additional news article submitted by Plaintiffs further casts doubt as to whether such transfer even took place as it notes that ZMDC fiercely resisted the alleged plan. *See* Am. Compl., ECF No. 40-11, p.3., pp. 5-6.

The allegations that Zimbabwe used ZMDC's assets and directed it to conclude an agreement with local and foreign companies are also insufficient to establish the second element of *alter ego* because there is no indication that Zimbabwe took the alleged actions to commit fraud or injustice. *See* Motion to Dismiss, pp. 20-22. The Court should also reject the allegations because they are contradicted by the appended news articles which the Court must defer to in cases of conflicts between the allegations in the complaint and the exhibits. *See ibid*.

Lastly, Plaintiffs also allege without *any* supporting facts that the Commissioner is an *alter ego* of Zimbabwe. *See* Am. Compl. ¶ 16. Without any supporting facts, this Court should find that any claim as to the existence of an alter-ego relationship between the Commissioner and Zimbabwe fails and should be dismissed.

## CONCLUSION

For the foregoing reasons, Zimbabwe, the Commissioner, and ZMDC request that the Court grant the Motion to Dismiss and whatever additional relief the Court considers just and proper.

Respectfully submitted,

/s/ Quinn Smith
**GST LLP**
Quinn Smith
DCD Bar No. FL0027
quinn.smith@gstllp.com
Katherine Sanoja
DC Bar No. 1019983
katherine.sanoja@gstllp.com
1111 Brickell Avenue
Suite 2715
Tel. (305) 856-7723

Bethel Kassa
DC Bar 1778957
bethel.kassa@gstllp.com
2600 Virginia Avenue, Suite 205
Washington D.C., 20037

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2023, I electronically filed this document with the Clerk of the Court of the U.S. District Court of the District of Columbia by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel off record. I further certify that I am unaware of any parties who will not receive such notice.

By: /s/ *Quinn Smith*
Quinn Smith

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Amaplat Mauritius Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph Riviere Street, Port Louis 11602, Mauritius;
and

Amari Nickel Holdings Zimbabwe Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph Riviere Street, Port Louis 11602, Mauritius,

Plaintiffs,

v.

Zimbabwe Mining Development Corporation,
90 Mutare Road, Msasa, Harare, Zimbabwe;

The Chief Mining Commissioner, Ministry of Mines of Zimbabwe,
6th Floor, ZIMRE Centre, Cnr. Leopold Takawira Street/Kwame Nkrumah Avenue, Private Bag 7709, Causeway, Harare, Zimbabwe;

and the Republic of Zimbabwe,
c/o Head of the Ministry of Foreign Affairs,
Ministry of Foreign Affairs, P.O. Box 4240, Munhumutapa Building, Cnr. Samora Machel Avenue/Sam Nujoma Street, Harare, Zimbabwe

Defendants.

Civil Action No. 1:22-cv-00058-CRC

**PLAINTIFFS' (1) OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT AND (2) CONDITIONAL CROSS-MOTION FOR JURISDICTIONAL DISCOVERY**

## TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. RELEVANT BACKGROUND. ........ 3

A. ZMDC Was Structured to Be Dominated by The Government of Zimbabwe, Through the Ministry of Mines. ........ 3

B. Plaintiffs' Investment in Zimbabwe. ........ 6

C. The Minister of Mines and His Hand-Picked ZMDC Board Chair Take Charge of ZMDC and Dismiss Its CEO. ........ 7

D. Using Its Control Over ZMDC, Zimbabwe Strips Plaintiffs of Their Mining Concessions. ........ 8

E. Zimbabwe's Further Manipulation of ZMDC. ........ 8

F. The Arbitration Award Finds Zimbabwe Provided False Testimony. ........ 12

G. The Zambian Post-Award Litigation and Judgment. ........ 14

H. Zimbabwe's Continuing Efforts to Defraud ZMDC's Creditors, Including Plaintiffs. ........ 15

III. LEGAL STANDARD ........ 15

IV. ARGUMENT ........ 16

A. Because They Are Alter Egos, This Court Has Subject Matter Jurisdiction Over Zimbabwe and ZMDC and Personal Jurisdiction Over ZMDC. ........ 17

1. Despite Defendants' Attempts to Ignore Them, The *Bancec* Factors Provide the Test for Alter Ego Status. ........ 18

2. The *Bancec* Factors Strongly Favor Alter Ego Status. ........ 19

a. Zimbabwe Exercises Total Economic Control of ZMDC. ........ 20

b. Zimbabwe Is Entitled To Any Profits. ........ 23

c. Zimbabwe Manages ZMDC. ........ 24

d. Zimbabwe Is the Beneficiary of ZMDC. ........ 26

e. Zimbabwe Has Used ZMDC's Corporate Form Inequitably. ........ 28

3. The Alter Ego Analysis Considers All Relevant Facts, Not Just Those at The Time A Contract Is Signed. ........ 29

B. In the Alternative, This Court Should Authorize Tailored Jurisdictional Discovery. ........ 31

C. ZMDC's Implied Waiver Extends to Its Alter Ego And To Judgments On Arbitration Awards. ........ 33

D. ZMDC Was Properly Served. ........ 34

1. Because ZMDC Is An Agency or Instrumentality, Substantial Compliance Plus Actual Notice Suffices. ........ 35

2. ZMDC Agreed That "Documents In Legal Proceedings" Could Be Served By Hand Delivery At Its Headquarters. .......... 35

3. Plaintiffs Served ZMDC In Accordance With The MoUs, And ZMDC's Failure to Give Notice of Its Office Move Does Not Avail It. .......... 37

4. If The Court Nonetheless Finds Service Ineffective, Dismissal Is Still Inappropriate And The Court Should Authorize Alternate Service Under 28 U.S.C. § 1608(b)(3)(C). .......... 40

E. The Amended Complaint States A Claim. .......... 41

V. CONCLUSION. .......... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
798 F. Supp. 2d 260 (D.D.C. 2011) ....................35

*In re Airadigm Commc'ns, Inc.*,
616 F.3d 642 (7th Cir. 2010) ....................36

*Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*,
No. 22-CV-58 (CRC), 2023 WL 2603746 (D.D.C. Mar. 22, 2023).................... *passim*

*Angellino v. Royal Fam. Al-Saud*,
688 F.3d 771 (D.C. Cir. 2012) ....................36

*Azima v. RAK Inv. Auth.*,
926 F.3d 870 (D.C. Cir. 2019) ....................37

*Barot v. Embassy of the Republic of Zambia*,
785 F.3d 26 (D.C. Cir. 2015) ....................40

*Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*,
168 F. Supp. 3d 1 (D.D.C. 2016) ....................41

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
734 F.3d 1175 (D.C. Cir. 2013) ....................16

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
447 F.3d 411 (5th Cir. 2006) ....................28

*Creighton Ltd. v. Gov't of State of Qatar*,
181 F.3d 118 (D.C. Cir 1999) ....................15

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019)....................18

*de Csepel v. Republic of Hungary*,
No. 1:10-CV-01261(ESH), 2020 WL 2343405 (D.D.C. May 11, 2020), *aff'd*,
27 F.4th 736 (D.C. Cir. 2022) ....................18

*Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*,
225 F. Supp. 3d 18 (D.D.C. 2014) ....................36, 39

*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983) (*Bancec*) .................... *passim*

*Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*,
766 F.3d 74 (D.C. Cir. 2014)....41

*Funnekotter v. Agric. Dev. Bank of Zimbabwe*,
No. 13 CIV. 1917 CM, 2015 WL 3526661 (S.D.N.Y. June 3, 2015) ....27

*Funnekotter v. Agric. Dev. Bank of Zimbabwe*,
No. 13 Civ. 1917 (CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015)....1, 17, 18, 30

*GSS Grp. Ltd v. Nat'l Port Auth.*,
680 F.3d 805 (D.C. Cir. 2012)....17, 34

*Hashem v. Shabi*,
No. CV 17-1645 (ABJ), 2018 WL 3382913 (D.D.C. Apr. 26, 2018) ....41

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,
185 F. Supp. 3d 233 (D.D.C. 2016)....32

*Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo*,
131 F. Supp. 2d 248 (D.D.C. 2001)....36, 39

*Long v. Home Indem. Co. of New York*,
169 So. 154 (La. Ct. App. 1936)....38

*McKesson Corp. v. Islamic Republic of Iran*,
52 F.3d 346 (D.C. Cir. 1995)....22, 26

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006)....37

*New England Merchants Nat. Bank v. Iran Power Generation & Transmission Co.*,
495 F. Supp. 73 (S.D.N.Y. 1980) ....40

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
73 F.4th 157 (3d Cir. 2023) .... *passim*

*Phoenix Consulting, Inc. v. Republic of Angola*,
216 F.3d 36 (D.C. Cir. 2000)....16, 32

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
No. 18-CV-594 (CRC), 2020 WL 7122896 (D.D.C. Dec. 4, 2020), *aff'd on other grounds,* 27 F.4th 771 (D.C. Cir. 2022) ....2

*Robbins v. S. Gen. Ins. Co.*,
243 A.2d 686 (D.C. 1968) ....37

*Rubin v. Islamic Republic of Iran*,
138 S. Ct. 816 (2018) ... 19

*Ry. Mail Ass'n v. Moore*,
15 F.2d 547 (4th Cir. 1926) ... 38

*Saleh v. Al Nahyan*,
No. CV 20-1168 (ABJ), 2021 WL 7210780 (D.D.C. July 16, 2021) ... 41

*Schimmelpennich v. Bayard*,
26 U.S. 264 (1828) ... 36

*TIG Ins. Co. v. Republic of Argentina*,
No. 18-MC-00129 (DLF), 2022 WL 1154749 (D.D.C. Apr. 18, 2022), *order corrected and superseded,* No. 18-MC-00129 (DLF), 2022 WL 3594601 (D.D.C. Aug. 23, 2022) ... 29, 30

*TMR Energy Ltd. v. State Property Fund of Ukraine*,
411 F.3d 296 (D.C. Cir. 2005) ... 21, 24

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
30 F.3d 148 (D.C. Cir. 1994) ... 23, 35, 39, 40

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
200 F.3d 843 (D.C. Cir. 2000) ... *passim*

**Statutes**

28 U.S.C. § 1605 ... 17

28 U.S.C. § 1608 ... *passim*

Mines and Minerals Act 1961 ch. 21:05 § 2 (Zim.) ... 4, 20

Zimbabwe Mining Develipment Corporation Act 1983 ch. 21:08 § 27 (Zim.) ... 4, 20, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08, Schedule § 20 (Zim.) ... 5, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08, Schedule § 21 (Zim.) ... 5, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08, Schedule § 22 (Zim.) ... 5, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08, Schedule § 23 (Zim.) ... 5, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08, Schedule § 24 (Zim.) ....................5, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 5 (Zim.)....................5, 24

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 6 (Zim.)....................5, 24

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 9 (Zim.)....................5, 24

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 13 (Zim.)....................5, 24

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 20 (Zim.)....................5, 20, 27

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 23 (Zim.)....................4, 20, 27

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 25 (Zim.)....................4, 21, 27

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 27 (Zim.)....................5

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 34 (Zim.)....................5, 24, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 36 (Zim.)....................5, 25

**Other Authorities**

72 C.J.S. Process § 126....................38

Fed. R. Civ. P. 4(f)(3) ....................41

## I.   INTRODUCTION

Plaintiffs seek to enforce the Zambian court's judgment registering an ICC arbitration award, which found that Zimbabwe Mining Development Corporation, or ZMDC, had unlawfully expropriated the Plaintiff's concessions at the behest of the Government of Zimbabwe. Plaintiffs are entitled to satisfy the judgment against Defendants because ZMDC and Zimbabwe are "alter egos" of one another. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) (*Bancec*); *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, No. 13 Civ. 1917 (CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015) (previously finding ZMDC and Zimbabwe to be alter egos).

Zimbabwe, principally through the Ministry of Mines, controls all material decisions of ZMDC; functionally it is an extension of the Ministry. That is by design. The Act establishing ZMDC grants the Minister unfettered power over ZMDC's Board and its executives and subsidiaries. It directs ZMDC to always act in the national interest and to pursue government policy. It tasks ZMDC's Board with implementing Ministerial instructions. In practice, Zimbabwe's power over ZMDC is, if anything, even greater than provided by the Act, as the Zimbabwean Government, not ZMDC, decides who wins (and loses) ZMDC's mining concessions—and much more. Most recently, Zimbabwe has used its control over ZMDC to play a shell game with ZMDC's assets with the apparent goal of frustrating ZMDC's creditors.

Both the Zimbabwean Parliament and the broader international community recognize ZMDC and Zimbabwe as interchangeable. The Parliament has complained of direct meddling and political interference by the Ministry in ZMDC's affairs, to the point that "the Secretary of Mines is directly involved in operational issues at," among other nominally juridically distinct entities, "ZMDC." The U.S. Government has repeatedly concluded that Zimbabwe allows ZMDC and other state-owned entities to "function without boards" and has sanctioned ZMDC

precisely because it is so closely connected to Zimbabwe's government and its policies. The combined identity of ZMDC and Zimbabwe is further supported here by expert testimony from Sternford Moyo, a respected Zimbabwean lawyer and former President of the International Bar Association, who concludes, based on his extensive experience, that the Minister of Mines exercises control over ZMDC's Board and the company itself.

Faced with the Amended Complaint's detailed allegations, Defendants offer only conclusory denials, ignore the ZMDC Act's plain language, and misstate the settled legal standards when the actual ones are inconveniently unhelpful. They do not even cite *Bancec*, the Supreme Court's leading case on alter ego status. That is because applying the *Bancec* factors clearly leads to a finding of alter ego status here; every one of them points toward domination and inequitable conduct, satisfying each of *Bancec's* alternative routes to alter ego liability.

Defendants make additional arguments, all without merit. As this Court has previously held, a party that agrees to arbitrate in a New York Convention country impliedly waives its sovereign immunity under 28 U.S.C. § 1608(a)(1). *See Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, No. 18-CV-594 (CRC), 2020 WL 7122896, at *6 (D.D.C. Dec. 4, 2020) (holding that Nigeria's submission to arbitration constituted implied waiver of sovereign immunity, regardless of whether arbitration exception applied), *aff'd on other grounds,* 27 F.4th 771 (D.C. Cir. 2022) (finding that arbitration exception applied, and thus declining to reach implied waiver issue). And *Bancec* itself precludes Defendants' argument that this Court should analyze Zimbabwe's waiver differently from its alter ego, ZMDC. Rather, if ZMDC is Zimbabwe's alter ego, then ZMDC's waiver is Zimbabwe's. *See Bancec*, 462 U.S. at 630 (holding that state-owned bank's waiver of sovereign immunity could be attributed to the Cuban Government under equitable veil-piercing principles). Similarly, this Court's prior order held, in

line with other courts, that an implied waiver extends to recognizing a judgment upon an arbitration award. Doc. 38 at 31-35. Finally, ZMDC alone reiterates its prior futile arguments about service. As Plaintiffs previously showed, the domicilium clauses in the Memoranda of Understanding that govern Plaintiffs' investments in Zimbabwe constitute a special arrangement for service under the FSIA, and Plaintiffs complied (and went over and above those clauses) by hand-delivering the summons, complaint, and accompanying materials at ZMDC's headquarters.

In sum, this Court should deny Defendants' motion in its entirety because Plaintiffs have satisfied their burden of production, Defendants' conclusory denials do not satisfy their burden of persuasion, and their remaining arguments are makeweight. However, even if the Court were not yet convinced, D.C. Circuit precedent requires that Plaintiffs be given the opportunity to prove their detailed allegations through jurisdictional discovery. Defendants should not be permitted to evade their liability because they possess the documents that prove the Plaintiffs' case.[1]

## II. RELEVANT BACKGROUND.

### A. ZMDC Was Structured to Be Dominated by The Government of Zimbabwe, Through the Ministry of Mines.

Zimbabwe hosts the world's second-biggest platinum and chrome deposits, and large deposits of diamonds, gold, coal, nickel, and iron ore, and the mining industry is key to Zimbabwe's economy. Declaration of Steven Davidson ("Davidson Decl.") Ex. A (International Trade Administration Report). In 1983, as part of a major effort to ensure that Zimbabwe benefited from its natural resources, newly-independent Zimbabwe enacted the Zimbabwe

[1] While all the arguments in the motion are relevant only to Zimbabwe and ZMDC, the Commissioner appears to also be identified as a movant. This Court has already held that Plaintiffs stated a claim against the Commissioner, Doc. 38, and to the extent that the motion implicitly contends that the Court's determination should be revisited, that prong of the motion should be denied for the reasons Plaintiffs previously explained, *see* Doc. 28.

Mining Development Corporation Act. Davidson Decl. Ex. B (ZMDC Act). Under Zimbabwean law, mining deposits belong to the state. *See* Davidson Decl. Ex. C (Mines and Minerals Act) § 2. Given this history, ZMDC is widely recognized as an "arm[] of the state" and "a state institution." Davidson Decl. Ex. E at 148, 157.

The ZMDC Act lays out a framework by which ZMDC is subordinated to the Government, from ownership to function, including that:

- Zimbabwe entirely owns ZMDC, and, even if it theoretically wanted to divest majority control, it could not. Davidson Decl. Ex. B (ZMDC Act § 27(2), (5)).
- ZMDC is strictly mandated to follow Government policy:

  It shall be the duty of the Corporation so to exercise—(a) that every application or proposal dealt with by it is considered strictly in accordance with Government economic policy; (b) that all matters relating to the mining industry are carefully reviewed in the national interest; and (c) that generally the activities of the Corporation referred to in section twenty are directed towards implementing Government mining development policy.

  *Id.* § 23.
- The Minister of Mines has the absolute power to direct ZMDC's Board to do whatever the Minister deems "to be requisite in the national interest," and the Board "shall, with all due expedition, comply with any direction" that the Minister gives. *Id.* § 25.
- ZMDC's "functions and duties" are stated in terms of carrying out Zimbabwean government policy and acting "on behalf of the state," and include roles advising the Ministry on policy matters, including "to review annually the general economic conditions and prospects of the mining industry and in particular investment schemes," and "to advise the Minister on all matters connected with

corporate investments in the mining industry and make recommendations for the proper co-ordination of all investment programmes," *Id.* § 20.

The Minister, moreover, has plenary control over ZMDC's Board:

- MDC's Board and Chairman are appointed by the Minister of Mines. *Id.* § 5.

- The Minister determines their terms of appointment and conditions of appointment, meaning that they serve at the pleasure of the Minister *Id.* § 6.

- The Minister determines their compensation. *Id.* § 13.

- The Minister has broad removal powers on top of this. *Id.* § 9. The Minister must approve the Board's choice of manager. *Id.* § 13.

Similarly, the Board is required to obtain the Government's approval, through the Minister, for a vast range of basic activities, including making investments or loans (*id.* § 34), managing its general reserve account (*id.* § 36(3)), and share transfers (*id.* § 27(4)). As noted in the Schedule to the Act, a vast number of activities, including creating subsidiaries, participating in joint ventures, acquiring property for development or use, providing financial assistance to the mining industry, and creating training or research programs are expressly subject to ministerial approval. (*Id.*, Schedule §§ 20-24.) A significant issue in the arbitration was whether the Minister had approved Plaintiffs' Memoranda of Understanding. Doc. 40-1 ¶¶ 124-145.

These are just the *formal* powers conferred by the Act. In practice, ZMDC's domination by the Ministry is also well-known. Sternford Moyo is an eminent Zimbabwean legal practitioner who has served as President of the International Bar Association and chair of the Zimbabwe Revenue Authority, and has more than 40 years of experience dealing with mining disputes. Moyo Decl. ¶ 1.  He describes the net effect of the provisions giving the Minister powers over ZMDC and its Board as creating a "subordinate board." *Id.* ¶ 6. For example, he recounts an

occasion when“the then chairman of ZMDC had informed a Parliamentary Portfolio Committee for Mines and Energy that the ZMDC board had no control over the subsidiaries of ZMDC.” *Id.*. By dominating the Board, “the entire State Corporation [is] under the ultimate control of the minister.” *Id.* ¶ 7. The Minister has made decisions about the granting and termination of joint venture agreements. *Id.* ¶ 9. The Minister has had a ZMDC subsidiary pay revenues directly into the Treasury rather than as dividends to ZMDC (presumably in order to evade the claims of ZMDC’s creditors). *Id.* ¶ 10. All this has given the Minister of Mines “day to day control” of ZMDC’s Board, and thus of the rest of ZMDC. *Id.* ¶ 11.

Even official Zimbabwean reports note the Government’s, and in particular the Ministry’s, domination of ZMDC. A 2017 Parliamentary report notes that “the ZMDC board is answerable to the Permanent Secretary of Mines and Mining Development.” Davidson Decl. Ex. F (2017 Zimbabwean Parliament Portfolio Committee on Mines and Energy Report) at 15. Indeed, the same report notes, under the heading “Political Interference” that “the Secretary of Mines is directly involved in *operational issues* at ZCDC, at MMCZ, *at ZMDC* and at other institutions that a[re] directly linked to the mining industry.” *Id.* at 18 (emphasis added) (also lamenting that “there is too much political interference . . . by the Permanent Secretary” and “the current system is porous and being abused.”).

**B. Plaintiffs’ Investment in Zimbabwe.**

In 2008, Zimbabwe was struggling with the fallout of a decade of hyperinflation and disinvestment. Davidson Decl. Ex. G at 921. Its primary offering were its abundant mineral deposits. *Id.* So, it turned to international investors in an attempt to stimulate its economy.

Among those investors were Plaintiffs. Plaintiffs entered into two memoranda of understanding with ZMDC to form joint venture companies to mine nickel and platinum. Docs. 40-2 & 40-4.

### C. The Minister of Mines and His Hand-Picked ZMDC Board Chair Take Charge of ZMDC and Dismiss Its CEO.

The Minister is bestowed great authority by the ZMDC Act. It includes the power to select the members of the ZMDC Board and to make decisions that may run counter to the interests of ZMDC. In June 2010, the then-Minister for Mines appointed a close political ally (whom he has consistently appointed to boards and committees at prior and subsequent ministries) as Chair of ZMDC's Board. Davidson Decl. Ex. H (discussing Minister Mpofu's repeated appointment of Chair Masimirembwa) & Ex. I (same). News reports indicate that the appointment was intended to secure a Board loyal to the Minister amid political fractioning. Davidson Decl. Ex. J (discussing rationale behind dismissal and replacement of the entire ZMDC Board); Ex. K at 3 (Minister "appointed or influenced the appointment of most of the people to represent government stakes in various companies involved in Marange diamond production and marketing,"). As a result, the Chair was dubbed a "one man board" by the Zimbabwean press. Davidson Decl. Ex. L at 240.

The Minister's new Board replaced the prior Board's appointees with politically loyal appointees. *See* Davidson Decl. Ex. J. For example, the CEO who had been leading ZMDC since 2004 was removed from his position. Subsequent legal proceedings regarding this removal contended that one factor behind the decision was the CEO's refusal to release ZMDC's funds to the Zimbabwean government without first conducting an audit to confirm the existence of profits from which a dividend could be paid. Davidson Decl. Ex. M (Labour Court Judgment) at 2-3. The former CEO—who would later testify as a witness in the arbitration at issue in this case and was found by the arbitrators to be credible—eventually prevailed in both the civil litigation challenging his dismissal and in the dismissal of criminal charges that were filed against him. Davidson Decl. Ex. N (High Court Judgment).

The Minister also directed the ZMDC Board to appoint loyalists (including the Minister's relatives) to the Boards of ZMDC subsidiaries, further cementing his control. Reports indicate that the Minister directed ZMDC to appoint to subsidiary boards Mr. Mpofu's sisters-in-law, his personal assistant, and a nephew. Davidson Decl. Ex. O (International Crisis Group Report) at 4.

**D.   Using Its Control Over ZMDC, Zimbabwe Strips Plaintiffs of Their Mining Concessions.**

As relayed at length in the arbitral award, almost immediately, the Minister, guiding the newly-appointed ZMDC Board, went about stripping companies that had entered into concessions under the prior leadership of their mining rights.

On approximately October 18, 2010, ZMDC told Plaintiffs' managing director on a telephone call that they had some queries about Plaintiffs' relationship with the former CEO. Davidson Decl. Ex. P (October 19, 2010 Letter from Amari to ZMDC.) Plaintiffs responded the next day offering to assist and cooperate with any queries and asked for specific questions in writing. *Id.* The day after that, the Chair personally met with Plaintiffs' principals and told them that a "disciplinary hearing" would be held less than a week later on October 26, 2010. Davidson Decl. Exs. Q (October 25, 2010 Letter from Amari to ZMDC) & R (October 25, 2010 Letter from Nunn to ZMDC); Ex. S (Summers Affidavit) ¶¶ 33-41. On November 10, 2010, the Acting General Manager of ZMDC, whom the Chair had personally appointed, sent a letter to Plaintiffs revoking the mining rights and threatening criminal charges against Plaintiffs. Davidson Decl. Ex. T (November 10, 2010 Letter from ZMDC to Amari). The Minister and the Permanent Secretary of the Ministry were copied on the letter. *Id.*

**E.   Zimbabwe's Further Manipulation of ZMDC.**

Zimbabwean government interference in ZMDC's day-to-day operations has been longstanding. A 2013 report of a Zimbabwean Parliamentary Committee discussed events around

the same time that Plaintiffs' investments were expropriated. It found that two diamond mining

concessions had been awarded by ZMDC at the direction of the Minister to companies with no

experience in diamond mining; the Minister testified that the Minister was "directed to go that

way and that is the way it is," and neither he nor ministry officials would disclose who actually

directed them to make the selection decision. Davidson Decl. Ex. U at 6, 13 (2013 Parliamentary

Report). The Committee concluded that "ZMDC seemed to have been coerced into accepting

these two companies." *Id.* at 14.

Similarly, the Committee found that—despite the ZMDC Act on its face empowering the

Minister to appoint only ZMDC's Board and the Board being tasked with appointing directors of

subsidiaries, the Minister had stated that he considered any Board-selected subsidiary director

appointments to be void and made the appointments himself: "The ZMDC Board was rendered

powerless when it came to the selection and appointment of members who sit on its subsidiary

companies. It's [sic] only function is to regularise the appointments made by the Minister." *Id.* at

15. The Committee noted that "[t]his is probably one of the reasons why the ZMDC Board has

little control and information over its subsidiary companies, namely Mbada, Anjin and DMC."

*Id.* at 15-16. The report found that ZMDC subsidiaries took direct instructions from the Ministry

without consulting ZMDC. *Id.* at 16.

Since that report, ZMDC has continued to be separate in name only from the

Government. Just as the Minister at the time of the expropriation of Plaintiffs' concessions had

appointed his own ZMDC Board when he took over the Ministry, when he was transferred to a

different department in December 2013, the new Minister of Mines dissolved ZMDC's entire

Board. Davidson Decl. Ex V. Widespread reports indicated that ZMDC's assets and those of its

subsidiaries were being used to benefit individuals closely connected with the Zimbabwean

government. *E.g.*, Davidson Decl. Ex. W at 3. Further Parliamentary reports continued to find that the Ministry was directly managing other ZMDC subsidiaries too—in some cases, having the Permanent Secretary of the Ministry as acting chair of subsidiaries' boards. Davidson Decl. Ex. F at 7.

Zimbabwe has consistently used ZMDC assets for state purposes. For example, Zimbabwean ministers concluded a deal whereby ZMDC would award a mining concession—including some of the Darwendale platinum rights that Plaintiffs had been awarded—to a Russian conglomerate including state-owned weapons manufacturer Rostec and state foreign affairs bank Vnesheconombank, and in return Zimbabwe's military would receive Russian aircraft. The deals with Russia for ZMDC assets were negotiated at the highest level, including Zimbabwe's Minister of Foreign Affairs meeting with Russia's Foreign Minister and Minister of Industry and Trade. Davidson Decl. Ex. X (Zimbabwean news report on deal, mentioning Plaintiffs' claim); Davidson Decl. Ex. Y (Russian news report on deal). ZMDC also awarded highly valuable concessions to Zimbabwe's armed forces, suggesting its mining assets are used to support the military. Davidson Decl. Ex. Z

The U.S. Government's position has long been that ZMDC is dominated by the Government of Zimbabwe. Executive Order 13469, originally issued on July 25, 2008 and continually renewed since, authorizes sanctions against "senior official[s] of the Government of Zimbabwe" and persons "owned or controlled by, directly or indirectly, the Government of Zimbabwe or an official or officials of the Government of Zimbabwe," among others. Davidson Decl. Ex. AA § 1(a). That same day, the Department of the Treasury designated numerous Zimbabwean parastatals, including ZMDC, for their role in "the undermining of democratic processes and institutions." Davidson Decl. Ex. BB (2008 Treasury Press Release). The press

release announcing the designations noted ZMDC's role in acting "on behalf of the Government of Zimbabwe" in "planning, coordinating and implementing mining projects." *Id.* OFAC has stated that it consistently reviews SDNs for whether they should continue to be designated, meaning that the U.S. Government continues to believe that ZMDC is used by the Government of Zimbabwe to undermine democratic processes and institutions. *See, e.g.*, Davidson Decl. Ex. CC (2022 Treasury Press Release) (discussing review process); Davidson Decl. Ex. DD (2009 Treasury Remarks to Congress); Davidson Decl. Ex. EE (State Department Press Release) ("The Zimbabwe sanctions program is a policy-driven program that targets human rights abusers and those who undermine democratic processes or facilitate corruption. . . . Sanctions are not intended to be permanent but to incentivize change.").

The U.S. Government has specifically noted instances in which ZMDC has failed to comply with basic corporate formalities. U.S. State Department reports have for years cited ZMDC's lack of a real Board as an example of issues with Zimbabwe's state-owned enterprises. Davidson Decl. Ex. FF-LL (State Department Investment Climate Statements for Zimbabwe) ("SOEs should have independent boards, but in some instances, such as the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards.")[2] The Government's misuse of ZMDC is a core basis for continuing sanctions against it. *E.g.*, Davidson Decl. Ex. MM at 3 (State Department Congressional Testimony) ("We are concerned about ongoing reports that diamond mining entities in Zimbabwe are being exploited by people in senior government and military positions for personal gain, that revenues from those enterprises are being diverted for partisan activities that undermine democracy.").

[2] Adding credibility to this report, Zimbabwe's own Parliament noted that other parastatals have either no legally constituted board or boards consisting of only one person, sometimes a Ministry official. Davidson Decl. Ex. F at 12, 15.

**F. The Arbitration Award Finds Zimbabwe Provided False Testimony.**

The Memoranda of Understanding (MOUs) that governed Plaintiffs' investments provided for arbitration before the International Chamber of Commerce's Court of Arbitration. Doc. 40-2 at Art. 11; Doc. 1-4 at Art. 9. All relevant countries in this case are parties to the New York Arbitration Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.[3] After ZMDC unsuccessfully sought to terminate the MoUs, Plaintiffs filed for arbitration against ZMDC and the Commissioner of Mines before the ICC Court which, after contested proceedings, ordered that the Tribunal be seated in Zambia. Doc. 40 ¶ 28. ZMDC further submitted to the arbitration in Zambia by signing the Terms of Reference, which expressly provided that "[b]y signing these Terms of Reference, the parties acknowledge that they agree to submit to this arbitration and expressly waive any procedural objections they may have with respect to known events, including the appointment of the Tribunal." Doc. 28-2 at Ex. 1 § 8.1. The Terms of Reference also agreed that the Tribunal would have the authority to decide its own jurisdiction. *Id.* § 6.2(1). The arbitration proceeded to a hearing on the merits. Doc. 40 ¶¶ 29-30; Doc. 30 at 3.

During the merits hearing, by their own account dissatisfied with the Tribunal's procedural rulings and interpretations of the ICC Court's rules, Doc. 30 at 2, ZMDC's party-appointed arbitrator submitted his resignation and then declined to participate further in the arbitration, Doc. 40 ¶¶ 30-32. In 2012, ZMDC briefly obtained an *ex parte* temporary restraining order from the Zambian High Court staying the arbitration while its assertions that the Tribunal as incorrectly reconstituted by the ICC Court were litigated in Zambia. Doc. 28-2 at Ex. 2

---

[3] The Secretary-General of the United Nations, as depositary under the Convention, maintains a list of contracting parties under the Convention at https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=XXII-1&chapter=22&clang=_en.

(October 18, 2012 Order). The Zambian High Court later determined that the temporary restraining order was entered with "no jurisdiction" and had only been entered *ex parte* because "the applicant suppressed material facts and laws from this court thereby misleading it to grant the ex-parte order of injunction." Doc. 28-2 at Ex. 3 (June 19, 2014 Order). It also observed that the proper remedy was to oppose the entry of a judgment based on the award. *Id.*

Correctly understanding that the *ex parte* order was void as in excess of jurisdiction, a preeminent Tribunal—as reconstituted by the ICC Court, Professor Doug Jones A.O., Stuart Isaacs Q.C., and Chikwendu Madumere[4]—resumed, with all proper notice to ZMDC, and completed hearings and issued a Final Award. Doc. 40-1. The Final Award rejected jurisdictional challenges, ordered ZMDC to pay Amaplat US$42,882,000 and ZMDC to pay Amari US$3,900,000, ordered both Respondents (ZMDC and the Commissioner) jointly to pay Plaintiffs' legal costs of US$2,220,583.74 and the costs of the arbitration of US$900,000, and ordered post-award interest at the rate of 5%. Doc. 40-1 at 39.

Notably, the Award found that Mr. Tinashe Chiparo—the same witness upon whom Defendants rely here—was not credible. Zimbabwe had deleted a former ZMDC employee's computer, despite the pending dispute, and Mr. Chiparo claimed that Board minutes approving the MOUs with Plaintiffs did not exist. Doc. 40-1 ¶ 118.The employee, however, had a backup copy, proving that Mr. Chiparo's testimony was inaccurate. *Id.* ¶¶ 118, 120. As the arbitrators put it, "[t]he Tribunal also cannot ignore that Mr. Chiparo's evidence in the Zimbabwe High Court Proceedings involved repeated and, in the Tribunal's view, unconvincing denials of the

[4] These are all well-known, experienced arbitrators. Their biographies can be viewed at: https://www.stuartisaacsqc.com/biography, https://www.madumereandco.com/team/, and https://dougjones.info/wp/. All Tribunal members are globally well-known arbitrators and have arbitrated several disputes.

existence of documents which plainly do exist and challenges to the authenticity of documentation, the existence of which the Respondents are unable to deny. *Id.* ¶ 120.

**G. The Zambian Post-Award Litigation and Judgment.**

ZMDC and the Commissioner again applied *ex parte* to the Zambian High Court to enjoin enforcement of the award; but the Zambian High Court declined to sign the proposed order. Doc. 28-1 ¶ 13. Proceedings in Zambia were stayed for several years pending Plaintiffs' successful appeal to the Zambian Supreme Court against an order consolidating the two proceedings brought by ZMDC. *Id.*

After years of post-award litigation were resolved in favor of Plaintiffs, on August 9, 2019, the High Court for Zambia at the Commercial Registry at Lusaka issued the Judgment—formally, an *Ex Parte* Order for Leave to Register and Enforce the Final Award, No. 2019/HPC/ARB/No. 0337, under Section 18 of the Arbitration Act, No. 19 of 2000, and Rules 15 and 16 of the Arbitration (Court Proceedings) Rules, 2001. Doc. 40-5. The Judgment provided that ZMDC and the Commissioner had 30 days after service to move to set aside the Judgment. *Id.* That is Zambia's standard procedure for reducing an arbitral award to judgment: an *ex parte* application is made to register it, which results in a judgment stayed for 30 days after service to allow for a set-aside application. Doc. 28-2 ¶¶ 18, 21.

On August 16, 2019, Plaintiffs' Zambian counsel, Simeza Sangwa & Associates, contacted ZMDC's and the Commissioner's Zambian counsel, Ms. Dinah Nundwe of the law firm, Ranchhod Chungu Advocates, to ask if the latter would accept service. Doc. 28-2 ¶ 23. The latter confirmed that Ranchhod Chungu Advocates could accept service of the *Ex Parte* Order granting leave to register and enforce the Final Award and the Notice of Registration of the Arbitral Award on behalf of ZMDC and the Commissioner. *Id.* ¶ 24. Accordingly, Simeza Sangwa & Associates sent a copy of the *Ex Parte* Order granting leave to register and enforce

the Final Award and the Notice of Registration of the award on August 19, 2019. *Id.* ¶ 24. No application to set aside the Judgment was ever filed—within or outside of the 30-day period after service. *Id*. ¶ 27. The Judgment is thus valid and enforceable in Zambia. Indeed, even Defendants do not claim that they were unaware of the judgment—so any attempt to vacate the judgment in Zambia or to seek to file its set-aside application out of time would fail for lack of diligence in moving.

### H. Zimbabwe's Continuing Efforts to Defraud ZMDC's Creditors, Including Plaintiffs.

Zimbabwe has, in the meantime, engaged in a process to attempt to evade Plaintiffs' award and judgment. As Sternford Moyo notes, ZMDC subsidiaries paid money directly to the Treasury, rather than having funds pass through ZMDC where creditors might be able to lay claim to it. Moyo Decl. ¶ 10. And, most recently, Zimbabwe has recently contemplated a specific plan to have the President order the transfer of ZMDC's mining rights to a new state-owned entity called Defold. Davidson Decl. Ex. NN (News Report). Notably, these reports have indicated that the Government has the power to reallocate ZMDC's assets even if ZMDC itself does not approve. *Id.* Press reports show that the plan is specifically motivated by evading the judgments against ZMDC, including Plaintiffs' one. *Id.* And Zimbabwean government documents that have become public confirm that Zimbabwe is transferring assets to Defold. Davidson Decl. Ex. OO (4/14/22 Memorandum re Transfer of ZMDC Shareholding to Defold).

## III. LEGAL STANDARD

Where, as here, a suit "involves claims against a foreign nation, the FSIA provides the framework for determining subject matter jurisdiction." *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, No. 22-CV-58 (CRC), 2023 WL 2603746, at *3 (D.D.C. Mar. 22, 2023) (citing *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 121 (D.C. Cir 1999). "[T]he

FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies." *Id.* (quoting *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)). But—as Defendants fail to acknowledge, despite this Court's prior ruling—this is a burden of production, and "[o]nce the plaintiff has made that threshold showing, however, 'the sovereign bears the ultimate burden of persuasion to show that the exception does not apply.'" *Id.* (quoting *Bell*, 734 F.3d at 1183).

Where defendants challenge only the legal sufficiency of jurisdictional allegations, the Court takes the factual allegations as true and determines as a matter of law whether they satisfy any of the exceptions to immunity. *Id.* But if the motion "presents 'a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA' by contesting a jurisdictional fact or raising a 'mixed question of law or fact,'" the court "'must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.'" *Id.* (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

## IV.   ARGUMENT

For the most part, Defendants' motion rests on factual denials of the complaint's allegations that ZMDC and Zimbabwe are alter egos—and thus that ZMDC's indisputable implied waiver of sovereign immunity by agreeing to arbitrate as a state party to the New York Convention extends to Zimbabwe as its alter ego, on the one hand, and that ZMDC is treated as the state for personal jurisdiction purposes, on the other.

The Amended Complaint's alter ego allegations are supported by ample evidence: ZMDC has always been completely controlled by Zimbabwe. This was intentional, as the Act establishing it was designed for the Ministry to have extensive control. And in practice, the

Government has often disregarded the structures of the Act to exert still further control. Additionally, the arbitration award in this case demonstrates that the Ministry's control directly led to the award and judgment, as the Minister and the Board chair, whom he hand-picked, attempted to reverse previous mining concessions.

**A. Because They Are Alter Egos, This Court Has Subject Matter Jurisdiction Over Zimbabwe and ZMDC and Personal Jurisdiction Over ZMDC.**

As this Court found with regard to the Chief Mining Commissioner, this case falls squarely within the FSIA's implied waiver exception to sovereign immunity, 28 U.S.C. § 1605(a)(1), because Zimbabwe is a party to the New York Convention, and ZMDC agreed to arbitrate in Zambia, which is also a party to the New York Convention. *Amaplat*, 2023 WL 2603746, at *15.[5] That waiver extends to Zimbabwe itself because Zimbabwe and ZMDC are alter egos—meaning that ZMDC's conduct was Zimbabwe's conduct and vice versa. Similarly, because ZMDC, as the state's alter ego, *is* the state, it lacks due process rights and is thus subject to personal jurisdiction in this District.[6]

This Court previously held that the Southern District of New York's holding in *Funnekotter*, 2015 WL 9302560, at *5-6, that Zimbabwe dominated ZMDC and that the two were alter egos was not preclusive. Nonetheless, it is clear that what was true in *Funnekotter* is just as true here—ZMDC is utterly dominated by Zimbabwe. Indeed, this case presents an even

[5] As Plaintiffs previously contended, the arbitration exception in the FSIA extends to judgments on awards too and direct the Court to their prior arguments on that issue, but Plaintiffs recognize this Court's contrary ruling and preserve this point for further review.
[6] The FSIA expressly confers this Court with personal jurisdiction over foreign states if process is properly served or waived, and "foreign sovereigns and their extensively-controlled instrumentalities are not 'persons' under the Fifth Amendment's Due Process Clause—and thus have no right to assert a personal jurisdiction defense." *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012); *see also id.* at 814-15 (noting that *Bancec* determines whether an instrumentality is sufficiently distinct from the state itself to have due process rights).

more compelling case for alter ego status than *Funnekotter* because here the facts that gave rise to ZMDC's liability arose from its domination by the Government.

### 1. Despite Defendants' Attempts to Ignore Them, The *Bancec* Factors Provide the Test for Alter Ego Status.

As this Court has previously noted, there is a rebuttable presumption that a government instrumentality established as a separate juridical entity should be treated as such for FSIA purposes. *Bancec*, 462 U.S. at 628; *see Amaplat*, 2023 WL 2603746 at *5. That presumption can be rebutted *either* (1) by showing that "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) where recognizing separate existence "would work fraud or injustice." *Bancec*, 462 U.S. at 629; *see Amaplat*, 2023 WL 2603746 at *5. It is settled law that *either* extensive control *or* fraud or injustice will suffice. *E.g.*, *de Csepel v. Republic of Hungary*, No. 1:10-CV-01261(ESH), 2020 WL 2343405, at *10 (D.D.C. May 11, 2020) ("Later courts have interpreted *Bancec* to allow them to disregard separate juridical status when the foreign entity is exclusively controlled by the foreign state *or* where recognizing the separateness of that entity and the foreign state would work fraud or injustice." (internal quotation marks omitted)), *aff'd,* 27 F.4th 736 (D.C. Cir. 2022); *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 847 (D.C. Cir. 2000).

*Bancec*'s first route can be satisfied *either* by showing control that "significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary and, indeed, amounts to complete domination of the subsidiary" *or* by showing the elements of a common law agency. *Transamerica*, 200 F.3d at 848-49; *see also Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 143 (3d Cir. 2019) ("The most persuasive interpretation of the various approaches is by the D.C. Circuit . . . These examples of control are disjunctive. Only one method of domination needs to be shown."). Defendants attempt to argue that *only* the

Restatement elements of common law agency count, *see* Doc. 42 at 8, but *Transamerica* holds precisely the opposite; complete domination is another route.

The Supreme Court has noted a number of factors developed initially by lower courts to guide this analysis: "Whether a state instrumentality is so closely tied to the sovereign that it may be the state's alter ego depends on a number of factors, including the level of the government's economic control over the entity, whether the entity's profits go to the government, the degree to which government officials manage the entity or its daily affairs, whether the government is the real beneficiary of the entity's conduct, and whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." *Amaplat*, 2023 WL 2603746 at *5 (citing *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018)). While these factors are not a "mechanical formula," *Bancec*, 462 U.S. at 630, courts use them "to aid their analysis" and as "a rough analogy to American corporate law veil piercing," *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 168 (3d Cir. 2023).

Oddly, and despite this Court having referred to it extensively in its prior opinion, Defendants' motion never actually cites *Bancec* or acknowledges it as the governing test for alter ego status. Instead, Defendants seem to engage in a free-form argument unconstrained by any of these factors. Doc. 42 at 8-24. That is presumably because Defendants recognize that the *Bancec* factors weigh quite strongly against them.

**2. The *Bancec* Factors Strongly Favor Alter Ego Status.**

Applied here, the *Bancec* factors compel a finding of alter ego status. Even as a matter of its founding statute, ZMDC is under tight control and must seek ministerial approval of routine activities. Zimbabwe gets any profits from ZMDC. And in fact, the Government pervasively exercises its control—and exercises even more control than the statute contemplates. It directs ZMDC's assets toward completely unrelated foreign policy goals and toward enriching

government insiders. And it is defrauding ZMDC's creditors by directing improper dividends and plotting how to keep ZMDC's assets out of creditors by playing exactly the sort of shell game with state-owned entities that *Bancec* and its progeny condemn.

a. **Zimbabwe Exercises Total Economic Control of ZMDC.**

Zimbabwe's pervasive economic control over ZMDC aligns precisely with the level of government domination courts have consistently held sufficient to establish alter ego status. In *OI*, for example, the Court pointed to Venezuelan law making oil deposits government property, reservation of state control over extraction, a mandate for the state to maintain ownership of PDVSA, and examples of "not merely aspirational" government control over PDVSA's activity. 73 F.4th at 172.

Every one of those is present here too. Zimbabwe vests all mineral rights in the President. Davidson Decl. Ex. C (Mines and Minerals Act 1961 ch. 21:05 § 2). Like PDVSA for Venezuela, Zimbabwe must by law maintain ownership of ZMDC; it is a definitively *governmental* corporation rather than one that could be privatized and operate like any other business. Davidson Decl. Ex. B (ZMDC Act) § 27. ZMDC's mandate is to pursue a long list of purposes that are framed in public policy terms—it not only invests on behalf of the State and helps the state plan and implement mining projects, but also assists people engaged in or planning to engage in mining and prepares economic and policy reports for the Ministry. *Id.* § 20. Reflecting the fact that it operates much more like an executive department of the government than a normal company, it is mandated by its organic statute to conform to "Government economic policy," the "national interest," and "Government mining development policy." *Id.* § 23.[7] And, in any event, the Minister of Mines has the absolute power to direct

[7] Defendants' response is merely to say that policy goals alone are not sufficient to establish alter ego status, Doc. 42 at 15, but that certainly does not make them *irrelevant* given the abundant

ZMDC's Board to do whatever the Minister deems "to be requisite in the national interest," and the Board "shall, with all due expedition, comply with any direction" that the Minister gives. *Id.* § 25.[8] The Schedule to the Act requires ministerial approval of, among other things, every joint venture ZMDC enters into, as was discussed in the Award. That is the type of control one expects from a department within a ministry, not an independent entity. Much like PDVSA is to Venezuela, ZMDC is thus, in Zimbabweans' eyes, an "arm[] of the state" and "a state institution." Davidson Decl. Ex. E. Those statutory provisions, notably, are strikingly similar to those in *TMR Energy Ltd. v. State Property Fund of Ukraine*, where the D.C. Circuit held that statutes tasking an entity with "implement[ing] national policies" gave "plenary control" to the Government to the point that the entity was "an agent of the State, barely distinguishable from an executive department of the government." 411 F.3d 296, 301-02 (D.C. Cir. 2005).[9]

---

evidence of deep control by Zimbabwe through the Ministry.

[8] Defendants argue that the Act's reference to directions "of a general character" constrains what the Minister can tell ZMDC to do. That is plainly wrong, because the evidence shows that the Minister makes very specific directions, including directing ZMDC as to which companies to award contracts to. *See* Davidson Decl. Ex. U at 13-15 (2013 Parliamentary Committee Report) (discussing Minister's directions to award joint ventures); Davidson Decl. Ex. F at 15, 18 (discussing interference and micromanagement by Permanent Secretary of Ministry).

[9] While Defendants make a conclusory assertion that pointing to these provisions ignores other provisions of the Act, the fact is that these are points that the D.C. Circuit found compelling in *TMR*. It is hardly newsworthy that a corporation has normal corporate powers—that is likely the case for almost every alter ego. Doc. 42 at 13-14. The point is whether Zimbabwe controls how ZMDC uses those powers. In other words, it is Zimbabwe's power over ZMDC that matters, not what powers ZMDC has itself.

Nor does it say anything about who controls ZMDC if its employees are exempt from certain civil service rules. *Id.* at 14. Likewise, Defendants point to sections of the Act requiring ZMDC to have corporate accounts—but again, that says nothing about what actually happens in practice. As discussed elsewhere, what happens in practice is that ZMDC's operating subsidiaries pay the Treasury directly to avoid funds passing into ZMDC, and ZMDC's most valuable assets—its mining rights—are given away for state purposes or transferred into other entities to defraud creditors.

Nor is that control merely theoretical. The Ministry's control over ZMDC has been exercised consistently and pervasively. Around the same time that Defendants were expropriating Plaintiffs' investments, the Minister ordered ZMDC to award diamond concessions to inexperienced companies based on a direction from a person whose name he refused to disclose even to the legislature. Davidson Decl. Ex. U at 14 ("I was a new Minister and directed to go that way and that is the way it is"). Even Zimbabwe's Parliament has expressed concern at "political interference" at ZMDC and has noted that "the ZMDC board is answerable to the Permanent Secretary of Mines and Mining Development." Davidson Decl. Ex. F at 15. And it has made clear that "the Secretary of Mines is directly involved in *operational issues . . . at ZMDC*." *Id.* at 18. That precisely echoes the legal standard for alter ego status: in *Transamerica*, the D.C. Circuit explained that a key fact in *McKesson* had been that "Iran *directly controlled routine business decisions*." 200 F.3d at 853 (emphasis added).

The control is all-encompassing. Zimbabwean Parliamentary reports have consistently found that the Ministry, rather than ZMDC, controls companies nominally set up as ZMDC subsidiaries. Davidson Decl. Ex. U at 15-16; Davidson Decl. Ex. F at 15. Indeed, the 2013 report indicated that the Ministry had ignored the law even when appointing ZMDC Board members. Davidson Decl. Ex. U at 26. Likewise, Sternford Moyo, a titan of the Zimbabwean legal profession with decades of mining experience, explains that ZMDC has a "subordinate board" that has "no control" over companies that are purportedly ZMDC's subsidiaries. Moyo Decl. ¶ 6. ZMDC is thus under the "ultimate control" of the Minister, *id.* ¶ 7, who makes decisions about whether ZMDC grants or terminates joint venture agreements, *id.* ¶ 9, who diverts revenue from ZMDC subsidiaries to the Treasury instead of ZMDC, *id.* ¶ 10, making ZMDC unable to pay its

bills, and in general exercises "day to day control" over ZMDC's Board and thus over ZMDC, *id.* ¶ 11.

Similarly, the pervasive evidence of ZMDC's assets being diverted for policy purposes—like arms deals with Russia and China or compensating government officials—gives strong evidence that Zimbabwe regards ZMDC as a branch of the government subject to its total and plenary control rather than anything approaching a quasi-independent business. *E.g.*, Davidson Decl. Exs. X, Y, Z. Normal companies distinct from the state do not engage in fundamentally sovereign acts like military spending. *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994) (holding that military forces are categorically governmental rather than commercial). Nor do they fund the government's obligations while unable to pay their own debts. In short, what the government says at ZMDC goes. In too many ways to count, the Ministry exercises control over ZMDC—as ZMDC's organic act expressly empowers the Ministry to do. That is not, as Defendants claim, Doc. 42 at 9, acting like an ordinary shareholder or an ordinary regulator. It is not voting for directors who then manage the company distinct from its shareholders—it is dominance with a board who act as rubber stamps if they act at all. It is not passing generally-applicable regulations or considering applications under some defined standard—it is controlling any decision that the Ministry wants to control, including critical issues like selecting joint venture partners and terminating concessions.

#### b. **Zimbabwe Is Entitled To Any Profits.**

This inquiry is, as in *OI*, "[n]ot" a "complicated inquir[y]." 73 F.4th 172-73. It is undisputed that Zimbabwe gets any profits that ZMDC makes. But as *OI* notes, profits are not limited to formal dividends, but also include disguised profits in the form of "taxes and royalties, sometimes at an artificially high rate." *Id.* at 173. That is precisely what occurs with ZMDC: to enrich the Treasury and keep assets away from ZMDC's creditors, revenues are taken directly

from subsidiaries rather than going to ZMDC first. Moyo Decl. ¶ 10. Zimbabwean litigation also shows that Zimbabwe takes money from ZMDC without verifying that ZMDC has any profits to distribute. Davidson Decl. Ex. M. In other words, Zimbabwe is not limited to mere dividends based on its shareholding, but takes whatever it can get.

c. **Zimbabwe Manages ZMDC.**

Similarly—and in many ways acting as the enforcement mechanism for Zimbabwe's economic control over ZMDC—Zimbabwe both determines who ZMDC's management will be and, critically, engages frequently in direct management of ZMDC and its subsidiaries. In *OI*, the court held that both of these things establish management, as well as noting that excessive entanglement with "military leaders and high government officials" weighs in favor of alter ego status. 73 F.4th at 173. Similarly, in *TMR*, the SPF Chairman was an appointee of the President and the entire board had to be approved by the government. 411 F.3d at 302. Indeed, far more under the Act requires the Minister's approval than the features identified in *TMR*. *Id.*

One could deem this factor satisfied by the fact that the Minister appoints the Chairman (with the approval of the President), appoints ZMDC's Chairman and the rest of the Board. *Id.* § 5. The Minister determines their terms of appointment and conditions of appointment, meaning that they serve at the pleasure of the Minister. *Id.* § 6.[10] The Minister determines their compensation. *Id.* § 13. The Minister has broad removal powers on top of this. *Id.* § 9. The Minister must approve the Board's choice of manager, which in practice means that the Board picks whoever the Minister wants. *Id.* § 13. Similarly, the Board is required to obtain the

[10] Defendants contend that Board members can only be removed for cause, but the broad and discretionary terms of the Act make clear that whatever the Minister determines is grounds for removal will suffice—and, regardless, Ministers have on repeated occasions fired the entire ZMDC Board, making clear that they view their removal power as plenary. Davidson Decl. Exs. J, V.

Government's approval, through the Minister, for a vast range of basic activities, including making investments or loans (*id.* § 34), managing its general reserve account (*id.* § 36(3)), and share transfers (*id.* § 27(4)). The Minister must approve every joint venture and a wide range of other decisions. (*Id.*, Schedule §§ 20-24.)

But even that would undersell the true extent of the Ministry's domination of ZMDC. The Government exerted control over the Boards of ZMDC subsidiaries by requiring direct appointment by the Minister, declaring all appointments made by ZMDC's Board void, and using the threat of removal to ensure that the ZMDC Board complied. Davidson Decl. Ex. U at 15-16. The Minister decided who would receive and lose joint venture agreements. Davidson Decl. Ex. U at 13-14; Moyo Decl. ¶ 9. The ZMDC Board at the time thus did not even know what its own subsidiaries were doing because the Minister's appointees were reporting to him directly rather than telling ZMDC's Board what they were doing. *Id.* at 15-16. And multiple subsequent reports have similarly found that the Ministry of Mines directly runs ZMDC subsidiaries and that ZMDC's own board has no control over them. Davidson Decl. Exs. F at 15, 18, Ex. U at 15-16; *see* Moyo Decl. ¶ 6. The Minister's hand-picked appointee was dubbed a "one man board" by the Zimbabwean press—a sign that it was widely known that the formal structure of ZMDC under the Act meant little because the Minister really decided everything that mattered. Davidson Decl. Ex. L at 240. Multiple U.S. Government reports observe that Zimbabwe at times allowed ZMDC to operate without a Board, presumably so that the Minister could directly run the company himself. Davidson Decl. Exs. FF-LL (Investment Climate Reports).

Perhaps most blatantly of all, Zimbabwe's Parliament has discussed "political interference" at ZMDC and has noted that "the ZMDC board is answerable to the Permanent

Secretary of Mines and Mining Development." Davidson Decl. Ex. F at 15. And it has made clear that "the Secretary of Mines is directly involved in *operational issues . . . at ZMDC*." *Id.* at 18. That is a clear example of the type of "extensive involvement in the day-to-day operations" of a company that the D.C. Circuit has held is sufficient to show alter ego status. *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 352 (D.C. Cir. 1995).

In short, the Ministry exercises extensive management powers over ZMDC, right down to quotidian matters. ZMDC's Board is so toothless and beholden to the Minister that it cannot control its own supposed nominees to its subsidiaries' boards, because the Minister picked them instead. Managerially as well, ZMDC is utterly dominated by the Ministry. This is, in short, not normal supervisory control by a shareholder or regulator—it is an arrangement where ZMDC's affairs are "so intermingled" with those of the ministry "that no distinct corporate lines are maintained." *Transamerica*, 200 F.3d at 849.[11]

d. **Zimbabwe Is the Beneficiary of ZMDC.**

Defendants fare no better on the question of who benefits from ZMDC. Courts have consistently held that both conventional benefits like dividends and less conventional ones such as patronage positions and the use of company assets for foreign policy purposes count toward this factor. *See OI*, 73 F.4th at 173 ("Venezuela committed PDVSA to sell oil to Caribbean and Latin American allies at steep discounts to further Venezuela's policies . . . . Senior members of the Maduro Regime used PDVSA's aircraft for state purposes."). Courts have also found that a company that operates for "political goals" is more likely to be regarded as substantively a state organ rather than an independent company. *Id.* Additionally, when a state awards rights to an

[11] Defendants say that ZMDC employees are exempt from certain civil service rules. Doc 42 at 14. It is unclear why that would matter—the point is that the Ministry decides what ZMDC does. If anything, a lack of civil service protections makes it *easier* for the Ministry to dominate ZMDC employees, not harder.

entity on preferential terms, that is indicative that it is not analogous to a normal private company. *Id.* (award of drilling rights for "no consideration").

Again, ZMDC exhibits all the tell-tale signs of domination. As noted above, Zimbabwe does not merely receive a right to dividends, but also extracts funds from ZMDC subsidiaries directly. Moyo Decl. ¶ 10. Normal companies do not have their country's Minister of Foreign Affairs negotiate with Sergei Lavrov and a Russian state-owned arms manufacturer, reportedly for military equipment in exchange for mining rights. Davidson Decl. Exs. X & Y. Normal companies do not assign mining rights to military leaders or party insiders. *E.g.*, Davidson Decl. Ex. Z. Normal companies are not founded by statutes that explicitly task them with pursuing their government's policy goals. *Supra* § II.A.; Davidson Decl. Ex. B §§ 20, 23, 25. And, as Mr. Moyo notes, ZMDC receives preferable terms for its mining rights because it acts on behalf of the state. In all, Zimbabwe treats ZMDC as an "arm[] of the state," precisely because it is one and not a truly distinct company. Davidson Decl. Ex. E at 148.

Finally, the U.S. Government's position is entitled to substantial weight. While not dispositive, "the OFAC SDN designation is one kind of (potentially very persuasive) evidence tending to show alter ego status." *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, No. 13 CIV. 1917 CM, 2015 WL 3526661, at *16 (S.D.N.Y. June 3, 2015).[12] ZMDC is sanctioned as an SDN precisely because it is indelibly associated with the Zimbabwean government and benefits political and military insiders. Davidson Decl. Ex. BB. The United States has consistently monitored and reaffirmed sanctions on ZMDC for 15 years because those conditions have not

---

[12] The case Defendants cite, *In re 650 Fifth Avenue*, similarly holds that SDN status is evidence of alter ego status but not determinative on its own.

changed. Davidson Decl. Exs. CC-EE (State Dep't press release discussing regular review process). In other words, the government and its officials benefit from ZMDC's activities.

e. **Zimbabwe Has Used ZMDC's Corporate Form Inequitably.**

Finally, Zimbabwe has benefited from using ZMDC while using it to avoid its obligations. Zimbabwe—like the United States—promised in the New York Convention to honor arbitration awards. Yet, rather than doing so, it is doing everything it can to render ZMDC judgment-proof—ranging from outright asset transfers to the new Defold entity, Davidson Decl. Exs. NN, OO, to taking cash directly from ZMDC subsidiaries rather than allowing that cash to flow up to ZMDC where ZMDC's creditors might reach it, Moyo Decl. ¶ 10. The fact that the Zimbabwean government has recently discussed moving ZMDC's assets to other entities with the express intent of defrauding ZMDC's creditors is a clear indication that ZMDC is actually managed from above and the Government's diktats matter far more than ZMDC's official management structure. Davidson Decl. Exs. NN, OO.

Zimbabwe's moves to strip ZMDC of assets for the specific purpose of defrauding named creditors *including Plaintiffs* are a classic example of when fraud or injustice would result from recognizing judicial separateness. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 417 (5th Cir. 2006) ("[T]he Government's manipulation of Turkmenneft to prevent Bridas from recovering any substantial damage award satisfies the 'fraud or injustice' prong.").

Here, Plaintiffs have presented evidence of Zimbabwe's shell game with ZMDC's assets, to the point of (at a minimum) exploring in depth a plan to transfer valuable assets from ZMDC to Defold, a different state-owned entity to avoid ZMDC's debts to Plaintiffs. *See* Davidson Decl. Ex. NN. There is substantial evidence of other asset-stripping behavior, including diverting ZMDC's subsidiaries' revenues directly to the Treasury so that ZMDC's creditors cannot reach them, Moyo Decl. ¶ 10, and demanding ZMDC pay cash to Zimbabwe without complying with

requirements to determine that ZMDC actually had any profits to distribute, Davidson Decl. Ex. M.

Defendants respond only with conclusory denials and a claim that any fraudulent transfers occurred too late to matter for alter ego status. The former speaks volumes about whether the transactions alleged were truly above-board; the latter makes no sense, since after a judgment is the *most* relevant time for fraudulent conveyances. In any event, Defendants' timing argument is simply wrong, as discussed at length above.

⁂

In short, even at this early stage, the evidence of Zimbabwe pulling the strings at ZMDC and of Zimbabwe engaging in fraudulent transfers to frustrate Plaintiffs' enforcement of their judgment is compelling. Zimbabwe treats ZMDC as essentially a mere department of the Mining Ministry and has used its resources as its own and attempted to shield them from creditors. The U.S. Government has repeatedly observed the lack of corporate formalities at ZMDC, and Zimbabwean government sources agree. Davidson Decl. Exs. FF-LL. Defendants' generic denials do not come close to carrying their burden to rebut Plaintiffs' showing. That is sufficient to deny the motion to dismiss.

3. **The Alter Ego Analysis Considers All Relevant Facts, Not Just Those at The Time A Contract Is Signed.**

Defendants principally contend that alter ego status can only be judged at the time that a contract, here, the Memoranda of Understanding, was signed—in other words, meaning that Zimbabwe's domination of ZMDC when it *breached* the MOUs, evaded the Award and Judgment, and dissipated assets do not matter. Doc. 42 at 17. The *sole* authority they cite for this proposition is *TIG Ins. Co. v. Republic of Argentina*, No. 18-MC-00129 (DLF), 2022 WL 1154749, at *9 (D.D.C. Apr. 18, 2022), *order corrected and superseded,* No. 18-MC-00129

(DLF), 2022 WL 3594601 (D.D.C. Aug. 23, 2022), an unpublished district court case that held that the arbitration exception to sovereign immunity did not apply to the sovereign as successor-in-interest to a defunct state-owned insurer.  Without citing authority, *TIG Ins.* rejected an alter ego argument on the basis that all the evidence dealt with the post-liquidation period rather than the time of the original agreement to arbitrate. This case, of course, deals with a different exception—implied waiver—and, as discussed below, presents evidence of intense government meddling at times that include when ZMDC submitted to arbitration and signed the terms of reference.[13]

But even aside from that, *TIG*'s limitation of the relevant period for an alter ego analysis is simply wrong. *Bancec* itself involved holding the state liable for setoff and counterclaims based on its liquidation of the state-owned entity plaintiff *after* the suit was filed—it did not limit its analysis to when Citibank's Cuban assets were expropriated or the moment the suit was filed. *Bancec*, 462 U.S. at 631. Cuba could not rely on the fact that the suit had originally been filed by Bancec before Cuba liquidated it to avoid the consequences of its actions in making Bancec its pawn.

The Third Circuit recently expressly rejected the position Defendants adopt here, holding that the totality of the circumstances determine whether the state and its instrumentality are a single enterprise. "[T]he totality of the sovereign conduct of Venezuela," it held, "answers the 'when' issue" for the alter ego analysis. *OI Eur. Grp. B.V.*  73 F.4th at 170. "[N]arrowing the temporal inquiry for alter-ego analysis," it held, "unnecessarily leaves room for manipulation."

---

[13] Defendants attempt to claim that this Court's prior order limited the relevant time period, but it does nothing of the sort. It simply held that the analysis for the period at issue in *Funnekotter* might differ from that at issue here, so offensive nonmutual collateral estoppel was inappropriate. Doc. 38 at 14-15.

*Id.* (internal quotation marks omitted). *Subsequent* conduct could not excuse prior exercise of domination, because "[w]e would invite fraud and injustice—the very concerns carefully cautioned against in *Bancec*—by considering only how a state acts after learning that its actions surrounding an instrumentality are under scrutiny." *Id.* "Nor is exclusive reliance on the time of injury a satisfying approach," it held, because it would invite judgment-evasion where, as in *Bancec* itself, the sovereign could "simply drop vulnerable assets into a new instrumentality." *Id.* The Third Circuit observed that many cases applying *Bancec* had considered prior or later conduct too. *Id.*

This case illustrates precisely why the Third Circuit's approach is right and a holistic analysis is necessary. Before the arbitration, Zimbabwe's domination of ZMDC caused Plaintiffs' injury when the Minister wanted to expropriate their mining rights. And after the Award, Zimbabwe has deprived ZMDC of assets to satisfy it—to the point of contemplating measures (objected to by ZMDC itself) expressly intended to defraud ZMDC's creditors. *All* those facts are relevant to whether the Government ought to have ZMDC's implied waiver and liability applied to it as ZMDC's alter ego.

**B. In the Alternative, This Court Should Authorize Tailored Jurisdictional Discovery.**

But even if this Court believes that the current record is insufficient, the law is clear that Plaintiffs must be given a sufficient opportunity to take jurisdictional discovery of Zimbabwe and ZMDC to prove that the Amended Complaint's alter ego allegations are true. Tellingly, Defendants contend that press reports and even government reports are not enough proof, but do not introduce evidence to contradict them. Plaintiffs are entitled to test Zimbabwe's denials, which are often either conclusory or backed only by the word of a witness whom the arbitrators found perjured himself.

The D.C. Circuit has held that, while a "district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction, but it *must* give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (emphasis added and internal quotation marks and citation omitted). Thus, unless another ground is dispositive of the motion, *id.*, jurisdictional discovery is mandatory. *See also Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 185 F. Supp. 3d 233, 248 (D.D.C. 2016) (jurisdictional discovery is mandatory "if it is possible that the plaintiff could demonstrate the requisite jurisdictional facts sufficient to constitute a basis for jurisdiction").

Here, there is no avoiding the issue of alter ego—it is the sole dispositive ground as to Zimbabwe and also dispositive as to ZMDC unless the Court agrees with its argument regarding the MOUs' service provisions. The Amended Complaint contains detailed allegations of abuses of the corporate form, domination, and efforts to defraud creditors, backed up by extensive publicly-available articles and U.S. Government reports. Defendants' response has largely been to deny the truth of these allegations or to claim that Plaintiffs' *evidence* is insufficient. But overwhelmingly, the evidence that they claim is necessary is in their own possession.

Thus, if the Court is not prepared to deny Defendants' motion altogether, targeted jurisdictional discovery is necessary. Plaintiffs believe that targeted discovery requests and a Rule 30(b)(6) deposition of Zimbabwe and ZMDC as to the following subjects should demonstrate that the alter ego allegations of the Amended Complaint are true:

(1)    Directions or orders from the Minister, Permanent Secretary, or Ministry to the Board of ZMDC or subsidiary boards;

(2) Payments from ZMDC or its subsidiaries to Zimbabwe, including whether ZMDC had audited financials showing a profit at the relevant time;

(3) Grants of concessions or joint ventures to (i) Russian or Chinese companies, and (ii) companies in which government, party, or military officials have an interest.

(4) Actual or contemplated transfers or reassignments of mining assets from ZMDC to other entities owned or controlled by the State or government officials or their relatives;

(5) The Ministry's involvement in the termination of Plaintiffs' concessions;

(6) Appointments and removals of Board members of ZMDC and its subsidiaries, including the relationship of Board members to the President, Minister, Permanent Secretary, or Ministry; and

(7) The truth of other allegations in government and media reports regarding ZMDC, including but not limited to the operational role of the Permanent Secretary of the Ministry, whether ZMDC operated without a board, and whether ZMDC had control over its own subsidiaries,

**C. ZMDC's Implied Waiver Extends to Its Alter Ego And To Judgments On Arbitration Awards.**

Defendants repeat their prior arguments that the implied waiver exception does not apply here. Doc. 42 at 25-27. It is unclear if Defendants are merely explaining why the alter ego analysis is dispositive or are making an argument intended to stand on its own, but to the extent that they contend that a state-owned entity's implied waiver does not extend to its alter ego, *Bancec* itself rejects that view, holding that the instrumentality's acts are imputed to the sovereign where the two are alter egos. "Giving effect to Bancec's separate juridical status in these circumstances, even though it has long been dissolved, would permit the real beneficiary of

such an action, the Government of the Republic of Cuba, to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets—a seizure previously held by the Court of Appeals to have violated international law." 462 U.S. at 632. Thus, Bancec's waiver was Cuba's waiver, so "Citibank may set off the value of its assets seized by the Cuban Government against the amount sought by Bancec." *Id.*; *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000) (the *alter ego* factors identified in *Bancec* "serve also as exceptions to the rule that a foreign sovereign is not amenable to suit based upon the acts of such an instrumentality.").

Similarly, Defendants reiterate their prior argument that an implied waiver by arbitrating in a state that is a party to the New York Convention does not extend to an action recognizing a judgment on the award. This Court rejected that argument before, and was right to do so. *Amaplat*, 2023 WL 2603746, at *15.

**D. ZMDC Was Properly Served.**

Finally, Defendants contend that the Court lacks personal jurisdiction. As to Zimbabwe, the argument is simply that the Court lacks personal jurisdiction because it lacks subject matter jurisdiction. Doc. 42 at 28. As to ZMDC, Defendants' first argument is that this Court lacks personal jurisdiction because ZMDC is not an alter ego and thus possesses due process rights. *Id.* at 28-29. Again, that argument stands or falls with the alter ego analysis; it has no independent vitality. *See GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012); *see also id.* at 814-15 (noting that *Bancec* determines whether an instrumentality is sufficiently distinct from the state itself to have due process rights).

That leaves one remaining argument: that ZMDC was not properly served. That argument was raised but not decided on the prior motion to dismiss; as Plaintiffs explained then, ZMDC

was properly served pursuant to the special arrangement for service specified in the MOUs. While acknowledging that 28 U.S.C. § 1608(b)(3)(B) only applies if there is no "special arrangement" for service under 28 U.S.C. § 1608(b)(1), ZMDC entirely ignores the fact that there is a clear special arrangement for service here: the MoUs expressly agree to service of "documents in legal proceedings," not just contractual notices, at the "domicilium *citandi* et executandi." That requires denial of ZMDC's motion.

1. **Because ZMDC Is An Agency or Instrumentality, Substantial Compliance Plus Actual Notice Suffices.**

To start, D.C. Circuit law holds that for agencies or instrumentalities served under Section 1608(b), Congress adopted a substantial compliance standard for service as long as the agency or instrumentality received actual notice. "The authorities generally hold that section 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state." *Transaero*, 30 F.3d at 153. Indeed, "[t]he Committee Report [for FSIA] states that section 1608(a) 'sets forth the exclusive procedures for service on a foreign state,' but contains no such admonition for section 1608(b)." *Id.* at 154. Thus, courts in this district apply a substantial compliance test to service on agencies and instrumentalities as long as the defendant received actual notice. *See, e.g.*, *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 798 F. Supp. 2d 260, 268 (D.D.C. 2011) (substantial compliance standard applies to agencies and instrumentalities).

2. **ZMDC Agreed That "Documents In Legal Proceedings" Could Be Served By Hand Delivery At Its Headquarters.**

That the domicilium clauses here agree to service—thus constituting a special arrangement—is not a close call. The D.C. Circuit has favorably cited a case holding that a "contract provision providing '[a]ll notices, demands, or requests between Sublessor and Sublessee shall be delivered in person, by certified mail, return receipt requested, or by registered mail' and providing addresses for notification constituted 'special arrangement for

service' under section 1608(a)(1)" *Angellino v. Royal Fam. Al-Saud*, 688 F.3d 771, 777 (D.C. Cir. 2012) (quoting *Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 251 (D.D.C. 2001)). This Court has suggested that, at least where a provision refers to notices under a contract, some contemplation of legal process rather just contractual notices may be necessary. *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 225 F. Supp. 3d 18, 23 (D.D.C. 2014) (Cooper, J.).

The provisions here unambiguously refer to service of process, not just contractual notices: they state that "documents in legal proceedings"—not just notices—"may be served" at the specified addresses, or at such other address as may be notified in writing. Doc. 1-2 § 12.8.1; Doc. 1-4 § 10.9.1. And they say that the address is the "domicilium citandi et executandi," a term used in Zimbabwean and South African law that translates as "domicile for being summonsed and execution" and means the address for service of process.[14] Doc. 1-2 § 12.8.2; Doc. 1-4 § 10.9.2; *see also Schimmelpennich v. Bayard*, 26 U.S. 264, 275 (1828) (quoting Amsterdam merchant's use of the variant "domicilium citandi et exequendi" to designate a notary's office as agent for service of process).

Similarly, the provisions apply to this case because an action to recognize a judgment based on the MoUs is in connection with them. While the rule of the last antecedent[15] means that, in the phrase "documents in legal proceedings or any written notices in connection with this MOU," Doc. 1-2 § 12.8.1; Doc. 1-4 § 10.9.1, "in connection with this MOU" modifies only "any

---

[14] While the term is self-explanatory once translated, publicly available sources also confirm that it means an address for service of process. *E.g.*, *Hay Management Consultants Ltd v. P3 Management Consultants (Pty) Ltd* [2004] ZASCA 116, [2005] 3 All SA 119 (SCA) (translating the term as "a domicilium for service of process and writs of execution").

[15] *See In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 655 (7th Cir. 2010) ("[R]elative and qualifying phrases, grammatically and legally, where no contrary intention appears, refer solely to the last antecedent.").

written notices" and not "documents in legal proceedings," this Court need not resolve the point. "[I]n connection with" is broad language, and an action to domesticate a judgment based on the MoUs is easily "in connection with" them. *Cf. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("in connection with" is given a "broad construction"). Indeed, the D.C. Circuit has held that an "in connection with" forum-selection provision "applies to claims arising from the Agreement *and* from its subject-matter or formation, not just claims connected to the 'contract.'" *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 878 (D.C. Cir. 2019). A judgment on an arbitration award for breach of the contract easily satisfies that test.

#### 3. Plaintiffs Served ZMDC In Accordance With The MoUs, And ZMDC's Failure to Give Notice of Its Office Move Does Not Avail It.

And Plaintiffs did what the service provision asked of them. It appears undisputed that Plaintiffs served a "responsible person" by hand during normal business hours. The only slight complication here is that ZMDC moved offices without serving Plaintiffs with a formal document calling itself a change of address notice. That changes nothing, for several independent reasons.

***First***, ZMDC did, in fact, notify Plaintiffs that it had moved: it sent Plaintiffs correspondence listing its new headquarters address as 6 Constantia Avenue. Davidson Decl. Ex. 1. Because the MoUs do not set specific form requirements for changing addresses other than that they are in writing, correspondence listing a new headquarters is sufficient under the MoUs themselves.

***Second***, even if the letters listing the new address were not sufficient to satisfy the contractual provisions themselves, courts have held that a party that learns of a change of address from a party to a contractual notices provision "not only may but must send notice . . . to the new or changed address." *Robbins v. S. Gen. Ins. Co.*, 243 A.2d 686, 688 (D.C. 1968) (discussing

notice of cancellation of insurance policy where a jury found policyholder had informed the insurer of his new address). Indeed, because service on what is known to be an out-of-date address is unlikely to achieve notice, courts have held that a party with "actual knowledge" of the new address must serve notices there, even where the other party failed to supply the new address in the correct formal manner. *Ry. Mail Ass'n v. Moore*, 15 F.2d 547, 551 (4th Cir. 1926); *see also Long v. Home Indem. Co. of New York*, 169 So. 154, 159 (La. Ct. App. 1936) ("[W]here the insurer has definite knowledge that the assured's address has been changed, it is required to govern itself thereby."). The same rule applies here: Plaintiffs learned that ZMDC's address had changed, so it was not only proper but necessary so that ZMDC would receive actual notice that Plaintiffs serve ZMDC at its new address.

***Second***, if this Court disagrees, then ZMDC—while contractually obligated to have a "responsible person" to accept service at 90 Mutare—failed either to have someone there or to serve a proper change of address notice. As such, it is estopped from relying on its own failures to do what it should have done. *See generally* 72 C.J.S. Process § 126 (collecting cases holding that parties who affirmatively represented their address were estopped from challenging service). Having signed a contract that directed it to serve notice if it changed its address, it *should have* served the formal notice of its office move, and its failure to do so prejudices Plaintiffs because it can unilaterally prevent hand service by keeping no one to receive it at the contractual address. Thus, equity treats as done that which ought to have been done: it. The basis for estoppel is even stronger, indeed, when ZMDC directly communicated with Plaintiffs' Zimbabwean counsel identifying its new offices as the appropriate return address, thus representing that it was now the correct address. Having unilaterally frustrated service at the specified address, if it is deemed to have also failed to sufficiently update its address for service, it cannot now insist that Plaintiffs

do the impossible and hand-serve process on its old address. Otherwise, it could prevent service *at all* by simply refusing to serve formal notice of its updated address.

Indeed, at least one court has found, under analogous circumstances, that it is proper to serve a foreign sovereign at its actual address when it fails to update a contractually-specified address. In *International Road Federation v. Embassy of the Democratic Republic of Congo*, the embassy subleased a property, but never took possession, and the sublease specified service at the subleased property. 131 F. Supp. 2d at 251. While acknowledging that Section 1608(a) of the FSIA (unlike Section 1608(b), the provision that applies to agencies and instrumentalities) requires "strict adherence" to *the Act's* terms the court found that the embassy's failure to take possession precluded it from arguing that the plaintiff should have served an empty building: "because service at the subleased premises would have been senseless, service at the Embassy's primary location satisfied the terms of the special agreement." *Id.* at 251.[16]

***Third***, and regardless, the parties agreed that actual receipt would always suffice. "Notwithstanding anything to the contrary contained or implied in this MOU," it said, "a written notice or communication actually received by one of the Parties from the other Party shall be adequate written notice or communication to such Party." Doc. 40-2 § 12.8.2; Doc. 40-4 § 10.9.2. That encompasses service: that text is contained in a section that deals with "documents in legal proceedings or any written notices," so the word "communication" would be superfluous if it only referred to written notices. It thus plainly includes "documents in legal proceedings," as

---

[16] This Court has previously expressed concern that the *International Road* court applied a "substantial compliance" rather than "strict adherence" standard to Section 1608(a). *Enron*, 225 F. Supp. 3d at 22. While *International Road* expressly stated that it was applying the strict adherence standard to the Act even as it applied equity to the contract, this case in any event involves Section 1608(b), which this Court noted in *Enron* was less unforgiving. *Id.*; *see Transaero*, 30 F.3d at 153 ("The authorities generally hold that section 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state.").

a form of communication. And, since it is undisputed that Defendants received actual notice, that suffices under the contracts.

**4. If The Court Nonetheless Finds Service Ineffective, Dismissal Is Still Inappropriate And The Court Should Authorize Alternate Service Under 28 U.S.C. § 1608(b)(3)(C).**

Finally, it is settled law in this Circuit that it is inappropriate to outright dismiss a case when service may yet be achieved. "[D]ismissal is not appropriate when there exists a reasonable prospect that service can be obtained." *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 29 (D.C. Cir. 2015). Moreover, there is no statutory deadline to serve under the Foreign Sovereign Immunities Act. *Id.*

Rather, this Court should authorize alternate service if it finds that ZMDC has successfully prevented service under the MoUs. Under 28 U.S.C. § 1608(b)(3)(C), the Court may approve any method of service "reasonably calculated to give actual notice" that is consistent with the laws of the place where service is to be made. *Transaero*, 30 F.3d at 154. The chosen method need not be the same way that service would be made in local proceedings—it just cannot violate positive law. *See New England Merchants Nat. Bank v. Iran Power Generation & Transmission Co.*, 495 F. Supp. 73, 78-79 (S.D.N.Y. 1980) ("The language in the FSIA requiring that the mode of service fashioned by the court be 'consistent' with the law of the foreign state, does not require that service be identical to the method prescribed by the foreign state. Rather, the language indicates that the mode of service authorized by the court should not be prohibited under the law of the foreign state."). Plaintiffs have now attempted service under the MoUs, mail service, and DHL service to no avail, and Zimbabwe is not a party to any relevant service treaty.

Accordingly, the Court should authorize alternative service. Specifically, the Court should authorize Plaintiffs to (1) hand-serve a responsible person at ZMDC at its 6 Constantia Avenue address, or any other address identified by ZMDC, during business hours; and (2) serve

ZMDC's counsel in these proceedings as its agent. Many courts have authorized service on counsel in the United States as a form of alternate service on a foreign entity under 28 U.S.C. § 1608(b)(3)(C) or Federal Rule of Civil Procedure 4(f)(3). *See Hashem v. Shabi*, No. CV 17-1645 (ABJ), 2018 WL 3382913, at *5 (D.D.C. Apr. 26, 2018); *Saleh v. Al Nahyan*, No. CV 20-1168 (ABJ), 2021 WL 7210780, at *4 (D.D.C. July 16, 2021); *Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 14 (D.D.C. 2016); *see also Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*, 766 F.3d 74, 83 (D.C. Cir. 2014) (remanding to allow the district court to exercise its discretion as to whether to authorize service on counsel in the United States for foreign entity).

### E. The Amended Complaint States A Claim.

Finally, Defendants contend that the Amended Complaint does not state an alter ego claim. Since the standard for defeating a motion challenging subject matter jurisdiction is higher than the standard for stating a claim, this argument has no independent weight. Even if the Court were to believe that any evidence presented in support of Plaintiffs' opposition goes beyond the well-pleaded allegations of the Amended Complaint, the appropriate response would be to grant leave to amend to conform to proof rather than to dismiss for failure to state a claim.

## V. CONCLUSION.

For the foregoing reasons, Defendants' motion to dismiss should be denied. In the alternative, Plaintiffs should be granted leave to take jurisdictional discovery targeted at the allegations of the Amended Complaint and the contentions made in Defendants' motion.

Dated: August 10 , 2023

Respectfully submitted,

*/s/ Steven K. Davidson*
Steven K. Davidson (D.C. Bar No. 407137)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795
Telephone: 202 429 3000
Facsimile: 202 429 3902
sdavidson@steptoe.com

Robert W. Mockler
Joseph M. Sanderson (D.D.C. No. NY0560)
Niyati Ahuja (*pro hac vice*)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Telephone: 212 506 3900
Facsimile: 212 506 3950
rmockler@steptoe.com
josanderson@steptoe.com
nahuja@steptoe.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**AMAPLAT MAURITIUS Ltd.,**
c/o CKLB International Management Ltd.,
P O Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius;
and

Amari Nickel Holdings Zimbabwe Ltd.,
c/o CKLB International Management Ltd.,
P O Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius;

Plaintiffs,

v.

Zimbabwe Mining Development Corporation,
90 Mutare Road, Msasa, Harare, Zimbabwe;

The Chief Mining Commissioner, Ministry of
Mines of Zimbabwe,
6th Floor, ZIMRE Centre, Cnr. Leopold
Takawira Street/Kwame Nkrumah Avenue
Private Bag 7709, Causeway, Harare
Zimbabwe;

And the Republic of Zimbabwe
c/o Head of the Ministry of Foreign Affairs,
Ministry of Foreign Affairs, P O Box 4240
Munhumutapa Building, Cnr. Samora
Machel Avenue/Sam Nujoma Street, Harare
Zimbabwe

Defendants.

Civil Case No. 1:22-cv-00058-CRC

---

## DECLARATION BY STERNFORD MOYO

---

I, Sternford Moyo, make this declaration based on my knowledge of Zimbabwean law.

1. My name is Sternford Moyo. I am a legal practitioner in Zimbabwe, having been registered as a legal practitioner of the High Court and Supreme Court of Zimbabwe in March 1982. I am the Senior Partner of Scanlen & Holderness, a law firm established in 1894 which I joined in December 1981. Apart from professional fees payable to me as an expert witness on Zimbabwean law, I have no personal interest in this matter.

2. I am familiar with the parastatal or statutory body known as Zimbabwe Mining Development Corporation (ZMDC). It is incorporated in Zimbabwe in terms of the Zimbabwe Mining Development Corporation Act [*Chapter 21:08*] of the laws of Zimbabwe.

3. ZMDC is an agency or instrumentality of the Government of Zimbabwe, although it is constituted as a separate body capable of suing and being sued in its own name and, subject to the provisions of Chapter 21:08, capable of performing all such Acts as a body corporate may, by law perform.

4. It operates under the ultimate control of the Government of Zimbabwe particularly in that:

4.1 Although it has a board of directors, they are appointed by the Minister of Mines and Mining Development (hereinafter referred to as '*the Minister*') after consultation with the President of the Republic of Zimbabwe. The appointment is made in accordance with any directions the President may give the Minister.

4.2 The chairman and deputy chairman of the board are appointed by the Minister. They are not elected by board members.

4.3 The Minister may require a member of the board to vacate his or her office.

4.4 The board is required to hold its first meeting on such date and at such place as the Minister may fix. This is done to enable the Minister to give in person directions regarding his expectations.

4.5 Board members are paid such remuneration and allowances as the Minister may fix.

4.6     Such officers of the public service as the Minister may designate, are entitled to attend board meetings and to take part in the proceedings of the board, or of any committee established by the board, although they do not have a right to vote at such meetings.

4.7     Among the functions of the corporation is to advise the Minister on all matters connected with corporate investments in the mining industry and to make recommendations for the proper coordination of all investment programmes and to carry out any other functions and duties which may be imposed upon the corporation by any enactment.

4.8     The corporation is required to submit to the Minister such reports as the Minister may require and the Minister may lay a report submitted to him by the corporation before Parliament.

4.9     The corporation is under a duty to ensure that every application or proposal dealt by it is considered strictly in accordance with government economic policy and that its activities are directed towards implementing government mining development policy.

4.10 The appointment of its general manager has to be approved by the Minister and the assignment to him or her by the corporation of any functions and powers of the corporation is subject to approval by the Minister.

4.11 The Minister may, after consultation with the board of the corporation, give to the corporation such directions of a general character relating to the exercise by it of its functions, duties and powers as may appear to the Minister to be requisite in the national interest. The corporation is required, with expedition, to comply with any directions given by the Minister. These are any directions the Minister considers to be in the national interest. They do not appear to be limited to policy directions.

4.12 Increase in the share capital of the corporation requires the approval of the Minister of Finance and Economic Development 'hereinafter simply referred to as, *'Minister of Finance'*. Indeed, all capital issues of the corporation require the approval of the Minister of Finance.

4.13    All investments of the corporation require the approval of the Minister, acting on the advice of the Minister of Finance.

4.14    Loans advanced by the corporation to any statutory corporation are on such terms as may be approved by the Minister and the Minister of Finance.

4.15    General reserves of the corporation may be established subject to the approval of the Minister and may be utilised for purposes approved by the Minister.

4.16    The corporation may keep such accounts and records as the Minister may approve.

4.17    Auditors may be appointed by the corporation subject to the approval of the Minister.

4.18    The Minister may at any time cause an investigation of the affairs of the corporation by one or more persons appointed by him.

4.19   The Minister may direct the general manager and the board to comply with the provisions of the Act and if they fail to do so, he may apply to the High Court for an order compelling them to do so.

4.20   The Minister may, in consultation with the board, make regulations prescribing anything which in terms of the Act is to be prescribed or which in his opinion is necessary or convenient to be prescribed for the carrying out or giving effect to the provisions of the Act under which the corporation is incorporated.

4.21   The beneficiary of all the operations and activities of the corporation is the Government of Zimbabwe which is its sole shareholder.

4.22   In addition to the Minister being entitled to direct that civil servants attend board meetings and committee meetings, before 2018, the year of the new dispensation, it was common to have board members with a civil service background.  For an example, Mr David Murangari who was chairman of ZMDC before 2018 had served as Permanent Secretary in the Ministry of Mines between 1988 and 1997, Deputy Secretary for Mines between 1985 and

1988, Deputy Director in the Geological Survey Department 1983 to 1985 and Regional Director for Harare Mining District 1980 to 1982.  Mr Titus Nyatsanga, another Director before 2018 had worked in the Ministry of Mines and Mining Development from 1980 to 1989.  Mr Ambassador Zenzo Nsimbi had been Deputy Minister of Mines 1995 to 1997, Deputy Minister of Transport and Energy 1997 to 2000.

5. ZMDC's conduct of its business affairs has, on occasions, been consistent with it viewing itself as an alter ego of the Government of Zimbabwe or an agent of the Government of Zimbabwe to a point where, recognizing its separate existence may, in some instances, result in injustice.

5.1 In August 2009, it entered into a joint venture with Grandwell Holdings (Pvt) Ltd, a foreign company. The joint venture company was known as Mbada Diamonds (Pvt) Ltd. ZMDC's interest in the joint venture was held by a company known as Marange Resources (Pvt) Ltd which it wholly owned. When the Government of Zimbabwe decided to force all diamond companies to become part of Zimbabwe Consolidated Diamond Company Limited, which it had formed, the ZMDC did not oppose the move despite the terms of the merger not having been clarified. In the judgement

attached hereto as **Exhibit "A"**, the High Court of Zimbabwe referred to Zimbabwe Development Corporation as a proxy of the Government of Zimbabwe. It also referred to the Minister of Mines and Mining Development, the Zimbabwe Development Corporation, Marange Resources (Pvt) Ltd and the Zimbabwe Consolidated Diamond Company as having acted in concert. The court interdicted them from what they purported to do in concert. An appeal against that judgement was dismissed by the Supreme Court of Zimbabwe as will appear from **Exhibit "B"**.

5.2   In another matter which appeared before the High Court and was adjudicated upon by the Supreme Court, the Zimbabwe Development Corporation displayed a heavy dependence on the Ministry of Mines and Mining Development as will appear from the judgement of the Supreme Court, attached hereto as **Exhibit "C"**.

6.   Whilst I agree that in general terms, the role of the board of ZMDC is akin to the role of any board of a statutory body, I see a difference in that whereas, in other statutory bodies, the Minister may give the board directions on matters of policy, in the case of ZMDC, he can give the corporation such directions, relating to the exercise of his functions, duties and powers, as may appear to the Minister, to be requisite in the