# EXHIBIT A

GRANDWELL HOLDINGS [PRIVATE] LIMITED
versus
MINISTER OF MINES & MINING DEVELOPMENT
and
ZIMBABWE MINING DEVELOPMENT CORPORATION
and
MARANGE RESOURCES [PRIVATE] LIMITED
and
ZIMBABWE CONSOLIDATED DIAMOND COMPANY
and
MBADA DIAMONDS [PRIVATE] LIMITED
and
COMMISSIONER-GENERAL, ZIMBABWE REPUBLIC POLICE


HIGH COURT OF ZIMBABWE
MAFUSIRE J
HARARE, 29 February 2016; 2, 4, 8 & 16 March 2016


**Urgent chamber application**


*S. Moyo*, with him, *E.T. Moyo* and *B. Mahuni,* for the applicant
*Adv. L. Uriri*, with him, *M. Magadure,* for the first respondent
*Adv. S. Hashiti*, with him, *J.R. Tsivama*, for the second, third & fourth respondents
*Adv. T. Mpofu*, for the fifth respondent
*Adv. G.R.J. Sithole*, for the sixth respondent


MAFUSIRE J: No one stops government from governing. No one stops government functionaries from crafting and implementing government policy. But in all this, the rule of law must be observed. This is paramount. It is a tenet the courts will defend to the last judge standing. The alternative is anarchy. Law and order are indispensable elements of civilised society. This must sound like a broken record. But unless the need for it falls away, the principle may continue to be re-stated. CHIDYAUSIKU CJ, in *Minister of Lands & Ors v Commercial Farmers Union*[1] put it this way:

> "... [T]he law is supreme over decisions and actions of government and private persons. There is ... one law for all. ... [T]he exercise of all public power must find its ultimate source in a legal rule. .... [T]he relationship between the State and the subject must be regulated by law. So must the relationship between subjects in order to prevent resort to self-help. The rule

[1] 2001 [2] ZLR 457 [S], at pp 479 - 480

2
HH 193-16
HC 1977/16

345

against self-help is necessary for the protection of the individual against arbitrary and subjective decisions and conduct of an adversary …"

[a]   **Summary of the dispute**

The proceedings before me were an urgent chamber application for an order *mandament van spolie* and an interdict. The crux of the matter was whether or not certain actions by the first respondent, aided and abetted by one or other of the officials of the second and third respondents, and with officers of the sixth respondent being the executioners, amounted to an illicit dispossession of the fifth respondent in respect of one of the diamond mining sites at the Chiadzwa Diamond Concessions ["*Chiadzwa*"].

Before deciding the main issue above, there were four points *in limine*. The first was whether or not the applicant was *peregrinus* and therefore one required by law to furnish security for the costs of the respondents before the application could proceed. The second was whether respondents 2 to 4 had soiled themselves and were coming to court with 'dirty hands', and therefore unfit for the court's audience. The third was whether the applicant had *locus standi in judicio*. The fourth was a variant of the third. It was whether the application was a derivative action as that expression is understood in company law. But before the details, the background to the whole dispute is necessary.

[b]   **Background to the dispute**

Despite occasional attempts at splitting hairs whenever some inconvenient detail stood in the way, it was clear to me that in August 2009 the government of Zimbabwe ["*the government*"], through the first respondent [hereafter referred to as "*the Minister*"], went into a commercial marriage with some foreign investors. The marriage was for the purpose of exploiting diamonds in Chiadzwa for mutual benefit. The marriage was in the form of a joint venture. The marriage would be consummated through proxies. For the foreign investors, the applicant was the proxy [hereafter referred to as "*Grandwell*"]. For the government, the proxy was the second respondent, a parastatal or statutory corporation set up in terms of its enabling Act [hereafter referred to as "*the ZMDC*"]. In turn, ZMDC was fronted by the third respondent, its wholly owned subsidiary [hereafter referred to as "*Marange*"]. Except for the sixth respondent who got joined to the proceedings in the middle, respondents 1 to 4 were effectively a single economic unit for the purposes of this marriage.

During courtship, all the necessary approvals were incepted, not least foreign exchange control authority, foreign investment licences and a Cabinet endorsement. The Cabinet endorsement, addressed to Grandwell on 10 February 2010, read like this:

"Re:   IMPLEMENTATION OF THE JOINT VENTURE ARRANGEMENT FOR MARANGE DIAMONDS MINING PROJECTS: MBADA DIAMONDS PVT LTD

This is to confirm that the Government of Zimbabwe has approved and therefore fully supports the joint venture project between Grandwell Holdings Ltd, a company registered in Mauritius and Marange Resources Pvt Ltd a ZMDC investment vehicle, currently carrying on the business of diamond mining under the name Mbada Diamonds [Pvt] Ltd.

Appropriate Government approval was duly obtained both for the identification of investor and the subsequent joint venture agreement."

Pre-nuptial contracts were executed. They included a joint venture agreement ["*the JVA*"] and a shareholders' agreement. The parties to these agreements were Marange, on the one hand, and Grandwell, on the other. ZMDC ceded for the project some of the Special Grants, the dispensation under which the diamonds would be mined and exploited.

In the JVA, ZMDC and Marange gave certain undertakings, warranties and guarantees. Among other things, the marriage was virtually in perpetuity. Marange would ensure the continued validity of the Special Grants.

On its part, Grandwell would invest US$100 million in tranches. The day to day management of the operations and the control of the mine, the recruitment and deployment of staff, the development of business strategies, and the like, were entrusted to it.

Born out of that marriage was the fifth respondent [hereafter referred to as "*Mbada*"]. It was duly incorporated as a private company, owned 50% by Grandwell, and 50% by Marange.

[c]   **The facts of the dispute**

The marriage endured for six or seven years. Mbada was happily mining. But apparently the government was brooding. Apart from its marriage with Grandwell, it had entered into several others with other foreign investors. But the government felt its partners were being unfaithful. It felt it was getting little or no remittances. To remedy this, it crafted a policy to merge all the diamond mining companies at Chiadzwa into one single entity. The fourth respondent was born out of this. It would be the special purpose vehicle for the new



venture. All the disparate companies would take up 50% of the equity in it. The government reserved the remaining 50% to itself.

Meetings were convened from about March 2015 over this new initiative. Grandwell was apprehensive. But it said it was not opposed in principle. It required a blue print and certain other details. There were some exchanges. But on 22 February 2016 events took a dramatic turn. Apparently government felt there was little or no progress towards the consolidation.  On that date it wrote to Mbada advising, among other things, that it had discovered that the Special Grants had expired, and that, with no title, Mbada had to cease all mining activities with immediate effect and vacate the mining site. Mbada was given 90 days to remove all its equipment and other valuables. Any further access to the mining site would be upon request.

The Minister called a press conference to announce the new development. On the same day of the letter, Mbada's operations were forcibly stopped through armed police. Processing plants were shut down. Mbada's security team was disbanded and expelled from site. Other employees were forcibly evicted both from the workstations and from their site residences. Security systems were paralysed.

It seems diamonds are to humans what fluorescent light bulbs are to flying insects. Despite the perils, they flock to them in droves. Grandwell said utter chaos ensued in the aftermath of the government's actions. There was massive looting of both the crushed and uncrushed diamonds by artisanal miners and other characters that seemed to have had prior knowledge of the events to unfold. Equipment was vandalised. Containers were stolen. Personal belongings from private residences were looted. The loss was said to be phenomenal.

It was said government efforts to incept replacement security was woefully inadequate. The bleeding continued. On 27 February 2016, Grandwell ran to the law. It filed this application. After laying out the above background and complaining about the government's breach of contract, it sought the following relief:

- an order that the respondents 1 to 4, their agents or anyone acting on their behalf, should vacate the mining site;

- an order that Mbada's peaceful and undisturbed possession of the mining site be restored;

- an interdict restraining any further interference with Mbada's operations at the mine;

- an interdict restraining the forcible or inducement or procurement of a breach of contractual obligations.

I now turn to deal with all the issues in the order that they arose.

[d]   **Points *in limine***

i/   Security for costs, applicant a *peregrinus*

The respondents 2 to 4 said Grandwell was a *peregrinus*. It was a foreign company registered and operating from Mauritius. As such, it had no automatic right of audience with our courts. It was obliged to provide security for their costs. Until it did, the application could not proceed.

In counter, Grandwell and Mbada argued that Grandwell might have been registered in Mauritius, but that a company was capable of having more than one place of residence. *In casu*, by virtue of the agreements, it was carrying on business at Chiadzwa, where it was resident. Among other things, it was the manager of the diamond mine and the one in charge of the day to day operations. In such circumstances, there was no need for security for costs. Furthermore, no prior demand for such costs had been made. In any case, it was capable of furnishing such security in a reasonable amount, or through a bond by its legal practitioners.

I summarily dismissed the point *in limine*. Plainly, it was raised in bad faith. The idea was manifestly to thwart the application before it could even begin. There had been no prior demand for such costs. Admittedly, events were unfolding very fast, the application having been launched on an urgent basis. But for an application that had been served on a Saturday, and an interim hearing held the next Monday, only for the issue to be raised for the first time on the Wednesday to which the matter had been postponed, and without any prior warning, was an unacceptable ambush.

Furthermore, given Grandwell's financial muscle that was manifest in the body of the application, there could have been no genuine fear by any of the respondents that it would be unable to meet any costs of suit that could be awarded against it. The JV seemed a multi-million dollar project. Grandwell was the manager and operator. Among other things, it was



due a management fee. The application also showed that Grandwell had high value equipment on site.

But substantively, an order for security for costs is one entirely in the discretion of the court. It is a rule of practice, not one of substantive law: see *Saker & Co Ltd v Grainger*[2]. Admittedly, the discretion has to be exercised judiciously, not capriciously. Many considerations are taken into account, not least the particular circumstances of the case, the equities and fairness of the request, and even the character of the *peregrinus* itself: see *Magida v Minister of Police*[3] and *SA Iron & Steel Corporation Ltd v Abdulnabi*[4].

Only when there is reason to believe that a company, whether local **or foreign**, may be unable to pay the costs of the defendant or respondent **may** the court order security for costs. This is what s 350 of the Companies Act [*Cap 24: 03*] says. *In casu*, I did not have such belief.

It was for those reasons that I summarily dismissed the point *in limine*.

ii/     Whether respondents 2 to 4 were coming to court with 'dirty hands'

The issue of 'dirty hands' arose during the course of the proceedings. It is now water under the bridge. It is raised herein as an historical account, and for the purposes of furnishing my reasons for the view that I took.

I concluded that the respondents had indeed got themselves dirty at some stage after the start of the proceedings. Thus, until they cleansed themselves, I would not hear them. The respondents had eventually complied.

The urgent chamber application had been filed on 27 February 2016. That was a Saturday. Grandwell had made out a very strong case of dire emergency warranting judicial intervention on an urgent basis. It was said that each hour that passed worsened the plight of Grandwell, Mbada and its workers who had been expelled from their homes. I caused the matter to be set down for hearing on the morning of Monday, 29 February 2016.

Come the Monday, the respondents 2 to 4 sought a two day postponement to enable proper briefing of their legal practitioners. Grandwell strenuously opposed the postponement unless the respondents were prepared to concede to some interim measure to safeguard the property that was continuously under threat at the mine. All parties appreciated the need for

---

[2] 1937 AD 223, at pp 226 – 227
[3] 1987 [1] SA 1 [A] at p 12B – D
[4] 1989 [2] SA 224 [T], at p 233C – I

some contingency measure pending the proper hearing of the matter. However, they could not agree the terms. In the end, I granted the postponement but directed that pending the hearing in the following two days, all of Mbada's security personnel, together with their chain of command, would be allowed back on the mining site for the purposes of safeguarding assets at both the work stations and the residences [hereafter referred to as "*the Monday order*"].

When the hearing resumed on the Wednesday, Mr *Moyo*, supported by Mr *Mpofu*, charged that there had been complete defiance of the Monday order. He said upon the order being granted, the Minister had gone on national television to announce his disappointment with it and to express his intention to appeal. To Mr *Moyo*, all that talk about being disappointed and wanting to appeal was just euphemism for defiance.

Mr *Uriri*, for the Minister, and Mr *Hashiti*, for the respondents 2 to 4, strenuously denied that the Monday order had been defied. They submitted that Mbada's security personnel had been allowed back on site but that to get into the more sensitive zone they had had to undergo some security clearance but that they had declined to do so. The respondents applied to lead *viva voce* evidence on the real situation on the ground before I could be called upon to condemn them. Despite fierce opposition, I granted the application.

For the respondents, evidence was led from the Minister and a Mr Mark Mabhudhu ["*Mabhudhu*"] who was Marange's Chief Executive Officer. For Grandwell and Mbada, evidence was led from one Jabulani Mukoko ["*Mukoko*"], Mbada's Chief Security Officer.

The totality of the evidence was that the Monday order had not been complied with. The Minister stressed that he was a law-abiding citizen. It was not in his nature to disobey court orders. On the Monday order, all he had been shown had been a draft. Nonetheless, he had telephoned Mabhudhu advising that he understood that an order for the return of Mbada's security personnel had been issued. He said he had instructed Mabhudhu to facilitate compliance.

On the television interview, the Minister said he had been called to the station and had reacted to a question from one of the journalists. He said he saw no wrong that he had committed as he had merely expressed his disappointment with the Monday order and his intention to appeal as it was his democratic right to do.

On the issue of security clearance, the Minister said diamond sites are highly security sensitive areas. No visitor, no matter who, accesses the red zone without security clearance.

8
HH 193-16
HC 1977/16

He gave the example of himself and a former head of state of a foreign country when they had visited the mining sites some time before the events of this case. The entire entourage had had to undergo advance security clearance.

As for Mabhudhu, it was clear that he would not take orders from any one, including the court, unless and until his Minister had instructed him to do so. Regarding the Monday order, Mabhudhu, contrary to the Minister's evidence, said the Minister had instructed him to wait for the final order to be issued. He was still waiting.

Mukoko's evidence was that he and his security team had never been asked to undergo any security clearance by anyone but that the police had simply blocked them access at the entrance to the red zone. He had got hold of the Monday order the day it had been issued. He had driven to site the following day. He had passed through three security check points without any problems. It was on the fourth and last check point that he and his team had been told by the police to wait. Consultations had been made on the telephone. Some police detail had been deployed to come and deal with him. His name and that of his team had been jotted down. But from about 6:00 hours to about 12:00 hours no one had come back to him. In the end he and his team had simply left. They had had no food or any ablution facilities.

It was upon the totality of such evidence that I ruled that there had been non-compliance with the Monday order. I ruled that the non-compliance had been due to the wilful and or deliberate acts of commission or omission by the respondents 1 to 4. I was satisfied that if the Minister had really wanted, all he would have done was to instruct whoever mattered that Mbada's security personnel be allowed back on site. The buck stopped with him. The police were on site on his account.

I was satisfied that the reason why Mukoko and his team had not been allowed back on site was not because they had refused to under-go any security clearance. No such thing had been asked of them. At any rate, the need for such clearance was manifestly superfluous. Mbada's security personnel had been riding on the back of a court order. Furthermore, it was that very team that had provided adequate security at the mine for all the preceding years until the disruption on 22 February 2016.

I was also satisfied that to Mabhudhu, the court order meant nothing, unless it was given some badge of authority by his minister. That was brazenly contemptuous.

9
HH 193-16
HC 1977/16

Having been satisfied that the respondents were coming to court with 'dirty hands', I issued another order on Friday, 4 March 2016. It confirmed the respondents' default. It then withdrew the jurisdiction of this court over the respondents' cause until such time that they had purged their default. The matter was postponed to Tuesday, 8 March 2016. On that day it would proceed in default of the respondents unless there was evidence of compliance. This was on the basis of the 'dirty hands' principle, as enunciated in a number of cases, the leading one of which, in this jurisdiction, is *Associated Newspapers of Zimbabwe [Private] Limited v The Minister of State for Information and Publicity in the President's Office & Ors*[5]. In that case the Chief Justice said:

> "This Court is a court of law, and as such, cannot connive at or condone the applicant's open defiance of the law. **Citizens are obliged to obey the law of the land and argue afterwards**." [my emphasis].

However, on the return day, all parties advised that the Monday order had since been complied with. The matter then proceeded in earnest.

iii/    Whether the applicant had *locus standi in judicio*

The respondents said it did not lie in the mouth of Grandwell to complain that it had been despoiled. The argument was that Mbada, and not Grandwell, had been the one that had been in peaceful and undisturbed possession of the mine. Grandwell was merely a shareholder in Mbada. At 50% equity, Mbada could not even be regarded as Grandwell's subsidiary. So, the argument concluded, only Mbada, and not Grandwell, was the one with the requisite *locus standi in judicio* to move for an order *mandament van spolie*.

Intrinsically linked to the question of *locus standi*, was the question of the competency of Grandwell to bring a derivative action. Although *locus standi* and the right to a derivative action are not necessarily cognates, in the circumstances of this case I found them speaking to the same thing. Therefore, I deal with both at one go.

iv/    Whether it was competent for Grandwell to bring a derivative action

In its founding affidavit, Grandwell said its right to sue, as I understood it, and in my own words, stemmed from the desire to protect its investment in Mbada. Such investment had

---

[5] 2004 [1] ZLR 538



suddenly become under threat owing to the abrupt actions by government. Grandwell also said that government's action threatened the very existence of Mbada as a JV project. To the extent that Mbada could not, of its own, seek relief by itself, it being a progeny of Grandwell and the government, it had been open to Grandwell to bring the application in its name, but for the benefit of Mbada itself.

Grandwell argued that government was the sole cause and sole source of the grief. Mbada's board was made up of an equal number of appointees from both shareholders. Under such circumstances, it would have been futile for Grandwell to have sponsored or motivated a resolution to sue government. It was argued that a derivative action was available where not only those controlling the company and bringing harm to it were in the majority. Even negative control suffices. Mr *Moyo* explained negative control as being where, even though not in the majority, as was the case in this matter, the directors could, by their negative vote, defeat a resolution.

The respondents countered that it was not correct to say that Mbada had been unable to bring, or had been disabled from mounting, the application in its own name and in its own right. They gave two illustrations. The one was a letter of demand on 23 February 2016 from Werksmans, Mbada's South African based attorneys. The letter was reacting to the one from the Minister's Permanent Secretary the day before. After recapping the events of the previous day and referring to the agreements, and after demanding the restoration of the status *quo ante*, Werksmans' letter concluded:

> "Should you fail to provide us with the written confirmation as hereinbefore demanded, our Clients will have no alternative but to take whatever legal steps/action as are available to them in order to protect their rights against the appropriate parties, which it shall do forthwith and without any further notice. Such remedies shall include, without limitation, an urgent court application to secure our Clients' rights and/or a claim for damages suffered."

To the respondents, the letter was sufficient evidence that Mbada had been conscious of the fact that only it alone could have brought the application that was now before me.

The other illustration by the respondents was an affidavit by the Chief Executive Officer of Mbada, one Thomas Lusiyano ["*Lusiyano*"]. It was filed on the day of the hearing on the first day. In it, Lusiyano said Mbada supported the application and the relief sought. He said he had taken instructions from Mbada's Chairman, to whom he reported.

Whilst questioning Lusiyano's authority to file such an affidavit, the authenticity of that affidavit and the veracity of certain allegations in it, the Respondents' major argument was that if Lusiyano could file papers supporting the application, purportedly on behalf of Mbada, then there was no reason why Mbada itself could not have brought the application. As such, the argument concluded, the right to a derivative action was not available to Grandwell.

A derivative action is recognised in our law: see *L Piras & Son [Pvt] Ltd v Piras*[6]. It is one of the exceptions to the general rule of company law that says that only the company can sue for wrongs done to it. In such a situation, the company is the proper plaintiff. This principle is called the rule in *Foss v Harbottle*[7], after the nineteenth century English case in which it was espoused.

The rule in *Foss v Harbottle* is of universal application. But there are exceptions. One such is the derivative action. In its classical form, this exception says that if a shareholder alleges that a wrong has been done to the company by persons in control of it, he may bring a derivative action against the wrongdoers, deriving his authority from his corporate right to sue on behalf of the company. The company is also cited as a co-defendant so that it is also brought before the court. The benefit from the suit flows directly to the company, not the disgruntled shareholder. He will be content with getting justice, and, to an extent, the appreciation or preservation of the value of the shares in the company, including his own.

That there could be exceptions to the proper plaintiff rule was even recognised by the court in the *Foss v Harbottle* case itself when one of the judges, WIGRAM V-C[8] talked of the unfairness that would ensue if shareholders, just because of their corporate status, would be deprived of their civil rights *inter se*:

> "If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporators in their private characters, and asking in such character the protection of the rights to which in their corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord Cottenham .... would apply, **and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.**" [my emphasis]

---

[6] 1993 [2] ZLR 245 [S]
[7] [1843] 2 Hare 461, 67 ER 189
[8] At p 492 -493



The exception was subsequently adopted and restated in various ways in various jurisdictions. In *Wallersteiner v Moir [No2]*[9], a case quoted with approval by our Supreme Court in *L Piras* above[10]; LORD DENNING MR, with characteristic clarity of expression, said[11]:

> "It is a fundamental principle of our law that a company is a legal person, with its own corporate identity, separate and distinct from the directors or shareholders, and with its own property rights, and interests to which alone it is entitled. If it is defrauded by a wrongdoer, the company itself is the one person to sue for damage. Such is the rule in *Foss v Habottle*. The rule is easy enough to apply when the company is defrauded by outsiders. The company itself is the only person who can sue. Likewise, when it is defrauded by insiders of a minor kind, once again the company is the only person who can sue. But suppose it is defrauded by insiders who control its affairs – by directors who hold a majority of the shares – who then can sue for damages? These directors are themselves the wrongdoers. If a board meeting is held, they will not authorise proceedings to be taken by the company against themselves. If a general meeting is called, they will vote down any suggestion that the company should sue them themselves. Yet the company is the one person who is damnified. It is the one person who should sue. **In one way or another some means must be found for the company to sue. Otherwise the law would fail in its purpose. Injustice would be done without redress.**" [my emphasis]

GOWER's *Principles of Modern Company Law*, 4th ed. at p 650, says that English case law authority, unlike American, establishes that there is no point in the disgruntled shareholder formally asking the directors to institute the proceedings where they will end up being the defendants. Further, it is not necessary to convene a general meeting and to invite it to resolve upon proceedings in the name of the company, provided that the court can be satisfied *aliunde* that the wrongdoers are in effective control.

GOWER also notes that it is not necessary to prove control [of the company by the wrongdoers], but merely to allege facts which, if proved, would establish control. The author however, further notes that the American courts are generally stricter in that they insist upon proof of an abortive demand having been made on the directors and, sometimes, a reference to the shareholders in a general meeting.

*In casu*, the position of the American courts, as stated by GOWER above, seemed to have been Mr *Hashiti's* point. He submitted that in the absence of an invitation by Grandwell to Marange for a meeting to pass a resolution to sue in the name of Mbada; that in the

---

[9] [1975] 1 All ER 849 [CA]
[10] At pp 250H – 251A - D
[11] At p 857d - f

absence of evidence that such an invitation had been turned down; that coupled with Werksmans' letter aforesaid, and Lusiyano's affidavit, it could not be said Mbada had been unable to bring the urgent chamber application by itself and that therefore the derivative action was not available to Grandwell.

I recognise the force of the respondents' argument. But in my view, the position of the English courts seems to accord more with notions of justice and the spirit of the derivative action. The law must not be rendered impotent. *In casu,* the Minister moved with exceeding speed. For six or seven years operations at Chiadzwa had gone on unhindered. But on 22 February 2016, in one fell swoop, things were turned upside down. Mining was abruptly terminated; Mbada's personnel were forcibly expelled from site; inadequate security had exposed the precious diamonds, the expensive equipment, personal belongings, and more, to destruction and theft. The situation was one of dire emergency. Werksmans letter of demand on 23 February 2016, sent by e-mail, had been ignored. There had been no let-up in the looting, forcing Grandwell, four days later, to run to the law.

Marange itself had already passed a resolution to adopt the Minister's plans for the consolidation of diamond mining companies, including Mbada, into one single entity without agreement with Grandwell, its co-shareholder. This was in spite of the outstanding details Grandwell had requested on the proposed scheme. Furthermore, the evidence showed that it was officials from Mbada, as the Minister's representatives, with the assistance of the police, who had executed the Minister's directive.

In my view, the spirit of the derivative action, being an exception to the rule in *Foss v Harbottle*, is that "… **the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue**" [my emphasis]

In *L Piras, supra*, there were only two shareholders. They were also the sole directors. They had equal control of the company. The one shareholder started doing sinister things behind the other's back: like suing the company for a debt that he knew the company did not owe; like serving the summons on his own wife, at his own residence, albeit also the company's registered office; and like not only refraining from entering an appearance to defend on behalf of the company, but also proceeding to enter judgment against it. When the other director eventually got to know about it, he applied to be joined to the suit against the company. The Supreme Court allowed the application under the derivative action.



I agree with Mr *Moyo*. The derivative action is available, not in situations of fraud to the company only, but also in all situations in which the company is harmed by those in control. The term fraud covers more than just the ordinary common law fraud. It also covers situations of intentional or unintentional, fraudulent or negligent wrongdoing: see *Daniels v Daniels*[12]. Control need not be control by the majority shareholders. Negative control, that is, where a resolution to sue in the name of the company is defeated by a negative vote cast, should suffice: see *East Pant Du Lead Mining Co v Meryweather*[13]. *In casu*, it would have been futile for Grandwell to have sponsored a resolution to sue the respondents given the stance Marange had already taken. At any rate, I was satisfied with events *aliunde* that Marange would not have tagged along with Grandwell. Among other things, it energetically opposed the application. Not only that, but Mabhudhu consciously and openly defied the Monday order. The reference to Werksmans' letter and Lusiyano's affidavit was a red herring. IN spite of them, it would still have been futile for Grandwell to successfully sponsor a resolution to sue the respondents.

Therefore, the respondents' point *in limine* that the right to a derivative action was not available to Grandwell is hereby dismissed. That should put paid to the objection on *locus standi*. But there is an additional point.

*Locus standi* refers to the **direct and substantial** interest one has in a *lis*, or suit: see *Zimbabwe Teachers Association & Ors v Minister of Education and Culture*[14]. In my view, there can be no question that Grandwell had such a direct and substantial interest in the present matter. Colloquially, it 'owned' half of Mbada. That, by itself is a huge legal interest. Furthermore, the application before me was for spoliatory relief. By virtue of the agreements, not only did Grandwell have the right to the occupation of the mine as the day to day manager of the project, but also, and as a matter-of-fact, it had been in physical occupation until the respondents abruptly caused the operations to stop. In the circumstances, Grandwell had the requisite *locus standi in judicio* to bring the derivative action.

---

[12] [1978] Ch 406
[13] (1864) 2 H & M 254
[14] 1990 (2) ZLR 48 (HC)

[e]    **The merits**

Whether or not Grandwell is entitled to an order *mandament van spolie* and to an interdict

The remedy of spoliation, or *mandament van spolie*, is designed to restore at once possession that has been deprived unlawfully: see SILBERBERG AND SCHOEMAN'S *The Law of Property*, 5th ed., para 13.2.1.2 at p 288. See also *Kama Construction [Pvt] Ltd v Cold Comfort Farm Co-operative & Ors*[15]. The applicant must show that he was in peaceful and undisturbed possession of the thing and that he was unlawfully deprived of such possession: *Kama Construction (Pvt) Ltd, supra,* and *Botha & Anor v Barrett*[16].

Spoliation is a quick remedy. Its rationale is to prevent anarchy in society: see *Muller v Muller*[17]. People must not resort to self-help each time they want to recover things they feel belong to them and which may be in the possession of another. In *Shoprite Checkers Ltd v Pangbourne Properties Ltd*[18], the rationale was expressed this way[19]:

> "All of this of course is based upon the fundamental principle that no man is allowed to take the law into his own hands and that no one is permitted to dispossess another forcibly or wrongfully and against his consent 'of the possession of property, whether movable or immovable' **and that if he does so 'the Court will summarily restore the *status quo ante* and will do that as a preliminary to any enquiry or investigation into the merits of the dispute**.'" [emphasis added]

*In casu*, the respondents argued that the dispensation by which Mbada was able to be mining the diamonds, to be on the site, and to be enjoying all the rights that went with the JVA and the shareholders agreement, had since expired. This dispensation was the Special Grants. They had not been renewed. Some had expired way back in 2010 and others in 2013. Although a third lot suggested that the period of expiry was still open, there was nothing of the sort. Despite the agreements purporting to grant a perpetual right to the diamonds, the Mines and Minerals Act, *Cap 21: 05*, gave no such right. Mining rights are granted, or are required to be granted, for specified periods which have to be spelt out and incorporated in the Special Grants. In this case, the respondents submitted, those Special Grants said to be

[15] 1999 [2] ZLR 19 [SC]
[16] 1996 [2] ZLR 73 [S], at p 79D – F
[17] 1915 TPD 29, at p 31
[18] 1994 [1] SA 616 [W ]
[19] At p 619H, per ZULMAN J



still open had to be deemed to have been valid for twelve months only as had been stated in them.

Relevant portions of s 291 of the Mines and Minerals Act say:

"**291    Issue of special grants**

[1]    The Secretary may issue to any person –

   [a]    a special grant to carry out prospecting operations; or

   [b]    a special grant to carry out mining operations or any other operations for mining purposes; upon a defined area situated within an area which has been reserved against prospecting or pegging under section *thirty-five* for a period which shall be specified in such special grant and on such terms and conditions, including terms and conditions relating to the amendment or cancellation thereof, as may be approved by the Minister and shall be incorporated in such grant."

Both Mr *Uriri* and Mr *Hashiti* argued forcefully that, without the right to mine, Mbada or Grandwell's continued presence at the site had become illegal. The Special Grants had expired by reason of their own failure to renew. That the JVA and the shareholders' agreements might have provided for certain rights in perpetuity could not override the provisions of an Act of Parliament which are superior to any provisions of a private agreement. The Minister is the regulator of all mining rights. The action that he took was to restore the law.

The respondents' additional argument was that, on the authority of *Kama Construction*, *supra*, Grandwell had moved for the wrong remedy. Spoliation was unavailable to it. All it could have sued for was specific performance, coupled with an interdict.

In *Kama Construction* the applicant had a management agreement with the respondent cooperative society, to restore its financial viability. It was the applicant that ran the day to day operations of the cooperative society. Later on, the cooperative society abruptly terminated the management agreement. There was a dispute as to whether or not the keys to the offices, the workshops, the vehicles, etc. had been forcibly taken away from the possession of the applicant. In this court, the applicant got a provisional order of spoliation. However, on the return day, the provisional order was discharged. On appeal, the Supreme Court confirmed the discharge. It held that a spoliation order had not been the proper remedy for the kind of wrong complained of by the applicant/appellant. It should have sued for

17
HH 193-16
HC 1977/16

specific performance of the management contract, together with interlocutory relief in the form of an interdict. The Supreme Court also said that the appellant could have been entitled to an interdict if it had established possession and unlawful dispossession. However, the court held that the appellant had not been in possession of the cooperative society's farmlands but that it merely had had rights of access as a member of the society.

Mr *Moyo* and Mr *Mpofu* blasted the respondents' attempted reliance on the expired Special Grants. They argued that, among other things, in terms of the agreements, the obligation to renew those Special Grants and to ensure their continued validity had been thrust on Marange, the government company. That they had not been renewed on expiry was the government's own fault. As such, the respondents were precluded from trying to profit from their own wrong. The law says no one maintains an action from his own wrong: see *Riggs v Palmer*[20].

But the major argument by Messrs *Moyo* and *Mpofu* was that the matter before me was not about the rights and wrongs of the respective parties. It was not about the validity or otherwise of Mbada's title to mine. That was a matter for another court on another day. Spoliatory relief was confined to the restoration of rights of possession, not ownership. Grandwell had shown that Mbada had been in peaceful and undisturbed possession of the mining site immediately prior to 22 February 2016. The respondents had taken the law into their own hands and had deprived Mbada of such possession. On that basis Mbada was entitled to relief.

On the *Kama Construction* case, Messrs *Moyo* and *Mpofu* said the case was distinguishable. Among other things, *in casu*, the Minister had not been a party to the agreements. Therefore, Grandwell could not have sought specific performance against a non-party. Furthermore, unlike Grandwell, in *Kama Construction* the applicant/appellant had not been in possession.

In my view, the respondents' actions were classically an act of spoliation. The matter before me was not about the right ***to*** possession [*ius possidendi*]. It was about the right ***of*** possession [*ius possessionis*] having been lost. The purpose of the *mandament van spolie* is to restore at once possession to the possessor where he has been unlawfully deprived of it. This

---

[20] ]1899] 115 NY 506, NE 188: "All courts may be controlled in their operation and effect by general, fundamental maxims of the common law. No one shall be permitted to profit from his own fraud, or to take advantage of his own wrong, or to found his own claim upon his own inequity or to acquire property by his own crime."



is so, in order to prevent people, governments included, from taking the law into their own hands: see *Mans v Marais*[21]. The purpose of spoliatory relief is merely to restore the right *of* possession, to restore the *status quo ante*. As ZULMAN J said in *Shoprite Checkers Ltd*: "… the Court will summarily restore the *status quo ante* **and will do that as a preliminary to any enquiry or investigation into the merits of the dispute**."

If the respondents suddenly discovered that the Special Grants had expired and wanted to terminate the marriage, they were obliged to follow the law. They were not entitled to take the law into their own hands and cause the forcible closure of the mine.

At any rate, in the circumstances of this case, the respondents' actions are difficult to understand. It seemed true that some of the Special Grants had indeed expired in 2010 and others in 2013. Yet Mbada had remained mining. For action only to be taken as late as February 2016 seemed to lend credence to the complaint by Grandwell that the government was punishing the foreign investors for seemingly dragging their feet, or refusing to comply, with the consolidation scheme.

Furthermore, the claim in the letter from the Minister's Permanent Secretary on 22 February 2016, among other things, that it had come to his attention that the Special Grants in question had since expired seemed to suggest a sudden discovery of that fact. Yet, as early as 30 September 2015, ZMDC had written to the Permanent Secretary himself, expressly pointing out that the Special Grants had expired, and seeking a further exemption. The government did not move in to shut down the mine then. The government had had all the time to act lawfully. So why the rush? Why the sudden emergency?

The case of *Kama Construction* is distinguishable, not because the Minister was not a party to the agreements in question as Mr *Moyo* submitted. I have already intimated the government was the other party to the agreements, albeit indirectly. The respondents 1 to 4 formed a single economic unit. *Kama Construction* is distinguishable because there the court found, as a matter of fact, that the applicant/appellant had not been in possession of the cooperative society's farming units.

Therefore, in my finding, an act of spoliation was committed by the respondents on Mbada. However, that is not the end of the matter. I must deal with the nature of the relief sought.

---

[21] 1932 CPD 352 at 356

19
HH 193-16
HC 1977/16

[f]     **The nature of the relief sought**

The substance of the relief sought by Grandwell is a return to the *status quo ante* so that the operations at the mine may resume as before, and continue unhindered by the respondents. The order seeks that respondents 1 to 4, their agents, or anyone acting on their behalf, or under their instructions or authority, be ordered to vacate the mining site.

In principle, and in my view, such a remedy would be available under normal circumstances. If one lends one's vehicle to another, with permission for the borrower to drive it anywhere and everywhere, but with instructions to return the car on a particular day, the owner/lender is precluded by law from forcibly recovering his vehicle if the borrower should fail to return the vehicle by the given date. If the owner/lender forcibly recovers the vehicle, the law will brand his action as self-help, i.e. an act of spoliation. The court will order the owner/lender to restore at once possession of the vehicle to the borrower until he comes to court for an order to recover his vehicle. The issue of his ownership of the vehicle or of his instruction which was disobeyed, will not be determined at that stage.

However, in ordering the restoration of the status *quo ante*, it would be, in my view, contrary to public policy were the court to allow the borrower, or create a situation where the borrower, can drive the vehicle everywhere and anywhere as before when, to the court's knowledge, the vehicle's licence and/or roadworthy permit and/or third party insurance has/have expired, these being the basis upon which the owner/lender may have lent the vehicle to the borrower.

In the present case, whilst the issue pertaining to the propriety of the Minister's desire to consolidate all the mining companies at Chiadzwa into a single conglomerate in the face of the contractual agreements; the issue whether or not Mbada's title to mine had expired, and if so, the issue as to whose fault it was, were not the primary matter before me, nonetheless, it seems obvious that the relevant Special Grants in question had expired. With that, Mbada's right _to_ possession [*ius possidendi*] had terminated. Efforts to renew the Special Grants in September 2015 failed. In terms of s 291 of the Mines and Minerals Act, a Special Grant is the authority that grants one title to the minerals. In terms of s 2, the dominium in, and the right of searching, mining and disposing of all minerals is vested in the State President. *In casu*, to allow Mbada to resume mining operations as before, when the right to do so expired, is to sanction an illegality. That, in my view, is contrary to public policy. In the circumstances, the remedy that Mbada, or Grandwell, may be entitled to cannot be one that



entitles the enjoyment of the rights accorded by the Special Grants when title to them has not been regularised.

[g]     Costs

The issue of costs is normally one for determination on the return date. It was not argued before me. But an order of spoliation is a final order. It does not have an interlocutory nature: see *Mankowitz* v *Loewenthal*[22] and SILBERBERG AND SCHOEMAN, *supra*, para 13.2.1.3 at p 292. The two elements of spoliation, namely peaceful and undisturbed possession, and the act of spoliation, have to be proved on a balance of probabilities. Thus, Grandwell having proved spoliation on a balance of probabilities, it is entitled to a final order. Costs normally follow the event. However, given that in this matter Grandwell did not seek a final order of spoliation, and given that the issue of costs was not argued, and given the manner that I have decided to dispose of the matter, it is only proper that the costs be in the cause.

[h]     **DISPOSITION**

i/      **The following final relief is hereby granted**:

1       It is hereby declared that the actions of the respondents on 22 February 2016 amounted to an act of spoliation against the fifth respondent in respect of its occupation of, and operations at, the diamond mining site at the Chiadzwa Concession.

2       However, notwithstanding the declaration in paragraph 1 above, but subject to paragraph 7 below, the rights normally accorded by the relevant Special Grants in respect of the Chiadzwa Concession as they pertain to the fifth respondent, shall not be restored until such time that the validity of such Special Grants has been regularised in accordance with the law.

3       The costs shall be in the cause.

---

[22] 1982 [3] SA 758, at p 767F - H

(364)

ii/     **The following interim relief is hereby granted**:

4.      Once the validity of the Special Grants aforesaid has been regularised as envisaged in paragraph 2 above, the first, third, fourth and sixth respondents, their agents, or anyone acting on their behalf, or under their instructions, shall be interdicted from interfering with the fifth respondent's lawful operations at the mine.

5.      The first, second, fourth and sixth respondents are hereby interdicted from inducing, or forcing, or in any manner procuring, a breach of the third respondent's contractual relationships with the applicant and the fifth respondent.

6.      Furthermore, the first and fourth respondents are hereby interdicted from inducing, or forcing, or in any manner procuring, a breach of the contractual relationships between the applicant and the fifth respondent on the one hand, and the second and third respondents on the other.

7.      For the purposes of safeguarding assets, all of the fifth respondent's security personnel, with all their chain of command, shall be entitled, authorised and empowered to remain at the fifth respondent's mining site at Chiadzwa Diamond Concession, as directed in paragraph 2 of the order of this court on 29 February 2016, until the resolution of this matter.

16 March 2016

*Scanlen & Holderness*, legal practitioners for the applicant;
*Civil Division, Attorney-General's Office*, legal practitioners for the first and sixth respondents;
*Sawyer & Mkushi*, legal practitioners for the second, third and fourth respondents.

# EXHIBIT B

**REPORTABLE**      **(23)**


**(1)    MINISTER OF MINES AND MINING DEVELOPMENT (2) ZIMBABWE MINING DEVELOPMENT CORPORATION (3) MARANGE RESOURCES (PRIVATE) LIMITED (4) ZIMBABWE CONSOLIDATED DIAMOND COMPANY**

vs

**(1)    GRANDWELL HOLDINGS (PRIVATE) LIMITED (2) MBADA DIAMONDS (PRIVATE) LIMITED (3) COMMISSIONER GENERAL ZIMBABWE REPUBLIC POLICE**


**SUPREME COURT OF ZIMBABWE**
**PATEL JA, GUVAVA JA & UCHENA JA**
**HARARE, 22 JUNE 2017 & 19 JUNE 2018**



REGISTRAR
SUPREME COURT OF ZIMBABWE

20 JUN 2018

P.O. BOX 879 CAUSEWAY
ZIMBABWE


*L. Uriri,* for the first appellant

*J.R. Tsivama,* for the second, third & fourth appellants

*T. Mpofu* with *E.T Moyo,* for the first respondent

No appearance for the second & third respondents


      **UCHENA JA:**        This is an appeal against part of the judgment of the High Court granting a spoliation order and other consequential relief in an application at the instance of a shareholder on behalf of a company.

      The facts leading to the application before the court *a quo* are as follows.

      The first respondent (Grandwell Holdings (Private) Limited) a private foreign company entered into a commercial arrangement with the Government of Zimbabwe for the purpose of mining diamonds in the Chiadzwa area in Manicaland Province. In 2009 the third

appellant (Marange Resources ((Private) Limited) a wholly owned subsidiary of the second respondent (Zimbabwe Mining Development Corporation) and Grandwell Holdings (Private) Limited signed an agreement. The agreement resulted in the incorporation of the second respondent, Mbada Diamonds (Private) Limited, a private company, owned 50 percent by first respondent, and 50 percent by third appellant. Mbada Diamonds was to mine diamonds at Chiadzwa on special grants granted to Marange Resources (Private) Limited.

Marange Resources (Private) Limited and Zimbabwe Mining Development Corporation are companies controlled by the Government of Zimbabwe. This extended Government's influence to the operations of Mbada Diamonds through Marange Resources (Private) Limited which has a 50 percent shareholding in Mbada Diamonds.

REGISTRAR
SUPREME COURT OF ZIMBABWE
2 0 JUN 2018
P.O. BOX 070, CAUSEWAY
ZIMBABWE

In 2015 the Government of Zimbabwe through the first appellant crafted a policy to merge all diamond mining companies at Chiadzwa into one single entity, the fourth appellant (Zimbabwe Consolidated Diamond Company). The parties engaged with a view of agreeing over this initiative. Meetings were convened from about March 2015. Grandwell was hesitant, but said it was not opposed in principle. It required a blueprint on the merger to enable it to decide whether or not Mbada Diamonds should join the merger. Communication between parties to the proposed merger continued in good faith. According to Grandwell's chairman, David Kassel, Grandwell's engagement was *bona fide*.

The engagement continued till the events of 22 February 2016. According to paras 43 and 44 of the first respondent's founding affidavit the shareholders of Mbada Diamonds held a meeting to resolve on whether or not Mbada should join the proposed merger of diamond mining companies. That meeting ended with what the first respondent called a

deadlock as the shareholders could not agree on whether or not to join the merger without

further information. Marange Resources (Private) Limited (the third appellant) was willing to

join the merger on the available information. Grandwell though not opposed to the merger was

taking a cautious approach. It wanted a blueprint with information which could help it make a

decision on that issue. It had placed it on record that it was in principle not opposed to the

merger. According to para 39 of its founding affidavit it was not taking a position of non-co -

operation as it would "seek to accommodate Government requirements wherever reasonably

possible". It was therefore not a deadlock as to whether or not Mbada could eventually join the

merger. The difference between the shareholders was therefore merely on their then current

positions.

REGISTRAR
SUPREME COURT OF ZIMBABWE

2 0 JUN 2018

P.O. BOX 870, CAUSEWAY
ZIMBABWE

On 22 February 2016 the Government through the Secretary for Mines and Mining

Development wrote to Mbada Diamonds advising it, among other things, that it had discovered

that the special grants entitling it to mine diamonds had expired, and that, with no title, Mbada

Diamonds had to cease all mining activities with immediate effect and vacate the mining site.

Mbada Diamonds was given 90 days to remove all its equipment and other valuables. Any

further access to the mining site would be upon request to the first appellant.


On the same day, the first appellant called a press conference to announce the new

development that Mbada Diamonds and other diamond mining companies no longer had valid

special grants or other rights on the basis of which they could continue with their mining

operations. The first appellant further announced that those companies should cease operating

and vacate the mining locations within 90 days. The first appellant specifically directed those

companies to remove all their machinery, equipment and other related materials from the

mining locations.

On 27 February 2016 the first respondent brought an urgent chamber application in the court *a quo* seeking an interdict and a spoliation order. The first respondent alleged that when the first appellant issued a press statement, Mbada Diamonds' operations were forcibly stopped by armed police assisted by some of Mbada Diamonds' senior employees. It alleged that after the first appellant's announcement, the police and officials from the first appellant moved into Mbada Diamond's processing plants and shut them down. Mbada Diamonds' security team was disbanded and evicted from site and other employees were forcibly evicted both from their work stations and their on-site residences. Security systems were paralysed. The first respondent also alleged that Marange Resources (Private) Limited the other shareholder of Mbada Diamonds, was in support of the initiative to consolidate the mining companies into a single entity and was therefore acting in concert with the first appellant to despoil the second respondent. The evidence on record does not support the allegation that Marange Resources (Pvt) Ltd directly participated in despoiling Mbada Diamonds. It merely proves Marange's willingness to join the merger before receiving further information while Grandwell needed further information before it could decide on whether or not Mbada Diamonds should join the merger.

It was on these facts that the first respondent sought an interim order declaring that the conduct of the appellants in removing Mbada Diamonds' representatives from its mining site and effectively assuming control of Mbada Diamond's mine constitutes an act of spoliation. The first respondent also sought an order directing the appellants to vacate Mbada Diamond's mining site with immediate effect and interdicting the appellants from interfering with Mbada Diamonds' operations. Mbada Diamonds through an affidavit signed by its Chief Executive Officer Luciyano supported the first respondent's application.

The application was opposed by the appellants who raised several preliminary points including that the first respondent as a shareholder of Mbada Diamonds had no *locus standi* to institute an action on behalf of the company. The appellants argued that Mbada Diamonds should have made the application to enforce its rights. The first respondent argued that it was entitled to institute proceedings on behalf of the company through a derivative action. The appellants argued that derivative action was not available to the first respondent.

The court *a quo* dismissed the preliminary point raised by the appellants and held that derivative action was available to the first respondent. The court *a quo* held that it would have been futile for the first respondent to seek a resolution to sue the appellants given the stance Marange Resources (Private) Limited had already taken towards the intended merger. The court *a quo* found that since Marange Resources (Private) Limited was acting in concert with the other appellants, it would have been futile for the first respondent to have called for a meeting to resolve that Mbada Diamonds should vindicate its rights. The court *a quo* held that the circumstances of the case justified the procedure adopted by the first respondent. In any event the court *a quo* also found that the first respondent, as a shareholder of the second respondent, had a direct interest in the second respondent and therefore had the necessary *locus standi* to institute the proceedings.

On the merits the court *a quo* held that the appellants committed an act of spoliation on the second respondent (Mbada Diamonds). The court therefore granted the application for spoliation. The first appellant was aggrieved by that decision and appealed to this court on the following grounds:

1. The court *a quo* erred in not finding that, to the extent the first respondent had alleged facts which went beyond the question of spoliation and rather sought to assert a right to

mine and consequently, of possession; the appellant was entitled to demonstrate the absence of the same and that, upon the court a *quo* accepting the absence of such rights, the first respondent could not be granted the relief of spoliation.

2. The court *a quo* erred in finding that the shareholder's derivative action was available to the first respondent when the founding affidavit had not made out a case for the same, and that, in any event, the first respondent had *locus standi in judicio* to institute the proceedings.

3. The court *a quo* further erred in finding that the first respondent had peaceful and undisturbed possession of the mining concessions in its capacity as project manager and that, therefore, it was entitled to spoliatory relief in its personal capacity when the founding affidavit did not make such allegation and relief was not sought on that basis.

4. The court *a quo* further erred in finding that the appellant had committed an act of spoliation against the fifth respondent when, in the circumstances, the appellant was not found to have done anything to evict the fifth respondent from mining concessions.

5. The court *a quo* further erred in entitling, authorising and empowering the fifth respondent's security personnel, with all its chain of command, to remain at the mining concessions until resolution of a matter that was resolved on the 22 February 2016 when the relevant statutory functionary exercised his discretion against the further extension/renewal of the special mining grants in question.

The second, third and fourth appellants were also aggrieved by the decision of the court *a quo* and appealed to this Court on the following grounds.

1. The court *a quo* erred in finding that the appellants had committed acts of spoliation against the first and second respondents in the absence of evidence or even an allegation that the appellants evicted the said respondents and in the face of evidence from sixth

respondent to the effect that its actions and presence at the mining site were for purposes

of preventing unlawful mining activities as well as securing State property.

2. The court *a quo* erred in finding that the first respondent had been despoiled when no

evidence had been placed before it, or even alleged, regarding any peaceful and

undisturbed possession of the mining site or spoliation by the appellants.

3. The court *a quo* erred in finding that the first respondent had *locus standi* and or that

the shareholder's derivative action was available to the first respondent in the absence

of evidence that the second respondent was unwilling or unable to institute the

proceedings.

4. The court *a quo* erred in concluding that the appellants (including the first appellant)

were effectively a single economic unit when their relationship is defined by law and

each acted or exercised its rights as provided by law.


      Having read the record and considered the submissions made by counsel for the

appellants and the first respondent, I find that, although the appeal is premised on many

grounds, only two issues arise for determination.

1. Whether or not the first respondent had *locus standi* to bring the application on behalf

of the second respondent through derivative action, or whether or not derivative action

was available to the first respondent.

2. Whether or not the appellants despoiled the second respondent.


      I will consider and determine the first issue.

**Whether or not derivative action was available to the First Respondent.**

Mr *Uriri* for the first appellant challenged the first respondent's right to institute

the application in the court *a quo* on behalf of the second respondent, a company which in

terms of the law is entitled to enforce its own rights. Mr *Tsivama* for the second, third, and

fourth appellants agreed with Mr *Uriri*'s submissions. It was argued for the appellants that the

first respondent did not have the right to institute action on behalf of the second respondent

without evidence that the second respondent was unable to institute the proceedings to protect

its interests. On the other hand Mr *Mpofu* for the first respondent argued that its right to institute

the application arose from derivative action since the second respondent was not able to act on

its own behalf. The issue is therefore on when a shareholder of a company can institute

proceedings on behalf of a company.

2 0 JUN 2018

P.O. BOX 870, CAUSEWAY
ZIMBABWE

It is a trite principle of company law that a company should itself enforce its rights

when it is wronged. This was considered as the rule in *Foss v Harbottle* [1843] 2 Hare 461, 67

ER 189. The rule in *Foss v Harbottle* is that, the proper plaintiff in an action in respect of a

wrong alleged to be done against a company is *prima facie* the company itself. Thus as a general

rule, where the company is wronged, the proper plaintiff to institute an action to remedy the

wrong is the company itself. No other person has the right to institute an action on behalf of

the company if the company is able to vindicate its rights. However, the rule as explained in

*Foss v Harbottle* is not inflexible and can be relaxed where necessary in the interest of justice.

Gibson, *South African Mercantile and Company Law*, 8th Ed at pages 370-371, states the

following:

> "But the rule in *Foss v Harbottle* is not universal. It is subject to exceptions. It does not
> apply where the interests of justice require the rule to be dispensed with (*Russell v
> Wakefield Waterworks Co (1875) LR 20 Eq 474).* **So where a wrong has been done
> to a company, a court will allow dissentient members to bring an action in their
> own names against those responsible, where the latter hold and control the**

**majority of the shares in the company and will not allow any action to be brought in the name of the company. "**(emphasis added)

The rule in *Foss v Harbottle* does not in appropriate circumstances prevent an individual member from suing through derivative action. Derivative action is an exception to the rule in *Foss v Harbottle*. In Zimbabwe, derivative action has been recognised in many cases. (*See L Piras and Sons* (Private) Limited *v Piras* 1993 (3) ZLR 245 (S) *and Lameck Kufandada v Dairiboard Zimbabwe and Others* HH 564/15). In the *Piras* case GUBBAY CJ said the following:

> "The derivative action is an exception to the rule in *Foss v Harbottle* (1843) 67 ER 189 and was expounded thus by Lord Denning MR in *Wallersteiner v Moir (No 2)* [1975] 1 All ER 849 (CA) at 857 d-f:
>
> > "It is a fundamental principle of our law that a company is a legal person, with its own corporate identity, separate and distinct from the directors or shareholders, and with its own property rights and interests to which alone it is entitled. If it is defrauded by a wrongdoer, the company itself is the one person to sue for the damage. Such is the rule in *Foss v Harbottle*. The rule is easy enough to apply when the company is defrauded by outsiders. The company itself is the only person who can sue. Likewise, when it is defrauded by insiders of a minor kind, once again the company is the only person who can sue. **But suppose it is defrauded by insiders who control its affairs — by directors who hold a majority of the shares — who then can sue for damages? Those directors are themselves the wrongdoers. If a board meeting is held, they will not authorise proceedings to be taken by the company against themselves. If a general meeting is called, they will vote down any suggestion that the company should sue them themselves. Yet the company is the one person who is damnified. It is the one person who should sue. In one way or another some means must be found for the company to sue. Otherwise the law would fail in its purpose. Injustice would be done without redress."**
>
> **The nature, then, of a derivative action is that it is a device designed to enable the court to do justice to a company controlled by its wrongdoers and prevents a serious wrong from going unremedied. A shareholder is allowed to appear as the plaintiff. He acts, not as representative of the other shareholders, but as a representative of the company to enforce rights derived from the company. The action is brought by him in his own capacity to vindicate the company's rights."** (emphasis added)

REGISTRAR
SUPREME COURT OF ZIMBABWE

2 0 JUN 2018

P.O. BOX 870, CAUSEWAY
ZIMBABWE

It is important to note that derivative action is available when certain requirements are met. It must be clear that the company has been prevented from instituting proceedings by alleged wrongdoers in control of the company. It must be alleged and proved that the wrongdoers (the majority shareholders or the other shareholder in the case of equal shareholders) have refused to institute the action and have prevented the company from instituting action using their majority or equal votes. In order for the company to institute proceedings on its own behalf, the shareholders must agree through a resolution. Thus if the majority shareholder, using his majority vote, or the equal shareholder using his equal vote, blocks the attempt by the company to institute action to remedy the wrong, the minority or other equal shareholder is entitled to approach the court through derivative action.

In this case, Mr *Uriri* for the first appellant, submitted that derivative action was not available to the first respondent because there was no finding that the second respondent was prevented from instituting proceedings and that there are no findings that the second respondent refused or failed to act in its own interest. Mr *Uriri* relied on the fact that the second respondent itself responded to the application filed by the first respondent. According to the first appellant this shows that the second respondent was capable of instituting the proceedings to safeguard its interests. In support of that, Mr *Tsivama,* counsel for the second to fourth respondents, submitted that in order for the court to find whether or not derivative action was available to the first respondent, the court ought to ask itself whether there was any wrongdoing against the company by the majority shareholders or those in control of the company, before the party which seeks to rely on derivative action can succeed.

REGISTRAR
SUPREME COURT OF ZIMBABWE
2 0 JUN 2018
P.O. BOX 670, CAUSEWAY
ZIMBABWE

On the other hand, Mr *Mpofu* for the first respondent submitted that derivative action was justified on the basis that the seeking of a resolution for the second respondent to

institute proceedings would be a futile exercise since the third appellant, the other shareholder of the second respondent, would have made that impossible. Mr *Mpofu* further submitted that the futility of the meeting was known as the first respondent tried to call for the meeting with the other shareholder. Mr *Mpofu* submitted that an attempt was made to call for a shareholders' meeting but was declined by the other shareholder.

A perusal of the record reveals that there is no evidence that an attempt was made for the shareholders of Mbada Diamonds to convene a meeting to decide whether or not Mbada should institute spoliation proceedings to protect its rights. There are only two shareholders of Mbada Diamonds, the first respondent (Grandwell) and the third appellant (Marange Resources). There is no evidence on record that the other shareholder actively prevented the company from instituting such proceedings. On record is a letter from the first and second respondents' South African legal practitioners threatening to institute proceedings on their behalf.

REGISTRAR
SUPREME COURT OF ZIMBABWE
2 0 JUN 2018
P.O. BOX 870, CAUSEWAY

Whether or not the first respondent attempted to call for a meeting with the third respondent is a question of fact which must be proved by evidence. In this case, it was not proved that an attempt was made. As a result, it was not established that the second respondent was actively prevented by the third appellant from instituting the proceedings *a quo* in its own name.

According to Gower L.C.M *Principles of Modern Company Law* pages 649-650, for derivative action to be justified:

"It must be shown that the alleged wrongdoers control the company. **The clearest way of doing this will be to show that both the directors and the general meeting have been invited to institute proceedings in the name of the company and have refused**

to do so, and that the refusal was because of the votes cast by the wrongdoers. However, the **English cases recognise that there is no point in formally asking the directors to institute the proceedings if they are to be the defendants, and that it is not necessary to convene a general meeting and to invite it to resolve upon proceedings in the company's name, provided that the court can be satisfied** *aliunde* **that the wrongdoers are in effective control.**" (emphasis added)

It is therefore clear that derivative action can be relied on in two circumstances. In the first situation, it must be proved that a meeting was called for the shareholders to pass a resolution for the company to institute proceedings. In the event that the other shareholders refused or prevented the meeting from taking place, the other shareholders can rely on derivative action to institute action on behalf of the company. However, this is not what happened in this case. No attempt was made by the shareholders of Mbada Diamonds to convene a meeting to pass a resolution for the company to institute the proceedings.

REGISTRAR
SUPREME COURT OF ZIMBABWE

P.O. BOX 870, CAUSEWAY
Zimbabwe

The court *a quo*, conscious of there being no such evidence, at pages 12 to 13 of its judgment, said:

> "In *casu,* the position of the American courts, as stated by Gower above, seemed to have been Mr Hashiti's point. He submitted that in the absence of an invitation by Grandwell to Marange for a meeting to pass a resolution to sue in the name of Mbada; that in the absence of evidence that such an invitation had been turned down; that coupled with Werksmans' letter aforesaid, and Luciyano's affidavit, it could not be said Mbada had been unable to bring the urgent chamber application by itself and that therefore the derivative action was not available to Grandwell."

**I recognise the force of the respondent's argument. But in my view, the position of the English courts seems to accord more with notions of justice and the spirit of the derivative action. The law must not be rendered impotent.** In *casu*, the Minister moved with exceeding speed. For six or seven years' operations at Chiadzwa had gone on unhindered. But on 22 February 2016, in one fell swoop, things were turned upside

down. Mining was abruptly terminated; Mbada's personnel were forcibly expelled from site; inadequate security had exposed the precious diamonds, the expensive equipment, personal belongings, and more to destruction and theft. The situation was one of dire emergency. Werksmans letter of demand of 23 February 2016, sent by email, had been ignored. There had been no let-up in the looting, forcing Grandwell, four days later, to run to the law.

Marange itself had already passed a resolution to adopt the Minister's plans for the consolidation of diamond mining companies, including Mbada into one single entity without agreement with Grandwell, its co-shareholder. This was in spite of the outstanding details Grandwell had requested on the proposed scheme. **Further, the evidence showed that it was officials from Mbada, as the Minister's representatives, with the assistance of the police, who had executed the Minister's directives.**

**In my view, the spirit of the derivative action, being an exception to the rule in Foss v Harbottle, is that "—the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue."**

These are the reasons which swayed the court *a quo* to allow derivative action by Grandwell (the first respondent).

The second situation, which basically reflects the English position, is that if it is proved that calling a meeting was an exercise in futility, the other shareholder can institute

proceedings on behalf of the company without seeking a resolution that the company institute

the proceedings. For the shareholder who seeks to rely on derivative action to rely on this

option, the court must be satisfied that the majority shareholders or equal shareholders, who

are the wrongdoers and would not want the company to institute proceedings, are in effective

control. The second respondent is owned by the first respondent and the third appellant in equal

shares of 50 percent each. This means, if a meeting was to be called to pass a resolution for the

company to sue and one shareholder votes against such a resolution, the company could not

sue in its own name. It can also be established that the other shareholder was in effective

negative control.

According to evidence on record Marange Resources was chaired by the Secretary

of Mines who authored the letter of 22 February 2016. The same Secretary also chaired the

second and fourth appellants. The special grants which enabled Mbada to mine belonged to

Marange Resources which is wholly owned by the second appellant. The Zimbabwe

Consolidated Diamond Company, fourth appellant, which was to replace Mbada Diamonds

and other diamond mining companies into mere 50 percent shareholders, is chaired by the

Secretary of Mines. The Secretary's office was responsible for crafting Government policy. It

was responsible for the granting of special grants. It also was entitled to make definitive orders

on mining operations as it did on 22 February 2016. In view of the above there is no doubt that,

in spite of formal equality as between the two shareholders, power and control were on

Marange Resources' side. The Secretary's word was administratively final.

It was also established and proved that the third appellant as the other shareholder

opposed the application. That alone made it pointless to call for a meeting to resolve that the

company institute application proceedings which the other equal shareholder was opposing.

There was clearly no chance that such a resolution could be passed. Therefore, derivative action was justified, because it would have been futile to call for a meeting to resolve that the company should sue in its own name. Marange Resources would clearly not have agreed that Mbada Diamonds should apply for an order against its own chairman and the Minister's decisions and conduct.

In this case the first respondent relied on an assumption that the third appellant would have made it impossible for the resolution to be passed.  That assumption is supported by sufficient evidence that it would have been futile to call for a meeting to resolve that Mbada Diamonds should make the application. The futility was clearly explained by the court *a quo*. It entitled the first respondent to rely on derivative action. There was proof that the third appellant was fully entangled to the will of its chairman and the other appellant companies he chaired. There was therefore evidence *aliunde* that it was impossible for the second respondent to institute spoliation proceedings in its own name.

It is clear that the right to institute proceedings using derivative action is meant to remedy wrongdoing against a company by its directors or majority or equal shareholders. In this case, the court *a quo* correctly relied on the futility of expecting the first respondent to call for a meeting to resolve that the company should sue the appellants for spoliation as the other equal shareholder's position on the application was known. It was opposing the application. It clearly would not have supported a resolution for the company to make an application it was opposing. The first respondent was therefore entitled to rely on derivative action to sue on behalf of the second respondent.

SUPREME REGISTRAR
SUPREME COURT OF ZIMBABWE
2 0 JUN 2018
P.O. BOX 870  CAUSEWAY
ZIMBABWE

      **GUVAVA JA**:      I fully concur with UCHENA JA's assessment of the facts leading up to the institution of the proceedings *a quo* and his conclusion on the first respondent's entitlement to sue by way of derivative action on behalf of the second respondent. Once it has been found that the first respondent had *locus standi* to bring the application then the second issue must be determined.

**Whether or not the appellants despoiled the second respondent**.

      In my view, the facts of this case disclose a classic text book case of spoliation. In the case of *Botha & Anor v Barrett* 1996 (2) ZLR 73 (S) GUBBAY CJ stated as follows at p 79 D-E:

> "It is clear law that in order to obtain a spoliation order two allegations must be made and proved. These are:
> That the applicant was in peaceful and undisturbed possession of the property; and,
> That the respondent deprived him of the possession forcibly or wrongfully against his consent."

      In order to make a determination of whether or not the second respondent was despoiled it is necessary to prove the two factors stated above.

REGISTRAR
SUPREME COURT OF ZIMBABWE
2 0 JUN 2018
P.O. BOX 870  CAUSEWAY
ZIMBABWE

      I propose to deal with each factor in turn.

(i)     Whether or not the second respondent was in peaceful possession.

      It was submitted, firstly, by the appellants that the second respondent was not in peaceful possession as the special grants entitling it to mine had expired. The appellants' argument was that, since the possession was unlawful, it could not be peaceful.

It has been stated in a number of cases that issues of rights are irrelevant in spoliation proceedings. In *Yeko v Oana* 1973 (4) SA 735 (AD) at 739 G it was stated that:

> "The fundamental principle of the remedy is that no one is allowed to take the law into his own hands. All that the spoliata has to prove, is possession of a kind which warrants the protection accorded by the remedy, and that he was unlawfully ousted."

In the case of *Chisveto v Minister of Local Government and Town Planning* 1984 (1) ZLR 248 (H) the court remarked:

> "Lawfulness of possession does not enter into it. The purpose of the *mandamus van spolie* is to preserve law and order and to discourage persons from taking the law into their own hands. To give effect to these principles, it is necessary for the status *quo ante* to be restored until such time as a competent court of law assess the relative merits of the claims by each party... In fact, the classic generalisation is sometimes made that in respect of spoliation actions even a robber or thief is entitled to be restored possession of the stolen property."

2 0 JUN 2018
ZIMBABWE

It is apparent from the facts of this case that the first respondent, being a 50 per cent shareholder of the second respondent, was in possession of the mining fields through the second respondent. Possession in legal terms depicts both the mental and physical elements. It is not in dispute that the second respondent was in physical possession of the mining fields at the relevant time and was carrying out mining operations.

Secondly, the appellants also alleged that there was no evidence on the record that the appellants had committed the acts complained of. The first appellant stated that the mere fact that he had called a press conference and stated that the possession of the respondents was unlawful does not in itself amount to spoliation. In any event he argues that he was not at the scene nor was any evidence given to link him to the persons who had despoiled the respondents.

It is not in dispute that agents of the State descended on the Mine premises on 22 February 2016. It was alleged in the founding affidavit that ZMDC and Marange were the implementing agents of the scheme which culminated in Mbada Diamonds being removed from the mining site. The evidence given by the second respondent clearly stated that the armed police were hired by the first to fourth appellants.

In my view it would be an absurdity to find that the police and the other officials would have acted in the manner they did without the authorisation and knowledge of the first appellant. The acts complained of were carried out immediately after the delivery of the letter from the permanent secretary of the first appellant stating that the special grants had expired. This was immediately followed by the press conference held by the first appellant reiterating that position and giving the second respondent notice to vacate the mining claims. It seems to me that the facts, as set out, establish that the first appellant was primarily instrumental in the removal of the second respondent from the mining site.

I am satisfied that the court *a quo* correctly found that the second respondent was in peaceful possession before the appellants acted in common purpose in removing the second respondent from its peaceful possession of the mining site.

SUPREME COURT OF ZIMBABWE

2 0 JUN 2018

P.O. BOX 870, CAUSEWAY

(ii)   Whether or not the second respondent was forcibly   and   wrongfully deprived   of possession

It is not in dispute that on 22 February 2016, after the press conference by the first appellant, armed police and officials from the Ministry of Mines moved onto the mining site which was being operated by second respondent and forcibly shut down its operations. The security team of second respondent was disabled and its employees were evicted from both

their work stations and their on-site accommodation. These actions were conducted without a

court order.


All Mbada Diamonds employees were rounded up and their communication with

the outside world was cut off. They were also subsequently forced off and barred from the

mining site. The officials proceeded to switch off the machines and equipment which were in

operation. The armed police officers remained on site and stopped employees from accessing

the plant. Mbada employees were threatened with violence and were forced to leave the mine

during the evening of the 23 February 2016. The third respondent, the Commissioner General

of Police, confirmed that the police had acted in the manner complained of. In my view, in

spite of the protestations of the third respondent, the police would not have acted in such a

manner if they had not been called upon to do so by the appellants, who stood to benefit from

the unlawful removal of the second respondent.


There is no doubt in my mind that these facts show that the second respondent was

removed without its consent. The removal was unlawful as it was carried out without due

process.


The court *a quo* thus correctly found that the second respondent had been

unlawfully removed without its consent.


It seems to me that the factors which must be proved in order to grant spoliatory

relief had been met and the court *a quo* was correct to grant the order as prayed.

RECEIVED
SUPREME COURT OF ZIMBABWE
2 0 JUN 2018
P.O. BOX 870, CAUSEWAY
ZIMBABWE

**PATEL JA:**        I have read the separate opinions rendered by UCHENA

JA and GUVAVA JA on the two issues for determination in this matter. I fully endorse and

concur with their respective conclusions for the following reasons.

As regards the first issue, the question of *locus standi a quo*, the authorities cited

above relate primarily to the situation where an aggrieved minority in a company seeks to

represent it in a derivative action against an oppressive majority. *In casu*, the position is slightly

different in that the situation to be addressed is that of one 50 per cent shareholder taking up

cudgels as against the other equal shareholder. Neither holds a majority shareholding in the

company but either is capable of frustrating the legitimate claims of the other by declining to

participate in matters concerning the good governance and best interests of the company. It is

in this sense that either shareholder can be said to be in effective negative control of the

company. As is aptly reasoned by UCHENA JA, this scenario fully justifies the entitlement of

either shareholder to proceed against the other by way of a derivative action in order to protect

or vindicate its rights.

REGISTRAR
SUPREME COURT OF ZIMBABWE

2 0 JUN 2019

BOX 877D. CAUSEWAY
ZIMBABWE

As for the second issue revolving around the question of spoliation, I can do no

more than adopt the succinct reasoning of GUVAVA JA. There can be no doubt that Mbada

Diamonds was in peaceful and undisturbed possession of the mining location in question at the

relevant time, irrespective of the continuing validity or otherwise of its special grants and

notwithstanding the supposed expiry of its right to carry out mining operations in that location.

It is equally indisputable that the appellants, acting in concert, contrived to abruptly and

unceremoniously deprive Mbada Diamonds of its possession of the mining location, forcibly

and wrongfully against its consent, through the agency of the Commissioner General of Police

and his cohorts.

In the result, both appeals in this matter must fail. It is accordingly ordered that the appeals herein be and are hereby dismissed with costs.

**GUVAVA JA:**          I agree.

**UCHENA JA:**          I agree.

*Civil Division, Attorney-General's Office,* appellant's legal practitioners

*Sawyer & Mkushi,* second, third and fourth appellants' legal practitioners

*Scanlen & Holderness,* first respondent's legal practitioners

# EXHIBIT C

**Judgment No. 5/20**
**Civil Appeal No. SC 1030/17**

<u>**REPORTABLE**</u>       **(6)**

GRANDWELL   HOLDINGS   (PRIVATE)   LIMITED
v
(1)     ZIMBABWE   MINING   DEVELOPMENT   CORPORATION     (2)
MARANGE   RESOURCES   (PRIVATE)   LIMITED   (3)   MBADA
DIAMONDS   (PRIVATE)   LIMITED

**SUPREME COURT OF ZIMBABWE**
**GWAUNZA DCJ, MAVANGIRA JA AND MATHONSI JA**
**HARARE: OCTOBER 21, 2019 & JANUARY 16, 2020**

*T. Magwaliba,* for the appellant.
*J.R. Tsivama,* for the 1st and 2nd respondents.
3rd respondent in default

**MATHONSI JA:** This is an appeal against the whole judgment of the High Court

handed down on 26 October 2016 dismissing the appellant's application for specific

performance with costs.

The facts are that the appellant and the second respondent are each the holders of

fifty percent of the issued share capital in the third respondent, a special joint venture company

incorporated in terms of a joint venture agreement entered into between the appellant and the

second respondent on 21 July 2009.  In terms of the joint venture agreement the appellant

would provide funding for the business of mining diamonds through the third respondent.

The second respondent undertook to ensure that the mining rights held under special grants at Marange existed in perpetuity.  The first respondent, which is the sole shareholder in the second respondent guaranteed the second respondent's performance of its obligations under the agreement.

Although the appellant performed its obligations under the agreement, the second respondent did not pay the special grants' renewal fees.  The second respondent let the special grants in terms of which the mining rights existed, expire.  When that happened, the second respondent did not secure the reinstatement of the special grants.  The first respondent, which had guaranteed the second respondent's performance of its contractual obligations, also failed to do anything about that breach of the agreement.

On 30 September 2015, the first respondent addressed a letter to the Permanent Secretary for Mines and Mining Development which, because of its centrality in the resolution of this case, is reproduced hereunder:

"RE: RENEWAL OF THE MARANGE DIAMOND SPECIAL GRANTS: 4718, 4719, 4720, 4765, 5244, 5247, 5249 & 5769

Reference is made to the above matter.
As per attached table below, ZMDC has five diamond Special Grants (SG) which expired in October 2013 and one in December 2010.  These are SG Nos. 4718, 4719, 4720, 4765 and 5769.  From this date the Corporation has to raise the required renewal fees and in 2014, the Ministry of Mines and Mining Development granted a 12 month exemption on the payment of the renewal fees for the said grants.  Given the fact that ZMDC's financial position has remained severely constrained, the Corporation is applying for a further exemption on renewal fees for these SGs, which have currently expired.

Further, given the fact that actual mining is now taking place in the first four of the above SGs, it is necessary for the SGs to be converted from prospecting to mining SGs, a process that also requires cash out lay by ZMDC, which funds the Corporation is currently finding difficult to raise.

In addition, Marange Resources (Pvt) Ltd, a wholly owned subsidiary of ZMDC, which is currently mining on Block B under SG4720, has requested for a valid copy of SG4720, which it requires in its application for exemption of import duty for an X-Ray Transmography Machine (XRT machine) that it intends to import. Unfortunately the Corporation is not able to assist, given the fact that the SG has expired.

Under these circumstances therefore, the Corporation is appealing to the Ministry, for the Ministry to reconsider its earlier position not to extend the exemption of payment of renewal SG fees, and grant ZMDC an exemption to update its diamond SGs for a further period of 3 years to 2016, to allow Marange Resources to process its application for exemption of import duty.

Sir, we are kindly requesting for your favourable consideration to our submission of renewal of the ZMDC held diamond Special Grants Nos 4718, 4719, 4720, 4765, 5244, 5247, 5249 & 5769 and conversion of SGs Nos. 4718, 4719, 4720 from prospecting to mining.

Yours faithfully

S. Simango
General Manager."
(The underlining is mine)

It is clear from the contents of the letter that the special grants, in terms of which mining operations were to be carried out by the third respondent, had expired in 2010 and 2013. The respondents did not have money to pay renewal fees and were thus asking for exemptions from the Secretary.  They had relied on exemptions previously to renew the special grants because they again did not have money.  If they were to be granted exemptions from paying renewal fees, only then would they apply for renewal or revival of the expired special grants.

The Secretary of Mines and Mining Development was not impressed.  He rejected the request for exemptions in a letter to the first respondent dated 22 February 2016.  It reads:

"RE: RENEWAL OF THE MARANGE DIAMOND SPECIAL GRANTS:  4718, 4719, 4720, 4765, 5244, 5247, 5249 AND 5769

The above matter refers.  We acknowledge receipt of your letter to our Ministry dated 30 September 2015 contents of which have been noted (copy attached for ease of reference). <u>As clearly admitted and indicated by yourselves, you have neglected or failed to renew the Special Grants that were issued to you, some expired as far back as 2010 and others in 2013</u>.  An exemption had been extended to you but there has been no commitment on your part to rectify this anomaly which is in contravention of section 293 of the Mines and Minerals Act {Chapter 21:05]. Instead you are requesting for a further exemption.  It has also come to our attention that there are some Special Grants that are purported not to have a duration period. It is trite law that a Special Grant is issued upon application and its issuance is done in terms of section 291 of the Mines and Minerals Act [Chapter 21:05] which demands that, a period for the subsistence of the Special Grant <u>shall</u> be specified failure of which renders the Special Grant void.  In light of this, these Special Grants shall be deemed to have been granted for the period which the applicant had requested in its application.

<u>After serious consideration of this matter, we do hereby notify you that the Ministry is not in a position to give any further exemptions for the renewal of all Special Grants namely 4718, 4719, 4720, 4765, 5244, 5247, 5249 and 5769 that were issued to you and neither are we renewing the same.</u>

Prof. P.F. Gudyanga Secretary for Mines and Mining Development." (The underlining is mine)

After the rejection of the request for exemptions, it is common cause that the respondents did not do anything. They did not challenge the Secretary's decision.  Neither did they raise money to pay for the renewal or revival of the expired Special Grants.

The appellant then launched an application in the High Court Seeking an order directing the respondents to pay renewal fees for the Special Grants and to file renewal applications among other ancillary relief. The application was prompted by the third respondent's inability to carry out mining operations without regularisation of the special mining grants. The application was premised on the respondents' breach of the joint venture agreement.

The first and second respondents opposed the application.  They denied breaching the agreement asserting that they applied for both exemption to pay renewal fees and the renewal of the Special grants to the Secretary for Mines.  It therefore became an issue for determination by the court *a quo* whether the first and second respondents breached the terms of the joint venture agreement by failing to perform specific acts in pursuance of their contractual obligations.

The court *a quo* held that the first respondent's letter of 30 September 2015 is indeed an application for renewal of the Special Grants.  The court *a quo* found that the response to the application by the Secretary for Mines dealt with the issues of exemption and renewal of the Special Grants which had expired.  The court *a quo* held that the Secretary for Mines had made a decision not to renew the Special Grants.  It would therefore be incompetent, so the court *a quo* reasoned, for the court to order the Secretary to review his own decision by granting an order for Specific performance.

This appeal is the fruit of the appellant's grief with that judgment of the court *a quo*.  The grounds of appeal are that:

1. The court *a quo* erred and grossly misdirected itself in finding that an application for renewal of the Special mining grants had been filed by the first and second respondents in discharge of their contractual obligations to the appellant;

2. The court *a quo* erred and grossly misdirected itself in limiting the first and second respondents' contractual obligations to filing an application for renewal of the special mining grants whereas their obligation was to do all that was necessary to ensure the existence in perpetuity of the special mining rights.

6

<u>Whether or not the court *a quo* correctly held the letter of the first respondent to the Secretary for Mines as an act of specific performance in terms of the parties' agreement.</u>

Generally the policy of the law is to give effect to the contracts of the parties because it is salutary in our jurisdiction to uphold the freedom of the parties to contract lawfully.  This notion is embodied in the principle of sanctity of contract.  Once the parties have contracted, it is not open to the courts to rewrite the contract they have entered into.  In addition, the court will not excuse any of the parties from the consequences of the contract that they freely and voluntarily entered into with their eyes wide open.  This is so even if the consequences are onerous or oppressive.  See *Magodora & Ors v Care International Zimbabwe* 2014 (1) ZLR 397 (S) at 403 C-D.

As to the remedy of specific performance in the law of contract, it is accepted that it is aimed at upholding the contract and obtaining the performance of the terms of the contract as agreed.  Indeed, specific performance is the primary or default remedy for breach of contract and is usually claimable.

According to the learned author I Maja, <u>The Law of Contract in Zimbabwe</u>, 2015, The Maja Foundation, at p126:

> "The general rule under Roman Dutch Law is that an innocent party has a right – in every case of breach of contract – to a remedy of specific performance unless there are exceptional circumstances which justify refusal of an order for specific performance.  According to *Farmers Co-operative Society (Reg) v Berry* 1912 AD 343 at 350:
>
> > '*Prima facie*, every party to a binding agreement who is ready to carry out his own obligation under it has a right to demand from the other party, so far as it is possible, a performance of his undertaking in terms of the contract.  As remarked by KOTZE CJ in *Thompson v Pullinger*

the right of the plaintiff to the specific performance of a contract where the defendant is in a position to do so is beyond all doubt.'"

See also *Smith & Ors v ZESA* 2003 (1) ZLR 158 (H) at p 165 A-B; *Savanhu v Marere N.O.* & Ors 2009 (1) ZLR 320 (S).

However, the right to claim specific performance is predicated on the concept that the party claiming it must first show that he or she has performed all his or her obligations under the contract or is ready, willing and able to perform his or her side of the bargain. Even then, the court has a discretion, which should be exercised judicially, to grant or refuse a decree of specific performance. It follows therefore that the court's discretion should not be exercised arbitrarily or capriciously. See *Minister of Public Construction & National Housing v Zescon (Pvt) Ltd* 1989 (2) ZLR 311 (S), where at 318 G, this Court stated:

"The law is clear. This is a remedy to which a party is entitled as of right. It cannot be withheld arbitrarily or capriciously."

It is important to consider the specific terms of the contract entered into between the parties which the appellant wishes to enforce. Clause 6.3 of the Joint Venture Agreement provides:

"6.3 Marange undertakes that it shall forthwith after the signature date and thereafter for the duration of this Agreement –

6.3.1 pay all necessary fees and make application for the renewal and/or continued existence and do all that may be necessary so as to ensure that the special grants and rights thereunder are in good standing and remain valid for the duration of this Agreement allowing Marange to mine and prospect the concession area in perpetuity ……"

The appellant's case is that the respondents breached that provision by failing to pay the necessary fees and to make the requisite application for the renewal of the Special Grants.

As a result the Special Grants lapsed.  The respondents submitted that the letter written by the first respondent to the Secretary of Mines on 30 September 2015 constituted a valid application for the renewal of the Special Grants which application was rejected by the Secretary for Mines. They therefore fulfilled their part of the bargain.

It is common cause that the appellant fulfilled its own obligations in terms of the contract and was therefore entitled to demand specific performance.  The court *a quo* found that the letter of 30 September 2015 was "an application for renewal" and that its heading was very clear needing no further explanation.  The court said at p 7 of the cyclostyled judgment:

> "What is clear from the above is that it is an application for renewal.  The heading is very clear and needs no further explanation.  The first paragraph makes reference to the heading and therefore the renewal of the special grants.  The second paragraph relates to an exemption to pay renewal fees.  Paragraphs 3 and 4 are not relevant to the determination of the issue at hand.  Paragraph 4, again, relates to exemptions.  The last paragraph puts paid to any doubt what the letter relates to.  It talks about renewal.  I agree with Mr *Tsivama* that there is no procedure or format laid down in JVA as to how the application for renewal is to be submitted."

With respect, the court *a quo* took a very simplistic, if not pedestrian, approach to the letter in question.  Clause 6.3.1 of the Joint Venture Agreement required the respondents first and foremost, to pay all necessary fees for the renewal of the special grants.  It also required them to make the necessary application for such renewal.  It recognised the reality that the payment of fees was a pre-requisite for a valid and successful application for renewal.

Such a situation is not what was obtaining on the ground and as such the letter of 30 September 2015 cannot, by any stretch of the imagination, be regarded as a fulfilment of the respondents' obligations under Clause 6.3.1 of the Joint Venture Agreement.  Clearly it was not a valid or competent application for renewal.  It is clear from the provisions of s 293

of the Mines and Minerals Act [*Chapter 21:05*] that the payment of renewal fees is central to

the validity of an application for renewal.  Section 293 provides:

> "The person to whom a special grant is issued shall pay the prescribed fee in respect
> of the issue of a special grant or any renewal thereof."

It is common cause that the respondents did not pay renewal fees.  In fact all the

relevant special grants were allowed to expire years before the letter of 30 September 2015 was

written.  The contents of that letter are clear that the first respondent was seeking an exemption

from paying renewal fees because of an incongruent financial position.  Without the payment

of renewal fees the renewal could only be done by the benevolence of the Secretary.

The respondents could not possibly be said to have performed their obligations of

ensuring the mining rights existed in perpetuity.  The rights had expired.  The court *a quo* fell

into error in that aspect.   The letter of 30 September 2015 did not constitute specific

performance of the respondents' obligations in terms of the contract.

**<u>Whether the respondents did all that was necessary to ensure the Special Mining rights
existed in perpetuity</u>**

Mr *Magwaliba* for the appellant submitted that the obligations of the respondents

set out in the contract were much broader than merely submitting an application for renewal of

the Special Grants.  They were required, so the argument goes, to ensure that the mining rights

existed in perpetuity.  They failed to perform to such an extent that the special grants expired

in 2010 and 2013 long before the respondents even submitted the letter they relied on.  I agree.

In fact once it is accepted that the respondents did not pay renewal fees and that they allowed the grants to expire, it cannot be said at the same time that the respondents did all that was necessary to ensure the existence of the special mining rights in perpetuity. They could only so exist if there was full compliance with renewal requirements including the timeous payment of renewal fees and submission of the necessary applications. Repeated requests for exemptions from payment would never ensure perpetuity as that left everything in the hands of the Secretary for Mines.

**Whether the court should exercise its discretion in favour of granting specific performance**.

Mr *Tsivama* for the respondents submitted that the Secretary for Mines made a decision not to renew the Special Grants which decision is contained in his letter of 22 February 2016 quoted above. He submitted that the court *a quo* cannot be faulted for concluding that it would be incompetent for the court to direct him to review his own decision by granting specific performance. Mr *Magwaliba* on the other hand sharply differed with that assertion. In his view there was no application for renewal placed before the Secretary for Mines. He could not grant an application which was not made and his response clearly showed his disquiet about the respondents' repeated failure to pay renewal fees.

I have said that the court has a discretion whether to grant specific performance but that discretion should be exercised judicially and not arbitrarily or capriciously. This is because specific performance is a remedy to which a party is entitled to as of right. See *Minister of Public Construction & National Housing v Zescon (Pvt) Ltd, Supra.*

The court *a quo* did not consider the circumstances that are relevant in deciding whether to grant a decree of specific performance or not.  In its view that was unnecessary because it had come to the conclusion that the respondent's letter to the Secretary for Mines amounted to specific performance.  I therefore do not agree with Mr *Tsivama* that the court a quo exercised judicial discretion and refused specific performance, which discretion can only be interfered with if exercised capriciously or upon a wrong principle.  The discretion was simply not exercised by the court *a quo* for obvious reasons, namely its finding that specific performance had occurred.

There is no doubt that the Secretary for Mines was called upon to decide whether or not to grant the respondents exemption from paying renewal fees.  He refused to do so because, according to him, an exemption had been granted previously but the respondents showed no commitment to rectify the anomalies.  The respondents were not entitled to further exemptions.  What is significant to note is that the respondents' obligations in terms of the contract are not to apply for exemptions but to pay renewal fees.  It is clear from the letter of the Secretary for Mines dated 22 February 2016 that if renewal fees are paid the application will be favourably considered.

In light of that I perceive no ground whatsoever for exercising the discretion reposed upon the court against the granting of specific performance.  After all it is the primary remedy for breach of contract.  The appellant has shown that the respondents breached the contract.  Specific performance is possible and as such it should be granted.

In the result, it is ordered that:

1.  The appeal succeeds with costs.

2.  The judgment of the court *a quo* is set aside and substituted with the following

    order:

    "2.1. The application be and is hereby granted.

    2.2.    The 1st and 2nd respondents be and are hereby directed to pay renewal

            fees in respect of the special grants constituting the concession on which

            the 3rd respondent was carrying out mining operations and which

            mining grants are referred to in the Joint Venture Agreement and the

            Shareholders Agreement attached to the application.

    2.3.    Thereafter the 1st and 2nd respondents be and are hereby directed to file

            a renewal application in respect of the said special grants and to provide

            the renewing statutory authority with all that is required to enable the

            said authority to process the renewal application including a detailed

            written motivation to ensure urgent renewal of the special grants.

    2.4.    The 1st and 2nd respondents shall provide the applicant with copies of

            the renewal application together with proof of payment of fees.

    2.5.    The 1st and 2nd respondents shall pay the costs of this application jointly

            and severally the one paying the other to be absolved.

**GWAUNZA DCJ**                        I agree

**MAVANGIRA JA**                    I agree

*Scanlen & Holderness*, legal practitioners for the appellant.

*Sawyer & Mkushi*, 1st and 2nd respondents' legal practitioners

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Amaplat Mauritius Ltd., c/o CKLB International Management Ltd., P.O. Box 80, Felix House, 24 Dr. Joseph Riviere Street, Port Louis 11602, Mauritius; and | |
| Amari Nickel Holdings Zimbabwe Ltd., c/o CKLB International Management Ltd., P.O. Box 80, Felix House, 24 Dr. Joseph Riviere Street, Port Louis 11602, Mauritius, | Civil Action No. 1:22-cv-00058-CRC |
| Plaintiffs, | |
| v. | |
| Zimbabwe Mining Development Corporation, 90 Mutare Road, Msasa, Harare, Zimbabwe; | |
| The Chief Mining Commissioner, Ministry of Mines of Zimbabwe, 6th Floor, ZIMRE Centre, Cnr. Leopold Takawira Street/Kwame Nkrumah Avenue, Private Bag 7709, Causeway, Harare, Zimbabwe; | |
| and the Republic of Zimbabwe, c/o Head of the Ministry of Foreign Affairs, Ministry of Foreign Affairs, P.O. Box 4240, Munhumutapa Building, Cnr. Samora Machel Avenue/Sam Nujoma Street, Harare, Zimbabwe | |
| Defendants. | |

**DECLARATION OF STEVEN K. DAVIDSON IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Steven K. Davidson states under penalty of perjury as follows:

1.  I am an attorney admitted to practice in this Court and counsel of record for Plaintiffs.

2.  I am making this Declaration to place before the Court certain materials that are relevant to Plaintiffs' opposition to Defendants' motion to dismiss.

3.  Attached hereto as Exhibit A is a copy of the United States International Trade Administration's Zimbabwe - Country Commercial Guide, as downloaded by my firm from https://www.trade.gov/country-commercial-guides/zimbabwe-mining-and-minerals.

4.  Attached hereto as Exhibit B is a copy of the Zimbabwe Mining Development Corporation Act 1983, as downloaded by my firm from https://old.zimlii.org/zw/legislation/num-act/1983/31/Zimbabwe%20Mining%20Development%20Corporation%20Act%20.pdf.

5.  Attached hereto as Exhibit C is a copy of the Mines and Minerals Act 1961, as downloaded by my firm from https://old.zimlii.org/zw/legislation/num-act/1961/38/MINES_AND_MINERALS_ACT_21_05.pdf.

6.  Attached hereto as Exhibit D is a copy of a report from the website of the World Trade Organization, as downloaded by my firm from https://www.wto.org/english/tratop_e/tpr_e/s398_sum_e.pdf.

7.  Attached hereto as Exhibit E is a copy of an academic article entitled "The State and the Bloody Diamond Rush in Chiadzwa: Unpacking the Contesting Interests in the Development of Illicit Mining and Trading, c.2006—2009," as downloaded by my firm from https://www.jstor.org/stable/23267007?seq=3.

8.  Attached hereto as Exhibit F is a copy of a 2017 Report of a Zimbabwean Parliamentary Committee, as downloaded by my firm from

https://www.veritaszim.net/sites/veritas_d/files/Portfolio%20Committee%20on%20Mine s%20and%20Energy%20Report%20on%20the%20Consolidation%20of%20the%20Dia mond%20Mining%20Companies%20-%20SC%209-2017.pdf.

9.  Attached hereto as Exhibit G is a copy of an academic article entitled "The Political Economy of Artisanal and Small-Scale Gold Mining in Central Zimbabwe," as downloaded by my firm from https://www.jstor.org/stable/24566554.

10. Attached hereto as Exhibit H is a copy of a news article entitled "Mpofu appoints Masimirembwa to chair CMED," as downloaded by my firm from https://nehandaradio.com/2014/06/12/mpofu-appoints-masimirembwa-chair-cmed/.

11. Attached hereto as Exhibit I is a copy of a news article entitled "Obert Mpofu, Masimirembwa, strange bedfellows," as downloaded by my firm from https://bulawayo24.com/index-id-news-sc-national-byo-49732.html.

12. Attached hereto as Exhibit J is a copy of a news article entitled "ZANU PF Infighting Blamed for the Suspension of Top Mining Officials," as downloaded by my firm from https://www.thezimbabwean.co/2010/08/zanu-pf-infighting-blamed-for-the-suspension-of-top-mining-officials/

13. Attached hereto as Exhibit K is a copy of a news article entitled "SPECIAL REPORT: Zimbabwe elite's role in billion dollar diamond leakages revealed," as downloaded by my firm from https://www.thecitizen.co.tz/tanzania/news/africa/special-report-zimbabwe-elite-s-role-in-billion-dollar-diamond-leakages-revealed-2554656.

14. Attached hereto as Exhibit L is a copy of a news article entitled "The Effectiveness of Initiatives to Promote Good Governance, Accountability and Transparency in the

Extractives Sector in Zimbabwe," as downloaded by my firm from

https://www.jstor.org/stable/24734897

15. Attached hereto as Exhibit M is a copy of a Zimbabwe Labour Court judgment, as

downloaded by my firm from https://old.zimlii.org/zw/judgment/labour-court/2014/10.

16. Attached hereto as Exhibit N is a copy of a Zimbabwe High Court judgment, as

downloaded by my firm from https://old.zimlii.org/zw/judgment/files/harare-high-

court/2016/270/2016-zwhhc-270.pdf.

17. Attached hereto as Exhibit O is an International Crisis Group report, as downloaded by

my firm from https://www.crisisgroup.org/africa/southern-africa/zimbabwe/time-rethink-

kimberley-process-zimbabwe-case

18. Attached hereto as Exhibit P is Annexure FA11 to the Zimbabwe High Court Affidavit of

Mark Summers, which was provided to my firm as part of the file for this matter.

19. Attached hereto as Exhibit Q is Annexure FA13 to the Zimbabwe High Court Affidavit

of Mark Summers, which was provided to my firm as part of the file for this matter.

20. Attached hereto as Exhibit R is Annexure FA14 to the Zimbabwe High Court Affidavit of

Mark Summers, which was provided to my firm as part of the file for this matter.

21. Attached hereto as Exhibit S is the Zimbabwe High Court Affidavit of Mark Summers,

which was provided to my firm as part of the file for this matter.

22. Attached hereto as Exhibit T is Annexure FA4 to the Zimbabwe High Court Affidavit of

Mark Summers, which was provided to my firm as part of the file for this matter.

23. Attached hereto as Exhibit U is a copy of a report of a Zimbabwean Parliamentary

Committee, as downloaded by my firm from https://www.thezimbabwean.co/wp-

content/uploads/2016/03/Diamond-report-Chindori-Chininga-Doc51.docx.

24. Attached hereto as Exhibit V is a copy of a news report entitled "3 Mining State Firms' Boards Dissolved," as downloaded by my firm from https://www.herald.co.zw/3-mining-state-firms-boards-dissolved/.

25. Attached hereto as Exhibit W is a copy of an internet post entitled "Government complicit in Marange diamond plunder warrant an independent commission," as downloaded by my firm from https://kubatana.net/2018/03/07/government-complicit-marange-diamond-plunder-warrant-independent-commission/.

26. Attached hereto as Exhibit X is copy of a news report entitled Russians start $3bn mine in Zimbabwe" as downloaded by my firm from https://www.iol.co.za/business-report/economy/russians-start-3bn-mine-in-zimbabwe-1751935#.VCA4vcgaL3g.

27. Attached hereto as Exhibit Y is a copy of a news report entitled "Russian Companies Buy Into Zimbabwe Platinum Field," as downloaded by my firm from https://www.themoscowtimes.com/2013/08/09/russian-companies-buy-into-zimbabwe-platinum-field-a26619.

28. Attached hereto as Exhibit Z is a copy of a news report entitled "The Zimbabwean army expands its influence," as downloaded by my firm from https://peoplesdispatch.org/2020/12/20/the-zimbabwean-army-expands-its-influence/.

29. Attached hereto as Exhibit AA is a copy of Executive Order 13469, as downloaded by my firm from https://www.govinfo.gov/content/pkg/WCPD-2008-07-28/pdf/WCPD-2008-07-28-Pg1025-2.pdf.

30. Attached hereto as Exhibit BB is a copy of a July 25, 2008 U.S. Treasury Department press release, as downloaded by my firm from https://home.treasury.gov/news/press-releases/hp1097.

31. Attached hereto as Exhibit CC is a copy of a December 12, 2022 U.S. Treasury
    Department press release, as downloaded by my firm from
    https://home.treasury.gov/news/press-releases/jy1158.

32. Attached hereto as Exhibit DD is a copy of September 30, 2009 U.S. Treasury
    Department Remarks, as downloaded by my firm from
    https://home.treasury.gov/news/press-releases/tg301.

33. Attached hereto as Exhibit EE is a copy of a U.S. State Department Press Release, as
    downloaded by my firm from https://www.state.gov/updates-to-the-zimbabwe-sanctions-
    list/.

34. Attached hereto as Exhibits FF through LL are copies, in reverse chronological order, of
    the 2023 through 2017 U.S. State Department Investment Climate Statements for
    Zimbabwe, all of which were downloaded by my firm from the State Department's
    website.

35. Attached hereto as Exhibit MM is a copy of State Department Congressional Testimony
    dated July 18, 2013, as downloaded by my firm from https://2009-
    2017.state.gov/p/af/rls/rm/2013/210807.htm.

36. Attached hereto as Exhibit NN is a copy of a news article entitled "Zim govt is plotting to
    strip state mine assets to hide from $467m in legal claims, but there's resistance from
    within," as downloaded by my firm from https://miningzimbabwe.com/zim-govt-is-
    plotting-to-strip-state-mine-assets-to-hide-from-us467m-in-legal-claims-but-theres-
    resistance-from-within/.

37. Attached hereto as Exhibit OO is a copy of what I am informed and believe to be an April
    14, 2022 Memorandum regarding ZMDC's transfer of shareholdings to Defold.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: August 10, 2023

       Washington, D.C.


                        */s/ Steven K. Davidson*
                        STEVEN K. DAVIDSON

# Exhibit A



Official Website of the International Trade Administration   Here's how you know



Home  | Country Commercial Guides  | **Zimbabwe - Mining and Minerals**

# Zimbabwe – Country Commercial Guide

Zimbabwe Country Commercial Guide ⌄

Doing Business in ⌄

Leading Sectors for US Exports & Investments ⌄

Agricultural Sectors

Construction

Energy

| Mining and Minerals

Biotechnology Research and Development Laboratories/Services
Agriculture

Medical Laboratory Supplies and Equipment

Travel and Tourism

Customs, Regulations & Standards                                        ⌄

Selling US Products & Services                                          ⌄

Business Travel                                                        ⌄

Investment Climate Statement                                           ⌄

Political & Economic Environment                                       ⌄

# Mining and Minerals

This is a best prospect industry sector for this country.  Includes a market overview and trade data.

**Last published date:** 2022-08-02

# Overview

Zimbabwe's mining sector is highly diversified, with close to 40 different minerals.  The predominant minerals include platinum group metals (PGM), chrome, gold, coal, and diamonds.  The country boasts the second-largest platinum deposit and high-grade chromium ores in the world, with approximately 2.8 billion tons of PGM and 10 billion tons of chromium ore.  The sector accounts for about 12 percent of the country's gross domestic product (GDP), and the minister of mines claims the sector has the potential to generate US$12 billion annually by 2023 if the

government addresses challenges such as persistent power shortages, foreign currency shortages, and policy uncertainties.

Low foreign currency retention requirements have challenged mineral exporters, particularly at times when the black-market exchange rate diverged greatly from the official rate leading to smuggling. The government's expectations the sector would drive economic growth were dampened by COVID-19 in 2020, but there have been some initial signs of recovery in 2021 driven by improved international commodity prices.  The government intends to amend the Mines and Minerals Act to make it more progressive and investor-friendly to attract more investment.

Companies are required to export all minerals through the state-owned Minerals Marketing Corporation of Zimbabwe (MMCZ), except gold which must be sold to the Reserve Bank of Zimbabwe's (RBZ) subsidiary Fidelity Printers and Refiners (FPR).  Individual companies may receive permission, however, from the government of Zimbabwe to sell minerals directly to avoid U.S.-targeted sanctions on the MMCZ.

# Leading Sub-Sectors

Zimbabwe's top minerals include gold, platinum group metals (PGM), chrome, coal, diamonds, and lithium.

Exploration of possible oil and gas deposits in Muzarabani is scheduled to begin later this year.  Compared to largely depressed mining activities in 2020 due to COVID-19 induced lockdowns, demand increased in 2021 for a wide range of commodities. Supply chain disruptions in South Africa and Russia helped increase global PGM prices in 2021.  Zimbabwe's Chamber of Mines 2021 state of mining report projected significant growth in the diamond, coal, and chrome subsectors, with PGM continuing to lead the sector.

According to the RBZ, legal exports of gold, Zimbabwe's top mineral export, increased from US$1.2billion in 2020 to US$1.7 billion in 2021.  The RBZ attributed the 42 percent increase in

2021 to improved gold output and firm prices as economies recovered from COVID-19 lockdowns.  Challenges including suspected smuggling, fuel shortages, and antiquated technology persisted.  FPR announced in mid-2021 that it will combat these underlying issues by allowing large-scale gold mining companies to export a portion of their bullion directly. FPR expects this measure to increase production by allowing companies to secure funding in the form of gold loans.  FPR also hopes that direct payments will help prevent the illegal export of gold, estimated at US$1.2 billion per year by small-scale miners who extract most of the country's gold.  A 2022 Center for Natural Resource Governance report on illicit financial flows in the artisanal mining sector estimated as much as US$1.9 billion is lost annually due to leakages.  The RBZ retracted its August 2021 announcement it would divide FPR into two separate companies and sell a majority stake in the new gold refinery business to ten mining companies in May 2022, noting FPR was now off the market.  FPR remains the country's sole buyer and exporter of gold.

The consolidation of diamond mining companies into the Zimbabwe Consolidated Diamond Company in Marange and the transition to conglomerates should lead to increased investment and purchases of new mining equipment.  The consolidation led to some international firms exiting the diamond sector, though some were later invited and returned.

According to the African Mining Market, Zimbabwe's lithium deposits are the largest in Africa, and the country will become one of the world's largest lithium exporters due to growing world demand for rechargeable batteries.  The government claims the country will meet 20 percent of the world's total demand for lithium when it fully exploits its known lithium resources, and four major lithium projects are currently under development.

# Opportunities

Besides direct investment in mining, there is a significant opportunity to provide heavy underground mining machinery

and other supplies, as well as transportation infrastructure and materials, including railways.  The government's renewed interest in increasing domestic production of value-added mineral products will require larger capital investments in the mining sector than the current business model which relies on exporting unprocessed or semi-processed natural resources.

Resources

Chamber of Mines of Zimbabwe

20 Mount Pleasant Drive, Mount Pleasant, Harare.

Tel: +263 242334517 / 242334507

## For U.S. Businesses

Export Solutions

Research Center

Regulations & Agreements

Resolve a Trade Problem

Attend an Event

News & Highlights

Let Our Experts Help

## For International Businesses

Buy From the USA

Invest in the USA

## About Us

Contact Us

Careers

Data & API

Site Map

**International Trade Administration
U.S. Department of Commerce**

1401 Constitution Ave NW
Washington, DC 20230

**Connect With ITA**

The **International Trade Administration**, **U.S. Department of Commerce,** manages
this global trade site to provide access to ITA information on promoting trade and
investment, strengthening the competitiveness of U.S. industry, and ensuring fair
trade and compliance with trade laws and agreements. External links to other
Internet sites should not be construed as an endorsement of the views or privacy
policies contained therein. This site contains PDF documents. A **PDF reader** is
available from Adobe Systems Incorporated.

USA.gov | FOIA | Privacy Program | EEO Policy | Disclaimer |
Information Quality Guidelines | Accessibility

# Exhibit B

TITLE   21

Chapter 21:08                                            PREVIOUS  CHAPTER

ZIMBABWE MINING DEVELOPMENT CORPORATION ACT
Acts 31/1982, 29/1990 (s. 22), 3/1991, 22/2001.
ARRANGEMENT OF SECTIONS
PART I
PRELIMINARY
Section

1.        Short title.
2.        Interpretation.
PART II
ZIMBABWE   MINING   DEVELOPMENT   CORPORATION   AND   MINING
DEVELOPMENT BOARD
3.        Establishment of Zimbabwe Mining Development Corporation
4.        Establishment of Mining Development Board.
5.        Constitution of Board.
6.        Conditions of office of members.
7.        Disqualifications for appointment as member.
8.        Vacation of office by member.
9.        Minister may require member to vacate office.
10.      Filling of vacancies on Board.
11.      Meetings and procedure of Board.
12.      Committees of Board.
13.       Remuneration  and  expenses  of  members  of  Board  and  members  of
committees.
14.      Right of certain officers to attend meetings of Board or committees.
15.      Members to declare connection with companies and firms dealing with
Corporation.
16.      Validity of decisions and acts of Board.
17.      Execution of contracts and instruments by Corporation.
18.      Transaction of business of an urgent nature.
19.      Minutes of proceedings of Board and committees.
PART III
FUNCTIONS, POWERS AND DUTIES OF CORPORATION
20.      Functions and duties of Corporation.
21.      Reports of Corporation.
22.      Powers of Corporation.
23.      Principles to be observed by Corporation.
24.      Appointment of general manager.
25.      Minister may give Corporation directions in national interest.
PART IV
ISSUE OF SHARES AND DEBENTURES BY CORPORATION
26.      Authorized share capital of Corporation.
27.      Allotment, issue and transfer of shares of Corporation.
28.      Liability of shareholders.
29.      Issue of debentures.
PART V
FINANCIAL PROVISIONS RELATING TO CORPORATION

30.     Conduct of financial affairs of Corporation.
31.     Capital of Corporation.
32.     Revenues of Corporation.
33.     Dividends.
34.     Investment and loans by Corporation.
35.     Corporation to make certain charges to revenue account.
36.     Establishment and operation of general reserve.
37.     Meeting of deficiencies.
38.     Financial year of Corporation.
39.     Accounts of Corporation.
40.     Audit of accounts of Corporation.
41.     Powers of auditors.
PART VI
GENERAL
42.     Investigation into affairs of Corporation.
43.     Proceedings on failure of general manager, Board or Corporation to comply with Act.
44.     Regulations.
        SCHEDULE: Powers of Corporation.

AN ACT to establish the Zimbabwe Mining Development Corporation and to provide for the functions, powers and duties thereof; to provide for the constitution, functions, powers and duties of the Mining Development Board; to regulate the financial affairs of the Zimbabwe Mining Development Corporation; and to provide for matters incidental to or connected with the foregoing.

[Date of commencement: 4th November, 1983.]

PART I

PRELIMINARY

1       Short title

This Act may be cited as the Zimbabwe Mining Development Corporation Act [Chapter 21:08].

2       Interpretation

In this Act—

"Board" means the Mining Development Board referred to in section four;

"Corporation" means the Zimbabwe Mining Development Corporation established by section three;

"member" means the chairman or any other member of the Board referred to in subsection (1) of section five;

"Minister" means the Minister of Mines or any other Minister to whom the President may, from time to time, assign the administration of this Act.

PART II

ZIMBABWE MINING DEVELOPMENT CORPORATION AND MINING DEVELOPMENT BOARD

3       Establishment of Zimbabwe Mining Development Corporation

There is hereby established a corporation to be known as Establishment of the Zimbabwe Mining Development Corporation, which shall be a body corporate and shall be capable of suing and being sued in Corporation to its corporate name and, subject to this Act, of performing all such acts as bodies corporate may by law perform.

4       Establishment of Mining Development Board

The operations of the Corporation shall, subject to this Act, be controlled by a board, to be known as the Mining Development Board, constituted in terms of this Part.

5        Constitution of Board

(1) The Board shall consist of not less than five and not more than nine members who shall be appointed by the Minister after consultation with the President and in accordance with any directions the President may give him and who shall be chosen for their ability and experience in the mining industry or administration and for their suitability otherwise for appointment as members.

(2) The Minister shall appoint one member as chairman of the Board and another member as deputy chairman of the Board, and the deputy chairman shall exercise the functions and powers and perform the duties of the chairman during any period that the chairman is unable to exercise his functions.

(3) The Minister may appoint any person to the Board as an alternate to any member referred to in subsection (1), and such member—

(a)        shall act as a member only when the member to whom he is alternate is for any reason unable to exercise his functions on the Board;

(b)        when acting as a member shall exercise the functions and powers and perform the duties of the member to whom he is alternate:

Provided that an alternate to the chairman or deputy chairman of the Board shall not exercise the functions and powers or perform the duties of the chairman or deputy chairman, as the case may be.

6        Conditions of office of members

(1) A member shall, subject to this Part, hold office for such period, not exceeding three years, as the Minister may fix on his appointment.

(2) Subject to section thirteen, a member shall hold office on such conditions as the Minister may in his case fix.

(3) A retiring member shall be eligible for re-appointment as a member.

7        Disqualifications for appointment as member

The Minister shall not appoint a person as a member and no person shall be qualified to hold office as a member who—

(a)        is not a citizen of Zimbabwe permanently resident in Zimbabwe; or

(b)        has, or is married to a person who has, a financial interest in any business or is, or is married to a person who is, engaged in any activity connected with any business, if, in the opinion of the Minister, such financial interest or activity is likely to interfere with the impartial discharge by that person of his duties as a member; or

(c)        has in terms of a law in force in any country—

(i)        been adjudged or otherwise declared insolvent or bankrupt and has not been rehabilitated or discharged; or

(ii)        made an assignment to, or arrangement or composition with, his creditors which has not been rescinded or set aside;

or

(d)        has within the period of five years immediately preceding the date of his proposed appointment, been sentenced in any country to a term of imprisonment of or exceeding six months imposed without the option of a fine and has not received a free pardon.

8        Vacation of office by member

A member shall vacate his office and his office shall become vacant—

(a)        after the expiry of one month after the date upon which he gives notice in writing to the Minister of his intention to resign, or after the expiry of such other period of notice, as he and the Minister may agree; or

(b)        on the date he begins to serve a sentence of imprisonment the term of which is not less than six months, whether or not any portion has been suspended,

imposed without the option of a fine in any country; or

    (c)    if he becomes disqualified in terms of paragraph (a), (b) or (c) of section seven to hold office as a member; or

    (d)    if he is required in terms of section nine to vacate his office; or

    (e)    if he is absent from three consecutive meetings of the Board without the Board's permission:

        Provided that such member as given not less than seven days' notice of each such meeting.

9      Minister may require member to vacate office

The Minister may require a member to vacate his office if the Minister is satisfied that the member—

    (a)    has been guilty of improper conduct as a member; or

    (b)    has failed to comply with the conditions of his office fixed by the Minister in terms of subsection (2) of section six; or

    (c)    is mentally or physically incapable of efficiently performing his duties as a member.

10     Filling of vacancies on Board

On the death of, or the vacation of office by, a member, the Minister shall appoint a person to fill the vacancy until the on Board expiry of the period during which the member would, but for his death or the vacation of his office, have continued in office:

Provided that, if the member would, but for his death or the vacation of his office, have continued to hold office for less than six months, the Minister need not appoint a person to fill the vacancy.

11     Meetings and procedure of Board

(1) The Board shall hold its first meeting on such date and at such place as the Minister may fix and thereafter the Board shall meet for the dispatch of business and adjourn, close and otherwise regulate its meetings and procedure as it thinks fit:

Provided that a meeting of the Board shall be held not less than three times in each financial year of the Corporation.

(2) The chairman of the Board may himself at any time and shall, at the request in writing of not less than two members, convene a special meeting of the Board, which meeting shall be convened for a date not less than seven days nor more than thirty days after receipt of such request.

(3) If at a meeting of the Board the chairman and the deputy chairman are both absent, the members present may elect one of their number to preside at that meeting as chairman.

(4) A majority of members shall form a quorum at a meeting of the Board.

(5) All acts, matters or things authorized or required to be done by the Board may be decided by a majority vote at a meeting of the Board at which a quorum is present.

(6) At all meetings of the Board each member present shall, subject to the provisions of section fifteen, have one vote on a question before the Board and, in the event of an equality of votes, the chairman shall have, in addition to a deliberative vote, a casting vote.

(7) Any proposal circulated among all members and agreed to in writing by a majority of all members shall be of the same force and effect as a resolution passed at a duly constituted meeting of the Board and shall be incorporated in the minutes of the next succeeding meeting of the Board:

Provided that, if a member requires that such proposal be placed before a meeting of the Board, the provisions of this subsection shall not apply to such proposal.

12     Committees of Board

(1) For the better exercise of its functions and powers the Board may establish one or more committees in which may be vested and on which may be imposed such of the functions and powers of the Board as the Board, with the consent of the Minister, may direct:

Provided that—

      (i)    the vesting in, or imposition on, a committee of any such functions and powers shall not divest the Board of such functions and powers; and

      (ii)    the Board may amend or withdraw any decision of any such committee in the exercise of its functions and powers.

(2) The procedure of a committee of the Board shall be fixed by the Board.

(3) The chairman of the Board may at any time and place convene a meeting of a committee of the Board.

(4) The Board—

      (a)    shall appoint to any committee established in terms of subsection (1) not less than one member of the Board;

      (b)    shall appoint as chairman of any such committee the member or one of the members of the Board appointed in terms of paragraph (a);

      (c)    may appoint as members of any committee established in terms of subsection (1), on such terms and conditions as the Board may fix, persons who are not members of the Board.

13    Remuneration and expenses of members of Board and members of committees

A member of the Board or of any committee of the Board shall be paid from the funds of the Corporation—

      (a)    such remuneration, if any, as the Minister may in his case fix; and

      (b)    such allowance as the Minister may fix to meet any reasonable expenses incurred by him in connection with the business of the Board or that committee, as the case may be.

14    Right of certain officers to attend meetings of Board or committees

Such officers of the Public Service as the Minister may designate shall be entitled to attend meetings and to take part in the proceedings of the Board or of a committee established in terms of section twelve as if they were members thereof but shall not have a vote on any question before the Board or committee, as the case may be.

15    Members to declare connection with companies and firms dealing with Corporation

(1) If a member or his spouse—

      (a)    tenders for or acquires or holds a direct or indirect pecuniary interest in a contract with the Corporation; or

      (b)    knowingly acquires or holds a direct or indirect pecuniary interest in a company or association of persons applying or negotiating for a contract with the Corporation; or

      (c)    owns immovable property or a right in immovable property or a direct or indirect pecuniary interest in a company or association of persons which results in his private interests coming or appearing to come into conflict with his duties as a member;

the member shall forthwith disclose the fact to the Board.

(2) A member referred to in subsection (1) shall take no part in the consideration or discussion of, or vote on, any question before the Board which relates to any contract, right, immovable property or interest referred to in that subsection.

(3) The general manager appointed in terms of section twenty-four shall take no part in the consideration or discussion of any question before the Board which relates to

the terms and conditions of his appointment as general manager.

16      Validity of decisions and acts of Board

No decision or act of the Board or act done under the authority of the Board shall be invalid by reason only of the fact that—

(a)      the Board consisted of less than the minimum number of persons for which provision is made in subsection (1) of section five; or

(b)      a disqualified person acted as a member at the time the decision was taken or the act was done or authorized.

17      Execution of contracts and instruments by Corporation

An agreement, contract or instrument approved by the Board may be entered into or executed on behalf of the Corporation by any person or persons generally or specially authorized by the Board for that purpose.

18      Transaction of business of an urgent nature

If it is impracticable to hold a meeting of the Board for the transaction of business of an urgent nature, the chairman of the Board, after consulting such of the other members as is practicable in the circumstances, may deal with the business himself and. as soon as may be thereafter, give to the Board full particulars of the nature and extent of the urgency of the business, of the circumstances in which the urgency arose and of the action that was taken by him in the matter.

19      Minutes of proceedings of Board and committees

(1) The Board shall cause minutes of all proceedings of and decisions taken at a meeting of the Board or of a committee of the Board to be entered in books kept for the purpose.

(2) Any minutes referred to in subsection (1) which purport to be signed by the chairman of the meeting to which the minutes relate or by the chairman of the next following meeting of the Board or the committee concerned, as the case may be, shall be accepted for all purposes as prima facie evidence of the proceedings of and decisions taken at the meeting concerned.

PART III

FUNCTIONS, POWERS AND DUTIES OF CORPORATION

20      Functions and duties of Corporation

Subject to this Act and the Mines and Minerals Act [Chapter 21:05], the functions and duties of the Corporation shall be—

(a)      to invest in the mining industry in Zimbabwe on behalf of the State;

(b)      to plan, co-ordinate and implement mining development projects on behalf of the State;

(c)      to engage in prospecting, exploration, mining and mineral beneficiation programmes;

(d)      to encourage and undertake the formation of mining co-operatives;

(e)      to render assistance to persons engaged in or about to engage in mining;

( f )      to review annually the general economic conditions and prospects of the mining industry and in particular investment schemes;

(g)      to advise the Minister on all matters connected with corporate investments in the mining industry and make recommendations for the proper co-ordination of all investment programmes;

(h)      to carry out any other functions and duties which may be imposed upon the Corporation by any enactment.

21      Reports of Corporation

(1) In addition to any annual report which the Corporation is required to submit to the Minister in terms of the Audit and Exchequer Act [Chapter 22:03], the Corporation—

(a)    shall submit to the Minister such other reports as the Minister may require;

(b)    may submit to the Minister such other reports as the Corporation may deem advisable;

in regard to the operations, undertakings and property of the Corporation.

(2) The Corporation shall give to the Minister all such information relating to the undertakings of the Corporation as the Minster may at any time require.

(3) The Minister may lay a report submitted to him by the Corporation in terms of subsection (1) before Parliament.

22    Powers of Corporation

Subject to this Act, the Corporation shall, for the better exercise of its functions, have power to do or cause to be done, either by itself or through its agents, all or any of the things specified in the Schedule, either absolutely or conditionally and either solely or jointly with others.

23    Principles to be observed by Corporation

It shall be the duty of the Corporation so to exercise—

(a)    that every application or proposal dealt with by it is considered strictly in accordance with Government economic policy;

(b)    that all matters relating to the mining industry are carefully reviewed in the national interest; and

(c)    that generally the activities of the Corporation referred to in section twenty are directed towards implementing Government mining development policy.

24    Appointment of general manager

(1) The Corporation—

(a)    shall appoint, subject to this Act and on such terms and conditions as the Board deems fit, a person approved by the Minister to be the general manager in whom, subject to the control of the Board, shall be vested the management of the operations. undertakings and property of the Corporation;

(b)    may, with the approval of the Minister, assign to the general manager such of the functions and powers of the Corporation as the Board deems fit.

(2) No person shall be appointed as general manager and no person shall be qualified to hold office as general manager if he is not a citizen of Zimbabwe permanently resident in Zimbabwe.

(3) The appointment of the general manager shall be terminated if he would be required in terms of paragraph (b) or (c) of section eight to vacate his office had that section and paragraphs (b) and (c) of section seven applied to him.

(4) The general manager of the Corporation shall have the right to attend meetings and take part in the proceedings of the Board as if he were a member but shall not have a vote on a question before the Board.

25    Minister may give Corporation directions in national interest

(1) The Minister may, after consultation with the Board, give to the Corporation such directions of a general character relating to the exercise by it of its functions, duties and powers as appear to the Minister to be requisite in the national interest.

(2) The Corporation shall, with all due expedition, comply with any direction given to it in terms of subsection (1).

PART IV

ISSUE OF SHARES AND DEBENTURES BY CORPORATION

26    Authorized share capital of Corporation

(1) The authorized share capital of the Corporation shall be one hundred and eighty million dollars divided into one hundred and eighty million shares of one dollar each.

(2) With the approval of the Minister and the Minister responsible for finance, the

Board may by resolution increase the authorized share capital of the Corporation.

(3) Where the Board has increased the authorized share capital of the Corporation in terms of subsection (1), the Minister shall cause the increase to be notified in the Gazette.

27      Allotment, issue and transfer of shares of Corporation

(1) Fifty-four million of the Corporation's shares shall be allotted to the State, subject to such terms and conditions as may be determined by the Minister and the Minister responsible for finance in consultation with the Board.

(2) Subject to subsection (5), the remainder of the Corporation's shares may be issued to the State and additionally, or alternatively, to persons other than the State, in such circumstances and subject to such terms and conditions as may be determined by the Board with the approval of the Minister and the Minister responsible for finance.

(3) Terms and conditions under which the Corporation's shares are allotted or issued to the State may include terms and conditions—

        (a)      for payment to be made out of moneys appropriated for the purpose by Act of Parliament; or

        (b)      after consultation with the Board, for the value of all or any of the shares to be set off against loans previously granted to the Corporation by the State; or

        (c)      for all or any of the shares to be allotted or issued in consideration for the writing off of loans previously granted to the Corporation by the State; or

        (d)      for all or any of the shares to be allotted or issued in consideration for capital grants previously made to the Corporation by the State.

(4) Subject to subsection (5), the Corporation's shares may be transferred by the holders subject to such terms and conditions as may be prescribed or as may be determined by the Minister and the Minister responsible for finance in consultation with the Board:

Provided that no fresh restrictions shall be imposed on the transferability of any share while it is held by a person other than the State.

(5) At all times at least fifty-one per centum of the Corporation's issued share capital shall be held by the State.

28      Liability of shareholders

The liability of the holder of a share issued by the Corporation shall be limited to the amount, if any, unpaid on the share.

29      Issue of debentures

(1) The Corporation may issue debentures, which may be taken up in such circumstances and under such terms and conditions as the Minister and the Minister responsible for finance may determine.

(2) Debentures may be issued by the Corporation to the State in respect of any loan previously granted by the State to the Corporation.

(3) Subject to subsection (2), debentures taken up by the State shall be paid for out of moneys appropriated for the purpose by Act of Parliament.

(4) The Corporation's debentures may be transferred subject to such terms and conditions as may be determined by the Minister and the Minister responsible for finance in consultation with the Board:

Provided that no fresh restrictions shall be imposed on the transferability of any debenture while it is held by a person other than the State.

PART V

FINANCIAL PROVISIONS RELATING TO CORPORATION

30      Conduct of financial affairs of Corporation

It shall be the object of the Corporation so to exercise its functions and conduct its

business as to ensure that in each financial year its income is sufficient—

     (a)     to meet the expenditure of the Corporation properly chargeable to revenue in that year; and

     (b)     to enable the Corporation to make provision for any taxes, duties or rates for which it is liable; and

     (c)     to permit the redemption on due date of the Corporation's debentures and other loan capital; and

     (d)     to enable the Corporation to make such appropriations to its general reserve in terms of section thirty-six as may be necessary or desirable; and

     (e)     to permit the payments referred to in section thirty-three;

and in general the Corporation shall conduct its business on sound commercial lines.

31     Capital of Corporation

The capital of the Corporation shall consist of—

     (a)     the share capital of the Corporation; and

     (b)     any other moneys or assets that may vest in or accrue to the Corporation as capital, whether in the course of its operations or otherwise.

32     Revenues of Corporation

The revenues of the Corporation shall consist of any moneys, other than moneys referred to in section thirty-one, that may accrue to the Corporation, whether in the course of its operations or otherwise.

33     Dividends

Where in a financial year the revenues of the Corporation are more than sufficient—

     (a)     to meet the expenditure of the Corporation properly chargeable to revenue in that year; and

     (b)     to enable the Corporation to make provision for any taxes, duties or rates for which it is liable; and

     (c)     to permit the redemption on due date of the Corporation's debentures and other loan capital; and

     (d)     to enable the Corporation to make such appropriations to its general reserve in terms of section thirty as are necessary or desirable;

the Corporation shall pay out of the surplus such dividends to its shareholders as the Board may determine in relation to that year.

34     Investments and loans by Corporation

(1) Moneys not immediately required by the Corporation may be invested in such manner as the Board may determine, subject to any directions given by the Minister acting on the advice of the Minister responsible for finance.

(2) Without derogation from subsection (1), the Board may and, if directed to do so by the Minister acting on the advice of the Minister responsible for finance, shall make loans out of the Corporation's revenues or accumulated revenues, to any statutory corporation, on such terms and conditions as may be approved by the Minister and the Minister responsible for finance.

35     Corporation to make certain charges to revenue account

(1) The Corporation shall charge to its revenue account all charges which, in the normal conduct of business, are regarded as proper to be charged to revenue account and, in so doing, shall make in each financial year proper provision for—

     (a)     the depreciation or diminution in value of assets; and

     (b)     the payment of interest on and all other charges and expenses incurred in connection with loans and debentures; and

     (c)     the redemption of loans at due times to the extent that such redemption exceeds provisions for depreciation.

(2) In charging to its revenue account all charges which in the normal conduct of

business are regarded as proper to be charged to revenue account as provided in subsection (1), the Corporation may, in each financial year, make provision for—

       (a)      meeting, in whole or in part, increases in the cost of replacing assets to an extent approved by the Minister, after consultation with the Minister responsible for finance;

       (b)      making payments to an insurance fund established by the Corporation to meet, in whole or in part, such liabilities of the Corporation as the Minister may approve;

       (c)      making payments to a pension fund established by the Corporation to meet, in whole or in part, superannuation liabilities of the Corporation.

36     Establishment and operation of general reserve

(1) The Corporation shall establish a general reserve to which, subject to this Part, may be appropriated from a surplus of income over expenditure at the end of its financial year such sums as the Minister may approve.

(2) Subject to this Part, moneys in the general reserve established in terms of subsection (1) may, with the approval of the Minister, be used for such purposes as the Board may consider expedient for the proper exercise by the Corporation of its functions including the development of its assets.

(3) The Board shall comply with any directions which the Minister may give in relation to the management of the general reserve established in terms of subsection (1).

(4) Moneys in the general reserve established in terms of subsection (1) shall not be reduced, without the approval of the Minister, below such an amount as the Minister may fix, otherwise than for the purpose of meeting a deficiency as is provided in subsection (1) of section thirty-seven.

37     Meeting of deficiencies

If in any financial year the income of the Corporation together with any surplus income brought forward from a previous financial year, is insufficient to enable the Corporation to meet the charges and to make the provisions required by section thirty-five, the deficiency shall, unless the Minister otherwise directs, be met from the general reserve established in terms of section thirty-six.

38     Financial year of Corporation

The financial year of the Corporation shall be the period of twelve months ending on the 30th June in each year or on such other date as may be prescribed.

39     Accounts of Corporation

(1) The Corporation shall keep proper accounts and other records relating thereto in respect of all its operations, undertakings and property, including such particular accounts and records as the Minister may direct.

(2) The Corporation shall prepare and submit to the Minister a statement of accounts in respect of each financial year or such period as the Minister may direct.

40     Audit of accounts of Corporation

(1) The Corporation shall appoint as auditors one or more persons approved by the Minister who are registered as public auditors in terms of the Public Accountants and Auditors Act [Chapter 27:12].

(2) The accounts of the Corporation kept in terms of subsection (1) of section thirty-nine shall be examined by the auditors appointed in terms of subsection (1).

(3) The auditors appointed in terms of subsection (1) shall make a report to the Board and the Minister on the statement of accounts prepared in terms of subsection (2) of section thirty-nine and such report shall state whether or not in their opinion the statement of accounts gives a true and fair view of the state of the financial affairs of the Corporation.

(4) In addition to the report referred to in subsection (3), the Minister may require the Board to obtain from the auditors appointed in terms of subsection (1) such other reports, statements or explanations in connexion with the operations, undertakings and property of the Corporation as the Minister may consider expedient.

(5) If, in the opinion of the auditors appointed in terms of subsection (1)—

      (a)      they have not obtained the information and explanations they require; or

      (b)      any accounts and records relating thereto have not been properly kept by the Corporation; or

      (c)      the Corporation has not complied with the provisions of this Part;

the auditors shall include in the report made in terms of subsection (3) or (4), as the case may be, statements to that effect.

41     Powers of auditors

(1) The auditors appointed in terms of subsection (1) of section forty shall be entitled at all reasonable times to require to be produced to them all accounts and other records relating thereto kept by the Corporation or its agents and to require from any member or person employed by the Corporation or its agents such information and explanations as in their opinion are necessary for the purposes their audit.

(2) Any member or employee or agent of the Board who fails without just cause to comply with a requirement of an auditor in terms of subsection (1) shall be guilty of an offence and liable to a fine not exceeding level four or imprisonment for a period not exceeding three months or to both such fine and such imprisonment.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

PART VI

GENERAL

42     Investigation into affairs of Corporation

(1) The Minister may at any time cause an investigation to be made into the affairs of the Corporation by one or more persons appointed b him in writing.

(2) Any person appointed in terms of subsection (1) shall have the same powers as are conferred Upon a commissioner by the Commissions of Inquiry Act [Chapter 10:07], other than the power to order a person to be detained in custody, and sections 9 to 13 and 15 to 19 of that Act shall apply, mutatis mutandis, in relation to an investigation made in terms of subsection (1) and to any person summoned to give or giving evidence at that investigation.

43     Proceedings on failure of general manager, Board or Corporation to comply with Act

(1) If at any time the Minister is satisfied that the general manager of the Corporation, the Board or the Corporation has failed to comply with the provisions of this Act, he may, by notice in writing, require the general manager, the Board or the Corporation, as the case may be, to make good the default within a specified time.

(2) If the general manager, the Board or the Corporation fails to comply with a notice issued in terms of subsection (1), the Minister may apply to the High Court for an order compelling the general manager, the Board or the Corporation, as the case may be, to remedy the default and the High Court may make such order on the application as it thinks fit.

44     Regulations

(1) The Minister may, after consultation with the Board, make regulations prescribing anything which in terms of this Act is to be prescribed or which, in his opinion is necessary or convenient to be prescribed for carrying out or giving effect to the provisions of this Act.

(2) Regulations made in terms of subsection (1) may provide for—

(a)      the reduction of the share capital of the Corporation;

(b)      the application, subject to such modifications as may be specified, of any of the provisions of the Companies Act [Chapter 24:03] in relation to the Corporation's shares and debentures.

(3) Regulations shall not be made in terms of subsection (1) in relation to the Corporation's shares and debentures without the approval of the Minister responsible for finance.

SCHEDULE (Section 22)

POWERS OF CORPORATION

1.      To acquire premises necessary or convenient for the exercise of its functions and the performance of its duties and for that purpose to buy, take on lease or in exchange, hire or otherwise acquire immovable property and interests therein and rights over the same and concessions, grants, rights, powers and privileges in respect thereof.

2.      To buy, take in exchange, hire or otherwise acquire movable property necessary or convenient for the exercise of its functions and the performance of its duties.

3.      To maintain, alter or improve property acquired by it.

4.      To mortgage any assets or part of any assets and, with the approval of the Minister, to sell, exchange, lease, dispose of, turn to account or otherwise deal with any assets or part of any assets which are not required for the exercise of its functions or the performance of its duties for such consideration as it may determine.

5.      To draw, make, accept, endorse, discount, execute and issue for the purposes of its functions or duties promissory notes, bills of exchange, bills of lading, securities and other negotiable or transferable instruments.

6.      To insure against losses, damages, risks and liabilities which it may incur.

7.      To make contracts and enter into suretyships or give guarantees in connexion with the exercise of its functions or the performance of its duties and to modify or rescind such contracts or rescind such suretyships or guarantees.

8.      With the approval of the Minister, to enter into, renew, cancel or abandon arrangements with any Government or authority, local or otherwise, that may seem conducive to the exercise of its functions or the performance of its duties or any of them and to obtain from such Government or authority rights, privileges and concessions which it thinks desirable to obtain and carry out, exercise and comply with such arrangements, rights, privileges and concessions.

9.      With the approval of the Minister and the Minister responsible for finance—

(a)      to raise loans or borrow money, by the issue of debentures or debenture stock or otherwise, in such amounts and for such purposes and under such conditions as may be approved by those Ministers;

(b)      to establish and administer such funds and reserves not specifically provided for in this Act as the Board may consider appropriate or necessary for the proper exercise of the functions and powers and discharge of the duties of the Corporation.

10.      To employ, upon such terms and conditions as the Board may deem fit, such persons, as may be necessary for conducting the affairs of the Corporation and suspend or discharge any such persons.

11.      To pay such remuneration and allowances and grant such leave of absence and, with the approval of the Minister, to make such gifts. bonuses and the like to its employees as it considers fit.

12.     To provide pecuniary benefits for its employees on their retirement, resignation, discharge or other termination of service or in the event of their sickness or injury and for their dependants, and for that purpose to effect policies of insurance, establish pension or provident funds or make such other provisions as may be necessary to secure for its employees and their dependants any or all of the pecuniary benefits to which the provisions of this paragraph relate.

13.     To purchase, take on lease or in exchange or otherwise acquire land or dwelling houses for use or occupation by its employees.

14.     To construct dwellings, outbuildings or improvements for use or occupation by its employees on land purchased, taken on lease or in exchange or otherwise acquired by the Corporation.

15.     To sell or lease dwelling-houses and land for residential purposes to its employees.

16.     To make or guarantee loans made to its employees or their spouses for the purchase of dwelling-houses or land for residential purposes, the construction of dwelling-houses and the improvement of dwelling-houses or land which are the property of its employees or their spouses.

17.     To provide security in respect of loans such as are described in paragraph 16 by the deposit of securities, in which the Corporation may invest such moneys as the Board may deem necessary for the purpose.

18.     To make loans to any employee of the Corporation—

(a)     for the purpose of purchasing vehicles, tools or other equipment to be used by him in carrying out his duties; or

(b)     not exceeding three months' salary or wages payable to him, for any purpose;

on such security as the Board considers adequate.

19.     To do anything for the purpose of improving the skill. knowledge or usefulness of its employees, and in that connexion to provide or assist other persons in providing facilities for training, education and research.

20.     With the approval of the Minister, to promote, establish or acquire companies or other undertakings and, in connexion with any such company or other undertaking—

(a)     to manage it and to act as secretary thereof;

(b)     to appoint any person to act on behalf of the Corporation as a director thereof or in any other capacity in relation thereto.

21.     With the approval of the Minister, to acquire an interest in, to provide by underwriting or otherwise or to assist in the subscription of capital for or to guarantee the obligations of a company, whether promoted by the Corporation or otherwise, engaged in or proposing to establish, expand or modernize any undertaking relating to the production, refining, smelting or processing of minerals.

22.     To recommend to the Minister that any property be acquired for development or utilization in the national interest for mining purposes.

23.     With the approval of the Minister and the Minister responsible for finance—

(a)     to provide financial assistance to any institution or person whose activities or part of whose activities are such as to be, in the opinion of the Board, of benefit to the Corporation or to the mining industry or any part or that industry;

(b)     to grant such scholarships or bursaries as the Board considers to be in the interest of the mining industry as a whole or any part thereof;

on such terms and conditions as the Board may fix in any particular case.

24.     With the approval of the Minister, to engage in, establish, operate or manage schemes for—

(a)      the training of persons engaged or to be engaged in any part of the mining industry;

(b)     mining or mineral research;

(c)     the refining, smelting or other processing of minerals.

25.     To do anything which by this Act is required or permitted to be done by the Corporation.

26.     To associate with, participate in or enter into joint or other ventures with individuals, associations or other bodies or corporations in the development of the mining industry in Zimbabwe.

27.     Generally to do all such things as are calculated to facilitate or are incidental or conducive to the performance of the functions of the Corporation or the exercise of its powers in terms of this Act or any other enactment.

**Go To Top Page**                                        **NEXT  CHAPTER**

# Exhibit C

**TITLE   21**

Chapter 21:05                                        <u>PREVIOUS  CHAPTER</u>

MINES AND MINERALS ACT

Acts 38/1961, 24/1962 (s. 2), 18/1963 (s. 24), 19/1963 (s. 12), 7/1964, 22/1964 (s. 54), 10/1966, 9/1967 (s. 17), 30/1968 (s. 38), 17/1969, 61/1969, 80/1971 (s. 33), 39/1973 (s. 52), 46/1973, 15/1975, 22/1976, 41/1976, 42/1976 (s. 10), 48/1976, 7/1978, 8/1978, 41/1978 (s. 12), 15/1979, 32/1979, 37/1979, 29/1981, 20/1982, 26/1987, 8/1988, 9/1990, 14/1991, 3/1992, 22/1992 (s. 9), 10/1993, 10/1994, 9/1997 (s. 10), 12/1997 (s. 15), 22/2001; R.G.N.s 153/1963, 801/1963, 214/1964, 386/1964, 216/1970, 217/1970, 313/1970, 88/1974, 1135/1975.

ARRANGEMENT OF SECTIONS

PART I

PRELIMINARY

Section

1.      Short title.
2.      Rights to minerals vested in President.
3.      Acquisition of mining rights.
4.      Savings.
5.      Interpretation.

PART II

ESTABLISHMENT AND FUNCTIONS OF MINING AFFAIRS BOARD

6.      Establishment and functions of Mining Affairs Board.
7.      Constitution of Board.
8.      Filling of vacancies.
9.      Remuneration of members of Board.
10.     Procedure of Board.
11.     Powers of Board in relation to applications.
12.     Witnesses may be examined on oath.
13.     Penalty for obstruction.

PART III

REGISTER OF APPROVED PROSPECTORS

14.     Register of Approved Prospectors.
15.     Application for registration as approved prospector.
16.     Expiry and renewal of registration.
17.     Cancellation or suspension of registration.
18.     Effect of expiry, cancellation or suspension of registration.
19.     Duplicate certificate of registration as an approved prospector.

PART IV

ACQUISITION AND REGISTRATION OF MINING RIGHTS

20.     Prospecting licences.
21.     Appointment of approved prospector as representative of holder of prospecting licence.
22.     Duplicate prospecting licence.
23.     Duration of prospecting licence.
24.     Holder of prospecting licence to be 18 or older.
25.     Sale of prospecting licence forbidden.
26.     Land open to prospecting.

27.  Rights of prospecting and pegging conferred by prospecting licence.
28.  Cancellation of certain rights to timber conferred by certain title deeds.
29.  Surface rights of holder of prospecting licence.
30.  Meaning of "land under cultivation" and "permanent improvements".
31.  Ground not open to prospecting.
32.  Disputes between landowners and prospectors.
33.  Registration of arable land.
34.  Roads and railways may be included in location under certain conditions.
35.  Reservations against prospecting and pegging.
36.  Reservation of timber on application by landowner.
37.  Reservation of timber on instruction of Minister.
38.  Notice of intention to prospect.
39.  Hours of pegging and posting notices.
40.  Manner in which notices to be posted.
41.  Prospecting notices.
42.  Discovery of minerals or precious stones.
43.  Pegging of precious metal, precious stones or base mineral blocks.
44.  Registration notices.
45.  Registration of blocks.
46.  Numbering of locations.
47.  Pegging of sites.
48.  Registration of sites.
49.  Sites to be attached to location.
50.  Cancellation of certificate of registration.
51.  Beaconing of locations.
52.  Survey for excess areas.
53.  Excess areas lawfully pegged.
54.  Excess areas not lawfully pegged.
55.  Determination of number of claims in block.
56.  Re-adjustment of internal beacons of groups of base mineral locations.
57.  Wilful overpegging.
58.  Impeachment of title, when barred.
59.  Lost certificates of registration.
60.  Address to be given to mining commissioner.
61.  Obligations of partnerships and companies.
62.  Cancellation of certificate of registration without abandonment.
PART V
PROSPECTING AND PEGGING ON GROUND RESERVED AGAINST PROSPECTING AND PEGGING
63.  Interpretation in Part V.
64.  Application for authority to prospect on reserved ground.
65.  Procedure on provisional approval.
66.  Grant or refusal of application.
67.  Board's powers in regard to application for authority to prospect.
68.  Extension and amendment of authority granted under section 67.
69.  Board may authorize more extensive prospecting operations.
70.  Extension and amendment of authority granted under section 69.
71.  Holder of authority may apply for order.
72.  Grant or refusal of order by Administrative Court.
73.  Appeals.

74.    Persons to whom copies of order to be sent.
75.    Authority or order may not be ceded.
76.    Rights of holders of authorities and orders.
77.    Revocation of authority or order.
78.    Approval of transfer of mining location.
79.    Forfeiture of mining location.
80.    Compensation.
81.    Withdrawal of reservation.
82.    Compulsory acquisition of land by holder of an authority or order.
83.    Factors to be considered in fixing price.
84.    Relinquishment of rights under an authority or order.
85.    Board's authority required for acquisition of mining title in certain circumstances.

PART VI

EXCLUSIVE PROSPECTING RESERVATIONS

86.    Interpretation in Part VI.
87.    Application for order.
88.    Hearing of application by Board.
89.    Board's recommendation in respect of application.
90.    President may approve or refuse order.
91.    Issue of order.
92.    Rights granted under order may not be ceded.
93.    Limitation of area of reservation.
94.    Duration of order.
95.    Challenge of validity of order, when barred.
96.    Submission of programmes of work.
97.    Deposit by concession holder in respect of longer period.
98.    Powers of Board in regard to programmes.
99.    Failure to submit programme.
100.    Report by concession holder on work carried out.
101.    Failure to complete programme.
102.    Failure to submit report.
103.    Rights of concession holders.
104.    Cutting and transporting of timber.
105.    Approved prospector to be in charge of all operations.
106.    Concession holder's rights limited in certain cases.
107.    Rights of holder of existing location unaffected.
108.    Demarcation of reservation.
109.    Performance of conditions of order.
110.    Increase of reservation.
111.    Inclusion of additional minerals in order.
112.    Abandonment of reservation.
113.    Disposal of deposits.
114.    Compensation for interference with registered mining location.
115.    Concession holder may expropriate dormant location.
116.    Plans and reports to be lodged by concession holder.
117.    Dangerous workings.
118.    Withdrawal of reservation made by mining commissioner.
119.    Order granting relief from provisions of this Part in certain circumstances.

PART VII

PEGGING OF UNDERGROUND EXTENSIONS
120.    Interpretation in Part VII.
121.    Application for order.
122.    Procedure on provisional approval.
123.    Grant or refusal of application.
124.    Board to be satisfied on certain points.
125.    Publication of order.
126.    Rights of applicant.
127.    Order may not be ceded.
128.    Approval of transfer of underground extension block.
129.    Forfeiture of underground extension block.
130.    Indicatory beacons.
131.    Surface rights abrogated.
132.    Secondary reefs.
133.    Compensation.
134.    Conversion of underground extension block.
PART VIII
MINING LEASES
135.    Application for mining lease.
136.    Reservation of ground by mining commissioner.
137.    Submission of application for provisional approval by Board.
138.    Notice of application to be published in Gazette.
139.    Determination of objections.
140.    Transmission of objections to Administrative Court.
141.    Submission of application to Board.
142.    Consideration of application by Board.
143.    Notice to applicant of Board's decision.
144.    Submission of amended survey plan.
145.    Issue of mining lease.
146.    Registers of mining leases.
147.    Withdrawal of reservation.
148.    Second or subsequent applications.
149.    Approval of transfer of mining lease.
150.    Mining rights of holder of mining lease.
151.    Beaconing of mining lease area.
152.    Cancellation of certificates of registration.
153.    No impeachment of title to mining leases.
154.    Increase of area of mining lease.
155.    Abandonment of portion of mining lease.
156.    Total abandonment of mining lease.
157.    Failure to comply with terms and conditions of mining
PART IX
SPECIAL MINING LEASES
158.    Interpretation in Part IX.
159.    Application for special mining lease.
160.    Application of certain provisions of Part VIII to special mining leases.
161.    Recommendation that application be granted in part.
162.    Forwarding of application to Minister and President.
163.    Issue of special mining lease.
164.    Terms and conditions of special mining lease.
165.    Application of further provisions of Part VIII to special mining leases.

166.   Issue of mining lease instead of special mining lease.
167.   Agreement re issue of special mining lease.
168.   Applications of other provisions of this Act relating to mining leases.

PART X

RIGHTS OF CLAIM HOLDERS AND LANDOWNERS

169.   Precious metal reef claims; mining rights within vertical limits.
170.   Pegging of secondary reef.
171.   Precious metal reef claims: extra-lateral mining right.
172.   Mining rights: other than precious metal claims.
173.   Conversion of blocks.
174.   Provisions concerning conversion of blocks.
175.   Amendment of registration certificates of base mineral blocks.
176.   Sites: mining rights.
177.   Priority of mining rights.
178.   Surface rights of miners.
179.   Saving of rights of landowner over mining location.
180.   Approval of scheme to cultivate surface of mining location.
181.   Termination of scheme by miner.
182.   Termination of scheme by consent.
183.   Board may cancel scheme.
184.   Resumption of rights by miner.
185.   Termination of scheme on forfeiture or abandonment of location.
186.   Scheme to bind successors in title.
187.   Inspection certificates and payments to landowners during period of agreement.
188.   Payments to landowners.
189.   Miner to fence mining location adjacent to pasture land.
190.   Trading on mining locations.
191.   Agreement as to use of private water.
192.   Registration of agreement.
193.   Right of miner to private water on State land.
194.   Public water.
195.   Subterranean water and storm-water.
196.   Owner or occupier of land may appoint agent.

PART XI

PRESERVATION OF MINING RIGHTS

197.   First inspection certificates.
198.   Second inspection certificates.
199.   Subsequent inspection certificates, etc.
200.   Particulars to accompany application for inspection certificates.
201.   Mining commissioner may order inspection of development work.
202.   Issue of inspection certificate.
203.   Work defined.
204.   Period within which work to be executed.
205.   Amount of work required to obtain inspection certificates for blocks pegged under ordinary prospecting licences.
206.   Inspection by survey.
207.   When development work not required for precious metal claims.
208.   Development work defined.
209.   Cleaning out, restoration and other work may be used under certain conditions.

210. Conditions for inspection by production.
211. Conditions for inspection by capital expenditure.
212. Inspection certificates for base mineral blocks obtainable by payment.
213. Extra work certificates.
214. Availability of extra work certificates.
215. Work executed by option holders or tributors.
216. Filing of extra work certificates.
217. Protection certificates for blocks.
218. Precious stones blocks to be worked continuously.
219. Alluvial, eluvial, rubble deposit and dump precious metal claims to be worked continuously.
220. Unutilized dumps.
221. Amount of work required and fees payable to obtain inspection certificates for mining leases.

PART XII

WORKING OF ALLUVIAL, ELUVIAL AND CERTAIN OTHER DEPOSITS

222. Control of working of alluvial or eluvial deposits of designated minerals.
223. Application for order controlling working of such deposits.
224. Application for order in respect of certain other deposits or reefs.
225. Board may make order.
226. Board may amend order.
227. Appeal to Administrative Court.
228. Order binding on all miners.
229. Enforcement of this Part.
230. Cancellation of rights under order.
231. Evidence of order.
232. Special payments to landowners.

PART XIII

CONTROL OF SITING OF WORKS ON MINING LOCATIONS

233. Interpretation in Part XIII.
234. Approved plan required prior to erection of certain works.
235. Particulars to be shown on plan.
236. Procedure on receipt of plan.
237. Approval of plan.
238. Amendment of plan.
239. When works may be erected or constructed without approved plan.
240. Mining commissioner may order removal of unauthorized works.
241. Re-siting of existing roads.
242. Approved plan to be binding on successors in title.

PART XIV

ROYALTY

243. Application of Part XIV.
244. Royalty.
245. Fixing of royalty.
246. Meaning of "property".
247. Beneficiation plant.
248. Dump may be unit for royalty purposes.
249. Exemption of royalty when ore extracted for experimental purposes.
250. Acquisition or removal of ore, etc., to be declared.
251. Monthly returns and payment of royalty.

252. Inspection of books and records, etc.
253. Prohibition of disposal of minerals when royalty or returns, etc., have not been lodged.
254. Remission of royalty.

PART XV

PAYMENTS OF LOCAL AUTHORITIES

255. Miners to make certain payments to local authorities.
256. Certain dumps to constitute separate mining locations.
257. Remission or exemption from liability to make payments.

PART XVI

ABANDONMENT AND FORFEITURE

258. Abandonment of unregistered locations.
259. Abandonment of registered blocks or sites.
260. Forfeiture for failure to obtain inspection certificate for block.
261. Forfeiture of alluvial, eluvial, rubble deposit or dump precious metal claims.
262. Forfeiture of precious stones blocks.
263. Forfeiture of mining leases.
264. Forfeiture of sites.
265. Forfeiture of mining locations.
266. Locations belonging to estate of deceased persons: special conditions as to forfeiture.
267. Removal of buildings and machinery from abandoned, forfeited or cancelled location.
268. Removal of beacons from abandoned or forfeited locations.
269. Open workings to be protected on abandonment, forfeiture or cancellation of location.
270. Removal of or interference with protective works prohibited.
271. Mining commissioner may declare location to be forfeited.
272. Relocation of abandoned, forfeited or cancelled locations and reinstatement of forfeited locations.
273. Mine plans to be lodged on abandonment or closing down.

PART XVII

REGISTRATION OF TRANSFERS, HYPOTHECATIONS, OPTIONS, TRIBUTE AGREEMENTS AND CONDITIONS GOVERNING MINING RIGHTS ON RESERVED GROUND

274. Interpretation in Part XVII.
275. Registration of transfer of mining locations and transfer duty payable.
276. Registration of hypothecation of mining location.
277. Hypothecation in respect of loans granted by the State.
278. Registration of options on mining locations.
279. Registration of hypothecation or option is bar to transfer.
280. Registration of tribute agreements.
281. Registration of conditions governing mining rights on reserved ground.
282. No tribute, sale or alienation of precious stones location without approval of Minister.

PART XVIII

APPROVAL OF TRIBUTE AGREEMENTS

283. Interpretation in Part XVIII.
284. Submission of tribute agreements for approval.

285.   Approval of tribute agreements by mining commissioner.
286.   Approval of tribute agreements by Board.
287.   Refusal of approval of or amendment of tribute agreements.
288.   Records of agreements.
289.   Penalty for acting under unapproved agreement.
290.   Prohibition of disposal of minerals.

PART XIX

SPECIAL GRANTS

291.   Issue of special grants.
292.   Register of special grants.
293.   Fee for special grant.
294.   Application of other provisions of this Act to special grants.
295.   Beaconing of special grant.
296.   Conversion of special grant to registered block.

PART XX

SPECIAL GRANTS FOR COAL, MINERAL OILS AND NATURAL GASES

297.   Interpretation in Part XX.
298.   Rights to mine coal, mineral oils or natural gases may only be acquired under special grant.
299.   Application for special grant.
300.   Consideration and report by Board on application for special grant.
301.   President may grant or refuse application for special grant.
302.   Rights under special grant personal to the grantee.
303.   Rate of royalty and annual fee.
304.   Amendment of area covered by special grant.
305.   Cancellation of special grant.
306.   Application of certain sections.
307.   This Part not to apply to certain blocks registered under Part XII of Cap.195 of 1939.

PART XXI

MINING ON TOWN LANDS

308.   Application of this Act to town lands.
309.   Local authorities may make by-laws on certain matters.
310.   Consent required for pegging of sites on town lands.
311.   Limitation of timber rights.
312.   Disposal of subterranean water.

PART XXII

ACQUISITION OF LAND BY HOLDERS OF MINING LEASES OR BY STATE

313.   Interpretation in Part XXII.
314.   Compulsory purchase or sale of private land covered by mining lease.
315.   Right of holder of mining lease to purchase State land.
316.   Compulsory purchase of land not covered by mining lease.
317.   Compulsory purchase of land covered by mining locations.
318.   Cost of survey to be borne by holder of mining location.

PART XXIII

EXPROPRIATION OF MINING LOCATIONS NOT BEING WORKED OR DEVELOPED

319.   Interpretation in Part XXIII.
320.   Report that mining location not being adequately worked.
321.   Board shall investigate why mining location is not being adequately developed or worked.

322.   Board may call upon holder to show cause why his mining location should not be expropriated.
323.   Recommendation for order of expropriation.
324.   Order of expropriation.
325.   Transfer of expropriated location.
326.   Part XI not to apply to expropriated location in certain respects.
327.   Sale of expropriated location.
328.   Disposal of expropriated location without consideration.
329.   Disposal of purchase price.
330.   Forfeiture of expropriated location.
331.   Part XI applies to expropriated location on transfer from Minister.
332.   Refund of deposit.
333.   Applicability of this Part.

PART XXIV
TERMINATION OF ENTITLEMENT TO SHARE IN ROYALTIES
334.   Interpretation in Part XXIV.
335.   President may terminate entitlement.
336.   President may refer question of compensation to judge.
337.   Procedure and powers of judge.
338.   No costs to be awarded.
339.   Powers of President on determination of compensation.
340.   Effect of declaration in terms of this Part.

PART XXV
ADMINISTRATION OF ACT
341.   Administration of Ministry.
342.   Declaration of mining districts.
343.   Appointment of officers.
344.   Mining commissioner's powers to take oaths.
345.   Jurisdiction of High Court and mining commissioners.
346.   Judicial powers of mining commissioners.
347.   Summons and commencement of proceedings before mining commissioner.
348.   Summary hearing of complaints.
349.   Mining commissioner may amend summons.
350.   Mining commissioner to keep register of his decisions.
351.   Writs of execution.
352.   Mining commissioner may direct surveys for purposes of trial of case.
353.   Mining commissioner's powers when encroachment alleged.
354.   Mining commissioner may grant injunctions.
355.   How mining commissioner's orders to be served.
356.   When mining commissioner may permit working of locations under injunctions.
357.   Mining commissioner may authorize certain works.
358.   How acts ordered by mining commissioner to be performed.
359.   Penalty for contempt of mining commissioner's court.
360.   Magistrates court procedure to be observed in mining commissioner's court.
361.   Appeal from mining commissioner's court to High Court.
362.   Magistrates may hear and decide matters in certain circumstances.
363.   Claim holders must point out boundaries of their locations.
364.   Prohibition of use of patented metallurgical process, etc.

365.   Disabilities of officials.
366.   Mining commissioner may sue for and have hypothec for amounts due.
367.   Indemnity of officials.
PART XXVI
OFFENCES AND PENALTIES
368.   Prospecting prohibited save in certain circumstances.
369.   Production of authority to prospect.
370.   Protection of open workings by prospectors.
371.   Duties of absentee prospector.
372.   Illegal pegging.
373.   Illegal cutting of wood.
374.   Interference with fences.
375.   Beacons and pegs to be maintained in good order.
376.   Position of beacons and pegs may not be altered.
377.   Mining permitted under certain objects on certain conditions.
378.   Salting.
379.   Theft of ore.
380.   Fraudulent acts.
381.   Eviction of squatters.
382.   Returns to be furnished.
383.   False declarations and certificates.
384.   Dams or reservoirs to be left intact.
385.   Plans of mines to be confidential.
386.   Mining commissioner's powers of entry upon locations.
387.   Geological survey.
388.   Obstruction of officials.
389.   Payment of fine without appearing in court.
390.   Penalty for mining secondary reef prior to pegging and registration.
391.   Discovery of precious stones to be notified.
392.   . . . . . .
[repealed by Act 22 of 2001, with effect from the 20th May,2002.]
PART XXVII
MISCELLANEOUS
393.   Application of Cap. 20:10.
394.   Submission of geological information.
395.   Site rent.
396.   Cash reward for new discovery of certain minerals.
397.   Land surveyors to be subject to provisions of Cap. 20:12.
398.   Expropriation of locations for public purposes.
399.   Cancellation of mining rights.
400.   Cancellation of mining rights in certain circumstances.
401.   Minister may order holder of mining location to transfer it.
402.   Training instructions.
403.   Regulations.
404.   Saving of powers of Administrative Court.
405.   Mining of limestone for agricultural operations.
406.   District advisory boards.
407.   Saving of existing rights.
SCHEDULE: Grading of Development Work.
AN ACT to consolidate and amend the law relating to mines and minerals.

[Date of commencement: 1st November, 1961.]

PART I

PRELIMINARY

1        Short title

This Act may be cited as the Mines and Minerals Act. [Chapter 21:05].

2        Rights to minerals vested in President

The dominium in and the right of searching and mining for and disposing of all minerals, mineral oils and natural gases, notwithstanding the dominium or right which any person may possess in and to the soil on or under which such minerals, mineral oils and natural gases are found or situated, is vested in the President, subject to this Act.

3        Acquisition of mining rights

Except where otherwise provided under any title deed to land granted prior to the 1st November, 1961, rights can be acquired in the manner hereinafter in this Act set out and in such manner only to all minerals, mineral oils and natural gases.

4        Savings

(1) Every prospecting licence, mining location or other mining right whatsoever legally acquired before the 1st November, 1961, and legally held at that date, and every special grant made before that date and legally held at that date, is hereby confirmed, but shall from and after that date be held under and subject to this Act:

Provided that—

        (i)        in the case of a prospecting licence, such licence shall be valid until and inclusive of the 1st November, 1963;

        (ii)        whenever, prior to the promulgation of the Mines and Minerals Ordinance, 1895, any mining location had been registered without a discovery point being established and a discovery notice posted, or whenever, prior to the promulgation of the Mines and Minerals Ordinance, 1903, any mining location had been registered and the discovery reef thereof is unascertainable from the documents in the possession of the mining commissioner, or cannot otherwise be proved, the expression "discovery reef", in relation to such location, shall mean the main or principal reef discovered, exposed or opened up in such location;

        (iii)        whenever the width of any mining location has been extended under the Mining Laws Defining Regulations, 1896, the date of acquisition of title to such extended width shall, if the ground covered by such extended width was open to prospecting at the time when such extended width was pegged, be deemed to be the same as the date of acquisition of title to such mining location;

        (iv)        in the case of an exclusive prospecting order, the terms and conditions thereof, including the conditions prescribed in the Mines and Minerals Act, 1951 (No. 18 of 1951), for an extension or renewal of the order, shall continue in force, notwithstanding anything contained in this Act which is contrary to or inconsistent with such terms or conditions, as though the laws repealed by this Act had not been so repealed.

(2) With effect from the 7th December, 1979—

        (a)        Special Grants Nos. 6, dated the 10th December, 1901, and 82, dated the 29th October, 1925, as held by the Wankie Colliery Company Limited (hereinafter in this subsection called the company) immediately before the 7th December, 1979, shall be deemed to be special grants issued under Part XX in respect of the reduced concession area as defined in the Wankie Coalfield Act [Chapter 167 of 1974], and the company shall continue to exercise its rights thereunder subject to the terms and conditions of the special grants and to such provisions of this Act as are not inconsistent therewith:

(b)      coal mining lease No. 1, dated the 1st November, 1976, granted to the company in terms of the Wankie Coalfield Act [Chapter 167 of 1974], shall be deemed to be a special grant issued in terms of Part XX, and the provision in the mining lease for the payment of an annual rent being construed as a provision for the payment of an annual fee referred to in subsection (2) of section three hundred and three, and the company shall continue to exercise its rights thereunder accordingly.

5      Interpretation

(1) In this Act—

"alluvial deposit" means—

      (a)      in relation to precious stones, any deposit, either non-coherent or consolidated, of any geological age, which has been formed by the agency of water or wind;

      (b)      in relation to any other mineral, any accumulation of sand, gravel or clay deposited by surface-water containing valuable minerals;

"approved beneficiation plant" means a bank assay department, factory, refinery, smelter or treatment plant which has been declared to be an approved beneficiation plant in terms of section two hundred and forty-seven;

"approved cultivation scheme" means a scheme approved by the Board under section one hundred and eighty;

"approved prospector" means a person for the time being registered in the Register of Approved Prospectors;

"aqueduct" means any artificial work, appliance or structure, other than a pipeline, for the conveyance of water, wherever situated;

"arbitration" means arbitration in terms of the Arbitration Act [Chapter 7:02], for which purpose the parties to a dispute shall be deemed to have entered into a written agreement to submit the dispute to arbitration, the arbitrators to be one person appointed by each of the parties, together with a third person appointed by such arbitrators;

"base minerals" means all minerals and mineral substances, other than nuclear energy source material, precious metals, precious stones, mineral oils, natural gases and coal, and includes all such slimes, concentrates, slags, tailings and residues as are valuable and contain base minerals as hereinbefore defined;

"block" means a claim or a group of claims which may be registered in terms of this Act under one certificate of registration;

"Board" means the Mining Affairs Board established under Part II;

"Chamber of Mines of Zimbabwe" means the Chamber of Mines of Zimbabwe incorporated in terms of the Chamber of Mines of Zimbabwe Incorporation (Private) Act [Chapter 21:02];

"coal" means anthracite, bituminous coal, brown coal, oil shale and lignite;

"course of a reef" means a line on the surface marking the intersection of the centre of a reef with such surface and, in cases where the whole or any portion of a reef is situated below the surface of the ground, the course of such reef shall be ascertained by projecting vertically to the surface the various points at which the centre of such reef approaches nearest to the surface, when the various points thus obtained shall be deemed to constitute the course of such reef;

"dam" means any works permitting of the artificial storage or accumulation of water, together with the water and all land submerged at high flood-level;

"disposal", in relation to any mineral or mineral-bearing product, means the sale, donation or other alienation of such mineral or mineral-bearing product:

Provided that, where any mineral or mineral-bearing product is disposed of under an agreement in terms of which delivery of the mineral or mineral-bearing product is to

be effected—

      (a)     at some future date; or

      (b)     over a period of time;

the mineral or mineral-bearing product, as the case may be, shall be deemed to have been disposed of on the dispatch thereof or on the dispatch of each consignment thereof, as the case may be;

"dump" means any aggregate of rock fragments or tailings which contain valuable minerals and have been accumulated by mining on a mining location;

"eluvial deposit" means a residual concentration of minerals in the immediate vicinity of the outcrop of the vein or lode from which it is derived;

"exclusive prospecting order" means an order issued under Part VI;

"exclusive prospecting reservation" means the area embraced by an exclusive prospecting order;

"extra-lateral right" means the right of following a reef on its dip beyond the vertical limits of a block;

"holder", in relation to a registered mining location, means the person in whose name such location is registered with the mining commissioner or with the Board or with the Secretary and, in the case of a deceased person or of a company in liquidation, or of any person under a legal disability, means the executor, administrator, liquidator, trustee, tutor, curator or other person who has the administration or control of the property of the person in whose name such location is registered;

"holding", in relation to private land, means the whole area of land which is held by an owner under one title or one agreement with the State:

Provided that if the owner of a holding has leased any portion thereof to any other person under an agreement of lease which is registered in the Deeds Registry, such portion shall be deemed to be a separate holding;

"inspector of mines" means an inspector of mines appointed in terms of section three hundred and forty-three;

"land surveyor" means a land surveyor duly admitted to practise in Zimbabwe and, at the time of the performance by him of any acts under this Act in such capacity, entitled so to practise in Zimbabwe;

"mine" includes any place, excavation or working whereon, wherein or whereby any operation in connection with mining purposes is carried on;

"mine surveyor" means a person who possesses, at the time of the performance by him of any acts under this Act required or permitted to be performed by a mine surveyor, such qualifications as may from time to time be specified by the Minister by statutory instrument;

"miner" means the person actually carrying on the work of mining on any mining location, whether he is the holder or the lessee or assignee of the rights of such holder;

"mineral" means—

      (a)     any substance occurring naturally in or on the earth, which has been formed by or subjected to a geological process; and

      (b)     any substance declared to be a mineral in terms of paragraph (a) of subsection (3), to the extent of such declaration;

but does not include—

      (i)     except for the purposes of Part XX, mineral oils and natural gases; or

      (ii)     any substance declared not to be a mineral in terms of paragraph (b) of subsection (3), to the extent of such declaration;

"mining commissioner" means the mining commissioner of the mining district within which the land or claims concerned, as the context may require, are situated;

"mining district" means a mining district declared in terms of section three hundred and forty-two;

"mining lease" means a mining lease issued under Part VIII or the area covered by such a mining lease, as the context may require, and subject to section one hundred and sixty-eight, includes a special mining lease;

"mining location" means a defined area of ground in respect to which mining rights, or rights in connection with mining, have been acquired under this Act or which were acquired under any previous law relating to mines and minerals and which were held immediately before the 1st November, 1961;

"mining purposes" means the purpose of obtaining or extracting any mineral by any mode or method or any purpose directly or indirectly connected therewith or incidental thereto;

"Minister" means the Minister of Mines or any other Minister to whom the President may, from time to time, assign the administration of this Act;

"nuclear energy source material" means uranium or thorium or any other substance containing one or both of such elements in such concentrations as may be prescribed;

"occupier", in relation to land, means the person lawfully and actually using or possessing any land under and by virtue of any grant or agreement;

"ore" means all forms of minerals or mineral aggregates which in the abstract are of economic value;

"output" means—

(a)     in respect of precious stones, precious stones which have been recovered from any mining location;

(b)     in respect of any other mineral, ore which has been mined and reduced to a saleable form or which is in a saleable form on being mined;

"owner", as applied to land, means the registered owner of such land or any person lawfully holding land in accordance with any enactment or agreement with the State which entitles such person to obtain title thereto on the fulfilment by him of the conditions prescribed by such enactment or agreement and the duly authorized representative of any such person or, in the case of any portion of Communal Land, the occupier of such portion;

"peg" means—

(a)     an artificial post or rod, other than a metal peg, of a height of not less than one comma two metres above the ground and not less than one hundred millimetres in diameter or of such other dimensions as may be prescribed;

(b)     a metal peg of a height of not less than one comma two metres above the ground or such other height as may be prescribed and not less than ten millimetres in cross-section;

"placer deposit" means any form of mineral deposit which does not fall within the definitions of "reef", "dump", "alluvial deposit", "eluvial deposit" or "rubble deposit";

"point of departure" means any point at which the course of a reef crosses a boundary of a mining location;

"precious metals" means gold, silver, platinum and platinoid metals in an unmanufactured state, and includes all such slimes, concentrates, slags, tailings. residues and amalgams as are valuable and contain such precious metals;

"precious stones" means rough or uncut diamonds or emeralds or any substances which may, in terms of subsection (2), be declared to be precious stones for the purposes of this Act;

"primary purposes" means domestic purposes and the support of animal life;

"private land" means any land the ownership of which has by law, grant or title deed

become vested in any person, and includes any land held by any person under any enactment or agreement whereby such person is entitled to obtain from the State title thereto on the fulfilment by him of the conditions prescribed by such enactment or agreement;

"private water" bears the same meaning as in the Water Act [Chapter 20:22];

"prospecting licence" means an ordinary or a special prospecting licence taken out under section twenty;

"public water" bears the same meaning as in the Water Act [Chapter 20:22];

"quarry" means any place, excavation or working, other than a mining location, where any substance other than a mineral is obtained or extracted by means of quarrying operations;

"reef" means any form of ore deposit contained within defined boundaries occurring in the earth's crust that has been deposited in the enclosing country rocks, and includes a true fissure vein, contact vein, segregated vein, gash vein, bedded vein or metalliferous banket, and all such deposits as conform generically to the above classification and any bed of any mineral, such as ironstone or limestone, but does not include alluvial deposits, eluvial deposits, placer deposits, rubble deposits or coal;

"Register of Approved Prospectors" means the register established in terms of section fourteen;

"registered mine manager" means the person registered in terms of the regulations as the mine manager of the mining location concerned;

"registered mining location" means—

(a)     a mining location which has been registered under this Act or which was registered under any previous law relating to mines and minerals and was held immediately before the 1st November, 1961;

(b)     a mining lease or a special mining lease;

(c)     a special grant as defined in this section or a special grant issued under Part XX;

but does not include an exclusive prospecting reservation or a special grant to carry out prospecting operations;

"rubble deposit" means any natural deposit of rock fragments accumulated at or near the surface of the ground;

"Secretary" means the Secretary of the Ministry for which the Minister is responsible;

"special grant" means—

(a)     a special grant issued under Part XIX;

(b)     a special grant which was acquired before the 1st November, 1961, under any law relating to mines and minerals and which was held immediately before that date;

(c)     any mining right or any right in connection with mining which was acquired before the 1st September, 1935, and was registered in terms of section 86 of the Mines and Minerals Ordinance, 1903, and which was held immediately before the 1st November, 1961;

"special mining lease" means a special mining lease issued under Part IX or the area covered by such a special mining lease, as the context may require;

"specified", in relation to a mineral or mineral-bearing product, means specified in a notice made in terms of section two hundred and forty-seven;

"State land" means land the ownership of which is vested in the President, excluding Communal Land:

Provided that, for the purposes of sections twenty-six and twenty-nine, State land shall not include any land which is private land;

"strike" means a horizontal line drawn at right angles to the dip of a reef;

"town lands" means any land falling within—

(a)      the area in terms of the Urban Councils Act [Chapter 29:15] of any municipality or town or any local government area for which a local board has been established; or

(b)      any other area declared by the President, by statutory instrument, to be town lands for the purposes of this Act;

"well" means a shaft sunk for the express purpose of abstracting water and which is being used for the abstraction of water.

(2) The Minister may, by statutory instrument, declare any substance to be precious stones for the purposes of this Act.

(3) The Minister may, by statutory instrument, declare that—

(a)      any naturally-occurring substance, which is obtained or extracted by mining or quarrying or by similar methods, shall be a mineral for the purposes of all or any of the provisions of this Act;

(b)      any substance referred to in paragraph (a) of the definition of "mineral" in subsection (1) shall not be a mineral for the purposes of all or any of this Act;

and may in like manner amend or revoke any such declaration.

PART II

ESTABLISHMENT AND FUNCTIONS OF MINING AFFAIRS BOARD

6        Establishment and functions of Mining Affairs Board

(1) There is hereby established a board to be known as the Mining Affairs Board which shall exercise and perform the powers, functions and duties conferred and imposed upon it by this Act and by any other enactment.

(2) The Board shall, in addition, perform such other functions and duties as may from time to time be required of it by the Minister.

7        Constitution of Board

(1) The Board shall consist of—

(a)      the Secretary or, in his absence, the Deputy Secretary of the Ministry responsible for mines, who shall be the chairman; and

(b)      an under secretary or, in his absence, an assistant secretary of the Ministry responsible for mines; and

(c)      the Chief Government Mining Engineer; and

(d)      the Director of Metallurgy; and

(e)      the Director of Geological Survey; and

( f )      six other members appointed in terms of subsection (3).

(2) A member appointed in terms of subsection (3) shall hold office for such period, not exceeding two years, as may be fixed in his case by the Minister and shall be eligible for re-appointment.

(3) Of the members appointed by the Minister—

(a)      four, of whom two shall be small-workers, shall be selected by the Minister from a panel of names submitted by the Chamber of Mines of Zimbabwe;

(b)      one shall be selected by the Minister from a panel of names submitted by the Commercial Farmers' Union of Zimbabwe;

(c)      one shall be a member of the Institute of Chartered Accountants of Zimbabwe who is publicly practising as a chartered accountant in terms of the Chartered Accountants Act [Chapter 27:02].

(4) The Chief Government Mining Engineer, the Director of Metallurgy and the Director of Geological Survey may each appoint another member of the Public Service, who is not a member of the Board, to be his alternate member on the Board, and such alternate member shall be entitled to attend and vote at any meeting of the

Board in the absence of the officer who appointed him.

(5) The Chamber of Mines of Zimbabwe and the Commercial Farmers' Union of Zimbabwe may nominate persons to be alternates to the members of the Board appointed by the Minister under paragraphs (a) and (b), respectively, of subsection (3) and each such person shall, if approved by the Minister, be an alternate member of the Board and shall be entitled to attend and vote at any meeting of the Board in the absence of the member to whom he is an alternate.

(6) If any body which is entitled to submit a panel of names in terms of subsection (3) for any cause whatsoever fails or neglects or refuses to submit such panel, it shall be lawful for the Minister to appoint to the Board any person as a member.

8       Filling of vacancies

(1) The office of a member of the Board, who is not a member of the Public Service, shall upon the declaration of the Minister be vacated—

    (a)    if his estate is sequestrated or assigned; or

    (b)    if he is absent from three consecutive meetings of the Board without the permission of the Board; or

    (c)    if he gives one month's notice in writing to the Minister of his intention to resign office and his resignation is accepted by the Minister; or

    (d)    if he is incapacitated by physical or mental illness or is otherwise unable or unfit to discharge the functions of a member; or

    (e)    if he is convicted of an offence and sentenced to imprisonment therefor without the option of a fine, whether such sentence is suspended or not.

(2) When a member's office is declared vacant, the Minister shall appoint a person, chosen as such member was chosen, to fill the vacancy.

(3) If any member of the Board, other than the chairman, is prevented by illness, absence from Zimbabwe or other specific cause from exercising his functions on the Board, the Minister may appoint any person to act for such member during his absence.

(4) If the chairman is prevented by illness, absence from Zimbabwe or other specific cause from exercising his functions on the Board, the Minister may appoint any person to act as chairman during his absence, and the person so appointed shall during the term of his appointment exercise all the powers and fulfil all the duties of the chairman.

(5) If a member of the Board is appointed to act as chairman, the Minister may appoint any person to act as a member of the Board during the period of the chairman's absence.

9       Remuneration of members of Board

The members of the Board shall be paid, out of moneys appropriated by Act of Parliament for the purpose, such remuneration or allowances or both as the Minister, after consultation with the Minister responsible for finance, may from time to time determine.

10      Procedure of Board

(1) The Board may meet together for the dispatch of business, adjourn and otherwise regulate its meetings and proceedings as it thinks fit.

(2) Seven members of the Board shall form a quorum at any meeting thereof.

(3) The chairman of the Board may himself at any time call a special meeting of the Board.

(4) The decision of the majority of the members of the Board present at any meeting shall constitute the decision of the Board:

Provided that in the event of an equality of votes at any such meeting the chairman at the meeting shall have a casting vote in addition to his deliberative vote.

(5) At all meetings of the Board the chairman or, in his absence, such member as the members present shall elect, shall act as chairman.

(6) No member of the Board shall vote upon or take part in a discussion if he has, directly or indirectly, any pecuniary interest in the matter before the Board.

11      Powers of Board in relation to applications

(1) In the exercise of its functions and duties the Board shall have power—

      (a)      to require any area of ground or mining location which is the subject matter of an application or an investigation to or by the Board to be examined by such person or persons as the Board may appoint for the purpose;

      (b)      to summon any applicant, the holder of any mining location, an owner of any land or any person having an interest in or knowledge of any matter before the Board to appear before the Board to give any evidence or explanations which the Board may require;

      (c)      to require the production of books, plans, accounts and other documents relating to any application or matter before the Board.

(2) Any person appointed under paragraph (a) of subsection (1) shall, if authorized by the Board, have power to take and remove samples of ore from the area of ground or mining location in question.

12      Witnesses may be examined on oath

(1) The Board may examine persons appearing before it on oath, which oath the chairman of the Board is hereby empowered to administer.

(2) Any person who, having been duly sworn, makes a false statement to the Board on any matter relevant to the inquiry, knowing the statement to be false or not having reasonable grounds for believing it to be true, shall be guilty of an offence and liable to a fine not exceeding level seven or to imprisonment for a period not exceeding two years or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(3) If any person summoned to give evidence or to produce books, plans, accounts and other documents fails to appear before the Board or fails to produce such books, plans, accounts and other documents to the Board, or refuses to be examined on oath or to answer any question, he shall be guilty of an offence and liable to a fine not exceeding level five or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

13      Penalty for obstruction

Any person who obstructs or hinders any person authorized by the Board in his examination of a mining location or other area of ground shall be guilty of an offence and liable to a fine not exceeding level five or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

PART III

REGISTER OF APPROVED PROSPECTORS

14      Register of Approved Prospectors

(1) The Secretary shall establish and maintain at the head office of the Ministry of Mines a register to be known as the Register of Approved Prospectors.

(2) There shall be entered in the Register of Approved Prospectors—

      (a)      the name of every approved prospector registered as such in terms of paragraph (a) of subsection (3) of section fifteen; and

      (b)      the area for which the approved prospector is registered in terms of subparagraph (i) of paragraph (a) of subsection (3) of section fifteen; and

      (c)      particulars of any renewal, cancellation or suspension of the

registration of such approved prospector; and

    (d)    such other particulars as the Secretary may deem necessary.

15    Application for registration as approved prospector

(1) A person who wishes to be registered as an approved prospector shall—

    (a)    make application in writing to a mining commissioner in the prescribed form; and

    (b)    submit therewith such photographs of himself as may be prescribed; and

    (c)    pay at the time of making such application the prescribed fee; and

    (d)    provide such other information as the mining commissioner may require:

Provided that a person who is not a permanent resident of Zimbabwe shall not be entitled to make any such application unless he has first obtained the prior written consent of the Secretary, and submits with his application such consent.

(2) On receipt of an application in terms of subsection (1) the mining commissioner shall satisfy himself as to the fitness of the applicant to be registered as an approved prospector, including the extent of the knowledge of the applicant of pegging procedures and of the rights and duties of prospectors and owners and occupiers of land under this Act, and shall then forward the application to the Secretary, together with his report and recommendation thereon.

(3) On receipt of an application, report and recommendation from the mining commissioner in terms of subsection (2) the Secretary may—

    (a)    if he is satisfied that no good cause to the contrary exists, grant the application, in which case he shall—

    (i)    register the applicant as an approved prospector; and

    (ii)    issue to him a numbered certificate of registration as an approved prospector which shall be in the prescribed form;

        or

    (b)    remit the application to the mining commissioner for further investigation, report and recommendation: or

    (c)    refuse the application, in which case the applicant shall be notified accordingly:

        Provided that before refusing an application the Secretary shall notify the applicant that he is considering refusing his application, informing him of the grounds therefor, and give him an opportunity to make written representations in connection therewith within twenty-one days after the date of such notification.

(4) An applicant whose application in terms of subsection (1) has been refused by the Secretary may, within twenty-one days after the date of notification of such refusal, appeal in writing, giving grounds, to the Minister who may—

    (a)    allow the appeal, in which case the Secretary shall proceed in accordance with paragraph (a) of subsection (3) as if he had originally granted the application; or

    (b)    dismiss the appeal, in which case the applicant shall be notified accordingly.

(5) An applicant whose appeal in terms of subsection (4) has been dismissed by the Minister may not make a fresh application in terms of subsection (1) until after the expiry of a period of five years from the date on which his appeal was dismissed or such lesser period as the Minister may specify when dismissing the appeal.

(6) No application in terms of subsection (1) shall be granted unless the applicant has attained the age of eighteen years.

16    Expiry and renewal of registration

(1) Subject to sections seventeen and eighteen, the registration of a person as an approved prospector shall be valid for a period of five years from the date of registration and then it shall automatically expire unless, prior to the expiry of such period, the registration is renewed for a further period of five years which shall be final.

(2) An approved prospector who wishes to renew his registration as such shall, not later than two months before his registration is due to expire in terms of subsection (1)—

      (a)     make written application to a mining commissioner on the prescribed form; and

      (b)     pay at the time of making such application the prescribed fee; and

      (c)     submit therewith his certificate of registration as an approved prospector.

(3) On receipt of an application in terms of subsection (2) the mining commissioner—

      (a)     shall issue the applicant with a temporary document which shall serve as his certificate of registration as an approved prospector during the remainder of the current period of registration; and

      (b)     may, and if so instructed by the Secretary shall, satisfy himself afresh as to the matters referred to in subsection (2) of section fifteen and shall forward the application, together with his report and recommendation thereon, to the Secretary.

(4) On receipt of an application, report and recommendation from the mining commissioner in terms of subsection (3) the Secretary may—

      (a)     if he is satisfied that no good cause to the contrary exists, renew the registration of the applicant for a further period of five years, endorse the certificate of registration accordingly and return it to the holder; or

      (b)     remit the application to the mining commissioner for further investigation, report and recommendation; or

      (c)     refuse the application, in which case the applicant shall be notified accordingly:

Provided that before refusing an application the Secretary shall notify the applicant that he is considering refusing his application, informing him of the grounds therefor, and give him an opportunity to make written representations in connection therewith within twenty-one days after the date of such notification.

(5) An applicant whose application in terms of subsection (1) has been refused by the Secretary may, within twenty-one days after the date of notification of such refusal, appeal in writing, giving grounds, to the Minister who may—

      (a)     allow the appeal, in which case the Secretary shall proceed in accordance with paragraph (a) of subsection (4) as if he had originally granted the application; or

      (b)     dismiss the appeal, in which case the applicant shall be notified accordingly.

(6) An applicant whose appeal in terms of subsection (5) has been dismissed by the Minister may not make a fresh application for registration as an approved prospector in terms of subsection (1) of section fifteen until after the expiry of a period of five years from the date on which his appeal was dismissed or such lesser period as the Minister may specify when dismissing the appeal.

17      Cancellation or suspension of registration

(1) The registration of a person as an approved prospector shall be cancelled or suspended by the Secretary on the direction of the Minister given in accordance with this section.

(2) If an approved prospector—

     (a)     is convicted of an offence, whether under this Act or otherwise; or

     (b)     has, in the exercise of any rights under this Act, conducted himself in a manner;

which, in the opinion of the Minister, renders it necessary to suspend or cancel his registration as an approved prospector, the Minister may direct the Secretary—

     (i)     to suspend his registration for a specified period which shall expire before the date on which that registration is in any event due to expire in terms of subsection (1) of section sixteen; or

     (ii)     to cancel his registration;

 as the case may be.

(3) Before giving a direction in terms of subsection (2) the Minister shall notify the approved prospector concerned that he is considering taking action in terms of that subsection, informing him of the grounds therefor, and give him an opportunity to make written representations in connection therewith within twenty-one days of the date of such notification.

(4) The cancellation or suspension of the registration of a person as an approved prospector in terms of this section shall be in addition to any other penalty which may be imposed under this Act or any other law.

(5) The Secretary shall give written notice to the approved prospector concerned of the cancellation or suspension of his registration in terms of this section and the period of suspension.

18     Effect of expiry, cancellation or suspension of registration

(1) A person whose registration as an approved prospector has expired in terms of section sixteen or has been cancelled or suspended in terms of section seventeen shall forthwith surrender to a mining commissioner his certificate of registration as an approved prospector.

(2) Where a certificate of registration as an approved prospector has been surrendered in terms of subsection (1) by reason of the suspension of the registration of the holder, such certificate shall be returned to the holder immediately on the expiry of the period of suspension.

(3) Until the period of suspension has expired a person whose registration as an approved prospector has been suspended in terms of section seventeen shall be deemed not to be registered as such.

(4) A person whose registration as an approved prospector has been cancelled in terms of section seventeen may not make a fresh application in terms of section fifteen for registration as an approved prospector until after the expiry of a period of five years from the date on which his registration was cancelled or such lesser period as the Minister may specify when directing the cancellation.

19     Duplicate certificate of registration as an approved prospector

(1) If an approved prospector has lost his certificate of registration or the certificate has been destroyed, he may apply to a mining commissioner for a duplicate copy thereof.

(2) On making an application referred to in subsection (1) the approved prospector shall—

     (a)     pay the prescribed fee; and

     (b)     furnish a solemn declaration in a form to be approved by the mining commissioner which shall state—

     (i)     the name of the holder of the certificate; and

     (ii)     the number of the certificate; and

     (iii)     that the certificate has been lost or destroyed; and

     (c)     submit such photographs as he would be required to submit if he were

making an application in terms of section fifteen.

(3) On receipt of an application complying with this section the mining commissioner shall forward the application and the solemn declaration to the Secretary who shall, if he is satisfied that no good cause to the contrary exists, issue a duplicate copy of the certificate endorsed as such and forward it to the applicant.

(4) A duplicate copy of a certificate issued in terms of this section shall be available for all purposes for which the original would have been available.

PART IV

ACQUISITION AND REGISTRATION OF MINING RIGHTS

20      Prospecting licences

(1) Subject to this section and section twenty-four, any person who is a permanent resident of Zimbabwe or any duly appointed agent of such person may take out at the office of any mining commissioner one or more prospecting licences on payment of the appropriate fee prescribed in respect of each such licence.

(2) On making application for a prospecting licence the applicant shall furnish to the mining commissioner his full name and permanent postal address, which shall appear on the licence issued to him, and such other information as the mining commissioner may require.

(3) The mining commissioner may refuse to issue a prospecting licence, but shall forthwith report each refusal to the Secretary.

(4) Upon receipt of a report in terms of subsection (3), the Secretary shall refer the report to the Minister and shall, if so instructed by the Minister, direct the mining commissioner to issue a prospecting licence.

21      Appointment of approved prospector as representative of holder of prospecting licence

(1) Any holder of a prospecting licence may, in writing under his hand, appoint an approved prospector to act as his representative under any prospecting licence already issued to him or under any prospecting licence which may thereafter be issued to him.

(2) A representative appointed in terms of subsection (1) shall act under a prospecting licence to which his appointment relates solely for the benefit of the holder of the licence.

(3) The rights conferred by this Act upon the holder of a prospecting licence—

        (a)      shall be exercised by the holder personally only if he is an approved prospector;

        (b)      shall, where the holder is not an approved prospector, be exercised only by a representative appointed by the holder in terms of subsection (1).

(4) Without prejudice to any right of the holder of a prospecting licence to cancel such an appointment, the appointment of a person as a representative in terms of subsection (1) shall automatically be terminated if the registration of that person as an approved prospector expires or is cancelled or suspended.

22      Duplicate prospecting licence

(1) If the holder of a prospecting licence has lost such licence, he may apply to any mining commissioner for a duplicate copy thereof.

(2) On such application he shall furnish a solemn declaration in a form to be approved by the mining commissioner which shall state—

        (a)      that the licence has been lost or destroyed; and

        (b)      from what mining commissioner's office he originally obtained the licence; and

        (c)      the number of the licence.

(3) On receipt of such application and such solemn declaration the mining commissioner shall make any necessary inquiries at the office from which the original

licence was obtained and shall, if he is satisfied that no good reason to the contrary exists, issue a duplicate copy of such licence to the applicant on payment of the prescribed fee for each such copy.

(4) A duplicate copy of a licence issued in terms of this section shall be available for all purposes for which the original would have been available.

23      Duration of prospecting licence

A prospecting licence shall be valid until and inclusive of the second anniversary of the date of issue thereof.

24      Holder of prospecting licence to be 18 or older

No person who is under the age of eighteen years shall hold any prospecting licence.

25      Sale of prospecting licence forbidden

(1) No person shall sell or otherwise dispose of any prospecting licence or certificate of registration as an approved prospector.

(2) Any sale or other disposition in terms of subsection (1) shall be void and the parties to such sale or other disposition shall be guilty of an offence level five or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

26      Land open to prospecting

Subject to the provisions and limitations contained in section thirty-one, the following land is open to prospecting—

        (a)      all State land and Communal Land;

        (b)      all private land in the title to which there has been reserved either to the British South Africa Company or to the Government of Zimbabwe the right to all minerals or the power to make grants of the right to prospect for minerals

        (c)      all land held by any person under any enactment or agreement whereby such person is entitled to obtain from the State title thereto on the fulfilment by him of the conditions prescribed by such enactment or agreement.

27      Rights of prospecting and pegging conferred by prospecting licence

(1) Subject to sections twenty-one and three hundred and sixty-eight, every holder of a prospecting licence shall be entitled to the following rights—

        (a)      the right, subject to the provisions and limitations hereinafter contained, of prospecting and searching for any minerals, mineral oils and natural gases on land open to prospecting, but not of removing or disposing of any mineral discovered save for the bona fide purpose of having it assayed or of determining the nature thereof or with the permission in writing of the mining commissioner;

        (b)      the right, subject to the provisions hereinafter contained, of pegging—

        (i)      one block of precious metal claims; or

        (ii)      one block of precious stones claims; or

        (iii)      one block of base mineral claims.

(2) No drilling or excavation work, whether at the surface or underground, shall be undertaken by the holder of a prospecting licence, save in the exercise of exclusive rights conferred on him by subsection (5) of section forty-one or subsection (2) of section forty-two.

(3) Any person who contravenes subsection (2) shall be guilty of an offence and liable to a fine not exceeding level five or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

28      Cancellation of certain rights to timber conferred by certain title deeds

Any condition in a title deed to any piece of land stating that all indigenous timber is reserved and may be cut free of charge by holders of mining locations or of

prospecting licences shall be regarded as pro non scripto and every right possessed by any such holder by virtue of such a condition shall cease with effect from the 1st November, 1961.

29      Surface rights of holder of prospecting licence

(1) In this section—

"location" means the area covered by the relevant prospecting notice and, where a discovery notice has also been posted, the area as extended by that discovery notice;

"private land" does not include Communal Land.

(2) The holder of a prospecting licence, hereinafter in this section called the prospector, shall, when bona fide employed in the pursuit of any of the rights conferred by section twenty-seven, the onus of proof whereof shall lie on him, be entitled to the following rights—

(a)      the right to take free of charge for primary purposes any public water or private water from land not closed to prospecting in terms of section thirty or thirty-five but only in so far as such taking does not interfere with the use of such water for primary purposes by the owner or occupier of the land;

(b)      after having posted his prospecting notice—

(i)      subject to the Forest Act [Chapter 19:05] and to such conditions as may be prescribed, and on payment to the occupier or, where there is no occupier, the owner of the land in advance of such tariff rate as may be prescribed, the right to take and use for firewood within the limits of his location any dead indigenous wood or timber found within those limits on land which is neither Communal Land nor land in regard to which a reservation has been made under section thirty-six or thirty-seven; and

(ii)      subject to this section, the right to erect within the limits of his location any temporary accommodation for himself and his employees and any temporary buildings or machinery for the purposes of his work:

Provided that this subparagraph shall not be deemed to confer any right, title or interest in the land upon which such accommodation, buildings or machinery may have been erected;

(c)      the right to remove, within ten days or such longer period as may be determined by the mining commissioner after the expiration of his prospecting notice, any accommodation, buildings or machinery which may have been erected under subparagraph (ii) of paragraph (b).

(3) A prospector who, after the expiry of the period of seven days from the posting of his prospecting notice, accommodates employees on occupied private land situated within his location shall forthwith give to the occupier of the land written notice of that fact describing the site of the accommodation.

(4) If an occupier of private land to whom notice has been given in terms of subsection (3) objects to the site chosen for such accommodation by the prospector and agreement between the occupier and the prospector on any such objection is not reached, the occupier may, within seven days of receipt of the notice or such longer period as may be determined by the mining commissioner, refer the matter to the mining commissioner to decide where the employees of the prospector should be accommodated and the decision of the mining commissioner shall be final and without appeal.

30      Meaning of "land under cultivation" and "permanent improvements"

For the purposes of section thirty-one—

"land under cultivation" means—

(a)      land which has been bona fide cleared or ploughed or prepared for the growing of farm crops;

(b)      ploughed land on which farm crops are growing;

(c)      ploughed land from which farm crops have been reaped, for a period of three years from the date of completion of such reaping;

(d)      land which has been bona fide prepared for the planting of such permanent crops as orchards or tree plantations, and land on which such crops have been planted and are being maintained;

(e)      ploughed land on which grass has been planted and maintained for harvesting, rotation of crops or stock feeding, for a period of six years from the date of planting:

Provided that if any land such as is described in paragraphs (a) and (d) is not utilized for the growing of farm crops or of such permanent crops as orchards or tree plantations within two years of its having been bona fide cleared or ploughed or prepared for such crops, such land shall forthwith become open to prospecting;

"permanent improvements" does not include fences of any description, aqueducts, pipelines, wells, boreholes, dams or reservoirs.

31      Ground not open to prospecting

(1) Save as provided in Parts V and VII, no person shall be entitled to exercise any of his rights under any prospecting licence or any special grant to carry out prospecting operations or any exclusive prospecting order—

(a)      upon any holding of private land except with the consent in writing of the owner or of some person duly authorized thereto by the owner or, in the case of a portion of Communal Land, by the occupier of such portion, or upon any State land except with the consent in writing of the President or of some person duly authorized thereto by the President—

(i)      within four hundred and fifty metres of the site of the principal homestead on such holding or on such State land, whether such homestead is already erected or actually in the course of erection;

(ii)      within four hundred and fifty metres of the site of any intended principal homestead, which site has been registered with the mining commissioner by the landowner:

Provided that if a principal homestead is not erected on such a site within three years after the date of such registration, such site shall thereupon become open to prospecting;

(iii)      within ninety metres of any area set aside on which housing constructed of brick or concrete has been erected for occupation by farm employees, if the total value of such housing is not less than five thousand dollars;

(iv)      within ninety metres of any other building or permanent improvement of a value of not less than five hundred dollars;

(v)      within ninety metres of any permanent cattle dip tank or spray race;

(vi)      upon any land under cultivation or within fifteen metres thereof;

(vii)      within nine metres of any other permanent bona fide farm building, except on payment to the landowner of such compensation as may be fixed by agreement or, failing agreement, by the Administrative Court to whom the matter shall be referred for decision;

(b)      upon any mining location, other than one in respect of which he may have acquired the exclusive right of prospecting under such licence or special grant or exclusive prospecting order;

(c)      within the surveyed limits of any city, town, township or village, or upon a belt fifty metres in width outside such limits;

(d)      upon any site which is on town lands, but outside the surveyed limits of any city, town, township orvillage situated thereon, and has been surveyed and set

aside for any specific purpose;

(e)     upon any licensed aerodrome or any emergency landing ground or aerodrome of the State;

( f )     upon any rifle range of the State, any railway reserve or any cemetery;

(g)     except with the consent in writing—

(i)     of the owner or of some person duly authorized thereto by the owner, upon any holding of land which does not exceed one hundred hectares in extent and which is held by such owner under one separate title:

Provided that if such owner has one or more holdings which are contiguous and the total area of such contiguous holdings exceeds one hundred hectares this paragraph shall not apply to such holdings; or

(ii)     in the case of a portion of Communal Land which does not exceed one hundred hectares in extent, of the occupier of such portion;

(iii)     where any consent in terms of this paragraph is unreasonably withheld, the Minister may authorize any person to exercise his rights under any prospecting licence or any special grant to carry, out prospecting operations or any exclusive prospecting order on such land, subject to such conditions as the Minister may impose;

(h)     upon any Communal Land occupied as a village without the written consent of the rural district council established for the area concerned.

(2) Where a site intended for a principal homestead has been registered by the landowner under subparagraph (ii) of paragraph (a) of subsection (1)—

(a)     the landowner shall as soon as may be after such registration erect a peg marking the centre of the site and bearing an inscription stating the purpose of such peg, and shall maintain such peg and maintain such inscription in legible form;

(b)     the landowner shall not, if such principal homestead has not been erected within the period of three years mentioned in the proviso to that subparagraph, be entitled again to register such site or any portion thereof until a period of not less than twelve months has elapsed from the date upon which such site again became open to prospecting.

(3) If a landowner fails to comply with any provisions of paragraph (a) of subsection (2), the mining commissioner may cancel the registration of the site to which such failure relates.

32     Disputes between landowners and prospectors

If any dispute arises between the holder of a prospecting licence or a special grant to prospect or an exclusive pro-specting order and a landowner or occupier of land as to whether land is open to prospecting or not, the matter shall be referred to the Administrative Court for decision.

33     Registration of arable land

(1) Every owner of a holding of private land, or any person who has acquired the right to obtain title to private land under an agreement of sale which has been notarially executed, may apply to the mining commissioner for the registration of the arable portion or portions of such land, not exceeding in all two hundred hectares in extent.

(2) Any arable land which, at the date of the application mentioned in subsection (1), is not open to prospecting and pegging by virtue of paragraph (a) of subsection (1) of section thirty-one shall be deducted from the area of two hundred hectares which may be registered in terms of this section.

(3) Every applicant shall submit with his application, made in terms of subsection (1), a plan of the holding showing the area or areas which he wishes to be registered, together with a certificate from such person as may be approved by the mining

commissioner confirming the situation and extent of such area or areas and of any other arable land and land under cultivation within such private land.

(4) Upon receipt of the plan and such certificate, referred to in subsection (3), the mining commissioner shall, if he is satisfied as to the title of the applicant and that the plan is satisfactory, register such land.

(5) Upon the registration of any land by the mining commissioner under this section, the land so registered shall, during the period of registration, be deemed to be land under cultivation for the purposes of section thirty-one.

(6) The person in whose favour registration has been granted under this section shall beacon the area or areas so registered in such manner as the mining commissioner may direct, and shall maintain the beacons in proper order and condition.

(7) If the person in whose favour registration has been granted under this section fails to beacon such area or areas or to maintain the beacons in proper order and condition, the mining commissioner may cancel the registration.

(8) The period of registration mentioned in subsection (5) shall terminate on the 31st August next succeeding the second anniversary of the date upon which the person upon whose application the registration was granted became the owner of the land so registered, or upon which such notarial agreement was executed, as the case may be:

Provided that the mining commissioner may on application extend the period of such registration for any period not exceeding three years.

(9) Any person who is aggrieved by the refusal of the mining commissioner to grant an extension of the period of registration may appeal against that decision to the Administrative Court.

34      Roads and railways may be included in location under certain conditions

(1) In this section—

"road " includes any area of land reserved for road purposes under Part III of the Roads Act [Chapter 13:12] and any restricted road declared under Part IV of that Act.

(2) Subject to this section and section three hundred and seventy-seven, the holder of a prospecting licence or of a special grant or of an exclusive prospecting order or of a mining lease, may include in his location any road, railway track, electric power line, aqueduct, pipeline, occupied dwelling, well, borehole, dam, reservoir or works designed to prevent soil erosion or any land reserved for the taking of road-making materials under section 24 of the Roads Act [Chapter 13:12].

(3) No person shall carry on prospecting or other mining or development operations upon any road, nor within fifteen metres of the middle of any road.

(4) No person shall carry on prospecting or other mining or development operations or erect any building for the purposes of a mining location upon any railway track, nor within forty-five metres of any railway track.

(5) No person shall hinder or impede the use of any road or railway track by mining operations.

(6) Notwithstanding anything in this Act relating to the erection and maintenance of pegs and beacons, no person shall erect any pegs or beacons of a mining location on any road or railway track, nor within fifteen metres of the middle of any road, nor within forty-five metres of any railway track, but in lieu thereof there shall be fixed such means of indicating the position of the location as shall be prescribed.

(7) No person shall carry on prospecting or other mining or development operations within twenty-five metres of any pipeline constructed of asbestos pipes exceeding thirty centimetres in diameter or five metres of any other pipeline, nor within ten metres of any occupied dwelling, nor within thirty metres of any aqueduct, well or borehole, nor within ninety metres of any dam or reservoir, without the consent of the owner of such work, and no person shall impair or interfere with any such work or

impede the use of such work by mining operations.

(8) No person shall carry on prospecting or other mining or development operations—

(a)    within ten metres of the centre line of an electric power line carrying 33kV or less; or

(b)    within twenty-five metres of the centre line of an electric power line carrying more than 33kV but not more than 132kV; or

(e)    within forty metres of the centre line of any electric power line carrying more than 132kV; or

(d)    within ten metres of a pole mounted transformer or ground mounted transformer with a capacity of less than 300kVA; or

(e)    within twenty-five metres of any other transformer or electricity substation or electrical equipment or building used for the transmission or distribution of electricity.

(9) No person shall carry on prospecting or other mining or development operations upon any land reserved for the taking of road-making materials under section 24 of the Roads Act [Chapter 13:12].

(10) The holder of any mining location which is pegged across any works designed to prevent soil erosion shall maintain such works in good condition, so that they continue to function for the purposes for which they were made:

Provided that this subsection shall not, during the period of an approved cultivation scheme, apply in respect of any mining location to which that scheme relates.

(11) Nothing in this section shall be deemed in any way to prejudice the right of any person to recover from the holder of a prospecting licence or of a mining location damages for any injury which he may prove to have been sustained by him in consequence of any act or thing done by such holder even though such holder has complied with this section.

35      Reservations against prospecting and pegging

(1) The mining commissioner may, and, if so instructed by the Secretary on the authority of the Minister, shall, reserve by notice posted at his office any area against prospecting and pegging, and all rights possessed by the holder of any prospecting licence or exclusive prospecting order to prospect for and peg minerals shall cease and may not be exercised within such area as from the date and hour of the posting of such notice or such later hour or later date and hour as may be specified in such notice:

Provided that the holder of a mining location, other than an exclusive prospecting reservation, within any such area shall retain and may exercise all rights lawfully held by him which existed at the date and hour as from which such notice takes effect in terms of this subsection.

(2) A reservation notice posted in terms of subsection (1) may specify that the reservation shall be for a specific period only:

Provided that nothing in this subsection shall be construed so as to prohibit the earlier withdrawal of the reservation in terms of this section.

(3) Where the mining commissioner has so reserved any area otherwise than on the instructions of the Secretary, he shall forthwith report the matter to the Secretary, who shall refer the matter to the Minister.

(4) If the Minister does not approve of such reservation, the Secretary shall instruct the mining commissioner to withdraw such reservation, and the mining commissioner shall forthwith comply with such instruction by posting a notice of withdrawal at his office.

(5) If the Minister approves of such reservation, the Secretary shall inform the mining

commissioner of such approval.

(6) Where a reservation has been made on the instructions of the Secretary or the Minister has approved of a reservation mentioned in subsection (3), such reservation shall be advertised by notice in the Gazette.

(7) Where the mining commissioner has made a reservation mentioned in subsection (3), he may before the approval thereof by the Minister, by notice posted at his office, withdraw such reservation and, where a reservation has been made on the instructions of the Secretary with the authority of the Minister or where a reservation referred to in subsection (3) has been approved by the Minister, he shall, if so instructed by the Secretary on the authority of the Minister, in like manner withdraw such reservation.

(8) A reservation may be withdrawn either in whole or in part.

(9) Every withdrawal of a reservation which has been advertised in the Gazette shall, likewise, be advertised by notice in the Gazette.

(10) The beaconing and demarcation of any area reserved under this section shall be carried out in such manner as the mining commissioner may direct.

(11) For all the purposes of this Act, every special reservation of any area against prospecting and pegging which was lawfully made by the Administrator, the Governor or a mining commissioner before the 1st November, 1961, and which was still in force immediately before that date, shall be deemed to be a reservation made by notice by the mining commissioner on the instructions of the Secretary under this section.

36      Reservation of timber on application by landowner

(1) Every owner or occupier of a holding of private land may apply for and shall be granted by the mining commissioner a reservation against the cutting or taking by prospectors or miners of fifty per centum of such indigenous wood or timber as is existing on his land at the time of his application for the reservation.

(2) A reservation of indigenous wood or timber made under subsection (1) shall not restrict prospecting or pegging or the working of mining locations on any such area.

(3) Any indigenous wood or timber within any area described in paragraph (a) of subsection (1) of section thirty-one shall be part of and be included in any timber reservation granted to such owner.

(4) The owner or occupier shall beacon and demarcate the area in which the wood or timber is reserved in such manner and within such time as the mining commissioner may direct.

(5) Where a reservation of timber has been granted under this section—

    (a)      the owner or occupier shall be entitled—

    (i)      to cut such wood or timber, and no more, outside the area of the reservation as may be necessary for the bona fide purposes of clearing or for the improvement of pastures;

    (ii)      to use the wood or timber so cut for his own purposes or to sell it to a prospector or miner or, with the consent of the mining commissioner, to sell it to any other person;

    (b)      a prospector or miner shall be entitled in the exercise of prospecting or mining rights in the area of the reservation—

    (i)      to cut such indigenous wood or timber, and no more, as interferes with prospecting or mining operations, development work or the erection of buildings for mining purposes:

        Provided that he shall stack or pile all wood or timber cut; and

    (ii)      with the consent of the owner, to use for his own purposes indigenous wood or timber cut in terms of subparagraph (i).

(6) Where a reservation of timber has been granted under this section and it appears

to the mining commissioner that a redistribution of the indigenous wood or timber on the land is necessary or desirable because the holding has been subdivided or for any other reason, he may cancel such reservation and grant a fresh reservation, and subsections (2), (3), (4) and (5) shall apply, mutatis mutandis.

(7) If any dispute arises as to the equal division of wood or timber under this section, the matter shall be referred to the Administrative Court for decision.

37      Reservation of timber on instruction of Minister

(1) The mining commissioner may, when authorized thereto by the Minister, reserve by notice posted at his office all indigenous wood and timber or any specified indigenous wood or timber on any area, and all rights conferred by this Act upon any holder of a prospecting licence or special grant or upon any holder of a mining location to cut or take such wood or timber shall cease and may not be exercised within such area as from the date and hour of the posting of the reservation notice, but any such reservation of wood or timber shall not restrict prospecting or pegging within such area or the cutting of wood or timber which interferes with prospecting or mining operations.

(2) The beaconing and demarcation of any area reserved under subsection (1) shall be carried out in such manner as the mining commissioner may direct.

(3) The mining commissioner may, under the same conditions and in the same manner, withdraw any reservation made under subsection (1).

38      Notice of intention to prospect

(1) This section shall apply to—

        (a)      town lands;

        (b)      private land the boundaries of which are fenced or clearly marked by beacons and cut lines or consist of rivers, roads or railway lines;

        (c)      any area of land declared under the Forest Act [Chapter 19:05] to be demarcated forest or protected private forest;

        (d)      Communal Land.

(2) Every person, before exercising any of his rights under a prospecting licence, special grant to carry out prospecting operations issued under subsection (1) of section two hundred and ninety-one or exclusive prospecting order on any land to which this section applies shall give notice of his intention to do so in whichever one or more of the following forms is applicable to the case—

        (a)      if the land is a portion of town lands, he shall give notice in writing by registered letter addressed to the local authority concerned;

        (b)      if the land is occupied private land, he shall give notice in writing to the occupier of the land in person or by registered letter addressed to the occupier at his ordinary postal address;

        (c)      if the land is unoccupied private land, he shall give notice in writing by registered letter addressed to the owner at his ordinary postal address;

        (d)      if the land has been declared a demarcated forest, he shall give notice in writing to the chief executive officer of the Forestry Commission established under the Forest Act [Chapter 19:05];

        (e)      if the land has been declared a protected private forest, he shall give notice in writing to the owner of such land in person or by registered letter addressed to the owner at his ordinary postal address or, if such land is unoccupied, to the mining commissioner;

        ( f )      if the land is in Communal Land, he shall give notice in writing to any rural district council established for the area concerned;

and shall state in such notice his permanent postal address.

(3) In every notice given in terms of subsection (2) there shall, in addition, be stated

the name and address of the person who will be in charge of prospecting operations on the land concerned.

(4) A notice which has been duly given in terms of this section by the holder of a prospecting licence shall be valid for a period of one hundred and twenty days from the date on which it was delivered or posted, as the case may be, and, if such holder has not pegged and registered a block on the land concerned within that period, he shall give fresh notice in terms of this section before continuing to exercise his rights under the prospecting licence.

(5) A notice which has been duly given in terms of this section by the holder of an exclusive prospecting order or a special grant to carry out prospecting operations shall be valid for the period of validity of that order or special grant.

(6) Notwithstanding subsections (4) and (5), in the event of any change in the particulars notified in terms of subsection (3), the holder shall forthwith give notice of that change and subsection (2) shall apply, mutatis mutandis, to the giving of that notice.

(7) Where a mining location has been pegged by a person who has failed to give any notice required by this section, the pegging of the mining location shall not be deemed to be invalid by virtue only of the failure to give such notice.

(8) Any person who fails to give any notice required in terms of this section, whether or not a mining location has been pegged, shall be guilty of an offence and liable to a fine not exceeding level three or to imprisonment for a period not exceeding one month or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, gazetted on the 1st February, 2002.]

39      Hours of pegging and posting notices

(1) No person shall peg any mining location, which term includes the posting of a prospecting, discovery or registration notice, between six o'clock in the afternoon and six o'clock in the morning.

(2) The pegging of any locations during the period prohibited by subsection (1) shall not confer any rights whatsoever on any person.

(3) No pegging shall be deemed to be illegal by reason of being done on a Sunday or public holiday.

40      Manner in which notices to be posted

(1) If a prospecting, discovery or registration notice is posted on a notice board, such board shall be fixed on a peg.

(2) All notices shall be distinctly and legibly written, printed or painted, and no paper or other material which is liable to be washed off, and no writing liable to be rendered illegible by rain or exposure shall, except for purely temporary purposes, be deemed a proper marking.

41      Prospecting notices

(1) Subject to this Act, any holder of a prospecting licence may and, if he wishes to drill or excavate, whether at the surface or underground, shall post a notice to be called a "prospecting notice" on ground open to prospecting.

 (2) Such notice shall—

        (a)      in so far as material be in the prescribed form, and all the particulars required by such form shall be duly filled in;

        (b)      be carried on a peg erected in a conspicuous and accessible place.

(3) On posting a prospecting notice the holder of the prospecting licence under which it is posted shall immediately forward to—

        (a)      the mining commissioner; and

        (b)      whichever authority or person would be entitled in terms of section thirty-eight to be given notice of intention to prospect on the land affected by the

prospecting notice;

a certified copy of the prospecting notice, together with a plan based on a map issued under the authority of the State and of a scale of not less than 1:25 000 sufficiently identifying the point where such notice has been posted and the area covered thereby.

(4) No person shall post a second prospecting notice by virtue of any licence until such time as notice of abandonment has been posted on the ground previously located in the manner provided in section two hundred and fifty-eight or until the prospecting notice previously posted under the same licence has lapsed.

(5) The posting of a prospecting notice in terms of subsection (1) shall confer upon the holder of the prospecting licence under which it is posted the exclusive right of prospecting, including the right to drill and excavate, whether at the surface or underground, for a period of thirty-one days each of twenty-four hours from the time of such posting on all ground which is open to prospecting at the time of the posting of such notice within an area described by a radius of three hundred metres from the point where the prospecting notice has been posted:

Provided that on the posting of a registration notice in terms of section forty-four all such rights outside the area of the block pegged shall lapse.

42      Discovery of minerals or precious stones

(1) If the holder of a prospecting licence, after posting his prospecting notice, by the work of himself or his agents, discovers within the area covered by such notice any ore or deposit of precious metals or precious stones, he shall mark the point of such discovery by a peg marked "DP".

(2) If the holder of a prospecting licence, after the posting of his prospecting notice, in like manner discovers within the area covered by such notice any ore or deposit of any base mineral, he shall mark the point of such discovery by a peg marked "DP" and indicate upon a notice to be styled a "discovery notice" in the prescribed form, posted at the spot where his prospecting notice is posted, the position of the DP peg, the nature of the base mineral he has discovered and the date and time of the discovery, and thereupon for the remainder of the period of thirty-one days mentioned in section forty-one he shall be entitled to the sole and exclusive right of prospecting, including the right to drill and excavate, whether at the surface or underground, upon all ground open to prospecting within an area described by a radius of nine hundred metres from his prospecting notice.

(3) The intersection of a reef by a borehole shall be deemed to constitute a discovery within the meaning of this section.

(4) If the holder of more than one special prospecting licence posts two discovery notices in such positions that the areas covered by such notices overlap, and thereafter he posts a registration notice in terms of section forty-four in respect of one of such areas, so much of the common segment as lies outside the block pegged by him shall, for the unexpired period of the prospecting notice in respect of which such registration notice was posted, be deemed to form part of the area covered by the other discovery notice.

43      Pegging of precious metal, precious stones or base mineral blocks

(1) A block of precious metal or precious stones claims shall, if possible, be pegged in regular form, and may be pegged in irregular form only if it is not possible to peg it in regular form.

(2) The regular form of a block of precious metal or precious stones claims shall be a parallelogram, which for a ten claim block shall not exceed five hundred metres in length nor two hundred metres in breadth, and the block shall be pegged in the following manner—

        (a)      the pegger shall first measure off a straight line, which in the case of

reef claims shall be in the direction of the strike of the reef, extending for a maximum distance of fifty metres in respect of each claim, not exceeding ten in all, which he desires to include in the block;

  (b)     the line thus established shall be known as the "centre line", and its ends shall be established by pegs, marked E and F respectively, which shall be known as the "centre end pegs";

  (c)     the pegger shall then measure off two parallel straight lines drawn as nearly as possible at right angles to the centre line, and passing respectively through each centre end peg and extending for equal distances not exceeding one hundred metres from each of those pegs on each side of the centre line;

  (d)     the lines thus measured off shall be known as the "end lines", and their ends shall be established by pegs, to be known as "corner pegs", marked A, B, C and D respectively in such manner that the line AD passes through E and the line BC passes through F;

  (e)     straight lines on either side of the centre line and joining the corner pegs A and B and C and D shall then constitute and be known as the "side lines" of the block;

  ( f )     the point marked "DP" shall lie within the boundaries of the block thus established, and no ground not open to prospecting, except as otherwise provided in section thirty-four, shall be included within such boundaries.

(3) A block in irregular form of precious metal or precious stones claims shall be so pegged as to fulfil all the following conditions—

  (a)     it shall be bounded on not more than two sides by ground open to prospecting;

  (b)     its area shall not exceed the area of a regular block of ten claims;

  (c)     the length of any straight line which can be drawn between any two points on its boundary lines, whether the course of such line lies within or without the block, shall not exceed five hundred metres;

  (d)     the point marked "DP" shall lie within its boundaries, and, except as otherwise provided in section thirty-four, no ground not open to prospecting shall be included within such boundaries;

  (e)     in the case of reef claims the pegger shall fix pegs marked "Q" and "R" respectively at two points within the boundaries of his block, and the straight line joining such pegs shall determine the mean direction of the end lines of the block;

  ( f )     the boundary lines shall be straight lines, and the position of all points at which they intersect shall be established by corner pegs lettered in consecutive alphabetical order commencing with the letter A.

(4) A block of base mineral claims may be pegged in any form, but shall be so pegged as to fulfil all the following conditions—

  (a)     the boundary lines shall be straight lines;

  (b)     the pegger shall erect pegs at all points of intersection of the boundary lines, and, if any boundary is more than three hundred metres in length, he shall erect intermediate pegs, so that no peg shall be more than three hundred metres from the next adjoining peg on either side;

  (c)     all pegs shall be lettered in consecutive alphabetical order, commencing with the letter A;

  (d)     the point marked "DP" shall lie within the boundaries of the block, and no ground not open to prospecting, except as otherwise provided in section thirty-four, shall be included within such boundaries.

(5) Where a block of base mineral claims is pegged by the holder of an ordinary prospecting licence it shall, in addition to the conditions mentioned in subsection (4),

fulfil the following conditions—

      (a)     it shall consist of not more than twenty-five claims and each claim shall not exceed one hectare in extent;

      (b)     the length of any straight line which may be drawn between any two points on its boundary lines, whether the course of such line lies within or without the block, shall not exceed one thousand two hundred and fifty metres.

(6) Where a block of base mineral claims is pegged by the holder of a special prospecting licence, it shall, in addition to the conditions mentioned in subsection (4), fulfil the following conditions—

      (a)     it shall consist of not more than one hundred and fifty claims, and each claim shall not exceed one hectare in extent;

      (b)     the length of any straight line which may be drawn between any two points on its boundary lines, whether the course of such line lies within or without the block, shall not exceed two thousand metres.

(7) Every peg mentioned in this section shall bear on it, in addition to the distinguishing letter, the number of the licence under which the block was pegged and the name of the holder of the licence.

44     Registration notices

(1) Within the period of thirty-one days each of twenty-four hours from the posting of the prospecting notice, the holder of the prospecting licence who has discovered within the area covered by such notice any ore or deposit of precious metals or precious stones or any ore or deposit of any base mineral may peg a block, and thereafter, within the said period, post upon such block a notice, to be styled a "registration notice", in like manner to the posting of the prospecting notice, and such registration notice shall be posted adjacent to the point marked "DP", and the block so pegged shall include such registration notice and the point marked "DP".

(2) Failure to peg off such block, and thereafter to post such registration notice within the period mentioned in subsection (1), shall be deemed to constitute an abandonment of all rights acquired by the posting of such prospecting notice.

(3) Notwithstanding subsection (1) or (2), where the discovery of the ore or deposit is by means of a borehole, the period within which a registration notice may be posted and a block pegged shall be extended to ninety days each of twenty-four hours from the time of the posting of the prospecting notice.

(4) A registration notice shall, so far as material, be in the form prescribed, and particulars required by such form shall be duly filled in.

45     Registration of blocks

(1) The holder of any mining location upon which a registration notice has been posted may, on application to the mining commissioner within a period of thirty-one days after the date of posting such registration notice, and on payment of the prescribed fee, obtain a certificate of registration.

(2) On every such application the applicant shall lodge the following with the mining commissioner—

      (a)     the prospecting licence and the power of attorney or other document, if any, under and by virtue of which the block was located;

      (b)     a copy of the prospecting notice;

      (c)     in the case of a base mineral block, a copy of the discovery notice;

      (d)     a copy of the registration notice;

      (e)     a plan in triplicate based on a map issued under the authority of the State and of a scale of not less than 1:25 000, sufficiently identifying the position of the block to be registered, the position and lettering of the pegs, including the peg marked "DP", and the position of the prospecting notice;

( f )      a certificate under his hand stating that the said copies of such notices are true copies and that all facts stated therein are true and correct;

(g)      if the block is pegged on ground for which the consent of the owner is required, the written consent of the owner or some person duly authorized thereto by the owner.

(3) If registration is granted, the mining commissioner shall—

(a)      return to the applicant one copy of the plan lodged with the registered number of the block endorsed thereon; and

(b)      send notification of such registration and one copy of the plan lodged with the registered number of the block endorsed thereon to whichever authority or person would be entitled in terms of section thirty-eight to be given notice of intention to prospect on the land on which the block is pegged; and

(c)      retain a copy of the plan.

(4) When application is made for a certificate of registration of a block which has been previously registered and abandoned or forfeited, the applicant shall furnish, if possible, the previous name and registered number of the block and so far as is possible any re-pegging of any location shall perpetuate the original name of such location.

(5) If the holder of any location fails to apply for a certificate of registration in the manner prescribed within the period of thirty-one days, he shall be deemed to have abandoned such block:

Provided that if such holder makes application within the said period to the mining commissioner for an extension of the period and furnishes any reason for such extension which to the mining commissioner seems good and sufficient, the mining commissioner may extend the said period for a further period not exceeding sixty-two days.

(6) If such holder of a location fails to apply for a certificate of registration in the manner prescribed within such extended period, he shall be deemed to have abandoned such block

46      Numbering of locations

The mining commissioner shall, on the original registration of every mining location, assign a registered number and name in his register.

47      Pegging of sites

(1) In this section—

"property" means two or more blocks of claims, whether contiguous or otherwise, owned by one person, from which the ore is being treated at the same milling or reduction plant, or which are under the control of one registered mine manager.

(2) The holder of a registered mining location may peg on any ground open to prospecting in the vicinity of such location a site or sites for the purpose of erecting thereon residences for himself or his employees, for a mill or other machinery required for the efficient working of his location, or for tailings or waste rock dumps, for a slimes or return water dam or dams, for the purpose of burning charcoal required for his mining location, or for any other legitimate object connected with and necessary for the purposes of his location:

Provided that the mining commissioner may, upon special application made to him for that purpose, and after consultation with the occupier of the land, grant permission for a site or sites to be pegged and registered on ground open to prospecting, although not in the vicinity of a registered mining location, for the purposes of such location.

(3) Save as otherwise provided in subsection (4), the maximum area which may be pegged as sites in terms of subsection (2) in respect of any one mining location or property shall be forty hectares and no one site shall exceed an area of forty hectares.

(4) The mining commissioner shall, on application made to him, permit the holder of a registered mining location or property to peg a site exceeding forty hectares or sites in the aggregate exceeding forty hectares if he is satisfied that such holder requires such larger area.

(5) In pegging a site, the position of all the points of intersection of the boundary lines, which shall be straight lines, shall be established by pegs, lettered in consecutive alphabetical order commencing with the letter A, and bear the word "site" and the registered number of the mining location in respect of which such site is pegged, and no ground not open to prospecting shall be included within such boundaries:

Provided that in no case shall the distance between two adjacent pegs on the same boundary line exceed three hundred metres.

(6) Any such holder who is aggrieved by the refusal of the mining commissioner to grant permission in terms of subsection (3) may appeal against such refusal to the Administrative Court.

48       Registration of sites

(1) Any pegger of any site mentioned in section forty-seven shall, on the same day as such site is pegged, post on it a registration notice as nearly as material in the prescribed form, and shall, within a period of thirty-one days from the date of such pegging, apply to the mining commissioner for a certificate of registration.

(2) On such application he shall lodge with the mining commissioner—

      (a)       a copy of the registration notice; and

      (b)       a plan in triplicate based on a map issued under the authority of the State and of a scale of not less than 1:25 000 sufficiently identifying the form, position and extent of the site; and

      (c)       a certificate under his hand that the copy of the registration notice is a true copy and that all the facts therein stated are true and correct; and

      (d)       the prescribed registration fee.

(3) The mining commissioner shall, if satisfied that the applicant is legally entitled to peg such site, issue to him a certificate of registration.

(4) If registration of a site is granted, the mining commissioner shall—

      (a)       return to the applicant one copy of the plan lodged with the registered number of the site endorsed thereon; and

      (b)       send notification of such registration and one copy of the plan lodged with the registered number of the site endorsed thereon to whichever authority or person would be entitled in terms of section thirty-eight to be given notice of intention to prospect on the land on which the site is pegged; and

      (c)       retain a copy of the plan.

(5) If the pegger of a site fails to apply for a certificate of registration in the manner prescribed within the aforesaid period of thirty-one days, he shall be deemed to have abandoned such site:

Provided that if such pegger makes application within the said period to the mining commissioner for an extension of the period and furnishes any reason for such extension which to the mining commissioner seems good and sufficient, the mining commissioner may extend the said period for a further period not exceeding sixty-two days.

(6) If such pegger fails to apply for a certificate of registration of the site in the manner prescribed within such extended period, he shall be deemed to have abandoned such site.

49       Sites to be attached to location

(1) Every site which is registered with the mining commissioner in terms of section

forty-eight shall be deemed to be inalienably attached to the location in respect of which it was pegged, and every transfer, hypothecation, option, abandonment, forfeiture or cancellation affecting such location shall act as a transfer, hypothecation, option, abandonment, forfeiture or cancellation affecting any site attached to such location, and no separate sale, lease, hypothecation or option purporting to affect any site apart from the mining location to which it is attached shall be valid.

(2) Any order of court affecting any mining location shall be deemed to affect similarly any site attached to such location.

(3) At any time prior to the hypothecation, giving of an option or lease, abandonment, forfeiture or cancellation of a mining location the holder thereof may apply to the mining commissioner for the cancellation of the registration of any site attached thereto, and, on filing with the mining commissioner the certificate of registration of such site, and on payment of the fee prescribed in section forty-eight, for the simultaneous re-registration thereof under a fresh registered number as attached to any other mining location registered in his name in the same vicinity, and upon such re-registration such other mining location shall, for the purposes of subsection (1), be deemed to be the location in respect of which the site was pegged.

50      Cancellation of certificate of registration

(1) Subject to subsection (2), the mining commissioner may, notwithstanding subsection (1) of section fifty-eight, at any time cancel a certificate of registration issued in respect of a block or site if he is satisfied that—

        (a)      at the time when such block or site was pegged it was situated on ground reserved against prospecting and pegging under section thirty-one or thirty-five or on ground not open to pegging in terms of subsection (3) of section two hundred and fifty-eight; or

        (b)      provisions of this Act relating to the method of pegging a block or site were not substantially complied with in respect of such block or site.

(2) At least thirty days before cancelling a certificate of registration under subsection (1), the mining commissioner shall give notice to the holder of the block or site of his intention to cancel such certificate and of the grounds for such cancellation and of the proposed date of such cancellation, and shall at the same time inform the holder that he may, at any time before that date, appeal in writing to the Minister against such cancellation.

(3) Such notice shall be given by registered letter addressed to the holder of the block or site at the postal address recorded in the office of the mining commissioner or, if no such address is recorded, by publication thereof in the Gazette.

(4) Where such an appeal is made, the Minister shall give directions to the mining commissioner as to whether or not the certificate of registration is to be cancelled, and the mining commissioner shall comply with such directions.

(5) Upon such cancellation the mining commissioner shall post upon the board whereon notices of forfeiture are posted a notice giving particulars of such cancellation and shall, in addition, publish those particulars in the Gazette and in a newspaper circulating in his district.

(6) A mining location, the certificate of registration of which has been cancelled in terms of this section, shall, for the purposes of sections two hundred and sixty-eight, two hundred and sixty-nine, three hundred and sixty-three and three hundred and seventy-five, be deemed to have been forfeited and, accordingly, any reference in section two hundred and sixty-nine to the posting of a forfeiture notice shall be read as including a reference to the posting of the notice of such cancellation.

51      Beaconing of locations

(1) Within a period of two calendar months from the date of issue of a certificate of

registration in respect of any mining location, all the pegs of such location shall be replaced by stone beacons or beacons consisting of concrete or mason work:

Provided that, where the pegs of a mining location have been replaced by stone beacons in terms of this subsection and thereafter a return in terms of paragraph (a) of subsection (1) of section two hundred and fifty-one has been rendered each month for six successive months in respect of that mining location, such beacons shall be replaced by beacons consisting of concrete or mason work.

(2) Every such stone beacon shall be at least six hundred millimetres high and one comma two metres in diameter at the base, and in the centre of such beacon there shall be solidly and securely fixed a peg in an upright position and standing not less than six hundred millimetres above the top of such beacon.

(3) Every such concrete or mason work beacon shall—

    (a)    unless securely set into the solid rock, be embedded into the ground to a depth of not less than three hundred millimetres; and

    (b)    be at least six hundred millimetres high; and

    (c)    be at least six hundred millimetres square at ground level and three hundred millimetres square at the top; and

    (d)    have in the centre thereof, solidly and securely fixed, a steel peg in an upright position and standing not less than six hundred millimetres above the top of the beacon.

(4) Every such concrete beacon shall be—

    (a)    of concrete consisting of at least one part of fresh cement to three parts of clean sand and six parts of clean stone aggregate; and

    (b)    solid or, if not solid, the shell thereof shall be not less than fifty millimetres thick.

(5) Where a beacon is placed on a boundary line there shall—

    (a)    in the case of a stone beacon, be dug two direction trenches not less than one metre long, three hundred millimetres wide and three hundred millimetres deep, or other permanent means of demarcation approved by the mining commissioner; or

    (b)    in the case of a concrete or mason work beacon, be engraved upon the top of the beacon, or otherwise affixed to the top of the beacon in such permanent manner as the mining commissioner may approve, two clear direction marks not less than one hundred millimetres long;

to indicate the direction of the boundary lines.

(6) The upright pegs of every beacon shall bear a metal plate, the upper edge of which shall be level with the upper edge of such peg and which shall be not less than two hundred millimetres square and shall face inwards, and on which shall be legibly printed or painted, in the order shown, the following particulars—

    (a)    a letter corresponding to the letter assigned to such peg in the registration notice; and

    (b)    the name of the block or, if a site, the word "site"; and

    (c)    the nature of the mineral in respect of which the location is pegged; and

    (d)    the registered number of the location; and

    (e)    the date of the original registration of the location; and

    ( f )    the name or names of the holder or holders; and

    (g)    in the case of a site, the registered number of the block of claims to which it is attached.

(7) All beacons, pegs, claim plates, direction trenches and direction marks shall be kept and maintained in good order until a quittance certificate has been issued in

terms of section two hundred and sixty-nine in respect of the mining location in question, and holders of mining locations shall make a certificate to the mining commissioner annually that the beacons, pegs, claim plates, direction trenches and direction marks of such location are in good order and condition and that they comply with the requirements of this Act.

(8) Subsections (2) to (6) shall not affect the validity of the beaconing of any mining location lawfully beaconed in accordance with the corresponding provisions in force immediately before the 1st January, 1974, hereinafter referred to as the old provisions, and the beacons, pegs, claim plates and direction trenches of any such location may be kept and maintained in accordance with the old provisions.

52      Survey for excess areas

(1) If at any time the mining commissioner has reason to believe that the number of claims in any block exceeds the number registered in such block, he may cause the boundaries of such block to be surveyed by a land surveyor.

(2) If the number of claims in such block is found on such survey to exceed the number registered as aforesaid, the holder thereof shall be liable to pay to the mining commissioner the cost of such survey, in addition to any amount which he may be liable to pay under section fifty-four.

(3) The mining commissioner may, before authorizing any such survey, require any person who has filed information regarding the excess to lodge with him such sum of money as may, in his opinion, be necessary to cover the cost of such survey.

(4) The money so lodged shall, in the event of any excess being established by any such survey, be repaid to the person so informing as aforesaid; but, if no excess is established, the cost of such survey shall be paid with or out of such money, and any balance returned to the person so informing.

53      Excess areas lawfully pegged

If more than ten precious metal claims have been pegged under one prospecting licence or special authority issued before the 1st September, 1935, which entitled the holder of such licence or authority to peg more than ten precious metal claims as one mining location, and such claims have been registered under one certificate of registration, all claims so registered shall be held as one block for all purposes of this Act.

54      Excess areas not lawfully pegged

(1) If at any time after the registration thereof it is found that the number of claims in a block pegged and registered under one prospecting licence or other authority exceeds the number of claims registered in such block, the mining commissioner shall notify the holder thereof.

(2) The holder thereof shall, within thirty-one days of a date to be fixed by the mining commissioner in such notice, forward to the mining commissioner the certificate of registration of such block, together with a fine an amount equivalent to level two for each claim or portion of a claim in excess of the number of claims originally registered in such block.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

(3) Upon receipt of the certificate of registration and the fine, the mining commissioner shall register such excess claims as part of the original block and shall endorse upon the certificate of registration of such block the number of the excess claims so registered and the date of registration.

(4) Any excess claims so registered under this Act and any excess claims similarly registered under any law relating to mines and minerals which was in force before the 1st September, 1935, shall be held, together with the claims originally registered in the block, as one block for all purposes of this Act.

55      Determination of number of claims in block

(1) In—

      (a)      subsection (2), every fifty metres in length and every hectare; and

      (b)      subsection (3), every hectare;

in area shall represent a claim.

(2) The number of claims in any precious metal or precious stones block shall be determined in a regular block by the length of the longest line which can be drawn within the block parallel to either side line, and in an irregular block by the length of the longest line which can be drawn between any two points on its boundary lines, whether the course of such line lies within or without the block, or in either case by the area, whichever may show the greater number of claims.

(3) The number of claims in every base mineral block shall be determined by its area: Provided that—

      (i)      in the case of a base mineral block which has been pegged by the holder of an ordinary prospecting licence, if the length of the longest straight line which can be drawn between any two points on its boundary lines, whether the course of such line lies within or without the block, exceeds one thousand two hundred and fifty metres, then, notwithstanding the fact that the total area of the block does not exceed twenty-five claims, every fifty metres of that excess of length shall be deemed to represent one claim;

      (ii)      in the case of a base mineral block which has been pegged by the holder of a special prospecting licence, if the length of the longest straight line which can be drawn between any two points on its boundary lines, whether the course of such line lies within or without the block, exceeds two thousand metres, then, notwithstanding the fact that the total area of the block does not exceed one hundred and fifty claims, every fifty metres of such excess of length shall be deemed to represent one claim.

(4) For the purposes of applying subsection (3) to any base mineral block registered under the provisions in force immediately before the 1st January, 1974, the first one hundred and fifty metres of any excess of length referred to in that subsection shall be disregarded.

56      Re-adjustment of internal beacons of groups of base mineral locations

Notwithstanding sections fifty-two, fifty-four and fifty-five, the Secretary may authorize the holder of any group of contiguous base mineral mining locations, after a survey thereof has been made by a land or mine surveyor, to adjust the beacons of blocks within the outside boundaries of such group of mining locations, and thereupon fines in respect of excess claims shall only be payable on the excess claims existing after the adjustment of the internal beacons of the mining locations within the area:

Provided that no additional ground outside the boundary of the area originally pegged shall be included in any adjustment of beacons, nor shall the total area originally pegged be reduced.

57      Wilful overpegging

Nothing in sections fifty-two, fifty-three, fifty-four, fifty-five and fifty-six shall be deemed to relieve any person from liability under this Act to any penalty prescribed for the wilful pegging of a mining location of a larger size than he is entitled to or purports to peg.

58      Impeachment of title, when barred

When a mining location or a secondary reef in a mining location has been registered for a period of two years it shall not be competent for any person to dispute the title in respect of such location or reef on the ground that the pegging of such location or reef

was invalid or illegal or that provisions of this Act were not complied with prior to the issue of the certificate of registration.

59      Lost certificates of registration

(1) If the holder of the certificate of registration or of special registration last issued in respect of any mining location has lost or mislaid such certificate. he may, thirty days after publication in the Gazette, in a form to be approved by the mining commissioner, of notice of his intention to do so, apply to the mining commissioner for a duplicate copy thereof.

(2) Such holder shall furnish to the mining commissioner with his application a solemn declaration which, inter alia shall state—

        (a)      the fact of the loss or destruction of the certificate or that the same has been mislaid; and

        (b)      that he has not delivered or pledged the certificate to any person either as security for money advanced to or owing by him or otherwise; and

        (c)      that he is of right entitled to the mining location mentioned in the certificate of which a duplicate is required.

(3) On receipt of such application and such solemn declaration the mining commissioner shall, if he is satisfied that no good reason to the contrary exists, issue a duplicate copy of such certificate to the applicant on payment of the prescribed fee.

(4) A duplicate copy of a certificate issued in terms of this section shall supersede and take the place of the original.

60      Address to be given to mining commissioner

(1) Every holder of a mining location on registration of such location in his name at the office of the mining commissioner and every lessee and assignee of such holder shall furnish such mining commissioner with an address within Zimbabwe at which all notices, orders or other processes shall be served by the mining commissioner or other officer duly appointed for the purposes of this Act, and any such holder, lessee or assignee may at any time change such address by registering at the office of such mining commissioner any other address within Zimbabwe.

(2) Service of any such notice, order or other process at such registered address shall be deemed to have the same effect as personal service.

(3) In default of any address being registered as by this section required, the posting in the office of the mining commissioner of any such notice, order or other process shall be deemed to have the same effect as personal service.

(4) Nothing in this section contained shall be construed so as to preclude the High Court from giving such directions with regard to service as to it seem proper or expedient.

61      Obligations of partnerships and companies

(1) No more than six persons shall be registered as the joint holders of a mining location.

(2) When two or more persons are registered as the joint holders of a mining location, each and every such person shall be jointly and severally responsible for every obligation and liability attaching to the registered holder of such location.

(3) Every partnership or company which is the holder of a mining location shall at the time of registration register at the office of the mining commissioner the name of an accredited agent residing in Zimbabwe, and such agent shall, when registered, be personally responsible under this Act for all matters, acts and omissions in connection with such location in the same manner as if such location were registered in his name as his own property.

(4) If such partnership or company at any time revokes the registration of any such accredited agent, it shall register some other person as its accredited agent.

(5) A registered accredited agent may at any time resign his appointment as such by giving notice in writing to the mining commissioner, but such resignation shall not take effect until the expiration of forty-eight hours after the receipt of such notice by the mining commissioner.

(6) Where a registered accredited agent has resigned, the partnership or company concerned shall, within forty-eight hours after receipt of notice from the mining commissioner of the fact of such resignation, register some other person as its accredited agent.

(7) Subsections (3), (4) and (6) shall apply to every partnership or company which is working a mining location under tribute or option:

Provided that the time of registration shall be within two weeks of the start of such working.

(8) Nothing in this section shall be taken in any way to relieve a company or the members of a partnership of any liability incurred or any duty imposed under this Act in regard to any mining location held by such company or such partnership.

62      Cancellation of certificate of registration without abandonment

(1) On application by the holder of any registered mining location, and on the production of the certificate of its registration, the Secretary may, at his discretion, authorize a mining commissioner to cancel such certificate of registration of such location without abandonment or forfeiture of such location, and cause to be issued to the said holder at one and the same time a fresh certificate or certificates of registration of the whole or any portion or portions of such location which have been previously beaconed off within such location in the manner prescribed in this Act, assigning to such certificate or certificates fresh registered numbers.

(2) The said holder shall pay to the mining commissioner the prescribed fee for each such fresh certificate.

(3) Within a period of seven days from the date of issue of such fresh certificate or certificates, or within such period as the mining commissioner may fix, the holder of such location shall remove all the beacons of the original mining location not used for the beaconing of the new portion or portions, and on the beacons of the new portion or portions shall replace the registered number originally assigned to such location by the new registered number assigned to such portion or portions.

PART V

PROSPECTING AND PEGGING ON GROUND RESERVED AGAINST PROSPECTING AND PEGGING

63      Interpretation in Part V

In this Part—

"order" means an order made under section seventy-one or seventy-two;

"owner", in relation to State land, means the Minister responsible for the administration of such land;

"reserved ground" means land upon which a prospector is prohibited in terms of paragraphs (a) and (g) of subsection (1) of section thirty-one from exercising any of his rights under his prospecting licence without the consent in writing of the owner of the land, but does not include that portion of such land which lies within two hundred and twenty-five metres of the site of the principal homestead mentioned in subparagraph (i) of paragraph (a) of that subsection.

64      Application for authority to prospect on reserved ground

(1) Any person may make written application to the Board for authority to prospect on reserved ground.

(2) The applicant shall furnish to the Board—

        (a)      full details of that portion of the reserved ground on which authority to

prospect is sought, together with a plan thereof prepared by a mine or land surveyor; and

(b)      the reasons why he thinks that such reserved ground may warrant the granting of the authority; and

(c)      full information as to his financial status; and

(d)      any other information relative to the application which may be required of him by the Board.

(3) On receipt of the application by the Board—

(a)      the chairman of the Board may issue a direction to the mining commissioner to reserve the ground to which the application relates against prospecting and pegging in terms of section thirty-five, and the mining commissioner shall, without obtaining the authority of the Minister, forthwith reserve such ground accordingly;

(b)      the Board may refuse the application or approve it provisionally.

65      Procedure on provisional approval

(1) If the Board provisionally approves such application it shall—

(a)      unless the chairman of the Board has issued a direction to the mining commissioner under paragraph (a) of subsection (3) of section sixty-four itself issue such a direction, and the mining commissioner shall comply therewith; and

(b)      after the mining commissioner has reserved the ground in accordance with a direction given under paragraph (a) of subsection (3) of section sixty-four or paragraph (a), notify the owner and the occupier, if any, of the reserved ground, of the application and require them to inform the Board in writing within thirty days of such notification whether they object to the grant of the application.

(2) Notification in terms of paragraph (b) of subsection (1) shall be given by posting a registered letter to the owner and the occupier, if any.

66      Grant or refusal of application

(1) If an owner or occupier of reserved ground informs the Board that he has objections to the grant of the application, the Board shall, on a day fixed by it and notified to the applicant and the objector, hear such evidence and arguments as those persons may wish to lay before it in regard to the grant or refusal of the application.

(2) If no notification of objection to the grant of the application has been received from the owner or the occupier, or if no notification was given in terms of paragraph (b) of subsection (1) of section sixty-five owing to the whereabouts of the owner and the occupier, if any, being unknown to the Board, the Board shall proceed with the consideration of the application.

67      Board's powers in regard to application for authority to prospect

(1) The Board may, after holding a hearing in terms of subsection (1) of section sixty-six or considering the application in terms of subsection (2) of that section—

(a)      grant authority to the applicant to prospect on such ground in such manner and by such means and for such period as shall be specified by the Board in such authority, if the Board is satisfied—

(i)      that the applicant's financial status is such that he will be able to pay any sum which may become payable by him under section eighty or eighty-two as a result of the exercise of his rights under such authority; and

(ii)      that minerals are likely to occur within the area to which the application relates; and

(iii)      that little or no interference with the rights of the owner or occupier of the ground will result from such prospecting; or

(b)      refuse the application.

(2) Before granting any such authority, the Board—

(a)     shall consult the Natural Resources Board;

(b)     may, and, if so required by the owner or the occupier of any of the reserved ground, shall, require the applicant to furnish a guarantee satisfactory to the Board for the payment of the sum mentioned in subparagraph (i) of paragraph (a) of subsection (1).

(3) The Board may attach to an authority such conditions as it may think fit.

68      Extension and amendment of authority granted under section 67

(1) The holder of an authority granted under section sixty-seven may, at any time before the expiry of the period for which the authority was granted, make written application to the Board—

(a)     for an extension of the period for which the authority was granted;

(b)     for the amendment of the authority in respect of the manner in or means by which the prospecting operations are to be carried out.

(2) On receipt of such application the Board shall notify the owner and the occupier, if any, of the reserved ground of such application and require them to inform the Board in writing within thirty days of such notification whether they object to the grant of the application, and subsection (2) of section sixty-five shall apply, mutatis mutandis, in respect of such notification.

(3) Sections sixty-six and sixty-seven shall apply, mutatis mutandis, in respect of such application.

(4) The holder of an authority in respect of which an extension of the period has been granted under this section may, in like manner and subject to the like conditions, from time to time apply for and be granted an extension or amendment of the authority.

69      Board may authorize more extensive prospecting operations

(1) Where, on the written application of the holder of an authority granted under section sixty-seven made before the date on which the reservation in respect of the reserved ground is withdrawn by the mining commissioner under section eighty-one, the Board is satisfied that, having regard to the results of the prospecting operations carried out on the reserved ground under the authority, such a course is justified, it may, after consultation with the owner and the occupier, if any, of such ground, grant authority for the conduct of such more extensive prospecting operations on such ground as shall be specified by the Board and in such manner and by such means and during such period as the Board may specify.

(2) Subsection (2) of section sixty-seven shall apply, mutatis mutandis, in respect of such authority.

(3) The Board may attach to an authority such conditions as it may think fit.

(4) It shall be a condition of every authority granted under this section and of every extension thereof that the holder of the authority shall conduct prospecting operations progressively inwards from the perimeter of the reserved ground in such manner as the Board shall specify in the authority, but the Board may grant exemption from such a condition if it is satisfied that the proper prospecting of the area would be unduly impeded thereby.

70      Extension and amendment of authority granted under section 69

(1) The holder of an authority granted under section sixty-nine may, at any time before the expiry of the period for which the authority was granted, make written application to the Board—

(a)     for an extension of the period for which the authority was granted;

(b)     for the amendment of the authority in respect of the manner in or means by which the prospecting operations are to be carried out.

(2) The Board may, after consultation with the owner and the occupier, if any, of the reserved ground, refuse such application or grant it subject to such conditions and for

such period as it may think fit.

(3) Subsection (2) of section sixty-seven shall apply, mutatis mutandis, in respect of such authority.

(4) The holder of an authority in respect of which an extension of the period has been granted under this section may, in like manner and subject to the like conditions, from time to time apply for and be granted an extension or amendment of the authority.

71      Holder of authority may apply for order

(1) The holder of an authority granted under section sixty-seven or sixty-nine may, at any time before the date on which the reservation in respect of the reserved ground is withdrawn by the mining commissioner under section eighty-one, in writing request the Board to recommend to the Administrative Court that an order be made by that Court authorizing the acquisition by him of mining title in such form and to or in respect of so much of the reserved ground as shall be specified in such request.

(2) On receipt of the request, the Board shall—

        (a)      if it is not satisfied that, having regard to the results of prospecting operations carried out under the authority, a deposit of minerals exists which is economic or likely to prove economic, refuse the request; or

        (b)      if it is so satisfied, refer the matter to the Administrative Court, together with its recommendation that mining title be granted, as to the form of such title, the area to be covered by such title and the conditions to be attached to such title, and as to any other matter which to it may seem relevant:

                Provided that where the owner and the occupier, if any, of the reserved ground have agreed in writing that the Board should itself issue the order and such agreement has been lodged with the Board, the Board shall not refer the matter to the Administrative Court and may itself issue an order for the grant of mining title in such form as it may determine and subject to such terms and conditions as may have been agreed upon by the parties and notified to the Board and such additional terms and conditions as the Board may determine.

72      Grant or refusal of order by Administrative Court

(1) Where a matter has been referred to the Administrative Court under section seventy-one, the Court shall, on a day fixed by it and notified in writing by registered post to the person seeking the order and the owner and the occupier, if any, of the reserved ground concerned, hear such evidence and arguments as those persons may wish to lay before it in regard to the grant or refusal of the order.

(2) Subject to subsection (3), the Administrative Court may grant or refuse to grant an order.

(3) The Administrative Court shall not grant an order—

        (a)      unless it is satisfied that the national interest would be better served by the ground in respect of which the order is sought being used for mining purposes than by its being used for agricultural purposes;

        (b)      unless, if the owner or occupier of the reserved ground concerned has so required, the personseeking the order has furnished a guarantee satisfactory to the Court for the payment of any sum which may become payable by him under the provisions of this Part by way of compensation or in respect of the acquisition by him of the reserved ground or of the holding of which the reserved ground forms a part.

(4) The Administrative Court may, in granting an order, attach thereto such conditions as to it may seem necessary or desirable, and shall attach a condition as to the period within which the rights under the order may be exercised.

73      Appeals

(1) There shall be no appeal against the grant or refusal by the Board of an application for an authority under section sixty-seven or sixty-nine or for the extension or

amendment of an authority under section sixty-eight or seventy or the refusal of the Board to recommend a request for an order under section seventy-one.

(2) Any person who is aggrieved by a decision of the Administrative Court on a matter referred to it under section seventy-one may, within thirty days of such decision, appeal against that decision to the Supreme Court.

74      Persons to whom copies of order to be sent

The registrar of the Administrative Court shall by registered post send a copy of the order to the owner and the occupier, if any, of the reserved ground to which the order relates, to the person in whose favour it is made, to the mining commissioner and to the Board.

75      Authority or order may not be ceded

The rights granted under an authority granted under this Part or an order shall be personal to the holder thereof who may not cede or assign any such rights to any other person:

Provided that the rights granted under an order may be ceded or assigned with the permission in writing of the owner of the reserved ground or on the authority of the Administrative Court.

76      Rights of holders of authorities and orders

(1) The person to whom an authority is granted under this Part shall, subject to the terms and conditions of such authority and in terms of this Act, and notwithstanding the reservation of the ground on a direction given under this Part, have the sole and exclusive right of prospecting on the reserved ground to which such authority relates.

(2) The person in whose favour an order is made shall, subject to the terms and conditions of such order and in terms of this Act, and notwithstanding the reservation of the ground on a direction given under this Part, have the sole and exclusive right of pegging and registering mining locations on or acquiring mining leases in respect of the reserved ground to which such order relates.

77      Revocation of authority or order

(1) If the person to whom an authority has been granted under this Part or the holder of an order fails to comply with any of the terms and conditions attached to such authority or order, as the case may be, he shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

(2) Where a person to whom such authority has been granted fails to comply with the terms and conditions thereof, the Board may, in addition, revoke the authority.

(3) Where the holder of an order fails to comply with the terms and conditions thereof, the Administrative Court may, in addition, revoke the order and may direct the mining commissioner to declare any mining location registered by virtue of such order and held by such holder to be forfeited, and the mining commissioner shall, whether or not such mining location is currently protected from forfeiture by an inspection or protection certificate issued in terms of Part XI, comply with such direction.

78      Approval of transfer of mining location

(1) A mining location which has been registered on reserved ground under an order may not as long as the ground remains reserved be transferred except to a person approved of by the Board, after consultation with the owner and the occupier, if any, of such reserved ground.

(2) The Board shall not approve of the transfer of such a mining location to any person unless he has furnished a guarantee satisfactory to the Board for the payment of such sum as is mentioned in paragraph (b) of subsection (3) of section seventy-two

and the Board is satisfied that the holder of such location has paid all compensation and other moneys payable by him in terms of the order by virtue of which the location was pegged and registered or in terms of this Part.

79      Forfeiture of mining location

(1) The terms and conditions of every order which relates to mining on reserved ground shall be binding on any person to whom a mining location registered under such order is transferred and on any miner thereof.

(2) If any such person fails to comply with any such terms or conditions, the Board may forthwith direct the mining commissioner to declare such mining location forfeited, and the mining commissioner shall, whether or not such mining location is currently protected from forfeiture by an inspection or protection certificate issued in terms of Part XI, comply with such direction.

80      Compensation

Any owner or occupier of reserved ground who is injuriously affected by the exercise of any rights under an authority or order granted under this Part or by any mining operation on any mining location registered under such order shall be entitled to recover compensation from the person to whom the authority was granted or in whose favour the order was made or the holder of the mining location, as the case may be, in such amount as may be agreed upon or, failing such agreement, as shall be determined by the Administrative Court.

81      Withdrawal of reservation

The Board shall, if it is satisfied that the reservation of any ground made under section thirty-five in consequence of a direction given under paragraph (a) of subsection (3) of section sixty-four or paragraph (a) of subsection (1) of section sixty-five is no longer necessary, direct the mining commissioner to withdraw such reservation, and the mining commissioner shall comply with such direction.

82      Compulsory acquisition of land by holder of an authority or order

(1) Where an authority has been granted under this Part in respect of reserved ground mentioned in subparagraph (i) or (ii) of paragraph (a) of subsection (1) of section thirty-one or an order has been granted in respect of any reserved ground, the owner of such reserved ground may, subject to this section, apply to the High Court for an order compelling the holder of such authority or order, as the case may be, to acquire by purchase, exchange or otherwise the whole or a portion of the holding of which such reserved ground forms a part.

(2) At least thirty days before making such application, the owner of the reserved ground shall by registered post give notice in writing to the holder of the authority or order, as the case may be, of his intention to make such application.

(3) Notwithstanding section eighty-four, the holder of an authority or order, as the case may be, to whom notice has been given under subsection (2), may not after the expiry of a period of twenty-one days from the date of the receipt by him of such notice and until the High Court has disposed of the application or the application has been withdrawn, relinquish his rights under such authority or order, as the case may be.

(4) On an application made under this section, the High Court may refuse the order applied for or may grant it if the Court is satisfied that—

        (a)      the holder of the authority or order, as the case may be, is not precluded by the provisions of the Constitution or any enactment from owning such land; and

        (b)      the exercise by the holder of the authority or order, as the case may be, of the rights granted thereunder has resulted or is likely to result in such interference with the rights of the owner or occupier of the reserved ground as will render such

ground or the holding of which such ground forms a part unsuitable, as far as such owner or occupier is concerned, for the purpose for which it was being used or was bona fide intended to be used immediately before the date of the making of the application to that Court and where such application is for an order compelling the acquisition of the whole of the holding or a portion thereof by an exchange of land, or partly by an exchange of land and partly by some other means, and the land required to be given in exchange for such holding or portion thereof is State land, the Court may make its order conditional upon such land being made available by the President for the purposes of such exchange.

(5) In deciding whether to grant or refuse the order applied for, the Court shall have regard to the stage which the prospecting operations of the holder of the authority or order, as the case may be, have reached at the time of the application and the extent to which minerals are present on the land and the economic possibilities of such minerals.

(6) If the High Court grants the order it shall determine the price to be paid or other consideration to be given for the reserved ground, having regard to the matters set out in section eighty-three.

(7) The costs of both parties to an application under this section shall be borne by the holder of the authority or order, as the case may be:

Provided that the High Court may make such order as to costs as to it seems just if the Court is of the opinion—

      (a)     that the applicant has unreasonably refused a fair offer for the acquisition of the holding concerned or portion thereof by such holder; or

      (b)     that the application is vexatious or frivolous.

(8) Where the owner of the reserved ground and the holder of the authority or order, as the case may be, have agreed in writing, the application mentioned in subsection (1) may be made to the Administrative Court, and in that event subsections (2) to (7) shall apply, mutatis mutandis, to and in respect of any such application.

(9) Any person who is aggrieved by the decision of the Administrative Court on an application made to it under subsection (8) may appeal against that decision to the Supreme Court.

83      Factors to be considered in fixing price

Where a Court grants an order under section eighty-two it shall, in determining the price to be paid or other consideration to be given for the land by the holder of the authority or order, as the case may be, make due allowance for—

      (a)     the value of any improvements on and development of the land;

      (b)     the possible loss of profits over the period of three years next succeeding the date of the application for such order;

      (c)     the depreciation, if any, in the value of that portion of the holding which is not the subject of such order;

      (d)     the expense or loss, other than loss of profits, caused to the owner by the grant of the authority or order;

      (e)     any other loss directly or indirectly caused by the grant of the authority or order or the exercise of any right granted thereunder;

but no account shall be taken of any minerals which have been or may be discovered on such land.

84      Relinquishment of rights under an authority or order

(1) Save as otherwise provided in section eighty-two, the holder of an authority or order granted under this Part may at any time give notice in writing to the owner or occupier of the reserved ground to which such authority or order, as the case may be, relates of his intention to relinquish his rights under such authority or order, as the

case may be, and shall lodge a copy of such notice with the Board.

(2) The rights of such holder under the authority or order, as the case may be, shall cease with effect from the time and date of the lodging of such notice with the Board.

(3) Nothing in this section contained shall affect the right of the owner or the occupier, if any, of the reserved ground to claim compensation from the holder of the authority or order, as the case may be, in respect of damage arising from anything done by the holder before the date of such relinquishment.

85      Board's authority required for acquisition of mining title in certain circumstances

(1) Where the Board has made a recommendation under section seventy-one, it shall not be competent, except with the authority of the Board, for any person other than the person at whose request that recommendation was made to peg and register a mining location or to be granted a mining lease on or in respect of the whole or any portion of the ground to which such recommendation relates, within a period of seven years from the date of such recommendation.

(2) The Board may, in granting such authority, attach thereto such conditions as it thinks fit, including a condition as to the reimbursement of the person at whose request the recommendation was made in respect of any expenditure incurred by him in connection with or arising out of operations conducted by him on the reserved ground concerned and as to the payment to him of such reward for any discovery made by him as the Board considers just.

PART VI

EXCLUSIVE PROSPECTING RESERVATIONS

86      Interpretation in Part VI

In this Part—

"concession holder" means a person in whose favour an order has been made;

"order " means an exclusive prospecting order made in terms of this Part;

"programme" means the programme of operations mentioned in section ninety-six;

"reservation" means the area embraced by an order.

87      Application for order

(1) Any person may make written application to the Board for the making of an order in his favour over any defined area in Zimbabwe, including any area reserved under section thirty-five.

(2) The applicant shall—

(a)      deposit with the Secretary in respect of a period of six months a sum calculated at the rate of two cents per month for every hectare or part of a hectare of the area in respect of which the order is sought:

Provided that a deposit in terms of this paragraph shall not exceed ninety thousand dollars; and

(b)      furnish the Board with—

(i)      full information as to his financial status;

(ii)      if so required by the Board, particulars of any guarantees that may be offered for the performance of his obligations under the order;

(iii)      particulars of the minerals which he wishes to seek and mine;

(iv)      details illustrated by a sketch plan of the area to be embraced by the order and the size of such area;

(v)      a statement whether or not he wishes the order to authorize him to prospect for specified minerals on any registered base mineral blocks within the reservation;

(vi)      any further information required of him by the Board;

(vii)      if the applicant is a company, the full names and nationality of the

directors and the full names by which those directors have at any time been known in any part of the world;

       (viii)    a programme of the prospecting operations he intends to carry out within the reservation during the first period of six months from the date of granting the order.

(3) The chairman of the Board may provisionally approve an application before it is considered by the Board and, if he does so, he shall issue a direction to the mining commissioner to reserve the area embraced by the application against prospecting and pegging in terms of section thirty-five, and the mining commissioner, without obtaining the authority of the Minister, shall forthwith reserve such area accordingly.

(4) On receipt of the application the chairman of the Board shall—

       (a)    publish a notice in the Gazette giving details of the application and inviting objections thereto; and

       (b)    if in any application authorization is sought to prospect on any registered base mineral blocks within the proposed reservation, give written notice to every registered holder of any such block.

88    Hearing of application by Board

The Board shall, at a place and on a day fixed by it and notified to the applicant and to any person who has lodged written objection with the Board to the grant of the application, hear such evidence and arguments as those persons may wish to lay before it in regard to the grant or refusal of the application or any part thereof.

89    Board's recommendation in respect of application

(1) If on any application under this Part the Board is satisfied—

       (a)    that the applicant is a fit and proper person to obtain an order and is of adequate financial standing to undertake the operations under an order; and

       (b)    that it would not be against the national interest to make such an order;

the Board may, subject to section ninety-three, recommend to the Minister the making of an order in favour of the applicant over such area and subject to such conditions as the Board may think fit to recommend.

(2) In making a recommendation in terms of subsection (1) the Board may recommend, in accordance with subsection (3) of section ninety-three, that the area to be embraced by the order applied for should exceed the maximum area specified in paragraph (a), (b) or (c), as the case may be, of subsection (2) of section ninety-three.

(3) If on any such application the Board is not satisfied in terms of subsection (1), it shall refuse to recommend the application and shall notify the applicant accordingly and such refusal shall be final and without appeal.

90    President may approve or refuse order

(1) Whenever on any application under this Part the Board recommends the making of an order, it shall submit to the Minister the application, together with all relevant documents, its written report and its recommendation in regard thereto.

(2) The Minister shall submit such recommendation to the President, who may refuse the application or authorize the issue of an order in terms of the recommendation of the Board or on such amended terms and conditions as he may think fit to fix.

91    Issue of order

(1) If the President has approved of the making of an order, the Minister shall forthwith make an order in favour of the applicant which shall be in accordance with the terms and conditions fixed by the President and which shall specify the date from which the rights granted thereunder may be exercised and the date upon which the exercise of those rights shall cease.

(2) Every order shall be published in the Gazette and a copy of such order shall be

sent to the applicant, to the Board and to the mining commissioner of the district in which the reservation is situated.

(3) Every order shall be laid before Parliament as soon as may be after Parliament next sits after the order is published in the Gazette.

(4) Where an order is made any reservation of the ground made in accordance with a direction given under subsection (3) of section eighty-seventy shall be deemed to have been withdrawn by the mining commissioner in all respects as if he had posted a notice of such withdrawal under that section at six o'clock in the morning on the day specified in the order as being the date from which the rights granted thereunder may be exercised.

92      Rights granted under order may not be ceded

(1) The rights granted under an order shall be personal to the concession holder who may not, save with the permission in writing of the Minister given in terms of subsection (2), cede or assign any such rights to any other person.

(2) The Minister may, on the recommendation of the Board and on such terms and conditions as the Board may recommend, permit a concession holder to cede or assign such rights to another person, but the Board shall only make such a recommendation in circumstances which it considers to be special.

93      Limitation of area of reservation

(1) For the purposes of subsection (5) a block shall be regarded as being worked or developed if the current inspection certificate for such block was obtained by any method other than by the payment of a fee in terms of section two hundred and twelve.

(2) Subject to subsection (3), no reservation shall exceed—

        (a)      in the case of an order made solely in respect of coal, mineral oils or natural gases, one hundred and thirty thousand hectares;

        (b)      in the case of an order which includes precious stones, other than diamonds, two thousand six hundred hectares;

        (c)      in the case of any other order, sixty-five thousand hectares;

and no order shall be granted in respect of an area which is less than two thousand six hundred hectares, except in the case of an order granted solely in respect of precious metals or precious stones.

(3) A reservation may exceed the maximum area specified in paragraph (a), (b) or (c), as the case may be, of subsection (2) if the Board, having due regard to—

        (a)      the particular suitability of the applicant and his financial and operational capacity to fulfil the obligations under and within the period of the order recommended by the Board in relation to the minerals specified therein; and

        (b)      the geographical situation of the area and the nature and extent of previous and current prospecting and mining activity therein; and

        (c)      the absence of and the need for geological mapping, geophysical and geochemical investigations and other relative geological detail in respect of the area;

recommends that the reservation should exceed the said maximum area.

(4) An order may require a concession holder—

        (a)      to furnish guarantees to the Minister to his satisfaction that the obligations of the holder under the order will be discharged;

        (b)      to abandon a portion or portions of the reservation within such period or periods as are specified in the order.

(5) Subject to such terms and conditions as may be prescribed in the order, an order may authorize the concession holder to prospect on all registered base mineral blocks or specified registered base mineral blocks in his reservation which are not being worked or developed on the date of the lodging of the application for the order, but,

save as aforesaid, no order may be made to authorize prospecting on any other registered block.

(6) Nothing in this section contained shall be deemed to prohibit the fixing of additional terms and conditions under an order.

94      Duration of order

No order shall be granted for a period in excess of three years but an order may be extended by the Minister, on the recommendation of the Board, for a further period or periods not exceeding three years in all.

95      Challenge of validity of order, when barred

(1) After a period of twelve months has elapsed since the date of publication of an order in the Gazette, it shall not be competent for any person to allege that any of the provisions of this Act were not complied with prior to the making of the order.

(2) Within thirty days of the extension of any order granted in terms of subsection (1), the concession holder shall deposit with the Secretary a sum calculated in accordance with the provisions of paragraph (a) of subsection (2) of section eighty-eight.

96      Submission of programmes of work

(1) Every concession holder shall, from time to time, prepare and submit for the approval of the Board programmes of the prospecting operations which he intends to carry out within his reservation during periods of six months.

(2) The first programme prepared in terms of subsection (1) shall be submitted for the approval of the Board at the time of the application for the grant of an order in terms of subsection (1) of section eighty-seven.

(3) The second programme and all other subsequent programmes shall, unless the concession holder has previously abandoned the whole of his reservation under section one hundred and twelve, be submitted for the approval of the Board not later than thirty days after the expiry of the period within which the last preceding programme was required to be carried out or, if an extension of such period has been granted under subsection (2) of section one hundred, not later than thirty days after the expiry of the extended period.

(4) Every programme shall contain particulars of the prospecting operations which are intended to be carried out thereunder and of the estimated cost of such operations.

97      Deposit by concession holder in respect of longer period

(1) Where the Board has approved a longer period under subsection (2) of section ninety-six, the concession holder shall, within thirty days from the date of such approval, if so required by the Board, deposit with the Secretary a further sum calculated at the rate set out in paragraph (a) of subsection (2) of section eighty-seven in respect of so much of such longer period as exceeds six months:

Provided that—

        (i)       a deposit in terms of this subsection shall not, together with the deposit made in terms of paragraph (a) of subsection (2) of section eighty-seven, exceed ninety thousand dollars;

        (ii)      where the deposit made in terms of paragraph (a) of subsection (2) of section eighty-seven amounts to ninety thousand dollars, no deposit shall be required in terms of this subsection.

(2) If the concession holder fails to comply with a requirement in terms of subsection (1), the Board may recommend to the Minister that the order be revoked. and the Minister may revoke the order.

98      Powers of Board in regard to programmes

On receipt of a programme, the Board shall consider it and—

        (a)       if satisfied that the programme makes provision for the proper prospecting of the reservation and that the estimated expenditure is consistent with

the programme, the Board shall approve it;

      (b)     if not so satisfied, the Board shall reject the programme.

99      Failure to submit programme

(1) If the concession holder fails to submit a programme within the period mentioned in section ninety-six, or if the programme submitted does not satisfy the Board, the Board shall by notice in writing require the concession holder to submit a programme or an amended programme, as the case may be, within such period, being not less than thirty days, as the Board shall specify in such notice.

(2) If at the end of the period specified in the notice the concession holder has not submitted a programme satisfactory to the Board, the Board shall inform the Minister, and the Minister shall revoke the order.

(3) The Minister, when he revokes the order, may, on the recommendation of the Board, by action in any court of competent jurisdiction recover from the concession holder as a penalty a sum calculated at the rate of eight cents per hectare or portion of a hectare of the reservation in respect of each month or portion of a month between the date of the revocation of the order and the date of expiry of the order.

(4) Notice under subsection (1) shall be given by posting a registered letter to the concession holder.

100     Report by concession holder on work carried out

(1) Every concession holder shall carry out the programme of work approved by the Board under section ninety-eight within the period covered by such programme or any extension thereof granted under subsection (2), and shall at any time after the completion thereof, but not later than thirty days after the expiry of such period or any extension thereof, submit to the Board a written report on the work carried out by him during the period covered by the programme, including particulars of the expenditure incurred in the carrying out of such work.

(2) The Board may, on application made to it before the expiry of the period covered by the programme, grant such extension of the period within which the programme of work is required to be carried out, as the Board may think fit, and where such extension has been granted, the Board may from time to time grant further extensions of such period.

(3) Where the Board has granted such an extension, the Minister may, on the recommendation of the Board, recover from the concession holder a sum calculated at the rate of two cents per hectare or portion of a hectare of the reservation for each month or portion of a month of such extension.

101     Failure to complete programme

(1) If a concession holder fails to satisfy the Board that he has carried out the programme approved by the Board, within the period covered by such programme or such extended period as the Board may have granted under section one hundred, the Board may recommend to the Minister—

      (a)     that the order be revoked; and

      (b)     that there be recovered from the concession holder such sum of money as, in the opinion of the Board, it would have been necessary for the concession holder to expend in order to carry out or complete, as the case may be, such programme.

(2) Where the Board does not recommend that the order be revoked the order shall continue in all respects as if the programme had been completed.

(3) Where the Board has recommended that the order be revoked, the Minister shall revoke such order, and if the Board has made a recommendation mentioned in paragraph (b) of subsection (1), the Minister may by action in any court of competent jurisdiction recover such sum from the concession holder.

102     Failure to submit report

(1) If a concession holder fails to submit a report in terms of subsection (1) of section one hundred, the Board shall notify him in writing that no report has been received and that the order is liable to be revoked.

(2) If such report is not received by the Board within twenty-one days of the posting of such notification, the Board shall inform the Minister, and the Minister shall revoke the order.

(3) Notification under subsection (1) shall be given by posting a registered letter to the concession holder.

103     Rights of concession holders

(1) In this section—

"private land" does not include Communal Land.

(2) Save as provided in section one hundred and six, within a reservation no person, other than the concession holder, may in terms of this Act prospect or peg and register any mining location or be issued with a special grant in respect of coal, mineral oils or natural gases:

Provided that the Minister may, on the recommendation of the Board, and with the consent of the concession holder, which consent shall not be unreasonably withheld, authorize within such period as he may specify, any person to peg and register a mining location within a reservation for a mineral other than a mineral for which the concession holder is authorized to prospect.

(3) No person shall peg and register more than five mining locations under an authority issued in terms of subsection (2).

(4) No base mineral mining location pegged and registered under an authority issued in terms of subsection (2) shall exceed twenty-five claims.

(5) The concession holder shall retain his right to prospect over any mining location pegged and registered under an authority issued in terms of subsection (2).

(6) Subject to any provision in his order limiting the minerals for which he may prospect or peg and register mining locations, a concession holder shall, in terms of this Act, have the right of prospecting and pegging and registering mining locations in his reservation or may within his reservation be issued with a special grant in respect of coal, mineral oils or natural gases:

Provided that a concession holder—

        (a)      need not take out a prospecting licence or post a prospecting or discovery or registration notice in terms of this Act; and

        (b)      shall not be subject to subsection (2) of section twenty-seven.

(7) Within his reservation a concession holder shall, when bona fide employed in the exercise of any of the rights conferred by his order, the onus of proof whereof shall lie upon him, be entitled to the following rights—

        (a)      the right to take free of charge for primary purposes any public water or private water from land not closed to prospecting in terms of section thirty-one or thirty-four, but only in so far as such taking does not interfere with the use of such water for primary purposes by the owner or occupier of the land;

        (b)      subject to this section and of the Forest Act [Chapter 19:05] and to such conditions as may be prescribed and on payment to the occupier or, where there is no occupier, the owner of the land in advance of such tariff rate as may be prescribed, the right to take and use for firewood or for any purposes connected with his prospecting operations any indigenous wood or timber from land open to prospecting which is neither Communal Land nor land in regard to which a reservation has been made under section thirty-six or thirty-seven;

        (c)      subject to this section, the right to erect on land open to prospecting

any temporary accommodation for himself and his employees and any temporary buildings or machinery for the purposes of his work:

Provided that this paragraph shall not be deemed to confer any right, title or interest in any land upon which such accommodation, buildings or machinery may have been erected;

(d)　　the right to remove, within three months or such longer period as may be determined by the mining commissioner after the expiration or revocation of his order, any accommodation, buildings or machinery which may have been erected under paragraph (c).

(8) A concession holder who desires to take indigenous wood or timber from land referred to in paragraph (b) of subsection (7) which is private land shall give notice of such desire—

(a)　　if the land is occupied, to the occupier of the land in person or by registered letter addressed to the occupier at his ordinary postal address; or

(b)　　if the land is unoccupied, by registered letter addressed to the owner at his ordinary postal address;

and thereafter the concession holder and the occupier or owner may agree as to the area and period within which such wood or timber may be taken, the quantity and kinds of such wood or timber to be taken, the price to be paid for such wood or timber and any other conditions relating to such wood or timber.

(9) If, within a period of seven days from the date of the giving of notice in terms of subsection (8), no agreement has been concluded in accordance with that subsection, the concession holder shall have the rights conferred upon him by paragraph (b) of subsection (7) in respect of the land concerned.

(10) A concession holder who accommodates employees on occupied private land situated within his reservation for longer than seven days shall forthwith give to the occupier of the land written notice of that fact describing the site of the accommodation.

(11) If an occupier of private land to whom notice has been given in terms of subsection (10) objects to the site chosen for such accommodation by the concession holder and agreement between the occupier and the concession holder on any such objection is not reached, the occupier may, within seven days of receipt of the notice or such longer period as may be determined by the mining commissioner, refer the matter to the mining commissioner to decide where the employees of the concession holder should be accommodated and the decision of the mining commissioner shall be final and without appeal.

104　　Cutting and transporting of timber

(1) If, in regard to any indigenous wood or timber required in connection with his prospecting operations, any concession holder does not carry out by his own labour or by the labour of his employees or with his own transport all or any of the following operations—

(a)　　the cutting of such wood or timber;

(b)　　the transporting of such wood or timber;

(c)　　the burning therefrom of any charcoal;

then the occupier of the land on which such wood or timber is situated shall have the first option of carrying out such cutting or transporting or burning or all such operations, as the case may be, on such terms and conditions as may be mutually agreed upon.

(2) If no mutual agreement is reached, the matter shall be referred to the mining commissioner to decide on what terms and conditions and within what time the occupier of the land may exercise his option.

**105    Approved prospector to be in charge of all operations**

(1) A concession holder may, in writing under his hand, appoint one or more approved prospectors to act as his representatives under his order and any such representative shall act under that order solely for the benefit of the concession holder.

(2) The rights conferred by this Act upon the concession holder by section one hundred and three—

(a)    shall be exercised by the concession holder personally only if he is an approved prospector;

(b)    shall, where the concession holder is not an approved prospector, be exercised only through a representative appointed by the concession holder in terms of subsection (1).

(3) Without prejudice to any right of the concession holder to terminate any such appointment, the appointment of a person as a representative in terms of subsection (1) shall automatically be terminated if the registration of that person as an approved prospector expires or is cancelled or suspended.

**106    Concession holder's rights limited in certain cases**

(1) For the purposes of this section—

(a)    a block shall be regarded as being developed—

(i)    during the period between the date of first registration thereof and the date of issue of the first inspection certificate for such block;

(ii)    if the current inspection certificate for such block was obtained by any method other than by payment of a fee in terms of section two hundred and twelve;

(b)    a "property" means two or more blocks of claims, whether contiguous or otherwise, owned by one person, from which the ore is being treated at the same milling or reduction plant, or which are under the control of one registered mine manager;

(c)    a "standard block" means a block which may be pegged by the holder of an ordinary prospecting licence.

(2) A concession holder may not, for a period of sixty days from the date of the publication of his order in the Gazette, prospect or peg within five hundred metres of the boundaries of any property or registered block within the reservation which is being worked or developed.

(3) Notwithstanding subsection (2) of section one hundred and three, the holder of any property or registered block referred to in subsection (2) shall, during the period of sixty days referred to in subsection (2), have the right—

(a)    to prospect and peg and apply for the registration of standard blocks not exceeding six in all within five hundred metres of the boundaries of his property or registered block:

Provided that the rights conferred by this paragraph shall be confined to prospecting, pegging and applying for the registration of blocks in respect of a mineral for which such property or registered block was being worked or developed on the date of the publication of the order in the Gazette; and

(b)    subject to section forty-seven, to peg a site or sites in respect of such registered block or in respect of any registered block within such property not exceeding an area of ten hectares in all.

**107    Rights of holder of existing location unaffected**

(1) An order shall not affect the rights of the holder of a mining location within a reservation to mine and develop his mining location.

(2) The holder of a mining location in a reservation who, save in a bona fide exercise of the rights mentioned in subsection (1), hinders or obstructs a concession holder in

the exercise of any rights conferred upon him by the order to prospect on such location, shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[amended by Act 22 of 2001, gazetted on the 1st February, 2002.]

(3) If a concession holder unlawfully hinders or obstructs the holder of a mining location in the exercise of his rights, he shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

108    Demarcation of reservation

A concession holder shall erect beacons or notices demarcating the boundaries of his reservation in such manner as the mining commissioner may direct and shall maintain such beacons or notices in good order and condition in their proper position.

109    Performance of conditions of order

(1) Every concession holder shall, when required by the Minister, furnish him with such information as may be necessary to satisfy the Minister that the conditions of the order are being complied with.

(2) If any concession holder is found to have given incorrect or incomplete information for the purposes of subparagraph (vii) of paragraph (b) of subsection (2) of section eighty-seven, or fails to comply with subsection (1), or in the opinion of the Minister has not complied with any terms or conditions of the order, the Minister may forthwith revoke such order, and thereupon the rights of the concession holder thereunder shall cease.

(3) Nothing in this section contained shall be deemed to relieve any concession holder of any penalty to which he may be liable under section one hundred and one.

110    Increase of reservation

(1) A concession holder may, at any time after the approval by the Board of the programme mentioned in subsection (2) of section ninety-six make application to the Board for the inclusion of an additional area in the order.

(2) Sections eighty-seven, eighty-eight, ninety and ninety-one shall apply, mutatis mutandis, to any application made in terms of this section.

(3) Where an order is amended in terms of this section, the Board may require the concession holder to submit, within such period as the Board may specify, an amended programme of operations to be carried out in the reservation as so amended, and thereafter section ninety-nine shall apply, mutatis mutandis.

111    Inclusion of additional minerals in order

(1) If in the course of exercising his rights under his order the concession holder discovers within his concession any mineral other than a mineral for which he is authorized to prospect he may apply to the Board for the inclusion of such mineral in his order.

(2) In making an application in terms of subsection (1), the concession holder shall furnish full particulars of the nature of the mineral he has discovered and of the situation and circumstances of the discovery.

(3) Sections ninety and ninety-one shall apply, mutatis mutandis, to any application made in terms of this section.

(4) Where an order is amended in terms of this section, the Board may require the concession holder to submit, within such period as the Board may specify, an amended programme of operations to be carried out in the reservation, and thereafter section ninety-nine shall apply, mutatis mutandis.

112    Abandonment of reservation

(1) At any time before the Board has approved the second programme mentioned in subsection (3) of section ninety-six, the concession holder may, subject to subsection (2), by written notice to the Board abandon the whole or a portion or portions of his reservation.

(2) It shall not be competent for a concession holder—

      (a)     to give more than one such notice; or

      (b)     to give such notice in respect of such portions of the reservation as would result in the area of the reservation to be retained by him being divided into separate portions or, except in the case of an order granted solely in respect of precious metals or precious stones, being less than two thousand six hundred hectares in extent.

(3) On receipt of a notice given under subsection (1), the Board shall inform the Minister thereof, and he shall—

      (a)     in the case of the abandonment of the whole reservation, revoke the order; or

      (b)     in the case of the abandonment of a portion or portions of the reservation, amend the order accordingly.

(4) Where at any time after the Board has approved the programme mentioned in subsection (2) of section ninety-six, the concession holder desires to abandon the whole or a portion of his reservation, he may make written application to the Board for the revocation or amendment of his order, as the case may be.

(5) If on an application made under subsection (4), the concession holder satisfies the Board—

      (a)     that he has carefully prospected his reservation or that portion which he desires to abandon, as the case may be; and

      (b)     that an economic deposit of any mineral for which he is authorized to prospect under his order is unlikely to be discovered in his reservation or that portion which he desires to abandon, as the case may be; and

      (c)     that he has complied with all the terms and conditions of his order; and

      (d)     that he has duly carried out the programme last approved by the Board under section ninety-eight;

the Board may recommend to the Minister that the order be revoked or amended, as the case may be, and the Minister may revoke or amend the order accordingly.

(6) If on an application under subsection (4), the Board is not satisfied as to any matter mentioned in subsection (5), it shall refuse the application, and such refusal shall be final and without appeal.

(7) Where an order is revoked or amended by the Minister under this Part, the Board shall publish notice thereof in the Gazette and the ground shall become open to prospecting and pegging in terms of this Act on the day following the date of such publication.

113    Disposal of deposits

The total of the amounts deposited under paragraph (a) of subsection (2) of section eighty-seven and subsection (1) of section ninety-seven, hereinafter referred to as the deposit, shall be disposed of by the Secretary in whichever of the following ways is applicable to the case—

      (a)     where the application for an order is refused there shall be refunded to the applicant the whole of the deposit;

      (b)     where the concession holder has not, under subsection (1) of section one hundred and twelve, abandoned the whole or any portion of his reservation, there shall, upon the approval by the Board of the reports mentioned in subsection (1) of

section one hundred and subsection (1) of section one hundred and sixteen, be refunded to him the deposit divided into equal amounts in proportion to the total number of reports required to be submitted, as and when such reports are submitted;

(c)   where the concession holder has, under subsection (1) of section one hundred and twelve, abandoned a portion of his reservation, the concession holder shall forfeit and the Secretary shall pay to the Consolidated Revenue Fund out of the deposit a sum calculated at the rate of two cents for each hectare or portion of a hectare of the area so abandoned for each month or portion of a month of the period between the date of the making of the order and the date of receipt by the Board of the notice of abandonment, reduced by such sum as the concession holder satisfies the Board that he has expended on operations within the area in respect of which the order was made carried out in the exercise of the rights granted under the order between the date of the making of the order and the date of the receipt by the Board of the notice of abandonment, and any balance of the deposit shall be refunded to the concession holder upon the approval by the Board of the programme mentioned in subsection (2) of section ninety-six;

(d)   where the concession holder has, under subsection (1) of section one hundred and twelve, abandoned the whole of the reservation, the concession holder shall forfeit and the Secretary shall pay to the Consolidated Revenue Fund out of the deposit a sum calculated at the rate of two cents for each hectare or portion of a hectare of the reservation for each month or portion of a month of the period between the date of the making of the order and the date of the receipt by the Board of the notice of abandonment, reduced by such sum as the concession holder satisfies the Board that he has expended on operations within the reservation carried out in the exercise of the rights granted under the order between the date of the making of the order and the date of the receipt by the Board of the notice of abandonment, and any balance of the deposit shall be refunded to the concession holder;

(e)   where an order is revoked under subsection (2) of section ninety-nine, the deposit shall be forfeited by the concession holder and shall be paid by the Secretary to the Consolidated Revenue Fund.

114   Compensation for interference with registered mining location

If a concession holder exercises on a registered base mineral block any prospecting rights conferred upon him by his order under subsection (5) of section ninety-three, he shall be liable to pay compensation to the holder of such location for any loss or damage caused thereby in such amount as may be agreed upon or, failing agreement, as shall be determined by arbitration.

115   Concession holder may expropriate dormant location

If in the exercise of his rights under an order a concession holder discovers, in a registered base mineral block upon which he has been authorized to prospect under subsection (5) of section ninety-three, a mineral for which he may prospect under such order, other than the mineral for which such block is registered or a mineral which has, within the twelve months preceding the date of the lodging of the application for the order, been produced from the block and declared to the mining commissioner in terms of section two hundred and fifty-one he may, upon the authority of the President granted by him upon the recommendation of the Board, expropriate such base mineral block upon the payment of such compensation as may be agreed upon or, failing such agreement, as shall be determined by arbitration:

Provided that in assessing such compensation no allowance shall be made for the actual or potential value of the mineral discovered by the concession holder.

116   Plans and reports to be lodged by concession holder

(1) Not later than three months after the expiry or revocation of an order, the person

who was the concession holder under such order shall lodge with the Board in triplicate a final report, including plans and other relevant information, which shall be in two separate parts with respect to—

      (a)    prospecting work carried out by the concession holder on any mining location within the reservation during the currency of such order; and

      (b)    prospecting work carried out by the concession holder within his reservation which has not been registered as a mining location:

Provided that if during the period referred to in this subsection, the concession holder applies in writing to the Board for an extension of such period and satisfies the Board that he was prevented by circumstances beyond his control from complying with this subsection within that period the Board may extend the period by such further period as the Board may determine.

(2) Any person who contravenes subsection (1) shall be guilty of an offence and level six or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[substituted by Act 22 of 2001, with effect from the 10th September, 2002.]

117    Dangerous workings

Section two hundred and sixty-two shall, save in respect of shafts, open surface workings and excavations not made by him apply, mutatis mutandis, to a concession holder in respect of his reservation and for this purpose the date of the expiration or revocation of the order shall be regarded as the date of the abandonment of the reservation.

118    Withdrawal of reservation made by mining commissioner

Where the mining commissioner has reserved any ground against prospecting and pegging under section thirty-five in consequence of a direction given under subsection (3) of section eighty-seven, the Board shall upon the refusal of the application direct the mining commissioner to withdraw the reservation, and the mining commissioner shall, without obtaining the authority of the Minister, withdraw such reservation.

119    Order granting relief from provisions of this Part in certain circumstances

(1) If at any time after the making of an order the Board, on the application of the concession holder, is satisfied that his operations have been or are likely to be restricted or curtailed by abnormal circumstances beyond his control, the Minister may, on the recommendation of the Board, give such directions as he deems fit for the relief of the concession holder from this Part.

(2) Without derogation from the generality of subsection (1), directions given in terms of that subsection may include provision for—

      (a)    refunding the deposit referred to in section one hundred and thirteen;

      (b)    where the reservation or a portion thereof is abandoned, reserving the ground so abandoned against prospecting and pegging pending a return to circumstances permitting normal operations and granting a first option in respect of the ground so reserved to the concession holder in respect of any fresh application in terms of this Part on the return of such circumstances;

      (c)    the suspension for an appropriate period of the concession holder's obligations under this Part and the extension of the order for a like period.

(3) To the extent that any direction given in terms of subsection (1) is inconsistent with any other provision of this Act the direction shall prevail.

(4) Directions given in terms of subsection (1) may at any time be revoked or varied by the Minister.

(5) Where directions given by the Minister in terms of subsection (1) affect the period of the order, the Minister shall publish notice thereof in the Gazette.

PART VII
PEGGING OF UNDERGROUND EXTENSIONS

120     Interpretation in Part VlI

In this Part—

"authorized holder" means a holder in whose favour an order has been made;

"holder", in relation to an underground extension block, means the person in whose name such block is from time to time registered;

"order" means an order issued under this Part authorizing a holder of a registered mining location to peg and register an underground extension;

"owner", in relation to State land, means the Minister responsible for the administration of such land;

"reserved ground" means land upon which a prospector is prohibited in terms of paragraph (a), (c), (d), (e), ( f ) or (g) of subsection (1) of section thirty-one or subsection (1) of section thirty-five from exercising any of his rights under his prospecting licence;

"underground extension block" means a block which has been pegged and registered under an order.

121     Application for order

(1) If the holder of a registered mining location, other than a site, has reason to believe that a deposit of any mineral occurs underground beneath reserved ground, he may make written application to the Board for an order authorizing him to peg and register an underground extension block or blocks contiguous to such location.

(2) The applicant shall furnish to the Board—

        (a)      full details of the reserved ground; and

        (b)      the reasons why he considers that such reserved ground warrants the granting of the authority; and

        (c)      the depth from the surface of the ground at which he wishes to be authorized to mine such reef; and

        (d)      full information as to his financial status; and

        (e)      any other information required of him by the Board.

(3) On receipt of the application by the Board—

        (a)      the chairman of the Board may, if the application relates to reserved ground referred to in paragraph (a) or (g) of subsection (1) of section thirty-one issue a direction to the mining commissioner to reserve the ground to which the application relates against prospecting and pegging in terms of section thirty-five and the mining commissioner shall, without obtaining the authority of the Minister, forthwith reserve such ground accordingly;

        (b)      the Board may refuse the application or approve it provisionally.

122     Procedure on provisional approval

(1) If the Board provisionally approves such application it shall—

        (a)      unless the chairman of the Board has issued a direction to the mining commissioner under paragraph (a) of subsection (3) of section one hundred and twenty-one itself issue such a direction, and the mining commissioner shall comply therewith; and

        (b)      after the mining commissioner has reserved the ground in accordance with a direction given under paragraph (a) of subsection (3) of section one hundred and twenty-one or paragraph (a), notify the owner and the occupier, if any, of the reserved ground, of the application and require them to lodge, within thirty days of such notification, or such longer period not exceeding sixty days as the Board may, on application made within the period of thirty days, approve, their objections, if any, to the grant of the application.

(2) Notification in terms of paragraph (b) of subsection (1) shall be given by posting a registered letter to the owner and the occupier, if any.

123     Grant or refusal of application

(1) If an owner or occupier of reserved ground lodges objections to the grant of the application, the Board shall on a day fixed by it and notified to the applicant and the objector hear such evidence and arguments as those persons may wish to lay before it in regard to the grant or refusal of the application.

(2) If no objection has been received or if no notification was given in terms of paragraph (b) of subsection (1) of section one hundred and twenty-two owing to the whereabouts of the owner and the occupier, if any, being unknown to the Board, after due inquiry, the Board shall proceed with the consideration of the application.

(3) After holding a hearing in terms of subsection (1) or considering the application in terms of subsection (2), the Board may refuse the application or, subject to section one hundred and twenty-four, grant it, in whole or in part, subject to such terms and conditions as it may fix, including a condition as to the period within which the rights under the order may be exercised.

(4) If the owner or the occupier of the reserved ground is aggrieved by the grant of the application, he may, within twenty-one days after the Board's decision, appeal to the Minister in writing against that decision, setting out the grounds of his appeal.

(5) On any such appeal the Minister may revise or alter the decision of the Board and may revoke the grant of the application or amend the terms and conditions fixed by the Board, and the Minister's decision shall be final and without appeal.

124     Board to be satisfied on certain points

The Board shall not grant an order unless it is satisfied—

    (a)     that there is reason to believe that the deposit occurs beneath the reserved ground; and

    (b)     that conditions permit of the mining of such reef below the surface without disturbing or detracting from the use or value of the reserved ground; and

    (c)     that the mining of such reef will be carried out without in any way interfering with the rights of the landowner in the reserved ground or causing any foreseeable loss or damage to such landowner; and

    (d)     that the financial status of the applicant is such that he will be able to pay any compensation payable under section one hundred and thirty-three.

125     Publication of order

(1) If no appeal is made to the Minister within the prescribed time or, if an appeal is made, on receipt of the Minister's decision thereon, the Board shall make an order consistent with the terms and conditions fixed by it or the Minister, as the case may be, authorizing the applicant to peg and register an underground extension block on the reserved ground.

(2) Every order shall be published in the Gazette and a copy of the order shall be sent to the applicant and to the mining commissioner of the district in which the reserved ground is situated and to the owner or the occupier of the reserved ground affected by such order.

126     Rights of applicant

An authorized holder shall, subject to the terms and conditions of the order and in terms of this Act, have the sole and exclusive right of pegging and registering an underground extension block or blocks on the reserved ground:

Provided that such authorized holder need not post a prospecting notice or DP peg in terms of this Act.

127     Order may not be ceded

The rights granted under an order shall be personal to the authorized holder who may

not cede or assign any such rights to any other person.

128     Approval of transfer of underground extension block

(1) An underground extension block may not be transferred except to a person approved of by the Board.

(2) The Board shall not approve of the transfer of an underground extension block to any person unless it is satisfied that his financial status is such that he will be able to pay any compensation payable under section one hundred and thirty-three and that the existing holder of the block has paid all compensation payable by him in terms of that section.

129     Forfeiture of underground extension block

(1) The terms and conditions attached to an order shall be binding on every registered holder of an underground extension block.

(2) If the holder of an underground extension block fails to comply with such terms and conditions, he shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

(3) In addition the Board may direct the mining commissioner to declare the underground extension block to be forfeited and the mining commissioner shall, whether or not such block is currently protected from forfeiture by an inspection or protection certificate issued in terms of Part XI, comply with such direction.

130     Indicatory beacons

Notwithstanding anything to the contrary contained in this Act, the mining commissioner may authorize the authorized holder to demarcate his underground extension block by indicatory beacons posted off the reserved ground in accordance with regulations.

131     Surface rights abrogated

The holder of an underground extension block may not exercise in respect of such block any of the surface rights mentioned in section one hundred and seventy-eight.

132     Secondary reefs

(1) The holder of an underground extension block who discovers a secondary reef therein shall notify the Board of such discovery.

(2) The Board may authorize such holder on such terms and conditions as it thinks fit to impose to mine such secondary reef.

(3) Such holder shall upon such authorization register the secondary reef with the mining commissioner in terms of this Act, but shall not post a DP peg or secondary reef registration notice or Q and R pegs.

133     Compensation

Any owner or occupier of reserved ground who is injuriously affected by any mining operations carried on any underground extension block shall be entitled to recover compensation from the holder of such block in such amount as may be agreed or, failing agreement, as shall be determined by the Administrative Court.

134     Conversion of underground extension block

(1) If the surface of an underground extension block ceases to be reserved ground, the holder of such block shall immediately notify the mining commissioner of the fact, and if the mining commissioner is, after due inquiry, satisfied that such ground is no longer reserved ground, he shall direct such holder to beacon the block in terms of this Act and, if such block has been pegged in irregular form, to erect pegs marked Q and R in terms of paragraph (e) of subsection (3) of section forty-three, and, if a secondary reef has been registered, to erect pegs marked Q and R in terms of paragraph (c) of subsection (1) of section one hundred and seventy.

(2) As soon as the holder has complied with the directions of the mining commissioner under subsection (1) the block shall cease to be an underground extension block and shall no longer be held subject to the order under which it was pegged and registered.

PART VIII

MINING LEASES

135    Application for mining lease

(1) The holder of a registered mining location or of contiguous registered mining locations may make written application to the mining commissioner for the issue to him of a mining lease in respect of a defined area within which such mining location or locations are situated:

Provided that, save as is provided in section thirty-four, ground not registered as a mining location in the name of the applicant shall not be included within the defined area unless it is open to prospecting.

(2) The applicant shall furnish to the mining commissioner—

        (a)      particulars of the minerals which are being mined or are to be mined in the area applied for;

        (b)      details illustrated by a sketch plan based on a map issued under the authority of the State and of a scale of not less than l:25 000 identifying the position of the area applied for and of any registered mining locations situated therein and specifying the extent of such area;

        (c)      if any precious metal reef blocks are covered by the application, details of such blocks in respect of which he wishes to retain extra-lateral rights in the event of the mining lease being issued;

        (d)      a list of all the mining locations registered in his name, situated within the area applied for, and the certificates of registration of such locations;

        (e)      the name and address of the owner and the occupier, if any, of the land to which the application relates;

        ( f )      any other information relevant to the application which may be required of him by the mining commissioner or the Board.

(3) The sketch plan mentioned in paragraph (b) of subsection (2) shall indicate the position of each mining location mentioned in paragraph (d) of that subsection and the position of the boundaries of any holding of land falling within the area applied for.

(4) The boundaries of the area applied for shall be straight lines.

136    Reservation of ground by mining commissioner

(1) Where the area applied for includes any ground which is not registered as a mining location in the name of the applicant, the mining commissioner shall, on receipt of the application, without obtaining the authority of the Minister, reserve the ground against prospecting and pegging in terms of section thirty-five.

(2) The landowner or occupier of land shall, in respect of the ground not so registered in the name of the applicant and reserved under subsection (1) and which was open to prospecting at the time such reservation was made, during the period of the reservation, have the same rights in all respects as if the ground not so registered formed part of a mining location registered in the name of the applicant.

137    Submission of application for provisional approval by Board

(1) On receipt of an application in terms of section one hundred and thirty-five and after complying where necessary with the provisions of subsection (1) of section one hundred and thirty-six, the mining commissioner shall submit the application to the Board together with any report he may wish to make on the application.

(2) The Board shall consider any application submitted to it under subsection (1) and

shall, if it is satisfied, having regard to the provisions of subsections (3) and (5) of section one hundred and forty-two, that the application has a reasonable prospect of success, provisionally approve the application in respect of either the whole or a portion of the area applied for or, if not so satisfied, shall refuse the application.

(3) Notwithstanding subsection (2), if the Board is satisfied—

     (a)     that the applicant will meet the criteria mentioned in paragraphs (a) and (b) of subsection (1) of section one hundred and fifty-nine; or

     (b)     having regard to the matters set out in subsection (2) of section one hundred and fifty-nine, that it is desirable in the interests of the development of Zimbabwe's mineral resources to consider the grant of a special mining lease to the applicant;

the Board may require the applicant to apply for a special mining lease in terms of Part IX.

(4) When the Board has arrived at a decision under subsection (2) or (3) it shall return the application to the mining commissioner together with written notification of the decision.

(5) The mining commissioner shall notify the applicant in writing of the Board's decision under subsection (2) or (3) and, where the Board has provisionally approved the application, the mining commissioner shall in writing require the applicant to submit, within such period as the mining commissioner shall specify, a plan in triplicate prepared by a land surveyor of the area provisionally approved by the Board which shall, where it is a portion of the area originally applied for, thereafter be deemed to be the area applied for.

(6) The plan mentioned in subsection (5) shall show all points of intersection of the boundary lines of the area concerned and all points of intersection of such boundary lines by the boundary lines of any piece of land in respect of which an approved diagram or general plan is filed on record in the office of the Surveyor-General.

(7) If the applicant fails to submit the plan mentioned in subsection (5) within the period specified by the mining commissioner, or within such extended period as the mining commissioner may have allowed, the application shall be deemed to have been withdrawn.

(8) Within the period or extended period mentioned in subsection (7), the applicant may, by written notice to the mining commissioner, withdraw his application.

(9) The decision of the Board under subsection (2) or (3) shall be final and without appeal, but—

     (a)     the provisional granting of an application under subsection (2) shall not in any way affect the discretion of the Board to approve or refuse the application under section one hundred and forty-two;

     (b)     a decision that the applicant should apply for a special mining lease under Part IX shall not in any way affect the discretion of the Board, the Minister or the President under that Part to make or not to make a recommendation or to grant or refuse an application, as the case may be.

138    Notice of application to be published in Gazette

On receipt of the plan mentioned in section one hundred and thirty-seven the mining commissioner shall—

     (a)     publish a notice in the Gazette giving details of the application, including particulars of the mining locations to which the application relates, and inviting the lodging, within a period of thirty days from the date of such publication, of objections thereto;

     (b)     by registered letter notify the owner and the occupier, if any, of the ground applied for of the application and invite them to lodge, within a period of

thirty days from the date of the publication in the Gazette of the notice mentioned in paragraph (a), their objections thereto.

139     Determination of objections

(1) If in any objection lodged with the mining commissioner under section one hundred and thirty-eight it is alleged that the title of the applicant to any of the mining locations to which the application relates is defective on the ground that the pegging of such locations was invalid or illegal or that this Act was not complied with prior to the issue of the certificate of registration in respect of such locations, the objection shall be determined by the mining commissioner in terms of this Act.

(2) If in any objection so lodged it is alleged by the owner or the occupier of the land that any ground which is not registered in the name of the applicant as a mining location was not, on the date of the reservation of the ground by the mining commissioner under subsection (1) of section one hundred and thirty-six open to prospecting and pegging, the matter shall be determined by the Administrative Court.

(3) Any objection not mentioned in subsections (1) and (2) shall be determined by the Board.

140     Transmission of objections to Administrative Court

(1) The mining commissioner shall, as soon as he receives an objection mentioned in subsection (2) of section one hundred and thirty-nine transmit it to the Administrative Court for determination.

(2) The registrar of the Administrative Court shall, as soon as the Court has determined an objection transmitted to it under subsection (1), forward to the mining commissioner a copy of the Court's determination.

141     Submission of application to Board

After the period for the lodging of objections has expired and all the objections mentioned in subsections (1) and (2) of section one hundred and thirty-nine have been determined, the mining commissioner shall submit the application to the Board, together with—

        (a)     any objections thereto mentioned in subsection (3) of that section; and

        (b)     copies of the determinations made in respect of any other objections lodged with him; and

        (c)     his report on the application.

142     Consideration of application by Board

(1) On receipt of the documents mentioned in section one hundred and forty-one the Board shall consider the application and any objections mentioned in subsection (3) of section one hundred and thirty-nine.

(2) The Board may, having regard to any determination made on any objection by the Administrative Court or the mining commissioner and any objection mentioned in subsection (3) of section one hundred and thirty-nine refuse the application or, subject to subsections (3), (4) and (5), approve it.

(3) The Board shall not approve an application unless it is satisfied—

        (a)     that the applicant's financial status is such that he will be able to meet any payment which may become due by him under the provisions of section three hundred and forty-four; and

        (b)     that mining operations on a substantial scale are likely to be conducted for a considerable period within the area applied for; and

        (c)     that no ground not open to prospecting, save as provided in section thirty-four is included in the area to which such approval would relate.

(4) Before approving an application the Board may, and, if so required by the landowner, shall, require the applicant to furnish a guarantee satisfactory to the Board for the payment mentioned in paragraph (a) of subsection (3).

(5) The Board may approve the application in respect of the whole of the area applied for or, having regard to the dispersal of the mineral deposits within the area, to the extent of the ground necessary for the mining operations mentioned in paragraph (b) of subsection (3) and to any other factor which the Board may deem to be relevant, may approve the application in respect of a portion of the area applied for, and may, in approving the application require the inclusion in the mining lease of such terms and conditions not inconsistent with this Act, as the Board may fix, including a condition amending any plan previously approved in terms of Part XIII.

(6) The decision of the Board to grant or refuse an application under this section shall be final and without appeal.

143     Notice to applicant of Board's decision

(1) The Board shall notify the applicant and any objector in writing of its decision under section one hundred and forty-two and, where the application has been approved, of the terms and conditions to be included in the mining lease under subsection (5) of that section.

(2) Where such approval relates to a portion of the area applied for, the Board shall furnish the applicant with details of such portion.

(3) Within thirty days of the date of the notification mentioned in subsection (1), the applicant may, by written notice given to the Board, the owner and the occupier, if any, of the land withdraw his application.

144     Submission of amended survey plan

(1) Where the Board has approved of the application in respect of a portion of the area applied for and the applicant does not withdraw his application under subsection (3) of section one hundred and forty-three he shall, within the period mentioned in that subsection, or such longer period as the Board may allow, submit to the Board an amended plan in triplicate prepared by a land surveyor of the area approved.

(2) If the applicant fails to submit such amended plan within the period mentioned in subsection (1), the Board shall inform him that the amended plan has not been received and, if the plan is not received by the Board within thirty days from such notification, the application shall be deemed to have been withdrawn.

(3) Subsection (6) of section one hundred and thirty-seven shall apply, mutatis mutandis to the preparation of an amended plan for the purposes of this section.

145     Issue of mining lease

(1) Where the Board has approved an application under section one hundred and forty-two the Board shall, unless the application has been withdrawn under subsection (3) of section one hundred and forty-three or the application is deemed to have been withdrawn under subsection (2) of section one hundred and forty-four forthwith issue a mining lease in favour of the applicant in respect of the area approved and in accordance with the terms and conditions fixed by the Board under subsection (5) of section one hundred and forty-two and shall give notice in writing of the issue thereof to the owner and the occupier, if any, of the land and to any objector.

(2) The original of such lease shall be sent to the applicant together with a copy of the plan prepared by a land surveyor mentioned in section one hundred and thirty-seven or one hundred and forty-four as the case may be, and one copy of such mining lease and such plan shall be sent to the mining commissioner by the Board.

(3) The Board shall retain a copy of such mining lease and of such plan for purposes of record.

146     Registers of mining leases

(1) The Board shall assign a number to each mining lease issued under this Part and such number and the particulars of each lease shall be recorded in a register of mining

leases kept by the Board for the purpose.

(2) The mining commissioner shall keep a register in which shall be recorded the number assigned thereto by the Board and the particulars of every mining lease issued in respect of ground within his district.

147     Withdrawal of reservation

Where the mining commissioner has reserved ground under section one hundred and thirty-six and—

    (a)     the application has been withdrawn or is deemed to have been withdrawn under section one hundred and thirty-seven or has been refused, the mining commissioner shall forthwith, without obtaining the authority of the Minister, withdraw the reservation;

    (b)     the application has been provisionally approved in respect of a portion of the area applied for, the mining commissioner shall forthwith, without obtaining the authority of the Minister, withdraw the reservation in respect of the portion not approved;

    (c)     the application has been approved in respect of the whole or a portion of the area applied for, the mining commissioner shall, without obtaining the authority of the Minister, withdraw the reservation—

    (i)     after the mining lease has been issued; or

    (ii)     after the application has been withdrawn under section one hundred and forty-three; or

    (iii)     after the application is deemed to have been withdrawn under section one hundred and forty-four;

        as the case may be.

148     Second or subsequent applications

Where an application has been refused under section one hundred and thirty-seven or one hundred and forty-three or has been withdrawn under section one hundred and thirty-seven or one hundred and forty-three or is deemed to have been withdrawn under section one hundred and thirty-seven or one hundred and forty-four the person who made the application may not make a second or subsequent application for a mining lease in respect of the same area until a period of twelve months has elapsed from the date of the refusal or withdrawal or the date on which the application is deemed to have been withdrawn, as the case may be.

149     Approval of transfer of mining lease

(1) A mining lease may not be transferred except to a person approved of by the Board, after consultation with the owner of the ground covered by the lease.

(2) The Board shall not approve of the transfer of a mining lease to any person unless the Board is satisfied that his financial status is such that he will be able to meet any payment which may become due by him under section three hundred and fourteen.

(3) Before approving of the transfer of a mining lease to any person the Board may, and if so required by the landowner, shall, require that person to furnish a guarantee satisfactory to the Board for the payment mentioned in subsection (2).

150     Mining rights of holder of mining lease

(1) Subject to any prior right possessed by the holder of any mining location under section one hundred and seventy-one, every holder of a mining lease, hereinafter in this Part called the lease holder, shall possess the following mining rights—

    (a)     the exclusive right of mining any ore or deposit of any mineral mentioned in paragraph (a) of subsection (2) of section one hundred and thirty-five which occurs within the vertical limits of the area covered by his lease; and

    (b)     the exclusive right within the vertical limits of the area covered by his lease of mining any ore or deposit of any other mineral discovered within such area

after he has notified the mining commissioner of such discovery:

Provided that nothing in this paragraph contained shall be construed so as to confer any right to mine any coal or mineral oil or natural gas.

(2) The holder of a mining lease which includes any precious metal blocks in respect of which he gave details under paragraph (c) of subsection (2) of section one hundred and thirty-five shall retain, in respect of such blocks, the extra-lateral rights which he held at the date of issue of the lease.

(3) The holder of a mining lease which includes such precious metal blocks shall, notwithstanding anything contained in this Part, keep and maintain in good order all the original beacons, pegs and claim plates of such blocks and shall make a certificate to the mining commissioner annually that such beacons, pegs and claim plates are in good order and condition and that they comply with section fifty-one.

151    Beaconing of mining lease area

(1) Subject to this section, within a period of two months from the date of issue of a mining lease or such longer period as the mining commissioner may allow, the lease holder shall—

(a)    erect beacons of concrete or solid mason work at all points of intersection of the boundary lines of the area covered by the lease and at all points of intersection of such boundary lines by the boundary lines of any piece of land in respect of which an approved diagram or general plan is filed on record in the office of the Surveyor-General; and

(b)    if any boundary is more than three hundred metres in length, erect intermediate beacons so that no beacon shall be more than three hundred metres from the next adjoining beacon on either side.

(2) All beacons mentioned in paragraph (a) of subsection (1) shall be erected under the supervision of, and in the position determined by, a land surveyor and may be so erected at the time the area concerned is surveyed for the purposes of preparing the plan mentioned in section one hundred and thirty-seven or one hundred and forty-four.

(3) The beacons referred to in subsection (1) shall be lettered in consecutive alphabetical order in a clockwise direction commencing with the letter A but omitting the letters Y and Z, and if there are more beacons than twenty-four the letters and figures A2, B2 and so on shall be used in respect of the beacons up to forty-eight and thereafter the letters and figures A3, B3 and so on shall be used

(4) Every beacon mentioned in this section shall bear on it, in addition to the distinguishing letter, the words "Mining Lease" followed by the number assigned to such lease by the Board.

(5) The distinguishing letter and the particulars mentioned in subsection (4) shall be engraved upon the beacon or otherwise affixed thereto in such permanent manner and in such position as the mining commissioner may approve.

(6) Subsections (3) and (4), paragraph (b) of subsection (5) and subsections (7) and (8) of section fifty-one shall apply, mutatis mutandis to and in respect of all such beacons.

152    Cancellation of certificates of registration

Upon the issue of a mining lease the certificates of registration in respect of all mining locations situated within the area covered by such lease shall be deemed to have been cancelled:

Provided that any site attached to any such mining location shall be deemed to be attached to such lease, and thereafter section forty-nine shall apply, mutatis mutandis to or in respect of such sites.

153    No impeachment of title to mining leases

When a mining lease has been issued it shall not be competent for any person to dispute the title of the lease holder to any of the ground covered by the lease on the following grounds—

(a)    that the pegging of any of the mining locations which were included in the area covered by such lease or of any secondary reef which was registered in respect of any such location was invalid or illegal or that provisions of this Act or of any other enactment were not complied with prior to the issue of the certificate of registration of any such location or reef;

(b)    that any ground not open to prospecting was included in the area covered by the lease;

(c)    that provisions of this Act were not complied with in respect of such lease prior to the issue thereof.

154    Increase of area of mining lease

(1) A lease holder may make written application to the Board for the inclusion in his mining lease of an additional contiguous area of ground.

(2) Subsections (2), (3) and (4) of section one hundred and thirty-five and sections one hundred and thirty-six to one hundred and forty-four and sections one hundred and forty-seven, one hundred and forty-eight and one hundred and fifty-two shall apply, mutatis mutandis to or in respect of such application, the reservation of the ground, the plan of the area concerned, any objections to the application, the approval or refusal of the application, the withdrawal of the reservation, the beaconing of the additional area and the certificates of registration of mining locations within such area, respectively.

(3) Where the Board has approved an application made under this section, the Board shall, unless the application has been withdrawn or is deemed to have been withdrawn, amend the original and the copies of the mining lease mentioned in section one hundred and forty-five accordingly, and shall return the amended original and a copy of the lease to the lease holder and the mining commissioner, respectively, and send a copy of the plan to each of them and shall retain one copy of the lease and of the plan.

(4) As soon as subsection (3) has been complied with, the registers mentioned in section one hundred and forty-six shall be amended accordingly.

(5) Where the area covered by a mining lease is amended by the inclusion of an additional area, the lease holder shall beacon such additional area in accordance with section one hundred and fifty-one so however, that—

(a)    the letter Y shall precede the letter or letters to be engraved upon or affixed to the beacons of the additional area under that section; and

(b)    it shall not be necessary for the lease holder to erect a new beacon at any point which is already demarcated by a beacon of the original area of the lease.

(6) Where the area covered by a mining lease is amended under this section, section one hundred and fifty-three shall apply in all respects as if the lease had been issued in respect of the increased area.

155    Abandonment of portion of mining lease

(1) A lease holder may make written application to the Board, through the mining commissioner, for the abandonment of any portion or portions of his mining lease:

Provided that it shall not be competent for a lease holder so to apply if—

(a)    the mining lease is the subject of a hypothecation or option registered under Part XVII; or

(b)    such abandonment would result in the area covered by the lease to be retained by him being divided into separate portions or if the boundaries of the reduced area of the lease would not be straight lines.

(2) The applicant shall, with his application, submit to the Board a plan in triplicate prepared by a land surveyor of the area or areas which he wishes to abandon.

(3) The Board may, if it is satisfied that all the terms and conditions of the mining lease have been complied with by the applicant, approve the application or may refuse it, and the Board's decision shall be final and without appeal.

(4) Where the Board has approved an application made under this section, the Board shall amend the original and the copies of the mining lease accordingly and shall retain one copy of the plan and send a copy thereof to the lease holder and the mining commissioner.

(5) As soon as subsection (4) has been complied with, the registers mentioned in section one hundred and forty-six shall be amended accordingly.

(6) Upon any such abandonment the lease holder shall—

(a)     remove the pegs or direction marks indicating the direction of boundary lines of any beacon which falls outside the reduced area of the mining lease;

(b)     erect beacons in accordance with the provisions of section one hundred and fifty-one along such boundaries of the reduced area of the lease as do not form part of the boundaries of the area covered by the lease before such abandonment, so, however, that the letter Z shall precede the letter or letters to be inscribed on the new beacons under that section.

(7) Where the area covered by a mining lease is amended under this section, section one hundred and fifty-three shall apply in all respects as if the lease had been issued in respect of the reduced area.

156     Total abandonment of mining lease

(1) A lease holder who desires to abandon the whole of his mining lease may in writing apply to the Board, through the mining commissioner, for the cancellation of his mining lease:

Provided that it shall not be competent for a lease holder so to apply if the mining lease is the subject of a hypothecation or option registered under Part XVII.

(2) The lease holder shall together with such application lodge with the mining commissioner his copy of the mining lease.

(3) On receipt of the application the Board shall cancel the mining lease and shall inform the mining commissioner and the applicant of such cancellation, and the fact of such cancellation shall be noted in the registers mentioned in section one hundred and forty-six.

157     Failure to comply with terms and conditions of mining lease

(1) If the Board is satisfied that a lease holder has failed to comply with any of the terms and conditions of his mining lease, the Board may recommend to the Minister that—

(a)     there be recovered from the lease holder as a penalty such sum as the Board may deem appropriate; or

(b)     that the mining lease be cancelled.

(2) Where the Board has recommended the recovery of a penalty under paragraph (a) of subsection (1), the Minister may by action in any court of competent jurisdiction recover from the lease holder the sum so recommended or such lesser sum as the Minister may deem fit.

(3) Where the Board has recommended that the lease be cancelled, the Minister may—

(a)     direct the Board to cancel the lease; or

(b)     recover from the lease holder by action in any court of competent jurisdiction, as a penalty, such sum as he may determine after consultation with the

Board.

(4) If the Minister directs that the lease be cancelled, the Board shall comply with such direction and shall inform the mining commissioner and the lease holder, and the fact of such cancellation shall be noted in the registers mentioned in section one hundred and forty-six.

PART IX

SPECIAL MINING LEASES

158     Interpretation in Part IX

In this Part—

"application" means an application for a special mining lease made in terms of section one hundred and fifty-nine;

"mining development plan" means a plan referred to in paragraph (e) of subsection (3) of section one hundred and fifty-nine.

159     Application for special mining lease

(1) Where the holder of one or more contiguous registered mining locations intends to establish or develop a mine thereon and, subject to subsection (2)—

      (a)     investment in the mine will be wholly or mainly in foreign currency and will exceed one hundred million United States dollars in value; and

      (b)     the mine's output is intended principally for export;

he may apply in writing to the mining commissioner for a special mining lease in respect of a defined area within which his mining location or locations are situated:

Provided that, except as provided in section one hundred and thirty-five, ground not registered as a mining location in the name of the applicant shall not be included within the defined area unless it is open to prospecting.

(2) The Board may permit a person to make an application under subsection (1) notwithstanding that either or both the criteria mentioned in paragraphs (a) and (b) of that subsection will not be met, if the Board, having regard to—

      (a)     the nature and size of the mineral deposits within the area over which the applicant seeks a special mining lease; and

      (b)     the estimated life and economic viability of the proposed mine; and

      (c)     the extent of the investment that will be made in the proposed mine; and

      (d)     the proposed method of extraction, mining and treatment of ore from the proposed mine; and

      (e)     any other relevant circumstance;

considers that it is desirable in the interests of the development of Zimbabwe's mineral resources to consider the grant of a special mining lease to the applicant.

(3) An applicant for a special mining lease shall furnish to the mining commissioner—

      (a)     particulars of the minerals which are being mined or are to be mined in the area applied for; and

      (b)     a sketch plan based on a map issued under the authority of the State and of a scale not less than 1:25 000 identifying the position of the area applied for and any registered mining locations situated therein and specifying the extent of the area; and

      (c)     a list of all the registered mining locations of which he is the sole or joint holder and which are situated within the area applied for, and the certificates of registration of such locations; and

      (d)     the name and address of each owner and the occupier, if any, of the land to which the application relates; and

      (e)     a plan for the development and operation of the proposed mine,

including—

(i)        a feasibility study relating to the development of the proposed mine; and

(ii)        a financing plan indicating the type and source of finance to be obtained in order to develop the proposed mine and construct the necessary infrastructure and facilities; and

(iii)        a marketing plan setting out proposals and a timetable for the beneficiation and disposal of the output of the proposed mine, together with any relevant marketing studies; and

(iv)        proposals for the efficient and economic exploitation of the mineral deposits to be mined, specifying the proposed method of mining and treatment of the ore and the dates on which such mining and treatment will commence; and

(v)        an economic evaluation of the proposed mine, including a detailed forecast of the capital investment, operating costs and projected revenues and profits; and

(vi)        a comprehensive report, supported by documentary evidence, on the mineral deposits to be mined, including details of their extent, grade and quantity and distinguishing between proven, probable and estimated ore reserves and indicating the anticipated mining conditions; and

(vii)        a report on the anticipated impact of mining operations on the environment and any measures to be taken to assess, prevent or minimize such impact, including proposals for—

A.        the prevention or treatment of pollution; and
B.        the treatment and disposal of waste;
C.        the protection of rivers and other sources of water; and
D.        the reclamation and rehabilitation of land disturbed by mining operations; and
E.        monitoring the effect of mining operations on the environment; and

(viii)        details of any roads, railway lines, electricity supply and other infrastructure which will be required and which the applicant proposes to provide for the purposes of mining operations; and

(ix)        the proposed timetable for the establishment and operation of the proposed mine and the facilities associated with it; and

(x)        details of any insurance to be taken out against liability arising from mining operations, including liability for damage to the environment and injury to persons and property; and

(xi)        proposals for the storage, recording and shipment of the output of the proposed mine; and

(xii)        information on the extent to which local goods and services will be utilized in the development and operation of the proposed time; and

(xiii)        details of the manpower requirements of the proposed time, including the numbers of expatriate staff and any proposals for training citizens of Zimbabwe; and

( f )        any other information which might reasonably affect the grant or refusal of the application or which relates to the applicant's ability to perform his obligations under a special mining lease or any agreement under section one hundred and sixty-seven; and

(g)        any other information relevant to the application which the mining commissioner or the Board may require

160        Applications of certain provisions of Part VIII to special mining leases

(1) Subject to this section, sections one hundred and thirty-six to one hundred and forty-two shall apply, mutatis mutandis, to the consideration of applications and the determination of any objections thereto:

Provided that the Board shall not have power to approve or refuse an application, but instead shall make recommendations thereon to the Minister, and any reference in those sections to an approval or refusal of an application by the Board shall be construed as a recommendation by the Board to the Minister that the application should be granted or refused, as the case may be.

(2) The Board shall not recommend to the Minister that an application be granted unless the Board is satisfied, in addition to the matters referred to in subsection (3) of section one hundred and forty-two, that—

      (a)     the criteria mentioned in paragraphs (a) and (b) of subsection (1) of section one hundred and fifty-nine will be met or, if those criteria will not be met, that having regard to the matters referred to in paragraphs (a) to (e) of subsection (2) of section one hundred and fifty-nine, it would be desirable in the interests of the development of Zimbabwe's mineral resources for the application to be granted; and

      (b)     the area to which the application relates contains a mineral or group of minerals which may profitably be mined and sold or otherwise disposed of; and

      (c)     the applicant's mining development plan takes proper account of environmental and safety factors; and

      (d)     the applicant's programme of mining operations will ensure the efficient, timely and beneficial use of the mineral resources concerned; and

      (e)     the applicant's proposals for the procurement and use of local goods and services and the employment of Zimbabwean citizens are satisfactory; and

      ( f )     the applicant is able and willing to comply with the terms and conditions of any special mining lease that may be granted to him and of any agreement that may be concluded with him in terms of section one hundred and sixty-seven; and

      (g)     the applicant possesses or can obtain the technical and financial resources required to develop and operate the proposed mine; and

      (h)     it would be in the national interest for the applicant to be granted a special mining lease.

(3) The Board shall not recommend refusal of an application on the ground that the Board is not satisfied as to any matter referred to in subsection (2) unless the Board has notified the applicant of the proposed recommendation and the reasons therefor, and has given the applicant a reasonable opportunity to modify his mining plan or make representations or otherwise to remove the ground on which the proposed recommendation is based.

(4) Where the Board recommends to the Minister that an application should be granted, the Board may include in its report recommendations as to—

      (a)     the minimum amount which the applicant should be required to invest in the development of the proposed mine; and

      (b)     where the proposed mine is to be developed by a company, the minimum shareholding which the applicant should hold in the company; and

      (c)     the area to be included in the special mining lease; and

      (d)     the period of the special mining lease and any renewal thereof; and

      (e)     the terms and conditions to be inserted in the special mining lease and in any agreement to be entered into with the applicant under section one hundred and sixty-seven; and

      ( f )     the period within which construction of the proposed mine should commence; and

(g)      any other matter connected with or incidental to the special mining lease.

161      Recommendation that application be granted in part

(1) Before recommending to the Minister that an application should be granted in respect of a portion of the area applied for, the Board shall notify the applicant in writing of its intention to make the recommendation and shall furnish him with details of the portion concerned.

(2) Within thirty days of the date of the notification mentioned in subsection (1), the applicant may, by written notice to the Board and any owner and occupier of land within the area applied for, withdraw his application.

(3) If the applicant does not withdraw his application in terms of subsection (2) he shall, within the period mentioned in that subsection, or such longer period as the Board may allow, submit to the Board an amended plan in triplicate, prepared by a land surveyor, of the area in respect of which the Board has recommended that the application should be granted.

(4) If the applicant fails to submit an amended plan in terms of subsection (3) within the period mentioned in subsection (2), the Board shall notify him in writing that the amended plan has not been received and, if the plan is not received by the Board within thirty days from such notification, the application shall be deemed to have been withdrawn.

(5) Subsection (6) of section one hundred and thirty-seven shall apply, mutatis mutandis, to the preparation of an amended plan for the purposes of this section.

162      Forwarding of application to Minister and President

(1) Having considered an application in terms of section one hundred and sixty, and, where appropriate, having complied with section one hundred and sixty-one, the Board shall without delay forward the application to the Minister together with its recommendations thereon and—

(a)      copies of all objections lodged in respect of the application and copies of the determinations made in respect of the objections; and

(b)      the mining commissioner's report on the application.

(2) The Minister, having considered the documents forwarded to him in terms of subsection (1), shall submit them to the President, together with his recommendations thereon, for the President's approval.

163      Issue of special mining lease

(1) After considering documents submitted to him in terms of subsection (2) of section one hundred and sixty-two, the President may authorize the Minister to issue a special mining lease in accordance with the Board's recommendations or on such other terms and conditions as the President may direct.

(2) Where the President has authorized him to do so, the Minister shall forthwith issue a special mining lease to the applicant, subject to sections one hundred and sixty-four and one hundred and sixty-seven, in accordance with the President's authorization or directions.

(3) The Minister shall cause the original of any special mining lease he issues under subsection (2) to be sent to the applicant together with a copy of the plan, prepared by a land surveyor, of the area over which the lease is issued, and shall cause copies of the lease and the plan to be sent to the Board and the mining commissioner.

164      Terms and conditions of special mining lease

(1) A special mining lease shall not be issued in respect of an area within which there is more than one mine that will be established and developed by the holder of the special mining lease

(2) A special mining lease shall not be issued—

(a)     to an individual, unless he is a citizen of Zimbabwe; or
(b)     subject to subsection (3), to a body of persons, unless they constitute a body corporate.

(3) A special mining lease may be issued to two or more persons jointly if each of them is qualified under subsection (2) to be issued with the lease:

Provided that, where a special mining lease is issued to two or more persons jointly, their obligations under the lease shall be joint and several.

(4) A special mining lease shall not be issued for a period exceeding twenty-five years, but provision may be made for its renewal by the Minister with the President's approval for periods not exceeding ten years, having regard to the life of the mine concerned and the circumstances then prevailing.

(5) Subject to the President's directions, a special mining lease shall contain such provisions, not inconsistent with this Act, as the Minister may determine.

165     Application of further provisions of Part VIII to special mining leases
Subject to this Part, sections one hundred and forty-six to one hundred and fifty-three and one hundred and fifty-five to one hundred and fifty-seven shall apply, mutatis mutandis, to special mining leases.

166     Issue of mining lease instead of special mining lease
If an application for a special mining lease has been refused in terms of this Part but the Board is satisfied that the applicant meets the requirements for the issue of a mining lease under Part VIII, the Board may, with the applicant's consent, issue him with a mining lease under section one hundred and forty-five.

167     Agreement re issue of special mining lease
The Minister, with the approval of the President, may enter into an agreement, not inconsistent with this Act, with any person regarding—
(a)     the issue of a special mining lease to that person, and the renewal of the special mining lease; and
(b)      the terms and conditions of any special mining lease that may be issued to that person; and
(c)     the liabilities and obligations of that person in terms of any special mining lease that may be issued to him, including payments by way of royalties, rents and fees; and
(d)     any other matter connected with or incidental to any special mining lease that may be granted to that person.

168     Application of other provisions of this Act relating to mining leases
Subject to this Part, provisions of this Act relating to mining leases and the rights and obligations of the holders thereof shall apply, mutatis mutandis, in relation to any special mining lease and its lease holder, except to the extent that those provisions are inconsistent with this Part.

PART X
RIGHTS OF CLAIM HOLDERS AND LANDOWNERS

169     Precious metal reef claims; mining rights within vertical limits
Every holder of a registered block of precious metal reef claims shall possess the following mining rights—
(a)     the exclusive right of mining such portions of his discovery reef as are comprised within the vertical limits of his block;
(b)      the exclusive right within the vertical limits of his block of prospecting for any other precious metal reefs which may exist within such limits in addition to his discovery reef, such reefs being hereinafter designated "secondary reefs";
(c)     the exclusive right, after discovery of any secondary reef, of pegging

and registering such reef in the manner provided in section one hundred and seventy and thereafter of mining such portions of such reef as are comprised within the vertical limits of his block;

(d)      the exclusive right of mining any placer deposit, alluvial deposit, eluvial deposit, rubble deposit or dump containing precious metals found within the vertical limits of his block;

(e)      the exclusive right within the vertical limits of his block of prospecting for any base mineral or precious stones and if any ore or deposit of any base mineral or precious stones is discovered within the block, the holder thereof shall notify the mining commissioner of such discovery and shall, subject to this Act, thereafter have the right of working such ore or deposit within the vertical limits of his block.

170    Pegging of secondary reef

(1) If the holder of a registered block of precious metal reef claims by the work of himself or his agents discovers a secondary reef, he may peg such reef in the following manner—

(a)      the point of discovery shall be marked by a peg marked DP:

Provided that where the reef is discovered at depth the said peg shall be placed at surface at a point as nearly as possible vertically above the point of discovery;

(b)      the pegger shall post near such peg a notice to be styled a secondary reef registration notice which shall be so far as is material in the form prescribed and shall contain the following particulars—

(i)      the depth from the surface of the reef;

(ii)      the direction of the dip of the reef;

(iii)      the approximate angle from the horizontal of the dip of such reef;

(c)      the pegger shall fix pegs marked Q and R respectively at two points within the boundaries of his block, the straight line joining such pegs being at right angles to the strike of the reef.

(2) The pegger of any secondary reef in respect of which a registration notice has been posted may, on application to the mining commissioner within a period of thirty-one days after the date of the posting of such registration notice, obtain a certificate of registration.

(3) The applicant shall lodge with every such application the following with the mining commissioner—

(a)      a copy of such registration notice;

(b)      a plan in duplicate showing the position of the secondary reef in relation to the boundaries of such registered block;

(c)      a certificate under his hand stating that the said copy of such notice is a true copy and that all the facts stated therein are true and correct.

(4) The mining commissioner shall assign a number to every secondary reef for which a certificate of registration has been issued.

(5) After he has issued a certificate of registration of the secondary reef, the mining commissioner shall return to the applicant one copy of the plan lodged with the registered number of such reef endorsed thereon, and shall retain the other copy.

171    Precious metal reef claims: extra-lateral mining right

(1) For the purposes of this section a block shall be deemed to be that portion of the block as pegged which lies between the side lines and the corrected end lines.

(2) For the purposes of extra-lateral rights conferred by this section, a regular block of precious metal reef claims shall have its end lines corrected as follows—

(a)      straight horizontal lines shall be drawn parallel to each other and to the

mean direction of the end lines of the block as pegged;

     (b)     each of such horizontal lines shall pass through one of the corner pegs of the block and they shall be so drawn that no portion of either of them shall lie outside the end lines of the block as pegged.

(3) Every holder of a registered regular block of precious metal reef claims shall possess the extra-lateral rights of pursuit of and mining the following portions of his discovery reef as it descends outside the vertical limits of his block—

     (a)     if only two points of departure are established, such portions of the reef as lie in its course within the block and as are comprised between two vertical planes of unlimited dimensions passing through straight horizontal lines drawn through the points of departure parallel to the corrected end lines;

     (b)     if more than two points of departure are established, such portions of the reef as lie in its course within the block and as are comprised between vertical planes of unlimited dimensions passing through straight horizontal lines drawn through the points of departure between which the course of the reef lies within the block and parallel to the corrected end lines;

     (c)     if only one point of departure is established and that point is situated on a corrected end line or if no point of departure is established, such portions of the reef as are comprised between vertical planes of unlimited dimensions passing through the corrected end lines;

     (d)     if only one point of departure is established and that point is situated on a side line, such portions of the reef as lie between two vertical planes of unlimited dimensions, of which one passes through a straight horizontal line drawn through the point of departure and parallel to the corrected end lines and the other passes through that corrected end line towards which the course of the reef runs within the block from the point of departure.

(4) Every holder of an irregular registered block of precious metal reef claims shall possess the extra-lateral rights of pursuit of and mining the following portions of his discovery reef as it descends outside the vertical limits of his block—

     (a)     if only two points of departure are established, such portions of the reef as lie in its course within the block and as are comprised between vertical planes of unlimited dimensions passing through straight horizontal lines drawn through the points of departure and parallel to the line QR;

     (b)     if more than two points of departure are established, such portions of the reef as lie in its course within the block and as are comprised between vertical planes of unlimited dimensions passing through straight horizontal lines drawn through the points of departure between which the course of the reef lies within the block and parallel to the line QR;

     (c)     if only one point of departure is established, such portions of the reef as are comprised between vertical planes of unlimited dimensions passing through two straight horizontal lines, both of which shall be drawn parallel to the line QR so that one of them passes through the point of departure and the other passes through the point at which a line drawn through the DP peg at right angles to the line QR crosses a boundary line of the block on that side of the DP peg which is opposite to the point of departure;

     (d)     if no point of departure is established, such portions of the reef as are comprised between vertical planes of unlimited dimensions passing through two straight horizontal lines which shall be drawn parallel to the line QR through the points at which a line drawn through the DP peg at right angles to the line QR crosses the boundary lines of the block.

(5) Every holder of a registered block of precious metal reef claims, whether such

block is regular or irregular, shall possess the same extra-lateral rights of pursuit of and mining any secondary reef registered by him as are given to the holder of an irregular block in respect of his discovery reef by subsection (4).

(6) Notwithstanding anything in this section contained, the holder of a registered block of precious metal reef claims shall not have or exercise any extra-lateral right in respect of any reef unless and until—

      (a)     it is established that some portion of the course of such reef lies within such block; or

      (b)     he has obtained a special grant of such right in terms of section two hundred and eighty-five.

(7) Notwithstanding anything in this section contained, no holder of any block of precious metal reef claims registered after the 1st September, 1935, shall have any extra-lateral right of pursuit of or mining any platinum or platinoid metal reef.

172    Mining rights: other than precious metal claims

Subject to any prior right possessed by the holder of any mining location under section one hundred and seventy-one and this Act, every holder of a registered block of claims other than precious metal reef claims shall possess the following mining rights—

      (a)     the exclusive right of mining any ore or deposit of the mineral in respect of which the block is registered which occurs within the vertical limits of his block; and

      (b)     the exclusive right within the vertical limits of his block of prospecting for any ore or deposit of any mineral other than the mineral in respect of which the block is registered and if any such ore or deposit is discovered within such block, the holder thereof shall notify the mining commissioner of such discovery and shall, subject to this Act, thereafter have the right of mining such ore or deposit within the vertical limits of his block:

      Provided that nothing in this paragraph contained shall confer any rights to mine any coal or mineral oil or natural gas.

173    Conversion of blocks

(1) The holder of a registered block of precious metal claims may, if he proves to the satisfaction of the mining commissioner that any base mineral occurs in such block in such amount as to exceed in value the amount of the precious metal contained therein, apply for the conversion of the block into a base mineral block, and thereupon the mining commissioner shall issue a new registration certificate for the area originally registered.

(2) The holder of a registered block of claims other than precious metal reef claims may, if he proves to the satisfaction of the mining commissioner that any reef containing precious metals occurs in such block in such amount as to exceed in value the amount of the mineral contained therein for which such block was registered, apply for the conversion of the block or any part thereof into a precious metal reef block or blocks, and shall peg such reef in terms of section forty-three and thereupon the mining commissioner shall issue a new registration certificate or certificates for the area converted.

(3) The mining commissioner may, if it appears to him that any precious metal discovered in any registered block of base mineral claims occurs in such quantity in such block as to exceed in value the mineral in respect of which the block was originally registered or that such block includes any ground which formerly formed part of a location registered for precious metal, call upon the holder to show cause why the block should not be relocated and repegged under the provisions of this Act relating to the pegging of precious metal claims and if the holder of such block fails

to show such cause to the satisfaction of the mining commissioner, the holder shall forthwith relocate and repeg the block in such manner as in this Act is prescribed for such precious metal, and shall thereafter hold such claims as precious metal claims.

(4) The mining commissioner may, if it appears to him that any precious stones discovered in any registered block of claims other than precious stones claims occur in such block in such amount as to exceed in value the mineral in respect of which the block is registered, call upon the holder to show cause why the block or portion thereof should not be relocated and repegged under the provisions of this Act relating to the pegging of precious stones claims and if the holder of such block fails to show such cause to the satisfaction of the mining commissioner, the holder shall relocate and repeg such block or portion of such block in such manner as in this Act is prescribed for precious stones and shall thereafter hold the block or such portion thereof as precious stones claims:

Provided that if the whole block is not so repegged, the holder may, at his option, abandon the remaining portion or portions of such block or may retain such remaining portion or portions as one or more blocks of claims registered for the mineral in respect of which the block was registered prior to such repegging and the mining commissioner may issue a fresh certificate of registration for any separate portion so retained.

(5) The holder of a registered block of claims other than precious stones claims may, if he proves to the satisfaction of the mining commissioner that precious stones occur in such block in such amount as to exceed in value the amount of mineral contained therein in respect of which the block was originally registered, apply for the relocation of such block under the provisions of this Act relating to the pegging of precious stones claims and if the mining commissioner approves the application, the holder shall forthwith relocate and re-register the block in such manner as in this Act is prescribed for precious stones, and the claims shall thereafter be held as precious stones claims:

Provided that if the whole block is not so repegged the remaining portion or portions shall be dealt with in the manner prescribed in subsection (4).

(6) The holder of a registered block of reef claims may apply for the conversion of the whole or any portion of such block into a block of dump, rubble deposit, alluvial or eluvial claims. If the mining commissioner approves the application, the holder shall forthwith relocate and re-register such block or portion of such block, and thereafter it shall be held as a dump rubble deposit, alluvial or eluvial claims block. If the whole block is not so relocated and re-registered, the holder shall abandon the remaining portion of the block.

(7) The holder of a registered block of claims may apply for the conversion of the whole or any portion of such block into a site. Such holder shall peg such site in terms of section forty-seven and the mining commissioner shall, if satisfied that the area pegged is not in excess of the holder's requirements for a site, issue a certificate of registration in terms of section forty-eight. If the whole block is not registered as a site, the holder shall abandon that portion of the block which is not so registered.

(8) The holder of a registered site may apply to the mining commissioner for the conversion of the whole or any portion of such site into a registered block of claims. If the mining commissioner approves the application, the holder of the site shall forthwith relocate and re-register such site or portion thereof in such manner as in this Act is prescribed for the appropriate class of mineral, and thereafter it shall be held as a registered block of claims in respect of the mineral for which it has been registered. If the whole site is not registered as a block of claims the holder shall abandon that portion of the site which is not so re-registered or may re-register such portion as a

site.

(9) Where any conversion is effected under this section the holder shall pay to the mining commissioner in respect of the new certificate of registration the fee that would have been payable under Part III if such certificate of registration had been an original certificate of registration.

174      Provisions concerning conversion of blocks

(1) Where the holder of a registered block of claims has—

      (a)      applied for the conversion of the whole or portion of the block in terms of subsection (2) of section one hundred and seventy-three and the mining commissioner has issued a new registration certificate; or

      (b)      relocated and repegged the whole or portion of the block under subsection (3) of section one hundred and seventy-three;

the mining commissioner shall report the matter to the Board.

(2) After receiving any report in terms of subsection (1), if the Board, after inquiring into the circumstances of the case and affording the holder an opportunity of making representations, is of the opinion that the block was not originally pegged for the bona fide purpose of working the mineral for which it was registered, the Board may recommend to the Minister that one or both of the following penalties be imposed—

      (a)      payment by the holder of an amount not exceeding two thousand dollars for each precious metal block so registered or relocated and repegged;

      (b)      such block be excluded from section one hundred and seventy-one.

(3) On receipt of a recommendation in terms of subsection (2) the Minister may make an order providing for one or both of the penalties referred to in paragraphs (a) and (b) of subsection (2), as he may deem fit.

(4) Where the Minister has imposed a penalty referred to—

      (a)      in paragraph (a) of subsection (2), the amount shall be payable by such holder to the mining commissioner for payment into the Consolidated Revenue Fund and, in default of payment, the amount may be recovered by the mining commissioner from such holder in any court of competent jurisdiction;

      (b)      in paragraph (b) of subsection (2), the mining commissioner shall endorse on the registration certificate relating to the block the fact that it is excluded from section one hundred and seventy-one.

175      Amendment of registration certificates of base mineral blocks

(1) If the holder of a registered block of base mineral claims discovers that any base mineral occurs in such block in such amount as to exceed in value the amount of the mineral contained therein in respect of which the block is registered, he may apply to the mining commissioner for the amendment of the certificate of registration of such block by the substitution of such first-mentioned mineral for the mineral in respect of which the block is registered, and the mining commissioner, if he is satisfied as to the grounds on which the application is made, may approve the application and, if he so approves, shall amend the certificate of registration and his records accordingly.

(2) The mining commissioner may, if it appears to him that any base mineral occurs in any registered base mineral block in such amount as to exceed in value the amount of the mineral contained therein in respect of which the block is registered, call upon the holder to show cause why the certificate of registration of the block should not be amended; if the holder of such block fails to show such cause to the satisfaction of the mining commissioner, the mining commissioner shall amend his records accordingly and thereafter the certificate of registration shall be deemed to have been amended accordingly.

176      Sites: mining rights

The holder of a registered site shall in respect of any minerals which may exist within

the vertical limits of his site, mutatis mutandis possess, but only within such limits, the same rights as are possessed by the holder of a registered block of claims in respect of minerals within the vertical limits of his block, but such rights shall be inseparably connected with and shall not be alienated in any way from such site.

177     Priority of mining rights

(1) For the purposes of this section—

"pegger" means the person in whose name or on whose behalf a mining location, reef or deposit was registered and each and every successor in title to the rights acquired by such person.

(2) For the purposes of subsection (3)—

"acquisition of title" shall be taken to mean the due performance of the first physical act required to be done under this Act, or any previous law governing mining rights at the time when the act was performed, in order to acquire any exclusive rights in respect of any mining location, reef or deposit.

(3) Priority of acquisition of title to any mining location, reef or deposit, if such title has been duly maintained, shall in every case determine the rights as between the various peggers of mining locations, reefs or deposits as aforesaid and in all cases of dispute the rule shall be followed that, in the event of the rights of any subsequent pegger conflicting with the rights of a prior pegger, then, to the extent to which such rights conflict, the rights of any subsequent pegger shall be subordinated to those of the prior pegger, and all certificates of registration shall be deemed to be issued subject to the above conditions.

(4) In case of any dispute arising with regard to any reef which has been registered by one pegger and is claimed as a discovery or secondary reef by another, the rule of priority shall be followed even though it involves the following of such reef into or through the vertical limits of the block or site belonging to another.

(5) Where reefs apparently distinct, but in reality merely branches of the same reef, or forming part of an irregular deposit, coalescing in depth, have been independently located by more than one pegger, then, up to the time of the fact of such coalescence as aforesaid having been established, each pegger shall, in pursuance of his prima facie right, have the right of following the reef even below any point of junction:

Provided that after establishment of such coalescence the right of pursuit below the point of junction shall be vested in the first pegger.

(6) Where any reefs intersect on the dip, each pegger shall have the right of following his reef through and beyond the junction of the reefs, but the whole of the ore at such junction shall, subject to subsection (7), be the property of the first pegger, and if any question arises as to the extent of the ore included in such junction, the same shall be referred to arbitration.

(7) In all cases the holder of any mining location shall, as long as he is bona fide in pursuit of his prima facie rights, have the right of working and of extracting any of the minerals which he is entitled to mine under this Act, until such time as any other pegger has obtained an injunction from the mining commissioner or from the High Court to stay such working, and all minerals so extracted prior to receiving notice from any other pegger who succeeds in establishing his priority rights shall be deemed to be and shall remain the property of such holder as aforesaid.

(8) If the holder of any mining location claims that an encroachment has been made on his location by a subsequent pegger, and the subsequent pegger proves—

(a)     that there is no encroachment according to the beacons existing at the time when such subsequent pegger pegged the alleged encroachment; and

(b)     that the alleged encroachment was caused by the failure of the claimant or of his predecessor in title to maintain his beacons in their original

positions;

the claimant shall be ordered to establish or replace his beacons in their original positions as shown on the survey or sketch plan lodged with the mining commissioner, and no action for damages shall lie against the subsequent pegger for any damages caused by the alleged encroachment.

178     Surface rights of miners

(1) For the purposes of paragraph (e) of subsection (2)—

"property" means two or more blocks of claims, whether contiguous or otherwise, owned by one person, from which the ore is being treated at the same milling or reduction plant or which are under the control of one registered mine manager.

(2) Every miner of a registered mining location shall have and possess the following respective surface rights—

(a)     the right, subject to any existing rights, to the use of any surface within the boundaries thereof for all necessary mining purposes of his location; and as against the holder of a prospecting licence or of any other mining location the right, except as in section three hundred and fifty-seven provided, to the use of all surface within such boundaries;

(b)     the right to use, free of charge, soil, waste rock or indigenous grass situated within his location for all necessary mining purposes of such location;

(c)     the right to sell or otherwise dispose of waste rock recovered by him from his location in the course of bona fide mining operations:

Provided that—

(i)     nothing in this paragraph contained shall be construed so as to derogate from the right conferred upon the Minister under section four hundred and two or any person duly authorized by him under that section;

(ii)     as from the date on which the rights of the miner to carry on the work of mining on the location cease, the rights of the miner to sell or otherwise dispose of such waste rock shall cease and any agreement for the sale or other disposition of such waste rock shall be of no further force or effect;

(d)     the same right of taking water for primary purposes as is possessed by the holder of a prospecting licence;

(e)     subject to this section and of the Forest Act [Chapter 19:05] and to such conditions as may be prescribed and on payment to the occupier or, where there is no occupier, the owner of the land in advance of such tariff rate as may be prescribed, the right to take and use for firewood or for the purposes of his mining location any indigenous wood or timber from land open to prospecting which is neither Communal Land nor land in regard to which a reservation has been made under section thirty-six or thirty-seven:

Provided that nothing in this paragraph shall be construed so as to permit a miner to use any wood or timber taken by him for firewood elsewhere than on his location or, where his location is a block forming part of a property, on that property.

(3) A miner who desires to take indigenous wood or timber from land referred to in paragraph (e) of subsection (2) which is private land shall give notice of such desire—

(a)     if the land is occupied, to the occupier of the land in person, or by registered letter addressed to the occupier at his ordinary postal address; or

(b)     if the land is unoccupied, by registered letter addressed to the owner at his ordinary postal address;

and thereafter the miner and the occupier or owner may agree as to the area and period within which such wood or timber may be taken, the quantity and kinds of

such wood or timber to be taken, the price to be paid for such wood or timber and any other conditions relating to such wood or timber.

(4) If, within the period of seven days from the date of the giving of notice in terms of subsection (3), no agreement has been concluded in accordance with that subsection, the miner shall have the rights conferred upon him by paragraph (e) of subsection (2) in respect of the land concerned.

(5) Section one hundred and four shall apply, mutatis mutandis, in relation to a miner in respect of indigenous wood or timber required by him in connection with his mining operations.

179    Saving of rights of landowner over mining location

Subject to subsection (12) of section one hundred and eighty, the owner or the occupier of land on which a registered mining location is situated shall retain the right to graze stock upon or cultivate the surface of such location in so far as such grazing or cultivation does not interfere with the proper working of the location for mining purposes.

180    Approval of scheme to cultivate surface of mining location

(1) For the purposes of this section and sections one hundred and eighty-one and one hundred and eighty-two—

"landholding parties" means—

(a)    in relation to land, other than Communal Land, to which an approved cultivation scheme or proposed scheme relates—

(i)    the owner; and

(ii)    where the occupier of the land is not the owner thereof, the occupier of that land;

(b)    in relation to Communal Land to which an approved cultivation scheme or proposed scheme relates, any rural district council within the area of which that Communal Land is situated;

"mining parties" means—

(a)    the holder of; and

(b)    where the miner of the registered mining location is not the holder thereof, the miner of; and

(c)    the holder of a hypothecation or option registered under this Act over;

the registered mining location to which an approved cultivation scheme or proposed scheme relates.

(2) Subject to subsection (3)—

(a)    the occupier of any land on which a registered mining location is situated may lodge with the mining commissioner, for examination by him and approval by the Board, a written scheme, together with three copies thereof, in regard to the cultivation by such occupier of the whole or any part of the surface of such location:

Provided that—

(i)    no such scheme shall provide for the cultivation of land for the purpose of planting or establishing orchards, tree plantations or other like permanent crops;

(ii)    where the occupier is not the owner of the land, no such scheme shall be lodged with the mining commissioner unless the owner has agreed to the scheme and his agreement has been endorsed on the scheme and signed by him;

(b)    a rural district council may lodge with the mining commissioner, for examination by him and approval by the Board, a written scheme, together with three copies thereof, in regard to the cultivation, by persons entitled to reside in such Communal Land, of the surface of any registered mining location situated on

Communal Land within the area of such rural district council:

　　　　　　　　Provided that no such scheme shall provide for the cultivation of land for the purpose of planting or establishing orchards, tree plantations or other permanent crops.

(3) Not later than thirty days before lodging a scheme under subsection (2), the occupier or rural district council, as the case may be, shall give notice of his or its desire to lodge the scheme, together with a copy of the scheme, to—

　　　　(a)　　　each of the mining parties affected thereby; and

　　　　(b)　　　where notice is being given by the occupier and he is not the owner of the land, the owner of the land;

in person or by posting a registered letter addressed to the ordinary postal address of the person concerned:

Provided that, if a scheme has been agreed to by all the landholding and mining parties and the agreement of each such party has been endorsed on the scheme and signed by him, this subsection shall not apply and the scheme may forthwith be lodged under subsection (2).

(4) On receipt of a scheme under subsection (2) and if satisfied that subsection (3) has been complied with or does not apply, the mining commissioner shall forthwith by registered letter—

　　　　(a)　　　notify each of the mining parties affected thereby of the receipt of the scheme and require the holder of the registered mining location to lodge with him, within twenty-one days of the date of such notification, his certificate of registration or his copy of the mining lease or special grant to carry out mining operations, as the case may be; and

　　　　(b)　　　if the scheme has not been agreed to by a mining party affected thereby and his agreement endorsed on the scheme and signed by him, send to that party a copy of the scheme and require him to inform the mining commissioner in writing, within twenty-one days of the date of such notification, whether he agrees to the scheme or objects to it and, if he objects, to set out his objections.

(5) After complying with subsection (4), the mining commissioner shall submit to the Board any scheme lodged with him under subsection (2), together with any objections thereto lodged under subsection (4) and his own report on the scheme and the objections.

(6) If, upon examination of the documents submitted to it under subsection (5) and after consulting the Minister responsible for agriculture, the Board is satisfied that—

　　　　(a)　　　the period of the scheme is clearly stated in the scheme and that the scheme is to terminate on a date specified therein; and

　　　　(b)　　　the registered mining location concerned is being held for bona fide mining purposes; and

　　　　(c)　　　the scheme specifies the basis on which the compensation shall be calculated in the event of termination of the scheme under section one hundred and eighty-one; and

　　　　(d)　　　the scheme is satisfactory in all respects and is not designed or likely to hinder or prevent the future exploitation of the mineral resources of the mining location;

the Board may approve the scheme.

(7) If the Board is not satisfied as to any of the matters referred to in subsection (6), it shall refuse to approve the scheme and may submit to the landholding and mining parties affected by the scheme such amendments to the scheme as it may deem fit and require them to state within a period to be specified by the Board—

　　　　(a)　　　in the case of a landholding party, whether or not he agrees to the

amendments;

   (b)      in the case of a mining party, any objections he may have to the amendments.

(8) If the landholding parties agree to the amendments submitted to them by the Board under subsection (7), the Board may, after considering any objections to the amendments stated by the mining parties, amend the scheme accordingly and approve the scheme as amended.

(9) Where the Board has approved a scheme it shall—

   (a)      endorse its approval on the scheme and on the copies thereof; and

   (b)      retain the original copy of the scheme; and

   (c)      send a copy of the scheme to each of the parties to the scheme and to the mining commissioner who shall forthwith endorse on the certificate of registration or copy of the mining lease or special grant, as the case may be, the fact that the registered mining location is subject to a scheme and the period of the scheme.

(10) The Board shall keep a record of schemes which have been approved by it under this section.

(11) Upon approval of a scheme by the Board under this section—

   (a)      in the case of land other than Communal Land, the occupier shall be entitled, subject to the provisions of the scheme, to exercise the rights conferred on him by the scheme, and

   (b)      in the case of Communal Land, persons entitled in terms of the Communal Land Act [Chapter 20:04] to cultivate the land concerned shall be entitled, subject to the provisions of the scheme, to exercise the rights conferred on them by the scheme; and

   (c)      the scheme shall be binding on the holder of the registered mining location concerned and on the miner, if any, thereof.

(12) Where a scheme has been approved by the Board under this section, any rights of cultivation conferred by section one hundred and seventy-nine in respect of the land to which the scheme relates shall be suspended for the duration of the scheme.

(13) Upon the approval of a scheme by the Board under this section the mining commissioner shall forthwith, without obtaining the authority of the Minister, reserve the ground covered by the scheme against prospecting and pegging under section thirty-five for the period of the scheme.

(14) Upon the termination of a scheme, whether by effluxion of time or otherwise, the mining commissioner shall by notice posted at his office withdraw the reservation.

181      Termination of scheme by miner

(1) Subject to this section, the miner of the registered mining location concerned or, if the location is not being mined, the holder thereof may at any time during the currency of an approved cultivation scheme terminate the scheme by giving written notice of termination to each of the landholding parties, either in person or by posting a registered letter to the ordinary postal address of the party concerned:

Provided that, if the miner is not the holder of the registered mining location, no notice of termination may be given unless the holder has agreed thereto and his agreement has been endorsed thereon and signed by him.

(2) A notice of termination of a scheme under subsection (1) shall specify the date on which the termination is to take effect which shall be a date not less than two months from the date of the giving of the notice of termination to the landholding parties:

Provided that, if notice has to be given to two or more landholding parties and is not given to them on the same day, the date so specified shall be not less than two months from the date of the last giving of such notice.

(3) Where notice of termination of a scheme has been given under this section—

(a)     the miner or, if there is no miner, the holder of the registered mining location shall on or before resumption of the land concerned pay to—

(i)     in the case of land other than Communal Land, the occupier or, if there is no occupier, the owner of the land;

(ii)     in the case of Communal Land, any rural district council established for the area concerned, for distribution to the persons entitled in terms of the Communal Land Act [Chapter 20:04] to cultivate the land;

such compensation as may be mutually agreed upon or, failing agreement, as may be determined, on the basis specified in the scheme, by the Board or by the Administrative Court on appeal from the determination of the Board under subsection (5);

(b)     the scheme shall cease to be of effect and the miner or holder, as the case may be, may resume possession of the land to which the scheme related—

(i)     on the date specified for that purpose in the notice of termination; or

(ii)     where the compensation referred to in paragraph (a) has not been paid before the date referred to in subparagraph (i), as soon as that compensation has been paid.

(4) Notwithstanding subsection (3), no person shall be disturbed in his cultivation of land under a scheme terminated under this section until he has had time to reap at the proper season any annual crops sown before the date of receipt of the notice of termination by—

(a)     in the case of land other than Communal Land, the occupier of the land;

(b)     in the case of Communal Land, the rural district council, if any, established for the area concerned.

(5) If either party is dissatisfied with the determination of compensation by the Board for the purposes of subsection (3), he may appeal against that determination to the Administrative Court.

182     Termination of scheme by consent

(1) An approved cultivation scheme may at any time be terminated, either as to the whole or a part of the area covered thereby, by the mutual consent of the landholding and mining parties affected by the scheme.

(2) Where a scheme is terminated under subsection (1) the parties involved in such termination shall forthwith inform the mining commissioner of the termination and the mining commissioner shall notify the Board.

(3) Any person who contravenes subsection (2) shall be guilty of an offence and liable to a fine not exceeding level four or to imprisonment for a period not exceeding three months or to both such fine and such imprisonment.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

183     Board may cancel scheme

(1) Where the owner or occupier of any land, other than Communal Land, to which an approved cultivation scheme relates has in the opinion of the Board failed adequately to exercise his rights under the scheme, the Board may call upon him to show cause why the scheme should not be cancelled and, if the owner or occupier fails to show such cause to the satisfaction of the Board, the Board may, after consultation with the Minister responsible for agriculture, cancel the scheme.

(2) Where the persons entitled in terms of the Communal Land Act [Chapter 20:04] to cultivate Communal Land to which an approved cultivation scheme relates have in the opinion of the Board failed adequately to exercise their rights under the scheme, the Board may call upon any rural district council established for the area concerned to show cause why the scheme should not be cancelled, and, if the rural district

council fails to show such cause to the satisfaction of the Board, the Board may cancel the scheme.

(3) Any person who contravenes subsection (2) shall be guilty of an offence and liable to a fine not exceeding level four or to imprisonment for a period not exceeding three months or to both such fine and such imprisonment.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

184     Resumption of rights by miner

On the expiry of the period of an approved cultivation scheme or on the termination of a scheme under section one hundred and eighty-two or the cancellation of a scheme under section one hundred and eighty-three, the miner or, if there is no miner, the holder of the registered mining location concerned may exercise his full rights in respect of the registered mining location or part thereof, as the case may be, without payment to any person for or in respect of anything done in the exercise of any rights under the scheme.

185     Termination of scheme on forfeiture or abandonment of location

(1) Subject to subsection (3) of section two hundred and seventy-two, if title to a mining location to which an approved cultivation scheme relates is extinguished by forfeiture or abandonment or in any other manner before the period of the scheme expires, the scheme shall be deemed to have been terminated and Part V shall thereafter apply to or in respect of so much of the land covered by the scheme as comes within the definition of "land under cultivation" contained in section thirty.

(2) Where a portion of a mining location to which an approved cultivation scheme relates is abandoned before the period of the scheme expires, the scheme shall be deemed to have been terminated in respect of that portion of the location which has been abandoned and Part V shall apply to so much of the abandoned portion as comes within the definition of "land under cultivation" contained in section thirty.

186     Scheme to bind successors in title

Unless an approved cultivation scheme is terminated or deemed to have been terminated or is cancelled before the expiry of the period thereof, the scheme and sections one hundred and eighty to one hundred and eighty-five shall for the period of the scheme apply to or in respect of and be binding on—

        (a)     any person to whom the mining location to which the scheme relates is transferred and on any miner thereof; and

        (b)     any person to whom land, other than Communal Land, covered by the scheme is transferred and on any occupier thereof; and

        (c)     any person becoming entitled in terms of the Communal Land Act [Chapter 20:04] to cultivate any Communal Land covered by the scheme:

Provided that, where a scheme has been terminated under section one hundred and eighty-two as to part only of the area covered thereby, this section shall apply in relation to the remainder of the area.

187     Inspection certificates and payments to landowners during period of agreement

During the currency of an approved cultivation scheme—

        (a)     any inspection certificate falling due in respect of the registered mining location to which the scheme relates shall, notwithstanding anything contained in Part XI, be obtainable, without any work having been executed for the purpose, on payment of the fee referred to in section two hundred; and

        (b)     neither the owner of the land concerned nor, in the case of Communal Land, the President shall be entitled to any payment under section one hundred and eighty-eight in respect of such location which would otherwise be due for the period of the scheme.

188     Payments to landowners

(1) In this section—

"block" does not include an underground extension block;

"producing mining location" means a block, mining lease or special grant in respect of which there have been rendered under section two hundred and fifty-one returns of minerals or mineral-bearing products won from the block, mining lease or special grant, as the case may be, during at least two months of the period to which an application made under subsection (2) relates;

"special grant" means a special grant to carry out mining operations issued under Part XIX or a special grant issued under Part XX.

(2) Subject to any regulations, every owner of a holding of private land shall, on application to the mining commissioner made on the prescribed form and within such period as may be prescribed and on furnishing such evidence as may be required by the mining commissioner to substantiate his claim, be entitled to the following payments for any period falling within the year ending on the previous 31st December during which a registered mining location situated upon his land was held—

      (a)     in respect of a site or a producing mining location, the appropriate sum prescribed for the purposes of this paragraph;

      (b)     where paragraph (a) does not apply, in respect of any registered block, mining lease or special grant, the appropriate sum prescribed for the purposes of this paragraph which shall be a sum smaller than the corresponding sum prescribed for the purposes of paragraph (a):

            Provided that, where the whole or any part of the period during which the location was held is covered by an order issued by the Board under subsection (4), the sum to be paid for that period or that part of that period, as the case may be, shall be the sum specified by the Board in its order.

(3) The owner of any holding of private land on which a registered mining location is situated may apply in writing to the Board for an order authorizing increased payments in respect of that location.

(4) On receipt of an application under subsection (3) the Board may, if satisfied that—

      (a)     on account of mining operations, whether past or present, on the registered mining location concerned, the applicant is denied the use of the surface of the location or a substantial portion thereof; and

      (b)     it is in all the circumstances reasonable that payments in respect of the registered mining location concerned should be made at a rate higher than the appropriate rate prescribed for the purposes of paragraph (b) of subsection (2);

make an order specifying for the purposes of the proviso to paragraph (b) of subsection (2) a sum which shall be greater than the appropriate sum prescribed for the purposes of that paragraph but not greater than the sum prescribed for the purposes of paragraph (a) of subsection (2).

(5) An order made by the Board under subsection (4) may—

      (a)     be made in respect of—

      (i)     the year preceding the year in which the application for the order is made:

            Provided that no owner shall be entitled by virtue of an order having been made to any additional payment for a period for which payment has already been made to any person under subsection (2); and

      (ii)     a definite or an indefinite period;

      (b)     at any time be amended or revoked by the Board.

(6) The Board shall forthwith notify the mining commissioner and the owner of the land concerned of every order made under subsection (4) and of any amendment or revocation thereof.

(7) Subsections (2) to (6) shall apply in respect of Communal Land as if all Communal Land within the area under the jurisdiction of any one rural district council were a holding and the rural district council were the owner thereof:

Provided that any payments due in terms of subsection (2) in respect of such Communal Land shall be paid to the District Development Fund referred to in section 3 of the District Development Fund Act [Chapter 29:06].

(8) Notwithstanding anything contained in this section, an owner of land shall not be entitled to receive the payments referred to in subsection (2) if he or his spouse or any child of either of them holds any direct or indirect pecuniary interest in the mining location concerned, other than the payments referred to in this section or in section two hundred and thirty-two or an entitlement to a share in the royalties due on minerals, mineral oils or natural gases won from that mining location.

(9) For the purposes of subsection (8), a person shall not be regarded as holding a pecuniary interest in a mining location solely by reason of his ownership of shares in a public company unless—

      (a)      his shareholding is such that he has: or

      (b)      where any other person referred to in subsection (8) owns shares in the same company, their combined shareholding is such that they have;

a controlling interest in the company.

(10) If the owner of a holding of land is entitled to any share in the royalties due on minerals, mineral oils or natural gases won from that holding of land and he invokes that entitlement by claiming a share of any royalties paid thereon in respect of any one year ending on the 31st December, he shall not be entitled to any payments in terms of this section in respect of any mining location on that holding of land for that year.

(11) From and after the 1st January, 1974, any condition in a title deed to any piece of land in terms of which payments due to the owner of the land under this section are payable to any person other than the owner of the land shall be regarded as pro non scripto and the rights possessed by any such other person in terms thereof shall lapse with effect from that date, and it shall not be lawful to include any such condition in any title deed to any piece of land.

(12) Nothing in this section contained shall be deemed to deprive the owner of any holding of land held under the title known as the Matabeleland Volunteer Right (Victoria Agreement) of any rights conferred by such title:

Provided that an amount equal to five per centum of any amount due under such title shall be deducted as the cost of collection.

(13) All moneys payable in terms of this section shall be defrayed from moneys appropriated for the purpose by Act of Parliament.

189     Miner to fence mining location adjacent to pasture land

(1) Where the owner or occupier of any land has fenced off a portion of such land for the purpose of depasturing stock, the mining commissioner may, on application by such owner or occupier, direct any miner who is carrying on mining operations within the area so fenced off, to fence off in the manner prescribed the whole or any portion of his mining location within such period as the mining commissioner may specify.

(2) If the miner fails to comply with such direction within the period specified, the owner or occupier may himself fence off the whole of the mining location and may recover the cost thereof from the miner.

190     Trading on mining locations

(1) For the purposes of subsection (3) "liquor" has the meaning assigned to it in the Liquor Act [Chapter 14:12].

(2) No person shall erect upon any registered mining location any building for the purpose of trading in any way with the public or for any other business not legitimately connected with and necessary for the purposes of such location, or carry on any such business upon such location, except when authorized thereto by the Secretary with the consent of the holder of such location and, unless the title deed of the land on which such location is situated is such that the consent of the owner of the land is not required, with the consent of the owner of the land.

(3) In giving his consent, such holder or owner, as the case may be, shall state whether or not the right to trade in liquor is included, and the Secretary shall, in granting his authority, state accordingly whether or not such right is included.

191     Agreement as to use of private water

The use of any private water on private land may be acquired by a miner requiring the use thereof for mining purposes upon such terms and conditions as may be mutually agreed upon between such miner and the owner of the private water.

192     Registration of agreement

Any agreement between a landowner and a miner as to the use of private water may be reduced to writing and registered at the office of the mining commissioner.

193     Right of miner to private water on State land

Private water may be taken free of charge by a miner from any source of supply existing upon State land which is both unalienated and unoccupied, under such conditions as may in each case be fixed by the President.

194     Public water

The right of any miner to the use of any public water for purposes other than primary purposes shall be regulated by the Water Act [Chapter 20:22].

195     Subterranean water and storm-water

(1) In subsection (2)—

"storm-water" has the meaning given by section 2 of the Water Act [Chapter 20:24].

 (2) The use of any water issuing from or brought to the surface of the ground from the subterraneous working of any mining location, provided the presence of such water in such workings is not due to a contravention of any provisions of this Act, and of any storm-water conserved by a dam or reservoir constructed by the holder of any mining location on such mining location or on any site attached to such mining location, which, but for such dam or reservoir, would have run to waste, shall, to the extent to which it may be required for the necessary purposes of such location or of any other mining location in the same vicinity, be vested in the holder of such location.

196     Owner or occupier of land may appoint agent

(1) The owner or occupier of any land may register with the mining commissioner or with the Board the name and postal address of a person appointed by such owner or occupier to represent him as his agent in any matter arising under this Act.

(2) Every such appointment shall be valid for a period of twelve months, but may be renewed from time to time for like periods.

PART XI

PRESERVATION OF MINING RIGHTS

197     First inspection certificates

(1) Except as otherwise provided in this Act, the holder of any block of base mineral claims or of any block of reef or placer deposit claims registered for precious metals or of any mining lease shall, within a period of six months from the date of registration of such block or the issue of such mining lease, as the case may be, apply

to the mining commissioner for and obtain a first inspection certificate therefor in respect of work executed upon such block or mining lease.

(2) A certificate issued in terms of subsection (1) shall protect the block or the mining lease from forfeiture for a period of twelve months from the date of registration of the block or the date of issue of the mining lease, as the case may be.

(3) Subsection (1) and (2) shall not apply to a mining lease upon which the principal mineral being mined or to be mined is precious stones.

198     Second inspection certificates

(1) Within a period of twelve months from the date of the registration of such block or the issue of such mining lease, the holder thereof shall apply to the mining commissioner for and obtain a second inspection certificate therefor in respect of work executed upon such block or mining lease.

(2) A certificate issued in terms of subsection (1) shall protect the block or mining lease from forfeiture for a period of twelve months from the date of expiry of the first inspection certificate.

199     Subsequent inspection certificates, etc.

(1) During each succeeding period of twelve months, beginning from the date of expiry of the first inspection certificate, the holder of a registered block or mining lease shall apply to the mining commissioner for and obtain an inspection certificate in respect of work executed upon such block or mining lease.

(2) A certificate issued in terms of subsection (1) shall protect the block or mining lease from forfeiture for a period of twelve months from the date of expiry of the last inspection certificate.

(3) Notwithstanding subsections (1) and (2), if the mining commissioner has reason to believe that any registered block or mining lease has not been worked at all, or has not been adequately developed or worked for a period of one year from the date of registration of such block or the issue of such mining lease, as the case may be, he shall defer the issue of an inspection certificate and refer the matter to the Board for investigation.

(4) If, in the light of an investigation carried out in terms of subsection (3), the Board is satisfied that the registered block or mining lease has not been worked at all, or has not been adequately developed or worked for a period of one year from the date of registration of such block or the issue of such mining lease, the Board shall call upon the holder of such block or mining lease to make representations to it as to why such block or mining lease should not be forfeited.

(5) After considering any representations made by the holder in terms of subsection (4), unless the Board finds that—

     (a)     the failure to develop or work, or adequately to develop or work such block or mining lease, is due to circumstances beyond the control of the holder and that he has made every effort to overcome them; or

     (b)     it is the holder's declared intention to start or continue developing or working the block or mining lease within a period of six months on a scale satisfactory to the Board; or

     (c)     there is reasonable cause for the delay in developing or working the block or mining lease or for not adequately developing or working such block or mining lease; or

     (d)     the block forms part of a series of not more than ten blocks contiguous to a main block being worked by the holder and is essential to the proper working of such main block;

the Board shall order the mining commissioner to forfeit forthwith the registered block or mining lease, and shall notify the holder accordingly.

(6) A person aggrieved by a decision of the Board in terms of this section may appeal to the Minister against such decision within thirty days of the notification thereof.

(7) The noting of an appeal in terms of subsection (6) shall suspend the forfeiture of the registered block or mining lease until the Minister's decision on the appeal has been given.

(8) Upon an appeal in terms of subsection (6), the Minister may confirm the forfeiture or set it aside.

200     Particulars to accompany application for inspection certificate

Every application for an inspection certificate, except as otherwise provided in this Act, shall be accompanied by a certificate by the applicant declaring the nature and extent of the work which has been executed and that none of such work has previously been used for the purpose of obtaining an inspection certificate or a certificate of extra work, and by the prescribed fee.

201     Mining commissioner may order inspection of development work

(1) Where an inspection certificate is applied for in respect of development work, the mining commissioner may, before issuing the inspection certificate, order an inspector of mines or any other official of the Ministry responsible for mines to inspect the work and measure it.

(2) The mining commissioner shall give notice to the holder of the block or the mining lease concerned of such inspection, and such holder shall, if so required by the mining commissioner, be present at such inspection and afford all facilities and information necessary for measuring.

202     Issue of inspection certificate

On receipt of the certificate mentioned in section two hundred and the prescribed fee, the mining commissioner shall issue to the applicant an inspection certificate:

Provided that the mining commissioner may refuse to issue such certificate if he is not satisfied that any work declared has been executed bona fide for the purposes of developing minerals or locating the reef in the block or mining lease concerned.

203     Work defined

For the purposes of this Part—

"work" includes—

> (a)      development work as defined in section two hundred and eight;
> (b)      the production of minerals;
> (c)      capital expenditure;
> (d)      such other work in connection with a mining location as the Minister

may from time to time, by statutory instrument, declare to be work for the purposes of this section.

204     Period within which work to be executed

The work required to be executed for obtaining an. inspection certificate shall—

> (a)      in the case of the first inspection certificate, be executed within a

period of six months from the date of the registration of the block or the date of the issue of the mining lease, as the case may be:

> > Provided that—
> > (i)      development work performed by the holder of a prospecting licence

subsequent to the posting of his prospecting notice may be declared for the purpose of obtaining such inspection certificate for such block;

> > (ii)      in the case of the first inspection certificate for a mining lease, any

work performed by the holder thereof within a period of twelve months before the date of the issue of the lease upon any registered mining location in respect of which the lease was issued may be declared for the purpose of obtaining such inspection certificate;

(b)      in the case of the second inspection certificate, be executed within a period of twelve months from the date of the registration of the block or the date of the issue of the mining lease, as the case may be;

(c)      in the case of the third or subsequent inspection certificate, be executed during the period for which the last issued inspection certificate was valid:

Provided that if more than the amount of work prescribed in this Part has been executed during that period, any excess of such work may be used for the purpose of obtaining the two next succeeding inspection certificates.

205    Amount of work required to obtain inspection certificates for blocks pegged under ordinary prospecting licences

(1) The amount of work required to obtain an inspection certificate for a block of claims, whether pegged under an ordinary prospecting licence or a special prospecting licence, shall be—

(a)      in the case of development work on—

(i)      a block of base mineral claims, five metres;

(ii)      a block of precious metal claims, ten metres;

(b)      in the case of the production of minerals, such quantity or value as may be prescribed in respect of the mineral for which the block is registered;

(c)      in the case of capital expenditure on—

(i)      a block of base mineral claims, four hundred dollars;

(ii)      a block of precious metal claims, two hundred and fifty dollars;

(d)      in the case where other work has been prescribed under paragraph (d) of section two hundred and three, such amount as may be prescribed;

for every five claims or portion of five claims registered for the block:

Provided that the amount of work required for obtaining a first or second inspection certificate shall be fifty per centum of the work prescribed in paragraph (a), (b) or (c).

(2) In prescribing the quantity or value of minerals for the purposes of paragraph (b) of subsection (1), the Minister may prescribe different quantities or values for different minerals.

206    Inspection by survey

The holder of a registered block of reef or placer deposit claims who lodges with the mining commissioner a survey plan of his block completed by a land surveyor may apply for and obtain one inspection certificate for such block on payment of the prescribed fee for each such certificate.

207    When development work not required for precious metal claims

(1) If the holder of a registered block of precious metal reef or placer deposit claims satisfies the Board that—

(a)      no development work is required for the proper working of such block by reason of the nature of the deposits of the precious metal; or

(b)      no further development work is required for the proper working of the block by reason of the fact that such block has already been thoroughly developed;

the Minister may upon the application of such holder authorize the issue of an inspection certificate for such block upon the payment of the prescribed fee.

(2) If the holder of a block of precious metal reef or placer deposit claims satisfies the Board that he was unable to carry out bona fide development work upon such block owing to circumstances which were entirely beyond his control, the Minister may upon the application of such holder authorize the issue of an inspection certificate for such block upon the payment of the prescribed fee.

(3) Lists of blocks for which inspection certificates have been issued in terms of this section shall from time to time be posted on a board to be exhibited in some conspicuous way outside the office of the mining commissioner.

208     Development work defined

(1) Development work shall consist of shafts, drives, adits or tunnels, winzes, rises and boreholes, and shall be performed for the purpose of developing the mineral contained within the mining location.

(2) Development work shall include trenching or excavation of a minimum depth of one metre which has been performed for the tracing of a reef or the proving of a deposit:

Provided that—

(i)      the trenching or excavation may only be utilized for obtaining first and second inspection certificates; and

(ii)      each seven cubic metres of trenching or excavation shall count as one metre of development work.

(3) Development work shall be new work and not the restoration or cleaning out of development work previously done.

(4) The minimum dimensions of development work, and the ratio in which work of larger dimensions or at certain distances from the surface shall be allowed to be reckoned as development work, shall be as fixed and prescribed in the First Schedule.

(5) The Minister may from time to time, by statutory instrument, declare any work in connection with a mining location not mentioned in subsections (1) and (2) to be development work for the purposes of this Part.

(6) Work may not be declared for the purpose of obtaining an inspection certificate in respect of development work to the extent that expenditure incurred in respect of that development work has been declared for the purpose of obtaining an inspection certificate in respect of capital expenditure.

209     Cleaning out, restoration and other work may be used under certain conditions

(1) Notwithstanding subsection (3) of section two hundred and eight, where bona fide work in connection with cleaning out, dewatering or restoration of old workings on a mining location is to be undertaken with a view to the reopening of such mining location, and, in addition, it can be shown to the satisfaction of the mining commissioner that an expenditure of not less than two thousand dollars will be incurred in carrying out such cleaning out, dewatering or restoration work, the holder of such property may apply for and be granted, on completion of such work to the said value of two thousand dollars, one certificate of inspection in respect of the block on which the work has been done, and for each additional amount of one thousand dollars expended in excess of two thousand dollars one certificate of extra work.

(2) A certified statement showing the amount and nature of the work done shall be lodged with the mining commissioner, to whom one month's notice shall be given by the holder of the mining location of his intention to carry out the work with a view to reopening such mining location.

(3) Capital expenditure on plant shall not be taken into account in arriving at the valuation of the work carried out.

210     Conditions for inspection by production

(1) The Minister may, in special circumstances, on application by the miner and on the recommendation of the Board, reduce the quantity or value of minerals prescribed under section two hundred and five in respect of any mining location for the purpose of obtaining any particular inspection certificate.

(2) Where two or more minerals are produced from any mining location, the total value of such minerals shall be aggregated for the purpose of obtaining inspection certificates.

(3) For the purpose of obtaining an inspection certificate in respect of the production of minerals, the value of such minerals shall be the value thereof shown in the return

referred to in subparagraph (i) of paragraph (a) of subsection (1) of section two hundred and fifty-one.

211    Conditions for inspection by capital expenditure

(1) For the purposes of section two hundred and three—

"capital expenditure" does not include—

      (a)     the purchase price paid or other consideration given in respect of the acquisition of a mining location;

      (b)     expenditure incurred in the exercise of rights under an exclusive prospecting order.

(2) If any dispute arises as to whether any expenditure declared for the purpose of obtaining an inspection certificate is capital expenditure, the matter shall be referred to the Board, whose decision shall be final and without appeal.

(3) For the purpose of obtaining an inspection certificate in respect of capital expenditure, any capital expenditure incurred in respect of any mining location after the date of the registration of the block or the date of the issue of the mining lease, as the case may be, may, notwithstanding section two hundred and four, be declared unless such expenditure was incurred more than two years before the date on which it is declared.

(4) Where capital expenditure is incurred in respect of any property, such expenditure may be declared for the purpose of obtaining an inspection certificate for any block forming part of such property, and in such case no certificate of extra work shall be required for any such inspection certificate.

(5) For the purposes of subsection (4)—

"property" means two or more blocks of claims, whether contiguous or otherwise, owned by one person from which the ore is being treated at the same milling or reduction plant or which are under the control of one registered mine manager.

(6) Every declaration of capital expenditure for the purpose of obtaining an inspection certificate or a certificate of extra work shall be accompanied by a statement certified by the auditors of the applicant for the inspection certificate, setting out the amount of expenditure ranking as capital expenditure for the purposes of this Act and such other information relevant to the application as may be required by the mining commissioner.

(7) For the purpose of obtaining the first or second inspection certificate, any expenditure in respect of prospecting operations other than expenditure incurred in the exercise of rights under an exclusive prospecting order may be declared as capital expenditure.

(8) Expenditure incurred in respect of development work may not be declared for the purpose of obtaining an inspection certificate in respect of capital expenditure to the extent that that development work has been declared for the purpose of obtaining an inspection certificate in respect of development work.

212    Inspection certificates for base mineral blocks obtainable by payment

(1) Subject to subsection (3) of section one hundred and ninety-nine, the holder of a registered block of base mineral reef or placer deposit claims may, from time to time, when an inspection certificate falls due, obtain such certificate upon payment to the mining commissioner of the prescribed sum for every five claims or portion of five claims registered for the block.

(2) If the mining commissioner has reason to believe that any block of base mineral claims has been pegged or is being held for any purpose other than bona fide mining purposes, he may report the matter to the Board, and the Board may order that no inspection certificate may be obtained in respect of such block under this section except with the approval of the Board or may, if it thinks fit, order the mining

commissioner to declare such block to be forfeited.

(3) The Board shall not approve of the issue, under subsection (2), of more than one inspection certificate at a time.

(4) The Board may at any time discharge an order made under subsection (2).

(5) Where the Board has under subsection (2) ordered the mining commissioner to declare a block to be forfeited, the mining commissioner shall forthwith, whether or not such block is currently protected from forfeiture by an inspection or protection certificate issued in terms of this Part, declare it to be forfeited.

(6) If the Minister is satisfied that the general market conditions prevailing in respect of or any other circumstances relating to any base mineral are such as to discourage the production of such mineral, he may, upon an application in writing made to the Board by the holder of any block registered for such mineral and upon the recommendation of the Board, reduce the fee prescribed under subsection (1) in respect of any certificate due at the date of such application or which will become due within a period of twelve months from such date:

Provided that—

(i)     the Minister shall not so reduce the fee unless he is satisfied that such market conditions or circumstances, as the case may be, have prevailed for a period of at least two years immediately preceding the date of the application;

(ii)     the Minister shall not so reduce the fee to an amount which is less than one-half of such prescribed fee.

(7) The Minister may in like manner and in like proportions reduce the fee prescribed under subsection (3) of section two hundred and twenty-one for mining leases upon which such mineral is the principal mineral being mined or to be mined.

(8) If the Minister is satisfied that the general market conditions prevailing in respect of or any other circumstances relating to any base mineral are such as to discourage the production of such mineral, he may, by statutory instrument, declare that during such period as may be specified in such notice, the fee payable under subsection (1) for inspection certificates which fall due within such period for all blocks registered for such mineral shall be reduced to such amount as may be specified in such notice:

Provided that—

(i)     the Minister shall not so reduce the fee unless he is satisfied that such market conditions or circumstances, as the case may be, have prevailed for a period of at least two years immediately preceding such declaration;

(ii)     the Minister shall not so reduce the fee to an amount which is less than one-half of such prescribed fee;

(iii)     the period specified in such notice shall not exceed one year, but the Minister may in like manner and from time to time reduce the fee for further periods not exceeding one year at a time.

(9) During the period of any reduction of inspection fees in terms of subsection (8) the fee payable for inspection certificates under subsection (3) of section two hundred and twenty-one for mining leases on which such mineral is the principal mineral being mined or to be mined shall be deemed to have been reduced in like proportions.

213     Extra work certificates

(1) Notwithstanding sections one hundred and ninety-seven, one hundred and ninety-eight and one hundred and ninety-nine, when any work has been executed on any block of claims while such block was still subject to those sections, in respect of which work an inspection certificate or a certificate of extra work has not previously been obtained, the holder may, upon giving a certificate under his hand to that effect and describing the nature and extent of such work, apply for and obtain from the mining commissioner a certificate of extra work so executed.

(2) In like manner a holder may, on complying with subsection (2) of section two hundred and nine, obtain a certificate of extra work.

(3) A certificate of extra work may not be applied for in respect of work executed more than twelve months before the date of application for such certificate:

Provided that capital expenditure may be used for the purpose of obtaining such a certificate if such expenditure was incurred within two years of the date of application for such certificate.

214    Availability of extra work certificates

(1) For the purposes of subsection (4)—

"property" means two or more blocks of claims, whether contiguous or otherwise, owned by one person from which the ore is being treated at the same milling or reduction plant or which are under the control of one registered mine manager.

(2)  A certificate of extra work may be used for the purpose of obtaining an inspection certificate for any other block which is registered in the name of the person to whom such certificate was issued or in which such person has a registered interest of not less than one-half and which is contiguous to, or forms part of a series of blocks in which such person has a registered interest of not less than one-half and which are contiguous to, the block on which the work was executed, and for that purpose the work in respect of which the certificate of extra work was issued shall be regarded as if executed on the block for which the inspection certificate is to be obtained:

Provided that—

      (i)      the number of blocks covered by inspection certificates issued in respect of certificates of extra work which have been obtained by virtue of work executed on any one block shall, in the case of precious metal blocks, at no time exceed ten;

      (ii)     . . . . . .

(3) In like manner, a certificate of extra work issued in respect of work executed on a block registered in the names of two holders in equal undivided interests may be used for the purpose of obtaining an inspection certificate for any other block registered in the name of either of such holders in such manner as may, by written agreement to be filed with the mining commissioner, be agreed upon between them.

(4) Notwithstanding the limitation contained in subsection (1), a certificate of extra work issued in respect of work executed on a block of precious metal claims shall, on the authority of the Board and under like conditions, be available for obtaining an inspection certificate of a block which forms part of a series of not more than twenty blocks contiguous to the block upon which the work was executed:

Provided that—

      (i)      the Board shall not grant such authority unless it is satisfied that—

      (a)      the holder of the block for which the inspection certificate is to be obtained is carrying on mining operations to the limit of his resources as far as plant, materials and labour are concerned; and

      (b)      distribution of work over the blocks would not be in the best interests of his mining operations; and

      (c)      all the blocks for which inspection certificates are to be obtained are necessary for the proper working of the property of which such first-mentioned block forms a part and that such holder has a registered interest of not less than one-half in such blocks;

      (ii)     the number of blocks covered by inspection certificates issued under this subsection shall at no time exceed twenty.

215    Work executed by option holders or tributors

If work has been executed by any person on a block registered in the name of another

but over which such person has an option or a tribute which has been approved in terms of Part XVIII, such work, after providing for the inspection certificate next due for such block, shall be apportioned in accordance with the terms of a written agreement entered into for that purpose between the holder of the block and the holder of the option or the tributor, as the case may be:

Provided that—

(i)      the work so apportioned to the option holder or tributor shall, subject to sections two hundred and thirteen and two hundred and fourteen, be regarded as if executed upon any other block registered in his name or over which he holds an option or tribute:

(ii)      in the case of an option, a duplicate original, grosse or notarially certified copy of the agreement shall be filed with the mining commissioner before a certificate of extra work is issued;

(iii)      the option holder or tributor shall obtain such certificate of extra work during the period of the option or tribute, as the case may be, or within fourteen days of the expiration thereof.

216      Filing of extra work certificates

The mining commissioner to whom any certificate of extra work is presented for the purpose of obtaining an inspection certificate shall retain and file such certificate of extra work.

217      Protection certificates for blocks

(1) The Secretary may authorize a mining commissioner to grant a protection certificate in respect of any block of reef or placer deposit claims.

(2) A protected block shall not, during the period of protection, be liable to forfeiture for any failure to take out an inspection certificate, but the date on which inspection certificates fall due shall be as prescribed in sections one hundred and ninety-seven, one hundred and ninety eight and one hundred and ninety-nine, and any inspection certificate which may be due shall be obtained on or before the expiry of the protection certificate.

(3) The Minister may, in circumstances which he may deem exceptional, by notice in writing to the holder of the blocks concerned, grant protection for any period in respect of any number of blocks or class of blocks or for all blocks situated in a particular area.

(4) A block protected under subsection (3) shall not, during the period of protection, be liable to forfeiture for failure to obtain an inspection certificate, and the period within which the first or the next inspection certificate, as the case may be, has to be obtained in respect of any such block shall be extended by a period equal to the period of such protection.

(5) The fee payable for a certificate in terms of subsection (1) or the grant of protection in terms of subsection (3) shall be as prescribed:

Provided that the Minister may remit, in whole or in part, any fee payable for the grant of protection in terms of subsection (3).

218      Precious stones blocks to be worked continuously

(1) The holder of a block of precious stones claims shall continuously work his claims from the date of registration of such block and shall pay to the mining commissioner annually in advance the prescribed fee in respect of such block.

(2) The Board may, on the application of such holder—

(a)      exempt him from the obligation continuously to work such claims for such period as it may deem fit;

(b)      where such block forms part of a group of contiguous blocks of precious stones claims owned by such holder, authorize him to restrict his work to

any one or more of such blocks.

(3) The holder of a mining lease upon which the principal mineral being mined or to be mined is precious stones shall continuously work such lease from the date of issue thereof and shall, in respect of such mining lease, pay to the mining commissioner annually in advance the prescribed fee.

(4) The Board may, on the application of the holder of a mining lease referred to in subsection (3), exempt him from the obligation continuously to work such mining lease for such period as it may deem fit.

219    Alluvial, eluvial, rubble deposit and dump precious metal claims to be worked continuously

(1) The holder of a block of precious metal claims which are registered as alluvial, eluvial, rubble deposit or dump claims shall continuously work his claims from the date of registration of such block and shall pay to the mining commissioner annually in advance the prescribed fee.

(2) The Board may, on the application of such holder—

(a)    exempt him from the obligation continuously to work such claims for such period as it may deem fit;

(b)    where such block forms part of a group of contiguous blocks of claims similarly registered, authorize him to restrict his work to any one or more of such blocks.

220    Unutilized dumps

(1) Where the Minister has cause to believe that any dump on any registered mining location appears to be unutilized, the Minister may direct the Board to investigate—

(a)    whether or not the dump is economically viable; and

(b)    whether the dump is in fact unutilized and, if so, the reasons therefor.

(2) In making an investigation in terms of subsection (1), the Board shall take into account—

(a)    the length of time that the dump has not been worked; and

(b)     the reasons, if any, given by the holder of the registered mining location concerned as to why the dump has not been worked; and

(c)     the intentions of the holder of the registered mining location concerned in regard to the future working of the dump; and

(d)    any other relevant factors bearing on the matter.

(3) At the conclusion of the investigation carried out in terms of subsection (2), the Board shall submit a report to the Minister advising whether or not it considers the dump to be unutilized, and whether or not the dump is economically viable, and shall forward a copy thereof to the holder of the registered mining location concerned.

(4) A holder of a registered mining location may, upon receipt of a copy of a report in terms of subsection (3) submit his comments thereon to the Minister for consideration.

(5) Where the Board reports that it considers the dump to be unutilized and that it is economically viable, the Minister may, if he considers it to be in the public interest to do so, direct the holder of the registered mining location concerned to work the dump himself or to tribute it so that it can be worked by someone else, within such reasonable period as the Minister may specify.

221    Amount of work required and fees payable to obtain inspection certificates for mining leases

(1) The amount of work required to obtain an inspection certificate for a mining lease shall be—

(a)    in the case of development work—

(i)     if the principal mineral being mined or to be mined is a base mineral,

five metres;

(ii) if the principal mineral being mined or to be mined is a precious metal, ten metres;

(b) in the case of production of minerals, such quantity or value as may be prescribed in respect of the principal mineral being mined or to be mined upon the mining lease;

(c) in the case of capital expenditure—

(i) if the principal mineral being mined or to be mined is a base mineral, four hundred dollars;

(ii) if the principal mineral being mined or to be mined is a precious metal, one thousand dollars;

(d) in the case where other work has been prescribed under paragraph (d) of section two hundred and three, such amount as may be prescribed;

for every five hectares or portion of five hectares contained in the area covered by the mining lease:

Provided that the amount of work required for obtaining a first or second inspection certificate shall be fifty per centum of the work prescribed in paragraph (a), (b) or (c).

(2) For the purpose of obtaining an inspection certificate for a mining lease, the holder may declare work of any of the kinds specified in section two hundred and three.

(3) For the purpose of obtaining any particular inspection certificate for a mining lease, the holder may declare work of one or more of the kinds of work specified in section two hundred and three and, if sufficient work has not been executed to obtain the inspection certificate, he may, if the principal mineral being mined or to be mined is a base mineral, make up the deficiency by the payment of the prescribed sum for every five hectares or portion of five hectares contained in the area covered by the mining lease not accounted for by the execution of work.

(4) For the purposes of this section, the Board shall determine which mineral is the principal mineral being mined or to be mined upon a particular mining lease and may from time to time reconsider and alter its determination.

PART XII

WORKING OF ALLUVIAL, ELUVIAL AND CERTAIN OTHER DEPOSITS

222    Control of working of alluvial or eluvial deposits of designated minerals

(1) In this section—

"designated mineral" means chromite and any other mineral declared to be a designated mineral in terms of subsection (2);

"working period" means a period notified by a miner under an order issued in terms of section two hundred and twenty-five as the period during which he proposes to conduct operations, including, where required by the order, the rehabilitation of the surface of the land worked, on the land concerned and includes any extension of such period permitted under the order.

(2) The Minister may, by statutory instrument, declare any mineral to be a designated mineral for the purposes of this section and may in like manner revoke any such declaration.

(3) No person shall work any alluvial or eluvial deposit of a designated mineral except under an order issued in terms of section two hundred and twenty-five.

(4) The miner of any alluvial or eluvial deposit of a designated mineral in respect of which an order has been issued in terms of section two hundred and twenty-five shall, before commencing or continuing operations under the order on—

(a) a block pegged under an ordinary prospecting licence, pay to the mining commissioner a levy consisting of the prescribed sum for every claim or

portion of a claim registered for such block for every year ending on the 31st December or portion of such year falling within any working period relating to that block;

(b)     any part of a block pegged under a special prospecting licence, a mining lease or a special grant or, where a portion only of a block, mining lease or special grant is subject to the order, any part of that portion, pay to the mining commissioner a levy consisting of the prescribed sum for every hectare or portion of a hectare in that part for every year ending on the 31st December or portion of such year falling within any working period relating to that part.

(5) Where—

(a)     an alluvial or eluvial deposit of a designated mineral other than chromite was being worked immediately before the date on which the mineral concerned became a designated mineral in terms of subsection (2); and

(b)     there was not at that time in force in relation thereto an order issued before the 1st January, 1974, which is deemed to have been issued under section two hundred and twenty-five or an order issued under section two hundred and twenty-five;

provisions of subsection (3) shall not apply to the working of that deposit until—

(i)     an order is issued in terms of section two hundred and twenty-five or the expiry of the period of three months commencing on the date on which the mineral becomes a designated mineral, whichever is the sooner; or

(ii)     where, during the period of three months referred to in subparagraph (i), an application for an order has been made in terms of section two hundred and twenty-three and the application has not been determined, the determination of the application.

(5) Any person who contravenes subsection (3) or (4) shall be guilty of an offence and liable to a fine not exceeding level seven or to imprisonment for a period not exceeding two years or to both such fine and such imprisonment.

[inserted/substituted by Act 22 of 2001, with effect from the 10th September, 2002.]

(6) Any person who contravenes subsection (3) or (4) shall be guilty of an offence and liable to a fine not exceeding level seven or to imprisonment for a period not exceeding two years or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

223     Application for order controlling working of such deposits

(1) Any person wishing to work a deposit referred to in subsection (3) of section two hundred and twenty-two shall make application in writing to the Board for an order prescribing the manner of and conditions governing the working of the deposit.

(2) An application referred to in subsection (1) shall specify details of the proposed method of working the deposit and shall be supported by a plan, based on a map issued under the authority of the State and of a scale of not less than 1:25 000, showing the registered mining location concerned:

Provided that, where, in the case of a block pegged under a special prospecting licence, a mining lease or a special grant, a portion only thereof is proposed to be covered by the order, that portion shall be accurately shown on the plan.

(3) The applicant shall send a copy of his application and the supporting plan to—

(a)     the Natural Resources Board; and

(b)     where the land affected by the application is—

(i)     State land, the Minister responsible for the administration of that land;

(ii)     Communal Land, any rural district council established for the area concerned;

(iii)     private land, the owner and the occupier, if any.

(4) An application in terms of this section may relate to more than one mining location.

224     Application for order in respect of certain other deposits or reefs

(1) This section shall apply to the working of—

(a)     any deposit of any mineral the working of which interferes with or is likely to interfere with the bed, banks or course of a public stream or any swamps or marshes forming the source of a public stream or found along its course; and

(b)     any alluvial or eluvial deposit or rubble or placer deposit of a mineral other than a designated mineral as defined in section two hundred and twenty-two; and

(c)     any chromite reef carried out by surface strip-mining using open-cast workings.

(2) Where any working referred to in subsection (1) is being carried out or is about to be commenced, written application may be made to the Board by—

(a)     in respect of any land, the Natural Resources Board;

(b)     where the land concerned is—

(i)     State land, the Minister responsible for the administration of that land;

(ii)     Communal Land, any rural district council established for the area concerned;

(iii)     private land, the owner or the occupier, if any;

for an order prescribing the manner of and conditions governing the working of the deposit or reef concerned.

(3) An application referred to in subsection (2) shall specify—

(a)     the registered mining location concerned; and

(b)     the proposed contents of the order applied for.

(4) The applicant shall send a copy of his application to the miner and to every other party entitled to make application in terms of subsection (2) in respect of the land concerned.

(5) An application in terms of this section may relate to more than one mining location.

225     Board may make order

(1) After hearing any evidence and representations made by the applicant and the other parties to whom copies of the application are required to be sent, the Board may refuse an application made in terms of section two hundred and twenty-three or two hundred and twenty-four or may make an order prescribing the manner of and conditions governing the working of the deposit or reef.

(2) An order made in terms of this section—

(a)     may contain provisions requiring the miner to rehabilitate the surface of any land worked;

(b)     shall contain provisions requiring the miner to give notice of—

(i)     every period during which he proposes to conduct operations, including, where required by the order, the rehabilitation of the surface of any land worked; and

(ii)     the particular land within the area covered by the order on which such operations are proposed to be conducted;

to the mining commissioner and where the land concerned is—

A.     State land, to the Minister responsible for the administration of that land;

B.     Communal Land, to any district council established for the area concerned;

C.     private land, to the owner and the occupier, if any, thereof.

226     Board may amend order

(1) Where an order has been made in terms of section two hundred and twenty-five, application for the amendment of the order may be made in writing to the Board by—

      (a)      the miner; or

      (b)      the Natural Resources Board. or

      (c)      where the land affected by the order is—

      (i)      State land, the Minister responsible for the administration of that land;

      (ii)      Communal Land, any rural district council established for the area concerned;

      (iii)      private land, the owner or the occupier, if any.

(2) An application in terms of subsection (1) shall specify the order concerned and the amendment applied for and the applicant shall send a copy of the application to all other interested parties referred to in subsection (1).

(3) After hearing any evidence and representations made by the applicant and the other interested parties referred to in subsection (1), the Board may refuse the application or may make an order amending the order concerned.

227     Appeal to Administrative Court

An appeal against any decision of the Board under section two hundred and twenty-five or two hundred and twenty-six shall lie to the Administrative Court at the instance of the applicant or any of the other interested parties referred to in the said section.

228     Order binding on all miners

(1) An order made under section two hundred and twenty-five, as amended from time to time by an order made under section two hundred and twenty-six, shall be binding on every miner of the mining location concerned.

(2) Notwithstanding the forfeiture, abandonment or cancellation of the registered mining location to which an order made under this Part relates, or the cancellation by the Board under subsection (1) of section two hundred and thirty of any rights under any order, any provisions of such order requiring the miner to rehabilitate the surface of the land concerned shall continue in force and be binding on the person who was the miner of the mining location concerned.

(3) Any person who contravenes or fails to comply with an order referred to in subsection (1) shall be guilty of an offence and liable to a fine not exceeding level seven or to imprisonment for a period not exceeding two years or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

229     Enforcement of this Part

(1) A copy of every order made under this Part shall be sent to—

      (a)      the miner; and

      (b)      the registered owner of the mining location; and

      (c)      where the land affected by the order is—

      (i)      State land, the Minister responsible for the administration of that land;

      (ii)      Communal Land, any rural district council established for the area concerned;

      (iii)      private land, the owner and the occupier, if any; and

      (d)      the Natural Resources Board-

[replaced by the Environmental Management Act No.13 of 2002 with effect from the 17th March 2003—Editor ]

            and

      (e)      the mining commissioner.

(2) The mining commissioner shall cause inspections of the mining location to be

made periodically.

(3) If any person—

      (a)     contravenes subsection (3) or (4) of section two hundred and twenty-two; or

      (b)     contravenes or fails to comply with the provisions of an order made under this Part which are binding on him;

he shall be guilty of an offence and liable to a fine not exceeding one thousand dollars or, in default of payment, to imprisonment for a period not exceeding twelve months. [awaiting amendment by Act 22 of 2001 – Editor]

(4) The court which has convicted any person of an offence under subsection (3) shall cause notification of the conviction and the sentence imposed to be sent to the Board. [awaiting amendment by Act 22 of 2001—Editor ]

230    Cancellation of rights under order

(1) In the event of a conviction under subsection (3) of section two hundred and twenty-nine the Board may cancel any right to work any deposit or reef under the order concerned made under this Part.

(2) The Board shall cause notification of the cancellation of any rights under subsection (1) to be sent to the miner, the mining commissioner and, where the land concerned is—

      (a)     State land, the Minister responsible for the administration of that land;

      (b)     Communal Land, any rural district council established for the area concerned;

      (c)     private land, the owner and the occupier, if any, thereof.

231    Evidence of order

The production of a copy of any order made under this Part which purports to be certified as correct by the secretary of the Board shall be sufficient evidence of the making of the order and of its contents.

232    Special payments to landowners

(1) As soon as possible after receipt of a levy referred to in subsection (4) of section two hundred and twenty-two, the mining commissioner shall, if any of the land in respect of which the levy has been paid is—

      (a)     Communal Land, pay to the District Development Fund referred to in section 3 of the District Development Fund Act [Chapter 29:06]; or

      (b)     private land, pay to the owner thereof;

the amount of the levy.

(2) Where the land in respect of which a levy has been paid does not consist solely of Communal Land or of land held by one owner, the manner of allocation of the amount of the levy shall be as prescribed.

(3) All moneys payable in terms of this section shall be defrayed from moneys appropriated for the purpose by Act of Parliament.

(4) Subsections (8), (9), (10), (11) and (12) of section one hundred and eighty-eight shall apply, mutatis mutandis, in respect of the payments referred to in this section.

(5) An order prescribing the manner of and conditions governing the working of an alluvial or eluvial deposit which is in force immediately before the 1st January, 1974, shall, unless it relates to the working of a deposit in relation to which it is not competent to issue an order in terms of this Part, continue in force and be deemed to have been issued in terms of section two hundred and twenty-five.

PART XIII

CONTROL OF SITING OF WORKS ON MINING LOCATIONS

233    Interpretation in Part XIII

In this Part, any reference to the owner or occupier of land shall be construed, in

relation to—

      (a)     Communal Land, as a reference to any rural district council established for the area concerned;

      (b)     State land, as a reference to the Minister responsible for the administration of the land concerned.

234     Approved plan required prior to erection of certain works

(1) Subject to section two hundred and thirty-nine, no miner of a registered mining location shall erect or construct upon his mining location any of the following works—

      (a)     machinery or plant used for the treatment of ores, concentrates, tailings, slimes or other residues;

      (b)     dumps;

      (c)     dams for the storage of waste water or slimes;

      (d)     compounds for his employees;

      (e)     buildings of a permanent nature;

      ( f )    sewage disposal works;

      (g)     recreation grounds;

      (h)     roads;

unless and until he has lodged with the mining commissioner a plan showing the position of such works and such plan has been approved under this Part.

(2) Before erecting or constructing any works mentioned in subsection (1), the miner of any registered mining location shall—

      (a)     lodge with the mining commissioner for his approval a plan in triplicate showing the position of the boundaries of the location and of the proposed site of such works or of the areas within which such works are to be situated;

      (b)     furnish to the mining commissioner the name and address of any owner and occupier, if any, of the land concerned and particulars of all mining locations which are contiguous to the mining location to which the plan relates.

(3) The miner shall, at the same time, furnish a copy of such plan to each such owner and occupier, if any, of land.

235     Particulars to be shown on plan

Such plan shall, in addition to the particulars mentioned in paragraph (a) of subsection (2) of section two hundred and thirty-four, indicate the position of the workings of such location, the position of any works erected or constructed under section two hundred and thirty-nine and the position of any rivers, hills and other natural features, and shall be prepared in such a manner as to indicate as clearly as possible the position of the proposed site and to conform to the requirements of the mining commissioner as to manner of preparation.

236     Procedure on receipt of plan

On receipt of the plan referred to in section two hundred and thirty-four, the mining commissioner shall forthwith—

      (a)     by registered letter notify—

      (i)     every owner and occupier, if any, of land concerned; and

      (ii)    every holder of a contiguous mining location;

         of the receipt of the plan and require them to lodge, within twenty-one days after the date of such notification, their objections, if any, to the approval of the plan or to any works which may have been erected or constructed under section two hundred and thirty-nine; and

      (b)     consult the provincial planning officer of the Department of Physical Planning, the regional mining engineer, the provincial water engineer and the regional land inspector of the Department of Natural Resources and, where it is proposed to

construct a road, the regional agricultural extension officer of the Department of Agricultural Technical and Extension Services.

237    Approval of plan

(1) If any objections have been lodged under section two hundred and thirty-six, the mining commissioner shall, on a day fixed by him and notified to the miner who submitted the plan and the objectors, hear such evidence and arguments as those persons may wish to lay before him in regard to the approval or otherwise of the plan or the siting of any works which have been erected or constructed under section two hundred and thirty-nine.

(2) If no objection has been received or if no notification was given under section two hundred and thirty-six owing to the whereabouts of the owner or the occupier or the holder of a contiguous mining location not being known to the mining commissioner after due inquiry, the mining commissioner shall proceed to consider the matter.

(3) After holding a hearing in terms of subsection (1) or considering the matter in terms of subsection (2), the mining commissioner may—

        (a)      approve the plan; or

         (b)      approve the plan with such amendments and subject to such conditions as he may deem necessary; or

        (c)      refuse to approve the plan:

Provided that the mining commissioner shall not uphold any objection or require any amendment or impose any condition if the mining operations of the miner who lodged the plan are likely to be affected adversely and materially thereby.

(4) In arriving at a decision for the purposes of subsection (3), the mining commissioner shall take into account the views, if any, expressed by the provincial planning officer of the Department of Physical Planning, the regional mining engineer, the provincial water engineer, the regional land inspector of the Department of Natural Resources or the regional agricultural extension officer of the Department of Agricultural Technical and Extension Services:

Provided that, if he considers it necessary for the fair decision of the application, he shall give the applicant an opportunity of making representations in relation to such views, either at the hearing in terms of subsection (1) or otherwise.

(5) If the mining commissioner does not so approve of the siting of any works which may have been erected or constructed under section two hundred and thirty-nine, such works shall thereupon be deemed to have been erected or constructed in contravention of this Part and section two hundred and forty shall apply thereto.

(6) If any person is aggrieved by the decision of the mining commissioner he may, within ten days of such decision, appeal against the decision to the Administrative Court, and the decision of that Court thereon shall be final and without appeal.

(7) On the approval of a plan under this section the mining commissioner shall return one copy of the plan to the miner concerned with such approval endorsed thereon and send one copy similarly endorsed to the landowner and to the occupier of the land, if any, concerned and shall retain the other copy similarly endorsed for purposes of record.

238    Amendment of plan

At any time after a plan has been approved under section two hundred and thirty-seven, the miner of the mining location to which the plan relates, or the owner or occupier of the land concerned, may apply to the mining commissioner for an amendment of the plan, and this Part shall apply, mutatis mutandis, in respect thereof as if such application were a plan submitted to the mining commissioner under section two hundred and thirty-four.

239    When works may be erected or constructed without approved plan