construct a road, the regional agricultural extension officer of the Department of Agricultural Technical and Extension Services.

237    Approval of plan

(1) If any objections have been lodged under section two hundred and thirty-six, the mining commissioner shall, on a day fixed by him and notified to the miner who submitted the plan and the objectors, hear such evidence and arguments as those persons may wish to lay before him in regard to the approval or otherwise of the plan or the siting of any works which have been erected or constructed under section two hundred and thirty-nine.

(2) If no objection has been received or if no notification was given under section two hundred and thirty-six owing to the whereabouts of the owner or the occupier or the holder of a contiguous mining location not being known to the mining commissioner after due inquiry, the mining commissioner shall proceed to consider the matter.

(3) After holding a hearing in terms of subsection (1) or considering the matter in terms of subsection (2), the mining commissioner may—

        (a)      approve the plan; or

        (b)      approve the plan with such amendments and subject to such conditions as he may deem necessary; or

        (c)      refuse to approve the plan:

Provided that the mining commissioner shall not uphold any objection or require any amendment or impose any condition if the mining operations of the miner who lodged the plan are likely to be affected adversely and materially thereby.

(4) In arriving at a decision for the purposes of subsection (3), the mining commissioner shall take into account the views, if any, expressed by the provincial planning officer of the Department of Physical Planning, the regional mining engineer, the provincial water engineer, the regional land inspector of the Department of Natural Resources or the regional agricultural extension officer of the Department of Agricultural Technical and Extension Services:

Provided that, if he considers it necessary for the fair decision of the application, he shall give the applicant an opportunity of making representations in relation to such views, either at the hearing in terms of subsection (1) or otherwise.

(5) If the mining commissioner does not so approve of the siting of any works which may have been erected or constructed under section two hundred and thirty-nine, such works shall thereupon be deemed to have been erected or constructed in contravention of this Part and section two hundred and forty shall apply thereto.

(6) If any person is aggrieved by the decision of the mining commissioner he may, within ten days of such decision, appeal against the decision to the Administrative Court, and the decision of that Court thereon shall be final and without appeal.

(7) On the approval of a plan under this section the mining commissioner shall return one copy of the plan to the miner concerned with such approval endorsed thereon and send one copy similarly endorsed to the landowner and to the occupier of the land, if any, concerned and shall retain the other copy similarly endorsed for purposes of record.

238    Amendment of plan

At any time after a plan has been approved under section two hundred and thirty-seven, the miner of the mining location to which the plan relates, or the owner or occupier of the land concerned, may apply to the mining commissioner for an amendment of the plan, and this Part shall apply, mutatis mutandis, in respect thereof as if such application were a plan submitted to the mining commissioner under section two hundred and thirty-four.

239    When works may be erected or constructed without approved plan

(1) For the purposes of subsection (2)—

"property" means two or more blocks of claims, whether contiguous or otherwise, owned by one person, from which the ore is being treated at the same milling or reduction plant, or which are under the control of one registered mine manager.

(2) Notwithstanding anything contained in section two hundred and thirty-four, the miner of any registered mining location or property may, subject to subsection (5) of section two hundred and thirty-seven, at any time before a plan has been approved under section two hundred and thirty-seven, erect or construct upon such location or property all or any of the following works—

      (a)     dumps other than tailings;

      (b)     residences to house not more than thirty-two persons employed in mining operations;

      (c)     roads not exceeding four metres in width which have no artificial surface such as gravel, stone or similar material:

            Provided that—

      (i)     nothing in this paragraph contained shall be construed so as to permit the construction of a road if there is in existence any other suitable road which serves the same purpose;

      (ii)     no such road may be constructed unless and until the siting thereof has been approved by—

      (a)     in the case of Communal Land, any rural district council established for the area concerned;

      (b)     in any other case, the conservation and extension officer of the district.

(3) For the removal of doubt it is hereby declared that a miner mentioned in subsection (2) may prior to the erection or construction of any of the works mentioned in that subsection lodge with the mining commissioner for his approval in respect of such works the plan referred to in paragraph (a) of subsection (2) of section two hundred and thirty-four.

240    Mining commissioner may order removal of unauthorized works

(1) If any miner erects or constructs any works on a registered mining location in contravention of this Part or of any condition attached to the approval of a plan under section two hundred and thirty-seven, the mining commissioner may order the holder or the miner of such mining location, within such period as shall be specified in the order, to remove such works or to discontinue the use thereof.

(2) If such holder or miner fails to comply with such order within the period specified therein, he shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment and the mining commissioner may thereafter make a fresh order or orders requiring such holder or miner to comply with his original order within a period which the mining commissioner shall specify, and if such holder or miner fails to comply with such further order or orders he may again be prosecuted notwithstanding any previous conviction or acquittal for failing to comply with any previous order and shall be liable to the penalties prescribed by this subsection.

[substituted by Act 22 of 2001, with effect from the 10th September, 2002.]

(3) Upon the conviction of a person for a contravention of subsection (2), the mining commissioner may authorize the owner or occupier of the land concerned or the holder or miner of a contiguous mining location to remove such works and if such owner, occupier, holder or miner does so he shall be entitled to recover the cost of such removal from the holder or miner to whom the order was given under subsection (1).

241     Re-siting of existing roads

(1) Where any road in respect of. which a plan has not been approved under section two hundred and thirty-seven has been constructed upon a registered mining location, whether it was constructed before or after the 1st November, 1961, the mining commissioner may, on the application of the owner or occupier of the land concerned, order the holder or miner of the mining location concerned to discontinue the use of such road or to alter the course thereof within such period as the mining commissioner may specify.

(2) If such holder or miner fails to comply with such order within the period specified therein he shall be guilty of an offence and liable to a fine not exceeding level four or to imprisonment for a period not exceeding three months or to both such fine and such imprisonment.

[substituted by Act 22 of 2001, with effect from the 10th September, 2002.]

242     Approved plan to be binding on successors in title

A plan approved under section two hundred and thirty-seven shall, subject to section two hundred and thirty-eight, be binding upon any holder or miner of the mining location concerned and upon any owner or occupier of the land.

PART XIV

ROYALTY

243     Application of Part XIV

This Part shall apply to the holder of a special mining lease only to the extent that the terms and conditions of his special mining lease or of any agreement entered into with him in terms of section one hundred and sixty-seven are consistent with this Part.

244     Royalty

(1) Subject to this Part, the miner of a registered mining location shall pay royalty on all minerals or mineral-bearing products won from such location which have been disposed of by him or on his behalf, whether within or outside Zimbabwe, during any month, at such rate per unit of mass as may be fixed in terms of section two hundred and forty-five.

(2) Where a registered mining location forms part of a property mentioned in section two hundred and forty-six royalty shall be paid in terms of subsection (1) on the total of all minerals or mineral-bearing products won from such property.

(3) Where the royalty assessed in respect of minerals or mineral-bearing products disposed of in any one month—

       (a)     does not exceed two hundred dollars, there shall be a full rebate of such royalty;

       (b)     exceeds two hundred dollars but does not exceed three hundred dollars, the royalty payable shall be three times the amount by which the assessed royalty exceeds two hundred dollars.

(4) There shall be a full rebate of royalty in respect of all minerals or mineral-bearing products used wholly within Zimbabwe.

(5) There shall be a rebate of royalty in respect of any mineral or mineral-bearing product which is—

       (a)     disposed of to or received for treatment by an approved beneficiation plant; and

       (b)     specified in relation to that approved beneficiation plant;

at the rate specified by the Minister in terms of section two hundred and forty-seven in respect of that approved beneficiation plant:

Provided that where the degree of beneficiation specified in the application made in terms of subsection (1) of section two hundred and forty-seven relating to the approved beneficiation plant is not carried out in relation to any mineral or mineral-

bearing product in respect of which a rebate referred to in this subsection has been earned, the owner of such mineral or mineral-bearing product shall, on the disposal thereof, pay royalty in the amount of the rebate to the mining commissioner within whose mining district the registered mining location from which the mineral or mineral-bearing product was won is situated.

245     Fixing of royalty

(1) Before the 31st August in each year the Minister may fix the rate of royalty payable in terms of section two hundred and forty-four.

(2) The rate of royalty fixed in terms of subsection (1) shall apply to the period of twelve months commencing on the 1st January next following the year in which the rate of royalty is fixed.

(3) In fixing the rate of royalty in terms of subsection (1) the Minister shall have regard to—

    (a)     the prices at which minerals or mineral-bearing products were sold during the period of three years immediately preceding the 1st July in the year in which the rate is fixed;

    (b)     the representations, if any, by the Chamber of Mines of Zimbabwe relating to the rate of royalty;

    (c)     any other matter which he deems fit.

(4) Notwithstanding subsections (1) and (2), where production commences in Zimbabwe of a mineral or mineral-bearing product in respect of which no rate of royalty has been fixed or, if the Minister considers it desirable in the national interest, where production of such a mineral or mineral-bearing product has previously commenced and been carried on, the Minister—

    (a)     may as soon as possible fix the rate of royalty which shall be payable in respect of that mineral or mineral-bearing product for—

    (i)     the period ending on the 31st December of the year in which such rate is fixed; or

    (ii)     if no rate has been fixed for such period in terms of subsection (1), the period of twelve months commencing on the 1st January next following the date on which such rate is fixed;

        or both;

    (b)     shall, in fixing the rate of royalty in terms of this subsection, have regard to—

    (i)     the prices at which that mineral or mineral-bearing product was sold during the period of three years ending on the 30th June preceding the date when the rate of royalty is fixed;

    (ii)     the representations, if any, by the Chamber of Mines of Zimbabwe relating to the rate of royalty;

    (iii)     such other matters as he may deem fit.

(5) In fixing the rate of royalty in terms of this section the Minister may fix different rates of royalty in respect of different minerals or mineral-bearing products.

(6) As soon as any rate of royalty has been fixed1 in terms of this section it shall be advertised by notice in the Gazette and by notice posted at the office of every mining commissioner.

246     Meaning of "property"

(1) For the purpose of calculating royalty on any mineral or mineral-bearing product, other than chrome, when ore from two or more blocks of claims, whether contiguous or otherwise, owned or held under a tribute agreement by the same person is treated at the same milling or reduction plant, then such blocks of claims shall be deemed to be one property.

(2) For the purpose of calculating royalty on chrome, all blocks owned or held under a tribute agreement and worked by the same person in any one mining district shall be deemed to be one property.

247    Beneficiation plant

(1) The Minister may, upon the application by the owner thereof, by statutory instrument, declare any bank assay department, factory, refinery, smelter or treatment plant which is situated in Zimbabwe to be an approved beneficiation plant in relation to a mineral or mineral-bearing product to be specified in the notice.

(2) In a declaration made in terms of subsection (1) the Minister shall specify the rate of rebate of royalty which shall apply in respect of any specified mineral or mineral-bearing pro duct treated at the approved beneficiation plant referred to in the declaration.

(3) A person making an application referred to in subsection (1) shall specify the degree of beneficiation which it is proposed to carry out at the bank assay department, factory, refinery, smelter or treatment plant, as the case may be.

(4) The Minister may, by statutory instrument, withdraw a declaration made in terms of subsection (1) in respect of any approved beneficiation plant—

    (a)    where the approved beneficiation plant is not operated as such for any period which exceeds, or aggregate of periods which exceed, three months in any one year; or

    (b)    where the degree of beneficiation carried out at the approved beneficiation plant is reduced below that specified in the application made in terms of subsection (1) relating to that plant.

(5) The owner of an approved beneficiation plant shall, not later than the tenth day of each month, render a return in the form prescribed of all minerals and mineral-bearing products disposed of to or received for treatment by the beneficiation plant in the preceding month to the mining commissioner within whose mining district the registered mining location from which the minerals or mineral-bearing products were won is situated.

248    Dump may be unit for royalty purposes

Notwithstanding anything to the contrary contained in section two hundred and forty-six, a dump shall be deemed to be a separate property if—

    (a)    the right to work the dump is held by a person other than the miner working the block on which it is situated; or

    (b)    the dump is worked by a person other than the miner working the block on which it is situated; or

    (c)    the reduction plant for the treatment of the dump is entirely separate from that in or at which the ore extracted from the block on which the dump is situated is being treated; or

    (d)    the person who has disposed of the right to work the dump or block on which the dump is situated has no interest in the working of the reduction plant for the treatment of the dump or of the ore extracted from the block on which the dump is situated, as the case may be, or the extraction from such dump or block, other than the payment, rental or royalty specified in the agreement under which the right to work the dump or block is given.

249    Exemption of royalty when ore extracted for experimental purposes

If any miner desires to extract or treat ore from his location for experimental or similar purposes, he may apply to the Secretary for permission to treat or deal with the mineral or mineral-bearing product obtained from his location for a limited period or up to a limited amount, and the Secretary may permit such treatment or dealing without payment of royalty under such terms and conditions as may by him be

deemed expedient.

250     Acquisition or removal of ore, etc., to be declared

If any person acquires or removes from the mining location from which it was derived any ore, tailings, slimes, concentrates, residues or other mineral-bearing product he shall immediately—

      (a)     declare such acquisition or removal to the mining commissioner;

      (b)     render to the mining commissioner such returns thereof as may be prescribed.

251     Monthly returns and payment of royalty

(1) A miner shall, not later than the tenth day of each month—

      (a)     render to the mining commissioner a return in the prescribed form showing—

      (i)     in respect of minerals, other than precious stones, or mineral-bearing products won from his mining location—

      A.     the output; and

      B.     full details of the disposal thereof by him or on his behalf;

      (ii)     in respect of precious stones won from his mining location, such details relating thereto and to the disposal thereof during the preceding month and the quantity thereof held by him at the end of the preceding month as may be prescribed; and

      (b)     furnish the mining commissioner with such affidavits, certificates and documents relating to any matter referred to in paragraph (a) as the mining commissioner may require; and

      (c)     submit to the mining commissioner the royalty payable by him in terms of section two hundred and forty-four in respect of the preceding month or the provisional amount of royalty assessed in terms of subsection (2).

(1a) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level five or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(2) Where it is impracticable for any reason to calculate before the tenth day of any month the royalty payable in respect of the preceding month the mining commissioner may assess a provisional amount of royalty which shall be payable.

(3) When the correct amount of royalty is assessed the miner shall—

      (a)     be entitled to a refund of any sum paid by him in terms of subsection (2) which exceeds the correct amount of royalty payable in terms of section two hundred and forty-four; or

      (b)     pay to the mining commissioner such sum as represents the difference between the correct amount of royalty payable in terms of section two hundred and forty-four and the amount paid in terms of subsection (2).

252     Inspection of books and records, etc.

The mining commissioner or any person duly authorized by him shall at all reasonable times have access for the purpose of inspection to all books and records, reports and other documents relating to the acquisition, disposal or removal of any mineral or mineral-bearing product as may be necessary for the purpose of ascertaining or verifying any return, details, solemn declaration, certificate or document rendered under this Part.

253     Prohibition of disposal of minerals when royalty or returns, etc., have not been lodged

(1) If the miner of a registered mining location fails to pay any royalty due in respect of such location the mining commissioner may issue an order prohibiting the disposal

of any minerals or mineral-bearing products from such location or from any other location which is being worked by the miner, whether or not the miner has failed to pay any royalty due in respect of the other location, until all outstanding royalty has been paid or until an arrangement has been made which is acceptable to the mining commissioner for the payment of such royalty.

(2) If the mining commissioner has reason to believe that minerals or mineral-bearing products have been produced or disposed of from any registered mining location and he has not received in respect thereof the return, details, solemn declarations, certificates and documents referred to in section two hundred and fifty-one he may issue an order prohibiting the disposal of any minerals or mineral-bearing products from that location until the return, details, solemn declarations, certificates and documents have been rendered and any royalty due in respect of such disposal has been paid or until an arrangement has been made which is acceptable to the mining commissioner for the payment of such royalty.

(3) A miner who fails to observe an order issued in terms of this section and any person who, knowing of such order, receives any minerals from the location referred to in the order contrary to the terms thereof shall be guilty of an offence and liable to a fine not exceeding level eight or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

254     Remission of royalty

(1) The President may remit, in whole or in part, the royalty payable on—

       (a)      any mineral or mineral-bearing product or class thereof; or

       (b)      any mineral or mineral-bearing product won from any specified registered mining location or property mentioned in section two hundred and forty-six;

for such period as he may determine whenever he deems it expedient to do so as an inducement to—

       (i)      the commencement or continuation of mining operations; or

       (ii)      the processing or refining within Zimbabwe of minerals or mineral-bearing products; or

       (iii)      the development of any export market;

and such remission may be granted with effect from a date which precedes the date on which it is granted by not more than four years.

(2) Notwithstanding the provisions of this Part, where a remission of royalty was granted or ordered before the 1st January, 1970, in respect of any period extending beyond the 31st December, 1969, that remission of royalty shall continue to apply in respect of that period.

PART XV

PAYMENTS TO LOCAL AUTHORITIES

255     Miners to make certain payments to local authorities

(1) The Minister, acting with the approval of the Minister responsible for finance and after consultation with the Minister responsible for local government and any organization which the Minister considers represents mining interests, may by statutory instrument, require any miner of a registered mining location, or any class of such miners, to pay a specified sum at specified intervals to any local authority within whose area the registered mining location is situated.

(2) The Minister may specify a sum for the purposes of subsection (1) as a lump sum or as a percentage of the value of the output of the mining location concerned, or in such other manner as the Minister may think appropriate.

(3) Every miner to whom a notice in terms of subsection (1) applies shall make the

payments required by the notice, and in the event of his default any sums unpaid shall be a debt due to the local authority concerned, and may be recovered by the local authority from the miner by proceedings in a competent court.

256    Certain dumps to constitute separate mining locations

For the purposes of section two hundred and fifty-five, a dump shall be deemed to be a separate mining location if—

(a)    the right to work the dump is held by a person other than the minor working the mining location on which it is situated; or

(b)    the dump is worked by a person other than the miner working the mining location on which it is situated;

and the person working the dump or holding the right to work it shall be deemed to be the miner of the dump.

257    Remission or exemption from liability to make payments

(1) The Minister, acting with the approval of the Minister responsible for finance and after consultation with the Minister responsible for local government and any organization which the Minister considers represents mining interests, may remit, in whole or in part, the sums payable in terms of section two hundred and fifty-five—

(a)    by any miner or class thereof; or

(b)    in respect of any mineral or mineral-bearing product or class thereof;

for such period as the Minister may determine, whenever he considers it expedient to do so as an inducement to—

(i)    the commencement or continuation of mining operations; or

(ii)    the development of any export market;

and the Minister shall cause any such remission to be notified in writing to every miner and local authority concerned.

(2) On application being made by a miner who wishes to extract ore from his mining location for experimental or similar purposes, the Secretary may permit the miner, subject to such terms and conditions as the Secretary may fix, to extract the ore without paying any sums in respect of it in terms of section two hundred and fifty-five.

(3) The Secretary shall ensure that the local authority concerned is notified in writing of any permission granted by him in terms of subsection (2).

PART XVI

ABANDONMENT AND FORFEITURE

258    Abandonment of unregistered locations

(1) The holder of any mining location with respect to which no certificate of registration has yet been obtained may at any time abandon such location.

(2) Prior to such abandonment, the holder shall remove all beacons, if any, from such location, and shall post on a peg on the location a notice stating the fact and date of such abandonment.

(3) No person shall make any relocation upon any unregistered mining location abandoned or deemed to be abandoned under the provisions of this Act until after the expiration of seven clear days from and exclusive of the date on which such location was abandoned or deemed to be abandoned.

259    Abandonment of registered blocks or sites

(1) Subject to section two hundred and seventy-nine, the holder of a registered block or site may abandon such block or site, or any portion of such block or site, by applying in writing to the mining commissioner for and obtaining a certificate of abandonment.

(2) Such certificate of abandonment shall be deemed to constitute valid and sufficient proof of such abandonment.

(3) If such holder abandons a portion only of such block or site, he shall re-beacon the remainder of such block or site according to section fifty-one.

260     Forfeiture for failure to obtain inspection certificate for block

Failure to obtain an inspection certificate within the period prescribed therefor shall, unless a protection certificate has been obtained under section two hundred and seventeen in respect of such block, render liable to forfeiture the block in respect of which such failure has taken place.

261     Forfeiture of alluvial, eluvial, rubble deposit or dump precious metal claims

If the holder of a block of precious metal claims which are registered as alluvial, eluvial, rubble deposit or dump claims fails to work his claims continuously, the block shall be liable to forfeiture unless—

        (a)     he has been exempted in respect of such block under paragraph (a) of subsection (2) of section two hundred and nineteen; or

        (b)     the Board has under paragraph (b) of subsection (2) of that section authorized him to restrict his work to one or more blocks and such block is one of the blocks on which work is not required to be done.

262     Forfeiture of precious stones blocks

If the holder of a block of precious stones claims fails to work his claims continuously, the block shall be liable to forfeiture unless—

        (a)     he has been exempted in respect of such block under paragraph (a) of subsection (2) of section two hundred and eighteen; or

        (b)     the Board has under paragraph (b) of subsection (2) of that section authorized him to restrict his work to one or more blocks and such block is one of the blocks on which work is not required to be done.

263     Forfeiture of mining leases

(1) If the holder of a mining lease fails to obtain any inspection certificate within the period prescribed therefor, the mining commissioner shall by registered letter notify the holder of such failure and shall send a copy of such letter to the Board.

(2) If within a period of thirty days from the date of posting such notification such holder has failed to obtain such inspection certificate, the mining commissioner shall inform the Board and the Board shall, by registered letter, notify the holder that the mining lease is liable to forfeiture.

(3) Within a period of thirty days from the date of the posting by the Board of such notification, the holder of the mining lease may, if he has not obtained such inspection certificate, make written application to the Board for an extension of time within which to obtain such certificate.

(4) If within the period mentioned in subsection (3), the holder of the mining lease has not obtained such inspection certificate or has failed to make such application for an extension of time, the Board may direct the mining commissioner to declare the mining lease to be forfeited, and the mining commissioner shall forthwith comply with such direction.

(5) Where the holder of a mining lease has made application to the Board for the extension of time mentioned in subsection (3), the Board may refuse such application or may grant an extension of time for such period as it may deem fit.

(6) Where an extension of time has been granted under subsection (5), the Board may, on the application of the holder of the mining lease, from time to time, grant further extensions of time.

(7) Where the Board has refused to grant any such extension of time or where an extension has been granted and the holder of the mining lease has failed to obtain the inspection certificate before the expiry of such extension of time, the Board may direct the mining commissioner to declare the mining lease to be forfeited, and the

mining commissioner shall forthwith comply with such direction.

264   Forfeiture of sites

If at any time the monthly rent of any registered mining site has remained due and unpaid for a period of three months or more, such site shall be liable to forfeiture:

Provided that in the case of a site attached to a mining lease, the mining commissioner shall by registered post notify the lease holder that payment of the site rent is so in arrear and if such rent is not paid within thirty days of the posting of such notification, the mining commissioner may declare the site to be forfeited.

265   Forfeiture of mining locations

(1) If a holder of a registered mining location fails to comply with a directive given by the Minister in terms of subsection (5) of section two hundred and twenty, the Minister may order in writing that the registered mining location on which the dump concerned is situated be forfeited, unless the holder thereof satisfies the Minister that he took all reasonable and practicable steps to comply with the directive either by working the dump himself or by tributing it to someone else but was unable to do so.

(2) Subject to subsection (3), an order in terms of subsection (1) shall not take effect until a period of thirty days has expired after the holder of the registered mining location concerned has been notified in writing of the order.

(3) During the period of thirty days referred to in subsection (2), any person aggrieved by an order in terms of subsection (1) to forfeit a registered mining location may appeal to the High Court against such order and, pending the determination of such appeal, the mining location concerned shall not be forfeited.

(4) The procedure in any appeal in terms of subsection (3) shall be as prescribed in rules of court.

(5) In any appeal in terms of subsection (3), the High Court may make such order in the matter as it thinks just.

266   Locations belonging to estate of deceased persons: special conditions as to forfeiture

(1) Any registered mining location belonging, and which is notified in writing to the mining commissioner by any person interested as belonging, to the estate or registered in the name of any deceased person, minor, mentally disordered or defective person or insolvent shall not, after the date of the receipt of such notification by the mining commissioner, be liable to forfeiture by reason of failure to take out any certificate within the prescribed period, or to pay licence moneys, rents, dues, fees or fines until after the expiration of a period of thirty days from the issue of letters of administration to the executor or executors of such deceased person, or, in the case of the estate of any minor, mentally disordered or defective person or insolvent, from the date of appointment of a curator or trustee of such estate.

(2) It shall be competent for any executor, curator or trustee within the aforesaid period of thirty days, according to the circumstances of the case, either to take out any certificate required as aforesaid or make the necessary payments in respect of licence moneys, dues, fees or fines, and to retain such location as aforesaid as an asset in such estate:

Provided that—

    (i)    if the issue of such letters of administration or the appointment of such curator or trustee has been made outside Zimbabwe, the above period of thirty days shall be reckoned from the date of the official recognition in Zimbabwe of such letters of administration or appointment, as the case may be;

    (ii)    in all cases after the expiration of six months from the date of the aforesaid notification to the mining commissioner, the provisions of this section shall cease to apply to such location unless the High Court otherwise directs.

267     Removal of buildings and machinery from abandoned, forfeited or cancelled location

Subject to section three hundred and sixty-six, the former holder of any mining location which has been abandoned, forfeited or cancelled may, within a period of three months from the date of such abandonment, forfeiture or cancellation, remove any buildings or machinery belonging to him:

Provided that—

      (i)     if such location or any part of it is repegged by any other person as a fresh mining location, the holder of such fresh mining location shall not be liable for any damage done to such buildings or machinery in the due and proper exercise of his rights as such holder;

      (ii)     the owner or the occupier of the land on which such buildings or machinery are situated shall not be liable for any damage done to such buildings or machinery in the due and proper exercise of his rights as owner or occupier of the land;

      (iii)     the mining commissioner may, if he is satisfied that it is necessary to do so, extend the period within which the buildings or machinery may be removed by a further period not exceeding three months.

268     Removal of beacons from abandoned or forfeited locations

Whenever any mining location or part of such location has been abandoned, or whenever any mining location has been duly forfeited according to law, and the holder has not removed all pegs and beacons appertaining to such location or the part abandoned, it shall be lawful for any mining commissioner, claim inspector or other person duly authorized thereto by the mining commissioner at any time after the date of such abandonment or forfeiture, to remove and destroy all the beacons, pegs and boundary marks of such location, or of so much as has been abandoned:

Provided that no such removal or destruction may be carried out until a quittance certificate has been issued in terms of section two hundred and sixty-nine in respect of such mining location or part thereof.

269     Open workings to be protected on abandonment, forfeiture or cancellation of location

(1) In this section—

"director" means any person who controls or governs the company or is a member of a body or group of persons which controls or governs the company or, where there is no such body or group, is a member of the company;

"holder" includes the person who was the holder of an abandoned, forfeited or cancelled mining location before its abandonment, forfeiture or cancellation;

"occupier", in relation to Communal Land, means any rural district council established for the area concerned;

"owner", in relation to State land, means the Minister responsible for the administration of such land;

"quittance work" means any work required for proper compliance with subsection (2).

 (2) On or before the abandonment, forfeiture or cancellation of a registered mining location or not later than thirty days after the posting by the mining commissioner of the notice mentioned in section two hundred and seventy-two, the holder of such location shall fill in all shafts, open surface workings and excavations or otherwise so deal with them as permanently to ensure the safety of persons and stock:

Provided that the mining commissioner may in circumstances which he may deem exceptional extend such period of thirty days.

(3) A holder who contravenes subsection (2) shall be guilty of an offence and liable to

a fine not exceeding level six or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment.

(4) Where a holder has contravened subsection (2), and whether or not he has been prosecuted for the contravention, the mining commissioner—

    (a)      shall in writing order him to comply with subsection (2) within such reasonable period as the mining commissioner shall specify in the order; and

    (b)      may make further such orders if the holder fails to comply with the order made in terms of paragraph (a).

(5) A holder who contravenes an order under subsection (4) shall be guilty of an offence and liable to a fine not exceeding level seven or to imprisonment for a period not exceeding two years or to both such fine and such imprisonment.

(5a) A holder may be convicted of an offence under subsection (5) whether or not he has been prosecuted—

    (a)      for the contravention of subsection (2) which gave rise to the order concerned; or

    (b)      for contravening any previous order made under subsection (4).

(5b) The court that convicts a person of contravening subsection (3) or (5) may order the cancellation of any prospecting licence held by him, and thereupon the licence shall be cancelled and no new licence shall be issued to him until he has proved to the satisfaction of the Secretary that he has complied in all respects with subsection (2) or with the order in respect of which he has been convicted, as the case may be.

[substituted by Act 22 of 2001, with effect from the 10th September, 2002.]

(6) Orders may be made under subsection (4) in respect of any registered mining location which was abandoned, forfeited or cancelled on or after the 1st July, 1947, and in respect of which a quittance certificate has not been issued.

[amended by Act 22 of 2001, with effect from the 20th May, 2002.]

(7) The manner in which shafts, open surface workings and excavations shall be dealt with for the purposes of subsection (2) shall be prescribed by regulation, and compliance with such regulations shall be sufficient compliance with that subsection.

(8) When such shafts, open workings or excavations have been filled in or suitably enclosed and protected, the holder shall, not later than thirty days after the completion of such work, send to the mining commissioner a certificate in the form prescribed by regulation stating the nature of the work which has been done for the purposes of subsection (2) and if there are no shafts, open surface workings or other excavations on the mining location which require quittance work, the holder shall, not later than thirty days after the posting of the notice mentioned in section two hundred and seventy-two by the mining commissioner, send to the mining commissioner a certificate to that effect:

Provided that, if the holder has not complied with subsection (2) within the period specified therein, he shall, not later than thirty days after the posting of the notice mentioned in section two hundred and seventy-two, send to the mining commissioner a written statement to that effect stating the reasons therefor.

(9) In addition to the certificate required by subsection (8), the holder shall send to the mining commissioner the written consent of the occupier or, if there is no occupier, the owner of the land upon which the relevant mining location was situated to the issue of a quittance certificate in terms of this section:

Provided that, if the holder has not been able to obtain such written consent, he shall send instead to the mining commissioner a written statement to that effect.

(10) If written consent to the issue of a quittance certificate is lodged in terms of subsection (9), the mining commissioner shall issue a quittance certificate relieving the holder from any further responsibility in terms of subsection (2).

(11) If written consent to the issue of a quittance certificate is not lodged in terms of subsection (9), the mining commissioner shall by registered letter notify the occupier of the land or, if there is no occupier, the owner of the land upon which the relevant mining location was situated that he has received such certificate and that a quittance certificate relieving such holder from any further responsibility under subsection (2) will be granted to such holder unless a written objection giving full details of all unprotected or insufficiently protected shafts, open surface workings or excavations is lodged by or on behalf of such owner or occupier within thirty days of the date of the posting of such notification by the mining commissioner.

(12) If the whereabouts of the owner or the occupier of any land are unknown to the mining commissioner after due inquiry or if no objection is lodged with the mining commissioner within the prescribed period, the mining commissioner shall issue a quittance certificate relieving the holder from any further responsibility under subsection (2).

(13) If an objection is received to the issue of a quittance certificate, the mining commissioner shall notify the person who lodged such objection and the holder of the time when a person appointed by the mining commissioner will inspect the abandoned or forfeited mining location, and the objector may attend at such inspection and point out to the inspector in what respect he considers the quittance work to be insufficient.

(14) If the mining commissioner is satisfied from the report of the inspector that the quittance work is adequate, he shall issue a quittance certificate relieving the holder from any further responsibility under subsection (2).

(15) If the mining commissioner is not satisfied in terms of subsection (14), he shall give written notice to the holder of what additional work is necessary and shall order the holder to perform such work within a time specified by the mining commissioner.

(16) If the holder fails to comply with the order of the mining commissioner within the specified time he shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment and the mining commissioner shall thereafter make a fresh order or orders requiring such holder to comply with his original order within a period specified by the mining commissioner.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(17) If the holder fails to comply with any such further order or orders he shall be guilty of an offence and liable to a fine not exceeding level seven or to imprisonment for a period not exceeding two years, and he may again be prosecuted notwithstanding any previous conviction or acquittal for failing to comply with any previous order of the mining commissioner.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(18) When the holder has complied with any order made by the mining commissioner in terms of this section, the mining commissioner shall issue to such holder a quittance certificate relieving such holder from any further responsibility under subsection (2).

(19) A copy of every quittance certificate issued in terms of this section shall be sent by the mining commissioner to the relevant owner or occupier of land.

(20) If any holder fails to furnish a certificate or written statement in terms of subsection (8) or (9) or makes any false statement in such certificate or written statement, he shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(21) Where, in the case of a registered mining location formerly held by a company, the company has been dissolved before the issue of a quittance certificate in terms of this section in respect of that registered mining location, every person who was a director of the company—

      (a)    at the time of the abandonment, forfeiture or cancellation of the registered mining location or at any time thereafter; or

      (b)    where the dissolution of the company occurred before the forfeiture or cancellation of the registered mining location, at the commencement of the winding up of the company or, in the event of a dissolution not preceded by a winding up, at its dissolution;

shall upon the dissolution of the company be deemed to be a holder of the registered mining location for the purposes of this section.

270     Removal of or interference with protective works prohibited

(1) Except in the exercise of any right acquired under this Act or with the permission in writing of the mining commissioner and subject to such conditions as the mining commissioner may attach to such permission, no person shall remove or interfere with any fencing or other works erected or constructed under section two hundred and sixty-nine for the protection of mine workings.

(2) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level five or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

(3) If any person is convicted of an offence under this section, the court may, in addition to any other penalty imposed by it, order such person to restore such fencing or other works or otherwise so to deal with them as permanently to ensure the safety of persons or stock.

271     Mining commissioner may declare location to be forfeited

(1) Subject to section two hundred and sixty-three, where any mining location is liable to forfeiture in terms of this Act, the mining commissioner may declare such location to be forfeited.

(2) Nothing in subsection (1) shall be construed as affecting in any way the duty of the mining commissioner to declare a location to be forfeited under section seventy-seven, seventy-nine, one hundred and twenty-nine, two hundred and twelve or three hundred and thirty.

272     Relocation of abandoned, forfeited or cancelled locations and reinstatement of forfeited locations

(1) Lists of registered mining locations which have been abandoned or forfeited in terms of this Act shall from time to time be posted on a board to be exhibited in some conspicuous way outside the office of the mining commissioner, and any such location may be relocated after the expiration of thirty-five clear days from and exclusive of the date of the posting of the notice relating thereto, unless the declaration of forfeiture is revoked in terms of this section or in the said notice it is upon instruction of the Secretary otherwise provided.

(2) The person who at the date of the declaration of forfeiture was the holder of a block or site which has been declared forfeited in terms of section two hundred and seventy-one owing to his failure to obtain the necessary inspection certificate or to pay site rent therefor may apply to the mining commissioner for the revocation of such declaration of forfeiture.

(3) If—

      (a)    the application under subsection (2) is made within twenty-one days of the date of the posting in terms of subsection (1) of the notice of forfeiture relating

to such mining location; and

(b)      the prescribed fee is paid to the mining commissioner; and

(c)       the applicant is granted a protection certificate under section two hundred and seventeen or obtains the necessary inspection certificate for such mining location or pays the arrears of site rent, as the case may be, within twenty-one days of the date of the posting in terms of subsection (1) of the notice of forfeiture relating to such mining location;

the mining commissioner shall revoke the declaration of forfeiture and upon such revocation such mining location shall be regarded for all purposes as if no forfeiture thereof had been declared and any approved cultivation scheme which relates to such mining location shall not be affected by such forfeiture.

273      Mine plans to be lodged on abandonment or closing down

(1) This section shall not apply to any mine upon which no development work has been done at a depth of more than fifteen metres.

(2) If the miner of any mine on which mining operations are being carried out intends to close down such mine or substantially reduce mining operations, he shall, not less than sixty days before such closing, down or such substantial reduction of mining operations, give written notice to the mining commissioner of such intention.

(3) A notice given in terms of subsection (2) shall state the reasons why the miner intends to close down the mine or substantially reduce mining operations.

(4) The mining commissioner shall, as soon as practicable after receiving a notice given in terms of subsection (1), forward it to the Minister, together with his comments thereon.

(5) Within thirty-one days of the date of closing down a mine or substantially reducing mining operations, the miner shall lodge with the mining commissioner in respect of each mine a plan or plans which shall comply with the following conditions—

(a)      where development work has been executed to a vertical or incline depth of more than one hundred metres on the dip, the plan or plans shall be prepared by a mine surveyor;

(b)      where development work has been executed to a vertical or incline depth of not more than one hundred metres on the dip, the plan or plans shall be prepared by a mine surveyor or otherwise shall be based on tape and compass survey;

(c)      the plan or plans shall show details of all work done on the mine, together with such further particulars as the mining commissioner may require;

(d)      plans prepared by a mine surveyor shall be drawn to any recognized scale; other plans shall be drawn to a scale of 1:250 or 1:500:

Provided that with effect from the promulgation of the regulations made under paragraph (c) of subsection (2) of section four hundred and three the plans to be lodged in terms of this paragraph shall comply with the said regulations and not with the aforesaid conditions.

(6) If the miner of any mine shows to the satisfaction of the Chief Government Mining Engineer that he is unable to prepare or cause to be prepared the plans required under subsection (3), the Chief Government Mining Engineer shall cause such plans to be prepared by a Government mining engineer.

(7) The miner of any mine who—

(a)      fails to furnish such notice or to lodge such plans as are prescribed; or

(b)      wilfully refuses to produce such plans or to allow them to be examined or copied by the inspector of mines or any other officer duly authorized thereto by the Minister; or

(c)      conceals any part of the workings of the mine from a Government

mining engineer who has been instructed to prepare the plans under subsection (3); or

(d)       knowingly produces or transmits an imperfect or inaccurate plan;

shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

PART XVII

REGISTRATION OF TRANSFERS, HYPOTHECATIONS, OPTIONS, TRIBUTE AGREEMENTS AND CONDITIONS GOVERNING MINING RIGHTS ON RESERVED GROUND

274      Interpretation in Part XVII

In this Part—

"mining location" does not include an exclusive prospecting reservation, a special grant or a special grant issued under Part XX.

275      Registration of transfer of mining locations and transfer duty payable

(1) When any registered mining location or any interest therein is sold or otherwise alienated in any manner whatsoever, the seller or person who so alienates shall notify the mining commissioner of the transaction within sixty days of the date of such transaction, and shall inform him of the name of the person to whom such location or interest is sold or otherwise alienated and of the amount of the valuable consideration, if any, agreed upon, and the date of the transaction.

(2) When any registered mining location or any interest therein has been sold or otherwise alienated, whether before or after the 1st November, 1961, in any manner whatsoever for valuable consideration, transfer duty at the rate fixed by Parliament shall be paid by the purchaser, which term shall include any person becoming entitled to such location or interest therein by way of sale, exchange or other like transaction.

(3) If the holder of a registered mining location has granted to any person the right to purchase such location, and if the said right to purchase becomes vested in some other person by cession or assignment of the said right, then upon the exercise of the said right to purchase any sums paid for any such cession or assignment shall be deemed to form part of the consideration in the sale or alienation of such mining location.

(4) The transfer duty payable in terms of subsection (2) shall be calculated on the cash value of the consideration. If the consideration consists partly of cash and partly of shares in a company already formed or to be formed, which is to acquire such location, the cash value of such shares shall be deemed to be their nominal value; if the consideration of any portion thereof consists of anything other than cash or such shares, then the duty shall be payable on the true cash value thereof, to be assessed by the parties concerned to the satisfaction of the mining commissioner. If the payment of the consideration or any portion thereof is contingent upon the happening of some future event, the purchaser shall give security to the satisfaction of the mining commissioner that he will pay transfer duty at the rate fixed as aforesaid on such consideration or such portion thereof if and when such consideration becomes payable.

(5) The transfer duty payable in terms of subsection (2) shall be paid within six months from the date of the sale or other alienation of the mining location, as the case may be:

Provided that—

(i)       such period may be extended by the Secretary on cause shown, but in any such case from and after the expiration of such period of six months and until payment or deposit of the amount of such duty, interest thereon at the rate of twelve per centum per annum shall be payable and paid by the purchaser;

(ii)      if the payment of the consideration or any portion thereof is contingent upon the happening of some future event, the period of six months provided for by this subsection shall, in respect of the transfer duty on such consideration or such portion thereof, be calculated as from the happening of such event.

(6) Subject to this Act, any person entitled to be registered as the holder of a registered mining location, or any interest therein, shall make application to the mining commissioner for the transfer of such location or interest, and every such application shall be in writing and signed by or on behalf of the applicant, and shall be accompanied. by the following particulars—

(a)      the last issued certificate of registration or of special registration of the location, or the holder's copy of the mining lease, as the case may be;

(b)      certificates by the transferor and transferee in the prescribed form;

(c)      a duplicate original, grosse or notarially certified copy of any and every existing written agreement affecting or bearing upon the sale, alienation, exchange or transfer;

(d)      in the event of there being no such existing written agreement, certificates by the transferor and transferee to that effect;

(e)      the original or a notarially certified copy of any power of attorney which may be required to authorize an agent to act on behalf of any party to the transfer; if the original power is lodged with the mining commissioner and the applicant does not wish the mining commissioner to retain it, he shall furnish with it a copy which the mining commissioner shall compare with the original, certify to be a true copy and retain;

( f )      if such application is in respect of the transfer of any mining location registered for precious stones or any interest therein, a certificate from the Secretary that the Minister has granted the permission required under section two hundred and eighty-two in respect of such transfer.

(7) The mining commissioner shall, on receipt of such application and other documents and of the transfer duty or, if no such duty is or may in the future be payable or the whole of such duty has been remitted under subsection (9), of the prescribed fee, and if he is satisfied that the other provisions of this Act have been complied with, register transfer by making the necessary entries in his registers and other records:

Provided that—

(i)      no transfer as aforesaid shall be valid unless it has been registered by the mining commissioner, and no such registration shall be made—

(a)      while such location is liable to forfeiture or under attachment;

(b)      until duties, fees, royalties, rents or other moneys due and payable to the mining commissioner under this Act in respect of the property to be transferred have been paid;

(c)      where the location is situated in the area of a rural council, unless there is produced to the mining commissioner a certificate, issued by the rural council concerned, stating that all charges payable to the council in respect of the location during the period of five years immediately preceding the date of issue of the certificate have been paid or are, in the opinion of the council, irrecoverable:

Provided that no such certificate shall be valid for the purposes of this paragraph for a longer period than three months from the date of issue thereof;

(d)      where the transferee is not a permanent resident of Zimbabwe, unless the mining commissioner, after consultation with the Reserve Bank of Zimbabwe, is satisfied that all requirements imposed by or under the Exchange Control Act

[Chapter 22:05] have been complied with;

(ii) where the location transferred is a mining lease, the mining commissioner shall endorse on the holder's copy of the mining lease the fact of transfer, the date of registration thereof and the name of the transferee and shall transmit to the Board the particulars of such transfer;

(iii) where security is required under subsection (4), the mining commissioner shall not register transfer until such security has been given.

(8) The mining commissioner shall also, on receipt of the prescribed fee, issue to the transferee a certificate of registration in the form prescribed and such certificate shall record the interest of the transferee, whether whole or otherwise, in such block.

(9) If it is proved to the satisfaction of the Minister that a transfer applied for is merely for the purpose of carrying out the reconstruction of any company holding a mining location, or the amalgamation of two or more companies holding locations, the duty to be paid in respect of such transfer shall be one-half of the rate aforesaid.

(10) If in any transfer from one company to another registered by the mining commissioner under this section, it is shown to the satisfaction of the Minister that at the date of the sale or other alienation of the mining location such mining location was acquired—

(a) by a company from its wholly-owned subsidiary; or

(b) by a wholly-owned subsidiary of a company from its parent company; or

(c) by a wholly-owned subsidiary of a company from another wholly-owned subsidiary of the same parent company, or

(d) by a company in which the majority shareholder is the same person who holds a majority of shares in the company which transferred the location;

the Minister shall remit the whole or any part of the duty payable under this section.

(11) If when any transfer is applied for the applicant did not derive his rights to transfer from the holder, but there has been any intermediate agreement of sale or alienation, or some other person has previously acquired the right to obtain transfer, transfer may be made direct to the applicant:

Provided that if transfer duty payable on any such intermediate transaction or acquisition of rights has not been paid, such duty shall be payable by the applicant and the requirements of subsection (2) shall be met in respect of each such intermediate transaction or acquisition of rights.

(12) No such transfer shall be registered until each seller and purchaser, or their respective agents, has filed a certificate in accordance with the prescribed form.

(13) All certificates lodged in terms of subsection (6) shall be filed in the office of the mining commissioner, who shall keep a register in which full particulars as to any transfer shall be kept; such particulars shall include the names of the parties to the transaction, the name and registered number of the mining location, the nature and amount of the stipulated consideration, if any, and the extent of the interest transferred.

276     Registration of hypothecation of mining location

(1) Any holder of a registered mining location may make application to the mining commissioner for the hypothecation of the whole or of any portion of his interest in such location.

(2) Every such hypothecation shall be effected at the office of the Secretary, where a register shall be kept in which full particulars as to the date and nature of the transaction, the names of the parties concerned, the official number of the mining location to be hypothecated, the stipulated amount for which the hypothecation is to be effected and the rate per centum and the times at which interest, if any, is payable

shall be duly registered.

(3) Every such application as aforesaid shall be accompanied by three duplicate original notarial copies or three notarially certified copies of the agreement between the parties to the transaction, embodying the terms upon which the hypothecation is to be effected, which notarial copies shall be endorsed by the notary before whom the same were completed to the effect that the minute or original filed in his protocol is stamped with revenue stamps in accordance with the fees fixed by Parliament:

Provided that where such notarial copies are endorsed by the notary to the effect that the hypothecation is auxiliary or collateral to or substituted for a previous hypothecation executed by the same person for the same debt or obligation and that the minute or original relating to such previous hypothecation was duly stamped in accordance with such prescribed fees, no such stamps or corresponding endorsement shall be required in respect of such subsequent hypothecation.

(4) The Secretary shall thereupon inscribe upon such deed of hypothecation an official or registered number, as also a certificate of registration of such hypothecation, and shall return to the notary who prepared them one copy, file another in his office and issue the third copy to the person in whose favour such hypothecation is effected:

Provided that—

      (i)      prior to the issue of such certified deed as aforesaid, the Secretary shall require the certificate of registration or of special registration or the holder's copy of the mining lease, as the case may be, of such location to be produced for his inspection, and shall inscribe on such certificate or mining lease the fact of such hypothecation as aforesaid having been effected, and also the date of registration of such hypothecation;

      (ii)      if the mining location sought to be hypothecated is registered for precious stones or. in the case of a mining lease, the principal mineral being mined or to be mined on such location is precious stones, the Secretary shall not register such hypothecation unless he is satisfied that the Minister has granted the permission required under section two hundred and eighty-two in respect thereof.

(5) Should the hypothecation of any interest in any mining location be for the purpose of securing any issue of debentures, the fees fixed in terms of subsection (3) shall only be payable on such amount of debentures as are actually issued from time to time in respect of such location.

277     Hypothecation in respect of loans granted by State

(1) If out of moneys provided by Parliament the Minister has, at the request of the holder of a mining location—

      (a)      made a loan to such holder; or

      (b)      caused work to be done on such location; or

      (c)      sold to such holder mining machinery for use on such location;

and such holder has failed to give suitable and sufficient security for the repayment of such loan, the payment for such work or the purchase price of such machinery, the Minister may instruct the Secretary to register a hypothecation of all or any of the mining locations registered in the name of such holder in favour of the State.

(2) On receipt of such instruction the Secretary shall, in respect of every mining location to be hypothecated in terms of subsection (1), enter in the register required to be kept in terms of section two hundred and seventy-six—

      (a)      the official number of such location; and

      (b)      the amount of the loan, the cost of the work done or the amount of the purchase price owed by the holder, as the case may be; and

      (c)      the rate per centum and the terms on which interest is payable; and

(d)      the fact that such location is hypothecated to the State.

(3) Such entries shall constitute a hypothecation of such location in favour of the State from the date on which such entries were made and for the amount stated and the interest thereon.

278      Registration of options on mining locations

(1) When and as often as any holder of a registered mining location or locations has agreed in writing to grant to any other person, hereinafter termed the option holder, the option of exercising the right to purchase, or in any other manner to deal with, such location or locations at a certain future date, such option holder may apply to the mining commissioner for the registration of a notarial deed embodying the terms of such contract in the office of such mining commissioner, where a register shall be kept in which full particulars as to such contract shall be described; such particulars shall include—

(a)      the names of the parties to the contract; and

(b)      the name and registered number of the mining location or locations to which such contract relates; and

(c)      the date upon which the right or option conferred by such contract commences and expires.

(2) Every such application as aforesaid shall be accompanied by three duplicate original notarial copies or three notarially certified copies of such deed and, if the application is in respect of a contract relating to a mining location registered for precious stones or a mining lease on which the principal mineral being mined or to be mined is precious stones or any interest therein, a certificate from the Secretary that the Minister has granted the permission required under section two hundred and eighty-three in respect thereof.

(3) The mining commissioner, on receipt of such application and of the deeds above mentioned, shall forthwith register such contract, retain one copy and return two copies to the applicant with an endorsement thereon by him of the fact of such registration:

Provided that if the application is in respect of a contract relating to a mining location registered for precious stones or a mining lease on which the principal mineral being mined or to be mined is precious stones or any interest therein, the mining commissioner shall not register the contract unless the certificate mentioned in subsection (2) is produced to him.

(4) There shall be paid by the applicant for the registration of the above mentioned deed the fees fixed by Parliament and where consideration is given and received for such option and the whole consideration is not in cash the true cash value of such consideration shall, for the purpose of determining the fees payable by the applicant, be declared by the option holder and the registered holder at the time of the registration of the option:

Provided that prior to the registration of such certified deed as aforesaid, the mining commissioner shall require the certificate of registration, or of special registration, or the holder's copy of the mining lease, as the case may be, of such location to be produced for his inspection, and shall inscribe on such certificate or copy the fact of such an option as aforesaid having been effected and also the date of registration of such option.

(5) Whenever an agreement registered in terms of this section contains provisions granting a tribute or any other limited right to work the mining location to the option holder, so much of such agreement as relates to the tribute or other limited right to work the mining location, hereinafter called the tribute agreement, shall, while it remains in force, be binding upon any person who acquires the ownership of such

mining location or any interest therein, and it shall not be lawful for the holder of such mining location to abandon such location during the period that such tribute agreement remains in force.

(6) Whenever an agreement registered in terms of this section contains provisions granting a tribute or any other limited right to work the mining location to the option holder, the mining commissioner shall, in addition to inscribing on the certificate of registration or of special registration or the holder's copy of the mining lease, as the case may be, of such mining location the fact of an option having been effected and the date of the registration thereof, inscribe on such certificate of registration or of special registration or copy of the mining lease, as the case may be, the fact of the existence of the agreement granting a tribute or any other limited right to work such mining location.

279     Registration of hypothecation or option is bar to transfer

(1) The registration of a hypothecation or option over any mining location shall, during the period for which such hypothecation or option continues to be of force and effect, be a bar to—

        (a)     the transfer of such mining location, unless the consent in writing of the holder of the hypothecation or option or the cancellation thereof has been obtained and filed in the office of the mining commissioner; and

        (b)     the abandonment of the whole or portion of such mining location.

(2) Notwithstanding anything in this section contained, the registration of a hypothecation or option shall not be a bar to the transfer of a mining location if the transfer is to be passed—

        (a)     in execution of the judgment of any competent court by the officer appointed by law or by that court; or

        (b)     by the trustee of an insolvent estate or by such an assignee as is described in Part VIII of the Insolvency Act [Chapter 6:04]; or

        (c)     by an executor administering and distributing an estate under the Administration of Estates Act [Chapter 6:01]; or

        (d)     by the liquidator of a company which is being wound up by or under the supervision of the High Court:

Provided that on any such transfer of a mining location over which an option is registered, the option shall continue and shall be endorsed by the mining commissioner on the new certificate of registration or special registration or on the holder's copy of the mining lease, as the case may be.

(3) The registration of an option over any mining location shall, during the period for which such option continues to be of force and effect, be a bar to the subsequent registration of any hypothecation of or any other option over such mining location, unless the consent in writing of the holder of the registered option or the cancellation thereof has been obtained and filed in the office of the mining commissioner.

280     Registration of tribute agreements

(1) If any holder of a registered mining location has agreed in writing to grant a tribute or any other limited right to work such mining location to any other person, hereinafter called the tributor, such tributor may, after such agreement has been approved under Part XVIII, apply to the mining commissioner for the registration of a notarial deed embodying the terms of such agreement in the office of such mining commissioner, where a register shall be kept in which particulars as to such agreement shall be entered.

(2) Such particulars shall include—

        (a)     the names of the parties to the agreement; and

        (b)     the name and registered number of the mining location or the

registered number of the mining lease to which such agreement relates; and

(c)      the date upon which the rights conferred by such agreement commence and expire.

(3) The applicant shall produce to the mining commissioner four duplicate original notarial copies or four notarially certified copies of such deed and the certificate of registration or of special registration or the holder's copy of the mining lease, as the case may be, of the mining location, and, if the application is in respect of a tribute agreement relating to a mining location registered for precious stones or a mining lease on which the principal mineral being mined or to be mined is precious stones or an interest therein, a certificate from the Secretary that the Minister has granted the permission required under section two hundred and eighty-two in respect thereof.

(4) The mining commissioner shall, on receipt of an application in terms of subsection (1) and of the documents mentioned in subsection (3)—

(a)      register the agreement; and

(b)      retain two copies of the deed; and

(c)      return the other copies of the deed to the applicant with an endorsement made thereon by him of the fact of such registration; and

(d)      inscribe on the certificate of registration or of special registration or the copy of the mining lease, as the case may be, the fact of the agreement having been registered and the date of the registration thereof.

(5) There shall be paid by the applicant for the registration of such deed the fee fixed by Parliament.

(6) Any agreement registered in terms of this section shall, while it remains in force, be binding upon any person who acquires the ownership of such mining location or any interest therein, and it shall not be lawful for the holder of such mining location to abandon the whole or part of such location during the period that such agreement remains in force.

(7) If in any agreement referred to in subsection (1) the tributor is granted the option of exercising the right to purchase or in any other manner to deal with such mining location at a certain future date, then the agreement may only be registered in terms of section two hundred and seventy-eight.

281      Registration of conditions governing mining rights on reserved ground

(1) In giving written consent in terms of paragraph (a) of subsection (1) of section thirty-one, the President or other person giving such consent may impose terms prescribing the conditions under which mining rights on any mining location that may be pegged and registered in terms of such consent may be exercised.

(2) If the President or other person has given a written consent referred to in subsection (1), the mining commissioner shall upon the registration of any mining location pegged under such consent—

(a)      register the terms of such consent in a register to be kept by him; and

(b)      retain the original written consent; and

(c)      inscribe on the certificate of registration the fact of such consent having been registered.

(3) The terms of any written consent registered under this section shall be binding upon the holder of the registered mining location and upon any person who acquires the ownership of such mining location or any interest therein.

(4) Upon application by the holder of the mining location or of the person who gave such written consent, the mining commissioner shall supply a certified copy of the written consent filed in his office to such person.

(5) If any person is guilty of any breach of the terms imposed in any written consent registered in terms of this section, he shall be guilty of an offence and liable to a fine

not exceeding level six.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

(6) On the contravention of this section the holder and any lessee or tributor or manager of the mining location in respect of which such terms were imposed shall be liable to prosecution and conviction for such contravention.

(7) After a conviction for a contravention of subsection (5) or (6) the mining commissioner shall, upon application by the person who owns the land upon which such mining location is situated, declare the mining location in question to be forfeited.

(8) In any prosecution for a contravention of subsection (5) or (6) a copy of any written consent certified as correct by the mining commissioner shall be received in evidence upon its production by the prosecutor.

282     No tribute, sale or alienation of precious stones location without approval of Minister

(1) Notwithstanding anything contained in this Act or any other enactment, no holder of a mining location registered for precious stones or a mining lease on which the principal mineral being mined or to be mined is precious stones shall tribute, cede, assign, sell or otherwise alienate in any manner whatsoever, that mining location or mining lease or any interest therein without the permission of the Minister.

(2) The Minister may require the holder and such other person to furnish to him such information as he may require for the purpose of deciding whether he should or should not grant his permission under this section.

PART XVIII

APPROVAL OF TRIBUTE AGREEMENTS

283     Interpretation in Part XVIII

In this Part—

"grantor" means any person who has under a tribute agreement given a tributor the right to mine a mining location;

"mining location" does not include a special grant or a special grant issued under Part XX;

"tribute agreement" means any agreement or arrangement entered into after the 1st July, 1947, whereunder any person has given a tribute, licence, concession, authority or other right to mine a mining location to a tributor; and includes any such agreement or arrangement which was entered into before the 1st July, 1947, and which is renewed after such date, and any agreement to alter the terms of a tribute agreement which has been approved by the Board and any renewal of a tribute agreement which has been approved by the Board;

"tributor" means the person who has been granted the right to mine a mining location under a tribute agreement.

284     Submission of tribute agreements for approval

The terms of every tribute agreement shall be reduced to writing and such agreement, together with the prescribed number of copies thereof, shall be submitted to the mining commissioner for examination and approval by the Board or the mining commissioner.

285     Approval of tribute agreements by mining commissioner

(1) The Board may authorize the mining commissioner to approve any tribute agreement which conforms to a standard agreement drawn up and approved by the Board.

(2) If any tribute agreement submitted to the mining commissioner conforms to such standard agreement, the mining commissioner may approve such agreement and shall report such approval to the Board and to the occupier or, if there is no occupier, the

owner of the land concerned and shall furnish the Board with a copy of the agreement.

(3) If the mining commissioner does not himself approve a tribute agreement he shall submit the agreement to the Board for consideration.

286    Approval of tribute agreements by Board

If upon examination of any tribute agreement which has been submitted to it by a mining commissioner the Board is satisfied—

(a)    that the method of fixing the tribute royalty payable to the grantor and the rate of such royalty are satisfactory and are not likely to retard the progress or expansion of the mine or bring about the early cessation of mining operations; and

(b)    that the interests of both the grantor and the tributor are adequately safeguarded thereunder; and

(c)    that the period of such agreement is clearly defined and, if termination of the agreement by notice is provided for, that the interests of the parties to the agreement are adequately protected; and

(d)    that the development work required by the agreement is reasonable in the circumstances and is not unduly burdensome or likely to cause the premature cessation of mining operations on the mine; and

(e)    that the tributor is required to carry out sufficient development work to ensure the continuity of mining operations on the mine; and

( f )    that the grantor is entitled periodically and at reasonable times to inspect the mine and satisfy himself that the terms of the agreement are being observed; and

(g)    that in all respects the agreement is satisfactory and likely to result in the mine being mined to the best advantage;

the Board may approve the agreement and shall endorse such approval thereon and shall inform the owner or occupier of the land concerned of such approval.

287    Refusal of approval of or amendment of tribute agreements

(1) If the Board is not satisfied in terms of section two hundred and eighty-six it may refuse to approve the agreement or may submit to the parties thereto such amendments as it may deem fit.

(2) If the parties agree to such amendments the Board shall make the necessary amendments to the agreement and the agreement shall have effect as so amended and approved by the Board.

(3) If the Board refuses to approve an agreement or is only prepared to approve an agreement with such amendments as the parties refuse to accept, the parties may appeal to the Minister to reverse the Board's decision, and the Minister, whose decision shall be final, may uphold or reverse the Board's decision.

(4) If the Minister reverses or alters the Board's decision, the Board shall approve the agreement in accordance with the Minister's decision and shall endorse the agreement accordingly.

288    Records of agreements

(1) The Board and the mining commissioner shall keep a copy of all tribute agreements submitted for approval under this Part.

(2) The Board shall further keep a record of what agreements have been approved or disapproved and the details of any amendments made to any agreements with the approval of the parties and shall notify the mining commissioner of approved agreements.

289    Penalty for acting under unapproved agreement

(1) No party to a tribute agreement shall exercise any right under such agreement unless and until such agreement has been examined and approved by the Board or a

mining commissioner.

(2) Any party who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level six.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

290    Prohibition of disposal of minerals

(1) If a tributor is mining a mining location under an unapproved agreement or in conflict with the terms of an approved agreement the mining commissioner shall issue an order prohibiting the disposal of minerals from such mining location until he is satisfied that the agreement has been approved under this Part or until the terms of the approved agreement are complied with.

(2) Any miner of such mining location who fails to observe such an order and any person knowing of such an order who contrary thereto receives any minerals from such mining location shall be guilty of an offence.

PART XIX

SPECIAL GRANTS

291    Issue of special grants

(1) The Secretary may issue to any person—

      (a)     a special grant to carry out prospecting operations; or

      (b)     a special grant to carry out mining operations or any other operations for mining purposes;

upon a defined area situated within an area which has been reserved against prospecting or pegging under section thirty-five for a period which shall be specified in such special grant and on such terms and conditions, including terms and conditions relating to the amendment or cancellation thereof, as may be approved by the Minister and shall be incorporated in such special grant.

(2) A copy of every special grant issued and of all documents relating thereto shall be retained by the Secretary for purposes of record.

(3) The Secretary shall send written notification of the issue of a special grant to every occupier or, if there is no occupier, owner of land falling within the area covered by the special grant.

292    Register of special grants

The Secretary shall maintain a register of special grants issued under section two hundred and ninety-one in which there shall be recorded the official number assigned to each grant and the particulars thereof.

293    Fee for special grant

The person to whom a special grant is issued shall pay the prescribed fee in respect of the issue of a special grant or any renewal thereof.

294    Application of other provisions of this Act to special grants

(1) Where a special grant to carry out mining operations has been issued, provisions of this Act relating to registered mining locations shall apply to such special grant but only in so far as they do not conflict with the terms and conditions of the special grant.

(2) Where a special grant to carry out prospecting operations has been issued, the holder of the special grant shall, subject to the terms and conditions of the special grant, have the following rights—

      (a)     the exclusive right of prospecting within the area of the special grant on all ground which is open to prospecting on the date on which the special grant is issued, including the right to drill and excavate, whether at the surface or underground;

      (b)     the same surface rights within the area of the special grant as are conferred upon the holder of a prospecting licence under section twenty-nine, and for

this purpose the date on which the special grant is issued shall be deemed to be the date of the posting of a prospecting notice by the holder of the special grant:

Provided that the holder of a special grant shall have the right of removing any accommodation, buildings or machinery which have been erected within that area within three months or such longer period as may be determined by the mining commissioner after the expiration or cancellation of the special grant.

295     Beaconing of special grant

The holder of a special grant shall beacon such grant in such manner as the mining commissioner may direct and shall maintain the beacons in good order and condition in their proper position.

296     Conversion of special grant to registered block

(1) If after the issue of any special grant, whether such grant was issued before or after the 1st November, 1961, any portion of such grant becomes land which would but for the presence of such grant be open to prospecting and pegging in terms of this Act, the Minister may permit or may direct the holder of the special grant to peg and register such portion in accordance with this Act governing the pegging and registration of blocks of claims:

Provided that for the purpose of such pegging the holder of the special grant shall not be required to take out a prospecting licence nor to post a prospecting, discovery or registration notice.

(2) If the holder of the special grant fails to comply with any such direction within such period as the Minister may have allowed, the Minister may cancel the special grant.

(3) On the issue of the certificate of registration in respect of any such portion of the special grant, the grant shall be deemed to have been cancelled in respect of that portion.

PART XX

SPECIAL GRANTS FOR COAL, MINERAL OILS AND NATURAL GASES

297     Interpretation in Part XX

In this Part—

"grantee" means any person to whom a special grant has been issued, ceded or assigned under this Part;

"special grant" means a special grant issued under this Part.

298     Rights to mine coal, mineral oils or natural gases may only be acquired under special grant

Subject to section three hundred and seven, no rights to mine coal, mineral oils or natural gases or nuclear energy source material may be acquired except under and in accordance with a special grant issued under this Part.

299     Application for special grant

Any person who wishes to mine coal, mineral oils or natural gases or nuclear energy source material may apply to the Board for a special grant, and on such application shall furnish to the Board—

(a)     full information as to his financial status; and

(b)     particulars of any guarantees that may be required for the performance of his obligations under the special grant; and

(c)     information whether the application relates to coal, mineral oils or natural gases; and

(d)     details illustrated by a sketch plan of the area to be embraced by the grant and the size of such area; and

(e)     if the applicant is a company, the full names and nationality of each director and the full names by which those directors have at any time been known in

any part of the world; and

( f )     any further information required of him by the Board.

300     Consideration and report by Board on application for special grant

(1) The Board shall consider every application in terms of section two hundred and ninety-nine and shall report thereon to the Minister with its recommendation whether the application should be granted or refused.

(2) In considering an application in terms of section two hundred and ninety-nine the Board shall have regard to whether—

(a)     the applicant is a fit and proper person to be issued with a special grant;

(b)     the financial status of the applicant is such that he will be able to comply with the terms and conditions of any special grant that may be issued to him;

(c)     it would be in the national interest to issue the special grant.

(3) Where the Board recommends that an application shall be granted it may include in its report recommendations relating to—

(a)     the minimum capital which the applicant should be required to invest in the development of the area to be covered by the special grant;

(b)     the period that should be permitted to the applicant to bring operations in the area to be covered by the special grant to the producing stage;

(c)     the minimum rate of production of coal, mineral oils or natural gases or nuclear energy source material that should be conducted by the applicant;

(d)     the amount of royalty that should be paid by the applicant to the Minister in respect of coal, mineral oils or natural gases or nuclear energy source material won by the applicant;

(e)     the annual fee that should be paid by the applicant to the Minister as a consideration for the issue of the special grant.

301     President may grant or refuse application for special grant

(1) The Minister shall submit the report and recommendations of the Board made to him in terms of section three hundred to the President who may refuse the application or authorize the Minister to issue a special grant on such terms and conditions as he may fix.

(2) Where the President has refused an application made in terms of section two hundred and ninety-nine the applicant shall not make a fresh application in terms of that section until at least three months have elapsed since the refusal of his last application.

302     Rights under special grant personal to the grantee

The rights granted under a special grant shall be personal to the grantee, who may not cede or assign any such rights to any other person unless authorized to do so by the President.

303     Rate of royalty and annual fee

(1) Notwithstanding Part XIV, provision may be made in a special grant stipulating for the payment of royalty on all coal, mineral oils or natural gases or nuclear energy source material won by the grantee under his special grant at such rate as the President may fix.

(2) Provision may be made in a special grant for the payment by the grantee of such annual fee as the President may fix as consideration for the issue of the special grant.

304     Amendment of area covered by special grant

The President may, on application by a grantee, extend or reduce the area covered by his special grant or may alter the boundaries thereof.

305     Cancellation of special grant

(1) If a grantee contravenes the terms and conditions attached to his special grant, the

President may cancel such grant.

(2) No grant shall be cancelled in terms of subsection (1) unless written notice has been given to the grantee of the proposed cancellation twelve months before such cancellation.

306    Application of certain sections

(1) Sections two hundred and ninety two to two hundred and ninety-five shall apply, mutatis mutandis, in relation to every special grant.

(2) Section two hundred and sixty nine shall apply, mutatis mutandis, to a grantee in respect of his mining location registered under the special grant, and for this purpose the date of the expiration or cancellation of the special grant shall be regarded as the date of the forfeiture of such mining location.

307    This Part not to apply to certain blocks registered under Part XII of Cap. 195 of 1939

This Part shall not apply to the holder of a block of coal, mineral oil or natural gas claims which was registered under Part XII of the Mines and Minerals Act [Chapter 195 of 1939].

PART XXI

MINING ON TOWN LANDS

308    Application of this Act to town lands

(1) This Part shall apply to town lands.

(2) The right to prospect for and mine and win minerals on or under any town lands shall be governed by the other Parts of this Act, except in so far as they conflict with this Part.

309    Local authorities may make by-laws on certain matters

The local authority having control over any town lands shall have full power and authority to make and enforce regulations and by-laws for proper and efficient sanitary arrangements, for the enclosing of all pits, excavations and dangerous surface works and for the protection of the neighbourhood within which prospecting and mining are being carried on, and shall for the above purposes have the right to enter upon and inspect all such works existing or proceeding on such lands:

Provided that no such regulation or by-law shall be of any force or effect until approved by the Minister and duly published in statutory instrument.

310    Consent required for pegging of sites on town lands

No holder of a registered mining location shall be entitled to peg or acquire any site on any town lands under section forty-seven unless and until he has obtained the consent in writing of the local authority concerned or, failing the consent of such local authority, the consent of the President.

311    Limitation of timber rights

No holder of a prospecting licence or of a mining location situated on town lands shall have the right of cutting indigenous wood or timber upon such lands without the consent of the mining commissioner, who shall only give his consent when such wood or timber interferes with prospecting or mining operations or the erection of buildings required for such operations.

312    Disposal of subterranean water

(1) The holder of any mining location situated on town lands shall lead into the nearest natural water channel any water issuing from or brought to the surface of the ground from the subterraneous working of such location and not being used by such holder.

(2) The holder, while complying with subsection (1), shall not pollute any water in such channel.

(3) Any person who contravenes subsection (1) or (2) shall be guilty of an offence

and liable to a fine not exceeding level five or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

PART XXII

ACQUISITION OF LAND BY HOLDERS OF MINING LEASES OR BY STATE

313    Interpretation in Part XXII

(1) In this Part—

"private land" means any land the ownership of which has by law, grant or title deed become vested in any person.

(2) The Land Acquisition Act [Chapter 20:10] shall apply, mutatis mutandis, in respect of matters arising under this Part.

314    Compulsory purchase or sale of private land covered by mining lease

(1) Subject to subsection (3), where a mining lease has been issued and the whole or a portion of the land covered by such mining lease is private land, the owner of such private land may apply to the Administrative Court for an order compelling the holder of such mining lease to purchase—

(a)    so much of his land as falls within the area of the mining lease;

(b)    where a portion only of his land falls within the area of the mining lease and by reason of the presence of such mining lease or the nature of the mining operations carried out in the area of such mining lease all his land has become unsuitable, so far as he or the occupier of the land, if any, is concerned, for the agricultural purpose for which it is being used or is bona fide intended to be used, all such land.

(2) Subject to subsection (3), the holder of a mining lease may apply to the Administrative Court for an order compelling an owner of private land to sell to him so much of such land as falls within the area of the mining lease.

(3) It shall not be competent for an application to be made under this section for an order if the proposed purchaser is a person who is precluded by the Constitution or any law from owning the land concerned or if the purchase or sale of such land is prohibited by any such enactments.

(4) The Administrative Court may grant or refuse the order applied for.

(5) The Administrative Court, in deciding whether to grant or refuse an order, shall have regard to the following matters—

(a)    the extent to which the surface of the land concerned is required or likely to be required for mining operations;

(b)    the value of permanent improvements erected or constructed for mining purposes or likely so to be erected or constructed on the land concerned;

(c)    the value of the land for agricultural purposes;

(d)    the interference or possible interference with the use or intended use of the land by the owner or occupier thereof of the mining operations being carried out or intended to be carried out by the holder of the mining lease;

(e)    in the case of an order referred to in paragraph (b) of subsection (1), whether the land concerned has become unsuitable, so far as the owner or occupier of the land, if any, is concerned, for the agricultural purpose referred to in that paragraph;

( f )    any other matter which to the Court may seem relevant.

(6) If the Administrative Court grants the order it shall determine the price to be paid for the land and shall in doing so make allowance for the depreciation, if any, in the value of any remaining portion of the land concerned due to the reduction in area of the land or the mining operations of the holder of the mining lease, but no deduction shall be made in respect of the appreciation, if any, in the value of such remaining

portion due to such mining operations.

315      Right of holder of mining lease to purchase State land

(1) Subject to subsection (2), the holder of a mining lease shall be entitled to purchase from the State any State land falling within the area of the mining lease:

Provided that nothing in this subsection contained shall be construed so as to constitute an encumbrance upon such land or so as to preclude the sale or other alienation thereof by the State to some other person before such holder has indicated that he intends to purchase such land.

(2) It shall not be competent for the holder of a mining lease to purchase land under subsection (1) if he is precluded by the Constitution or any law from owning such land or if the purchase or sale of such land is prohibited by any such enactment or if such land is land held by any person under any enactment or agreement whereby such person is entitled to obtain from the President title thereto on the fulfilment by him of the conditions fixed by such enactment or agreement, as the case may be.

(3) If the holder of the mining lease and the President are unable to agree upon the price to be paid for the land mentioned in subsection (1), the President shall refer the matter to the Administrative Court for determination.

316      Compulsory purchase of land not covered by mining lease

(1) For the purposes of this section—

"mining property" means a registered block or two or more such blocks, whether contiguous or otherwise, owned by one person from which the ore is being treated at the same milling or reduction plant or which are under the control of one registered mine manager.

(2) Where the owner of any private land on which the whole or a portion of a mining property, other than a mining lease, is situated considers that the nature and extent of the mining operations being carried out or likely to be carried out thereon fulfil the requirements in that regard for the issue of a mining lease in respect of such mining property, he may make application in writing to the Board, through the mining commissioner, for a certificate to that effect.

(3) The Board shall, on a day fixed by it, being not less than thirty days after the date of posting such notification, and notified to the applicant and the holder of the mining property, hear such evidence and arguments as those persons may wish to lay before it in regard to the grant or refusal of the application.

(4) If the Board is satisfied that mining operations on a substantial scale are likely to be conducted for a considerable period on the mining property concerned it shall issue the certificate unless the holder of the mining property satisfies the Board that his financial status is such that he is unable to meet any payment for which he would be liable if the order mentioned in subsection (6) were granted.

(5) The decision of the Board to grant or refuse the application shall be final and without appeal:

Provided that if the Board's decision to refuse the application is based solely on the ground that the financial status of the holder is inadequate, the owner of the land may appeal against such decision to the Administrative Court.

(6) On the issue to him of the certificate referred to in subsection (2) the owner of the land concerned may apply to the Administrative Court for an order compelling the holder of the mining property to purchase—

        (a)      so much of his land as falls within the area of such mining property; or

        (b)      where a portion only of his land falls within the area of the mining property and by reason of the presence of such mining property or the nature of the mining operations carried out thereon all his land has, so far as he or the occupier of the land, if any, is concerned, become unsuitable for the agricultural purpose for

which it is being used or is bona fide intended to be used, all such land;

and subsections (3), (4), (5) and (6) of section three hundred and fourteen shall apply, mutatis mutandis, in respect of such application.

(7) The Board may, if it considers that any application made under this section is vexatious or frivolous, order the applicant to reimburse the holder of the mining property in respect of any costs or expenses incurred by him in connection with the application in such amount as to the Board may seem just and equitable.

317     Compulsory purchase of land covered by mining locations

(1) If the owner of any holding of private land upon which one or more registered mining locations are situated finds that by reason of the presence of such mining locations or the nature of the mining operations carried out thereon such holding has become unsuitable, so far as he or the occupier of the land, if any, is concerned, for the purpose for which it is being used or is bona fide intended to be used, he may apply to the Minister for the purchase by the President of such holding of land and shall inform the Minister of the price which he considers should be paid to him for such land:

Provided that it shall not be competent for any owner so to apply by reason of the presence of a registered mining location owned by him or in which he or his wife or the minor child of either of them has a direct or indirect interest or of any registered mining location, other than a mining lease, which was registered within a period of two years before the making of such application.

(2) If the President is satisfied that—

    (a)    the holding of land has, by reason of the presence thereon of the mining location or by reason of the nature of the mining operations carried out thereon, become unsuitable, so far as the applicant or the occupier, if any, of such land is concerned, for the purpose mentioned in subsection (1); and

    (b)    the price stipulated by the applicant is fair and reasonable;

he shall purchase such holding at that price.

(3) If the President is not so satisfied as to the matter mentioned in paragraph (a) of subsection (2) or as to the price stipulated by the applicant or as to both such matters, he shall refer such matter or matters to the Administrative Court for determination.

(4) The Administrative Court shall determine any matter referred to it under subsection (3) and shall cause a copy of such determination to be sent to the Minister and to the applicant.

(5) If the Administrative Court finds in favour of the applicant on the matter mentioned in paragraph (a) of subsection (2) or the President has not referred that matter to the Administrative Court for determination, the President shall purchase the land at the price stipulated by the applicant or, if the matter of the price to be paid for such land has been referred to the Administrative Court and the applicant agrees within thirty days of the Court's determination to accept the price determined by that Court, at the price so determined:

Provided that if the applicant does not so agree to accept the price as determined by the Administrative Court, the President shall not be bound to purchase the land.

(6) Where the President has purchased land under this section then, for the purposes of subsection (1) of section three hundred and fourteen, such land shall be deemed to be private land and the President shall be deemed to be the owner thereof.

318     Cost of survey to be borne by holder of mining location

Where any land is purchased by the holder of a mining location under the provisions of this Part, the cost of the survey of such land for the purpose of obtaining title thereto shall be borne by such holder.

PART XXIII

EXPROPRIATION OF MINING LOCATIONS NOT BEING WORKED OR DEVELOPED

319     Interpretation in Part XXIII

In this Part—

"expropriated location" means a mining location which has been transferred to the Minister in terms of this Part and is registered in his name;

"order" means an order of expropriation made under this Part.

320     Report that mining location not being adequately worked

(1) If any person has reason to believe that a registered mining location is not being worked at all or is not being adequately developed or worked, he may report the matter in writing to the mining commissioner and, with such report, shall lodge a deposit of four hundred dollars.

(2) On receipt of such report the mining commissioner shall obtain from a Government mining engineer a report on the matter.

(3) If the mining commissioner has reason to believe, whether in consequence of the receipt of a report mentioned in subsection (1) or otherwise, that a registered mining location is not being worked at all or is not being adequately developed or worked, he shall obtain a report from a Government mining engineer.

(4) On receipt of the report of the Government mining engineer under subsection (2) or (3), the mining commissioner shall refer the matter to the Board.

321     Board shall investigate why mining location is not being adequately developed or worked

Upon the receipt of a report in terms of section three hundred and twenty, the Board shall inquire into the history of the mining location and investigate the mining activities that have been or are being conducted on such mining location with a view to discovering whether such location is being adequately developed or worked.

322     Board may call upon holder to show cause why his mining location should not be expropriated

If after investigation the Board is of opinion that the mining location is not being developed or worked at all or is not being adequately developed or worked, it shall call upon the registered holder of such location to show cause why such location should not be expropriated.

323     Recommendation for order of expropriation

After considering the representations made by the registered holder under section three hundred and twenty-two, the Board may recommend to the President that an order expropriating the mining location be made by him unless it is satisfied as to any one of the following matters—

        (a)     that the failure to develop or work or adequately to develop or work such location is due to causes beyond the control of the holder, which he has made every effort to overcome;

        (b)     that it is the holder's intention to start or continue developing or working the location within a period of six months on a scale satisfactory to the Board;

        (c)     that the location is essential to other mining operations being conducted by the holder and will be worked when the mine which he is at present operating ceases to be productive;

        (d)     that there is reasonable cause for the delay in developing or working such location or for not adequately developing or working such location;

        (e)     that the location forms part of a series of not more than ten blocks contiguous to a main block being worked by the holder and is essential to the proper working of such main block.

324     Order of expropriation

(1) Whenever the Board makes a recommendation for the making of an order of expropriation, it shall submit to the President all relevant documents and a written report setting out the grounds for its recommendation.

(2) Upon receipt of such report and recommendation the President may require the Board to make further investigations and shall afford the holder of the location an opportunity of making representations to him why the order should not be granted.

(3) If after considering all the information laid before him the President is of opinion that the mining location is not being worked at all or is not being adequately developed or worked, he may make an order declaring that the mining location is expropriated.

(4) Every order made by the President under this section shall be published in the Gazette and a copy of the order shall be sent to the holder of the expropriated mining location and to the mining commissioner of the district in which the mining location is situated and, where the expropriated mining location is a mining lease, to the Board.

325     Transfer of expropriated location

(1) Upon receipt of a copy of the order the mining commissioner shall transfer the expropriated location to the Minister by making the necessary entries in the appropriate registers and other records and shall inform the Board of such transfer.

(2) No fee or duty shall be payable in respect of anything done in terms of subsection (1).

(3) Save as provided by section three hundred and twenty-nine, no compensation shall be payable to the holder of any expropriated location or to any other person in respect of an expropriated location.

326     Part XI not to apply to expropriated location in certain respects

The provisions of Part XI in regard to the obtaining of inspection certificates shall not apply to an expropriated location.

327     Sale of expropriated location

(1) The Board may sell any expropriated location on such terms and conditions as it thinks fit.

(2) The Board shall publish monthly in the Gazette and in such newspapers circulating in Zimbabwe as it may select a statement describing expropriated locations and calling for tenders for their purchase.

(3) The Board shall be under no obligation to accept any tender or the highest tender.

(4) In determining the purchaser the Board shall pay due regard to his ability to finance and conduct mining operations on the expropriated location.

328     Disposal of expropriated location without consideration

The Minister may, on the recommendation of the Board, transfer any expropriated location to any person for no valuable consideration.

329     Disposal of purchase price

The purchase price of any expropriated location shall be paid by the Board to the holder from whom such location was expropriated less any costs incurred by the Board in connection with such location and its sale.

330     Forfeiture of expropriated location

If an expropriated location has not been sold or transferred within twelve months of the date when it was transferred to the Minister, the Board shall, in the case of a mining lease, cancel such lease, or otherwise the mining commissioner shall declare such expropriated location to be forfeited, whether or not it is currently protected from forfeiture by an inspection or protection certificate issued in terms of Part XI:

Provided that if the Board is of the opinion that no economic deposit of any mineral

has been found or is likely to be found thereon, such location may be so cancelled or forfeited after the expiration of such shorter period as the Board may fix.

331     Part XI applies to expropriated location on transfer from Minister

An expropriated location which has been transferred to any person shall be subject to Part XI in regard to the obtaining of inspection certificates, and for such purpose the date of registration by the mining commissioner of the transfer shall be deemed to be the date of the registration of the block or the date of the issue of the mining lease, as the case may be.

332     Refund of deposit

The deposit mentioned in section three hundred and twenty shall, after the Board has considered the matter under section three hundred and twenty-three, be refunded to the person who made the deposit:

Provided that if the Board is of the opinion that the report made under section three hundred and twenty is frivolous or vexatious it may direct that such deposit be forfeited and be paid by the mining commissioner into the Consolidated Revenue Fund.

333     Applicability of this Part

Nothing in this Act contained shall be construed so as to preclude the expropriation under this Part of a mining location, the last issued inspection certificate for which was obtained by payment under section two hundred and twelve.

PART XXIV

TERMINATION OF ENTITLEMENT TO SHARE IN ROYALTIES

334     Interpretation in Part XXIV

In this Part—

"beneficiary" means the beneficiary under an entitlement;

"entitlement" means a right, by virtue of a condition in the title deeds to any land, to any share in the royalties due on minerals, mineral oils or natural gases won from such land or to any share in any other revenues whatsoever which may accrue by reason of the ownership of the said land from the exercise in relation to such land of mining or kindred rights under the law relating to mines and minerals;

"judge" means the Chief Justice or any other judge of the High Court whom the Chief Justice may appoint to decide any question of compensation referred to a judge by the President in terms of this Part.

335     President may terminate entitlement

Subject to this Part, the President may at any time declare any entitlement to be absolutely terminated.

336     President may refer question of compensation to judge

(1) If the President considers it desirable to terminate an entitlement, the Minister shall notify the beneficiary thereof, who shall forthwith inform the Minister of the amount of compensation which he considers should be paid to him for the loss of his entitlement.

(2) If the President and the beneficiary agree on the amount of the compensation, the President may forthwith declare that the entitlement concerned is absolutely terminated.

(3) Upon any declaration made in terms of subsection (2) the amount of compensation agreed shall become payable to the beneficiary.

(4) If the President and the beneficiary are unable to agree on the amount of the compensation and if, after negotiations with the beneficiary, the President still considers it desirable to terminate the entitlement, the President shall refer the question of compensation to a judge for his determination, and the Minister shall notify the beneficiary of such reference.

337   Procedure and powers of judge

Subject to this Part, the procedure to be followed in any proceedings for the determination of compensation in terms of this Part shall be as determined by the judge, who shall have and may exercise, mutatis mutandis, any of the powers conferred in terms of the Arbitration Act [Chapter 7:02] or the Schedule thereto on—

      (a)     a judge in regard to the summoning of witnesses; and

      (b)     an arbitrator.

338   No costs to be awarded

Save as provided in section three hundred and thirty-nine, neither party to any proceedings in terms of this Part shall be liable to pay the costs of the other party and the judge shall not make any order as to costs.

339   Powers of President on determination of compensation

(1) The President shall, within twelve months of the date of the determination by the judge of the amount of compensation due to a beneficiary—

      (a)     declare that his entitlement is absolutely terminated; or

      (b)     notify the beneficiary that he does not intend to make such a declaration.

(2) Upon any declaration made in terms of paragraph (a) of subsection (1), the amount of compensation fixed by the judge shall become payable to the beneficiary in question from moneys appropriated for the purpose by Act of Parliament.

(3) If the President gives notification in terms of paragraph (b) of subsection (1), the Minister shall, subject to subsection (4), pay to the beneficiary from moneys appropriated for the purpose by Act of Parliament the costs incurred by the beneficiary in connection with the proceedings.

(4) If the Minister considers that the amount claimed as costs by a beneficiary for the purposes of subsection (3) is excessive, he may require the costs to be taxed, in which event the costs shall be determined and taxed by the registrar of the High Court in accordance with the rules of the High Court relating to the taxation of costs.

(5) Notification in terms of paragraph (b) of subsection (1) shall not preclude the President thereafter from taking action afresh in terms of section three hundred and thirty-six:

Provided that, on a further reference to a judge to fix the amount of compensation, no alteration to the amount of compensation previously fixed shall be made unless fresh facts justifying such alteration are adduced to the judge.

340   Effect of declaration in terms of this Part

(1) With effect from the date on which the President makes a declaration in terms of this Part that an entitlement is absolutely terminated, that entitlement shall lapse and cease to be of force or effect for all purposes whatsoever.

(2) Whenever an entitlement has been terminated in terms of this Part, the Minister shall give written notice of the fact and date of such termination to the beneficiary and to the Registrar of Deeds, who shall record the termination in the appropriate register in the Deeds Registry.

PART XXV

ADMINISTRATION OF ACT

341   Administration of Ministry

(1) The Secretary shall be and is hereby vested with authority generally to supervise and regulate the proper and effectual carrying out of this Act by mining commissioners or other officers of the Public Service duly appointed thereto, and to give all such orders, directions or instructions as may be necessary.

(2) The Secretary may at his discretion assume all or any of the powers, duties and functions by this Act vested in any mining commissioner, and may lawfully perform

all such acts and do all such things as a mining commissioner may perform or do, and is further empowered in his discretion to authorize the correction of any error in the administration or in the carrying out of the provisions of this Act, or to perform any other lawful act which may be necessary to give due effect to its provisions.

(3) The Secretary may exercise such of the powers by this Act vested in the Minister as may be delegated to him by the Minister.

342     Declaration of mining districts

The Minister may, from time to time, by statutory instrument, declare any area within Zimbabwe to be a mining district, and may, by like notice, alter the boundaries of or abolish any such district.

343     Appointment of officers

For the purposes of this Act, there shall be—

    (a)     a Chief Mining Commissioner; and

    (b)     in respect of every mining district, a mining commissioner who shall perform the functions imposed upon him under this Act or any other enactment; and

    (c)     whenever the exigencies of the mining industry so require, an acting mining commissioner, assistant mining commissioner or such other officer to perform the functions of a mining commissioner; and

    (d)     a Director of Geological Survey; and

    (e)     a Director of Metallurgy; and

    ( f )     a Chief Government Mining Engineer; and

    (g)     Regional Mining Engineers; and

    (h)     a Chief Mine Surveyor; and

    (I)     Regional Mine Surveyors; and

    ( j)     such inspectors of mines and other mining officers as may be necessary for the efficient administration of this Act;

who shall respectively perform the functions imposed upon them under this Act or any other enactment.

344     Mining commissioner's powers to take oaths

(1) Any such mining commissioner, acting mining commissioner or assistant mining commissioner may, with the consent of the Secretary, delegate to any other officer any of the powers or duties by this Act vested in him.

(2) In all matters in which, in terms of this Act, an oath or solemn declaration is required to be made, such mining commissioner, assistant mining commissioner, acting mining commissioner or any other person may and is hereby empowered to administer such oath or receive such solemn declaration.

345     Jurisdiction of High Court and mining commissioners

(1) Except where otherwise provided in this Act, or except where both the complainant and defendant have agreed in writing that the complaint or dispute shall be investigated and decided by the mining commissioner in the first instance, the High Court shall have and exercise original jurisdiction in every civil matter, complaint or dispute arising under this Act and if in the course of any proceeding and if it appears expedient and necessary to the Court to refer any matter to a mining commissioner for investigation and report, the Court may make an order to that effect.

(2) Where the parties have agreed in writing, as provided for in subsection (1), the mining commissioner shall, in the investigation and the decision of the complaint or dispute, be guided by sections three hundred and forty-six to three hundred and sixty.

(3) The mining commissioner, before whom any claim, dispute or proceeding is brought, shall hear and determine such claim, dispute or proceeding in the manner set forth in this Act and shall be and is hereby empowered to give and make all such

orders, directions, judgments or decrees, and do or cause to be done all such things, as may be necessary to give effect to his decision in respect of such claim, dispute or proceeding:

Provided that no mining commissioner shall have or exercise any criminal jurisdiction except as provided in section three hundred and eighty-nine mentioned, nor adjudicate upon any claim for debt or damages.

346     Judicial powers of mining commissioners

(1) A mining commissioner may hold a court in any part of the mining district to which he is appointed, or at his discretion in such place outside the said mining district as may be convenient to the parties interested, and may adjourn such court from time to time and from place to place as occasion may require.

(2) A mining commission shall hear and determine, in the simplest, speediest and cheapest manner possible, all actions, suits, claims, demands, disputes and questions arising within his jurisdiction, as set forth in section three hundred and forty-five, and make such orders as to costs as he may deem just.

(3) For the purpose of such hearing a mining commissioner shall examine witnesses on oath, which oath he is hereby empowered to administer, and take down the evidence in writing to be signed by the person giving the same, and do all things which he may deem necessary for a proper decision.

(4) A mining commissioner shall have power to summon all witnesses required by the respective parties, or whom he may deem necessary to appear before him, and, in default of any such witness appearing, may, upon proof that his reasonable expenses have been paid or tendered to him, issue a warrant for his arrest, and may inflict upon him such penalties as he would have been liable to for disobedience to a subpoena to appear before a magistrates court.

(5) The service of the summons and the execution of the warrant, issued in terms of subsection (3), may be lawfully performed by any person appointed for that purpose by the mining commissioner.

(6) Any witness who, being duly sworn, wilfully gives false evidence before such mining commissioner on any question material to the matter at issue, knowing such evidence to be false, or not knowing or believing it to be true, shall be guilty of an offence and liable to a fine not exceeding level seven or to imprisonment for a period not exceeding two one years or to both such fine and such imprisonment.

[substituted by Act 22 of 2001, with effect from the 10th September, 2002.]

347     Summons and commencement of proceedings before mining commissioner

(1) Every proceeding in a mining commissioner's court shall be commenced by a summons which shall as nearly as material be in the prescribed form.

(2) Every such summons shall be issued by such mining commissioner upon the application of any complainant, and shall be filled up according to the nature of his case so as to show the substance of the complaint, and shall require the defendant to appear before the mining commissioner's court on a day and at a place to be named in the summons.

(3) Upon the day and at the place so named, or upon any adjourned day of hearing and upon proof of such service or substituted service of the said summons as the mining commissioner thinks sufficient, the court shall proceed to investigate the matter of such complaint, and in the presence of the parties interested, or of such of them as appears to him sufficiently to represent all the parties interested, or in the absence of any of the parties interested who, having been duly served with such summons, do not appear, shall hear, receive and examine evidence and determine such complaint in a summary way, with full power to adjourn the hearing of such complaint to any other time or place, and to make all such amendments in any

proceedings in such court as may be necessary for the purpose of determining the real question at issue between the parties.

348     Summary hearing of complaints

Notwithstanding requirements of sections three hundred and forty-five and three hundred and forty-six, the mining commissioner may, if the parties concerned consent thereto in writing and are both present at the hearing, hear and determine any such complaint as above mentioned, summarily, and without any formal proceedings taken before him.

A minute of the decision shall be made by him in a register of complaints in which shall be entered every complaint laid before him, together with particulars thereof.

349     Mining commissioner may amend summons

No complaint shall be dismissed by any mining commissioner for informality, either in the summons itself or in the entry thereof, nor shall any objection to any such summons or complaint be taken or allowed for any alleged defect or misnomer or inaccurate description of any person or place or on the ground that the complainant appears at the hearing of the summons to be entitled to different relief from that sought therein, or for any variance between such summons and the evidence adduced on the part of the complainant, but such summons may be amended by the mining commissioner so that the real question in controversy between the parties plainly appears and the court shall proceed to adjudicate according to the rights of the parties: Provided that if it appears to the mining commissioner, upon the hearing of the case, that the defendant has been deceived, misled or prejudiced, by reason of any such amendment having been made, such mining commissioner may, on such terms as to costs or otherwise as he thinks fit, adjourn the further hearing of the case to another day.

350     Mining commissioner to keep register of his decisions

(1) A minute in the form prescribed of every decision of a mining commissioner's court shall be entered by such mining commissioner in the register mentioned in section three hundred and forty-eight and he shall make an order in accordance with such decision, and note the same in that register; and such decision with the order so noted shall be signed by the mining commissioner, and no formal order or other record of such decision shall be necessary.

(2) A copy of such minute or order shall be given on demand by the mining commissioner to any of the parties interested therein, and any copy certified by the mining commissioner as a true copy shall at all times be admitted in all courts and places whatsoever as conclusive evidence of such decision or order having been given or made.

(3) Unless an appeal has been noted against the order concerned, any person who contravenes or fails to comply with an order of a mining commissioner in terms of subsection (1) shall be guilty of an offence and liable to a fine not exceeding level five or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[substituted by Act 22 of 2001, with effect from the 10th September, 2002.]

351     Writs of execution

(1) Where any sum of money is awarded in a mining commissioner's court by way of costs and the same is not forthwith paid, the mining commissioner, on the application of the person entitled to receive such sum or of any legal practitioner or duly authorized agent on his behalf, shall grant to the party so applying a writ of execution under his hand as nearly as practicable in the form in use in a magistrates court: Provided that the mining commissioner may withhold the issue of such writ, if he considers it just and reasonable so to do, until after the expiration of three days from

the date of the decision under which such sum was awarded.

(2) Any messenger of a magistrates court to whom such writ is directed by such mining commissioner for execution shall do and perform all things in respect of such writ which such messenger is required to do and perform in respect of a writ of execution issued out of a magistrates court in the case of the non-payment of money under the judgment of such court.

(3) Every such messenger may, by virtue of such writ, seize and take such property and dispose thereof in the same manner as he could seize, take and dispose thereof by virtue of a writ issued out of a magistrates court.

352    Mining commissioner may direct surveys for purposes of trial of case

If before or during the hearing of any complaint it appears to the mining commissioner that it will be necessary for a survey to be made of any land or mining location in dispute, such mining commissioner may order either party to cause such survey and a plan thereof to be made, and the costs thereof shall be in the discretion of the mining commissioner.

353    Mining commissioner's powers when encroachment alleged

(1) Any mining commissioner may at his discretion upon the application of any person claiming to be legally interested in any mining location, by writing under the hand of such mining commissioner, authorize a surveyor or other duly appointed officer to enter upon any mining location or land adjacent to such first-mentioned mining location for the purpose of ascertaining whether the holder, owner or occupier of the mining location or land so to be entered upon is encroaching upon such first-mentioned mining location.

(2) Such surveyor or officer may thereupon enter upon the mining location or land described in such order and descend any shaft or mine, and for such purpose use the engines and machinery ordinarily employed for that purpose.

(3) Such surveyor or officer may make such plans or sections of the mining location or land entered upon and of any drives or other works therein or thereon as are necessary for the purpose aforesaid.

(4) Every such surveyor or officer shall, before entering upon such mining location or land, make a sworn declaration before such mining commissioner that he, the said surveyor or officer, will not, except as a witness in a court of justice, without the consent in writing of the holder, owner or occupier of the mining location or land to be entered upon, divulge or cause to be divulged, to any person whomsoever, any information obtained upon or by such entry, save only as to whether such holder, owner or occupier is encroaching upon such first-mentioned mining location.

354    Mining commissioner may grant injunctions

(1) Any person claiming to be legally interested in any mining location, or in any servitude appertaining to a mining location, or complaining that he has been obstructed or interfered with in the enjoyment of his rights in respect of the premises aforesaid, may make application to the mining commissioner for an injunction in terms of this section.

(2) At least twenty-four hours before the making of such application the applicant shall serve or cause to be served notice thereof on all the parties interested in opposing the application, or on such persons as appear to the mining commissioner sufficiently to represent such parties.

(3) If the mining commissioner is satisfied that reasonable attempts have been made to serve notices on the parties mentioned in subsection (2) without success it shall be sufficient service of any such notice if the same is advertised in such newspaper and for such time as the mining commissioner appoints.

(4) Upon such application the mining commissioner may in the presence of such

parties as aforesaid, or in the absence of any of them upon whom service of such notice is proved to his satisfaction to have been effected, hear, receive and examine evidence.

(5) The mining commissioner may in his discretion and upon such terms as he may consider just, by order under his hand, enjoin any person named in such order to refrain from encroaching upon, occupying, using or working such mining location or servitude as aforesaid, or from prospecting thereon or extracting or removing any mineral or other substance to which this Act applies from such mining location, or from selling or disposing of or otherwise interfering with such mining location, servitude, mineral or other substance or any share or interest therein, or from doing any act whereby the right, title or interest of such applicant in or to the same might be affected, or from obstructing or interfering with such applicant in the enjoyment of his rights in respect of the premises aforesaid.

(6) On every such application the mining commissioner shall make such order as to costs as to him seems just.

(7) Every such order shall be in force for such period as is named therein unless it is sooner discharged by the mining commissioner making it or by the High Court.

(8) Nothing in this section contained shall be deemed to divest the High Court of the power of granting injunctions in any matter arising under this Act.

355     How mining commissioner's orders to be served

Every order made by a mining commissioner under section three hundred and fifty-four shall, unless the mining commissioner otherwise orders, be served by delivering a copy to the person to be bound thereby, and at the same time showing the original order if such person requires to see the same, and every such order shall be entered by the mining commissioner, who made it, in the register to be kept by him as aforesaid:

Provided that if the mining commissioner sees fit so to direct, it shall be sufficient service of any such order to publish a copy thereof in such newspaper, and to affix a copy thereof in such conspicuous place at or near the property in dispute, if any, as the mining commissioner appoints.

356     When mining commissioner may permit working of locations under injunctions

When any injunction has been granted by a mining commissioner under this Act, such mining commissioner may, upon application of any holder or holders of any registered mining location adjacent to the mining location under such injunction, who shows to the satisfaction of such mining commissioner that the location of such holder or holders will sustain damage, or be materially depreciated in value, by reason of the non-working of the mining location under injunction, order, upon such terms and conditions as he thinks fit, such working of the mining location as in his opinion will be sufficient to prevent such damage or depreciation and the mining commissioner shall make such order as to the cost of such working as he thinks just.

357     Mining commissioner may authorize certain works

(1) Any holder of any mining location may apply to the mining commissioner for an order authorizing the applicant to sink such boreholes for water on any land or any other mining location or to construct or erect upon or over any land or any other mining location such aqueducts, roads, railways, tramways, wires, electric power lines, fencing or other works as may be necessary for the more advantageous working of the mining location held by the applicant, or authorizing the applicant to sink tunnels or boreholes on such land or other mining location for the purpose of ascertaining or prosecuting any extra-lateral rights to which the applicant may be entitled under the provisions of this Act.

(2) In like manner, the owner or the occupier of any land may apply to the mining

commissioner for an order authorizing the applicant to sink such boreholes for water on any mining location or to construct or erect upon or over any mining location such aqueducts, dams, roads, fencing or other works as may be necessary for the better working of his land.

(3) In like manner, any local authority may apply to the mining commissioner for an order authorizing it to construct or erect upon or over any mining location such works as may be necessary for the institution or maintenance of any public services which such local authority may lawfully institute and maintain.

(4) In like manner, the holder of any mining location may apply to the mining commissioner for an order authorizing the applicant to use any existing private road for any lawful purpose in connection with such location.

(5) On receipt of any such application the mining commissioner shall forthwith give notice to the holder, owner and occupier, if any, of the land or mining location on which the borehole for water is to be sunk or upon or over which such works are to be constructed or erected or on which the tunnels or boreholes are to be sunk or over which the road mentioned in subsection (4) passes, as the case may be, calling upon him to appear before the mining commissioner upon a fixed day, not being a day within thirty days of such notice, and to show cause why the order applied for should not be granted:

Provided that if both the applicant and the respondent consent the period of notice may be less than thirty days.

(6) On the day appointed, or on any other day to which the hearing of the matter may be adjourned, the mining commissioner may grant an order authorizing the applicant to do all or any of the acts or things applied for, in, upon or in respect of such land or mining location:

Provided that, before making any order authorizing the applicant to construct a road, the mining commissioner shall consult—

  (a)     where any land concerned is Communal Land, any rural district council established for the area concerned;

  (b)     in the case of land which is not Communal Land, the conservation and extension officer for the area concerned.

(7) No such order shall be granted unless the mining commissioner is satisfied that the use and working of any land or mining location belonging to any person other than the applicant will not be materially impeded, interfered with or obstructed by any act or thing done pursuant to such order.

(8) The mining commissioner granting any such order may limit such order by such terms, conditions and restrictions as appear to him to be required for the protection of the owner, occupier or holder of such last-mentioned land or mining location, and shall include a condition requiring the holder of the mining location to maintain or contribute towards the cost of maintaining any road mentioned in subsection (4), and may at any time on due cause shown amend or cancel such order.

(9) No such order shall be deemed in any way to affect or bind any owner, occupier or holder to whom no such notice as aforesaid has been given.

(10) Nothing in this section contained shall be deemed in any way to prejudice the right of any person thereafter to recover from the applicant or any other person acting under any such order damages for any injury which he may prove to have been sustained by him in consequence of any act or thing done by the applicant pursuant to any such order by any mining commissioner.

(11) Any person who is aggrieved by any order made by the mining commissioner under this section or by the refusal of the mining commissioner to make such an order may, within ten days thereof, appeal against such order or such refusal, as the case

may be, to the Administrative Court.

358     How acts ordered by mining commissioner to be performed

Whenever a mining commissioner's court or mining commissioner is empowered or required by this Act to cause any act to be performed, and the mode of performing such act is not otherwise expressly provided for, any person verbally authorized by the mining commissioner, and in his presence, or any police officer authorized in writing by the mining commissioner, may perform such act, and all police officers shall, if so required, aid and assist any mining commissioner or person authorized as aforesaid in the performance of his duty under this Act.

359     Penalty for contempt of mining commissioner's court

(1) If any person—

      (a)      wilfully insults a mining commissioner during his sittings in court; or

      (b)      wilfully interrupts the proceedings of a mining commissioner's court; or

      (c)      on being summoned or examined as a witness before a mining commissioner, refuses to be sworn or to answer any lawful question;

the mining commissioner may impose on the offender a fine not exceeding level three or commit him to prison for a period not exceeding one month, or impose such a fine on him and commit him to prison for such a period.

[substituted by Act 22 of 2001, with effect from the 10th September, 2002.]

(2) In any case in which a mining commissioner acts in terms of subsection (1) he shall issue a warrant in the form, as nearly as material, in use in a magistrates court; such warrant shall be good and valid in law without any other order, summons or adjudication whatsoever, and the officer to whom the same is addressed shall obey the same.

(3) In every case in which a mining commissioner has acted in terms of subsection (1) he shall without delay transmit to the registrar of the High Court for the consideration of a judge in chambers a statement certified by him to be true and correct of the circumstances and reasons for having fined or imprisoned the offender, and shall likewise furnish the offender with a copy of such certified statement, and the judge may confirm, amend or cancel any committal order or sentence imposed by the mining commissioner as to him may seem in accordance with real and substantial justice.

360     Magistrates court procedure to be observed in mining commissioner's court

Save as otherwise provided in this Act, the procedure to be observed by a mining commissioner's court and the fees chargeable in respect of any proceedings therein shall, so far as practicable, be in accordance with the law and rules governing procedure and fees in civil cases in magistrates courts.

361     Appeal from mining commissioner's court to High Court

Any party who is aggrieved by any decision of a mining commissioner's court under this Act may appeal against such decision to the High Court, and that court may make such order as it deems fit on such appeal.

362     Magistrates may hear and decide matters in certain circumstances

If in any matter between a miner and a farmer, which would otherwise come before the mining commissioner under this Part, the farmer states to the mining commissioner in writing that he wishes the matter decided by the provincial magistrate instead of by the mining commissioner, then the matter shall be heard and decided by the provincial magistrate who for that purpose shall have all the powers conferred by this Part upon the mining commissioner.

363     Claim holders must point out boundaries of their locations

(1) The holder of a mining location shall, when called upon by a mining

commissioner or any other person duly authorized thereto by a mining commissioner, point out all notices, beacons, pegs or other landmarks defining or purporting to define in terms of this Act the boundaries of any mining location registered in his name or belonging to him.

(2) Subsection (1) shall apply to any person who was the holder of an abandoned, forfeited or cancelled mining location in respect of which a quittance certificate is required and has not been issued under section two hundred and sixty-nine.

(3) If the holder of the mining location fails or refuses to comply with subsection (1), the mining commissioner may by registered letter call upon him so to comply and at the same time warn him that on failure to do so within the period stated in such letter such location will become liable to forfeiture and if the address of the holder is not known the mining commissioner shall cause a notice in the like terms to be inserted in the Gazette.

(4) If within the period mentioned in subsection (3) such holder has not so complied, the mining commissioner may declare the mining location to be forfeited, and such forfeiture shall not relieve such holder from any other penalty to which he may be liable under this Act.

364    Disabilities of officials

(1) Except on behalf of the State without personal reward or gain, no official in the Ministry responsible for mines shall directly or indirectly acquire or hold any mining location or any interest in such location, or carry on any trade or undertake any agency of any sort whatsoever, or have any share in any mining company or any mining partnership carrying on business in Zimbabwe, or in any partnership in any mining business, or be connected with any mining company as director, adviser, manager or official.

(2) Any official who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level eight, in addition to any penalty to which he may be liable under any law relating to the Public Service.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

365    Prohibition of use of patented metallurgical process, etc.

(1) Subject to sections 34, 35 and 36 of the Patents Act [Chapter 26:03], no official in the Ministry responsibility for mines shall, within ten years of his leaving the service of the Ministry, use for his personal reward or gain or for that of any other person any metallurgical process, prototype plant, machine or other invention produced with public funds for the service of the State, in respect of which specifications relating thereto have been lodged with the Patent Office.

(2) Subsection (1) shall apply, mutatis mutandis, to the reproduction, refinement or simulation of any metallurgical process, prototype plant, machine or other invention referred to in that subsection.

(3) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level nine.

[substituted by Act 22 of 2001, with effect from the 10th September, 2002.]

366    Mining commissioner may sue for and have hypothec for amounts due

(1) The mining commissioner, or other official duly authorized thereto by him, may ask, demand, sue for, recover and receive all amounts due and payable in respect of licences, royalties, fines, transfer duties or any other fees payable on or in connection with any mining location in his mining district.

(2) For any such amounts the mining commissioner shall have a hypothec against such location and all buildings, machinery or plant thereon which are the property of the holder of the location, and against any machinery and plant thereon which are the property of a lessee of the location; such hypothec shall be preferent to any other

hypothec or lien whatsoever:

Provided that where such royalty is payable by any person other than the holder of the mining location, the mining commissioner shall not have a hypothec therefor against such location or such buildings, machinery or plant which are the property of such holder.

367     Indemnity of officials

No action for injury or wrong shall lie in any court against any mining commissioner or other official for any act done in good faith by him in the exercise of the functions by this Act vested in him.

PART XXVI

OFFENCES AND PENALTIES

368     Prospecting prohibited save in certain circumstances

(1) Subject to subsections (2) and (3), no person shall prospect or search for any mineral, mineral oil or natural gas except in the exercise of rights granted under a prospecting licence, exclusive prospecting order or special grant or unless he is the duly authorized representative of the holder of such licence, order or special grant and acting in the exercise of such rights.

(2) No person shall prospect or search for any mineral, mineral oil or natural gas unless he is an approved prospector.

(3) No approved prospector registered for Communal Land only in terms of subparagraph (i) of paragraph (a) of subsection (3) of section fifteen shall prospect or search for any mineral, mineral oil or natural gas elsewhere than in Communal Land.

(4) Any person who contravenes subsection (1), (2) or (3) shall be guilty of an offence and liable to a fine not exceeding level five or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

369     Production of authority to prospect

(1) Every person prospecting or searching for any mineral, mineral oil or natural gas shall, if so requested by any official duly authorized thereto by the mining commissioner or at the request of any police officer or of the owner or the occupier of the land on which he is so prospecting or searching, or of the duly authorized representative of such owner or occupier, produce his certificate of registration as an approved prospector, his prospecting licence or evidence of any other authority under which he is prospecting.

(2) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level four or to imprisonment for a period not exceeding three months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

370     Protection of open workings by prospectors

(1) Every person digging a prospecting trench shall throw out the earth in such manner as to form as far as possible regular ridges on either side of such trench.

(2) Every person acting under and by virtue of any prospecting licence, exclusive prospecting order or special grant shall fence or enclose the mouths of all his shafts and other open surface workings and excavations sufficiently to ensure the safety of persons and stock, and he shall maintain such fencing or other works in good and effective repair while carrying on his work and before abandoning any prospecting area, he shall fill in such shafts, workings and excavations or shall so fence or deal with them as permanently to ensure the safety of persons and stock, and shall restore any work previously erected or constructed for the protection of mine workings which he may have removed or interfered with, and shall notify the occupier, if any, of the land that he has completed the protection work required under the provisions of this

subsection:

Provided that if any such shaft, working or excavation is within twenty metres of a public road or thoroughfare he shall not fence it, but shall fill it in.

(3) Subject to the proviso to subsection (2), the manner in which shafts, open surface workings and excavations shall be dealt with for the purposes of subsection (2) shall be prescribed by regulations and compliance with such regulations shall be sufficient compliance with that subsection.

(4) Any person who contravenes subsection (1) or (2) shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(5) The court that convicts a person of contravening subsection (4) may order the cancellation of any prospecting licence held by him, and thereupon the licence shall be cancelled and no new licence shall be issued to him until he has proved to the satisfaction of the Secretary that he has complied in all respects with subsection (1) or (2), as the case may be.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

371    Duties of absentee prospector

(1) Whenever an approved prospector, acting under and by virtue of—

    (a)    a prospecting licence, proposes to be absent from the area covered by a prospecting notice; or

     (b)    an exclusive prospecting order or special grant for prospecting, proposes to be absent from his area of operations;

for a continuous period of more than twenty-four hours and to leave any employees in such area during his absence, he shall appoint a suitable person to be in charge of such employees and shall provide him with written evidence of such appointment which he shall produce upon request by the owner or occupier of the land or the duly authorized representative of such owner or occupier.

(2) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level five or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

372    Illegal pegging

(1) No person shall intentionally peg any ground which is not open to prospecting.

(2) No person shall post—

    (a)    a prospecting notice;

    (b)    a discovery notice; or

     (c)    a registration notice, save a registration notice applicable to the pegging of—

    (i)    a site in terms of section forty-eight; or

    (ii)    a secondary reef in terms of section one hundred and seventy;

unless he is an approved prospector and the holder of a prospecting licence or the duly authorized representative of such holder, and there is correctly stated in such notice the number of the prospecting licence under which such notice is to be posted.

(3) No person shall peg any ground, save ground to be pegged as—

    (a)    a site in terms of section forty-seven; or

    (b)    a secondary reef in terms of section one hundred and seventy;

unless he is an approved prospector.

(4) No person shall post a prospecting, discovery or registration notice which is incorrect in any material particular.

(5) No person shall peg a mining location in a manner other than that prescribed.

(6) No person shall wilfully peg a larger or longer mining location than he is entitled to peg or purports to peg.

(7) No person shall register or attempt to register a mining location under or by virtue of a prospecting licence other than the one under which it was pegged.

(8) No person shall register or attempt to register a mining location under or by virtue of a prospecting licence of which he was not the lawful holder at the time of pegging.

(8a) Any person who contravenes subsection (1), (2), (3), (4), (5), (6), (7) or (8) shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(9) The mining commissioner may refuse to register a mining location in respect of which there has been a contravention of this section.

373    Illegal cutting of wood

(1) No person purporting to act under section twenty-nine, one hundred and three, one hundred and seventy-eight or two hundred and ninety-four shall cut, fell, remove or use any indigenous wood or timber for any other purpose than those therein authorized.

(2) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding three months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

374    Interference with fences

(1) Save as provided in section two hundred and seventy, no holder of a prospecting licence, exclusive prospecting order or special grant and no miner shall cut or in any way interfere with any fence on any land, except with the consent in writing of the owner or the occupier of such land or under an order granted in terms of section three hundred and fifty-seven.

(2) No owner or occupier of any land shall cut or in any way interfere with any fence on any mining location erected by the holder or miner of such location, except with the consent in writing of such holder or such miner or under an order granted in terms of section three hundred and fifty-seven.

(3) Any person who contravenes subsection (1) or (2) shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding three months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

375    Beacons and pegs to be maintained in good order

(1) The holder of any mining location who fails, in terms of this Act, to erect or to keep in proper order and in their proper positions his notices, pegs, beacons or trenches of such location shall be guilty of an offence and liable to a fine not exceeding level three and, in addition, to a fine not exceeding level one for each month or portion of a month during which he has allowed such location to remain improperly designated or beaconed after notice thereof has been given to him by the mining commissioner.

[substituted by Act 22 of 2001, with effect from the 10th September, 2002.]

(2) Subsection (1) shall apply to any person who was the holder of an abandoned or forfeited mining location in respect of which a quittance certificate is required and has not been issued under section two hundred and sixty-nine.

376    Position of beacons and pegs may not be altered

(1) No person shall, except as provided in this Act, deface, alter the position of, remove, pull down, injure, destroy or erect or renew in any other than its proper or original position any peg, notice, beacon or landmark designating or intended to

designate the position, boundary, name or other particular of any mining location, reef or deposit or designating the name of the discoverer or holder thereof.

(1a) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level seven or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(2) Save as otherwise provided in this Act, if the position of any one or more of the pegs or beacons of any mining location has been altered or dealt with by the holder of such location or his agent so as to make it appear that any of the original ground is cut off from or any fresh ground is added to such location, or if the holder or his agent has consented to or condoned any such action, the mining commissioner may, in addition to any other penalty attaching to such action, declare any ground so cut off to have ceased to be a portion of such location from the date of such action or from any later date, and no fresh ground so added shall in any case be deemed to have become a portion of such location.

377     Mining permitted under certain objects on certain conditions

(1) For the purposes of this section—

"road" includes any area of land reserved for road purposes under Part III of the Roads Act [Chapter 13:12] and any restricted road declared under Part IV of that Act.

(2) Save as otherwise provided in subsection (3) the holder of a mining location shall not exercise any right to carry out mining operations in respect of such location beneath any of the following—

    (a)    any road, railway or railway reserve or pipeline reserve;

    (b)    any electric power line;

    (c)    any aqueduct, pipeline, well or borehole;

    (d)    any land within the surveyed limits of any city, town, township or village referred to in paragraph (c) of subsection (1) of section thirty-one;

    (e)    any licensed aerodrome or any State emergency landing ground or State aerodrome;

    ( f )    any State rifle range;

    (g)    any cemetery;

    (h)    any race course, public park or playground reserved under section thirty-five;

    (i)    any kraal;

    ( j )    any building stand or machinery site;

    (k)    any river, lake, dam, reservoir or irrigation work other than irrigated lands;

    (l)    land under cultivation or land to which an approved cultivation scheme relates;

    (m)    any other surface object which in the opinion of the Chief Government Mining Engineer requires protection and of which he has given written notice to the holder;

or beneath the land outside the boundaries of any such premises as aforesaid and lying within such distance of such boundaries as may be prescribed or otherwise as the mining commissioner may specify.

(3) The Chief Government Mining Engineer or other official authorized thereto by him may grant permission in writing to such holder to carry out mining operations beneath any work mentioned in subsection (2) subject to such terms and conditions as may be specified by the Chief Government Mining Engineer or such other official, as the case may be:

Provided that no such permission shall be given until the owner of such work or other

person interested therein has been given an opportunity to submit any objections which he may have.

(3a) Any person who contravenes subsection (2) or any term or condition specified in terms of subsection (3) shall be guilty of an offence and liable to a fine not exceeding level seven or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(4) Nothing in this section contained shall be deemed in any way to prejudice the right of any person to recover from the holder of the mining location damages for any injury which he may prove to have been sustained by him in consequence of any act or thing done by such holder even though the permission mentioned in subsection (3) has been given.

378    Salting

(1) No person shall place or deposit or be accessory to the placing or depositing of any minerals in any spot or place with intent to mislead any person as to the payable nature of such spot or place.

(2) No person shall mingle or cause to be mingled with any sample of any valuable mineral any valuable mineral or substance whatsoever which will increase the value of or in way change the nature of the said ore with intent to deceive, cheat or defraud.

(2a) Any person who contravenes subsection (1) or (2) shall be guilty of fraud and liable to be prosecuted and punished accordingly.

[inserted by Act 22 of 2001, with effect from the 20th May, 2002.]

(3) In any proceedings taken for the contravention of subsection (1), if the accused person is proved to have placed or deposited or to have been accessory to the placing or depositing of any mineral in any spot or place where the finding thereof would tend to mislead any other person as to the payable nature of such spot or place, he shall be deemed to have so placed or deposited such mineral in contravention of that subsection unless he produces satisfactory evidence to the contrary.

379    Theft of ore

Any person who breaks, severs or removes any mineral from any mining location, reef or deposit, or who takes, removes or conceals any mineral, slags, slimes, amalgam, residues, tailings or concentrates, the product of any mining location, reef or deposit, with intent to deprive the lawful owner or holder thereof, shall be guilty of theft and liable to be prosecuted and punished accordingly.

380    Fraudulent acts

Any person engaged in the business of milling, leaching, sampling, concentrating, reducing, assaying, transporting or dealing in ores, metals or minerals, who keeps or uses any false or fraudulent scales or weights for weighing such ores, metals or minerals, or who keeps or uses any false or fraudulent assay scales or weights, or enriched fluxes used for ascertaining the assay value of minerals, knowing them to be false or fraudulent, shall be guilty of fraud and liable to be prosecuted and punished accordingly.

381    Eviction of squatters

(1) If it appears to the mining commissioner that a registered mining location occupied by any person in reliance on mining title is being occupied otherwise than for bona fide mining purposes in accordance with the rights conferred on the miner thereof by section one hundred and seventy-eight, he may serve an order upon the occupier to vacate the mining location.

(2) Unless he has noted an appeal against the order in terms of subsection (3), a person upon whom an order has been served in terms of subsection (1) shall vacate the mining location concerned within fourteen days after the order was served, and

shall not return to the location as long as the order remains in force.
[amended by Act 22 of 2001, with effect from the 20th May, 2002.]
(2a) Any person who contravenes subsection (2) shall be guilty of an offence and
liable to a fine not exceeding level five or to imprisonment for a period not exceeding
six months or to both such fine and such imprisonment.
[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]
(3) A person who is aggrieved by an order served upon him in terms of subsection (1)
may at any time before the expiry of the period of fourteen days referred to in
subsection (2) lodge an appeal in writing with the Secretary against such order,
setting out his grounds of appeal, and shall at the time of noting the appeal deposit
such sum as may be prescribed with the Secretary.
[amended by Act 22 of 2001, with effect from the 20th May, 2002.]
(4) When an appeal has been noted in terms of subsection (3), the order appealed
against shall be suspended until the Minister has given his decision on the appeal in
terms of subsection (5).
(5) The Minister may confirm or set aside the order appealed against and shall give
notice of his decision to the mining commissioner and the appellant.
(6) Where the Minister—

      (a)     confirms the order, the appellant shall comply with subsection (2)
within fourteen days of the service upon him of notice of the decision of the Minister;

      (b)     sets aside the order, the deposit paid in terms of subsection (3) shall be
refunded to the appellant.
[amended by Act 22 of 2001, with effect from the 20th May, 2002.]
(6a) Any person who contravenes paragraph (a) of subsection (6) shall be guilty of an
offence and liable to a fine not exceeding level five or to imprisonment for a period
not exceeding six months or to both such fine and such imprisonment.
[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]
(7) An order made in terms of this section which has not been set aside by the
Minister in terms of subsection (5) shall remain in force until revoked by the mining
commissioner on proof to his satisfaction of the intention of the person concerned to
occupy the mining location for bona fide mining purposes.
382     Returns to be furnished
(1) The holder of any mining location and the miner thereof and the owner of any
metallurgical establishment, or his representative, shall furnish to the mining
commissioner such returns and reports of his operations thereon or therein, and such
certificates or solemn declarations in respect of them, as are prescribed by or under
this Act.
(2) Any person who is required to furnish a return, report, certificate or solemn
declaration in terms of subsection (1) and who—

      (a)     fails to furnish the return, report, certificate or solemn declaration in
accordance with that subsection; or

      (b)     fails to furnish a corrected return, report, certificate or solemn
declaration after due notice that any such return, report, certificate or solemn
declaration furnished by him was defective in a material respect;
shall be guilty of an offence and liable to a fine not exceeding level five or to
imprisonment for a period not exceeding six months or to both such fine and such
imprisonment.
[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]
383     False declarations and certificates
(1) Any person who makes any declaration, supplies any certificate or renders any
return in terms of this Act which he knows to be false or which he does not know or

reasonably believe to be true in any material particular shall be guilty of an offence.

(1a) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(2) In addition to any other penalty which it may inflict, the court may order that any person who has been convicted of an offence in terms of subsection (1a) shall forfeit his prospecting licence and all his title to or interest in any mining location to which such declaration or certificate had reference.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(3) It shall be lawful for the Minister to prohibit the issue of a prospecting licence to any person who has been convicted of an offence in terms of subsection (1a) for such period and on such terms as he deems fit.

[inserted by Act 22 of 2001, with effect from the 10th September,2002.]

384     Dams or reservoirs to be left intact

(1) On abandonment, forfeiture or cancellation of any mining location to which a dam or reservoir is attached the holder of such location shall leave such dam or reservoir intact, together with the water it contains:

Provided that—

      (i)     all machinery and appliances in connection with such dam or reservoir which can be readily removed without in any way injuring, weakening or impairing such dam or reservoir, or impairing the water it contains, may be taken away by the holder within the period of three months next succeeding such abandonment, forfeiture or cancellation;

      (ii)     the owner or the occupier of the land on which such machinery or appliances are situated shall not be liable for any damage done to such machinery or appliances in the due and proper exercise of his rights as owner or occupier of the land;

      (iii)     the mining commissioner may, if he is satisfied that it is necessary to do so, extend the period within which the machinery or appliances or the machinery and appliances may be removed, by a further period not exceeding three months.

[inserted by Act 22 of 2001, gazetted on the 1st February, 2002.]

(2) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level seven or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment.

[Subsection (2) inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

385     Plans and returns of mines to be confidential

(1) In subsection (2) "tributor" shall have the meaning assigned thereto in section two hundred and seventy-nine.

(1a) Any person who contravenes subsection (2) shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment;

      (b)     in subsection (3) by the deletion of "subsection (3)" and the substitution of "subsection (2)".

[inserted by Act 22 of 2001, gazetted on the 1st February, 2002.]

(2) No person shall, without the permission in writing of the holder or tributor of the registered mining location concerned or the manager of the mine concerned, furnish to any person or allow any person to inspect any—

      (a)     plan of any mine working or any copy thereof; or

      (b)     return or report or any copy thereof;

which has been taken, transmitted or rendered in terms of this Act.

(2a) Any person who contravenes subsection (2) shall be guilty of an offence and liable to a fine not exceeding level six or to imprisonment for a period not exceeding one year or to both such fine and such imprisonment.

[Subsection (2a) inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(3) Subsection (2) shall not apply in respect of any plan, return or report relating to any mining location which has been abandoned, forfeited or cancelled.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

386     Mining commissioner's powers of entry upon locations

(1) The mining commissioner or other official duly authorized thereto by him may at all times enter upon any mining location or any premises or workings thereof or thereunder for the purpose of—

        (a)       generally inspecting such location, premises or workings and examining the mining operations or the treatment of minerals performed thereon and any plans, books, registers or other documents relating thereto; or

        (b)       ascertaining whether provisions of this Act are being carried out; or

        (c)       ascertaining whether precious stones have been discovered or are being mined, and determining the nature of such stones and whether the extent of the deposit of such stones warrants an application for a licence or permit to mine for precious stones and what measures, if any, are necessary for the protection of any such deposit; or

        (d)       ascertaining whether any nuisance exists upon such location, premises or workings; or

        (e)       giving directions and taking steps to enforce any provisions of this Act or to abate or remove any nuisance; or

        ( f )     taking samples or specimens of the rocks, strata or minerals situated upon such location for the purpose of determining the nature or the percentage of the minerals contained therein.

(2) Any person who, without lawful excuse—

        (a)       fails or refuses to provide all reasonable facilities and assistance to a mining commissioner or other authorised official when acting under subsection (1); or

        (b)       fails or refuses to comply with any direction given by a mining commissioner or other authorised official in terms of paragraph (e) of subsection (1); shall be guilty of an offence and liable to a fine not exceeding level four or to imprisonment for a period not exceeding three months or to both such fine and such imprisonment.

(2a) A court convicting a person of an offence under subsection (2) may order him to remedy his default by providing such facilities and assistance as the court may specify to the mining commissioner or authorised official concerned or by complying with the direction given by the mining commissioner or authorised official concerned, as the case may be.

(2a) Any person who contravenes or fails to comply with an order in terms of subsection (2a) shall be guilty of an offence and liable to—

(2b) Any person who contravenes or fails to comply with an order in terms of subsection (2a) shall be guilty of an offence and liable to—

        (a)       a fine not exceeding—

        (i)       level five; or

        (ii)      level two for each month during which he has contravened or failed to comply with the order;

whichever is the greater; or

(b)     imprisonment for a period of six months;

or to both such fine and such imprisonment.

[substituted by Act 22 of 2001, with effect from the 10th September, 2002.]

(3) The powers of entry conferred upon a mining commissioner under subsection (1) are hereby conferred upon the Director of Metallurgy, the Chief Government Mining Engineer, the Director of Geological Survey and any Government mining engineer, inspector of mines or other officer appointed in terms of section three hundred and forty-three, and subsection (2) shall be read as including a reference to those officials.

387     Geological survey

(1) The Director of Geological Survey and any person duly authorized in writing by him may for the purpose of carrying out any prospecting or exploration work on behalf of the State or a geological survey of Zimbabwe or any part thereof—

(a)     enter at all reasonable hours upon any land with such persons, animals, vehicles, appliances, instruments and materials as are necessary for such survey;

(b)     break up the surface of any part of such land for the purpose of ascertaining the rocks, strata or minerals within or under the same;

(c)     take and carry away samples and specimens of the rocks, strata or minerals found therein;

(d)     fix any post, stone, mark or object to be used in the survey in any such land;

(e)     dig up any ground for the purposes of fixing any such post, stone, mark or object;

( f )     enter into or upon any land on which it is proposed to carry out such prospecting or exploration work, or through which it may be necessary to pass for the purposes of such survey or such work:

Provided that—

(i)     it shall not be lawful to fix any object, post, stone or mark within any walled garden, orchard or pleasure ground without the consent of the owner or the occupier thereof;

(ii)     reasonable notice of the intention to exercise any of the powers conferred by this subsection shall be given to the owner or the occupier of such land unless such land is unoccupied State land;

(iii)     as little damage and inconvenience as possible shall be caused by the exercise of any of the powers conferred by this section and such owner or occupier shall be entitled to compensation for any damage sustained in the execution of the powers conferred by this subsection.

(2) Any prospecting or exploration work carried out in terms of subsection (1) shall be subject to the provisions of sections thirty-one and thirty-four, save those of paragraph (b) of subsection (1) of section thirty-one.

(3) No prospecting or exploration work shall be carried out on a mining location pursuant to the powers conferred by subsection (1) without prior consultation with the holder of such location.

(4) Any person who in any way whatsoever prevents, obstructs or impedes the exercise of any of the powers conferred by subsection (1) or who displaces, defaces or destroys any stone, post, mark or object set up and placed for the purposes of any geological survey shall be guilty of an offence and liable to a fine not exceeding level three.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

(5) If any dispute arises as to the amount of compensation payable under this section,

the matter shall be referred to the Administrative Court for determination.

388     Obstruction of officials

(1) No person shall—

    (a)    obstruct or resist any mining commissioner or any person duly authorized in writing by any court or mining commissioner in lawfully entering upon any mining location or land or in performing any other act authorized by this Act; or

    (b)    obstruct or resist any inspector of mines or other person in the performance of his duty or in the exercise of his powers under this Act; or

    (c)    after being removed under the provisions of this Act from any mining location or other place, forcibly or clandestinely retake or retain or endeavour to retake or retain possession thereof or of any portion thereof; or

    (d)    after any decision that any complainant is entitled to use for mining purposes or to divert any water, obstruct or resist such complainant or his agents in such use or diversion.

[inserted by Act 22 of 2001, gazetted on the 1st February, 2002.]

(2) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level five or to imprisonment for a period not exceeding six months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

389     Payment of fine without appearing in court

(1) Where any person has, in respect of any offence in terms of this Act committed by him, been informed by a mining commissioner or an inspector of mines that it is intended to institute criminal proceedings against him for that offence and the mining commissioner or the inspector of mines, as the case may be, has reasonable grounds for believing that the court which will try that person for that offence will, on convicting him of that offence, not impose a sentence of imprisonment or a fine exceeding level three, that person may sign and deliver to the mining commissioner or inspector of mines, as the case may be, a document admitting that he is guilty of that offence and deposit with the mining commissioner or inspector of mines, as the case may be, such sum of money, not exceeding an amount equal to a fine of level three or the maximum of the fine with which the offence is punishable, whichever is the lesser, as the mining commissioner or inspector of mines may fix.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

(2) Subject to subsection (7), a person who has signed an admission of guilt and paid a deposit in terms of subsection (1) shall not be required to appear in court to answer the charge of having committed the offence concerned.

(3) An admission of guilt signed and delivered in terms of subsection (1) shall forthwith be transmitted to the clerk of the court before which the person concerned would otherwise have appeared and shall be entered by him in the records of that court.

(4) As soon as an admission of guilt has been recorded in terms of subsection (3) it shall be laid before the court and the court shall thereupon—

    (a)    proceed to convict the person concerned of the offence charged and forthwith sentence him to a fine not exceeding level three in accordance with law; or

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

    (b)    by endorsement on the document signify its refusal to convict such person.

(5) If the sum deposited is not sufficient to pay the fine imposed by the court, the balance remaining due shall be recovered from the offender in the manner provided by section 348 of the Criminal Procedure and Evidence Act [Chapter 9:07].

(6) If the sum deposited is greater than the fine imposed by the court, the difference

shall be refunded to the offender.

(7) Where the court has refused to convict the person concerned, as in paragraph (b) of subsection (4) provided, the sum deposited shall be refunded to him and he may be prosecuted in the ordinary course.

(8) Any magistrate of the court which will try the person concerned for the offence may advise the mining commissioner or inspector of mines, as the case may be, as to what the court is likely to consider an appropriate fine in any case and in fixing the sum of money to be deposited under subsection (1) regard shall be had to his advice.

(9) For the purpose of deciding whether to convict the person concerned in accordance with subsection (4) or determining the amount of the fine to be imposed, the court may have regard to any statements relevant to the offence charged made by the mining commissioner or inspector of mines or any other person having knowledge thereof.

(10) Where the admission of guilt signed and delivered in terms of subsection (1) purports to have been signed by a director, manager or secretary of a corporate body as the representative of that corporate body, the director, manager or secretary shall, notwithstanding proviso (i) to subsection (2) of section 385 of the Criminal Procedure and Evidence Act [Chapter 9:07], be presumed to have been authorized by that corporate body to plead guilty on its behalf, unless the contrary is proved.

(11) The magistrate who convicted a person in accordance with subsection (4) may, notwithstanding anything contained in any law, set aside the conviction and order the refund to the person concerned of the fine paid by him in respect thereof if satisfied that that person should not have been convicted.

390    Penalty for mining secondary reef prior to pegging and registration

Any person who mines any secondary reef before it has been pegged and registered in the manner set out in section one hundred and twenty-nine shall be guilty of an offence and liable to a fine not exceeding level nine.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

391    Discovery of precious stones to be notified

(1) Any person who discovers any precious stones shall, within ten days of the date of such discovery, give notice thereof and of the place where such discovery has been made to the mining commissioner.

(2) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level four or to imprisonment for a period not exceeding three months or to both such fine and such imprisonment.

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

392. . . . . .

[repealed by Act 22 of 2001, with effect from the 20th May, 2002.]

PART XXVII

MISCELLANEOUS

393    Application of Cap. 20:10

Wherever it is provided in this Act that any matter relating to the payment of compensation shall be referred to or determined by the Administrative Court—

        (a)    at least two months before the claim is so referred the claimant shall, unless the other party agrees otherwise, submit to the other party a claim for compensation which complies with subsection (1) of section 22 of the Land Acquisition Act [Chapter 20:10]; and

        (b)    that Act shall thereafter apply, mutatis mutandis.

394    Submission of geological information

(1) The miner of a registered mining location shall submit annually to the Director of Geological Survey any information of a geological nature, including logs and assay

results of drill cores from surface diamond drill holes, and reports on any geological, geochemical and geophysical work, obtained by him during the course of his prospecting or mining operations.

(1a) Any person who contravenes subsection (1) shall be guilty of an offence and liable to a fine not exceeding level four or to imprisonment for a period not exceeding three months or to both such fine and such imprisonment

[inserted by Act 22 of 2001, with effect from the 10th September, 2002.]

(2) The Director of Geological Survey shall not, without the consent of the holder, disclose any informationsubmitted in terms of subsection (1) to any person, or allow any person to inspect it unless the mining location to which it relates is forfeited, abandoned, or has been cancelled:

Provided that the Minister may, after consultation with the miner, disclose such information if he considers it necessary in the public interest to do so.

(3) In addition to the information specified in subsection (1), the miner of a registered mining location shall submit to the Director of Geological Survey, if called for, any representative rock samples obtained by him in the course of his prospecting and mining operations.

395     Site rent

The holder of a registered mining site shall in respect of such site pay annually in advance to the mining commissioner rent calculated at the prescribed rate.

396     Cash reward for new discovery of certain minerals

(1) For the purposes of subsection (2)—

"prescribed mineral" means—

        (a)      precious metals; or

        (b)      such precious stones or other mineral as the Minister may, by statutory instrument, prescribe for the purposes of this section.

(2) If any person registers with the mining commissioner a block of claims for a prescribed mineral which—

        (a)      has not been held during the previous fifteen years; and

        (b)      is situated not less than twenty kilometres from any other current mining location which is or was previously registered for the same mineral;

he shall receive a cash reward for such discovery in accordance with regulations, but the onus of proving that he is so entitled to the cash reward shall be upon such person.

397     Land surveyors to be subject to Cap. 20:12

Any land surveyor who carries out any surface survey under this Act shall have the same duties and be subject to the same liabilities as if he were carrying out a survey in terms of the Land Survey Act [Chapter 20:12].

398     Acquisition by President of location for public purposes

(1) Subject to this section, the President may at any time, for the utilization of any mining location for a purpose beneficial to the public generally, or to any section thereof, acquire either the whole or any portion of such mining location, or limit the rights enjoyed by the owner thereof under this Act.

(2) The Land Acquisition Act [Chapter 20:10] shall apply, mutatis mutandis, to such acquisition or limitation of rights as is referred to in subsection (1).

(3) For the purpose of ascertaining the amount of compensation payable to any person for an acquisition in terms of subsection (1), the Minister may direct any person employed in his Ministry to conduct an investigation into the nature and extent of any mining operations that have been or are being conducted on the mining location that has been or is to be acquired.

(4) A person directed to conduct an investigation in terms of subsection (3) shall have power at all reasonable times—

(a)      to enter the mining location that has been or is to be acquired; and

(b)      to require any person to supply any information or to produce any book, record or document relating to any mining operations that have been or are being conducted on the mining location that has been or is to be acquired; and

(c)      to make copies of or extracts from any book, record or document referred to in paragraph (b);

and shall make a written report to the Minister on the results of his investigation within such period as the Minister may direct.

(5) Any report prepared in terms of subsection (4) shall be admissible on its production by any person in any proceedings relating to the payment of compensation for an acquisition in terms of subsection (1), and the court concerned shall pay due regard to the contents of any report so produced.

(6) Any person who contravenes or fails to comply with any direction or requirement in terms of this section shall be guilty of an offence and liable to a fine not exceeding five thousand dollars or to imprisonment for a period not exceeding two years or to both such fine and such imprisonment.

399     Cancellation of mining rights

(1) If a mining commissioner has reason to believe that the holder of a registered mining location is using wasteful mining methods or metallurgical processes, he shall inspect the registered mining location forthwith and report to the Board accordingly.

(2) After receiving the report referred to in subsection (1), if the Board is satisfied that the holder of a registered mining location is using wasteful mining methods or metallurgical processes, the Board shall forthwith institute an inquiry into the matter and invite the holder of the registered mining location concerned to make representations to the inquiry as to why his certificate of registered mining location should not be cancelled for using wasteful mining methods or metallurgical processes.

(3) If in the light of an inquiry held in terms of subsection (2), and after due consideration of any representations made by the holder, the Board is still satisfied that the holder has actually used wasteful mining methods or metallurgical processes, the Board shall notify the holder accordingly and request him, within such reasonable time as the Board shall specify in the notification, to remedy the situation or to show cause why his certificate of registered mining location should not be cancelled.

(4) If within the time specified in the notification referred to in subsection (3), the holder of the registered mining location fails to remedy the situation, or to satisfy the Board that he has not used wasteful mining methods or metallurgical processes, the Board shall cancel his certificate of registered mining location and notify him accordingly.

(5) A holder whose certificate of registered mining location is cancelled in terms of this section may appeal to the Minister against such cancellation within thirty days of the notification thereof.

(6) The noting of an appeal in terms of subsection (5) shall suspend the cancellation until the Minister's decision on the appeal has been given.

(7) Upon an appeal in terms of subsection (5), the Minister may confirm the cancellation or set it aside.

400     Cancellation of mining rights in certain circumstances

(1) If the Minister has reason to believe that a miner—

(a)      has failed, within a reasonable period after commencing mining operations, to declare any output from his mining location, whether in terms of this Act or any other enactment; or

(b)      has knowingly rendered a false return or declaration regarding the

output from his mining location, whether in terms of this Act or any other enactment; or

      (c)     has, in relation to his mining location or the output thereof, contravened—

      (i)     section 5 or 6 of the Gold Trade Act [Chapter 21:03]; or

      (ii)     section 5, 6 or 14 of the Precious Stones Trade Act [Chapter 21:06]; or

      (iii)     section 42 or 50 of the Minerals Marketing Corporation of Zimbabwe Act [Chapter 21:04];

      whether or not he has been convicted thereof by a court;

the Minister may do either or both of the following—

      (i)     by written notice served on the miner concerned, notify the miner concerned of his intention to cancel his rights in relation to the mining location concerned, and call on the miner to show cause, within such reasonable period as may be specified in the notice, why such rights should not be cancelled;

      (ii)     direct any person employed in his Ministry to conduct an investigation into the nature and extent of any mining operations that have been conducted on the mining location concerned.

(2) A person directed to conduct an investigation in terms of paragraph (ii) of subsection (1) shall have power at all reasonable times—

      (a)     to enter the mining location concerned; and

      (b)     to require any person to supply any information or to produce any book, record or document relating to any mining operations conducted on the mining location concerned; and

      (c)     to make copies of or extracts from any book, record or document referred to in paragraph (b);

and shall make a written report to the Minister on the results of his investigation within such period as the Minister may direct.

(3) If, at the expiration of the period specified in a notice given in terms of paragraph (i) of subsection (1), and after considering any representations made to him by the miner concerned and any report made in terms of subsection (2), the Minister is satisfied on reasonable grounds that the miner—

      (a)     has failed in a respect referred to in paragraph (a) of subsection (1); or

      (b)     has rendered a false return or declaration referred to in paragraph (b) of subsection (1); or

      (c)     has contravened a provision referred to in paragraph (c) of subsection (1);

the Minister may, by notice in writing to the miner, cancel the miner's rights in relation to the mining location and make such order as he thinks fit in regard to the disposal of any output from the mining location which is in the possession of the miner or held on his behalf by any other person.

(4) Where the Minister has made an order in terms of subsection (3) in regard to the disposal of any output from a mining location, that order shall be enforced in the manner specified in the order.

(5) If a miner's rights are cancelled in terms of subsection (3) and the mining location concerned—

      (a)     is registered in the miner's name, the mining commissioner shall declare the mining location to be forfeited, and thereafter sections two hundred and sixty-seven to two hundred and seventy-two shall apply in relation thereto;

      (b)     is not registered in the miner's name, any tribute agreement between the miner and the holder of the mining location shall thereupon expire and neither the

miner nor any other person shall exercise any right to mine the mining location except in accordance with the Minister's written approval.

(6) Any person who—

 (a) contravenes or fails to comply with any order, direction or requirement in terms of this section; or

 (b) mines any mining location in contravention of paragraph (b) of subsection (5);

shall be guilty of an offence and liable to a fine not exceeding five thousand dollars or to imprisonment for a period not exceeding two years or to both such fine and such imprisonment.

401 Minister may order holder of mining location to transfer it

(1) The holder of any registered mining location may apply in writing to the Board for the issue of an order authorizing the transfer to him of a registered mining location held by any other person, hereinafter referred to as the other location.

(2) On receipt of such application the Board shall by registered letter notify the holder of such other location and any person to whom a duly approved tribute has been granted over such location or in whose favour any option or hypothecation over such location has been registered with the mining commissioner of such application and require them to lodge with the Board in writing within sixty days of the posting of such letter their objections, if any, to the grant of the application.

(3) If any person lodges any objection with the Board within such period, the Board shall, on a day fixed by it and notified to the applicant and every objector, hear such arguments and evidence as such persons may wish to lay before it in regard to the grant or refusal of the application.

(4) If no objection is lodged to the grant of the application, the Board shall proceed with the consideration of the application.

(5) If the Board is satisfied that—

 (a) it is essential for the better working of the mining location owned by the applicant that he should have the use of the surface of the whole or a portion of such other location and that an order under section three hundred and fifty-seven could not lawfully be granted or, if granted, would not adequately meet the needs of the case; and

 (b) the applicant has made a reasonable offer to the holder of such other location to purchase such location which such holder has refused to accept; and

 (c) the applicant is able to pay any compensation likely to become payable if the order were granted; and

 (d) the granting of the order would be in the national interest;

it may recommend to the Minister that an order be made by him authorizing the transfer of such other location to the applicant or, if the Board is not so satisfied, it shall refuse the application, and such refusal shall be final and without appeal.

(6) Where the Board recommends that the order be granted, it shall submit to the Minister the application, together with all relevant documents and its written report and recommendation in regard thereto, and the Minister shall submit such recommendation to the President, who may approve or refuse to approve the making of the order.

(7) Where the President has approved the making of an order, the Minister shall forthwith make an order authorizing the mining commissioner to effect transfer of such other location to the applicant, in terms of this section, and such order shall be valid for a period of three months unless the Minister for any reason which to him seems good and sufficient extends such period.

(8) The mining commissioner shall by registered post send a copy of such order to the

applicant, the holder of such other location and every person who lodged objections under subsection (2) and require such holder or other person to inform him in writing, within a period of sixty days, whether he intends to claim compensation.

(9) Any person who may be adversely affected by the exercise of the rights granted under an order shall be entitled to be paid such compensation by the person in whose favour the order has been made as may be agreed upon or, failing agreement, as may be determined by arbitration:

Provided that such right shall be deemed to have lapsed unless such person has informed the mining commissioner in writing within the period of sixty days mentioned in subsection (8) of his intention to claim such compensation.

(10) The person in whose favour an order has been made under this section shall, before obtaining transfer of the other location, either pay to the person or persons entitled thereto the compensation mentioned in subsection (9), or furnish a guarantee satisfactory to the mining commissioner for the payment of such compensation.

(11) The mining commissioner shall, notwithstanding any bar to the registration of transfer under subsection (7) of section two hundred and seventy-five or of section two hundred and seventy-nine, on application made within the period of validity of the order by the person in whose favour the order has been made and on payment of the transfer duty mentioned in section two hundred and seventy-five, forthwith register transfer of such other location to such person by making the necessary entries in his registers and other records:

Provided that the mining commissioner shall not so register transfer unless he is satisfied that the compensation mentioned in subsection (10) has been paid or the guarantee mentioned in that subsection has been furnished.

(12) As from the date on which the holder of the other location is notified by the Board of an application made under this section and until the date on which such application is refused or, if it is granted, until the period of the validity of the order has expired, it shall not be lawful for the holder of such other location to sell, cede, assign or otherwise dispose of such location or any part thereof or interest therein, or to abandon or hypothecate such location or any part thereof or interest therein, or to grant an option or tribute over such location or any part thereof or interest therein.

(13) If the person in whose favour an order is made does not, during the period of validity of the order, apply to the mining commissioner under subsection (11) and satisfy the mining commissioner that the compensation mentioned in subsection (10) has been paid or furnish the guarantee mentioned in that subsection, the order shall be deemed to have lapsed.

402     Training institutions

(1) The Minister may provide for the establishment, equipment, maintenance, administration and operation of any institution for the technical education and training of persons leading to the award of diplomas, certificates and other qualifications relevant to the mining industry.

(2) For the purpose of establishing, equipping, maintaining, administering and operating any institution referred to in subsection (1), the Minister may—

        (a)      enter into agreements and execute contracts or other instruments; and

        (b)      provide suitable premises, equipment and amenities for the institution; and

        (c)      with the approval of the Minister responsible for finance, make grants of money to the institution; and

        (d)      subject to any charter referred to in subsection (3), appoint a board of management to control, manage and administer the institution; and

        (e)      do all such other things as, in his opinion, are necessary or desirable

for the purpose.

(3) The legal capacity, objects, autonomy and administration of an institution referred to in subsection (1) shall be provided for in a charter granted by the President by proclamation in the Gazette.

(4) All expenditure incurred by the Minister in terms of subsection (1) shall be met from moneys appropriated for the purpose by Act of Parliament.

403      Regulations

(1) The Minister may make such regulations as he may deem expedient to give force or effect to this Act or for its better administration.

(2) Regulations may provide for the following matters—

    (a)      the proper and efficient management and working of all mining locations, quarries and mining operations;

    (b)      the submission to the Minister by miners and persons operating or managing quarries of programmes of their intended exploration development and mining operations, showing the estimated amount of minerals to be produced during any specified period and the estimated cost thereof, and the right of the Minister to recommend changes thereto;

    (c)      the registration of quarries and the licensing of persons who operate or manage quarries;

    (d)      the grading of mica and its examination by a Government inspector and the control of the sale, disposal or export of mica which has not been graded in accordance with such regulations;

    (e)      (i)      the preparation, keeping and inspection of survey plans of mining locations and quarries, including underground workings;

    (ii)      the details and particulars to be shown on such plans, the manner of their preparation and the scale and size of plans;

    (iii)      the limits of error allowable on surveys in connection with the preparation of such plans;

    (iv)      the preparation of survey plans by the Chief Government Mining Engineer or a person authorized by him in case of failure by any person to comply with the regulations and the recovery by the Minister of the costs of survey and preparation of such plans;

    ( f )      the examination of mine surveyors and the fee payable in respect of such examination and the grant of certificates to successful candidates;

    (g)      the inspection of books and documents relating thereto;

    (h)      the regulation of works and machinery in so far as protection and safety is concerned;

    (i)      sanitation;

    ( j)      establishment of burial places;

    (k)      the proper feeding and housing of labourers;

    (l)      the appointment by employers of suitable persons approved by the Minister to supervise all matters relating to the welfare of labourers and the observance of regulations affecting them;

    (m)      the safety and health of persons employed in or about any mining location, quarry or mining operations;

    (n)      the reporting of accidents and deaths occurring on any mining location or quarry;

    (o)      what works, other than those defined in this Act, may be deemed to be development work;

    (p)      any forms required for the purposes of this Act;

    (q)      search and inspection fees, fees for duplicate copies of certificates

issued under this Act, and any other fees, charges, levies, sums, amounts or payments required or permitted to be prescribed for the purposes of this Act;

(r)      the manner or procedure in regard to the hearing of any action, suit or cause arising out of this Act, other than any application or appeal to the Administrative Court, the High Court or the Supreme Court, and the fees and charges to be taken by officers and practitioners in connection therewith;

(s)      the amount of and manner of claiming any cash reward payable under section three hundred and ninety-six;

(t)      the periods for which and within which the payments prescribed in section one hundred and eighty-eight may be claimed and the manner of allocation of such payments in cases where a mining location is situated partly on one holding and partly on another;

(u)      the duties and responsibilities of holders, lessees or assignees of the rights of a holder, managers and other persons engaged in or about a mine or quarry;

(v)      the qualifications to be possessed by persons engaged in or about a mine or quarry in the capacity of mine manager, resident engineer or underground manager and the keeping of official registers of persons so engaged;

(w)      the examination of persons wishing to be engaged in any capacity referred to in paragraph (v) and the fees payable in respect of such examination and the grant of diplomas or certificates to successful candidates;

(x)      the making by the mine manager or other person in authority of special rules, not inconsistent with this Act, for the maintenance of order and discipline and the prevention of accidents at any mine or quarry, such rules to have the same force and effect as the regulations;

(y)      all such matters as are by this Act required or permitted to be prescribed.

(3) Before prescribing any tariff rate for the purposes of section twenty-nine, one hundred and three or one hundred and seventy-eight in respect of indigenous wood or timber taken from private land other than Communal Land, the Minister shall consult the Chamber of Mines of Zimbabwe and the Commercial Farmers' Union of Zimbabwe and any tariff rate so prescribed shall be reviewed at intervals of not more than five years after like consultation.

(4) On non-compliance with any regulation made in the interests of safety or health, the Minister may order that work on any mine or any section thereof shall cease, save and in so far as work is necessary to remedy any defect complained of and any miner of such mine who, knowing of such order, fails to comply therewith, shall be guilty of an offence and liable to a fine not exceeding level seven or to imprisonment for a period not exceeding two years or to both such fine and such imprisonment.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

(5) Regulations may provide for penalties for any contravention thereof:

Provided that such penalties shall not exceed—

(a)      in the case of a regulation made in the interests of management and safety or health and sanitation, a fine of level seven or imprisonment for a period of two years or both such fine and such imprisonment;

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

(b)      in the case of any other regulation, a fine of level five or imprisonment for a period of six months.

[amended by Act 22 of 2001, with effect from the 10th September, 2002.]

404      Savings of powers of Administrative Court

(1) Nothing in this Act contained shall be deemed to derogate in any way from the powers of Administrative Court exercising its jurisdiction and powers in terms of the

Water Act [Chapter 20:22].

(2) Any order of a mining commissioner which—

      (a)    is made in terms of this Act; and

      (b)    affects public water or water works as defined in the Water Act [Chapter 20:22];

shall be provisional only and referred to the Administrative Court.

(3) The Administrative Court may confirm, vary or set aside an order referred to it in terms of subsection (2).

405    Mining of limestone for agricultural operations

(1) If the Minister is satisfied that any owner or occupier of land needs limestone for his own farming purposes, he may, on application by such owner or occupier, authorize the reservation in terms of section thirty-five of such area of the land of such owner or occupier as he deems sufficient.

(2) Such owner or occupier may in the area so reserved search for and mine limestone solely for his own farming purposes, and this Act shall not apply to such owner or occupier in relation to such search and mining.

(3) If the Minister is satisfied that any such owner or occupier is using any limestone mined under subsection (2) or any lime derived therefrom for any purpose other than his own farming purposes, he shall order the withdrawal of any reservation authorized in terms of subsection (1), and after such withdrawal the right of such owner or occupier to search for and mine limestone under subsection (2) shall cease.

406    District advisory boards

(1) The Minister may establish a district advisory board for any mining district to advise him generally on mining affairs in that mining district and additionally, or alternatively, on any particular matter in connection with the mining industry in that mining district, as may be specified by the Minister.

(2) The Minister shall appoint the members of a district advisory board who shall hold office during the pleasure of the Minister on such terms and conditions as the Minister may fix.

(3) The functions and duties of a district advisory board shall be to advise the Minister as required in terms of subsection (1).

(4) The powers of a district advisory board shall be as are prescribed.

407    Saving of existing rights

(1) Neither—

      (a)    the replacement of the definition of "minerals" in section five by the Mines and Minerals Amendment Act, 1990; nor

      (b)    any declaration in terms of subsection (3) of section five that any substance shall be a mineral for the purposes of this Act;

shall have the effect of vesting in the President any mineral or substance which vested in some other person immediately before the 4th May, 1990, or of the declaration, as the case may be.

(2) Nothing in subsection (1) shall prevent the application of the appropriate provisions of this Act to the mining or quarrying of any mineral or substance referred to in that subsection.

SCHEDULE (Section 208)

GRADING OF DEVELOPMENT WORK

Dimensions

      1.    None of the following shall count as development work—

      (a)    any shaft, winze, rise, drive, adit or tunnel of less superficial area than 2 square metres;

      (b)    any shaft which has been sunk to a total vertical or incline depth of

less than 6 metres from the surface;

(c)      any borehole which has been sunk to a total vertical or incline depth of less than 20 metres from the surface;

(d)      any borehole from which a core is unobtainable and any borehole used for-blasting:

Provided that where intensive and systematic drilling of shallow boreholes has been carried out through overburden to prove the economic potentialities of mineral deposits, the Board may, notwithstanding subparagraphs (c) and (d), authorize such work to count as development work.

2.      Subject to paragraph 1—

(a)      each metre of any shaft, winze or rise of 2 to 4 square metres superficial area shall count as one metre;

(b)      each metre of any shaft, winze or rise of over 4 and up to 6 square metres superficial area shall count as 2 metres;

(c)      each metre of any shaft, winze or rise of over 6 square metres superficial area shall count as 3 metres;

(d)      each metre of any drive, adit or tunnel from the surface of 4 square metres superficial area and over shall count as 2 metres;

of development work.

3.      Where the Board has, in terms of paragraph 1, authorized that intensive and systematic drilling of shallow boreholes shall count as development work, each metre of any such borehole shall count as one metre of development work unless the Board determines a lesser rate of calculation.

Depth

4.      Each metre of any portion of a shaft, winze or rise, or any drift, the floor of which is—

(a)      not more than 20 metres below the natural surface at the working point, shall count as 1 metre;

(b)      more than 20 metres but not more than 30 metres below the natural surface at the working point, shall count as 1,5 metres;

(c)      more than 30 metres but not more than 60 metres below the natural surface at the working point, shall count as 2 metres;

(d)      more than 60 metres but not more than 90 metres below the natural surface at the working point, shall count as 3 metres;

(e)      more than 90 metres but not more than 120 metres below the natural surface at the working point, shall count as 4 metres;

( f )      more than 120 metres but not more than 150 metres below the natural surface at the working point, shall count as 5 metres;

(g)      more than 150 metres below the natural surface at the working point, shall count as 6 metres;

of development work.

Distance from Entrance

5.      Each metre of any portion of an adit or tunnel from the surface which is 30 metres to 90 metres from a point in the centre of the roof at the entrance shall count as 1,5 metres of development work, and each metre of any portion which is 90 metres or more from that point shall count as 2 metres of development work.

General

6.      All dimensions shall be taken at right angles to the line of direction of the work, and in the clear between outside timbers, if in position, or allowing for them, if they are to be put in later.

7.      Depth in incline work shall be measured on the incline and the

allowances for dimensions and depth or distance from entrance shall be cumulative, that is to say, each metre of any portion of a shaft of over 6 square metres superficial area which is more than 30 metres but not more than 60 metres from the surface shall count as 6 metres of development work.

Allowance for Boreholes

       8.      Each metre drilled below the natural surface for a distance—

      (a)      of 90 metres, shall count as 1 metre;

      (b)      exceeding 90 metres and up to 180 metres, shall count as 2 metres;

      (c)      exceeding 180 metres and up to 270 metres, shall count as 3 metres;

      (d)      exceeding 270 metres and up to 360 metres, shall count as 4 metres;

      (e)      exceeding 360 metres, shall count as 5 metres;

            of development work.

**Go To Top Page**                                        **NEXT  CHAPTER**

# Exhibit E



The State and the Bloody Diamond Rush in Chiadzwa: Unpacking the Contesting Interests in the Development of Illicit Mining and Trading, c.2006—2009

Author(s): Tinashe Nyamunda and Patience Mukwambo

Source: *Journal of Southern African Studies*, March 2012, Vol. 38, No. 1 (March 2012), pp. 145-166

Published by: Taylor & Francis, Ltd.

Stable URL: https://www.jstor.org/stable/23267007

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Taylor & Francis, Ltd.* is collaborating with JSTOR to digitize, preserve and extend access to *Journal of Southern African Studies*

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

*Journal of Southern African Studies, Volume 38, Number 1, March 2012*



# The State and the Bloody Diamond Rush in Chiadzwa: Unpacking the Contesting Interests in the Development of Illicit Mining and Trading, c.2006–2009

TINASHE NYAMUNDA

(Economic History Department, University of Zimbabwe)

PATIENCE MUKWAMBO

(Centre for Population Studies, University of Zimbabwe)

*This article examines the development of diamond mining and trading in Chiadzwa, a communal area in Marange, Zimbabwe. It also examines the nature of the state and its role in the early dynamics of diamond exploitation. Mining development in Chiadzwa had far-reaching political, economic, cultural and moral, as well as epidemiological, demographic and environmental, implications for the Marange landscape. This article unravels the activities surrounding illicit diamond activities in Marange, revealing the different interests involved, their interaction with the state and their impact on the landscape of the diamondiferous area. From March 2006, Chiadzwa – located some 80 kilometres from the eastern town of Mutare – literally and metaphorically became a terrain of contestation following the 'discovery' of diamonds. Numerous interests converged on the area seeking to exploit the diamonds, systematically displacing the interests and hegemony of the original, mostly apostolic, inhabitants of Marange.*

*The discovery also unleashed state violence on these groups, who evolved coping strategies in their efforts to continue benefiting from the resource, until a decisive police and army operation, 'Dzokera Kumusha' (Go Back Home), violently expelled the majority of artisanal miners from Chiadzwa in January 2009. This operation was an attempt by the state to regulate the diamond mining and trading process, in order to allow the registered mining companies it favoured to move in and start mining operations.*

## Background

The convergence of competing forces on the Chiadzwa diamond fields was informed by many factors, chief among which was the chameleon nature of the state expressed through competition among a variety of different state representatives and institutions. For the artisanal miners and informal traders and buyers, however, the most important force was the negative economic state of the country. Diamonds were 'discovered'[1] in early 2006, when the country was facing a worsening economic crisis. Discussing the origins of Zimbabwe's political and economic crisis, Brian Raftopolous summarises how the Zimbabwean economy

---

1  The South African company De Beers had operated in the area for several years under four-year renewable prospecting licences, suggesting there may have been knowledge of the presence of diamonds at ministry level.

ISSN 0305-7070 print; 1465-3893 online/12/010145-22

© 2012 The Editorial Board of the *Journal of Southern African Studies*  http://dx.doi.org/10.1080/03057070.2012.649945

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

declined from the late 1990s as a result of the colonial legacy, the failure to build a broad productive base, an unsustainable labour reproduction system and inconsistent government policies.[2] He adds that,

> The more immediate causes lay in a combination of the increased 'threat' around the land reform, the large pay outs made to war veterans and the involvement in the conflict in the Democratic Republic of the Congo. The confluence of these issues became manifest on 14 November 1997 when the Zimbabwe dollar lost 74% of its value in a four hour period.[3]

This crisis culminated in the first period of hyper-inflation in the twenty-first century. According to Steve Hanke, inflation peaked at a rate of 80 billion per cent month-on-month and, ultimately, 6.5 quindecillion novemdecillion per cent by December 2008.[4] The equivalent day-to-day inflation averaged 98 per cent. As political scientist Charles Maier put it, this translates into 'the most sadly picturesque deterioration of purchasing power'.[5]

This confluence of negative economic factors had the effect of reversing any perceived gains of the 1980s, causing de-industrialisation and rising unemployment. In consequence, the rising masses of the unemployed increasingly engaged in either of two livelihood alternatives: the informal sector or emigration. Jonathan Crush and Daniel Tevera have produced illustrative works on the consequent emigration by Zimbabweans.[6] For those who remained, the dominant alternative was the informal sector. The country descended into what Jeremy Jones has termed 'Zimbabwe's *Kukiya-kiya* economy',[7] where the majority simply had to make do with whatever they could get from their day-to-day activities. These included, among others, informal furniture-making, tuck shops, cross border trading and roadside trades in currency, basic commodities, fuel and so on.[8] On that list should be added artisanal mining for gold and diamonds.

Displacement was not limited to those who were 'pushed out' of the country. Internal displacement also occurred on many levels. As Deborah Potts has observed, although 'rates of migration to town increased in the 1980s as many rural people moved to take advantage of higher urban incomes and better social facilities', this situation changed in the 1990s as net in-migration into towns fell because of increasing unemployment and a worsening urban economy. By the end of the millennium, Potts notes, postcolonial livelihood destruction had become the major influence on migration trends.[9]

As a result, by the mid-2000s people had become increasingly displaced within Zimbabwe on an extraordinary scale. As Hammer, McGregor and Landau have noted, this 'displacement … stimulated often unexpected and inventive strategies for survival, adaptation and prosperity'.[10] For many of the politically and economically displaced, Chiadzwa provided a refuge as well as an economic niche for those willing to work under the

---

2  B. Raftopolous, 'The Crisis in Zimbabwe, 1998 to 2008', in B. Raftopolous and A. Mlambo, *Becoming Zimbabwe* (Weaver Press, Harare, 2009), p. 219.

3  Raftopolous, 'The Crisis in Zimbabwe, 1998 to 2008'.

4  S. Hanke, 'The Printing Press', retrieved on 3 May 2010 from www.cato.org/zimbabwe.

5  C.S. Maier, 'The Politics of Inflation in the 20th Century', in F. Hirsch and J.H. Goldthorpe, *The Political Economy of Inflation* (London, Martin Robertson and Co. Ltd, 1978), p. 44.

6  J. Crush and D. Tevera, 'Exiting Zimbabwe', in J. Crush and D. Tevera (eds), *Zimbabwe's Exodus Crisis: Migration, Survival* (Cape Town, Unity Press, 2010).

7  See J.L. Jones, '"Nothing is Straight in Zimbabwe": The Rise of the Kukiya-kiya Economy, 2000–2008', *Journal of Southern African Studies [JSAS]*, 36, 2 (2010).

8  See also S. Mawowa and A. Matongo, 'Inside Zimbabwe's Roadside Currency Trade: The 'World Bank' of Bulawayo' and F. Musoni, 'Operation Murambatsvina and the Politics of Street Vendors in Zimbabwe', *JSAS*, 36, 2 (2010).

9  D. Potts, 'Internal Migration in Zimbabwe: The Impact of Livelihood Destruction in Rural and Urban Areas', in Crush and Tevera, *Zimbabwe's Exodus Crisis*, pp. 170, 178 & 181.

10  A. Hammar, J. McGregor and L. Landau, 'Introduction. Displacing Zimbabwe: Crisis and Construction in Southern Africa', *JSAS*, 36, 2 (2010), pp. 263 & 266.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

trying conditions. It offered some reprieve to the unemployed or the 'gainlessly' employed. In Chiadzwa an interplay of diverse interests, from different branches of the state to mining capital, and from informal traders to artisanal miners, converged from different backgrounds, to be adaptive, survivalist and even prosperous in one of the most inviting opportunities that had emerged. The results were wide-ranging and often dictated the interests each group represented. These different forces, emerging from diverse economic contexts and situations, scripted the early development of diamond mining at Chiadzwa, between the 'discovery' of diamonds in 2006 and the violent, military-led expulsions of late 2008 and early 2009, when the ZANU(PF)-aligned security arms of the state asserted control over the area by expelling the 'new community' of artisanal miners and informal traders that had formed around the diamond fields.[11]

In his work, aptly titled 'Geologies of Power', Richard Saunders observes that the discovery of diamonds in Marange 'coincided with a dramatic and worsening economic crisis of accumulation and political crisis of legitimacy for interests associated with the ruling ZANU(PF) party and state'. He notes how in 2007 ruling party and state structures quickly became involved in the emergence of what amounted to 'a new case of "blood diamonds" in which Zimbabwe state security forces secretly managed the extraction and criminal smuggling of stones, while violently and irregularly displacing local communities, legal title holders and informal miners'.[12] Saunders's work highlights how 'criminalized political networks spanning political, security and business élites' became involved in diamond mining and trading at Chiadzwa, and the wider questions this raises about 'the shape and prospects of transition to post nationalist political orders in Southern Africa'. He observes how the convergence of political need and élite accumulation around opportunities arising from alluvial diamond geology fuelled a direct challenge to the viability of Zimbabwe's new unity government formed in early 2009.

This article contributes to this emerging understanding of the political economy of diamonds, by focusing on the historical processes within Chiadzwa between 2006–2009, from the time of the 'discovery' of diamonds to the violent expulsion of artisanal miners and traders. Drawing on interviews and field research within the diamond-producing areas, we aim to explore the experiences, discourses and practices of the artisanal miners, as well as their relationships with the state. Interviews were carried out between 2006 and 2009 with various people involved in the diamond-mining process, including artisanal diamond miners, a shop owner from Chakohwa, officials from mining companies such as African Consolidated Resources (ACR), inhabitants of Chiadzwa and surrounding areas, and some military and police, diamond dealers and other traders.

The forces that converged on Chiadzwa include, among others, private mining interests (specifically the ACR); illicit and artisanal diamond diggers (known colloquially as *magweja* [*gweja* sing.]); illicit diamond dealers (locally referred to as *mabuyer*); formal and informal traders of other goods and services; different arms of the state, which included statutory corporations such as the Minerals Marketing Corporation of Zimbabwe (MMCZ) and the Zimbabwe Mining Development Corporation (ZMDC); and the police and soldiers who, as

---

11  For more on this 'new community' and the creative new language forms it forged, see S. Nyota and F. Sibanda, 'Digging for Diamonds, Wielding New Words: A Linguistic Perspective on Zimbabwe's "Blood Diamonds"', *JSAS*, 38, 1 (January 2012, this issue).

12  R. Saunders, 'Genealogies of Power: Blood Diamonds, Security Politics and Zimbabwe's Troubled Transition', in M. Clarke and C. Bassett (eds), *Legacies of Liberation: Post-Colonial Struggles for a Democratic Southern Africa* (Cape Town, HSRC Press, 2011). We are grateful to the author for permission to view and use his very insightful work from which I benefited immensely. See also R. Saunders, 'Crisis, Capital, Compromise: Mining and Empowerment in Zimbabwe', *African Sociological Review*, 12, 1 (December 2008).

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

agents of the state, were brought in 'to put a stop to the illegal activities' and to 'protect' the area.[13]

The nature and operation of the state deserve particular scrutiny here. 'The state' proved to be multi-faceted and varied in its interests. Among others, state actors included the heads of the mining statutory corporations and such politicians as Christopher Mushowe. He sought to be elected as a member of parliament for Mutare West constituency in which Chiadzwa is a district. Mushowe enjoyed the support of the resident governor of Manicaland province. These state actors encouraged free mining for all inhabitants of Marange and surrounding areas in 2006. They espoused a discourse of indigenisation and black empowerment in search of votes, perhaps even going so far as to encourage the exploitation of cheap artisanal labour on the part of the ZMDC and the MMCZ. In that context, police presence was meant only to monitor – not halt – operations, although a few minor influx-control operations took place. On the other hand, other elements within the state argued that the diamonds were a national resource that should be exploited by formal mining operations, insisting that the 'free for all' claim was a cover for big politicians who sought to secretly exploit the diamonds by hiding behind artisanal activities while reaping huge benefits. This discourse was not as prominent in the earlier days, but it gained momentum towards 2008.

Chronologically, the attitude of the central state tended to shift. Whereas from around 2006 to around late 2007, artisanal activities were tolerated by the ZANU(PF) central state, this changed following the March 2008 elections, elections in which ZANU(PF) lost only to recover in the controversial runoff election held in June 2008 in which Mugabe was the only contestant. Following these developments, state actors increasingly declared informal activities to be illegal, and decisive operations to flush out informal operators were intensified. The reasons for the change of attitude range from claims that, after the initial election which Mugabe lost, the central state felt betrayed by the people they had accommodated in Chiadzwa, to claims that the state sought to derive maximum benefit from taxing the companies that would formally exploit diamonds. In any case, these developments depict the fragmentary nature of the state as represented by the different interests of statutory institutions. The dynamics that influenced developments in Chiadzwa shifted depending on which arm of the state was dominant at different points, as determined ultimately by the central state. Central state strategy shifted according to the evolution of its relationship with the informal operators in Chiadzwa and their perceived gains from the exploitation of diamonds, culminating in the displacement of the informal operators following the 2008 elections.

Another important dimension of the larger Marange story (of which Chiadzwa is a part) is the involvement of the Kimberley Process Certification Scheme (KPCS), a global governance system that is designed to help 'in combating the trade in conflict diamonds, also known as blood diamonds'.[14] All these different interests acted on, contested and negotiated the Marange landscape in different ways, authoring the dynamic situation that emerged from diamond activities in the area. It also shaped the approach of the central state towards the Chiadzwa issue. Following the expulsion of informal operators and the formation of the Government of National Unity (GNU) between ZANU(PF) and the Movement for Democratic Change (MDC) in 2009, the central state increasingly sought to represent the ideal conditions for diamond mining as formal and legitimate and therefore sought certification to ensure that Zimbabwe diamonds could be sold on the formal international market.

---

13 Quoted in 'Diamond Fields Sealed Off', *The Herald*, 9 March 2007.
14 'The Kimberley Process at Risk', http://www.kimberlyprocess.com:8080/site/?name=participants, retrieved February 2009.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

Although it is generally believed that diamonds were discovered in 2006, different accounts point to much earlier periods. Although De Beers had held a prospecting licence since 1994, it is difficult to tell whether the government was aware of the presence of the resource in the country prior to its 'discovery' in 2006. The confusion over this history relates, in part, to the way that the discovery of diamonds has often been narrated in term of miraculous, ancestral or divine intervention, and there are many conflicting versions of such stories. In one well known account, a certain Chiadzwa villager received a vision from his ancestors about 'the gift of the diamonds' that was to provide a reprieve for local inhabitants from the harsh economic challenges they endured because of the region's dry environment[15] and the dramatic decline of the economy in general. Such stories were encouraged rather than dismissed by state officials, politicians and the media. Similarly in November 2006, a media report noted how 'intervention by traditional leaders and a spirit medium … persuaded the government to suspend its plans to have the police and army cordon off the Marange diamond fields'.[16] According to the report, '[T]he drastic action was averted after traditional leaders, reportedly acting on the advice of a spirit medium or *svikiro*, pleaded for the action to be put on hold. They … convinced the authorities that the discovery of the industrial diamonds … was a "divine" reaction to the "traditional prayers" to relieve these drought stricken communities'.[17] Notwithstanding the famous and bizarre case of the 'diesel *n'anga*' who in 2007 allegedly duped government officials into believing she could procure diesel from rocks in Chinhoyi,[18] such stories are not uncommon in Zimbabwe and have a long history that relates to discourses and practices of environmental control, notions of belonging and rural structures of authority, in which national politicians and the state are often implicated in complex ways.[19]

Such accounts about the ancestral or divine origin of the diamonds did not only circulate in the national media, but were also a feature of the discourse among *magweja* in the diamond fields themselves. For example, it was widely maintained that the invasion of the fields by 'aliens' or 'strangers' from elsewhere invoked the anger of the ancestors, thus explaining the frequent accidental deaths in the tunnels dug by *magweja*, or from police violence and *magombiro* (gangs of armed robbers).[20] In fact, many *magweja* believed in and told tales of a large mystical snake which apparently emerged from the hills in the area as a manifestation of the anger of local ancestors.[21] Moreover, *magweja* who tell this story, often state that there were cultural codes and practices that successful diggers usually followed. Other visitors not conversant with such practices would thus find it difficult to cope with the demands of living and working in the fields and could run afoul of disgruntled spirits.

---

15  Interview with ACR officials.
16  'Diamonds from the Spirit', *The Manica Post*, 19 December 2006.
17  *Ibid.* Also noted from an interview with George (pseudonym) held at Chakohwa Shopping Centre, 23 December 2006.
18  The story of Rotina Mavhunga, the 'diesel n'anga' ended with her conviction and imprisonment for fraud. During the trial it merged that while she 'duped' some government ministers, she was also being closely assisted by other high-ranking officials, suggesting a sub-plot of internal ZANU(PF) factionalism lay behind this bizarre affair. See for example, 'Diesel N'anga: The True Story', *The Standard*, 2 October 2010; 'Mudede "Directly Linked" to Chinhoyi Diesel-from-Rock Rigging – Court', *Zimbabwe Mail*, 27 July 2009.
19  For example, see the extensive scholarly debates that have taken place about the role of ancestral cults, spirit mediums and the *Mwari* cult shrines of the Matopos in not only rain-making and environmental management, but also during the war of liberation, and afterwards. See, for example, T. Ranger *Voices from the Rocks* (Oxford, James Currey, 1999); D. Lan, *Guns and Rain* (Oxford, James Currey, 1985); M. Spierenburg, *Strangers, Spirits and Land Reforms* (Brill, 2004); J. Fontein, *The Silence of Great Zimbabwe* (London, UCL Press, 2006) and 'Graves, Ruins and Belonging: Towards an Anthropology of Proximity', *Journal of the Royal Anthropological Institute*, 17 (December 2011), pp. 706–27.
20  'Spirit Medium Stalls Plans to Seal off Diamond Fields', *The Standard*, 5 November 2006.
21  This was a common belief among many *magweja* that we interviewed, although none of them had actually witnessed it.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

Another common story refers to a farmer living in Chiadzwa who, upon being visited by a relative from South Africa, was told that some of the stones in his field strongly resembled diamonds. A sample the relative took back to South Africa confirmed his suspicions.[22] In an article entitled 'Diamond Rush', *The Manica Post* also carried such a story.[23] Many of our respondents have made reference to similar accounts.

The most credible account, however, came from an interview with 'Farai Dombo' (a pseudonym), of Zengeni village in Chief Chiadzwa's area.[24] He recalled how he and some colleagues worked for De Beers when it was prospecting in the area, collecting the precious stones. Upon the expiry of their prospecting licence, which was not renewed, their former bosses at De Beers told them that the stones they had routinely collected were actually diamonds. Dombo claims that they were asked to collect the stones and told they could make a lot of money from the mineral, which the respondent had hitherto been unaware of. It remains unclear why a big profit-driven organisation such as De Beers did not exploit these diamonds itself, or whether they secretly smuggled some of the stones to South Africa. Perhaps they were simply waiting for an opportune time to exploit the mineral intensively, especially given that they were in the area for twelve years.

## Expiry of the De Beers licence, the ACR Factor and the Rush into Chiadzwa, 2006–2007

This section focuses on the brief period of African Consolidated Resource's (ACR) operations in Chiadzwa and how it was quickly expelled from the area. The dynamics that are revealed here particularly show the changing nature of the state. This was manifested through, firstly, the granting of the prospecting licence to ACR. Secondly, the state quickly shifted its position within a few months and expelled that mining company in favour of exploitation of diamonds by the locals of Chiadzwa. The section also shows how different arms of the state sometimes display contesting interests. While the Minerals Markerting Corporation of Zimbabwe (MMCZ), as a statutory corporation had granted ACR a prospecting licence, Christopher Mushowe appealed to the indigenisation discourse and thus undermined ACR's operations. In the end, Mushowe's position reflected central state interests, which eventually carried the day.

The international conglomerate De Beers operated in the Chiadzwa area under three-year prospecting licences renewed four times between 1994 and 2006. What is especially interesting is how, given this background, De Beers never declared any diamond exports. One is left to speculate about the company's operations. In his work on the origins of the MMCZ and its impact on the mining sector, Kudakwashe Chitofiri explains how the state is always suspicious of mining concerns failing to, or under-declaring minerals they export out of the country.[25] Such fears justified the creation of the MMCZ in 1983, to market all minerals except gold, with a view to curbing or at least controlling such practices. Arguably, De Beers may have managed to secretly exploit the mineral and evade the MMCZ for twelve years until its expulsion in 2006. Nonetheless, despite this silence from De Beers, word of the

---

22  Interview with David (not his real name).
23  'Diamond Rush', *The Manica Post*, 6 October 2006.
24  Interview with Farai Dombo, 18 August 2009. I must thank a colleague and friend, Bernard Kusena, for directing me to this informant and for other insights into the area.
25  K. Chitofiri, 'The Mining Industry at the Crossroads, MMCZ and Marketing Policy in Zimbabwe' (BA Honors dissertation, University of Zimbabwe, 2003).

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

'discovery' of diamonds soon spread after its expulsion from Marange, eventually culminating in a rush on the diamondiferous area. Following the 'discovery' in May 2006, Dombo and other locals acted upon the information they received from De Beers' officials. Facing marketing challenges in the early days, and impatient with De Beers' slowness, they travelled 'as far as Harare to look for buyers'.[26] The local community soon joined in the extraction of the stones. The 'gospel' of *mangoda* (industrial diamonds) and *maclear* (commercial diamonds) spread to the neighbouring communities of Chakohwa, Chaseyama, Wengezi, Nyanyadzi, Maraire and Hot Springs, and soon Chiadzwa filled with diamond diggers, not just the largely apostolic Marange inhabitants, but also their fellow *VaBocha*. (While people in Marange and surrounding areas are known as the *VaBocha,* not all of them are from the Marange apostolic church. Thus most Marange people are distinguished generally by their religion).[27] In no time, migration to Chiadzwa became a national phenomenon.

According to one digger, Lucky Nyandoro, marketing the diamonds in early 2006 involved bartering small containers or 'plastics' of *mangoda* and *maclear* with local shop owners for household groceries, such as soap, bread and candles.[28] One business owner, Valentine Tekere, recalls refusing to accept 'those stones we all thought were worthless', insisting on cash payments.[29] Nyandoro, like many other *magweja*, would never have guessed that the unfolding dynamics would make it possible that one good find could spell a fortune for the lucky finder or bargaining buyer, and in the process would also eventually benefit Tekere's and other local businesses, from the increased demand for their products among the newly wealthy *magweja*.

The news of these finds also spread to other areas, such as Chimanimani where gold panning had been going on in places like Roy Bennett's former Outward Bound farm, extending as far as the dense forest on the border with Mozambique called *Kwamusanditevera* (meaning 'thicket', or literally, 'if you get lost you might not find your way back', suggesting the presence of spirits).[30] Police operations meant to flush out these panners drove more *magweja* to Marange.[31] With the entrance of the buyers, the place exploded into a hub of economic activity. Some foreign diamond buyers settled in nearby Mozambique to evade police, buying smuggled stones from middlemen. In his assessment of Chiadzwa smuggling networks and other informal activities in the country, Nedson Pophiwa notes that the term 'smuggling' (in this case, of diamonds to Mozambique) does not fully capture the activities of those involved, choosing to call it an 'underground economy', 'second economy' or 'informal economy'.[32]

Soon after the expulsion of De Beers in 2006, and just before the knowledge of the existence of diamonds had become widespread, ACR was awarded a prospecting licence. According to one of the company's officials, Pfungwa Jambga, the organisation, which was founded in 2004 and has twenty other mining interests in platinum, gold and other minerals around the country, 'is currently the largest mining capital in the country and it acquired the prospecting licence to Marange uncontested in March 2006. Though strategic and very

---

26  Interview with Dombo.
27  Interview with Lucky Nyandoro (a pseudonym), Chakohwa Shopping Centre, 23 December 2008.
28  *Ibid.*
29  Interview with Lucky Nyandoro, Chakohwa Shopping Centre, 24 December 2008.
30  Interview with a group of *magweja* who did not provide their names, at the shops at Outward Bound Farm in Chimanimani, 8 January 2009. They were suspicious and initially completely refused to talk to me as they were coming from the *kumunda* (field) where they pan for gold.
31  *Ibid.*
32  N. Pophiwa, 'Smuggling on the Zimbabwe–Mozambique Border', in Crush and Tevera, *Zimbabwe's Exodus Crisis*, p. 291.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

important, Marange possibly comprises only a twentieth of ACR projects'.[33] Although
Jambga played down the importance of Chiadzwa in the interview, ACR clearly recognised
its financial potential and acted quickly when it learned of the existence of the mineral at
Chiadzwa. As soon as they acquired their prospecting licence in March 2006, ACR began
investigating the claims. The Chief Security Officer of ACR, Rtd Lt-Col. Misheck
Mutsatswa, recalls how they started pegging claims between April and June 2006.[34] These
operations started from the day of the cessation of De Beers' Exclusive Prospecting Order
(EPO). At this point, the state and its security apparatus were not involved, nor were they
particularly concerned about the activities of ACR. Their confidence in the entity was
reflected in the speed with which the ACR was issued with their new prospecting licence
following the withdrawal of De Beers. ACR then tried to fully secure their diamond claims
through fencing their claimed sites, a measure commonly taken by other diamond companies,
such as at Murowa mines in Zvishavane or River Ranch Private Limited.[35] Possibly at this
early point the securing of ACR claims first became a site of struggle between the company
and the increasing numbers of *magweja* collecting in the area, particularly those from
local communities who often viewed these finds, as 'culturally' and 'spiritually' theirs – their
'divine gift' so to speak.

Thus the orthodox property rights that legitimised the ACR's claim to Chiadzwa's
diamonds were challenged by the 'traditional' claims to the landscape made by Marange
people. In some cases, *magweja* from other areas as far as Buhera, Chivhu, Harare and other
places outside the '*Bocha*' area, also competed for a stake on the basis that the mineral should
benefit the entire nation, defying both the ACR's 'legal' claims, and the claims of local
groups who appealed to 'cultural property rights'. This third group's feelings may be captured
by Ukpolo's contention that, 'the environment is a common property of mankind. It provides
the public with the natural elements needed for survival (including precious minerals)'.[36]
The situation at Chiadzwa, however, provoked violent contestations over rights to diamonds,
with each group seeking to gain control of operations during the period from 2006 to 2009.
Ultimately in 2009, the central state seized control on the behalf of their preferred Chinese
and other capital interests that were aligned to state interests. Instead of this 'common
property being a blessing to the Zimbabwean public', it became, as Paul Collier has noted,
something of a curse.[37]

Prior to 2009, however, ACR had made inroads in developing claims in the diamond
fields, fencing off a portion in August 2006. The company also managed to clear a strip of 25
to 30 metres, using 6 bulldozers, along its (estimated) 15 km perimeter. They also bought
mobile processing plants at the cost of US$3 million dollars each, which were still across the
Zimbabwe–South Africa border at Beitbridge in 2011 when this article was written. The
delay was caused mainly when the ACR's diamond claims were later opened to Marange
people by some state officials, such as, for example, Christopher Mushowe, who made
promises at his campaign rally in Chiadzwa in 2006. Before their licence was withdrawn,
however, the ACR's Chiadzwa project employed over 200 inhabitants of Marange, as well as
other skilled labour such as accountants, managers and geologists.[38] These efforts could not,

33  Interview with ACR officials, 28 February 2009. Revealingly, the ACR story is either misrepresented or not told
    in most newspapers in Zimbabwe.
34  Interview with ACR officials, 28 February 2009.
35  *Ibid.*
36  V. Ukpolo, 'The Link Between Poverty and Environmental Degradation in Sub-Saharan Africa', in V.U. James
    (ed.), *Environmental and Economic Dilemmas of Developing Countries in Africa in the 21st Century* (Praeger
    Publishers, Britain, 1994), p. 71.
37  P. Collier and A. Hoeffler, 'Greed and Grievance in Civil War', *Research Working Paper No. 2355* (World
    Bank, Washington DC, 2001), p. 23.
38  Collier and A. Hoeffler, 'Greed and Grievance in Civil War'.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

however, withstand the dynamics that evolved following the central state's increased interest in the diamonds, as well as the interest of other influential actors from private capital, as well as the artisanal miners and dealers who swarmed into the area. By mid-2007, this combination of forces had managed to dislodge ACR from Chiadzwa.

The central state's interest in Chiadzwa and desire to extend its control intensified when they realised the financial potential of Chiadzwa. This can be illustrated by the comments made in a Zimbabwe Broadcasting Corporation (ZBC) television interview of President Mugabe on 22 February 2007, to commemorate his birthday. He noted that,

> *Kuma*diamonds, the discovery of diamonds by us is more recent, when we discovered that De Beers had been playing tricks *kwa*Marange *uko*, saying it was prospecting, it was still doing tests, when in fact it was digging diamonds and selling them to South Africa and elsewhere. We then decided to take over and this was after we had seen a rush onto that area *yekwa*Marange and we have taken that over. Yes we discovered that there was a company called ACR, whatever those initials stand for and that some big names, yes, names of some of our members of the politburo, one or two ministers, they had joined that company.[39]

This interview reveals a number of very important points, not only about the secretive origins of extraction and trade, but also about the contestation to which it led and the range of forces that converged on Chiadzwa. These included the buyers, diggers, other traders and the ACR, (which was being accused of involving 'members of the politburo, [and] one or two ministers'),[40] and of course including the state corporations, the MMCZ and eventually the Zimbabwe Mining Development Commission (ZMDC) which 'then decided to take over'[41] on behalf of the state.

In their article on the criminalisation of the state, Vigneswaran Araia, Hoag and Tshabalala quote Charles Tilly's analogy between 'state behaviour and organised crime'.[42] Commenting on the literature on informal economies, Tilly suggests that accepted distinctions between legitimate and illegitimate forms of political behaviour are historically produced through struggles to define what sort of actors may be counted as members of the dominant cartel. The case of Chiadzwa reflects moments of accommodation and expulsion, of allowing and then denying certain interests access to Chiadzwa. A statutory corporation, ACR, whose shareholders included powerful ZANU(PF) figures such as the late Solomon Mujuru, was initially granted a prospecting licence by the MMCZ, but eventually found itself out of favour and excluded by the central state. This could be explained through the internal succession struggles within ZANU(PF) or simply as a contest for control between powerful state actors.

As illustrated in Janice Thompson's work on the decline of pirates, mercenaries and trading companies, 'while the law is not wholly arbitrary, states have reshaped and directly flouted laws, moral codes, and ideals in order to preserve the benefits of their cartels and to eliminate competitors'.[43] In Chiadzwa, there existed, at different points, both a confluence and a divergence of interests. At one point the central state tolerated *magweja*, allowing them for some time to become the most dominant group or 'cartel', while ACR capital was expelled. Changing dynamics determined the state's shifting position. While the legal battle between ACR and the central state over Chiadzwa continued, *magweja* flourished and multiplied in Chiadzwa. The activities continued to expand, and a new artisanal mining

---

39  Quoted in 'Senior Government Officials', 23 February 2007.
40  *Ibid.*
41  *Ibid.*
42  D. Vigneswaren, T. Araia, C. Hoag and X. Tshabalala, 'Criminality or Monopoly? Informal Immigration Enforcement in South Africa', *JSAS*, 36, 2 (2010), p. 471.
43  J.E. Thompson, *Mercenaries, Pirates and Sovereigns: State-building and Extra-territorial Violence in Early Modern Europe* (Princeton, Princeton University Press, 1994), as cited in Vigneswaren, Araia, Hoag and Tshabalala, 'Criminality or Monopoly?', p. 468.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

community that also included *mabuyer*, other informal traders and state security forces that monitored development in Chiadzwa became more consolidated and rooted. This period defined what this article and the emerging discourse around Chiadzwa has called the 'free for all' period.

In this period, the police and, at times, the MMCZ and the ZMDC tended to be the central actors in Chiadzwa. The security forces monitored the developments in the area while implementing influx control operations intermittently. The MMCZ sought to compete with informal buyers in the marketing of diamonds. Meanwhile, the mining statutory corporations were failing to compete with private buyers and were eventually sidelined when informal miners sought buyers. Having initially appealed to the discourse of indigenisation, it was difficult for the central state to simply flush out *magweja*. Moreover, some powerful politicians and business people took advantage of the apparently anarchic situation to enrich themselves. What emerged was thus a potent economy based on illicit networks of informal miners and traders that were accommodated by the political situation, as well as some corrupt politicians who benefited from these developments.

## The Chabal and Daloz State: Informalisation and the 'Free for All' Phase in Chiadzwa's Diamond History

In this section we consider the insights into Chiadzwa's situation that can be gained using ideas of state power, fragmentation, disorder and informalisation that have been applied to other situations in Africa, as in the work of Chabal and Daloz and others. The contestations that led to the dislodging of the African Consolidated Resources (ACR) from Chiadzwa included a partisan politics which allowed the competing interests within the fragmented ZANU(PF) state to thrive. This fragmentation was enhanced by the self interest of influential business people and key political figures at the local level. In the end, what emerged was a loosely regulated system in which different elements within the state exploited the presence of *magweja* who became the face of the Chiadzwa landscape. As the word spread of the discovery of the precious gem, many converged on Chiadzwa from all over Zimbabwe. There was, in a sense, an 'instrumentalisation' of the situation for political ends by certain state actors, such as Mushowe who supported the informal activities.

The concept of the instrumentalisation of disorder propounded by Chabal and Daloz,[44] although problematic in some respects because of its pessimistic and generalising view of Africa, can nevertheless be usefully applied to the Chiadzwa case. They argue that 'the social and political processes witnessed across Sub-Saharan Africa represent an instrumentalisation of disorder. Since Africa defies the notion of order, apparent disorder can have its own logic and such political (and indeed economic) formations only appear as disorder when viewed through an externally constructed lens'.[45] With the arrival of informal players, such as buyers, artisanal miners, traders and others, it appeared that the state was losing control and developments in Chiadzwa had descended into disorder, yet in many ways this comprised a carefully orchestrated strategy, especially by particular, regional ZANU(PF) government officials in the early period around 2006, a situation which was over the longer term continued through the machinations of key state individuals. Eventually, the central state played the pivotal role in determining the pace of developments, culminating in the expulsion of informal interests in 2009.

---

44  P. Chabal and J.P. Daloz, *Africa Works: Disorder as a Political Instrument* (Oxford, James Currey, 1999), p. 19.
45  Chabal and Daloz, *Africa Works*, p. 23.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

The Chabal and Daloz framework should not be overemphasised, however, because the 2009 outcome was also influenced by other factors, beyond the carefully-projected strategy by some of the state's key actors. *Magweja* and *mabuyer* had their own agency, as they used various measures to compete with and negotiate space with the state. After all, they sustained their activities for a good three years in the face of an increasingly brutal state security machinery. Nonetheless, those who most benefited from it took advantage of the situation to manipulate events, especially at state level.

Zawe illustrates how 'policies are often no more than *ad hoc* utterances of politicians and government officials'.[46] Matondi goes further in labelling them "walking policies", that is, the populist rhetoric of politicians touring their constituencies'.[47] The moment when capital, represented in the form of ACR, was dislodged and replaced by *magweja* can be traced back to a political rally held in Marange in 2007. This political rally was held for Christopher Mushowe's parliamentary election campaign and was also attended by the Governor of Manicaland, Tinaye Chigudu; the Minister of Mines, Amos Midzi; and the MMCZ boss, Onesimo Moyo. At the rally, villagers were encouraged to mine in the diamond fields, as long as it benefited the local inhabitants' families.[48] This discourse of land resettlement and 'indigenisation' resonated with the strategy the ZANU(PF) government had utilised since the late 1990s, to manipulate the rural electorate to gain its support. Indigenisation had become even more prominent following the land resettlement programme and was now expanding into industry and commerce.

By subverting the formal process of exploiting diamonds through refusing to recognise the licence they had given to ACR, these elements of the central state achieved several outcomes. First, land patronage networks were reorganised: Where the original inhabitants claimed traditional tenure to the area, their authority had been subverted by the arrival onto the Chiadzwa landscape of the ACR. After the mentioned political rally, this authority was again transferred, not back to the people of Chiadzwa only, but also to the *magweja* who had descended on the mining fields. In fact, because of the state's 'benevolence', the media reported that the police were engaged to 'persuade' people to suspend panning activities to vote in the 2008 harmonised parliamentary and presidential elections. It was reported that, 'miners could resume work tomorrow'[49] after the elections were over. Onesimo Moyo (MMCZ CEO) had also promised that the MMCZ would come to Chiadzwa to buy the diamonds from the people. Thus, in search of votes, ZANU(PF) officials had created a patronage system that would reward the informal miners if they supported the party. Rather than disorder and informality, this was a rational strategy meant to win votes. Nonetheless, ZANU(PF) did not do well in the 2008 elections.

Despite the progress ACR had made in Chiadzwa, when the election was imminent their efforts were in one stroke subverted because the company had no obvious capacity to win the elections for the ZANU(PF) candidates. Thus, the company was accused of not being indigenous because it was 'a British firm'. Jambga, a company official, denied this 'Britishness' by posing the question, '[I]f being listed on the London Stock Exchange makes you British, then does it mean that Zimplats are British?'.[50] Ironically, Zimbabwe Platinum is a mining consortium, a subsidiary of Impala Platinum (Implats) from South Africa involved

---

46  C. Zawe, 'Reforms in Turbulent Times. A Study in the Theory and Practice of Three Irrigation Management Policy Reform Models in Mashonaland, Zimbabwe' (PhD thesis, Wageningen University, 2006), p. 290.
47  P. Matondi, 'Evolving Land Rights and the "Futures" of New Farmers in Mazowe and Mangwe Districts in Zimbabwe' (unpublished paper presented at the conference on 'Political Economies of Displacement in Post-2000 Zimbabwe', Johannesburg, 9–11 June 2008).
48  'Diamond Rush', *The Post*, 6 October 2006.
49  'Army to Seal off Diamond Field', *Sunday Mail*, 29 October 2006.
50  Interview with ACR officials, Jambga, 28 February 2009.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

in platinum mining in Chegutu. It took over from Broken Hill Proprietary (BHP mineral) from Australia in the late 1990s. Although he lost the election, Mushowe had attempted to selectively use the discourse of indigenisation as a campaign strategy, to manipulate contesting interests in Chiadzwa, to suit his political agenda.

Many of the respondents to our interviews remembered the hope that Chiadzwa had brought to them, especially its potential to give the economy a 'shot in the arm'. One interviewee, David, commented that,

> Diamond digging is not easy, that is why when we get money we spend it like there is no tomorrow. If only those in charge created formal employment and offered us jobs paying enough to sustain our families and not just to buy cars, many would stop artisanal mining, instead they steal and want to enjoy the money on their own. The way things stand, a person is prepared to die, get bitten by dogs like Bruno, be shot by mossback or guns or even having the tunnels collapsing on him. It is not easy, if you live comfortably you will not come here unless you are a buyer.[51]

Similarly, another interviewee, Mr Mkhosi, commented on the first report of the joint committee on lands, land reform and the plight of farm workers. He said of those alien workers chased away from resettled farms, 'The next thing was that they were told to go back to their communal areas, as they were aliens and foreigners. They had nowhere to go so they decided to go out and start gold panning activities. Whilst they were panning for gold and other minerals a law was passed to arrest those illegally panning. Suddenly they were arrested for a crime of wanting to earn a living'.[52] This is remarkably similar to the argument that Hammar, McGregor and Landau make about displacement,[53] and his comment also captures the plight of those nationals who found themselves in challenging economic circumstances when unemployment had reached nearly 90 per cent. These vulnerable people would become part of an illicit network, acting like a catalyst to energise a system manipulated by certain politicians and influential 'strong men' who sought personal aggrandisement. According to Bayart, such attributes reflect the characteristics of a failing state whose 'shadow' and illicit networks set the pace in the economic terrain, though they be can be reversed if the authorities are honestly committed to the development process.

Although it sometimes appeared as if the central state wanted to remove *magweja* in early 2007, as manifested in anti-panner operations such as *Chikorokoza Chapera*[54] carried out by the police and army forces, some officials welcomed their continued stay because they could exploit the situation. This illustrates the struggle between different state interests. As Maconachie observes, in many situations of mineral-induced conflict, it is artisanal miners (whether 'state' sanctioned or not) who are especially vulnerable and bear the brunt of such conflicts, often working 'at the bottom of the supply chain (and) . . . endur[ing] dangerous conditions, . . . liv[ing] on less than a dollar a day'.[55] The politically influential can often utilise their representatives to trade with the artisanal miners to their advantage, while because of their vulnerable position, artisanal miners can be easily exploited. However, despite the wretched and dangerous working conditions, *magweja* could and sometimes did suddenly strike it rich, when they found good stones and 'fair' buyers.

There were even gendered appeals for female *magwejelina*, for example by the Deputy Minister of Women Affairs, Gender and Community Development, Abigal Damasane,

---

51  Interview with David.
52  Quoted in *Zimbabwe Parliamentary Debates: The Senate*, 27 March 2007.
53  See Hammar, McGregor and Landau (eds), 'Introduction: Displacing Zimbabwe', *JSAS*, 36, 2 (2010), p. 265.
54  'Chaos at Diamond Fields', *Sunday Mail*, 11 March 2007. In late 2008 another more effective and much more violent operation was launched called 'Operation Hakudzokwi' (You Will Not Return) which led to many miners and traders being removed.
55  R. Maconachie, 'Diamond Mining, Governance Initiatives and Post Conflict Developments in Sierra Leone' (unpublished working paper, University of Manchester).

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

who was quoted as saying that her ministry was reorganising women panners so they could also benefit from the diamonds. She made this appeal in 2006 despite the fact that a number of operations had already attempted, apparently, to remove the '*gweja*' element. She added '[W]e are trying to make it more organized, women have been marginalized for a long time but through this programme we want to ensure that they benefit'.[56] In fact, the Reserve Bank was to provide a $16-million dollar facility to the ministry, to help women venturing into mining. Even in the senate, there was a casual approach to the issue of panners, not yet criminalised in early 2007. A comment by Senator Vivian Mwashita Muchicho (Harare–Mbare–Hatfield constituency) is revealing:

> Zimbabweans, we are in problems because diamonds are found everywhere. Even grandmothers working in the fields are digging diamonds. When we have diamonds, we need to know where we can take these diamonds to. Let us educate these folks at home so that they are aware of what to do when they get this diamond and gold. They need to know that it is a diamond and it can help us live well. As leaders where are we missing this? Where does manna come from and where do we get this manna? As Zimbabweans we are not suppose to be living in poverty because God loves Zimbabwe.[57]

Remembered by many respondents as the 'free for all' period, the time before 2008 was also a period of unconstrained and largely unregulated finance revolving around artisanal mining, not just for diamond buying but also for other kinds of related commerce. Even such large entities such as Dairiboard and Arda were reported in early 2006 to be trading with the *magweja*, who became a captive market for often ridiculously overpriced goods.[58]

Gradually the central state began shifting the goal posts around mid-2007 and began describing activities in Chiadzwa in more negative terms. Over time, the discourse of indigenisation and empowerment conveniently faded. Although at different points even as early as 2006, these informal operations had sometimes been denounced as illegal, the intensity of these denunciations was mild compared to the period around 2008, especially following the harmonised elections. Central state response became increasingly violent towards these increasingly 'criminalised' elements. The move towards the formalisation of mining activities in Marange and the criminalising of the once-tolerated artisanal mining activities illustrates the state's shifting position.[59] Duffy examines a similar situation surrounding the illicit economy in Madagascar, stressing 'the complex links between the formal and informal economies, criminalized networks . . . in Sub-Saharan Africa'.[60] She uses this conceptual framework to study illicit sapphire mining in Illakaka and the related development of a 'shadow state'. In Zimbabwe, formalisation could simply have been facilitated by allowing a private company, in partnership with a state institution such as the ZMDC and the MMCZ itself, to operate with well-funded security measures in place. Alternatively, the largely disparate groups of artisanal miners could have been organised into a manageable co-operative entity.

The Marange situation illustrates not only the ambiguities that can exist between formal and informal economies, and between imperatives towards order and disorder in post-colonial

---

56 'Diamonds in the Seams of her Dress', *Daily Mirror*, 23 November 2006.
57 Quoted in *Zimbabwe Parliamentary Debates: The Senate*, Volume 16, No. 29, 6 May 2007.
58 'Business Boom at Chiadzwa', *The Manica Post*, 10 November 2006.
59 The 'shadow state' concept was introduced by William Reno. Although it is a relevant analytical tool in some cases, its pitfalls are that it tends to generalise the African situation. It also wrongly implies that African nations, by their very nature, are not capable of governing themselves. See W. Reno, *Corruption and State Politics in Sierra Leone* (Cambridge, Cambridge University Press, 1995).
60 R. Duffy, 'Global Environmental Governance and the Challenge of Shadow States: The Impact of Illicit Sapphire Mining in Madagascar', *Development and Change*, 36, 5 (September 2005), pp. 829.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

African states, but also how these strategies and imperatives can shift through time. This is illustrated by Chabal and Daloz's concept of disorder as a political instrument. For Duffy,

> [t]his alternative way of viewing areas that are beyond official control is particularly useful for understanding the importance of illegal gem mining and trafficking. Although it might look anarchic and chaotic from one perspective, it clearly has logic and organizational form of its own that roams outside the formal structures of governance through the networks of states, international NGOs and donors.[61]

Chabal and Daloz are too dismissive in their suggestion that African states defy 'the notion of order'. Chiadzwa was never really beyond official control but was always under the watchful surveillance of the state and within some measure of its control. In fact, there was an order imposed by the state, in the specific context of Chiadzwa, which was meant to determine who could act upon the Chiadzwa landscape, as well as largely define the parameters of their operations. The strategy of Mushowe's political campaign, to allow *magweja* or illicit miners to operate, was quite in order until the priorities changed for the same state that he represented. The language changed from one that tolerated local exploitation of the resource to support families, so that 'even grandmothers working in the fields (were) picking', to a language that criminalised these activities. The shifting nature of the central state can also be seen in the Precious Stones Amendment Bill which was passed in September 2007. This bill criminalised illicit diamond-mining, and artisanal mining became illegal. Although illicit mining had been denounced occasionally prior to September 2007, the bill marked a hardening view of artisanal activities in Chiadzwa. Nevertheless, a large measure of tolerance continued towards *magweja* following the Precious Stones Amendment Act of 2007, perhaps because a sudden expulsion of the informal actors would not have been politically expedient in the run-up to the harmonised elections. It was thus only in the aftermath of the 2008 elections that the Act was finally, violently, enforced.

A series of increasingly brutal operations led up to Operation *Dzokera Kumusha*, in January 2009, which decisively expelled informal miners and traders. This pleased those powerful state actors who had wanted to utilise the formal route from the very early days in 2006. Some officials, according to reports, 'wanted villagers off the sites so that selected indigenous companies could be awarded contracts to mine the diamond'.[62] (This had occurred in spite of the contract that had been awarded to ACR in March 2006 but their efforts had largely been fruitless with informal element having flourished until the post September 2007 period.) Given this debacle, it remains unclear what criteria were used to select such 'indigenous' companies that attempted to operate in 2006. Nonetheless, these indigenous mining companies – the majority of which were seriously undercapitalised and inexperienced in the mining of diamonds – would also suffer the same fate as ACR by December 2006 when the issuing of mining licences was suspended and eventually revoked. The companies operated no differently from artisanal miners, using rudimentary tools and panning methods to extract the mineral. In the end, they were no different from the panners because, 'some businesspeople who were issued with licences were abusing the privilege by engaging in clandestine diamond extraction...'.[63] This evaluation would thus become stronger as the indigenisation discourse lost strength and formalisation gradually replaced it as the more popular watchword promoting the passing of the 2007 Precious Stones Amendment Act. Indeed, in the post-2009 period, other companies would be depicted as indigenous, for example, Mbada Holdings (although it would eventually emerge that this entity contained a strong Chinese element).

61  *Ibid.*
62  'Army to Seal off Diamond Fields', *Sunday Mail*, 29 October 2006.
63  'Issuing of Mining Licences Suspended', *Manica Post*, 8 December 2006.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

Another reason used to justify the September 2007 Precious Stones Act was the negative impact of informal activities on the environment. The informal economy may have benefited some of the actors in the short term but it has long-term repercussions. V.U. James captures this point:

> The consequence of unplanned development is severe environmental degradation. It is difficult to tackle environmental problems in Africa because they occur from a synergism of problems including population explosion; adoption of inappropriate technologies; retaining old, traditional methods no longer effective in tilling the land or harnessing natural resources; lack of laws and regulations to control the rate of environmental degradation; indiscriminate exploitation by multinationals, the debt burden; and corruption.[64]

This encapsulates many of the problems that now bedevil Chiadzwa's environment, problems which could have been avoided. James's comment has a neo-Malthusian character if generally applied, but it aptly describes the outcome of the dynamics in the Marange diamond field.

Eventually the state decided that Chiadzwa required protection as 'a no-go area':[65] 'All people intending to visit the diamonds fields in Marange should have a police clearance…'.[66] Moreover, Obert Benge, a police assistant commissioner, was quoted as saying, '…people who intend visiting their relatives who reside next to the fields will have to prove to the officers manning the roadblocks that they are, indeed, genuine kinsmen, otherwise any suspicious individual will not be allowed passage'.[67] This included even state officials, described as '…senior officials (who) were abusing their offices to bulldoze their way to Chiadzwa, where they loot the precious mineral'.[68] Thus, the initial order in the 'disorder' of Chiadzwa shifted toward a new *exclusionary* form of order.

## Mass Eviction of *Magweja*: The State, the Kimberley Process and the Militarisation of Chiadzwa, 2007–2009

By 2009, the discourse about Chiadzwa had shifted significantly, as had the power and interests of different elements of the state involved in its diamond economy. Conditions during the 'free-for-all' period that had been seen as acceptable now were described as disorderly and anarchic. The meaning of 'indigenisation' itself had shifted to favour order and formal enterprise in mineral exploitation. To enforce this new idea of order, violence was seen as necessary to expel the 'illegal' elements that had rooted themselves in Chiadzwa. Commenting on the Suppression of Foreign and International Terrorism Bill in June 2007, the Minister of Justice, Legal and Parliamentary Affairs Patrick Chinamasa said, 'Diamonds are not found in many countries in Europe save for Russia, the rest do not have diamonds but the Kimberley process committee is based somewhere in Europe so we are forced to comply with their regulations. For us to sell our diamonds if we have to comply with set procedures, we run the risk of being stuck out'.[69] His words illustrated the central state's initial resentment that diamond mining in Zimbabwe had to comply with the global Kimberley Process Certification Scheme (KPCS) and its governance regulations. However, this position shifted as the central state moved towards certification to legitimise formal attempts at mining in

---

64  V.U. James, 'Introduction: The Significance of Economic and Environmental Impact Studies in Africa's Development', in James (ed.), *Environmental and Economic Dilemmas of Developing Countries*, p. 69.
65  'Chiadzwa: A No Go Area', *Manica Post*, 9 February 2007.
66  *Ibid.*
67  *Ibid.*
68  *Ibid.*
69  Quoted in *Parliamentary Debates: The Senate*, Vol. 16, No. 44, 13 June 2007.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

Chiadzwa. It is still unclear to what extent the formalisation process has benefited the local populace as the accounting framework of the proceeds of the diamonds exploitation and their contribution into the fiscus is not public knowledge.

The fact that the *magweja* situation in Chiadzwa was in part the creation of the state no longer mattered. Those who would benefit within the central state conveniently altered its position to accommodate a change in global regulations from which they could now profit. Saunders aptly terms this complex situation 'the geologies of power', to capture a sense of the deep layers of competing motivation and interests within the state. As a result of this shift of state interests from within, Chiadzwa had to be effectively controlled and thus heavily militarised. Ironically, considering its earlier toleration of informality, the central state then sought KPCS legitimacy after it expelled the *magweja* after 2009.

During the 'free-for-all' period, the state had gone some way towards empowering the artisanal miners by using the parastatal company MMCZ to buy their diamonds, but the parastatal company had failed to compete in price with private buyers; thus from the perspective of the *magweja*, selling to MMCZ was far from satisfying.[70] MMCZ would not only underpay or take several days before payment, but in many instances actually failed to pay altogether. This was in stark contrast with the unlicensed buyers, who were prompt in their dealings. This explains why the central state had to enforce the rule that all other buyers were acting contrary to the MMCZ Act, an act that recognised the parastatal company as the sole marketing entity in the country for all minerals except gold.[71]

This illustrates the constantly shifting position of a central state. The MMCZ Act was conveniently applied only after the presence of artisanal miners and informal buyers no longer suited the aspirations of the state, in conjunction with 2007 Precious Stones Amendment Act. Moreover, one of the reasons they had been tolerated, had been because some of them were proxies of powerful people within the state. This led to a blurring of the boundary between legal and illegal activities and its frequent renegotiation, making the most important influence determining the boundary the sustenance of patronage networks that followed political party lines. The later period, when the army was brought in, thus represents the imposition of new forms of power and illegality. This sudden imposition of enforcement exposed the workings of the 'geologies of power' within the state.[72]

To understand how the geologies of power within the state changed to bring about this shift, it is important to show the details of the transition that led to enforcement of regulations and the criminalising of informal activities. To ensure state monopoly, initially all artisanal miners were required to sell their stones only to the MMCZ, a requirement they often resisted. The MMCZ, thus, called for the removal of those who resisted. In early 2007 Rusere stated unequivocally, 'All diamonds have to be sold and exported through MMCZ. We will prosecute those who violate these guidelines. We have to abandon this chaotic manner of exploring the minerals in favour of proper mining that does not flout KPCS guidelines, as doing so will put the country at the risk of being banned from trading on the international market'.[73] Onesimo Moyo, Cheif Executive Officer at MMCZ, added that '...we are currently improving our mineral marketing intelligence to catch those behind these illegal activities. The commodity starts and ends with the wrong hands, creating an illicit cycle that has to be stopped because it starves the nation of foreign currency'.[74] Suddenly, previously accepted mining activities had become illegal and chaotic, in a visible shift of the state's

---

70  Interview with Dombo and Kusena, and 'Army to Seal Off Diamond Fields'.
71  K. Chitofiri, 'Minerals Marketing at the Crossroads', p. 7.
72  Saunders, 'Geologies of Power'.
73  Quoted in 'Senior Government Officials', 23 February 2007.
74  *Ibid.*

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

position, despite the lack of uniformity in the views of other state officials towards the Marange diamond field.

Pre-occupation with the harmonised elections of 2008, however, delayed the 'full sweep of the law' in Chiadzwa. Instead, less brutal but increasingly violent operations were conducted, allowing artisanal mining to survive until December 2008. Perhaps the commitment of the 'state', as a supposedly single entity, to the extraction of diamonds prior to December should also be questioned; elements within the state may have been profiting in ways that others in the central state authority came to fear for economic or political reasons. As Saunders has noted, 'Unlike other infamous cases of "blood diamonds" such as Sierra Leone and Angola, where mineral proceeds fuelled armed rebellion from outside the state, Zimbabwe's conflict diamonds posed a threat to legitimate government from within'.[75] Often senior government officials were implicated in illegal diamond dealings. In fact, 'the officials were reported to be using their political muscle to continue looting the precious gems, rendering policing ineffective . . . the officials' teams were using tricks to ferry the trucks from Chiadzwa to an unknown destination for processing'.[76]

President Robert Mugabe also expressed 'concern':

> MaDealer! *Ndizvo zvinoitwa mamwe maministers, nhingi nanhingi madealer, kuMash Central ndinotoudzwa ngana Nangana madealer, vanopota vachichera, vano ah, vanotova nevanhu vavo vanotovakorokozera, chimbovatarisai svondo nesvondo vanenge vachienda ku*South Africa, *Mwedzi nemwedzi vanenge vachienda ku*South Africa. One doesn't know whether one goes to South Africa because one is a dealer, or *arikuenda kuSouth Africa* for medical treatment, or just because you want to visit. So, yes, there is that concern on my part and it's a terrible situation, there are very few honest people.[77]

In most cases, the suspected ministers were not named.

Mugabe's position also reflected the changing position of the state. Although he took no retributive measures towards the so-called corrupt ministers, his statement was a clear warning that the state was reclaiming Chiadzwa. Until this point, 'Zimbabwe's state security forces secretly managed the extraction and criminal smuggling of stones, while violently and irregularly displacing local communities, legal title holders, and informal miners'.[78] It was this very irregularity that had characterised the systematic accommodation that had been manipulated to sustain informal activities, but the time had now come to permanently displace these other actors within the state for the benefit of the state and its chosen mining company.

This displacement of informal activities happened at a time of worsening economic conditions nationwide. Turton has observed, 'Like other forms of displacement, clean-up projects are inevitably sites of tension. In most cases where such programmes have occurred, the state comes out as "the problem and the solution, the key player as well as the referee, [while the victim is] an insider who is also an outsider"'.[79] As Roberta Cohen and Francis Deng argue, '[T]he state perceives the targeted persons as its enemies on various grounds. Not surprisingly, the victims of displacements often respond in ways that depict a deep understanding of their complex relations to the state, as well as their determination to undermine the legitimacy of the state's authority'.[80]

75  Saunders, 'Geologies of Power'.
76  *Ibid.*
77  *Ibid.*
78  *Ibid.*
79  D. Turton, 'Forced Displacement and the Nation State', in J. Robinson, (ed.), *Development and Displacement* (Oxford, The Open University Press, 2002), p. 56; quoted in Musoni, 'Operation Murambatsvina'.
80  R. Cohen, and F.M. Deng, *Masses in Flight: The Global Crisis of Internal Displacement* (Washington DC, Brookings Institution Press, 1998); quoted in iMusoni, 'Operation Murambatsvina'.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

In contrast to Musoni's depiction of the informal traders' reaction to 'Operation Murambatsvina',[81] most *gwejas* in Chiadzwa fought back. The situation increasingly became brutal, prompting such lobbying groups as Human Rights Watch to characterise the state's actions as rife with human rights violations, especially as artisanal miners were, more often than security forces, the victims of vicious attacks.[82] What the state was creating, Misheck Matsatswa (Chief Security Officer of ACR) proposed, was a situation in which '…people are being cultured into resisting police and the government on whose behalf the law enforcement agents are working…'.[83] His views were confirmed by the numerous running battles the law enforcement agents continued to have even with the artisanal miners. In some cases, although the panners were more vulnerable and would eventually be subdued, there were reports of 'panners at war with cops',[84] resulting in casualties on both sides.

People implicated in the activities in Chiadzwa, including senior government officials and other influential figures, constituted an important covert force. According to Dietrich's study of power struggles in the diamond fields of Angola, different officials use different strategies to impose their influence and benefit from the dynamics of the activities.[85] In his view, in a situation of free competition, some may benefit either by competing or by operating in alliance, even using private buyers to deal in the stones. He noted,

> …the expulsion of diggers from the Lundas [region] created a system of flux and altering allegiances. While many garimpeiros remain peripheral to power sources, clean up operations often forced the illegal labourers to seek protection from those groups threatening the highest degree of violence. The opaque and lucrative source of unconstrained finance revolving around diamond mining has actually become a strategic objective in itself, with the FAA manipulating violent behavior to dominate commerce.[86]

Parallels can be drawn with the situation in the Marange fields. According to one police officer, 'Policemen fight to go on duty at Chiadzwa because there is money to be made there. Our pay is in Zimbabwe dollars and quite useless because if you "burn" it, you realize less than $US5 from it. In Chiadzwa on the other hand, you extort up to R100 for every syndicate you catch or R20 for those individuals that seek permission to enter'.[87]

A *gweja* said,

> Even the military is forming syndicates with diggers because they have realized that they benefit nothing from shooting them. You just have to be alert because they can cheat you but some split the findings in half because they cannot get into the mining area to dig for themselves. If there is an imminent operation they warn you in advance to vacate the area but if you disregard the warning and they catch you, you can be beaten to death even by your 'partner'.[88]

In this case, the direct link established is with law enforcement officers in the diamond fields who benefit from using their influence, but the link with senior officials is usually unclear and less often publicised. This lack of clarity in power networks generates conspiracy theories, as for instance, the idea that there is a fenced-off area in the diamond fields known by *gwejas* as *kwaMai Mujuru*,[89] belonging to one of the country's vice

---

81  Musoni, 'Operation Murambatsvina'.
82  See report on www.humanrightswatch.com.
83  Kachere, 'Chaos at Diamonds Fields'.
84  'Panners at War with Cops', *Manica Post*, 28 December 2007.
85  C. Dietrich, *Power Struggles in the Diamond Fields*, in J. Cilliers and C. Dietrich (eds), *Angola's War Economy: The Role of Oil and Diamonds* (Pretoria, Institute for Security Studies, 2000), p. 174.
86  *Ibid.*
87  Interview with a roadblock policeman who preferred to remain anonymous, 29 December 2008.
88  Interview with an artisanal miner who preferred to remain anonymous. The interview was facilitated by one of other respondents, David, on 24 December 2008.
89  *Ibid.*

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

presidents, Joice Mujuru. This rumour is firmly believed despite the lack of any concrete proof that the area belongs to her.

As Dietrich claims for the Angolan case, 'Through the militarization of this commercial base, supposedly military pursuits in the Lundas are often replaced by informal business webs linking warring factions in profits, with garimpeiros integrated as an essential captive market for overpriced goods bought with the proceeds of diamond sales'.[90] In the Zimbabwean context, artisanal miners were not only a source of lucrative marketing at different points, but also provided labour and a major source of the stone before January 2009. Moreover, to effectively remove them was difficult because, as Police Commissioner Benge admitted, 'The mining was initially legalised and the 15,000 people who invaded Chiadzwa before we moved in, are used to having money in their pockets and they can no longer afford to survive without money, when they know they can sneak into Chiadzwa and Chirasika and mine. *Zvazviri iko zvino kuteya vanhu neriva* [the way things stand our efforts are quite ineffectual]'.[91] What he neglected to mention was that the different enforcement agencies who visited the fields also had a taste of this mammon and, as one Commuter Omnibus operator commented, the policemen who visited Chiadzwa, '…have become a nuisance on the roads and solicit ridiculous bribes'.[92] In essence, the informal economy that developed around Chiadzwa, which included different contesting and sometimes collaborating forces, helped to perpetuate the illicit activities. Moreover, the diverse interests of actors within the state led to a complex and ambivalent approach to the Chiadzwa issue.

One case particularly reveals the interests of powerful officials: the arrest of the Principle Director of the Ministry without Portfolio, the late William Nhara, in March 2007. He was arrested for his association with a Lebanese woman who had attempted to smuggle diamonds out of the country by trying to pay a $700 bribe to a police officer.[93] This arrest was prompted by rising concerns, captured by one Harare lawyer, Terrence Hussein, who said 'The issue of diamonds and gold going out of the country through influential people has reached alarming levels. Such people should be put where they belong, and that is in prison. The situation means either the system is not working or those behind it are not doing much'.[94] Others believed that the solution to this problem would be to regularise mining in the area. This, it was hoped, would deal a death blow to the 'shadow economy' that had developed around the illicit mining of diamonds.

Yet even the regulation process was fraught with problems. The statutory institution employed to partner the MMCZ, the Zimbabwe Mining Development Corporation (ZMDC), was, at least according to one respondent, ill equipped to perform diamond mining.[95] Apart from providing state security, ZMDC failed to carry out other measures required for diamond mining, such as fencing off fields. Many *gwejas* observed that it was almost as if the ZMDC was *gwejaring* alongside them.[96]

In addition, the marketing process introduced another set of questionable practices. A Sunday Mirror article revealed that the MMCZ and the Ministry of Mines,

> …face police investigations after they held three secret diamond auctions last month, where only international players and members of the diplomatic community were invited….the country

90  Dietrich, *Power Struggles*, p. 175
91  Quoted in 'Senior Government Officials', 23 February 2007.
92  Interview with J. Nyamunda of Fern Valley Commuter Operator, held on 8 January 2009. Some of his commuters ply the Mutare to Nyanyadzi or Mutare to Marange routes.
93  'Net Closes in on Diamond Barons', *Sunday Mail*, 4 March 2007.
94  *Ibid.*
95  Interview with Lucky Nyandoro.
96  *Ibid.*

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

> could have been prejudiced of millions of United States dollars after the MMCZ conducted auctions in what appears to have been shady circumstances. MMCZ sold 50 kg of the contentious Marange diamonds . . . .[97]

What is interesting is that the 'clear' diamonds were sold in kilogrammes and not carats, as they are supposed to be sold. It is unlikely that this was caused by a lack of knowledge, for the MMCZ had claimed to be carrying out viability studies to determine the prospects for marketing the mineral. Moreover, they had bought some of the stones after considering 'the four Cs' in clear diamond examination–that is, clarity, carat weight, cut or shape of the stone and its colour – to determine the price. One must also question the secrecy of the auctions. Meanwhile, other artisanal diggers claimed that the ZMDC worked in such a way that the majority of the stones that found their way to the MMCZ were never the best: Those disappear before they arrive at MMCZ.[98]

The shift to militarisation in Chiadzwa coincided at national level with the shift towards establishing the Unity government, making it seem likely that the ZANU(PF) government wanted to establish effective control of the area to forestall any interference from MDC interests within a future joint government. In the run-up to the creation of the joint government, the discourse about informal mining shifted again, becoming dominated by calls for proper regulation. An illustration of what came to be the dominant thinking is found in a comment in the *Daily Mirror* of February 2009: 'Honestly, given our awareness of illegal panning, particularly where gold is concerned, in more than a decade, our authorities should have known that there was bound to be unscrupulous elements that would take advantage of the arrangements to freely pan for diamonds in the Marange area'.[99] The 'damage has already visited the economy', the writer goes on, but '[t]hose that are ready to learn from past mistakes are wise, and we hope that in the future, relevant authorities will thoroughly plan before making decisions, more so at this particular time when our preoccupation is with turning around the economy'.[100]

As part of 'restoring order', a concept associated with the government's 'corrective' discourse when cleaning up conditions they had previously allowed to prevail, the state employed their usual apparatus, a brutal militarisation that unleashed the usual fatal violence. In a decisive move, the state enforced Operation *Dzokera Kumusha* (go back home). The police, who had also been brutal, were considered ineffective compared to the military, and thus it was the army that commanded this and later operations. On the 1st of January 2009, scores of people who had been driven out of Chiadzwa could be seen walking, in many cases over 70 kilometres, into Mutare. The majority of them had made Chiadzwa their home, creating makeshift settlements in the hills and adapting socially to the community that emerged in the informal settlement. Far from being limited to diamond mining, this community functioned as a full-scale settlement, with a range of activities and behaviours found elsewhere in informal settlements, including sexual services, cooking, hawking and transportation services, as well as the petty crime and theft that plague all communities. Although this article is not about the emergent settlement, but rather the contestations over the diamond field, this portrait of *magweja* as settlers illustrates how entrenched they had become. The *magweja* had been initially allowed to mine diamonds for the sake of political expedience, but, in the end, it was for reasons of political expedience that they were discarded. Lives were lost and an emergent community was destroyed.

---

97  'Shady Diamond Auctions: Top Officials, MMCZ Sucked in', *Sunday Mirror*, 4 March 2007.
98  *Ibid.*
99  'Lessons From Marange Diamond Panning', *Daily Mirror*, February 2009.
100 *Ibid.*

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

## Conclusion

Numerous actors with various and conflicting interests descended on the Chiadzwa landscape when diamonds were 'discovered' in 2006. Although the chief architect of the situation in Chiadzwa was the state, groups and individuals within and outside the state sought to exploit diamond mining and benefit from diamonds and the informal economy that sprang up around them. The story of contestation around this informal economy concluded when the *gwejas* and buyers were violently expelled by the state. Although it has been some time since the 'discovery' of diamonds in the country and the violent 'take over' by the state, the diamonds, which were expected to provide a huge windfall for the economy, have not yet led to any apparent improvement in the country's finances. Instead, the institutions that supposedly controlled diamond mining have been implicated in scandal. The statutory institutions claim that they sought private capital as partners, at one point 'inviting' eleven companies to potentially participate.[101] In the end, the invited companies, including Mbada, Canadile and others, have been rocked by scandal.

All these factors gave the KPCS regulators a negative picture of diamond mining in Zimbabwe. Given the state's inconsistent behaviour, which continued around the Chiadzwa issue into 2008, it was unclear whether or not the state wanted regulation, because 'certain stalwarts tend to lose if the whole process is regularized. If it passes the KPCS under the current conditions, then it exposes glaring weaknesses with the scheme'.[102] Moreover, at all levels, different interests struggled against each other and sometimes co-existed in a shady network that was created and sustained by the state. For the situation in Sierra Leone, Machonachie notes that there are instances 'where diamonds have had a significant developmental effect on society and have played an important part in the national economy; but on the other hand, there have been times when they have been a destructive force, perpetuating insecurity, poverty and war'.[103] Although Zimbabwe's situation never descended into competing factions led by warlords, insecurity reigned in the diamond fields, for both the *gwejas* and the local inhabitants, both groups vulnerable when state security agents 'unleash[ed] a reign of terror, shooting and assaulting villagers arrested for illegal mining'[104] once the state began the crackdown.

These developments reflected the nature of the state. While other actors, such as informal miners and buyers, sought agency and expressed themselves in various forms, the state utilised its machinery to claim hegemony, but in inconsistent ways that reflected the shifting power and interests among a range of different actors within the state. Thus the central state tolerated informal activities when it suited powerful politicians, but as the geological relations of power among politicians and other state actors shifted, so did the state's position. Even when illegal miners were accommodated, however, a measure of state force was always available as a control mechanism. The changing behaviour of the state, from its initial 'instrumentalisation of disorder' to its appeals to concepts of indigenisation and empowerment, as well as its inconsistent use of the rhetoric of legal and formal mining enterprise, nevertheless exhibited one constant. The military nature of the state determined to a large extent the dynamics of change in the area, culminating in the brutal crackdown of Operation *Dzokera Kumusha*. In the end, the principal beneficiaries of diamond exploitation

---

101  'Government Invites 11 Companies to Partner in the Mining of Diamonds', *Business Herald*, July 2009.
102  'The Diamond Saga', www.newzimbabwe.com.
103  Maconachie, Governance Initiatives and Post Conflict Developments in Sierra Leone', Governance Initiatives and Post Conflict Developments in Sierra Leone' (unpublished working paper, University of Manchester), p. 103.
104  'Terror in Marange', *The Chronicle*, 4 March 2007.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

166   *Journal of Southern African Studies*

have not been the people of Chiadzwa, but the foreign mining companies and their ZANU(PF) partners exploiting Chiadzwa.

TINASHE NYAMUNDA
*Economic History Department, University of Zimbabwe, P.O. Box MP 167, Mt Pleasant, Harare. E-mail: tnyamunda@arts.uz.ac.zw*

PATIENCE MUKWAMBO
*Centre for Population Studies, University of Zimbabwe, P.O. Box MP 167, Mt Pleasant, Harare.*

---

*All correspondence can be sent to this e-mail address.

This content downloaded from
165.225.220.185 on Thu, 10 Aug 2023 13:55:50 +00:00
All use subject to https://about.jstor.org/terms

# Exhibit F



---

FIRST REPORT

---

OF THE PORTFOLIO COMMITTEE ON MINES AND ENERGY ON THE
CONSOLIDATION OF THE DIAMOND MINING COMPANIES

---

FOURTH SESSION – EIGHTH PARLIAMENT

---

*Presented To Parliament on the 6th of April, 2017*

[S.C. 9 - 2017]

---

DISTRIBUTED BY VERITAS
e-mail: veritas@mango.zw; website: www.veritaszim.net
Veritas makes every effort to ensure the provision of reliable information,
but cannot take legal responsibility for information supplied.

**ORDERED IN TERMS OF STANDING ORDER No. 17 THAT:**

1) At the commencement of every Session, there must be as many Committees to be designated according to government portfolios as the Committee on Standing Rules and Orders may deem fit.

2) Each Select Committee must be known by the portfolio determined for it by the Committee on Standing Rules and Orders.

## TERMS OF REFERENCE OF PORTFOLIO COMMITTEES STANDING ORDER No. 20

Subject to these Standing Orders, Portfolio Committees must-

a) examine expenditure administration and policy of government departments and other matters falling within their jurisdiction as Parliament may, by resolution determine;

b) consider and deal with all Bills other than a Constitutional Bill and Statutory Instruments or other matters which are referred to them by or under a resolution of the House of by the Speaker;

c) consider or deal with an Appropriation or Money Bill or any aspect of an Appropriation or Money Bill referred to them by these Standing Orders or by resolution of this House;

d) monitor, investigate, enquire into and make recommendations relating to any aspect of the legislative programme, budget, policy, or any other matters it may consider relevant to the government department falling within the category of affairs assigned to them, and may for that purpose consult and liaise with such department; and,

e) consider or deal with all international treaties, conventions and agreements relevant to it, which are from time to time negotiated, entered into or agreed upon.

On Thursday, 6 October 2016, Mr Speaker announced that the Committee on Standing Rules and Orders had nominated the following Members to serve on the Portfolio Committee on Mines and Energy:

**Hon. Dr. Daniel Shumba (Chairperson) ;** Hon. S. Bhuda ; Hon K Kazembe ; Hon  T. Muzenda ; Hon L Chikomba ; Hon M Matambanadzo ; Hon J Holder ; Hon J Madubeko ; Hon P Haritatos ; Hon M Kaundikiza ; Hon M Nkatazo ; Hon D Mashonganyika ; Hon T Khumalo ; Hon P Mutseyami ; Hon F Munengami ; Hon T Matangira ; Hon T Zhou ; Hon F Chirisa ; Hon L Sibanda ; Hon T Chisorochengwe ;  Hon R Mukwena ; Hon J Jaboon ; Hon S Mudarikwa ; Hon A Ndebele ; Hon J Gabbuza ; Hon E Gumbo ; Hon O.S Hungwe ; Hon B Majaya ; Hon S Matsunga ; Hon E. S Muzondiwa ; Hon I Pedzisai ; Hon T Mliswa

# CONTENTS

Introduction………………………………………………………………………

Objectives of the Committee ……………………………………………….

Methodology ………………………………………………………………..

Findings, Observations and Recommendations ……..…………………..

Conclusion…………………………………………………………………..

Report on the Consolidation of Diamond Mining Companies, 2017

## 1. Introduction

The diamond industry plays an important role in the socio-economic development of several African countries, given that 65% [1]of the world's diamonds, with an annual value of 8, 5 billion American dollars are extracted from the continent.  Globally, it is estimated that 10 million people benefit either directly or indirectly from the diamond industry.In Southern Africa, countries such as Botswana, Namibia and South Africa are realising substantial socio-economic gains from the diamond industry.  For instance, diamond revenues in Botswana enable all children up to the age of 13 to receive free education and in Namibia the diamond sector contributes 40% of the country's annual export earnings[2].  World leaders, including the late Nelson Mandela have outlined the socio-economic importance of diamonds to the lives of African people.

However, in Zimbabwe the situation is the opposite of what is happening in itsneighbouring countries. After the discovery of huge diamond deposits in Marange in the mid-2000, theexpectation was thatdiamond revenues will contribute significantly to national development but the industry has been a disappointment. This sentiment is expressed in the 2016 National Budget Statement bythe Minister of Finance and Economic Development stateswherein he statedthat, *"this is a resource that seems to have not benefitted the generality of our people...."*

In this context, the Committee on Mines and Energy sought to follow the objectives below;

- To unpack the underlying causes of the poor performance by the diamond industry;
- To analyse the contributionof diamonds to Treasury; and
- To analyse the socio-economic impacts of consolidation of diamond mines.

## 2. Background on the Diamond Industry in Zimbabwe

Diamonds were first discovered in Zimbabwe in 1903 in the Somabula area.  For over a century, the industryremained small with two mining operations by River Ranch located in Beitbridge and Murowa Diamonds in Zvishavane.   The sector became a force to reckon with following hugediscoveries in Marange in the mid-2000s withestimates that the country could supply 25% of the world's annual diamond market.  Several companies were awarded special grants to operate in Marange through joint venture partnerships with the Government, represented by Zimbabwe

---

[1] Diamondfacts.org
[2] Diamondfacts.org

Mining Development Corporation (ZMDC). Government had a 50% shareholding in all these companies which included;Mbada Diamonds, Marange Resources, Jinan, Diamond Mining Corporation (DMC) and Anjin Investments. Other mining companies includedKusena Diamonds, Rera, GyeNyame, Marange Resources, Nan Jiang Africa Resources in Bikita and DTZ OZGEO in Chimanimani. The alluvial diamonds were identified over hundreds of thousands of hectares, hence government in its wisdom decided to issue multiple licenses to various investors. The policy position of government shifted in 2015, with the thrust of centralising all diamond mines in the country which would be managed through a company known as the Zimbabwe Consolidated Diamond Company (ZCDC).

### 3.   Methodology

The Committee held oral evidence sessions with the following stakeholders:  the Ministry of Mines and Mining development was represented by its Minister Hon Walter Chidhakwa, the Deputy Minister, Hon Fred Moyo and the Permanent Secretary Professor Francis Gudyanga; Officials and former employees of ZCDC; a representative from Pedstock and the former acting General Manager of Minerals Marketing Corporation of Zimbabwe (MMCZ), Mr RichardChingodza. The Committee had an opportunity to conduct a field visit to Chiadzwatoget an insight into the socio-economic impacts of the consolidation process. Unfortunately the Committee did not get an opportunity to interact with ZMDC's former joint venture partners because of a legal dispute that is before the courts. The Committee was unable to visit and interact with regional countries such as Botswana and Namibia, due to limited financial resources. The proposed visit would have enabled the Committee to get an understanding of the factors behind the success recorded by their diamond industries.

### 4.   Findings

### *4.1*   **Purpose of Consolidation of Diamond Mining Companies**

The Committee was informed by the Minister of Mines and Mining Development that overally, the consolidation process sought to stimulate growth and productivity of the diamond industry, as well as promote transparency and accountability in the entire diamond value chain, with the ultimate result of improved revenues inflows to Treasury.

The consolidation process would also address the following challenges that were inhibiting the growth of the sector;

i.   *Erratic diamondsales.*Mining companies were negotiating contracts for the sales and marketing of diamonds to companies of their choice and these contracts were individualistic in nature and disregarded national interests. Through consolidation, marketing and sales would be conducted through one institution.

ii.  *To plug out smuggling and leakages of diamonds.*Allegations were abound of leakages and smuggling of diamonds,with estimates that diamond revenues worth about  US$15 billion could not be accounted for. Monitoring and supervision would be easier through one company.

iii. *Lack of mutual respect and trust.* There was no longer mutual respect and trust between government and its joint venture partners.  This was emanating from the fact that the joint venture partners were not willing to expand their operations into the mining of conglomerates and for the exploration of the kimberlitic pipes given that alluvial diamonds are almost depleted. Underground operations require huge investment and the joint venture partners were unwilling to invest into those expansion projects.  To address this ZCDC would embark in underground mining for the conglomerates and kimberlitic pipes.

### 4.2 Structure of the Zimbabwe Diamond Consolidation Company (ZCDC)

#### 4.2.1   Legal Status

The Committee was informed by the Minister of Mines and Mining Development that ZCDC is a subsidiary company under ZMDC and is similar in nature to other subsidiaries such Jena Mines, Sandawana Mines and Marange Resources. ZCDC was formed following the loss of mining rights by the former joint venture partners. This had been preceded by theinvocation of section 291 of the Mines and Minerals Act where the Secretary of Mines exercised his right of refusal to renew the licenses. This paved the way for Government to establish ZCDC, through the Companies Act and Zimbabwe Mining Development Corporation Act.

Some of the companies such as DMC, DTZ-OZGEO and Kusena agreed to the consolidation process but there was resistance from others that included Mbada Diamonds, Jinan and Anjin.

#### 4.2.2   Shareholding of ZCDC

The initial plan by Government was that ZCDC's shareholding would comprise of all the mining companies that were operating in Marange with government retaining a 50% shareholding. ZCDC

appointed five of the ten board members and the rest would be selected from among the former joint venture partners. Each joint venture partner would get shares based on the net value of assets and liabilities.  Mbada Diamonds, Anjin and Jinan took the matter to court and lost first case. Government then resolved to expand its shareholding in ZCDC to a 100 per cent. Behind closed doors, bilateral negotiations were held between China and the government, resulting in Anjin and Jinan agreeing to a settlement whose matter is still before the Constitutional Court and the rest of the board members will be appointed once a determination has been made. ZCDC will also then be able to operate in all the mining concessions.

*4.2.3    Corporate Governance*

Currently, ZCDC has five board Members and the Permanent Secretary of Mines and Mining Development Professor F.P Gudyanga  is the acting Chair. The Committee learnt that all the board Members hail from Manicaland. This is in violation of Section 194 (j) of the Constitution of Zimbabwe. Secondly, during the Committee's visit to Chiadzwa, it noted that almost 90% of the Management Executives of ZCDC were holding their positions inan acting capacity.  According to the former CEO of ZCDC, Mr MarkMabhudhunone of them, including the acting CEO Dr Ridge Nyashanu , have any experience in the mining of diamonds.The management Executives that were relieved of their duties, two months into the consolidation process, had a combined total of 127 years of experience in the diamond industry acquired from well renowned companies such as De Beers.

**4.3     Diamond Production atChiadzwa.**

Production statistics from Marange diamond operations have been on the downward trend for the past five years, largely attributed to a number of factors which include:

I.    Depletion of alluvial diamonds at most of the concessions;

II.   Inadequate exploration to determine the quantities and values of the diamonds before formal mining operations began in 2009.  The lifespan of the mining operations in Chiadzwa are unknown and current ZCDC operations are not supported by any geological exploration information.

III.  The diamond recoveries at the diamond concessions have gone down.  At the height of production in 2011, recoveries stood between 25 to 40 carats per tonne but at the time of consolidation this had gone down to between 5 to 6 carats per tonne.

IV.  Inadequate investment to meet mining obligations.  Most of the joint venture companies did not fulfil their investment agreements.

V.  The Committee was informed that at the time of consolidation all the companies were insolvent, hence impacting negatively on mining operations.

VI.  There is legal contestation between ZMDC and some of its former joint venture partners, hence ZCDC's operations have been restricted to two of the nine mining concessions.

ZCDC officials informed the Committee that their future plans were on ramping up production, through exploration and investment.  The full throttle the company's annual production projections are for 6 million carats. In 2016, ZCDC managed to produce just below a million carats.  In 2015, before the consolidation process, approximately 2,3 million carats were produced by all the companies operating in Marange.


## 4.4  Operational Capacity of ZCDC

After the consolidation process was effected, ZCDC management was ordered by the Permanent Secretary of Mines and Mining Development Professor F.P Gudyanga to increase production volumes and according to the former company executives, these targets were unrealistic given the high operational costs and the low grade recoveries.  The alluvial diamonds had depleted in most concessions and were near depletion in others. This did not make economic sense to the management that was in office at the time, but they were forced to comply.

After a 100s day into office, the former management team was dismissed, save for one person, Dr R Nyashanu and yet, some of them had signed 6 year contracts.  Most of them were dismissed after undergoing a polygraph test, commonly known as a lie detector. The former employees were asked questions such as 'are you drunk', 'do you operate a syndicate[3]'. The Management executives were not given any reasons for their retrenchment or dismissal. This may constitute an unfair labour practice as defined in Section 65 of the Constitution.

During the site visit, the Committee was informed by ZCDC officials that the company did not have adequate machinery and equipment.  As a result ZCDC was hiring some of its mining equipment and machinery, and has contracted companies to work on some of its operations. To boost its operational capacity, ZCDC secured a loan from the Reserve Bank of Zimbabwe worth US$ 30 million for recapitalisation.  The Company also managed to purchase equipment at an auction in January, 2017 worth US$7,5 million that previously belonged to Mbada Diamonds.  The Committee noted

[3] Oral Evidence Session with the Former Employees of ZCDC held in July 2016

that the two mining operations of ZCDC relied heavily on diesel generators because there are not connected to the national power grid.

Furthermore, the Committee was informed by the Minister of Mines and Development that ZCDC has embarked into gold mining in Katshe Gatshe and has since purchased machinery and equipment for that venture. Although mining has not yet started, ZCDC will be at the centre of those operations.

In essence, ZCDC does not have a skilled human resource base, working capital, adequate equipment and machinery and working capital.

### 4.5     Diamond Prices

The Committee was informed by the acting Chief Executive Officer of ZCDC Dr R. Nyashanu, that the joint venture companies realised different prices for their diamonds. The average price stood at 47,29 American dollars. The prices realised by the diamond companies is revealed in the graph below:



**Figure 1: Diamond Prices (Source: Presentation by Dr Nyashanu to the Portfolio Committee during the Fact-finding Visit to Marange)**

The acting CEO of ZCDC further highlighted that Mbada Diamonds had the lowest diamond prices yet owned concessions with the richest ore grades.  Dr Nyashanu attributed the low prices to either illicit practices or to low grade recoveries.


4.6       Diamond Revenues Submitted to the Treasury

In the 2016 Budget Statement, the Minister of Finance laments the poor revenue inflows to the fiscus from the diamond sector when he states that *"there was greater economic impact from diamonds during times of uncontrolled alluvial panning than what is being realised following the introduction of formal diamond mining arrangements."*In the same vein, the former acting General Manager of the Minerals Marketing Corporation of Zimbabwe (MMCZ), Mr Richard Chingodza attributed the poor revenues to Treasury due to incapacity ofgovernment representatives that sat on the boards of the joint venture companies to access critical information such as production statistics, board minutes or audited financial reports.

The Permanent Secretary of Mines and Mining Development Professor F.P Gudyanga, told the Committee that the country lost diamond revenuesthrough leakages and smuggling and the loss will be quantified through a forensic audit being conducted by the Auditor General.

According to the Permanent Secretary of Mines and Mining Development Professor F.P Gudyanga , from 2010, Treasury has realised approximately 600 million American dollars as shown in the table below:



*Figure 2: Payments to Government from Diamond Sector (Source: Presentation by Secretary of Mines at the 2016 AGM of Chamber of Mines)*

**4.7      Illicit Financial Out-Flows**

The Committee received evidence from the former acting General Manager of MMCZ Mr Richard Chingodza of illicit financial outflows flows from the extractive sector.  Some of these illicit financial flows were aided or facilitated by government officials, in clear violation of government accounting procedures and regulations.The MMCZ lost approximately four (4) million America dollars. The money was transferred to Pedstock, an agricultural company, which further transmitted it to an unknown recipient who resides outside the country.   The Director of Pedstock, Mr Jackson Dror admitted before the Committee that he was being used as a conduit to transfer the money from MMCZ to the unnamed recipient.

The Former Acting General Manager of MMCZ was ordered to release this money by the Permanent Secretary of Mines and Mining Development, who is currently the acting board Chairperson of the parastatal. The invoice raised for the money was that it would be used for the Zimbabwe Republic Police (ZRP) Border Control and Minerals Unit operations in curbing leakages and smuggling of minerals.

 The Permanent Secretary of Mines and Mining Development Professor F.P Gudyanga admitted to the Committee that the money was sent to the unknown recipient who is a foreigner and his identity could not be disclosed because it will jeopardise the State security operations aimed at curbing leakages and smuggling of minerals. Pedstock made cash payments to the unknown recipient because herefused to open a bank account. Pedstock received a commission for its services.

Furthermore, the Committee learnt that the Permanent Secretary of Mines and Mining Development Professor F.P Gudyanga had both personal and official links with Pedstock, where on several occasions he purchased agricultural equipment from the company.

**4.8      Role of MMCZ in the Diamond Industry**

The Minerals Marketing and Corporation of Zimbabwe, has the main responsibility of advising government on the marketing of its diamonds, however, the corporation has been facing a number of challenges in  executing its mandate.

Since 2009, the parastatal is without a substantive general manager and since 2013 without a Board. The parastatal is being run by a one-man board, comprising of the Permanent Secretary of Mines and Mining Development Professor F.P Gudyanga and in 2015, he was paid 30 000 American dollars as board fees in violation of the MMCZ Act and basic principles of corporate governance. The board should have 6 to 10 members. So legally and technically MMCZ has no board and board fees should not have been paid to anyone. In the absence of a Board, the annual budgets of MMCZ have failed to get approval in violation of the Public Finance and Management Act, the MMCZ Act and the Audited Office Act.

Furthermore, the Parastatal has been unable to conduct strategic planning sessions to discuss critical issues, including government's intention to transform it into an exploration company.

The Committee was also informed that MMCZ has paid for some of the Ministry of Mine's expenses, activities and programs, yet these should be supported by Treasury. Some of these payments have found their way into personal accounts, and an example was cited of payments made into the account of Mr Nzarayapenga whose credentials the Committee did not find but was alluded to during an oral evidence hearing with the Acting General Manager Mr Richard Chingodza.

During the fact-finding mission to Marange, the Committee noted the absence of MMCZ at the mining operations yet its officers are visible in other mining operations which include platinum where government does not necessarily have a controlling shareholding.

### 4.9    Value Addition and Marketing of Diamonds from Marange

The Committee was told by the former CEO of ZCDC, Mr Mark Mabhudhu that the country lost a lot of diamond revenues before 2014 due to lack of value addition. The marketers of Marange diamonds, never fully understood its footprint and after feedback from the market, it became apparent that the country had sold some very unique diamonds with fancy colours for a song.   The diamonds were not being properly sorted, hence it was easy for them to be undervalued.

The cleaning and sorting of diamonds from Marange is undertaken by a company known as First Element. The Committee was informed by Mr Richard Chingodza that First Element is a foreign company that was hand-picked by the Permanent Secretary of Mines and Mining Development. Due diligencewas not conducted to ascertain its capability and credibility.  In the course of time, management at MMCZ noted operational deficiencies which they highlighted to the Executive but no action was taken and the management of MMCZ was threatened not to interfere in the affairs of First Element.

The first anomaly, was on the losses experienced in the cleaning of diamonds. This was noted following a comparative analysis with a former company Kenako, which is an indigenous company that used to clean the diamonds.

Secondly, an arrangement was made for the construction of a cleaning facility for the diamonds through a build-operate-transfer arrangement where First Element won the bid yet it had inflated the costs in comparison with other bidders. MMCZ management disapproved of the agreement, the Permanent Secretary of Mines and Mining Development Professor F.P Gudyanga was not happy it hencecreating tension between the two parties.

Furthermore, management of MMCZ observed that when auctioning diamonds, First Element would claim to have invited 80 or 100 companies when in reality there just a few buyers, less than five. Upon scrutiny it was discovered that one company would be just 20 or more people passing out as individual companies. This created room for collusion and transfer pricing prejudicing the country of substantial revenues.

Another anomaly, was on the auditing of MMCZ's books. The Committee was informed that the Permanent Secretary of Mines and Mining Development Professor F.P Gudyanga hand-picked an audit firm to scrutinise MMCZ books. However, the audit firm was not appointed by the Auditor General's (AG)office and the AG was not even aware that such an operation was taking place. As a result the company's financial records have been compromised.


**4.10    Relocated Mining Community at ArdaTransau**

When diamonds were discovered in Marange, several thousands of families were relocated to Arda Transau, a farm on the outskirts of Mutare city. The relocation program began during the era of the joint venture agreements. When it came into existence in 2015, ZCDC has managed to relocate 23 families. However, the company inherited several unfulfilled obligations by the former joint venture companies. The Committee had an opportunity to visit and interact with the relocated families. These were some of their concerns:

i.    **Housing defects:** Some of the home owners were experiencing housing defects such as cracks on the floors and walls. This was attributed to poor workmanship and the fact that some of their houses were constructed on wetlands.

ii.   **Relocation Allowance/Disturbance Allowance**: There were complaints by some of the families that they did not receive their relocation allowance, which was supposed to be

given on an individual basis rather than per household. Most of the households are in polygamous relationships.

iii. **Inadequate Space for Expansion**: Complaints were raised that children who had reached the age of majority or had married were failing to get land to build their own homes. The half-a—hectare plots they were allocated are inadequate to meet their needs.

iv. **Unemployment**: The youth complained they had no sources of livelihood in the area. This was attributed to lack of capital to start income generating projects.

v. **Right to Water**: Some of the residents complained that portable water had been disconnected to their homesteads. Each household has to pay $8 per month but due to lack of sustainable livelihoods, very few households have the capacity to pay these bills. For households without tap connections, they walk long distances to access water from wells, some of which is not safe for drinking.

vi. **Lack of Houses**: There are some families who were relocated but have not yet been allocated houses. There were allegations that some people were are renting out their houses to persons from elsewhere other than Marange.

vii. **Compensation for Property**: A complaint was raised by a former shop owner who had not been compensated for loss of property which he left behind in Marange. The relocated families also highlighted there were not aware of valuation results of their properties which they left behind in Marange.

viii. **Lack of Feedback:**The community expressed disappointment in that government agencies and the mining company did not give feedback regarding their concerns.

In spite of these challenges, the local authority of Mutare, is co-ordinating an irrigation project, which seeks to empower the community in market-gardening. The project has been constrained by lack of financial resources.

**5.     Committee Observations**

*These were the observations of the Committee:*

**5.1 Purpose of Consolidation:**

The purpose of consolidating diamonds mines, whilst it is a noble idea, need to be supported by best international practices.   In regional countries such as Botswana and South Africa, their diamondpolicy framework allows for independent players to participate in the sector.   What was

lacking in the former arrangement, with joint venture partners, was strong monitoring by the government representatives who sat on the company boards.

## 5.2 Structure of the ZCDC

### 5.2.1   Legal Status

ZCDC is not properly constituted. This is a private company formed under the Companies Act and is supposed to superintend over such an important national resource.Secondly, Section 315(2) of the Constitution clearly highlights that *"an Act of Parliament must provide for the negotiation and performance of....concessions of mineral and other rights to ensure transparency, honesty, cost-effectiveness and competitiveness'*.  The Ministry of Mines missed an opportunity to correct the challenges it is facing in Chiadzwa.

### 5.2.2   Corporate Governance

It is unacceptable that ZCDC should be a subsidiary of ZMDC, when it is clear that the Board of ZMDC has no control over the company as revealed by its absence during the Committee's visit to Chiadzwa.  There is also a conflict of interest in that currently ZCDC is chaired by the Secretary of Mines and ZMDC Board oversees that subsidiary, yet the ZMDC board is answerable to the Permanent Secretary of Mines and Mining Development.  Such an arrangement clearly violates good corporate governance principles.

Secondly, nepotism and tribalism was the criteria used in appointing the board of ZCDC.  All of them hail from Manicaland and there is no illustration of gender representation.  This clearly violates sections 17 and 18 of the Constitution which promote gender balance and fair regional representation respectively.  Furthermore, it is improper that ZCDC should be run by a management team that does not have any experience in diamond mining.  Surely, the country should not expect positive growth and meaningful returns to emanate from such an operation.

## 5.3 Diamond Production at Chiadzwa

The six (6) million carats per annum projections are possible only if the company acquires investment for exploration.  Right now, no one knows the quantum or the values of the diamonds in Chiadzwa.  Without adequate geological information, ZCDC cannot outline strategic goals for the future.  Secondly, in proper governance system, management is supposed to advise the Board on operational issues, but instead in this case the Secretary of Mines is directing the mining operations.

The Committee would also like to express its disappointment on low productivity at the mines, more particularly due to the fact that it failed to see any diamonds during its site visit. The Committee had high expectations that after rigorous physical searches, it would see the diamonds.

The Minister of Finance and Economic Development highlights that government realised better revenue during times of uncontrolled panning, highlighting the significance of artisanal and small-scale miners to the growth of the sector. Other countries, especially in West Africa have developed sustainable models for integrating artisanal and small-scale miners into the diamond sector. The Minister of Mines and Mining Development needs to consider such models, as a way of empowering and creating employment for surrounding communities.

### 5.4 Operational Capacity of ZCDC

During the fact-finding visit, the Committee observed that ZCDC does not have adequate equipment and machinery and has to hire some of it.   It is inadequate for ZCDC to borrow from the local financial market given the high interest rates.   ZCDC has to scout for investors but there is low investor confidence, after the ouster of the joint venture partners.  It will be difficult for the company to attract the much needed investment. It is also important for Government to be consistent in the implementation of its policies. This is one area that has been raised by investors, in various mining fora such as the Regional Mining Indaba held in Cape Town annually. Secondly, the Committee is concerned that ZCDC is now venturing into gold mining operations in Katshe Gatshe yet its operational capital is very thin.

### 5.5 Diamond Prices and Revenues to Treasury

The Committee awaits for the results of the forensic audit to determine the extent to which the country may have been prejudiced by the former joint venture partners. Poor revenues to Treasury should also be attributed to delays taken by government to set up cleaning and sorting facilities. A lot of valuable diamonds were sold for a song. Secondly, the blame on the poor revenues and the disparities in diamond prices should be apportioned to both Government and the former joint venture companies.  Government had representatives that sat on the Boards of the joint venture agreements and were there to advise government on policy issues or anomalies which were hindering the State from realising its objectives.

### 5.6 Illicit Financial Outflows

It will be very difficult to conduct an audit trail on some of the funds that were siphoned from MMCZ. Pedstock made cash payments to its unnamed source for services rendered. It is clear that government accounting systems were violated and there are no prospects for MMCZ to recover the US$4 million that it lost.

Secondly, State security matters should be financed by the relevant agency, under the intelligence services. It was improper for the Permanent Secretary of Mines and Mining Development Professor F.P Gudyanga to siphon MMCZ of its resources and expect it to perform effectively afterwards. It defeats the whole purpose of Government's intentions of developing turnaround strategies to revamp or rebuild ailing or dead parastatals.

### 5.7 Cleaning, Sorting and Marketing of Diamonds

The Committee noted with concern the allegations of diamond lossesexperienced during the cleaning, sorting and evaluation of diamonds. One of the functions of MMCZ is to advise the Minister on important issues such as this one, so the Minister should take seriously matters of this nature. It is not proper to disregard concerns raised by an institution which has been established to safeguard national interests of government and defend a private company which might not have the interests of the nation at heart.

### 5.8 Relocated Families

The unfulfilled expectations of the relocated families can only be met once ZCDC is fully operational and making a profit. ZCDC has inherited a number of liabilities from the former joint venture partners, such as wages. ZCDC's financial position is very precarious and cannot be expected to meet the concerns of the communities anytime soon.

### 5.9 Property Rights Issues

Section 72 (2) of the Constitution states that *"every person has the right, ...to acquire, hold, occupy, use, transfer, hypothecate, lease or disposes of all forms of property, either individually or in association with others".*The grounds for dispossessing the mining companies of their concessions is weak and indefensible. These were joint venture agreements and if the lease had expired, surely

ZMDC could have easily reacted to rectify the anomaly. It appears this was just a weak excuse to get rid of the joint venture partners. It cannot be denied that the consolidation process put a dent on investor confidence into the mining sector. It is important that property rights are respected so that it does not affect investment opportunities for the entire mining industry. When the Committee visited Marange it saw immovable property such as offices, airstrip, employee houses, watch towers, machinery which was lost inadvertently by the joint partners and will now be inherited by ZCDC without paying any compensation.

## 5.10    Workers' Rights

These need to be respected in line with the labour laws of the country. It defies logic that the Board of ZCDC retrenches some of its workers and then immediately replace those positions. Retrenchment entails downsizing operations. The former management Executives of ZCDC were relieved of their duties after undergoing a polygraph test. The questions and manner in which the polygraph was applied clearly violates fundamental rights particularly section 51 of the Constitution which talks about the right to human dignity. In other countries, polygraph tests are permitted but adhere to fundamental human rights. In practice, a polygraph test cannot be used as a basis for a finding of guilt, it is used to support other evidence, but in this case, the polygraph tests were used to find the eleven (11) interviewees guilty and a strong reason for dismissal. Zimbabwe's jurisprudence need to be developed on the application of polygraph test in order to protect the rights of workers.

## 5.11    Political Interference

The Committee noted with concern that there is too much political interference in the mining of diamonds in Marange particularly by the Permanent Secretary of Mines and Mining Development, Professor F.P Gudyanga. Without a proper legal framework which outlines the responsibilities of the various State actors in the diamond sector, the current system is porous and being abused. As a result the country will not be able to realise meaningful returns from the sector. Whilst, the Diamond Policy outlines government's vision in the diamond sector, it is not binding on anyone. Furthermore, it is unacceptable that the Secretary of Mines is directly involved in operational issues at ZCDC, at MMCZ, at ZMDC and at other institutions that a directly linked to the mining industry. The workload is too heavy for one person and this had negative impacts on operations of some of this entities.

## 6   Recommendations

| | Resolution | Action | Timeline |
|---|---|---|---|
| 6.1 | ZCDC should be properly constituted. | The Ministry of Mines and Mining Development should bring before Parliament a bill to regulate diamond mining operations by ZCDC in line with section 315 (2)(c) of the Constitution. | Before end of December 2017 |
| 6.2 | The Board of ZCDC should be dissolved. | Any board appointments by ZMDC or by the Minister of Mines should be in line with sections 17 and 18 of the Constitution which promotes fair regional representation and gender balance. | On-going. |
| 6.3 | A Board for MMCZ should be appointed and the process of selecting a substantive general manager for the parastatal concluded. | The Minister of Mines should initiate the process for the appointment of the board of MMCZ and its substantive general manager in order to promote good corporate governance at the parastatal and in the mining sector. | Before end of June 2017 |
| 6.4 | Mining policies for the diamond industry should be clear and consistent in order to attract investment both foreign and local. | The Ministry of Mines needs to come out clearly on the position of government pertaining to foreign direct investment into mining concessions in Marange | Policy should be outlined by June 2017. |
| 6.5 | Competition should be promoted in the production of diamonds in Zimbabwe. | The Ministry of Mines should allow independent players to participate in diamond production in various parts of the country, including the Marange concessions. | By December 2017. |
| 6.6 | Investment is needed for exploration of diamonds in Marange. | The Ministry of Mines need to create a conducive platform that promotes investment into exploration to determine the quantum and values of diamonds in Marange. Evidence-based information will strengthen government's ability to make decisions on diamonds in Marange. | On-going |
| 6.7 | ZCDC should solely focus on diamond production. | The Ministry of Mines should ensure that ZCDC focuses only on diamond production and cease all operations of gold mining in KatsheGatshe. | Within a month of tabling this report. |
| 6.8 | Illicit financial outflows from MMCZ should be thoroughly investigated. | The Auditor General, the Anti-Corruption Commission and the Zimbabwe Republic Police, must investigate these illicit financial outflows. | Before end of June 2017. |
| 6.9 | Due diligence should be conducted on companies to be | MMCZ should ensure public tenders forthe cleaning, sorting and buying of | On-going. |

| | | | |
|---|---|---|---|
| | selected for cleaning and sorting of diamonds as well as on buyers who attend the domestic diamonds auctions. | the country's diamonds are floated and due diligence is followed in the selection process in order to minimise leakages and collusion in pricing of the gems | |
| 6.10 | Allegations of diamond losses through cleaning and sorting by First Element should be investigated. | A Commission of inquiry should be appointed by the Minister of Mines to ascertain if the country has been prejudiced by First Element and give feedback of its findings to Parliament. | Before June 2017 |
| 6.11 | MMCZ officers should have representation at all diamond operations including those in Marange. | The Minister of Mines should ensure that all MMCZ officers are visible at diamond mining operations in Marange in order to promote transparency and accountability. | On-going. |
| 6.12 | ZCDC should be managed by skilled personnel with knowledge of the diamond sector. | Appointments to serve on ZCDC should be based on merit, so that State participation in the industry is justifiable. | Within three (3) months of tabling this Report. |
| 6.13 | Results of polygraph tests should not be used as a basis for finding one guilty or dismissal of workers. | The Ministry of Mines should reinstate workers that were dismissed due to polygraph test because the practice is not supported by the labour laws of the country. | By June 2017. |
| 6.14 | Property rights in the mining sector should be respected in line with section 72(2) of the Constitution. | The Minister of Mines need to ensure that property rights of investors in the mining sector are respected in order to build confidence that Zimbabwe is an investment friendly destination. Furthermore, companies that lost their properties as a result of consolidation should be compensated. | By December 2017. |
| 6.15 | Relocated families at ArdaTransau should be compensated for loss of property and be given their relocation allowances on an agreeable formula. | ZCDC should ensure that all relocated families that lost their properties are compensated fairly and relocation allowance should take into account families in polygamous relationships. | By June 2017. |
| 6.16 | New land should be identified to cater for population growth at ArdaTransau. | The Ministry of Local Government need to address the shortage of land at ArdaTransau, so that families live in socially and culturally acceptable environments. | Before end of June 2017. |
| 6.17 | Corrective action should be taken on homes that have developed defects. | Ministry of Local Government should institute an inspection of houses with defects at ArdaTransau to assess the safety and well-being of the tenants. Furthermore, corrective action should be taken on those buildings | Before end of December 2017. |
| 6.18 | A policy should be developed to integrate artisanal and small- | The Ministry of Mines needs to copy best international practices, especially | Before end of December |

|  | | | |
|---|---|---|---|
|  | scale diamond miners who are operate illegally in Marange. | from countries in West Africa and come up with a policy position in order to integrate artisanal and small-scale miners in the mining of alluvial diamonds. | 2017. |
| 6.19 | Government and political interference in mining of diamonds in Marange should cease forthwith, particularly by the Secretary of Mines | The Civil Service Commission should recall the Permanent Secretary of Mines Professor Gudyanga in line with section 205 of the Constitution. The grounds for dismissal include;his role in aiding illicit financial outflows, poor corporate governance and at times his position has been conflicted. | Within a month of tabling this report. |
| 6.20 | Modern equipment and technology should be installed for searches in sorting areas in order to curb leakages. | ZMDC should invest in modern equipment for diamond detection rather than conducting body searches which an archaic method of control. | Before December 2017 |
| 6.21 | State participation in the diamond sector should be minimal but the marketing of diamonds should be centralised and remain the preserve of the State. | The Ministry of Mines should ensure that marketing of diamonds is centralised and is in the hands of the State. | Before December 2017 |

## 7   Conclusion

The diamond industry in Zimbabwe need to be supported by strong and consistent policies and a sound legal framework. This should also be buttressed by the observance of good corporate governance principles by the implementers of these policies and laws. In that way Treasury and the country will be able to experience positive socio-economic returns from the diamond industry as being experienced in the neighbouring countries.

# Exhibit G



The Political Economy of Artisanal and Small-Scale Gold Mining in Central Zimbabwe
Author(s): Showers Mawowa
Source: *Journal of Southern African Studies*, Vol. 39, No. 4, SPECIAL ISSUE: POLITICS, PATRONAGE AND VIOLENCE IN ZIMBABWE (December 2013), pp. 921–936
Published by: Taylor & Francis, Ltd.
Stable URL: https://www.jstor.org/stable/24566554
Accessed: 10-08-2023 13:56 +00:00

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Taylor & Francis, Ltd.* is collaborating with JSTOR to digitize, preserve and extend access to *Journal of Southern African Studies*

*Journal of Southern African Studies*, 2013
Vol. 39, No. 4, 921–936, http://dx.doi.org/10.1080/03057070.2013.858540



# *The Political Economy of Artisanal and Small-Scale Gold Mining in Central Zimbabwe*

## SHOWERS MAWOWA

(University of KwaZulu Natal)

*Zimbabwe's post-2000 period has been characterised by a dramatic increase in artisanal small-scale mining (ASM), particularly gold mining. Economic decline and rising unemployment meant that ASM provided one of the very few opportunities for survival and capital accumulation. This article provides a contextual analysis of the growth of ASM, together with a detailed discussion of a case study of mining in Totororo, Kwekwe District in central Zimbabwe, based on field research and media reports. Totororo was initially the site of an intense gold rush, which was quasi-formalised through being registered as a small mine. The article situates the discussion of the growth of ASM in the context of the political economy of Zimbabwe's crisis decade and subsequent period of power sharing. It reveals both similarities and differences with the political economy of diamond mining in Zimbabwe, which has attracted greater attention from scholars and the human rights community. Artisanal gold mining in Totororo clearly provided significant survivalist livelihood opportunities. Yet the site was also highly politicised and contested, and the politics of controlling extraction and trade were part of a bigger story of elite accumulation and patronage. The article criticises those who approach ASM only through debates over grass-roots, informal survivalism, and also suggests some of the ways in which elite accumulation has provided not only lucrative opportunities for a broad network of lower ranking party or state agents but also work for locals and itinerant panners who would otherwise be jobless.*

## Introduction

From 1999 to early 2009, Zimbabwe's economy suffered a cumulative decline of 54.8 per cent.[1] According to the 2010 *Human Development Report* (*HDR*), by end of 2008 the country's human development indicators were at an all-time low.[2] A chaotic land-reform programme, through which supporters of the ruling Zimbabwe African National Union (Patriotic Front) (ZANU[PF]) grabbed farms from whites, crippled the country's agriculture and associated industries. The economic decline coincided with, and was aggravated by, a political crisis. ZANU(PF) was accused of using violence against political opponents and rigging elections to retain power, creating a crisis of legitimacy. As the crisis escalated, the mining sector also suffered a setback, and by November 2008 nearly all of the country's mines were either closed or under care and maintenance. In 2009, following an inconclusive election, ZANU(PF), through SADC mediation, entered into a power-sharing agreement with two formations of the opposition Movement for Democratic Change (MDC), ushering in a new period of economic stability. This article is about the political economy of one key sector

---

1 Zimbabwe National Statistics Agency (ZIMSTAT), Harare, 2010
2 *Human Development Report 2010*, 20th anniversary edition, *The Real Wealth of Nations: Pathways to Human Development*, United Nations Development Programme (UNDP) (Palgrave Macmillan, New York, 2010).

© 2013 The Editorial Board of the *Journal of Southern African Studies*

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

of the economy during Zimbabwe's crisis, that of artisanal and small-scale mining (ASM), focusing on gold.

There is no single agreed definition of ASM, though common references associate the practice with low levels of production, poorly skilled labour, poor technology, small claims, subsistence and illegality.[3] ASM blurs the boundary between informal and registered small-scale miners, both of which are generally included in the definition. Moreover, debates over the category have a strong focus on poverty. Hentschel *et al.* argue that 'The development of the sector (ASM) shows a strong relationship to the general economic indicators of the country: ASM is poverty related'.[4] They and other authors interpret the growth of ASM through a focus on the temporary, survivalist strategies that people use as a means of coping with poverty and unemployment.

Policy and legal frameworks in Zimbabwe do not provide a specific definition of ASM, and policy practice suggests a rather loose interpretation. Although there is a provision in the Mines and Minerals Act for registration of small claims of less than 20,000 square metres, there is no law or policy specifically to regulate or govern ASM more broadly.[5] In 2002, the government used output criteria to define 'small ASM' gold producers, limiting them to those producing 'less than 15 kgs of gold per year'.[6] In practice, one can distinguish between two broad types of ASM miners, namely: 1) registered miners, i.e. those who have registered small claims and gold processing mills with the Ministry of Mines at regional centres; these are usually individually or family-owned, though they may also be company owned; 2) informal, unregistered, or illegal producers, known locally as *makorokoza* (meaning panners, the practice is called *chikorokoza*). From the colonial period to the 1980s, government often referred to the size of the labour force (less than 50 employees) in distinguishing small miners from medium- to large-scale operations.[7] *Chikorokoza* involves both full-time, often nomadic artisanal miners targeting auriferous reefs, abandoned mines, old workings and dumps, or rural subsistence farmers engaging in artisanal mining between farming activities. In practice there is a strong intersection between small registered works and *chikorokoza*, with the former usually purchasing and processing gold from the latter.

Associating ASM only with informality and casting it as a survival strategy for the poor is clearly inadequate in the Zimbabwean context, as senior civil servants, ZANU(PF) politicians and military figures play a critical role in ASM and the informal economy more generally. ASM should be conceptualised as part of the development, sustenance and reproduction of a patronage system controlled by those with state and/or party positions.[8] This seems to validate Castells and Portes's argument that informality, 'far from being a euphemism for poverty, entails a specific form of relationships of production'.[9] It can be observed, however,

3  T. Hentschel, R. Hruschka and M. Priester, *Artisanal and Small-Scale Mining: Challenges and Opportunities* (International Institute for Environment and Development and World Business Council for Sustainable Development, London, 2003), p. 7.

4  *Ibid.*, p. 8.

5  Zimbabwe, *Mines and Minerals Act*, [Chapter 21:05], 1961 (last amended in 2006).

6  Oliver Maponga and Maidoyi Meck, 'Illegal Artisanal Gold Panning in Zimbabwe – A Study of Challenges to Sustainability along the Mazowe River', in Gavin M. Hilson (ed.), *The Socio-Economic Impact of Artisanal and Small-Scale Mining in Developing Countries* (A.A. Belkema, Lisse [Netherlands], 2003), p. 350.

7  See Ian Phimister, *An Economic and Social Economic History of Zimbabwe, 1890–1948: Capital Accumulation and Class Struggle* (Longman, London, 1988); Showers Mawowa, 'Political Economy of Crisis, Mining and Accumulation in Zimbabwe: Evidence from the Chegutu-Mhondoro Area' (PhD thesis, University of KwaZulu Natal, 2013).

8  Showers Mawowa, 'Tapping into the Chaos: State, Crisis and Accumulation' (MA thesis, University of KwaZulu-Natal, 2007).

9  M. Castells and A. Portes, 'World Underneath: The Origins, Dynamics, and Effects of the Informal Economy', in A. Portes, M. Castells and L. Benton (eds), *The Informal Economy: Studies in Advanced and Less Developed Countries* (Baltimore, Johns Hopkins University Press, 1989).

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

that ASM remains characterised by small production volumes at the lower end of the mineral industry spectrum and loose regulation.

Official figures show that, except for platinum and diamonds, Zimbabwe's mining sector experienced a general decline between 2000 and 2008. While the more general economic crisis can be attributed to the violent seizures of white-owned farms in the name of wealth redistribution, economic indigenisation and empowerment, the same cannot easily be said about the mining sector. It was only from 2011 that the Zimbabwe government started to enforce a 2008 indigenisation law that required all foreign-owned mines to dispose of at least a 51 per cent stake. Thus the reasons for the decline in mining output cannot be directly blamed on agrarian populism. It is also the case that most output from ASM is unaccounted for, rendering official output figures a massive underestimation. In 2007 the governor of the Reserve Bank of Zimbabwe estimated that more than 15 tons of gold (worth over US$400m), diamonds worth over US$800 million and other minerals worth about US$200 million were smuggled out of the country annually between 2002 and 2007.[10]

The human rights violations, smuggling and looting of diamonds from Marange fields in eastern Zimbabwe epitomises Zimbabwe's crisis political economy and the role within it of the politics of resource control.[11] The discovery of the Maranke diamonds in 2006 saw the area being invaded by thousands of artisanal miners. In contrast to the country's goldfields, where there was a similar popular rush, Zimbabwe's military violently drove away artisanal diamond miners. After a period of initial turbulence in Marange, and unlike diamond-mining in much of Africa, where artisanal miners still predominate, the key Zimbabwean diamond fields seem at the time of writing to be stabilising into large-scale operations owned by the Zimbabwean state, the military and foreign investors.[12] While violent state clampdowns on *makorokoza* are not peculiar to the Marange diamond fields, the scale of the violence and the decisiveness of the military intervention stand out. In the Marange, the state eliminated a popular survival economy that continues to exist in the gold sector. This is perhaps because the stakes in diamonds were higher and the interest stronger. Yet the political economy of both gold and diamonds are similar in other ways, and arguably represent a similar anatomy of criminalisation, patronage and accumulation.

In the Totororo case discussed below, exploitation of the gold fields began in the form of a popular and intensive gold rush, attracting hundreds of artisanal miners, before one powerful figure drove away the *makorokoza* through a combination of violence (using local police and youth militia), political and legal manipulation, and established a stable registered small mining operation with opportunities for employment limited to the patron's own political clients.

The political economy of gold and diamond mining in Zimbabwe invites reference to theories of the postcolonial state in Africa, and to debates over primitive accumulation and capitalist development. Scholars of Zimbabwe have invoked Karl Marx's notion of primitive accumulation to explore elite accumulation and state violence.[13] One is made to recall how

10  Gideon Gono, 'Promoting Indigenous Economic Empowerment': Address to the Extraordinary Session of ZANU (PF) Congress in Harare, 14 December 2007,

11  Human Rights Watch, *Diamonds in the Rough: Human Rights Abuses in the Marange Diamond Fields of Zimbabwe* (June 2009).

12  Tinashe Nyamunda and Patience Mukwambo, 'The State and the Bloody Diamond Rush in Chiadzwa: Unpacking the Contesting Interests in the Development of Illicit Mining and Trading, 2006–2009', *Journal of Southern African Studies*, 38, 1 (2012), pp. 145–66; Patrick Bond and Khadija Sharife, 'Zimbabwe's Clogged Political Drain and Open Diamond Pipe', *Review of African Political Economy*, 39, 132 (2012), pp. 351–65.

13  Karl Marx, 'Capital Volume 1 – Part viii: The So-Called Primitive Accumulation', in Robert C. Tucker (ed.), *The Marx–Engels Reader*, 2nd Edition (New York, Norton, 1972), pp. 431–8.

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

capitalism was (is) conceived with 'blood dripping from its pores', through processes of primitive accumulation.[14] The violence of gold mining in Zimbabwe invokes Anderson's 'absolutist state', which emerged during Western Europe's long periods of primitive accumulation.[15] Historically conflict has been part of the birth pangs of capitalist development. Unlike Western European trajectories, however, it is not clear that Zimbabwean processes have encouraged increased productivity. David Moore has suggested that in the absence of a state capable of enforcing and maintaining a specific property regime, processes of primitive accumulation may be protracted or may stagnate, 'hence blood continues to flow'.[16] As those controlling violent forms of accumulation benefit through access to the international markets, Rosa Luxemburg suggests, primitive accumulation should not be labelled 'primitive' at all, but must recur in order to revive capitalism.[17] Many apparently anti-capitalist aspects of the Zimbabwe crisis – the hyperinflation and volatile currency, the deployment of militia and 'war vets', the high levels of informality and economic disorder – can be cast within these frameworks as part of a broader process of accumulation by dispossession.

The political economy of the Zimbabwean crisis also resonates with Reno's 'political economy of conflict', prompting scholars to invoke what Chabal and Daloz refer to as the 'instrumentalisation of disorder and violence'.[18] The state appears to have been turned into a vehicle for private accumulation, behaving like Reno's 'shadow state', both enforcing and refraining from enforcing legal provisions to regulate accumulation for the benefit of members of the ruling elite, or those connected to them. However, Reno and other commentators, drawing primarily on West African cases, apply the notion of 'political economy of conflict' to weak and failed states characterised by civil war. Yet Zimbabwe retains a strong bureaucracy and coercive apparatus. Even where violence appears to have spiked out of control, for example where artisanal miners clash with police or vigilante groups go on the rampage, this only goes as far as the state or elements within it can tolerate, and can be readily crushed by the police or military.

The analysis presented below of the political economy of ASM gold mining in central Zimbabwe begins by contextualising the growth of gold panning in Zimbabwe's post-2000 crisis political economy. My examination of how an apparently survivalist gold rush became the focus for competing political and economic interests and matured into a registered formal small-scale mining operation casts the process as a mimic of the birth of capitalism and the shift 'from primitive accumulation to civilised accumulation'.[19] Analysing the form, structure and organisation of production at this ASM site, the article reveals the intersection between patronage politics, economic crisis, survivalism and elite accumulation.

## Growth of Gold Panning in Post-2000 Zimbabwe

Gold mining and trade in Zimbabwe predates the advent of colonial rule in 1890. Pre-colonial mining consisted of small works in gold, copper and iron – what would qualify in the modern

14  *Ibid.*; Perry Anderson, *Lineages of the Absolutist State* (London, New Left Books, 1974); Michael Perelman, *The Invention of Capitalism: Classical Political Economy and the Secret History of Primitive Accumulation* (Durham, NC and London, Duke University Press, 2000).

15  Perry Anderson, *Lineages*.

16  David Moore, 'Intellectuals Interpreting Zimbabwe's Primitive Accumulation: Progress to Market Civilisation?' *Safundi*, 8 (2007), pp. 199–222.

17  Rosa Luxemburg, *The Accumulation of Capital* (London, Routledge and Kegan Paul, 2003).

18  P. Chabal and J-P. Daloz, *Africa Words: Disorder as Political Instrument* (London, James Currey, 1999).

19  Karl Marx, 'Capital Volume I', cited in D. Moore, 'The Second Age of the Third World: From Primitive Accumulation to Global Public Goods?', *Third World Quarterly* 25 (1), 2004, pp. 27–109.

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

era as ASM.[20] Evidence suggests that gold production and trade was vital for the pre-colonial Zimbabwe polities of Great Zimbabwe, Khami and Mutapa.[21] Colonial policies that forced Africans into wage labour saw the death of this craft. Though colonial Zimbabwe had a vibrant small-scale gold-mining sector, this was restricted to whites.[22] Only minimal riverbank panning by Africans remained as a continuation of precolonial mining. With the end of colonial rule in 1980, the sector opened up somewhat with several new small-scale mines being established with support from the ministry of mines and the state-owned Zimbabwe Mining Development Corporation (ZMDC). ZMDC was formed in 1982 to invest on behalf of the state, oversee the development of the mining sector and support mining co-operatives. According to Masiya *et al.*, registered claims increased from 1,000 to 10,000 between 1983 and 1990.[23] The ZANU(PF) government then viewed ASM as part of the solution to the unemployment problem.

Yet it was not until the early 1990s that government started actively to encourage artisanal mining. The IMF- and World Bank-sponsored Economic Structural Adjustment Programme (ESAP), adopted in 1990, promoted economic liberalisation and encouraged ASM and other self-employment activities. Ironically ASM would later be viewed as offering refuge to victims of ESAP's tragic economic effects. The new Mining Regulations of 1990 allowed rural district councils (RDCs) to license artisanal miners and regulate environmental impacts. The ministry of mines, with assistance from the University of Zimbabwe's engineering department, provided technical training for artisanal miners. The effort to regulate was not entirely successful, owing to lack of technical support in local authorities. In 1993, Zimbabwe hosted a world summit on ASM, which produced the *Harare Guidelines on Small/Medium-Scale Mining*. The declaration provided commitments to poverty-reduction-oriented development assistance for ASM in developing countries.[24]

By this time, there was a shift in how the international community viewed ASM, which was now cast as a poverty-alleviation activity, in contrast to earlier views of the sector as unwanted.[25] The political logic was: 'Thousands of artisanal and small miners are less of a threat to public order than thousands of the unemployed'.[26] In Zimbabwe a gradual shift from the earlier preoccupation with co-operatives to tolerating and even encouraging individual participation is noticeable during this period. From 1996, the Reserve Bank of Zimbabwe (RBZ)'s gold-buying agency, Fidelity Printers, started to accept gold in small amounts (as low as 50 grams). Small miners were offered relatively high prices for gold deliveries. However, police raids on 'illegal' artisanal mining activities were not uncommon, though not as intense as in the post-2000 period.[27]

---

20 Tendai Masiya, Layman Mlambo and Motive Mungoni, 'Small-Scale Mining in Zimbabwe: Historical Perspective', in *Global Conference on Business and Finance Proceedings*, Volume 7, Number 2 (Harare, University of Zimbabwe, 2012), p. 290.
21 Elizabeth Schmidt, 'Farmers, Hunters and Gold Washers: A Re-evaluation of Women's Role in Precolonial and Colonial Zimbabwe', *African Economic History*, 17 (1988), pp. 45–80.
22 Ian Phimister, 'History of Mining in Southern Rhodesia to 1953' (PhD thesis, University of Rhodesia, 1975).
23 Masiya *et al.*, 'Small Scale Mining in Zimbabwe', p. 293.
24 Gavin Hilson and Rita Van Der Vorst, 'Technology, Managerial, and Policy Initiatives for Improving Environmental Performance in Small-scale Gold Mining Industry', *Environmental Management*, 30, 6 (2002), pp. 764–77; Gavin Hilson, 'Small-Scale Mining, Poverty and Economic Development in Sub-Saharan Africa: An Overview', *Resources Policy*, 34, 1 (2009), pp. 1–5.
25 The Canadian International Development Agency (CIDA) and various German and Swedish agencies worked with the Zimbabwe government to encourage more sustainable ASM activities.
26 Luke Danielson, 'Foreword', in Hilson (ed.), *The Socio-Economic Impacts of Artisanal and Small-Scale Mining*, p. xiv.
27 Mawowa, 'Political Economy of Crisis'.

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

Post-2000 Zimbabwe has witnessed phenomenal growth of ASM. In 2002, Shoko estimated that 500,000 people were 'employed' in the sector.[28] Over the crisis period, government policies such as price controls, fixing foreign exchange and gold prices were often populist, ill-tempered and lacked economic realism. Inflation rose to become the second-worst in world history, rendering the country's payment and exchange system dysfunctional. This led to a thriving parallel/informal market, as literally everything ceased to be available on the formal market, from meat to fuel to foreign currency and gold. In 2006 the government enacted the Environmental Management Act, undoing several elements of the 1990 mining regulations. These included the illegalisation of river-bed gold panning, and regulations banning RDCs from issuing mining permits (though mining remains part of their ratepayers' base). ASM miners were required to fulfil stringent environmental requirements. To be fair, this legislation is most progressive in its efforts to regulate the negative environmental effects of artisanal mining, though its enforcement has created compliance challenges for the ASM.

The year 2008, which was the lowest point for Zimbabwe's mining industry, was the high point of ASM. This is reflected in the graph below. In November of that year, Metalon Gold, which accounted for 55 per cent of Zimbabwe's annual gold output, suspended operations on its five mines, affecting thousands of jobs. The reason for closure was the non-payment of US$18.3 million in lieu of gold deliveries by the RBZ. By the time gold trade was liberalised in 2009, gold miners were owed more than US$30 million by the RBZ.[29] At the time of writing, RBZ was failing to redeem the gold bonds it issued to gold miners for unpaid gold deliveries. It is thus not surprising that between 2000 and 2008 gold deliveries to RBZ declined tenfold.

In the light of RBZ's non-payment, and unviable exchange controls, miners had to choose between suspending operations and channelling gold into the parallel market. ASM is, by its small-scale nature, highly adaptable to smuggling. The graph above shows that while official gold output was declining due to the scaling down and closure of formal mining operations, ASM output was rising. It is thus safe to say that formal figures portray an exaggerated picture of receding gold output: rather most of the gold was channelled to the parallel market. By 2008 some 2 million Zimbabweans were dependent on ASM gold mining, according to UNIDO.[30]

Artisanal gold mining is not unique to Zimbabwe. It is a worldwide phenomenon, especially in mineral-rich developing countries. Maponda and Meck describe the global extent of this activity, and related local nomenclatures, including *galamseys* (Ghana), *makorokoza* (Zimbabwe) and *garimpeiros* (Brazil).[31] The contribution of artisanal mining to poverty alleviation in Africa and elsewhere is well documented.[32] In 2003, estimates of the number of people employed globally as artisanal and small-scale miners ranged from 60 million (ILO) to 100 million.[33] Approximately 3 – 15 million of these are in China, about 555,000 in Tanzania and 500,000I in India.[34] ASM accounts for more than 20 per cent

28  Dennis S.M. Shoko, 'Small-scale Mining and Alluvial Gold Panning within the Zambezi Basin', in Godfrey Chikowore (ed.), *Managing Common Property in an Age of Globalization: Zimbabwean Experiences* (Harare, Weaver Press, 2002).
29  *Zimbabwe Independent*, 18 June 2010.
30  UNIDO, *Empowering Small-Scale Miners in Zimbabwe: An Overview of Recommendations from the Global Mercury Project* (United Nations Industrial Development Organization, 2007).
31  Maponda and Meck, 'Illegal Artisanal Gold Panning in Zimbabwe', p. 349.
32  Eleanor Fisher, Rosemarie Mwaipopo, Wilson Mutagwaba, David Nyange, and Gil Yaron, '"The Ladder that Sends Us to Wealth": Artisanal Mining and Poverty Reduction in Tanzania', *Resources Policy*, 34, 1 (2009), pp. 32 – 8.
33  See http://www.miningfacts.org/Communities/What-is-Artisanal-and-Small-Scale-Mining/
34  *Ibid.*; Maponda and Meck, 'Illegal Artisanal Gold Panning in Zimbabwe', p. 349.

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms



**Figure 1.** Growth of artisanal small-scale mining in Zimbabwe 2003–2009. *Source*: several RBZ reports from 2003–2009 and UNIDO, *Empowering Small-Scale Miners in Zimbabwe: An Overview of Recommendations from the Global Mercury Project* (UNIDO, 2007).

of the world's non-fuel mineral production.[35] Zimbabwe's ASM sector is thus one of the world's largest.

By 2009, dollarisation and the formation of a coalition government brought some economic and political stability to Zimbabwe. Inflation plunged to single digits, averaging 5 per cent between 2009 and 2012. In spite of the modest gains by the new government, however, there has been no significant change in unemployment. ASM continues to proliferate, as it remains one of the few real avenues for survival and, in some instances, upward mobility. There have, however, been changes in the extent to which gold is channelled through formal routes following dollarisation and the liberalisation of the gold trade in early 2009. Over the course of 2011, the monthly contribution of artisanal small-scale gold producers grew from 125 kg (6 per cent) in January to 429 kg (31 per cent) in December.[36]

Regulation of ASM in Zimbabwe tends to be half-hearted, inconsistent and election-driven. In some instances, government ministers have expressed unease over the uncontrolled nature of small-scale mining. At the same time, government has been quick to celebrate the sector's contribution to the national economy and empowerment of blacks. Thus government has often held meetings sponsored by local businessmen, such as in 2003 and 2005, when the police, the Zimbabwe Small-Scale Miners' Federation, the Zimbabwe Small-Scale Buyers' Association (ZIMSSBA), the ministry of mines, and local government authorities came together ostensibly to deal with problems of smuggling and environmental degradation associated with ASM.[37] Government was promising to 'empower the historically disadvantaged small-scale miners' and to regulate illegal gold mining and trade.[38] The minister of mines in 2012 went so far as to call for the unbanning of illegal mining and the release of all arrested artisanal miners.[39] He called on police to stop arresting gold panners 'because they are contributing to the economy'.[40]

---

35  See also Gavin Hilson and Sadia Mohammed Banchirigah, 'Are Alternative Livelihood Projects Alleviating Poverty in Mining Communities? Experiences from Ghana', *Journal of Development Studies*, 45, 2 (2009), pp. 172–96; Fisher *et al.*, '"The Ladder that Sends Us to Wealth"'.

36  Reserve Bank of Zimbabwe, *Monetary Policy Statement*, 2012.

37  *Midlands Observer*, 3 June 2003; 27 May 2005.

38  *Midlands Observer*, 3 June 2003.

39  Minister Obert Mpofu, quoted in *Newsday*, 21 September 2012 (online edition) http://www.newsday.co.zw/2012/09/21/jailed-gold-panners-to-be-released/, accessed 19 August 2013.

40  *Ibid.*

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

## ASM in Central Zimbabwe

Nowhere in Zimbabwe is ASM more prevalent than in the central Kwekwe District. Kwekwe has earned the title *Chikorokoza* capital of Zimbabwe. So extensive and unordered has been artisanal mining in Kwekwe that trenches have been dug through national roads, railway lines, and on both public and private premises. In one extreme case a school in Kwekwe was reported to have been temporarily closed owing to damage to infrastructure by uncontrolled artisanal mining activity.[41] In October 2001 the *Midlands Observer* reported that some 600,000 people were involved in ASM activities in Kwekwe alone.[42] If this figure is true, one can guess the number to have risen to 1 million by 2012. Totororo, where observations for this study were made, represents one of the many sites where artisanal mining is taking place. It is located approximately 60 km north-east of Kwekwe, close to the ghost township of the former Empress Mine.

The growth of ASM in Totororo can be dated back to the time following the closure of the two most important mines in the area, namely Empress Mine in 1989 and Venice Mine in 1998, both owned by the Canadian company Falcon Gold. Thereafter, many former mine workers continued to stay at the mines' townships, eking out a living from farming, mining and informal vending. The ministry of mines assisted some former mine workers to form small mining co-operatives or register individual claims. However, because mining proved demanding in comparison to gold buying, most of these claim holders ended up acting as middlemen, buying gold for resale to RBZ from local peasant farmers and artisanal miners.[43] The semi-arid climate and poor geological conditions of the area means that seasonal crop cultivation alone can never be a reliable and adequate sole means of subsistence.[44] Artisanal miners rely on mills owned by registered small miners for the processing of gold ore. With rising unemployment, artisanal mining became a means of supporting collapsing livelihoods.

In a recent study of artisanal mining in southern Zimbabwe, Clifford Mabena has observed that changes in landownership patterns in Zimbabwe due to the land-reform programme have increased the scale of involvement in off-farm activities, particularly artisanal mining.[45] In the wake of droughts and lack of farming inputs, artisanal mining became the only viable alternative for the newly resettled farmers. In Totororo, there were no resettled farmers but there were a significant number of former farm workers among the artisanal miners. Most of the artisanal miners were aged between 17 and 35.

The government of Zimbabwe's shifting regulatory policy and practice sent contradictory signals to artisanal miners. Though it is a criminal offence for unlicensed persons to be found in possession of gold,[46] in practice the state buying agencies purchased gold without verifying the source. In reality artisanal mining is regulated by the police, RBZ, ministry of mines and ZANU(PF) structures. These entities do not always work harmoniously. In the run-up to elections in 2002, ZANU(PF) allowed – in fact encouraged – artisanal miners led by self-confessed war veterans and ZANU(PF) youth to take over the disused Globe and Phoenix Mine, about 20 km from Totororo. Yet the police also launched selective crackdowns on illegal mining sites, accusing artisanal miners of selling gold on the parallel market. Artisanal

---

41  *Sunday News*, online edition, www.sundaynews.co.zw.geo.webdev.co.zw/index.php?...gold-panning, accessed 15 August 2013
42  *Midlands Observer*, 24 October 2001.
43  Interview, son of a small-scale miner, 2 July 2007.
44  The area is too rocky for crop cultivation, and rainfall patterns are poor.
45  Clifford Mabena, 'Mining with a "Vuvuzela": Reconfiguring Artisanal Mining in Southern Zimbabwe and its Implications to Rural Livelihoods', *Journal of Contemporary African Studies*, 30, 2 (April 2012), pp. 219–33.
46  *Gold Trade Act [Chapter 21:03], 1940* (last amended, 2006).

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

miners I interviewed at Venice Mine explained inconsistency on the part of the police as political: targeting perceived MDC supporters while sparing ZANU(PF) supporters.[47] RBZ did not discourage its licensed buyers from buying gold from so-called illegal miners.

ASM in central Zimbabwe tends to occur in and around disused mines and, in rare cases, accidental new discoveries. Incidents of accidental gold discovery while cultivating fields are not uncommon. This often triggers a gold rush, which dies out once the gold ore has been exhausted. The rush tends to disregard protest or resistance from the field's owner and results in serious environmental degradation. Scars of gold rushes are visible nearly everywhere in Totororo. Rags-to-riches stories are common among villagers. The mining that occurs upon discovery of an old disused mine shaft tends to last longer and often leads to a stable small mining operation. This is often preceded by an acrimonious gold rush.

Upon discovering an old shaft, the finder often hides the discovery or starts mining pretending to have obtained mining rights. Such a claim is easy to make when the find is not on someone's property. When the discovery is made in someone's homestead, however, conflict frequently ensues. In both situations, it is common that no formal right to mine exists. One site I observed at Totororo was known as a disused mine, which, like other old shafts, villagers claimed was operated by Germans in the early 1900s. It only received attention due to the increase in panning activities in the area, and once it was found to be rich in gold caused a scramble. At the peak of the gold rush in 2005 the site drew people from every province in Zimbabwe.[48] From about 20 metres the tunnel soon extended to about 100 metres in length. The large number of people mining the shafts and contest over access resulted in two tunnels being developed. So intense was the activity that soon an area of more than 8,000 square metres was excavated underground.[49] Except for the first few metres at the mouth of the tunnel, the distance between its floor and roof was between 50 centimetres and 1 metre. Miners working inside the tunnel had to crawl most of the time. At the gold rush's peak, as many as 60 panners would be underground at a time.[50] During the field study dozens of miners could be observed at the mouth of the tunnel, some leaving with sacks of gold ore (*motoro*). The place buzzed with activity both day and night, with only brief intervals of quiet when there was rumour of a pending police raid. By the end of 2008, however, one syndicate, allegedly connected to the local chief, regional mining ministry officials, RBZ and local businessmen, managed to wrest control of the pit, and registered it as a small mine.[51] Twenty-four-hour private security guarded the place, effectively barring artisanal miners other than those who were clients of the owners.

Intense gold rushes of this sort commonly result in fatalities. During the field research, on 5 June 2007, a miner, son of the ZANU(PF) co-ordinator in the area, drowned in an underground pool that had formed at the deep end of the tunnel. With the consent of the father and two local police officers, fellow miners retrieved the body and buried it without due procedure.[52] When such deaths occur in the course of illegal activity, they are covered up to avoid raising media attention and the police. According to miners, there were cases where tunnels had collapsed, burying those inside.[53] One such incident occurred during the field research. Serious deaths and injuries can also result from violent clashes between the miners and police, and among miners themselves.

---

47  Interview, anonymous miner number four, 3 July 2007.
48  Interview with anonymous miner number three, 3 July 2007.
49  *Ibid.*
50  *Ibid.*
51  Follow-up interview with an anonymous Totororo miner, Chegutu, 11 February 2009.
52  Anonymous Sidhakeni police officer, 8 June 2007.
53  Interview with anonymous miner number one, 2 June 2007.

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

At the time of writing, artisanal mining remained pervasive in central Zimbabwe and many other parts of the country. The mass media went so far as to allege that artisanal mining was out of control. In early 2012, over 100 kilogrammes of pure gold nuggets were allegedly found in Kwekwe's Sherwood area, triggering a massive gold rush.[54] Gold buyers from as far away as South Africa camped at the site, notably competing with RBZ licensed buyers.[55] Local ZANU(PF) youth clashed with police in a bid to restrict access to party members.

> Announcing the takeover of the area at a rally attended by hundreds of panners who had been chased away from the fields by police, ZANU(PF) Midlands provincial security officer Owen 'Mudha' Ncube said the gold deposits in Sherwood belonged to his party. NewsDay said ZANU (PF) has started compiling registers of people who will be allowed to enter the fields to mine the gold. Cornelius Mpereri, a close ally of Emmerson Mnangagwa, tipped as a possible successor to Mugabe, and Josphats 'Gold' Sibanda have registered the Sherwood Block mining claim, it added.[56]

The case of Sherwood provides a glimpse of how both horizontal and vertical dynamics are at play in Zimbabwe's ASM. The following section analyses the form, structure and organisation of ASM in central Zimbabwe.

## Horizontal and Vertical Networks

The form, structure and organisation of ASM are opaque. Taking it at face value, one may easily dismiss ASM as mere survival activity for the poor. Such a simplistic view is tempting, considering how the sector has grown with Zimbabwe's economic decline. However, the benefits go beyond rural survival. The sector's opacity can be penetrated by closer examination of modes of organisation. Commonly used terms such as 'syndicate', 'sponsor', 'front', '*Mbimbo*' (a feared strong man leading a mafia), '*Zvipamuzi*' (literally, a slave), 'shefu' (chief/boss) '*kwamainini*' (literally, a second wife, but used to refer to the less rewarding of two gold shafts), '*Mwana wemuno*' (local), 'foreigner' and '*vakuru*' (superior), among others, say a lot about the organisation and structure of ASM.[57]

The word 'syndicate' usually implies a group of artisanal miners working together to extract ore and sharing it equally after processing, thus suggesting a horizontal network. This idea of syndicates is to some extent a legacy of government-sponsored small mining co-operatives in the 1980s and 1990s. Such syndicates might be mobile: often operating as nomadic miners moving from one gold rush to another. Field observations and interviews, however, reveal that groups of miners in syndicates do not always work together as equals, and what appears to be a loose coalition of miners is often linked to and supported by a well-to-do and often powerful political or business person referred to as a 'sponsor', '*shefu*' or '*vakuru*'. The 'sponsor' can take 50 per cent of recovered gold, while the other 50 per cent is shared equally among miners. Some syndicates are thus no more than employees of a 'sponsor', whose connection to the state's coercive apparatus provides protection from both police harassment and rival groups. It is common for the 'sponsor' to be the owner of the mill to which ore is taken for processing and to be a holder of a gold-buying licence, controlling production and trade. Thus through syndicates ASM can be oligopolistic, controlled by a few powerful individuals.

---

54  *Newsday*, 1 October 2012.
55  Interview with Silas, 8 January 2013.
56  *Mail and Guardian*, 12 January 2012, http://mg.co.za/article/2012-01-10-mugabes-zanupf-moves-in-on-gold-deposits, accessed 20 August 2013.
57  See also Shumirai Nyota and Fortune Sibanda, 'Digging for Diamonds, Wielding New Words: A Linguistic Perspective on Zimbabwe's "Blood Diamonds"', *Journal of Southern African Studies*, 38, 1 (2012), pp. 129–44.

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

Syndicates vary from organised and permanent operations to impromptu alliances of convenience. Impromptu syndicates normally arise where locals (*vana vemuno*) gang up against 'foreigners' (outsiders). In some cases, impromptu syndicates are led by the strongest man ('*mbimbo*'), who commands '*zvipamuzi*' (slaves) to dig ore for him. It is also common for artisanal miners to organise against the police. In 2007 there were estimated to be more than eighty organised permanent syndicates in Kwekwe alone.[58] Exploiting connections with the regional mining commissioner, the 'sponsor' is often able to register a claim under his name soon after a gold rush confirms the richness of a site. Syndicates are distinguishable from individual miners who may have made artisanal mining a permanent vocation or those who engage in the practice infrequently. Miners operating individually are mostly local youths, but they can also be nomadic.

In the case of the Totororo tunnels, two powerful syndicates competed for control during the rush, from late 2006 to mid-2007. One was headed by a man named Comfort, alleged to be a brother-in-law of Emmerson Mnangagwa, Minister of Defence, former MP for Kwekwe, and ZANU(PF) secretary for administration, who is often tipped as a potential successor to President Mugabe. Mazenge, the local villager who occupies the homestead within which the entrance to the gold tunnel lies, was 'incorporated' into this syndicate to legitimise the claim. The syndicate was reported to have direct access to the South African market.[59]

The second Totororo syndicate involved the local headman, whose homestead lies next to Mazenge's. The headman argued that, since the tunnel went via his kraal, he had an equal right to the claim. Mazenge's syndicate was working with individuals connected to the RBZ, and had the support of RBZ senior officials, a Gweru businessman who is a ruling party member, and a former provincial mining commissioner.[60] The headman had a prospecting licence and claim registration certificate. He admits that the legal paperwork was 'fast-tracked' to legitimise the claim ahead of the other group's. According to the headman, the razor wire erected around his homestead had been funded by Fidelity Printers because the space was to be used for processing and buying gold. For more than a year, the premises were guarded by Fawcet Security Company, which is linked to the Gweru businessman working with the headman. The headman's syndicate was digging a tunnel parallel to that of the first syndicate. The erection of such fences is not uncommon for Fidelity. It has been RBZ policy to establish such fenced gold-buying stations at gold mills and places were ASM is prevalent.

These two syndicates thus represent competing interests of members of ZANU(PF)'s elite. Such contests over ownership involving powerful figures in ZANU(PF) are not uncommon in the ASM gold sector. Indeed, the whole chain of ASM is controlled by powerful people. For example, the so called 'local' gold buyers are, more often than not, front men acting on behalf of big chiefs in government, party or business. One well-known buyer based in Totororo village was alleged to work with a ZANU(PF) councillor and businessman from my home town of Chegutu, 102 km south-west of Harare.[61] Established syndicates such as those in Totororo claimed to have their own networks of gold trading, which spanned local, national and regional Southern African borders.

The organisation of ASM thus follows a national pattern of elite accumulation, which is entwined with ZANU(PF)'s project to retain political power. Notwithstanding differences in

---

58   *Midlands Observer*, 16 March 2007, p. 1.
59   Interview with anonymous miner number one, Totororo, 2 June 2007.
60   In what could be a case of accumulation rivalry in ZANU(PF), the mining commissioner was once arrested for corruption on the awarding of mining claims certificates. He was released and later transferred to Masvingo.
61   Anonymous Totororo gold buyer, 4 June 2007.

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

the degree of control over the gold and diamond sectors, in both areas those arms of the state tasked with stopping 'illegal' mining operations often become actively involved in the smuggling.[62] In most places where gold rushes occur, police seem keen to move in and regulate, but their 'regulation' contravenes the law. They control access instead of prohibiting it, allowing miners to take hourly turns in the tunnels for a standardised fee. In Navhata, a few kilometres from Totororo, where there was a new gold rush, police were reported to be allowing access for a fee.[63] In Totororo, during my fieldwork, police admitted to taking kickbacks for turning a blind eye or releasing arrested miners.[64] This quasi-institutionalised rent-seeking was closely entwined with other aspects of Zimbabwe's thriving parallel economy. Police have become used to taking 'instant taxation' (bribes), whether at traffic checkpoints, retail shops in the name of price controls, foreign currency trade points, or other informal markets. Zimbabwe has retained a cohesive state structure that allows accumulation by state bodies controlling resource access: David Towriss argues that the state tolerated the looting of diamonds in Marange by security agencies.[65] Individuals with positions within, or connections to, key state institutions selectively applied laws to their own advantage. Interviews with ASM miners showed that, for one to stay in the game, both horizontal and vertical networks were crucial.

## Violence, Party/State and ASM

Both spontaneous and organised violence are common features of ASM gold mining, as rival miners and syndicates contest access to mining sites or resist police. The lines of conflict commonly manifest a local–'foreigner' (from another region or village) dichotomy. They also frequently pit registered syndicates against unregistered miners, or lie between rival registered elite-controlled syndicates. Violent clashes can involve as many as 400 panners, and often result in serious injuries and deaths.[66] One such violent group of artisanal miners in Kwekwe is the 'Vampire group', which was infamous for violent behaviour and disrespect for other people's property in digging for gold ore.[67] The group was said to derive its name from its mode of operation, and has allegedly 'caused havoc and instilled fear in other … syndicates'. It was said to have links with 'powerful individuals within the police force and ZANU(PF)', and thus 'does its activities without fear of reprisals from law enforcers'.[68] Most miners interviewed in Totororo in early June 2007 alleged that it was not uncommon for members of the same syndicate to turn against each other in the wake of a rich find or in disputes over the sharing of recovered gold, sometimes resulting in death.[69]

Conflicts and subsequent violence over gold have not been restricted to the actual mining sites. Most violent clashes at local shopping centres have been traced to 'the tunnel'. The community is suspicious of nomadic artisanal miners, often accusing them of stealing. Local media reported one such incident where a miner was beaten to death.[70] In a letter to the

---

62  David Towriss, 'Buying Loyalty: Zimbabwe's Marange Diamonds', *Journal of Southern African Studies*, 39, 1 (2013), pp. 99–117.
63  Follow-up interview with an anonymous Totororo miner, Chegutu, 11 February 2009.
64  Anonymous Sidhakeni police officer, Totororo, 8 June 2007.
65  *Ibid.*
66  *Midlands Observer*, 3 October 2003.
67  *Midlands Observer*, 7 November 2003.
68  *Midlands Observer*, 7 May, 2003.
69  Interview with anonymous miner number one, Totororo, 13 September 2007; follow-up interview with an anonymous Totororo miner, Chegutu, 11 February 2009.
70  *The Times*, February 28–March 6, 2003.

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

Kwekwe-based private newspaper *Midlands Observer*,[71] a reader expressed concern over Chipinda, a mafia and syndicate leader in Kwekwe. He alleged that Chipinda had been terrorising residents of Kwekwe. Before his arrest and three-year sentence for murdering his girlfriend, 'Chipinda had become so powerful … and so untouchable that the Zimbabwe Republic Police (ZRP) would even "salute" him'.[72] Some syndicates would hire private security companies or the ZRP to bar rivals from accessing contested sites.

The above scenario, where police are hired by individual illegal miners against rivals, has left the force bereft of miners' respect. As a result, police have suffered at the hands of determined artisanal miners, even where impartial action has been taken. In some instances miners were able to mobilise and resist police raids. At one point during the field research, an officer representing local police held a 'peace-building' meeting with miners only to find his bicycle tyres deflated afterwards.[73] Violence against the police is by no means unique to Totororo, neither is it restricted to gold. In 2006, at the height of diamond smuggling in Marange, similar clashes were often reported.[74]

Nevertheless, the violent contestations have also produced attempts to create order and harmonious coexistence on the part of the very same authorities – the Ministry of Mines, police, chiefs and headmen, and ZANU(PF) party structures. The state's attitude and actions on ASM can be defined as an interplay of contradictory interests in order and disorder, as well as being cross-cut by interests in accumulation, producing at best ambivalent outcomes.

This ambivalent interest in order produced a succession of actions by the police or the central state against artisanal mining operations. The first attempted clampdown occurred through a nationwide militarised intervention named Operation Mariyawanda ('too much money') in February 2003. During this operation in the area studied, 900 miners were arrested in Totororo and nearby Venice mine, illegal settlements were destroyed, and over 300 shacks were burned.[75] This was a joint brutal operation conducted by the Military, Police and Prison Service. According to the *Midlands Observer*, Venice was a perceived support base for Zimbabwe's opposition MDC. This was followed up in 2005 by a police raid at the Totororo tunnels, in which 33 miners were arrested, including a local chief. The accused were sentenced to three months' imprisonment, but the option of a fine meant that none would go to prison. Given the limited survival alternatives and the extent of the devaluation of the Zimbabwe dollar, the fine meant nothing. Nearly always, miners would be arrested only to be released after paying fines.[76] The next nationwide intervention occurred in 2006, when Operation Chikorokoza Chapera ('artisanal mining has ended') was launched. Twenty-six thousand people were arrested in the months following, and in May 2007 ten people died in police raids.[77]

Many police raids can be interpreted as reactions to violence between miners rather than as intended to stop criminalised artisanal mining. The *Midlands Observer* reported a police officer justifying their intervention: 'We are not saying that they should cease their activities forthwith, but that they should be wary of the dangers associated with disused mines and shafts especially now that the rain season has started'.[78] This comment came after a miner had

---

71   The paper has been accused by ZANU(PF) supporters and war veterans of being pro-MDC, and the editor was threatened with unspecified action in June 2008, according to allafrica.com, http://allafrica.com/stories/200806021526.html, accessed 20 August 2013. The ownership of the paper could not be established at the time of writing.
72   *Midlands Observer*, 13 April 2007.
73   Interview with anonymous miner number three, 9 July 2007.
74   Lloyd Sachikonye, 'Diamonds in Zimbabwe: A Situational Analysis', *Resource Insight 1* (Braamfontein: Southern Africa Resource Watch, 2007).
75   *Midlands Observer*, 14 February 2003.
76   *Midlands Observer*, 1 March 2005.
77   *Zimonline*, 14 May 2007.
78   *Midlands Observer*, 24 October 2003.

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

drowned in a disused mining tunnel at Turtle mine in Silobela. At one point there was an instruction for police to close the Totororo tunnels, but this was never followed through.

In a typical case of instant taxation, far from cracking down on artisanal mining, the police cashed in by managing access to mining sites. During the field research a new gold-rush site in Bhamala (near Totororo) was heavily guarded by the police, who were charging Z$3 million (R200 – a fee equivalent to a policeman's monthly salary in July 2007) per hour spent in the tunnel. Miners grateful to the police for managing access, creating order and averting violent conflict were happy to pay, and entered in groups of eight to ten each turn. Thus an apparently mutually beneficial relationship was established between artisanal miners and law enforcers in this instance, unlike the case of Marange diamonds,. The police presence at the tunnel increased rapidly: starting with three police officers, the number quickly mounted to six on the second day and fourteen on the third.[79] So lucrative was this arrangement that police officers started to compete with one another, then began to operate in two-day shifts in order to accommodate the greater numbers.

Spending as much as twelve hours guarding the pit translated to Z$36 million. When shared among ten officers, each could take home Z$3.6 million tax-free,[80] more than a police officer's monthly salary. By charging rents in this way from those extracting the gold, the police were beneficiaries simply because of their position in the state. In the same year, the policemen were also deserting their official duties to guard yet another mining tunnel at St George,[81] about 12 kilometres from Totororo. These appeared to have made an arrangement with their immediate superiors. While the superiors did not go out to man the mines, they got remittances from juniors trying to please them in order to guarantee 'redeployment' to lucrative mining sites. More than once these police officers reportedly ran away when other, more senior officers arrived.[82]

The ruling party provincial leadership was also involved in rent-seeking. One ex-combatant wrote to the *Midlands Observer* as follows:

> I am writing in connection with corruption happening at Gaika Mine. I am a war veteran. The recently posted Support Unit Police boss is making hefty amounts of money through the Amakorokozas. He is said to be charging about Z$3 000 000 per syndicate and getting a monthly lump sum of Z$50 000 000. This is a circle involving some ruling party members, it's so boring when I am making a living from the only Z$1 000 000 gratuity I am being paid …[83]

One cannot help noticing the emphasis, 'I am a war veteran'; the writer signed off as 'War Vet'. The 'war vet' seems to be saying 'I must not be left out, being also a war vet and member of ZANU(PF). How can I continue to survive on a meagre Z$1,000,000 when others are making as much as Z$50,000,000?'

ZANU(PF) party structures often worked together with police in the regulation of ASM. In Totororo, the ZANU(PF) youth leader was active in managing access to the tunnel in the name of organising youths. He was also a member of the local police reserve, giving him double legitimacy. The state has thus vacillated between supporting and criminalising artisanal gold mining. In 2007, for instance, all small-scale miners were ordered to

---

79 Interview with anonymous miner number two, 3 July 2007.
80 The high rate of inflation and exchange rate make this figure vague. With a July 2007 parallel rate of Z $15,000 = R1, 36 million is reduced to R2,400, and 3.6 million is reduced to R240.
81 The tunnel at St George hospital was left after its owner committed suicide. Sakala, the deceased owner, is said to have been directed to the abandoned mine by a German national whose grandfathers operated the mine long ago. Sakala was making a fortune until he committed suicide after being tricked of 1 kilogramme of gold by some Nigerians. He had even managed to electrify Chief Samambwa's home. Interview with anonymous miner number three, 3 July 2007.
82 Anonymous 3, interview, 3 July 2007.
83 War Vet, Kwekwe, in The *Midlands Observer*, December 2 2005.

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

stop mining until the Ministry of Mines had sorted out issues of registration, suggesting a shift towards regulation and accommodation of those in the illegal mining trade.[84] But there is no evidence that this was followed through or enforced.

The RBZ position on artisanal mining was also far from consistent. It is uncertain whether this was out of realism or mere double-dipping (i.e. double standards, whereby the Bank banned the activity but bought gold from the same artisanal miners). Despite its avowed criminalisation of artisanal miners, the Bank issued special licences to designated agents to buy gold from gold-rush sites, as part of a strategy of the 'decentralisation of gold buying' in 2004.[85] As of July 2004, '176 custom millers and 38 agents were working together with Fidelity Printers and Refiners (the gold-buying arm of RBZ)'. [86] The rationale was that this would 'reduce grey market activities'. Most of the licensed buyers were in fact surrogates for senior ZANU(PF) officials and became super rich. In practice RBZ was accepting gold from unlicensed buyers. For the most part however, there was a wide disparity between the parallel-market price and official prices offered by RBZ. Very few miners sold to RBZ as a result. For example, in July 2007 RBZ was buying at Z\$1.2 million per gramme while the parallel-market buyers were paying Z\$3 million per gramme.


## Conclusion

Zimbabwe's crisis period, as analysed through the prism of the artisanal gold-mining sector in central Zimbabwe, shows varied and perhaps contradictory outcomes. It has produced beneficiaries as well as losers. ASM grew initially as a survival enclave for the poor and jobless but very quickly became entangled in elite accumulation. A straightforward account of artisanal mining as a survivalist, poverty-driven enterprise is thus inadequate. The structure of control over ASM gold mining shows very clearly that high political office and accumulation go hand in glove. One can perceive a form of localised capitalist oligarchy made up of beneficiaries of the crisis political economy. As the economic situation worsened, the political elite and its functionaries grew increasingly conscious of the utilitarian value of economic gate-keeping, using control over artisanal gold mining as a means of both political and economic gain.

An accumulating class, or perhaps what the *Zimbabwe Independent* columnist Muckraker has termed a 'vulturine class',[87] is now visible in the gold sector and other lucrative parts of the economy. As in the case of land reform, this class has developed in the mining sector by deploying narratives of liberation war credentials, indigenisation, economic empowerment and party affiliation in order to legitimise access. Low-ranking police officers and local political leaders can tap into this political economy of accumulation through gold by regulating access, mediating connections between elites and grassroots extractors, and widening the net of beneficiaries. The broad net of beneficiaries has, perhaps, enhanced the sustainability of the emerging structure of patronage in ASM gold mining. Though appearing at face value to be self-employed, the ASM syndicates and nomadic miners rely on a patron and are thus a labour force of a special type. The 'real' capitalists are members of the ruling elite who have control over the means of production through the party-state. This capitalist can choose to operate directly at the mine through a syndicate or have bands of nomadic

---

84  IRIN Africa, 16 April 2007, accessed at http://www.irinnews.org/report/71631/zimbabwe-crackdown-on-illegal-mining-has-unforeseen-consequences on 20 August 2013.
85  The Reserve Bank of Zimbabwe, *Monetary Policy Statement: The Second Quarter to 30 June, 2004*, issued by the Governor, Gideon Gono, in terms of Reserve Bank of Zimbabwe Act Chapter 22:15, Section 46, July 2004.
86  *Ibid.*, p. 20.
87  *Zimbabwe Independent*, 13–19 July 2007.

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

936   *Journal of Southern African Studies*

miners working for him, to whom he pays wages in the name of buying or sharing gold. The miners have little or no control over either the selling price or access to the means of production.

ASM has thus produced a complex accumulation process in central Zimbabwe. While it can be seen as a form of primitive accumulation, it is not clear if the trajectory is one of stagnation or progression away from widespread violence. I argued here that it is possible to see the transformation of chaotic gold rush into registered small-scale claim as a shift away from 'primitive' accumulation, rather than simply its perpetuation. Stabilisation does, however, appear to narrow opportunities at the bottom to clients of the registered holder. But in the case of gold, it is not clear that vertical mobility has been restricted only to those at the top, or those with high-ranking political connections. A view of highly restricted elite gain could not accommodate some of the majestic rags-to-riches stories that circulate in the goldfields. Controls over access are varied. The trajectory from rush to registered claim is not smooth or always predictable, and the sustainability of ASM operations is often uncertain. Sometimes there has been an agglomeration of derivative businesses serving the mining communities and tapping into their wealth. At the peak of Totororo's illegal gold-mining activities, new booking houses were built at the local shopping centre to accommodate the influx of nomadic miners and prostitutes. One local businessman, a headmaster, constructed two new grocery shops and a bottle store. With the passing of the gold boom, however, these businesses declined. The established registered small mining operation seemed unable to sustain the former buzz. Understanding the political economy of artisanal gold in Zimbabwe must therefore be sensitive to change over time, both in the broader economic context and in modes of control. It must also incorporate an account of the shifting, diverse and often contradictory interests of the large range of players involved in the networks and hierarchies of extraction, trade and regulation, ranging from the key players in Zimbabwe's unfolding political story at the top to the local subsistence farmers and rural and urban poor at the bottom.

SHOWERS MAWOWA
*School of Built Environment and Development Studies (BEDS), University of KwaZulu-Natal, Durban, South Africa. E-mail: showersmawowa@gmail.com*

This content downloaded from 165.225.220.185 on Thu, 10 Aug 2023 13:56:20 +00:00
All use subject to https://about.jstor.org/terms

# Exhibit H



**News    Politics    Local    Courts    Showbiz    Sports    Business    Bizarre    International    Diaspora    Opinion**                    ☰

# Mpofu appoints Masimirembwa to chair CMED

By Nehanda Radio    —    On Jun 12, 2014    —    580    —                    BUSINESS  NEWS

Former ZMDC board chairman Godwills Masimirembwa

*Former ZMDC board chairman Godwills Masimirembwa*

**Transport and Infrastructural Development Minister Dr Obert Mpofu has appointed former Zimbabwe Mining Development Corporation chairman Mr Godwills Masimirembwa the new CMED (Pvt) Ltd chairperson, taking over from Mr Albert Kamhunga.**

Former ZMDC board chairman Godwills Masimirembwa

*Former ZMDC board chairman Godwills Masimirembwa*

Mr Masimirembwa will be deputised by Mr Seymour Mpofu, a former police Assistant Commissioner.

Other board members are Mr Chipiwa Philimon Pasipamire, Mrs Sihle Khabo, Mrs Tinotenda Nhwewde, Mr Phinias Lugube, Engineer Tedious Chinyanga and Mrs Rita Lukukuma.

In September last year President Mugabe told a luncheon held for lawmakers that Government aimed to get to the bottom of allegations that Mr Masimirembwa had demanded and received a US$6 million bribe from Ghanaian investors who wanted to mine diamonds in Marange

---

RELATED ARTICLES

Illegal miners stealing railway ballast to crush as…
Feb 8, 2023    **19,560**

Railway infrastructure worth US$3,6 million destroyed and…
Jan 31, 2023    **30,596**

Minister defends appointment of Tshinga Dube (81) to NRZ…
Jan 27, 2023    **40,658**

'We owe each Zimbo a corrupt-free policy and delivery…
Nov 7, 2022    **43,344**

PREV    NEXT    1 of 101

---

However, in an interview to mark his 90th birthday aired on ZBC TV in February, the President cleared Mr Masimirembwa, claiming that the Ghanaians had misled the nation.

Masimirembwa was also engulfed in another storm last year in October after it emerged he bussed youths from Mabvuku to work in a security firm offering services in Chiadzwa during his tenure as the ZMDC boss.

In a suspected case of conflict of interest, Masimirembwa also engaged the same security firm, National Eye — guarding the ZMDC subsidiary's premises at Chiadzwa diamond fields in Manicaland — to provide security services at his farm in Beatrice.

Meanwhile Minister Mpofu also announced a new National Railways of Zimbabwe board, chaired by former NRZ general manager Engineer Alvord Mabhena.

■ Latest Articles

ECOWAS leaders say all options open in Niger, including 'use…
Aug 10, 2023    26,689

UN chief prosecutor decries leniency for genocide accused…
Aug 10, 2023    18,828

Mnangagwa declares "loving, hardworking" Tomana…
Aug 10, 2023    54,918

Botswana's Sua Flamingoes release ex-Bosso striker…
Aug 10, 2023    24,425

Longtime friend of Senzo Meyiwa disputes Kelly Khumalo…
Aug 10, 2023    41,100

LOAD MORE POSTS



**Nehanda Radio Alerts via Email**

Enter your email

Subscribe to Breaking News

Powered by ☐

■ **Follow Us On Social Media**

Eng Mabhena is deputised by Brigadier-General (Retired) David Chiweza, the only member of the previous board. Other board members are Mr Joseph Mashika, Mr Erick Makarimayi, Mrs Nomathemba Ndlovu, Mrs Chrystosoma Kanjoma and Mrs Angeline Karonga.

Because you are here...
consider supporting us

Nehanda Radio

VISA   mastercard   AMERICAN EXPRESS   PayPal

Donate

Facebook
Likes

Twitter
Followers

Youtube
Subscribers

Instagram
Follow Us

## Most Commented Today

Ex-Dynamos coach Shepherd Murape linked with Zimbabwe…
Aug 9, 2023   44,484

Kuda Mahachi becomes first player from Zimbabwe to play for…
Aug 9, 2023   39,070

'Politicians should keep their faith to themselves and…
Aug 9, 2023   35,994

ECOWAS leaders say all options open in Niger, including 'use…
Aug 10, 2023   26,689

Bad start for Kaitano Tembo at Richards Bay, loses first two…
Aug 10, 2023   25,575

LOAD MORE POSTS

Albert Kamhunga   Alvord Mabhena   Angeline Karonga   Chipiwa Philimon Pasipamire   Chrystosoma Kanjoma   CMED
David Chiweza   Erick Makarimayi

PREV POST
Zim TV show exploits plight of cancer patient

NEXT POST
Pupil retaliates after teacher whips him with hosepipe

## You Might Also Like

BUSINESS

Illegal miners stealing railway ballast to crush as potential gold ore

BUSINESS

Railway infrastructure worth US$3,6 million destroyed and stolen

POLITICS

Minister defends appointment of Tshinga Dube (81) to NRZ board

POLITICS

'We owe each Zimbo a corrupt-free policy and delivery culture' –…

POLITICS

"Tell him to report matter to the police" – Obert Mpofu on stealing…

POLITICS

'We are going to be in power for a very long time': Zanu PF's Obert…

LOAD MORE POSTS

## Comments



Facebook
Join us on Facebook

Twitter
Join us on Twitter

Youtube
Join us on Youtube

Instagram
Join us on Instagram

SoundCloud
…

## Contact Us

Editorial: editor@nehandaradio.com

Advertising: adverts@nehandaradio.com

Whatsapp: +447748665050

About Us     Advertising     Contact Us     Donate     Listen To Radio     Privacy Policy     Who Is Who     #NehandaEyes

© 2023 - Nehanda Radio. All Rights Reserved.

Privacy & Cookies Policy

# Exhibit I



Menu

| | Latest News | Editor's Choice | |

News / National

## Obert Mpofu, Masimirembwa, strange bedfellows

by Shame Makoshori

28 Jun 2014 at 15:26hrs | 3987 Views

Bulawayo24.com uses cookies to ensure you get the best experience on our website

Got it!

 Cookie Consent



THE darkest hour in the uneasy relationship between government and business was reached during hyperinflation in 2007, when the National Incomes and Pricing Commission (NIPC) was established to enforce price controls that crippled industries. Charging viable prices turned into a crime as government, through the NIPC pushed struggling firms to the brink, deploying police to raid shops and arrest defiant executives, even as inflation galloped to a record of 500 billion percent in 2008.

Over 23 000 business managers and executives were arrested for allegedly attempting to incite public anger against government by making people's lives extremely difficult through price hikes. The man propelled into the hot seat by industry and international trade minister at the time, Obert Mpofu, was Godwills

Masimirembwa, who was appointed NIPC chairman.

Cowed into submission, supermarket owners maintained prices at uneconomic levels, but soon found themselves unable to replenish dwindling stocks, leaving shelves empty and a stranded population grappling for basics on the black market. Government ignored advice about the implications of an all powerful pricing body. The Zimbabwe National Chamber of Commerce had warned in 2007 the NIPC Bill, which was in the process of being made into an Act, was "counterproductive to foreign investment".

But it was equally bad even to domestic investment. The advice fell on deaf ears, and government nonetheless passed the legislation, resulting in the creation of the NIPC. On his appointment, Masimirembwa fought to accomplish the assignment at hand, leading to a blossoming relationship with Mpofu, with whom he seemed to share a common belief that populist policies were the solution to a pricing crisis.

After the NIPC's interventions had already inflicted tremendous damage to the economy, with over 40 000 losing jobs in mines, over 1 500 companies closed, banks on their knees and three million Zimbabweans having fled the crisis to other countries; government, as an afterthought, accepted liberal polices in 2009. The defenceless Zimbabwe dollar, then trading at ZW$3,5 trillion to US$1, was ditched and replaced by multiple currencies, rendering the NIPC, which however still exists, irrelevant.

Today, it is largely a white elephant draining State funds for nothing. With the NIPC era gone, many thought they had seen the last of Masimirembwa, who had unsuccessfully fought to be re-registered as a practising lawyer by the Zimbabwe Law Society. They were wrong.

Mpofu, who retained a Cabinet post in the power-sharing government between ZANU-PF and two Movement for Democratic Change formations, and was re-assigned to the influential Mines and Mining Development ministerial, brought him back, this time to a new State body, the Zimbabwe Mining Development Corporation (ZMDC).

The ZMDC was given a mandate to ensure that the mining sector led economic recovery. Gold mines had collapsed, SMM Holdings' key asbestos mines had closed under the weight of excessive State interference, offloading 3 000 jobs. The ZMDC was being re-positioned to take over 50 percent shareholding in each of the diamond mines in Marange diamond fields, resuscitate the asbestos outfits, and rebuild its own struggling gold mines.

Government was battling to arrest alleged impropriety in the gems industry where millions were being unaccounted for. And a strong team was required to drive ZMDC. Mpofu turned to Masimirembwa, whom he gave the mantle to take leadership of the process as ZMDC chairman. "What people don't know is that Masimirembwa impressed Mpofu while at the NIPC," said a ZMDC official.

"He was an instruction taker who rarely questioned the minister," he said.

Takunda Mugaga, head of research at Econometer Global Capital agreed.

"Ministers have soft spots for certain individuals," he said. "This is everywhere, even when Presidents appoint their Cabinets; there are certain people you know will get appointments," Mugaga said. This is the problem that has dragged Zimbabwe into the situation it finds itself in today.

At ZMDC, a 2013 parliamentary report questioned how the mining firm was being managed. "The committee noted with concern the manner and the type of people who were being appointed to serve on ZMDC's subsidiary companies…board appointments to ZMDC's subsidiary companies were being made by the Minister of Mines, in clear violation of the ZMDC Act," the report said.

When Zimbabwe held its elections on July 31, 2013, Masimirembwa resigned from his position as ZMDC chairman, in line with a government proclamation that all those on State institutions intending to contest in the elections had to resign. He contested for a Parliamentary seat in Mabvuku, but lost. Then he received a public lashing from President Robert Mugabe that everyone thought would spell his doom.

President Mugabe accused Masimirembwa corruption involving a US$6 million bribe from a Ghanaian diamonds investor who wanted diamond claims in Marange. Mugabe demanded swift police action against Masimirembwa charging: "Come on, we can't have that in our country. That n*ked corruption, no!" But Masimirembwa quietly wriggled himself out of a potential criminal investigation, even arrest.

In fact, the pendulum surprisingly swung the other way: The top brass within the police insisted it was in fact the Ghanaians who should be prosecuted, arguing they had embarked on illegal deals, including trading in gold, when they were in the country. Many Zimbabweans still thought Masimirembwa would not rise again from the President's attack, despite having survived the threat of incarceration.

But Mpofu, now Transport, Communications and Infrastructure Development Minister, gave him an unexpected lifeline. He, this month, appointed Masimirembwa chairman of CMED (Private) Limited, a State firm that manages and fuel facilities for mostly government departments.

The appointment was apparently endorsed by President Mugabe, who approves all appointments to key parastatals by his ministers. Rashweat Mukundu, a Harare-based analyst, said the appointment was inappropriate. "This is a case of jobs for the boys," he says.

"Government is equally telling citizens to go to hell by appointing questionable characters to its State enterprises' boards."

**Source - fingaz**

More on: *#Obert_Mpofu*

Comments

**mangoAds**



Nkulumane Munyoro
House For Sale







## News

Local

Regional

National

Africa

Education

Health

Religion

International

Agriculture

Press Release

Live

APO

## Sports

Local

Soccer

Cricket

Basketball

Rugby

Schools

Live

Other

## Business

Local

Companies

Economy

International

Your Money

## Lifestyle

Dose of Encouragement

Eats

Fashion

Health

Travel and Tourism

Relationships

Comics

Photos

## Opinion

Columnist

Interviews

Speeches

Letters

Blogs

Religion

Women's Corner

Youth Corner

WhatsApp Updates

Bereavements

Book Reviews

## Entertainment

Music

Celebrity

Movies

Games

TV Guide

Arts

Radio

Shows

Events

Team Bulawayo

Weekend Guide

## Technology

Motors

Camera

Internet

Mobile phone

Computers

Software

Robotics

Science

Other

## Videos

News

Sport

Entertainment

Motoring

Women

Food

Tourism

Health

Documentary

Viral

## Other

Widgets

Site map

RSS Feeds

About Us

Contact Us

Our Team



### News Team
editor@bulawayo24.com
news@bulawayo24.com
info@bulawayo24.com

### Advertising
advertise@bulawayo24.com

Share

Facebook

Twitter

Google+

Reddit

RSS Feeds

Latest Stories

# Exhibit J

# The Zimbabwean

## A Voice for the Voiceless

Friday 11th
August 2023
Updated: 20:05

Go to...

18.8.2010
6:55

# ZANU PF infighting blamed for the suspension of top mining officials

by

The suspension of the Zimbabwe Mining Development Corporations chief executive officer and three other top managers, allegedly for misappropriation of US$40 million in proceeds from gold and diamond sales, is being linked to vicious infighting in ZANU PF circles.

Chief Executive Dominic Mubayiwa, Finance Director Robert Karemba, Group Technical Manager Albert Chitambo and Corporate Secretary Tichaona Muhonde, were recently placed on forced leave at the instigation of Mines Minister Obert Mpofu.

Mpofu last month brought in Goodwills Masimirembwa to become ZMDC chairman after going on record as saying times of protection and connections will soon come to an end. A source told us on Tuesday the remarks were obviously aimed at Mubayiwa, who was reported to be always at loggerheads with Mpofu over the handling of the diamonds cash.

It has taken government almost two years to act on Mubayiwa who was fingered in a Reserve Bank report that claimed the ZMDC could not account for almost $20 million from diamond sales.

But the former ZMDC board, stashed with loyalist from the Solomon Mujuru faction, failed to take any action or carry out investigations into the allegations.

SW Radio Africa is reliably informed that matters came to a head when Mubayiwa reportedly gave out information of the full corporate breakdown of the companies involved in the Chiadzwa diamonds.

The information that Mubayiwa, released was deemed too sensitive to the ZANU PF establishment, especially those linked to the Emmerson Mnangagwa faction. Mpofu is reportedly linked to that camp and according to Mubayiwa some Mbada board members are allegedly close relatives to the minister. The suspended ZMDC boss identified Sithengisiso Mpofu as one those on the board of Mbada, one of the companies government is allowing to mine the controversial diamonds at

Have your say:
Jump to comments

## Related

Opposition accuses Zimbabwe President of unlawful activities to remain in power

President Says Zimbabwe Will Be 'Lost' If He Is Not Re-elected



Privacy • Terms

Chiadzwa, Marange. The board chairman is Robert Mhlanga, a former
Presidential helicopter pilot to Robert Mugabe.

Post published in: News

## Leave a Reply

Name...   Email...   Website...

Send

Interested in advertising?

Search the site   Search

Advertise with us

## Branded Content

**Partner with us now**

## The Zimbabwean

Friday 11th August 2023
Update: 20:05

- Opinions
- Lifestyle
- Technology
- Travel
- Human Rights

© The Zimbabwean 2005 - 2023

- Privacy Policy
- Advertise
- Contact Us
- About Us
- Subscriptions

- News
- Sport
- Business
- Entertainment
- Politics



Manage consent

https://www.thezimbabwean.co/2010/08/zanu-pf-infighting-blamed-for-the-suspension-of-top-mining-officials/[8/10/2023 7:51:31 PM]

# Exhibit K

**News**

# SPECIAL REPORT: Zimbabwe elite's role in billion dollar diamond leakages revealed

Sunday, May 08, 2016 — updated on April 04, 2021



## Summary

**The secret ownership by the Zimbabwean security sector is believed to have given generals the chance to divert proceeds from Marange for personal gain**

**A parliamentary committee on mining headed by Edward Chindori-Chininga estimated in 2013 that Zimbabwe had the capacity to supply 25 percent of the global market from Marange and a couple of mines elsewhere**

**Harare.** Zimbabwean president, Robert Mugabe, got the world jawing angrily in early March this year. He used his traditional birthday interview with State television to reveal that his country had produced diamonds worth more than $15billion over six years, yet only about $2 billion of the gems had been accounted for (https://soundcloud.com/zimpapers1980/president-interviewwav).



He dumped the stinking carcass at the doorstep of the eight mining companies that had been operating in the sprawling diamond fields of rural Marange in eastern Zimbabwe and claimed he had no clue how the leakages happened. That way, the 92-year old statesman who has been in power for 36 years skirted, quite conveniently, the role played by the ruling elite in the leakages.

The common tale is that diamonds were discovered in Marange in 2006. Thousands of poor illegal miners swamped the area and fed local and international underground syndicates with the gems until 2008 when the governments sent in soldiers to violently flush out the hungry alluvial gem miners. This paved the way for commercial production that commenced on a low note in 2009. By 2015, a total of eight companies were extracting the diamonds, with most of them in joint ventures with the government.

**ALSO READ**

| It is hypocrisy: Uganda responds to World Bank funding freeze | High Court rules in favour of Tanzania- Dubai port deal |
|---|---|
| East Africa News    May 08, 2016 | National    May 08, 2016 |

**Diamond trail**

The discovery of diamonds in the area dates far earlier than the gem rush in 2006, though. De Beers, the world's largest diamond company, held an Exclusive Prospecting Order (EPO) over Marange from the early 1980s via a subsidiary, Kimberly Searches Ltd. This order expired in 2006 and the British-registered African Consolidated Resources (ACR) took over the exploration rights. ACR challenged government's subsequent takeover of the mining rights and initially won through a High Court order but the same court reversed its decision in September 2010.



A parliamentary committee on mining, headed by Edward Chindori-Chininga, the late legislator from the ruling Zanu (PF), estimated in a June 2013 report that Zimbabwe had the capacity to supply 25 percent of the global market from Marange and a couple of mines elsewhere. However, there were repeated concerns from civil society, opposition politicians, international watchdogs and some government officials that not much was coming out of the gem fields amidst widespread reports that the diamonds were being systematically carted out of the country to various destinations.

By 2014, alluvial diamond deposits were running ultra-thin, meaning that extraction had to go deeper in search of conglomerates, but the mining companies were ill-prepared for the tech-intensive development. Late last year, government expressed dismay at the "mysterious" losses of diamonds. It announced that it would be stopping the mining companies so as to form a consolidated outfit that it is now spearheading.

**Sudden Riches**

Zimbabwe has nothing to show for six years of the multi-billion commercial diamond mining that attracted mostly negative international attention for human rights abuses at the gem fields and a looting frenzy by Mafia-type syndicates. The signature of the ruling elite looms large in the leakages. Senior government officials and their allies closely linked to diamond extraction, tellingly, amassed overnight riches whose sources have remained a mystery.



Obert Mpofu was the Mines and Mining Development minister between 2009, when commercial mining commenced, and late 2013 when President Mugabe shifted him to the transport portfolio in a cabinet reshuffle. He had been in business for a long time, but his profile was modest until he landed the mines ministry. His high value investments subsequently straddled transport, banking, tourism, properties, mining, ranching and the media. At one time, he was rumoured to own half of the world-famous resort town of Victoria Falls.

Mpofu's empire started crumbling when he was moved from the mines ministry. The Zimbabwe Mail newspaper he jointly owned with Robert Mhlanga, a former senior Airforce of Zimbabwe officer who chaired the board of Mbada Diamonds, one of the leading mining companies, collapsed when Mpofu left the mines ministry. So did Allied Bank which he had bought during his tenure at the ministry. The minister insists his hands are clean and claims he built his wealth from a golden handshake he got when he left a Zanu (PF)-owned company, Treggers, in the late 1980s.

His tale has not convinced many. Sceptics include former Finance minister under the 2009-2013 Government of

National Unity (GNU), Tendai Biti, who now leads the People's Democratic Party (PDP). "Obert Mpofu has a lot to explain to Zimbabwe and the world over how he handled our diamonds. He must be brought before an independent commission of inquiry," Biti told Africa Review.   He is bitter that President Mugabe protected Mpofu from cabinet scrutiny during his tenure at the mines ministry. Biti accused Mpofu of barring him from directly engaging with the mines following poor receipts into Treasury, repeatedly forcing him to revise national budgets downward.


AD

Mpofu, 66, illegally appointed or influenced the appointment of most of the people to represent government stakes in various companies involved in Marange diamond production and marketing, according to a parliamentary study that was headed by Chindori-Chininga. The legislator, a former Mines minister, came from the ruling Zanu (PF) and died in a mysterious car crash months after the release of the dThe report is brazen in its condemnation of Mpofu who signed himself off as Mugabe's "Ever Obedient Son".  "Board appointments…were being done by the Minister of Mines in clear violation of Section 5(2) of the ZMDC Act… Due to the unilateral appointments by the Minister, certain individuals with a conflict of interest were appointed."  Four key individuals with Zanu (PF) links are named. They must have been disqualified from sitting on boards of the companies because they held shares in some of the diamond firms.

Robert Mhlanga is a name that sticks out prominently. Mhlanga, who was the chairperson of Mbada Diamonds, was a shareholder in Liparm, a subsidiary of the giant mining company that the Chindori-Chininga report said was arrogant and untouchable. Besides jointly owning the Zimbabwe Mail with Mpofu, he shared more than his first name with the Zimbabwean president. He is a former Air Vice-Marshal in the Airforce of Zimbabwe (AFZ) and was Mugabe's helicopter pilot for a long time. Uncorroborated reports claimed he represented Mugabe's business interests and the president was the one who directly ordered his appointment as Mbada chair. He was also implicated in a 2002 sting operation against Morgan Tsvangirai, the MDC president, who was then accused of treason for allegedly plotting to "exterminate Mugabe" but the opposition leader was subsequently acquitted.


AD

Mhlanga made big news when he acquired prime real estate on the Durban north coast and Sandton in Johannesburg, South Africa. South African media reported in mid-2012 that Mhlanga had bought a US$24.5 million mansion in Kwa-Zulu Natal, 'complete with two man-made lakes, bullet proof windows, a helipad and an underground bunker beneath a security building". Some said the mansion would be Mugabe's get-away or retirement home but no proof has been provided yet. Deeds records in South Africa show that, in one day in January 2011, Mhlanga bought three properties worth US$7.4 in Durban and Sandton and purchased more properties elsewhere, sometimes at above-market prices.

Other officials associated with Mpofu played key roles in the diamond industry. Goodwills Masimirembwa was the chairperson of ZMDC, the government arm tasked with overall diamond production as well as the establishment of mergers, and which had 50 per cent ownership in most of the mining firms. Masimirembwa has been following Mpofu wherever he goes.

Prior to his ZMDC appointment, he was the chairperson of a pricing commission that fell under the ministry of Industry and Trade that Mpofu headed. When Mpofu was moved to the transport portfolio, Masimirembwa resurfaced as the chair of CMED, a government parastatal under the ministry, but he was fired when his godfather was last year moved to Macro-Economic Planning and Investment. Mugabe in 2014 publicly

accused Masimirembwa of soliciting for a US$10 million bribe from would-be diamond investors but the President later swallowed his own accusation.



Mr Mpofu declined to comment when contacted by Africa Review. "I am not commenting on this because I am no longer the minister of Mines," he said. Mr Mhlanga and Mr Masimirembwa did not respond to several requests for comment.

**Official confirmation**

There is official confirmation of the role played by political bigwigs in protecting local and international illegal diamond dealers. The current Mines and Mining Development minister, Walter Chidhakwa, in March this year toured Manicaland province where Marange is located and had no kind words for the senior politicians. "We want to see the politicians who protected them (the syndicates) to loot this country," said Chidhakwa.

There are also anecdotes that point an angry finger at army generals who could have taken advantage of murky shareholding at one of the big mining companies, Anjin Investments.  ZMDC insists a Chinese company, Anhui, owned 50 per cent of Anjin while the corporation had 10 per cent and government 40 per cent.

It has never been explained which part of government owned the 40 per cent and why that was so, given the fact that ZMDC is a government unit, but observers say the share belonged to the security sector. Anhui is, in fact, thought to be a proxy of the Chinese military.
The secret ownership by the Zimbabwean security sector is believed to have given generals the chance to divert proceeds from Marange for personal gain and funding of covert military and intelligence operations. Indeed, several shadowy projects were set up in the run-up to the 2013 general elections and these were funded from diamond proceeds. A Zanu (PF) propaganda newspaper, The Patriot, for instance, bought numerous new vehicles during this period and paid its staff well despite having low circulation and failing to attract advertising.

**It's the content that counts**

**We come to you.** We are always looking for ways to improve our stories. Let us know what you liked and what we can improve on.

I've got feedback!

---

IN THE HEADLINES

NEWS   OPED   ZANZIBAR   MAGAZINES   SUPPLEMENT   JOBS   NOTICES   PHOTOS   VII

### It is hypocrisy: Uganda responds to World Bank funding freeze

World Bank says Uganda's Anti-Homosexuality Act fundamentally

### High Court rules in favour of Tanzania-Dubai port deal

The court has agreed that Dubai has the authority to enter into such agreements.

contradicts the World Bank Group's values.

East Africa News   7 hours ago

National   7 hours ago

NEWS          OPED          ZANZIBAR          MAGAZINES          SUPPLEMENT          JOBS

Business
Entertainment
Sports

NOTICES          PHOTOS          VIDEO

Tenders

Contact us    ePaper    Web Mail    Frequently asked questions    NMG Privacy Policy    Terms of use    Terms and Conditions of Use          The Citizen © 2
Our Blog Rules

# **Exhibit L**

# The Effectiveness of Initiatives to Promote Good Governance, Accountability and Transparency in the Extractives Sector in Zimbabwe

Tumai Murombo*

University of the Witwatersrand, South Africa

Tumai.Murombo@wits.ac.za

## Abstract

The regulation of the extractives sector in Zimbabwe has recently come under scrutiny due to the uncertain social, economic and political environment. Zimbabwe's mining sector was under colonial legislation for a long time and that legislation has recently been reviewed. Existing extractives sector laws do not adequately promote transparency and accountability, an issue recognized by stakeholders throughout the mining sector. The advent of the new constitution and law reform processes indicates Zimbabwe's intention to incorporate good governance, transparency and accountability provisions in the mining sector. State driven reforms have been inspired by global and local civil society initiatives. Analysis shows that, for various reasons, the government does not readily embrace such initiatives, which are important drivers of official policy and legal reforms. Zimbabwean environmental civil society groups have been exceptional in this regard.

### Keywords

Accountability, EITI, environmental law, extractives, mining law, transparency, Zimbabwe

## INTRODUCTION

The extractives sector is one of the most resilient sectors of the Zimbabwean economy. Since 2000, the country's economy has gone through extremely challenging phases that threatened the viability of the mining sector. However, despite the challenges, the extractives sector has now emerged as key to economic recovery.[1] This is despite the global impact on minerals prices, and asymmetries and distortions in the global resources market. The extractives sector, specifically mining, can play a critical role in economic

---

* Associate professor of law and director, Mandela Institute, School of Law, University of the Witwatersrand, South Africa. LLB (hons) (Zimbabwe), LLM (Cape Town), LLM (Pace) and PhD candidate (Witwatersrand). The author acknowledges the research assistance of Gilbert Makore and comments on earlier drafts by Mutuso Dhliwayo of the Zimbabwe Environmental Law Association (ZELA).

1   C Mudhunguyo and A Ndaona "An investigation into the contribution of mining to the Zimbabwe economy" (2012) *Journal of Strategic Studies* 96 at 105.

development, growth and democracy.[2] In many countries, leakage of revenue has been the foundation for corruption, patronage, conflict and the eventual underdevelopment and impoverishment of mining communities.[3] Despite abundant mineral resources, the Zimbabwean economy continues to struggle to return to its former glory. There is a pervasive lack of transparency in the management of mineral revenues and contracts in Zimbabwe.[4] In order to assess effectively the extent to which Zimbabwe's minerals sector is bedevilled by a lack of transparency and accountability, appropriate research methods must be employed to reach authentic, defensible and valid findings. Furthermore, the findings must be usable by policy makers to reform Zimbabwe's mining laws so that they promote accountability and transparency, leading to good natural resources governance. While assessing the effectiveness of civil society and state initiatives to promote transparency and accountability, this article also includes an analysis of existing legal and policy frameworks that enable or obstruct such transparency.

Against this backdrop, the purpose of this article is first to analyse how the legal and policy framework, and civil society initiatives in Zimbabwe have either promoted or obstructed good natural resources governance, transparency and accountability in the minerals sector. Secondly, it assesses the effectiveness of the different initiatives adopted, including the Publish What You Pay, Kimberly Process Certification Scheme and Civil Society Coalition, in promoting good governance in the extractives sector. The article also discusses regional and international initiatives that seek to promote transparency and accountability in the extractives industry. These study objectives are pursued through the gathering and analysis of different stakeholder perceptions on transparency and accountability issues in Zimbabwe's mining sector. The challenges faced by Zimbabwe as a resource rich country are not peculiar to this country alone, hence the findings of this study could very well be replicable in other similarly situated African countries. An underlying aim of this article is also to understand the relevance of non-state initiatives and the possibility of such initiatives shaping legal developments and policy reforms to promote transparency and accountability.

The article begins by setting the context of the current legal and institutional framework for the mining sector in Zimbabwe, to provide a background for the study. It then analyses the framing concepts confirmed by field surveys through focus group discussions and discursive interviews with interested and affected stakeholders. The article concludes with findings and recommendations.

---

2   NM Jensen and NP Johnston "Political risk, reputation, and the resource curse" (2011) 44/6 *Comparative Political Studies* 662 at 665. See also generally T Hawkins *The Mining Sector in Zimbabwe and its Potential Contribution to Recovery* (2009, UNDP Zimbabwe).

3   C Rose "The application of human rights law to private sector complicity in governmental corruption" (2011) 24 *Leiden Journal of International Law* 715 at 716.

4   Portfolio Committee on Mines and Energy "First report on diamond mining (with reference to Marange Diamond Fields) 2009–2013" (presented to the Parliament of Zimbabwe, Harare, June 2013).

## Why accountability and transparency initiatives matter

Analyses of the strengths and weaknesses of policy and legal frameworks for good governance, transparency and accountability in the extractives sector are confounded by conceptual ambiguities, contested meanings and implications of framing norms. This background analysis is crucial for an understanding of the civil society or non-state actor initiatives discussed in this article. To start, it is therefore important to determine the origins, content and relevance of these concepts in the context of natural resources governance in Zimbabwe, focusing on the mining sector.

It is now a truism that the concept of "good governance" defies universal definition and there are various interpretations of what good governance is and how to achieve it.[5] Varied conceptualizations have been developed and various indicators mooted.[6] Invariably, the concept is linked to democracy and there are several assumptions that underpin its presence in a governance system.[7] The United Nations (UN),[8] the World Bank,[9] the African Union and other international organizations have projected their own understandings of good governance and how it should be implemented and measured.[10] While there are various understandings of good governance, this article seeks to extrapolate the common threads linking these understandings and apply them to the extractives sector. It became clear in unpacking the literature on governance that the concept seems largely related to *procedural issues* as opposed to *substantive rights*. Transparency and accountability appear

---

5   D Kaufmann et al "The worldwide governance indicators methodology and analytical issues" (policy research working paper 5430, the World Bank Development Research Group Macroeconomics and Growth Team, September 2010) at 3, noting: "Although the concept of governance is widely discussed among policymakers and scholars, there is as yet no strong consensus around a single definition of governance or institutional quality. Various authors and organizations have produced a wide array of definitions. Some are so broad that they cover almost anything." In specific areas of governance, such as the rule of law, there is extensive debate among scholars over "thin" versus "thick" definitions, where the former focus narrowly on whether existing rules and laws are enforced, while the latter emphasize more the justice of the content of the laws.

6   Ibid.

7   S Mtisi et al "Extractive industries policy and legal handbook analysis of the key issues in Zimbabwe's mining sector: The case study of the plight of Marange and Mutoko mining communities" (2012, ZELA) at 9. Contrast with S Wilkins "Can bad governance be good for development?" (2011) 53/1 *Global Politics and Strategy* 61 at 69, reporting that the causal effect between democracy and good governance as solutions to bad governance is not always true.

8   L Kotze "Environmental governance" in A Paterson and L Kotze (eds) *Environmental Compliance and Enforcement in South Africa: Legal Perspectives* (2009, Juta) 103 at 103 and 105.

9   Kaufmann et al "The worldwide governance indicators", above at note 5 at 2.

10  Wilkins "Can bad governance", above at note 7 at 71. See also T Bovaird "Public-private partnerships: From contested concepts to prevalent practice" (2004) 7/2 *International Review of Administrative Sciences* 199 at 208–10, setting out criteria for assessing good public governance.

among other components or indicators of good governance.[11] The rule of law[12] and compliance with, and enforcement of, laws also appear as indicators and components of good governance.[13] There is an inextricable link between the notion of democracy and good governance, although the nature of this link seems misunderstood or poorly explored in the literature. There is disagreement over the authority to define and shape the content and meaning of the idea of good governance, especially between public state and non-state (mainly civil society) actors. There are also global and local nuances shaping the discourse on good governance. Ultimately, it is observed that there are limits to what good governance can do in environmental (natural resources) management.[14]

In the natural resources sector (focusing on extractive activities), good governance has been understood to refer to the existence of certain institutions, procedural guarantees and recourse aimed at promoting the sustainable management and use of natural resources. Bonnie Campbell argues that "[t]he quality of governance of a country is a key determinant for the development outcomes of extractive industries activities".[15] Meanwhile Louis Kotze, after reviewing the various understandings of the notion of "governance",[16] states:

"Certain elements can be distilled from the above array of definitions:
- governance is a management process;
- there are numerous actors involved in governance, including the international community, government and civil society;
- governance is concerned with the promotion of common interests;
- governance relationships are embedded in law; and
- functions embedded in governance include formulating policies and law and implementing and ensuring compliance with this policy and law."[17]

---

11   R Ako and N Uddin "Good governance and resource management in Africa" in F Botchway (ed) *Natural Resource Investment and Africa's Development* (2011, Edward Elgar) 21 at 24.

12   Some writers caution against abuse of these good norms by global capital. See J Hund "Globalisation and the rule of law: Socio-economic reflections" (2004) 19 *Southern Africa Public Law* 25 who, at 26, labels the "rule of law as [an] export product of global capitalism" and argues that "a series of linked concepts have been deployed to explain the West's ascendancy and as a prescription for underdeveloped countries. The 'rule of law' has emerged as a concept that has been central to the economic success of the West."

13   Kotze "Environmental governance", above at note 8 at 106.

14   K Muller "Environmental governance in South Africa" in HA Strydom and ND King (eds) *Environmental Management in South Africa* (2nd ed, 2009, Juta) 68 at 73; Kotze "Environmental governance", above at note 8; B Campbell (ed) *Factoring in Governance is Not Enough: Mining Codes in Africa, Policy Reform and Corporate Responsibility* (2003) 18/3 *Minerals & Energy Raw Materials Report* 1 at 1.

15   Ibid, Campbell; JG Frynas "Corporate social responsibility and societal governance: Lessons from transparency in the oil and gas sector" (2010) 93 *Journal of Business Ethics* 163 at 164.

16   Kotze "Environmental governance", above at note 8 at 104.

17   Id at 105.

Kotze concludes that "good governance" is about improving the quality of governance of these listed aspects.[18]

While transparency[19] and accountability strike one as two sides of the same coin, clearly one is an enabler of the other. First, by definition, accountability presupposes transparency, that is, to hold an authority to account one must understand what the authority, functions, powers, duties and mandate of that other authority are. Secondly, accountability presupposes the presence and observance of other norms, institutions, practices and concepts, such as access to information, openness, rule of law, absence of fear and intimidation, protection of a number of human rights (expression, liberty, association, assembly and movement), an impartial tribunal and access to courts. Lastly, apart from a constitutional guarantee of these rights, transparency and accountability both depend on the existence of strong institutions to implement and enforce laws and policies.

## The extractives sector as the analytical space

Natural resources have been a site of lack of transparency and accountability, not only in Zimbabwe, but also in other resource rich countries.[20] They have masked corruption, red tape and pillaging of many a country's natural resources for private wealth creation, thus earning the adage of being a "curse".[21] Recently it has been recognized that to enable natural resources to play their rightful role in the economy there must be transparency, accountability and overall good environmental, economic, social and political governance.[22] The need for transparency and accountability is even more urgent in resource-endowed developing countries that are plagued by serious regulatory gaps that cause huge revenue losses at the expense, generally, of the state but more specifically of communities affected by extractive activities.[23] Bad governance, and the lack of transparency and accountability pervade all

---

18  Id at 120.

19  Frynas "Corporate social responsibility", above at note 15 at 167; C Lindstedt and D Naurin "Transparency is not enough: Making transparency effective in reducing corruption" (2010) 31 *International Political Science Review* 301 at 302, commenting at 304.

20  See generally C Eads et al (eds) *Advancing the EITI in the Mining Sector: A Consultation with Stakeholders* (2009, Extractive Industries Transparency Initiative) at 46–89.

21  This is why transparency is seen as the initiative to address the governance deficit: Frynas "Corporate social responsibility", above at note 15 at 167.

22  L Etter "Can transparency reduce corruption? Evidence from firms in Peru and Mali on the impact of the Extractive Industries Transparency Initiative (EITI) on corruption" (master of public policy thesis, Georgetown University, 2012) at 10.

23  Ibid. See also S Tsiko "Lobbyists push for Diamond Act enactment" (7 November 2012) *The Herald* (Harare) available at: <http://www.herald.co.zw/lobbyists-push-for-diamond-act-enactment> (last accessed 5 March 2016); Contrast with FS Mtondoro et al "Research paper on the power dimension to mineral related corruption: Preliminary findings on the state of corruption in the mining sector: The case of gold diamond and platinum mining in Kwekwe, Gwanda, Marange and Mhondor-Ngezi" (Transparency International Zimbabwe (TIZ), 14 January 2013).

natural resources including minerals, forests, oil and gas, referred to in this article as the extractives sector or industries.[24] Developed countries also face a degree of opaqueness in how they exploit and channel revenues from extractive natural resources.

States' failure over time to spearhead initiatives to promote good governance, transparency and accountability in the extractives sector, spawned non-state initiatives aimed at promoting these principles.[25] Civil society organizations (CSOs) are driven by various motives to engage in promoting transparency and accountability in the natural resources sphere of the economy.[26] While some countries buy into and support such CSO initiatives,[27] others are averse to the whole notion of CSOs driving such publicly interested initiatives.[28] This is the case in countries where bad governance, and a lack of transparency and accountability have become ingrained in the cronyism, corruption and rent seeking behaviour of political institutions. CSO initiatives are also motivated by conflicts and human rights abuses linked to extractives sectors worldwide. The question is whether CSO initiatives have been, and can be the foundations for state driven legal and policy initiatives to promote transparency and accountability in the exploitation of natural resources.

Recently, quite a substantial amount of research has been done on the regulation of mining in Zimbabwe. Much of this literature focuses on the mineralogy of Zimbabwe and the social and economic impacts of mining.[29] The Zimbabwe Environmental Law Association and Transparency International Zimbabwe have recently performed studies on the legal framework governing mining, yet this research still focused on Marange diamonds and the platinum

---

24  This borrows from international practice, including usage by the UN Development Programme in its "Strategy for supporting sustainable and equitable management of the extractive sector for human development" (December 2012), available at: <http://www.undp.org/content/dam/undp/library/Poverty%20Reduction/Extractive%20Industries/StrategyNote_ExtractiveSector.pdf> (last accessed 2 April 2015).

25  Notable examples include advocacy work by Global Witness, Human Rights Watch, Transparency International, Open Society Institute and Revenue Watch Institute, among many other global civil society organizations. These international initiatives have filtered through to regional and domestic levels with networks such as the AIMES promoted by Third World Network-Africa, Southern Africa Resource Watch and ZELA.

26  In Zimbabwe, some civil society actors are motivated by their cause and remain apolitical, while others are clear instruments of political persuasion. An example is one NGO that used to advocate heavily for the government, some of whose leaders later competed for political office on ZANU (PF) tickets.

27  Nigeria enacted the Nigerian Extractive Industry Transparency Initiative Act 2007, while Mozambique, Zambia, Niger, Mali, Liberia and Ghana are among the EITI compliant countries in Africa that report regularly.

28  It is argued and claimed that foreign funded CSOs push these initiatives to promote the ideology and agenda of the governments of their funders. However, there is not much evidence on the ground to support such claims.

29  Most in the tone of Mudhunguyo and Ndaona "An investigation", above at note 1.

group of metals on the Great Dyke.[30] These studies are mostly intended as baseline surveys and seldom explore the high-level legal analysis of the specific laws and policies involved. In particular, the studies are pioneering but can only begin to unravel what the legal framework is. This article goes a step further in seeking to analyse the laws and policies, and the institutional context within which they operate. This is done with reference to how these laws and policies promote transparency, accountability and good natural resources governance. This analysis sets the scene for an assessment of the effectiveness of the initiatives to promote transparency and accountability in the minerals sector, as outlined below.

Accountability, transparency and good governance in the mining sector are matters scattered across a range of legislative instruments. This article unpacks the regulatory synergy or disjuncture among the legislation governing mining, environmental taxation, corruption prevention, empowerment and access to information, with reference to provisions, if any, promoting accountability, transparency and good governance in the minerals sector. Superimposed on this is a similar, if somewhat concise, analysis of policy documents, such as the Diamond Policy, Environmental and Natural Resources Policy, Medium Term Strategic Plan, and the draft Zimbabwe Mining Revenue Transparency Initiative. Precisely because the latter are still mere policy documents that are not legally effective in Zimbabwe, much more research will need to be done when they become law.

## THE NORMATIVE LEGAL AND INSTITUTIONAL FRAMEWORK

The crosscutting analytical framework for this article is good governance, transparency and accountability in the extractives sector. However, promoting good governance, transparency and accountability does not depend merely on making laws and policies. More fundamental are the institutions created to implement these laws and the governance institutional culture that directs such institutions. Implementation of laws, monitoring and enforcement against violations are critical components of good governance and safeguarding transparency.

### Constitutional and policy context

A country's constitution defines the state entity, its people, structures, ethos, and rights and obligations. It is the supreme law of the land and any law that is inconsistent with it is invalid to the extent of such inconsistency.[31] Zimbabwe is at the dawn of a new constitutional era and it is crucial for this study to situate the issues of good governance, transparency and

---

30  G Makore and V Zano "Mining within Zimbabwe's Great Dyke: Extent, impacts and opportunities" (2012, ZELA).
31  Constitution of the Republic of Zimbabwe 2013, sec 2(1).

accountability in this new constitutional context.[32] Unlike the Lancaster House Constitution of 1979, Zimbabwe's Constitution of 2013 (2013 Constitution) contains provisions that, if implemented, could change the regulatory environment for natural resources in Zimbabwe.[33] In particular, the 2013 Constitution contains all known social, economic and cultural rights[34] whose fulfilment requires the prudent management and sustainable use of natural resources to provide the state with the necessary capital resources.

Elsewhere, the inclusion of environmental rights premised on the sustainable use of natural resources has improved the role of natural resources in a country's socio-economic development.[35] However, environmental rights clauses have not in themselves been directly useful in promoting transparency and accountability in the extractives sector. In South Africa, legislation mandated under section 24 of the constitution, such as the Minerals and Petroleum Resources Development Act 28 of 2002 and the National Environment Management Act 107 of 1998, particularly provisions on environmental impact assessment, have been more useful in this function.[36] Civil and political rights that promote public participation, administrative justice, and access to justice and information have augmented the National Environment Management Act 107 of 1998 and been useful in this respect.[37] Overall, the mining sector in South Africa remains untouchable, despite environmental and other rights in South Africa's Constitution.[38] As the

---

32  It is significant that the 2013 Constitution expressly refers only to transparency and accountability in its preamble and founding principles. Sec 3(1)(h) and 3(2)(g) refer to good governance, the rule of law, transparency, justice, accountability and responsiveness as part of the founding values and principles. These preliminary parts of the constitution may not be justiciable. However, sec 9 provides further for good governance and its essential elements.

33  This includes provisions in chap 2 on national objectives, particularly good governance, development and empowerment, and fostering fundamental rights and freedoms.

34  2013 Constitution, chap 4 and particularly secs 73 (environmental rights), 77 (right to food and water), 62 (right of access to justice) and 68 (right of access to information).

35  In South Africa a similarly worded constitutional environmental rights clause has spawned well-crafted mining and environmental legislation.

36  *Fuel Retailers Association of Southern Africa v Director General: Environmental Management, Department of Agriculture Conservation and Environment, Mpumalanga Province and Others* 2007 (6) SA 4 (CC), *Bengwenyama Minerals (Pty) Ltd v Genorah Resources (Pty) Ltd* 2011 (4) SA 113 (CC) and *Supersize Investments 11 CC v MEC of Economic Development Environment and Tourism Limpopo Provincial Government* (70853/2011) [2013] ZAGPPHC 98 (11 April 2013).

37  *City of Johannesburg Metropolitan Municipality v Gauteng Development Tribunal* 2010 (6) SA 182 (CC); *AgriSA v Minister of Minerals and Energy* 51/12 [2013] ZACC 9 (CC); J Dugard and A Alcaro "Let's work together: Environmental and socio-economic rights in the courts" (2013) 29 *South African Journal on Human Rights* 14. The 2013 Constitution, secs 62 and 68 guarantee administrative justice and access to information.

38  Constitution of the Republic of South Africa 1996. See generally *Maccsand (Pty) Ltd v City of Cape Town* 2012 (4) SA 181 (CC).

Zimbabwean environmental rights clause is modelled on section 24 of the South African Constitution, experience with this section in South Africa provides good lessons on the potential impact of the Zimbabwean clause. While South Africa's section 24 has mainstreamed sustainable development and promoted the sustainable use of natural resources, it has played a peripheral role in eradicating poverty and has had minimal impact on preventing unsustainable mining activities.

The initial impact of the 2013 Constitution is that natural resources and environmental legislation must be amended to comply with the constitution where there are inconsistencies. Thus, the Mines and Minerals Act contains many inimical provisions that must be amended.[39] As a law regulating a natural resource, it must be informed by section 73 of the constitution on the sustainable use of natural resources. The Environmental Management Act of 2002 (chapter 20:27) is largely compliant and is expected to have greater impact with the advent of the 2013 Constitution. The expanded right in section 85 (1)(c) and (d) of the 2013 Constitution to enforce constitutional rights is a new development, timely for civil society as guardians and stewards of the "voiceless" environment and disempowered mining communities.

## Institutional arrangement for the minerals sector in Zimbabwe

Mining in Zimbabwe is largely regulated by the Mines and Minerals Act of 1961 (chapter 21:05).[40] This archaic law defines what constitutes mining and regulates licensing and mining rights acquisition. However, there are also other laws that regulate aspects of the mining process and the management of revenue from mining. Furthermore, there are laws that are indirectly relevant to mining. These include laws governing the environment and natural resources,[41] regulating and controlling pollution, and laws for the relocation and resettlement of displaced communities. Such laws include local government, communal property and land laws.

Specific mining laws and other laws that are indirectly relevant may contain provisions that could be regarded as promoting transparency and accountability in extractive processes. Similarly, pollution control and environmental sustainability laws may contain provisions that provide for accountability.[42] The

---

39   These include provisions giving mining activity precedence over environmental regulation and other forms of regulation.

40   The deputy prime minister has called this act a "criminal" law that is allowing the plunder of Zimbabwean minerals by individuals and multinational corporations: F Machivenyika "Need to amend mining laws" (13 February 2013) *The Herald* (Harare), available at: <http://www.herald.co.zw/need-to-amend-mining-laws> (last accessed 5 March 2016).

41   Mtondoro et al "Research paper", above at note 23 at 10. Mining cannot take place unless the Environment Management Agency has approved the project after an environmental impact assessment.

42   In this sense, transparency and accountability are conceived in a broader sense beyond tracking mining revenues. There has been a tendency in the literature to focus overly on

overall assumption underlying this study is that most of these laws, as current-ly implemented in Zimbabwe, do not adequately provide for transparency and accountability,[43] hence the claim that the whole mining value chain is opaque and full of gaps that can be exploited by opportunists. Noteworthy however, is the deeper issue of whether laws are in fact necessary to promote transparency and accountability or whether voluntary and non-state initiatives are just as good. Hund argues that "[t]he specificity of rules, and concomitant curtail-ment of discretion, is thought to enhance transparency, while the unbounded use of official discretion is seen as opening the door to corruption and the abuse of power."[44]

The primary institution responsible for regulating mining in Zimbabwe is the Ministry of Mines and Mining Development together with its Mining Affairs Board and the mining commissioner. The ministry and its functionar-ies are complemented by the Minerals Marketing Corporation of Zimbabwe (MMCZ),[45] Zimbabwe Mining Development Corporation (ZMDC), Ministry of Finance, Zimbabwe Revenue Authority (ZIMRA), and Environment[46] and Tourism Ministries. Relevant non-state industry bodies include the Chamber of Mines Zimbabwe, labour unions and industry level associations. State departments responsible for mining are constituted almost exclusively through political processes, such as appointment by the president after con-sulting one or more statutory bodies. Such processes are inherently political, but one could say there is technical transparency. The boards and manage-ment of parastatals are also appointed by the respective ministers after con-sultation with specified bodies, inevitably leading to problems of board and management independence.[47] In Zimbabwe there have been repeated

———

contd
diamond revenue and money matters and less on human rights abuses, except for the pioneering work of the Centre for Research and Development in exposing gross human rights violations in the Marange diamond fields, documented by F Maguwu "Marange diamonds and Zimbabwe's political transition" (2013) 8/1 *Journal of Peacebuilding & Development* 74 at 74–78; C Kabemba "The Kimberley Process and the Chiadzwa diamonds in Zimbabwe: Challenges and effectiveness" (2010) 3 *Perspectives* 4 at 6, available at: <http://www.boell.de/sites/default/files/assets/boell.de/images/download_de/2010-07-22_Perspectives_3.10.NEU%281%29.pdf> (last accessed 31 March 2015).

43   Mudhunguyo and Ndaona "An investigation", above at note 1 and Mtondoro et al "Research paper", above at note 23 at 13.

44   Hund "Globalisation", above at note 12 at 29.

45   The Minerals Marketing Corporation of Zimbabwe Act, sec 20 provides for the functions of the MMCZ.

46   This ministry should be consulted on environmental authorization and pollution con-trol matters.

47   MMCZ Act, sec 5 provides that the minister appoints the MMCZ board after consulting the president and representatives of special interests and affected departments. See also sec 5 of the ZMDC Act; even the ZMDC general manager's appointment is subject to ministerial approval (sec 27(1)(a)), a problem played out in *Mubayiwa v Zimbabwe Mining Development Corporation* case no LC104/10 [2014] ZWLC 10 (31 January 2014).

arguments that state owned enterprises are inefficient due to the appointment of poor or incompetent political nominees.[48] This has compromised a number of state owned enterprises from delivering effectively on their mandates. MMCZ and ZMDC are state owned enterprises that have been beset with these problems. ZMDC presents further transparency challenges, as it is not only a state owned enterprise but also a mining corporation that undertakes mining activities on behalf of the state, and is regulated by sister government departments like Water, Environment and Tourism, the Environment Management Agency and Finance.

The minister of mines is accountable to the cabinet and Parliament through the relevant portfolio committee that can summon the minister when necessary.[49] This committee has however had longstanding challenges in holding the ministry to account. The removal of a minister is essentially the prerogative of the president; currently there is nothing much that the public or civil society can do with corrupt or incompetent ministers in Zimbabwe. The relationship between the government, MMCZ and the Ministry of Mines and Mining Development can be complicated and lead to obscure processes, especially where there is a lack of co-operative governance.[50] This is despite clear laws mandating which institutions are responsible for licensing mining, and for marketing and trading precious minerals. This was evident when the ministry accused one company, Mbada Diamonds (Pvt Ltd), of trying to auction diamonds illegally in 2010. Mbada Diamonds is one of the companies mining diamonds in Marange. Its ownership and shareholding are a point of contention as investigative studies have exposed how it may be a front for state securocrats,[51] which supposedly explains its unwillingness to be subjected to regulation. The authorities stopped the attempted illegal auction. Meanwhile, the MMCZ was led to believe that the government had given the same mining company powers to market and sell minerals that are statutorily bestowed on the MMCZ.

The lack of co-operation was also evident when the Ministry of Finance struggled to obtain figures on diamonds sold and the revenue collected by

---

contd
See also "Masimirembwa plays one-man board at ZMDC" (3 December 2010) *NewsDay* (Harare), available at: <https://www.newsday.co.zw/2010/12/03/2010-12-03-masimirembwa-plays-oneman-board-at-zmdc> (last accessed 31 March 2015).
48   Mtondoro et al "Research paper", above at note 23.
49   Ministers often rebuff the committee, as reported in the Portfolio Committee on Mines and Energy "First report", above at note 4.
50   B Chiketo "Zimbabwe's Marange diamonds: ZANU-PF's best friend" (4 February 2013) *Think Africa Press*, available at: <http://allafrica.com/stories/201302051291.html> (last accessed 5 March 2016) and Mtondoro et al "Research paper", above at note 23 at 61.
51   N Kriger "ZANU PF politics under Zimbabwe's 'power sharing' government" in D Moore, N Kriger and B Raftopoulos (eds) *Progress in Zimbabwe?: The Past and Present of a Concept and a Country* (2013, Routledge) 11 at 22; see also S Ntlhakana "Conflict diamonds in Zimbabwe: Actors, issues and implications" (2014) 3/1 *Southern African Peace and Security Studies* 61 at 69, detailing the controversial shareholding of Mbada.

ZIMRA.[52] The role of the Ministry of Mines and Mining Development in the marketing of diamonds is murky. While the MMCZ is the sole marketer for all minerals, the MMCZ Act allows the MMCZ to authorize the sale and export to other persons, subject to the MMCZ negotiating the contracts and receiving the proceeds.[53] Parliament may be able to check on the minister through annual reports or audited financial statements, as the MMCZ receives a parliamentary appropriation.[54] However, this is only a permissive section, as the minister "may" or "may not" table annual reports submitted to the office by the MMCZ.[55] The act requires the MMCZ to consult when executing its mandate.[56] Whether or not this happens in practice is open to question. This is particularly so given the reported lack of transparency surrounding the marketing and sale of diamonds in Zimbabwe.[57] This veil of secrecy is officially provided for in the MMCZ Act.[58]

A worrying aspect though is the extent to which these institutions are accountable, not only to other government departments, but also to the public.[59] To what extent are the operations of public entities like the MMCZ, ZMDC and Ministry of Mines and Mining Development open to public scrutiny? The provisions in the founding legislation for these state owned enterprises provide little room for transparency and accountability in what the institutions do.[60] The public has little say in the composition of their boards. It was only given the problems with Marange diamonds from 2006 onwards that the public and civil society became alert to the functions of the MMCZ and ZMDC and the potential for these corporations to mask mismanagement of critical resources. Undoubtedly, the original idea behind the corporations was to promote the national interest by ensuring that natural resources are exploited to support national development.[61] With time, the institutions could have become dysfunctional and prone to abuse by the people appointed to run them.[62]

--------

52  Budget speeches by Zimbabwe minister of finance, 2010 and 2011.
53  MMCZ Act, secs 42(1)(iii), 42(1)(b)(ii), 43(1) and 47.
54  Id, secs 23(3), 36 and 37 generally. While there is no express provision to table audited financial statements in Parliament, the MMCZ is bound to do so as it can receive appropriation from Parliament to its purchasing fund.
55  Reports are required under the Audit and Exchequer Act (chap 22:03).
56  MMCZ Act, sec 22(b).
57  Mudhunguyo and Ndaona "An investigation", above at note 1 at 122.
58  Id, sec 54.
59  Mtondoro et al "Research paper", above at note 23 at 16, claiming that the minister of mines and the president are accountable to no-one when they exercise functions under the Mines and Minerals Act.
60  Ibid.
61  The founding legislation for MMCZ and ZMDC provides as one of the key objectives the promotion of the national interest by the respective corporations.
62  D Muleya "Diamond saga: A case of deceit, fraud" (4 November 2010) *The Standard* (Harare), available at: <http://www.thestandard.co.zw/2010/11/04/diamond-saga-a-case-of-deceit-fraud> (last accessed 31 March 2015); B Chakaodza "Govt must come clean on

The minister of mines is not the only authority defining ownership and sharing in the benefits from mineral resources and this has recently become a thorny issue. There is a sustained drive in Zimbabwe to enhance the participation of indigenous Zimbabweans in the mining sector. Legislation is in place to mandate indigenization and empowerment transactions, requiring that Zimbabweans must own a proportion of multinational mining companies operating in the country. This has been partly implemented through the constitution of community share ownership trust schemes, a concept pioneered by civil society in Zimbabwe and later borrowed by the government. The key legislation in this regard is the Indigenization and Empowerment Act and regulations. Under this act, the National Indigenization and Economic Empowerment Board is, like the MMCZ and ZMDC boards, a key authority in the implementation of the state's indigenization and empowerment programme. However, the appointment procedure creates a potential lack of autonomy, as is the case with the other parastatal boards discussed above.[63] Lack of transparency and accountability is self-evident, not only from the feedback during field research regarding the composition of community share ownership trusts, but even some of the mining companies involved are not sure of the nature of the agreements they conclude with the trusts. The recent dispute between Zimplats and the government is further illustration of uncertainty in the implementation of the indigenization policy.[64] It is important to investigate if this institutional context, which disables transparency and accountability, has anything to do with substantive mining legislation, which is considered in the next section.

## Transparency and accountability in minerals legislation and policy

Recent mining policy documents, such as the Diamond Policy, the Draft Mines and Minerals Amendment Bill[65] and Zimbabwe's Draft Minerals Policy of

---

contd
Chiadzwa" (12 November 2010) *Financial Gazette* (Harare), available at: <http://allafrica.com/stories/201011150385.html> (last accessed 5 March 2016).

63   Indigenisation and Empowerment Act 47 of 2007, sec 7. Some of the appointments go against the requirement to appoint independent boards in the Corporate Governance Framework for State Enterprises and Parastatals (Ministry of State Enterprises and Parastatals, November 2010).

64   M Mtaranyika "Zimplats stand firm despite policy chaos" (6 March 2013) *Mining MX* (South Africa) 1; R Ndlovu "Mugabe broadside leaves Zimplats takeover in a muddle" (8 March 2013) *Mail & Guardian* (South Africa) available at: <http://mg.co.za/article/2013-03-08-00-mugabe-broadside-leaves-zimplats-takeover-in-a-muddle> (last accessed 5 March 2016).

65   House Bill no 14 of 2007, published in (16 November 2007) *Government Gazette*. See also C Anderson "Creating a legislative framework to govern mining in Zimbabwe" (July 2011) *Revenue Watch Brief*, available at: <http://www.revenuewatch.org/sites/default/files/zimbabwebriefing.pdf> (last accessed 31 March 2015).

2013,[66] seek to mainstream transparency and accountability provisions in
Zimbabwean mining law.[67] Disappointingly, these remain policy documents
and will be of little relevance until the government acts to transform them
into legally binding laws. Civil society should focus on ensuring that there
are sufficient public consultations and stakeholder input into the final docu-
ments and advocating for legislation to implement the policy objectives in
these documents.

*The mines and minerals legislation*
The Mines and Minerals Act regulates the process of granting various mining
permits and licences.[68] The intention of this article is not to delve deeper into
the individual processes involved but to look at the generic processes and ana-
lyse if there are opportunities for transparent and accountable decision-
making.[69] The legal framework for mining in Zimbabwe does not permit
adequate public participation in the granting of prospecting licences and min-
ing permits, does not protect the environment, and lacks provisions on trans-
parency and accountability.[70] Good governance, transparency and
accountability in the process of granting mining permits can be measured
by subjecting the processes to common good practices. These good practices
include whether or not there is public participation through comment or
objection processes, appeal and review procedures, and independence of
decision-making authorities, and whether there is consultation with inter-
ested and affected parties such as landowners, communal people and relevant
government departments in the case of protected areas or environments. Most
land in Zimbabwe is open to prospecting and mining.[71]

An analysis of the act indicates that there is no space for consultation with
interested and affected parties. A prospective miner who is applying for a

---

66  Republic of Zimbabwe, Ministry of Mines and Mineral Development *Draft Minerals Policy*
    (2013); see also M Dhliwayo *A Review of Zimbabwe's Draft Minerals Policy* (2014, ZELA) and M
    Dhliwayo and S Mtisi *Towards the Development of a Diamond Act in Zimbabwe: Analysis of the
    Legal and Policy Framework on Diamonds and Zimbabwe's Compliance with the Kimberley
    Process Certification Scheme (KPCS) Minimum Requirements* (2012, ZELA).
67  G Sibanda "Government to overhaul Mines Act" (19 March 2013) *The Herald* (Harare),
    quoting then Deputy Minister of Mines and Mining Development G Chimanikire, who
    indicated that, instead of creating a mineral specific act for diamonds, the Cabinet
    Committee on Legislation is aiming to revamp the entire Mines and Minerals Act.
68  Part IV (acquisition and registration of mining rights).
69  For a detailed discussion of the processes, see Mtondoro et al "Research paper", above at
    note 23 at 15–17 and Hon G Chimanikire "Zimbabwe's mining industry policy" (presen-
    tation to the Japan Sustainable Mining, Investment and Technology business forum,
    Tokyo, Japan, 16 May 2013).
70  "Distribution of mining revenue in Zimbabwe" (National Association of Non
    Governmental Organisations policy brief no 5/2012) and S Mtisi et al "Extractive indus-
    tries policy", above at note 7 at 35.
71  Mtondoro et al "Research paper", above at note 23 at 8 and Mines and Minerals Act,
    sec 26.

prospecting licence,[72] special mining rights, exclusive prospecting order or mining permit deals directly with the mining commissioner and relevant government departments, such as rural district councils, the Forestry Commission[73] and private land owners.[74] The details of contracts and concessions negotiated and signed by the government and investors are seldom made public.[75] This is a contested area, where civil society advocates call for such contracts to be made public, while corporates often raise the defence of confidentiality based on privity of contract.[76] Most of the arguments for the disclosure of contracts are not based on law but on good corporate governance, global transparency and accountability best practice. Failure to ground these demands in law may continue to undermine any calls for disclosure. Transparency in this contested field should ideally be a legally mandated requirement. This could be grounded in the need for government, as public trustee over natural resources, to manage such resources transparently, and the rights of citizens to know; disclosure must be made in both the public and national interests.[77] Basing the call for disclosure on voluntary international initiatives may not prevail with regimes that perceive themselves to be under assault by western ideologists bent on controlling the global economy.[78] The Access to Information and Protection of Privacy Act (AIPA) has proved ineffective, as it contains exceptions[79] within which these defences fit very well. Implementation of the 2013 Constitution could improve this situation, with section 62 providing for the right of access to information, provided the AIPA is amended to improve the administrative bottlenecks currently being experienced.

There is some protection in the Mines and Minerals Act against mining within certain distances of dwelling places, boreholes, roads, railway lines etc.[80] These provisions can be used to ensure accountability when decisions are made about where to mine and how to address the relocation of affected communities. To an extent, it could be argued that these provisions provide for transparent decision-making on matters affecting the livelihoods of communities affected by mining. However, this only works if the law is complied with and enforced in the event of violations. The Mines and Minerals Act

---

72  Mines and Minerals Act, sec 27 (rights granted under prospecting licence).

73  Id, sec 36 (application to reserve 50% of forests from mining activities).

74  Id, sec 38.

75  Mtisi et al "Extractive industries policy", above at note 7 and Mtondoro et al "Research paper", above at note 23 at 13.

76  See above at note 23 for contrasting views and opinions.

77  This can arguably fit within disclosure under sec 28(1) of the AIPA, which allows disclosure of third party information in the public interest in defined categories, including safety and environmental protection.

78  Some argue that disclosure is required of developing countries, but developed countries seldom disclose the contracts they conclude with extractive corporations or the revenues made from the sector.

79  AIPA, sec 24(1).

80  Mines and Minerals Act, secs 31(1)(a) and 34(2) and (7).

provides for consultation with communal dwellers, rural district councils and local authorities; however there is less transparency in how decisions on whether or not to authorize mining in communal areas are made. Arguably, consultation has tended to consist of information sessions, where local authorities and communal area dwellers are simply advised that mining is to take place. In some cases, even the information shared is vague and useless for planning purposes.[81]

Complementary and specific minerals legislation, such as the Gold Trading Act of 1940 (chapter 21:03), Base Minerals Export Control Act of 1949 (chapter 21:01) and Precious Stones Trade Act 1978 (chapter 21:06), largely consists of technical regulatory laws with no provisions to promote transparency and accountability in the mining sector. This legislation generally aims to promote the regulatory monopoly of the Ministry of Mines and Mining Development, the MMCZ and other authorized agencies like the Reserve Bank to be the sole dealers in minerals.[82] The sole mandates created by these acts are not guarantees of transparency although, if enforced, they could reduce leakage of revenue and easily identify accountable authorities. Most decisions made under these acts, including the issuing of licences, permits or prohibitions, are not open to public consultation and scrutiny, hence exposing the acts to abuse in the wrong hands.

### Transparency and accountability in environmental laws

Apart from the mining legislation discussed above, a number of environmental laws contain provisions that could promote transparency in the regulation of extractive mining activities.[83] Key among these is the recent Environmental Management Act (EMA). The EMA is the overarching framework law that regulates the sustainable use of natural resources in Zimbabwe. The key clauses include provisions for an environmental impact assessment (EIA)[84] to be carried out before listed activities are authorized. Globally, EIA has proved to be central to transparency and accountability in the extractives sector. The process provides an opportunity not only to assess the possible impacts of mining on the environment, but also to scrutinize the sustainability of mining activities and provide for the rehabilitation of the natural environment[85] once mining has ceased. Environmental legislation enables access to information about new mining ventures authorized by the regulators and permits challenges to such information. A better law than the AIPA could improve the

---

81   For example, the Chiadzwa communities were not, until recently, provided with official information on relocation and compensation plans.

82   The Reserve Bank of Zimbabwe has exclusive marketing and trading rights over gold and silver; remaining minerals are marketed by MMCZ.

83   EMA sec 3.

84   Id, sec 1, defines "environmental impact assessment". Id, sched 1, items 7 and 8 list mining activities.

85   Id, sec 1 defines "environment".

effectiveness of environmental laws in this regard. The utility of environmental legislation also depends on the extent to which the legislation provides for public participation in the EIA processes and issuance of various pollution control permits.[86]

*The Environmental Management Act*
Several provisions of the EMA could promote transparency and accountability in natural resources management. First, the principles of environmental management in section 4 of the act can promote transparency and accountability, or facilitate platforms for civic engagement. In particular, these principles include the duty to promote public participation in environmental decision-making, the need to promote sustainable development, the precautionary approach and access to justice. More fundamentally, these principles are embedded in an environmental right, which is the basis on which to question the impact of many extractive activities on the environment. Environmental rights highlight pollution prevention and the EIA process. Environmental rights are human rights and good governance is a precondition for them to be protected, promoted and fulfilled. To this end, it is argued that the EMA would create a framework for good and transparent environmental governance, if effectively implemented.

Secondly, the EMA provides for institutions that can be effective in implementing its provisions. Among these institutions is the Environment Management Agency (the Agency), charged with implementing the EMA. The Agency has been relatively effective in the country's current political circumstances. Relevant to the extractives sector is the regulation and control of emissions and discharges, mandated by norms and standards developed by the Agency's committees.[87] The Agency is charged with providing information to the Environmental Management Board so that the board can make informed decisions.

Thirdly, the EMA mandates planning instruments that have the potential to promote good environmental governance and transparency. Some of the plans are relevant as they can be used to regulate where and when mining takes place. The EMA provides for the development of a national environmental plan,[88] which must contain strategies and measures for the sustainable management of natural resources through, among others, the promotion of sustainable use, environmental protection, and protection of the environment against pollution and harmful substances.[89] Once approved, a national environmental plan binds every person as well as all state organs,[90] and no

86   T Murombo "Beyond public participation: The disjuncture between South Africa's environmental impact assessment (EIA) law and sustainable development" (2008) 3 *Potchefstroom Electronic Law Journal* 1 at 11.
87   EMA, part IX.
88   Id, sec 7.
89   Id, sec 88 on the contents of the national environmental plan.
90   Id, sec 92(1).

project may be implemented unless it aligns with the plan.[91] The EMA also requires listed government agencies to develop environmental management plans if their mandate and activities positively or negatively affect the environment.[92] The Ministry of Mines and Mining Development and state owned enterprises all undertake activities that potentially affect the environment in terms of section 96(1)(a) and should therefore develop national environmental plans. Section 96(3) shows that these plans can be used to control the activities of these mining entities. Local authorities are bound to develop local environmental management plans that are synchronized with the national plan.[93] Environmental plans could be more effective if implemented in synergy with mining legislation, which is currently not the case in Zimbabwe where mining legislation predominates.

Fourthly, throughout the development of environmental plans the public can comment and provide input on drafts.[94] This is part of transparent policy-making and of making environmental information available. The plans impact extractive activities in that, for instance, the granting of prospecting licences or other mining permits should take into account these plans to prevent extractive activities in environmentally sensitive and protected areas. Furthermore, this planning is essential to prevent uncontrolled mining that affects infrastructure such as schools, roads, catchment areas and important ecosystems. Failure to align mining activities with these plans can be used by activists and communities to hold government and mining companies to account and to enforce environmental legislation.[95] Most effective remedies for holding mining companies accountable for the environmental impacts of their extractive activities lie in environmental legislation, not mining laws.

Fifthly, the EMA provides for pollution prevention through the licensing of certain activities.[96] A number of these activities emanate from extractive processes. For instance, the emission of polluted air and wastewater is regulated and licensed under the EMA.[97] The EMA provides a consultative process for the issuing of these licenses, and it is expected that communities affected by mining, as well as civil society, can participate in the process.[98] While civil

---

91  Id, sec 92(3)(b). Mining activities are listed in sched 1 (sec 97) as projects requiring an EIA. Mining activities should also be aligned with local plans; *Maccsand*, above at note 38, confirms this position in South Africa.

92  EMA, sec 96(1)(a).

93  Id, sec 95.

94  Id, sec 89.

95  In contrast, environmental legislation has been the main tool used in South Africa to control the negative impacts of mining. This ranges from water use licence requirements, to preventing mining in protected environmental and heritage sites.

96  EMA, part IX, secs 60, 64 and 71, regulating effluent, air and waste licences.

97  Id, secs 70 (prohibition against discharge and disposal of wastes), 71 (application for waste licence), 64 (licensing emissions) and 65 (application for emissions licence). One of the recent issues with diamond mining has been the pollution of the river systems in Marange by mining companies.

98  Id, sec 60 and 60(4) (licence to discharge effluents).

society has heavily engaged in transparency and accountability regarding revenue from the mining sector, it is beyond doubt that, to communities affected by mining, holding mining companies to account includes ensuring that they are held accountable for environmental degradation.[99] The EMA does this by setting standards for pollution and waste control, regulating toxic and hazardous substances,[100] and providing for the environmental auditing[101] of projects. The Agency implements these processes.[102]

At the policy level, the national environmental policy and strategies of 2009 can promote transparency, accountability and good governance in the management of natural resources. The vision espoused in the policy is aimed at alleviating poverty and improving the life of Zimbabweans through the sustainable use of natural resources.[103] One of the goals supporting this vision is: "[t]o avoid irreversible environmental damage, maintain essential environmental processes, and preserve the broad spectrum of biological diversity so as to sustain the long-term ability of natural resources to meet the basic needs of people, enhance food security, reduce poverty, and improve the standard of living of Zimbabweans through long-term economic growth and the creation of employment".[104]

The vision and goals in the environmental policy and strategies call for laws and regulations that promote the transparent and accountable use of natural resources. Without accountability in how natural resources are used, the goals remain vainglorious. The impact of the policy has been minimal due to the dominance of resource exploitation laws such as the Mines and Minerals Act.

*Water legislation*
Similarly, an analysis of the Water Act shows that it contains provisions that could promote transparency in environmental decision-making, both generally and regarding mining activities. The Water Act provides for the control of water use and water pollution, and these provisions are critical for holding mining companies to account for activities that could pollute water resources. Water resources and catchment areas may be more valuable than revenue from mining activities; hence the Water Act requires all water uses, other than primary uses,[105] to be licensed. Applications for a water use licence for mining purposes must be submitted to the mining commissioner who

---

99  Id, sec 107.
100  Id, sec 77 (definition of "hazardous substance").
101  Id, sec 76.
102  Id, sec 10(1)(b)(xiv) and 10(2)(4) provide for the Agency's functions.
103  Government of Zimbabwe, Ministry of Environment and Natural Resources "National environmental policy and strategies" (2009) at 2. The policy is analysed at length by T Murombo "Balancing interests through framework environmental legislation in Zimbabwe" in M Faure and W du Plessis (eds) *The Balancing of Interests in Environmental Law in Africa* (2011, Pretoria University Press) 557 at 579.
104  Government of Zimbabwe, Ministry of Environment and Natural Resources "National environmental policy and strategies" (2009) at 2 (emphasis original).
105  Water Act of 1998 (chap 20:24), sec 34.

transfers applications to the catchment council for consideration.[106] Compensation must be paid to beneficial users of water who may lose that use as a result of the granting of a mining water use licence.[107] Monitoring of the activities of most of the diamond mining companies in Marange and scientific studies have confirmed a disregard for these key provisions to prevent water pollution.[108] It has been the task of civil society, complementing the Agency, to hold mining companies to account for pollution and to spur them into action to improve the infrastructure installed for wastewater treatment at the plants.

### Transparency and accountability in state revenue laws

Revenue from extractive industries, both worldwide and in Zimbabwe, has recently become the central focus of efforts to promote transparency and accountability. In particular, the controversy around Marange diamond revenue and how it has been managed, exposed huge gaps in transparency and accountability with respect to how the state determines, collects and accounts for revenue from royalties and other taxes on mining activities.[109] Transparency and accountability discourse in Zimbabwe has exclusively focused on revenue management. This leaves many questions unanswered. What laws govern the imposition of royalties and how they are determined and collected? What role do the public and Parliament play in the whole process of determining and collecting royalties? To whom does ZIMRA account for revenue collected from mining activities and royalties, amid claims that it has been sidelined?[110] What are the institutional misalignments that could impede transparency and accountability in how state revenue is collected? What do the Income Tax and the Revenue Authority Acts say and how accessible are the provisions to the affected communities, civil society and Parliament?[111]

---

106  Id, sec 34(2).
107  Id, sec 34(6).
108  ZELA "Report on the scientific investigation of the impact of Marange diamond mining operations on water quality in the Save and Odzi rivers: Including assessment of the health, environmental and livelihoods impacts" (July 2012), available at: <http://woek.de/web/cms/upload/pdf/kasa/publikationen/zela_2012_report_on_the_scientific_investigation_marange_water.pdf> (last accessed 5 March 2016); *ZELA and Others v ANJIN and Others* Harare HC9451/12 (High Court Harare), an ongoing case in which ZELA and affected communities are suing diamond mining companies for polluting the Save River downstream.
109  Mundunguyo and Ndaona "An investigation", above at note 1 at 112 and Mtisi et al "Extractive industries policy", above at note 7; see also the Chamber of Mines, Zimbabwe "2011 fiscal budget analysis", noting that high royalties are counterproductive.
110  Id, Mundunguyo and Ndaona at 122.
111  Answers to these and many other questions can be found in the tax and exchange control legislation, but importantly proposed answers are also in the Draft Diamond Bill of 2011 and the principles behind the Diamond Policy of 2012.

While the legal framework for revenue management exists, the persistent problem has been the potential for such legislation to be circumvented with impunity by government officials, acting alone or aiding private corporations to circumvent the legislation.[112] The mining sector pays various taxes to the government, ranging from income tax (corporate), "pay as you earn", marketing commissions, customs duty, licensing fees and royalties.[113] Also included must be the deductibles available to mining companies at the prospecting and pre-mining phases, some of which are claimed as corporate social responsibility (CSR) activities.[114]

Of these various taxes, royalties charged and remitted to governments have been the most controversial.[115] While it is clear which legislation provides for the levying of royalties, the ideal or optimum percentage rate of tax has never been agreed.[116] Members of the mining industry persistently contest the situation claiming that the government overestimates what the industry produces and should contribute to the fiscus, and that the government overlooks the capital and operational needs of the mining sector, while on the other hand it claims that the extractives sector is not contributing enough to the economy. Admittedly, the mining sector's economic contribution slowed down in sympathy with the economic decline. While it is recently picking up pace, the Chamber of Mines claims that high levels of taxation are eroding the capacity of the mining sector to recapitalize, grow and improve its infrastructure.[117] This process is necessary to bring the sector to full capacity.

Whatever the case may be, the challenge in Zimbabwe is how to hold government to account for the revenue collected from the mining sector. It is in this regard that the argument is made below that transparency and accountability initiatives that merely track movement of revenue without questioning how the government uses the funds are inadequate. Budget monitoring can provide better information in this respect.

---------

112  For instance, in 2010 the ZMDC claimed that it had submitted collected revenue to the minister of finance who claimed not to have received the remittance; see also Mundunguyo and Ndaona "An investigation", above at note 1 at 122, noting that diamond production figures and remittances are always at a tangent, and Portfolio Committee on Mines and Energy "First report", above at note 4.

113  See generally ZELA "An outline of the mining taxation regime in Zimbabwe" (2012), a basic layperson's outline of the taxes levied on mining and applicable legislation.

114  Income Tax Act (chap 23:02), sec 15(2)(f)(i) read with 5th sched; mining companies' claims that CSR activities are benevolent are incorrect, as the state essentially co-funds such activities through deductions.

115  Royalties are paid under sec 15(2)(f)(iii) of the Income Tax Act, read with the Mines and Minerals Act (chap 21:05) and the Finance Act (chap 23:04).

116  See Mudhunguyo and Ndaona "An investigation", above at note 1 at 111–12, providing a comparative table of royalties in some Southern African Development Community countries as of 2011 and (at 109) providing a five year table showing the level of royalties levied on different minerals in Zimbabwe.

117  Chamber of Mines "2011 fiscal budget analysis", above at note 109.

### Transparency and accountability in corporate regulation and governance provisions

Many private companies in Zimbabwe have accepted the idea of sustainability reporting and want to be seen to be promoting sustainable ways of doing business. Questions, however, abound regarding the genuineness of these green initiatives. The green economy, green growth and low carbon economy are trending concepts and agendas. Nevertheless, traditional environmentalists doubt if, in a capitalist world, it would ever be possible for a private company to be sustainable, as it would be incorporated to create shareholder value and profit. Globally, companies involved in the extractives sector have been implicated in scandals concerning fraud, environmental pollution, human rights abuses, patronage and collaboration with rogue states to plunder natural resources.[118] Solutions have been proposed to this challenge, but this continues to be a mammoth task, especially for developing countries. The wealth of some of these countries pales into insignificance when compared with the cash reserves of private multinational corporations. It is in these mismatched economic power relations that it has been most challenging to promote good governance, transparency and accountability in the extractives sector. In one study, the World Bank found that resource rich countries often lack "pro-poor public and corporate governance" systems that can "maximize poverty alleviation through sustainable development".[119] It also found that there is need for "more effective social and environmental policies" and "increased respect for human rights".[120]

Analysing the recommendations from this World Bank study, a group of researchers have argued that increasingly resource rich countries lack "the ability to respond to pressures, notably from communities affected by mining", and that their abilities have "become circumscribed by the legal and practical conditions to attract foreign investment".[121] Szablowski adds that states have gradually abdicated their responsibilities to multinational mining companies, who unwittingly take on the task of social development and managing community expectations.[122] He argues that "states themselves are involved in transferring legal authority to mineral enterprises to manage social mediation".[123] This strategy has variously been termed the "retreat of

---

118  See generally Amnesty International "Profits and loss: Mining and human rights in Katanga, Democratic Republic of the Congo" (June 2013); International Council on Mining and Metals "Human rights in the mining & metals industry: Overview, management approach and issues" (May 2009), available at: <https://www.icmm.com/document/8331> (last accessed 5 March 2016).

119  B Campbell *Mining in Africa: Regulation and Development* (2009, Pluto Books) at 243.

120  Ibid.

121  Id at 246.

122  D Szablowski *Transnational Law and Local Struggles: Mining Communities and the World Bank* (2007, Hart Publishing) at 45, as cited by Campbell *Mining in Africa*, above at note 119 at 246.

123  Szablowski, id at 27.

the state" or "selective absence", the sequel to which is "legitimacy gaps" or "governance gaps".[124] Communities are left to wonder if their fate is in the hands of their government or extractive corporations and they question the legitimacy of the companies to usurp state functions. Abdication by the state of its responsibilities is weakening legal and regulatory instruments for accountability.

In Zimbabwe, it is a paradox that the companies at the centre of the mining controversy are mostly state owned or private corporations in which the state holds a substantial stake even if not a majority. In addition, even the private companies involved have shareholders with strong connections to the state. The challenge in Zimbabwe, therefore, is how to regulate state owned enterprises that have virtually become laws unto themselves or alter egos of ministers contrary to the 2010 corporate governance framework.[125] If it were difficult to regulate multinational corporations, one would assume that it should be easier to deal with state owned local corporations. But alas, in Zimbabwe collusion between state owned mining entities and state actors has made regulating these companies a nightmare.[126] It is difficult to hold them accountable financially, socially or environmentally. Weak regulations, conflict of interest, and conflation of corporate and state priorities are having a debilitating effect on regulators, who struggle to hold these entities to account. The environment of mistrust that exists between regulatory ministries and some mining companies aggravates the situation. Consequently, claims and counterclaims of mismanagement of mining revenue abound. The Agency bemoans its impotence in the face of politically emboldened corporations that persistently violate environmental regulations, while revenue leaks along the way from the corporations to the taxman.

The legislation that created a number of state owned mining enterprises does contain orthodox features of corporate governance and accountability. However these are now out-dated and have been overtaken by the times. Having an independent board and reporting requirements are no longer sufficient to promote good corporate governance in state owned enterprises. In line with modern corporate governance practices, state owned enterprises must be legally bound to open their operations to public scrutiny, not only

------

124 B Campbell "Corporate social responsibility and development in Africa: Redefining the roles and responsibilities of public and private actors in the mining sector" (2012) 37 *Resources Policy* 138 at 140; see generally B Campbell, ER Grégoire and ML Julia "Regulatory frameworks, issues of legitimacy, responsibility and accountability: Reflections drawn from the PERCAN Initiative" in J Sagebien and NM Lindsay (eds) *Governance Ecosystems: CSR in the Latin American mining sector* (2011, Palgrave Macmillan) 84.

125 The Corporate Governance Framework, above at note 63, sought to incorporate King III Code principles and other modern good corporate governance principles into the management of state owned enterprises and parastatals in Zimbabwe. Persisting problems show that it has not been fully implemented.

126 As reported in the Portfolio Committee on Mines and Energy "First report", above at note 4.

by Parliament and other government departments, but also by concerned members of the public.[127] A lack of transparency and accountability in investment arrangements, mining contracts and revenue flows thrives on a lack of legally mandated obligations for the companies. Attempts to obtain investment agreements and mining contracts entered into by the Ministry of Mines and Mining Development and mining companies are doomed, so long as there is no legal obligation on the state or the companies to comply with such requests, at the very least by disclosure to Parliament. This lack of transparency and accountability platforms in the public sphere drove non-state actors to create alternative spaces and initiatives to hold extractive entities to account.

## GOOD GOVERNANCE, PUBLIC ACCOUNTABILITY AND TRANSPARENCY INITIATIVES

CSOs in Zimbabwe and internationally have instigated a number of initiatives to promote transparency and accountability in the natural resources sector. Such initiatives include the Extractive Industries Transparency Initiative (EITI),[128] Publish What You Pay (PWYP),[129] Kimberly Process Certification Scheme (KPCS), Global Reporting Initiative and others. Some of the initiatives were started by a combination of CSOs and state actors in pursuit of the sustainable use of natural resources. Central to most of the initiatives is a concern about the impact of extractive or mining activities on the environment, local communities and national economies. Human rights violations igniting civil conflicts also inspired a number of these initiatives. However, questions have been raised about the integrity of some of the global initiatives in terms of their ideological foundations and raison d'être. Politicians in some developing countries see Eurocentric initiatives as vectors for the imposition or perpetuation of forms of economic and political control or domination by nostalgic imperialists under the guise of human rights and good natural resources governance.[130] Others see the initiatives as part of bolstering the skewed world

-------

127  Increasingly, public corporations are voluntarily subjecting themselves to the King III Code of Good Corporate Governance.

128  EITI is the brainchild of Tony Blair who was its face at the World Summit on Sustainable Development in 2002. However its launch resulted from pressure from Global Witness and Human Rights Watch. Not everyone recognizes the good intentions behind EITI, particularly given the lack of transparency in some reports submitted by its members, for instance Nigeria, which was praised for being the first African country to join the initiative. See J Gouseva "EITI: A new global standard for lying" (11 September 2008) *Open Democracy* (Russia), available at: <http://www.opendemocracy.net/article/yes/eiti-a-new-global-standard-for-lying> (last accessed 31 March 2015); see also Etter "Can transparency reduce corruption?", above at note 22 at 9.

129  PYWP preceded the establishment of EITI and is the brainchild of George Soros's Open Society Institute.

130  Hund "Globalisation", above at note 12 at 27–28; P Blunt "Cultural relativism, 'good' governance and sustainable human development" (1995) 15/1 *Public Administration and*

development and trade systems that favour the West and relegate developing countries to permanent suppliers of unbeneficiated raw materials. In this regard Blunt cautions that:

> "[O]ne of the greatest obstacles to global development and harmony, that of social disintegration, becomes insurmountable in the face of hardening social divisions based on ideas of ethnic, religious or cultural supremacy. Such possibilities are encouraged by views of the human condition which imply that their authors have in some sense acquired or assumed exclusive occupation of the moral, intellectual and political high ground."[131]

Be that as it may, there is a consensus that countries do not need to adopt the non-state initiatives in their entirety. Countries can take lessons from the initiatives and implement, at the national level, what each state believes to be in its social, economic and political interests: aspects that resonate with its developmental aspirations.[132] This is precisely what Zimbabwe is in the process of doing with the Zimbabwe Mining Revenue Transparency Initiative (ZMRTI),[133] as well as by complying with the KPCS to assure consumers that its diamonds are "clean".

## Initiatives by state and state affiliated entities or actors

With CSO support, Zimbabwe began some initiatives to promote good natural resources governance, transparency and accountability in the mining sector. ZMRTI represents the high water mark of state and CSO co-operation in difficult circumstances. Encouragingly, the Zimbabwean state is also in the process of developing a diamond policy, a supposed precursor to a Diamonds Act and overhaul of the Mines and Minerals Act. While ZMRTI is encouraging, it is submitted that the country can do more in terms of law and policy formulation to promote good natural resources governance. This is particularly so in the areas of fiscal regulation, public participation and regulation of the mining process and its impact on the environment and the economy.[134] As noted above, the legal framework for mining is archaic, lacking provisions on public participation, access to information and protection of mining local

---

contd
*Development* 1 at 3; S Mtisi (ed) *Sowing the Seeds of Advocacy Work on Transparency and Accountability in the Extractive Sector in Zimbabwe* (report on the proceedings of the multi-stakeholder conference on promoting transparency and accountability in the extractive sector in Zimbabwe, 22–23 September 2010) at 6.

131 Ibid, Blunt.
132 What is important is for states to implement the spirit of the EITI principles without necessarily getting bogged down with the question of whether or not they are a member of EITI.
133 "Zimbabwe mining revenue transparency initiative" (concept note developed by the office of Deputy Prime Minister Hon T Khupe, 8 September 2011).
134 Chamber of Mines budget commentary 2011 and Mtisi et al "Extractive industries policy", above at note 7.

communities. In addition, inadequate licensing and control systems cripple the legislation.[135] Good political and economic governance are integral aspects of good natural resources governance.[136] Without the implementation of new constitutional guarantees and environmental legislation, the progressive revision and reform of mining law and policy is only one step in a multi-step process to improve governance, transparency and accountability.

Initiatives by the state and CSOs should not be the only interventions promoted. Private mining companies should join in and develop internal and industry-wide best practices, codes and other initiatives to promote good (corporate) governance and assist the state in promoting good natural resources governance.[137] The role of private corporations is even more relevant when it comes to transparency and accountability because, without their co-operation, state disclosure per se will be insufficient. However, as indicated in the next section, there are serious shortcomings with voluntary initiatives, whether they originate in the private or state sector.

## Critical analysis of CSO initiatives

The EITI and PWYP initiatives originally had their impetus from civil society concerns about human rights violations and corruption funded by pilfered resource revenues. The EITI standard, principles and criteria are all grounded in good intentions that, if implemented at the local (national) level, can anchor transparency and accountability on revenue flows from extractive activities.[138] EITI's governance structure is the ideal, with representatives from the three key interested stakeholders (government, corporate and civil society). However, there is no direct representation of indigenous / local communities and it is assumed that civil society is the bridge between such communities and states. Among EITI's membership are "implementing countries" (largely African and east European resources rich states) and "supporting countries" (mostly European states, plus a few developing states).[139] The EITI process

---

135  Dhliwayo and Mtisi *Towards the Development*, above at note 66 at 6; T Biti "Mining, taxation laws need urgent amendment", available at: <http://www.mines.gov.zw/85-mining-taxation-laws-need-urgent-amendment> (last accessed 5 March 2016), arguing that "[t]here is need to amend the [sic] Zimbabwe's mining and taxation laws so that the country benefits from its natural resources. If we are going to wait for royalties and taxes, Government can forget using the minerals to pay for the country's debt ... The mining sector requires a transparent, honest and proper evaluation report. If we are not transparent in this sector, then we should not talk about a resource-based debt repayment strategy".

136  L Feris "The role of good environmental governance in the sustainable development of South Africa" (2010) 13/1 *Potchefstroom Electronic Law Journal* 73 at 73.

137  Kotze "Environmental governance", above at note 8 at 121.

138  As noted above, EITI is a multi-stakeholder coalition of governments, companies, civil society groups, investors and international organizations; for more details, see: <http://eiti.org/eiti> (last accessed 31 March 2015).

139  EITI "Members registry", as of 24 February 2011, available at: <http://eiti.org/files/20110224-EITI-members-registry.pdf> (last accessed 31 March 2015).

is a simple reporting process, which makes information available on who has paid what to whom, ie PWYP.[140] There is also a call by other activists for corporations to publish what they do not pay.

The EITI standard, principles and criteria are fundamental building blocks for an effective global system to promote transparency in the extractives sector. However, like other international legal regimes, EITI does not contain the necessary teeth to compel countries to join and implement its principles. Furthermore, it does not have effective enforcement mechanisms in the event of violations.[141] Unless implementing countries domesticate the EITI principles, it will remain a soft initiative.[142] The current EITI framework is as effective as was anticipated. In this respect, transparency and publishing revenue information are still some steps away from creating a platform for holding governments and corporations accountable for their actions.[143] This requires good governance at the national level, buttressed by key governance institutions, processes and laws that enable action against failures and abuses by the state and extractive corporations.[144]

The role of developed countries and the World Bank in the funding, management and implementation of EITI also raises questions that may affect how receptive resources rich countries are to the initiative. There is real potential for the power relations and asymmetries in the running of EITI to see some countries shaping the agenda. The World Bank's track record in supporting extractive development projects and economic structural adjustment programmes,[145] most of which fail to promote sustainable development in developing countries, is known.[146] Globalization, the world trade system and the capacity of actors to dominate and control it, play a crucial role in fostering good governance in resource rich countries. While it is possible for the

---

140 "Implementing the Extractive Industries Transparency Initiative: Applying early lessons from the field" (2008, The International Bank for Reconstruction and Development / The World Bank) at 60, available at: <http://siteresources.worldbank.org/INTOGMC/Resources/implementing_eiti_final.pdf> (last accessed 31 March 2015).

141 See generally Etter "Can transparency reduce corruption?", above at note 22.

142 See for example the Nigeria Extractive Industries Transparency Initiative Act, 2007.

143 N Rudra and NM Jensen "Globalization and the politics of natural resources" (2011) 44/6 *Comparative Political Studies* 639 at 654, expressing doubt and uncertainty about the potential of civil society initiatives like EITI to mediate the effects of globalization on natural resources governance.

144 In 2011 and 2012 Zimbabwe produced KPCS annual reports that detail the carats exported and their value, but how much was recovered from diamond production remains contested with the Ministry of Mines and Mining Development. See *Zimbabwe 2011 Annual Report to Kimberley Process Certification Scheme*, submitted by the Ministry of Mines and Mining Development, available at: <http://www.kimberleyprocess.com/en/system/files/documents/Zimbabwe%20Annual%20Report%202011_0.pdf> (last accessed 5 March 2016).

145 See generally E Oshionebo "World Bank and sustainable development of natural resources in developing countries" (2009) 27 *Journal of Energy and Natural Resources Law* 193 at 203–04.

146 Ibid.

global market to call supplier countries to account and uphold certain standards, this can also fuel bad governance, corruption and a lack of transparency to facilitate easy access to resources in critical demand.

Unlike EITI, KPCS is the product of diamond producing countries of southern Africa who came together in 2000 to develop best practices to stop the trade in conflict diamonds that was fuelling civil wars and conflict in many African countries. Starting as a regional initiative, it received the blessing of the UN later the same year.[147] Membership is open to countries that can abide by its requirements.[148] Diamond trade associations and some CSOs have participated in KPCS plenaries.[149] Once a member, a country's diamonds are certified as conflict free and therefore freely tradable. The scheme works by controlling access to diamond markets on the back of conditions that promote good governance, transparency and accountability in the diamond producing member countries. A particular strength of KPCS is its ability to reduce demand for tainted diamonds. This is bolstered by the membership of diamond producing and trading countries and associations.

One of the gaps identified by this research is the lack of initiatives targeting the consumers of mineral products as a way of promoting good governance, transparency and accountability. KPCS is among the few initiatives that attempt to use the markets to control the behaviour of states and corporations. Another attractive aspect of KPCS is its ability indirectly to drive policy and legal reforms in member countries, for them to meet its certification requirements. Such reforms can promote transparency and accountability in the mining sector.

KPCS's Achilles heel is its narrow focus on conflict diamonds.[150] This has been at the centre of its activities regarding Marange diamonds in Zimbabwe. Once diamonds are not classifiable as conflict diamonds, it becomes difficult to subject such diamonds to KPCS certification. Hence the call to redefine "conflict diamonds" to broaden KPCS's reach. Like EITI and other voluntary initiatives, KPCS is a voluntary scheme with consensus-based

---

147  "Role of diamonds in fuelling conflict" (report of the UN General Assembly 55th session, official record, 29 January 2001): A/RES/55/56.

148  Currently KPCS members account for approximately 99.8% of the global production of rough diamonds.

149  Notably the World Diamond Council and Partnership Africa Canada. KPCS regularly constitutes ad hoc working groups that provide opportunities for national civil society groups to feed into its processes.

150  See generally I Smillie "Blood on the Stone: Greed, Corruption and War in the Global Diamond Trade" (2010, Anthem Press), especially chap 12 "Kimberley: A hope in hell". Smilie gives an excellent account of the travails of the KPCS in Zimbabwe in id "Blood diamonds and non-state actors" (2013) 46 Vanderbilt Journal of Transnational Law 1003 at 1017 et seq. The UN defines a conflict diamond as "any diamond that is mined in areas controlled by forces opposed to the legitimate, internationally recognized government of a country and that is sold to fund military action against that government"; see "Blood diamond" Encyclopaedia Britannica Online, available at: <http://www.britannica.com/EBchecked/topic/1793249/blood-diamond> (last accessed 31 March 2015).

decision-making. Apart from mobilizing the market against a country's products, KPCS does not appear to have any other effective enforcement mechanisms. This is among many reasons why legal reforms are still necessary to strengthen the transparency provisions in Zimbabwe's legal frameworks for mining and taxation.

## Other relevant initiatives to promote transparency and accountability

The Africa Initiative on Mining, Environment and Society is a movement started by a coalition of CSOs working in the extractives sector and communities affected by mining in Africa. It has gained audience within intergovernmental ministerial bodies to lobby for better policies to regulate the extractives industry. This initiative was very instrumental in the adoption of the African Mining Vision by African heads of government and state in February 2009. The African Mining Vision has principles of good governance, transparency and accountability, which could promote good governance in the mineral sectors across the region. In addition, the African Mining Vision is geared towards promoting sustainable development through mining.

Globally, the Global Reporting Initiative (GRI) founded in 1997 is an initiative by two US non-profit organizations, the Coalition for Environmentally Responsible Economies and the Tellus Institute, aimed at creating and promoting sustainability reporting standards and tools for corporations generally. Although voluntary, GRI has been adopted by many companies involved in the extractives sector with the aim of cleaning up their operations and reputations. GRI dovetails into the UN Global Compact[151] that espouses ten principles[152] that can potentially promote good governance and responsible business practices. These principles are at the intersection of business, human rights and sustainable development. There is great potential for the Global Compact together with other initiatives, especially the UN driven business and human rights programme,[153] to promote good natural resource

---

151  "The UN Global Compact is a strategic policy initiative for businesses that are committed to aligning their operations and strategies with ten universally accepted principles in the areas of human rights, labour, environment and anti-corruption"; see: <http://www.unglobalcompact.org/AboutTheGC/index.html> (last accessed 31 March 2015). For an analysis, see E Oshionebo "The UN Global Compact and accountability of transnational corporations: Separating myth from realities" (2007) 19 *Florida Journal of International Law* 1.

152  These include principles of human rights, labour, environment and anti-corruption; see:   <http://www.unglobalcompact.org/AboutTheGC/TheTenPrinciples/index.html> (last accessed 31 March 2015).

153  The UN appointed a special representative on business and human rights, John Ruggie, whose mandate was from 2005–11. He established a working group that has developed fundamental principles that can enable countries and corporations to operate in an environment of openness, transparency and accountability; see "Guiding principles on business and human rights: Implementing the United Nations 'protect, respect, remedy' framework", available at: <http://www.ohchr.org/Documents/Publications/GuidingPrinciplesBusinessHR_EN.pdf> (last accessed 2 April 2015). See also C Iglesias

governance and transparency at the international level. The UN Principles for Responsible Investment also provide international good practices on investing in the natural resources sector, among other sectors. As officially stated, the "goal [of these principles] is to understand the implications of sustainability for investors and support signatories to incorporate these issues into their investment decision-making and ownership practices. In implementing the Principles, signatories contribute to the development of a more sustainable global financial system."[154]

The drawback is that the principles are voluntary and there is no enforcement mechanism against rogue investors who do not pay attention to human rights and sustainability when making investment decisions. An underdeveloped area is the UN business and human rights initiative, as the human rights approach can make it easier for CSOs and states to subject corporations to transparency and accountability mechanisms.

Overall, these global "soft law" voluntary codes, compacts, principles and standards are important, although they may not have effective enforcement mechanisms. Nevertheless, like general soft law declarations, they can still shape the development of progressive domestic legally binding laws and regulations. This is the case with initiatives that include state actors and intergovernmental bodies like the Africa Mining Vision and the UN backed initiatives. They cannot be discounted as mere voluntary initiatives, but be taken as foundational processes that can inform national and regional drivers towards transparency and accountability in the extractives sector.

## PATHWAYS TO PROMOTING TRANSPARENCY AND ACCOUNTABILITY

Ultimately, the analysis in this article confirms that certain reforms should be implemented as conditions precedent to the introduction of any transparency and accountability initiatives in Zimbabwe. However, some of these reforms first require a change of ethics and attitude by government and corporate actors, steps that could be implemented immediately.

### The legal and policy frameworks and possible reforms or review

The first step that can be taken by state actors, mining regulators and mining companies is to observe the rule of law, in the sense of following even the existing procedure and processes under the Mines and Minerals Act, Income Tax Act and how state revenue should be collected and managed. As recently

---

contd
"Conflict minerals regulation: Mapping international initiatives and challenges ahead" (2014) 13/1 *Southern African Peace and Security Studies* 45 for analysis of other international initiatives.

154  For more information on the UN backed Principles for Responsible Investment, see: <http://www.unpri.org/about-pri/about-pri> (last accessed 31 March 2015).

reported, most of the transgressions and legal non-compliance in the mining sector are violations of current laws, a problem that can be addressed pending reform of the ineffective laws.

Secondly, as violations and breaches have been well documented, law enforcement agencies and authorities must act on violations to instil a culture of compliance on mining companies and state actors who have failed to uphold the law. This is the first step towards accountability, pending any legal and policy reforms. Reform of mining legislation or the lifting of economic sanctions does not affect the readiness of law enforcement agencies to implement and enforce existing laws impartially.

Lastly, while these recommended actions are being implemented, the legal and policy framework for mining must be reviewed and reformed where necessary. This has already begun with the diamond policy and the proposed amendment of the Mines and Minerals Act, yet the pace at which these reforms are being pursued and their nature could be improved. More public consultation and participation is required on draft legislative changes. The principles that underpin the 2013 Constitution and ZMRTI should be embedded in the mining code amendment process, rather than it being centred on technical amendments that may not change the ethical outlook on transparency and accountability in the sector.

## State-driven initiatives and their implementation

The good intentions behind ZMRTI and law reform must promote a system where there are effective monitoring and enforcement mechanisms to strengthen the primary role of legal regulation. The role of local communities and civil society in state initiatives must be improved through the building of trust between the state, and civil society and community actors. This opens up vast resources for the state to use as it designs laws and policies to promote transparency and accountability. Local community and civil society actors are the eyes of the state and play a central role in monitoring compliance and reporting lack of transparency and violations to relevant state authorities.

Civil society should be strategic in its engagement with the state, particularly where the aim is to influence legal and policy reforms. Confrontational lobbying and shaming are good strategies but these often have no impact if brazenly executed. Legal and policy reform advocacy requires influencing the action of ministers, parliamentarians and agencies constitutionally mandated to initiate legal and policy reforms. Needlessly antagonizing these authorities is a fruitless exercise and civil society should seriously consider this recommendation. The effectiveness of the Portfolio Committee on Mines and Energy as well as the Parliament of Zimbabwe regarding extractives issues is a direct result of CSOs constructively engaging with these institutions. The lack of collaboration from the Ministry of Mines and Mining Development is equally a direct result of civil society's inability to work with this authority, exacerbated by the department's own intransigence. The recent change of minister holds promises of open engagement with all stakeholders.

Unfortunately, in Zimbabwe, CSOs that complement state activities are vilified as sell-outs or weak activists. Yet confrontation for the sake of it has not produced any real impact. Of late, there have been increasing efforts by CSOs and funding partners to work collectively towards a common purpose that the author has also aligned to the public interest to promote the sustainable use of natural resources.

Co-operative governance is required among state institutions. This requires relevant state institutions to co-ordinate their functions to prevent the undermining of other state institutions. An example of such co-ordination is the relationship that existed between and among the Ministry of Mines and Mining Development, Ministry of Finance, and the Portfolio Committee on Mines and Energy and sometimes the Environmental Management Agency. Inter-ministerial co-ordination thrives on transparency and accountability within government institutions.

### The role of public and private mining corporations

Corporate actors should desist from being technically legalistic in everything they do, especially if they need to retain the social licence to operate. Adherence to global and national voluntary codes, initiatives and standards is critical. CSR is not a legal requirement in Zimbabwe or many other countries, but mining companies undertake many CSR activities. Equally there is no reason why, in the absence of a legal obligation to promote transparency and accountability in the sector, mining companies cannot act by publishing their contracts, revenue flows and legal compliance reports. This has been the strength of the EITI and PWYP initiatives, which are often voluntary initiatives in those countries that have adopted the standard and principles. Good corporate citizens observe the law and it is recommended that mining companies should promote genuine good natural resources governance, pay their taxes and observe environmental regulations. In the same vein, corporate actors, including state owned enterprises, must recognize and respect the authority and role of state regulatory and oversight institutions such as Parliament and its committees, the judiciary and specialized agencies including the Environmental Management Agency, ZIMRA, Zimbabwe National Water Authority and rural district councils.

### What the state should do

The Zimbabwe government must operationalize the sovereign wealth fund[155] and design an appropriate management strategy for it.[156] It must build

---

155   Constituted under the Sovereign Wealth Fund of Zimbabwe Act (chap 22:20) (no 7 of 2014), gazetted 10 November 2014 (general notice 461 of 2014) but not yet in force.

156   T Rosenberg "Avoiding the curse of the oil-rich nations" (13 February 2013) *The New York Times*, available at: <http://opinionator.blogs.nytimes.com/2013/02/13/avoiding-the-curse-of-the-oil-rich-nations> (last accessed 31 March 2015), lamenting the resource "curse" and giving examples of good uses of sovereign wealth funds.

capacity and competency in contract negotiations, deal structuring, choosing joint venture partners and implementing mining laws and policies. In addition, the country must reclaim legitimacy with local communities impacted by mining, by taking the lead and regaining control from mining corporations, including the power to hold corporations accountable. The mining sector has witnessed an abdication by the state of its responsibilities to respect, promote and protect the rights of communities. This has caused citizens to mistrust the state and often treat it as complicit in violations by mining corporate actors. Lastly, Zimbabwe must strengthen state institutions that deal with corruption, fraud, patronage and revenue leakages. This requires legal reforms and nurturing a culture of good political, social, economic and environmental governance: breathing the spirit of transparency into laws and policies. Above all, enforcement of laws ranging from mining, environmental, revenue collection, export control to constitutional human rights, must be improved.

## CONCLUSIONS

The cross cutting experience of stakeholders in Zimbabwe's extractives industry is that, while there are laws, regulations and policies to regulate mining and associated activities, these are inadequate as instruments to promote good governance, transparency and accountability in the mining sector within the current political context. Other things being equal, it is argued that, in a different and normal political context, the regulatory impact of current laws and policies could very well be different. Indeed, since 2013 there has been a marked improvement and this is partly the result of years of CSO activism.

The socio-economic and political environment of regulation shapes the regulatory effectiveness and responsiveness of regulated entities. The situation obtaining in Zimbabwe since 2000, with heavily informalized economic activities, was not conducive to effective regulation through law and enforcement. The global political "smart sanctions" taken against the country's political leadership and associated companies have admittedly had an impact on transparency in the diamond trade, yet this is not sufficient justification for the lack of transparency and accountability. The country and mining companies used grey channels to trade in diamonds, often at give-away prices. This is why targeted sanctions cannot primarily be used to explain away an inherent lack of accountability and the legal violations that are officially reported on by the Portfolio Committee on Mines and Energy, among others. The situation in Zimbabwe is complex and unique, influenced by other factors beyond the findings in this article.

The regulatory and political context of Zimbabwe necessitated the introduction of global and non-state actor driven transparency and accountability initiatives, but this very context makes it difficult to implement and enforce against the state and state actors as well as corporates. The politico-economic environment is a serious obstacle to any transparency and accountability interventions, especially those deriving inspiration from global initiatives.

Perhaps general UN driven initiatives may be acceptable to the government. This is often lost on CSO and non-state actors, who often treat the regulatory and political environment in Zimbabwe as normal. In comparison, in countries that are not undergoing a revolution it has not been similarly diffi-cult to domesticate the EITI and PWYP initiatives or to reform extractives laws. However, even in those countries it remains challenging to implement accountability and transparency initiatives; nothing more can be expected from a country in political limbo like Zimbabwe. The end of the Government of National Unity and the progressive easing of smart sanctions, especially by the European Union, have exposed the lack of transparency for what it is, as Zimbabwe is still not benefiting fully from the diamonds it exports.

# Exhibit M

**IN THE LABOUR COURT OF ZIMBABWE**          **JUDGMENT NO LC/H/10/14**

**HELD AT HARARE 21ST NOVEMBER 2013**          **CASE NO LC/REV/104/10**

**& 31ST JANUARY 2014**

In the matter between:-

**DOMINIC MUBAYIWA**                                        **Applicant**

**And**

**ZIMBABWE MINING DEVELOPMENT CORPORATION          Respondent**

Before The Honourable Hove, J

**For Appellant          Mr Moyo (Legal Practitioner)**

**For Respondent          Advocate Mpofu with Mr Mutevedzi J (Client
                         Representative)**


**HOVE, J:**

        The Applicant was employed as the Chief Executive Officer (CEO) by the
first Respondent.   Applicant had been employed by the 1st Respondent in
February 1985 initially as an Internal Auditor.   He later became first
Respondent's Group Chief Accountant, the Group Financial Controller and the
General Manager Finance and Investments.   In 2004, he was appointed to the
position of Chief Executive Officer.   He reported directly to the Board of
Directors.

        The Chairman of the Board of Directors was appointed in June 2010.
Applicant alleges that right from the time the new Board of Directors

Chairperson was appointed it was clear that he had a specific task to remove him as the Chief Executive Officer. He was not sure why this attitude existed but he is of the opinion that the reasons were malicious.  He outlined why he was of that opinion.

Firstly he alleges that in  less than a month of the new chairperson's appointment, he was sent on forced leave in July 2010 but several things had happened prior to the Applicant's being sent on forced leave.

1) at a strategic planning meeting it was resolved to abolish the Applicant's position

2) sometime in the same month of July 2010 the Chairperson had communicated to Applicant to change the 1st Respondent's lawyers to a firm of lawyers he (the chairman)had served in the position of a board member.  Applicant advised against such a move pointing out that there would be a conflict of interest.

3) during the Chairperson's 2nd week in office, he had also wanted to allocate a new Jeep Cherokee to the Deputy Chairperson again Applicant advised against this move arguing that it would be against a ministerial directive and also it was not provided for in the 1st Respondent's conditions of service.

4) around 20 July  the Chairman wanted the purchase of vehicles that were not budgeted for and again Applicant advised against this as being against the Audit and Exchequer Act and that further, the purchase had to be approved by the Tender Board but there had not been such approval.

5) again in July 2010, the Applicant had advised the Chairperson against declaring a dividend because it was ill timed and that the declaration

2

would require an audit first.  Inspite of this advise, the Chairperson advised that a cheque be prepared to be presented to the Minister of Mines as a dividend on 27 July.

6) on 27 July, the Chairperson called for a board meeting and management was excused from the deliberations.  It was then that the board resolved to send Applicant and other senior managers on forced leave.

7) In the same month of July Applicant had again advised against the appointment of some thirty three persons as board members of subsidiary mining companies before the nominees' curriculum vitaes had been received, before security vetting had been conducted and before considering the issue of balancing of skills.

8) the Applicant had also resisted what he submitted was an illegal transaction of allocating committed mineral rights to a company called Khameni.

It was submitted that these points of conflicting opinions clearly demonstrate why Applicant was of the view that the Chairperson would be biased against him. When allegations of misconduct were preferred he had an apprehension that he would not receive a fair hearing.

Against this background, the Applicant was sent on forced leave and the Chairperson proceeded to disregard the advise of the now suspended Chief Executive Officer and proceeded to introduce all the changes and purchase vehicles etc which he had been advised against.

What followed were allegations of misconduct.  16 charges were raised against him.  The Applicant alleges that the Chairperson was abrasive and

uncooperative.   He was impatient with Applicant's adherence to good corporate governance.  He was trying to get rid of the Applicant who would not be bullied into any irregular or unlawful actions

One day after receiving the letter of suspension with the 16 charges of misconduct on 20th October, he received a notice to attend a disciplinary hearing on 26 October 2010.  Applicant was given less than a week to prepare for the hearing.   Applicant engaged a lawyer who requested for further particulars and asked to have copies of documents which would be used against the Applicant.

The 2nd Respondent denied the Applicant access to some of the documents like the audit report.  Further, he allowed the production of other voluminous document and did not allow a postponement to enable the Applicant to properly prepare for the hearing.

The merits of this application for review raise  the following issues;

1) *The Disciplinary Authority was irregularly set up.  It was set up contrary to the agreement between the parties.*
2) *The composition of the Disciplinary Authority was contrary to the provisions of Statutory Instrument No 15 of 2006.*
3) *There was malice and bias.*
4) *The circumstances of the disciplinary proceedings were not condusive to a fair hearing.*

I will deal with these issues raised one after the other here below:

<u>Whether or not the Disciplinary Authority was unlawfully appointed</u>

The Applicant alleges that the contract of employment provided in clause 29 as follows;

*"In the case of any dispute or difference arising between the parties hereto as to the construction of/or their rights, duties or obligations under or any matter arising out of/or concerning this agreement, any difference or dispute shall unless otherwise agreed to by the parties hereto, be referred to a single arbitrator in accordance with the provisions of the Arbitration Act of Zimbabwe [Chapter 7:02]."*

The parties therefore specifically agreed on the method of dispute Resolution.  But when a dispute arose, the 1st Respondent completely ignored the provision of clause 29 and appointed the 2nd Respondent and an Assessor. These two were unilaterally appointed and they were presumably going to be paid by the 1st Respondent which would on the face of it compromise their ability to adjudicate fairly or at least in the eyes of an objective person, their ability to be fair would be seriously compromised.

It is clear and not disputed by the 1st Respondent that it appointed the 2nd Respondent and the Assessor unilaterally.  The Applicant had no impute in the whole process.  He even found that the press had been invited to the hearing.  All this was contrary to the spirit of clause 29 of the contract of employment which called for "agreement" between the parties or in terms of law i.e. the Arbitration Act.

5

The 1st Respondent acted ultra vires the agreement between the parties and the proceedings were therefore irregular.

Whether or not the Disciplinary Committee was improperly composed

This is an issue that becomes irrelevant after my initial finding that the Disciplinary Authority was unlawfully appointed.

Statutory Instrument 15/2006 does not provide for the appointment of a hearing authority and an assessor as was the case in this incident.  So even if it was lawful to proceed in terms of Statutory Instrument 15/2006, the provisions of that instrument had not been complied with.

Whether or not there was malice and bias and whether there was a condusive environment for a fair hearing

The law provides that in cases were bias and malice are alleged you need not prove actual bias, the test is whether the person challenged has so associated himself with one of the two opposing views that there is a real likelihood of bias or that a reasonable person would believe that he would be biased.

See the case of **City and Suburban Transport (Pvt) Ltd  v Local Board Road Transportation, Johannesburg** 1932 WLD 100.

In order to establish bias, the onus rests on the person alleging bias to show that

i)       The bias was clearly or actually displayed or;

6

**JUDGMENT NO LC/H/10/14**

ii)    That in the circumstances there was a real possibility of bias.

The proceedings, as outlined, ie the hearing and the setting up of the Disciplinary Authority were in circumstances were there was a real possibility of bias.

The 2nd Respondent and the assessor had been privately appointed by the 1st Respondent.  Circumstances of their appointment and remuneration were not revealed to the Applicant when he sought to inquire into this matter by asking for further particulars, the Disciplinary Authority refused to allow for the production of these particulars.

The Disciplinary Authority also made decisions that were unfortunate. They refused to postponed the disciplinary proceedings in circumstances that principles of fairness were such that a postponement ought to have been granted.

The Disciplinary Authority appeared to have knowledge of the Applicant's imprisonment in circumstances that showed that they may have been closely associating with the employer party in the absence of the Applicant.

The Disciplinary Authority also appeared to have wanted to go along with the employer's initial decision to call members of the Press when the Applicant had indicated that he was not comfortable with the proceedings being conducted in full glare of members of the press.

The 2nd Respondent also refused for the Applicant to be given sight of all relevant documents which included the audit report. This would have made it difficult for the Applicant to prepare his defence.  See the case of **Chataira vs Zesa** 2001 (1) ZLR 30. Principle of natural justice require that a party be given an opportunity to have sight of all the documents that are intended to be used against him.

All these incidences and decisions made by the 2nd Respondent and the 1st Respondent do give an impression that the Applicant was not going to be afforded a fair hearing as there was likely going to be bias against the Applicant.  Further the Applicant was not going to be able to prepare his defence properly without having seen the relevant documents.

The 1st Respondent argued that clause 29 provided that any dispute arising  would be referred to a single arbitrator in the absence of agreement between the parties.  It was argued that Applicant agreed to the appointment of the 2nd Respondent because he did not question their appointment and he pleaded to the charges.

This cannot be true.  The facts show that the Applicant pleaded not guilty yes but in his request for particulars, he immediately questioned the appointment of the 2nd Respondent.  There is thus no evidence of actual or tacit agreement to the appointment of the 2nd Respondent and the assessor.

I find that the appointment of the 2nd Respondent and the assessor was unlawful everything that then flowed from such an appointment was a nullity.

8

The entire proceedings were null and void.  I am fortified in this view by the remarks of Lord Denning in the case of **Macfay v United Africa Co. Ltd** [1961] 3 All ER quoted with approval in **Muchakata v Nertherburn Mine** 1996 (1) ZLR 153.

> *"If an act is void then it is a nullity.  It is not only bad but incurably bad… and ever proceeding which is founded on it is also bad and incurably bad. You cannot put something on nothing and expect it to stay there.  It will collapse."*

Flowing from this finding it becomes unnecessary to consider the other issues in  any great detail.

I therefore make the following order;

1) *That the proceedings being null and void are hereby set aside.*

2) *The matter is remitted to the employer for it to proceed in terms of article 29 of the contract of employment.*

3) *Should the employer fail to conduct the fresh proceedings in terms of Article 29 of the contract of employment, within 21 days of the date of this decision, Applicant would be deemed to be reinstated with no loss of salary or benefits.*

4) *Should reinstatement no longer be an option, the Applicant is to be paid damages in lieu of reinstatement and for the premature loss of his employment.*

   *Should parties fail to agree on the quantum of damages, either party can approach the Court for quantification.*


**Kentor & Immerman, Applicant's Legal Practitioners**

**Mutamangira & Associates, Respondent's Legal Practitioners**