# Exhibit N

THE STATE
versus
1. LOVEMORE KUROTWI
2. DOMINIC MUBAIWA


HIGH COURT OF ZIMBABWE

BHUNU J

HARARE, 15 February 2011, 13 February 2015 and 4 May 2016


Assessors:    1.    Mr Chidyausiku.
              2.    Mr Shenje.


**Criminal trial**


*C. Mutangadura*, for the State
Mrs *B. Mtetwa*, for the 1st accused
*L. Uriri,* for the 2nd accused


BHUNU J: This is an application for the discharge of both accused persons at the close of the State case in terms of s 198 (3) of the Criminal Procedure and Evidence Act [*Chapter 9:07*]. The section provides for the acquittal of an accused person at the closure of the State case if the court is of the opinion that there is no evidence that the accused committed the offence charged or any other offence upon which he might be convicted arising from that charge.

The first accused is an entrepreneur in the diamond mining industry operating under the style of Core Mining and Mineral Resources (Pvt) Ltd a South African registered company in which he is a director and shareholder. The 2nd accused is the erstwhile Chief Executive Officer of the Zimbabwe Mining Development Corporation hereinafter referred to as ZMDC.

Benny Steinmeitz Group Resources (BSGR) is a company based in South Africa with interests in extraterritorial diamond mining ventures.

ZMDC is a State owned public company duly registered as such in terms of the Zimbabwe Mining Development Act [*Chapter 21:06*] whereas Marange Resources (Pvt) Ltd is a subsidiary company of ZMDC. In that capacity it is mandated among other things to invest and engage in mining business ventures on behalf of the State.

Sometime in 2006 it acquired special grants to prospect and mine diamonds in the Marange district. The special grants covered a total area of more than 66 648 hectares in extent. For want of adequate financial resources it sought joint venture partnerships with reputable competent financiers in the industry.

Both accused now stand charged with fraudulently causing the government of Zimbabwe actual prejudice to the tune of two billion United States dollars.  It being alleged that both accused persons acting in consort and common purpose through a series of fraudulent misrepresentations to the government of Zimbabwe, the Ministry of Mines and Mining Development and ZMDC induced ZMDC to enter into a joint venture agreement of diamond mining with Core-Mining to the loss and prejudice of government in the sum of Two Billion United States dollars.

The factual basis upon which the charge is founded is to a large extent well documented and a matter of common cause. The *viva voce* evidence of the bulk of State witnesses is somewhat tainted as most of them were either accomplice witnesses or persons with special interest in the outcome of this trial.

At the inception of the trial Mrs *Mtetwa* took a preliminary point arguing that the charge was defective in so far as it did not particularise the natural persons to whom the alleged misrepresentations were made. I overruled the objection on the basis that there was no legal requirement that in a charge of fraud the State must particularise the natural person to whom the misrepresentation was made. Section 136 of the Criminal Law (Codification) and Reform Act [*Chapter 9:23*] under which the common law offence is now codified simply defines fraud as:

"**136 Fraud**
Any person who makes a misrepresentation□

*(a)* intending to deceive another person or realising that there is a real risk or possibility of deceiving another person; and

*(b)* intending to cause another person to act upon the misrepresentation to his or her prejudice, or realising that there is a real risk or possibility that another person may act upon the misrepresentation to his or her prejudice;

shall be guilty of fraud if the misrepresentation causes actual prejudice to another person or is potentially prejudicial to another person, and be liable to□

(i)     a fine not exceeding level fourteen or not exceeding twice the value of any property obtained by him or her as a result of the crime, whichever is the greater; or

(ii)     imprisonment for a period not exceeding thirty-five years; or both"

It is plain that the section makes no distinction between a natural and juristic person. For that reason, it is sufficient for the State to allege that a misrepresentation was made to an artificial person.

In terms of s146 (2) (a) of the Act when framing a charge, it is sufficient for the State to describe the charge in the words of the enactment creating the offence or in similar words. If however the accused person needs to know the natural persons to whom the misrepresentation was made he or she may request for further particulars in terms of s 177 of the Criminal Procedure and Evidence Act [*Chapter 9:09*] as Mrs *Mtetwa* did in this case.

The application for further particulars was however ill-conceived and misplaced in that the summary of State case in her possession particularises the natural persons to whom the alleged misrepresentations were made. For the avoidance of doubt the summary states in clear unambiguous terms that the misrepresentations were made to the Minister of Mines and Mining Development Obert Mpofu, the ZMDC Chief Executive Officer Dominic Mubaiwa and various other persons mentioned in ZMDC   minutes. There is therefore no substance in Mrs *Mtetwa*'s complaint that her client was handicapped in the preparation of his defence for want of information as to the natural persons to whom the alleged misrepresentations were made.

In her heads of argument Mrs *Mtetwa* further argued that her client could not be prosecuted in his personal capacity because the alleged offence was committed in the course of duty as company director. Placing reliance on the case of *Mkombachoto* v *CBZ and another*[1] she strenuously argued that it was a principle of company law that actions done for and on behalf of a company should not be visited on a director of the company in his personal capacity unless a basis for piercing the corporate veil has been established. The *Mkombachoto* case *(supra)* was a civil matter. It appears counsel got all mixed up and sought to apply inapplicable civil law principles to criminal proceedings. While the corporate veil doctrine might protect a director against personal civil liability it certainly does not protect him against criminal conduct committed while going about his company duties.

---

[1] 2002 (1) ZLR 21 (H)

A company director who commits a crime while going about his company's business attracts personal criminal liability under s 318 of the Companies Act [*Chapter 24:03*] as read with s 385 (7) of the Criminal procedure and Evidence Act [*Chapter 9:07*].

Section 318 (1) of the Companies Act prohibits directors from indulging in fraudulent conduct while conducting their company's business while ss 3 criminalises such conduct and it reads:

> "3)    Without prejudice to any other criminal liability incurred, where any business of a company is carried on with such intent or for such purpose as is mentioned in subsection (1), every director of the company or *other* person who was knowingly a party to the carrying on of the business in manner aforesaid shall be guilty of an offence and liable to a fine not exceeding level ten or to imprisonment for a period not exceeding two years or to both such fine and such imprisonment."

It should be noted that the above section opens the door for the prosecution of company directors for any other criminal offences they might commit while going about their company's business. To that end s 385 (7) of the Criminal Procedure and Evidence Act renders evidence admissible against the company also admissible against the director whether or not the company is also charged with the same offence.

 What this means is that it is perfectly permissible to charge both the director and his company either jointly or separately for the same offence committed in the course of company business. In other words a company director or employee can be an accomplice to a crime committed by his company. For the fore going reasons I can only come to the conclusion that the doctrine of corporate veil has no place in this case. It provides no shield for the accused's alleged fraudulent criminal conduct. He can therefore not hide behind the corporate veil.

I now turn to consider the matter on the merits. It is common cause that ZMDC was desirous to enter into a viable joint mining venture with an investor with a sound financial footing on behalf of its principal the government of Zimbabwe. The 1st accused introduced BSGR to government and ZMDC as a viable investor in the diamond mining industry. Due to the scourge of economic sanctions against Zimbabwe both ZMDC and BSGR elected to transact business through special purpose vehicles being Marange Resources (Pvt) Ltd and Core Mining (Pvt) Ltd respectively.

Now, the allegations are that both accused persons acting in common purpose fraudulently misrepresented to government through the ministry of Mines and ZMDC that Core-mining was a special purpose vehicle for BSGR standing as guarantor for Core-Mining.

As a result of such misrepresentation government approved the joint venture agreement between Marange Resources (Pvt) Ltd and Core-mining under the mistaken belief that Core-Mining was a special purpose vehicle for BSGR with  the capacity to finance the whole joint venture mining enterprise to the tune of US$2 billion. It is alleged that both accused persons fraudulently  held out to the Minister of Mines and ZMDC  officials that Core-Mining had the capacity to carry out its mandate when in truth and in fact they knew that it was a mere shelf company with no capacity whatsoever to carry out such a mammoth task.

It is common cause that the 1st accused Lovemore Kurotwi made various representations to both the minister of mines and ZMDC in which he held out that Core Mining was a special purpose vehicle of BSGR capable of financing the joint diamond mining venture to the tune of US$2 billion. The critical issue for determination is however, not that the representations were made but whether they were made fraudulently with the intention to mislead the complainant to enter into a fictitious joint mining venture with a bankrupt entity to its loss and prejudice as alleged by the State.

The alleged representations made by the accused are amply captured in accused one's letter dated 30 March 2009 addressed to the Minister of Mines Obert Mpofu. The letter reads:

"Dear Minister Mpofu,

RE: JOINT VENTURE WITH ZIMBABWE GOVERNMENT THROUGH ZMDC TO MINE MARANGE DIAMONDS.

Reference is made to the meeting we held in your Bulawayo office on Friday 27th March 2009 at which my partner was also present and at which we discussed the above subject.

We discussed the intended investment in the above mentioned mine by BSG Group which I represent in Zimbabwe. Our discussion has culminated in the attached documents which I am attaching by way of introducing Bateman Engineering, a subsidiary of BSG Group which is the holding company involved in mainly mining (particularly diamonds), processing and engineering activities throughout the world as per the enclosed introductory profile summary.

I have worked with this organisation in the last three years and my association with the group has shown me that they can and have the capacity to go a long way in resuscitating our economy in Zimbabwe. Having worked with the group and practically seen their seriousness and singleness of purpose, I am convinced that this initial project we intend to carry out with them, an investment worth up to 2 billion, will lead to the opening up of bigger projects and investments in the future.

May I also take this opportunity to acknowledge and thank you for giving us an audience at such short notice which we fully appreciate. Please feel free to go through the enclosed information and get back to me at your earliest convenience.

Yours sincerely

Signed

Lovemore Kurotwi."

True to his word on 5 May 2009 BSGR wrote to the Chief executive Officer ZMDC expressing its willingness to fully support Core Mining in the proposed joint venture but set conditions which had to be fulfilled before it could participate in the joint venture. The letter reads in part:

> "Subject to the provisos listed below, BSGR intends to fully support Core in all aspects of its obligations in the Marange Diamond Project (operation, management, financing, processing) once final binding agreements have been concluded.
>
> The above intention by BSGR is subject to the following:
>
> 1. that the Core diligence report indicates to BSGR that the Marange Diamond Project can be economically mined in accordance with all BSGR's internal investment criteria;
>
> 2. That all legal tenure matters relating to the Marange Diamond Project area have been resolved (or suitable comfort has been provided to BSGR for the resolution of such tenure matters);
>
> 3. That final agreements in respect of the Marange Diamond Project are concluded between the ZMDC and Core that are acceptable to BSGR.
>
> 4. That all diamonds to be produced from the Marange Diamond project continue to be certified in terms of the Kimberley processing Certification Scheme ; and
>
> 5. That all parties to the Marange Diamond project Joint venture will adhere to the principles of good corporate governance. The parties will ensure that the operations are conducted in a way that is consistent with the rule of law and protects all stakeholder(s) and Shareholders' rights. The parties shall ensure that there will be adherence to all anti-corruption laws. The parties shall adhere to international norms in this regard and shall ensure that no corruption practice take place.
>
> …
>
> Yours faithfully
>
> Signed
>
> MARC STRUIK
> Director"

On the basis of the above undisputed letter the Court finds as a matter of fact that the 1st accused was in fact telling the truth when he made the representation to the minister and

ZMDC that Core Mining was a special purpose vehicle of BSGR. It is also common cause that BSGR met all the prescribed requirements for the joint venture to be consummated. No question of misrepresentation of facts can therefore arise in this respect.

It is however plain that BSGR was raising issues of fundamental importance which needed to be resolved before any sane investor could commit himself to any investment. Issues of due diligence, security of tenure, contractual validity, freedom from corruption, adherence to international norms and the rule of law are critical considerations to any investor before he can sink his hard earned money into any investment. Thus before the parties could conclude a lawfully binding contract, the conditions set by BSGR had to be dealt with and addressed to the satisfaction of all the parties concerned.

The elementary rules of contract are that for there to be a valid contract there must be a meeting of the minds in the sense of offer and acceptance communicated between the parties. While the offeror may set conditions for acceptance the offeree's acceptance must be candid, unequivocal and devoid of any doubt or conditions. In the words of Professor Christie[2]:

> "To be effective in creating a contract, acceptance must be so clear and unequivocal as to leave no reasonable doubt in the offeree's mind that his offer has been accepted… A purported acceptance in the form of, 'Yes but…' will not do, because by seeking to add to or subtract from the terms of the offer it does not create the necessary agreement but leaves the negotiations open."

In the South African case of *Price* v *Price*[3]  the court quoting from an American textbook[4] observed that:

> "Any words or acts of the offeree indicating that he declines the offer or which justify the offeror in inferring that the offeree intends not to accept the offer, or give it further consideration, amounts to a rejection. This principle is most commonly illustrated where a counter-offer or a conditional acceptance which amounts to a counter-offer is made by the offeree. This operates as a rejection of the original offer.

> The reason is that the counter-offer is interpreted as being in effect a statement by the offeree not only that he will enter into the transaction on terms stated in his counter-offer, but also by implication that he will not assent to the terms of the original offer. An answer purporting to accept upon condition is not an acceptance but is in effect a counter-offer, because it states in substance that the offeree will contract on the terms of the original offer if some addition or subtraction is made from them, but implies that otherwise he will not comply."

---

[2] . R.H Christie Business Law in Zimbabwe 1998 edition at page 39
[3] . (696/89) [1990] ZASCA 87.
[4] Williamston on Contracts (Third edition) Vol. 1 paragraph 51 (pages 164 – 167)

The principle was succinctly articulated in *Sands & Company INC*[5] where the court remarked that:

> "It is a fundamental principle of contract law that a valid acceptance must comply with the terms of the offer, and, if qualified with conditions, it is equivalent to a rejection and counter-offer"

What this means is that BSGR's conditional acceptance was a rejection of the original offer coupled with a counter-offer to stand as financial guarantor to Core Mining on its own terms in the proposed joint mining venture.

Thus if the parties were to conclude a valid binding contract, the above conditions set by BSGR had to be met or a compromise reached first before a valid contract could be entered into between the parties.

It is common cause that the conditions stipulated by BSGR in its counter-offer were never met or addressed. Confronted by Mrs *Mtetwa* counsel for the 1st accused with the difficult question how there could have been a valid contract when BSGR's conditions were never met, Mr Masimirembwa the erstwhile ZMDC chief executive, a lawyer by training retorted that the counter-offer merely amounted to a suspensive condition.

That response is misplaced and erroneous at law. Consensus is of the essence of contact. There can be no contract where there is no agreement as to the terms of the contact and the parties are not *ad idem* as is the state of affairs in this case. A suspensive condition can only come into play where the parties are in agreement and they agree to suspend the operation of the contract until the happening of a particular event. Since there was no agreement in this case there was no conditional contract that came into being. That being the case, there was nothing to suspend in the absence of any contractual agreement.

It was therefore untenable, illogical and remiss of government and ZMDC to insist on Core mining being funded by BSGR with the full knowledge that its conditions had not been met.

The long and short of it all, is that in the absence of any agreement the proposed contract for BSGR to stand as guarantor for Core Mining as its special purpose vehicle was aborted and BSGR moved out of the picture.

Despite BSGR having moved out of the picture, ZMDC continued to negotiate with Core Mining resulting in the signing of a memorandum of agreement between Marange Resources (Pvt) Ltd and Core mining and Minerals Resources (Pvt) Ltd on 24 July 2009.

---

[5] 2005 NY Slip Op 30510 (U)

ZMDC signed and stood as guarantor for Marange Resources whereas Subithry Naidoo and Licht Yehuda signed and stood as guarantor for Core Mining. The purpose and terms of the agreement are in the introductory clause 2 para(s) 2.1.3 to 2.2.3 which provide as follows:

> "2.1.3   Marange wishes to strategically partner with Core Mining which shall provide funding as well as financial, technical management and operational expertise upon the terms and conditions of the shareholders agreement and this agreement, to develop, mine, market and beneficiate diamonds and/or other material mined from the concession areas.

> 2.1.4   Marange is a wholly owned subsidiary of ZMDC and ZMDC as shareholder hereby guarantees the obligations of Marange under and in terms of this Agreement in terms of clause 16 of this Agreement.

> 2.1.5   Core Mining is a company in which at least 50% of the issued share capital shall be held by Subithry Naidoo and Licht Yehuda hereby guarantees the obligations of Core Mining under and in terms of this Agreement in terms of clause 17.

> 2.2      Marange or its nominee and Core Mining shall incorporate a JOINT VENTURE COMPANY in Zimbabwe as soon as reasonably possible after the signature date, the issued ordinary shares of which shall, immediately after incorporation, be subscribed for and be held as 50% by Core Mining and 50% by Marange or its nominee, in order to fulfil the functions referred to in clause 2.1, on the terms and conditions of this Agreement.

> 2.3      Marange or its nominee and Core Mining jointly undertake to procure that THE JOINT VENTURE COMPANY agrees in writing to be bound by and perform all of its obligations as set out in this agreement."

The above document speaks for itself. In terms of the well-known parole evidence rule no one can speak on its behalf as it is the exclusive memorial of the parties' agreement. The parties are strictly bound by the four corners of the contractual document. The parties cannot add or subtract anything from the contractual document.

In Minister of *Home Affairs and another* v *Trimu Agencies and Distributors*[6] the Supreme Court held that the effect of the parole evidence rule is that where a contract is

---

[6] 2000 (2) ZLR 191 (S)

incorporated into a single and complete written document that reflects the entire agreement a party to that agreement cannot lead evidence to add to or modify that written agreement.

It is clear in this case that the memorandum of agreement makes no reference at all to BSGR as guarantor for Core Mining. That being the case, neither party nor the court can incorporate BSGR into the contact when the written document signed by the parties freely and voluntarily with their eyes wide open makes no mention of BSGR at all.

Both government and ZMDC cannot be heard to complain that they were duped into signing the contractual document under the mistaken belief that BSGR was standing as guarantor for Core mining when the contractual document makes no mention of BSGR at all.

It is also inconceivable that both government and ZMDC could have believed that BSGR was the guarantor for core Mining when Subithry Naidoo and Licht Yehuda signed the contractual document in their personal capacities as guarantors without any reference to BSGR.

Considering that the contractual document was subjected to scrutiny by government lawyers before execution it is highly unlikely and not in the least probable that they too could have been mistaken that BSGR were the guarantors for Core Mining when the written contract stipulated in clear and unambiguous terms that Subithry Naidoo and Licht Yehuda were the guarantors.

It is wholly unbelievable that government, ZMDC and Marange Resources could have genuinely believed that BSGR was standing as guarantor for Core Mining with the full knowledge that they had not accepted its counter offer. It therefore boggles the mind how all these three eminent entities backed up by proficient lawyers could have entertained the idea of contracting with BSGR without the contractual basics of offer and acceptance.

On the basis of the above findings of fact the court comes to the conclusion that the government, ZMDC and Marange Resources having failed to accept BSGR's counter offer they elected to contract with Core Mining on the terms and conditions stipulated in the memorandum of agreement of 24 July 2009.

The memorandum of agreement required that a due diligence test be carried out on Core Mining to assess its capacity to discharge its contractual obligations in terms of the proposed joint venture agreement before signing a shareholder agreement.. To that end it is alleged that accused one in collusion with the 2nd accused led ZMDC on a wild goose chase by conducting a sham due diligence test in South Africa where they misrepresented certain massive diamond mining operations as belonging to Core-Mining. As a result of such

misrepresentation government and ZMDC were induced to approve the joint venture
agreement to their loss and prejudice to the extent of US$2 billion.

It was common cause that a due diligence test was conducted in terms of the
memorandum of agreement. A factual dispute however arose concerning the status and
ownership of the mining operations exhibited to ZMDC officials during the exercise. This
prompted the State to apply for the court to go for an inspection in loco in South Africa to
view the evidence which could not be brought to court. I granted the application under
judgment number HH 285-12.

As this was a novel unprecedented exercise it might be necessary to outline the steps
and procedures we adopted to facilitate the holding of an inspection in loco in South Africa.

1. The State through our embassy requested for Mutual Legal Assistance from the South
   African Department of International Relations and Cooperation to conduct an
   inspection in loco at Pikwane Diamonds and the Vaal Bosch diamond mining Area in
   Kimberly, South Africa.

2. Following the observance of all protocols permission was dully granted by the South
   African authorities to conduct the inspection in loco in their country in terms of their
   International Co-operation In Criminal Matters Act 75 of 1996.

3. The inspection *in loco* was conducted on 12 December 2014 in terms of s7 which
   provides that:

   "**Foreign requests for assistance in obtaining evidence**

   7. (1)   A request by a court or Tribunal exercising jurisdiction in a  foreign State or
      by an appropriate government body in a foreign State, for assistance in obtaining
      evidence in the Republic of South for use in such foreign State shall be submitted
      to the Director- General.

   (2) Upon receipt of such request the Director General shall satisfy  himself or herself
      –

      (a)   That proceedings have been instituted in a court or tribunal  exercising
         jurisdiction in a the requesting State; or
      (b) That there are reasonable grounds for believing that an offence has been
         committed in the requesting State or that it is necessary to determine
         whether an offence has been so committed and that an investigation in
         respect thereof is being conducted in the requesting State.

(3).   For purposes of subsection (2) the Director-General may rely on a certificate purported to be issued by a competent authority in the State concerned, stating the facts contemplated in paragraph (a) or (b) of the said subsection.

(4)   The Director-General shall, if satisfied as contemplated in subsection (2), submit the request for obtaining assistance to the minister for his or her approval.

(5)   Upon being notified of the Minister's approval the Director-General shall forward the request contemplated in subsection (1) to the magistrate within whose area the witness resides."

Before convening the court sitting, the designated magistrate and I agreed that the magistrate was merely a facilitator in proceedings which were essentially those of a Zimbabwean Court. His role was to convene the Court and grant the Zimbabwean Court permission to conduct its business on South African soil.

The proceedings commenced with the South African prosecutor presenting the purpose of the sitting to the magistrate. The magistrate acknowledged and welcomed the Zimbabwean Court to South Africa. He then granted the Zimbabwean Court permission to convene on South African soil. Thereafter he handed over the proceedings to the Zimbabwean Court dully constituted on South African Soil.

Once properly constituted as a Zimbabwean Court on South African soil I took over the judicial mantle and commenced proceedings in terms of Zimbabwean rules and procedures.

At the commencement of the hearing Mrs *Mtetwa* indicated that the defence had hired a South African Advocate to assist with clarification on certain issues since we were on foreign land. I overruled the application on the basis that this was a Zimbabwean Court to which South African lawyers ordinarily have no audience without following set procedures.

After handing over the judicial mantle the magistrate remained with the court throughout observing the proceedings but without taking any part in the deliberations.

From the court room the court proceeded to Pikwane Diamond offices at 88 Dutoit Street Kimberly. All the state witness comprising Gloria Mawarire, Tichaona Muhode and, Ashton Ndlovu indicated and identified a boardroom at the offices as the boardroom they were taken to during the due diligence exercise on Core in 2009. Thereafter the entourage proceeded to the Vaal Bosch mining area about 80 kilometres west of Kimberly.

Apart from confirming that this was the general area where they were taken to during the due diligence exercise, none of the State witnesses was able to pinpoint the exact location where they viewed the mining operations allegedly misrepresented by the accused as belonging to Core Mining. In fact the court was taken to a patch of deserted forest in the wilderness with no sign of any mining operations having taken place.

The State then closed its case without leading any evidence pertaining to the alleged misrepresentations allegedly made by the accused concerning the due diligence exercise on Core Mining. No evidence was led to establish that Core Mining did not operate from Pikwane Diamond offices. There was equally no evidence led to establish that Core mining did not own the mining operations viewed by the due diligence delegation. In fact the State took the court all the way to South Africa to show it none existent evidence in the forests of the Vaal Bosch area.

Misrepresentation is a vital component of the crime of fraud without which the crime cannot be committed. That being the case I accordingly come to the conclusion that the state has failed to establish that the due diligence exercise was fraudulent as alleged by the State.

Since the 2nd accused's liability is crafted on the back of the allegations against the 1st accused, they either sink or swim together.

As already pointed out at the beginning of this judgment I have elected to base my judgment mainly on irrefutable documentary evidence and matters which are common cause. This is because I consider the bulk of *viva voce* evidence in this case to be coloured and tainted by self-interest as most of such evidence is from suspect co-conspirators. I have also disregarded character evidence as intrusive and unhelpful in the determination of this case.

The State having failed to establish a *prima facie* case against the accused it is accordingly ordered that both accused be and are hereby acquitted and discharged.

*The Attorney-General's office*, the State's legal practitioners
*Mtetwa & Nyambirai Incorporating Wilmot & Bennet*, the 1st accused's legal practitioners
*Kantor & Immerman*, the 2nd accused's legal practitioners

# Exhibit O

COMMENTARY / AFRICA    04 NOVEMBER 2010    ⏱ 17 MINUTES

# Time to Rethink the Kimberley Process: The Zimbabwe Case



Broken Image of Thierry Vircoulon

**Thierry Vircoulon**

Former Senior Consultant, Central Africa

**Related Tags**

ZIMBABWE

On 11-12 September 2010, Zimbabwe auctioned diamonds from the controversial Marange mines. There was little international condemnation, especially compared to the controversy over the first sale of Marange diamonds in August. Since an export ban was imposed on diamonds from Marange in November 2009, the Kimberley Process (KP) [1] has permitted Zimbabwe to hold two auctions, although the country has not been able to guarantee that widespread human rights violations in the mines and smuggling have stopped. Criticised by both those who favour and those who oppose the ban, this unusual compromise demonstrates that the KP's narrow definition of conflict diamonds is inadequate, and that the body must expand its authority if it is not to lose its credibility and legitimacy as the diamond-trade watchdog.

## Zimbabwe: Still Trying for Democracy

Zimbabwe, a landlocked country of some 12.5 million inhabitants, is stuck in a decade-long political crisis and struggling to move from dictatorship to democracy. For 28 years from independence in 1980, Robert Mugabe ruled uninterrupted. During the first ten years, the country was a major tobacco producer and a main food supplier for the region. Starting in the early 1990s, however, the de facto one-party state implemented various measures to increase its grip on power, including a crack-down on civil liberties, and by the last years of the century, the increasingly mismanaged economy had started to crumble.

The economic problems and political repression triggered opposition, as the Movement for Democratic Change (MDC) [2] led by Morgan Tsvangirai threatened to end ZANU-PF's domination. The defeat of Mugabe's proposed constitutional referendum on presidential powers and controversial land reforms in 2000 was a clear sign of the changing

political landscape. The ZANU-PF government reacted brutally to the growing opposition by suppressing press freedom, intimidating the opposition and launching a forced distribution of white-owned commercial farms. The latter campaign led to massive flight of white farmers, serious food shortages and the beginning of the collapse of the agriculture-based economy. The result was hyperinflation, unemployment and deteriorating living conditions. [3]

Zimbabweans became increasingly disillusioned with the country's leadership, but, relying heavily on fraud and intimidation, Mugabe was reelected in 2002 and ZANU-PF won a two-thirds majority in the 2005 parliamentary elections. [4] In that same year, the government launched "Operation Restore Order" to forcibly clear informal housing structures and businesses, especially from the capital, Harare, resulting in the displacement of 700,000 mostly poor supporters of the opposition. [5] The U.S., UK, European Union (EU), Switzerland, Canada, Australia, and New Zealand reacted to the worsening political situation by imposing travel restrictions against and freezing financial assets of senior Zimbabwean officials and banning the sale of arms to Zimbabwe.

2008 was a landmark year. In the March presidential elections, the Tsvangirai received the most votes, but not enough to win outright in the initial round. Ahead of the scheduled late June run-off, the government and ZANU-PF organised massive violence against opposition party members and supporters, causing Tsvangirai to withdraw. Under international pressure and with the assistance of the Southern African Development Community (SADC), a transitional power-sharing arrangement — the Global Political Agreement — was hammered out and eventually signed in September. Mugabe retained the presidency, and Tsvangirai became prime minister.

Despite initial skepticism, the unity government succeeded in stabilising the economy and ending the widespread repression. However, while the parties have agreed that the end of the inclusive, transitional government should be based on the completion of the process to produce a new constitution, a referendum on that document and new elections, democracy remains elusive: the political reform provided for in the agreement has not been carried out, and ZANU-PF maintains control over the security services.

# The Discovery of Marange

8/10/23, 12:39 PM
Case 1:22-cv-00058-CRC   Document 45-26   Filed 08/10/23   Page 4 of 10
Time to Rethink the Kimberley Process: the Zimbabwe Case | Crisis Group

The Marange mine in eastern Zimbabwe is the most recently discovered (2006) of the country's three major diamond fields [6] and already produces six million carats per year. Its discovery unleashed a diamond rush of 15,000 to 20,000 unlicensed artisanal miners and uncontrolled smuggling; international diamond buyers streamed in. [7]

Shortly after the mining boom started, British-registered African Consolidated Resources (ACR), which had taken up the exploration rights from De Beers a few months earlier, began operations. However, its license was soon revoked by the state-owned Zimbabwe Mining Development Corporation (ZMDC) and its mines shut. Despite a subsequent court ruling in its favour, police prevented ACR from resuming operations. The dispute took a new twist in September 2010, when another court reversed the earlier decision, arguing that ACR had fraudulently acquired the mining rights. The state now intends to prosecute the company for unlawful acquisition.

## Marange Fields: Violence, Smuggling and Corruption

In early 2007, the police were sent to Marange to take control of the diamond fields. By mid-2007, illegal mining was believed to have been brought under control; however, by the fourth quarter of 2008, tens of thousand illegal diamond miners were reappearing. [8] To restore and maintain order and to ensure access of the ZANU-PF elites to the diamond fields, the army deployed more than 800 soldiers in October 2008, in Operation "Hakudzokwi Kumunda", [9] which resulted in more than 200 deaths.

The Marange fields were turned into a military stronghold. Operations were taken over by soldiers, who either mined themselves or forced residents, including children, to work for them. While violence peaked with the military takeover in 2008, the police and army have continued to commit human rights violations, including the use of forced labour and torture against both diamond workers and local communities. [10]

The same security forces are also responsible for widespread smuggling out of Zimbabwe, generally through Mozambique, a non-KP member. [11] Vila de Manica, just over the eastern border, where the illegal trade is conducted openly with the complicity of Zimbabwean and Mozambican officials, has become the main transit point for Marange's undocumented diamonds. Middlemen, miners and soldiers bring the diamonds out, after which they are exported to international cutting and polishing centres. [12]

It is not just the soldiers stationed at the mines who benefit. While the military controls some 90 per cent of the Marange fields,    13    the rest is operated by mining companies. The revenue from sales benefits only a few individuals connected to the military and the companies. The two firms authorised to operate in the mines since November 2009 are Canadile Miners Private Ltd and Mbada Diamonds (aka Condurango).    14    Both are equal partnerships with Marange Resources Private Ltd (Marange Resource), a ZMDC subsidiary.    15    Mbada is owned by Mauritius-registered Grandwell Holdings, a subsidiary of the New Reclamation Group from South Africa.    16    Canadile belongs to the South African Core Mining and Mineral Resources Ltd.    17    The third company allowed to mine the fields is Unki, a recent joint venture of a little-known Chinese firm, Anjin Investment, and Marange Resources.    18

Mines Minister Mpofu (ZANU-PF) admitted in early 2010 that the process of awarding concessions to the two South African companies has been opaque and not in conformity with proper procedures.    19    Unki was also established in a non-transparent way, without disclosing the nature of the joint venture or the identity of its board members. Two of the three parent companies are not known in the diamond industry. New Reclamation Group normally deals with recycling and scrap metal; while little information is available on the Chinese company, it is said to have no prior experience in diamond mining.    20    The Zimbabwe government needs to make the contents of the contracts public if it is to regularise the deals.

The industrialisation of diamond mining in Marange by Canadile and Mbada was seen as part of the solution of bringing it into compliance with international standards, but the two companies have become part of the opaque business.    21    The ten-member boards of directors of both include individuals with close personal and family ties to ZANU-PF and almost no one with diamond mining experience. Mbada's chairman, Robert Mhlanga, is Mugabe's former personal helicopter pilot, the cousin of Minister Mpofu, who was allegedly involved in the diamond trade in the Democratic Republic of Congo during the war in the late 1990s, when Zimbabwean troops fought there.    22    On Canadile's board is Lovemore Kurotwi, a retired major who reportedly played a senior role during the infamous Matabeleland massacre in the 1980s.    23

Minister Mpofu is said to have handpicked the five boards seats assigned to ZMDC.    24    Mbada's board includes Mpofu's sister-in-law, Sithengisisco Mpofu, and his personal assistant, Dingiswayo Ndlovu.    25    Beauty Moyo, his sister-in-law, and Alvin Ncube, his nephew, are on Candile's board.    26    The ZANU-PF elites directly benefit from these joint-ventures,

though some, including Minister Mpofu, are under targeted Western sanctions.

# The Involvement of the Kimberly Process

Out of concern for the situation in and around the Marange diamond fields, a Kimberley Process Review Mission was sent in June of 2009. [27]  It concluded that Zimbabwe was in non-compliance with KP minimum requirements and called for withdrawal of the army and ending of the illegal mining and sale of diamonds. [28]  At the annual KP plenary in November 2009, civic groups called for Zimbabwe's expulsion from the Kimberley scheme, but a joint work plan was agreed instead. Its objective is to bring Zimbabwe into compliance with minimum KP standards.

The country was given six months to fulfill requirements, including gradually withdrawing the army; ending illegal mining by setting up an adequate security infrastructure and engaging potential investors; and curbing smuggling by tightening border control and developing a joint strategy with Mozambique, among others. [29]  In an innovation for the KP, whose embargoes normally cover a country's entire diamond exports, it banned diamonds from Marange but not from the other two fields. [30]

Abbey Chikane, [31]  the KP monitor responsible for supervising compliance with the work plan, concluded in his June 2010 report, that Zimbabwe had met the minimum requirements. This contrasted with reports by human rights organisations of continued violence, including torture, beating and rape, by armed forces and the continuation of widespread smuggling for the benefit of a few individuals connected to the military and ZANU-PF. [32]  The revelation of those discrepancies was followed by state-sponsored intimidation. Farai Maguwu, director of the Centre for Research and Development, a civil and political rights organisation, was arrested in early June for allegedly providing false information about Marange to Chikane. Following international pressure, including a public call for his release by the president of the World Diamond Council, [33]  he was freed on 12 July and the charges dropped on 21 October. [34]

Despite many calls by civic groups, some member states, and industry representatives to continue the export ban, the KP agreed in St. Petersburg in July to allow Zimbabwe to conduct two supervised Marange diamonds auctions. It was also decided that a KP review team would be sent to Marange to determine whether full export could be resumed. This came

after KP members had failed to reach a decision in mid-June, when most African countries, India, China and Russia advocated lifting the export ban, and the U.S., Canada and Australia opposed. The compromise came about only after the MDC joined ZANU-PF in urging the West to drop its opposition, arguing that Zimbabwe badly needed the revenue to rebuild its devastated economy and pay for government expenditures.

The compromise also resulted from the KP's limited legal basis to put pressure on the Zimbabwe government. The process' founding document defines conflict diamonds as those "rough diamonds used by rebel movements or their allies to finance conflict aimed at undermining legitimate governments ..."   35   The Marange stones do not fit this definition.   36   Permission for Zimbabwe to conduct two sales should be understood in this context as well as a way to keep it inside the KP by easing pressure. The decision to ban only Marange diamonds rather than impose a full embargo had the same rationale. The KP can monitor Marange and work with the government to make production compliant with security, human rights and transparency standards only as long as Zimbabwe agrees to continue participation.

The first public auction, on 11 August, sold 900,000 carats of diamonds, estimated to be worth $46 million, with the government receiving $30 million. Surat Diamond Sourcing Limited of India (SDSL), a major importer of rough diamonds recently formed by diamantaires from Surat India, bought 83 per cent.   37   Other buyers are said to have come from Russia, the U.S., Lebanon and Israel.   38   The U.S.-based Rapaport Diamond Trading Network advised its more than 10,000 international diamond buyer and supplier members to boycott,   39   as it was impossible to be certain whether the violence in the mines had ended, and threatened to expel and blacklist anyone taking part in the auction. The government seemed unimpressed, citing the ease with which it could find buyers in Asia and Russia.   40

At the second auction, on 11-12 September, at least 400,000 carats of diamonds were sold to buyers reportedly from India, the United Arab Emirates and Belgium.   41   In mid-October, however, two major European banks, ABN Amro and the Antwerp Diamond Bank, announced they would not finance any transactions involving diamonds from Zimbabwe.   42

# The Kimberly Process: Between a Rock and a Hard Place

The two authorised sales of Marange diamonds make clear the Zimbabwe government has no reason to feel threatened by a Western diamond import ban. In the diamonds world, too, emerging powers are challenging the rules and becoming more influential. Buyers, especially from India,  43  have been more than willing to fill the gap resulting from the absence of most Westerners. Chinese buyers could also potentially compete, since Beijing joined New Delhi in strongly urging that the export ban be lifted during the negotiations leading to the St. Petersburg compromise. With world diamond production falling by 24 per cent since 2009 and increased competition, buyers are becoming readier to push human rights and governance standards aside. Marange is already a major producer, and new deposits are still being discovered in the country, so Zimbabwe's importance as an exporter is likely to grow.  44

In an environment in which some governments of diamond-producing countries are reluctant to comply fully with the KP standards, and some governments of diamond-buying countries are willing to ignore the contribution the diamond trade is making to insecurity, human rights violations and conflict, the KP's regulator role is being challenged.  45  This is all the more so in situations where, as in Zimbabwe, it actually has no legal basis to ban diamonds exports, but has to rely on the voluntary agreement of the diamond exporting government. In fact, expelling Zimbabwe from the KP scheme as has been suggested by civic groups, may not legally be possible and in any event might only allow new actors, such as Indian diamond buyers, to push more aggressively into the market without any human rights consideration.

The Marange affair reveals two contradictory trends: the emergence of new voices within an industry previously dominated by one major company, De Beers, and the politicisation of the KP. While the KP was established only to prevent rebel groups from profiting from diamonds, some have suggested extending the definition of conflict diamonds to take governance issues (such as corruption, political oppression and violence) into consideration. This would shift the focus of the process. The question is whether authoritarian regimes under international sanctions such as Zimbabwe should be prevented from using diamonds as a financial lifeline or whether only rebel groups should be targeted.

The KP has to make decisions about the conflict diamond definition, about how to improve transparency in the industry (for instance, requiring full disclosure of all contracts), about how to adjust to the industry's new configuration and above all about the political issues behind the diamond trade.  46  Otherwise, it risks becoming increasing irrelevant.

# Appendix I: Chronology

**2006**

- April: African Consolidated Resources Ltd. (ACR) receives exploration rights to the Marange fields.

- September: Diamond rush in the Marange fields starts.

- December: ACR starts mining and is shortly after shut down.

**2007**

- January: Police are sent to control the Marange fields.

- Spring: KP review mission is sent to Marange.

**2008**

- Late October/early November: Operation "Hakudzokwi Kumunda" is launched.

**2009**

- June: KP Review Mission is sent to Zimbabwe.

- November: KP plenary meeting is held in Namibia: Zimbabwe and KP agree on Joint Work Plan. Joint ventures are formed.

**2010**

- March: KP Monitor undertakes first visit to the Marange fields.

- May: KP Monitor undertakes second visit to the Marange fields.

- June: KP members meet in Israel.

- July: KP members meet in Russia and reach compromise decision on Marange.

- August: The first public auction is held.

- September: The second public auction is held.

- November: KP plenary meeting is held in Israel.

## Appendix II : Chart



# Exhibit P

 

Mr I Chimuka
Zimbabwe Mining Development Corporation
MMCZ Building
90 Mutare Road
Harare
Zimbabwe

19 October 2010

Dear Mr Chimuka

**RE: AMARI/ZMDC**

Our telephonic discussion yesterday morning refers.

During that call you advised that the ZMDC board has some queries on the nature of Amari's relationship with Mr D Mubayiwa, the former CEO of ZMDC. As you are aware ZMDC and Amari became joint ventures partners in November 2007. Amari has maintained a cordial and professional relationship with members of the ZMDC board and management team over time, including Mr D Mubayiwa who was the CEO of ZMDC for a period and one of the directors appointed by ZMDC to the various joint venture companies of Amari and ZMDC.

Please be assured that Amari is happy to assist and cooperate with ZMDC with any queries in regard to this matter.

In order to properly address this matter could you please forward any specific queries that the ZMDC board may have to me in writing so that these can be formally addressed and the necessary due process followed in resolving any such queries?

Yours sincerely

**RICHARD NAPIER**
**MANAGING DIRECTOR**



Head office
Le Montaigne
7 Avenue de Grande Bretagne
Monte Carlo
MC 98000
Monaco
Tel: +377 97 97 14 97
Fax: +377 93 50 62 55

Registered office
PO Box 211
Melrose Arch, 2076
Johannesburg, South Africa
Tel: +27 11 994 5006
Fax: +27 11 994 5051

Directors:  Campion Corporate Directors Ltd   H Hum   R Napier   H Summers   A Bekker   P Haskel   L Guldbrand   AMARI Resources Holdings Ltd   Reg no. 1906324



# SCHINDLERS

◆

attorneys – conveyancers – notaries

# NOTARIAL AUTHENTICATION CERTIFICATE

### BE IT HEREBY MADE KNOWN

That I CELESTE KEARTLAND, Notary Public residing and practicing in Johannesburg, Gauteng South Africa, by lawful authority duly admitted and sworn, do hereby certify that I saw MICHAEL JOHN NUNN, the person referred to in the document attached hereto, sign and execute the attached document, and that the signature thereon is the signature of MICHAEL JOHN NUNN.

In witness thereof I, being the Notary, have signed this deed and have caused the seal of office to be affected thereto at Johannesburg on this 17th day of January 2011.

QUOD ATTESTOR

**NOTARY PUBLIC**



| | | | |
|---|---|---|---|
| **Address:** | Second Floor<br>3 Melrose Boulevard<br>Melrose Arch<br>2076 | **Docex:**<br>**Postal address:** | Dx 10, Hyde Park<br>P O Box 10909<br>Johannesburg, 2000 |
| **Tel number:**<br>**Fax numbers:** | (+27) (11) 448-9600<br>Primary – (+27) 86 608 9600<br>Alternative – (+27) 86 609 0900<br>Alternative – (+27) (11) 448-9620/10 | **E-mail address:**<br>**Web Site:**<br>**Vat number:** | info@schindlers.co.za<br>www.schindlers.co.za<br>4600139721 |

**Partners:** Hilton Schindler B Proc (Wits) · Maurice Crespi BA LLB (Rhodes) H Dip Co Law (Wits) · David Hepburn B Comm LLB (Rhodes) · Lisa Sher B Comm (Unisa) LLB (Wits) · Marius van Rensburg BA LLB (Rhodes) (Conveyancer) · Anne Pienaar B Comm LLB (Wits) H Dip Tax (Unisa) · Sarah Thackwell B Comm LLB (Rhodes)

**Senior Associates:** Celeste Keartland LLB (UKzN) (Notary) (Conveyancer) · Kim Zolty B Soc Sci LLB (UCT) (Notary) (Conveyancer) David Brimer BA LLB (Rhodes) · Bianca Backos BA LLB (UNISA)

**Associates:** Lee Binneman BA (RAU) LLB (UJ) · Gareth Young BA LLB (Rhodes) · Jason Olifant LLB LLM Labour Law H Dip Tax (UJ) Michal Snider BA LLB (Rhodes) · Nomfundo Shezi LLB (Wits) · Kirsty James BSc (UP) LLB (Rhodes) · Candice Dreyer BA LLB (Wits) · Dean Wright BA LLB (UJ) · Anthea Hoskin B Comm LLB (Wits) · Chantelle Gladwin BA LLB (Rhodes) (Notary) (Conveyancer) · Christopher Baird BA LLB (Rhodes) · Mercia Heathcote B Comm LLB (Wits) · Nicole Stiglingh LLB (Wits)

**Financial Director:** Elizabeth Beulich BAcc (Rhodes) (CA)(SA)
**Office Manager:** Mariska Hulley

# Exhibit Q



Attention: Mr G Masimirembwa
Zimbabwe Mining Development Corporation
MMCZ Building
90 Mutare Road
HARARE
Zimbabwe

25 October 2010

Dear Sir

INVESTIGATION: MR MUBAYIWA

1    Capacity

1.1.   I write to you on behalf of Amari Resources Holdings Limited (ARHL)
       (the ultimate holding company within the Amari Resources Group,
       Amaplat Mauritius Ltd (Maur) (ZMDC's joint venture partner for the
       exploitation of PGMs, base metals and ancillary metals through the
       joint venture company Zimari Platinum (Pvt) Ltd (Zim) and Amari
       Nickel Zimbabwe Holdings Ltd (Maur) (ZMDC's joint venture partner
       for the exploitation of Nickel claims through the joint venture company,
       Zimari Nickel (Pvt) Ltd (Zim)).   ARHL has both South African and
       international shareholders.

2    The issue

2.1.   We understand from our meeting with you on 20th October 2010 that
       you and your colleagues are carrying out an investigation into the
       conduct of Mr Mubayiwa the former CEO of ZMDC and in the course
       of that investigation are examining whether there is "a corrupt
       relationship between Amari and Mr Mubayiwa".

2.2.   We also understand from your closing statements that you have said
       that if a corrupt relationship was found to exist at the disciplinary
       hearing to be held on 26 October 2010, then you intend to terminate
       the Amari Group's memoranda of understanding and joint ventures
       with ZMDC and the rights which flow therefrom.

2.3.   We were not fully informed as to the nature of the meeting on 20th
       October 2010 and were not provided, despite written and verbal
       requests, with an agenda for the said meeting, so were not prepared
       for the line of questioning.

Administrative Head office
Le Montagne
7 Avenue de Grande Bretagne
Monte Carlo
MC 98000
Monaco
Tel: +377 97 97 14 97
Fax: +377 93 56 02 55

G. A. Killoran
Cambridge
2 Clubbe Boulevard
PO Box 210
Melrose Arch, 2076
Johannesburg, South Africa
Tel: +27 11 994 5000
Fax: +27 11 994 5050

Directors: Camerons Corporate Directors Ltd    H North    R Heald    H Sutherland    A Ritter    P Hooke    L Gulbrand    AMARI Resources Holdings Ltd    Reg no. 12492-1



3   <u>Due Process</u>

3.1.   The Amari Group (as set out in paragraph 1) is not a party to your investigation, which we understand is confined to an internal disciplinary hearing between ZMDC and its former CEO.

3.2.   We have read the letter submitted to you by Mr Michael Nunn of even date.

3.3.   The Amari Group was not a party to the assistance which was rendered by Mr Nunn (through Amari Services) to Mr Mubayiwa.

3.4.   The Amari Group had no knowledge of and did not authorize the rendering of such assistance.

3.5.   Mr Nunn maintains that any assistance that he rendered to Mr Mubayiwa was not improper or illegal.

3.6.   In any event, Mr Nunn's conduct is not attributable to the Amari Group and played no role in the conclusion of the memoranda of understanding or the rights which flowed therefrom.

3.7.   The Amari Group and the two joint venture companies are entitled to due and fair process and cannot be subjected to the unilateral cancellation of the memoranda of understanding flowing from evidence given at an internal disciplinary hearing to which the Amari Group and the joint venture companies are not a party to.  The memoranda of understanding contain arbitration clauses which govern dispute resolution between ZMDC and the Amari Group and, inter alia, envisage that the parties first try to resolve their disputes through negotiation, failing which such disputes must be submitted to the international court of arbitration in Paris.

3.8.   We urge you to respect the rights of the stakeholders and to permit a due and fair process before taking any unilateral steps to cancel the memoranda of understanding and joint ventures.

4   <u>Stakeholders</u>

4.1.   There are many stakeholders whose interests would be dramatically and detrimentally affected by any decision on your part to cancel the joint venture agreements, including South African and international investors, banks, creditors, employees, suppliers and many others.

4.2.   The Amari Group has invested considerable funds and resources into the Zimbabwean economy since 2006, well prior to the Global Political Agreement (GPA) being signed in Harare on 15 September 2008, and, at a time when there was little foreign investment in the Zimbabwe economy.

4.3.   Amari representatives accompanied the South African Department of Trade & Industry delegation, which included Rob Davies, the current South African Minister of Trade & Industry, to the signing ceremony in Harare on 27 November 2009 of the "Agreement between the government of the Republic of South Africa and the government of the

2



Republic of Zimbabwe for the promotion and reciprocal protection of investments" between the two countries.  At the ceremony an Amari Group representative spoke in support of investing in Zimbabwe.  This was an important milestone in trade relations between South Africa and Zimbabwe, and, the Amari Group played an integral role in encouraging foreign investment into the Zimbabwean economy by testifying as to its experience since its involvement in Zimbabwe since 2006.

4.4.   To date the Amari Group has invested approximately US$22 million (R161 million) into Zimbabwean assets and is committed to the development of at least one platinum mine at a development cost of approximately US$200 million (R1,5 billion).

4.5.   In relation to Zimari Nickel, the Amari Group has to date funded in excess of approximately US$550 000 (R4 million) for exploration work.

4.6.   In relation to Zimari Platinum, the Amari Group has to date funded approximately US$5 million (R38 million) for exploration work.

4.7.   Zimari Platinum was widely considered to be a higher risk greenfields project and there were few investors who had the appetite for this kind of risk at the time the memorandum of understanding was concluded. Through its investment in the project, the Amari Group has created considerable value for the benefit of the joint venture partners including the Government of Zimbabwe.  A recent valuation values the Zimari Platinum Project in excess of approximately US$100 million (R750 million).

4.8.   In respect of both Zimari Nickel and Zimari Platinum, the Amari Group has obtained Zimbabwe Investment Authority ("ZIA") approval in respect of both projects. The Zimari Nickel ZIA approval has recently been renewed.

4.9.   The Amari Group entered into an agreement with the Centre for Business Co-operation with Foreign Countries (CBC) in respect of the Darwendale platinum project and paid CBC approximately US$16 million (R120 million) as part payment for a 40% interest in the Darwendale project based entirely on the introduction by ZMDC representatives at the time, and received approval for the investment from both the Zimbabwean Ministry of Mines and the Zimbabwean Ministry of Defence.  ZMDC is a partner in the Darwendale joint venture company with the Amari Group.  The long standing dispute between the Amari Group and CBC is in the process of being settled, which will allow for exploration on this project to re-commence in due course.

4.10.  The Amari Group has funded the Zimari joint ventures for approximately 3 years and has yet not received any return on its investments in Zimbabwe, which demonstrates that the Amari Group is a long term investor.

4.11.  The Amari Group has placed its trust and confidence in the Zimbabwean economy and in the integrity of receiving fair and just



treatment at the hands of the Zimbabwean government and its parastatals.

4.12. The Amari Group has been actively involved in various aspects of social upliftment in the Serui area and specifically at the Saruwe School. The Amari Group has created employment for Zimbabweans and has made payment of its taxes as and when they have fallen due.

4.13. The Amari Group condemns corruption in any form and is willing to engage with ZMDC and to render whatever assistance it can to root out corruption and help ZMDC in its investigations into the conduct of Mr Mubayiwa.

## 5   Engagement

5.1. The Amari Group respectfully requests you to engage formally with us before taking any steps to terminate the memoranda of understanding and joint ventures.

5.2. Please advise us on the way forward.

Yours faithfully,

RICHARD NAPIER
Managing director



4

# Exhibit R



**M J NUNN**
22 Oak Lane
Melrose Arch
P.O. Box 2542
Parklands, 2121

Attention: Mr G Masimirembwa
Zimbabwe Mining Development Corporation
MMCZ Building
90 Mutare Road
HARARE
Zimbabwe

25 October 2010

Dear Sir

INVESTIGATION: MR MUBAYIWA

1      Thank you for affording me the opportunity to elaborate and expand on the answers which I gave you at our meeting on Wednesday, 20 October 2010 and to substantiate my explanations with documentary evidence.

2      Prior to addressing the specific questions which you have asked me to deal with, I respectfully submit that it is important that you and your colleagues take cognizance of certain facts:

    2.1.    With regard to the queries raised by you, I confirm that I provided assistance to Mr Mubayiwa, the nature of which will be dealt with below.

    2.2.    The assistance I provided was in my personal capacity through my financial management consulting company, Amari Services (Pty) Ltd (registration number 2002/029251/07) ("Amari Services"). Amari Services was previously known as Amari Management Services (Pty) Ltd.

    2.3.    At the time I provided the assistance:

        2.3.1.    Amari Services was controlled by my family trust, the Michael John Nunn Family Trust (Trust no. IT3086/01);

        2.3.2.    Amari Services was not part of the Amari Group of Companies, notwithstanding the common use of the name Amari.

    2.4.    I did not provide the assistance for an improper purpose and, more particularly, to influence Mr Mubayiwa.

    2.5.    I do not believe that the assistance I provided to Mr Mubayiwa had any influence on ZMDC's decision to enter into the Memorandum of Understanding dated 22 November 2007 for the exploitation of the Nickel

1

118  (118)

claims through the joint venture company, Zimari Nickel (Pvt) Limited (Zim).

2.6.　　I do not believe that the assistance I provided to Mr Mubayiwa had any influence on ZMDC's decision to enter into the Memorandum of Understanding dated 25 July 2008 for the exploitation of PGMs, Base Metals and ancillary metals through the joint venture company, Zimari Platinum (Pvt) Ltd (Zim).

2.7.　　Arising out of my business relationship with Mr Mubayiwa we became friends. On occasion he visited my home in South Africa. Mr Mubayiwa informed me that he needed tiles for a house he was building and that he was unable to source the tiles in Zimbabwe. He asked me to assist him on the understanding that he would pay for the tiles. I informed Mr Mubayiwa that I would instruct my personal assistant, Mr Ralph, to assist with sourcing the tiles, pay for them on his behalf and arrange for their delivery to the shipping yard in Harare. I arranged for the tiles to be included on an Amari container that was going to Harare in any event. I informed Mr Mubayiwa that it was easier for me to disburse the monies on his behalf and to thereafter recover payment from him, as I did not know exactly what amount would be payable in advance of the order and the shipment.

2.8.　　I asked my personal assistant to secure the order of tiles and to arrange for their shipment and to confirm the arrangements with Mr Mubayiwa in writing. Mr Ralph duly did so in the form of the exchange of the e-mails which are in your possession and to which you referred me at our meeting. As appears from an ordinary reading of the e-mails:

2.8.1.　　Mr Ralph asked Mr Mubayiwa to confirm the type of tile that he required ("please can you confirm that you would like to proceed with the tile – FADIMA BIANCO.")

2.8.2.　　Mr Mubayiwa replied by informing Mr Ralph that he sought his assistance "in confirming the order" and asked Mr Ralph to advise him "<u>of the amount and how I proceed from here</u>" (my underlining).

2.8.3.　　Mr Ralph responded by informing Mr Mubayiwa that Amari Services "has agreed to cover everything", by which he meant that Amari Services had undertaken to pay for the tiles and to arrange for their delivery. My personal assistant did not convey or intend to convey that Amari Services intended to pay for assisting at its own cost.

2.8.4.　　This was clearly understood by Mr Mubayiwa as is evident, where he expresses his appreciation "for Amari offer to assist".

2





2.9.　　In addition, Mr Mubayiwa repaid Amari Services the full amount for the tiles. In this regard:

　　2.9.1.　　During or about the last weeks of May 2008, Mr Mubayiwa was in South Africa. He asked me to assist him by exchanging US Dollars for Rand and with the purchase of items, specifically tiles, for a house he was building. I advanced him R25 000 in cash on the understanding that he would repay me in US Dollars before he returned. Before returning to Zimbabwe he gave me US$9 000 in cash. At that point neither of us knew what the tiles would cost and I handed the US$9 000 to my accountant during the first week of June 2008. A portion of the US$9 000 was to repay the temporary loan and the balance he asked me to retain and to apply against the amount which would become owing to me for assisting him with the sourcing and delivery of the tiles. Annexure "A" shows the proof of payment of the US$9 000.

　　2.9.2.　　I arranged for Amari Services to pay the sum of R41,819 for the tiles on 30 May 2008. In this regard I refer to annexure "B" hereto, being the quotation for the tiles. I applied the balance of the money deposited with me by Mr Mubayiwa to discharge his indebtedness to me for the payment of the tiles.

2.10.　　I did not charge Mr Mubayiwa for the transport as this was done at no cost.

2.11.　　The Amari Group was unaware of the assistance I gave to Mr Mubayiwa and did not authorize it, whether expressly, tacitly or otherwise.

2.12.　　I am not a director or shareholder of Amaplat Mauritius Ltd (Maur) or Zimari Platinum (Pvt) Ltd (Zim) and have never been.

2.13.　　I am not a director of Amari Nickel Zimbabwe Holdings Ltd (Maur) or Zimari Nickel (Pvt) Ltd (Zim).

2.14.　　These are the companies which have an interest in the 2 joint venture agreements which are under consideration by you.

2.15.　　There is no cross-shareholding between Amari Services and these companies.

2.16.　　The assistance I provided to Mr Mubayiwa through Amari Services cannot be attributed to these companies. In any event I have been repaid in full and there was nothing untoward about the assistance that I provided.

2.17.　　The companies concerned have their own boards of directors and rights and obligations.

3



3      I now deal with your specific questions as follows:

    3.1.   the Amari Group's relationship with Mr Mubayiwa has at all times been a business relationship which has been conducted in a professional and arms-length manner in every respect;

    3.2.   Amari Services assisted Mr Mubayiwa with the purchase and transport of the tiles in the circumstances set out above;

    3.3.   At no time did Mr Mubayiwa travel on an Amari Services or Amari Group chartered flight.

4      On occasion I have given assistance to Mr Mubayiwa and other Zimbabwean citizens, from time to time. I have done so as a result of my personal friendships with them and because they were unable to source the supply of goods and services in Zimbabwe conveniently or at all. I have never done so for any improper purpose.

5      Should you have any other questions that you wish me to answer, please submit them in writing to enable me to give you a comprehensive response.


Yours sincerely,


_____

MICHAEL NUNN



4

# Ledger Accounts
## AMARI SERVICES (PTY) LTD

From : May 2008   To : July 2008

Ledger Accounts

Page 1 of 1

| Date | Reference | Description | Debit | Credit | Balance |
|------|-----------|-------------|-------|--------|---------|
| *Account Type : Bank* | | | | | |
| 8250000 (US$ float) | | Opening Balance | 11,948.63 | | |
| 07/05/08 | 1160 | Three Diamonds-U$10700 @7.60 | 81,320.00 | | 93,268.63 |
| 13/05/08 | INV40915 | Sales Order | | 1,480.00 | 91,788.63 |
| 14/05/08 | INV40916 | Sales Order | | 11,100.00 | 80,688.63 |
| 19/05/08 | INV40917 | Sales Order | | 3,700.00 | 76,988.63 |
| 19/05/08 | INV40918 | Sales Order | | 18,500.00 | 58,488.63 |
| 31/05/08 | INV40939 | Sales Order | | 7,400.00 | 51,088.63 |
| 31/05/08 | INV30016 | Goods Received Voucher | 38,286.00 | | 89,374.63 |
| 01/06/08 | INV40968 | Sales Order | | 37,000.00 | 52,374.63 |
| 01/06/08 | INV40969 | Sales Order | | 25,900.00 | 26,474.63 |
| /06/08 | INV40970 | Sales Order | | 13,320.00 | 13,154.63 |
| 6/08 | INV40973 | Sales Order | | 37,000.00 | (23,845.37) |
| 05/06/08 | INV40967 | Sales Order | | 3,700.00 | (27,545.37) |
| 05/06/08 | INV60071 | Goods Received Voucher | 69,210.00 | | 41,664.63 |
| 30/06/08 | CN4102 | Credit Note | 3,256.00 | | 44,920.63 |
| 30/06/08 | CN4103 | Credit Note | 25,900.00 | | 70,820.63 |
| 30/06/08 | INV40974 | Sales Order | | 3,700.00 | 67,120.63 |
| 30/06/08 | CN4104 | Credit Note | 13,407.25 | | 80,527.88 |
| 30/06/08 | CN4101 | Credit Note | 10,730.00 | | 91,257.88 |
| 04/07/08 | FNB113 | U$4000.00 @7.9006 | 31,602.40 | | 122,860.28 |
| 08/07/08 | INV41033 | Sales Order | | 29,600.00 | 93,260.28 |
| 08/07/08 | CN4110 | Credit Note | 7,355.60 | | 100,615.88 |
| 10/07/08 | INV41026 | Sales Order | | 3,700.00 | 96,915.88 |
| 10/07/08 | INV41029 | Sales Order | | 5,550.00 | 91,365.88 |
| 10/07/08 | CN4108 | Credit Note | 5,032.00 | | 96,397.88 |
| 11/07/08 | INV41028 | Sales Order | | 1,850.00 | 94,547.88 |
| 15/07/08 | FNB114 | U$2000.00 @7.7586 | 15,517.20 | | 110,065.08 |
| 17/08 | INV41024 | Sales Order | | 3,700.00 | 106,365.08 |
| 7/08 | INV41027 | Sales Order | | 3,700.00 | 102,665.08 |
| 22/07/08 | INV41025 | Sales Order | | 7,400.00 | 95,265.08 |
| 2/07/08 | CN4107 | Credit Note | 2,960.00 | | 98,225.08 |
| 1/07/08 | CN4111 | Credit Note | 740.00 | | 98,965.08 |
| | | Closing Balance | 98,965.08 | | |





**iTALTiLE**

The style. The passion.

*Quotation*

COPY

*Italtile Bryanston*
Cnr William Nicol and Peter Place
Bryanston
011 510 9000(T) - 011 510 9019(F)
P O Box 1689, Randburg 2125

VAT Reg.: 4740229580 - Registration: 1981/007176/06

| Client Details | : Mr Ralph |
| | To Be advised |
| | Bryanston |
| | South Africa |
| | 011 994 5000 (T) |

| Document Number | : 23734797 |
| Document Date & Time | : 28.05.2008 (10:11:04) |
| Validity Period | : 28.05.08 to 04.06.08 |
| Gross Weight | : 4,978.400 KG |
| Currency | : ZAR |
| Page Number | : 1 of   1 pages |

Client Order No: I905/Z-Ord#002359340

Sales Consultant:  AMRAJ DURSAN
   AMRAJ@ITALTILE.CO.ZA

| Code | Description | Quantity | Unit Price | Amount Incl.VAT |
|------|-------------|----------|-----------|-----------------|
| .U1326 | PFI1041A FIDAMA BIANCO 7T/B 45X45 | 247.450 M2 / 175 BOX | 169.00 /1M2 | 41,819.05 |

| | |
|---|---|
| Sub-Total (Incl.VAT) | 41,819.05 |
| Total Due (Incl.VAT) | 41,819.05 |
| VAT Amount | 5,135.67 |
| *Total (Excl.VAT)* | *36,683.38* |

on acceptance of this quotation, the Customer purchases and Italtile sells the goods stipulated herein at the price quoted herein, subject to the standard terms and conditions at the branch where the goods will be purchased

Absa Domestic Cash - Transaction

## Audit Trail - Create Transfer

? HELP

Fri, May 30, 2008 at 12:21:48 PM

| | | |
|---|---|---|
| Group | 21429 | AMARI MANAGEMENT SERVICES (PTY |
| Operator Number | 002 | |
| Status | Captured | |

**Transaction Status**

| | Captured | First Approval | Final Approval |
|---|---|---|---|
| Operator | 2 | 0 | 0 |
| Date | 080530 | 0 | 0 |
| Time | 120821 | 0 | 0 |

**Transfer Transaction Detail**

| | | | |
|---|---|---|---|
| From Account | 633605 | 0000004060018417 AMARI SERVICES (PTY) LTD | |
| Description | 1    0000009191061700 TR# 0000248 | Frequency | Adhoc |
| To Account | 633205 | 0000009191061700 R RALPH | |
| Description | 1    0000004060018417 TR# 0000248 | Mandate | |
| Date | 20080530 | Amount | 41819.05 |
| Transaction Number | 248 | | |

[ Proceed ]   [ Cancel ]

*MILL, HOW DO I ACCOUNT FOR THIS?*

*I will get cash from him*
*(or deposit my C/A in cash in)*

https://e.absa.co.za/cashfocus/audit_trail_tran_detail.jsp

# Exhibit S





# SCHINDLERS

◆

attorneys − conveyancers − notaries

## NOTARIAL AUTHENTICATION CERTIFICATE

### BE IT HEREBY MADE KNOWN

That I CELESTE KEARTLAND, Notary Public residing and practicing in Johannesburg, Gauteng South Africa, by lawful authority duly admitted and sworn, do hereby certify that I saw MARK ROBERT SUMMERS, the person referred to in the document attached hereto, sign and execute the attached document, and that the signature thereon is the signature of MARK ROBERT SUMMERS.

In witness thereof I, being the Notary, have signed this deed and have caused the seal of office to be affected thereto at Johannesburg on this 17th day of January 2011.



QUOD ATTESTOR

**NOTARY PUBLIC**

---

| | | | |
|---|---|---|---|
| **Address:** | Second Floor<br>3 Melrose Boulevard<br>Melrose Arch<br>2076 | **Tex:**<br>**Postal address:** | Dx 10, Hyde Park<br>P O Box 10909<br>Johannesburg, 2000 |
| **Tel number:** | (+27) (11) 448-9600 | **E-mail address:** | info@schindlers.co.za |
| **Fax numbers:** | Primary – (+27) 86 608 9600<br>Alternative – (+27) 86 609 0900<br>Alternative - (+27) (11) 448-9620/10 | **Web Site:**<br>**Vat number:** | www.schindlers.co.za<br>4600139721 |

**Partners:** Hilton Schindler B Proc (Wits) · Maurice Crespi BA LLB (Rhodes) H Dip Co Law (Wits) · David Hepburn B Comm LLB (Rhodes) · Lisa Sher B Comm (Unisa) LLB (Wits) · Marius van Rensburg BA LLB (Rhodes) (Conveyancer) · Andre Pienaar B Comm LLB (Wits) H Dip Tax (Unisa) · Sarah Thackwell B Comm LLB (Rhodes)

**Senior Associates:** Celeste Keartland LLB (UKzN) (Notary)(Conveyancer) · Kim Zolty B Soc Sci LLB (UCT) (Notary)(Conveyancer) David Brimer BA LLB (Rhodes) · Bianca Backos BA LLB (UNISA)

**Associates:** Lee Binneman BA (RAU) LLB (UJ) · Gareth Young BA LLB (Rhodes) · Jason Olifant LLB LLM Labour Law H Dip Tax (UJ) Michal Snider BA LLB (Rhodes) · Nomfundo Shezi LLB (Wits) · Kirsty James BSc (UP) LLB (Rhodes) · Candice Dreyer BA LLB (Wits) · Dean Wright BA LLB (UJ) · Anthea Hoskin B Comm LLB (Wits) · Chantelle Gladwin BA LLB (Rhodes)(Notary) (Conveyancer) · Christopher Baird BA LLB (Rhodes) · Mercia Heathcote B Comm LLB (Wits) · Nicole Stiglingh LLB (Wits)

**Financial Director:** Elizabeth Beulich BAcc (Rhodes) (CA)(SA)
**Office Manager:** Mariska Hulley



# IN THE HIGH COURT OF ZIMBABWE

## (HARARE)

CASE NO.

In the matter:

AMAPLAT MAURITIUS LTD                                    First Applicant

AMARI NICKEL HOLDINGS ZIMBABWE LTD                      Second Applicant

And

ZIMBABWE MINING DEVELOPMENT CORPORATION                 First Respondent

THE CHIEF MINING COMMISSIONER, MINISTRY OF              Second Respondent
MINES, ZIMBABWE

ZIMARI PLATINUM (PVT) LTD                                Third Respondent

ZIMARI NICKEL (PVT) LTD                                 Fourth Respondent

---

## FOUNDING AFFIDAVIT

---

I, the undersigned,

## MARK ROBERT SUMMERS

do hereby make oath and say that:-

1.      I am an adult male residing at 48B Boundary Road, Illovo, Johannesburg.

2.      I am the Group Financial Director of the Amari Resources Holdings Ltd (hereinafter
        referred to as "**AMARI**"), which is the ultimate holding company of both the first and
        second applicants in this application.  I am also a director of both the first and
        second applicants, as well as the fourth respondent.

3.    For the sake of convenience, wherever I intend to refer to Amari and the first and second applicants collectively, I shall refer to them as "**THE AMARI GROUP**".

4.    I am duly authorised to depose to this affidavit on behalf of the applicants and annex hereto, marked "**FA1a**" and "**FA1b**", resolutions of meetings of the applicants held on 16 January 2011. As I am a director of the applicants and as I am fully *au fait* with the affairs of both those entities, I depose to this founding affidavit in support of this application.

## THE APPLICANTS

5.    The first applicant is **AMAPLAT MAURITIUS LTD,** a private company with limited liability incorporated in accordance with the laws of Mauritius with registration number 079678 C2/GBL and with its principal place of business at Amari, 3rd Floor, Melrose Boulevard, Melrose Arch, Johannesburg, South Africa.

6.    The second applicant is **AMARI NICKEL HOLDINGS ZIMBABWE LTD,** a private company with limited liability incorporated in accordance with the laws of Mauritius with registration number 079651 C2/GBL and with its principal place of business at Amari, 3rd Floor, Melrose Boulevard, Melrose Arch, Johannesburg, South Africa.

## THE RESPONDENTS

7.    The first respondent is **ZIMBABWE MINING DEVELOPMENT CORPORATION**, a body corporate established in terms of the Zimbabwe Mining Development Corporation Act, Chapter 21:08 of the Republic of Zimbabwe with chosen *domicilium citandi et executandi* in the agreements referred to below as Ground Floor, MMCZ Building, 90 Mutare Road, Msasa, Harare, Zimbabwe.

8.    The second respondent is **THE CHIEF MINING COMMISSIONER, MINISTRY OF MINES, ZIMBABWE**, acting in his official capacity, 7th Floor, Zimre Centre, Private Bag CY 7709, Causeway, Harare, Zimbabwe.   No relief is sought against the second respondent, however, due to his interest herein, he is joined to these proceedings.

9.    The third respondent is **ZIMARI PLATINUM (PVT) LTD** a private company with limited liability incorporated in accordance with the laws of Zimbabwe with registration number 15458/2008 and with its principal place of business at Amari House, 186 Fife Avenue, Harare, Zimbabwe.   The third respondent was incorporated as Maflox Mining (Pvt) Ltd but a name change was affected on 27 May 2008 to **ZIMARI PLATINUM (PVT) LTD.**  A copy of the Certificate of Change of Name is annexed hereto marked "**FA2**".

10.   The fourth respondent is **ZIMARI NICKEL (PVT) LTD**, a private company with limited liability incorporated in accordance with the laws of Zimbabwe with registration number 8305/2008 and with its principal place of business at Amari House, 186 Fife Avenue, Harare, Zimbabwe.   The fourth respondent was incorporated as Mint Minerals (Pvt) Ltd but a name change was affected on 17 July 2008 to **ZIMARI NICKEL (PVT) LTD.**  A copy of the Certificate of Change of Name is annexed hereto marked "**FA3**".

**LOCUS STANDI OF THE APPLICANTS AND NATURE OF THE RELIEF SOUGHT**

11.   As set out in detail below, the first applicant and the first respondent each hold 50% of the shareholding of the third respondent, being a joint venture company incorporated by the first applicant and the first respondent in terms of a Memorandum of Understanding (hereinafter referred to as "the Platinum Joint

4

Venture"). Similarly, the second applicant holds 55% and the first respondent holds 45% of the shareholding of the fourth respondent, being a joint venture entity incorporated by the second applicant and the first respondent in terms of another Memorandum of Understanding (hereinafter referred to as "the Nickel Joint Venture").

12.    The relief that the applicants seek is an order that the first respondent be interdicted from alienating or otherwise disposing of or dealing with the mining rights, licences and other business interests of the third and fourth respondents arising out of the Memoranda of Understanding concluded between the applicants and the first respondent (hereinafter referred to as "**THE RIGHTS**"), pending the outcome of an arbitration to be instituted by the applicants in Paris in accordance with the aforementioned Memoranda of Understanding as dealt with in detail below.

13.    Accordingly, this application is in effect a derivative one brought by a shareholder of the third and fourth respondents for their benefit. The applicants are forced to bring this application on behalf of the third and fourth respondents as certain members of the board of directors of the latter companies have failed to take the necessary steps to protect the rights of those companies. As set out in detail below, the directors of those boards who have been appointed by the applicants have called upon the directors appointed at the behest of the first respondent to convene board meetings but to no avail.

14.    It is clear from the conduct of the latter directors that they are in breach of their fiduciary duties towards the third and fourth respondent in placing the interest of the first respondent before the interests of third and fourth respondents. I set out details of this conduct below. Accordingly, the applicants have been

option but to resort to their rights *qua* shareholders to protect the interests of the third and fourth respondents.

15.    It is for these reasons that the third and fourth respondents are joined to this application and the relief sought in this application is for their benefit.  However, having regard to the fact that the first respondent have directors on the respective boards of both the third and fourth respondents and as these directors have refused numerous requests to attend board meetings of the third and fourth respondents, the applicants have a reasonable and justifiable concern that the aforementioned directors will attempt to divest the third and fourth respondents of their rights. Accordingly, the applicants also seek an order that the third and fourth respondents be interdicted from alienating or otherwise disposing of or dealing with their rights, pending the outcome of the arbitration to be instituted by the applicants.  However, as the relief sought is for the third and fourth respondent's ultimate benefit, no cost order is sought against them.

16.    Furthermore, in light of the conduct of the first respondent as set out in detail below, the applicants also seek an order that the first, third and fourth respondents be interdicted from amending, altering or changing the shareholding in and the share registers of the third and fourth respondents pending the outcome of the arbitration.

**URGENCY**

17.    As can be seen from the considerable flow of correspondence dealt with in paragraphs 31 and 50 below, every effort has been made to avoid bringing this application.  In the circumstances, and reluctantly, the applicants have to bring this application as a matter of urgency and we respectfully request the Honourable Court to treat it as such.

18.     That which has made the matter urgent is the following:

18.1.   on 10 November 2010, the first respondent wrote a letter to Amari denying that there are valid agreements between the parties and advising the Amari Group that it must consider the relationship between the applicants and the first respondent "terminated for both the platinum and nickel properties". A copy of the letter is annexed hereto marked "**FA4**";

18.2.   the requests made by the applicants' appointed directors to the boards of the third and fourth respondents for board meetings have been ignored by the first respondent's appointed directors. Copies of the emails containing such requests by the applicants' legal counsel dated 15 December 2010 and 7 January 2011 to the secretary of the 3rd and 4th respondent are annexed hereto marked "**FA5a**" and "**FA5b**";

18.3.   the first respondent has refused to provide an undertaking in writing by close of business on 14 January 2011 that it would not do anything to alienate, dispose of or otherwise prejudice the rights of the third and fourth respondents and the Amari Group pending the final determination of the arbitration process provided for in the Memorandums of Understanding. The letter in which the request for the undertaking was made is annexed hereto marked "**FA6**".

18.4.   Representatives of the Amari Group in Zimbabwe have been informed that the 1st Respondent is in the process of negotiating the disposal of the rights to a 3rd party.

19.     Accordingly, the applicants had no alternative but to launch this application on an urgent basis.

## BACKGROUND

20.     As I mentioned in paragraph 2 above, the shareholdings in the applicants are ultimately held by Amari. Amari is a resource investment company with various interests in exploration and mining in Sub-Saharan Africa, based in South Africa.

21.     On 22 November 2007, in Harare, **AMARI HOLDINGS LTD (BVI) ("AMARI (BVI)")**, the ultimate holding company of Amari, represented by MJ Nunn and the first respondent, represented by DL Mubayiwa concluded a written Memorandum of Understanding (hereinafter referred to as "the Nickel MOU"), in terms of which the following was agreed:

21.1.     the parties would incorporate a joint venture company (subclause 3.5);

21.2.     the joint venture company's purpose would be to hold certain nickel claims, to undertake exploration and, subject to successful bankable feasibility studies, to develop and operate mines on the nickel claim areas (subclause 5.8);

21.3.     the first respondent would hold 45% of the shares in the joint venture company and Amari BVI would hold 55% (subclause 5.3);

21.4.     the overall management of the joint venture company would vest in the board of directors (subclause 5.9);

8

21.5.    the initial board would consist of five directors, two directors appointed by the first respondent and three directors appointed by Amari BVI (subclause 5.11);

21.6.    the Memorandum of Understanding was subject to the parties obtaining necessary board and/or shareholder approval  before 31 December 2007 (clause 9);

21.7.    the Memorandum of Understanding would commence three business days after the fulfilment or waiver of the condition precedent contained in clause 9 and would be binding on the parties upon signature thereof and the Memorandum of Understanding would be superseded by joint venture agreements which would incorporate the terms and conditions contained therein (clause 8);

21.8.    in the event of a dispute arising, such dispute would first be negotiated between the parties.  In the event that no settlement is reached, any party may submit the dispute to the ICC International Court of Arbitration in Paris for arbitration in accordance with the procedural rules of arbitration of the said Arbitration Court (clause 11);

21.9.    the parties undertook to act in the utmost good faith to each other in giving effect to the Memorandum of Understanding (subclause 12.5);

21.10.   the first respondent chose the address set out in paragraph 7 as its chosen *domicilium citandi et executandi* (subclause 12.8.1.1).

22.     A copy of the Nickel MOU is annexed hereto marked "**FA7**".



22.1.   Thereafter the fourth respondent was incorporated as the joint venture company, the parties obtained the necessary board and/or shareholder approvals and statutory approvals and the nickel claims were transferred into the name of the fourth respondent.

23.   Thereafter, on 6 June 2008, the parties concluded a Deed of Novation in terms of which the second applicant replaced Amari BVI as the contracting party to the Nickel MOU. A copy of the Deed of Novation is annexed hereto marked "FA8".

24.   Due to the fact that there was an existing relationship between Amari and the first respondent arising from the Nickel MOU, and due to the fact that the parties had a good working relationship, on 25 July 2008, at Harare, the first applicant (being a subsidiary of Amari) and the first respondent concluded a further written Memorandum of Understanding (hereinafter referred to as "the Platinum MOU"). The first applicant was represented by MJ Nunn and the first respondent by DL Mubayiwa. In terms of this agreement, the parties agreed upon the following:

24.1.   the parties would incorporate a joint venture company (subclause 4.1);

24.2.   the first respondent would hold 50% of the shares in the joint venture company and the first applicant would hold the remaining 50% (subclause 4.2);

24.3.   the joint venture company would hold certain PGM's, Base Metals and ancillary metals claims (hereinafter referred to as "the platinum claims"), undertake exploration and feasibility studies in respect thereof and, subject to a successful feasibility study, develop and operate a mine over the claims area (subclause 4.4);



24.4.    the overall management of the joint venture company would vest in the board of directors (subclause 4.7);

24.5.    the board would consist of up to five directors, the initial board to consist of two directors appointed by the first respondent and two directors appointed by the first applicant (subclause 4.8);

24.6.    the Memorandum of Understanding would commence on date of signature (being 25 July 2008) and would be binding on the parties upon signature thereof and the Memorandum of Understanding would be superseded by joint venture agreements which would incorporate the terms and conditions contained therein. However, the Memorandum of Understanding would continue to be of full force and effect and would be binding on all parties until such time as the more comprehensive agreements were concluded (clause 8);

24.7.    in the event of a dispute arising, such dispute would first be negotiated between the parties. In the event that no settlement is reached, any party may submit the dispute to the ICC International Court of Arbitration in Paris for arbitration in accordance with the procedural rules of arbitration of the said Arbitration Court (clause 9);

24.8.    the parties undertook to act in the utmost good faith to each other in giving effect to the Memorandum of Understanding (subclause 10.6);

24.9.    the first respondent chose the address set out in paragraph 7 a its chosen *domicilium citandi et executandi* (subclause 10.9.1.1).

25.    A copy of the Platinum MOU is annexed hereto marked "**FA9**".



26.     Thereafter the third respondent was incorporated as the joint venture company and the platinum claims were transferred into the name of the third respondent. The claims that were transferred into the name of the third respondent are listed in a document annexed hereto marked "**FA10**".

## EVENTS SUBSEQUENT TO THE CONCLUSION OF THE MEMORANDUMS OF UNDERSTANDING

27.     Over the last three years, the applicants have funded the exploration work for the Platinum Joint Venture and the Nickel Joint Venture in the amounts of USD5 million and USD550 000, 00 respectively.

28.     In respect of the Platinum Joint Venture, the third respondent has indirectly employed an average of 50 people for exploration work on a project known as the Serui Project ("**THE SERUI PROJECT**") and direct employment of about 17 local Zimbabweans in respect of that project, including geologists, geological technicians and a mining engineer. Approximately 12 of the employees are based on site and the balance in Harare.

29.     The first applicant has caused the following exploration work to be done in respect of the Serui Project:

29.1.     a ground magnetic survey, MMI soil sampling and trenching in order to identify the Main Sulphide Zone outcrop. This was followed up with an extensive drilling programme;

29.2.     45 boreholes, totalling approximately 25 000m, were drilled from April 2009 to June 2010, as well as two large diameter boreholes to obtain material for metallurgical test work;



29.3.   during June 2010, a Pre-Feasibility Study commenced in order to determine the viability of developing a mine on site;

29.4.   as part of the Pre-Feasibility Study, SRK Consulting (an internationally renowned mining consulting firm) was contracted to review and produce an independent Resource Statement in accordance with the SAMREC code (which is the South African Code for reporting of mineral resources and mineral reserves).  SRK confirmed a total of 17.14 million ounces of Platinum, Palladium, Rhodium and Gold, of which 5.1 million ounces are in an Indicated Category and 12.04 million ounces in an Inferred Category;

29.5.   certified mining, processing, geotechnical, environmental and other engineering consultants have been employed and contracted to work on the design project.

30.   At the time of concluding the Platinum MOU, Amari assessed the Serui Project as being a higher risk greenfields exploration opportunity.  Due to this risk, and the marginal commercial value, Amari was not aware of any other companies competing to be involved in the project at the time.  Very little work had been previously undertaken on the property, and no meaningful exploration work had ever been undertaken on the eastern side of the Hartly Complex of the Great Dyke, which is where the Serui Project is located.  Accordingly, as a result of the Amari Group's investment in the project, as well as its mining exploration experience and expertise being focused on the project over a 2 and a half year period, the first applicant has created significant value in the project for the benefit of its joint venture partners and the Zimbabwean economy, which value will increase substantially as the project develops.  In March 2010, the Amari Group obtained a



13

business model of the Serui Project from JP Morgan (South Africa) showing a projected value of the project at USD345 million.

31.   Both the applicants and the first respondent have been actively involved in the day-to-day running of the third and fourth respondents.   By way of examples, the following has occurred over the last three years:

31.1.   a number of board meetings, one as recently as 14 September 2010, have been held, as well as a number of AGM's have taken place, all of which have been attended by directors and representatives of both the applicants and the first respondent;

31.2.   auditors have been appointed for both companies and Annual Financial Statements have been audited and approved by the third and fourth respondent's boards;

31.3.   19 technical feedback meetings have been held between August 2008 and October 2010 all of which were minuted and joint decisions taken on the respective projects by both the applicants and the first respondent;

31.4.   investment approvals by the Zimbabwe Reserve Bank and the Zimbabwe Investment Authority were prepared and sought by both the applicants and the first respondent together and the approvals were obtained;

31.5.   on 15 April 2010, a formal site visit to the Platinum Joint Venture's Serui Project took place and was attended by representatives of both the applicants and the first respondent and by several government dignitaries including the Minister of Mines and Mining Development, the Honourable

Minister Mpofu and the Deputy Minister of Mines and Mining Development, the Honourable Deputy Minister Zwizwai.

32.    As part of its commitment to the Platinum Joint Venture and to the people of Zimbabwe, the Amari Group has also been actively involved in various aspects of social upliftment in the Serui area where the Serui Project is situated.  In particular, the Amari Group has been actively involved in the development of a school in the area, known as the Saruwe School.  This involvement has included assisting in the refurbishment of the school, as well as provision of learning materials and books. The Amari Group has also been involved in the development of a clinic within the same area.

## THE DISPUTES BETWEEN THE AMARI GROUP AND THE FIRST RESPONDENT

33.    In or about October 2010, the board of the first respondent had certain queries relating to the nature of Amari's relationship with DL Mubayiwa, the former CEO of the first respondent.  On hearing about these concerns, on 19 October 2010, the Managing Director of Amari wrote to I Chimuka of the first respondent advising that the Amari Group has maintained a cordial and professional relationship with members of the first respondent's board and management team over time.  He requested that any specific queries be formally addressed in writing in order for the Amari Group to deal with them comprehensively.  A copy of the letter is annexed hereto marked "FA11".

34.    In response to the aforementioned letter, G Masimirembwa, the chairperson of the first respondent arranged for a meeting to take place the following day, 20 October 2010 at the offices of the first respondent.  Masimirembwa, Moyo, Chipika, Chiparo and Sibiza were present on behalf of the first respondent and M Nunn

Napier, A Bekker, C Kamurai and A Cockhead were present on behalf of the Amari Group.

35. Masimirembwa advised that the reason for the meeting was to discuss the findings of a forensic investigation recently undertaken by the first respondent into the actions of the management team of the first respondent. He advised that the first respondent had found an email on Mubayiwa's laptop computer between one R Ralph of Amari and Mubayiwa, which, on the face of it, indicated that Mubayiwa had accepted favours from Amari just prior to the signing of the Platinum Joint Venture and accordingly that a corrupt relationship between Amari and Mubayiwa existed. Particularly, emails had been discovered that seemed to indicate that Amari had paid for tiles for Mubayiwa's home. The first respondent also alleged that Mubayiwa had been on charter flights arranged by Amari.

36. The representatives of the Amari Group had not been involved in the internal investigations undertaken by the first respondent and accordingly were only informed of the aforementioned allegations for the first time at the meeting. Accordingly, they did not have any documentary evidence with them at the meeting. However, Nunn denied that there was a corrupt relationship between Amari and Mubayiwa and was able to advise the representatives of the first respondent that any payments made on behalf of Mubayiwa were repaid by the latter. He advised that the emails relating to the tiles indicated that Amari Services (Pty) Ltd (being Nunn's company which was in no way affiliated with Amari) had agreed to assist in sourcing the tiles for Mubayiwa in South Africa and that it would arrange for the transportation thereof to Mubayiwa in Zimbabwe. At no stage did Amari or Amari Services undertake to pay for the tiles and Mubayiwa did in fact repay Amari Services for same. Furthermore, Napier confirmed that Amari was not aware of



16

Amari Services' arrangement with Mubayiwa and denied that Amari had any corrupt relationship with Mubayiwa.

37.    The first respondent advised Amari that in the event that they were to find that a corrupt relationship did in fact exist, then they intended terminating both the Nickel and Platinum MOUs. The meeting concluded with Nunn and Napier undertaking to provide formal responses in respect of the allegations made by the first respondent.

38.    Confirmatory Affidavits of Nunn and Napier are annexed hereto marked **"FA12a"** and **"FA12b"**.

39.    On 25 October 2010, Napier, on behalf of the Amari Group, wrote a formal response to the first respondent, in which the following is set out:

39.1.    the Amari Group were not a party to the assistance which was rendered by Nunn (through Amari Services) to Mubayiwa;

39.2.    the Amari Group had no knowledge of and did not authorise the rendering of such assistance;

39.3.    Nunn maintains that any assistance that he rendered to Mubayiwa was not improper or illegal;

39.4.    in any event, Nunn's conduct could not be attributable to the Amari Group and played no role in the conclusion of the Nickel and Platinum MOUs or the rights that flow therefrom;

39.5.    the Amari Group are entitled to due and fair process and cannot be subject to the unilateral cancellation of the Nickel and Platinum

flowing from evidence given at an internal disciplinary hearing to which the Amari Group were not a party;

39.6.   the Nickel and Platinum MOUs contain arbitration clauses which govern dispute resolution between the first respondent and the applicants and, inter alia, envisage that the parties first try to resolve their disputes through negotiation, failing which such disputes must be submitted to the International Court of Arbitration, Paris;

39.7.   the first respondent was urged to respect the rights of the applicants and to permit a due and fair process before taking any unilateral steps to cancel the Nickel and Platinum MOUs.

40.   A copy of the letter is annexed hereto marked "**FA13**".

41.   Nunn also responded to the allegations made by the first respondent.  He did so in a letter dated 25 October 2010, in which he stated the following:

41.1.   he assisted Mubayiwa in purchasing tiles for his home;

41.2.   the assistance was provided in his personal capacity through his financial management consulting company, Amari Services;

41.3.   at the time that he provided the assistance, Amari Services was controlled by his family trust, the Michael John Nunn Family trust (trust No IT3086/01) and it was not part of the Amari Group, notwithstanding the common use of the name Amari;

41.4.   he did not provide the assistance for an improper purpose or to influence Mubayiwa;

41.5.   he does not believe that the assistance influenced the first respondent's decision to conclude the Nickel and Platinum MOUs;

41.6.   arising out of the business relationship with Mubayiwa, he and Mubayiwa became friends and Mubayiwa visited Nunn's home in South Africa on a number of occasions.  Mubayiwa requested assistance with the purchase of tiles for his home on the understanding that he would pay for them.  He informed Mubayiwa that he would instruct his personal assistant, Ralph to assist with the sourcing of the tiles, pay for them on his behalf and arrange for their delivery in Harare.  He arranged for the tiles to be included in an Amari container that was going to Harare in any event.  He informed Mubayiwa that it was easier for him to disburse the monies on his behalf and to thereafter recover payment from him, as he did not know exactly what amount would be payable in advance of the order and the shipment;

41.7.   he asked his personal assistant, Ralph, to order the tiles and to arrange for their shipment.  Ralph did so in the form of the exchange of e-mails, in which Ralph advised Mubayiwa that Amari Services had undertaken to pay for the tiles and to arrange for their delivery.  He did not convey, or intend to convey that Amari Services intended to pay for assisting at its own cost;

41.8.   in addition, Mubayiwa repaid Amari Services the full amount for the tiles and Nunn attached documents to the letter to show the repayment;



41.9.   he did not charge Mubayiwa for the transport as this was done at no cost; ...

41.10.   the Amari Group were unaware of the assistance that he gave to Mubayiwa and did not authorise it;

41.11.   he is not a director of the first or second applicants and there is no cross-shareholding between these two companies and Amari Services. Accordingly, the assistance provided to Mubayiwa through Amari Services cannot be attributed to the applicants. In any event, he was repaid in full and there was nothing untoward about the assistance that he provided;

41.12.   he submitted that Amari Group's relationship with Mubayiwa was a business relationship which was conducted in a professional and arms-length manner in every respect;

41.13.   he denied that Mubayiwa ever travelled on an Amari Services or Amari chartered flight.

42.   A copy of the letter is annexed hereto marked "**FA14**".

43.   On 10 November 2010, the first respondent responded to the aforementioned correspondence by addressing a letter to Amari, which is referred to in subparagraph 18.1 above. From the letter, the following is apparent:

43.1.   the first respondent alleged that it had "noted" that there was a corrupt relationship which unduly influenced the signing of the Platinum MOU;

43.2.   the first respondent denied that there are valid agreements between the parties as clause 8.2 of the Platinum MOU provides

comprehensive Joint Venture Agreement was to be entered into ....but never was for the past two and a half years";

43.3.   the first respondent advised the Amari Group that it considers its conduct to be "unacceptable, improper and directly undermines the basic tenets of corporate governance" (sic).  Accordingly, the first respondent advised the Amari Group that it is "no longer prepared to engage [the Amari Group] for negotiations to the next stage of a Joint Venture Agreement".  The first respondent concluded the letter by stating that the Amari Group must consider the relationship "terminated for both the platinum and nickel properties".

44.   On 22 November 2010, I responded to the aforementioned letter on behalf of the Amari Group, in which I stated the following:

44.1.   the Amari Group wishes to resolve the issues which have arisen amicably without the need for arbitration or litigation, if at all possible;

44.2.   the Amari Group does not accept the allegation that there was an improper and corrupt relationship between the Amari Group and Mubayiwa or that the conclusion of the Nickel and Platinum MOUs were in any way influenced by there being an improper relationship with Mubayiwa;

44.3.   the Amari Group's request to engage with the first respondent has been ignored and the Amari Group has not been afforded a reasonable opportunity to present evidence in support of its contentions. The

Group does not accept that the first respondent is entitled to make a unilateral finding on the issue of corruption;

44.4.    the MOUs make provision for disputes to be resolved firstly, by the board, and failing that, by the shareholders through negotiation and, thereafter by way of submission to arbitration in Paris;

44.5.    the first respondent's assertion that there appears to be no joint ventures regulating the parties relationship is simply not correct.   The MOUs provide that they will "continue to be of full force and effect and binding on the parties" until comprehensive agreements are concluded;

44.6.    furthermore, the fact that there are joint venture agreements in place (in the form of the MOUs) is borne out by the fact that the joint venture companies have been formed (namely the third and fourth respondents) and the necessary claims have been transferred to these companies;

44.7.    the MOUs are legally binding, are of full force and effect and govern the relationship between the parties and the MOUs have been given effect to by all parties;

44.8.    there are a number of stakeholders whose interests would be detrimentally affected by the first respondent's decision to unilaterally attempt to cancel the MOUs including South African and international investors, banks, creditors, employees and suppliers;

44.9.    the Amari Group has invested considerable funds and resources into the Zimbabwean economy since 2006.   To date the Amari Group has invested approximately USD22 million into Zimbabwean assets and is



22

committed to the development of the Platinum Joint Venture at a development cost of approximately USD200 million;

44.10. at the time that the Amari Group concluded the Platinum Joint Venture, the project was a high risk "greenfields" project of marginal value. Through its significant investment of time, expertise and USD5 million to date, the Amari Group has created significant value for both the third respondent and the first applicant, as well as the Government of Zimbabwe;

44.11. the current issues have resulted in various local and international contractors on the various projects being sent home and as a result of the current uncertainty only limited further exploration work is being done on the projects, thus resulting in possible delays to the advancement of the project;

44.12. a request for a further meeting was made to attempt to resolve the dispute amicably through negotiation;

44.13. finally a request was also made for an undertaking by the first respondent that it would not disturb the presently existing legal relationship as established by the MOUs and the rights arising therefrom pending the outcome of the proposed meeting.

45. A copy of the letter is annexed hereto marked "**FA15**".

46. In response to the aforementioned letter, a meeting took place on 30 November 2010 at the offices of the first respondent. Masimirembwa, and Sibiza were present

on behalf of the first respondent and Kamurai, Manase, Noy and myself were present on behalf of the Amari Group.

47.   During this meeting, Masimirembwa repeated the first respondent's contentions that the MOUs between the parties were not binding as formal comprehensive joint venture agreements had not been concluded and that the first respondent considered the MOUs to be terminated. I advised Masimirembwa that the MOUs remain valid until any other agreements are concluded and since no further agreements had in fact been concluded, the MOUs regulated the relationship between the parties. I highlighted the fact that the third and fourth respondents had been incorporated and that the claims had been transferred to those entities in accordance with the terms of the MOUs. I also highlighted the fact that both the applicants and the first respondent have been actively involved in the businesses of the third and fourth respondents. Unfortunately, we were unable to resolve the dispute during the meeting.

48.   On 15 December 2010 and 7 January 2011, I caused emails to be sent to the members of the boards of the third and fourth respondents seeking to convene board meetings for each company and attaching draft agendas. Copies of these emails are referred to in subparagraph 18.2 above. No response to either email was received.

49.   Furthermore, no undertaking was provided by the first respondent and accordingly, on 13 January 2011, I sent the letter referred to in paragraph 18 above. In this letter, I set out the following:

   49.1.   the Amari Group has made numerous attempts to resolve the disputes, which unfortunately did not prove successful;

49.2.   the Amari Group has also attempted to arrange board meetings of the third and fourth respondents and no response has been received;

49.3.   the Amari Group has learned that the first respondent has taken steps in an attempt to alienate or otherwise dispose of the rights of the third and fourth respondents to a third party;

49.4.   it is evident from the first respondent's unilateral attempt to cancel the MOUs and to terminate the joint venture relationships and from the first respondent's failure to provide the Amari Group with an undertaking, that the first respondent does in fact intend to act unilaterally and to ignore the dispute resolution process provided for in the MOUs;

49.5.   the Amari Group requested an undertaking in writing by close of business on 14 January 2011 that it would not do anything to alienate, dispose of or otherwise prejudice the rights of the third and fourth respondents and the Amari Group pending the final determination of the arbitration process provided for in the MOUs.

50.   No response to the aforementioned letter was received and no undertaking was provided by the first respondent by close of business on 14 January 2011. Accordingly, the applicants had no alternative but to launch this application on an urgent basis.

51.   It is also apparent from the correspondence received from the first respondent that the first respondent has not tendered restitution or compensation to the applicants following their alleged cancellation of the MOUs and their alleged termination of the joint venture relationship between the parties.   Until the first respondent makes

25

restitution and compensates the applicants for the value of the mining claims held by the third and fourth respondents, which value would include the enhanced value thereof due to the investment and mining expertise expended by the applicants on behalf of the third and fourth respondents, the first respondent cannot be permitted to deal with or dispose of these claims. Even in the event that the first respondent is ultimately successful in defending the applicants' claims in the arbitration to be instituted in Paris and it is found that the MOUs have been validly cancelled or that no legal relationship between the parties exists (which is denied), the applicants' would be entitled to compensation for the value of the mining claims, which value would include the aforementioned enhanced value thereof. Accordingly, the first respondent should be precluded from dealing with or disposing the rights of the third and fourth respondents pending the arbitration to be instituted by the applicants in Paris.

## MERITS OF THIS APPLICATION

52.   I am advised that I am required to demonstrate that the applicants have a *pima facie* right to the declaratory order that they seek. I submit that, *inter alia*, the following facts suggest strongly that the MOUs are valid and binding:

52.1.   the MOUs have been signed on behalf of both parties and provide that they will "continue to be of full force and effect and binding on the paties" until comprehensive agreements are concluded. Accordingly, if no such agreements are concluded, then the MOUs are legally binding, are of full force and effect and govern the relationship between the parties;

52.2.   the fact that there are joint venture agreements in place (in the form of the MOUs) is borne out by the fact that the joint venture companies have



been formed (namely the third and fourth respondents) and the necessary claims have been transferred to these companies;

52.3.    the MOUs have been given effect to by all parties, including the first respondent over a significant period as described in paragraph 31 above.

53.    It is submitted that the first respondent cannot unilaterally terminate its relationship with the Amari Group. That relationship is governed by the Nickel and Platinum MOUs, which contain reciprocal rights and obligations which must be honoured. Also to be honoured is the manner in which disputes are to be resolved and determined. The Amari Group is entitled to have the obligations honoured.

54.    I am confident that the facts set out by me in this affidavit, and the fact that the first respondent will not be able to dispute these facts, demonstrate for the purposes of this application that the inherent probabilities demonstrate that *prima facie*, the applicants will be successful in the arbitration. The applicants seek to retain the status quo that presently exists between the parties, pending the outcome of the arbitration that will have to be launched in Paris.

55.    As stated in paragraph 27 above, over the last three years, the applicants have invested approximately USD5 million and USD550 000, 00 into the Platinum and Nickel Joint Ventures respectively. Furthermore, they have invested approximately three years of specialised mining expertise which has resulted in dramatic increases in the value of the respective projects. In the event that the applicants are not awarded the relief that they seek, they will be unable to recover not only their investment but also their share in the increased value of the projects. However, in the event that the relief is granted, and the applicants are ultimately unsuccessful in the arbitration to be instituted in Paris, the Amari Group

27 

financial position to compensate the first respondent for any losses that it may suffer.

56.     The applicants will suffer irreparable harm if the interim relief is not granted and they are ultimately successful in the arbitration.   This will be because of the following reasons:

56.1.     the first respondent has taken steps in an attempt to alienate or otherwise dispose of the rights of the third and fourth respondents to a third party;

56.2.     it is evident from the first respondent's unilateral attempt to cancel the MOUs and to terminate the joint venture relationships and from the first respondent's failure to provide the Amari Group with an undertaking, that the first respondent does in fact intend to act unilaterally and to ignore the dispute resolution process provided for in the MOUs;

56.3.     in the event that the first respondent does so, the third and fourth respondents will lose their rights arising from the MOUs and will be unable to continue with the projects of the Joint Ventures.  This will result not only in substantial delay and cost, but will also have the knock-on effect with regard to employees, creditors, suppliers and financiers.  Effectively, in the event that the applicants are not awarded the relief that they seek, and are forced to await the outcome of the arbitration in Paris, the projects will be crippled and the investment made by the Amari Group and the first respondent irretrievably lost.

**WHEREFORE** the applicants pray for an order in terms of the Notice of Motion to which this Founding Affidavit is annexed.



28

**DEPONENT**

SIGNED AND SWORN TO BEFORE ME AT Melrose Arch   ON THIS 17 DAY OF JANUARY 2011, THE DEPONENT HAVING ACKNOWLEDGED THAT HE KNOWS AND UNDERSTANDS THE CONTENTS OF THIS AFFIDAVIT, HAS NO OBJECTION TO TAKING THE PRESCRIBED OATH AND CONSIDERS SAME TO BE BINDING ON HIS CONSCIENCE.

**COMMISSIONER OF OATHS**



# Exhibit T

  

ZMDC
ZIMBABWE MINING
DEVELOPMENT CORPORATION

"Unearthing the future"

TELEPHONE: 487014-20                                                      M.M.C.Z. BUILDING
TELEGRAMS: GRENAMMO HARARE                                       90 MUTARE ROAD, MSASA
FAX: 487022/159                                                   P.O. BOX 4101, HARARE, ZIMBABWE

YOUR REF:

OUR REF:


10 November 2010

AMARI
Le Montaigne
7 Avenue de Grande Bretagne
Monte Carlo
MC 98000
Monaco
France

Dear Sir/Madam


RE: <u>ZMDC – AMARI JOINT VENTURE AGREEMENT</u>


We refer to the above matter and in particular our meeting with yourselves on 20
October 2010 at our offices and the subsequent correspondence from yourselves to the
Chairman of the Board.

We draw your attention to the discussion therein in which you were duly advised of
ZMDC's forensic audit report findings on the conduct and/or relationship between its
executive management, especially Mr. D.L. Mubayiwa, and Amari.

Chief among the issues discussed include;
   a) The improper and corrupt relationship between Amari and Mr. Mubayiwa wherein
      it was pointed out that Amari corruptly extended favours by purchasing tiles to
      cover 200 sq.m. towards the construction of his private residence situated at
      No.13 Hillview Road, Philadelphia, Harare on or about the 28th of May 2008.

   b) The fact that e-mails between a one Ralph, Amari official and Mr. Mubayiwa
      clearly pointed out that tiles were bought just prior to the signing of Memorandum
      of Understanding with Amari in respect of platinum mining project.


DIRECTORS: G. MASIMIREMBWA (CHAIRMAN), B. MOYO (VICE-CHAIRMAN), F.G. MOYO, A. NCUBE, O. CHIMUKA, 
M.C. SIBANDA, DR. M. TSOMONDO, A. NDLOVU, D.L. MUBAYIWA  (CEO)



It was further agreed that Amari would make its representations to the above issue by Friday, 22nd October 2010 which representations we have received and taken into account in arriving at the decision being communicated hereunder.

After thorough deliberations and considerations by the Legal, Risk and Audit Committee and the Mining Development Board, it was noted that there indeed was a corrupt relationship which unduly influenced the signing of the Memorandum of Understanding on 25th July 2008. That the said MOU is very clear in terms of clause 8.2 that a comprehensive Joint Venture Agreement was to be entered into and between ZMDC and Amari but never was for the past two and half years (2½). There was therefore no Joint Venture Agreement regulating our relationship.

As a result of the above, we advise that your conduct is unacceptable, improper and directly undermines the basic tenets of corporate governance principles which we so cherish and adhere to. It contravenes the Zimbabwean laws and we reserve the right to report you for prosecution. Your conduct goes to the core of our relationship and as such we are no longer prepared to engage yourselves for negotiations to the next stage of a Joint Venture Agreement. In fact, consider our relationship terminated for both platinum and nickel properties.

Be guided accordingly.

Yours faithfully

S.D. SIZIBA
**ACTING GENERAL MANAGER**

c.c. The Hon. Minister of Mines and Mining Development
c.c. The Permanent Secretary – Ministry of Mines and Mining Development
c.c. The Chairman – Mining Development Board
c.c. The Acting Company Secretary & Legal Advisor



# Exhibit U



--------------------------------------

**FIFTH SESSION – SEVENTH PARLIAMENT**

------------------------------------------

**FIRST REPORT**

**OF THE PORTFOLIO COMMITTEE ON MINES AND ENERGY**

**ON**

**ON DIAMOND MINING (with special reference to Marange Diamond Fields)**

**2009 - 2013**

**Presented to Parliament June 2013**

**(S.C.4, 2012)**

**ORDERED   I  T  r      S   d   Ord r N .**

    a)     At the commencement of every session, there shall be as many committees Rules   to   be designated according to government portfolios as the Standing and Orders Committee may deem fit.

    b)     It shall be the function of such committees to examine expenditure administration and policy of government departments and other matters falling under their jurisdictions as Parliament may, by resolution determine.

    c)     The members of such committees shall be appointed by the Standing Rules and Orders Committee, from one or both Houses of Parliament, and such appointments shall take into account the expressed interests or expertise of the Members and Senators and the political and gender composition of Parliament.

    d)     Each Select Committee shall be known by the portfolio determined for it by the Standing Rules and Orders Committee.

**T  r      r  r         P  r      C                S   d   Ord r N .**

"Subject to these Standing Orders a Portfolio Committee shall:

a)     Consider and deal with all bills and statutory instruments or other matters which are referred to it by or under a resolution of the House or by the Speaker;

b)     Consider or deal with an appropriation or money bill or any aspect of appropriation or money bill referred to it by these Standing Orders or by under resolution of this House; and

c)     Monitor, investigate, enquire into and make recommendations relating to any aspect of the legislative programme, budget, policy or any other matter it may consider relevant to the government department falling within the category of affairs assigned to it, and may for that purpose consult and liaise with such department; and

d)     Consider or deal with all international treaties, conventions and   agreements relevant to it, which are from time to time negotiated, entered into or agreed upon.

On Tuesday, 30th October 2013, the Speaker announced that the Committee on Standing Rules and Orders nominated the following members to serve on the Portfolio Committee on Mines and Energy

22.  Hon. Haritatos Peter

**H   . C    d r C        E.      C    r   r**

---

1       Erskine May: Treatise on the Law, Privileges, Proceedings and Usage of Parliament; 22nd Edition, pg 63

2        Privileges, Immunities and Powers of Parliament Act
3        Erskine May: Treatise on the Law, Privileges, Proceedings and Usage of Parliament; 22nd Edition, pg 63

|  |  |  |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |

|  |  |
|--|--|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

---

4   Oral Evidence by Mbada Diamonds Chairperson



---

Oral Evidence by the Minister of Mines

---

7    Due Diligence Report by ZMDC, pg 3

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

---

Zimbabwe Diamond Policy, pg 7



. Government should consider establishing a one-stop mineral administration systems with sufficient capacity to deliver on their critical mandate.

. Because of the discrepancies that exists between the amount that companies pay to government and what government report to have receive, companies are encouraged to publish what they pay to government and government is equally encouraged to publish what it received from companies. It is

therefore important for government to operationalise a domesticated  Zimbabwe Mining Transparency Initiative (ZMTI).

    i.    The Executive should clearly layout the selection criteria for joint venture partners in the mining sector.  Equally, contract negotiation with venture partners must be led by a legitimate institution of the state. The principle of complete public transparency must operate prior to the awarding of contracts and the contracts themselves must be made public.

ii.   Government must develop the necessary human capacity to negotiate contracts effectively. Contract negotiation must be all inclusive[9] and cover areas such as environmental mitigation and protection measures, land use and rights, displacement and resettlement of local communities and their rights, mining closure, corporate social responsibility, disaster management and water use.

iii.  Negotiations can only start after due diligence studies have been conducted to ascertain whether the company has the technical and financial capability to actually mine to avoid selecting companies with no mining experience..

---

9

# Exhibit V

**ZIMPAPERS DIGITAL**

THE SUNDAY MAIL

BUSINESS WEEKLY

CHRONICLE

SUNDAY NEWS

B-METRO

KWAYEDZA

SUBURBAN

MANICAPOST

UMTHUNYWA

MORE +

PLAY RADIO

PODCAST

Today Fri, 11 Aug 2023                                          Subscribe



Search...

December 13, 2013



3 mining State firms' board

Your browser can't play this video.
Learn more

News



Minister of Mines and Mining Development Cde Walter Chidhakwa



MINISTER CHIDHAKWA

MINES and Mining Development Minister Walter Chidhakwa has dissolved the boards of three mining State enterprises after some members of the previous boards ran for or took up political office. In a statement on Wednesday, the ministry announced the dissolution of the Minerals Marketing Corporation of Zimbabwe, the Zimbabwe Mining Development Corporation and Marange Resources.

In an interview, Minister Chidhakwa said there were not enough people to sit on the boards hence the need to dissolve them in order to appoint new board members.

"For example, only two people were left on the Marange board. We felt there was also need to dissolve the other two – MMCZ and ZMDC – because we want to look at what they are doing.

"Once we are clear on what we want, we will then reconstruct new boards."
For instance, Mr Supa Mandiwanzira, who was a board member at the ZMDC, left the board to participate in the parliamentary elections.
He won the Nyanga South seat and was subsequently appointed Information, Media and Broadcasting Services Deputy Minister.

Mr Godwills Masimirembwa stepped down as chairperson of the ZMDC board to contest in parliamentary elections on a Zanu- PF ticket for the Mabvuku-Tafara seat, which he lost.

Former MMCZ board chairman Mr Chris Mutsvangwa, now the Deputy Minister of Foreign Affairs, resigned to venture into politics while Colonel Tshinga Dube, who was the chairman of Marange Resources, which is wholly owned by ZMDC, also resigned to contest in the elections.

Another former MMCZ board member, Mr Tongai Muzenda, is now the Deputy Minister of Public Service, Labour and Social Welfare while former ZMDC board member Mr Freddy Moyo is now the Deputy Minister of Mines and Mining Development

Other MMCZ board members included Mr Johnson Masawi, Mr Tendai Munyoro, Mrs Nonhlanhla Ndlovu, Mr Felix Moyo, Mr Nicholas Dube and Mr Morris Mpofu.

ZMDC board members included Mr Togarmah Dhlakama, Mr Ashton Ndlovu, lawyer Mr Psychology Maziwisa, geologist Mrs Ntombizodwa Masuku, Mr Mutabu Sibanda and administrator Mrs Esther Marava- nyika. Minister Chidhakwa added that the duties and functions of these boards will be assumed by the ministry's permanent secretary, Professor Francis Gudyanga, until the appointment of new boards.

Share This:





December 13, 2013

**Kim gushes about fiance Kanye**



December 13, 2013

**Kim gushes about fiance Kanye**

YOU MIGHT ALSO LIKE                                                                    /



BUSINESS

August 11, 2023

**'Zim to remain safe haven for investors...'**

Michael Tome Business Writer ZIMBABWE has made huge strides in efforts to turnaround and grow the economy while extensive reforms have been instituted to improve the regulatory and business environment to attract domestic and foreign direct investment, a Cabinet Minister said Information, Publicity and Broadcasting Services Minister, Monica Mutsvangwa said the Southern African country was aiming […]

Continue Reading...



BUSINESS

August 11, 2023

**Notable property gains incremental...column**

Wendy Nyakurerwa-Matinde THE Reserve Bank of Zimbabwe (RBZ) has registered remarkable progress towards ensuring universal access to funding for productive purposes through its financial inclusion strategies, a senior bank official has said. This comes as the Government has prioritised inclusive economic growth that leaves "no one and no place behind" as enunciated under National Development […]

Continue Reading...



BUSINESS

August 11, 2023

**Zim diaspora remittances bolster forex i...**

Enacy Mapakame Although Zimbabwe continues to lose skilled personnel to the diaspora, the increase in remittances is helping the country to significantly grow its foreign currency inflows. This is also driving consumer demand as a significant number of households are getting economically empowered through remittances from the diaspora, experts have said. Remittances accounted for 14 […]

Continue Reading...

## Other Publications

- The Sunday Mail
- Business Weekly
- Chronicle
- Sunday News
- H-Metro

COMMENTS

SPONSORED LINKS

**Classifieds**

Electronics

Cars & Parts

Building Supplies

**Web Development**

Domain Registration

Email Hosting

Web Hosting

Services

Property, Houses

Home & Garden

Commercial
Supplies

Jobs

Business Directory

## Online Payments

Buy ZESA Tokens

Buy TelOne ADSL

Buy Airtime

Pay Tuition Fees

Pay Nyaradzo

.

AGRICULTURE JOURNAL



## SIGN UP TO OUR NEWSLETTER

Receive news headlines directly to your inbox, daily!

Enter Your email address

Subscribe

Your browser can't play this video.
Learn more

## SPONSORED LINKS

**MUDZI RDC**

**ZB Bank - Money Transfer**

**OK Grand Challenge**

**Window Mechanisms Repairs**

## ABOUT US

Zimbabwe Newspapers (1980) Ltd is the oldest newspaper publisher and commercial printer in Zimbabwe.

Read More

## OTHER PUBLICATIONS

The Sunday Mail

Business Weekly

Chronicle

Sunday News

Herald House, Cnr George Silundika & Sam Nujoma,
Harare, Zimbabwe

+263 024 795771

+263 71 683 6796

theherald@zimpapers.co.zw

H-Metro

## TV STATIONS

Zim papers TV network

## RADIO STATIONS

All Radio Stations

## COMMERCIAL PRINTING DIVISIONS

All printing divisions

## CATEGORIES

Top Stories

National

International

Business

Sport

ARTS & CULTURE

## SUBSCRIBE

Paper Subscription

About Zimpapers

Newsletter Subscription

Advertise

© 2023          . All Rights Reserved.




Home  |  Disclaimer

# Exhibit W



# Government complicit in Marange diamond plunder warrant an independent commission

Human Rights (https://kubatana.net/category/human-rights/) | Legislation (https://kubatana.net/category/legislation/)

👤 Centre for Research and Development in Zimbabwe (CRD)(https://kubatana.net/author/crd/)
📅 March 7, 2018(https://kubatana.net/2018/03/07/)

On 23 February 2018 the Minerals Marketing Corporation of Zimbabwe (MMCZ) announced in Parliament that only US$2.4 billion dollars had been realised from Marange diamonds sales between 2009 to 2017. This confirmed the state's complicity in expropriation of one of Zimbabwe's most valuable mineral wealth. To begin with, Zimbabwe Mining Development Corporation (ZMDC) was coerced by government elites to enter into mining ventures with dubious companies such as Reclaim and Core Mining. The ZMDC due diligence report for example described the companies as "having no diamond mining as part of their vision and growth strategy".

The Parliamentary Portfolio Committee on Mines(PPCM) report on Marange that was published in 2013 revealed that Dr Obert Mpofu had rendered ZMDC powerless by appointing board members to ZMDC subsidiary companies in Marange in clear violation of section 5 (2) of the ZMDC Act. As a result, securocrats and individuals with diamond cartels like Dr Mhlanga and Dr Obey Chimuka were appointed to ZMDC subsidiaries like Mbada, Anjin and DMC. Another PPCM report published in 2016 pointed out that Zimbabwe had lost billions of dollars in potential diamond revenue from Marange to illicit financial flows through undervaluing of diamond export sales and transfer pricing. The report accused MMCZ of failing to undertake due diligence processes in the production and marketing of Marange diamonds. The Botswana Government Valuators raised Marange diamonds that have been valued at US$26 a carat to US$76 in 2017 according to government sources. In a test diamond auction recently conducted by government in Harare, one gemstone fetched US$1888 per carat. According to mining sources, 20% of diamonds produced before the consolidation of diamond companies were gemstones. There was no transparency in the accounting of diamonds mined as most gemstones were not officially declared but smuggled to international markets by mining executives and syndicate buyers. Some of the smuggled gemstones were intercepted at local roadblocks and some at international airports en route to trade markets of Dubai, Hong Kong, Israel and India.

kubatana

The 2016 Auditor General's report on state enterprises that was presented to Parliament in June 2017 found evidence of governance deficits at ZMDC and MMCZ. At the MMCZ which only had one board member,Professor Gudyanga,then Permanent Secretary in the Ministry of Mines and senior officials at the corporation awarded themselves huge, unapproved financial benefits and allowances that were prejudicial to government. The report also highlighted that the MMCZ made donations close to US$3 million against the approved budget of US$ 250 000.The funds were channeled to ZANU PF related activities including the US$4 million facility paid to NIKUV linked Pedstock agriculture company by Professor Gudyanga.ZMDC was issued with an adverse opinion for its failure to provide the value of its 50% shareholding it transferred to several companies including Mbada, Diamond Mining Corporation (DMC) and Jinan diamond companies. No audited financial information was availed to the AG by ZMDC for the US$1.7 million in revenue that ZMDC was entitled to collect as depletion fees from the sale of diamonds by Anjin Investments. The government of Robert Mugabe's decision to consolidate Marange diamond companies in 2016 was meant to manage ZANU PF political power struggles rather than to address issues of transparency and accountability. This explains why former Minister of Mines Chidhakwa who was closely linked to the former President's political faction circumvented public scrutiny by registering the Zimbabwe Consolidation Diamond Company (ZCDC) as a private entity. Minister Chidhakwa also appointed his former permanent secretary Professor Gudyanga to act as an acting chairman for ZCDC, ZMDC and MMCZ leading to serious corporate governance violations and illicit financial outflows. Moreover consolidation without due diligence provided the opportunity for government elites to conceal vital information on mining contracts, production statistics, revenue generated and beneficial ownership of shares in former mining ventures.

The plunder of Marange diamonds was also achieved through state brutality, environmental destruction and economic exclusion of the host community of Marange. The new political dispensation of Emmerson Mnangagwa promised zero tolerance on corruption when it came into power in November 2017. It also gave assurances to the nation that the pillars of state that promote democracy in Zimbabwe would be strengthened and protected. However recent events in parliament where former Minister of Mines Obert Mpofu refused to answer questions on the missing US$15 billion diamond revenue hold proof of a government that is not walking the talk. Furthermore, the refusal by the Chairman of the Agriculture and Rural Development Authority(ARDA), Basil Nyabadza, to disclose in parliament the beneficial ownership of shares in ARDA indicate that opacity in government joint ventures continues.Meanwhile the "Zimbabwe is open business"mantra being spearheaded by the Mnangagwa administration is not backed by important policy frameworks that promote transparency and accountability especially in natural resource governance.

Against this background it becomes imperative that government adapt a multi stakeholder approach to hold perpetrators of economic crimes and human rights abuses to account. In the diamond sector, an independent commission must be set to investigate the plunder of Marange diamonds.The findings of the Chindori Chininga and Daniel Shumba led PPCM investigations on Marange diamond mining is a good starting point for the commission.The commission must work closely with civic society and international agencies like the Financial Action Task Force to track beneficial ownership of former mining companies and individuals responsible for plundering Zimbabwe diamonds through smuggling and undervaluing of



export sales or transfer pricing.Some companies like Mbada diamonds are registered in countries like Hong Kong, British Virgin Islands,Mauritius and Dubai. The UN guiding principle on business and human rights recommends "operational-level grievance mechanisms" as effective means of enabling remediation.The commission can also create sustainable dialogue in communities impacted by diamond mining to allow affected communities to claim their rights through restitution and compensation.

**Source:** Center for Research and Development Zimbabwe

## Share this update

Waiting   (https://kubatana.net/2018/03/07/waiting-
for Itai    for-itai/)

High Court
hears pro-
democracy
campaigner's
challenge of
abuse of
Presidential
Powers to
amend
Electoral Act

(https://kubatana.net/2018/03/08/high-
court-hears-pro-democracy-
campaigners-challenge-abuse-
presidential-powers-amend-electoral-
act/)

## Liked what you read?

We have a lot more where that came from!
Join **36,000** subscribers who stay ahead of the pack.

Name

Email

Sign Up

## Related Updates

- Update on the Human Rights Situation in Marange Diamond...
  (https://kubatana.net/2021/09/24/update-on-the-human-rights-situation-in-marange-diamond-

community) Police Brutality in Chirasika village of Marange at around 2am...

- Growing Citizens' Concern on Mercury and Cyanide... (https://kubatana.net/2021/11/08/growing-citizens-concern-on-mercury-and-cyanide-contamination-on-the-environment-amid-gold-plunder-in-penhalonga/) Today, 08 November 2021, the Zimbabwe Republic Police: Penhalonga,Environmental Management...
- Bill Watch 77/2020 - The Zimbabwe Independent Complaints... (https://kubatana.net/2020/11/27/bill-watch-77-2020-the-zimbabwe-independent-complaints-commission-bill/) Section 210 of the Constitution states: "An Act of Parliament...
- Victims Perspectives on the Establishment of the Zimbabwe... (https://kubatana.net/2021/04/22/victims-perspectives-on-the-establishment-of-the-zimbabwe-independent-complaints-commission/) Introduction Zimbabwe is, at present, working towards establishing an Independent...
- Complaints Commission Should be Truly Independent: Byo... (https://kubatana.net/2021/06/08/complaints-commission-should-be-truly-independent-byo-residents/) The soon to be established Zimbabwe Independent Complaints Commission should...
- Summary Analysis of the Independent Complaints Commission... (https://kubatana.net/2021/06/08/summary-analysis-of-the-independent-complaints-commission-bill-2020/) On 03 November 2020 Cabinet approved the formulation of the...

## Categories

Select Category

## Authors

Select Author

## Archives

Select Month

## Focus

Abductions (72) (https://kubatana.net/focus/abductions/) Access to Information (73) (https://kubatana.net/focus/access-to-information/) Accountability (87) (https://kubatana.net/focus/accountability/) Activism (95) (https://kubatana.net/focus/activism/) Arrests (124) (https://kubatana.net/focus/arrests/) Budget (52) (https://kubatana.net/focus/budget/) Bulawayo (120) (https://kubatana.net/focus/bulawayo/) BVR (115) (https://kubatana.net/focus/bvr/) By-Elections (89) (https://kubatana.net/focus/by-elections/) Civil Service (77) (https://kubatana.net/focus/civil-service/) Constitution (341)

(https://kubatana.net/focus/constitution/) Constitutional Amendments (114)

(https://kubatana.net/focus/constitutional-amendments/) Coronavirus (1147)

(https://kubatana.net/focus/coronavirus/) Corruption (161)

(https://kubatana.net/focus/corruption/) Cost of Living (68) (https://kubatana.net/focus/cost-of-living/)

COVID-19 (268) (https://kubatana.net/focus/covid-19/) COVID-19 Vaccine

(351) (https://kubatana.net/focus/covid-19-vaccine/) Doctors (63)

(https://kubatana.net/focus/doctors/) Electoral reforms (65) (https://kubatana.net/focus/electoral-reforms/) Freedom of

Expression (150) (https://kubatana.net/focus/freedom-of-expression/) Fuel Protests (77)

(https://kubatana.net/focus/fuel-protests/) Gender Based Violence (95) (https://kubatana.net/focus/gender-based-

violence/) Harare (169) (https://kubatana.net/focus/harare/) human rights (162)

(https://kubatana.net/focus/human-rights/) Informal Sector (193)

(https://kubatana.net/focus/informal-sector/) Intimidation (73) (https://kubatana.net/focus/intimidation/)

Journalists (124) (https://kubatana.net/focus/journalists/) Justice (57) (https://kubatana.net/focus/justice/)

Lockdown (1026)

(https://kubatana.net/focus/lockdown/) Masvingo (75)

(https://kubatana.net/focus/masvingo/) Matabeleland (53) (https://kubatana.net/focus/matabeleland/) Parliament (283)

(https://kubatana.net/focus/parliament/) Peace (52) (https://kubatana.net/focus/peace/) Post-Election (84)

(https://kubatana.net/focus/post-election/) Rural (237) (https://kubatana.net/focus/rural/)

Salaries (114) (https://kubatana.net/focus/salaries/) Schools (94) (https://kubatana.net/focus/schools/)

Service Delivery (215) (https://kubatana.net/focus/service-delivery/) Teachers (186)

(https://kubatana.net/focus/teachers/) Testing (110) (https://kubatana.net/focus/testing/)

Violence (145) (https://kubatana.net/focus/violence/) Voter Registration (181)

(https://kubatana.net/focus/voter-registration/) Water (189)

(https://kubatana.net/focus/water/) ZEC (62) (https://kubatana.net/focus/zec/) ZRP (180)

(https://kubatana.net/focus/zrp/)

 All the Old News

If you're into looking backwards, visit our archive of over 25,000 different documents from 2000-
2013.

Archive →
(http://archive.kubatana.net/html/archive/arch_start.asp)

**kubatana**

Kubatana is a civic society information hub in Zimbabwe

(https://twitter.com/kubatana/)

(https://www.facebook.com/kubatana/)

(https://instagram.com/kubatanadch.zw)

## Get In Touch

+263 779 567 768

info@kubatana.net(mailto:info@kubatana.net)

## Instagram











© 2023 Kubatana | Website designed by Gareth Wynn Design (http://garethwynn.com)

# Exhibit X





*Mugabe with Russia's FM, Lavrov at his rural home in Zvimba shortly before commissioning big platinum mine. Mugabe described Russia as a long standing ally. Picture credits: Tawanda Karombo.*

| Published Sep 17, 2014

The good news for Zimbabwe is that Russian investors have started a new $3 billion (R33bn) platinum mine about 50km north-west of Harare. Russian Foreign Minister Sergey Lavrov and Zimbabwe's President Robert Mugabe turned the first sod yesterday.

The bad news for Zimbabwe is that a South African mining firm, which believed it had a licence to extract platinum nearby, and invested millions prospecting and producing a feasibility study, and was then kicked off its claim, last week won an order to seize all Zimbabwe's diamonds sold in Antwerp over the past 10 days.

Lavrov and Mugabe launched the joint venture to develop the Zimbabwean deposit of platinum

https://www.iol.co.za/business-report/economy/russians-start-3bn-mine-in-zimbabwe-1751935[8/10/2023 8:11:41 PM]

group metals in the Darwendale district. The mine was targeting production of 250 000 ounces annually within three years, the Zimbabwean ministry of mines said.

Peak production would be 800 000 ounces a year, which should help Zimbabwe produce 1 million ounces annually in five years time.

The land, which includes the site Russian investors secured, used to belong to South African-owned Zimbabwe Platinum (Zimplats), which ceded it to the government of Zimbabwe in 2006 for empowerment credits and cash, but was never paid out. The argument between Mugabe's government and Zimplats about "indigenisation" of its assets is still simmering.

Zimplats is still owed about $150 million from that enormously rich but geologically complex asset. Part of the land was also portioned out to other potential investors who have not yet decided whether to begin mining or sell off.

The Russian project that went live this week involves a consortium consisting of the Rostekhnologii state corporation, Vneshekonombank, as well as investment and industrial group Vi Holding, in a joint venture with as yet unnamed private Zimbabwe investors as well as the Mugabe government.

Initially it was thought the new platinum mine was ready to go, but some mining engineers in Zimbabwe say some more exploration is still needed, which will cost between $30m and $40m and take 17 months.

Various potential Russian and Chinese speculators and potential investors have been prospecting the former Zimplats land for nearly a decade.

Several licences were issued for this vast chunk of platinum-rich land, some of which have since been bought and sold. The Russian venture is the first one to get to start up.

A mining insider in Zimbabwe said: "It is going to be a geological challenge for them. This is very different land from what they are used to working with in the Russian palladium mines. Let's hope it works and provides jobs, but it is going to [be] a long haul and difficult."

Mugabe took the obvious opportunity at yesterday's launch of the joint venture to lambaste Western powers for imposing sanctions on Russia because of its annexation of Ukraine's Crimea.

"We share the viewpoint on the unacceptability of the use the sanctions regime by individual countries and human rights-related issues for an interference in the internal affairs of other states," the president said.

But while the mines ministry is celebrating the intended Russian investment, diamond mining houses operating out of eastern Zimbabwe had bad news late last week.

Their stones were on sale in Antwerp for the past 10 days and about $45m of gems were seized last week by a South African company via the International Court of Arbitration (ICC) in Paris.

Amari Platinum Holdings, which believed it had a licence for part of the original Zimplats land, and spent money prospecting it, was later refused permission to become operational by former mines minister Obert Mpofu.

Amari's South African chief executive Michael Nunn, who now lives in Monaco, launched the claim against the government of Zimbabwe.

Zimbabwean rough stones are mostly sold via Antwerp these days. These usually small, rough stones from the Manange communal lands in eastern Zimbabwe are mined by mostly foreign companies in joint ventures with the government.

Amari Platinum went to the ICC claiming a $500m suit. - Independent Foreign Service

RELATED TOPICS:

## You may like



Independent Online, popularly known as IOL, is one of South Africa's leading news and information websites bringing millions of readers breaking news and updates on Politics, Current Affairs, Business, Lifestyle, Entertainment, Travel, Sport, Motoring and Technology. Read more

SECTIONS ON IOL

News

Lifestyle

Entertainment

Travel

Business

Property

Sport

Motoring

Opinion

IOL TV

Brandstories

MORE ON IOL

About IOL

Contact Us

Weather

My News

Bookmarks

Newspapers Highlights

Newspapers Contacts

Manage My Notifications

SUBSCRIBE

Independent Media

Email Newsletter

© 2023 Independent Online and affiliated companies. All rights reserved.

Press Code   Privacy Policy   Terms & Conditions   Advertise with us   Feedback   Complaints Procedure

# Exhibit Y



Support The Moscow Times!

**CONTRIBUTE TODAY**

**NEWS**

**UKRAINE WAR**

**BUSINESS**

**OPINION**

**ARTS AND LIFE**

**PODCASTS**

**NEWSLETTERS**

**ARCHIVE**

**RU**

# Russian Companies Buy Into Zimbabwe Platinum Field

By The Moscow Times
Aug. 9, 2013



A group of companies which includes state-owned Rostec and Vneshekonombank is buying a 40 percent stake in a project to develop the world's second largest platinum field in Zimbabwe.

The consortium will invest in Ruschrome Mining, a Russian-African joint venture licensed to mine the field, Kommersant reported Friday, citing sources close to the deal and in the Russian Foreign Ministry.

The talks on the deal, which also includes the Netherlands-based aluminum company Vimetco, ended in mid-July, when Ruschrome's board of directors approved attracting a strategic investor to the project.

Ruschrome Mining is partly owned by Zimbabwe's government and the Center of Business Cooperation with Foreign Countries, an association of machinery producers and defense companies that will retain a 10 percent stake in the project.

Kommersant's source estimates the deal's value at $300 million.

The Darwendale platinum project in Zimbabwe has 19 tons in proven reserves and 775 total tons of metals including palladium, gold, nickel and copper.

Both Vneshekonombank and the Center of Business Cooperation declined to comment on the deal. Rostec said that developing international projects is one of its priorities and that it's ready to enter into joint ventures in developing countries.



READ MORE

CROSS-BORDER FIRE
**2 Dead After Ukraine Shells Russian Border Region – Governor**
1 MIN READ

'CRITICAL' SHORTAGE
**Russian Police Force Lost 5K Personnel in July, Interior Minister Says**
1 MIN READ

IN DEPTH
**'Absolutely Inadequate': Russian Activists Pressure Authorities on Loosened Air Quality Rules**
4 MIN READ

'SOCIAL AND MORAL DAMAGE'
**Russia Seeks New Trial for Man Who Criticized Child's Pro-War Hat**
1 MIN READ

**The Moscow Times**

About us

Jobs

Advertise with us

Privacy Policy

Your Personal
Information

Change Consent

Podcasts

Videos

Galleries

Newsletters

Archive

**Follow us**

**Media Partners**

Faridaily

Coda Story

Eurasianet

The Bell

The Eurasian
Climate Brief

Carnegie
Endowment

© The Moscow Times, all rights reserved.

# Exhibit Z

8/10/23, 12:54 PM
Case 1:22-cv-00058-CRC   Document 45-27   Filed 08/10/23   Page 2 of 10
The Zimbabwean army expands its influence | Peoples Dispatch

   



# The Zimbabwean army expands its influence

The army's reach now extends to the media, business, the health sector and even the electoral commission, despite the Constitution being against its involvement in politics.

December 20, 2020 by Tonderayi Mukeredzi



The Zimbabwe Defense Forces (ZDF) has added a television station, NRTV, to what is fast becoming a growing business empire as the armed forces substantively consolidate their power outside of their military competence.

Rusununguko Media, a ZDF company that owns NRTV, is one of six that were awarded lisences to operate free-to-air commercial television stations by the Broadcasting Authority of Zimbabwe in October. Interested parties have described the process of awarding that lisence as bipartisan and lacking in diversity.

Rusununguko Media also partly owns Fairtalk Communications, one of the television licensees based in Bulawayo, the country's second biggest city.

The latest incursion into television broadcasting by the armed forces reinforces the participation of the army in the political economy of the country. The extent of the role of the defense forces outside the military sphere has always been a matter of much public concern.

According to the Ministry of Defense, the defense forces are constitutionally mandated to defend the country's independence, sovereignty, territorial integrity and national interests, create common regional security architecture, maintain international peace and stability, and give military assistance in times of need.

Until a few years ago, Operation Sovereign Legitimacy (Osleg) Private Limited, a joint-venture company formed in 1999 between the ZDF and the Joseph Kabila-led Democratic Republic of Congo (DRC) government, and arms and ammunition manufacturer Zimbabwe Defense Industries (ZDI) were the two companies synonymous with Zimbabwe's defense forces.

Osleg was established to exploit timber and minerals in the DRC in exchange for Zimbabwe's military support in that country's civil war in 1998.

But the discovery of diamonds in 2006 in Chiadzwa's Marange area, just outside the city of Mutare, bred more companies, not only for the ZDF but also for other security forces – the Zimbabwe Republic Police and secret service agency, the Central Intelligence Organization (CIO).

Investigations by Global Witness, a United Kingdom-based international non-governmental organization, revealed that the CIO covertly controlled a stake in Kusena Diamonds, a company publicly owned by the Zimbabwe Mining Development Corporation (ZMDC). The military, through the ZDI, similarly possessed shareholding in Chinese companies Anjin Investments and Jinan Mining that mined diamonds in Marange, and the covert operations offered off-budget finance for the security forces. Anjin was owned by the Chinese army, the ZMDC (10%) and the ZDI (40%).

The army has continued to further its commercial interests beyond diamond mining. In 2014, the ZDI and ZMDC formed Great Dyke Investments through Pen East Pvt Limited, a joint venture with a Russian consortium comprising VI Holdings, Rostec and

Vnesheconombank, to mine platinum group metals in Darwendale. But Zimbabwean President Emmerson Mnangagwa last year said that the defense forces had sold their stake in the $4 billion platinum group metals venture to an undisclosed local private investor.

## Reasons for military business

Another Zimbabwe Defense Forces company, Qualisave Mineral Resources, operates a joint-venture firm, the Zimbabwe ZhongXin Electric Energy, with Yuxia ZhongXin Coking Company of China, which is building a 50MW coal-fired power plant in Hwange.

In another incident that demonstrates the armed forces' predatory exploits, the Supreme Court last month reversed a high court ruling that had allowed army company Rusununguko Nkululeko and its partner, Falcon Resources, a company controlled by two Pakistan ex-military officers, to seize and exploit RioZim's chrome mining concessions in Darwendale.

Defense industries are common the world over. A 2003 book edited by Jörn Brömmelhörster and Wolf-Christian Paes, *The Military as an Economic Actor: Soldiers in Business*, revealed that while the reasons for the emergence of military business differ from country to country, there are four common factors where they exist: the armed forces have access to material and human resources that are less accessible to civilians; they often turn to private enterprise to make up for shortfalls in defense budgets; weak states and poor civilian control of the armed forces create an added incentive for military elites to undertake commercial enterprises; and to create self-sufficiency for insurgent military forces.

In Zimbabwe, more than engaging in economic activities, the military and other security forces have long been known to play a key role in politics, even though it goes against the Constitution.

In November 2017, the armed forces deposed president Robert Mugabe through a coup. Soon after the coup, incumbent Mnangagwa, whom the army anointed to take over from Mugabe, then appointed Constantino Chiwenga, the former army general who masterminded the coup, as his vice-president. Retired major general Sibusiso Moyo, the coup announcer, was named as the minister of foreign affairs, and airforce of Zimbabwe commander Perrance Shiri got the agriculture minister role.

The military was also involved in the campaign of violence and repression that returned Mugabe to power in the 2008 runoff elections, after the Movement for Democratic Change's Morgan Tsvangirai was widely believed to have won the election.

## Soldiers in office and the electoral commission

Over the years, serving and retired military officers have found employment and continue to be employed by state enterprises as chief executive officers, directors and workers, including in strategic organizations such as the country's electoral body, the Zimbabwe Electoral Commission (ZEC). In one such example, the ZEC, whose allegiance to Zanu-PF has been unambiguous, appointed Utoile Silaigwana, a former soldier, as its chief elections officer in 2019. The militarization of the ZEC was confirmed by its chairperson, Priscilla Chigumba, who told Parliament in 2018 that over 15% of ZEC officers were former military officers.

The justification for the absorption of army officers into state bodies is that military officers possess the temperament essential for the effective administration of state institutions, which is a fallacy.

The militarization of the state bodies has continued unabated. In August, Mnangagwa appointed Chiwenga to double as the health minister, while Jasper Chimedza, an air force commodore, became the health permanent secretary. The government went a step further and made it mandatory for junior doctors to join the army as part of their housemanship. It's a move that observers argue is meant to stop young doctors from demanding better wages and better working conditions because the military is not allowed to strike.

Thabani Moyo, the national director of the Media Institute of Southern Africa Zimbabwe, said by getting into broadcasting, the armed forces have shown that they do not want to be left out of getting a piece of the pie in strategic sectors of the economy.

He said that their role was to defend the country's sovereignty from aggression. "That mandate is best served when the army gets its support financially from the national budget – that way it's more accountable," he added. "What you then see as the omnipresence in business and politics in our social spheres shows that the army has gone beyond its normative role, and it is redefining its role in terms of its muscle from that of defending the country to being a player in politics and the national economy."

## The army's role in Zimbabwe

Moyo said the dabbling of the military in politics and civilian activities was unique because it has been endorsed by the Southern African Development Community and the broader league of nations.

Political analyst and constitutional expert Lovemore Madhuku said: "There is no express prohibition of [military involvement in business] in the Constitution. What the Constitution prohibits is the involvement of the army people in partisan political party activities or executing part of the executive."

University of Zimbabwe political science lecturer Eldred Masunungure said the defense forces were by nature a political institution, but in Zimbabwe, partisan politics is explicitly and unambiguously prescribed for the security forces.

"I'm aware of views that Zimbabwe is a party state, meaning that it is ruled by a ruling party that is symbiotically linked to the state but in that state there is the military that looms very large in the state apparatus," Masunungure said. "So I would say constitutionally partisan politics is a no-go area for the military, though we do know that our defenses are involved, to some extent even actively, especially towards and during elections.

*Article first published in New Frame.*



## Zimbabwe

🏷   COVID-19 in Zimbabwe     Doctors' strike in Zimbabwe

Operation Sovereign Legitimacy (Osleg)     Zimbabwe Defense Forces (ZDF)

*RELATED STORIES*

8/10/23, 12:54 PM
The Zimbabwean army expands its influence | Peoples Dispatch
Case 1:22-cv-00058-CRC Document 45-27 Filed 08/10/23 Page 7 of 10



Systemic corruption, mismanagement worsen Zimbabwe's economic crisis



Zimbabwe's nurses wrest concessions from government



Two-weeks off after every week of work for nurses in Zimbabwe

*RECENT ARTICLES*



Ecuadorian presidential candidate Fernando Villavicencio assassinated following campaign rally



Gustavo Petro's first year: Social and environmental justice and regional integration

Niger accuses France of destabilization. Peoples' movements urge against imperialist intervention



## SUBSCRIBE TO OUR NEWSLETTER

| Email Address | GO |

    

All text content published on peoplesdispatch.org is the property of Peoples Dispatch and is under a
Creative Commons Attribution-ShareAlike 4.0 (CC BY-SA) license.
For license to republish any audio, video or image content, please get in touch with the Peoples Dispatch
Team.

# Exhibit AA



Note: This proclamation was released by the Office of the Press Secretary on July 25, and it will be published in the *Federal Register* on July 29.

### Statement on Signing an Executive Order Blocking Property of Additional Persons Undermining Democratic Processes or Institutions in Zimbabwe

*July 25, 2008*

Today I have signed a new Executive order that expands our sanctions against the illegitimate Government of Zimbabwe. The new Executive order significantly enhances our ability to designate individuals in and entities connected to the Mugabe regime. Under the new Executive order, the Treasury Department will today designate several of these Government-controlled entities.

This action is a direct result of the Mugabe regime's continued politically-motivated violence, disregarding calls from the Southern African Development Community, the African Union, and the United Nations to halt the attacks. The regime has also continued its ban against NGO activities that would provide assistance to the suffering and vulnerable people of Zimbabwe. No regime should ignore the will of its own people and calls from the international community without consequences.

Should ongoing talks in South Africa between Mugabe's regime and the Movement of Democratic Change result in a new government that reflects the will of the Zimbabwean people, the United States stands ready to provide a substantial assistance package, development aid, and normalization with international financial institutions.

In the meantime, I am reaffirming my commitment to support the suffering people of Zimbabwe, authorizing the use of up to $2.5 million from the U.S. Emergency Refugee and Migration Assistance Fund to assist Zimbabwean refugees and asylum seekers who have been displaced due to the ongoing violence in their country. We will also continue our efforts to provide food and health assistance as part of our commitment to help

the people of Zimbabwe in their time of greatest need.

Note: The statement referred to President Robert Mugabe of Zimbabwe; and Executive Order 13469.

### Executive Order 13469—Blocking Property of Additional Persons Undermining Democratic Processes or Institutions in Zimbabwe

*July 25, 2008*

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), and section 301 of title 3, United States Code,

I, **George W. Bush**, President of the United States of America, find that the continued actions and policies of the Government of Zimbabwe and other persons to undermine Zimbabwe's democratic processes or institutions, manifested most recently in the fundamentally undemocratic election held on June 27, 2008, to commit acts of violence and other human rights abuses against political opponents, and to engage in public corruption, including by misusing public authority, constitute an unusual and extraordinary threat to the foreign policy of the United States, and to deal with that threat, hereby expand the scope of the national emergency declared in Executive Order 13288 of March 6, 2003, and relied upon for additional steps taken in Executive Order 13391 of November 22, 2005, and hereby order:

**Section 1.** (a) Except to the extent provided by statutes, or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the date of this order, all property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of United States persons, including

their overseas branches, of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

Any person determined by the Secretary of the Treasury, after consultation with the Secretary of State:

(i) to be a senior official of the Government of Zimbabwe;

(ii) to be owned or controlled by, directly or indirectly, the Government of Zimbabwe or an official or officials of the Government of Zimbabwe;

(iii) to have engaged in actions or policies to undermine Zimbabwe's democratic processes or institutions;

(iv) to be responsible for, or to have participated in, human rights abuses related to political repression in Zimbabwe;

(v) to be engaged in, or to have engaged in, activities facilitating public corruption by senior officials of the Government of Zimbabwe;

(vi) to be a spouse or dependent child of any person whose property and interests in property are blocked pursuant to Executive Order 13288, Executive Order 13391, or this order;

(vii) to have materially assisted, sponsored, or provided financial, material, logistical, or technical support for, or goods or services in support of, the Government of Zimbabwe, any senior official of the Government of Zimbabwe, or any person whose property and interests in property are blocked pursuant to Executive Order 13288, Executive Order 13391, or this order; or

(viii) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to Executive Order 13288, Executive Order 13391, or this order.

(b) I hereby determine that the making of donations of the type of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to paragraph (a) of this section would seriously impair my ability to deal with the national emergency

declared in Executive Order 13288, as amended, and I hereby prohibit such donations as provided by paragraph (a) of this section.

(c) The prohibitions of this section include but are not limited to (i) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to Executive Order 13288, Executive Order 13391, or this order, and (ii) the receipt of any contribution or provision of funds, goods, or services from any such person.

(d) The provisions of Executive Orders 13288 and 13391 remain in effect, and this order does not affect any action taken pursuant to those orders.

**Sec. 2.** (a) Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b)Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

**Sec. 3.** For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States; and

(d) the term "Government of Zimbabwe" means the Government of Zimbabwe, its agencies, instrumentalities, and controlled entities.

**Sec. 4.** For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that, because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render these measures ineffectual. I therefore determine that,

for these measures to be effective in addressing the national emergency declared in Executive Order 13288, there need be no prior notice of a listing or determination made pursuant to section 1 of this order.

**Sec. 5.** The Secretary of the Treasury, after consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government consistent with applicable law. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

**Sec. 6.** The Secretary of the Treasury, after consultation with the Secretary of State, is hereby authorized to submit the recurring and final reports to the Congress on the national emergency declared in Executive Order 13288, as amended, and 5 expanded in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703).

**Sec. 7.** This order is not intended to, and does not create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

**George W. Bush**

The White House,
July 25, 2008.

[Filed with the Office of the Federal Register, 8:45 a.m., July 28, 2008]

Note: This Executive order will be published in the *Federal Register* on July 29.

### Message to the Congress on Blocking Property of Additional Persons Undermining Democratic Processes or Institutions in Zimbabwe

*July 25, 2008*

*To the Congress of the United States:*

Pursuant to the International Emergency Economic Powers Act, as amended (50 U.S.C. 1701 *et seq.*) (IEEPA), I hereby report that I have issued an Executive Order (the "order") that expands the scope of the national emergency declared in Executive Order 13288 of March 6, 2003, which was relied upon for additional steps taken in Executive Order 13391 of November 22, 2005, and takes additional steps with respect to that national emergency.

In Executive Order 13288, I found that the actions and policies of certain members of the Government of Zimbabwe and other persons to undermine Zimbabwe's democratic processes or institutions constituted an unusual and extraordinary threat to the foreign policy of the United States and declared a national emergency to deal with that threat. Executive Order 13288 blocks the property and interests in property of the persons listed in its Annex and permits the designation of any person or entity owned or controlled by, or acting or purporting to act directly or indirectly for or on behalf of, any person listed in that Annex.

Executive Order 13391 took additional steps to address the national emergency declared in Executive Order 13288 and amended the provisions of that earlier order. Executive Order 13391 blocks the property of the persons and entities listed in its Annex and permits the designation of any person or entity determined: to have engaged in actions or policies to undermine Zimbabwe's democratic processes or institutions; to have materially assisted, sponsored, or provided financial, material, or technological support for; or goods or services in support of, such actions or policies or any persons whose property and interests in property are blocked pursuant to Executive Order 13288, as amended; to be or have been an immediate family member of any person whose property and interests in property are blocked pursuant to Executive Order 13288, as amended;

# Exhibit BB

U.S. DEPARTMENT OF THE TREASURY

# Treasury Designates Zimbabwean Parastatals and Companies Supporting the Mugabe Regime

July 25, 2008

*(Archived Content)*

HP-1097

**Washington, DC--**The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) today designated seventeen entities, including several Zimbabwean parastatals, and one individual whose support for Robert Mugabe's regime contributes to the undermining of democratic processes and institutions in Zimbabwe.

In light of the continued intransigence of the brutal Mugabe regime, the U.S. is imposing further sanctions against this regime and its supporters, said OFAC Director Adam J. Szubin. These actions send a clear warning to those who would protect Mugabe and his assets at the expense of the Zimbabwean people.

Today's designations include a number of Zimbabwean parastatals and entities that are owned or controlled by the Government of Zimbabwe. Robert Mugabe, his senior officials, and regime cronies have used these entities to illegally siphon revenue and foreign exchange from the Zimbabwean people. Treasury's designations today include the Minerals Marketing Corporation of Zimbabwe (a.k.a MMCZ), the sole marketing and export agent for all minerals, except gold and silver, mined in Zimbabwe; the Zimbabwe Mining Development Corporation (a.k.a. ZMDC), involved in investment in the mining industry in Zimbabwe, and in planning, coordinating and implementing mining projects on behalf of the Government of Zimbabwe; the Zimbabwe Iron and Steel Company (a.k.a. ZISCO), Zimbabwe's largest steel works; the Agricultural Development Bank of Zimbabwe (a.k.a Agribank), a commercial bank owned by the Government of Zimbabwe; the Industrial Development Corporation of Zimbabwe Ltd, a state-owned enterprise that owns a large number of companies operating in the industrial sector, including the chemical, clothing and textiles, mineral processing, and motor and transport sectors; the Infrastructure Development Bank of Zimbabwe, a financing entity; Zimre Holdings Limited, an investment and reinsurance entity; ZB Financial Holdings Limited, a holding company for a group of companies involved in commercial and merchant banking; and 4 major subsidiaries of ZB Financial Holdings Limited: ZB Bank Limited (a.k.a Zimbank), ZB Holdings Limited, Intermarket Holdings Limited, and Scotfin Limited.

Also designated today are Thamer Bin Saeed Ahmed Al-Shanfari, an Omani national with close ties to Mugabe and his top officials, as well as his company, Oryx Natural Resources, which Al-Shanfari uses to enable Mugabe and his senior officials to maintain access to, and derive personal benefit from, various mining ventures in the Democratic Republic of the Congo (the DRC). OFAC has also designated OSLEG (a.k.a. Operation Sovereign Legitimacy), an enterprise that is a commercial arm of the Zimbabwean army representing its interests in the DRC and elsewhere, and which is controlled by various senior officials in Zimbabwe. The activities of OSLEG and Al-Shanfari's Oryx Natural Resources, benefiting Robert Mugabe and his regime's senior officials, have been widely documented by various non-governmental and human rights organizations.

Finally, OFAC is designating the following companies that are owned or controlled by a number of Specially Designated Nationals (SDNs): Divine Homes, a property company whose Chairman is SDN David Chapfika, Zimbabwe's Deputy Minister of Agriculture; COMOIL (Pvt) Ltd., a petroleum importing company, owned by SDN Saviour Kasukuwere, Zimbabwe's Deputy Minister of Youth Development and Employment Creation; and Famba Safaris, a registered Zimbabwean safari operator, whose Director and major shareholder is SDN Webster Shamu, Mugabe's Minister of State for Policy Implementation.

As a result of Treasury's action, any assets of the individual and entities designated today that are within U.S. jurisdiction must be frozen. Additionally, U.S. persons are prohibited from conducting financial or commercial transactions with the individual or entities.

**-30-**

**REPORTS**

- Statement by the President
- Executive Order

# Exhibit CC

U.S. DEPARTMENT OF THE TREASURY

## Treasury Takes Additional Actions in Zimbabwe

December 12, 2022

WASHINGTON — Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated four Zimbabwean individuals and two Zimbabwean entities, and removed seventeen Zimbabweans from the Specially Designated Nationals and Blocked Persons List (SDN List).

The Zimbabwe sanctions program targets human rights abusers and those who undermine democratic processes or facilitate corruption. U.S. sanctions do not target the Zimbabwean people, the country of Zimbabwe, or Zimbabwe's banking sector.

"We urge the Zimbabwean government to take meaningful steps towards creating a peaceful, prosperous, and politically vibrant Zimbabwe, and to address the root causes of many of Zimbabwe's ills: corrupt elites and their abuse of the country's institutions for their personal benefit," said Under Secretary of the Treasury Brian E. Nelson. "The goal of sanctions is behavior change. Today's actions demonstrate our support for a transparent and prosperous Zimbabwe."

Today, OFAC designated **Sandra Mpunga, Nqobile Magwizi, Fossil Agro, Fossil Contracting**, and **Obey Chimuka**, for their ties to the previously designated individual Kudakwashe Tagwirei and his company, Sakunda Holdings. OFAC designated Tagwirei in August 2020 for having materially assisted, sponsored, or provided financial, material, logistical, or technical support for, or goods or services in support of, the Government of Zimbabwe; and Sakunda for being owned or controlled by Tagwirei. Tagwirei has utilized his relationships with high-level Zimbabwean officials to gain state contracts and receive favored access to hard currency, including U.S. dollars. In turn, Tagwirei has provided high priced items, such as expensive cars, to senior-level Zimbabwean government officials. Since former Zimbabwe President Robert Mugabe's 2017 departure, Tagwirei used a combination of opaque business dealings and his ongoing relationship with President Mnangagwa to grow his business empire dramatically and rake in millions of U.S. dollars.

OFAC is also designating **Emmerson Mnangagwa, Jr.**, the son of President Mnangagwa of Zimbabwe.

Sandra Mpunga is Tagwirei's wife. Together they created Sakunda, which is a neologism of Sandra and Tagwirei's abbreviated first name, "Kuda". Mpunga has served as the executive director of Sakunda and together with Tagwirei is the sole beneficial owner of the company. Mpunga was designated pursuant to E.O. 13469 for being the spouse of Tagwirei.

Magwizi has served as the chief marketing and public relations officer of Sakunda as well as Mpunga's executive assistant. In the spring of 2022, Magwizi was serving as a project coordinator for Sakunda. Nqobile Magwizi was designated pursuant to E.O. 13469 for acting for or behalf of Sakunda.

Fossil Agro has supplied the Government of Zimbabwe's Command Agriculture Program, a state farm subsidy largely financed by Sakunda which has failed to account for billions of dollars in disbursements. The Government of Zimbabwe awarded Fossil Contracting nearly $40 million in contracts in 2021. Fossil Agro and Fossil Contracting were designated pursuant to E.O. 13469 for providing material, logistical, or technical support to the Government of Zimbabwe.

Chimuka owns Fossil Contracting and is also its director and is the CEO and director of Fossil Agro. Chimuka is a longtime business partner of Tagwirei and is considered part of Tagwirei's inner circle. Chimuka also sits on the board and serves as director of several of Tagwirei's companies. Obey Chimuka was designated pursuant to E.O. 13469 for acting for or on behalf of Fossil Agro, Fossil Contracting, and Tagwirei.

Emmerson Mnangagwa, Jr. is President Mnangagwa's son and has been in charge of the president's business interests related to Tagwirei. Mnangagwa, Jr. was designated pursuant to E.O. 13391 for being an immediate family member of the Zimbabwean president and OFAC-blocked Emmerson Mnangagwa.

Additionally, OFAC has determined that the seventeen individuals being removed from the SDN list no longer undermine Zimbabwe's democratic processes and institutions or meet any of the other criteria for designation under OFAC's Zimbabwe sanctions program. Each year, the U.S. Government removes hundreds of individuals and entities from the SDN List. Each removal is based on a thorough review in order to maintain the integrity of U.S. sanctions.

## SANCTIONS IMPLICATIONS

As a result of today's designations, all property and interests in property of the designated persons located in the United States or in the possession or control of U.S. persons are blocked and must be reported to OFAC. In addition, any entities that are owned, directly or indirectly, 50 percent or more in the aggregate by one or more of such persons are also blocked. All transactions by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons are prohibited, unless authorized by a general or specific license issued by OFAC, or otherwise exempt. These prohibitions include the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any blocked person and the receipt of any contribution or provision of funds, goods, or services from any such person.

The power and integrity of OFAC sanctions derive not only from the ability to designate and add persons to the SDN List, but also the willingness to remove persons from the SDN List consistent with the law. The ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior. For information concerning the process for seeking removal from an OFAC list, including the SDN List, please refer to OFAC's Frequently Asked Question 897. For detailed information on the process to submit a request for removal from an OFAC sanctions list.

View identifying information on the individuals and entities designated and delisted today.

###

# Exhibit DD

U.S. DEPARTMENT OF THE TREASURY

# Remarks of Acting Assistant Secretary Andy Baukol, As Prepared for Delivery, Senate Foreign Relations Subcommittee on African Affairs: "Exploring U.S. Policy Options during Zimbabwe's Transition"

September 30, 2009

*(Archived Content)*

TG-301

Chairman Feingold, Senator Isakson, and distinguished members of the Committee, thank you for inviting me to testify at this important hearing on the current situation in Zimbabwe. Thank you also for asking my colleagues from the Department of State and USAID to join me at the witness table.  I think we all agree that Zimbabwe's economy has taken a turn for the better over the last seven months and that progress could be fleeting if it is not supported by a political solution that restores democracy, rule of law, and strong institutions.

People who follow Zimbabwe closely are probably familiar with the recent economic trends, but it is worth recapping the economic mismanagement that devastated the country and contributed to the profound fragility of the current situation.   When Robert Mugabe took office as leader of Zimbabwe after a long civil war, Zimbabwe had all the ingredients necessary for prosperity.   With a per capita GDP of around $1,400 [1], Zimbabwe was blessed with ample mineral resources, decent infrastructure, and productive farms that made it a breadbasket to Southern Africa.    In 1980, Tanzania's then-President Nyerere told Mugabe he had inherited the jewel of Africa.   For almost two decades, Mugabe's government managed to maintain economic growth and roughly stable per capita GDP, but beginning in the late 1990s, the wheels began to come off.   Thanks to a set of disastrous economic policies, headlined by a chaotic land redistribution scheme, five decades of economic progress were erased in five years, with per capita GDP in 2005 roughly equaling that in 1953, according to an analysis by the Center for Global Development.   The combination of undermining the rule of law, instituting oppressive economic decrees, and suppressing press freedoms and political opposition led one observer in 2003 to describe Zimbabwe as a case study in How to Kill a Country. [2]

The economic crisis further deepened as bad policies and the government's paranoid reaction to international isolation due to gross violations of human rights fed the spiral of decline.

- The government revalued the currency in 2006 but quickly began resorting to the printing press to paper over yawning budget deficits.  Inflation hit 90 sextillion percent in November 2008.

- Despite its former status as a breadbasket for the region – one that sourced UN-sponsored food aid to other countries in Africa [3] – Zimbabwe's agricultural output declined to the point that about half of the population was in need of food aid in 2008.

- Neglect of the medical sector and water infrastructure helped lead to a cholera outbreak that killed 4,276, according to the WHO. [4]

- An estimated one-fourth of the population left conditions in Zimbabwe over the last decade; most went to South Africa in search of jobs to support their families.

- The country's reserves plummeted to $5.8 million by the end of 2008, according to the IMF, [5] despite the country's possession of mineral resources such as chromite, coal, platinum, asbestos, copper, nickel, gold, and iron ore.

- Economic activity and GDP plummeted, with the IMF estimating that per capita GDP fell to $188 on a PPP basis in 2008.

In this context, the last seven months have been characterized by relative economic stability as reformist elements of the transitional government began to undo some of the more disastrous economic policies of the previous nine years.  In the weeks before the transitional government became effective and only weeks after introducing a 100 trillion Z-dollar note, the acting finance minister acknowledged the ongoing dollarization of the economy by allowing Zimbabweans to conduct business in other currencies.  The rapid abandonment of the Zimbabwe dollar by the populace – and later steps by the government to do away with the discredited currency – have led to stabilization of prices and some revival of economic activity.   Finance Minister Biti has also introduced other measures to reduce the government's interference in the economy, including eliminating the 7.5 percent foreign exchange surrender requirement, eliminating the 5 percent tax on bank profits, eliminating import duties on capital equipment and raw materials, cutting import duties in half on intermediate products, and stopping quasi-fiscal activities at the Reserve Bank of Zimbabwe (which took the form of directed lending for favored businesses and sectors).   Consumer demand has rebounded modestly, and businesses are also reacting to the new incentives of a stable currency and the removal of many restrictions on economic activity.

Government revenues are beginning to recover, and the Zimbabwean government expects to take in about $1 billion in revenue this year, or about 25 percent of GDP.   This would represent a sharp uptick from an estimated 4.2 percent of GDP in 2008.   The Finance Ministry has slashed government expenditures to more closely match expected revenues, thereby avoiding the accumulation of massive arrears or the printing of money to pay government debts.   Yet the government is facing significant pressures for increased civil service pay and expenditures in basic social services that were neglected in

recent years, especially in health and education.   It is also banking on large amounts of budget support by the donor community, roughly 10 percent of GDP, which has not materialized yet.

While there may be an interest from businesses in resuming production and some room for the agricultural sector to take advantage of the current situation, recovery will not be easy.   The banking sector – traditionally a critical source of funding for business growth – suffers in Zimbabwe from a lack of liquidity.   There are only $700 million in deposits in the country's banking system – not nearly enough to fund the lending needed to restart the economy.   Zimbabwe's banking sector is interested in gaining access to lines of credit from abroad to enable local lending, but the general uncertainty about the investment climate and the lack of a credible central bank make it unlikely that Zimbabwe will be able to access additional credit lines.   Even local branches of international banks are strapped for liquidity, with their parent banks unwilling to take on the risk of funneling more capital into Zimbabwe.   The central bank in Zimbabwe (RBZ) has been an active part of the economic destabilization of the last decade, but it has been neutralized for the time being by dollarization.   Substantial reform of the RBZ is needed to enable it to play a positive role in the economy.   In summary, Zimbabwe remains one of the riskiest locations for investment, and Dunn & Bradstreet recently called it the worst investment location in the world, equal to Afghanistan.

The international financial institutions (IFIs) have taken a cautious approach to engagement in Zimbabwe due to the large arrears by the government – over $1.3 billion – and the lack of a track record on reform. The IMF has begun to lead short-term, targeted technical assistance missions, [6] and the World Bank is administering a multi-donor trust fund to support basic analytical work on the Zimbabwean economy and to assess its needs.   Further actions will depend on a track record of reform as well as a plan to address Zimbabwe's arrears.

Zimbabwe has around $6 billion in foreign debt, of which $1.3 billion is arrears to multilateral bodies.   It owes the IMF 89.5 million SDRs, or around $140 million.   At the development banks, Zimbabwe has $702.5 million in arrears to the World Bank and $468.8 million in arrears to the African Development Bank as of July 2009.   Clearing Zimbabwe's arrears at the IFIs will depend greatly on whether the IMF and World Bank Boards find Zimbabwe eligible for the Heavily Indebted Poor Countries (HIPC) Initiative.   Zimbabwe has limited domestic resources, and competing expenditure priorities make it unlikely that it could repay arrears – even in part – in the foreseeable future.

I would note that the donor community has been functioning well in the case of Zimbabwe.   The donor community coordinates closely and has adopted a common set of principles for engagement in Zimbabwe.   Donors are united in seeking to support reformers when appropriate and enhance social service delivery in key sectors such as health and education.   They are also working to enhance food production and reduce Zimbabwe's dependence on food aid.   Finally, some donors are working on key

economic governance issues, such as improving the Ministry of Finance's financial management capability.   We are actively looking at what role the U.S. can play in assisting reform-minded Zimbabwean officials in areas of economic governance in order to stabilize the region.   The depressed state of the Zimbabwean economy introduces fragility and risk to the region, as witnessed by recent refugee flows and the spread of the cholera epidemic beyond Zimbabwe's borders.   Sustained improvements in the economy will not come without a full restoration of democracy and law and order.   We are disturbed by new violent farm invasions and other violations of the Global Political Agreement (GPA) that cast doubt on the commitment of the ZANU-PF to true cooperation with the MDC.   The continued presence of Gideon Gono as head of the central bank is one example fueling these doubts.   Mugabe reappointed Gono as head of the RBZ at the beginning of the new government despite Gono's leadership over the monetary policies that led to one of the world's worst cases of hyperinflation.   Gono has also been linked to several corruption scandals and is currently subject to U.S. and EU sanctions.   Finance Minister Biti, the leading force behind recent economic reforms and a member of the MDC, has effectively limited Gono's power by terminating the RBZ's quasi-fiscal activities and has introduced legislation to increase oversight over the RBZ.

We continue to look for signs of sustained commitment to economic reform and believe that it will be important for U.S. agencies to have the ability to respond positively if conditions for assistance are demonstrated.   Broad assistance programs or cash assistance by the U.S. are not appropriate given the tenuous nature of the reform process, but targeted technical assistance that complies with current legal restrictions could help address the capacity constraints that have arisen from years of political repression and brain drain.   Such technical assistance would have to be provided to officials and ministries who have demonstrated the willingness to reform and stabilize the economy and who can show a continued commitment to these efforts.   Such assistance could also be deployed – or withdrawn – quickly, according to circumstances on the ground.   Assistance to Zimbabwe is also affected by other legislation, such as the Zimbabwe Democracy and Economic Recovery Act (ZDERA) and the recent designation of Zimbabwe as non-compliant with minimum standards under the Trafficking Victims Protection Act.

As you know, the United States does not have broad economic sanctions on the country of Zimbabwe.   In accordance with Executive Order (E.O.) 13469 of July 25, 2008, E.O. 13391 of November 22, 2005, and E.O. 13288 of March 6, 2003; the Treasury Department has maintained targeted economic sanctions against the Mugabe regime and has designated dozens of senior regime officials, supporters, and state-owned or - controlled companies.   In cases where the behavior of listed individuals or institutions changes, the U.S. government could consider easing sanctions via licensing, delisting or other appropriate measures, if warranted.

In summary, Zimbabwe has arrived at a second crucial crossroads in its modern history.   In light of Robert Mugabe's continued resistance to heed the results of democratic elections, the United States and the rest

of the international community have a right to be skeptical of his actions and withhold full reengagement and development assistance.   However, we should also support people and institutions in Zimbabwe that are pursuing appropriate economic policies and working to bring about a government that reflects the will of Zimbabwe's people.

### 

[1] Michael Clemens and Todd Moss, Costs and Causes of Zimbabwe's Crisis, *CGD Notes*, Center for Global Development, July 2005.

[2] Samantha Power, How to Kill a Country, *The Atlantic Monthly*, December 2003.

[3] Ibid.

[4] World Health Organization, June 9, 2009 update (http://www.who.int/csr/don/2009_06_09/en/index.html).

[5] International Monetary Fund, 2009 Article IV Consultation With Zimbabwe, 6 May 2009, PIN No. 09/53 (http://ww.imf.org)

[6] In May, the IMF's Executive Board approved a request to lift the suspension of technical assistance and allow targeted technical assistance in the areas of tax policy, payments systems, lender-of-last-resort operations and banking supervision, and central banking governance and accounting.

# Exhibit EE

**Home**  >  ...  > Updates to the Zimbabwe Sanctions List

# Updates to the Zimbabwe Sanctions List

**PRESS STATEMENT**

**NED PRICE, DEPARTMENT SPOKESPERSON**

SEPTEMBER 15, 2022

As part of an ongoing review of the sanctions program to ensure it remains focused and relevant, today, the United States is delisting 11 individuals from the Specially Designated Nationals (SDN) List, based on a determination they no longer warrant inclusion on the SDN List.  The 11 individuals being removed from the SDN list are either deceased or have been deemed to no longer undermine Zimbabwe's democratic processes and institutions.

The Zimbabwe sanctions program is a policy-driven program that targets human rights abusers and those who undermine democratic processes or facilitate corruption.  U.S. sanctions do not target the Zimbabwean people, the country of Zimbabwe, or Zimbabwe's banking sector.  Sanctions are not intended to be permanent but to incentivize change, and these delistings reflect that.  Each year, the U.S. government removes hundreds of individuals and entities from the SDN List.  Each removal is based on a thorough review.  Maintaining the integrity of U.S. sanctions is a high priority and is the driving principle behind a rigorous review process that evaluates every request for removal individually on its merits and applies consistent standards to all of them.

The United States is also designating Stephen Mutamba, the Zimbabwe Republic Police's Deputy Commissioner for Administration, pursuant to Executive Order 13469 for his role in undermining Zimbabwe's democratic processes and institutions.  Over the past two years, Mutamba has organized a host of actions that threaten and undermine legitimate political parties and others who oppose the policies

of the Government of Zimbabwe or the ruling Zimbabwe African National Union-Patriotic Front (ZANU-PF) party.  It is vital that the Government of Zimbabwe allow full participation across the political spectrum.

The United States continues to stand with the Zimbabwean people against corruption, human rights abuses, and efforts to undermine democratic processes or institutions.  We will not hesitate to designate those who undermine Zimbabwe's democratic processes and institutions or otherwise fall within the scope of our sanctions program.

For more information on today's action, please see the Department of the Treasury's **press release**.

---

**TAGS**

**Bureau of African Affairs**   **Bureau of Economic and Business Affairs**

**Division for Counter Threat Finance and Sanctions**   **Office of the Spokesperson**   **Sanctions**   **Zimbabwe**

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit FF

An official website of the United States Government Here's how you know

◉ **Live Now:** Secretary Blinken Joint Press Availability with Mexican Foreign Secretary Bárcena Ibarra

○

**Home** >  ...  > Zimbabwe

# 2023 Investment Climate Statements: Zimbabwe

**IN THIS SECTION** /
**EXECUTIVE SUMMARY**

## Executive Summary

Zimbabwe presents a challenging, and yet potentially rewarding, investment climate.  The country's skilled labor, high literacy rate, mineral wealth, agricultural potential, bountiful wildlife, and natural landscapes present commercial opportunities for U.S. firms.  Sectors that currently attract the most investor interest include agriculture (tobacco in particular), mining, energy, and tourism.  Authorities estimate the economy grew by four percent in 2022 while the International Monetary Fund (IMF) estimates Zimbabwe's economy grew by 3.5 percent in 2021.

The Government of Zimbabwe (GOZ) adopted an "open for business" policy in 2018 to encourage more foreign direct investment (FDI).  For example, the GOZ set an ambitious $12 billion target for the mining sector by the end of 2023 and is calling for increased investment in renewable energy.  Despite these pronouncements, the Zimbabwe government has not implemented enough investor-friendly policies to attract robust investment and corruption remains a major concern.  FDI into Zimbabwe remains below regional peers.

Debt also hinders Zimbabwe's economic growth and development.  Zimbabwe owes over $14 billion ($6.3 billion of which is in arrears and penalties) to international financial institutions and bilateral creditors equating to about 66 percent of the country's GDP.  The country's high external debt (public and priv

limits its ability to access official development assistance at concessional rates.  Domestic banks do not offer financing for periods longer than two years, with most financing limited to 180 days or less.

To ease doing business, the government formed the Zimbabwe Investment and Development Agency (ZIDA) in 2020, intended as a one-stop-shop to promote and facilitate both domestic and foreign investment in Zimbabwe.  Zimbabwe's incentives to attract FDI include tax breaks for new investment by foreign and domestic companies and making capital expenditures on new factories, machinery, and improvements fully tax deductible.  The government waives import taxes and surtaxes on capital equipment.  It has made gradual progress in improving the business environment by reducing regulatory costs, but policy inconsistency and weak institutions have continued to frustrate businesses.  Corruption remains rife and there is little protection of property rights, particularly with respect to agricultural land.  Historically, the government has committed to protect property rights but has also expropriated land without compensation.

The government in February 2023 reduced the proportion of foreign exchange that businesses surrender to the Reserve Bank of Zimbabwe (RBZ) at the interbank rate after selling goods and services in foreign currency on the domestic market from 20 percent of the receipts to 15 percent.  It also reduced the proportion that exporters must surrender from 40 percent of foreign currency earnings at the unfavorable interbank rate to 25 percent.

The 2020 Finance Act (No 2) amended the Indigenization Act to remove language designating diamonds and platinum as the only minerals subject to indigenization (requiring majority ownership by indigenous Zimbabweans), ending indigenization requirements in all sectors.  The government has issued statements to reassure investors that no minerals will be subject to indigenization, including diamonds and platinum.

The United States has targeted financial sanctions on 60 individuals and 39 entities from Zimbabwe.  The U.S. Government imposed these sanctions because of the actions and policies of certain members of the Government of Zimbabwe and other persons that undermine democratic institutions or processes in Zimbabwe, violate human rights, or facilitate corruption.  U.S. companies can do business with Zimbabwean individuals and companies not on the specially designated nationals (SDN) list.

*Table 1: Key Metrics and Rankings*

| Measure | Year | Index/Rank | Website Address |
| --- | --- | --- | --- |
| TI Corruption Perceptions Index | 2022 | 157 of 180 | http://www.transparency.org/research/cpi/overview |
| Global Innovation Index | 2022 | 107 of 132 | https://www.globalinnovationindex.org/analysis-indicator |
| U.S. FDI in partner country ($M USD, historical stock positions) | 2021 | (D) | https://apps.bea.gov/international/factsheet |
| World Bank GNI per capita | 2021 | USD 1,530 | http://data.worldbank.org/indicator/NY.GNP.PCAP.CD |

(D) – Information suppressed to avoid disclosure of data of individual companies

# 1. Openness To, and Restrictions Upon, Foreign Investment

**POLICIES TOWARDS FOREIGN DIRECT INVESTMENT**

After reaching $745 million in 2018, Zimbabwe witnessed a significant decline in foreign direct investment (FDI).  According to data from the United Nations Conference on Trade and Development (UNCTAD), FDI inflows into Zimbabwe fell from $280 million in 2019 to $194 million in 2020 and further to $166 million in 2021.

To attract FDI and improve the country's competitiveness, the government has encouraged public-private partnerships and emphasized the need to improve the investment climate by lowering the cost of doing

business as well as restoring the rule of law and sanctity of contracts.  Implementation, however, has been limited.

The government amended in 2020 the Indigenization Act by removing diamonds and platinum from minerals subject to indigenization (requiring majority ownership by indigenous Zimbabweans), although the new legislation appeared to grant broad discretion to the GOZ to designate minerals as subject to indigenization in the future.  Subsequently, the GOZ reassured investors through a joint statement of the ministers for finance, mines and mining development, and industry and commerce in February 2021 that no minerals will be subject to indigenization, including diamonds and platinum.  To encourage investments in value addition facilities, Zimbabwe issued the Base Minerals Export Control (Unbeneficiated Base Mineral Ores) Order in January 2023 to limit the export of raw critical minerals such as lithium ore, nickel, and manganese.  There are, however, smaller sectors "reserved" for Zimbabweans (see below).

To improve the ease of doing business, the government enacted legislation that led to the formation of the Zimbabwe Investment and Development Agency (ZIDA) in 2020.  ZIDA replaced the Zimbabwe Investment Authority and serves as a one-stop-shop center in promoting and facilitating both domestic and foreign investment in Zimbabwe.

While the government has committed to prioritizing investment retention, there are still no mechanisms or formal structures to maintain ongoing dialogue with investors.

## LIMITS ON FOREIGN CONTROL AND RIGHT TO PRIVATE OWNERSHIP AND ESTABLISHMENT

Foreign and domestic private entities have a right to establish and own business enterprises and engage in all forms of remunerative activity, but foreign ownership of businesses in certain reserved sectors is limited.  The GOZ did not make any significant changes in the past year.

Foreign investors are free to invest in most sectors without any restrictions as the government aims to bring in new technologies, value-add manufacturing, and generate employment.  According to the ZIDA Act, "foreign investors may invest in, and reinvest profits of such investments into, any and all sectors of the economy of Zimbabwe, and in the same form and under the same conditions as defined for Zimbabweans under the applicable laws and regulations of Zimbabwe."  The government, however, reserves certain sectors for Zimbabweans such as passenger buses, taxis and car hire services, employment agencies, grain milling, bakeries, advertising, dairy processing, and estate agencies.

Zimbabwe screens FDI through the ZIDA in liaison with relevant line ministries to confirm compliance with the country's laws.

According to the country's laws, U.S. investors are not especially disadvantaged or singled out by any of the ownership or control mechanisms relative to other foreign investors.  In its investment guidelines, the government states its commitment to non-discrimination between foreign and domestic investors and amongst foreign investors.

## OTHER INVESTMENT POLICY REVIEWS

The government has not undergone any third-party investment reviews (IPRs) over the past four years.  In a 2019 review, Global Witness recommended reform of Zimbabwe's diamond sector through publication of all diamond mining contracts, shareholdings, and their ultimate beneficial owners; production of timely annual reports, including audited accounts detailing revenues raised and all payments to the Treasury and all transfers to private shareholders. **https://www.globalwitness.org/en/blog/time-zimbabwes-opaque-diamond-sector/**

The Zimbabwe Environmental Lawyers Association (ZELA) published in October 2021 and March 2022 reports focused on the investment climate around the extractives sector.  Though the reports view the extractives sector through the lens of People's Republic of China (PRC) engagement, the information on laws, regulations, and gaps in legislation and enforcement remain relevant for all interested investors.

The Handbook of Zimbabwe-China Economic Relations: **http://www.zela.org/download/the-handbook-of-zimbabwe-china-economic-relations/**

Zimbabwe Open for Business: Progress Check on Implementation:
**http://www.zela.org/download/zimbabwe-is-open-for-business-a-progress-check-on-implementation/**

## BUSINESS FACILITATION

Policy inconsistency, administrative delays and costs, and corruption hinder business facilitation.  Zimbabwe does not have a fully online business registration process, though one can begin the process and conduct a name search online via the ZimConnect web portal.  The government created the Zimbabwe Investment Development Agency (ZIDA, **https://www.zidainvest.com/**) which replaced the Zimbabwe Investment Authority (ZIA), the Special Economic Zones Authority, and the Joint Venture Unit to oversee the

licensing and implementation of investment projects in the country.  The Agency has established a one-stop investment services center (OSISC) which houses several agencies that play a role in the licensing, establishment, and implementation of investment projects including the Zimbabwe Revenue Authority (ZIMRA), Environmental Management Agency (EMA), Reserve Bank of Zimbabwe (RBZ), National Social Security Authority (NSSA), Zimbabwe Energy Regulatory Authority (ZERA), Zimbabwe Tourism Authority, the State Enterprises Restructuring Agency, and specialized investment units within relevant line ministries. Although the business registration process currently takes 27 days, investors can shorten the period to two days if they go through ZIDA.

**OUTWARD INVESTMENT**

Zimbabwe does not promote or incentivize outward investment due to the country's tight foreign exchange reserves.  Although the government does not restrict domestic investors from investing abroad, any outward investment requires approval by the RBZ's Exchange Control Department.  Firms interested in outward investment would face difficulty accessing the limited foreign currency at the more favorable official exchange rate.

## 2. Bilateral Investment and Taxation Treaties

Zimbabwe has negotiated investment treaties with 32 countries, but it has ratified only 17 including those with the Netherlands, Kuwait, Denmark, China, Germany, Russia, South Africa, and Switzerland. Despite these agreements, the government has failed to protect investments undertaken by nationals from these countries, particularly regarding land. In 2009, for example, an army officer seized a farm belonging to a German national, but the government did not intervene, despite its assurance that Zimbabwe would honor all obligations and commitments to international investors. Some claimants protected by investment treaties have pursued arbitration through the International Centre for Settlement of Investment Disputes. For example, in 2015, a Swiss-German family won a landmark US$196 million judgment at the International Center for Settlement of Investment Disputes in compensation for expropriated land but has received only partial payment.

Zimbabwe is a member of the Southern African Development Community (SADC) and the Common Market for Eastern and Southern Africa (COMESA), and it is a signatory to the SADC and COMESA trade protocols establishing free trade areas (FTA) with the aim of growing into a customs union. Zimbabwe is also a member of the African Continental Free Trade Area (AfCFTA) which came into force on January 1, 2021, with the aim of creating a single continental market and paving the way for the establishment of a customs union.

The United States does not have a bilateral taxation and/or investment treaty with Zimbabwe. The United States has a Trade and Investment Framework Agreement (TIFA) with the Common Market for Eastern and Southern Africa (COMESA), of which Zimbabwe is a member. This TIFA provides a mechanism to discuss disputes, although the protection offered by the TIFA is much more limited than protection typically provided by a bilateral investment treaty.

# 3. Legal Regime

## TRANSPARENCY OF THE REGULATORY SYSTEM

The government officially encourages competition within the private sector and seeks to improve the ease of doing business, but the bureaucracy within regulatory agencies lacks transparency and corruption is prevalent. Investors complain of policy inconsistency and unpredictability. Moreover, Zimbabwe does not have a centralized online location where key regulatory actions are published, and investors must contact ZIDA.

The government at times uses statutory instruments and temporary presidential powers to alter legislation impacting economic policy. These powers have limited duration – the government must pass legislation within six months for presidential powers to become permanent. These measures, which can appear without warning, often surprise businesses and lack implementation details, leading firms to delay major business decisions until gaining clarity. For example, the government unexpectedly prohibited the use of foreign currencies for domestic transactions in June 2019 but lifted the ban in March 2020, amid the COVID-19 pandemic and growing economic pressure. The government has made changes to the share of foreign currency earnings exporters must surrender to the central bank without warning or stakeholder consultations. The standard legislative process, on the other hand, provides opportunities for public review and comment before the final passage of new laws. The development of regulations follows a standard process and includes a period for public review and comment. National regulations are the most relevant for foreign businesses.

The government, through the environmental management agency (EMA), promotes mandatory companies' environmental, social, and governance (ESG) disclosure, especially in mining projects to ensure the sustainable management of natural resources and protection of the environment. EMA claims its processes, activities, outputs, and impacts are publicly available on its website and subject to public scrutiny. In practice, ESG disclosures are not always thoroughly completed for mining sector projects.

Zimbabwe adopted the International Financial Reporting Standards in 1993. Public companies must prepare financial statements at the end of the financial year and lodge them with the Business Register so they become accessible to the public.

According to the Department of State's 2022 Fiscal Transparency Report, there is a notable lack of transparency regarding debts of state-owned enterprises and the extraction of natural resources. Information on public finances is generally unreliable, as actual revenues and expenditures have deviated significantly from the enacted budgets. Information on some debt obligations is publicly available, but not information on contingent debt.

## INTERNATIONAL REGULATORY CONSIDERATIONS

Zimbabwe is a member of the Southern African Development Community (SADC) and the Common Market for Eastern and Southern Africa (COMESA), and it is a signatory to the SADC and COMESA trade protocols establishing free trade areas (FTA) with the aim of growing into a customs union. Zimbabwe is also a member of the African Continental Free Trade Area (AfCFTA) which came into force on January 1, 2021, with the aim of creating a single continental market and paving the way for the establishment of a customs union. Although the country is also a member of the World Trade Organization (WTO), it normally notifies only SADC and COMESA of measures it intends to implement.

## LEGAL SYSTEM AND JUDICIAL INDEPENDENCE

According to the country's Roman-Dutch law and Constitution, Zimbabwe has an independent judicial system whose decisions are binding on the other branches of government. The country has written commercial law and, in 2019, established four commercial courts at the magistrate level. The government also trained 55 magistrates in the same year. Administration of justice in commercial cases that do not touch on political interests is still generally impartial, but for politicized cases government interference in the court system has hindered the delivery of impartial justice. A lack of judicial independence, including at the highest levels, remains a concern. Regulations or enforcement actions are appealable and are adjudicated in the national court system.

## LAWS AND REGULATIONS ON FOREIGN DIRECT INVESTMENT

Foreign investors are free to invest in most sectors, including mining, without any restrictions. A 2020 government amendment to the Indigenization and Economic Empowerment Act removed the requirement for majority indigenous Zimbabwean ownership to attain its goal to bring in new technologies, generate

employment, and promote value-added manufacturing. In certain sectors, such as primary agriculture, transport services, and retail and wholesale trade and distribution, foreign investors may not own more than 35 percent equity.

The ZIDA ( **https://www.zidainvest.com/** ), which now acts as a one-stop shop for investors, promotes and facilitates both local and foreign direct investment.

## COMPETITION AND ANTITRUST LAWS

The government officially encourages competition within the private sector according to the Zimbabwe Competition Act. The Act provided for the formation of the Tariff and Competition Commission charged with investigating restrictive practices, mergers, and monopolies in the country. The Competition and Tariff Commission (CTC) is an autonomous statutory body established in 2001 with the dual mandate of implementing and enforcing Zimbabwe's competition policy and law and executing the country's trade tariffs policy. The Act provides for transparent norms and procedures. Although the decision of the Commission is final, any aggrieved party can appeal the decision to the Administrative Court.

## EXPROPRIATION AND COMPENSATION

In 2000, the government began to seize privately-owned agricultural land and transfer ownership to government officials and other regime supporters. In April 2000, the government amended the constitution to grant the state's right to assert eminent domain, with compensation limited to the improvements made on the land. In September 2005, the government amended the constitution again to transfer ownership of all expropriated land to the government. Since the passage of this amendment, top government officials, supporters of the ruling Zimbabwe African National Union – Patriotic Front (ZANU-PF) party, and members of the security forces have continued to disrupt production on commercial farms, including those owned by foreign investors, those owned by black indigenous farmers, and those covered by bilateral investment agreements. Similarly, government officials have sought to impose politically-connected individuals as indigenous partners on privately and foreign-owned wildlife conservancies.

In 2006, the government began to issue 99-year leases for land seized from commercial farmers, retaining the right to withdraw the lease at any time for any reason. These leases, however, are not readily transferable, and banks do not accept them as collateral for borrowing and investment purposes. The government continues to seize commercial farms without compensating titleholders, who have no recourse to the courts. The seizures continue to raise serious questions about respect for property rights and the rule of law in Zimbabwe.

In 2017, the government announced its intention to compensate farmers who lost their land and made small partial payments to the most vulnerable claimants. In July 2020, the government and white commercial farmers, represented by the Commercial Farmers Union (CFU), who lost land to the land reform program signed a US$3.5 billion Global Compensation Deed (GCD) Agreement for improvements made by commercial farmers on the farms. The government promised to pay a 50 percent deposit within 12 months of signing the agreement and 25 percent of the remainder in each subsequent year so that it makes full payment over five years. As of July 2021, the GOZ paid a token US$1 million towards compensating former commercial farmers. As of April 2023, the government and the CFU are renegotiating the repayment terms of the GCD. Farmers covered by bilateral investment agreements can apply to get their seized land back, but this has not yet been tested successfully.

## DISPUTE SETTLEMENT

### ICSID Convention and New York Convention

Zimbabwe acceded to the 1965 Convention on the Settlement of Investment Disputes between States and Nationals of Other States and to the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards in 1994. However, the government does not always accept binding international arbitration of investment disputes between foreign investors and the state.

### Investor-State Dispute Settlement

The government is signatory to several bilateral investment agreements with several countries (see above) in which international arbitration of investment disputes is recognized. Zimbabwe does not have a Bilateral Investment Treaty or Free Trade Agreement with an investment chapter with the United States.

Local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors. For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial farms to the original owners. Once an investor has exhausted the administrative and judicial remedies available locally, the Government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law (UNCITRAL). However, this has not occurred in practice.

## INTERNATIONAL COMMERCIAL ARBITRATION AND FOREIGN COURTS

Domestic legislation on arbitration is modeled after the United Nations Commission on International Trade Law (UNCITRAL) model law, with minor modifications. This law covers both domestic and international arbitration. As noted above, local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors. For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial farms to the original owners. Once an investor has exhausted the administrative and judicial remedies available locally, the government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law. However, this has not occurred in practice.

## BANKRUPTCY REGULATIONS

In the event of insolvency or bankruptcy, Zimbabwe applies the Insolvency Act. All creditors have equal rights against an insolvent estate. Zimbabwe does not criminalize bankruptcy unless it is the result of fraud, but the government blacklists a person declared bankrupt from undertaking any new business.

# 4. Industrial Policies

## INVESTMENT INCENTIVES

Government incentives to foreign investors depend on the form of investment, the sector, and whether the GOZ awards the investment national project status. For investment in industrial parks and tourism development zones, investors are exempt from paying tax for the first five years, after which they will pay tax at the rate of 25 percent (the normal tax rate is 35 percent). For build, own, operate, and transfer (BOOT) and build, operate, and transfer (BOT) joint ventures, investors are exempt from paying taxes for the first five years after which they will pay tax at the rate of 15 percent. Investors in the mining sector who export 50 percent of output benefit from a reduced corporation tax of 20 percent and are exempt from import duties on capital goods while losses are carried forward indefinitely for mining operations. Moreover, the government generally allows for duty exemptions in the importation of raw materials used in the manufacture of goods for export. In addition to these incentives, investments with national project status such as those in the renewable energy sector are allowed to borrow on local capital markets where they enjoy incentives including tax exemption on interest.

The GOZ encourages investment in renewable energy by waiving payment of duty on importation of solar equipment including batteries and panels.

Zimbabwe has approximately 183 companies operating in Export Processing Zones (EPZs). Benefits include a five-year tax holiday, duty-free importation of raw materials and capital equipment for use in the EPZ, and no tax liability from capital gains arising from the sale of property forming part of the investment in EPZs. The government generally requires foreign capital comprise most of the investment in an EPZ-designated company and requires the company to export at least 80 percent of output. The latter requirement has constrained foreign investment in the zones. ZIDA took over the regulation of EPZs and the Special Economic Zones in 2020. To date, however, activity in special economic zones has been limited despite the incentives.

The ZIDA act provides incentives to investors licensed under the special economic zones (SEZ) including a special initial allowance (tax deductible expense that allows taxpayers to write off the cost of an asset over time) of 50 percent of cost from first year and 25 percent in the subsequent two years, exemption from non-residents withholding tax on fees for services not locally available, exemption from non-residents' tax on royalties, and exemption from capital gains tax.

Although there are no discriminatory import or export policies affecting foreign firms, the government's approval criteria heavily favor export-oriented projects. Import duties and related taxes range as high as 110 percent.

## PERFORMANCE AND DATA LOCALIZATION REQUIREMENTS

In 2019, the government approved the Zimbabwe local content strategy to promote local value addition and linkages through utilization of domestic resources. According to the strategy, the country aims to increase local content levels in prioritized sectors such as mining, agro-processing, and infrastructural development from 25 to approximately 80 percent by 2023. The government has found it difficult to implement this strategy.

There are no general performance requirements for businesses located outside Export Processing and Special Economic Zones. Government policy, however, encourages investment in enterprises that contribute to rural development, job creation, exports, the addition of domestic value to primary products, use of local materials, and the transfer of appropriate technologies.

Government participation is required for new investments in strategic industries such as energy, public water provision, and railways. The terms of government participation are determined on a case-by-case

basis during license approval. The few foreign investors (e.g., PRC, Russia, and Iran) in reserved strategic industries have either purchased existing companies or have supplied equipment and spares on credit.

The government does not require foreign IT providers to turn over source code and/or provide access to surveillance. Only banks are required to maintain all their data in the country through the escrow agreement.

# 5. Protection of Property Rights

## REAL PROPERTY

The government enforces property rights in residential and commercial properties in urban areas. This is not the case with agricultural land, as discussed above. Mortgages and liens do exist for urban properties, but liquidity constraints have led to a fall in the number of mortgage loans. The recording of mortgages is generally reliable. The government retains ownership of all agricultural land with 99-year leases guaranteeing use. These leases remain too weak and untradable to serve as collateral for bank loans.

## INTELLECTUAL PROPERTY RIGHTS

Zimbabwe follows international patent and trademark conventions, and it is a member of the World Intellectual Property Organization (WIPO). Generally, the government seeks to honor intellectual property ownership and rights, although a lack of expertise and manpower as well as corruption limit its ability to enforce these obligations. Pirating of books, videos, music, and computer software is common.

The government has not enacted new IP related laws or regulations over the past year. The country does not publish information on the seizures of counterfeit goods.

Zimbabwe is not included in the United States Trade Representative (USTR) Special 301 Report or Notorious Markets List.

For additional information about national laws and points of contact at local IP offices, please see WIPO's country profiles at **http://www.wipo.int/directory/en/**

# 6. Financial Sector

Zimbabwe has two stock exchanges: one in Harare, and one in Victoria Falls. The Zimbabwe Stock Exchange (ZSE) in Harare currently has 46 publicly listed companies with a total market capitalization of $3.6 billion as of March 31, 2023. Nine companies have listed on the Victoria Falls Stock Exchange (VFEX) with a market capitalization of US$1 billion as of March 31, 2023. Stock and money markets are open to foreign portfolio investment. Foreign investors can take up to a maximum of 49 percent of any locally listed company with any single investor limited to a maximum of 15 percent of the outstanding shares. Regarding the money market, foreign investors may buy up to 100 percent of the primary issues of bonds and stocks and there is no limit on the level of individual participation.

There is a 1.48 percent withholding tax on the sale of marketable securities, while the tax on purchasing stands at 1.73 percent. Totaling 3.21 percent, the rates are comparable with the average of 3.5 percent for the region. As a way of raising funds for the state, the government mandated insurance companies and pension funds invest between 25 and 35 percent of their portfolios in prescribed government bonds. Zimbabwe's high inflation has greatly eroded the value of domestic debt instruments and resulted in negative real interest rates on government bonds.

The country respects the IMF's Article VIII and refrains from restrictions on payments and transfers for current international transactions provided there is sufficient foreign exchange to finance the transactions. Depending on foreign currency availability, foreign companies with investments in Zimbabwe can borrow locally on market terms.

Although credit is allocated on market terms and foreigners are allowed to borrow on the local market, lack of foreign exchange constrains the financial sector from extending credit to the private sector.

## MONEY AND BANKING SYSTEM

Three major international commercial banks and several regional and domestic banks operate in Zimbabwe, but they have reduced their branch network substantially in line with declining business opportunities. The central bank (Reserve Bank of Zimbabwe (RBZ)) asserts the banking sector is generally stable despite a harsh operating environment characterized by high credit risk, high inflation, and foreign exchange constraints. Most Zimbabwean correspondent banking relationships are in jeopardy or have already been severed due to international bank efforts to reduce risk (de-risking) connected to the high penalties for non-compliance with prudential anti-money laundering/counter-terrorism finance (AML/CFT) guidelines in developed countries. In March 2022, the Financial Action Task Force (FATF) removed

Zimbabwe from the "grey list" in response to "significant progress in improving its AML/CFT regime" and Zimbabwe is no longer subject to the FATF's increased monitoring process.

As of December 31, 2022, the banking sector had 19 operating institutions, comprising 14 commercial banks, four building societies, and one savings bank. According to the RBZ, as of December 2022, all banking institutions complied with the prescribed minimum core capital requirements. The central bank believes the financial sector's capital position is adequate to absorb unexpected shocks as well as ensure business continuity. The level of non-performing loans rose from 0.94 percent in December 2021 to 1.58 percent by December 2022. The RBZ reports the total loans-to-deposits ratio rose from 48.3 percent in December 2021 to 55.7 percent in December 2022, with foreign currency-denominated loans accounting for 78.2 percent of total banking sector loans.

## FOREIGN EXCHANGE AND REMITTANCES

### Foreign Exchange

The RBZ converts 25 percent of foreign currency earned from exports into local currency at the interbank rate while exporters retain the other 75 percent in foreign exchange. The authorities change these levels periodically without notice depending on the severity of the foreign exchange constraint. Additionally, businesses selling domestically in foreign currency must surrender 15 percent of the receipts to the central bank in exchange for local currency at the interbank rate.

Weak investment inflows and poor export growth have resulted in a perennial shortage of foreign exchange. Consequently, investors cannot freely convert funds associated with any form of investment into foreign currency. Although the situation improved after authorities adopted an auction system and an interbank market to allocate foreign exchange, businesses still rely on the parallel market for foreign exchange to make external payments as the supply of foreign exchange always falls short of demand. The GOZ claims to have cleared by December 2022 the allotments backlog stretching over six months. However, companies awarded foreign exchange through the auction have faced months-long delays in receiving allocations.

As of March 20, 2023, the interbank and auction rates are close to 32 percent stronger than the parallel market rate.

### Remittance Policies

Foreigners can remit capital appreciation, dividend income, and after-tax profits provided the foreign exchange is available. Firms may find difficulty in accessing foreign exchange at the auction rate.

**Sovereign Wealth Funds**

The government set aside $1 million toward administrative costs related to establishing a Sovereign Wealth Fund (SWF) in its 2016 budget. Although the government proposed to capitalize the SWF through a charge of up to 25 percent on royalty collections on mineral sales, as well as through a special dividend on the sale of diamond, gas, granite, and other minerals, it has not done so. e.

# 7. State-Owned Enterprises

Zimbabwe has 107 state-owned enterprises (SOEs), defined as companies wholly owned by the state. A list of the SOEs appears **here**    . Many SOEs support vital infrastructure including energy, mining, and agribusiness. Competition within the sectors where SOEs operate tends to be limited. However, the GOZ invites private investors to participate in infrastructure projects through public-private partnerships (PPPs). Most SOEs have public function mandates, although in more recent years, they perform hybrid activities of satisfying their public functions while seeking profits. SOEs should have independent boards, but in some instances, such as the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards.

Zimbabwe does not appear to subscribe to the Organization for Economic Cooperation and Development (OECD) guidelines on corporate governance of SOEs. SOEs are subject to the same taxes and same value-added tax rebate policies as private sector companies. SOEs face several challenges that include persistent power outages, mismanagement, lack of maintenance, inadequate investment, a lack of liquidity and access to credit, and debt overhangs. As a result, SOEs have performed poorly. Few SOEs produce publicly available financial data and even fewer provide audited financial data. SOE poor management and lack of profitability have imposed significant costs on the rest of the economy.

**PRIVATIZATION PROGRAM**

Although the government committed itself to privatize most SOEs in the 1990s, it only successfully privatized two parastatals. In 2018, the government announced it would privatize 48 SOEs. So far, it has only targeted five in the telecommunications, postal services, and financial sectors for immediate reform, but the privatizations have not yet concluded. The government encourages foreign investors to take advantage of the privatization program to invest in the country, but inter-SOE debts of nearly $1 billion pose

challenges for privatization plans. According to the government's investment guidelines, it is still working out the process under which it will dispose its shareholding to the private sector. The 2020 Zimbabwe Investment and Development Act states public private partnerships (PPPs) require public expressions of interest where appropriate but notes a contracting authority may choose not to require public bids when it has already identified a proposed project with an identified counterparty and disclosed this fact.

# 8. Responsible Business Conduct

Awareness of standards for responsible business conduct (RBC) is mainly driven by the private sector through the Standards Association of Zimbabwe.

The Zimbabwean government has not instituted or proposed requirements for businesses to conduct due diligence or reporting regarding human rights or other responsible business conduct issues. It has also not taken any measures to encourage RBC and it does not consider RBC policies or practices in procurement decisions.

The private sector developed the National Corporate Governance Code of Zimbabwe (ZimCode), which is a framework designed to guide Zimbabwean companies on RBC. The Confederation of Zimbabwe Industries (CZI), an industrial advocacy group, has a standing committee on business ethics and standards that drives ethical conduct within the Zimbabwean private sector. The organization has developed its own charter according to OECD guidelines, highlighting good corporate governance and ethical behavior. Firms that demonstrate corporate social responsibility do not automatically garner favorable treatment from consumers, employees, or the government.

The U.S Department of Labor's (DOL) report **https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods** published in September 2022 reports that children work in Zimbabwe's sugarcane, gold, tobacco industries. The DOL's **report https://www.dol.gov/agencies/ilab/resources/reports/child-labor/zimbabwe** found children in Zimbabwe engage in the worst forms of child labor, including in mining, agriculture, and tobacco production. Law enforcement agencies lack resources to enforce child labor laws. The COVID-19 crisis severely limited the government's ability to combat the worst forms of child labor. The country's continuing economic decline likely increased the vulnerability of children working in informal labor sectors, including those that harbor the worst forms of child labor, to support family incomes. of children working in informal labor sectors, including those that harbor the worst forms of child labor, to support family incomes.

The government regularly thwarts union efforts to demonstrate with violence and excessive force and harasses labor leaders. Police and state intelligence services regularly attend and monitor trade union activities, sometimes preventing unions from holding meetings with their members and carrying out organizational activities. Although unions are not required by law to notify police of public gatherings, police require such notification in practice. Those unions engaging in strikes deemed illegal risk fines and imprisonment.

The government ordered in March 2021 the eviction of 13,000 members of the Chilonga community in the southeastern part of the country, but eventually backed down after a court ruled in favor of a temporary relief. Although the Chilonga villagers appealed the eviction citing unconstitutionality of sections of the Communal Land Act the government used in its eviction order, the High Court ruled in favor of the government but recommended a review of the Act.

The Zimbabwean government has expressed its intention to implement the Extractive Industries Transparency Initiative (EITI) principles to strengthen accountability, good governance, and transparency in the mining sector, but it has yet to launch an EITI program. A domestic initiative called the Zimbabwe Mining Revenue Transparency Initiative (ZMRTI) has produced limited results.

Although Zimbabwe has a high usage of private security companies by the government or industry, it is not signatory to the Montreux Document on Private Military and Security Companies.

U.S. Customs and Border Patrol issued a withhold release order on Zimbabwean rough diamonds from Marange in 2019 after an investigation concluded that forced labor contributed to the mining activity. Widespread artisanal and small-scale gold mining presents a threat to the environment, and informal miners have little-to-no safety and labor protections.

## ADDITIONAL RESOURCES

Department of State
Country Reports on Human Rights Practices ( **https://www.state.gov/reports-bureau-of-democracy-human-rights-and-labor/country-reports-on-human-rights-practices/**)
Trafficking in Persons Report ( **https://www.state.gov/trafficking-in-persons-report/**)
Guidance on Implementing the "UN Guiding Principles" for Transactions Linked to Foreign Government End-Users for Products or Services with Surveillance Capabilities ( **https://www.state.gov/key-topics-bureau-of-democracy-human-rights-and-labor/due-diligence-guidance/**)
U.S. National Contact Point for the OECD Guidelines for Multinational Enterprises (

**https://www.state.gov/u-s-national-contact-point-for-the-oecd-guidelines-for-multinational-enterprises/**)

Xinjiang Supply Chain Business Advisory ( **https://www.state.gov/xinjiang-supply-chain-business-advisory/**)

Department of the Treasury
OFAC Recent Actions ( **https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions** )

Department of Labor
Findings on the Worst Forms of Child Labor Report (
**https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings** )
List of Goods Produced by Child Labor or Forced Labor (
**https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods** )
Sweat & Toil: Child Labor, Forced Labor, and Human Trafficking Around the World (
**https://www.dol.gov/general/apps/ilab** )
Comply Chain ( **https://www.dol.gov/ilab/complychain/** )

## CLIMATE ISSUES

Zimbabwe developed a national climate policy in 2017 which provides an overarching framework that gives the country basic principles and guidance under which climate change response strategy will be implemented. The government has stated its intention to reduce emissions of sectoral greenhouse gasses without specifying action plans to achieve these objectives. The policy does not specify any regulatory incentives towards achievement of set objectives.

The GOZ, through the Procurement and Regulatory Authority of Zimbabwe, introduced in 2023 a framework that compels businesses to make environmental, social, and governance issues an integral part of their business strategy. The framework aims to ensure transparency, fairness, honesty, and competition as required by the Zimbabwean Constitution.

# 9. Corruption

Endemic corruption presents a serious challenge to businesses operating in Zimbabwe. Zimbabwe's scores on governance, transparency, and corruption perception indices are well below the regional average. U.S. firms have identified corruption as an obstacle to FDI, with many corruption allegations stemming from opaque procurement processes.

While anti-corruption laws exist and extend to family members of officials and political parties, the government tends to engage in selective enforcement. As a result, Transparency International ranked Zimbabwe 157 out of 180 countries and territories surveyed in 2022 with respect to perceptions of corruption.

In 2005, the government enacted an Anti-Corruption Act that established a government-appointed Zimbabwe Anti-Corruption Commission (ZACC), the structure of which has evolved over time. The 2013 constitution established ZACC's status as an independent commission. Following the end of Robert Mugabe's rule in November 2017, the government appointed a new ZACC chaired by a former High Court Judge and granted it new powers. President Mnangagwa also established a special unit within his office to deal with corruption cases. While ZACC has in recent years investigated and arrested some high-level officials, it does not have prosecutorial authority. Many high-ranking individuals are released after their initial arrest (in what is known as "Catch and Release"). The National Prosecuting Authority of Zimbabwe is responsible for prosecuting cases and referring all cases to the specialized anticorruption courts. The government has a track record of prosecuting individuals selectively, focusing on those who have fallen out of favor with the ruling party and ignoring transgressions by members of the favored elite. Accusations of corruption seldom result in formal charges and convictions. Zimbabwe does not provide any special protections to NGOs investigating corruption in the public sector. Journalists reporting on high-level corruption and opposition members have suffered from arbitrary arrests and lengthy detentions.

While Zimbabwe does not have laws that guard against conflict of interest with respect to the conduct of private companies, existing rules on both the Zimbabwe Stock Exchange and the Victoria Stock Exchange compel listed companies to adhere to minimum disclosure requirements through annual reports. Regarding SOEs, the government has specified laws that require managers and directors to declare their financial interests, although these may not be followed in practice. After the 2020 launch of the National Anti-Corruption Strategy, ZACC conducted a campaign in 2022 that resulted in multiple public and private officials signing integrity pledges.

While Zimbabwe signed the United Nations Convention against Corruption in 2004 and ratified the treaty in 2007, it is not party to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

Resources to Report Corruption

Contact at the government agency or agencies that are responsible for combating corruption:

Zimbabwe Anti-Corruption Commission (ZACC)

172 Herbert Chitepo Avenue,

Harare.

+263 (242) 369602; +263 71 952 9483

reports@zacc.co.zw

Contact at a "watchdog" organization:

Transparency International Zimbabwe

96 Central Avenue,

P O Box CY 434, Causeway

Harare

+263 4 793 246/7

**tiz@tizim.org**     ; **info@tizim.org**

# 10. Political and Security Environment

Political parties, labor organizations, and civil society groups encounter state-sponsored intimidation and repression from government security forces and Zimbabwe African National Union – Patriotic Front (ZANU-PF) – linked activists. Disagreements between and within political parties occasionally result in violence targeting political party supporters. Political tensions and civil unrest persist since the end of Robert Mugabe's rule in November 2017. On August 1, 2018, the army fired upon people demonstrating against the delay in announcing official presidential election results, killing six civilians. In response to January 2019 demonstrations against rising fuel prices, security forces killed 17, raped 16, injured hundreds, and arrested more than 800 people over the course of several weeks. The crackdown targeted members of the main opposition party, civil society groups, and labor leaders.

President Mnangagwa's government has arrested and detained journalists, several senior opposition officials, and trade union activists for organizing demonstrations against corruption and allegedly violating bail conditions. Police also arrested three women members of the opposition party, MDC Alliance (now Citizens Coalition for Change (CCC)), including a member of parliament for violating lockdown measures when they demonstrated against corruption and food shortages during the first of several lockdowns imposed on the country to fight COVID-19. They were subsequently abducted from police custody and tortured by alleged security agents. Since then, the government has occasionally arrested and detained the three leaders when they have spoken out against the government. Political tensions also prevailed during the March 2022 by-elections campaigns. Leading up to the by-election, ZANU-PF-affiliated youths allegedly

killed a CCC rally attendee and injured 22 others in Kwekwe. CCC also reported attacks targeted at its activists and supporters in 2023 and continued use of lawfare to target opposition and civil society actors. With general elections in 2023, Zimbabwe's political tensions will likely rise in the pre-election and immediate post-election period.

Political uncertainty remains high. Violent crime, such as assault, smash and grabs, and home invasion, is common. Armed robberies perpetrated by serving members of the army and police have increased. Local police lack the resources to respond effectively to serious criminal incidents. Incidents of violence have typically not targeted investment projects.

## 11. Labor Policies and Practices

Decades of political and economic crises have led to the emigration of many of Zimbabwe's skilled and well-educated citizens, especially in the fragile healthcare sector. Formal sector employment has fallen significantly. Anecdotal evidence shows widespread youth unemployment as the country continues to produce graduates without a matching growth in employment opportunities. According to the most recent Labor Force Survey, Zimbabwe's unemployment rate stood at 16.4 percent in 2019. The informal sector is estimated at over 85 percent of the workforce. Most informal workers worked in agriculture, trading, or mining. An estimated 500,000 people worked in small-scale or artisanal mining, according to the Zimbabwe Economic Policy Analysis and Research Unit, an independent think tank. The government strongly encourages foreign investors to make maximum use of Zimbabwean management and technical personnel and any investment proposal that involves the employment of foreigners must present a strong case to obtain work and residence permits. Normally, the maximum contract period for a foreign national is three years with a possible extension to five years for individuals with highly specialized skills.

According to the IMF, Zimbabwe has the second largest informal economy (as a share of GDP) in the world, after Bolivia, with 60.6 percent contribution to the country's GDP. Official data from the Zimbabwe National Statistical Agency (ZimStat) shows women accounted for 43 percent of the people involved in the informal sector in 2019. A 2018 ILO survey claimed women comprised up to 65 percent of the informal economy.

The country's labor laws make it very difficult for employers to adjust employment in response to an economic downturn except in the Special Economic Zones (SEZs) where labor laws do not apply. Outside the SEZs, the employer must engage employees and their representatives and agree to adopt measures to avoid retrenchment. If the measures fail, the employer can retrench and pay an all-inclusive package of one-month salary for each two years of service or the pro rata share thereof. Labor laws differentiate between layoffs and severance with the former falling under retrenchment where the retrenchment law

must apply. The law does not accept unfair dismissal or layoffs of employees. The 2015 amendments to the act only permit terminations of contracts to be in terms of a registered code of conduct, expiry of a contract of fixed term duration, or mutual agreement. There is no unemployment insurance or other safety net programs for workers laid off for economic reasons.

Collective bargaining agreements apply to all workers in an industry, not just union members. Collective bargaining takes place at the enterprise and industry levels. At the enterprise level, work councils negotiate collective agreements, which become binding if approved by 50 percent of the workers in the bargaining unit. Industry-level bargaining takes place within the framework of National Employment Councils. Unions representing at least 50 percent of the workers may bargain with the authorization of the Minister of Public Service and Labor. The law encourages the creation of employee-controlled workers' committees in enterprises where less than 50 percent of workers are unionized. Workers' committees exist in parallel with trade unions. Their role is to negotiate shop floor grievances, while that of the trade unions is to negotiate industry-level grievances, notably wages. The minister and the registrar have broad powers to take over the direction of a workers' committee if they believe it is mismanaged. Trade unions regarded the existence of such a parallel body as an arrangement that allows employers to undermine the role of unions.

Employers in all sectors rely heavily on temporary or contract workers to avoid having to pay severance costs and follow other onerous termination procedures. The Labor Amendment Act of 2015, however, requires employment councils to limit the number of times employers can renew short-term contracts. The government does not waive labor laws to attract or retain investment, except in the case of SEZs.

The law provides for the right of private sector workers to form and join unions, conduct legal strikes, and bargain collectively. Public sector workers may not form or join trade unions but may form associations that bargain collectively and strike. The law prohibits anti-union discrimination, provides that the labor court handle discrimination complaints, and may direct reinstatement of workers fired due to such discrimination. However, the government does not evenly respect workers' rights to form or join unions, strike, and bargain collectively.

Parliament enacted a bill establishing the Tripartite Negotiating Forum (TNF) in 2019 to formalize dialogue efforts among government, labor leaders, and employers to discuss social and economic policy and address demands. However, the forum has made limited progress since its establishment. The Zimbabwe Congress of Trade Unions (ZCTU) stated the TNF done little to address workers' demands for wage increases and labor law reform, and the government showed little progress in supporting workers' protections, fairness, and peaceful resolution of labor disputes.

The country has a labor dispute resolution process that starts at the company level through disciplinary or grievance committees. If the issue is not resolved at this level, the aggrieved party can appeal to either the employment council or the Labor Court depending on the industrial agreement. Other redress is through the Ministry of Public Service, Labor, and Social Welfare in which labor officers settle disputes for industries without employment councils. From the Labor Court, an aggrieved party can appeal to the Supreme Court. Labor inspections are conducted regularly, but face challenges due to a lack of inspectors and resources for inspections.

The government continues to harass labor unions and their leaders. Police and state intelligence services regularly attend and monitored trade union activities and sometimes prevented unions from holding meetings with their members and carrying out organizational activities. Although unions are not required by law to notify police of public gatherings, police require such notification in practice. Those unions engaging in strikes deemed illegal risk fines and imprisonment.

Strikes were commonly met with police brutality, force, and dismissals during the period under review, yet did not pose a direct risk to foreign investment. The government enacted punishment and retaliatory action against teachers who participated in continued strikes regarding the right to a living wage.

The government is a member of the International Labor Organization (ILO) and has ratified conventions protecting worker rights. The country has been subject to ILO supervisory mechanisms for practices that limit workers' rights to freely associate, organize, and hold labor union meetings. At the 108th session of the ILO's International Labor Conference in June 2019, the Committee on the Application of Standards noted concern regarding the government's failure to implement specific recommendations of the 2010 Commission of Inquiry, which found the government responsible for serious violations of fundamental rights by its security forces, including a clear pattern of intimidation that included arrests, detentions, violence, and torture against union and opposition members. The Committee also noted persisting allegations of violations of the rights of the freedom of assembly of workers' organizations. The Committee urged the government to accept a direct contacts mission of the ILO to assess progress before the next conference. The government ultimately agreed to accept a direct contacts mission, originally scheduled for May 2020 but postponed to April 2022 due to the COVID-19 pandemic. The results have not been publicly shared.

In 2020 the Office of the U.S. Trade Representative initiated a review of Zimbabwe's eligibility for trade preferences under the Generalized System of Preferences (GSP) due to concerns of worker rights related to a lack of freedom of association, including the rights of independent trade unions to organize and bargain

collectively, and government crackdown on labor activists. As the GSP program is on a congressional hold, the review has not yet concluded.

The Health Service Amendment Act came into force on January 4.  Passed in response to a significant exodus of health workers as a result of mismanagement of the health care sector, the act deems health care an essential service, criminalizes collective job action over 72 hours or for more than 72 hours in any given 14-day period, and requires a 48-hour notification of collective job action (ref A).  Violators face a fine of approximately $60, imprisonment of up to six months, or both.  Labor leaders and healthcare associations publicly condemned the law as a violation of international workers' rights and noted it could further accelerate brain drain.

## 12. U.S. International Development Finance Corporation (DFC), and Other Investment Insurance or Development Finance Programs

The U.S. government and Zimbabwe concluded with OPIC (now DFC) an Investment Incentive Agreement in April 1999, which permits DFC to conduct transactions in Zimbabwe. The agreement entered into force in March 2021. DFC has a few loan portfolio guarantees (LPG) with local banks in Zimbabwe. The agency has not initiated a new project since 2015. The LPG stimulates credit and increases access to finance for Zimbabwean micro and small-to-medium enterprises (MSMEs) in the agricultural sector as well as youth and women-owned enterprises in every sector. To date, supported banks have disbursed more than 700 loans worth nearly $6 million to MSMEs in Zimbabwe with 90 percent going to new borrowers who are traditionally excluded due to lack of collateral and perceived high risk. DFC support for Zimbabwe projects is currently limited.

Zimbabwe acceded to the World Bank's Multilateral Investment Guarantee Agency in September 1989. Support from the Export-Import Bank of the United States is limited in Zimbabwe. Finance and export promotion programs, as well as investment insurance offered through international financial institutions, remain limited due largely to Zimbabwe's mounting multilateral and bilateral debt arrears.

## 13. Foreign Direct Investment Statistics

*Table 2: Key Macroeconomic Data, U.S. FDI in Host Country/Economy*

| Economic Data | Host Country Statistical source* | | USG or international statistical source | | USG or International Source of Data:  BEA; IMF; Eurostat; UNCTAD, Other |
|---|---|---|---|---|---|
| | Year | Amount | Year | Amount | |
| Host Country Gross Domestic Product (GDP) ($M USD) | 2021 | $29,346 | 2021 | $28,370 | www.worldbank.org/en/country |
| Foreign Direct Investment | Host Country Statistical source* | | USG or international statistical source | | USG or international Source of data:  BEA; IMF; Eurostat; UNCTAD, Other |
| U.S. FDI in partner country ($M USD, stock positions) | 2021 | N/A | 2021 | $(D) | BEA data available at https://apps.bea.gov/international/factsheet/ |
| Host country's FDI in the United States ($M USD, stock positions) | 2021 | N/A | 2021 | (*) | BEA data available at https://apps.bea.gov/international/factsheet/ |
| Total inbound stock of FDI as % host GDP | 2021 | N/A | 2021 | 21.4% | UNCTAD data available at https://unctad.org/topic/investment/world-investment-report |

* Ministry of Finance and Economic Development, 2023 National Budget Statement.

(D) – Information suppressed to avoid disclosure of data of individual companies

(*) – Indicates a non-zero value between -USD500,000 and +USD500,000.

**Table 3: Sources and Destination of FDI**
Data not available.

# 14. Contact for More Information

*Economic Specialist*
*U.S. Embassy Harare*
*2 Lorraine Drive, Bluffhill, Harare*
*+263 8677011000*
*zimbizopps@state.gov*

---

**TAGS**

Bureau of African Affairs     Bureau of Economic and Business Affairs     Zimbabwe

---



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit GG

An official website of the United States Government Here's how you know

**Home** >  ...  > Zimbabwe

# 2022 Investment Climate Statements: Zimbabwe

**IN THIS SECTION** /
**EXECUTIVE SUMMARY**

## Executive Summary

Zimbabwe suffered serious economic contractions in 2019 and 2020 due to the economic mismanagement, the extended effects of the COVID-19 pandemic, and climate shocks that crippled agriculture and electricity generation. According to the government of Zimbabwe, the economy recovered strongly, growing by 7.8 percent, in 2021 although the International Monetary Fund (IMF) estimates the economy grew by 6.1 percent, thanks to increased agricultural production, high commodity prices, and improved capacity utilization in the manufacturing sector. The government expects the economy to grow by 5.5 percent in 2022 as the negative impacts of COVID-19 subside. International financial institutions also project positive but more modest growth, with the IMF forecasting a real GDP growth of 3.1 percent in 2022. Inflation remained high in 2021, but steadily declined to end the year at 60.6 percent. Authorities attributed the decline to the introduction of a weekly foreign exchange auction system in June 2020 and fiscal consolidation that resulted in near balanced budgets in 2020 and 2021. However, the inflation rate has continued to rise to 72.7 percent by March 2022 due to the negative effects of the Russia-Ukraine war on commodity prices as well as the depreciation of the Zimbabwe dollar. Zimbabwe's local currency has lost 79 percent of its value relative to the U.S. dollar since the government adopted an auction system on June 23, 2020. A gap between the auction and parallel-market exchange rates has persisted, with U.S. dollars more than twice as expensive on the parallel market.

To improve the ease of doing business, the government formed the Zimbabwe Investment and Development Agency (ZIDA) in 2020, intended as a one-stop-shop to promote and facilitate both domestic and foreign investment in Zimbabwe. Zimbabwe's incentives to attract FDI include tax breaks for new

investment by foreign and domestic companies, and making capital expenditures on new factories, machinery, and improvements fully tax deductible. The government waives import taxes and surtaxes on capital equipment. It has made gradual progress in improving the business environment by reducing regulatory costs, but policy inconsistency and weak institutions have continued to frustrate businesses. Corruption remains rife and there is little protection of property rights, particularly with respect to agricultural land. Historically, the government has committed to protect property rights but has also expropriated land without compensation.

The Finance Act (No 2) at the end of 2020 amended the Indigenization Act by removing language designating diamonds and platinum as the only minerals subject to indigenization (requiring majority ownership by indigenous Zimbabweans), finally ending indigenization requirements in all sectors. However, the new legislation also granted broad discretion to the government to designate minerals as subject to indigenization in the future. The government subsequently issued statements to reassure investors that no minerals will be subject to indigenization, including diamonds and platinum.

The government ended its 2019 ban on using foreign currencies for domestic transactions in March 2020. However, the authorities decreed businesses selling in foreign exchange must surrender 20 percent of the receipts to the central bank in exchange for local currency at the overvalued auction rate. Exporters must surrender 40 percent of foreign currency earnings at the unfavorable auction rate.

Zimbabwe owes approximately US$10.7 billion (US$6.5 billion of which is in arrears) to international financial institutions accounting for 71 percent of the country's GDP. The country's high external debt (public and private) limits its ability to access official development assistance at concessional rates. Additionally, domestic banks do not offer financing for periods longer than two years, with most financing limited to 180 days or less. The sectors that attract the most investor interest include agriculture (tobacco, in particular), mining, energy, and tourism. Zimbabwe has a well-earned reputation for the high education levels of its workers.

Although the United States has a targeted sanctions program against Zimbabwe, it currently applies to only 83 individuals and 37 entities.  The U.S. Government imposed sanctions against specifically identified individuals and entities in Zimbabwe, as a result of the actions and policies of certain members of the Government of Zimbabwe and other persons that undermine democratic institutions or processes in Zimbabwe, violate human rights, or facilitate corruption.  U.S. companies can do business with Zimbabwean individuals and companies that are not on the specially designated nationals (SDN) list.

After reaching US$745 million in 2018, Zimbabwe witnessed significant declines in foreign direct investment (FDI). According to data from the United Nations Conference on Trade and Development (UNCTAD), FDI

inflows into Zimbabwe fell from US$280 million in 2019 to US$194 million in 2020.

Table 1: Key Metrics and Rankings

| Measure | Year | Index/Rank | Website Address |
|---|---|---|---|
| **TI Corruption Perceptions Index** | 2021 | 157 of 180 | http://www.transparency.org/research/cpi/overview |
| **Global Innovation Index** | 2021 | 113 of 132 | https://www.globalinnovationindex.org/analysis-indicator |
| **U.S. FDI in partner country ($M USD, historical stock positions)** | 2020 | (D) | https://apps.bea.gov/international/factsheet/ |
| **World Bank GNI per capita** | 2020 | USD 1,140 | https://data.worldbank.org/indicator/NY.GNP.PCAP.CD |

(D) – Information suppressed to avoid disclosure of data of individual companies.

# 1. Openness To, and Restrictions Upon, Foreign Investment

## POLICIES TOWARDS FOREIGN DIRECT INVESTMENT

To attract FDI and improve the country's competitiveness, the government has encouraged public-private partnerships and emphasized the need to improve the investment climate by lowering the cost of doing business as well as restoring the rule of law and sanctity of contracts. Implementation, however, has been limited.

The government amended the Indigenization Act by removing diamonds and platinum from minerals subject to indigenization (requiring majority ownership by indigenous Zimbabweans), although the new legislation appeared to grant broad discretion to the GOZ to designate minerals as subject to indigenization in the future. Subsequently, the GOZ reassured investors that no minerals will be subject to indigenization, including diamonds and platinum. However, there are smaller sectors "reserved" for Zimbabweans (see below).

To improve the ease of doing business, the government enacted legislation that led to the formation of the Zimbabwe Investment and Development Agency (ZIDA) in 2020. ZIDA replaced the Zimbabwe Investment Authority and serves as a one-stop-shop center in promoting and facilitating both domestic and foreign investment in Zimbabwe.

While the government has committed to prioritizing investment retention, there are still no mechanisms or formal structures to maintain ongoing dialogue with investors.

## LIMITS ON FOREIGN CONTROL AND RIGHT TO PRIVATE OWNERSHIP AND ESTABLISHMENT

Foreign and domestic private entities have a right to establish and own business enterprises and engage in all forms of remunerative activity, but foreign ownership of businesses in certain reserved sectors is limited.

Foreign investors are free to invest in most sectors without any restrictions as the government aims to bring in new technologies, value-add manufacturing, and generate employment. According to the ZIDA Act, "foreign investors may invest in, and reinvest profits of such investments into, any and all sectors of the economy of Zimbabwe, and in the same form and under the same conditions as defined for Zimbabweans under the applicable laws and regulations of Zimbabwe." However, the government reserves certain sectors for Zimbabweans such as passenger buses, taxis and car hire services, employment agencies, grain milling, bakeries, advertising, dairy processing, and estate agencies.

The country screens FDI through the ZIDA in liaison with relevant line ministries to confirm compliance with the country's laws.

According to the country's laws, U.S. investors are not especially disadvantaged or singled out by any of the ownership or control mechanisms relative to other foreign investors. In its investment guidelines, the government states its commitment to non-discrimination between foreign and domestic investors and among foreign investors.

## OTHER INVESTMENT POLICY REVIEWS

In a 2019 review, Global Witness recommended reform of Zimbabwe's shadowy diamond sector through publication of all diamond mining contracts, shareholdings, and their ultimate beneficial owners; production of timely annual reports, including audited accounts detailing revenues raised and all payments to the Treasury and all transfers to private shareholders. **https://www.globalwitness.org/en/blog/time-zimbabwes-opaque-diamond-sector/**

The Zimbabwe Environmental Lawyers Association (ZELA) published in October 2021 and March 2022 reports focused on the investment climate around the extractive sector. Though the reports view the extractive sector through the lens of PRC engagement, the information on laws, regulations, and gaps in legislation and enforcement remain relevant for all interested investors.

The Handbook of Zimbabwe-China Economic Relations:

Zimbabwe Open for Business: Progress Check on Implementation:

## BUSINESS FACILITATION

Policy inconsistency, administrative delays and costs, and corruption hinder business facilitation. Zimbabwe does not have a fully online business registration process, though one can begin the process and conduct a name search online via the ZimConnect web portal. The government created the Zimbabwe Investment Development Agency (ZIDA, **https://www.zidainvest.com/**    ) which replaced the Zimbabwe Investment Authority (ZIA), the Special Economic Zones Authority, and the Joint Venture Unit to oversee the licensing and implementation of investment projects in the country. The Agency has established a one-stop investment services center (OSISC) which houses several agencies that play a role in the licensing, establishment, and implementation of investment projects including the Zimbabwe Revenue Authority (ZIMRA), Environmental Management Agency (EMA), Reserve Bank of Zimbabwe (RBZ), National Social Security Authority (NSSA), Zimbabwe Energy Regulatory Authority (ZERA), Zimbabwe Tourism Authority, the State Enterprises Restructuring Agency, and specialized investment units within relevant line ministries. The business registration process currently takes 27 days.

## OUTWARD INVESTMENT

Zimbabwe does not promote or incentivize outward investment due to the country's tight foreign exchange reserves. Although the government does not restrict domestic investors from investing abroad, any outward investment requires approval by exchange control authorities. Firms interested in outward investment would face difficulty accessing the limited foreign currency at the more favorable official exchange rate.

# 2. Bilateral Investment and Taxation Treaties

Zimbabwe has negotiated investment treaties with 35 countries, but it has ratified only 11 including those with the Netherlands, Kuwait, Denmark, China, Germany, Russia, South Africa, and Switzerland. Despite these agreements, the government has failed to protect investments undertaken by nationals from these countries, particularly with regard to land. In 2009, for example, an army officer seized a farm belonging to a German national, but the government did not intervene, despite its assurance that Zimbabwe would honor all obligations and commitments to international investors. Some claimants protected by investment treaties have pursued arbitration through the International Centre for Settlement of Investment Disputes. For example, in 2015, a different Swiss-German family won a landmark US$196 million judgment at the International Center for Settlement of Investment Disputes in compensation for expropriated land but has received only partial payment.

Zimbabwe is a member of the Southern African Development Community (SADC) and the Common Market for Eastern and Southern Africa (COMESA), and it is a signatory to the SADC and COMESA trade protocols establishing free trade areas (FTA) with the aim of growing into a customs union. Zimbabwe is also a member of the African Continental Free Trade Area (AfCFTA) which came into force on January 1, 2021, with the aim of creating a single continental market and paving the way for the establishment of a customs union.

The United States does not have a bilateral taxation and/or investment treaty with Zimbabwe. The United States has a Trade and Investment Framework Agreement (TIFA) with the Common Market for Eastern and Southern Africa (COMESA), of which Zimbabwe is a member. This TIFA provides a mechanism to discuss disputes, although the protection offered by the TIFA is much more limited than protection typically provided by a bilateral investment treaty.

# 3. Legal Regime

## TRANSPARENCY OF THE REGULATORY SYSTEM

The government officially encourages competition within the private sector and seeks to improve the ease of doing business, but the bureaucracy within regulatory agencies lacks transparency, and corruption is prevalent. Investors complain of policy inconsistency and unpredictability. Moreover, Zimbabwe does not have a centralized online location where key regulatory actions are published, and investors must contact ZIDA.

The government at times uses statutory instruments and temporary presidential powers to alter legislation impacting economic policy. These powers have limited duration – the government must pass legislation within six months for the presidential powers to become permanent. These measures, which can appear without warning, often surprise businesses and lack implementation details, leading firms to delay major business decisions until gaining clarity. For example, the government unexpectedly prohibited the use of foreign currencies for domestic transactions in June 2019 but lifted the ban in March 2020, amidst the COVID-19 pandemic and growing economic pressure. The government has made changes to the share of foreign currency earnings exporters must surrender to the central bank without warning or stakeholder consultations. The standard legislative process, on the other hand, does provide ample opportunity for public review and comment before the final passage of new laws. The development of regulations follows a standard process and includes a period for public review and comment.

According to the Department of State's 2021 Fiscal Transparency Report, public budget documents do not provide a full picture of government expenditures, and there is a notable lack of transparency regarding state-owned enterprises and the extraction of natural resources. Information on public finances is generally unreliable, as actual revenues and expenditures have deviated significantly from the enacted budgets. Information on some debt obligations is publicly available, but not information on contingent debt.

## INTERNATIONAL REGULATORY CONSIDERATIONS

Zimbabwe is a member of the Southern African Development Community (SADC) and the Common Market for Eastern and Southern Africa (COMESA), and it is a signatory to the SADC and COMESA trade protocols establishing free trade areas (FTA) with the aim of growing into a customs union. Zimbabwe is also a member of the African Continental Free Trade Area (AfCFTA) which came into force on January 1, 2021, with the aim of creating a single continental market and paving the way for the establishment of a customs union. Although the country is also a member of the World Trade Organization (WTO), it normally notifies only SADC and COMESA of measures it intends to implement.

## LEGAL SYSTEM AND JUDICIAL INDEPENDENCE

According to the country's law and constitution, Zimbabwe has an independent judicial system whose decisions are binding on the other branches of government. The country has written commercial law and, in 2019, established four commercial courts at the magistrate level. The government also trained 55 magistrates in the same year. Administration of justice in commercial cases that do not touch on political interests is still generally impartial, but for politicized cases government interference in the court system has hindered the delivery of impartial justice. Regulations or enforcement actions are appealable and are adjudicated in the national court system.

## LAWS AND REGULATIONS ON FOREIGN DIRECT INVESTMENT

Foreign investors are free to invest in most sectors including mining without any restrictions. In 2020, the government amended the Indigenization and Economic Empowerment Act which required majority ownership by indigenous Zimbabweans to attain its goal to bring in new technologies, generate employment, and value-added manufacturing. In certain sectors, such as primary agriculture, transport services, and retail and wholesale trade including distribution, foreign investors may not own more than 35 percent equity.

The ZIDA ( **https://www.zidainvest.com/** ), which now acts a one-stop shop for investors, promotes and facilitates both local and foreign direct investment.

## COMPETITION AND ANTITRUST LAWS

The government officially encourages competition within the private sector according to the Zimbabwe Competition Act. The Act provided for the formation of the Tariff and Competition Commission charged with investigating restrictive practices, mergers, and monopolies in the country. The Competition and Tariff Commission (CTC) is an autonomous statutory body established in 2001 with the dual mandate of implementing and enforcing Zimbabwe's competition policy and law and executing the country's trade tariffs policy. The Act provides for transparent norms and procedures. Although the decision of the Commission is final, any aggrieved party can appeal the decision to the Administrative Court.

## EXPROPRIATION AND COMPENSATION

In 2000, the government began to seize privately-owned agricultural land and transfer ownership to government officials and other regime supporters. In April 2000, the government amended the constitution to grant the state's right to assert eminent domain, with compensation limited to the improvements made on the land. In September 2005, the government amended the constitution again to transfer ownership of all expropriated land to the government. Since the passage of this amendment, top government officials, supporters of the ruling Zimbabwe African National Union – Patriotic Front (ZANU-PF) party, and members of the security forces have continued to disrupt production on commercial farms, including those owned by foreign investors, those owned by black indigenous farmers, and those covered by bilateral investment agreements. Similarly, government officials have sought to impose politically connected individuals as indigenous partners on privately and foreign-owned wildlife conservancies.

In 2006, the government began to issue 99-year leases for land seized from commercial farmers, retaining the right to withdraw the lease at any time for any reason. These leases, however, are not readily transferable, and banks do not accept them as collateral for borrowing and investment purposes. The government continues to seize commercial farms without compensating titleholders, who have no recourse to the courts. The seizures continue to raise serious questions about respect for property rights and the rule of law in Zimbabwe.

In 2017, the government announced its intention to compensate farmers who lost their land and made small partial payments to the most vulnerable claimants. In July 2020, the government and white commercial farmers who lost land to the land reform program signed a US$3.5 billion Global Compensation

Deed Agreement for improvements made by commercial farmers on the farms. The government promised to pay a 50 percent deposit within 12 months of signing the agreement and 25 percent of the remainder in each subsequent year so that it makes full payment over five years. Given fiscal constraints, it remains unclear how the government will finance this sum. As of July 2021, the GOZ paid a token US$1 million towards compensating former commercial farmers, but it still lacks a credible plan to pay the remaining US$3.499 billion and has pushed back its deadline for doing so.

## DISPUTE SETTLEMENT

### ICSID Convention and New York Convention

Zimbabwe acceded to the 1965 Convention on the Settlement of Investment Disputes between States and Nationals of Other States and to the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards in 1994. However, the government does not always accept binding international arbitration of investment disputes between foreign investors and the state.

### Investor-State Dispute Settlement

The government is signatory to several bilateral investment agreements with several countries (see above) in which international arbitration of investment disputes is recognized. Zimbabwe does not have a Bilateral Investment Treaty or Free Trade Agreement with an investment chapter with the United States.

Local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors. For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial farms to the original owners. Once an investor has exhausted the administrative and judicial remedies available locally, the government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law (UNCITRAL). However, this has not occurred in practice.

### International Commercial Arbitration and Foreign Courts

Domestic legislation on arbitration is modeled after the United Nations Commission on International Trade Law (UNCITRAL) model law, with minor modifications. This law covers both domestic and international arbitration. As noted above, local courts recognize and enforce foreign arbitral awards issued against the

government, but there is a history of extrajudicial action against foreign investors. For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial farms to the original owners. Once an investor has exhausted the administrative and judicial remedies available locally, the government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law. However, this has not occurred in practice.

## BANKRUPTCY REGULATIONS

In the event of insolvency or bankruptcy, Zimbabwe applies the Insolvency Act. All creditors have equal rights against an insolvent estate. Zimbabwe does not criminalize bankruptcy unless it is the result of fraud, but the government blacklists a person declared bankrupt from undertaking any new business.

# 4. Industrial Policies

## INVESTMENT INCENTIVES

Government incentives to foreign investors depend on the form of investment, the sector, and whether the GOZ awards the investment national project status. For investment in industrial parks and tourism development zones, investors are exempt from paying tax for the first five years, after which they will pay tax at the rate of 25 percent (the normal tax rate is 35 percent). For build, own, operate, and transfer (BOOT) and build, operate, and transfer (BOT) joint ventures, investors are exempt from paying taxes for the first five years after which they will pay tax at the rate of 15 percent. Investors in the mining sector who export 50 percent of output benefit from a reduced corporation tax of 20 percent and are exempt from import duties on capital goods while losses are carried forward indefinitely for mining operations. Moreover, the government generally allows for duty exemptions in the importation of raw materials used in the manufacture of goods for export. In addition to these incentives, investments with national project status such as those in the renewable energy sector are allowed to borrow on local capital markets where lenders enjoy incentives including tax exemption on interest.

The GOZ set up a Zimbabwe Women's Microfinance Bank in 2018 so marginalized women could access credit facilities with affordable rates and innovative women-centered financial products and services.

The GOZ encourages investment in renewable energy by waiving payment of duty on importation of solar equipment including batteries and panels.

Zimbabwe now has approximately 183 companies operating in Export Processing Zones (EPZs). Benefits include a five-year tax holiday, duty-free importation of raw materials and capital equipment for use in the EPZ, and no tax liability from capital gains arising from the sale of property forming part of the investment in EPZs. The government generally requires foreign capital comprise a majority of the investment in an EPZ-designated company and requires the company to export at least 80 percent of output. The latter requirement has constrained foreign investment in the zones. ZIDA took over the regulation of EPZs and the Special Economic Zones. However, to date, activity in special economic zones has been limited despite the incentives.

Although there are no discriminatory import or export policies affecting foreign firms, the government's approval criteria heavily favor export-oriented projects. Import duties and related taxes range as high as 110 percent.

## PERFORMANCE AND DATA LOCALIZATION REQUIREMENTS

Foreigners intending to engage in meetings or discussions for business purposes are advised to secure a business visa for entry into Zimbabwe. Individuals found to be engaging in business-related activities on a tourist visa have been arrested, expelled from the country, and/or fined. A passport, visa, return ticket, and adequate funds are required to enter Zimbabwe.

In 2019, the government approved the Zimbabwe local content strategy to promote local value addition and linkages through utilization of domestic resources. According to the strategy, the country wants to increase local content levels in prioritized sectors from 25 to approximately 80 percent by 2023. However, the government has found it difficult to implement such a strategy.

There are no general performance requirements for businesses located outside Export Processing and Special Economic Zones. Government policy, however, encourages investment in enterprises that contribute to rural development, job creation, exports, the addition of domestic value to primary products, use of local materials, and the transfer of appropriate technologies.

Government participation is required for new investments in strategic industries such as energy, public water provision, and railways. The terms of government participation are determined on a case-by-case basis during license approval. The few foreign investors (for example, from China, Russia, and Iran) in reserved strategic industries have either purchased existing companies or have supplied equipment and spares on credit.

While foreign investors are not currently forced to use domestic content in production, the government is in the process of developing a local content policy designed to encourage the use of local inputs in production.

The government does not require foreign IT providers to turn over source code and/or provide access to surveillance. Only banks are required to maintain all their data in the country through the escrow agreement.

The new government investment guidelines do not permit mandatory and/or arbitrary performance requirements that distort or limit the expansion of trade and investment.

# 5. Protection of Property Rights

## REAL PROPERTY

The government enforces property rights in residential and commercial properties in cities although this is not the case with agricultural land, as discussed above. Mortgages and liens do exist for urban properties although liquidity constraints have led to a fall in the number of mortgage loans. The recording of mortgages is generally reliable. The government retains ownership of all agricultural land with 99-year leases guaranteeing use. These leases remain too weak to serve as collateral for bank loans.

## INTELLECTUAL PROPERTY RIGHTS

Zimbabwe follows international patent and trademark conventions, and it is a member of the World Intellectual Property Organization (WIPO). Generally, the government seeks to honor intellectual property ownership and rights, although a lack of expertise and manpower as well as corruption limit its ability to enforce these obligations. Pirating of books, videos, music, and computer software is common.

The government has not enacted new IP related laws or regulations over the past year. The country does not publish information on the seizures of counterfeit goods.

Zimbabwe is not included in the United States Trade Representative (USTR) Special 301 Report or Notorious Markets List.

For additional information about national laws and points of contact at local IP offices, please see WIPO's country profiles at **http://www.wipo.int/directory/en/**

**CAPITAL MARKETS AND PORTFOLIO INVESTMENT**

Zimbabwe has two stock exchanges in Harare and Victoria Falls. The Zimbabwe Stock Exchange (ZSE) in Harare currently has 51 publicly listed companies with a total market capitalization of US$13 billion as of March 16, 2022. Stock and money markets are open to foreign portfolio investment. Foreign investors can take up to a maximum of 49 percent of any locally listed company with any single investor limited to a maximum of 15 percent of the outstanding shares. Regarding the money market, foreign investors may buy up to 100 percent of the primary issues of bonds and stocks and there is no limit on the level of individual participation.

There is a 1.48 percent withholding tax on the sale of marketable securities, while the tax on purchasing stands at 1.73 percent. Totaling 3.21 percent, the rates are comparable with the average of 3.5 percent for the region. As a way of raising funds for the state, the government mandated insurance companies and pension funds invest between 25 and 35 percent of their portfolios in prescribed government bonds. Zimbabwe's high inflation has greatly eroded the value of domestic debt instruments and resulted in negative real interest rates on government bonds.

Zimbabwe launched the Victoria Falls Stock Exchange (VFEX) in September 2020. Four companies have listed on the VFEX with a market capitalization of US$256 million as of March 16, 2022.

The country respects the IMF's Article VIII and refrains from restrictions on payments and transfers for current international transactions provided there is sufficient foreign exchange to finance the transactions. Depending on foreign currency availability, foreign companies with investments in Zimbabwe can borrow locally on market terms.

Although credit is allocated on market terms and foreigners are allowed to borrow on the local market, lack of foreign exchange constrains the financial sector from extending credit to the private sector.

**MONEY AND BANKING SYSTEM**

Three major international commercial banks and several regional and domestic banks operate in Zimbabwe, but they have reduced their branch network substantially in line with declining business opportunities. The central bank (Reserve Bank of Zimbabwe (RBZ)) maintains the banking sector is generally stable despite a harsh operating environment characterized by high credit risk, high inflation, and foreign