# TABLE OF CONTENTS

## Volume 5

State Department 2022 Investment Climate Statement for Zimbabwe (ECF No. 45-34)(continued)...............................................................................JA1001

State Department 2021 Investment Climate Statement for Zimbabwe (ECF No. 45-35)...........................................................................................JA1015

State Department 2020 Investment Climate Statement for Zimbabwe (ECF No. 45-36)...........................................................................................JA1041

State Department 2019 Investment Climate Statement for Zimbabwe (ECF No. 45-37)...........................................................................................JA1063

State Department 2018 Investment Climate Statement for Zimbabwe (ECF No. 45-38)...........................................................................................JA1086

State Department 2017 Investment Climate Statement for Zimbabwe (ECF No. 45-39)...........................................................................................JA1110

Congressional Testimony, dated July 18, 2013 (ECF No. 45-40)................JA1133

Mining Zimbabwe Article (ECF No. 45-41)..................................................JA1137

Memorandum re Transfer of ZMDC Shareholding to Defold, dated April 14, 2022 (ECF No. 45-42)............................................................................JA1142

Reply to Opposition to Motion Dismiss (ECF No. 48).................................JA1144

Memorandum Opinion and Order dated February 9, 2024 (ECF No. 51).....JA1172

Notice of Appeal (ECF No. 52).....................................................................JA1193

exchange constraints. Most Zimbabwean correspondent banking relationships are in jeopardy or have already been severed due to international bank efforts to reduce risk (de-risking) connected to the high penalties for non-compliance with prudential anti-money laundering/counter-terrorism finance (AML/CFT) guidelines in developed countries. However, in March 2022, the Financial Action Task Force (FATF) removed Zimbabwe from the "gray list" in response to "significant progress in improving its AML/CFT regime" and Zimbabwe is no longer subject to the FATF's increased monitoring process.

As of December 31, 2021, the sector had 19 operating institutions, comprising 13 commercial banks, five building societies, and one savings bank. According to the RBZ, as of December 2021, 11out of 13 operating commercial banking institutions and two out of five building societies complied with the prescribed minimum core capital requirements. The level of non-performing loans rose slightly from 0.31 percent in December 2020 to 0.94 percent by December 2021. The RBZ attributed the increase to the disruptive effects of the COVID-19 pandemic. The RBZ reports the total loans-to-deposits ratio rose from 40.4 percent in December 2020 to 48.3 percent in December 2021.

According to the central bank, total deposits (including interbank deposits), rose from ZWL$204.13 billion in December 2020 to ZWL$476.35 billion in December 2021, an increase of 76 percent in U.S. dollar terms. The total assets of the banking sector stood at ZWL$763 billion or US$7 billion at the end of December 2021 up from ZWL$349.6 billion or US$4.3 billion on December 31, 2020.

## FOREIGN EXCHANGE AND REMITTANCES

### Foreign Exchange

The RBZ takes 40 percent of foreign currency earned from exports at the auction exchange rate while exporters retain the other 60 percent in foreign exchange. The authorities change these levels periodically without notice depending on the severity of the foreign exchange constraint. Additionally, businesses selling domestically in foreign currency must surrender 20 percent of the receipts to the central bank in exchange for local currency at the auction rate.

Weak investment inflows and poor export growth have resulted in a perennial shortage of foreign exchange. Consequently, investors cannot freely convert funds associated with any form of investment into foreign currency. Although the situation improved after authorities adopted an auction system to allocate foreign exchange, businesses still rely on a black market for foreign exchange to make external payments as the supply of foreign exchange always falls short of demand leading to long allotments backlog.

Following the June 2019 ban on the use of foreign currencies in domestic transactions in favor of the Zimbabwe dollar, the Zimbabwe dollar continued to depreciate on the parallel market as the government did not have reserves to defend the local currency in the face of the COVID-19 pandemic. Consequently, the government reversed course in March 2020 and allowed the use of foreign currencies in domestic transactions. However, due to foreign currency shortages, the consistent gap between the parallel market and the official exchange rates continued to grow. In April 2020, the RBZ instituted an official fixed exchange rate of 25:1, while U.S. dollars remained over twice as expensive on the parallel market. By June 23, 2020, the government could no longer sustain the fixed exchange rate and instituted weekly foreign exchange auctions, allowing the local currency to depreciate 77 percent relative to the U.S. dollar by December 2021. The official rate is close to 80 percent stronger than the parallel market rate, and business leaders maintain the RBZ manipulates the auction results and exercises discretion in allocating which businesses can access foreign currency at the auction rate.

**Remittance Policies**

Foreigners can remit capital appreciation, dividend income, and after-tax profits provided the foreign exchange is available. Firms may find difficulty in accessing foreign exchange at the auction rate.

## SOVEREIGN WEALTH FUNDS

The government set aside US$1 million toward administrative costs related to the setting up of a SWF in its 2016 budget. Although the government proposed to capitalize the SWF through a charge of up to 25 percent on royalty collections on mineral sales, as well as through a special dividend on the sale of diamond, gas, granite and other minerals, it has not done so. In 2021, state media listed the SWF as a shareholder of a new major mining company in Zimbabwe.

# 7. State-Owned Enterprises

Zimbabwe has 107 state-owned enterprises (SOEs), defined as companies wholly owned by the state. A list of the SOEs appears **here**. Many SOEs support vital infrastructure including energy, mining, and agribusiness. Competition within the sectors where SOEs operate tends to be limited. However, the government of Zimbabwe (GOZ) invites private investors to participate in infrastructure projects through public-private partnerships (PPPs). Most SOEs have public function mandates, although in more recent years, they perform hybrid activities of satisfying their public functions while seeking profits. SOEs should

have independent boards, but in some instances such as the recent case of the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards.

Zimbabwe does not appear to subscribe to the Organization for Economic Cooperation and Development (OECD) guidelines on corporate governance of SOEs. SOEs are subject to the same taxes and same value-added tax rebate policies as private sector companies. SOEs face several challenges that include persistent power outages, mismanagement, lack of maintenance, inadequate investment, a lack of liquidity and access to credit, and debt overhangs. As a result, SOEs have performed poorly. Few SOEs produce publicly available financial data and even fewer provide audited financial data. SOE poor management and lack of profitability has imposed significant costs on the rest of the economy.

## PRIVATIZATION PROGRAM

Although the government committed itself to privatize most SOEs in the 1990s, it only successfully privatized two parastatals. In 2018, the government announced it would privatize 48 SOEs. So far, it has only targeted five in the telecommunications, postal services, and financial sectors for immediate reform, but the privatizations have not yet concluded. The government encourages foreign investors to take advantage of the privatization program to invest in the country, but inter-SOE debts of nearly USD 1 billion pose challenges for privatization plans. According to the government's investment guidelines, it is still working out the process under which it will dispose its shareholding to the private sector.

# 8. Responsible Business Conduct

Awareness of standards for responsible business conduct (RBC) is mainly driven by the private sector through the Standards Association of Zimbabwe.

The Zimbabwean government has not taken any measures to encourage RBC and it does not take into account RBC policies or practices in procurement decisions.

The private sector developed the National Corporate Governance Code of Zimbabwe (ZimCode), which is a framework designed to guide Zimbabwean companies on RBC. The Confederation of Zimbabwe Industries, an industrial advocacy group, , has a standing committee on business ethics and standards that drives ethical conduct within the Zimbabwean private sector. The organization has developed its own charter according to OECD guidelines, highlighting good corporate governance and ethical behavior. Firms that demonstrate corporate social responsibility do not automatically garner favorable treatment from consumers, employees, or the government.

1003

The U.S Department of Labor's (DOL) report **https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods** published in September 2020 reports that children work in Zimbabwe's sugarcane and tobacco industries. The DOL's **report** **https://www.dol.gov/agencies/ilab/resources/reports/child-labor/zimbabwe** found children in Zimbabwe engage in the worst forms of child labor, including in mining, agriculture, and tobacco production. Law enforcement agencies lack resources to enforce child labor laws. The COVID-19 crisis severely limited the government's ability to combat the worst forms of child labor. The country's continuing economic decline and school closures due to COVID-19 lockdown restrictions likely increased the number of children working in informal labor sectors, including those that harbor the worst forms of child labor, to support family incomes.

The government regularly thwarts union efforts to demonstrate with violence and excessive force and harasses labor leaders. Police and state intelligence services regularly attend and monitor trade union activities, sometimes preventing unions from holding meetings with their members and carrying out organizational activities. Although unions are not required by law to notify police of public gatherings, police require such notification in practice. Those unions engaging in strikes deemed illegal risk fines and imprisonment.

The government ordered in March 2021 the eviction of 13,000 members of the Chilonga community in the southeastern part of the country, but eventually backed down after a court ruled in favor of a temporary relief. Although the Chilonga villagers appealed the eviction citing unconstitutionality of sections of the Communal Land Act the government used in its eviction order, the High Court ruled in favor of the government but recommended a review of the Act.

Although the Zimbabwean government has expressed its intention to implement the Extractive Industries Transparency Initiative (EITI) principles to strengthen accountability, good governance, and transparency in the mining sector, it has yet to launch an EITI program. A domestic initiative called the Zimbabwe Mining Revenue Transparency Initiative (ZMRTI) has produced limited results.

Zimbabwe is not signatory to the Montreux Document on Private Military and Security Companies.

U.S. Customs and Border Patrol issued a withhold release order on Zimbabwean rough diamonds from Marange in 2019 after an investigation concluded that forced labor contributed to the mining activity. Widespread artisanal and small-scale gold mining presents a threat to the environment, and informal miners have little-to-no safety and labor protections.

## ADDITIONAL RESOURCES

Department of State

Country Reports on Human Rights Practices;

Trafficking in Persons Report;

Guidance on Implementing the "UN Guiding Principles" for Transactions Linked to Foreign Government End-Users for Products or Services with Surveillance Capabilities;

U.S. National Contact Point for the OECD Guidelines for Multinational Enterprises; and;

Xinjiang Supply Chain Business Advisory

Department of the Treasury

OFAC Recent Actions

Department of Labor

Findings on the Worst Forms of Child Labor Report;

List of Goods Produced by Child Labor or Forced Labor;

Sweat & Toil: Child Labor, Forced Labor, and Human Trafficking Around the World and;

Comply Chain.

## CLIMATE ISSUES

Zimbabwe developed a national climate policy in 2017 which provides an overarching framework that gives the country basic principles and guidance under which climate change response strategy will be implemented. The government has stated its intention to reduce emissions of sectoral greenhouse gasses without specifying action plans to achieve these objectives. The policy does not specify any regulatory incentives towards achievement of set objectives.

# 9. Corruption

Endemic corruption presents a serious challenge to businesses operating in Zimbabwe. Zimbabwe's scores on governance, transparency, and corruption perception indices are well below the regional average. U.S. firms have identified corruption as an obstacle to FDI, with many corruption allegations stemming from opaque procurement processes.

1005

In theory, the government has specified laws that require managers and directors to declare their financial interests in the public sector, although these may not be followed in practice. As noted below, Zimbabwe does not have laws that guard against conflict of interest with respect to the conduct of private companies, but existing rules on the Zimbabwe Stock Exchange compel listed companies to disclose, through annual reports, minimum disclosure requirements.

While anti-corruption laws exist and extend to family members of officials and political parties, the government tends to engage in selective enforcement against the opposition while engaging in "catch and release" of government officials and their business partners. As a result, Transparency International ranked Zimbabwe 157 out of 175 countries and territories surveyed in 2020 with respect to perceptions of corruption. In 2005, the government enacted an Anti-Corruption Act that established a government-appointed Zimbabwe Anti-Corruption Commission (ZACC), the structure of which has evolved over time. Following the end of Robert Mugabe's rule in November 2017, the government pledged to address governance and corruption challenges by appointing a new ZACC chaired by a former High Court Judge and granting it new powers. President Mnangagwa also established a special unit within his office to deal with corruption cases. Despite these developments, the government has a track record of prosecuting individuals selectively, focusing on those who have fallen out of favor with the ruling party and ignoring transgressions by members of the favored elite. Accusations of corruption seldom result in formal charges and convictions. Zimbabwe does not provide any special protections to NGOs investigating corruption in the public sector. Journalists reporting on high-level corruption have suffered from arbitrary arrests and lengthy detentions.

While Zimbabwe does not have laws that guard against conflict of interest with respect to the conduct of private companies, existing rules on the Zimbabwe Stock Exchange compel listed companies to disclose, through annual reports, minimum disclosure requirements. Regarding SOEs, the government has specified laws that require managers and directors to declare their financial interests. In 2016, the World Bank report on the extent of conflict-of-interest regulation index (0-10), put Zimbabwe at 5.

While Zimbabwe signed the United Nations Convention against Corruption in 2004 and ratified the treaty in 2007, it is not party to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

## RESOURCES TO REPORT CORRUPTION

Contact at the government agency or agencies that are responsible for combating corruption:

Zimbabwe Anti-Corruption Commission (ZACC)

172 Herbert Chitepo Avenue,

Harare.

+263 (242) 369602; +263 71 952 9483

reports@zacc.co.zw

Contact at a "watchdog" organization:

Transparency International Zimbabwe

96 Central Avenue,

P O Box CY 434, Causeway

Harare

+263 4 793 246/7

**tiz@tizim.org**     ; **info@tizim.org**

# 10. Political and Security Environment

Political parties, labor organizations, and civil society groups sometimes encounter state-sponsored intimidation and repression from government security forces and Zimbabwe African National Union – Patriotic Front (ZANU-PF) – linked activists. Disagreements between and within political parties occasionally result in violence targeting political party members. Political tensions and civil unrest persist since the end of Robert Mugabe's rule in November 2017. On August 1, 2018, the army fired upon people demonstrating against the delay in announcing official presidential election results, killing six civilians. In response to January 2019 demonstrations against rising fuel prices, security forces killed 17, raped 16, injured hundreds, and arrested more than 800 people over the course of several weeks. The crackdown targeted members of the main opposition party, civil society groups, and labor leaders.

In 2020 and 2021, the government arrested and detained journalists, several leaders of opposition parties, and trade union activists for organizing demonstrations against corruption and allegedly violating bail conditions. Police also arrested three women members of the opposition party, MDC Alliance (now Citizens Coalition for Change (CCC)), including a member of parliament for violating lockdown measures when they demonstrated against corruption and food shortages during the first of several lockdowns imposed on the country to fight COVID-19. They were subsequently abducted from police custody and tortured by alleged security agents. Since then, the government routinely arrests and detains the three leaders whenever they speak out against the government. Political tensions also prevailed during campaigns for the March 26, 2022 by-elections. On February 26, 2022, ZANU-PF-affiliated youths allegedly killed CCC rally attendee

Mboneli Ncube and injured 22 others after they stormed a CCC rally in Kwekwe. The CCC also reported attacks targeted at its activists and supporters across the country.

Political uncertainty remains high. Violent crime, such as assault, smash and grabs, and home invasion, is common. Armed robberies perpetrated by serving members of the army and police have increased. Local police lack the resources to respond effectively to serious criminal incidents. Incidents of violence have typically not targeted investment projects.

# 11. Labor Policies and Practices

Decades of political and economic crises have led to the emigration of many of Zimbabwe's skilled and well-educated citizens. Formal sector employment has fallen significantly. Anecdotal evidence shows widespread youth unemployment as the country continues to produce graduates without a matching growth in employment opportunities. According to the Labor Force Survey, Zimbabwe's unemployment rate stood at 16.4 percent in 2019, the latest available data. As a result, most end up joining the informal sector estimated at over 85 percent of the workforce. The government strongly encourages foreign investors to make maximum use of Zimbabwean management and technical personnel and any investment proposal that involves the employment of foreigners must present a strong case to obtain work and residence permits. Normally, the maximum contract period for a foreigner is three years but with possible extension to five years for individuals with highly specialized skills.

According to the IMF, Zimbabwe has the second largest informal economy (as a share of GDP) in the world, after Bolivia, with a 60.6 percent contribution to the country's GDP. Official data from the Zimbabwe National Statistical Agency (ZimStat) shows women accounted for 43 percent of the people involved in the informal sector in 2019.

The country's labor laws make it very difficult for employers to adjust employment in response to an economic downturn except in the Special Economic Zones (SEZs) where labor laws do not apply. Outside the SEZs, the employer must engage the employees and their representatives and agree to adopt measures to avoid retrenchment. If the measures fail, the employer can retrench and pay an all-inclusive package of one-month salary for each two years of service or the pro rata share thereof. Labor laws differentiate between layoffs and severance with the former falling under retrenchment where the retrenchment law must apply. The law does not accept unfair dismissal or layoffs of employees. The 2015 amendments to the act only permit terminations of contracts to be in terms of a registered code of conduct, expiry of a contract of fixed term duration, or mutual agreement. There is no unemployment insurance or other safety net programs for workers laid off for economic reasons.

Collective bargaining agreements apply to all workers in an industry, not just union members. Collective bargaining takes place at the enterprise and industry levels. At the enterprise level, work councils negotiate collective agreements, which become binding if approved by 50 percent of the workers in the bargaining unit. Industry-level bargaining takes place within the framework of National Employment Councils. Unions representing at least 50 percent of the workers may bargain with the authorization of the Minister of Public Service and Labor. The law encourages the creation of employee-controlled workers' committees in enterprises where less than 50 percent of workers are unionized. Workers' committees exist in parallel with trade unions. Their role is to negotiate shop floor grievances, while that of the trade unions is to negotiate industry-level grievances, notably wages. The minister and the registrar have broad powers to take over the direction of a workers' committee if they believe it is mismanaged. Trade unions regarded the existence of such a parallel body as an arrangement that allows employers to undermine the role of unions.

Employers in all sectors rely heavily on temporary or contract workers to avoid having to pay severance costs and follow other onerous termination procedures. The Labor Amendment Act of 2015, however, requires employment councils to put a limit on the number of times employers can renew short-term contracts. The government does not waive labor laws in order to attract or retain investment, except in the case of SEZs.

The law provides for the right of private-sector workers to form and join unions, conduct legal strikes, and bargain collectively. Public-sector workers may not form or join trade unions but may form associations that bargain collectively and strike. The law prohibits anti-union discrimination, provides that the labor court handle discrimination complaints, and may direct reinstatement of workers fired due to such discrimination. However, the government does not respect workers' rights to form or join unions, strike, and bargain collectively.

Parliament enacted a bill establishing the Tripartite Negotiating Forum (TNF) in 2019 to formalize dialogue efforts among government, labor leaders, and employers to discuss social and economic policy and address demands. However, the forum met only once in 2020. The Zimbabwe Congress of Trade Unions (ZCTU) stated the TNF did little to address workers' demands for wage increases and labor law reform, and the government showed little progress in supporting workers' protections, fairness, and peaceful resolution of labor disputes.

The country has a labor dispute resolution process that starts at the company level through disciplinary or grievance committees. If the issue is not resolved at this level, the aggrieved party can appeal to either the employment council or the Labor Court depending on the industrial agreement. Other redress is through the Ministry of Public Service, Labor, and Social Welfare in which labor officers settle disputes for industries

without employment councils. From the Labor Court, an aggrieved party can appeal to the Supreme Court. Labor inspections are minimal due to a lack of inspectors.

The government continues to harass labor unions and their leaders. Police and state intelligence services regularly attend and monitored trade union activities and sometimes prevented unions from holding meetings with their members and carrying out organizational activities. Although unions are not required by law to notify police of public gatherings, police require such notification in practice. Those unions engaging in strikes deemed illegal risk fines and imprisonment.

The government used violence and excessive force when some unions tried to demonstrate during the period under review. Police arrested three members of the Amalgamated Rural Teachers Union of Zimbabwe (ARTUZ) following a June 2020 protest in Masvingo to demand increased salaries paid in U.S. dollars. Police also arrested 13 nurses at Harare Central Hospital in July and charged them with contravening COVID-19 lockdown regulations, with photos and video of police holding clubs and chasing nurses circulating widely on social media. In July 2020, the Zimbabwe Republic Police published a list of 14 prominent government critics wanted for questioning, including the presidents of ZCTU and ARTUZ, regarding planned anti-corruption demonstrations on July 31, 2020. In the lead-up to the planned July 31 protests, the ZCTU president suspected state security agents slashed his car tires and unsuccessfully tried to seize his relatives, and the ARTUZ president alleged that armed suspected state security agents detained his wife and besieged the home of a relative demanding to know his whereabouts.

The government is a member of the International Labor Organization (ILO) and has ratified conventions protecting worker rights. The country has been subject to ILO supervisory mechanisms for practices that limit workers' rights to freely associate, organize, and hold labor union meetings. At the 108th session of the ILO's International Labor Conference in June 2019, the Committee on the Application of Standards noted concern regarding the government's failure to implement specific recommendations of the 2010 Commission of Inquiry, which found the government responsible for serious violations of fundamental rights by its security forces, including a clear pattern of intimidation that included arrests, detentions, violence, and torture against union and opposition members. The Committee also noted persisting allegations of violations of the rights of the freedom of assembly of workers' organizations. The Committee urged the government to accept a direct contacts mission of the ILO to assess progress before the next conference. The government ultimately agreed to accept a direct contacts mission, originally scheduled for May 2020 but postponed due to the COVID-19 pandemic.

In 2020 the Office of the U.S. Trade Representative initiated a review of Zimbabwe's eligibility for trade preferences under the Generalized System of Preferences due to concerns of worker rights related to a lack

of freedom of association, including the rights of independent trade unions to organize and bargain collectively, and government crackdown on labor activists. The review has not yet concluded.

## 12. U.S. International Development Finance Corporation (DFC), and Other Investment Insurance or Development Finance Programs

The U.S. government and Zimbabwe concluded with OPIC (now DFC) an Investment Incentive Agreement in April 1999, which permits DFC to conduct transactions in Zimbabwe. The agreement entered into force in March 2021. DFC has a few loan portfolio guarantees (LPG) with local banks in Zimbabwe. The agency has not initiated a new project since 2015. The LPG stimulates credit and increases access to finance for Zimbabwean micro, small and medium enterprises (MSMEs) in the agricultural sector as well as youth and women-owned enterprises in every sector. To date, supported banks have disbursed more than 700 loans worth nearly $6 million to MSMEs in Zimbabwe with 90 percent going to new borrowers who are traditionally excluded due to lack of collateral and perceived high risk.

Zimbabwe acceded to the World Bank's Multilateral Investment Guarantee Agency in September 1989. Support from the Export-Import Bank of the United States is limited in Zimbabwe. Finance and export promotion programs, as well as investment insurance offered through international financial institutions, remain limited due largely to Zimbabwe's mounting multilateral and bilateral debt arrears.

## 13. Foreign Direct Investment Statistics

Table 2: Key Macroeconomic Data, U.S. FDI in Host Country/Economy

| Economic Data | Host Country Statistical source* | | USG or international statistical source | | USG or International Source of Data: BEA; IMF; Eurostat; UNCTAD, Other |
|---|---|---|---|---|---|
| | Year | Amount | Year | Amount | |
| Host Country Gross Domestic Product (GDP) ($M USD) | 2020 | $18,333 | 2020 | $18,051 | www.worldbank.org/en/country |
| Foreign Direct Investment | Host Country Statistical source* | | USG or international statistical source | | USG or international Source of data: BEA; IMF; Eurostat; UNCTAD, Other |
| U.S. FDI in partner country ($M USD, stock positions) | 2020 | N/A | 2020 | (D) | BEA data available at https://apps.bea.gov/ international/factsheet/ |
| Host country's FDI in the United States ($M USD, stock positions) | 2020 | N/A | 2020 | (*) | BEA data available at https://www.bea.gov/ international/direct-investment -and-multinational-enterprises- comprehensive-data |
| Total inbound stock of FDI as % host GDP | 2020 | 32.2% | 2020 | 28.1% | UNCTAD data available at https://unctad.org/topic/ investment/world-investment- report |

*Ministry of Finance and Economic Development, 2021 National Budget Statement.*

(D) – Information suppressed to avoid disclosure of data of individual companies.

(*) – Indicates a non-zero value between -USD500,000 and +USD500,000.

**Table 3: Sources and Destination of FDI**

Data not available.

**Table 4: Sources of Portfolio Investment**

Data not available.

# 14. Contact for More Information

Economic Specialist

U.S. Embassy Harare

2 Lorraine Drive, Bluffhill, Harare

+263 8677011000

zimbizopps@state.gov

---

**TAGS**

Bureau of African Affairs    Bureau of Economic and Business Affairs    Zimbabwe

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

1013

# Exhibit HH

An official website of the United States Government <u>Here's how you know</u>

○

**Home** > ... > Zimbabwe

# 2021 Investment Climate Statements: Zimbabwe

**IN THIS SECTION /**
**EXECUTIVE SUMMARY**

## EXECUTIVE SUMMARY

Zimbabwe suffered serious economic contractions in 2019 and 2020 due to the extended effects of climate shocks that crippled agriculture and electricity generation as well as a fiscal adjustment, a volatile currency, and the negative impact of the COVID-19 pandemic which led to lockdowns, reduced investment inflows, and broken supply chains. Although the authorities acknowledge the COVID-19 pandemic still presents risks, they project that a favorable balance of payments position, fiscal consolidation, and a good 2020/21 agricultural season will result in a 7.4 percent economic recovery in 2021. International financial institutions also project positive, if more modest, growth. In 2020, inflation peaked at 837 percent in July then remained high but steadily declined to end the year at 384 percent. Authorities attributed the decline to the introduction of a weekly foreign exchange auction system in June 2020. Although the weekly weighted average exchange rate between the Zimbabwe dollar and the U.S. dollar depreciated by 70 percent between June 2020 and February 2021, it remains overvalued relative to the black market. The government aims to reduce inflation to 135 percent in 2021.

To improve the ease of doing business, the government formed the Zimbabwe Investment and Development Agency (ZIDA) in 2020, intended as a one-stop-shop to promote and facilitate both domestic and foreign investment in Zimbabwe. Zimbabwe's incentives to attract FDI include tax breaks for new investment by foreign and domestic companies, and making capital expenditures on new factories, machinery, and improvements fully tax deductible. The government waives import taxes and surtax capital equipment. It has made gradual progress in improving the business environment by reducing regulatory costs, but policy inconsistency and weak institutions have continued to frustrate businesses.

Corruption remains rife and there is little protection of property rights, particularly with respect to agricultural land. Historically, the government has committed to protect property rights but has, at times, resorted to expropriating land without compensation.

The Finance Act (No 2) at the end of 2020 amended the Indigenization Act by removing language designating diamonds and platinum as the only minerals subject to indigenization (requiring majority ownership by indigenous Zimbabweans), thus finally ending all indigenization requirements in all sectors. However, the new legislation also granted broad discretion to the government to designate minerals as subject to indigenization in the future. The government subsequently issued statements to reassure investors that no minerals will be subject to indigenization, including diamonds and platinum.

The government ended its 2019 ban on using foreign currencies for domestic transactions in March 2020. However, the authorities decreed that businesses selling in foreign exchange must surrender 20 percent of the receipts to the central bank in exchange for local currency. Exporters must surrender 40 percent of foreign currency earnings.

Zimbabwe's arrears in payments to international financial institutions and its high external debt (public and private) of over USD 10.7 billion limit the country's ability to access official development assistance at concessional rates. Additionally, domestic banks do not offer financing for periods longer than two years, with most financing limited to 180 days or less. The sectors that attract the most investor interest include agriculture (tobacco, in particular), mining, energy, and tourism. Zimbabwe has a well-earned reputation for the high education levels of its workers.

*Table 1: Key Metrics and Rankings*

| Measure | Year | Index/Rank | Website Address |
|---|---|---|---|
| **TI Corruption Perceptions Index** | 2020 | 157 of 175 | http://www.transparency.org/research/cpi/overview |
| **World Bank's Doing Business Report** | 2020 | 140 of 190 | http://www.doingbusiness.org/en/rankings |
| **Global Innovation Index** | 2020 | 120 of 131 | https://www.globalinnovationindex.org/analysis-indicator |
| **U.S. FDI in partner country ($M USD, historical stock positions)** | 2019 | -USD 72 | https://apps.bea.gov/international/factsheet/ |
| **World Bank GNI per capita** | 2019 | USD 1,390 | http://data.worldbank.org/indicator/NY.GNP.PCAP.CD |

# 1. Openness To, and Restrictions Upon, Foreign Investment

**Policies Towards Foreign Direct Investment**

To attract FDI and improve the country's competitiveness, the government has encouraged public-private partnerships and emphasized the need to improve the investment climate by lowering the cost of doing business as well as restoring the rule of law and sanctity of contracts. Implementation, however, has been limited.

The government amended the Indigenization Act by removing diamonds and platinum from minerals subject to indigenization (requiring majority ownership by indigenous Zimbabweans), although the new legislation appeared to grant broad discretion to the GOZ to designate minerals as subject to indigenization in the future. Subsequently, the GOZ reassured investors that no minerals will be subject to indigenization, including diamonds and platinum. However, there are smaller sectors "reserved" for Zimbabweans (see below).

To improve the ease of doing business, the government enacted legislation that led to the formation of the Zimbabwe Investment and Development Agency (ZIDA) in 2020. ZIDA replaced the Zimbabwe Investment Authority and describes itself as a one-stop-shop center in promoting and facilitating both domestic and foreign investment in Zimbabwe.

While the government has committed to prioritizing investment retention, there are still no mechanisms or formal structures to maintain ongoing dialogue with investors.

**Limits on Foreign Control and Right to Private Ownership and Establishment**

Foreign and domestic private entities have a right to establish and own business enterprises and engage in all forms of remunerative activity, but foreign ownership of businesses in certain reserved sectors is limited, as outlined below.

Foreign investors are free to invest in most sectors without any restrictions as the government aims to bring in new technologies, generate employment, and value-added manufacturing. According to the ZIDA Act, "foreign investors may invest in, and reinvest profits of such investments into, any and all sectors of the economy of Zimbabwe, and in the same form and under the same conditions as defined for Zimbabweans under the applicable laws and regulations of Zimbabwe." However, the government reserves certain sectors for Zimbabweans such as passenger buses, taxis and car hire services, employment agencies, grain milling, bakeries, advertising, dairy processing, and estate agencies.

The country screens FDI through the ZIDA in liaison with relevant line ministries to confirm compliance with the country's laws.

According to the country's laws, U.S. investors are not especially disadvantaged or singled out by any of the ownership or control mechanisms relative to other foreign investors. In its investment guidelines, the government states its commitment to non-discrimination between foreign and domestic investors and among foreign investors.

**Other Investment Policy Reviews**

In the past three years, the government has not conducted an investment policy review through the Organization for Economic Cooperation and Development (OECD), the World Trade Organization (WTO) or the United Nations Conference on Trade and Development (UNCTAD).

**Business Facilitation**

Policy inconsistency, administrative delays and costs, and corruption hinder business facilitation. Zimbabwe does not have a fully online business registration process, though one can begin the process and conduct a name search online via the ZimConnect web portal. The government created the Zimbabwe Investment Development Agency (ZIDA, **https://www.zidainvest.com/** ) which replaced the Zimbabwe Investment Authority (ZIA), the Special Economic Zones Authority, and the Joint Venture Unit to oversee the licensing

and implementation of investment projects in the country. The Agency has established a one-stop investment services center (OSISC) which houses several agencies that play a role in the licensing, establishment, and implementation of investment projects including the Zimbabwe Revenue Authority (ZIMRA), Environmental Management Agency (EMA), Reserve Bank of Zimbabwe (RBZ), National Social Security Authority (NSSA), Zimbabwe Energy Regulatory Authority (ZERA), Zimbabwe Tourism Authority, the State Enterprises Restructuring Agency, and specialized investment units within relevant line ministries. The business registration process currently takes 27 days.

**Outward Investment**

Zimbabwe does not promote or incentivize outward investment due to the country's tight foreign exchange reserves. Although the government does not restrict domestic investors from investing abroad, any outward investment requires approval by exchange control authorities. Firms interested in outward investment would face difficulty accessing the limited foreign currency at the more favorable official exchange rate.

# 2. Bilateral Investment and Taxation Treaties

Zimbabwe has negotiated investment treaties with 35 countries, but it has ratified only 11 including those with the Netherlands, Kuwait, Denmark, China, Germany, Russia, South Africa, and Switzerland. In spite of these agreements, the government has failed to protect investments undertaken by nationals from these countries, particularly with regard to land. In 2009, for example, an army officer seized a farm belonging to a German national, but the government did not intervene, despite its assurance that Zimbabwe would honor all obligations and commitments to international investors. Some claimants protected by investment treaties have pursued arbitration through the International Centre for Settlement of Investment Disputes. For example, in 2015, a different Swiss-German family won a landmark USD 196 million judgment at the International Center for Settlement of Investment Disputes in compensation for expropriated land but has received only partial payment.

Zimbabwe is a member of the Southern African Development Community (SADC) and the Common Market for Eastern and Southern Africa (COMESA), and it is a signatory to the SADC and COMESA trade protocols establishing free trade areas (FTA) with the aim of growing into a customs union. Zimbabwe is also a member of the African Continental Free Trade Area (AfCFTA) which came into force on January 1, 2021, with the aim of creating a single continental market and paving the way for the establishment of a customs union.

The United States does not have a bilateral taxation and/or investment treaty with Zimbabwe. The United States has a Trade and Investment Framework Agreement (TIFA) with the Common Market for Eastern and Southern Africa (COMESA), of which Zimbabwe is a member. This TIFA provides a mechanism to discuss disputes, although the protection offered by the TIFA is much more limited than protection typically provided by a bilateral investment treaty.

# 3. Legal Regime

**Transparency of the Regulatory System**

The government officially encourages competition within the private sector and seeks to improve the ease of doing business, but the bureaucracy within regulatory agencies still lacks transparency, and corruption is prevalent. Investors have complained of policy inconsistency and unpredictability. Moreover, Zimbabwe does not have a centralized online location where key regulatory actions are published and investors have to contact ZIDA.

The government at times uses statutory instruments and temporary presidential powers to alter legislation impacting economic policy. These powers have limited duration – the government must pass legislation within six months for the presidential powers to become permanent. These measures, which can appear without warning, often surprise businesses and lack implementation details, leading firms to delay major business decisions until gaining clarity. For example, the government unexpectedly prohibited the use of foreign currencies for domestic transactions in June 2019 but lifted the ban in March 2020, amidst the COVID-19 pandemic and growing economic pressure. The government has made changes to share of foreign currency earnings that exporters must surrender to the central bank without warning or stakeholder consultations. The standard legislative process, on the other hand, does provide ample opportunity for public review and comment before the final passage of new laws. The development of regulations follows a standard process and includes a period for public review and comment.

According to the Department of State's 2020 Fiscal Transparency Report, public budget documents do not provide a full picture of government expenditures, and there is a notable lack of transparency regarding state-owned enterprises and the extraction of natural resources. The information on public finances is generally unreliable, as actual revenue and expenditure have deviated significantly from the enacted budgets. Information on some debt obligations is publicly available, but not information on contingent debt.

**International Regulatory Considerations**

Zimbabwe is a member of the Southern African Development Community (SADC) and the Common Market for Eastern and Southern Africa (COMESA), and it is a signatory to the SADC and COMESA trade protocols establishing free trade areas (FTA) with the aim of growing into a customs union. Zimbabwe is also a member of the African Continental Free Trade Area (AfCFTA) which came into force on January 1, 2021, with the aim of creating a single continental market and paving the way for the establishment of a customs union. Although the country is also a member of the World Trade Organization (WTO), it normally notifies only SADC and COMESA of measures it intends to implement.

**Legal System and Judicial Independence**

According to the country's law and constitution, Zimbabwe has an independent judicial system whose decisions are binding on the other branches of government. The country has written commercial law and, in 2019, established four commercial courts at the magistrate level. The government also trained 55 magistrates in the same year. Administration of justice in commercial cases that do not touch on political interests is still generally impartial, but for politicized cases government interference in the court system has hindered the delivery of impartial justice. Regulations or enforcement actions are appealable and are adjudicated in the national court system.

**Laws and Regulations on Foreign Direct Investment**

As noted above, in 2020, foreign investors are free to invest in most sectors including mining without any restrictions following the amendment to the Indigenization and Economic Empowerment Act which required majority ownership by indigenous Zimbabweans, as the government aims to bring in new technologies, generate employment, and value-added manufacturing. In certain sectors, such as primary agriculture, transport services, and retail and wholesale trade including distribution, foreign investors may not own more than 35 percent equity.

The ZIDA (found at **https://www.zidainvest.com/**), which now acts a one-stop shop for investors, promotes and facilitates both local and foreign direct investment.

**Competition and Antitrust Laws**

The government officially encourages competition within the private sector according to the Zimbabwe Competition Act. The Act provided for the formation of the Tariff and Competition Commission charged with investigating restrictive practices, mergers, and monopolies in the country. The Competition and Tariff Commission (CTC) is an autonomous statutory body established in 2001 with the dual mandate of implementing and enforcing Zimbabwe's competition policy and law and executing the country's trade

tariffs policy. The Act provides for transparent norms and procedures. Although the decision of the Commission is final, any aggrieved party can appeal to the Administrative Court against that decision.

**Expropriation and Compensation**

In 2000, the government began to seize privately-owned agricultural land and transfer ownership to government officials and other regime supporters. In April of that year, the government amended the constitution to grant the state's right to assert eminent domain, with compensation limited to the improvements made on the land. In September 2005, the government amended the constitution again to transfer ownership of all expropriated land to the government. Since the passage of this amendment, top government officials, supporters of the ruling Zimbabwe African National Union – Patriotic Front (ZANU-PF) party, and members of the security forces have continued to disrupt production on commercial farms, including those owned by foreign investors and those covered by bilateral investment agreements. Similarly, government officials have sought to impose politically connected individuals as indigenous partners on privately and foreign-owned wildlife conservancies.

In 2006, the government began to issue 99-year leases for land seized from commercial farmers, retaining the right to withdraw the lease at any time for any reason. These leases, however, are not readily transferable, and banks do not accept them as collateral for borrowing and investment purposes. The government continues to seize commercial farms without compensating titleholders, who have no recourse to the courts. The seizures continue to raise serious questions about respect for property rights and the rule of law in Zimbabwe.

In 2017, the government announced its intention to compensate farmers who lost their land and made small partial payments to the most vulnerable claimants. In July 2020, the government and white commercial farmers who lost land to the land reform program signed a US$3.5 billion global compensation agreement (GCA) for improvements made by commercial farmers on the farms. The government promised to pay a 50 percent deposit within 12 months of signing the GCA and 25% of the remainder in each subsequent year so that it makes full payment over five years. Given fiscal constraints, it remains unclear how the government will finance this sum.

**Dispute Settlement**

*ICSID Convention and New York Convention*

Zimbabwe acceded to the 1965 Convention on the Settlement of Investment Disputes between States and Nationals of Other States and to the 1958 New York Convention on the Recognition and Enforcement of

Foreign Arbitral Awards in 1994. However, the government does not always accept binding international arbitration of investment disputes between foreign investors and the state.

*Investor-State Dispute Settlement*

The government is signatory to several bilateral investment agreements with several countries (see above) in which international arbitration of investment disputes is recognized. As noted above, Zimbabwe does not have a Bilateral Investment Treaty or Free Trade Agreement with an investment chapter with the United States.

Local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors. For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial farms to the original owners. Once an investor has exhausted the administrative and judicial remedies available locally, the government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law (UNCITRAL). However, this has not occurred in practice.

*International Commercial Arbitration and Foreign Courts*

Domestic legislation on arbitration is modeled after the United Nations Commission on International Trade Law (UNCITRAL) model law, with minor modifications. This law covers both domestic and international arbitration. As noted above, local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors. For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial farms to the original owners. Once an investor has exhausted the administrative and judicial remedies available locally, the government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law. However, this has not occurred in practice.

**Bankruptcy Regulations**

In the event of insolvency or bankruptcy, Zimbabwe applies the Insolvency Act. All creditors have equal rights against an insolvent estate. In terms of resolving insolvency, Zimbabwe ranks 142 out of 190 economies in the World Bank's 2020 Doing Business Report. Zimbabwe does not criminalize bankruptcy unless it is the result of fraud, but the government blacklists a person declared bankrupt from undertaking any new business.

1024

# 4. Industrial Policies

**Investment Incentives**

Government incentives to foreign investors depend on the form of investment, the sectors, and whether or not the GOZ awards it national project status. For investment in industrial parks and tourism development zones, investors are exempt from paying tax for the first five years, after which they will pay tax at the rate of 25 percent (the normal tax rate is 35 percent). For build, own, operate, and transfer (BOOT) and build, operate, and transfer (BOT) joint ventures, investors are exempt from paying taxes for the first five years after which they will pay tax at the rate of 15 percent. Investors in the mining sector who export 50 percent of output benefit from a reduced corporation tax of 20 percent and are exempt from import duties on capital goods while losses are carried forward indefinitely for mining operations. Moreover, the government generally allows for duty exemptions in the importation of raw materials used in the manufacture of goods for export. In addition to these incentives, investments with national project status such as those in the renewable energy sector are allowed to borrow on local capital markets where lenders enjoy incentives including tax exemption on interest.

**Foreign Trade Zones/Free Ports/Trade Facilitation**

Zimbabwe now has approximately 183 companies operating in Export Processing Zones (EPZs). Benefits include a five-year tax holiday, duty-free importation of raw materials and capital equipment for use in the EPZ, and no tax liability from capital gains arising from the sale of property forming part of the investment in EPZs. The government generally requires that foreign capital comprise a majority of the investment in an EPZ-designated company and requires the company to export at least 80 percent of output. The latter requirement has constrained foreign investment in the zones. As noted above, the ZIDA took over the regulation of EPZs and the Special Economic Zones. However, to date, activity in special economic zones has been limited in spite of the incentives.

Although there are no discriminatory import or export policies affecting foreign firms, the government's approval criteria heavily favor export-oriented projects. Import duties and related taxes range as high as 110 percent.

**Performance and Data Localization Requirements**

The government mandates local employment except for specialized skills that are in short supply locally. The government encourages foreign investors to make maximum use of Zimbabwean management and technical personnel, and any investment proposal that involves the employment of foreigners must present

a strong case to obtain work and residence permits. Normally, the maximum contract period for a foreigner is three years but with possible extension to five years for individuals with highly specialized skills.

Foreigners intending to engage in meetings or discussions for business purposes are advised to secure a business visa for entry into Zimbabwe. Individuals found to be engaging in business-related activities on a tourist visa have been known to be arrested, expelled from the country, and/or occasionally fined. A passport, visa, return ticket, and adequate funds are required to enter Zimbabwe.

There are no general performance requirements for businesses located outside Export Processing and Special Economic Zones. Government policy, however, encourages investment in enterprises that contribute to rural development, job creation, exports, the addition of domestic value to primary products, use of local materials, and the transfer of appropriate technologies.

Government participation is required for new investments in strategic industries such as energy, public water provision, and railways. The terms of government participation are determined on a case-by-case basis during license approval. The few foreign investors (for example, from China, Russia, and Iran) in reserved strategic industries have either purchased existing companies or have supplied equipment and spares on credit.

While foreign investors are not currently forced to use domestic content in production, the government is in the process of developing a local content policy designed to encourage the use of local inputs in production.

The government does not require foreign IT providers to turn over source code and/or provide access to surveillance. Only banks are required to maintain all their data in the country through the escrow agreement.

The new government investment guidelines do not permit mandatory and/or arbitrary performance requirements that distort or limit the expansion of trade and investment.

# 5. Protection of Property Rights

### Real Property

The government enforces property rights in residential and commercial properties in cities although this is not the case with agricultural land, as discussed above. Mortgages and liens do exist for urban properties although liquidity constraints have led to a fall in the number of mortgage loans. According to the World Bank's 2020 Doing Business Report, Zimbabwe is ranked 109 out of 190 countries in terms of registering

property. The recording of mortgages is generally reliable. With regard to agricultural land, the government generally provides and protects the usage rights of indigenous people, i.e., black Zimbabweans. The government retains ownership of all agricultural land with 99-year leases guaranteeing use. These leases remain too weak to serve as collateral for bank loans.

**Intellectual Property Rights**

Zimbabwe follows international patent and trademark conventions, and it is a member of the World Intellectual Property Organization (WIPO). Generally, the government seeks to honor intellectual property ownership and rights, although a lack of expertise and manpower as well as corruption limit its ability to enforce these obligations. Pirating of videos, music, and computer software is common.

The government has not enacted new IP related laws or regulations over the past year. The country does not publish information on the seizures of counterfeit goods.

Zimbabwe is not included in the United States Trade Representative (USTR) Special 301 Report or Notorious Markets List.

For additional information about national laws and points of contact at local IP offices, please see WIPO's country profiles at **http://www.wipo.int/directory/en/**

# 6. Financial Sector

**Capital Markets and Portfolio Investment**

Zimbabwe has two stock exchanges in Harare and Victoria Falls. The Zimbabwe Stock Exchange (ZSE) in Harare currently has 56 publicly listed companies with a total market capitalization of USD 5.2 billion on March 19, 2021. Stock and money markets are open to foreign portfolio investment. Foreign investors can take up to a maximum of 49 percent of any locally listed company with any single investor limited to a maximum of 15 percent of the outstanding shares. With regard to the money market, foreign investors may buy up to 100 percent of the primary issues of bonds and stocks and there is no limit on the level of individual participation.

There is a 1.48 percent withholding tax on the sale of marketable securities, while the tax on purchasing stands at 1.73 percent. Totaling 3.21 percent, the rates are comparable with the average of 3.5 percent for the region. As a way of raising funds for the state, the government mandated that insurance companies and pension funds invest between 25 and 35 percent of their portfolios in prescribed government bonds.

Zimbabwe's high inflation has greatly eroded the value of domestic debt instruments and resulted in negative real interest rates on government bonds.

Zimbabwe launched the Victoria Falls Stock Exchange (VFEX) in September 2020 after the government suddenly suspended trading on the ZSE for five weeks between June and August following a rapid depreciation of the Zimbabwe dollar. The government blamed instability of the Zimbabwe dollar and rising inflation on the behavior of stock trading counters dual-listed on foreign exchanges, and suspended trading on the ZSE from late June to early August. When trading resumed, the authorities suspended trading of dual-listed counters on the ZSE, advising them to list on the VFEX where they trade in foreign currency and benefit from generous incentives meant to attract foreign investment. To date, only one company is listed on the VFEX.

The country respects IMF's Article VIII and refrains from restrictions on payments and transfers for current international transactions provided there is sufficient foreign exchange to finance the transactions. Depending on foreign currency availability, foreign companies with investments in Zimbabwe can borrow locally on market terms.

**Money and Banking System**

Three major international commercial banks and several regional and domestic banks operate in Zimbabwe, but they have reduced their branch network substantially in line with declining business opportunities. The central bank (Reserve Bank of Zimbabwe (RBZ) maintains that the banking sector is generally stable despite a harsh operating environment characterized by high credit risk, high inflation, and foreign exchange constraints. Most Zimbabwean correspondent banking relationships are in jeopardy or have already been severed due to international bank efforts to reduce risk (de-risking) connected to the high penalties for non-compliance with prudential anti-money laundering/counter-terrorism finance guidelines in developed countries. As of December 31, 2020, the sector had 19 operating institutions, comprising 13 commercial banks, five building societies, and one savings bank. According to the RBZ, as of December 2020, all operating banking institutions complied with the prescribed minimum core capital requirements. The level of non-performing loans fell from 1.75 percent in December 2019 to 0.31 percent by December 2020 largely reflecting the banks' low appetite to lend to high-risk clients. The RBZ reports that the total loans to deposits ratio rose from 36.6 percent in December 2019 to 39.5 percent as of December 31, 2020.

According to the central bank, the total deposits (including interbank deposits), rose from ZWL$34.5 billion in December 2019 to ZWL$208.9 billion by December 2020, an increase of 19 percent in US dollar terms.

**Foreign Exchange and Remittances**

*Foreign Exchange*

A large share of the economy operates using U.S. dollars for day-to-day transactions. The RBZ takes 40 percent of foreign currency earned from exports at the official exchange rate while exporters retain the other 60 percent in foreign exchange. The authorities change these levels periodically without notice depending on the severity of the foreign exchange constraint. Additionally, businesses selling domestically in foreign currency must surrender 20 percent of the receipts to the central bank in exchange for local currency.

Weak investment inflows and poor export growth have resulted in a perennial shortage of foreign exchange. Consequently, investors cannot freely convert funds associated with any form of investment into foreign currency. Although the situation improved after authorities adopted an auction system to allocate foreign exchange, businesses still rely on a black market for foreign exchange to make external payments.

*Remittance Policies*

Foreigners can remit capital appreciation, dividend income, and after-tax profits provided the foreign exchange is available. Firms may find difficulty in accessing foreign exchange at the auction rate.

**Sovereign Wealth Funds**

The government set aside USD 1 million toward administrative costs related to the setting up of a SWF in its 2016 Budget. Although the government proposed to capitalize the SWF through a charge of up to 25 percent on royalty collections on mineral sales, as well as through a special dividend on the sale of diamond, gas, granite and other minerals, it has not done so. In 2021, state media listed the SWF as a shareholder of a new major mining company in Zimbabwe.

# 7. State-Owned Enterprises

Zimbabwe has 107 state-owned enterprises (SOEs), defined as companies wholly owned by the state. A list of the SOEs appears **here**. Many SOEs support vital infrastructure including energy, mining, and agribusiness. Competition within the sectors where SOEs operate tends to be limited. However, the government of Zimbabwe (GOZ) invites private investors to participate in infrastructure projects through public-private partnerships (PPPs). Most SOEs have public function mandates, although in more recent years, they perform hybrid activities of satisfying their public functions while seeking profits. SOEs should

have independent boards, but in some instances such as the recent case of the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards.

Zimbabwe does not appear to subscribe to the Organization for Economic Cooperation and Development (OECD) guidelines on corporate governance of SOEs. SOEs are subject to the same taxes and same value added tax rebate policies as private sector companies. SOEs face several challenges that include persistent power outages, mismanagement, lack of maintenance, inadequate investment, a lack of liquidity and access to credit, and debt overhangs. As a result, SOEs have performed poorly. Few SOEs produce publicly available financial data and even fewer provide audited financial data. This has imposed significant costs on the rest of the economy.

**Privatization Program**

Although the government committed itself to privatize most SOEs in the 1990s, it only successfully privatized two parastatals. In 2018, the government announced it would privatize 48 SOEs. So far, it has only targeted five in the telecommunications sector, postal services, and financial sector for immediate reform, but the privatizations have not yet concluded. The government encourages foreign investors to take advantage of the privatization program to invest in the country, but inter-SOE debts of nearly USD 1 billion pose challenges for privatization plans. According to the government's investment guidelines, it is still working out the process under which it will dispose its shareholding to the private sector.

# 8. Responsible Business Conduct

Since 2009, awareness of standards for responsible business conduct (RBC) has increased, driven by the private sector through the Standards Association of Zimbabwe.

The Zimbabwean government has not taken any measures to encourage RBC and it does not take RBC policies or practices into its procurement decisions.

The private sector developed the National Corporate Governance Code of Zimbabwe (ZimCode), which is a framework designed to guide Zimbabwean companies on RBC. An industrial advocacy group, the Confederation of Zimbabwe Industries, has a standing committee on business ethics and standards that drives ethical conduct within the Zimbabwean private sector. The organization has developed its own charter according to OECD guidelines, highlighting good corporate governance and ethical behavior. Firms that demonstrate corporate social responsibility do not automatically garner favorable treatment from consumers, employees, or the government.

The U.S Department of Labor's (DOL) report **https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods** published in September 2020 reports that children work in Zimbabwe's sugarcane and tobacco industries. The DOL's report **https://www.dol.gov/agencies/ilab/resources/reports/child-labor/zimbabwe** found children in Zimbabwe engage in the worst forms of child labor, including in mining, agriculture, and tobacco production. Law enforcement agencies lack resources to enforce child labor laws. The COVID-19 crisis severely limited the government's ability to combat the worst forms of child labor. The country's continuing economic decline and school closures due to COVID-19 lockdown restrictions likely increased the number of children working in informal labor sectors, including those that harbor the worst forms of child labor, to support family incomes.

The government regularly thwart union efforts to demonstrate with violence and excessive force and harasses labor leaders. Police and state intelligence services regularly attend and monitor trade union activities, sometimes preventing unions from holding meetings with their members and carrying out organizational activities. Although unions are not required by law to notify police of public gatherings, police require such notification in practice. Those unions engaging in strikes deemed illegal risk fines and imprisonment.

The government ordered the eviction of 13,000 members of the Chilonga community in the southeastern part of the country in March 2021, but eventually backed down after a court ruled the move unconstitutional amid a public outcry.

Although the Zimbabwean government has expressed its intention to implement the Extractive Industries Transparency Initiative (EITI) principles to strengthen accountability, good governance, and transparency in the mining sector, it has yet to launch an EITI program. A domestic initiative called the Zimbabwe Mining Revenue Transparency Initiative (ZMRTI) has produced limited results.

Zimbabwe is not signatory to the Montreux Document on Private Military and Security Companies.

U.S. Customs and Border Patrol issued a withhold release order on Zimbabwean rough diamonds from Marange in 2019 after having conducted an investigation and concluding that forced labor contributed to the mining activity. Widespread artisanal and small-scale gold mining presents a threat to the environment, and informal miners have little to no safety and labor protections.

*Additional Resources*

Department of State

Country Reports on Human Rights Practices

Trafficking in Persons Report;

Guidance on Implementing the "UN Guiding Principles" for Transactions Linked to Foreign Government End-Users for Products or Services with Surveillance Capabilities and;

**North Korea Sanctions & Enforcement Actions Advisory**

Department of Labor

Findings on the Worst Forms of Child Labor Report;

List of Goods Produced by Child Labor or Forced Labor.

Sweat & Toil: Child Labor, Forced Labor, and Human Trafficking Around the World and;

Comply Chain.

# 9. Corruption

Endemic corruption presents a serious challenge to businesses operating in Zimbabwe. Zimbabwe's scores on governance, transparency, and corruption perception indices are well below the regional average. U.S. firms have identified corruption as an obstacle to FDI, with many corruption allegations stemming from opaque procurement processes.

In theory, the government has specified laws that require managers and directors to declare their financial interests in the public sector, although these may not be followed in practice. As noted below, Zimbabwe does not have laws that guard against conflict of interest with respect to the conduct of private companies, but existing rules on the Zimbabwe Stock Exchange compel listed companies to disclose, through annual reports, minimum disclosure requirements.

While anti-corruption laws exist and extend to family members of officials and political parties, the government tends to engage in selective enforcement against the opposition while engaging in "catch and release" of government officials and their business partners. As a result, Transparency International ranked Zimbabwe 157 out of 175 countries and territories surveyed in 2020 with respect to perceptions of corruption. In 2005, the government enacted an Anti-Corruption Act that established a government-appointed Zimbabwe Anti-Corruption Commission (ZACC), the structure of which has evolved over time. Following the end of Robert Mugabe's rule in November 2017, the government pledged to address governance and corruption challenges by appointing a new ZACC chaired by a former High Court Judge and

granting it new powers. President Mnangagwa also established a special unit within his office to deal with corruption cases. Despite these developments, the government has a track record of prosecuting individuals selectively, focusing on those who have fallen out of favor with the ruling party and ignoring transgressions by members of the favored elite. Accusations of corruption seldom result in formal charges and convictions. Zimbabwe does not provide any special protections to NGOs investigating corruption in the public sector. Journalists reporting on high level corruption have suffered from arbitrary arrests and lengthy detentions.

While Zimbabwe does not have laws that guard against conflict of interest with respect to the conduct of private companies, existing rules on the Zimbabwe Stock Exchange compel listed companies to disclose, through annual reports, minimum disclosure requirements. Regarding SOEs, the government has specified laws that require managers and directors to declare their financial interests. In 2016, the World Bank report on the extent of conflict of interest regulation index (0-10), put Zimbabwe at 5.

While Zimbabwe signed the United Nations Convention against Corruption in 2004 and ratified the treaty in 2007, it is not party to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

*Resources to Report Corruption*

Zimbabwe Anti-Corruption Commission

172 Herbert Chitepo Avenue, Harare

Transparency International Zimbabwe

96 Central Avenue

P O Box CY 434, Causeway

Harare +263 4 793 246/7

+263 4 793 246/7

**tiz@tizim.org**    ; **info@tizim.org**

# 10. Political and Security Environment

Political parties, labor organizations, and civil society groups sometimes encounter state-sponsored intimidation and repression from government security forces and Zimbabwe African National Union – Patriotic Front (ZANU-PF) – slinked activists. Disagreements between and within political parties occasionally results in violence targeting political party members. Political tensions and civil unrest persist since the end

of Robert Mugabe's rule in November 2017. On August 1, 2018, the army fired upon people demonstrating against the delay in announcing official presidential election results, killing six civilians. In response to January 2019 demonstrations against rising fuel prices, security forces killed 17, raped 16, injured hundreds, and arrested more than 800 people over the course of several weeks. The crackdown targeted members of the opposition political party, civil society groups, and labor leaders. In 2020 and 2021, the government arrested and detained journalists, several leaders of opposition parties, and trade union activists for organizing demonstrations against corruption and allegedly violating bail conditions. Police also arrested three women members of the opposition party, MDC Alliance, including a member of parliament for violating lockdown measures when they demonstrated against corruption and food shortages during the first of several lockdowns imposed on the country to fight COVID-19. They were subsequently abducted from police custody and tortured by alleged security agents. Since then, the government routinely arrests and detains the three leaders whenever they speak out against the government. Political uncertainty remains high. Violent crime, such as assault, smash and grabs, and home invasion, is common. Local police lack the resources to respond effectively to serious criminal incidents. Incidents of violence have typically not targeted investment projects.

## 11. Labor Policies and Practices

Decades of political and economic crises have led to the emigration of many of Zimbabwe's skilled and well-educated citizens. Formal sector employment has fallen significantly. Anecdotal evidence shows widespread youth unemployment as the country continues to produce graduates without a matching growth in employment opportunities. According to the Labor Force Survey, Zimbabwe's unemployment rate stood at 16.4 percent in 2019, the latest available data. As a result, most end up joining the informal sector estimated at over 75.6 percent of the workforce. The government strongly encourages foreign investors to make maximum use of Zimbabwean management and technical personnel.

The country's labor laws make it very difficult for employers to adjust employment in response to an economic downturn except in the Special Economic Zones (SEZs) where labor laws do not apply. Outside the SEZs, the employer must engage the employees and their representatives and agree to adopt measures to avoid retrenchment. If the measures fail, the employer can retrench and pay an all-inclusive package of one-month salary for each two years of service or the pro rata share thereof. Labor laws differentiate between layoffs and severance with the former falling under retrenchment where the retrenchment law must apply. The law does not accept unfair dismissal or layoffs of employees. The 2015 amendments to the act only permit terminations of contracts to be in terms of a registered code of conduct, expiry of a contract of fixed term duration, or mutual agreement. There is no unemployment insurance or other safety net programs for workers laid off for economic reasons.

Employers in all sectors rely heavily on temporary or contract workers to avoid having to pay severance costs and follow other onerous termination procedures. The Labor Amendment Act of 2015, however, now requires employment councils to put a limit on the number of times employers can renew short-term contracts. The government does not waive labor laws in order to attract or retain investment, except in the case of SEZs.

The law provides for the right of private-sector workers to form and join unions, conduct legal strikes, and bargain collectively. Public-sector workers may not form or join trade unions but may form associations that bargain collectively and strike. The law prohibits antiunion discrimination, provides that the labor court handle discrimination complaints, and may direct reinstatement of workers fired due to such discrimination. However, the government did not respect workers' rights to form or join unions, strike, and bargain collectively.

Parliament enacted a bill establishing the Tripartite Negotiating Forum (TNF) in 2019 to formalize dialogue efforts among government, labor leaders, and employers to discuss social and economic policy and address demands. However, the forum met only once in 2020. The Zimbabwe Congress of Trade Unions (ZCTU) stated the TNF did little to address workers' demands for wage increases and labor law reform, and the government showed little progress in supporting workers' protections, fairness, and peaceful resolution of labor disputes.

The country has a labor dispute resolution process that starts at the company level through disciplinary or grievance committees. If the issue is not resolved at this level, the aggrieved party can appeal to either the employment council or the Labor Court depending on the industrial agreement. Other redress is through the Ministry of Public Service Labor and Social Welfare in which labor officers settle disputes for industries without employment councils. From the Labor Court, an aggrieved party can appeal to the Supreme Court. Labor inspections are minimal due to a lack of inspectors.

The government continues to harass labor unions and their leaders. Police and state intelligence services regularly attended and monitored trade union activities and sometimes prevented unions from holding meetings with their members and carrying out organizational activities. Although unions are not required by law to notify police of public gatherings, police require such notification in practice. Those unions engaging in strikes deemed illegal risk fines and imprisonment.

The government used violence and excessive force when some unions tried to demonstrate during the period under review. Police arrested three members of the Amalgamated Rural Teachers Union of Zimbabwe (ARTUZ) following a June 2020 protest in Masvingo to demand increased salaries paid in U.S. dollars. Police also arrested 13 nurses at Harare Central Hospital in July and charged them with

contravening COVID-19 lockdown regulations, with photos and video of police holding clubs and chasing nurses circulating widely on social media. In July 2020, the Zimbabwe Republic Police published a list of 14 prominent government critics wanted for questioning, including the presidents of ZCTU and ARTUZ, regarding planned anti-corruption demonstrations on July 31, 2020. In the lead-up to the planned July 31 protests, the ZCTU president suspected state security agents slashed his car tires and unsuccessfully tried to seize his relatives, and the ARTUZ president alleged that armed suspected state security agents detained his wife and besieged the home of a relative demanding to know his whereabouts.

The government is a member of the International Labor Organization (ILO) and has ratified conventions protecting worker rights. The country has been subject to ILO supervisory mechanisms for practices that limit workers' rights to freely associate, organize, and hold labor union meetings. At the 108th session of the ILO's International Labor Conference in June 2019, the Committee on the Application of Standards noted concern regarding the government's failure to implement specific recommendations of the 2010 Commission of Inquiry, which found the government responsible for serious violations of fundamental rights by its security forces, including a clear pattern of intimidation that included arrests, detentions, violence, and torture against union and opposition members. The Committee also noted persisting allegations of violations of the rights of the freedom of assembly of workers' organizations. The Committee urged the government to accept a direct contacts mission of the ILO to assess progress before the next conference. The government ultimately agreed to accept a direct contacts mission, originally scheduled for May 2020 but postponed due to the COVID-19 pandemic.

In 2020 the Office of the U.S. Trade Representative self-initiated a review of Zimbabwe's eligibility for trade preferences under the Generalized System of Preferences due to concerns of worker rights related to a lack of freedom of association, including the rights of independent trade unions to organize and bargain collectively, and government crackdown on labor activists. The review has not yet concluded.

# 12. U.S. International Development Finance Corporation (DFC), and Other Investment Insurance or Development Finance Programs

The U.S. government and Zimbabwe concluded an Investment Incentive Agreement in April 1999, which permits DFC to conduct transactions in Zimbabwe. Zimbabwe acceded to the World Bank's Multilateral Investment Guarantee Agency in September 1989. Support from the Export-Import Bank of the United States is limited in Zimbabwe. Finance and export promotion programs, as well as investment insurance offered through international financial institutions, remain limited due largely to Zimbabwe's mounting multilateral and bilateral debt arrears.

# 13. Foreign Direct Investment and Foreign Portfolio Investment Statistics

*Table 2: Key Macroeconomic Data, U.S. FDI in Host Country/Economy*

| Economic Data | Host Country Statistical source* | | USG or international statistical source | | USG or International Source of Data:  BEA; IMF; Eurostat; UNCTAD, Other |
|---|---|---|---|---|---|
| | Year | Amount | Year | Amount | |
| Host Country Gross Domestic Product (GDP) ($M USD) | 2018 | $24,312 | 2019 | $21,440 | www.worldbank.org/en/country |

| Foreign Direct Investment | Host Country Statistical source* | | USG or international statistical source | | USG or international Source of data:  BEA; IMF; Eurostat; UNCTAD, Other |
|---|---|---|---|---|---|
| U.S. FDI in partner country ($M USD, stock positions) | 2019 | N/A | 2019 | -$72 | BEA data available at https://apps.bea.gov/international/factsheet |
| Host country's FDI in the United States ($M USD, stock positions) | 2019 | N/A | 2019 | N/A | BEA data available at https://www.bea.gov/international/direct-investment-and-multinational-enterprises-comprehensive-data |
| Total inbound stock of FDI as % host GDP | 2018 | 9.3 | 2019 | 7.0 | UNCTAD data available at https://stats.unctad.org/handbook/EconomicTrends/Fdi.html |

*Zimbabwe Statistical Agency (Zimstat).*

**Table 3: Sources and Destination of FDI**

Data not available.

**Table 4: Sources of Portfolio Investment**

Data not available.

# 14. Contact for More Information

Joseph Muzulu

Economic Specialist

U.S. Embassy Harare, 2 Lorraine Drive, Bluffhill, Harare +263 8677011514

+263 8677011514

Email: **muzuluj@state.gov**

---

TAGS

Bureau of African Affairs    Bureau of Economic and Business Affairs    Zimbabwe

---

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit II

An official website of the United States Government Here's how you know

O

**Home** > ... > Zimbabwe

# 2020 Investment Climate Statements: Zimbabwe

**IN THIS SECTION /**
**EXECUTIVE SUMMARY**

## EXECUTIVE SUMMARY

Investor optimism following the 2017 fall of President Robert Mugabe has dissipated as the Mnangagwa government has been slow to follow through on its promise of reforms to improve the business environment.  The economy suffered hyperinflation and contracted sharply in 2019, worsened by climate shocks that crippled agriculture and electricity generation.  Unsustainable monetary policy has led to a protracted currency crisis, which continues to strain the economy.  The Zimbabwe dollar, introduced in February 2019, has already lost approximately 98 percent of its value on the black market.  Failure to implement monetary reforms to complement finance ministry efforts to rein in the budget deficit undermined public confidence in the financial sector.  The government adopted a stabilization and reform agenda supported by an IMF Staff-Monitored Program (SMP), but by February 2020 the IMF reported the SMP had gone off-track due to government failures to fully implement reforms.  Zimbabwe remains in arrears to the World Bank and other multilateral and bilateral creditors, restricting many forms of multilateral assistance.  Although the government has repeatedly affirmed its commitment to improve transparency, streamline business regulations, and address corruption, the last two years have brought limited progress.

Zimbabwe has attracted less than USD 600 million a year on average in foreign direct investment over the past decade.  Zimbabwe's incentives to attract FDI include tax breaks for new investment by foreign and domestic companies and making capital expenditures on new factories, machinery, and improvements tax deductible.  The government waives import taxes and surtaxes on capital equipment.  The government has made slow progress at improving the business environment by reducing regulatory costs but policy

inconsistency, weak institutions, and lack of fiscal discipline have continued to frustrate businesses. Corruption remains rife and there is little protection of property rights, particularly with respect to agricultural land. Historically, the government has committed to protect property rights but has, at times, resorted to expropriating land without compensation.

In 2016, Zimbabwe introduced a surrogate currency (commonly called the "bond note" or Zimbabwe dollar), officially pegged to the U.S. dollar, used only for domestic transactions.  Money printing caused the local currency to lose value, and in February 2019, the Reserve Bank of Zimbabwe (RBZ) de-linked the local currency from the U.S. dollar and has not yet implemented a market-clearing exchange rate regime.  As a result, it remains difficult to access dollars at the official exchange rate.  This has given rise to an unstable black market for U.S. dollars with the price of dollars sometimes double the official exchange rate.  The government banned the use of foreign currencies for domestic transactions in June 2019, further complicating the business environment, but introduced some exceptions for investors and further relaxed rules in March 2020 amidst the COVID-19 pandemic.  Year-on-year inflation jumped from 10.6 percent in 2018 to 676 percent by March 2020, reflecting monetary expansion, currency depreciation, and the removal of subsidies on fuel and electricity.

Zimbabwe's arrears in payments to international financial institutions and its high external debt (public and private) of over USD 10.7 billion limit the country's ability to access official development assistance at concessional rates.  Additionally, domestic banks do not offer financing for periods longer than two years, with most financing limited to 180 days or less.  The sectors that attract the most investor interest include agriculture (tobacco, in particular), mining, energy, and tourism.  Zimbabwe has a well-earned reputation for the high education levels of its workers.

## Table 1: Key Metrics and Rankings

| Measure | Year | Index/Rank | Website Address |
|---|---|---|---|
| **TI Corruption Perceptions Index** | 2019 | 158 of 180 | http://www.transparency.org/research/cpi/overview |
| **World Bank's Doing Business Report** | 2019 | 140 of 190 | http://www.doingbusiness.org/en/rankings |
| **Global Innovation Index** | 2019 | 122 of 129 | https://www.globalinnovationindex.org/analysis-indicator |
| **U.S. FDI in partner country ($M USD, historical stock positions)** | 2018 | USD -2 | http://www.bea.gov/ |
| **World Bank GNI per capita** | 2018 | USD 1790 | http://data.worldbank.org/indicator/NY.GNP.PCAP.CD |

1043

# 1. Openness To, and Restrictions Upon, Foreign Investment

**Policies Towards Foreign Direct Investment**

In order to attract greater FDI and improve the country's competitiveness, the government has encouraged public-private partnerships and emphasized the need to improve the investment climate by lowering the cost of doing business and restoring the rule of law and sanctity of contracts.  Implementation, however, has been limited.

Zimbabwe's Indigenization and Economic Empowerment law limits the amount of shares owned by foreigners in the diamonds and platinum sectors to 49 percent with specific indigenous organizations owning the remaining 51 percent.  The government has signaled it intends to remove these restrictions.  There are also smaller sectors "reserved" for Zimbabweans.

The Zimbabwe Investment Authority (ZIA) promotes and facilitates both foreign direct investment and local investment.  ZIA facilitates and processes investment applications for approval.  ZIA's website is **http://www.investzim.com/**    .  The country encourages companies to register with ZIA and the process currently takes approximately 90 days.  The government has formed a more powerful, but not yet fully functional streamlined entity (a "one-stop shop") – the Zimbabwe Investment Development Authority (ZIDA).

While the government has committed to prioritizing investment retention, there are still no mechanisms or formal structures to maintain ongoing dialogue with investors.

**Limits on Foreign Control and Right to Private Ownership and Establishment**

While there is a right for foreign and domestic private entities to establish and own business enterprises and engage in all forms of remunerative activity, foreign ownership of businesses in the diamond and platinum sectors is limited to 49 percent (or less in certain reserved sectors), as outlined above.

In 2007, the government passed the Indigenization and Economic Empowerment Act, which required that "indigenous Zimbabweans" (i.e.  black Zimbabweans) own at least 51 percent of all enterprises valued over USD 500,000.  A March 2018 amendment to the law limits these restrictions to the diamond and platinum sectors.  The government has promised to repeal the Indigenization and Economic Empowerment Act by removing diamonds and platinum from the reserved list.  According to the Minister of Finance and Economic Development, shareholding on platinum and diamonds will be based on open negotiations between the government and interested investors.

1044

Foreign investors are free to invest in the vast majority of non-resource sectors without any restrictions as the government aims to bring in new technologies, generate employment, and value-added manufacturing.  The government reserves certain sectors for Zimbabweans such as passenger buses, taxis and car hire services, employment agencies, grain milling, bakeries, advertising, dairy processing, and estate agencies.

The country screens FDI through the Zimbabwe Investment Authority (ZIA) in liaison with relevant line ministries to confirm compliance with the country's investment regulations.  Once an investor meets the criteria, ZIA issues the company or entity with an investment certificate.

According to the country's laws, U.S. investors are not especially disadvantaged or singled out by any of the ownership or control mechanisms relative to other foreign investors.  In its investment guidelines, the government states its commitment to non-discrimination between foreign and domestic investors and among foreign investors.

**Other Investment Policy Reviews**

In the past three years, the government has not conducted an investment policy review through the Organization for Economic Cooperation and Development (OECD), the World Trade Organization (WTO) or the United Nations Conference on Trade and Development (UNCTAD).

**Business Facilitation**

Policy inconsistency, administrative delays and costs, and corruption hinder business facilitation. Zimbabwe does not have a fully online business registration process, though one can begin the process and conduct a name search online via the ZimConnect web portal.  In February 2020, the government passed legislation creating the Zimbabwe Investment Development Agency (ZIDA) to act as a one-stop investment center (and to replace the still-operational Zimbabwe Investment Authority (ZIA)).  The ZIDA, which is still not fully functional, will house several agencies that play a role in the licensing, establishment, and implementation of investment projects including the Zimbabwe Revenue Authority (Zimra), Environmental Management Agency (EMA), Reserve Bank of Zimbabwe (RBZ), National Social Security Authority (NSSA), Zimbabwe Energy Regulatory Authority (ZERA), Zimbabwe Tourism Authority, the State Enterprises Restructuring Agency, and specialized investment units within relevant line ministries.

The Zimbabwe Investment Authority (ZIA) facilitates both foreign direct investment and local investment. ZIA's website is **http://www.investzim.com/**    . According to the World Bank, business registration requires nine distinct processes and takes an average of 27 days.

**Outward Investment**

Zimbabwe does not promote or incentivize outward investment due to the country's tight foreign exchange reserves.  Although the government does not restrict domestic investors from investing abroad, any outward investment requires approval by exchange control authorities.  Firms interested in outward investment would face difficulty accessing the limited foreign currency at the more favorable official exchange rate.

# 2. Bilateral Investment Agreements and Taxation Treaties

Zimbabwe has negotiated investment treaties with 33 countries, but it has ratified only ten including those with the Netherlands, Denmark, China, Germany, Russia, South Africa, and Switzerland.  Two other investment agreements with India and Iran are awaiting ratification before they go into effect.  In spite of these agreements, the government has failed to protect investments undertaken by nationals from these countries, particularly with regard to land.  In 2009, for example, an army officer seized a farm belonging to a German national, but the government did not intervene, despite its assurance that Zimbabwe would honor all obligations and commitments to international investors.  Some claimants protected by investment treaties have pursued arbitration through the International Centre for Settlement of Investment Disputes.  For example, in 2015, a different Swiss-German family won a landmark USD 196 million judgment at the International Center for Settlement of Investment Disputes in compensation for expropriated land but has received only partial payment.

The United States does not have a bilateral taxation and/or investment treaty with Zimbabwe.  The United States has a Trade and Investment Framework Agreement (TIFA) with the Common Market for Eastern and Southern Africa (COMESA), of which Zimbabwe is a member.  This TIFA provides a mechanism to discuss disputes, although the protection offered by the TIFA is much more limited than protection typically provided by a bilateral investment treaty.

# 3. Legal Regime

**Transparency of the Regulatory System**

The government officially encourages competition within the private sector and seeks to improve the ease of doing business, but the bureaucracy within regulatory agencies still lacks transparency, and corruption is prevalent.  Investors have complained of policy inconsistency and unpredictability.

The government has introduced import taxes to protect certain inefficient producers who lobby for protection against more competitive imports.  In late 2012, the finance ministry announced a 25 percent surtax on selected imported products including soaps, meat products, beverages, dairy products, and cooking oil as well as other import taxes on beer, cigarettes, and chickens brought in from outside the Southern African Development Community (SADC) and the Common Market for Eastern and Southern African (COMESA) regions.  In 2016, the government banned the importation of a number of products manufactured locally, but in October 2018, the government removed many import license requirements to prevent shortages of basic commodities.

The government at times uses statutory instruments and temporary presidential powers to alter legislation impacting economic policy.  These powers have limited duration – the government must pass legislation within six months for the presidential powers to become permanent.  These sudden measures often surprise businesses and lack implementation details, leading firms to delay major business decisions until gaining clarity.  For example, a statutory instrument established the sudden prohibition on the use of foreign currency in June 2019, eliminating with no legislative discussion and no warning the decade-old policy of dollarization.  The standard legislative process, on the other hand, does provide ample opportunity for public review and comment before final passage.  The development of regulations follows a standard process and includes a period for public review and comment.

According to the Department of State's 2019 Fiscal Transparency Report, public budget documents do not provide a full picture of government expenditures, and there is a notable lack of transparency regarding state-owned enterprises and the extraction of natural resources.  The information on public finances is generally unreliable, as actual revenue and expenditure have deviated significantly from the enacted budgets.  Information on some debt obligations is publicly available, but not information on contingent debt.

**International Regulatory Considerations**

Zimbabwe is a member of the Southern African Development Community (SADC) and the Common Market for Eastern and Southern Africa (COMESA), and it is signatory to the SADC and COMESA trade protocols establishing free trade areas (FTA) with the aim of growing into a customs union.  Zimbabwe is also a member of the African Continental Free Trade Area (AfCFTA) which aims to create a single continental market, paving the way for the establishment of a customs union.  Although the country is also a member of the World Trade Organization (WTO), it normally notifies only SADC and COMESA of measures it intends to implement.

**Legal System and Judicial Independence**

According to Zimbabwe's law and constitution, Zimbabwe has an independent judicial system whose decisions are binding on the other branches of government.  The country has written commercial law and, in 2019, established four commercial courts at the magistrate level.  The government also trained 55 magistrates in the same year. Administration of justice in commercial cases that do not touch on political interests is still generally impartial, but for politicized cases government interference in the court system has hindered the delivery of impartial justice.  Regulations or enforcement actions are appealable and are adjudicated in the national court system.

## Laws and Regulations on Foreign Direct Investment

As noted above, in 2007, the government introduced the Indigenization and Economic Empowerment Act requiring that "indigenous Zimbabweans" (black Zimbabweans) own at least 51 percent of all enterprises valued over USD 500,000, but now amended to apply only to the diamond and platinum sectors.  In certain sectors, such as primary agriculture, transport services, and retail and wholesale trade including distribution, foreign investors may not own more than 35 percent equity.

The Zimbabwe Investment Authority (ZIA) promotes and facilitates both foreign direct investment and local investment.  ZIA facilitates and processes investment applications for approval.  ZIA's website is **http://www.investzim.com/**   .  The government passed legislation to create a more powerful, streamlined entity (a "one-stop shop") – the Zimbabwe Investment Development Authority (ZIDA) in February 2020, but the agency is not yet operational.

## Competition and Anti-Trust Laws

The government officially encourages competition within the private sector according to the Zimbabwe Competition Act.  The Act provided for the formation of the Tariff and Competition Commission charged with investigating restrictive practices, mergers, and monopolies in the country.  The Competition and Tariff Commission (CTC) is an autonomous statutory body established in 2001 with the dual mandate of implementing and enforcing Zimbabwe's competition policy and law and executing the country's trade tariffs policy.

## Expropriation and Compensation

In 2000, the government began to seize privately-owned agricultural land and transfer ownership to government officials and other regime supporters.  In April of that year, the government amended the constitution to grant the state's right to assert eminent domain, with compensation limited to the improvements made on the land.  In September 2005, the government amended the constitution again to

transfer ownership of all expropriated land to the government.  Since the passage of this amendment, top government officials, supporters of the ruling Zimbabwe African National Union – Patriotic Front (ZANU-PF) party, and members of the security forces have continued to disrupt production on commercial farms, including those owned by foreign investors and those covered by bilateral investment agreements. Similarly, government officials have sought to impose politically connected individuals as indigenous partners on privately and foreign-owned wildlife conservancies.

In 2006, the government began to issue 99-year leases for land seized from commercial farmers, retaining the right to withdraw the lease at any time for any reason.  These leases, however, are not readily transferable, and banks do not accept them as collateral for borrowing and investment purposes.  The government continues to seize commercial farms without compensating titleholders, who have no recourse to the courts.  The seizures continue to raise serious questions about respect for property rights and the rule of law in Zimbabwe.

In 2017, the government announced its intention to compensate farmers who lost their land and made partial payments to the most vulnerable claimants. Negotiations between the government and farmers' groups are ongoing.

## Dispute Settlement

*ICSID Convention and New York Convention*

Zimbabwe acceded to the 1965 Convention on the Settlement of Investment Disputes between States and Nationals of Other States and to the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards in 1994.  However, the government does not always accept binding international arbitration of investment disputes between foreign investors and the state.

*Investor-State Dispute Settlement*

The government is signatory to a number of bilateral investment agreements with a number of countries (see above) in which international arbitration of investment disputes is recognized.  As noted above, Zimbabwe does not have a Bilateral Investment Treaty or Free Trade Agreement with an investment chapter with the United States.

Local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors.  For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial

farms to the original owners.  Once an investor has exhausted the administrative and judicial remedies available locally, the government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law (UNCITRAL).  However, this has not occurred in practice.

*International Commercial Arbitration and Foreign Courts*

Domestic legislation on arbitration is modeled after the United Nations Commission on International Trade Law (UNCITRAL) model law, with minor modifications.  This law covers both domestic and international arbitration.  As noted above, local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors.

**Bankruptcy Regulations**

In the event of insolvency or bankruptcy, Zimbabwe applies the Insolvency Act.  All creditors have equal rights against an insolvent estate.  In terms of resolving insolvency, Zimbabwe ranks 142 out of 190 economies in the World Bank's 2020 Doing Business Report.  Zimbabwe does not criminalize bankruptcy unless it is the result of fraud, but the government blacklists a person declared bankrupt from undertaking any new business.

# 4. Industrial Policies

**Investment Incentives**

Government incentives to foreign investors depend on the form of investment, the sectors, and whether or not the GOZ awards it national project status.  For investment in industrial parks and tourism development zones, investors are exempt from paying tax for the first five years, after which they will pay tax at the rate of 25 percent (the normal tax rate is 35 percent).  For build, own, operate, and transfer (BOOT) and build, operate, and transfer (BOT) joint ventures, investors are exempt from paying taxes for the first five years after which they will pay tax at the rate of 15 percent.  Investors in the mining sector who export 50 percent of output benefit from a reduced corporation tax of 20 percent and are exempt from import duties on capital goods while losses are carried forward indefinitely for mining operations.  Moreover, the government generally allows for duty exemptions in the importation of raw materials used in the manufacture of goods for export.  In addition to these incentives, investments with national project status such as those in the renewable energy sector are allowed to borrow on local capital markets where lenders enjoy incentives including tax exemption on interest.

**Foreign Trade Zones/Free Ports/Trade Facilitation**

Zimbabwe now has approximately 183 companies operating in Export Processing Zones (EPZs).  Benefits include a five-year tax holiday, duty-free importation of raw materials and capital equipment for use in the EPZ, and no tax liability from capital gains arising from the sale of property forming part of the investment in EPZs.  The government generally requires that foreign capital comprise a majority of the investment in an EPZ-designated company and requires the company to export at least 80 percent of output.  The latter requirement has constrained foreign investment in the zones.  The Zimbabwe Investment Authority currently regulates EPZs but will eventually be replaced by the Zimbabwe Investment Development Authority, Zimbabwe has recently passed amendments to the Zimbabwe Investment Authority Act to include Special Economic Zones.  However, to date, activity in special economic zones has been limited in spite of the incentives.

Although there are no discriminatory import or export policies affecting foreign firms, the government's approval criteria heavily favor export-oriented projects.  Import duties and related taxes range as high as 110 percent.

**Performance and Data Localization Requirements**

The government mandates local employment except for specialized skills that are in short supply locally.  The government encourages foreign investors to make maximum use of Zimbabwean management and technical personnel, and any investment proposal that involves the employment of foreigners must present a strong case in order to obtain work and residence permits.  Normally, the maximum contract period for a foreigner is three years but with possible extension to five years for individuals with highly specialized skills.

There are no general performance requirements for businesses located outside Export Processing and Special Economic Zones.  Government policy, however, encourages investment in enterprises that contribute to rural development, job creation, exports, the addition of domestic value to primary products, use of local materials, and the transfer of appropriate technologies.

Government participation is required for new investments in strategic industries such as energy, public water provision, and railways.  The terms of government participation are determined on a case-by-case basis during license approval.  The few foreign investors (for example, from China, Russia, and Iran) in reserved strategic industries have either purchased existing companies or have supplied equipment and spares on credit.

While foreign investors are not currently forced to use domestic content in production, the government is in the process of developing a local content policy designed to encourage the use of local inputs in production.

The government does not require foreign IT providers to turn over source code and/or provide access to surveillance.  Only banks are required to maintain all their data in the country through the escrow agreement.

The new government investment guidelines do not permit mandatory and/or arbitrary performance requirements that distort or limit the expansion of trade and investment.

# 5. Protection of Property Rights

**Real Property**

The government enforces property rights in residential and commercial properties in cities although this is not the case with agricultural land, as discussed above.  Mortgages and liens do exist for urban properties although liquidity constraints have led to a fall in the number of mortgage loans.  According to the World Bank's 2020 Doing Business Report, Zimbabwe is ranked 109 out of 190 countries in terms of registering property.  The recording of mortgages is generally reliable.  With regard to agricultural land, the government provides and protects the usage rights of indigenous people, i.e., black Zimbabweans.  The government retains ownership of all agricultural land with 99-year leases guaranteeing use.  These leases remain too weak to serve as collateral.

**Intellectual Property Rights**

Zimbabwe follows international patent and trademark conventions, and it is a member of the World Intellectual Property Organization (WIPO).  Generally, the government seeks to honor intellectual property ownership and rights, although a lack of expertise and manpower as well as corruption limit its ability to enforce these obligations.  Pirating of videos, music, and computer software is common.

It does not appear that the government enacted new IP related laws or regulations over the past year.  The country does not publish information on the seizures of counterfeit goods.

Zimbabwe is not included in the United States Trade Representative (USTR) Special 301 Report or Notorious Markets List.

For additional information about national laws, treaty obligations, and points of contact at local IP offices, please see WIPO's country profiles at: **https://www.wipo.int/directory/en/**

# 6. Financial Sector

**Capital Markets and Portfolio Investment**

Zimbabwe's stock market currently has 56 publicly listed companies, but just 12 of them account for about 71 percent of total market capitalization, which stood at USD 2.5 billion on April 24, 2020. Stock and money markets are open to foreign portfolio investment. Foreign investors can take up to a maximum of 49 percent of any locally listed company with any single investor limited to a maximum of 15 percent of the outstanding shares. With regard to the money market, foreign investors may buy up to 100 percent of the primary issues of bonds and stocks and there is no limit on the level of individual participation. However, foreign investors have low appetite for such instruments given the prevailing harsh economic environment.

There is a 1.48 percent withholding tax on the sale of marketable securities, while the tax on purchasing stands at 1.73 percent. Totaling 3.21 percent, the rates are comparable with the average of 3.5 percent for the region. As a way of raising funds for the state, the government mandated that insurance companies and pension funds invest between 25 and 35 percent of their portfolios in prescribed government bonds. Zimbabwe's high inflation has greatly eroded the value of domestic debt instruments and resulted in negative real interest rates on government bonds. Nevertheless, the government has been borrowing from the local market by issuing treasury bills to financial institutions to finance government expenditure.

**Money and Banking System**

Three major international commercial banks and several regional and domestic banks operate in Zimbabwe, but they have reduced their branch network substantially in line with declining business opportunities. The central bank (Reserve Bank of Zimbabwe (RBZ)) believes that the banking sector is generally stable despite a harsh operating environment characterized by high credit risk, high inflation, and foreign exchange and liquidity constraints. Most Zimbabwean correspondent banking relationships are in jeopardy or have already been severed due to international bank efforts to reduce risk (de-risking) connected to the high penalties for non-compliance with prudential anti-money laundering/counter-terrorism finance guidelines in developed countries. As of December 31, 2019, the sector had 19 operating institutions, comprising 13 commercial banks, five building societies, and one savings bank. According to the RBZ, as of December 2019, all operating banking institutions complied with the prescribed minimum core capital requirements. The level of non-performing loans fell from 6.92 percent in December 2018 to

1.75 percent by December 2019 largely reflecting the banks' low appetite to lend to high risk clients.  The RBZ reports that the total loans to deposits ratio fell from 40.7 percent in December 2018 to 36.6 percent as of December 31, 2019.

According to the central bank, the total deposits (including interbank deposits), rose from ZWL 14 billion in December 2018 to ZWL 34.5 billion by December 2019, but fell 84 percent in US dollar terms.

## Foreign Exchange and Remittances

*Foreign Exchange*

The RBZ retains a portion (which varies by sector) of foreign currency earned by exporters.  The levels have changed periodically, but as of May 2020, most exporters retained 80 percent of their foreign currency earnings, with 55 percent for gold producers, 50 percent for all other minerals, and 30 percent for tobacco and cotton farmers.

Weak investment inflows, Zimbabwe's fiscal and current account deficits, and the RBZ's inability to defend the official exchange rate have resulted in a shortage of foreign exchange available at the official rate. Consequently, investors cannot freely convert any funds associated with any form of investment into any world currency.  Businesses rely on a black market for foreign exchange to make external payments.

In February 2019, after months of tacitly accepting that domestic bank balances officially denominated in U.S. dollars no longer reflected U.S. dollar values, Zimbabwe reintroduced its own domestic currency, the Zimbabwe dollar.  In June 2019, the government banned the use of foreign currencies in domestic transactions in favor of the Zimbabwe dollar.  The consistent gap between the black market and official exchange rate implies the RBZ has not allowed market forces to determine the official exchange rate, and it is unable to make sufficient interventions to defend the rate.  Instead, the RBZ has periodically devalued the Zimbabwe dollar but has never let it fall to a market-clearing rate.  In April 2020, the RBZ instituted an official fixed exchange rate of 25:1, while U.S. dollars remained over twice as expensive on the black market.

*Remittance Policies*

Foreigners can remit capital appreciation, dividend income, and after-tax profits provided the foreign exchange is available.  Firms may find difficulty in accessing foreign exchange at the more favorable official rate.

## Sovereign Wealth Funds

1054

Zimbabwe does not have a sovereign wealth fund (SWF).  The government set aside USD 1 million toward administrative costs related to the setting up of a SWF in its 2016 Budget.  Although the government proposed to capitalize the SWF through a charge of up to 25 percent on royalty collections on mineral sales, as well as through a special dividend on the sale of diamond, gas, granite and other minerals, it has not done so.

# 7. State-Owned Enterprises

Zimbabwe has 107 state-owned enterprises (SOEs), defined as companies wholly owned by the state.  A list of the SOEs appears **here**    .  Many SOEs support vital infrastructure including energy, mining, and agribusiness.  Competition within the sectors where SOEs operate tends to be limited.  However, the government of Zimbabwe (GOZ) invites private investors to participate in infrastructure projects through public-private partnerships (PPPs).  Most SOEs have public function mandates, although in more recent years, they perform hybrid activities of satisfying their public functions while seeking profits.  SOEs should have independent boards, but in some instances such as the recent case of the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards.

Zimbabwe does not appear to subscribe to the Organization for Economic Cooperation and Development (OECD) guidelines on corporate governance of SOEs.  SOEs are subject to the same taxes and same value added tax rebate policies as private sector companies.  SOEs face several challenges that include persistent power outages, mismanagement, lack of maintenance, inadequate investment, a lack of liquidity and access to credit, and debt overhangs.  As a result, SOEs have performed poorly.  Few SOEs produce publicly available financial data and even fewer provide audited financial data.  This has imposed significant costs on the rest of the economy.

**Privatization Program**

Although the government committed itself to privatize most SOEs in the 1990s, it only successfully privatized two parastatals.  In 2018, the government announced it would privatize 48 SOEs.  So far, it has only targeted five in the telecommunications sector, postal services, and financial sector for immediate reform.  The government encourages foreign investors to take advantage of the privatization program to invest in the country, but inter-SOE debts of nearly    USD 1 billion pose challenges for privatization plans.  According to the government's investment guidelines, it is still working out the process under which it will dispose its shareholding to the private sector.

# 8. Responsible Business Conduct

1055

Since 2009, awareness of standards for responsible business conduct (RBC) has increased, driven by the private sector through the Standards Association of Zimbabwe.

The Zimbabwean government has not taken any measures to encourage RBC and it does not take RBC policies or practices into its procurement decisions.

The private sector developed the National Corporate Governance Code of Zimbabwe (ZimCode), which is a framework designed to guide Zimbabwean companies on RBC.  An industrial advocacy group, the Confederation of Zimbabwe Industries, has a standing committee on business ethics and standards that drives ethical conduct within the Zimbabwean private sector.  The organization has developed its own charter according to OECD guidelines, highlighting good corporate governance and ethical behavior.  Firms that demonstrate corporate social responsibility do not automatically garner favorable treatment from consumers, employees, or the government.

Although the Zimbabwean government has expressed its intention to implement the Extractive Industries Transparency Initiative (EITI) principles to strengthen accountability, good governance, and transparency in the mining sector, it has yet to launch an EITI program.  A domestic initiative called the Zimbabwe Mining Revenue Transparency Initiative (ZMRTI) has produced limited results.

# 9. Corruption

Endemic corruption presents a serious challenge to businesses operating in Zimbabwe.  Zimbabwe's scores on governance, transparency and corruption perception indices are well below the regional average.  U.S. firms have identified corruption as an obstacle to FDI, with many corruption allegations stemming from opaque procurement processes.

While anti-corruption laws exist, enforcement is weak as law enforcement agencies lack political will and resources.  As a result, Transparency International ranked Zimbabwe 158 out of 180 countries and territories surveyed in 2019 in regards to perceptions of corruption.  In 2005, the government enacted an Anti-Corruption Act that established a government-appointed Zimbabwe Anti-Corruption Commission (ZACC), the structure of which has evolved over time.  Following the end of Robert Mugabe's rule in November 2017, the government pledged to address governance and corruption challenges by appointing a new ZACC chaired by a former High Court Judge and granting it new powers.  President Mnangagwa also established a special unit within his office to deal with corruption cases.  Despite these developments, the government has a track record of prosecuting individuals selectively, focusing on those who have fallen out of favor with the ruling party and ignoring transgressions by members of the favored elite.  Accusations of

corruption seldom result in formal charges and convictions.  Zimbabwe does not provide any special protections to NGOs investigating corruption in the public sector.

While Zimbabwe does not have laws that guard against conflict of interest with respect to the conduct of private companies, existing rules on the Zimbabwe Stock Exchange compel listed companies to disclose, through annual reports, minimum disclosure requirements.  Regarding SOEs, the government has specified laws that require managers and directors to declare their financial interests.  In 2016, the World Bank report on the extent of conflict of interest regulation index (0-10), put Zimbabwe at 5.

While Zimbabwe signed the United Nations Convention against Corruption in 2004  and ratified the treaty in 2007, it is not party to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

*Resources to Report Corruption*

Transparency International Zimbabwe

96 Central Avenue,

P O Box CY 434, Causeway

Harare

+263 4 793 246/7

**tiz@tizim.org**; **info@tizim.org**

# 10. Political and Security Environment

Political parties, labor organizations, and civil society groups sometimes encounter state-sponsored intimidation and repression from government security forces and Zimbabwe African National Union – Patriotic Front (ZANU–PF)-linked activists. Disagreements between and within political parties occasionally resulted in violence targeting political party members.  Political tensions and civil unrest persist since the end of Robert Mugabe's rule in November 2017.  On August 1, 2018, the army fired upon people demonstrating against the delay in announcing official presidential election results, killing six. In response to January 2019 demonstrations against rising fuel prices, security forces killed 17, raped 16, injured 100s and arrested 800 people over the course of several weeks.  The crackdown targeted members of the opposition political party, civil society groups, and labor leaders. Political uncertainty remains high.  Violent crime, such as assault, smash and grabs, and home invasion, is common.  Local police lack the resources to respond effectively to serious criminal incidents.  Incidents of violence have typically not targeted investment projects.

# 11. Labor Policies and Practices

Decades of political and economic crises have led to the emigration of many of Zimbabwe's skilled and well-educated citizens.  Formal sector employment has fallen significantly.  Anecdotal evidence shows widespread youth unemployment as the country continues to produce graduates without a matching growth in employment opportunities.  As a result, most end up joining the informal sector estimated at over 90 percent of the workforce.  The government strongly encourages foreign investors to make maximum use of Zimbabwean management and technical personnel.

The country's labor laws make it very difficult for employers to adjust employment in response to an economic downturn except in the Special Economic Zones (SEZs) where labor laws do not apply.  Outside the SEZs, the employer must engage the employees and their representatives and agree to adopt measures to avoid retrenchment.  If the measures fail, the employer can retrench and pay an all-inclusive package of one-month salary for each two years of service or the pro rata share thereof.  Labor laws differentiate between layoffs and severance with the former falling under retrenchment where the retrenchment law must apply.  The law does not accept unfair dismissal or layoffs of employees.  The 2015 amendments to the act only permit terminations of contracts to be in terms of a registered code of conduct, expiry of a contract of fixed term duration, or mutual agreement.  There is no unemployment insurance or other safety net programs for workers laid off for economic reasons.

Employers in all sectors rely heavily on temporary or contract workers to avoid having to pay severance costs and follow other onerous termination procedures.  The Labor Amendment Act of 2015, however, now requires employment councils to put a limit on the number of times employers can renew short-term contracts.  The government does not waive labor laws in order to attract or retain investment, except in the case of SEZs.

Labor unions affiliated with the Zimbabwe Congress of Trade Unions (ZCTU) are independent of the government.  Those affiliated with the Zimbabwe Federation of Trade Unions (ZFTU) and the Zimbabwe Industrial Revolution Workers Federation support the government.  Collective bargaining takes place through a National Employment Council (NEC) in each industry, comprising representatives from labor, business, and government.  The agreements apply to the entire sector regardless of whether all employees are members to the council or not, except for managerial employees.

The country has a labor dispute resolution process that starts at the company level through disciplinary or grievance committees.  If the issue is not resolved at this level, the aggrieved party can appeal to either the employment council or the Labor Court depending on the industrial agreement.  Other redress is through

the Ministry of Public Service Labor and Social Welfare in which labor officers settle disputes for industries without employment councils.  From the Labor Court, an aggrieved party can appeal to the Supreme Court. Labor inspections are minimal due to a lack of inspectors.

The government continues to harass labor unions and their leaders.  Police and state intelligence services regularly attended and monitored trade union activities and sometimes prevented unions from holding meetings with their members and carrying out organizational activities.  Although unions are not required by law to notify police of public gatherings, police require such notification in practice.  Those unions engaging in strikes deemed illegal risk fines and imprisonment.  The government met some union efforts to demonstrate with violence and excessive force during the period under review.

Labor leaders were among the targets of the government's violent crackdown of January 2019 demonstrations.  In August 2019, when the Amalgamated Rural Teachers' Union of Zimbabwe (ARTUZ) held a demonstration at the finance ministry to protest low teachers' salaries, the Zimbabwe Republic Police broke up the protest and arrested the ARTUZ president and seven other members, as well as their attorney.  When the Zimbabwe Hospital Doctors' Association (ZHDA) went on strike in September 2019 after failing to reach an agreement on a salary increase with the government, the government responded with a proposed bill to designate medical service providers essential which would prohibit their right to strike. Unidentified assailants believed to be state agents abducted and tortured the head of the ZHDA, who was found five days later with severe injuries.

The government is a member of the International Labor Organization (ILO) and has ratified conventions protecting worker rights.  The country has been subject to ILO supervisory mechanisms for practices that limit workers' rights to freely associate, organize, and hold labor union meetings.  At the 108th session of the ILO's International Labor Conference in June 2019, the Committee on the Application of Standards noted concern regarding the government's failure to implement specific recommendations of the 2010 Commission of Inquiry, which found the government responsible for serious violations of fundamental rights by its security forces, including a clear pattern of intimidation that included arrests, detentions, violence, and torture against union and opposition members.  The Committee also noted persisting allegations of violations of the rights of the freedom of assembly of workers' organizations.  The Committee urged the government to accept a direct contacts mission of the ILO to assess progress before the next conference.  The government ultimately agreed to accept a direct contacts mission, originally scheduled for May 2020 but postponed due to the COVID-19 pandemic.

# 12. U.S. International Development Finance Corporation (DFC) and Other Investment Insurance Programs

The U.S. government and Zimbabwe concluded an OPIC (now DFC) agreement in April 1999, which permits OPIC to conduct transactions in Zimbabwe.  Zimbabwe acceded to the World Bank's Multilateral Investment Guarantee Agency in September 1989.  Support from the Export-Import Bank of the United States is not available in Zimbabwe.  Finance and export promotion programs, as well as investment insurance offered through international financial institutions, remain limited due largely to Zimbabwe's mounting multilateral and bilateral debt arrears.

# 13. Foreign Direct Investment and Foreign Portfolio Investment Statistics

**Table 2: Key Macroeconomic Data, U.S. FDI in Host Country/Economy**

| Economic Data | Host Country Statistical source* | | USG or international statistical source | | USG or International Source of Data:  BEA; IMF; Eurostat; UNCTAD, Other |
|---|---|---|---|---|---|
| | Year | Amount | Year | Amount | |
| Host Country Gross Domestic Product (GDP) ($M USD) | 2018 | $24,040 | 2019 | $31,001 | www.worldbank.org/en/country |
| **Foreign Direct Investment** | **Host Country Statistical source*** | | **USG or international statistical source** | | **USG or international Source of data:  BEA; IMF; Eurostat; UNCTAD, Other** |
| U.S. FDI in partner country ($M USD, stock positions) | N/A | N/A | 2018 | -$2 | BEA data available at https://www.bea.gov/international/direct-investment-and-multinational-enterprises-comprehensive-data |
| Host country's FDI in the United States ($M USD, stock positions) | N/A | N/A | 2018 | N/A | BEA data available at https://www.bea.gov/international/direct-investment-and-multinational-enterprises-comprehensive-data |
| Total inbound stock of FDI as % host GDP | 2018 | 20.8 | 2018 | 20.8 | UNCTAD data available at https://unctad.org/en/Pages/DIAE/World%20Investment%20Report/Country-Fact-Sheets.aspx |

* Zimbabwe Statistical Agency

**Table 3: Sources and Destination of FDI**

Data not available.

**Table 4: Sources of Portfolio Investment**

Data not available.

# 14. Contact for More Information

Joseph Muzulu

Economic Specialist

U.S. Embassy Harare, 2 Lorraine Drive, Bluffhill, Harare

+263 8677011514

Email: muzuluj@state.gov

---

TAGS

Bureau of African Affairs    Bureau of Economic and Business Affairs    Zimbabwe

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

---

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit JJ

An official website of the United States Government Here's how you know

**Home** >  ...  > Zimbabwe

# 2019 Investment Climate Statements: Zimbabwe

**IN THIS SECTION** /
**EXECUTIVE SUMMARY**

## Executive Summary

Investor optimism following the November 2017 fall of President Robert Mugabe has weakened as President Emmerson Mnangagwa's government has been slow to follow through on reforms to improve the ease of doing business, and a protracted currency crisis strains the economy.  The Transitional Stabilization Program, announced in 2018, includes structural and fiscal reforms that, if fully implemented, would resolve many of the economy's fundamental weaknesses. The new government did move quickly to amend the restrictive indigenization (local ownership) law to apply only to the diamond and platinum sectors, opening other sectors to unrestricted foreign ownership.  Nevertheless, investors remain cautious. Zimbabwe has attracted low investment inflows of less than USD 500 million annually over the past decade. Between 2014 and 2017, foreign direct investment inflows fell from USD 545 million to USD 289 million, but rose to approximately USD 470 million in 2018. The government announced its commitment to improving transparency, streamlining business regulations, and removing corruption, but the last two years have brought only modest progress.

Zimbabwe's incentives to attract FDI include tax breaks for new investment by foreign and domestic companies, and making capital expenditures on new factories, machinery, and improvements fully tax deductible.  The government waives import taxes and surtaxes on capital equipment. The government has been working to improve the business environment by reducing the regulatory costs measured in the World Bank's Ease of Doing Business index, but the pace of such reforms has been slow, and policy inconsistency remains a major challenge to foreign investors.  In addition, corruption remains rife and there is little protection of property rights, particularly with respect to agricultural land. Historically, the

government has resorted at times to expropriating land without compensation, although it has indicated a new commitment to protecting property rights.

Zimbabwe's period of hyperinflation ended in 2009 with the country's commitment to the use of the multicurrency monetary regime, under which the U.S. dollar dominated most transactions.  This restored a degree of business confidence in the country until November 2016, when Zimbabwe introduced a surrogate currency (the "bond note") used only for domestic transactions. The local currency has since lost value, and the country is currently experiencing a binding foreign exchange shortage that makes it difficult for companies to meet their foreign payment obligations.  In February 2019, the Reserve Bank of Zimbabwe (RBZ) officially unpegged the local currency from the U.S. dollar and created an interbank market for foreign exchange, but has failed to implement a market-clearing exchange rate regime. Therefore, it remains difficult to access dollars at the official exchange rate, and an unstable black market for U.S. dollars persists.

Zimbabwe's arrears in payments to international financial institutions and Zimbabwe's high external debt (public and private) of over USD 10.7 billion complicate the situation by limiting the country's ability to access official development assistance at concessional rates.  Additionally, the country's banks do not offer financing for periods longer than two years, with most financing available for 180 days or less.

Zimbabwe's sectors that attract the most investor interest include agriculture (tobacco, in particular), mining, energy, and tourism.  Investors appreciate the high education levels of Zimbabwean workers.

*Table 1: Key Metrics and Rankings*

| Measure | Year | Index/Rank | Website Address |
|---|---|---|---|
| **TI Corruption Perceptions Index** | 2018 | 160 of 175 | http://www.transparency.org/research/cpi/overview |
| **World Bank's Doing Business Report** | 2019 | 155 of 190 | http://www.doingbusiness.org/en/rankings |
| **Global Innovation Index** | 2018 | 113 of 126 | https://www.globalinnovationindex.org/analysis-indicator |
| **U.S. FDI in partner country ($M USD, stock positions)** | 2017 | $ 37 | http://www.bea.gov/international/factsheet/ |
| **World Bank GNI per capita** | 2017 | $ 985 | http://data.worldbank.org/indicator/NY.GNP.PCAP.CD |

# 1. Openness To, and Restrictions Upon, Foreign Investment

**Policies Towards Foreign Direct Investment**

The government has a clear desire to attract greater FDI in order to improve the country's competitiveness. The government encourages public-private partnerships in order to enhance technological development, while also emphasizing the need to improve the investment climate by restoring the rule of law and sanctity of contracts.  Implementation has been limited.

Zimbabwe's Indigenization and Economic Empowerment law limits the amount of shares owned by foreigners in the diamonds and platinum sectors to 49 percent with specific indigenous organizations

1066

owning the remaining 51 percent.  The government has signaled it intends to remove these restrictions.  There are also smaller sectors "reserved" for Zimbabweans.

The Zimbabwe Investment Authority (ZIA) promotes and facilitates both foreign direct investment and local investment.  ZIA facilitates and processes investment applications for approval.  ZIA's website is **http://www.investzim.com/**       .  The country encourages companies to register with ZIA and the process currently takes approximately 90 days.  The government has announced plans for a more powerful, streamlined entity (a "one-stop shop") – the Zimbabwe Investment Development Authority (ZIDA).

While the new government of President Emerson Mnangagwa commits to prioritizing investment retention, there are as of yet no mechanisms and formal structures through which this is done.

**Limits on Foreign Control and Right to Private Ownership and Establishment**

While there is a right for foreign and domestic private entities to establish and own business enterprises and engage in all forms of remunerative activity, foreign ownership of businesses in the diamonds and platinum sectors is limited to 49 percent (or less in certain reserved sectors), as outlined above.

In 2007, the government passed the Indigenization and Economic Empowerment Act, which required that "indigenous Zimbabweans" (i.e. black Zimbabweans) own at least 51 percent of all enterprises valued over USD 500,000.  A March 2018 amendment to the law limits these restrictions to the diamond and platinum sectors.

Foreign investors are free to invest in the non-resource sectors without any restrictions as the government aims to achieve technology transfer, create employment, and achieve value addition.  The government further reserves certain sectors such as passenger busses, taxis and car hire services, employment agencies, grain milling, bakeries, advertising, dairy processing and estate agencies for Zimbabweans.

The country screens FDI through the Zimbabwe Investment Authority (ZIA) in liaison with relevant line ministries to confirm compliance with the country's investment regulations.  Once an investor meets the criteria, ZIA issues the company or entity with an investment certificate.

According to the country's laws, U.S. investors are not especially disadvantaged or singled out by any of the ownership or control mechanisms relative to other foreign investors.  In its investment guidelines, the government states its commitment to non-discrimination between foreign and domestic investors and among foreign investors.

**Other Investment Policy Reviews**

In the past three years, the government has not conducted an investment policy review through the Organization for Economic Cooperation and Development (OECD), the World Trade Organization (WTO) or the United Nations Conference on Trade and Development (UNCTAD).

**Business Facilitation**

The government expressed its desire to reduce the time it takes to start up a business.  It has also committed itself to improving the transparency and predictability of its policies and to dealing decisively with corruption.

Zimbabwe does not have a fully online registration process.  One is able to begin the process and conduct a name search online via the ZimConnect web portal.  The Zimbabwe Investment Authority (ZIA) is the country's investment promotion body set up to facilitate both foreign direct investment and local investment.  ZIA's website is **http://www.investzim.com/**    . According to the World Bank, it takes on average 32 days to start a business and requires nine distinct processes, with costs greater than an individual's average annual income.

**Outward Investment**

Zimbabwe does not promote or incentivize outward investment because of the tight foreign exchange constraint.  Any outward investment requires approval by exchange control authorities.

# 2. Bilateral Investment Agreements and Taxation Treaties

Zimbabwe has investment treaties with 35 countries but ratified only ten of these treaties, including those with the Netherlands, Denmark, Yugoslavia, China, Germany, Russia, South Africa, and Switzerland.  Two other investment agreements with India and Iran are awaiting ratification before they go into effect. In spite of these agreements, the government has failed to protect investments undertaken by nationals from these countries, particularly with regard to land.  In 2009, for example, an army officer seized a farm belonging to a German national but the government did not intervene, despite its assurance that Zimbabwe would honor all obligations and commitments to international investors. Some claimants protected by investment treaties have pursued arbitration through the International Centre for Settlement of Investment Disputes. The German Pezold family won a landmark USD 196 million judgment, but has received only partial payment.

The United States does have a Trade and Investment Framework Agreement (TIFA) with the Common Market for Eastern and Southern Africa (COMESA), of which Zimbabwe is a member.  This TIFA provides a mechanism to talk about disputes, although the protection offered by the TIFA is much more limited than protection typically provided by a bilateral investment treaty.

The United States does not have a bilateral taxation and/or investment treaty with Zimbabwe.

# 3. Legal Regime

**Transparency of the Regulatory System**

The government's official policy is to encourage competition within the private sector, but the bureaucracy within regulatory agencies lacks transparency, and corruption is prevalent.  Investors have also complained of policy inconsistency and unpredictability.

The government has introduced import taxes arbitrarily to support certain inefficient producers who lobby for protection against more competitive imports.  In late 2012, the Ministry of Finance announced a 25 percent surtax on selected imported products including soaps, meat products, beverages, dairy products, and cooking oil starting January 1, 2013 as well as other import taxes on beer, cigarettes, and chickens brought in from outside the Southern African Development Community (SADC) and the Common Market for Eastern and Southern African regions (COMESA).  In 2016, the government, through the Ministry of Industry and Commerce, introduced statutory instrument (SI) 64 which banned importation of a number of products manufactured locally. In 2017, the government replaced SI 64 with SI 122, which removed some products from requiring import licenses on importation. In October 2018, the government repealed SI 122 altogether to allow local companies and individuals with free funds to import commodities and stock up and stave off shortages of basic commodities.

In the last year, the government has stated its commitment to ensuring that laws, regulations and policies pertaining to investment are enacted after proper notice and consultation and are available publicly in a prompt and transparent manner.

According to the Department of State's 2018 Fiscal Transparency Report, public budget documents do not provide a full picture of government expenditures, and there is a notable lack of transparency regarding state-owned enterprises and the extraction of natural resources.

**International Regulatory Considerations**

1069

Zimbabwe is a member of the Southern African Development Community (SADC) and the Common Market for Eastern and Southern Africa (COMESA), and it is signatory to the SADC and COMESA trade protocols establishing free trade areas (FTA) with the aim of growing into a customs union.  Although the country is also a member of the World Trade Organization (WTO), it normally notifies only SADC and COMESA of measures that it intends to implement.

## Legal System and Judicial Independence

According to Zimbabwe's law and constitution, Zimbabwe has an independent judicial system whose decisions are binding on the other branches of government.  The country has written commercial law and it has expressed its intention to set up specialized commercial courts in 2019. Administration of justice in commercial cases that lack political overtones is still generally impartial.  Regulations or enforcement actions are appealable and are adjudicated in the national court system.

## Laws and Regulations on Foreign Direct Investment

As noted above, in 2007, the government introduced the Indigenization and Economic Empowerment Act requires that "indigenous Zimbabweans" (black Zimbabweans) own at least 51 percent of all enterprises valued over USD 500,000, but now amended to apply only to the diamonds and platinum sectors.  In certain sectors, such as primary agriculture, transport services, and retail and wholesale trade including distribution, foreign investors may not own more than 35 percent equity.

The Zimbabwe Investment Authority (ZIA) promotes and facilitates both foreign direct investment and local investment.  ZIA facilitates and processes investment applications for approval.  ZIA's website is **http://www.investzim.com/**    .  The government has announced plans for a more powerful, streamlined entity (a "one-stop shop") – the Zimbabwe Investment Development Authority (ZIDA).

## Competition and Anti-Trust Laws

The government's official policy is to encourage competition within the private sector with the enactment of the Zimbabwe Competition Act.  The Act provided for the formation of the Tariff and Competition Commission charged with investigating restrictive practices, mergers, and monopolies in the country.  The Competition and Tariff Commission (CTC) is an autonomous statutory body established in 2001 with the dual mandate of implementing and enforcing Zimbabwe's competition policy and law and executing the country's trade tariffs policy.

## Expropriation and Compensation

Despite provisions in Zimbabwe's previous constitution that prohibited the acquisition of private property without compensation, in 2000 the government began to allow the uncompensated seizures of privately owned agricultural land, serially amending the constitution to grant the government increasingly broad authorities to do so after the fact.  The authorities subsequently transferred many of the farms seized to government officials and other regime supporters. In April 2000, the government amended the constitution to authorize the compulsory acquisition of privately owned commercial farms with compensation limited to the improvements made on the land. In September 2005, the government amended the constitution again to transfer ownership of all expropriated land to the government.  Since the passage of this amendment, top government officials, supporters of the ruling Zimbabwe African National Union – Patriotic Front (ZANU-PF) party, and members of the security forces have continued to disrupt production on commercial farms, including those owned by foreign investors and those covered by bilateral investment agreements. Similarly, government officials have sought to impose politically-connected individuals as indigenous partners on privately and foreign-owned wildlife conservancies.

In 2006, the government began to issue 99-year leases for land seized from commercial farms. These leases, however, are not readily transferable or acceptable as collateral that would allow for borrowing and investment.  The government retains the right to withdraw the lease at any time for any reason. The government's program to seize commercial farms without compensating the titleholders, who have no recourse to the courts, has raised serious questions about respect for property rights and the rule of law in Zimbabwe.  As a result, Zimbabwe ranked 95 out of 190 countries considered with respect to the country's ability to protect minority investors in the World Bank's 2018 Doing Business report.

Zimbabwe's new government has announced its intention to compensate farmers who lost their land. Negotiations between the government and farmers' groups are ongoing.

**Dispute Settlement**

*ICSID Convention and New York Convention*

Zimbabwe acceded to the 1965 Convention on the Settlement of Investment Disputes between States and Nationals of Other States and to the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards in 1994.  However, the government does not always accept binding international arbitration of investment disputes between foreign investors and the state.

*Investor-State Dispute Settlement*

The government is signatory to a number of bilateral investment agreements with a number of countries (see above) in which international arbitration of investment disputes is recognized.  As noted above, Zimbabwe does not have a Bilateral Investment Treaty or Free Trade Agreement with an investment chapter with the United States.

Local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors.  For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial farms to the original owners.  Once an investor has exhausted the administrative and judicial remedies available locally, the government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law.  However, this has not occurred in practice.

*International Commercial Arbitration and Foreign Courts*

As noted above, local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors.  For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial farms to the original owners. Once an investor has exhausted the administrative and judicial remedies available locally, the government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law.  However, this has not occurred in practice.

**Bankruptcy Regulations**

In the event of insolvency or bankruptcy, Zimbabwe applies the Insolvency Act.  All creditors have equal rights against an insolvent estate. In terms of resolving insolvency, Zimbabwe ranks 102 out of 190 economies in the World Bank's 2017 Doing Business Report.

# 4. Industrial Policies

There are a number of incentives depending on the form of investment and the sectors.  For investment designed to develop industrial parks and investment in tourism development zones and joint ventures in the form of the build, own, operate, and transfer (BOOT) and build, operate, and transfer (BOT), the investors will not pay tax in the first five years after which they will pay tax at the rate of 25 percent compared to the normal tax rate of 35 percent.  For BOOT and BOT joint ventures, investors will not pay tax

for the first five years after which they will pay tax at the rate of 15 percent per annum. Investors within the mining sector exporting 50 percent of output will have reduced corporation tax of 20 percent and receive import duty exemption on imported capital goods while losses are carried forward indefinitely for mining operations.  Moreover, the government generally allows for duty exemptions in the importation of raw materials used in the manufacture of goods for export.

**Foreign Trade Zones/Free Ports/Trade Facilitation**

The government promulgated legislation creating Export Processing Zones (EPZs) in 1996.  Zimbabwe now has approximately 183 EPZ-designated companies. Benefits include a five-year tax holiday, duty-free importation of raw materials and capital equipment for use in the EPZ, and no tax liability from capital gains arising from the sale of property forming part of the investment in EPZs.  Since January 2004, the government has generally required that foreign capital comprise a majority of the investment. The requirement on EPZ-designated companies to export at least 80 percent of output has constrained foreign investment in the zones. The merger between the Zimbabwe Investment Centre and the Zimbabwe Export Processing Zones Authority, which began in 2006, has completed and the Zimbabwe Investment Authority now performs both roles.  Zimbabwe has recently passed amendments to the Zimbabwe Investment Authority Act to include Special Economic Zones. However, to date, activities in special economic zones have not been meaningful in spite of the generous incentives offered to investors in these areas.

Although there are no discriminatory import or export policies affecting foreign firms, the government's approval criteria heavily favor export-oriented projects.  Import duties and related taxes range as high as 110 percent. Export Processing Zone-designated companies must export at least 80 percent of output.

**Performance and Data Localization Requirements**

The government mandates local employment except for specialized skills that are in short supply locally. There are no general performance requirements for businesses located outside Export Processing and Special Economic Zones.  Government policy, however, encourages investment in enterprises that contribute to rural development, job creation, exports, the addition of domestic value to primary products, use of local materials, and the transfer of appropriate technologies.

Government participation is required for new investments in strategic industries such as energy, public water provision, and railways.  The terms of government participation are determined on a case-by-case basis during license approval. The few foreign investors (for example, from China, Russia, and Iran) in reserved strategic industries have either purchased existing companies or have supplied equipment and spares on credit.

The government encourages foreign investors to make maximum use of Zimbabwean management and technical personnel, and any investment proposal that involves the employment of foreigners must present a strong case in order to obtain work and residence permits.  Normally, the maximum contract period for a foreigner is three years but with possible extension to five years for individuals with highly specialized skills.

While currently there is no forced localization in which foreign investors must use domestic content in goods, the government is in the process of developing a local content policy designed to encourage the use of local inputs in production.

The government does not require foreign IT providers to turn over source code and/or provide access to surveillance.  Only banks are required to maintain all their data in the country through the escrow agreement.

The new government investment guidelines do not permit mandatory and/or arbitrary performance requirements that distort or limit the expansion of trade and investment.

# 5. Protection of Property Rights

**Real Property**

The government enforces interests in residential and commercial properties in cities although this is not the case with agricultural land.  Mortgages and liens do exist for urban properties although liquidity constraints have led to a fall in the number of mortgage loans. According to the World Bank's 2019 Doing Business Report, Zimbabwe is ranked 109 out of 190 countries in terms of registering property.  The recording of mortgages is generally reliable. With regard to agricultural land, the government provides and protects the usage rights of indigenous people, and it is currently in the process of developing new 99-year leases that will guarantee use, with the government retaining ownership of all agricultural land.  Current 99-year leases have not been strong enough for banks to accept them as collateral.

**Intellectual Property Rights**

Zimbabwe follows international patent and trademark conventions, and it is a member of the World Intellectual Property Organization (WIPO).  Generally, the government seeks to honor intellectual property ownership and rights, although a lack of expertise and manpower as well as corruption limit its ability to enforce these obligations.  Pirating of videos, music, and computer software is common.

It does not appear that the government enacted new IP related laws or regulations over the past year.  The country does not publish information on the seizures of counterfeit goods.

Zimbabwe is not included in the United States Trade Representative (USTR) Special 301 Report or Notorious Markets List

For additional information about national laws, treaty obligations, and points of contact at local IP offices, please see WIPO's country profiles at **http://www.wipo.int/directory/en/** .

# 6. Financial Sector

**Capital Markets and Portfolio Investment**

Zimbabwe's stock market currently has 56 publicly-listed companies, but just 12 of them account for about 75 percent of total market capitalization, which stood at USD 5.7 billion on March 25, 2019.  In September 1996, the government opened the stock and money markets to limited foreign portfolio investment. Since then, a maximum of 49 percent of any locally-listed company can be foreign-owned in line with the indigenization policy framework, with any single investor allowed to acquire up to 15 percent of the outstanding shares.

There is a 1.48 percent withholding tax on the sale of marketable securities, while the tax on purchasing stands at 1.73 percent.  Totaling 3.21 percent, the rates are comparable with the average of 3.5 percent for the region. As a way of raising funds for the state, the government mandated that insurance companies and pension funds invest between 25 and 35 percent of their portfolios in prescribed government bonds. Zimbabwe's hyperinflation, which ended with the 2009 dollarization, wiped out the value of domestic debt instruments. However, the government has been borrowing from the local market by issuing Treasury Bills (TBs) to financial institutions to finance government expenditure. Official statistics show that by the end of 2017, the government had issued in excess of USD 2 billion worth of TBs to financial institutions.

**Money and Banking System**

Three major international commercial banks and a number of regional and domestic banks operate in Zimbabwe, with a total of over 200 branches.  The central bank (Reserve Bank of Zimbabwe (RBZ)) believes that the banking sector is generally stable in spite of a harsh operating environment characterized by high credit risk and liquidity constraints.  As most international banks reduce risk (de-risking) in the face of high penalties for non-compliance with prudential guidelines in developed countries, most Zimbabwean

correspondent banking relationships are in jeopardy. As of December 31, 2018, the sector had 19 operating institutions, comprising 13 commercial banks, five building societies and one savings bank. According to the RBZ, as of December 2018, all operating banking institutions complied with the prescribed minimum core capital requirements. The level of non-performing loans increased somewhat from 7.08 percent in December 2017 to 8.25 percent by December 2018 largely reflecting a decline in credit quality due to the poor operating environment. The RBZ still believes the NPLs of financial institutions will fall due to banks adopting credit risk management tools in line with the internationally accepted accounting standards.

According to the central bank, the total deposits (including interbank deposits), rose from USD 8.48 billion in December 2017 to USD 10.32 billion by December 2018. The RBZ reports that as of December 31, 2018, total nostro foreign currency deposits amounted to USD 673.81 million, mostly dominated by corporates (97.17 percent).

## Foreign Exchange and Remittances

### Foreign Exchange

In 2009, the government lifted exchange controls and demonetized the Zimbabwe dollar. The RBZ permitted bank accounts and transactions in the following currencies: Euro, Botswana pula, South African rand, British pound, U.S. dollar, Chinese yuan, Australian dollar, Indian rupee, and Japanese yen, with most business conducted in U.S. dollars. Zimbabwe's export performance rose but at a slower pace than imports. Weak investment inflows and Zimbabwe's fiscal and current account deficits gradually resulted in a shortage of foreign exchange. In response to a binding cash crisis, the government introduced a surrogate currency, the bond note, in 2016 which traded on a 1:1 basis with the U.S. dollar, but the shortage of dollars meant RBZ would only allocate U.S. dollars to priority payments, to others payments after a delay, or – when the situation reached a crisis in late 2018 and early 2019 – not at all. Businesses have resorted to a black market for foreign exchange in order to make external payments. On February 20, 2019, the RBZ introduced the real time gross settlement (RTGS) dollar (incorporating the RTGS balances, bond notes and coins) whose value against the U.S. dollar should be market-determined (via a new interbank foreign exchange market emerged), but RBZ has not allowed the official rate to fall in line with market pressures. The black market persists. Since October 2018, banks have set up distinct foreign currency accounts denominated in U.S. dollars. The government's arrears on over USD 7 billion in external debt block the country's access to multilateral financing. These conditions severely constrain external financing for the economy, which has resulted in rising external payments arrears for necessary imports.

### Remittance Policies

In line with recommendations from the Southern African Development Community (SADC) and the IMF, the government revised the Foreign Exchange Control Act, which regulated currency conversions and transfers before the withdrawal of the Zimbabwe dollar.  With these changes and the liberalization of most current account transactions, exporters retained 100 percent of their foreign currency receipts for their own use until 2016. From 2016 to February 2019, the RBZ retained 50 percent of the foreign exchange generated by export proceeds (distributing the equivalent amount to the exporter in local currency), shared among competing foreign payments needs based on a priority list.  In February 2019, the government raised the amount most exporters can retain for their own use to 80 percent, 55 percent for gold producers, 50 percent for all other minerals, and 30 percent for tobacco and cotton farmers. Moreover, foreigners can remit capital appreciation, dividend income and after tax profits provided the foreign exchange is available.

**Sovereign Wealth Funds**

Zimbabwe does not have a sovereign wealth fund (SWF). The government set aside USUSD 1 million toward administrative costs related to the setting up of the Sovereign Wealth Fund in its 2016 Budget.  Although the government proposed to capitalize the SWF through a charge of up to 25 percent on royalty collections on mineral sales, as well as on special dividend on the sale of diamond, gas, granite and other minerals, the concept has not progressed any further.

# 7. State-Owned Enterprises

Zimbabwe has 107 state-owned enterprises (SOEs), defined as companies wholly-owned by the state.  A list of the SOEs appears **here**     . Many SOEs support vital infrastructure, including energy, mining, and agribusiness, for example.  As a result, competition within the sectors where SOEs operate tends to be limited. However, the government of Zimbabwe (GOZ) invites private investors to participate in infrastructure projects through public-private partnerships (PPPs).  Most SOEs have public function mandates, although in more recent years, they perform hybrid activities of satisfying their public functions while making profits. SOEs should have independent boards, but in some instances such as the recent case of the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards.

Zimbabwe does not appear to subscribe to the Organization for Economic Cooperation and Development (OECD) guidelines on corporate governance of SOEs.  SOEs operate under the same taxes and same value added tax rebate policies as private sector companies. The SOEs face a number of challenges that include persistent power outages, mismanagement, lack of maintenance, inadequate investment, a lack of liquidity and access to credit, and debt overhangs.  As a result, SOEs have performed poorly in recent years. Few

SOEs produce publicly available financial data and even fewer provide audited financial data. This has imposed significant costs on the rest of the economy.

**Privatization Program**

Although the government committed itself to privatize most SOEs across the economic sectors since the start of the privatization program in the 1990s, it only successfully privatized two parastatals.  In 2018, the government agreed to privatize 48 SOEs but currently, it has targeted five SOEs in the telecommunications sector, postal services, and financial sector for immediate reform. It encourages foreign investors to take advantage of the privatization program to invest in the country, although inter-SOE debts of nearly USD 1 billion pose challenges for privatization plans because they further weaken the entities' balance sheets. According to the recently published investment guidelines, the government is still working out the modalities for disposing part of its shareholding to the private sector.

# 8. Responsible Business Conduct

Following dollarization in 2009, there has been increased awareness of standards for responsible business conduct (RBC), driven by the private sector through the Standards Association of Zimbabwe.  The private sector developed the National Corporate Governance Code of Zimbabwe (ZimCode), which is a framework designed to guide Zimbabwean companies on RBC. An industrial advocacy group, the Confederation of Zimbabwe Industries, has a standing committee on business ethics and standards that drives ethical conduct within the Zimbabwean private sector.  The organization has developed its own charter according to OECD guidelines, highlighting good corporate governance and ethical behavior. The Zimbabwean government has not taken any measures to encourage RBC and it does not take RBC policies or practices into its procurement decisions.

Firms that demonstrate corporate social responsibility do not automatically garner favorable treatment from consumers, employees, and government.  With regard to indigenization, foreign companies receive formal indigenization credits of up to 31 percent for conducting CSR determined by the extent to which the activity achieves the government's socio-economic objectives.

Although the Zimbabwean government has considered implementing the World Bank's Extractive Industries Transparency Initiative (EITI) principles in order to strengthen accountability, good governance, and transparency in the mining sector, it has yet to launch an EITI program.  However, the government has stated its intention to adopt a domestic initiative called the Zimbabwe Mining Revenue Transparency Initiative (ZMRTI), though it has made little progress in implementing the initiative.

# 9. Corruption

In 2005, the government enacted an Anti-Corruption Act that established a government-appointed Zimbabwe Anti-Corruption Commission (ZACC) to investigate corruption.  The 2009 – 13 government of national unity (GNU) enhanced the institutional capacity of the ZACC with members appointed from civil society and the private sector. However, when the ZACC's term of office expired, the new ZACC did not include civil society and private sector representatives.  The government has a track record of prosecuting individuals selectively, focusing on those who have fallen out of favor with the ruling party and ignoring transgressions by members of the favored elite. Accusations of corruption seldom result in formal charges and convictions. Many corruption charges stem from opaque procurement processes.

While the laws to combat corruption exist, enforcement of the laws is weak as law enforcement agencies lack political will and resources.  As a result, Transparency International ranked Zimbabwe 160 out of 175 countries and territories surveyed in 2018. The Mnangagwa government has committed itself to eradicate corruption.  Since December 2017, ZACC has arrested and brought before the courts a number of high-ranking officials, mostly aligned to the Mugabe faction from the previous government. In spite of this, the courts have not sent many of the accused persons to prison.

Existing rules on the Zimbabwe Stock Exchange compel listed companies to disclose, through annual reports, minimum disclosure requirements.

The government also created a policy to improve accountability in the use of state resources through the introduction of the Public Finance Management Act in March 2010.  Nevertheless, corruption remains endemic, especially within the diamond sector where production and export figures are largely unreliable. The government has introduced a diamond policy that focuses on ensuring the 100 percent government ownership of all alluvial diamonds in the ground and the involvement of the Zimbabwe Revenue Authority (ZIMRA) in the entire value chain of diamond production.

While Zimbabwe signed the United Nations Convention against Corruption on February 20, 2004 and ratified the treaty on February 20, 2007, it is not party to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

*Resources to Report Corruption*

Transparency International Zimbabwe
96 Central Avenue
P O Box CY 434, Causeway

Harare

+263 4 793 246/7

Email: info@tizim.org

# 10. Political and Security Environment

Political parties, labor organizations, and civil-society groups sometimes encounter state-sponsored intimidation and repression from government security forces and Zimbabwe African National Union – Patriotic Front (ZANU–PF)-linked activists.  Disagreements between and within political parties occasionally resulted in violence targeting political party members.

Political tensions and civil unrest persist under the government of President Emmerson Mnangagwa who came into power following the military intervention of November 2017 that resulted in the departure of longstanding dictator Robert Mugabe.  On August 1, 2018, the army used live ammunition to disperse people demonstrating against the delay in announcing official presidential election results, leaving six people dead. Following demonstrations against a 140 percent increase in fuel prices on January 14, 2019, security forces responded with excessive violence and human rights abuses, including the use of live ammunition, arbitrary beatings and arrests, resulting in 17 deaths and hundreds injured over the course of weeks.  The crackdown targeted members of the opposition political party, civil society groups, and labor leaders. Political uncertainty remains high.

Violent crime, such as assault, carjacking, and home invasion, is common. Local police lack the resources to respond effectively to serious criminal incidents.

# 11. Labor Policies and Practices

Decades of political and economic crises have led to the emigration of many of Zimbabwe's skilled and well-educated citizens.  Formal sector employment has fallen significantly. Anecdotal evidence shows widespread youth unemployment as the country continues to produce graduates without a matching growth in employment opportunities.  As a result, most end up joining the informal sector estimated at over 90 percent of the workforce.

The government encourages foreign investors to make maximum use of Zimbabwean management and technical personnel.

The country's labor laws make it very difficult for employers to adjust employment in response to an economic downturn except in the Special Economic Zones (SEZs) where labor laws do not apply.  Outside the SEZs, the employer must engage the employees and their representatives and agree to adopt measures to avoid retrenchment. If the measures fail, the employer can retrench and pay an all-inclusive package of one month salary for each two years of service or the pro rata share thereof.

The labor laws differentiate between layoffs and severance with the former falling under retrenchment where the retrenchment law must apply.  The law does not accept unfair dismissal or layoffs of employees. The 2015 amendments to the act only permit terminations of contracts to be in terms of a registered code of conduct, expiry of a contract of fixed term duration, or mutual agreement.  There is no unemployment insurance or other safety net programs for workers laid off for economic reasons.

Employers in all sectors rely heavily on temporary or contract workers because there is no need to follow termination procedures.  The employee will only wait for the expiry of the agreed period of employment. The Labor Amendment Act of 2015, however, now requires employment councils to put a limit on the number of times employers can renew short-term contracts.

The government does not waive labor laws in order to attract or retain investment, except in the case of SEZs.

Labor unions affiliated to the Zimbabwe Congress of Trade Unions (ZCTU) are independent of the government and those affiliated to the Zimbabwe Federation of Trade Unions (ZFTU) and the Zimbabwe Industrial Revolution Workers Federation support the government.

Collective bargaining takes place through a National Employment Council (NEC) in each industry, comprising representatives from labor, business, and government.  The agreements apply to the entire sector regardless of whether or not all employees are members to the council or not, except for managerial employees.

The country has a labor dispute resolution process that starts at company level through disciplinary committees or grievance committees.  If the issue is not resolved at this level, the aggrieved party can appeal to either the employment council or the Labor Court depending on the industrial agreement.  Other redress is through the Ministry of Public Service Labor and Social Welfare in which labor officers settle disputes for industries without employment councils. From the Labor Court, an aggrieved party can appeal to the Supreme Court.

Labor inspection is minimal due to a lack of inspectors, and there is discrimination in practice.  The government continues to harass labor unions and their leaders. Labor leaders were among the targets of the January 2019 violent government crackdown.

The government is a member of the International Labor Organization (ILO) and has ratified conventions protecting worker rights.  The country has been subject to ILO supervisory mechanisms for practices that limit workers' rights to freely associate, organize, and hold labor union meetings.

## 12. OPIC and Other Investment Insurance Programs

The U.S. government and Zimbabwe concluded an OPIC agreement in April 1999, which permits OPIC to conduct transactions in Zimbabwe.  Zimbabwe acceded to the World Bank's Multilateral Investment Guarantee Agency in September 1989. Support from the Export-Import Bank of the United States is not available in Zimbabwe.  Finance and export promotion programs, as well as investment insurance offered through the international financial institutions, remain limited due largely to Zimbabwe's mounting multilateral and bilateral debt arrears.

## 13. Foreign Direct Investment and Foreign Portfolio Investment Statistics

*Table 2: Key Macroeconomic Data, U.S. FDI in Host Country/Economy*

| | **Host Country Statistical Source\*** | | **USG or International Statistical Source** | | **USG or International Source of Data: BEA; IMF; Eurostat; UNCTAD, Other** |
|---|---|---|---|---|---|
| **Economic Data** | **Year** | **Amount** | **Year** | **Amount** | |
| Host Country Gross Domestic Product (GDP) ($M USD) | 2017 | $22,041 | 2017 | $22,041 | www.worldbank.org/en/country |
| **Foreign Direct Investment** | **Host Country Statistical Source\*** | | **USG or International Statistical Source** | | **USG or International Source of Data: BEA; IMF; Eurostat; UNCTAD, Other** |
| U.S. FDI in partner country ($M USD, stock positions) | 2017 | N/A | 2017 | $37 | BEA data available at https://www.bea.gov/international/direct-investment-and-multinational-enterprises-comprehensive-data |
| Host country's FDI in the United States ($M USD, stock positions) | 2017 | N/A | 2016 | 0 | BEA data available at https://www.bea.gov/international/direct-investment-and-multinational-enterprises-comprehensive-data |
| Total inbound stock of FDI as % host GDP | 2017 | N/A | 2017 | 30.3% | UNCTAD data available at https://unctad.org/en/Pages/DIAE/World%20Investment%20Report/Country-Fact-Sheets.aspx |

1083

*Zimbabwe National Statistical Agency*

*Table 3: Sources and Destination of FDI*

Data not available.

*Table 4: Sources of Portfolio Investment*

Data not available.

# 14. Contact for More Information

Joseph Muzulu

Economic Specialist

U.S. Embassy Harare, 2 Lorraine Drive, Bluffhill, Harare

+263 8677011514

Email: **muzuluj@state.gov**

---

**TAGS**

Bureau of African Affairs     Bureau of Economic and Business Affairs     Zimbabwe

---



Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit KK

An official website of the United States Government Here's how you know

Home >   ...   > Zimbabwe

# 2018 Investment Climate Statements: Zimbabwe

**IN THIS SECTION /**
**EXECUTIVE SUMMARY**

## Executive Summary

While the government of Zimbabwe has implemented a number of measures since 2009 designed to attract foreign direct investment (FDI), many of its macroeconomic policies, such as the indigenization and economic empowerment laws, acted as significant deterrents. Following recent political changes, the new government amended indigenization, or local ownership laws, to reduce the restriction to only the diamond and platinum sectors; other sectors are now open to unrestricted foreign ownership. Moreover the government has announced its commitment to improving transparency and removing corruption.

Zimbabwe's incentives to attract FDI include tax breaks for new investment by foreign and domestic companies and allowing capital expenditures on new factories, machinery, and improvements to be fully tax deductible. The government also waives import taxes and surtaxes on capital equipment. The government has been working to improve the business environment by trying to reduce costs measured by the World Bank's Ease of Doing Business index, although the pace of introducing such reforms is extremely slow.

In spite of these developments, the country still needs to implement a comprehensive economic reform program designed to address the debt burden and attract foreign financial inflows at concessionary rates. In addition, corruption remains rife and there is little protection of property rights, particularly with respect to agricultural land. The government routinely expropriates land without compensation.

The country's commitment to the use of the multicurrency monetary regime, under which the U.S. dollar dominates most transactions, restored some business confidence in the country up to November 2016, but the introduction of a surrogate currency (the "bond note") used only for domestic transactions, has reintroduced uncertainties in the economy. The country is currently experiencing a binding foreign exchange constraint that makes it difficult for companies to meet their foreign payment obligations, the backlog of which now stretches as far as twelve months.

Zimbabwe's arrears in payments to international financial institutions and the high external debt overhang of over USD 10.7 billion complicate the situation by limiting the country's ability to access official development assistance at concessional rates. Additionally, the country's banks do not offer financing for periods longer than two years, with most financing available for 180 days or less. As a result of these negative factors, Zimbabwe has generally attracted low investment inflows of less than USD 500 million annually over the past decade.

*Table 1*

| Measure | Year | Index/Rank | Website Address |
|---|---|---|---|
| **TI Corruption Perceptions Index** | 2017 | 157 of 180 | http://www.transparency.org/research/cpi/overview |
| **World Bank's Doing Business Report "Ease of Doing Business"** | 2017 | 159 of 190 | www.doingbusiness.org/rankings |
| **Global Innovation Index** | 2017 | 121 of 128 | https://www.globalinnovationindex.org/analysis-indicator |
| **U.S. FDI in partner country (M USD, stock positions)** | 2015 | USD 8 | http://www.bea.gov/international/factsheet/ |
| **World Bank GNI per capita** | 2015 | USD 1,810 | http://data.worldbank.org/indicator/NY.GNP.PCAP.CD |

# 1. Openness To, and Restrictions Upon, Foreign Investment

**Policies Towards Foreign Direct Investment**

The government's policies reflect the need to attract greater FDI in order to improve the country's competitiveness, even though it does not fully support the policies in practice. The new government encourages public-private partnerships in order to enhance technological development, while also emphasizing the need to improve the investment climate by restoring the rule of law and sanctity of contracts. It remains to be seen if the statements and actions of many senior government officials will be consistent with the need to attract FDI and ultimately improve investor confidence.

Zimbabwe has an Indigenization and Economic Empowerment law that limits the amount of shares owned by foreigners in the diamonds and platinum sectors to 49 percent with specific indigenous organizations owning the remaining 51 percent. There are also sectors such as passenger transport, retail and wholesale trade, and hair dressing that are "reserved" for Zimbabwean entrepreneurs.

The Zimbabwe Investment Authority (ZIA) promotes and facilitates both foreign direct investment and local investment. ZIA facilitates and processes investment applications for approval. ZIA's website is **http://www.investzim.com/**       . The country encourages companies to register with ZIA and the process currently takes approximately 90 days.

While the new government of President Emerson Mnangagwa commits to prioritizing investment retention, there are as yet no mechanisms and formal structures through which this is done.

**Limits on Foreign Control and Right to Private Ownership and Establishment**

While there is a right for foreign and domestic private entities to establish and own business enterprises and engage in all forms of remunerative activity, foreign ownership of businesses in the diamonds and platinum sectors is limited to 49 percent (or less in certain reserved sectors), as outlined above.

In 2007, the government passed the Indigenization and Economic Empowerment Act, which requires that "indigenous Zimbabweans" (i.e. black Zimbabweans) own at least 51 percent of all enterprises valued over USD 500,000. A March 2018 amendment to the law limits these restrictions to the diamond and platinum sectors.

In the diamonds and platinum sectors, the government still restricts foreign ownership to 49 percent; foreign investors are free to invest in the non-resource sectors without any restrictions as the government battles to achieve technology transfer, create employment, and achieve value addition. The government further reserves certain sectors such as passenger busses, taxis and car hire services, employment agencies, grain milling, bakeries, advertising, dairy processing and estate agencies for Zimbabweans.

1090

The country screens FDI through the Zimbabwe Investment Authority (ZIA) in liaison with relevant line ministries to confirm compliance with the country's investment regulations. Once an investor meets the criteria, ZIA issues the company or entity with an investment certificate.

According to the country's laws, U.S. investors are not especially disadvantaged or singled out by any of the ownership or control mechanisms relative to other foreign investors. In its investment guidelines, the government states its commitment to non-discrimination between foreign and domestic investors and among foreign investors.

**Other Investment Policy Reviews**

In the past three years, the government has not conducted an investment policy review through the Organization for Economic Cooperation and Development (OECD), the World Trade Organization (WTO) or the United Nations Conference on Trade and Development (UNCTAD).

**Business Facilitation**

The government has committed itself to improving the transparency and predictability of its policies and to dealing decisively with corruption. In spite of this commitment, the World Bank's 2017 Doing Business Report ranks Zimbabwe 180 out of 187 economies studied with respect to starting a business.

Zimbabwe does not have an online registration process. The Zimbabwe Investment Authority (ZIA) is the country's investment promotion body set up to facilitate both foreign direct investment and local investment. ZIA's website is **http://www.investzim.com/**    . The country encourages companies to register with ZIA and the process currently takes 90 days.

ZIA does not discriminate between men and women investors when it comes to business facilitation. According to the World Bank's 2017 Doing Business data, it takes 61 days for both men and women to start a business in Zimbabwe and the cost for starting a business is the same between men and women.

**Outward Investment**

Zimbabwe does not promote or incentivize outward investment because of a tight foreign exchange constraint. Any outward investment has to be approved by exchange control authorities.

# 2. Bilateral Investment Agreements and Taxation Treaties

Zimbabwe has investment treaties with 17 countries but ratified only eight of these treaties, including those with the Netherlands, Denmark, Yugoslavia, China, Germany, Russia, South Africa, and Switzerland. Two other investment agreements with India and Iran are awaiting ratification before they go into effect. In spite of these agreements, the government has failed to protect investments undertaken by nationals from these countries, particularly with regard to land. In 2009, for example, an army officer seized a farm belonging to a German national but the government did not intervene, despite its assurance that Zimbabwe would honor all obligations and commitments to international investors.

The United States does have a Trade and Investment Framework Agreement (TIFA) with the Common Market for Eastern and Southern Africa (COMESA), of which Zimbabwe is a member. This TIFA provides a mechanism to talk about disputes, although the protection offered by the TIFA is much more limited than protection typically provided by a bilateral investment treaty.

The United States does not have a bilateral taxation and/or investment treaty with Zimbabwe.

# 3. Legal Regime

**Transparency of the Regulatory System**

The government's official policy is to encourage competition within the private sector, but the bureaucracy within regulatory agencies lacks transparency, and corruption within the regulatory system is believed to be rampant.

The government introduces import taxes arbitrarily to support certain inefficient producers who continue to lobby for protection against more competitive imports. In late 2012, the Ministry of Finance announced a 25 percent surtax on selected imported products including soaps, meat products, beverages, dairy products, and cooking oil starting January 1, 2013 as well as other import taxes on beer, cigarettes, and chickens brought in from outside the Southern African Development Community (SADC) and the Common Market for Eastern and Southern African regions (COMESA). In 2016, the government, through the Ministry of Industry and Commerce, introduced statutory instrument (SI) 64 which bans importation of a number of products manufactured locally.

Since the last review, the government has stated its commitment to ensuring that laws, regulations and policies pertaining to investment are enacted after proper notice and consultation and are available publicly in a prompt and transparent manner.

**International Regulatory Considerations**

Zimbabwe is a member of the Southern African Development Community (SADC) and the Common Market for Eastern and Southern Africa (COMESA), and it is signatory to the SADC and COMESA trade protocols establishing free trade areas (FTA) with the aim of growing into a customs union. Although the country is also a member of the World Trade Organization (WTO), it normally notifies only SADC and COMESA of measures that it intends to implement.

**Legal System and Judicial Independence**

According to host country law, Zimbabwe has an independent judicial system whose decisions are binding on the other branches of government. The country has written commercial law but does not have specialized commercial courts. Administration of justice in commercial cases that lack political overtones is still generally impartial. Regulations or enforcement actions are appealable and are adjudicated in the national court system.

**Laws and Regulations on Foreign Direct Investment**

As noted above, in 2007, the government introduced the Indigenization and Economic Empowerment Act, which requires that "indigenous Zimbabweans" (black Zimbabweans) own at least 51 percent of all enterprises valued over USD 500,000, but now amended to apply only to the diamonds and platinum sectors. In certain sectors, such as primary agriculture, transport services, and retail and wholesale trade including distribution, foreign investors may not own more than 35 percent equity.

**Competition and Anti-Trust Laws**

The government's official policy is to encourage competition within the private sector with the enactment of the Zimbabwe Competition Act. The Act provided for the formation of the Tariff and Competition Commission charged with investigating restrictive practices, mergers, and monopolies in the country. The Competition and Tariff Commission (CTC) is an autonomous statutory body established in 2001 with the dual mandate of implementing and enforcing Zimbabwe's competition policy and law and executing the country's trade tariffs policy.

**Expropriation and Compensation**

Despite provisions in Zimbabwe's previous constitution that prohibited the acquisition of private property without compensation, in 2000, the government began to sanction uncompensated seizures of privately

owned agricultural land, serially amending the constitution to grant the government increasingly broad authorities to do so after the fact. The authorities subsequently transferred many of the farms seized to government officials and other regime supporters. In April 2000, the government amended the constitution to authorize the compulsory acquisition of privately owned commercial farms with compensation limited to the improvements made on the land. In September 2005, the government amended the constitution again to transfer ownership of all expropriated land to the government. Since the passage of this amendment, top government officials, supporters of President Mugabe's Zimbabwe African National Union – Patriotic Front (ZANU-PF) party, and members of the security forces, have continued to disrupt production on commercial farms, including those owned by foreign investors and those covered by bilateral investment agreements. Similarly, government officials have sought to impose politically-connected individuals as indigenous partners on privately and foreign-owned wildlife conservancies.

In 2006, the government began to issue 99-year leases for land seized from commercial farms. These leases, however, are not readily transferable. The government retains the right to withdraw the lease at any time for any reason. The government's program to seize commercial farms without compensating the titleholders, who have no recourse to the courts, has raised serious questions about respect for property rights and the rule of law in Zimbabwe. As a result, Zimbabwe ranked 89 out of 190 countries considered with respect to the country's ability to protect minority investors in the World Bank's 2017 Doing Business report.

The government is still deliberating amendments to the Mines and Minerals Act, although the provision related to indigenization is now limited to the diamonds and platinum sectors.

**Dispute Settlement**

*ICSID Convention and New York Convention*

Zimbabwe acceded to the 1965 Convention on the Settlement of Investment Disputes between States and Nationals of Other States and to the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards in 1994. However, the government does not always accept binding international arbitration of investment disputes between foreign investors and the state.

*Investor-State Dispute Settlement*

The government is signatory to a number of bilateral investment agreements with a number of countries (see above) in which international arbitration of investment disputes is recognized. As noted above,

Zimbabwe does not have a Bilateral Investment Treaty or Free Trade Agreement with an investment chapter with the United States.

Local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors. For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial farms to the original owners. Once an investor has exhausted the administrative and judicial remedies available locally, the government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law. However, this has not occurred in practice.

*International Commercial Arbitration and Foreign Courts*

As noted above, local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors. For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial farms to the original owners. Once an investor has exhausted the administrative and judicial remedies available locally, the government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law. However, this has not occurred in practice.

**Bankruptcy Regulations**

In the event of insolvency or bankruptcy, Zimbabwe applies the Insolvency Act. All creditors have equal rights against an insolvent estate. In terms of resolving insolvency, Zimbabwe ranks 155 out of 190 economies in the World Bank's 2017 Doing Business Report.

# 4. Industrial Policies

**Investment Incentives**

There are a number of incentives depending on the form of investment and the sectors. For investment designed to develop industrial parks and investment in tourism development zones and joint ventures in the form of the build, own, operate and transfer (BOOT) and build operate and transfer (BOT), the investors will not pay tax in the first five years after which they will pay tax at the rate of 25 percent compared to the normal tax rate of 35 percent. For joint ventures in the form of the build, own, operate and transfer (BOOT)

and build operate and transfer (BOT), investors will not pay tax for the first five years after which they will pay tax at the rate of 15 percent per annum. Investors within the mining sector exporting 50 percent of output will have reduced corporation tax of 20 percent and receive import duty exemption on imported capital goods while losses are carried forward indefinitely for mining operations. Moreover the government generally allows for duty exemptions in the importation of raw materials used in the manufacture of goods for export.

## Foreign Trade Zones/Free Ports/Trade Facilitation

The government promulgated legislation creating Export Processing Zones (EPZs) in 1996. Zimbabwe now has approximately 183 EPZ-designated companies. Benefits include a five-year tax holiday, duty-free importation of raw materials and capital equipment for use in the EPZ, and no tax liability from capital gains arising from the sale of property forming part of the investment in EPZs. Since January 2004, the government has generally required that foreign capital comprise a majority of the investment. The requirement on EPZ-designated companies to export at least 80 percent of output has constrained foreign investment in the zones. The merger between the Zimbabwe Investment Centre and the Zimbabwe Export Processing Zones Authority, which began in 2006, has been completed and the new institution—ZIA—now serves as a one-stop shop for both local and foreign investors. Zimbabwe has recently passed amendments to the Zimbabwe Investment Authority Act to include Special Economic Zones. However, to date, activities in special economic zones have not been meaningful in spite of the generous incentives offered to investors in these special areas.

Although there are no discriminatory import or export policies affecting foreign firms, the government's approval criteria heavily favor export-oriented projects. Import duties and related taxes range as high as 110 percent. Export Processing Zone-designated companies must export at least 80 percent of output.

## Performance and Data Localization Requirements

The government mandates local employment except for specialized skills that are in short supply locally. There are no general performance requirements for businesses located outside Export Processing and Special Economic Zones. Government policy, however, encourages investment in enterprises that contribute to rural development, job creation, exports, the addition of domestic value to primary products, use of local materials, and the transfer of appropriate technologies.

Government participation is required for new investments in strategic industries such as energy, public water provision, and railways. The terms of government participation are determined on a case-by-case basis during license approval. The few foreign investors (for example, from China, Russia, and Japan) in

reserved strategic industries have either purchased existing companies or have supplied equipment and spares on credit.

The government encourages foreign investors to make maximum use of Zimbabwean management and technical personnel, and any investment proposal that involves the employment of foreigners must present a strong case in order to obtain work and residence permits. Normally, the maximum contract period for a foreigner is three years but with possible extension to five years for individuals with highly specialized skills.

While currently there is no forced localization in which foreign investors must use domestic content in goods, the government is in the process of developing a local content policy designed to encourage the use of local inputs in production.

The government does not require foreign IT providers to turn over source code and/or provide access to surveillance. Only banks are required to maintain all their data in the country through the escrow agreement.

The new government investment guidelines do not permit mandatory and/or arbitrary performance requirements that distort or limit the expansion of trade and investment.

# 5. Protection of Property Rights

**Real Property**

The government enforces interests in residential and commercial properties in cities although this is not the case with agricultural land. Mortgages and liens do exist for urban properties although liquidity constraints have led to a fall in the number of mortgage loans. According to the World Bank's 2015 Doing Business Report, Zimbabwe is ranked 94 out of 189 countries in terms of registering property. The recording of mortgages is generally reliable. With regard to agricultural land, the government provides and protects use rights of indigenous people and it is currently in the process of developing new 99-year leases that will guarantee use, with the government retaining ownership of all agricultural land.

**Intellectual Property Rights**

Zimbabwe applies international patent and trademark conventions, and it is a member of the World Intellectual Property Organization. Generally, the government seeks to honor intellectual property ownership and rights, although a lack of expertise and manpower and rampant corruption limit its ability to enforce these obligations. Pirating of videos, music, and computer software is common.

It does not appear that the government enacted new IP related laws or regulations over the past year. The country does not publish information on the seizures of counterfeit goods. The country is not listed in USTR's Special 301 report.

For additional information about treaty obligations and points of contact at local IP offices, please see WIPO's country profiles at **http://www.wipo.int/directory/en/** .

Zimbabwe is not listed in the notorious market report. For additional information about national laws and points of contact at local IP offices, please see WIPO's country profiles at **http://www.wipo.int/directory/en/** .

# 6. Financial Sector

## Capital Markets and Portfolio Investment

Zimbabwe's stock market currently has 59 publicly-listed companies, but just 17 of them account for over 80 percent of total market capitalization, which stood at USD 8.8 billion on March 7, 2018. In September 1996, the government opened the stock and money markets to limited foreign portfolio investment. Since then, a maximum of 49 percent of any locally-listed company can be foreign-owned in line with the indigenization policy framework, with any single investor allowed to acquire up to 15 percent of the outstanding shares.

There is a 1.48 percent withholding tax on the sale of marketable securities, while the tax on purchasing stands at 1.73 percent. Totaling 3.21 percent, the rates are comparable with the average of 3.5 percent for the region. As a way of raising funds for the state, the government mandated that insurance companies and pension funds invest between 25 and 35 percent of their portfolios in prescribed government bonds. Zimbabwe's hyperinflation, which came to an end with the 2009 dollarization, wiped out the value of domestic debt instruments. However, the government has been borrowing from the local market by issuing Treasury Bills (TBs) to financial institutions to finance the ever widening government expenditure. Official statistics show that by the end of 2017, the government had issued in excess of USD 2 billion worth of TBs to financial institutions.

## Money and Banking System

Three major international commercial banks and a number of regional and domestic banks operate in Zimbabwe, with a total of over 200 branches. The central bank (Reserve Bank of Zimbabwe (RBZ)) believes

that the banking sector is generally stable in spite of a harsh operating environment characterized by high credit risk and liquidity constraints. As most international banks reduce risk (de-risking) in the face of high penalties for non-compliance with prudential guidelines in developed countries, most Zimbabwean correspondent banking relationships are in jeopardy. As of December 31, 2017, the sector had 19 operating institutions, comprising 13 commercial banks, five building societies and one savings bank. According to the RBZ, as of December 2017, all operating banking institutions complied with the prescribed minimum core capital requirements. The level of non-performing loans improved somewhat from 7.87 percent in December 2016 to 7.08 percent by December 2017 largely due to the general strengthening of credit management systems in the aftermath of balance sheet clean up through disposals of non-performing loans (NPLs) to the Zimbabwe Asset Management Company.

According to the central bank, the total deposits (including interbank deposits), rose from USD 6.5 billion in December 2016 to USD 8.48 billion by December 2017. The RBZ attributed the notable increase in deposits to increased export receipts, the expansionary impact of government expenditure and the multiplier effect of new deposits.

The central bank received a USD 200 million injection from the African Export Import Bank (Afreximbank) to revitalize Zimbabwe's inter-bank lending market which started operating on March 23, 2015 (see above).

**Foreign Exchange and Remittances**

*Foreign Exchange Policies*

Until the end of 2008, Zimbabwe's exchange-rate policies made it difficult for firms to obtain foreign currency, and this, in turn, resulted in shortages of fuel, electric power, and other imported goods. Other consequences included defaults on public- and private-sector debt and a sharp decline in industrial, agricultural, and mining operations. In 2009, the government lifted exchange controls and demonetized the Zimbabwe dollar. The RBZ now permits bank accounts and transactions in the following currencies: Euro, Botswana pula, South African rand, British pound, U.S. dollar, Chinese yuan, Australian dollar, Indian rupee, and Japanese yen, with most business conducted in U.S. dollars. Zimbabwe's export performance is rising but at a slower pace than imports. The government's arrears on over USD 10 billion in external debt block the country's access to multilateral financing. These conditions severely constrain external financing for the economy which has resulted in rising external payments arrears for necessary imports.

*Remittance Policies*

In line with recommendations from the Southern African Development Community (SADC) and the IMF, the government revised the Foreign Exchange Control Act, which regulated currency conversions and transfers before the withdrawal of the Zimbabwe dollar. With these changes and the liberalization of most current account transactions, exporters retain 100 percent of their foreign currency receipts for their own use until the second quarter of 2016. Since then, the RBZ retains 50 percent of all export proceeds to be shared among competing foreign payments needs based on a priority list. In spite of this, foreigners can remit capital appreciation, dividend income and after tax profits provided the foreign exchange is available.

Zimbabwe is a member of the Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG). The country still awaits the results of the 2014 Financial Action Task Force (FATF) assessment of Zimbabwe's compliance with the international standards on money laundering and terrorism financing, and the authorities believe that the results will be positive.

**Sovereign Wealth Funds**

Zimbabwe does not have a sovereign wealth fund (SWF). The government set aside USUSD 1 million toward administrative costs related to the setting up of the Sovereign Wealth Fund in its 2016 Budget. The government proposes to capitalize the SWF through a charge of up to 25 percent on royalty collections on mineral sales, as well as on special dividend on the sale of diamond, gas, granite and other minerals.

# 7. State-Owned Enterprises

Zimbabwe has 72 state-owned enterprises (SOEs), defined as companies wholly-owned by the state, but there is no published list of these entities. Many SOEs support vital infrastructure, including energy, mining, and agribusiness, for example. As a result, competition within the sectors where SOEs operate tends to be limited. However, the government of Zimbabwe (GOZ) invites private investors to participate in infrastructure projects through public-private partnerships (PPPs). Most SOEs have public function mandates, although in more recent years, they perform hybrid activities of satisfying their public functions while making profits. SOEs should have independent boards but in some instances such as the recent case of the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards.

Zimbabwe does not appear to subscribe to the Organization for Economic Cooperation and Development (OECD) guidelines on corporate governance of SOEs. SOEs operate under the same taxes and same value added tax rebate policies as private sector companies. The SOEs face a number of challenges that include persistent power outages, mismanagement, lack of maintenance, inadequate investment, a lack of liquidity

and access to credit, and debt overhangs. As a result, the SOEs have performed poorly in recent years. Few SOEs produce publicly available financial data and ever fewer audited financial data. This has imposed significant costs on the rest of the economy.

**Privatization Program**

Currently, the government owns various state owned enterprises (SOEs) across various economic sectors. The government has committed itself to privatize most SOEs across the economic sectors and since the start of the privatization program in the 1990s, it only successfully privatized two parastatals. The government encourages foreign investors to take advantage of the privatization program to invest in the country although inter-SOE debts of nearly USD 1 billion pose challenges for privatization plans because they further weaken the entities' balance sheets. According to the recently published investment guidelines, the government is still working out the modalities on how to dispose of part of its shareholding to the private sector.

# 8. Responsible Business Conduct

Following dollarization in 2009, there has been increased awareness of standards for responsible business conduct (RBC), driven by the private sector through the Standards Association of Zimbabwe. The private sector developed the National Corporate Governance Code of Zimbabwe (ZimCode), which is a framework designed to guide Zimbabwean companies on RBC. An industrial advocacy group, the Confederation of Zimbabwe Industries, has a standing committee on business ethics and standards which drives ethical conduct within the Zimbabwean private sector. The organization has developed its own charter according to OECD guidelines, highlighting good corporate governance and ethical behavior. The Zimbabwean government has not taken any measures to encourage RBC and it does not take RBC policies or practices into its procurement decisions.

Firms that demonstrate corporate social responsibility do not automatically garner favorable treatment from consumers, employees, and government. With regard to indigenization, foreign companies receive formal indigenization credits of up to 31 percent for conducting CSR determined by the extent to which the activity achieves the government's socio-economic objectives.

Although the Zimbabwean government has considered implementing the World Bank's Extractive Industries Transparency Initiative (EITI) principles in order to strengthen accountability, good governance, and transparency in the mining sector, it has yet to launch an EITI program. However, the government has

stated its intention to adopt a domestic initiative called the Zimbabwe Mining Revenue Transparency Initiative (ZMRTI) but it has made little progress in implementing the initiative.

# 9. Corruption

In 2005, the government enacted an Anti-Corruption Act that established a government-appointed the Zimbabwe Anti-Corruption Commission (ZACC) to investigate corruption. However, the ACC did not include any members from civil society or the private sector. The government of national unity (GNU) enhanced the institutional capacity of the ZACC with members appointed from civil society and the private sector. However, when the ZACC's term of office expired, the new ZACC did not include civil society and private sector representatives. The government prosecutes individuals selectively, focusing on those who have fallen out of favor with ZANU-PF and ignoring transgressions by members of the favored elite. Accusations of corruption are used as a political tool but seldom result in formal charges and convictions.

While the laws to combat corruption exist, enforcement of the laws is weak as the law enforcement agencies lack the political will and resources to do their job effectively. As a result, Transparency International ranked Zimbabwe 157 out of 180 countries and territories surveyed in 2017. The new government has, however, committed itself to eradicate corruption and, since December 2017, ZACC has arrested and brought before the courts a number of high ranking officials in the previous government.

Existing rules on the Zimbabwe Stock Exchange compel listed companies to disclose, through annual reports, minimum disclosure requirements.

The government also created a policy to improve accountability in the use of state resources through the introduction of the Public Finance Management Act in March 2010. In spite of this, corruption is still endemic, especially within the diamond sector where production and export figures are largely unreliable. In this respect, the government has introduced a Diamond Policy that focuses on ensuring the 100 percent government ownership of all alluvial diamonds in the ground and the involvement of the Zimbabwe Revenue Authority (ZIMRA) in the entire value chain of diamond production.

While Zimbabwe signed the United Nations Convention against Corruption on February 20, 2004 and ratified the treaty on February 20, 2007, it is not party to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

**Resources to Report Corruption**

Contact at "watchdog" organization:

Transparency International Zimbabwe

96 Central Avenue,

P O Box CY 434, Causeway

Harare

+263 4 793 246/7

**tiz@tizim.org**; **info@tizim.org**

# 10. Political and Security Environment

Political parties and civil-society groups that oppose ZANU-PF routinely encounter state-sponsored intimidation and repression from government security forces and ZANU-PF-linked activists. This environment persisted even during the period of the coalition government when the main opposition parties, the Movement for Democratic Change-Tsvangirai (MDC-T) and the Movement for Democratic Change-Ncube (MDC-N), joined ZANU-PF in an Inclusive Government from February 2009 to June 2013. Individuals and companies out of favor with ZANU-PF routinely suffer harassment and bureaucratic obstacles in their business dealings. Disagreements between and within political parties occasionally resulted in violence targeting political party members. In December 2013, customers broke the windows at a bank branch which had run out of funds to distribute to depositors. Such violence is sporadic and increase as elections draw close.

Despite perceived widespread dissatisfaction with government policy, there had not been large-scale demonstrations until November 18, 2017 when a demonstration, sanctioned by the army eventually forced Mugabe to resign. Since then, President Mnangagwa has emphasized the need to be peaceful as the country heads for the 2018 elections. Nevertheless, there are still isolated cases of violence allegedly perpetrated by ZANU-PF aligned youths country-wide.

# 11. Labor Policies and Practices

Zimbabwe's interconnected economic and political crises from 1998 through 2008 prompted many of the country's most skilled and well-educated citizens to emigrate, leading to widespread labor shortages for managerial and technical jobs. At the same time, the decade-long severe contraction of the economy caused formal sector employment to drop significantly. The Zimbabwe Statistical Agency (Zimstat) began to compile meaningful employment statistics in 2010. According to these figures, Zimbabwe's non-farm employment rose from 721,000 in December 2011 to 802,000 in June 2012 (the latest date for which official

data are available). Anecdotal evidence shows widespread youth unemployment as the country continues to churn out graduates without any meaningful employment growth. As a result, most end up joining the informal sector estimated at over 90 percent of the workforce.

Although the country's HIV/AIDS epidemic had previously taken a heavier toll on the workforce, in 2014, 15 percent of adults were living with HIV/AIDS.

The government encourages foreign investors to make maximum use of Zimbabwean management and technical personnel.

The country's labor laws make it very difficult for employers to adjust employment in response to an economic downturn except in the Special Economic Zones (SEZs) where labor laws do not apply. Outside the SEZs the employer must engage the employees and their representatives and agree to adopt measures to avoid retrenchment. If the measures fail, the employer can retrench and pay an all-inclusive package of one month salary for each two years of service or the pro rata share thereof.

The labor laws differentiate between layoffs and severance with the former falling under retrenchment where the retrenchment law must apply. The law does not accept unfair dismissal or layoffs of employees. The 2015 amendments to the act only permit termination of contract to be in terms of a registered code of conduct, expiry of a contract of fixed term duration or mutual agreement. There is no unemployment insurance or other safety net programs for workers laid off for economic reasons.

Employers in any sector tend to use temporary or contract workers because it is easy to lay them off as there is no need to follow termination procedures. The employee will only wait for the expiry of the agreed period of the contract ranging from 3 months renewed occasionally. The Labor Amendment Act of 2015, however, now requires employment councils to put a limit on the number of times employers can renew short term contracts.

The government does not waive labor laws in order to attract or retain investment.

Labor unions affiliated to the Zimbabwe Congress of Trade Unions (ZCTU) are independent of the government and those affiliated to the Zimbabwe Federation of Trade Unions (ZFTU) and the Zimbabwe Industrial Revolution Workers Federation support the government.

Collective bargaining takes place through a National Employment Council (NEC) in each industry, comprising representatives from labor, business, and government. The agreements apply to the entire

sector regardless of whether or not all employees are members to the council or not, except for managerial employees.

The country has a labor dispute resolution process that starts at company level through disciplinary committees or grievance committees. If the issue is not resolved at this level, the aggrieved party can appeal to either the employment council or the Labor Court depending on the industrial agreement. Other redress is through the Ministry of Public Service Labor and Social Welfare in which labor officers settle disputes for industries without employment councils. From the Labor Court an aggrieved party can appeal to the Supreme Court.

The ZCTU called for a demonstration on August 8, 2015 to protest against massive job losses as a result of the Supreme Court decision allowing employers to terminate contracts of employment on three-month notice under the common law. The police banned the activity and riot police camped at ZCTU offices for a week, preventing workers from gathering and accessing union offices. Following the ZCTU appeal to the High Court on August 22, 2015, the demonstration went ahead.

Labor inspection is very minimal and there is discrimination in practice. The government continues to harass labor unions and their leaders. In December 2012, for example, the police arrested two ZCTU officials for allegedly holding an unsanctioned protest march to celebrate Human Rights Day in the city of Bulawayo, even though the police had sanctioned it beforehand. Under Zimbabwe labor law, the government can intervene in ZCTU's internal affairs if it determines that the leadership is misusing funds.

The government enacted some amendments to the labor act in 2015 to compel employers who dismissed workers from July 2015 as a result of the Supreme Court judgment to pay retroactive compensation. While employers are unhappy with such a provision, trade unions are somewhat pleased with the decision. But the compensation is limited to one month salary for each two years of service or a share thereof. It violates trade union and employers' right to freedom of association by giving power to the Minister to investigate and appoint administrators in situations where there is alleged mismanagement of the trade union.

The government is a member of the International Labor Organization (ILO) and has ratified conventions protecting worker rights. The country has been subject to ILO supervisory mechanisms for practices that limit workers' rights to freely associate, organize, and hold labor union meetings.

# 12. OPIC and Other Investment Insurance Programs

1105

The U.S. government and Zimbabwe concluded an OPIC agreement in April 1999 which permits OPIC to conduct transactions in Zimbabwe. Zimbabwe acceded to the World Bank's Multilateral Investment Guarantee Agency in September 1989. Support from the Export-Import Bank of the United States is not available in Zimbabwe. Finance and export promotion programs, as well as investment insurance offered through the international financial institutions, remain limited due largely to Zimbabwe's mounting multilateral and bilateral debt arrears and deteriorating investment climate.

# 13. Foreign Direct Investment and Foreign Portfolio Investment Statistics

*Table 2: Key Macroeconomic Data, U.S. FDI in Host Country/Economy*

| Economic Data | Host Country Statistical Source* | | USG or International Statistical Source | | USG or International Source of Data: BEA; IMF; Eurostat; UNCTAD, Other |
|---|---|---|---|---|---|
| | Year | Amount | Year | Amount | |
| Host Country Gross Domestic Product (GDP) (M USD) | 2015 | USD 16,305 | 2015 | USD 16,303 | www.worldbank.org/en/country |

| Foreign Direct Investment | Host Country Statistical Source* | | USG or International Statistical Source | | USG or International Source of Data: BEA; IMF; Eurostat; UNCTAD, Other |
|---|---|---|---|---|---|
| U.S. FDI in partner country (M USD, stock positions) | 2015 | N/A | 2015 | (D) | BEA data available at http://bea.gov/international/direct_investment_multinational_companies_comprehensive_data.htm |
| Host country's FDI in the United States (M USD, stock positions) | 2015 | N/A | 2015 | (D) | BEA data available at http://bea.gov/international/direct_investment_multinational_companies_comprehensive_data.htm |

| Total inbound stock of FDI as % host GDP | 2015 | N/A | 2015 | 24.3 | N/A |
| --- | --- | --- | --- | --- | --- |

*Zimbabwe National Statistical Agency

(D) Data suppressed to avoid disclosure of data of individual companies

*Table 3: Sources and Destination of FDI*

Data not available.

*Table 4: Sources of Portfolio Investment*

Data not available.

# 14. Contact for More Information

Joseph Muzulu

Economic Specialist

U.S. Embassy Harare, 172 H. Chitepo Avenue, Harare

+263 4 250 593

**muzuluj@state.gov**

---

**TAGS**

Bureau of African Affairs    Bureau of Economic and Business Affairs    Zimbabwe

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit LL

An official website of the United States Government Here's how you know

**Home** >  ...  > Zimbabwe

# 2017 Investment Climate Statements: Zimbabwe

**IN THIS SECTION** /
**EXECUTIVE SUMMARY**

## Executive Summary

While the government of Zimbabwe has implemented a number of measures since 2009 designed to attract foreign direct investment (FDI), many of its macroeconomic policies, such as the indigenization and economic empowerment laws, are significant deterrents. The country's commitment to the use of the multicurrency monetary regime, under which the U.S. dollar dominates most transactions, restored some business confidence in the country up to November 2016, but the introduction of a surrogate currency (the bond note) used only for domestic transactions, has reintroduced uncertainties in the economy. The country is currently experiencing a binding liquidity constraint as the U.S. dollar disappears from circulation making it difficult for companies to meet their foreign obligations.

Zimbabwe's incentives to attract FDI include tax breaks for new investment by foreign and domestic companies and allowing capital expenditures on new factories, machinery, and improvements to be fully tax deductible. The government also waives import taxes and surtaxes on capital equipment. The government has been working to improve the business environment by trying to reduce costs measured by the World Bank's Ease of Doing Business index, although the pace of introducing such reforms is extremely slow.

In spite of these developments, the country still needs to implement a comprehensive economic reform program designed to address the debt burden and attract foreign financial inflows and capitalization competitive rates. In addition, corruption is rife and there is little protection of property rights, particularly with respect to agricultural land. The government routinely expropriates land without compensation.

Moreover, the inconsistent application of "indigenization" regulations, which set minimum ownership levels by black Zimbabweans of enterprises valued over $500,000 at 51 percent in most economic sectors, continues to discourage investment.

Zimbabwe's arrears in payments to international financial institutions and poor macroeconomic policies complicate the situation by limiting the country's ability to access official development assistance at concessional rates. Additionally, the country's banks do not offer financing for periods longer than two years, with most financing available for 180 days or less. As a result of these negative factors, Zimbabwe generally ranks poorly in global comparisons of economic competitiveness.

*Table 1*

| Measure | Year | Index/Rank | Website Address |
|---|---|---|---|
| **TI Corruption Perceptions Index** | 2016 | 154 of 176 | http://www.transparency.org/research/cpi/overview |
| **World Bank's Doing Business Report "Ease of Doing Business"** | 2017 | 160 of 190 | doingbusiness.org/rankings |
| **Global Innovation Index** | 2016 | N/A | https://www.globalinnovationindex.org/analysis-indicator |
| **U.S. FDI in partner country ($M USD, stock positions)** | 2015 | N/A | http://www.bea.gov/international/factsheet |
| **World Bank GNI per capita** | 2015 | USD 1,710 | http://data.worldbank.org/indicator/NY.GNP.PCAP. |

# 1. Openness To, and Restrictions Upon, Foreign Investment

**Policies Towards Foreign Direct Investment**

The government's policies are nominally designed to attract greater FDI in order to improve the country's competitiveness, though it does not fully support the policies in practice. While the government appears to encourage public-private partnerships in order to enhance technological development and the need to improve the investment climate by restoring the rule of law and sanctity of contracts, the statements and

actions of many senior government officials undermine Zimbabwe's ability to attract FDI and ultimately undermine investor confidence.

Zimbabwe has an Indigenization and Economic Empowerment law that limits the amount of shares owned by foreigners in an organization to 49 percent with a requirement for the remaining 51 percent to be owned by indigenous blacks.

The Zimbabwe Investment Authority (ZIA) promotes and facilitates both foreign direct investment and local investment. ZIA's website is **http://www.investzim.com/**    . The country encourages companies to register with ZIA and the process currently takes approximately 90 days.

**Limits on Foreign Control and Right to Private Ownership and Establishment**

While there is a right for foreign and domestic private entities to establish and own business enterprises and engage in all forms of remunerative activity, foreign ownership of businesses is limited to 49 percent (or less in certain sectors), as outlined above.

In 2007, the government passed the Indigenization and Economic Empowerment Act, which requires that "indigenous Zimbabweans" (i.e. black Zimbabweans) own at least 51 percent of all enterprises valued over $500,000.

In the natural resources sectors such as mining, the government restricts foreign ownership to 49 percent with the remainder reserved to indigenous Zimbabweans or the government. In the non-resource sectors, the government grants waivers based on achievements of certain initiatives such as technology transfer, creation of employment, and value addition. In certain sectors, such as primary agriculture, transport services, and retail and wholesale trade including distribution, foreign investors may not own more than 35 percent equity. The government reserves certain sectors such as passenger busses, taxis and car hire services, employment agencies, grain milling, bakeries, advertising, dairy processing and estate agencies for Zimbabweans.

The country screens FDI through the Zimbabwe Investment Authority (ZIA) in liaison with relevant line ministries to confirm compliance with the country's investment and indigenization regulations. Once an investor meets the criteria, ZIA issues the company or entity with an investment certificate.

**Other Investment Policy Reviews**

In the past three years, the government has not conducted an investment policy review through the Organization for Economic Cooperation and Development (OECD), the World Trade Organization (WTO) or the United Nations Conference on Trade and Development (UNCTAD).

**Business Facilitation**

Zimbabwe does not have an online registration process. The Zimbabwe Investment Authority (ZIA) is the country's investment promotion body set up to facilitate both foreign direct investment and local investment. ZIA's website is **http://www.investzim.com/**      . The country encourages companies to register with ZIA and the process currently takes 90 days.

**Outward Investment**

Zimbabwe does not promote or incentivize outward investment because of tight liquidity constraints.

## 2. Bilateral Investment Agreements and Taxation Treaties

The United States does not have a bilateral taxation and/or investment treaty with Zimbabwe.

Zimbabwe has investment treaties with 17 countries but ratified only seven of these treaties (with the Netherlands, Denmark, Germany, South Korea, South Africa, Botswana, and Switzerland). Three other investment agreements with Russia, India, and Iran are awaiting ratification before they go into effect. In spite of these agreements, the government has failed to protect investments undertaken by nationals from these countries, particularly with regard to land. In 2009, for example, an army officer seized a farm belonging to a German national but the government did not intervene, despite its assurance that Zimbabwe would honor all obligations and commitments to international investors.

The United States does have a Trade and Investment Framework Agreement (TIFA) with the Common Market for Eastern and Southern Africa (COMESA), of which Zimbabwe is a member. This TIFA provides a mechanism to talk about disputes, although the protection offered by the TIFA is much more limited than protection typically provided by a bilateral investment treaty.

## 3. Legal Regime

**Transparency of the Regulatory System**

1115

The government's official policy is to encourage competition within the private sector, but the bureaucracy within regulatory agencies lacks transparency, and corruption within the regulatory system is believed to be rampant.

The government introduces import taxes arbitrarily to support certain inefficient producers who continue to lobby for protection against more competitive imports. In late 2012, the Ministry of Finance announced a 25 percent surtax on selected imported products including soaps, meat products, beverages, dairy products, and cooking oil starting January 1, 2013 as well as other import taxes on beer, cigarettes, and chickens brought in from outside the Southern African Development Community (SADC) and the Common Market for Eastern and Southern African regions (COMESA). In 2016, the government, through the Ministry of Industry and Commerce, introduced statutory instrument (SI) 64 which bans importation of a number of products manufactured locally.

## International Regulatory Considerations

Zimbabwe is a member of the Southern African Development Community (SADC) and the Common Market for Eastern and Southern Africa (COMESA) and it is signatory to the SADC and COMESA trade protocols establishing free trade areas (FTA) with the aim of growing into a customs union. Although the country is also a member of the World Trade Organization (WTO), it normally notifies only SADC and COMESA of measures that it intends to implement.

## Legal System and Judicial Independence

According to law, Zimbabwe has an independent judicial system whose decisions are binding on the other branches of government. The country has commercial law but does not have specialized commercial courts. Administration of justice in commercial cases that lack political overtones is still generally impartial. Regulations or enforcement actions are appealable and are adjudicated in the national court system.

## Laws and Regulations on Foreign Direct Investment

As noted above, in 2007, the government introduced the Indigenization and Economic Empowerment Act requires that "indigenous Zimbabweans" (black Zimbabweans) own at least 51 percent of all enterprises valued over $500,000. In certain sectors, such as primary agriculture, transport services, and retail and wholesale trade including distribution, foreign investors may not own more than 35 percent equity.

The Zimbabwe Investment Authority (ZIA) is the country's investment promotion body set up to facilitate both foreign direct investment and local investment. ZIA's website is **http://www.investzim.com/**      . The

country encourages companies to register with ZIA and the process currently takes 90 days.

**Competition and Anti-Trust Laws**

The government's official policy is to encourage competition within the private sector with the enactment of the Zimbabwe Competition Act. The Act provided for the formation of the Tariff and Competition Commission charged with investigating restrictive practices, mergers, and monopolies in the country. The Competition and Tariff Commission (CTC) is an autonomous statutory body established in 2001 with the dual mandate of implementing and enforcing Zimbabwe's competition policy and law and executing the country's trade tariffs policy.

**Expropriation and Compensation**

Despite provisions in Zimbabwe's previous constitution that prohibit the acquisition of private property without compensation, in 2000 the government began to sanction uncompensated seizures of privately owned agricultural land, serially amending the constitution to grant the government increasingly broad authorities to do so after the fact. The authorities subsequently transferred many of the farms seized to government officials and other regime supporters. In April 2000, the government amended the constitution to authorize the compulsory acquisition of privately owned commercial farms with compensation limited to the improvements made on the land. In September 2005, the government amended the constitution again to transfer ownership of all expropriated land to the government. Since the passage of this amendment, top government officials, supporters of President Mugabe's Zimbabwe African National Union – Patriotic Front (ZANU-PF) party, and members of the security forces have continued to disrupt production on commercial farms, including those owned by foreign investors and those covered by bilateral investment agreements. Similarly, government officials have sought to impose politically-connected individuals as indigenous partners on privately and foreign-owned wildlife conservancies.

In 2006, the government began to issue 99-year leases for land seized from commercial farms. These leases, however, are not readily transferable. The government retains the right to withdraw the lease at any time for any reason. The government's program to seize commercial farms without compensating the titleholders, who have no recourse to the courts, has raised serious questions about respect for property rights and the rule of law in Zimbabwe. As a result, Zimbabwe ranked 87 out of 189 countries considered with respect to the country's ability to protect minority investors in the World Bank's 2015 Doing Business report.

President Mugabe and other politicians have in the past threatened to target the mining and manufacturing sectors for similar forced indigenization. In 2008, the government amended the Mines and Minerals Act,

outlining indigenization requirements for mining. For strategic energy minerals (coal, methane, uranium), the legislation required mining companies engaged in extraction or exploitation to transfer ownership to the state of 51 percent of the shares; 25 percent would be without compensation. The 2008 legislation directs a transfer of 25 percent of the shares in precious metals and precious stones to the state without compensation and a further 26 percent to the state or to indigenous Zimbabweans. The government is still deliberating amendments to the Mines and Minerals Act, which may include a "use it or lose it" provision for unexploited mining concessions and new "indigenous" ownership requirements in the sector in line with the Indigenization Act. In addition, the government intends to amend the provisions of the Precious Stones Trade Act relevant to diamonds to enforce, among other things, 100 percent government ownership of all alluvial diamonds in the ground, immediate separation of diamond mining and marketing activities, and the promotion of value addition through the prohibition of exports of unpolished diamonds.

## Dispute Settlement

### ICSID Convention and New York Convention

Zimbabwe acceded to the 1965 Convention on the Settlement of Investment Disputes between States and Nationals of Other States and to the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards in 1994. However, the government does not always accept binding international arbitration of investment disputes between foreign investors and the state.

### Investor-State Dispute Settlement

The government is signatory to a number of bilateral investment agreements with a number of countries (see above) in which international arbitration of investment disputes is recognized. As noted above, Zimbabwe does not have a Bilateral Investment Treaty or Free Trade Agreement with an investment chapter with the United States.

Local courts recognize and enforce foreign arbitral awards issued against the government, but there is a history of extrajudicial action against foreign investors. For example, senior politicians declined to support enforcement of a 2008 SADC Tribunal decision ordering Zimbabwe to return expropriated commercial farms to the original owners. Once an investor has exhausted the administrative and judicial remedies available locally, the government of Zimbabwe agrees, in theory, to submit matters for settlement by arbitration according to the rules and procedures promulgated by the United Nations Commission on International Trade Law. However, this has not occurred in practice.

### International Commercial Arbitration and Foreign Courts

Zimbabwe is a member of the International Center for Settlement of Investment Disputes, but in practice local courts have not recognized foreign arbitration since the Fast Track Land Reform program in the early 2000s when commercial farmers lost much of their property.

**Bankruptcy Regulations**

In the event of insolvency or bankruptcy, Zimbabwe applies the Insolvency Act. All creditors have equal rights against an insolvent estate. In terms of resolving insolvency, Zimbabwe ranks 145 out of 190 economies in the World Bank's 2016 Doing Business Report.

# 4. Industrial Policies

**Investment Incentives**

There are a number of incentives depending on the form of investment and the sectors. For investment designed to develop industrial parks and investment in tourism development zones and joint ventures in the form of the build, own, operate and transfer (BOOT) and build operate and transfer (BOT), the investors are not required to pay tax in the first five years after which they will pay tax at the rate of 25 percent compared to the normal tax rate of 35 percent. For joint ventures in the form of the build, own, operate and transfer (BOOT) and build operate and transfer (BOT), investors are not required to pay tax for the first five years after which they will pay tax at the rate of 15 percent per annum. Investors within the mining sector exporting 50 percent of output will have reduced corporate tax of 20 percent and receive import duty exemption on imported capital goods.

**Foreign Trade Zones/Free Ports/Trade Facilitation**

The government promulgated legislation creating Export Processing Zones (EPZs) in 1996. Zimbabwe now has approximately 183 EPZ-designated companies. Benefits include a five-year tax holiday, duty-free importation of raw materials and capital equipment for use in the EPZ, and no tax liability from capital gains arising from the sale of property forming part of the investment in EPZs. Since January 2004, the government has generally required that foreign capital comprise a majority of the investment. The requirement on EPZ-designated companies to export at least 80 percent of output has constrained foreign investment in the zones. The merger between the Zimbabwe Investment Centre and the Zimbabwe Export Processing Zones Authority, which began in 2006, has been completed and the new institution—ZIA—now serves as a one-stop shop for both local and foreign investors. Zimbabwe is currently in the process of

amending the Zimbabwe Investment Authority Act to include Special Economic Zones. However, to date, activities in special economic zones overall have not been meaningful.

**Performance and Data Localization Requirements**

The government mandates local employment except for specialized skills that are in short supply locally. There are no general performance requirements for businesses located outside Export Processing Zones. Government policy, however, encourages investment in enterprises that contribute to rural development, job creation, exports, the addition of domestic value to primary products, use of local materials, and the transfer of appropriate technologies.

Although there are no discriminatory import or export policies affecting foreign firms, the government's approval criteria heavily favor export-oriented projects. Import duties and related taxes range as high as 110 percent. Export Processing Zone-designated companies must export at least 80 percent of output.

Government participation is required for new investments in strategic industries such as energy, public water provision, and railways. The terms of government participation are determined on a case-by-case basis during license approval. The few foreign investors (for example, from China, Russia, and Iran) in reserved strategic industries have either purchased existing companies or have supplied equipment and spares on credit.

The government does not require foreign IT providers to turn over source code and/or provide access to surveillance. Only banks are required to maintain all their data in the country through the escrow agreement.

The government encourages foreign investors to make maximum use of Zimbabwean management and technical personnel, and any investment proposal that involves the employment of foreigners must present a strong case in order to obtain work and residence permits. Normally, the maximum contract period for a foreigner is three years but with possible extension to five years for individuals with highly specialized skills.

# 5. Protection of Property Rights

**Real Property**

The government enforces interests in residential and commercial properties in cities although this is not the case with agricultural land. Mortgages and liens do exist for urban properties although liquidity constraints have led to a fall in the number of mortgage loans. According to the World Bank's 2015 Doing Business

Report, Zimbabwe is ranked 94 out of 189 countries in terms of registering property. The recording of mortgages is generally reliable. With regard to agricultural land, the government provides and protects use rights of indigenous people and it is currently in the process of developing new 99-year leases that will guarantee use, with the government retaining ownership of all agricultural land.

**Intellectual Property Rights**

Zimbabwe applies international patent and trademark conventions, and it is a member of the World Intellectual Property Organization. Generally, the government seeks to honor intellectual property ownership and rights, although a lack of expertise and manpower and rampant corruption limit its ability to enforce these obligations. Pirating of videos, music, and computer software is common.

It does not appear that the government enacted new IP related laws or regulations over the past year. The country does not publish information on the seizures of counterfeit goods.

For additional information about treaty obligations and points of contact at local IP offices, please see WIPO's country profiles at **http://www.wipo.int/directory/en/** .

Zimbabwe is not listed in the notorious market report. For additional information about national laws and points of contact at local IP offices, please see WIPO's country profiles at **http://www.wipo.int/directory/en/** .

# 6. Financial Sector

**Capital Markets and Portfolio Investment**

Zimbabwe's stock market currently has 58 publicly-listed companies, but just 17 of them account for over 80 percent of total market capitalization, which stood at $3.8 billion on February 28, 2017. In September 1996, the government opened the stock and money markets to limited foreign portfolio investment. Since then, a maximum of 49 percent of any locally-listed company can be foreign-owned in line with the indigenization policy framework, with any single investor allowed to acquire up to 15 percent of the outstanding shares.

There is a 1.48 percent withholding tax on the sale of marketable securities, while the tax on purchasing stands at 1.73 percent. Totaling 3.21 percent, the rates are comparable with the average of 3.5 percent for the region. As a way of raising funds for the state, the government mandated that insurance companies and pension funds invest between 25 and 35 percent of their portfolios in prescribed government bonds.

Zimbabwe's hyperinflation, which came to an end with the 2009 dollarization, wiped out the value of domestic debt instruments, and the government has only recently restarted issuing Treasury Bills.

## Money and Banking System

Three major international commercial banks and a number of regional and domestic banks operate in Zimbabwe, with a total of over 200 branches. The central bank (Reserve Bank of Zimbabwe (RBZ)) believes that the banking sector is generally stable in spite of a harsh operating environment characterized by high credit risk and liquidity constraints. As most international banks reduce risk (de-risking) in the face of high penalties for non-compliance with prudential guidelines in developed countries, most Zimbabwean correspondent banking relationships are in jeopardy. As of December 31, 2016, the sector had 18 operating institutions, comprising 13 commercial banks, four building societies and one savings bank. According to the RBZ, as of December 2016, all operating banking institutions complied with the prescribed minimum core capital requirements. The level of non-performing loans improved somewhat from 10.87 percent in December 2015 to 7.9 percent by December 2016 largely due to a general improvement in credit management and the selling of qualifying bad assets to the Zimbabwe Asset Management Company, set up to cleanse banks' balance sheets through acquisition and restructuring of non-performing loans.

According to the central bank, the total deposits (excluding interbank deposits), rose from $5.7 billion in December 2015 to $6.5 billion by December 2016. Demand deposits accounted for 54.6 percent of the total while time deposits accounted for 26.9 percent.

The central bank received a $200 million injection from the African Export Import Bank (Afrexim Bank) to revitalize Zimbabwe's inter-bank lending market which started operating on March 23, 2015 (see above).

## Foreign Exchange and Remittances

*Foreign Exchange*

Until the end of 2008, Zimbabwe's exchange-rate policies made it difficult for firms to obtain foreign currency, and this, in turn, resulted in shortages of fuel, electric power, and other imported goods. Other consequences included defaults on public- and private-sector debt and a sharp decline in industrial, agricultural, and mining operations. In 2009, the government lifted exchange controls and demonetized the Zimbabwe dollar. The RBZ now permits bank accounts and transactions in the following currencies: Euro, Botswana pula, South African rand, British pound, U.S. dollar, Chinese yuan, Australian dollar, Indian rupee, and Japanese yen, with most business conducted in U.S. dollars. Zimbabwe's export performance is rising but at a slower pace than imports. The government's arrears on over $10 billion in external debt block the

country's access to multilateral financing. These conditions severely constrain external financing for the economy which has resulted in rising external payments arrears for necessary imports.

*Remittance Policies*

In line with recommendations from the Southern African Development Community (SADC) and the IMF, the government revised the Foreign Exchange Control Act, which regulated currency conversions and transfers before the withdrawal of the Zimbabwe dollar. With these changes and the liberalization of most current account transactions, exporters retain 100 percent of their foreign currency receipts for their own use until the second quarter of 2016. Since then, the RBZ retains 50 percent of all export proceeds to be shared among competing foreign payments needs based on a priority list. In spite of this, foreigners can remit capital appreciation, dividend income and after tax profits provided the foreign exchange is available.

Zimbabwe is a member of the Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG). The country still awaits the results of the 2014 Financial Action Task Force (FATF) assessment of Zimbabwe's compliance with the international standards on money laundering and terrorism financing, and the authorities believe that the results will be positive.

**Sovereign Wealth Funds**

Zimbabwe does not have a sovereign wealth fund (SWF). The government set aside US$1 million toward administrative costs related to the setting up of the Sovereign Wealth Fund in its 2016 Budget. The government proposes to capitalize the SWF through a charge of up to 25% on royalty collections on mineral sales, as well as on a special dividend on the sale of diamond, gas, granite and other minerals.

# 7. State-Owned Enterprises

Zimbabwe has 76 state-owned enterprises (SOEs), defined as companies wholly-owned by the state, but there is no published list of these entities. Many SOEs support vital infrastructure, including energy, mining, and agribusiness, for example. As a result, competition within the sectors where SOEs operate tends to be limited. However, the government of Zimbabwe (GOZ) invites private investors to participate in infrastructure projects through public-private partnerships (PPPs). Most SOEs have public function mandates, although in more recent years, they perform hybrid activities of satisfying their public functions while making profits. SOEs should have independent boards but in some instances such as the recent case of the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards.

Zimbabwe does not appear to subscribe to the Organization for Economic Cooperation and Development (OECD) guidelines on corporate governance of SOEs. SOEs operate under the same taxes and same value added tax rebate policies as private sector companies. The SOEs face a number of challenges that include persistent power outages, mismanagement, lack of maintenance, inadequate investment, a lack of liquidity and access to credit, and debt burdens. As a result, the SOEs have performed poorly in recent years. Few SOEs produce publicly available financial data and ever fewer audited financial data. This has imposed significant costs on the rest of the economy.

**Privatization Program**

Since the start of the privatization program of its 76 state-owned enterprises (SOEs) in the 1990s, the government has only successfully privatized two parastatals. The government established a ministry responsible for state-owned enterprises in 2009 but disbanded it in 2013. Inter-SOE debts of nearly $1 billion pose challenges for privatization plans because they further weaken the entities' balance sheets. In addition, lack of political will and the enterprises' operational inefficiencies make it unlikely that privatization will accelerate in the near term.

# 8. Responsible Business Conduct

Following dollarization in 2009, there has been increased awareness of standards for responsible business conduct (RBC), driven by the private sector through the Standards Association of Zimbabwe. The private sector developed the National Corporate Governance Code of Zimbabwe (ZimCode), which is a framework designed to guide Zimbabwean companies on RBC. An industrial advocacy group, the Confederation of Zimbabwe Industries, has a standing committee on business ethics and standards which drives ethical conduct within the Zimbabwean private sector. The organization has developed its own charter according to OECD guidelines, highlighting good corporate governance and ethical behavior. The Zimbabwean government has not taken any measures to encourage RBC and it does not take RBC policies or practices into its procurement decisions.

Firms that demonstrate corporate social responsibility do not automatically garner favorable treatment from consumers, employees, and government. With regard to indigenization, foreign companies receive formal indigenization credits of up to 31 percent for conducting CSR determined by the extent to which the activity achieves the government's socio-economic objectives.

Although the Zimbabwean government has considered implementing the World Bank's Extractive Industries Transparency Initiative (EITI) principles in order to strengthen accountability, good governance,

and transparency in the mining sector, it has yet to launch an EITI program. However, the government has stated its intention to adopt a domestic initiative called the Zimbabwe Mining Revenue Transparency Initiative (ZMRTI) but it has made little progress in implementing the initiative.

# 9. Corruption

In 2005, the government enacted an Anti-Corruption Act that established a government-appointed Anti-Corruption Commission (ACC) to investigate corruption. However, the ACC did not include any members from civil society or the private sector. The government of national unity (GNU) enhanced the institutional capacity of the ACC with members appointed from civil society and the private sector. However, when the ACC's term of office expired, the new ACC did not include civil society and private sector representatives. The government prosecutes individuals selectively, focusing on those who have fallen out of favor with ZANU-PF and ignoring transgressions by members of the favored elite. Accusations of corruption are used as a political tool but seldom result in formal charges and convictions.

While laws to combat corruption exist, enforcement of the laws is weak as the law enforcement agencies lack the political will and resources to do their job effectively. As a result, Transparency International ranked Zimbabwe 154 out of 176 countries and territories surveyed in 2016 for its corruption perceptions index.

Existing rules on the Zimbabwe Stock Exchange compel listed companies to comply, through annual reports, with minimum disclosure requirements.

The government also created a policy to improve accountability in the use of state resources through the introduction of the Public Finance Management Act in March 2010. In spite of this, corruption is still endemic, especially within the diamond sector where production and export figures are largely unreliable. In this respect, the government has introduced a Diamond Policy that focuses on ensuring the 100 percent government ownership of all alluvial diamonds in the ground and the involvement of the Zimbabwe Revenue Authority (ZIMRA) in the entire value chain of diamond production.

While Zimbabwe signed the United Nations Convention against Corruption on February 20, 2004 and ratified the treaty on February 20, 2007, it is not party to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

*Resources to Report Corruption*

Transparency International Zimbabwe

96 Central Avenue

P O Box CY 434, Causeway

Harare, Zimbabwe

+263 4 793 246/7

**tiz@tizim.org**; **info@tizim.org**

# 10. Political and Security Environment

Political parties and civil-society groups that oppose ZANU-PF and President Mugabe routinely encounter state-sponsored intimidation and repression from government security forces and ZANU-PF-linked activists. This environment persisted even during the period of the coalition government when the main opposition parties, the Movement for Democratic Change-Tsvangirai (MDC-T) and the Movement for Democratic Change-Ncube (MDC-N), joined ZANU-PF in an Inclusive Government from February 2009 to June 2013. Individuals and companies out of favor with ZANU-PF routinely suffer harassment and bureaucratic obstacles in their business dealings.

Within the ruling ZANU-PF party, tensions over succession are increasingly carried out in public and the battle over who will succeed President Mugabe will continue to intensify. Though Zimbabweans are increasingly frustrated with the President Mugabe government's mismanagement of the economy and political repression, neither the opposition nor political activists have articulated convincingly a feasible way forward. In 2013, Zimbabwe passed a new constitution and held seriously flawed national elections. The next presidential, parliamentary, and local elections will take place in July or August 2018, if the government adheres to constitutional framework. Political violence and human rights abuses persist in Zimbabwe, though at lower levels than in 2008. However, with increased factionalism in both the ruling and opposition parties, intra-party violence is rising. Recent discussions among Zimbabwe's main opposition party leaders have prompted speculation about a possible coalition challenge to ZANU-PF in 2018 elections, although there is no agreement on which candidate would lead such a ticket.

Despite the perceived widespread dissatisfaction with government policy, there have not been large-scale demonstrations since the July 2013 general elections. Disagreements between and within political parties occasionally resulted in violence targeting political party members. In December 2013, customers broke the windows at a bank branch which had run out of funds to distribute to depositors. Such violence is sporadic, but will increase as elections draw close.

# 11. Labor Policies and Practices

Zimbabwe's interconnected economic and political crises from 1998 through 2008 prompted many of the country's most skilled and well-educated citizens to emigrate, leading to widespread labor shortages for managerial and technical jobs. At the same time, the decade-long severe contraction of the economy caused formal sector employment to drop significantly. The Zimbabwe Statistical Agency (Zimstat) began to compile meaningful employment statistics in 2010. According to these figures, Zimbabwe's non-farm employment rose from 721,000 in December 2011 to 802,000 in June 2012 (the latest date for which official data are available). Anecdotal evidence shows widespread youth unemployment as the country continues to churn out graduates without any meaningful employment growth. As a result, most end up joining the informal sector estimated at over 90 percent of the workforce.

Although the country's HIV/AIDS epidemic had previously taken a heavier toll on the workforce, in 2014, 15 percent of adults were living with HIV/AIDS.

The government encourages foreign investors to make maximum use of Zimbabwean management and technical personnel.

The country's labor laws make it very difficult for employers to adjust employment in response to an economic downturn except in the Special Economic Zones (SEZs) where labor laws do not apply. Outside the SEZs the employer must engage the employees and their representatives and agree to adopt measures to avoid retrenchment. If the measures fail, the employer can retrench and pay an all-inclusive package of one month salary for each two years of service or the pro rata share thereof.

The labor laws differentiate between layoffs and firing for cause, with the former falling under retrenchment where the retrenchment law must apply. The law does not accept dismissal or layoffs of employees without full retrenchment packages in place. The 2015 amendments to the act only permit termination of contract in terms of a registered code of conduct, expiry of a contract of fixed term duration or mutual agreement. There is no unemployment insurance or other safety net programs for workers laid off for economic reasons.

Employers in any sector tend to use temporary or contract workers because it is easy to lay them off as there is no need to follow termination procedures. Employers typically negotiate contracts ranging from 3 months to one year, renewed as necessary. The Labor Amendment Act of 2015, however, now requires employment councils to put a limit on the number of times employers can renew short term contracts.

1127

The government does not waive labor laws in order to attract or retain investment, except in the case of special economic zones if and when the law is passed to establish such zones.

Labor unions affiliated to the Zimbabwe Congress of Trade Unions (ZCTU) are independent of the government and those affiliated to the Zimbabwe Federation of Trade Unions (ZFTU) and the Zimbabwe Industrial Revolution Workers Federation support the government.

Collective bargaining takes place through a National Employment Council (NEC) in each industry, comprising representatives from labor, business, and government. The agreements apply to the entire sector regardless of whether or not all employees are members to the council, except for managerial employees.

The country has a labor dispute resolution process that starts at company level through disciplinary committees or grievance committees. If the issue is not resolved at this level, the aggrieved party can appeal to either the employment council or the Labor Court depending on the industrial agreement. Other redress is through the Ministry of Public Service Labor and Social Welfare in which labor officers settle disputes for industries without employment councils. From the Labor Court an aggrieved party can appeal to the Supreme Court.

The ZCTU called for a demonstration on August 8, 2015 to protest against massive job losses as a result of the Supreme Court decision allowing employers to terminate contracts of employment on three-month notice under the common law. The police banned the activity and riot police camped at ZCTU offices for a week, preventing workers from gathering and accessing union offices. Following the ZCTU appeal to the High Court on August 22, 2015, the demonstration went ahead.

Labor inspection is very minimal and there is discrimination in practice. The government continues to harass labor unions and their leaders. In December 2012, for example, the police arrested two ZCTU officials for allegedly holding an unsanctioned protest march to celebrate Human Rights Day in the city of Bulawayo, even though the police had sanctioned it beforehand. Under Zimbabwe labor law, the government can intervene in ZCTU's internal affairs if it determines that the leadership is misusing funds.

The government enacted some amendments to the labor act in 2015 to compel employers who dismissed workers from July 2015 as a result of the Supreme Court judgment to pay retroactive compensation. While employers are unhappy with the provision, trade unions are somewhat pleased with the decision. But the compensation is limited to one month salary for each two years of service or a share thereof.

The government is a member of the International Labor Organization (ILO) and has ratified conventions protecting worker rights. The country has been subject to ILO supervisory mechanisms for practices that limit workers' rights to freely associate, organize, and hold labor union meetings.

## 12. OPIC and Other Investment Insurance Programs

The U.S. government and Zimbabwe concluded an OPIC agreement in April 1999 which permits OPIC to conduct transactions in Zimbabwe. Zimbabwe acceded to the World Bank's Multilateral Investment Guarantee Agency in September 1989. Support from the Export-Import Bank of the United States is not available in Zimbabwe. Finance and export promotion programs, as well as investment insurance offered through the international financial institutions, remain limited due largely to Zimbabwe's mounting multilateral and bilateral debt arrears and deteriorating investment climate.

## 13. Foreign Direct Investment and Foreign Portfolio Investment Statistics

*Table 2: Key Macroeconomic Data, U.S. FDI in Host Country/Economy*

|  | Host Country Statistical Source* | | USG or International Statistical Source | | USG or International Source of Data: BEA; IMF; Eurostat; UNCTAD, Other |
|---|---|---|---|---|---|
| **Economic Data** | **Year** | **Amount** | **Year** | **Amount** | |
| **Host Country Gross Domestic Product (GDP) ($M USD)** | 2015 | $14,059 | 2015 | $14,419 | www.worldbank.org/en/country |
| **Foreign Direct Investment** | **Host Country Statistical Source*** | | **USG or International Statistical Source** | | **USG or International Source of Data: BEA; IMF; Eurostat; UNCTAD, Other** |
| **U.S. FDI in partner country ($M USD, stock positions)** | 2015 | N/A | 2015 | (D) | BEA data available at http://bea.gov/international/direct_investment_multinational_companies_comprehensive_data.htm |
| **Host country's FDI in the United States ($M USD, stock positions)** | 2015 | N/A | 2015 | (D) | BEA data available at http://bea.gov/international/direct_investment_multinational_companies_comprehensive_data.htm |
| **Total inbound stock of FDI** | 2015 | N/A | 2015 | (D) | N/A |

1130

*Zimbabwe National Statistical Agency

(D) Data suppressed to avoid disclosure of data of individual companies

*Table 3: Sources and Destination of FDI*

Data not available.

*Table 4: Sources of Portfolio Investment*

Data not available

# 14. Contact for More Information

Joseph Muzulu

Economic Specialist

U.S. Embassy Harare, 172 H. Chitepo Avenue, Harare

+263 4 250593

**muzuluj@state.gov**

---

**TAGS**

**Bureau of African Affairs**   **Bureau of Economic and Business Affairs**   **Zimbabwe**

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit MM

# ARCHIVED CONTENT

Information released online from January 20, 2009 to January 20, 2017.

**NOTE:** Content in this archive site is **NOT UPDATED**, and links may not function. External links to other Internet sites should not be construed as an endorsement of the views contained therein.

Go to the current State.gov website for up-to-date information. (http://www.state.gov/)

---

## U.S. Department of State
Diplomacy in Action

## Examining Prospects for Democratic Reform and Economic Recovery in Zimbabwe

Testimony
Donald Y. Yamamoto
Acting Assistant Secretary, Bureau of African Affairs
As Prepared
Testimony Before the U.S. Senate Committee on Foreign Relations Subcommittee on African Affairs
Washington, DC
June 18, 2013


(/documents/organization/211019.pdf)

---

Chairman Coons, Ranking Member Flake, and distinguished Members of the Committee, thank you for holding this hearing on Zimbabwe. Thank you also for affording me the privilege of testifying before you about this very important country at this critical juncture. It is my honor to have this opportunity to speak with you and our other assembled guests here today about the Department of State's work in Zimbabwe. We appreciate the deep interest of this Committee in Zimbabwe over the years, and we are pleased to work closely with members of Congress in support of our national interests in Zimbabwe and the region.

After nearly five years under Zimbabwe's unity government, 2013 began as a year of promise and opportunity for Zimbabwe. In February, President Mugabe's ZANU-PF party and the MDC parties led by Morgan Tsvangirai and Welshman Ncube agreed on a draft constitution. In March, Zimbabwe held a peaceful referendum in which the Zimbabwean people overwhelmingly approved the draft constitution and, on May 22, President Mugabe signed Zimbabwe's new constitution into law.

The June 15 communique issued by the Southern African Development Community (SADC) called for the parties in Zimbabwe's unity government to seek more time to complete important reforms and create a conducive environment for peaceful, credible elections. Too short a timeline would risk undermining the careful work of SADC to build a framework for peaceful, credible, transparent elections and to ensure necessary reforms are in place.

These elections present an important opportunity for Zimbabwe to improve its relationship with the United States by holding elections that are regarded as peaceful, credible, and transparent by a broad range of international observers. Former U.S. Ambassador to the UN and civil rights leader Andrew Young recently delivered a letter to President Mugabe from Secretary Kerry outlining this opportunity. As elections

approach, however, reports indicate that elements within Zimbabwean political parties and government security agencies have already begun efforts to intimidate voters and illicitly shape the outcome of the elections.

This includes a troubling trend of arrests, detentions, and harassment of organizations and individuals working on human rights, electoral assistance, and related issues. The chilly reception offered to a partial UN Electoral Needs Assessment Mission (after all but one member of the delegation was denied entry into Zimbabwe), Zimbabwean hardliners' persistence in brushing off calls for a broad range of international election observers, and ZANU-PF's insistence on the removal of all sanctions rather than recognizing good faith efforts to ease some restrictions constitute obstacles to the conditions that we feel are necessary for warming relations between the United States and Zimbabwe. Influential officials within the Zimbabwean Government and the Zimbabwean defense and security sectors who benefit from the perpetuation of the status quo remain the most vocal critics of further engagement with the "West."

The Government of Zimbabwe now faces a key decision point. Zimbabwe must decide whether it will support a credible electoral process, or continue to repress its people and isolate itself from the international community. The 2011 Southern African Development Community's (SADC) Roadmap and Zimbabwe's new constitution outline key reforms focused on voter education and registration, inspection of voters' rolls, media reform, security sector reform, freedom of assembly and association. We are concerned that holding elections without providing adequate time for voter registration, inspection of voters' rolls, other needed electoral and democratic reforms – particularly reforms of the Public Order and Security Act, media reforms, and security sector reforms - will put the credibility of the outcome at risk.

The United States shares the same fundamental interest as the people of Zimbabwe: a stable, peaceful, democratic Zimbabwe that reflects the will of her people and provides for their needs. U.S. support for human rights and democracy groups contributed to the success of the long and difficult development of Zimbabwe's new constitution. The U.S. also supported Zimbabwe's progress in attaining universal coverage for antiretroviral treatment, reducing the HIV/AIDS prevalence to just under 15 percent and extending the quality and reach of Zimbabwe's health care system. U.S. development assistance in smallholder farming has improved the lives of tens of thousands of everyday Zimbabweans, and U.S. support to the quasi-governmental statistics and economic research institutions, as well as nongovernmental organizations, has fostered a more disciplined approach to evidence-based fiscal and agriculture policy development in Zimbabwe.

In May, following the peaceful and credible constitutional referendum, and as a means of demonstrating the sincerity of our intent to work toward normalizing relations should Zimbabwe make progress consolidating its democratic institutions , the Administration eased restrictions on two Zimbabwean banks – the Agricultural Development Bank of Zimbabwe and the Infrastructure Development Bank of Zimbabwe. Both remain on the Office of Foreign Assets Control's (OFAC) list of Specially Designated Nationals (SDN List), despite the issuance of a General License by OFAC allowing Americans to conduct transactions with those banks. As part of our regular review of U.S. targeted sanctions, we also removed eight individuals and one entity designated under the Zimbabwe sanctions program from the SDN list. Some of the individuals are recently deceased, but others have left their positions in the Zimbabwean Government or are now using positions of influence to effect positive change. One hundred thirteen (113) individuals and 70 entities remain sanctioned under the Zimbabwe program today.

In an effort to leverage SADC's consistent position that elections in Zimbabwe should be conducted properly rather than expediently, we in Washington and our ambassadors in the field have been working to highlight and reinforce key U.S. policies on Zimbabwe, including strong support for SADC as the guarantor of the Global Political Agreement (GPA) and creator of the roadmap charting the reforms to which the unity government has committed. The people of Zimbabwe deserve the full and complete enactment of the reforms called for in the GPA, the SADC Roadmap, and the new constitution prior to elections. An environment free of political intimidation and violence, and the inclusion of a broad range of international observers, are essential for credible elections. Led by SADC, a robust contingent of election observers would play a central role in verifying that the credibility of the upcoming election and Zimbabwe's ability to live up to international electoral standards. The absence of local and international observers would detract from the credibility of the electoral process.

We are also profoundly troubled by the lack of transparency within the diamond sector and the possibilities for illicit diamond sales in Zimbabwe. We are concerned about ongoing reports that diamond mining entities in Zimbabwe are being exploited by people in senior government and military positions for personal gain, that revenues from those enterprises are being diverted for partisan activities that undermine democracy, and that proceeds from diamond sales are enriching a few individuals and not the Treasury and people of Zimbabwe. The Zimbabwean people deserve to benefit from Zimbabwe's diamond fields and the many millions of carats (and dollars) that they likely hold.

Giving all Zimbabweans the opportunity to choose their government this year, in peaceful, credible, and transparent elections, will help ensure a democratic, prosperous future for Zimbabwe. The United States Government has made it clear that we deeply respect the sovereign will of the Zimbabwean people, and that we will work with any government chosen in such elections.

We are prepared to consider steps to further roll back sanctions and expand trade and investment between our countries. However, as a necessary first step, Zimbabwe must first hold elections that are peaceful, credible, transparent, and truly reflective of the will of the Zimbabwean people, and which are verified as such by a broad range of international observers. Thank you for providing me the opportunity to speak with your Committee today. I welcome any questions you may have at this time.

---

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

# Exhibit NN


START STRONG
TO FINISH STRONG
CALL US TODAY!
CONTAINA WISE
6 Borgward Road, Msasa, Harare | +263 242 447 748/9 or +263 779 621 486


# Mining
ZIMBABWE

HOME   NEWS   MAGAZINE   GOLD BUYING   REGULATION   INTERVIEWS   SOLUTIONS        FOLLOW ▾

NEWS

## Zim govt is plotting to strip state mine assets to hide from US$467m in legal claims, but there's resistance from within

APRIL 29, 2022






GET ISSUE 66 Soft Copy

MINING ZIMBABWE MAGAZINE ISSUE 67



| Gold Price Today | | |
|---|---|---|
| USD-United States | | |
| United States | | USD |
| Ounce | | 1,915.71 |
| Karat 24 | | 61.60 |
| Karat 22 | | 56.46 |
| Karat 21 | | 53.89 |
| Karat 18 | | 46.18 |
| Karat 14 | | 35.94 |
| Thursday, 10 August 2023 | | |

Fidelity Gold Refinery (FGR) gold buying prices 7 August 2023

Vast to recommence diamond mining agreement, awaits diamond parcel release

Six miners die in an underground water burst

Official gold buying prices 4 August 2023

Gardener Steals US$3.5 Million gold from employer

What do you do when your company has claims of close to half a billion US dollars against it? Strip its assets and hide them under another company.

Internal documents obtained by *newZWire* reveal how the Zimbabwe government plans to strip assets from its state-owned mining company to stave off US$467 million in claims from creditors.

Through the Zimbabwe Mining Development Corporation (ZMDC), the government holds mining assets, from gold, to precious stones and lithium. But the government is shifting some of the company's remaining assets into another vehicle, Defold Mine, hoping to escape legal trouble.

It's a case that raises fresh questions over the government's stewardship of the country's mineral resources, and goes back to controversial decisions made by Zimbabwe years ago to take away assets from investors.

## The claims

1138

In 2016, Grandwell Holdings, registered in Mauritius, lost its 50% joint venture with ZMDC in Mbada Diamonds when government cancelled all licences in the Marange diamond fields. The company went to court for damages, and, according to correspondence, it is claiming US$378 million.

> Trending
> **Fidelity Gold Refinery (FGR) gold buying prices 7 August 2023**

Another former diamond investor, Canadile, has also made a claim of US$3 million against the government.

Government also faces a US$12 million from ShinZim. This was a 2006 joint venture, called Global Platinum, between ZMDC and China's Norinco, to mine platinum claims once held by Zimplats in Selous. The venture was also cancelled, resulting in the claim.

In 2011, Amari, a company registered in the British Virgin Islands, had its joint venture with ZMDC cancelled. The company lost its platinum and nickel claims in Selous. In 2019, Amari won the right to seize Zimbabwean assets worth US$65.9 million in compensation, in a ruling by the International Court of Arbitration in Lusaka. With interest, Amari is now owed US$73 million.

The claims were awarded to Bravura, a company owned by Nigerian billionaire Benedict Peters. Bravura has plans to develop a new platinum mine on the claims, and claims to have already raised US$1 billion for the initial phase to bring the site to production. But Bravura has had to delay the project because of the Amari lawsuit.

Under pressure from President Emmerson Mnangagwa to develop the claims or lose them, Peters initially negotiated with Amari to settle part of the debt. Ian Small-Smith, a lawyer acting for Amari, told Bloomberg in 2019 that Peters had approached Amari to thrash out a settlement. But, after initially agreeing to the deal and signing off on an escrow account to allow payment, the Zimbabwe government pulled out of the deal.

On January 17 this year, Treasury Secretary George Guvamatanga wrote to the Ministry of Mines, ordering the closure of the escrow account into which Amari's payments would have been made. He also rejected a proposal by the Ministry of Mines for government to take over the debt, saying this would encourage more suits against the government.

"Transferring of this obligation will expose a wider array of government assets to additional litigation," Guvamatanga wrote to Mines secretary Onesimo Moyo.

## The asset transfer

Now, unable to hive off the debts to the taxpayer, the Ministry of Mines has hatched a new plan; Mines Minister Winston Chitando has ordered that ZMDC's assets be spirited away into a new government company, Defold. This time, the Ministry got the support of Guvamatanga at Treasury.

Most of ZMDC's projects are idle. This includes two that are subject of a letter by Guvamatanga, in a letter to the Ministry of Mines on April 14, which lifted the lid on the asset plan. These are the Kamativi tin mine in north-western Zimbabwe, and Todal-Bokai, which hosts platinum claims on the country's mineral-rich Great Dyke.

Guvamatanga, in the letter, grants the Mines Ministry authority "for the transfer of Zimbabwe Mining Development Corporation's effective 93% shareholding in Kamativi Tine Mines (Pvt) Ltd and 40% shareholding held in Todal (Pvt) Ltd to Defold Mine."

Justifying this call, Guvamatanga says Cabinet had approved the transactions at a meeting in December. While Guvamatanga, in his letter, says the Cabinet decision was reached on December 21, the matter was discussed at Cabinet's last meeting of 2021, held a week earlier.

Cabinet's public statement after that meeting does not disclose the extent of the authorization given on the asset transfer.



READ NEXT

**Zimplats' US1.4bn investment strategy remains on course**

On Kamativi, Cabinet said: "The Minister of Mines and Mining Development briefed Cabinet on the current state of the tailings dump and reopening of underground operations at Kamativi Tin Mines. Cabinet noted the need to ensure that these two projects get into production as soon as possible so that they contribute to the US$12 Billion Mining Industry milestone. The Minister of Mines and Mining Development was tasked to follow up on the issues accordingly."

Cabinet made similar announcements on the Todal-Bokai Platinum Project: "Cabinet also considered the need to get the Todal-Bokai Platinum Project next to Unki Mine into production as soon as possible so that it contributes to the US$12 Billion Mining Industry milestone. The Minister of Mines and Mining Development was also tasked to follow up on the issue accordingly."



*ZMDC's old mines are desperate for investors, but quality buyers stayed away*

## The ZMDC sell-off

The government has been selling off parts of ZMDC, since 2018, when it first issued a tender for six mines held by the company.

In 2020, the government announced Landela Mining as the winning bidder for ZMDC's gold assets and Sandawana Mine. Last year, the same ZMDC assets – including Jena and Sabi gold mines – were handed to another new company, Kuvimba Mining House, whose ownership has been controversial.

The shares in Todal, a long-delayed platinum project, and Kamativi, are now among ZMDC's remaining investments.

At Kamativi, Canada-listed Chimata Gold's local Zimbabwean partner, Jimbata, holds 60% of the Kamativi Tailings Company, which plans to treat the dumps at the old tin mine to recover lithium. The remaining 40% is held by Kamativi Tin Mines, a unit of ZMDC. It is that 40% that government now wants to move to Defold.

SEE ALSO

NEWS
**UK company completes pilot coke plant in Zimbabwe**

These would not be the first state assets to be put under Defold. The company already holds 100% of the Zimbabwe Diamond Consolidated, the country's biggest gem producer.

## ZMDC: Not in our interest

An internal ZMDC assessment of the order to surrender assets to Defold says the move should be rejected. The ZMDC board, concerned that the asset transfer would be illegal and against its interest, in February asked its legal department to investigate.

"It is difficult to see how a disposal of assets that does not comply with the procurement laws of the country, gives no direct benefit to the corporation itself but to a different entity altogether, Defold Mining, and at the expense of ZMDC and or its subsidiaries can be said to be lawful or in the national interest," the ZMDC cautions.

ZMDC lawyers say moving the assets will not solve the company's debt fix.

"The fact that the government of Zimbabwe is the sole shareholder in Defold Mining makes no material difference as the corporation's responsibility does not lie with the shareholders only but the other stakeholders, including employees," the lawyers say.

Pushing the assets to another company may be illegal, and may incriminate company officials, the lawyers warned.



The ZMDC advisory says: "It is highly unlikely that disposing of the corporation's (or subsidiary's) assets for no consideration and for the benefit of another company when it has debts of its own which have not been satisfied can be said to be in its best interests. In fact, the indications appear to be that the corporation's liabilities actually exceed its assets. This simply means that the corporation is not in a financially viable enough position to make a donation of such magnitude."

Newzwire

1140



# Exhibit OO

Telegrams: "MINFIN", Harare
Telex: 2141
Telephone: 263-242-250967
Fax: 263-242-250615
Private Bag 7705 CY, Causeway
Harare
Zimbabwe



ZIMBABWE

SECRETARY FOR FINANCE AND ECONOMIC
DEVELOPMENT
Mgandane Dlodlo Building
Corner Samora Machel Ave/Simon v. Muzenda
Harare
Zimbabwe

14 April 2022

Mr. O. M. Moyo
**Secretary for Mines and Mining Development**

RE:   **TREASURY APPROVAL TO TRANSFER NINETY-THREE PERCENT SHAREHOLDING HELD BY
ZIMBABWE MINING DEVELOPMENT CORPORATION IN KAMATIVI TIN MINES (PVT) LTD AND
40% SHAREHOLDING IN TODAL (OPVT) LTD TO DEFOLD MINES (PVT) LTD**

I write with reference to your letter dated 15 March 2022 on the above subject matter.

Treasury notes the decision by Cabinet at its 43rd meeting held on 21 December 2021, wherein it was resolved
that Zimbabwe Mining Development Corporation's 93% shareholding in Kamativi Tin Mines (Pvt) Ltd and
40% shareholding held in Todal (Pvt) Ltd be transferred to Defold Mine (Pvt) Ltd, a company wholly owned
by Government through the Ministry of Mines and Mining Development.

In this regard, in line with section 48(3) ⒞ of the Public Finance Management Act [Chapter 22:19], Treasury
authority is hereby granted for the transfer of Zimbabwe Mining Development Corporation's effective 93%
shareholding in Kamativi Tin Mines (Pvt) Ltd and 40% shareholding held in Todal (Pvt) Ltd to Defold Mine
(Pvt) Ltd.

Please be guided accordingly.

G.T. Guvamatanga
**SECRETARY FOR FINANCE AND ECONOMIC DEVELOPMENT**

Cc;   Hon. Prof. M. Ncube, Minister of Finance and Economic Development
Dr. M.J.M. Sibanda, Chief Secretary to the President and Cabinet
Mr. E.M. Zvandasara, Acting Accountant General

1143

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **Amaplat Mauritius Ltd.,** *et al*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Case No. 1:22-cv-00058-CRC** |
| ) | |
| **Zimbabwe Mining Development** ) | |
| **Corporation,** *et al*, ) | |
| ) | |
| **Defendants.** ) | |
| _____ | |

### REPLY TO PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS

Defendants, the Chief Mining Commissioner of the Ministry of Mines of Zimbabwe (the "Commissioner"), Republic of Zimbabwe ("Zimbabwe"), and Zimbabwe Mining Development Corporation ("ZMDC), by and through their undersigned counsel, hereby file their Reply to Plaintiffs' Opposition to the Motion to Dismiss the Amended Complaint filed by Amaplat Mauritius Ltd. ("Amaplat") and Amari Nickel Holdings Zimbabwe Ltd. ("Amari") (collectively, the "Plaintiffs"), and in support thereof, state as follows:

### INTRODUCTION

To defeat the presumption of separateness, Plaintiffs must come forward with detailed allegations, supported by facts, that show extensive control in day-to-day operations. Plaintiffs fall far short. Faced with the exacting standard in *Bancec*, Plaintiffs resort to overstatement, routinely substituting the word "Zimbabwe" for "ZMDC," or they misstate the terms of the ZMDC Act and the contents of news articles. Plaintiffs' supposed expert follows the trend. Mr. Moyo relies on conjecture and assumption, citing statements never made and vague notions of "judicial notice" that he undermines with his own uncertainty. In reality, this case is Plaintiffs' last gasp at escaping the contracts they signed. Almost 15 years ago, Plaintiffs chose to do business with ZMDC, a sanctioned entity, never once considering Zimbabwe to have any responsibility for the terms and conditions of the MOUs. Plaintiffs tried to make their *alter ego* theory work, bringing similar arguments to the Belgian courts, where they lost and were ordered to pay costs. Plaintiffs have now come to the United States, no longer interested in bringing their *alter ego* claims in other enforcement jurisdictions. This Court should end Plaintiffs' misguided attempt to hold Zimbabwe responsible and grant the motion to dismiss for the reasons below.

### RELEVANT BACKGROUND

### A.  Plaintiffs continued to transact with ZMDC, knowing it was a sanctioned entity

The EU and the UK added ZMDC as a sanctioned entity in January 2009. Declaration of Quinn

1

Smith ("Smith Decl.") **Ex. A** and **Ex. B**. These sanctions bind any EU citizen or person transaction business in the EU and UK citizens or subjects with a right to abode in the UK and entities incorporated under the law of any part of the United Kingdom. *Id.* at **Ex. A**. at 1, Article 1. UK sanctions also extend to its overseas territories, including the British Virgin Islands ("BVI"). Smith Decl. **Ex. O.**

Plaintiffs are Mauritian companies but are held or owned by UK nationals or subjects. Michael John Nunn is listed as a director for both Plaintiffs. Smith Decl., **Exs. C, D,** Corporate Records in Mauritius. Nunn appears to be a British subject or national and has lived in the UK. Smith Decl. **Ex. E.** Both Plaintiffs appear to be held by a BVI-registered company by the name of Amari Holdings, Ltd. Smith Decl. **Ex. N.**

Plaintiffs entered the MOUs with ZMDC and continued to transact under the MOUs until January 2011, which was at least two years after the U.S. sanctions were in place.

### B. ZMDC, not Zimbabwe, terminated the MOUs

The Complaint consistently (and wrongly) refers to Zimbabwe in connection with the Award and the actions that led to the arbitration between ZMDC and Plaintiffs. *See, e.g.,* Am. Compl. at ¶ 2. Throughout their Response, Plaintiffs mislead by referring to Zimbabwe as having terminated the MOUs and provided "false testimony" in the arbitration. Response at 8, 12.

The Award did not determine that Zimbabwe had terminated the MOUs. The Tribunal expressly found that the MOUs were terminated by ZMDC. Ex. ECF No. 40-1 at ¶¶ 7, 9. There is no mention anywhere in the Award of Zimbabwe. *See generally,* ECF No. 40-1. The only mention of the Minister of Mines is about whether the MOUs were ultimately approved by the Minister to be legally valid. *See* ECF No. 40-1 at 18-22. There are no allegations that ZMDC acted under the instruction of the Minister or Zimbabwe in terminating the MOUs, and therefore the Award made no factual or legal findings on the issue. *Id.* No witnesses appeared on behalf of Zimbabwe, so it is impossible that any Zimbabwe

witness provided "false testimony." *Id.*

### C.  Zimbabwe was not a party to the MOUs or a participant in the Arbitration Proceedings

Plaintiffs continue to allege that Defendants (which includes Zimbabwe) have failed to pay the amounts under the Award and have similarly failed to satisfy the Judgment that the Zambian court issued based on the arbitral award. Am. Compl. ¶ 3. They also allege that "Defendants waived sovereign immunity by agreement to arbitrate under the ICC Rules, and by agreeing to and participating in an arbitration governed by the New York Convention. . . ." Am. Compl. ¶ 10. It is indisputable that Zimbabwe was not a party to the MOUs nor did it participate in the Arbitration. *See generally,* ECF No. 40-1. There is no mention of Zimbabwe (even in passing) in the Award. *Id.* The only party held liable for breaching the MOUs was ZMDC. *Id. at* 36. There was no finding of liability on the part of the Commissioner or Zimbabwe. *Id.*

### D.  Plaintiffs are not seeking to enforce the Judgment against Zimbabwe in other jurisdictions

Plaintiffs sought to enforce the Award in Zambia only against ZMDC and the Commissioner. ECF No. 1-5. Similarly, in 2022, Plaintiffs initiated proceedings in Ontario, Canada seeking to enforce the Award and Zambian judgment against ZMDC and the Commissioner. Notably absent is Zimbabwe as a named party in those proceedings. *See* Smith Decl. **Ex. F**

### E.  Plaintiffs' previous attempts under an *alter ego* theory have failed before other courts

This is not the first time that Plaintiffs attempt an *alter ego* theory. Plaintiffs sought in 2014 to seize assets belonging to two of ZMDC's subsidiaries (Mdaba Diamonds and Marange Resources) to satisfy the Award before the courts in Belgium under an *alter ego* theory. Smith Decl. **Ex. G** at 3. The Belgian court rejected a finding of *alter ego*, deciding that ZMDC's subsidiaries solely owned the assets,

separate and apart from ZMDC or Zimbabwe. *See id.* at 5-6. In that same ruling, the Funnekotter claimants argued that ZMDC is an *alter ego* of Zimbabwe. *Id.* The court also rejected this claim. *Id.*

Neither Zimbabwe nor ZMDC appeared in these proceedings, which were brought against Plaintiffs by three entities DTZ OZGEO Private Ltd, Mbada Diamonds Private Ltd., and Marange Resources. *Id.* at 1.

**ARGUMENT**

## I.    Plaintiffs bear the burden of proof to establish the existence of an *alter ego* relationship

As this Court has set out in its prior order, "[o]n a motion to dismiss for lack of subject matter jurisdiction or lack of personal jurisdiction, '[t]he plaintiffs bears the burden of establishing, by a preponderance of the evidence." ECF No. 38 ("Court Order") at 5. On the issue of whether an exception to the FSIA applies, Plaintiffs bear the initial burden to overcome the presumption of immunity by producing evidence that the exception applies. *Id.* at 6. Contrary to Plaintiffs' position, the issue of *alter ego*, however, does not resolve, in and of itself, whether an exception applies, and thus the burden of proof under the FSIA is not applicable. Rather, where there is a factual dispute concerning the presumed separateness between a sovereign and its agency or instrumentality, the party seeking to overcome the presumption must prove it by a preponderance of the evidence. *See, e.g., Crystallex Int'l Corp. v. Republic of Venezuela,* 333 F. Supp. 3d 380, 399 (D. Del. 2018) (requiring preponderance of the evidence for *Bancec* inquiries).

## II.    This Court should disregard any evidence or allegations of an *alter ego* relationship outside of the relevant period it established in its Decision

The law of the case doctrine dictates that "the same issue presented a second time in the *same case* in the *same* court leads to the *same result." LaShawn A. Barry,* 87 F.3d 1389, 1393 (D.C. Cir. 1996).

Here, this Court has already identified that the relevant time period for subject matter jurisdiction

4

"is whether ZMDC was the Republic's alter ego either when it entered into the MOUs with Plaintiffs in 2007 and 2008 or when it participated in the Zambian arbitration in 2011." Court Order at 14. Thus, the time period identified by the Court is not only the time the contracts were signed but also concerns the time of ZMDC's participation in the underlying arbitration proceedings. *Id.*

Plaintiffs deny in a footnote of their Response that the Court limited the time period in its prior order because the Court was simply holding that "the analysis of the period at issue in *Funnekotter* might differ from that at issue here." Response at 30, fn 13. But it is precisely that differentiation in the relevant time period between the cases that factored into the Court's decision that the offensive nonmutual collateral estoppel doctrine is inapplicable. Court Order at 15. Plaintiffs' footnote is plainly incorrect. If the time period was any and all circumstances as the Plaintiffs argue, the Court would not have needed to distinguish the time period between the facts of this case and that of *Funnekotter.*

Plaintiffs also attempt to downplay this Court's decision in *TIG Ins. Co. v. Argentina* because it is an unpublished decision and was decided in the context of the arbitration exception, rather than the implied waiver exception. Response at 29-30. Under that reasoning, Plaintiffs undermine their reliance on *OI Eur. Grp.,* which is not a binding decision and arose under the arbitration exception. Response at 30; *OI Eur. Grp. B.V.* 73 F.4th at 165 (finding FSIA jurisdiction under arbitration exception). Plaintiffs then do nothing to explain why the exception invoked would make any difference—the ratification of the New York Convention has nothing to do with the time period for an *alter ego* analysis.

Plaintiffs cite *Bancec* as support, but that decision is not determinative on the issue of timing. In *Bancec,* the Court did not specifically address the relevant time period and cautioned that its decision "announces no mechanical formula" for "determining the circumstances" for disregarding the normal separate juridical status of a government instrumentality. *Bancec,* 462 U.S. at 633.

Considering this Court's prior Order, any evidence outside of the time period identified by this

5

Court should be disregarded for purposes of any *alter ego* determination.

### III. Plaintiffs' latest allegations and documents are insufficient to show the existence of an *alter ego* relationship

Plaintiffs allege that the issue of *alter ego* is dispositive as to whether this case goes forward. Response at 32. This Court's Order recognized that "Plaintiffs' theory for the Court's subject matter jurisdiction over the Republic and their theory for personal jurisdiction over ZMDC are both premised on the allegation that ZMDC is the Republic's *alter ego*." Court Order at 1. Plaintiffs must therefore show that ZMDC is the Republic's *alter ego* to avoid due process requirements of minimum contacts to establish personal jurisdiction over ZMDC. *See GSS Grp. Ltd v. Nat'l Port Auth.,* 680 F.3d 805, 815 (D.C. Cir. 2012)*.* As for the Republic, the *alter ego* relationship is necessary to attribute ZMDC's agreement to arbitrate to the Republic.[1] Court Order at 35.

Instead of engaging with Defendants' criticisms of the evidence,[2] Plaintiffs add more exhibits that continue the theme of relying largely on opinion, speculation, and unsupported assumptions concerning the relationship between ZMDC and Zimbabwe. This latest round of documents falls short.

Among the new exhibits submitted, Plaintiffs continue to add additional news reports and articles filled with opinions, assumptions, and vague factual allegations concerning ZMDC's operations. *See* Exs. E, H, I, J, K, O, V, W, X, Y, Z, and NN. There are also several documents submitted that have no relevance to the *alter ego* discussion because they address in more general terms the mining industry

---

[1] This Court conclusively excluded the possibility of applying the arbitration exception under Section 1608(a)(6). *See* Court's Order at 30. ("In light of *Comimpex*, and without any countervailing authority to suggest that an action to enforce a foreign judgment falls within the text of § 1605(a)(6), the Court concludes that the arbitration exception does not apply in this case.

[2] Plaintiffs try to categorize Defendants' criticisms of the evidence as "only conclusory denials" (Response at 2) but Defendants pointed out, among other issues, the inconsistency in the evidence and the discrepancy between the allegations and the actual content of the evidence. ECF No. 43, Motion to Dismiss at 7-25. The failure to engage with Defendants' arguments leaves Defendants' points unscathed and persuasive.

in Zimbabwe or fail to even refer to ZMDC. *See, e.g.,* Ex. A, G, X, Y, and MM. Plaintiffs also revisit

evidence concerning allegations raised in the underlying arbitration that focused on whether Amari

obtained the MOUs through corruption, an issue that was addressed by the Tribunal in the Award. *See*

Ex. P, Q, R, S and T. Further afield, Plaintiffs introduce evidence of court cases involving ZMDC's

former CEO, Dominic Mubayiwa, which dealt with a labor dispute between him and ZMDC. Exs. M

and N. Notably, Mr. Mubayiwa sued ZMDC, not Zimbabwe, for matters related to his employment

agreement, and Mr. Mubayiwa based his claim on disagreements with the Board of Directors of ZMDC,

not the Minister. Ex. M at 2-3. Mr. Mubayiwa certainly did not take the position that ZMDC operated

without a board or was an *alter ego* of Zimbabwe. Exhibit N is an irrelevant court case, except for the

fact that the court found that ZMDC is a "State-owned public company." Ex. N at 2. No one involved

in the case treated ZMDC as an *alter ego* of Zimbabwe.

Plaintiffs also submit several documents related to U.S. sanctions against ZMDC and its entities,

most of which repeat the same general statement that ZMDC operates without a board. *See* Exs. AA

through MM. On this point, Plaintiffs' evidence is contradictory. *See, e.g.,* Exs. F,H, I , J, N, U (all of

which refer to the existence of a Board for ZMDC). The last of the documentary evidence are two

parliamentary reports focused on the diamond industry in Zimbabwe, one of which addresses issues

outside of the relevant time period (Exs F. and U) and a purported memorandum indicating a cabinet

decision to transfer ZMDC's shareholding in Kamativi Tin Mines and Todal (Pvt) Ltd to another state-

owned entity in 2021. Ex. OO. As to this last exhibit, there is no indication that any transfer occurred or

its value.

Lastly, the Plaintiffs submit the expert declaration of Zimbabwean lawyer Mr. Sternford Moyo.

While declaring it an expert report, Mr. Moyo does not qualify his expertise. *See* ECF No. 45-1. He also

does not disclose that he has had several litigations where he has represented interests against the

government and ZMDC, despite referring to a number of those cases in his declaration. *Id.* The

declaration also is scant on legal support and citation, which Defendants address in more detail below.

A.  **Plaintiffs have not sufficiently plead or provided factual evidence that supports a finding of an *alter ego* relationship between Zimbabwe and ZMDC under the "extensive control" prong**

As the Supreme Court cautioned in *Rubin, Bancec* provides no "mechanical formula" for

disregarding juridical separateness." *See Rubin v. Republic of Iran,* 138 S. Ct. 816, 822 (2018). The five

factors that courts have coalesced around are meant to "aid" a "case-by-case" analysis for "identifying

extensive control." *See Crystallex Int'l Corp. v. Bolivarian Rep. of Venezuela,* 932 F. 3d 126, 141 (3rd

Cir. 2019). In cases where courts have applied these five *Bancec* factors, they look at all, not just one

set of facts to make the determination. *See, e.g., Crystallex,* 932 F.3d at 173. Unfortunately, courts have

provided little insight into the relative importance of these factors in the analysis. From the case law, the

conclusion that can be drawn is that these factors are guideposts for courts carrying out a type of

balancing test in light of the particular circumstances of a case.

Plaintiffs make an unnecessary fuss that Defendants failed to cite *Bancec,* especially since

Plaintiffs failed to follow the *Bancec* factors in their Amended Complaint.[3] In any event, there is no

doubt that Defendants addressed *Bancec's* test under which Plaintiffs seek to establish an *alter ego*

relationship: (1) principal-agent relationship (or extensive control)[4] and (2) fraud and injustice. *See*

Motion at 8-24. These same two theories were reflected in this Court's Order, which indicated that the

---

[3] The *Bancec* factors are meant to "aid case-by-case analysis rather than establish a "mechanical formula" for identifying *extensive control. See Crystallex Int'l Corp.,* 932 F.3d at 141 (citing to *Bancec,* 462 U.S. at 633) (emphasis added).

[4] Under the first prong, contrary to Plaintiffs' assertion, Defendants addressed both control or apparent authority. "*See* Motion at 7-24.; Response at 18; *see GSS Group Ltd. v. Republic of Liberia,* 31 F. Supp 3d 50, 62 (D.C.C. 2014) (interpreting *Transamerica Leasing* as establishing two grounds under the "agency exception," which the court identified as control or apparent authority.

"presumption can be overcome, however, where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created or where recognition of the instrumentality as an entity apart from the state would work fraud or injustice." Court Order at 9 (citing *Bancec*). The extensive control prong can be satisfied by either showing "complete domination" or the existence of a "apparent authority," which requires plaintiffs to show reliance. *See Transamerica Leasing v. La Republica de Venezuela,* 200 F.3d 843, 848 (D.C. Cir. 2000). In their Response, Plaintiffs focus the inquiry on the "complete domination" approach, so Defendants limit their Reply accordingly. Response at 18-19. Plaintiffs would certainly fail to show "apparent authority" since they never thought that ZMDC could be an *alter ego* until after the MOUs.

It was not until their Response that Plaintiffs arranged their allegations/evidence around the five *Bancec* factors. Response at 20-28. For the ease of the Court's review, Defendants will address the evidence and allegations under each *Bancec* factor below.

### 1. Plaintiffs have not shown that Zimbabwe exerts total economic control over ZMDC

*Bancec* clearly set out that ownership of a state-owned entity by a sovereign is not determinative. *Bancec,* 463 U.S. at 624. Even if the government provides capital or covers losses of that entity. *Id.* at 624 (recognizing that government "appropriations to provide capital or to cover losses" do not prevent a typical government instrumentality from being considered a separate juridical entity). The Court in *Bancec* also identified certain key features of an instrumentality, including that it is (1) created by an enabling statute that prescribes it powers and duties; (2) its board of directors is selected by a foreign state; (3) it has the power to hold and sell property ;(4) it has primary responsibility over its finances; and (5) it is run as a distinct economic enterprise. *See also DRC, Inc. v. Republic of Honduras,* 71 F. Supp 3d 201, 216-17 (D.C.C. 2014) (citing *Bancec*).

As a result, to establish this factor, economic control must be plenary or significant beyond that

normally existing between a State and a state-owned entity. *OI Eur. Grp. B.V.,* 73 F.4th at 172. This

Court has found that a State may exercise some degree of financial oversight and allocate economic

resources to a state-owned entity without undermining the presumption of separability. *See, e.g., DRC,*

*Inc.,* 71 F Supp.3d at 211 (finding that ultimate supervisory economic control over an entity by an

appointee of the President without day-to-day involvement was insufficient to show the entity as a state

organ).

Plaintiffs rely on drawing comparisons between ZMDC and PDVSA in the *OI Eur. Grp. B.V.*

and the State Property Fund of Ukraine ("SPF") in *TMR Energy*. The attempt is unavailing. There are

several important distinctions that Plaintiffs overlook.

In *OI Eurp Grp.,* there were far more facts regarding Venezuela's economic control over

PDVSA that are not present or alleged here.[5] Contrary to Plaintiffs' assertion (Response at 20), the

ZMDC Act expressly provides that ZMDC can sell shares to persons other than the State, as long as the

State retains a 51% share. *See* ECF No. 45-4, ZMDC Act, § 27 (2) and (5). PDVSA on the contrary had

to remain fully owned by Venezuela. *OI Eurp. Grp.,* 73 F.4th at 172. Unlike ZMDC, PDVSA was also

found to have no autonomy over its sales or prices and expressly announced in public documents that it

was subject to government directives. Evidence in that case also showed that the government maintained

direct access to PDVSA's bank accounts, paid its legal bills, and declared PDVSA's property

"Venezuelan property." *Id.* On the contrary, ZMDC maintains its own bank accounts, negotiates the

---

[5] Plaintiffs overstate the impact of numerous, anodyne facts that contribute little, if anything, to the analysis. For example, Plaintiffs point to State ownership of minerals in Zimbabwe as evidence of State control sufficient to create an *alter ego* relationship. This is a red herring. State control of mineral assets is common throughout the world. *See, e.g.,* Chile https://www.trade.gov/country-commercial-guides/chile-mining (showing that all minerals vest with State); South Africa, Mineral and Petroleum Resources Development Act, 28 0f 2002 (vesting the State as the custodian of all mineral and petroleum resources). *See also,* Smith Decl., **Ex. P.**

terms of the joint venture agreements and its financials are supervised and approved by the Board of Directors and subject to annual external audits. ECF No. 29-1, ¶¶ 12; 16. Smith Decl., **Ex. H** at 18-20, 56. Unlike PDVSA, there is no admission by ZMDC that it is part of the Zimbabwean government or that its assets belong to the State. Smith Decl., **Ex. I**.

Plaintiffs allege in a conclusory fashion that the statutory provisions of the ZMDC Act are "strikingly similar" to those in *TMR Energy.* Response at 21. This is yet another overstatement. In *TMR Energy,* while the Court cited *Bancec* generally, it provided only a single-paragraph analysis without resorting to the *Bancec* factors. 411 F. 3d at 302. In that paragraph, the Court cited certain statutory provisions, but those provisions differ from the law governing ZMDC in many ways. First, the Court cited regulations that expressly admit that STF is a "body of the State." *Id.* Second, SPF is funded directly from the budget of the State of Ukraine. *Id.* Lastly, the nature of SPF activities, unlike ZMDC, were activities that necessarily required strict government control as they involved the "privatization" of state-owned property. Smith Decl., **Ex. J**. (referring to itself as a "central bod[y] of executive power with special status)." ZMDC has none of those features. ZMDC was set up as a corporation, legally distinct and capable of suing and being sued. ZMDC Act § 3. ZMDC's day-to-day activities by statute are overseen by a Board of Directors, not the executive branch. ZMDC Act § 4. Although ZMDC was created, among other purposes, to implement a "government mining development policy," its right over the minerals (state assets) is no different than private enterprise—it applies as a joint-venture partner alongside private business for mining licenses. *See, e.g.,* Ex 45-1 at 11; *see also, id.* at Ex. C. at 63 (showing the ZMDC had to apply for an exemption since it had yet to "raise the required fees," which the government was free to deny or grant and, in that case, denied); *see also,* Muzawazi Decl. at ¶ 8 (noting that private mining investors can also apply). ZMDC is also funded through its operations, rather than from the State's budget. *Id.;* Smith Decl. **Ex. H** at 46 (item 19); **Ex. R** at 48 (item 17); **Ex. S** at 50

(item 17).

In any event, *TMR Energy* is of little import here because in that case there was evidence in the record that SPF had conceded that it was "part" of the government, that the government approved and funded its expenses, including litigation expenses, and had previously described itself as a "governmental organ" and a "state body" in the underlying arbitration proceedings. *See* Smith Decl., **Ex. K**. at 16-17, **Ex. L.** at 4 ¶ 18 and 94 *et seq.* (Ex. N). This is nothing like ZMDC.

Plaintiffs continue to insist that ZMDC operates "much more like an executive department of the government" because it is mandated to conform to "government economic policy," the "national interest" and "Government mining development policy." Response at 20. But these are key attributes of state-owned entities. In the United States, federal entities are created "to help address a broad range of public policy goals." Smith Decl., **Ex. M** at 4. On this point, Plaintiffs' reliance on *TMR Energy* is misleading. The D.C. Circuit did not find that "implement[ing]" national policies gave "plenary control" to the Government, rather it considered this along with a showing of express executive and legislative control to make its determination. 411 F. 3d at 302.

Beyond that, Plaintiffs complain, at length, about the role of the Minister of Mines in its capacity to ensure compliance with government policy. There is nothing to this argument. The Minister has no day-to-day control over ZMDC or its employees. *See* Muzawazi Decl. at ¶¶ 7, 11. Instead, the Minister must consult with the Board of Directors and has far less power than the President of the United States would have over government-owned entities. For example, the President of the United States can change the budget of a government-owned corporation. 31 U.S.C. § 9103(c). And there are other measures to limit the autonomy of government-owned corporations, far beyond any restrictions on ZMDC. Under U.S. law, appropriations are limited by Congress. 31 U.S.C § 9104(a). And audits are not necessarily external, such as the one that ZMDC must conduct. § 31 U.S.C 9105(a).

Indeed, Plaintiffs' arguments are so overreaching that they would effectively collapse the hundreds of agencies and instrumentalities owned by the United States government into a series of *alter egos*. Plaintiffs complain, wrongly, about the oversight provided by the ZMDC Board of Directors. This pales in comparison to the U.S. government's control over its corporations. For example, Fannie Mae has operated since 2008 under the direct control of the Department of Treasury. Smith Decl., **Ex. Q** at 3 (Part I); **Ex. M** at 18. The Board of Directors has no fiduciary duty to the shareholders, just to the U.S. government. *Id.*

As to the Minister's exercise of power in practice, the evidence is insufficient to overcome the presumption of separateness. Plaintiffs rely on their expert and two parliamentary reports (Exs. F and U) to claim that there is direct government involvement in operational issues because the Minister supposedly appointed the board of some of ZMDC's subsidiaries in violation of the ZMDC Act, directly diverted revenues from these entities, and gave specific directions to ZMDC as to whom to award diamond concessions. Response at 22.

In any event, the Parliamentary Reports are insufficient evidence. The Parliamentary Committee Report (2017) ("2017 Report") not only appears to address facts outside of the relevant time but also provides no factual basis for the findings Plaintiffs cite. The Committee reports that it was "clear" that the "Board of ZMDC has no control over the company" because of ZMDC's absence during the Committee's visit to Chiadzwa. ECF 45-7 at 16. The absence of ZMDC on a site visit does not in and of itself show "clear" evidence of no control. In conclusory form only, the Committee states that "the ZMDC board is answerable to the Permanent Secretary of Mines and Mining Development" and that "Secretary of Mines is directly involved in operational issues at . . . ZMDC." *Id.* at 16, 19. There is no factual basis provided for these conclusions.

The 2013 Parliamentary Committee Report ("2013 Report") fares no better, and on many points

reinforces the separateness between ZMDC and Zimbabwe. For example, as to the selection of joint venture partners, the Committee found that they were misled into believing that the choice of the two investors was made through a Cabinet decision because the Cabinet minutes only showed that they "simply encouraged ZMDC to enter into joint venture partnerships and *did not specifically state that ZMDC should enter into* joint ventures with Reclaim and Core Mining. 45-22 at 15 (emphasis added). The Committee also noted that a due diligence report had been prepared by ZMDC even though it noted that it was not clear who selected the two investors. *Id.* at 15-16. Plaintiffs focus on the Committee's statements regarding the manner of appointment of ZMDC's subsidiaries, but the report shows that ZMDC was working to manage a rush of activity in Zimbabwe's diamond fields. ZMDC conducted its own due diligence report (*id.* at 15-16), actively managed the entity it wholly owned (*id.* at 18-19) while deferring to its private industry partners to manage other subsidiaries (*ibid.*), and worked to assert its authority (*id.* at 17). In any event, precedent on the issue has established that appointments of individuals to a Board of Directors is insufficient. *See, e.g., Foremost-McKesson,* 905 F.3d at 440.

Plaintiffs' expert continues the theme of overstatement. Plaintiffs' expert relies on the 2013 Report to claim that it is a "notorious fact" that the ZMDC Chairman confirmed that the ZMDC "had no control over ZMDC's subsidiaries." 45-1 at ¶ 6. There is no such statement contained in the 2013 Report or the 2017 Report. And no such statement could ever arise. Neither the 2013 Report nor the 2017 Report considers all of ZMDC's subsidiaries—only issues related to diamond mining. The only statement from a ZMDC Chairman is contained in the 2013 Report and simply reports that ZMDC was not "involved" in the "day-to-day" operations of its subsidiaries. Ex. 45-22 at 18. There is nothing remarkable about this statement, as it is common for parent companies not to be involved in the day-to-day operations of their subsidiaries. Otherwise, all subsidiaries would be at risk of being considered an *alter-ego* of their parent company.

Finally, Plaintiffs allege that there is "pervasive" evidence of ZMDC's assets being diverted for "policy purposes." Response at 23. For this allegation, Plaintiffs rely on a number of news articles that purport to claim that mineral rights are being granted in exchange for arms from Russia and China or to "compensate" government officials (Exs. X, Y, and Z). Putting aside the credibility of these news sources, the articles discussing Russia's involvement in a platinum joint venture do not even mention any rights or assets belonging to ZMDC or any deal in exchange for arms (Ex. X and Y). No content in these articles suggests that ZMDC's assets are being diverted for the government's own benefit. *Id.* The other article is from 2020 and claims that a police and secret service agency ("CIO") "covertly" owns a stake in Kusena Diamonds, which the article claims to be owned by ZMDC. Ex. Z at 2. ZMDC Annual Reports failed to mention Kusena Diamonds as a subsidiary at that time. Smith Decl., **Ex. R** at 13, **Ex. S** at 13 (identifying only Jena Mine and Sabi Mine as subsidiaries). To that end, Plaintiffs suggest that ZMDC has "awarded highly valuable concessions" to the "armed forces" (Response at 10), but ZMDC does not grant concessions; it can only apply for them just like any other company. *See, e.g.,* ECF 45-1 Ex. C to Moyo Decl.; ECF No. 29-1 ¶ 21; Response at 20.

### 2. Plaintiffs have not shown that Zimbabwe receives anything other than dividends as a shareholder

In reviewing whether this factor is satisfied, courts have looked at payments beyond dividends. *See OI Eur. Grp.* 73 F.4th at 173 (relying on the fact that profits, accompanied by taxes and royalties are paid sometimes at an "artificially high rate" and that the government retained direct access to PDVSA's bank accounts which were characterized as Venezuelan assets). It thus has to be more than entitlement to profits as a shareholder. Otherwise, it would make every state-owned entity susceptible to being an *alter ego*.

Plaintiffs allege that "revenues are taken directly from subsidiaries rather than going to ZMDC first" and that "Zimbabwe takes money from ZMDC without verifying it has any profits to distribute."

15

Response at 23-24. To support these allegations, Plaintiffs rely on supposed expert testimony and allegations presented before a Zimbabwean court. *See* Response at 24. As to the first issue, there is no evidence other than conclusory statements that Zimbabwe is taking revenue directly from the subsidiaries. Mr. Moyo claims that this is a "notorious fact" that "any tribunal in Zimbabwe would take judicial notice." 45-1 at ¶ 10. There is no basis for his opinion that it is a notorious fact in Zimbabwe. Muzawazi Decl. ¶ 10; Smith Decl., **Ex. U**. There is also evidence to the contrary. Annual Reports issued by ZMDC show that independent auditors found that revenues from the subsidiaries were accounted for under ZMDC's consolidated statement.[6] *See* Smith Decl., **Ex. H** at 20-21. There is no indication that the revenues bypassed ZMDC, something a highly regarded firm such as BDO would have surely flagged. This is also belied by the Belgium court's 2014 finding that the subsidiaries were not *alter egos* of either ZMDC or Zimbabwe. *See, e.g.,* Smith Decl. **Ex. G.** As to the second allegation, Plaintiffs rely solely on allegations made in a labor dispute between ZMDC and its former CEO. Plaintiffs' allegation is not supported by any factual finding of the Court in that case. ECF No. 45-14, Ex. M at 2-3 (referring to the former CEO's allegations against the new Chairperson). The court decided no issues concerning acts by the Minister or Zimbabwe in that case, let alone find that Zimbabwe was taking profits without an audit. *Id.* In light of this, it is difficult to accept Mr. Moyo's conclusory statement that the Minister exercises day-to-day control over ZMDC's board. Muzawazi Decl. at ¶ 11. Without persuasive evidence to support that Zimbabwe has received anything but dividends as a shareholder, this Court should find that this factor weighs in favor of Defendants.

---

[6] The auditors provided a "qualified opinion" concerning the consolidated financial statements which they claim provided a "true and fair view of the position of" ZMDC and its subsidiaries "as of 31 December 2012." *See* Smith Decl., **Ex. H** at 19.

**3. Plaintiffs have not shown that Zimbabwe "manages" or exerts day-to-day control over ZMDC's operations**

"Mere involvement by the state in the affairs of an agency or instrumentality does not answer the question of whether the agency or instrumentality is controlled by the state for purposes of FSIA. *Foremost-McKesson, Inc. v. Islamic Republic of Ira,* 905 F. 2d 438 (D.C. Cir. 1990). This means that it is "not enough to show that various government entities or officials represent a majority of the shareholders or constitute a majority of the board of directors of the applicable agency or instrumentality." *Id.* Government involvement must rise to a higher level. *McKesson Corp. v. Islamic Republic of Iran,* 52 F.3d 346, 351–52 (D.C.Cir.1995) (concluding that the separate juridical entity presumption was overcome where Iran controlled routine business decisions, such as declaring and paying dividends and honoring contracts). *See also, Transamerica Leasing,* 200 F.3d at 849 (finding that a sovereign does not create an agency relationship by appointing a corporation's Board of Directors). In light of precedent on the issue, this Court agreed. *See* Court Order at 11-12.

Moreover, where the daily affairs of a corporation are overseen by the Board of Directors, control over the entity by the government has been considered quite limited. *See Flatow v. Republic of Iran,* 308 F.3d 1065, 1074 (9th Cir 2002). Even if the Board is deemed to be composed of government officials or "political" appointments, that is not enough to show the requisite control over the entity. *See Gen. Star Nat'l Insu. Co. v Asigurarilor de Stat, Carom, S.A., 713 F. Supp. 2d 267 (S.D.N.Y. 2010); BCI Aircraft Leasing, Inc. v Republic of Ghana,* 2006 WL 2989291 *(N.D. Ill. 2006); (First Inv. Corp. v Fujian Mawei Shipbuilding, Ltd.,* 858 F. Supp. 2d 658 (E.D. La. 2012)). It also stands that a foreign state can inject capital into an entity, cover its debts, and engage in a financial rescue without being viewing the entity as an alter ego. *See Transamerica Leasing,* 200 F.3d at 851 (finding that a sole shareholder exercising its influence, through the Board of Directors, where the subsidiary is troubled is insufficient to overcome the presumption).

Yet, Plaintiffs claim that this Court "could deem this factor satisfied by the fact that the Minister appoints the Chairman…and the rest of the Board." Response at 24. This baseless assertion contradicts the case law discussed above. Plaintiffs then proceed to reiterate many of the same arguments addressed under the first factor,[7] including the Minister's powers enumerated under the ZMDC Act and allegations concerning the Minister's exercise of those powers. *Id.*

As far as the enumerated powers of the Minister, these are the types of limited supervisory powers that are common in state entities. *See, e.g.,* 31 U.S.C. §§ 9103-9108 (referring to powers of the President as to U.S. government corporations); *see also,* Smith Decl., **Ex. M** at 13-15 (describing a more significant oversight role by the U.S. government of government corporations). As to the remaining evidence cited, Defendants have already addressed much of it (Expert Report, Exs. F and U) above in section (a), so the focus will be on addressing the additional cited evidence (Exs. L, FF-LL). *See* Response at 25-26.

The additional evidence can be divided into two types. One is a journal article from a South African professor reviewing new legislative initiatives passed by Zimbabwe to increase good governance and accountability in mining. Ex. L. The other evidence is a string of reports and statements from the U.S. government concerning sanctions against Zimbabwe and certain entities.

As to the journal article, this Court should find it is of little weight as the text referenced by Plaintiffs is based on the title of a news article cited in the footnote of the journal. ECF No. 45-13 at 240, fn, 47. That article appears to not be available as Plaintiffs failed to include it. The remaining evidence (Exs. FF-LL) refers to reports on the Investment Climate in Zimbabwe issued by the U.S. State Department between 2017 and 2023, which all contain the same text that asserts that ZMDC was

---

[7] Plaintiffs concede that the evidence and allegations for the first and third factor overlap. ¶Response at 24.

allowed to "function" without a board. *See* Ex. FF-LL. Besides being outside of the relevant time frame, the finding of the U.S. government concerning a lack of a board is directly contradicted by other evidence Plaintiffs rely on that shows the existence of a ZMDC board. *See, e.g.,* Exs. F, H, I, J, N, and U. In any event, annual reports for ZMDC show the existence of a board. *See* Smith Decl., **Exs. R and S** at 6-8 (identifying board members in 2019 and 2020)

To the extent that Plaintiffs are relying on Exs. AA-EE, which they do not cite under this section, the existence of sanctions against ZMDC is not itself sufficient to establish an *alter ego*. Response at 27. Moreover, the continuation of sanctions by the United States against ZMDC is contradicted by the findings of the EU which lifted sanctions in 2013. Smith Decl., **Ex T**. As far as the congressional testimony cited, it fails to provide any specific allegations concerning ZMDC itself. *See, e.g.,* Ex. MM at 3 (which refers generally to reports concerning "diamond mining entities" without specific reference to state-owned entities or ZMDC and is focused on concerns involving corruption because Zimbabwe is *not* benefiting from mining revenues).

### 4. Plaintiffs have not shown that Zimbabwe is the real beneficiary of ZMDC's conduct

Similar to the profits prong, courts reviewing this factor look for benefits that go beyond those of a shareholder. This factor is satisfied when finding that the sovereign used the assets of the state-owned entity without compensation or consent to further policy goals, pay a debt, or enrich itself. *See, e.g., Crystallex,* 932 F.3d at 148; *OI Eur.Grp.* 73 F.4th at 173.

None of the evidence is sufficient to satisfy this factor. Plaintiffs' supposed expert claims in a conclusory fashion that "the beneficiary of all the operations and activities of the corporation is the Government of Zimbabwe which is its sole shareholder." 45-1 at ¶ 4.21. But the benefits of a shareholder alone are not sufficient to satisfy this factor, otherwise, this would make every state entity an *alter ego* of the government. To the extent that Plaintiffs claim that the Treasury extracts the

19

dividends directly from ZMDC subsidiaries (Response at 27), this is belied by evidence to the contrary. Smith Decl., **Ex H** at 20-21, ECF No. 45-40, Ex. MM at 3 (referring to reports that mining revenues are not going to Zimbabwe's treasury)

Plaintiffs then turn to comparing what a "normal" company would do with ZMDC, relying primarily on Exs. X, Y, and Z, which Defendants have already addressed above as irrelevant because ZMDC cannot assign mining rights, while there is no evidence that ZMDC's assets were involved in the Russian transaction. *See* Exs. X and Y. Moreover, a state-owned entity cannot be compared to a "normal company" because by its nature state-owned entities are set up to pursue policy goals and have other unique attributes as identified by the Supreme Court which in and of themselves do not make them part of the State. *Bancec,* 463 U.S. at 624.

As to the U.S. government's sanctions on ZMDC, for the same reasons as set out above, these are not dispositive on the issue. Response at 27. In any event, Plaintiffs' reliance on subsequent U.S. reports is contradicted by other countries' findings, which are also reviewed annually, that removed the sanctions in 2013. Smith Decl., **Ex. T**.

Lastly, Plaintiffs vaguely claim that Zimbabwe is using ZMDC's assets for its own benefit. But the only evidence, aside from poorly sourced and exaggerated news articles, is a cabinet approval to transfer interest in two of ZMDC's companies to another state-owned entity. There is no evidence that this transaction is not for value or that the transfer is being done to benefit Zimbabwe directly. It is common for companies to restructure, especially in times of financial distress. *See, e.g., See Transamerica Leasing,* 200 F.3d at 851.

### 5. <u>Plaintiffs have not shown that equities weigh in their favor</u>

Courts have focused on whether the corporate form has been abused, whether the sovereign has used the separate status of the entities for their own benefit (*Doe v. Holy See,* 557 F.3d at 1078-80 (9th

Cir. 2009), or whether the agency or instrumentality was formed or liquidated to evade liability of the sovereign. *See, e.g., Bancec,* 462 U.S. at 633 (finding that since Bancec was dissolved before Citibank asserted its setoff, any benefit from disallowance of the setoff would accrue solely to Cuba); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan,* 447 F.3d 411 (5th Cir. 2006) (finding that foreign state was "intentionally bleeding" the instrumentality to avoid recovery).

Unlike the cases Plaintiffs cite involving Venezuela, the judgment here is not against the sovereign State. The judgment is against ZMDC, a separate instrumentality. Zimbabwe has not been involved in the underlying dispute until now. Moreover, there is no indication that ZMDC or Zimbabwe derive significant benefits from the U.S. judicial system, as was the case with *Bancec* seeking relief before U.S. courts. To the extent that Plaintiffs rely on allegations that Zimbabwe is transferring assets to shield ZMDC from creditors, the only evidence they have presented does not show that an actual transfer has taken place, that the transfer was for no value or nefarious reasons. *See* Exs. OO and NN. This is a far cry from an *alter ego*.

### B. Plaintiffs have not shown that adherence to separate identities would permit fraud or injustice

In applying the second theory for disregarding juridical separateness, which the Supreme Court applied in *Bancec,* this Court has identified certain nonexclusive grounds that might apply. These include where a foreign sovereign (1) "intentionally seeks to gain a benefit while using the legally separate status of its instrumentality as a shield, (2) "unjustly enriches itself through the instrumentality; and (3) "uses instrumentality to defeat a statutory policy." *DRC, Inc. v. Republic of Honduras,* 71 F.Supp.3d 201, 218 (D.C.C. 2014). This Court also found that this exception may also apply where the "complaining party reasonably relies upon that manifestation of authority." *Id.*

In their Response, Plaintiffs do not focus their arguments and evidence expressly on the fraud and injustice approach. Response at 20-29 (focused on *Bancec* factors for establishing control). But in

their Amended Complaint they allege that treating Zimbabwe and ZMDC would result in fraud and injustice, mainly because they claim that the Republic is unjustly enriching itself through ZMDC. *See* Am. Compl. at 9. To the extent that this Court will analyze the existence of an *alter ego* relationship through the lens of "fraud or injustice," Plaintiffs have not satisfied this prong for reasons already stated. Motion at 17-24. Plaintiffs' additional, related evidence continues to be insufficient. For the same reasons, this Court dismissed previous evidence on the issue, it should find that Plaintiffs additional evidence continues to fall short. Opinion at 13, n. 4.

For the same reasons expressed previously, this Court should give little weight to inadmissible hearsay in news articles (Exs. NN, X, Y and Z). To the extent this Court considers the Cabinet's authorization of a transfer of ZMDC's assets, there is nothing from that document that suggests that a transfer occurred, that it was for no value, or that it was done for purposes of evading creditors. As far as congressional testimony Plaintiffs cite, as mentioned before, this does not address specific issues with state-owned entities or ZMDC itself, as the comment Plaintiffs cite refers to mining entities in general. *See* Ex. MM. There is simply no evidence presented that shows that Zimbabwe had moved assets from ZMDC to thwart creditors.

## IV.   Even if an alter ego relationship exists, Zimbabwe has not impliedly waived immunity under 1605(a)(1)

The existence of an *alter ego*, standing alone, does not answer the question of whether ZMDC and Zimbabwe have impliedly waived immunity.[8] While this Court found implied waiver applicable to

---

[8] Plaintiffs claim that it was unclear in Defendants' motion to dismiss whether Defendants were "merely explaining why the alter ego analysis is dispositive or are making an argument to stand on its own." It is the latter. The alter ego argument does not in and of itself resolve the implied waiver issue. Defendants continue to maintain that the implied waiver is inapplicable regardless of an alter ego finding.

22

the Commissioner because Zimbabwe is a signatory to the New York Convention (ECF No. 38 at 36),

that does not necessarily apply to ZMDC and Zimbabwe.

As this Court noted in its Opinion, the application of the implied waiver exception must be done

with "due caution." Order at 34. Caution is warranted here. The New York Convention addresses

arbitration awards, and if there is a waiver, it must come from the existence of the arbitration and later

award. Zimbabwe never agreed to arbitrate, a fact uncontested by Plaintiffs, and where ZMDC's implied

waiver is connected to Zimbabwe through an *alter ego* argument, the absence of Zimbabwe's consent

to arbitration undermines both parties' implied waiver.

There are additional problems with applying the New York Convention. As Defendants have

previously pointed out, unlike in this case, the underlying awards in *Seetransport* and *Comimpex,* were

subject to New York Convention scrutiny because the award debtors were able to litigate the

enforceability of the award. *See, e.g.,* ECF No. 29 at 18-19. Here, none of the Defendants were allowed

to defend against the award enforcement in Zambia because Zimbabwe was not a party to those

proceedings and ZMDC was not properly served as explained in Defendants' prior pleadings. *See* ECF

No. 29 at 20; ECF No. 29-2. It cannot stand to reason that Zimbabwe impliedly consented to the

enforcement of an award, let alone a subsequent judgment, that was not afforded any scrutiny under the

New York Convention.

V.     **Plaintiffs have not properly served ZMDC with either the Complaint or Amended Complaint**

Although this issue was previously briefed, the Court did not determine whether ZMDC had

been properly served in its Opinion of March 5, 2023. The issue remains open and ZMDC continues to

rely on its prior arguments, including those submitted in response to the Original Complaint. *See* ECF

Nos. 30 at 7-8 and ECF No.34 at 8-11.

In a contradictory fashion, Plaintiffs allege that since ZMDC is an agency or instrumentality,

substantial compliance plus actual notice suffices, and that ZMDC was served through a special arrangement contained in the MOUs in compliance with section 1608(a)(1). None of their arguments withstand scrutiny.

First, Plaintiffs cannot rely on contradictory arguments to establish jurisdiction. To establish jurisdiction over ZMDC, Plaintiffs have admittedly relied solely on allegations that ZMDC is the Republic's *alter ego*, *i.e.*, that it is the foreign state. *See Transaereo, Inc. v. La Fuerza Area Boliviana,* 30 F.3d 148, 151 (1994) (which held in part that for the purpose of determining the proper method of service under the FSIA, an entity that is an "integral part of a foreign state's political structure" is to be treated as the foreign state itself"). Yet, to claim that they have properly served ZMDC they are invoking the standard applied to foreign instrumentalities and agencies to claim that substantial, rather than strict compliance applies. *See* ECF No. 45 at 35.

Even if this Court were to accept that substantial compliance is applicable, Plaintiffs have made no attempt to substantially comply with the service provisions of 1608. *See Harris Corp. v. Nat'l Iranian Radio,* 691 F.2d 1344, 1353, n. 16 (11th Cir. 1982)*;* (finding that for actual notice to compensate the failure to strictly follow section 1608(b), actual notice must be accompanied by substantial compliance with the FSIA requirements); *see also, Freedom Watch, Inc. v. Organization of the Petroleum Exporting Countries,* 766 F.3d 74, 81 (D.C. Cir. 2014)(finding that substantial compliance with federal rules on service required for the court to consider actual notice).

First, there is no special arrangement in place because the MOUs were terminated in January 2011. *See* ECF No. 40-1 at ¶¶ 182, 227. The Tribunal accepted Plaintiffs' arguments that the MOUs were wrongfully terminated and made a factual finding that the MOUs came "to an end" when Plaintiffs initiated the Arbitration. ECF 40-1 at ¶ 182. In any event, the MOUs do not provide a special arrangement here because Plaintiffs are not seeking relief under the MOUs, rather they are seeking to

enforce a Zambian High Court Judgment before this Court. *See* ECF No. 40; *see also* reasons outlined in ECF No. 34 at 9-10.

Without a special arrangement in place, plaintiffs must serve ZMDC pursuant to section 1608(b)(3). *See* 28 U.S.C. § 1608(b). According to section 1608(b)(3)(B), a plaintiff can serve an agency "by any form *of mail* requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency…to be served." 28 U.S.C. § 1608 (b)(3)(B) (emphasis added).

In their affidavit of service filed on August 18, 2022, Plaintiffs indicate that they effected service by "personally hand delivering" the Summons and Complaint on "Theresa Kanengoni" who allegedly "was a secretary" of ZMDC. ECF No. 24 at ¶¶ 2-4 (emphasis added). This method of service does not comply with 28 U.S.C. § 1608(b)(3)(B) or any of the provisions under section 1608(b). *See Daly v. Casto LLanes*, 30 F. Supp. 2d at 416 (S.D.N.Y 1998) (holding that service through personal delivery is incompatible with 28 U.S.C. § 1608(b)(3)). Accordingly, this Court lacks personal jurisdiction over ZMDC.[9]

## CONCLUSION

For the foregoing reasons, Zimbabwe and ZMDC request that the Court grant the Motion to Dismiss and grant any additional relief the Court considers just and proper.

Respectfully submitted,

/s/ Quinn Smith
GST LLP
Quinn Smith
DCD Bar No. FL0027

---

[9] Since Plaintiffs fail to defend the sufficiency of the factual allegations contained in the Amended Complaint in light of Defendants' criticisms, no further response from Defendants is required. Defendants refer the Court to those arguments outlined in their Motion to Dismiss. ECF No. 42 at 31-32.

quinn.smith@gstllp.com
Katherine Sanoja
DC Bar No. 1019983
katherine.sanoja@gstllp.com
1111 Brickell Avenue, Ste 2715
Tel. (305) 856-7723

26

**CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2023, I electronically filed this document with the Clerk of the Court of the U.S. District Court of the District of Columbia by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel off record. I further certify that I am unaware of any parties who will not receive such notice.

By: /s/ Quinn Smith
Quinn Smith

27

1171

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **AMAPLAT MAURITIUS LTD.** *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 22-cv-58 (CRC) |
| **ZIMBABWE MINING DEVELOPMENT CORPORATION,** *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Mining companies Amaplat Mauritius Ltd. and Amari Nickel Holdings Zimbabwe Ltd.

("Plaintiffs") filed suit under the D.C. Uniform Foreign-Country Money Judgments Recognition

Act.  The suit seeks recognition of a foreign court judgment enforcing an arbitral award against

the Republic of Zimbabwe, the Chief Commissioner of the Zimbabwean Ministry of Mines, and

the Zimbabwe Mining Development Corporation ("ZMDC").  The Court has already ruled on

one round of motions to dismiss.  Teed up now are the Republic and ZMDC's ("Defendants")

motion to dismiss the amended complaint for lack of subject matter jurisdiction, lack of personal

jurisdiction, and failure to state a claim.  All three grounds for dismissal turn on whether the

Republic and ZMDC can be considered alter egos under the Foreign Sovereign Immunities Act

("FSIA").  Finding that Plaintiffs have established an alter-ego relationship between the Republic

and ZMDC, the Court denies the motion to dismiss.

**I.    Background**

The Court's previous opinion detailed the facts and procedural history of this case so the

Court will pick up the thread where that opinion left off.  See <u>Amaplat Mauritius Ltd. v.</u>

<u>Zimbabwe Mining Dev. Corp.</u>, 663 F. Supp. 3d 11, 16–18 (D.D.C. 2023).  After the Court

dismissed the original complaint without prejudice, Plaintiffs filed an amended complaint and included new allegations detailing the Republic and ZMDC's purported alter-ego relationship. Am. Compl. ¶¶ 41–80.  In turn, the Defendants moved to dismiss the amended complaint, contending that the Court lacks both subject matter and personal jurisdiction over them and that the complaint fails to state a claim.  Plaintiffs also filed a conditional cross-motion for jurisdictional discovery, requesting an opportunity to explore the Republic and ZMDC's relationship should the Court find Plaintiffs' alter-ego allegations inadequate.  Both motions are fully briefed.

## II.   Legal Standards

On a motion to dismiss for lack of subject matter jurisdiction or lack of personal jurisdiction, "[t]he plaintiff bears the burden of establishing, by a preponderance of the evidence, that the court has jurisdiction."  Cause of Action Inst. v. Internal Revenue Serv., 390 F. Supp. 3d 84, 91 (D.D.C. 2019) (quoting Whiteru v. Wash. Metro. Area Transit Auth., 258 F. Supp. 3d 175, 182 (D.D.C. 2017)).  Because this suit involves claims against a foreign nation, the FSIA provides the framework for determining subject matter jurisdiction.  Creighton Ltd. v. Gov't of State of Qatar, 181 F.3d 118, 121 (D.C. Cir. 1999).  Under the FSIA, a federal district court has original jurisdiction over a civil suit against a foreign state only if the foreign state is not entitled to immunity under the statute.  28 U.S.C. § 1330(a).  "[T]he FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies."  Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  Once the plaintiff has made that threshold showing, however, "the sovereign bears the ultimate burden of persuasion to show that the exception does not apply."  Id.; accord Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000)

1173

("'In accordance with the restrictive view of sovereign immunity reflected in the FSIA,' the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." (quoting <u>Transamerican S.S. Corp. v. Somali Democratic Republic</u>, 767 F.2d 998, 1002 (D.C. Cir. 1985))).

If, on the one hand, "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." <u>Phoenix Consulting</u>, 216 F.3d at 40.  On the other hand, if the motion to dismiss presents "a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA" by contesting a jurisdictional fact or raising a "mixed question of law and fact," such as whether the "person alleged to have harmed [the] plaintiff was [an] agent of [the] sovereign," then "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged" but instead "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." <u>Id.</u> (citing <u>Foremost-McKesson, Inc. v. Islamic Republic of Iran</u>, 905 F.2d 438, 448–49 (D.C. Cir. 1990)).

Defendants also move to dismiss under Rule 12(b)(6) for failure to state a claim.  In reviewing a Rule 12(b)(6) motion, the Court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." <u>Banneker Ventures, LLC v. Graham</u>, 798 F.3d 1119, 1129 (D.C. Cir. 2015). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," however, nor does the Court "assume the truth of legal conclusions." <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).  Accordingly, "[t]o survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" Id. (quoting Iqbal, 556 U.S. at 678).[1]

## III.  Analysis

Defendants' twin jurisdictional arguments—that the Court lacks subject matter and

personal jurisdiction over them—overlap and both hinge on whether ZMDC is the Republic's

alter ego.  The two involve other considerations as well, but the Court will begin by conducting

its alter-ego analysis in the context of the Republic's claim that the Court lacks subject matter

jurisdiction over it.

### A.  Subject Matter Jurisdiction

Unless one of the FSIA's exceptions to sovereign immunity applies, the FSIA bars suit

against foreign sovereigns.  Plaintiffs rely on two such exceptions: § 1605(a)(1)'s waiver

exception and § 1605(a)(6)'s arbitration exception.  The Court has already rejected the

application of the arbitration exception in this case, leaving just the waiver exception at issue.

See Amaplat, 663 F. Supp. 3d at 31–33.  Section 1605(a)(1) divests a sovereign of immunity

when "the foreign state has waived its immunity either explicitly or by implication,

notwithstanding any withdrawal of the waiver which the foreign state may purport to effect

except in accordance with the terms of the waiver."  28 U.S.C. § 1605(a)(1).  Plaintiffs maintain,

and ZMDC does not dispute, that ZMDC waived its sovereign immunity under § 1605(a)(1) by

agreeing to arbitrate disputes in the 2007 and 2008 Memoranda of Understanding ("MOUs")

between Plaintiffs and ZMDC and by participating in the arbitration in Zambia.  Am. Compl. ¶

---

[1]  As Plaintiffs' conditional cross-motion for jurisdictional discovery is moot in light of
the Court's opinion, the Court need not address the standard for jurisdictional discovery.

10.   Plaintiffs allege that ZMDC's waiver is attributable to the Republic because the two are alter egos.

### 1.   Alter-Ego Relationship

"A government instrumentality 'established as [a] juridical entit[y] distinct and independent from [its] sovereign should normally be treated as such,'" and therefore such entities are "presumed to have legal status separate from that of the sovereign."  Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 847 (D.C. Cir. 2000) (alterations in original) (quoting First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611, 627 (1983)).   "That presumption can be overcome," however, if the plaintiff demonstrates that the sovereign and instrumentality are alter egos.  Id. at 847–48.  The two are deemed alter egos in either of two circumstances: (1) the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) "recognition of the instrumentality as an entity apart from the state 'would work fraud or injustice.'"  Id. at 848 (quoting Bancec, 462 U.S. at 629).

To assess the presence of both circumstances, courts have "coalesced around [] five factors," dubbed the Bancec factors: (1) whether the government exercises economic control over the entity, (2) whether government officials manage the entity or its daily affairs, (3) whether the entity's profits go to the government, (4) whether the government is the sole beneficiary of the entity's conduct, and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.  Rubin v. Islamic Republic of Iran, 583 U.S. 202, 210 (2018) (cleaned up).[2]

---

[2]  The parties' briefing reflects understandable confusion about how the five Bancec factors fit into the two alter-ego inquiries, namely the principal-agent and fraud-or-injustice

The first step in the alter-ego analysis is to define the relevant time period, which the parties dispute.  See Mot. Dismiss at 16–17; Pls.' Opp'n at 29; Defs.' Reply at 4–5.  Defendants urge the Court to consider only events that occurred between ZMDC's signing of the MOUs with Plaintiffs (2007 and 2008) and ZMDC's participation in the arbitration (2011).  Mot. Dismiss at 16.  Plaintiffs counter that the Court should also consider facts that post-date the commencement of the arbitration, including, for example, information in a 2017 Zimbabwe Parliamentary report.  Pls.' Opp'n at 29–31, Third Declaration of Steven K. Davidson ("Third Davidson Decl.") Ex. F.  The Court's approach falls somewhere between the parties' positions.

For the principal-agent analysis (roughly mapping onto Bancec factors one through four), the Court will consider only facts that bear on whether ZMDC was Zimbabwe's alter ego from 2007 to 2011.  Of course, events that occurred soon before or after this period may be relevant to whether ZMDC acted as Zimbabwe's agent within this timeframe.  But the pertinent question is whether ZMDC was Zimbabwe's agent between 2007 and 2011.  This approach accords with the D.C. Circuit's guidance that jurisdiction over a sovereign cannot "necessarily" be maintained just because "a state and a state-owned corporation may in some circumstances be, respectively, principal and agent."  Transamerica, 200 F.3d at 850.  "[T]he agent's actions [must be] related to

---

inquiries.  See Pls.' Opp'n at 28–29; Defs.' Reply at 21–22.  In Rubin, the Supreme Court suggested that the Bancec factors apply to both.  538 U.S. at 210.  But the fit isn't perfect. Factors one through four bear more on the principal-agent inquiry.  The fifth Bancec factor— whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations—does capture notions of fraud and injustice.  But it is narrower than what courts have found relevant to the fraud-or-injustice prong.  For example, the Supreme Court in Bancec, as well as the D.C. Circuit in subsequent cases, considered as part of the fraud-or-injustice analysis whether the state had undercapitalized the instrumentality or transferred money to avoid debtors.  See Bancec, 462 U.S. at 633; Transamerica, 200 F.3d at 854.  The Court will therefore use the framework of the five Bancec factors but incorporate other considerations into the equity factor.  This flexible approach hews to the Supreme Court's guidance that the Bancec factors do not supply a "mechanical formula" for determining judicial separateness.  Rubin, 583 U.S. at 210 (quoting Bancec, 462 U.S. at 633).

the substance of plaintiff's cause of action." Id. (cleaned up); see also TIG Ins. Co. v. Republic

of Argentina, No. 18-mc-00129 (DLF), 2022 WL 1154749, at *9 (D.D.C. Apr. 18, 2022), order

corrected and superseded, No. 18-mc-00129 (DLF), 2022 WL 3594601 (D.D.C. Aug. 23, 2022)

(defining the "relevant time" for the principal-agent analysis as "when the contracts 'were

made.'").

Events that pre- or post-date 2007 to 2011 are relevant, however, to the fraud-or-injustice

prong. The Supreme Court adopted this approach in Bancec by considering the Cuban

government's conduct after the plaintiff filed suit. 462 U.S. at 615–16. Namely, the Court found

that because the government dissolved Bancec and transferred its assets to other entities, in order

to insulate those assets from possible counterclaims, "adher[ing] blindly to the corporate form"

"would cause [] an injustice." Id. at 632. The Court will therefore follow suit and assess the

Republic's conduct beyond 2011 as part of the fraud-or-injustice inquiry.

With these guideposts in place, the Court now turns to the Bancec factors.

a. Economic Control and Day-to-Day Management

Plaintiffs have demonstrated that the Republic exercised significant economic control

over ZMDC. ZMDC's organic statute, the ZMDC Act, vests the Republic with control over the

instrumentality. Under the act, the government's Minister of Mines appoints ZMDC's board

members. Third Davidson Decl., Ex. B ("ZMDC Act") § 5(1).[3] The act also mandates that the

---

[3] Defendants submit a declaration from Dominic Muzawazi, a Zimbabwean lawyer, explaining that subsequent legislation has superseded some of the ZMDC Act's provisions. Defs.' Reply, Declaration of Dominic Muzawazi ("Muzawazi Decl.") ¶ 3.2. Of relevance to the section cited above, Mr. Muzawazi notes that the Corporate Governance Act now requires the Minister of Mines to consult with the president before appointing or terminating ZMDC's board members. Id. ¶ 4.1 ("[T]he President now has a close control on [Board] appointments."). The Corporate Governance Act went into effect only in 2018, however, and therefore would not have impacted the Republic's authority over ZMDC during the relevant period. See Date of

Republic hold at least fifty-one percent of ZMDC's shares and conditions the sale of other shares on government ministers' approval.  Id. §§ 27(2), (5).  And from ZMDC's founding until at least September 2023, the Republic has owned 100 percent of ZMDC's shares.  Am. Compl ¶ 45; Muzawazi Decl. ¶ 4.  These factors alone do not establish an alter-ego relationship.  See Foremost-McKesson, 905 F.2d at 448 ("Majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA.").  But the ZMDC Act also grants the Minister of Mines authority to give ZMDC "directions of a general character relating to the exercise . . . of its functions, duties and powers," and ZMDC is required, "with all due expedition, [to] comply with [these] direction[s]."  ZMDC Act § 25.  Moreover, under Zimbabwe's Public Finance Management Act, ZMDC must notify and seek approval from the government before "the acquisition or disposal of a significant asset," "the commencement or cessation of a significant business activity," or "participation to a significant extent . . . in a partnership, trust, unincorporated joint venture or similar arrangement."  Defs.' Reply, Declaration of Quinn Smith ("Smith Decl."), Ex. Z ("PFM Act") § 48(3).[4]

The Republic's control is also "not merely aspirational."  See OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela, 73 F.4th 157, 172 (3d Cir. 2023) (finding Venezuela exercised economic control over a national oil company because "statements of authority [we]re not merely aspirational.")  A 2010 news article documented that the Minister of Mines "brought in" a new chairperson for ZMDC's Board, and then "at the instigation of [the] Mines Minister"

---

Commencement: Public Entities Corporate Governance Act (Jun. 8, 2018), https://perma.cc/9AV8-PLSJ.

[4]  The Public Finance Management Act went into effect April 2, 2010.  See PFM Act at 1.

1179

ZMDC's senior executives were placed on forced leave.  Third Davidson Decl., Ex. J at 1.[5]  But see Transamerica, 200 F.3d at 851 (finding no alter-ego relationship even when the Venezuelan government appointed members of an instrumentality's Board and "exercis[ed] its influence, through the Board of Directors, to put its own chosen manager in charge of a corporation.").

Plaintiffs have also submitted evidence that the Republic was involved in the "day-to-day operations" of ZMDC and its subsidiaries.  McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346, 352 (D.C. Cir. 1995).  In 2008, the U.S. Treasury Department's Office of Foreign Asset Controls ("OFAC") imposed sanctions against ZMDC and numerous other companies that supported the regime of former Zimbabwean President Robert Mugabe.  Third Davidson Decl., Ex. BB (OFAC press release) at 2.  In so doing, OFAC described ZMDC as "planning, coordinating and implementing mining projects on behalf of the Government of Zimbabwe."  Id. at 1.  And a 2013 Zimbabwe Parliamentary report noted that the Minister of Mines, not ZMDC's Board, controlled appointments to the boards of ZMDC's subsidiaries.  See Third Davidson Decl., Ex. U at 15 ("The ZMDC Board was rendered powerless when it came to the selection and appointment of members who sit on its subsidiary companies.  It[]s only function is to regulari[z]e [] appointments made by the Minister.").  Though a government's appointment of members to an instrumentality's board does not alone create an alter-ego relationship, see

---

[5]  The Court hesitates to rely on unsubstantiated newspaper articles, but Defendants themselves cite to this 2010 article as evidence that ZMDC had a board.  See Defs.' Reply at 19.  Moreover, though courts must rely only on "evidence satisfactory to the court" in deciding motions for default judgment under the FSIA, see 28 U.S.C. § 1608(e), and courts in this district have therefore rejected inadmissible hearsay when ruling on those motions, see, e.g., Strange v. Islamic Republic of Iran, No. 14-cv-435 (CKK), 2017 WL 11670394, at *1 (D.D.C. Feb. 8, 2017), the same standard does not apply to evidence used to establish subject matter jurisdiction.  In TJGEM LLC v. Republic of Ghana, for example, the D.C. Circuit considered information in "an internet news story" when analyzing the FSIA's commercial activity exception.  No. 14-7036, 2015 WL 3653187, at *1 (D.C. Cir. June 9, 2015) (ultimately concluding the allegations in the news story did not establish subject matter jurisdiction).

Transamerica, 200 F.3d at 851, the report found the Republic used board appointments to exercise control over ZMDC's subsidiaries.  As a result, the ZMDC Board "ha[d] little control and information over its subsidiary companies."  Id. at 15–16.[6]

        b.  Profits and Beneficiaries

Plaintiffs have also shown that the Republic took ZMDC's profits and was the beneficiary of its conduct during the relevant time period.  The Republic owns ZMDC shares (indeed, all of its shares) and therefore receives profits in the form of dividends.  Again, stock ownership does not alone create an alter-ego relationship.  See Transamerica, 200 F.3d at 849 ("A sovereign does not create an agency relationship merely by owning a majority of a corporation's stock. . . .").  But Plaintiffs have also offered evidence that, as early as 2008, government officials illegally diverted ZMDC's revenue to their own coffers.  OFAC placed ZMDC on its sanctions list that year because "Robert Mugabe, his senior officials, and regime cronies ha[d] used [ZMDC and other] entities to illegally siphon revenue and foreign exchange from the Zimbabwean people."  Third Davidson Decl., Ex. BB at 1.  And, in 2013, the State Department's Acting Assistant Secretary in the Bureau of African Affairs testified before Congress about similar misuse of mining funds.  Third Davidson Decl., Ex. MM (June 18, 2013 testimony).  He stated that the State Department was "concerned about ongoing reports that

---

[6]  Plaintiffs also cite a 2017 Zimbabwe Parliamentary report about Zimbabwe's diamond industry.  Pls.' Opp'n at 25.  The Court will not rely on the report because, as it describes, the Republic's level of control over the diamond industry shifted in 2015.  Previously, the Republic had "issue[d] multiple licenses to various investors."  Third Davidson Decl., Ex. F at 5.  In 2015, however, the government "centrali[zed] all diamond mines" in the Zimbabwe Consolidated Diamond Company, a subsidiary of ZMDC.  Id. at 5–6.  Analysis in the 2017 report therefore has limited relevance to the 2007 to 2011 time period.  Likewise, the Court will not rely on the 2017 to 2023 State Department Investment Climate Impact Reports cited by Plaintiffs.  See Third Davidson Decl. Exs. FF–LL.  The 2017 to 2022 reports all noted that "recent[ly]" the "government allow[ed] [ZMDC] to function without [a] board[]."  See, e.g., Third Davidson Decl. Ex. LL at 13.  Recently is likely not 2011.

diamond mining entities in Zimbabwe [we]re being exploited by people in senior government and military positions for personal gain, that revenues from those enterprises [we]re being diverted for partisan activities that undermine democracy, and that proceeds from diamond sales [we]re enriching a few individuals and not the Treasury and people of Zimbabwe." Id. at 2.

As other courts have found, officials' use of an instrumentality's funds for personal gain or policy goals contributes to the creation of an alter-ego relationship. In Transamerica, the D.C. Circuit held that an alter-ego relationship exists when the "affairs of the [instrumentality] [are] so intermingled that no distinct corporate lines are maintained" and cited as an example a company's use of its subsidiary's "profits for its own purposes." 200 F.3d at 849 (cleaned up). Likewise, in OI Eur. Grp. B.V., the Third Circuit held that Venezuela and a state instrumentality were alter egos because, among other things, Venezuela "committed [the instrumentality] to sell oil to [] allies at steep discounts" and senior officials used the instrumentality's "aircraft[s] for state purposes." 73 F.4th at 173. See also McKesson, 52 F.3d at 352 (finding an alter-ego relationship because the instrumentality's "policy was not commercial" and instead was guided by "government representatives"). Plaintiffs' evidence here is of a similar vein.

### c.  Fraud and Injustice

Under a narrow application of the fifth Bancec factor—whether adherence to separate identities would entitle the foreign state to benefits in U.S. courts while avoiding its obligations—Plaintiffs have not demonstrated that the Republic seeks any benefits from the U.S. legal system. But, more broadly, "recognition of [ZMDC] as an entity apart from the state 'would work fraud or injustice.'" Transamerica, 200 F.3d at 848 (quoting Bancec, 462 U.S. at 629). When a government shields its instrumentality from creditors—for example, by "thinly

capitaliz[ing]" the instrumentality or transferring its "assets to separate juridical entities"—this conduct supports an alter-ego finding.  See id. at 854; Bancec, 462 U.S. at 633.

And there is evidence that the Republic did exactly that.  According to a 2022 Zimbabwean news article, as legal judgments against ZMDC began to pile up, the Republic started "selling off parts" of the company.  Third Davidson Decl., Ex. NN at 3.  In 2018, the Republic issued a tender offer for six mines held by ZMDC.  Id.  In early 2022, the Minister of Mines then ordered that two of ZMDC's few remaining assets—the Kamativi and Todal mining projects—"be spirited away into a new government company, Defold," even though ZMDC's board expressed concern that the asset transfer was "illegal and against [ZMDC's] interest."  Id. at 2–3.  According to the article, the government made the transfer to "stave off US$467 million in claims from [ZMDC's] creditors."  Id. at 1.[7]  In April of that year, the Secretary for Finance and Economic Development approved the transfer of ZMDC's shares to Defold.  Third Davidson Decl., Ex. OO (April 14, 2022 approval letter).  The fraud-or-injustice inquiry therefore supports a finding that the Republic and ZMDC are alter egos.

In light of Plaintiffs' evidence, the Court finds that the Republic was ZMDC's alter ego and can therefore be subject to this Court's jurisdiction.  Moreover, because Plaintiffs seek to take jurisdictional discovery only "to prove that the Amended Complaint's alter ego allegations are true," the Court denies that motion as moot.  Pls.' Opp'n at 31.

---

[7]  Again, the Court is cautious not to put too much stock in news articles.  But Plaintiffs' other evidence—namely, the record indicating that the government authorized ZMDC to sell its shares in the Kamativi and Todal mining projects to Defold—substantiates the 2022 article. Third Davidson Decl., Ex. OO.  And, though Defendants take issue with Plaintiffs' citations to news articles and the government record, they do not deny that ZMDC's assets were diverted to Defold or offer countervailing evidence.  See Defs.' Reply at 22.

## 2. Remaining Subject Matter Jurisdiction Arguments

The subject matter jurisdiction analysis does not end with the alter-ego determination. Defendants suggest that, even if ZMDC is the Republic's alter ego, § 1605(a)(1)'s implied-waiver exception is still not satisfied. See Mot. Dismiss at 24–27; Defs.' Reply at 22–23. Defendants offer two supporting theories, but neither is availing. First, Defendants contend that a foreign state that "was not a party to the arbitration agreement" could not have impliedly waived its immunity to suit. Mot. Dismiss at 25; Defs.' Reply at 23. But the D.C. Circuit has rejected this argument; indeed, that is the whole point of the alter-ego exception. See Transamerica, 200 F.3d at 848 (the principal-agent and fraud-or-injustice alter-ego theories are "exceptions to the rule that a foreign sovereign is not amenable to suit based upon the acts of such an instrumentality").

Second, Defendants renew their argument that the waiver exception does not apply because the New York Convention governs enforcement of arbitration awards, not enforcement of foreign judgments confirming arbitral awards. Mot. Dismiss at 26–27. This theory would deprive the Court of jurisdiction over both the Republic and ZMDC, but the Court has already rejected it. See Amaplat, 663 F. Supp. 3d at 35–36. When a sovereign (or its instrumentality) waives immunity by signing on to the New York Convention and agreeing to arbitrate in another signatory's jurisdiction, "the cause of action to enforce [a] foreign judgment is within the scope of [that] implicit waiver of sovereign immunity." Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 582 (2d Cir. 1993).[8] "The cause of action is within the scope of the waiver because

---

[8] Although the Court adopted Seetransport's implicit-waiver rule in its ruling on Defendants' prior motion to dismiss, it cautioned that a panel of the D.C. Circuit recently

the cause of action is so closely related to the claim for enforcement of the arbitral award."  Id. at

583.[9]

The Court finds, accordingly, that it has subject matter jurisdiction over the Republic and

ZMDC.

B.  Personal Jurisdiction

1.  The Republic

Under the FSIA, personal jurisdiction exists over a foreign state if the district court has

subject matter jurisdiction and service has been effected.  28 U.S.C. § 1330(b).  In other words, a

simple equation governs:  "[S]ubject matter jurisdiction plus service of process equals personal

jurisdiction."  GSS Grp. Ltd. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting

Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002)).

The Republic does not dispute that it was properly served.  Thus, because the Court may

exercise subject matter jurisdiction over the Republic, it also has personal jurisdiction.

2.  ZMDC

The personal jurisdiction analysis is a bit more complicated for ZMDC.  "Whenever a

foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship

---

signaled concerns about the rule's application.  Amaplat, 663 F. Supp. 3d at 33–35; see also
Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria, 27 F.4th 771 (D.C. Cir. 2022).

[9] Defendants' Reply also seems to suggest that ZMDC could not have waived its
immunity to suit because it was improperly served in the Zambian award enforcement
proceeding.  Defs.' Reply at 23.  Putting aside whether Zambian service issues are properly
considered at this stage of proceedings, see Amaplat, 663 F. Supp. 3d at 39–40, as the Second
Circuit explained in Seetransport, it was ZMDC's agreement to arbitrate and its participation in
the arbitration proceeding—not its participation in the Zambian award proceeding—that waived
its immunity in this suit, see Seetransport, 989 F.2d at 582 ("Navimpex, a Romanian agency or
instrumentality, had implicitly waived its sovereign immunity because it was a signatory to the
Convention and had proceeded to arbitration in the I.C.C.").

arises between them, the instrumentality receives the same due process protection as the sovereign: none." GSS, 680 F.3d at 815.  In that situation, the simple equation for personal jurisdiction over a state—"subject matter jurisdiction plus service of process equals personal jurisdiction"—also applies to the instrumentality.  But, when an instrumentality is not the sovereign's alter ego, "the instrumentality [] enjoy[s] all the due process protections available to private corporations," including the requirement of "minimum contacts" with the relevant forum. Id. at 815, 817.  Plaintiffs have opted for the alter-ego route, contending that ZMDC is not entitled to due process protections due to the Republic's substantial control over it.  The Court agrees.  Since ZMDC and the Republic are alter egos, personal jurisdiction over ZMDC is satisfied by subject matter jurisdiction and service.[10]  As the Court has already concluded it may exercise subject matter jurisdiction over ZMDC, all that is left to consider is service.[11]  And the Court finds service was proper:  Plaintiffs served ZMDC pursuant to the "special arrangement" in the 2007 and 2008 MOUs.  See 28 U.S.C. § 1608(b)(1).

The FSIA creates a "hierarchical regime for the appropriate methods of service" on agencies or instrumentalities of a foreign state.  Est. of Hartwick v. Islamic Republic of Iran, No. 18-cv-1612, 2021 WL 6805391, at *8 (D.D.C. Oct. 1, 2021).  The first-choice method in the

---

[10]  Defendants claim Plaintiffs "cannot rely on contradictory arguments" to establish jurisdiction and therefore cannot contend ZMDC is an "instrumentalit[y] [or] agenc[y]" after arguing it is Zimbabwe's "alter ego."  Defs.' Reply at 24.  The two theories offered by Plaintiffs are not contradictory:  ZMDC can be both an instrumentality and an alter ego of the Republic.  In fact, the D.C. Circuit defined the alter-ego doctrine as applying to a "sovereign" that dominates its "instrumentality."  See Transamerica, 200 F.3d at 848 ("A sovereign is amenable to suit based upon the actions of an instrumentality it dominates because the sovereign and the instrumentality are in those circumstances not meaningfully distinct entities; they act as one.").

[11]  As noted above, Defendants made, and the Court rejected, the contention that subject matter jurisdiction over ZMDC does not lie because service in the Zambian award proceedings was allegedly improper and because ZMDC's waiver does not extend to this suit.

hierarchy, and the one Plaintiffs used, allows a party to effect service by "deliver[ing] [] a copy of the summons and complaint in accordance with [a] special arrangement for service between the plaintiff and the agency or instrumentality."  28 U.S.C. § 1608(b)(1).  The MOUs contain the following "special arrangement":

> The Parties choose the following physical addresses at which documents in legal proceedings or any written notices in connection with this MOU may be served. . . .  Any notice given in terms of this MOU shall be in writing and shall if delivered by hand to a responsible person during ordinary business hours at the physical address chosen as its *domicilium citandi et executandi* be deemed to have been duly received by the addressee.

Am. Compl. Ex. B §§ 12.8.1–2 (emphasis added); Am. Compl. Ex. D §§ 10.9.1–2 (emphasis added).  The MOUs further provide that "a written notice or communication actually received by one of the Parties from the other Party shall be adequate written notice or communication to such Party."  Am. Compl. Ex. B § 12.8; Am. Compl. Ex. D § 10.9.

Plaintiffs complied with the special arrangement in the MOUs:  They hand delivered copies of the summons, complaint, and notice of suit to Theresa Kanengoni, "a secretary for Zimbabwe Mining Development Corporation," who "stated that she was authorized to accept service" for ZMDC.  Return of Service [ECF No. 24] ¶¶ 2–4.[12]

---

[12]  As Plaintiffs acknowledge, they hand delivered the papers to a different address than the one listed for ZMDC in the MOUs.  See Pls.' Opp'n at 37; Return of Service ¶ 3.  ZMDC does not suggest that this change rendered service improper, and, in any event, service was still proper for several reasons.  First, prior to the date of service, ZMDC notified Plaintiffs that its address had changed.  See Second Declaration of Steven K. Davidson, Ex. 1 [ECF No. 32–2].  And, as other courts have noted, it would be "senseless" to attempt service at a location plaintiffs know the defendant does not occupy.  Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo, 131 F. Supp. 2d 248, 251 (D.D.C. 2001).  Second, the MOUs allow some wiggle room; they provide that "a written notice or communication *actually received* by one of the Parties from the other Party shall be adequate written notice or communication to such Party."  Am. Compl. Ex. B § 12.8 (emphasis added); Am. Compl. Ex. D § 10.9 (emphasis added).  Finally, 28 U.S.C. § 1608(b) also permits some flexibility:  "[S]ection 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state."  Transaero, Inc. v.

ZMDC contends that Plaintiffs cannot rely on the MOUs' special service provision for two reasons:  (1) the MOUs were terminated as a result of the arbitration proceedings and (2) even if the MOUs' service provisions survived contract termination, they do not apply in a proceeding to enforce an arbitration award.  Defs.' Reply at 24–25.

As to the first contention, other district courts, including at least one in this district, have held that service under the FSIA can be effected pursuant to a special service provision in a terminated contract.  In G.E. Transp. S.P.A. v. Republic of Albania, for example, petitioners sought confirmation of an arbitral award against the Republic of Albania.  693 F. Supp. 2d 132, 133 (D.D.C. 2010).  Even though the arbitral tribunal determined the underlying contract was no longer in effect (in fact, the tribunal determined the contract never "enter[ed] into force" because Albania "prevented [its] reali[z]ation"), the district court still held the petitioners could rely on the contract's special service provision.  Id. at 136–37; Petition, Ex. A at 60, G.E. Transp. S.P.A. v. Republic of Albania, 693 F. Supp. 2d 132, 133 (D.D.C. 2010) (No. 08-cv-2042), ECF No. 1–1.  Likewise in Arbitration Between Space Systems/Loral, Inc. v. Yuzhnoye Design Office, the court found "[t]he fact that [the plaintiff] purported to terminate the contract at some point before serving its petition [did] not prohibit it from using the special arrangement established" in the contract. 164 F. Supp. 2d 397, 403 (S.D.N.Y. 2001).

This view—that special service provisions can survive contract termination—accords with the Supreme Court's holding in Nolde Brothers, Inc. v. Local No. 358, Bakery and Confectionary Workers Union.  430 U.S. 243 (1977).  There, the Supreme Court considered whether a mandatory arbitration clause (and not a special service provision) survived contract

---

La Fuerza Aerea Boliviana, 30 F.3d 148, 153 (D.C. Cir. 1994); see also Agudas Chasidei Chabad of U.S. v. Russian Fed'n, 798 F. Supp. 2d 260, 267 (D.D.C. 2011) (applying a "substantial compliance" standard to service of agencies or instrumentalities under § 1608(b)).

termination and therefore governed the parties' dispute over severance pay.  Id. at 244.  The arbitration clause at issue provided that "'any grievance' arising between the parties was subject to binding arbitration."  Id. at 245.  The Supreme Court found the arbitration clause governed:  A contract provision "survive[s] contract termination when the dispute [i]s over an obligation arguably created by the expired agreement."  430 U.S. 243, 252 (1977) (citing John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 552 (1964)); see also Livingston, 376 U.S. at 553 (a provision requiring arbitration for any disputes "arising out of or relating to [the] agreement, or its interpretation or application, or enforcement" survived termination).

The same is true here for MOUs' special service provisions.  Though the arbitral panel considered a number of arguments, the core of the dispute was whether ZMDC illegally cancelled the MOUs.  See Am. Compl. Ex. A ¶¶ 7–8, 92, 179.  A dispute about whether a contract can be cancelled—or, put differently, whether a contract remains binding—is a dispute "over an obligation [] created" by the contract.  The special service provision therefore survived contract termination.

Second, ZMDC contends that the service provisions do not cover actions to enforce arbitral judgments.  This comes down to contract interpretation.  As noted above, the MOUs' service provisions provide (1) that "documents in legal proceedings or any written notices in connection with this MOU may be served" at listed addresses and (2) that "[a]ny notice given in terms of this MOU . . . shall[,] if delivered by hand to a responsible person . . . at the physical address chosen as its *domicilium citandi et executandi*[,] be deemed to have been duly received."  Am. Compl. Ex. B §§ 12.8.1–2 (emphasis added); Am. Compl. Ex. D §§ 10.9.1–2 (emphasis added).

The MOUs' service provisions extend to the current case. *Domicilium citandi et executandi* is a term in Zimbabwean and South African law that refers to the address for service of process. <u>See</u> Pls.' Opp'n at 36; Christian Schulze, <u>Practical Problems Regarding the Enforcement of Foreign Money Judgments</u>, 17 S. Afr. Mercantile L. J. 125, 131 (2005) ("[A] domicilium citandi et executandi" refers to a "domicile for the purpose of facilitating service of process and levying execution."). Because the MOUs used this term of art, it is clear the parties intended for hand-delivery to the chosen location to satisfy service of process in legal proceedings.

Defendants nevertheless contend that the service provisions' phrase "in connection with this MOU" renders the provisions inapplicable to actions to enforce arbitral judgments. <u>See</u> Defs.' First Reply [ECF No. 34] at 9–10 ("Under section 12.8 and section 10 of MOUs, ZMDC only agreed to accept service of 'documents in legal proceedings or any written notices in connection with the' MOUs . . . . Plaintiffs are not seeking relief under the MOUs, such as a finding of a breach of the MOUs. Rather, the Complaint is connected to the Zambian High Court's order."). Yet the D.C. Circuit has held that the phrase "in connection with" is "quite broad." <u>Azima v. RAK Inv. Auth.</u>, 926 F.3d 870, 877 (D.C. Cir. 2019). It is equivalent to the phrase "in relation to," and a dispute arises "in relation to" an agreement so long as "the origin of the dispute is related to that agreement, meaning it has some logical or causal connection to the agreement." <u>Id.</u> (cleaned up). Applying these definitions, the D.C. Circuit rejected the notion that a claim "is 'in connection with' a contract only when 'the dispute occurs as a fairly direct result of the performance of contractual duties.'" <u>Id.</u> at 878. Though the current suit is now several steps removed from the original arbitration, it still has a direct "logical or causal connection" to the MOUs. Plaintiffs won an arbitration award finding Defendants illegally

terminated the MOUs, a Zambian court confirmed that award, and now Plaintiffs seek to have it enforced.

Moreover, the MOUs specifically contemplated that the parties might dispute the confirmation or enforcement of awards. See Am. Compl. Ex. B § 11 ("[A]ny Party may submit [a] dispute to ICC International Court of Arbitration in Paris for arbitration . . . , the award of which shall be final and binding upon all Parties."); Am. Compl. Ex. D § 9 (same). See also Yuzhnoye Design Off., 164 F. Supp. 2d at 403 (finding a special service provision applied to arbitration enforcement actions because the parties' contract "specifically contemplate[d] that 'disputes between the [p]arties arising out of [the contract]' [would] be submitted to arbitration and that the parties [could] apply for judicial confirmation of an arbitration award"). "If [ZMDC] had wished to mark a narrower boundary for th[e] [service] clause[s], [it] could have easily done so." Azima, 926 F.3d at 878.. It did not, so it cannot now claim that service pursuant to the special arrangements was improper.

The personal jurisdiction equation is therefore solved: The Court has subject matter jurisdiction over ZMDC and Plaintiffs properly served ZMDC, ergo the Court has personal jurisdiction over ZMDC.

C. Failure to State a Claim

Finally, Defendants contend that Plaintiffs have failed to plead facts sufficient to establish an alter-ego relationship. As Defendants acknowledge, however, the standard under Rule 12(b)(6) is "more forgiving than that applicable to allegations for establishing personal and subject-matter jurisdiction." Mot. Dismiss at 31. See also Citizens for Resp. & Ethics in Washington v. Pruitt, 319 F. Supp. 3d 252, 256 (D.D.C. 2018) ("The standard to survive a motion to dismiss under Rule 12(b)(1) is less forgiving" than Rule 12(b)(6)'s standard.) Thus,

1191

for the reasons explained above, the Court finds Plaintiffs have pled facts sufficient to establish that the Republic and ZMDC are alter egos.

The Court therefore denies Defendants' motion to dismiss.  To avoid juggling two complaints and because the Amended Complaint reincorporates the original complaint's allegations against the Chief Mining Commissioner, the Amended Complaint shall be the operative complaint for all three defendants.

## IV.  Conclusion

For these reasons, it is hereby

**ORDERED** that [ECF No. 42] Defendants' Motion to Dismiss is DENIED.  It is further

**ORDERED** that [ECF No. 46] Plaintiffs' Cross-Motion for Jurisdictional Discovery is DENIED as moot.  It is further

**ORDERED** that the Amended Complaint shall be the operative complaint in this case.  It is further

**ORDERED** that the Republic, ZMDC, and the Chief Mining Commissioner are directed to file an answer to Plaintiffs' Amended Complaint by March 11, 2024.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>February 9, 2024</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Amaplat Mauritius Ltd**, *et al.*,  )<br>  )<br> **Plaintiffs**,  )<br>  )<br> v.  )<br>  )<br> **Zimbabwe Mining Development**  )<br> **Corporation**, *et al.*,  )<br>  )<br> **Defendants.**  ) | **Case No. 1:22-cv-00058 (CRC)** |

## NOTICE OF APPEAL

Pursuant to Rule 4(a)(1)(A) of the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit, Defendants, Zimbabwe Mining Development Corporation ("ZMDC"); Chief Mining Commissioner, Ministry of Mines of Zimbabwe (the "Commissioner"); and the Republic of Zimbabwe ("Zimbabwe") hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Memorandum Opinion and Order [ECF No. 51] denying the Motion to Dismiss filed by Defendants, and the Memorandum Opinion and Order [ECF No. 38] denying the Motion to Dismiss filed by Zimbabwe and the Commissioner.

Dated: March 8, 2024

Respectfully submitted,
/s/      *Quinn Smith*
**GST LLP**
Quinn Smith
DCD Bar No. FL0027
quinn.smith@gstllp.com
Katherine Sanoja
DC Bar No. 1019983

1

1193

katherine.sanoja@gstllp.com
1111 Brickell Avenue
Suite 2715
Tel. (305)-856-7723

1194

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2024, I electronically filed this document with the Clerk of the Court of the U.S. District Court of the District of Columbia by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel off record. I further certify that I am unaware of any parties who will not receive such notice.


By:     /s/ *Quinn Smith*
        Quinn Smith

1195