ORAL ARGUMENT NOT YET SCHEDULED

No. 24-7030

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

AMAPLAT MAURITIUS LTD.; AND AMARI NICKEL HOLDINGS ZIMBABWE LTD.,

Plaintiffs-Appellees

- against -

ZIMBABWE MINING DEVELOPMENT CORPORATION; CHIEF MINING
COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE; AND
REPUBLIC OF ZIMBABWE

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Columbia
No. 1:22-cv-00058
Hon. Christopher Reid Cooper

_____

FINAL BRIEF FOR PLAINTIFFS-APPELLEES

_____

Robert W. Mockler               Steven K. Davidson
Joseph M. Sanderson             STEPTOE LLP
STEPTOE LLP                     1330 Connecticut Ave. NW
1114 Avenue of the Americas     Washington, DC 20036
New York, New York 10036        Phone: 202-429-3000
Phone: 212-506-3900             SDavidson@steptoe.com
RMockler@Steptoe.com
JoSanderson@Steptoe.com

                                *Counsel for Plaintiffs-Appellees*


August 29, 2024

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.     PARTIES AND AMICI

All parties, intervenors, and amici appearing before the District Court and in this court are listed in the Brief for Appellants.

## B.     RULINGS UNDER REVIEW

References to all rulings at issue appear in the Brief for Appellants.

## C.     RELATED CASES

All related cases appear in the Brief for Appellant.

 /s/ Steven K. Davidson
Steven K. Davidson
STEPTOE LLP
1330 Connecticut Ave. NW
Washington, DC 20036
Phone: 202-429-3000
SDavidson@steptoe.com
*Counsel for Plaintiffs-Appellees*

Dated:     August 29, 2024

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees Amaplat Mauritius Ltd., and Amari Nickel Holdings Zimbabwe Ltd. have no parent company that is held by the public, but they are each majority-owned by Zimbabwe Investment Holdings, Ltd., a privately-held company, which is a wholly-owned subsidiary of Hybrid Capital Group, Inc., which has no parent company. No publicly-held company owns 10% or more of their stock.

/s/ Steven K. Davidson
Steven K. Davidson
STEPTOE LLP
1330 Connecticut Ave. NW
Washington, DC 20036
Phone: 202-429-3000
SDavidson@steptoe.com
*Counsel for Plaintiffs-Appellees*

Dated:     August 29, 2024

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................iv

GLOSSARY ...........................................................................................ix

PRELIMINARY STATEMENT ............................................................... 1

COUNTERSTATEMENT OF JURISDICTION ....................................... 2

COUNTERSTATEMENT OF ISSUES PRESENTED............................. 2

STATEMENT OF THE CASE ................................................................ 4

    A.    ZMDC Is Controlled by the Zimbabwean Government, Through the Ministry of Mines. ............................................... 4

    B.    Plaintiffs Invest in Zimbabwe, Making Sure to Insist on International Arbitration Provisions. ................................ 7

    C.    The Minister of Mines and His Hand-Picked ZMDC Board Chair Take Charge of ZMDC and Dismiss Its CEO............................................................................................. 9

    D.    Using Its Total Control Over ZMDC, Zimbabwe Strips Plaintiffs of Their Mining Concessions. ................................ 10

    E.    Zimbabwe Continues to Manipulate ZMDC and Divert Its Assets for Domestic and Foreign Policy Goals, Enrichment of Regime Insiders, and to Frustrate Creditors. ................................................................................ 12

    F.    Plaintiffs Pursue Arbitration and Obtain An Award. .......... 16

    G.    Zimbabwe's Unsuccessful Post-Award Litigation and the Entry of the Award as A Zambian Judgment. ............... 18

    H.    Zimbabwe Continues to Defraud ZMDC's Creditors, Specifically Including Plaintiffs. ........................................... 19

I.    The U.S. District Court Proceedings. ..................................... 20

SUMMARY OF ARGUMENT ................................................. 25

STANDARD OF REVIEW ..................................................... 29

ARGUMENT .......................................................................... 30

I.    Under Both the Implied Waiver and Arbitration Exceptions
      to the FSIA, U.S. Courts Have Jurisdiction Over ZMDC and
      the Commissioner Based on Their Submission to Arbitration
      Overseas ..................................................................... 30

      A.    ZMDC and the Commissioner Impliedly Waived
            Sovereign Immunity by Submitting to Arbitration in A
            New York Convention Jurisdiction. ...................... 32

            1.    Congress and the Courts Have Long Found
                  Agreeing to Binding Arbitration Where All
                  Relevant States Are New York Convention
                  Parties Implicitly Waives Sovereign Immunity. ......... 33

            2.    As *Seetransport* Correctly Holds, The Implicit
                  Waiver Does Not Turn on the Particular
                  Procedure Used to Enforce an Award. ......................... 40

      B.    Jurisdiction in Any Event Exists Under the Arbitration
            Exception. ....................................................... 44

      C.    The FAA's Statute of Limitations Does Not Negate
            FSIA Exceptions. ............................................... 47

II.   Zimbabwe Is ZMDC's Alter Ego, So ZMDC's Waiver Is
      Zimbabwe's. ................................................................. 49

      A.    Zimbabwe Shows No Clear Error in The Trial Court's
            Findings of Day-to-Day Control, Diversion of Assets to
            Government Officials, Fraudulent Transfers, and
            Much, Much More. ............................................ 50

1. Zimbabwe Ignores the Standard of Review. .................50

2. The Trial Court's Findings Lead to Alter Ego Status. ........................................................51

B. Alter Ego Liability Does Not Turn on Whether Fraud Specifically Targeted the United States. .............................56

C. Post-Breach Fraud Is Relevant to Alter Ego Status. ...........58

III. ZMDC Agreed to Service at Its *Domicilium Citandi* and Cannot Evade It by Withholding Formal Notice of Its Change of Address..........................................................59

IV. The Commissioner—A Regulatory Office—Is Part of the Zimbabwean State...............................................64

V. Defendants' Effort to Incorporate by Reference Arguments Below Is Improper. ...........................................66

CONCLUSION ........................................................66

CERTIFICATE OF COMPLIANCE WITH
        TYPE-VOLUME LIMITATION,
        TYPEFACE REQUIREMENTS, AND TYPE STYLE
        REQUIREMENTS.........................................67

CERTIFICATE OF SERVICE.............................................68

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Airadigm Commc'ns, Inc.*,
  616 F.3d 642 (7th Cir. 2010) ................................................................. 61

*Angellino v. Royal Fam. Al-Saud*,
  688 F.3d 771 (D.C. Cir. 2012) ............................................................... 61

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) ................................................................................ 48

*Azima v. RAK Inv. Auth.*,
  926 F.3d 870 (D.C. Cir. 2019) ............................................................... 62

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
  447 F.3d 411 (5th Cir. 2006) ......................................................... 50, 56

*Commissions Imp. Exp. S.A. v. Republic of the Congo*,
  757 F.3d 321 (D.C. Cir. 2014) (*Comimpex*) ........... 43, 44, 45, 46, 47, 48

*Comparelli v. Republica Bolivariana De Venezuela*,
  891 F.3d 1311 (11th Cir. 2018) ............................................................. 57

*Creighton Ltd. v. Gov't of State of Qatar*,
  181 F.3d 118 (D.C. Cir. 1999) .............................. 33, 34, 35, 39, 40, 57

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  932 F.3d 126 (3d Cir. 2019) .................................................................. 56

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
  104 F.4th 287 (D.C. Cir. 2024) ............................................................. 30

*EM Ltd. v. Banco Central de la Republica Argentina*,
  800 F.3d 78 (2d Cir. 2015) .................................................................... 59

*First Nat'l City Bank v. Banco Para El Comericio Exterior de Cuba*,
  462 U.S. 611 (1983) (*Bancec*) ............... 23, 49, 51, 52, 53, 55, 56, 58, 59

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990) ............................................................... 34

*Funnekotter v. Agric. Dev. Bank of Zimbabwe*,
  No. 13 Civ. 1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec.
  17, 2015) ...................................................................................... 20, 22

*Int'l Rd. Fed'n v. Embassy of the Democratic Republic
  of the Congo*,
  131 F. Supp. 2d 248 (D.D.C. 2001) ............................................... 61, 64

*Ivanenko v. Yanukovich*,
  995 F.3d 232 (D.C. Cir. 2021) ............................................................ 35

*Khochinsky v. Republic of Poland*,
  1 F.4th 1 (D.C. Cir. 2021) ................................................................... 35

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013) ............................................................................ 57

*Loper Bright Enters. v. Raimondo*,
  No. 22-1219, 2024 WL 3208360 (U.S. June 28, 2024) ....................... 38

*McKesson Corp. v. Islamic Republic of Iran*,
  52 F.3d 346 (D.C. Cir. 1995) ......................................................... 53, 54

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006) .............................................................................. 62

*OI European Grp. B.V. v. Bolivarian Republic of Venezuela*,
  73 F.4th 157 (3d Cir. 2023) .............................................. 53, 54, 58, 59

*Posadas v. Nat'l City Bk. of N.Y.*,
  296 U.S. 497 (1936) ............................................................................ 38

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  389 F.3d 192 (D.C. Cir. 2004) ............................................................ 29

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
  27 F.4th 771 (D.C. Cir. 2022) (*P&ID*) .......................................... 31, 37

*Robbins v. S. Gen. Ins. Co.,*
  243 A.2d 686 (D.C. 1968) ................................................................ 63

*Rubin v. Islamic Republic of Iran,*
  138 S. Ct. 816 (2018) ...................................................................... 52

*Ry. Mail Ass'n v. Moore,*
  15 F.2d 547 (4th Cir. 1926) ............................................................ 63

*Samantar v. Yousuf,*
  560 U.S. 305 (2010) ........................................................................ 65

*Saudi Arabia v. Nelson,*
  507 U.S. 349 ................................................................................... 30

*Schimmelpennich v. Bayard,*
  26 U.S. 264 (1828) .......................................................................... 61

*Seetransport Wiking Trader Schiffahrtsgesellschaft MBH &*
  *Co., Kommanditgesellschaft v. Navimpex Centrala*
  *Navala,*
  29 F.3d 79 (2d Cir. 1994) (*Seetransport II*) ............................... 41, 48

*Seetransport Wiking Trader Schiffahrtsgesellschaft MBH &*
  *Co., Kommanditgesellschaft v. Navimpex Centrala*
  *Navala,*
  989 F.2d 572 (2d Cir. 1993) (*Seetransport I*) ....... 22, 25, 34, 35, 40, 41,
  ........................................................................... 42, 43, 47, 57

*Tatneft v. Ukraine,*
  771 F. App'x 9 (D.C. Cir. 2019) ............................................. 33, 37, 38

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
  30 F.3d 148 (D.C. Cir. 1994) .......................................................... 51

*Transamerica Leasing, Inc. v. La Republica de Venezuela,*
  200 F.3d 843 (D.C. Cir. 2000) .................................................. 49, 50, 54

*Transamerican S.S. Corp. v. Somali Democratic Republic,*
  767 F.2d 998 (D.C. Cir. 1985) ........................................................ 30

*World Wide Mins., Ltd. v. Republic of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir. 2002) ........................................... 35

**Statutes**

9 U.S.C. § 207 ................................................................. 3, 46, 47

28 U.S.C. § 1292 ...................................................................... 2

28 U.S.C. § 1605(a)(1) ................................................. 3, 22, 25, 30, 39

28 U.S.C. § 1605(a)(6) ........................... 3, 25, 30, 38, 39, 44, 45, 46, 57

28 U.S.C. § 1608(a)(3) ........................................................... 20

28 U.S.C. § 1608(b)(3)(B) ........................................................ 20

**Legislative Materials**

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976
    U.S.C.C.A.N. 6604 ........................................................... 8

**International Materials**

*African Consol. Res. Plc v. Minister of Mines & Mining
    Develop.*,
    No. HC 1345/10, [2010] ZWHHC 57 (Zim.) ......................... 65

*CC/Devas (Mauritius) Ltd. c. Republic of India*, 2022 QCCS
    4785 (Can.), *leave granted*, 2023 QCCA 327 (Can.) ........................ 39

*Marasha v. Shirihuru*,
    Nos. HH 565/15 & HC 9059/14, [2015] ZWHHC 656 (Zim.) .............. 65

Mines and Minerals Act 1961 c.21:05 § 343 (Zim.) ................................. 65

New York Arbitration Convention on the Recognition and
    Enforcement of Foreign Arbitral Awards, June 10, 1958,
    330 U.N.T.S. 3 ................................................................. 16

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .................................................. 38

Black's Law Dictionary (12th ed. 2024) .................................................. 45

72 C.J.S. *Process* § 126 .............................................................. 64

# GLOSSARY

| Abbreviation | Definition |
|---|---|
| Amaplat | Amaplat Mauritius, Ltd. |
| Amari | Amari Nickel Holdings Zimbabwe Ltd. (and its predecessor in interest, Amari Holdings Ltd.) |
| Commissioner | Defendant Chief Mining Commissioner, Ministry of Mines of Zimbabwe |
| FAA | Federal Arbitration Act of 1925 |
| FSIA | Foreign Sovereign Immunities Act of 1976 |
| The Republic | Defendant Republic of Zimbabwe |
| ZMDC | Zimbabwe Mining Development Corporation |
| MOUs | The Memoranda of Understanding dated November 22, 2007 (Amari) and July 25, 2008 (Amaplat) |
| FSIA | The Foreign Sovereign Immunities Act of 1976 |
| UFCMJRA | D.C. Uniform Foreign Country Money Judgments Recognition Act of 2011 |
| Op. | The District Court's Memorandum Opinion issued February 9, 2024 |

## PRELIMINARY STATEMENT

This case is about Plaintiffs' efforts to collect on a judgment it obtained on a lawfully recognized arbitration award against Zimbabwe's state-owned monopoly ZMDC, its Ministry of Mines and now, because of Zimbabwe's complete domination of its instrumentalities, the state itself. Plaintiff, through joint ventures with ZMDC, invested millions of dollars to turn Zimbabwe's underdeveloped natural resource reserves into functioning mines. But owing to corruption and cronyism at the Ministry of Mines, which completely controls ZMDC, ZMDC terminated Plaintiffs' concessions to award them to political allies instead. Pursuant to the parties' agreements and arbitration terms of reference, Plaintiffs commenced and won an arbitration award in Zambia against ZMDC and the Commissioner, which was entered as a judgment by Zambian courts.

After ZMDC and the Commissioner refused to honor that award and judgment and the Zimbabwean Government continued to attempt to divert ZMDC's assets to frustrate its creditors, Plaintiffs brought suit here to seek recognition of the Zambian judgment confirming the award. Defendants sought sovereign immunity, but the district court

correctly denied it. Decades of case law, in this Court and elsewhere, hold that when one party to the New York Convention agrees to arbitrate in another country that is also party to the New York Convention, it anticipates entry of the award as a judgment in any other party to the Convention. Similarly, Defendants show no error— still less clear error—in the court's alter ego findings. Zimbabwe's meddling in everyday operations at ZMDC, disregard for corporate boundaries when it comes to ZMDC's management and assets, and efforts to transfer assets to new entities to evade ZMDC's creditors all are classic types of conduct that warrant treating a state and its state-owned entity as one and the same. The District Court's order should be affirmed.

## COUNTERSTATEMENT OF JURISDICTION

While Amari and Amaplat disagree with Appellants' contentions as to the underlying dispute as to subject-matter jurisdiction, they agree that this Court has jurisdiction under 28 U.S.C. § 1292 *solely* as to claims of sovereign immunity and not as to any other issue.

## COUNTERSTATEMENT OF ISSUES PRESENTED

The issues presented are:

1. **"Implied Waiver" Exception.** Did the District Court correctly hold that ZMDC impliedly waived its sovereign immunity under FSIA's implied waiver exception (28 U.S.C. § 1605(a)(1)) by agreeing to arbitrate in a New York Convention jurisdiction?

2. **Arbitration Exception.** Is Plaintiffs' judgment also enforceable under FSIA's arbitration exception (28 U.S.C. § 1605(a)(6)), which provides an exception to immunity "to enforce an [arbitration] agreement made by the foreign state *** or to confirm an award *** governed by a treaty *** calling for the recognition and enforcement of arbitral awards"?

3. **FAA Statute of Limitations in Non-FAA Case.** Did the District Court properly conclude that the Federal Arbitration Act's three-year statute of limitations applicable to the statute's cause of action to enforce an award (9 U.S.C. § 207) did not impliedly limit FSIA's sovereign immunity exceptions when an award is recognized and enforced through an independent cause of action?

4. **Alter Ego.** Did the District Court correctly hold that ZMDC was an alter ego of Zimbabwe, based on its extensive findings of fact—that Zimbabwe used its total control over ZMDC to expropriate Plaintiffs' concessions, to dissipate ZMDC's assets to political and geopolitical allies, and to plot to transfer ZMDC's remaining assets to new state-owned entities for the stated purpose of frustrating ZMDC creditors?

5. **Service.** Did the District Court properly conclude that Plaintiffs properly served ZMDC at its headquarters, under a provision for "legal documents" to be "served" at its headquarters and correspondence listing ZMDC's new headquarters' address after it moved offices?

6. **Statutory Office as Political Subdivision.** Did the district court correctly find that the Chief Mining Commissioner is a

political subdivision of Zimbabwe, where the Commissioner holds a statutory office under Zimbabwean law and sues and is sued by that title?

## STATEMENT OF THE CASE

### A. ZMDC Is Controlled by the Zimbabwean Government, Through the Ministry of Mines.

Zimbabwe has the world's second-biggest platinum and chrome deposits, and large deposits of diamonds, gold, coal, nickel, and iron ore, making the mining industry the most important one for Zimbabwe's economy. JA471-77. In 1983, as part of a major effort to ensure that Zimbabwe benefited from its natural resources, newly-independent Zimbabwe enacted the Zimbabwe Mining Development Corporation Act. JA478-92. Under Zimbabwean law, mining deposits belong to the state. JA504 § 2. Given its purpose to ensure government control of the mining industry, scholars of Zimbabwe refer to ZMDC as an "arm[] of the state" and "a state institution." JA669, JA678.

ZMDC's structure—and its subordination to the Ministry of Mines—are defined in the Zimbabwe Mining Development Corporation Act. The Government owns ZMDC entirely. JA486 §§ 27(2) & (5)).

ZMDC is strictly mandated to follow Government policy:

> It shall be the duty of the Corporation so to exercise—(a) that every application or proposal

> dealt with by it is considered strictly in
> accordance with Government economic policy; (b)
> that all matters relating to the mining industry
> are carefully reviewed in the national interest;
> and (c) that generally the activities of the
> Corporation referred to in section twenty are
> directed towards implementing Government
> mining development policy."

JA485 § 23.

Consistent with this, the Minister of Mines has the absolute power to direct ZMDC's Board to do whatever the Minister deems "to be requisite in the national interest," and the Board "shall, with all due expedition, comply with any direction" that the Minister gives. JA485 § 25.

The Minister has plenary control over ZMDC's Board. The Minister appoints ZMDC's Board and Chairman. JA481 § 5. The Minister determines their terms of appointment and conditions of appointment, meaning that they serve at the pleasure of the Minister JA481 § 6. The Minister determines their compensation. JA483 § 13. The Minister has broad removal powers on top of this. JA482 § 9. The Minister must approve the Board's choice of manager. JA485 § 24(1)(a). Similarly, the Board is required to obtain the Government's approval, through the Minister, for a vast range of basic activities, including

making investments or loans (JA487 § 34), managing its general reserve account (JA488 § 36(3)), and share transfers (JA486 § 27(4)). And those are just the *formal* powers conferred by the Act.

Beyond those formal powers, ZMDC's domination by the Ministry and its disregard for corporate formalities is well-known in Zimbabwe. Sternford Moyo, an eminent Zimbabwean Legal Practitioner and former International Bar Association President and chair of the Zimbabwe Revenue Authority, has more than 40 years of experience dealing with mining disputes. JA393 ¶ 1. He describes the net effect of the provisions giving the Minister powers over ZMDC and its Board as creating a "subordinate board." JA393-401 ¶¶ 4,6. For example, on one occasion, "the then chairman of ZMDC had informed a Parliamentary Portfolio Committee for Mines and Energy that the ZMDC board had no control over the subsidiaries of ZMDC." JA401 ¶ 6. By dominating the Board, "the entire State Corporation [is] under the ultimate control of the minister." JA401 ¶ 7. The Minister has made decisions about the granting and termination of joint venture agreements. JA403 ¶ 9. The Minister has had a ZMDC subsidiary pay revenues directly into the Treasury rather than as dividends to ZMDC (presumably in order to

evade the claims of ZMDC's creditors). JA403-04 ¶ 10. All this gives the Minister "day to day control" of ZMDC's Board, and thus of ZMDC. JA404 ¶ 11.

Even official Zimbabwean reports note the Government's, and in particular the Ministry's, domination of ZMDC. A 2017 Parliamentary report notes that "the ZMDC board is answerable to the Permanent Secretary of Mines and Mining Development." JA703. Indeed, the same report notes, under the heading "Political Interference" that "the Secretary of Mines is directly involved in *operational issues* at ZCDC, at MMCZ, *at ZMDC* and at other institutions that a[re] directly linked to the mining industry." JA706 (emphasis added) (also noting that "there is too much political interference *** by the Permanent Secretary" and "the current system is porous and being abused").

### B. Plaintiffs Invest in Zimbabwe, Making Sure to Insist on International Arbitration Provisions.

In 2008, Zimbabwe was struggling with the fallout of a decade of hyperinflation and disinvestment. JA712. Its primary weapon to attempt to restore economic growth was its abundant mineral deposits. JA712. The economic crisis had driven away foreign mining investors, leaving the country unable to engage in serious exploitation of its

natural resources. JA712. So, it turned to international investors in an attempt to better its fortunes.

Plaintiffs were among those investors. They entered into MOUs with ZMDC to form joint venture companies to develop nickel and platinum mines. JA269-283; JA285-300. As foreign investors dealing with a sovereign in a country that had a history of instability and corruption issues, they unsurprisingly insisted on dispute resolution through international arbitration before the International Chamber of Commerce's International Court of Arbitration, headquartered in Paris. JA280 § 11 & JA296-97 § 9.

Well-advised sovereigns have long known what agreeing to such a provision means for any claim of immunity—and why investors dealing with sovereigns demand them. As the U.S. House of Representatives, when passing the Foreign Sovereign Immunities Act, recognized "[w]ith respect to implicit waivers [of sovereign immunity], the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country." H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617.

The MOUs also contained provisions for service of process. They expressly agree to service of "documents in legal proceedings," at the "*domicilium citandi et executandi.*" JA282 § 12.8.2 & JA299 § 10.9.2. That Latin jargon, a legal term of art widely used in Zimbabwe and South Africa, among other countries, literally translates as "domicile for being summoned," that is, served with a summons, "and executed upon." Among other methods, the clause provided for hand service on a responsible person at ZMDC's headquarters.

**C.    The Minister of Mines and His Hand-Picked ZMDC Board Chair Take Charge of ZMDC and Dismiss Its CEO.**

Unfortunately, matters deteriorated rapidly a little less than two years into the joint ventures. In June 2010, the then-Minister for Mines appointed a close political ally as Chair of ZMDC's Board. JA729, 733-37. News reports indicate that the appointment was intended to secure a Board loyal to the Minister's political faction. JA747-48, 752. Reflecting the extraordinary power he possessed, the Chair was dubbed a "one man board" by the Zimbabwean press. JA766-67.

The first order of business for the Minister's new Board was to replace the prior Board's appointees with political appointees of their own. JA747-48. The ZMDC's longtime CEO was dismissed, with later

litigation revealing that one reason for the dismissal was that he resisted paying ZMDC's funds to the Government without an audit to establish that there were any actual profits from which to pay a dividend. JA792-93. The former CEO—who would later testify as a witness in the arbitration at issue in this case and was found by the arbitrators to be credible—eventually prevailed in litigation challenging his termination and in dismissing criminal charges that were filed against him. JA802-14.

The Minister also directed the ZMDC Board to appoint loyalists (including relatives) to the Boards of ZMDC subsidiaries, further cementing his control. Reports indicate that Minister Mpofu directed ZMDC to appoint to subsidiary boards his sister-in-law, his personal assistant, another sister-in-law, and a nephew. JA819.

### D.     Using Its Total Control Over ZMDC, Zimbabwe Strips Plaintiffs of Their Mining Concessions.

As relayed at length in the arbitral award, almost immediately, the Minister and his hand-picked ZMDC Board Chair, Mr. Masimiremba, went about stripping companies that had entered into concessions under the prior leadership of their mining rights.

In mid-October 2010, ZMDC told Plaintiffs' managing director on a telephone call that they had some queries about Plaintiffs' relationship with Mr. Mubayiwa, the former CEO. JA826. Plaintiffs responded the next day offering to assist and cooperate with any queries and asked for specific questions in writing. JA826. The day after that, Mr. Masimiremba personally met with Plaintiffs' principals and told them that a "disciplinary hearing" would be held less than a week later. JA829-32, 834-40, 856-61 ¶¶ 33-41. Two weeks after that, the Acting General Manager of ZMDC, whom Mr. Masimiremba had personally appointed, sent a letter to Plaintiffs revoking the mining rights and threatening criminal charges against Plaintiffs. JA872-73. The Minister and the Permanent Secretary of the Ministry were copied on the letter. JA873.

Shortly thereafter, Plaintiffs availed themselves of the dispute resolution procedures in the MOUs, commencing an arbitration before the International Chamber of Commerce.

### E. Zimbabwe Continues to Manipulate ZMDC and Divert Its Assets for Domestic and Foreign Policy Goals, Enrichment of Regime Insiders, and to Frustrate Creditors.

Meanwhile, Zimbabwe continued to meddle with ZMDC and strip it of assets. A 2013 Parliamentary Committee report, discussing events around the same time that Plaintiffs' investments were expropriated, found that two diamond mining concessions were awarded by ZMDC at the direction of the Minister to companies with no experience in diamond mining. JA880, 887. The Minister's response was that he was "directed to go that way and that is the way it is," and neither he nor ministry officials would disclose who actually directed them to make the selection decision. JA889. The Committee concluded that "ZMDC seemed to have been coerced into accepting these two companies." JA890.

Similarly, the Committee found that the Minister had demanded to personally approve any director of a ZMDC subsidiary so that the Minister (rather than ZMDC) could control the subsidiaries: "The ZMDC Board was rendered powerless when it came to the selection and appointment of members who sit on its subsidiary companies. It[]s only function is to regularise the appointments made by the Minister."

JA890. The Committee noted that "[t]his is probably one of the reasons why the ZMDC Board has little control and information over its subsidiary companies, namely Mbada, Anjin and DMC." JA890-91. It found that ZMDC subsidiaries took direct instructions from the Ministry without consulting ZMDC. JA890-91.

Since that report, ZMDC continued to be separate in name only from the Government. Just as Minister Mpofu had appointed his own ZMDC Board when he took over the Ministry, when he was transferred to a different department in December 2013, the new Minister of Mines dissolved ZMDC's entire Board. JA904-06. Widespread reports regarding ZMDC's assets being used to benefit an assortment of government insiders continue. *E.g.*, JA915. Later Parliamentary reports continued to find that the Ministry was directly managing other ZMDC subsidiaries too. JA694.

Similarly, throughout this period, Zimbabwe has consistently used ZMDC assets for state purposes. For example, Zimbabwean ministers concluded a deal whereby ZMDC would award a mining concession to a Russian conglomerate including state-owned weapons manufacturer Rostec and state foreign affairs bank Vnesheconombank, and in return

Zimbabwe's military would receive Russian aircraft. The deals with Russia for ZMDC assets were negotiated at the highest level, including Zimbabwe's Minister of Foreign Affairs meeting with Russia's Foreign Minister and Minister of Industry and Trade. JA921-23, JA926-27. ZMDC also awarded highly valuable concessions to Zimbabwe's armed forces. JA930-34.

The U.S. Government too found that Zimbabwe and regime insiders dominated ZMDC. Executive Order 13469, originally issued in 2008, authorized sanctions against "senior official[s] of the Government of Zimbabwe" and persons "owned or controlled by, directly or indirectly, the Government of Zimbabwe or an official or officials of the Government of Zimbabwe," among others. JA940 § 1(a). Immediately after it was signed, the Department of the Treasury designated numerous Zimbabwean parastatals, including ZMDC, for their role in "the undermining of democratic processes and institutions." JA942. The press release announcing the designations noted ZMDC's role in acting "on behalf of the Government of Zimbabwe" in "planning, coordinating and implementing mining projects." JA942. Throughout the period from 2008 to 2024 when the United States imposed sanctions on Zimbabwe,

the U.S. Government's position was that ZMDC was used by the Government of Zimbabwe to undermine democratic processes and institutions. *See, e.g.*, JA945-47, 949-53, 955-56.

The U.S. Government specifically noted instances in which ZMDC failed to comply with basic corporate formalities. U.S. State Department reports for years cited ZMDC's lack of a real Board as an example of issues with Zimbabwe's state-owned enterprises. JA974, 1002-03, 1029-30, 1055, 1077, 1100, 1123 ("SOEs should have independent boards, but in some instances, such as the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards.") The Government's misuse of ZMDC continued to be cited as a core basis for the sanctions on Zimbabwe until the Zimbabwe sanctions expired earlier this year. *E.g.*, JA1135 ("We are concerned about ongoing reports that diamond mining entities in Zimbabwe are being exploited by people in senior government and military positions for personal gain, that revenues from those enterprises are being diverted for partisan activities that undermine democracy.").

**F.** **Plaintiffs Pursue Arbitration and Obtain An Award.** The

MOUs that governed Plaintiffs' investments provided for

arbitration before the International Chamber of Commerce's Court of

Arbitration. JA280 art. 11 & JA296-97 art. 9. All relevant countries are

parties to the New York Arbitration Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, June 10, 1958, 330 U.N.T.S.

3.[1]

After ZMDC sought to terminate the MOUs, Plaintiffs filed for

arbitration against ZMDC and the Commissioner before the ICC Court

in Paris which, after contested proceedings, ordered that the Tribunal

be seated in Zambia.[2] JA212 ¶ 28. ZMDC further submitted to the

arbitration in Zambia by signing the Terms of Reference, which

expressly provided that "[b]y signing these Terms of Reference, the

parties acknowledge that they agree to submit to this arbitration and

expressly waive any procedural objections they may have with respect

---

[1]
https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=XXII-1&chapter=22&clang=_en.

[2] This case is not the only one in which Zimbabwe seeks to avoid payment under an arbitral award. *See, e.g.*, *von Pezold v. Zimbabwe*, No. 23-7109 (D.C. Cir., filed Aug. 28, 2023); *Border Timbers Ltd. v. Zimbabwe*, No. 23-7110 (D.C. Cir., filed Aug. 28, 2023).

to known events, including the appointment of the Tribunal." JA87 §

8.1. The Terms of Reference agreed that the Tribunal had the authority

to decide its own jurisdiction. JA84 § 6.2(1). The arbitration proceeded

to a hearing on the merits. JA212 ¶¶ 29-30 & JA136.

During the merits hearing, by their own account dissatisfied with

the Tribunal's procedural rulings and interpretations of the ICC Court's

rules, JA135, ZMDC's party-appointed arbitrator submitted his

resignation and then declined to participate further in the arbitration,

JA212-13 ¶¶ 30-32. In 2012, ZMDC briefly obtained an *ex parte*

temporary restraining order from the Zambian High Court staying the

arbitration while its assertions that the Tribunal was incorrectly

reconstituted by the ICC Court were litigated in Zambia. JA91-92. The

Zambian High Court later determined that the temporary restraining

order was entered with "no jurisdiction" and had only been entered *ex*

*parte* because "the applicant suppressed material facts and laws from

this court thereby misleading it to grant the ex-parte order of

injunction." JA115-17. It also observed that the proper remedy was to

oppose the entry of a judgment based on the award. JA117.

Correctly understanding that the *ex parte* order was void as in excess of jurisdiction, a preeminent Tribunal—Professor Doug Jones A.O., Stuart Isaacs Q.C., and Chikwendu Madumere—resumed, with all proper notice to ZMDC, completed hearings, and issued a Final Award. JA229-67. The Final Award rejected jurisdictional challenges, ordered ZMDC to pay Amaplat US$42,882,000 and ZMDC to pay Amari US$3,900,000, ordered both Respondents (ZMDC and the Commissioner) jointly to pay Plaintiffs' legal costs of US$2,220,583.74 and the costs of the arbitration of US$900,000, and ordered post-award interest at the rate of 5%. JA266.

**G. Zimbabwe's Unsuccessful Post-Award Litigation and the Entry of the Award as A Zambian Judgment.**

ZMDC and the Commissioner again applied *ex parte* to the Zambian High Court to enjoin enforcement of the award, but the court declined to sign the proposed order. JA69 ¶ 13. Proceedings in Zambia were stayed for several years pending Plaintiffs' successful appeal to the Zambian Supreme Court against an order consolidating two proceedings brought by ZMDC. JA69.

After years of post-award litigation were resolved in favor of Plaintiffs, on August 9, 2019, the High Court for Zambia at the

Commercial Registry at Lusaka issued the Judgment—formally, an *Ex Parte* Order for Leave to Register and Enforce the Final Award, No. 2019/HPC/ARB/No. 0337, under Section 18 of the Arbitration Act, No. 19 of 2000, and Rules 15 and 16 of the Arbitration (Court Proceedings) Rules, 2001. JA23-25. The Judgment provided that ZMDC and the Commissioner had 30 days after service to move to set aside the Judgment. JA24. No application to set aside the Judgment was ever filed—within or outside of the 30-day period after service. JA72 ¶ 27. The Judgment is thus valid and enforceable in Zambia.

## H.    Zimbabwe Continues to Defraud ZMDC's Creditors, Specifically Including Plaintiffs.

Zimbabwe has, in the meantime, engaged in a process to attempt to evade Plaintiffs' award and judgment. As Sternford Moyo notes, ZMDC subsidiaries paid money directly to the Treasury, rather than having funds pass through ZMDC where creditors might be able to lay claim to them. JA403-04. And, most recently, Zimbabwe contemplated a specific plan to have the President order the transfer of ZMDC's mining rights to a new state-owned entity called Defold. JA1138-40. Notably, these reports indicated that the Government has the power to reallocate ZMDC's assets even if ZMDC itself does not approve. JA1138-40. Press

reports show that the plan is specifically motivated by evading the judgments against ZMDC, including Plaintiffs' judgment. JA1138-40. And Zimbabwean government documents that have become public confirm that Zimbabwe is transferring assets to Defold. JA1143.

## I.    The U.S. District Court Proceedings.

After receiving the Zambian judgment, Plaintiffs attempted to convince Zimbabwe to pay (or settle) voluntarily. JA302-04, 306-07. With no satisfactory resolution forthcoming, on January 10, 2022, Plaintiffs filed suit in the District Court to enforce the Zambian judgment recognizing and enforcing the arbitration award. JA11-21. They also sought to hold Zimbabwe liable as ZMDC's and the Commissioner's alter ego. JA11-21. Initially, Plaintiffs contended that a prior adjudication that ZMDC had operated as a single enterprise with Zimbabwe's treasury during the same time period was entitled to issue-preclusive effect. *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, No. 13 Civ. 1917(CM), 2015 WL 9302560, at *5-6 (S.D.N.Y. Dec. 17, 2015).

Plaintiffs served the Republic and the Commissioner under 28 U.S.C. § 1608(a)(3) and (b)(3)(B), through the clerk's mailing of the summons, complaint, and notice of suit. JA26-34. For ZMDC, after

attempts to confirm service by registered mail or DHL failed, Plaintiffs employed a different option provided by the MOUs. The MOUs directed that "documents in legal proceedings," among others, "may be served" on a "responsible person" at the addresses identified in the MOUs or such other addresses as may be notified in writing. JA281-82 § 12.8.1; JA298-99 § 10.9.1. ZMDC identified its then-headquarters at 90 Mutare Road as its "domicilium citandi at executandi." JA280-82 § 12.8.2; JA298-99 § 10.9.

Accordingly, Plaintiffs had their South African counsel hand-deliver the summons and complaint at ZMDC's headquarters. JA63-65. By this time, ZMDC had moved its offices to 6 Constantia Road and had sent Plaintiffs correspondence listing this address as its headquarters. JA157 ¶ 3 & JA159. It did not, however, send any formal document entitled "notice of change of address." Since the move was common knowledge in Zimbabwe, the South African counsel delivered the summons and complaint at ZMDC's new headquarters to a ZMDC employee who stated that she was authorized to accept service. JA63-65.

All Defendants moved to dismiss. Initially, the trial court granted

the motion as to Zimbabwe (on sovereign immunity grounds) and ZMDC

(on personal jurisdiction grounds, since alter ego status is necessary for

ZMDC to be a foreign state for due process purposes) because it found

that issue preclusion did not apply based on the *Funnekotter* and the

remaining allegations of alter ego status were too general. JA165-206.

It denied the Commissioner's motion, finding that the Commissioner

was a "foreign state" because of the office's governmental role and

waived sovereign immunity by signing terms of reference that

submitted to the jurisdiction of arbitrators seated in Zambia. JA165-

206. The court found that the Commissioner's submission to arbitration

was an implied waiver under 28 U.S.C. § 1605(a)(1), collecting

authorities including the Second Circuit's leading decision on the issue

in *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co.,*

*Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572 (2d

Cir. 1993) (*Seetransport I*) and multiple cases from this Circuit

endorsing *Seetransport*'s analysis. JA165-206.

Plaintiffs shortly thereafter filed an amended complaint, adding

extensive factual allegations and attaching detailed evidence of the

closely-intertwined nature of Zimbabwe and ZMDC and asset dissipation. JA207-27. Defendants moved to dismiss again. JA308-41. Plaintiffs' opposing papers provided still further evidence of alter ego status to support their allegations, including testimony from an esteemed Zimbabwean lawyer, Zimbabwean Parliament reports on politicization, corruption, and other meddling at ZMDC, and U.S. Government reports and statements to similar effect. JA343-1143.

This time, the trial court agreed that the materials Plaintiffs submitted established alter ego status. In a detailed memorandum opinion, it discussed at length the legal standards for alter ego status under *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) (*Bancec*) and its progeny. JA1176.

On the single enterprise/principal-agent prong, even limiting its analysis to the pre-breach period, it found ample evidence of operational control. It noted the Minister's extensive powers to direct ZMDC and his approval powers over its decisions, JA1179, but also extensive evidence of more day-to-day meddling over staffing and effectively running ZMDC's nominal subsidiaries directly, with ZMDC's own board having no power over its subsidiaries, JA1179-80. It also noted the U.S.

Government's findings that ZMDC had been abused by the Mugabe regime to support regime insiders. JA1180. It found ample evidence that ZMDC's assets were in practice used to enrich government and military officials and pursue non-commercial policy goals. JA1181-82. In other words, Zimbabwe in practice treated ZMDC's assets as its own without maintaining distinct corporate lines.

On the fraud prong, the trial court considered post-breach asset dissipation as well. In addition to the prior diversions of assets, the trial court credited evidence that Zimbabwe had developed a plan to transfer ZMDC's assets to a new state-owned entity with the express goal of frustrating ZMDC's creditors, noting the telling lack of denial or contrary evidence from Zimbabwe on this point. JA1183. It thus found subject-matter jurisdiction over ZMDC and, as ZMDC's alter ego, Zimbabwe. JA1183-85. It also denied Defendants' personal jurisdiction and Rule 12(b)(6) arguments. Defendants filed a notice of appeal, limited, as required by the collateral order doctrine, to sovereign immunity arguments. JA1193.

# SUMMARY OF ARGUMENT

Defendants lack sovereign immunity from jurisdiction in this action to enforce the Zambian judgment confirming the arbitral award entered against ZMDC and the Commissioner.

Defendants impliedly waived their sovereign immunity from suit when they submitted to binding arbitration overseas subject to the New York Convention. 28 U.S.C. § 1605(a)(1). As the Second Circuit held in *Seetransport*—a decision that this Court has repeatedly endorsed—a state's decision to arbitrate abroad subject to a treaty like the New York Convention necessarily implies that there will be judgments based on the arbitrators' award. And *Seetransport* broke no new ground: the Congressional committee report explaining what the implied waiver exception meant gave *precisely* that scenario as an example of implied waiver. Other common law jurisdictions have agreed that arbitration overseas waives immunity.

Alternatively, this case falls within the later-enacted arbitration exception to sovereign immunity. 28 U.S.C. § 1605(a)(6). If Congress had meant to limit the exception to actions under Chapter 2 of the Federal Arbitration Act, it would have said so. An action to recognize a

foreign court's decision enforcing an arbitration agreement or confirming an award is just as much an action to enforce an arbitration agreement or confirm an award as a case where the first enforcement occurs in the United States.

Similarly, Zimbabwe's argument that the Federal Arbitration Act's statute of limitations applies not only to actions under that Act but also to limit FSIA's implied waiver and arbitration exceptions is atextual and meritless. That Congress provided a federal cause of action to recognize and enforce *some* arbitral awards does not limit FSIA's sovereign immunity exceptions—nor does it exclude other types of actions based on arbitral awards.

Defendants' alter ego arguments fare no better. Plaintiffs presented extensive evidence of extensive control and fraud on creditors like Plaintiffs, and the trial court's findings of fact crediting that evidence must be accepted in the absence of clear error. Defendants try to paint this case as one where a minister has some statutory powers over a state-owned entity, but this case presents far more. It is a case where a high government official installed his relatives and allies to maintain day-to-day control, evaded or kept vacant ZMDC's board, and

disposed of ZMDC assets at will, treating them as interchangeable with the state budget. It is a case where Zimbabwe's own Parliament has criticized the Ministry's domination of ZMDC and warned of funds being diverted from ZMDC subsidiaries, all while ZMDC fails to pay its debts. It is a case where the U.S. Government has published dozens of reports about how Zimbabwe fails to maintain corporate formalities. Zimbabwe has issued memoranda suggesting it could move ZMDC's assets to a new shell, mentioning Plaintiffs by name as creditors it is trying to evade. Witnesses, official reports, and far more all show that ZMDC is functionally dominated by the Ministry and that domination is being used to defraud its creditors.

Nor is there any basis to limit alter ego doctrine to frauds specifically targeting the United States. That limit has no textual basis and Defendants fail to point to a single authority imposing such a limit.

The same goes for the suggestion that alter ego status is measured exclusively at the time a contract is signed, for jurisdictional purposes. Again, no authority supports that proposition; to the contrary, *Bancec* itself involved a bank that originally was private and later was nationalized and became dominated by Cuba. Again, the limit makes no

sense. After all, in almost every investment case, the state-owned company will look responsible at the time a contract is signed—that is why the plaintiff is willing to invest. The fraud is when domination and asset dissipation prevent the state-owned entity from abiding by the deal or the alternate remedy of paying damages. Alter ego status tests all the circumstances, not just a slice at an artificially-defined time.

Finally, ZMDC's service arguments fail. A *domicilium citandi* is, quite literally, a domicile for serving a summons. Case law confirms that is its meaning. And ZMDC agreed that legal documents could be delivered there, making clear that summonses, not merely business correspondence, were intended to go there. Defendants served the summons and complaint in accordance with the MOUs. Nor is it relevant that ZMDC had moved its headquarters without serving a document formally named "notice of change of address." ZMDC's well-known move and correspondence showing it had moved its headquarters sufficed as notice of change of address. And even absent technically-compliant notice, longstanding authority supports serving a party at its actual, new address when a plaintiff knows it has moved

but notice is technically defective or where the party is estopped from relying on its own improper failure to give notice.

The District Court's decision as to the Commissioner is correct. Chief Mining Commissioner is a regulatory office of the Zimbabwean state, meaning it is part of the state, and the arbitrators awarded damages against the office, not against any particular officeholder.

## STANDARD OF REVIEW

Contrary to Defendants' assertions, on an interlocutory appeal from denial of a motion to dismiss based on sovereign immunity where, as here, the defendants made factual challenges to the Complaint's jurisdictional allegations, this Court "review[s] the district court's findings of fact—including facts that bear upon immunity and therefore upon jurisdiction—for clear error." *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004). "[O]nce the facts have been settled, we decide *de novo* whether those facts are sufficient to divest the foreign sovereign of its immunity." *Id.*

In so doing, this Court employs a burden-shifting test. While "a foreign state is presumptively immune from the jurisdiction of United States courts," that is true only "unless a specified exception applies."

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 104 F.4th 287, 294 (D.C. Cir. 2024) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355). The FSIA "embodies a restrictive view of sovereign immunity," under which "[t]he plaintiff bears only the initial burden to produce evidence that an exception applies.'" *Id.* (internal quotation marks and brackets omitted). Once the plaintiff does that, it is "the defendant" that "bears the ultimate burden of persuasion to show the exception does not apply." *Id.* (internal quotation marks omitted). Thus, "[i]n accordance with the restrictive view of sovereign immunity reflected in the FSIA, the burden of proof in establishing the inapplicability of these exceptions is upon the party claiming immunity." *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985).

## ARGUMENT

**I.     Under Both the Implied Waiver and Arbitration Exceptions to the FSIA, U.S. Courts Have Jurisdiction Over ZMDC and the Commissioner Based on Their Submission to Arbitration Overseas.**

Both the "implied waiver" exception under 28 U.S.C. § 1605(a)(1) and the "arbitration" exception under 28 U.S.C. § 1605(a)(6) provide jurisdiction over ZMDC and the Commissioner here based on their

submission to arbitration in Zambia, and over Zimbabwe as their alter ego. As the District Court correctly found, Congress and the courts have long recognized that when a sovereign submits to binding arbitration in another country—and particularly when that country is party to a treaty that requires courts to enforce arbitrators' awards—that agreement inherently recognizes that the award will become an enforceable judgment. That is, in fact, the very first example Congress gave of an implied waiver. And, in any event, while the District Court thought otherwise, the FSIA's "arbitration" exception is not limited to suits under the Federal Arbitration Act but rather extends to any action to enforce an arbitral award. This Court may affirm on either ground. *See Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 775 (D.C. Cir. 2022) (*P&ID*) (affirming on the basis of the arbitration exception where the same district court as here had decided the case on the basis of implied waiver).[3]

---

[3] Defendants make a cursory argument that Plaintiffs were required to cross-appeal in order to preserve their arbitration exception arguments, but that is simply an alternate ground for affirming the trial court's order denying the motion to dismiss. Plaintiffs' opposition brief below expressly directed the trial court to their prior arguments on the earlier motion and asked it to reconsider its holding on the arbitration exception, so the point is preserved.

## A. ZMDC and the Commissioner Impliedly Waived Sovereign Immunity by Submitting to Arbitration in A New York Convention Jurisdiction.

Decades of authority have warned sovereigns that, if they are a Contracting Party to the New York Convention, then, by agreeing to binding arbitration in another New York Convention state, they waive their sovereign immunity from suit in the United States if they ignore the award and foreign judgments confirming it. That is precisely the situation here: Zimbabwe is a Contracting Party; ZMDC agreed to arbitrate disputes in a New York Convention jurisdiction; and the Commissioner, by signing the Terms of Reference agreed to join the arbitration and delegate issues of arbitral jurisdiction to the arbitrators. And, as addressed below, the Commissioner is an integral part of the foreign government itself and ZMDC is the government's alter ego. Foreign investors frequently rely upon this authority in drafting their contracts with state-owned entities.

ZMDC agreed to the MOUs containing the arbitration clauses and ZMDC and the Commissioner to the Terms of Reference with full notice of the consequences. If they had wanted non-binding, advisory arbitration or to restrict award enforcement to specified jurisdictions,

the time to ask for that was back when they were negotiating the MOUs. They did not, likely because they feared Plaintiffs would not invest in a country with a history of instability and expropriation without an arbitration clause worth more than the paper it was written on. This Court should reject their efforts to overturn longstanding precedent and disrupt the expectations of international investors.

> 1. **Congress and the Courts Have Long Found Agreeing to Binding Arbitration Where All Relevant States Are New York Convention Parties Implicitly Waives Sovereign Immunity.**

This Court has reiterated and made clear that "a sovereign, by signing the New York Convention, waives its immunity from arbitration-enforcement actions in other signatory states." *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019). In *Creighton Ltd. v. Government of State of Qatar*, this Court explained that this exception applied where "a signatory to the [New York] Convention" agreed "to arbitrate in the territory of a state that had signed the New York Convention." 181 F.3d 118, 123 (D.C. Cir. 1999). Agreeing with the Second Circuit, it held that "when a country becomes a signatory to the Convention, by the very provisions of the Convention, the signatory State must have contemplated enforcement actions in other signatory

States." *Id.* (quoting *Seetransport Wiking Trader*

*Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v.*

*Navimpex Centrala Navala*, 989 F.2d 572, 578 (2d Cir. 1993)). In

*Creighton*, Qatar had not signed the Convention—but Zimbabwe has,

and so have Zambia, the United States and, to the extent it is relevant,

France, where the ICC is headquartered.

In addition, the legislative history compels this result. As this

Court has noted, "[t]he legislative history of FSIA gives three examples

of circumstances in which courts have found implied waivers," including

when "a foreign state has agreed to arbitration in another country."

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444

(D.C. Cir. 1990).

Indeed, arbitration was the *very first* example of what the House

Judiciary Committee's report on the Foreign Sovereign Immunities Act

termed "implicit waivers" of sovereign immunity. "With respect to

implicit waivers," it stated "the courts have found such waivers in cases

where a foreign state has agreed to arbitration in another country or

where a foreign state has agreed that the law of a particular country

should govern a contract." H.R. Rep. No. 94-1487, at 18 (1976),

*reprinted in* 1976 U.S.C.C.A.N. 6604, 6617.

Defendants attempt to muddy the waters by pointing to two non-arbitration cases that, in passing and citing *Creighton*, list "arbitration in the United States" as an example of implicit waiver, but that is simply reciting *Creighton*'s baseline rule from where the states involved are *not* New York Convention states. Br. at 19-20 (citing *Khochinsky v. Republic of Poland*, 1 F.4th 1, 8-9 (D.C. Cir. 2021) and *Ivanenko v. Yanukovich*, 995 F.3d 232, 239 (D.C. Cir. 2021)). Neither case actually dealt with arbitration agreements; *Ivanenko* involved RICO claims by Ukrainian nationals against the Ukrainian government and *Khochinsky* was a tort claim challenging an extradition attempt. Indeed, both cases cite *Creighton* for the implied waiver standard, making them an unlikely source of a sub silentio overruling of its endorsement of *Seetransport*. The same is true of the other case *Ivenenko* cites, which held that agreeing to arbitrate *different* claims overseas did not waive immunity as to RICO claims. *World Wide Mins., Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1163 (D.C. Cir. 2002). Again, that case endorses *Creighton*'s analysis, so its brief reference to

arbitration in the United States just means the rule absent a mutual treaty relationship. None of these cases were dealing with, still less addressing, the situation here, where one Contracting State arbitrates in another Contracting State and recognition is sought in a third Contracting State.

In short, the *Creighton-Seetransport* standard remains, consistent with the FSIA's legislative history, the law of this Circuit. When agreeing to *binding* arbitration in another Convention state, a signing state necessarily agrees to be bound by the award, and Courts in other Convention states will hold it to the award if it does not comply. Countless international contracts with state-owned entities have been drafted in reliance on those holdings. Sovereigns—the repeat players in international contracting—are on notice of that consequence of agreeing to arbitrate, and can ask for different terms if they want to manifest a different intent.

Nonetheless, Defendants contend that this Court is *required* to follow a position that a single amicus brief by the United States in a prior case, *P&ID*, tentatively proposed. That brief actually contended there was *no* sovereign immunity—it just urged the Court to affirm

based on the arbitration exception rather than implied waiver because the former was more straightforward. Brief for the United States as Amicus Curiae at 5-9, *P&ID*, No. 21-7003 (D.C. Cir., filed Jan. 20, 2022). It recounted arguments on both sides, recognizing that *Tatneft* had *rejected* the reading of the arbitration exception as exclusive. *Id.* at 13 (citing *Tatneft*, 771 F. App'x at 10). As a prudential matter, it urged the court not to decide "these thorny issues" because the arbitration exception applied and declined to take a formal position on whether the United States would view its immunity as waived in similar circumstances. *Id.* at 13-15. The brief, in short, merely recognizes that the arbitration exception, where it applies, is an easier way to decide cases. It does not purport to be a definitive statement of exactly what an implied waiver is.

Precisely the same option is open to the Court here: by its terms, the arbitration exception applies to confirming awards; it does not distinguish between doing so under the Federal Arbitration Act, under state arbitration law, or by affording comity to a foreign judgment confirming an award. Holding that recognizing an order confirming an

arbitration award is within the arbitration exception would obviate the need to consider implied waiver at all.

If the Court does reach the implied waiver exception, Defendants' contention that this Court is *required* to defer to a tentative position in an amicus brief in a different case is without any basis whatsoever— especially where the Court *declined* to resolve that issue in favor of the arbitration exception. "[T]he views of the Executive Branch c[an] inform the judgment of the Judiciary, but d[o] not supersede it." *Loper Bright Enters. v. Raimondo*, No. 22-1219, 2024 WL 3208360, at *9 (U.S. June 28, 2024).

This Court was, in any event, right in *Tatneft* where it held that— like every other exception in Section 1605(a)—the arbitration exception was not exclusive. Congress could have—but did not—add a word like "only" when it enacted 28 U.S.C § 1605(a)(6) if it wished to clarify that it was the exclusive exception for arbitral awards. Implied repeals are disfavored absent "irreconcilable conflict" or an amendment that "covers the whole subject." *Posadas v. Nat'l City Bk. of N.Y.*, 296 U.S. 497, 503 (1936); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 328 (2012). Neither is present here,

because there is a perfectly sensible explanation for keeping both:

Section 1605(a)(6) provides a floor to make abundantly clear that

awards within its scope were to be enforced; Section 1605(a)(1)

remained to leave the rest up to judicial interpretation of what "implied

waiver." Indeed, the cross-reference in Section 1605(a)(6)(D) to Section

1605(a)(1) that the amicus brief posited would otherwise be superfluous

is perfectly consistent with this reading—it is Congress taking care to

*avoid* any negative implication from listing the "floor" that a court

might otherwise interpret as lowering the "ceiling" in an amendment

designed to confirm exemption from immunity, not narrow it.[4]

---

[4] Nor does the argument that some other countries *might* interpret immunity more broadly have anything to do with interpreting the FSIA. *Creighton* is, in any event, consistent with the predominant international trend. As a recent Canadian opinion noted, many jurisdictions have held—consistent with *Creighton* and often citing it—that arbitrating in a New York Convention country implicitly waives immunity. *CC/Devas (Mauritius) Ltd. c. Republic of India*, 2022 QCCS 4785 ¶¶ 161-174 (Can.) (collecting cases from numerous countries), *leave granted*, 2023 QCCA 327 (Can.). It is Defendants who are advocating for an international outlier position.

Defendants' argument that Article XIV of the New York Convention—a reciprocity provision allowing defensive reprisals if a state breaches the Convention or adopts reservations to it—somehow binds this Court to follow an amicus brief as a matter of international law is baseless. The United States was not adopting a reservation to the

### 2. As *Seetransport* Correctly Holds, The Implicit Waiver Does Not Turn on the Particular Procedure Used to Enforce an Award.

Defendants also argue that this Court should depart from *Seetransport* and hold that implied waiver does not extend to an action to recognize a judgment confirming an award. They do this even though *Creighton* itself adopted *Seetransport*'s reasoning. There is no reason to split with the Second Circuit on this issue, because its holding was plainly correct: when a sovereign anticipates an award being turned into a judgment in any New York Convention state, it does not matter what particular procedures each state uses to achieve that end.

*Seetransport* has long been the leading case on the implied waiver exception as applied to arbitration agreements, and it was the case whose analysis this Circuit endorsed in *Creighton*. 181 F.3d at 123. It held unequivocally that the implied waiver through agreeing to arbitrate in a Convention state extended to recognizing a judgment on the award too: "Although the claim for enforcement of the arbitral award has been dismissed as time-barred, we nonetheless conclude that

_____

Convention or violating it; it was expressing arguments on both sides about how to interpret the FSIA.

subject matter jurisdiction exists, under § 1330(a), with respect to the alternative cause of action seeking enforcement of the decision of the Court of Appeals of Paris." *Seetransport I*, 989 F.2d at 582. "[T]he cause of action to enforce the foreign judgment," it held, "is within the scope of Navimpex's implicit waiver of sovereign immunity." *Id.*; *see also Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 29 F.3d 79, 81 (2d Cir. 1994) (*Seetransport II*) ("[B]y signing the Convention and proceeding to arbitration, Romania waived its immunity to an action to enforce a foreign money judgment under Article 53.").

Defendants' attack on *Seetransport* misunderstands that case's reasoning. The case does not turn, as Defendants claim, on whether or not the New York Convention explicitly speaks to particular procedures at a level of granularity. Rather, *Seetransport* holds that a state signing a treaty agreeing that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon," by those terms, "must have contemplated enforcement actions in other signatory States." 989 F.2d at 578. Indeed, it is well recognized that the

Convention gives states a good deal of discretion in implementing its provisions. Because a sovereign "logically *** had to have contemplated the involvement of the courts of any of the Contracting States" when agreeing to binding arbitration in a Contracting State, that was inconsistent with maintaining immunity. *Id.* at 579. What determines the scope of waiver is whether "the cause of action is so closely related to the claim for enforcement of the arbitral award," not whether the action arises directly under FAA Chapter 2, and a state law claim to recognize a judgment confirming an award qualifies. *Id.* at 582-83.

*Seetransport*'s principle, in other words, is that what matters is that the sovereign could foresee the courts of Convention jurisdictions being involved with enforcing the award—not the particular procedure employed by a particular court in a particular country. That is why Defendants are wrong to complain that the Convention does not speak explicitly about recognizing judgments confirming awards. Foreign sovereigns contemplate litigating *about the award* in Convention jurisdictions and that waives immunity *about the award*, regardless of the precise procedure employed to enforce it.

Indeed, as this Court has previously observed, the Convention itself contemplates alternative procedures to enforce awards. Agreeing with the position of the United States as amicus—which favorably cited *Seetransport*—this Court held that the Convention "expressly preserves, under Article VII, arbitral parties' right to rely upon domestic laws that are *more favorable* to award enforcement than are the terms of the Convention." *Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 328, 330 (D.C. Cir. 2014) (*Comimpex*). The "Convention is aimed at facilitating recognition and enforcement of foreign arbitral awards; if domestic law or other treaties make recognition and enforcement easier, that regime can be relied upon." *Id.* at 328. Federal states "may implement the Convention in a manner that is internally non-uniform" under Article XI." *Id.*

Here—as in *Comimpex*—one well-known additional procedure to enforce arbitration awards that are governed by the Convention is using the D.C. UFCMJRA to recognize the original order confirming the award. Because Zimbabwe should have contemplated the award becoming a judgment in any Convention state, the precise path it takes to get there is irrelevant to the scope of the waiver.

**B.    Jurisdiction in Any Event Exists Under the Arbitration Exception.**

This Court need not address the precise scope of the implied waiver exception because another, more obvious exception is available. Under the arbitration exception, there is no sovereign immunity in an action: "to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties *** or to confirm an award made pursuant to such an agreement to arbitrate, if *** the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6).

As this Court held in *Comimpex*, recognizing a foreign judgment confirming an award under precisely the same D.C. statute at issue here is an alternate way to enforce an arbitral award governed by the New York Convention. The Convention "preserves, under Article VII, arbitral parties' right to rely upon domestic laws that are *more favorable* to award enforcement than are the terms of the Convention." 757 F.3d at 328. Thus, "[p]ermitting the [plaintiff] to have recourse to

the D.C. Recognition Act to enforce the [foreign] judgment, then, would appear to be consistent with FAA Chapter 2's objectives and to pose no obstacle to the accomplishment of its purpose." *Id.* at 329. After all, Chapter 2's limits were "tied to its relatively generous summary confirmation process" and "streamlined procedures." *Id.* at 327. Judgment recognition and Chapter 2 of the FAA are thus *complementary* ways to confirm an arbitral award governed by the Convention.

This action falls within the literal terms of the exception: the relief sought is to "confirm an award." It employs a different procedure—recognizing another country's judgment confirming the award—but the relief sought is precisely the same. It "give[s] formal approval to" the award and turns it into a domestic judgment just as much as direct enforcement of the award would have. *Confirm*, Black's Law Dictionary (12th ed. 2024). Tellingly, Section 1605(a)(6) does *not* cross-reference Chapter 2 of the FAA, a strong sign that Congress intended the exception to encompass confirming awards *by any procedure*, be it Chapter 2 of the FAA, state arbitration laws, contract law, judgment

recognition, or anything else. The relief sought—turning an award into a judgment—is what defines the exception.

The District Court nevertheless read the term "confirm" narrowly, relying on the United States' statement in its amicus brief in *Comimpex* that "[a]s a matter of U.S. law, the mechanism for obtaining recognition and enforcement of a foreign money judgment arising out of an arbitral award has been understood to be distinct from an action seeking recognition and enforcement of an arbitral award," with the latter traditionally "governed by state law." 757 F.3d at 330 (quoting U.S. Amicus Brief at 14). But that statement was in a different context— whether Chapter 2 of the FAA was intended to be preemptive or to supplement state-law enforcement mechanisms—and thus spoke to whether Congress intended to occupy the field by passing 9 U.S.C. § 207 as part of the Federal Arbitration Act, not to the intended scope of the arbitration exception in 28 U.S.C. § 1605(a)(6). It was, in other words, discussing why the presumption against federal preemption of an area of traditional state activity was not rebutted. Here, the question is not one of the presumption against preemption but instead what Congress meant by "confirm an award," and extending comity to foreign orders

confirming awards, which is what the UFCMRJA does, falls comfortably within that language.

## C. The FAA's Statute of Limitations Does Not Negate FSIA Exceptions.

Finally, Defendants halfheartedly contend that the statute of limitations for actions under Chapter 2 of the FAA atextually limits any exception to sovereign immunity. This argument is squarely foreclosed by *Comimpex*'s holding that Chapter 2 does not preempt other ways of enforcing arbitration clauses, as well as by *Seetransport*, which involved New York's foreign judgment recognition statute.

Nothing in FAA Chapter 2 purports to modify the FSIA. Congress provided *one* way to turn an arbitral award into a judgment, with a limitation period premised on its expedited procedures. *Comimpex*, 757 F.3d at 327. States can provide others if they choose. *Id.* at 328-29. "[U]niformity was not Congress's exclusive concern in enacting section 207." *Id.* at 329. As this Court held, Congress's policy favoring arbitration "is not undermined—and frequently will be advanced— through recourse to parallel enforcement mechanisms that exist independently of the FAA." *Id.* at 330. None of this comes remotely close to suggesting that, when Congress passed the FSIA *after* FAA Chapter

2, it secretly intended to limit immunity exceptions to actions under FAA Chapter 2. To the contrary, when it comes to a statute that the Supreme Court has said is the "sole basis" for civil jurisdiction over foreign sovereigns, it would be odd if Congress expected parties to have to cross-reference entirely different, unmentioned enactments to have to figure out what it meant. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). Defendants' argument is entirely atextual.

Nor does Defendants' argument that any implied waiver is limited to an action under FAA Chapter 2 and subject to its limitations period make sense. An implied waiver need not contemplate the precise procedure that will be used: *Seetransport II*, which this Court relied upon extensively in *Comimpex*, found implied waiver extended to a judgment recognition action even after the FAA limitations period. 29 F.3d at 80. States have broad discretion in setting limitations periods under the New York Convention, so the submission to judgment in other Contracting States' courts cannot possibly be constrained to any particular period, or even the assumption that a state will keep a limitations period at all. *See Comimpex*, 757 F.3d at 328 ("Under Article

III of the Convention, signatory countries may apply their own statutory periods for the enforcement of arbitral awards, so long as such periods are not unduly short, or may choose, as many countries have, not to impose any time limit on enforcement."). ZMDC and the Commission could envisage award-related litigation in any Convention state; that is all that matters. They need not have contemplated the particular procedural route or even that those procedures would remain static.

## II.  Zimbabwe Is ZMDC's Alter Ego, So ZMDC's Waiver Is Zimbabwe's.

The District Court also correctly held that Zimbabwe is ZDMC's alter ego and that, as a result, Zimbabwe has also waived sovereign immunity.[5] *See Bancec*, 462 U.S. at 632-33 (because Cuba's actions were inconsistent with Bancec's juridical separateness, "Citibank may set off the value of its assets seized by the Cuban Government against the amount sought by Bancec."); *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000) (the *alter ego* factors identified in *Bancec* "serve also as exceptions to the rule that

---

[5] While not before this Court under the collateral order doctrine, this issue also affects whether ZMDC is a "person" or a foreign state for the purpose of due process limits on personal jurisdiction.

a foreign sovereign is not amenable to suit based upon the acts of such an instrumentality"); *see also Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 413, 415 (5th Cir. 2006) (Government bound to arbitration agreement because state-owned entity was its alter ego). The District Court's factual findings are reviewed under the highly deferential clear error standard; they are plainly correct. Zimbabwe's efforts to avoid this conclusion are meritless.

A. **Zimbabwe Shows No Clear Error in The Trial Court's Findings of Day-to-Day Control, Diversion of Assets to Government Officials, Fraudulent Transfers, and Much, Much More.**

1. **Zimbabwe Ignores the Standard of Review.**

To start, this Court reviews the trial court's factual findings only for clear error, while the ultimate determination of whether they add up to alter ego status is a question of law reviewed de novo. *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 847 (D.C. Cir. 2000). The trial court entered detailed factual findings regarding Zimbabwe's control over ZMDC, the Minister of Mines' practical ability to control day-to-day matters, Zimbabwe and Zimbabwean government insiders' diversion of ZMDC's profits, fraudulent transfers to try to frustrate creditors, and more. JA1178-83. It broadly credited the

extensive evidence Plaintiffs proffered, including a declaration of an

eminent Zimbabwean lawyer, Zimbabwean and U.S. official reports on

corruption and irregularities at ZMDC, and the U.S. Government's

findings regarding ZMDC under the sanctions scheme then in force.

Defendants entirely ignore the standard of review and fail to

demonstrate any error—still less clear error—in the trial court's factual

findings. The *only* questions properly before this Court, then, are

whether those facts add up to alter ego status. And they do.

> 2.  **The Trial Court's Findings Lead to Alter Ego Status.**

Under *Bancec* and this Circuit's precedent applying it,

determining whether a foreign state is responsible for a nominally

distinct entity's conduct is a two-step process. First, the Court considers

whether the entity *is* the state itself for FSIA purposes, which

principally turns on whether its core functions are governmental,

regardless of its formal status under foreign law. *Transaero, Inc. v. La

Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994). Second, if it

is commercial, the Court considers whether the "presumption of

independent status" has been rebutted. *Bancec*, 462 U.S. at 627.

That presumption is rebutted in two circumstances. First, "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other." *Id.* at 629. Second, "our cases have long recognized the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice." *Id.* (internal quotation marks omitted). "[S]imilar equitable principles" govern the alter ego liability of a sovereign for its instrumentalities' conduct. *Id.* at 630.

Courts have identified "*Bancec* factors" to determine whether or not an instrumentality is the sovereign's alter ego: "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018). While these

factors are not a "mechanical formula," *Bancec*, 462 U.S. at 630, courts

use them "to aid their analysis" and as "a rough analogy to American

corporate law veil piercing," *OI European Grp. B.V. v. Bolivarian*

*Republic of Venezuela*, 73 F.4th 157, 168 (3d Cir. 2023).

Here, the trial court found ample evidence on both *Bancec* prongs,

and Defendants' arguments to the contrary principally rely on ignoring

the trial court's findings or quibbling with the language it used. Relying

on U.S. and Zimbabwean government sources, the Court found

involvement in ZMDC's "day-to-day operations," with the Board merely

existing (at most) to rubber-stamp the Minister's directives. JA1180.

This, as the trial court properly noted, is precisely what this Court has

held creates an alter ego relationship. *McKesson Corp. v. Islamic*

*Republic of Iran*, 52 F.3d 346, 352 (D.C. Cir. 1995).

Likewise, while the right to dividends was not enough alone, the

trial court found that diversion of assets to then-President Mugabe and

other regime insiders, use of ZMDC resources for state purposes like

foreign policy, and diversion of ZMDC subsidiaries' profits to the state

or government insiders was precisely the type of conduct repeatedly

held to violate the corporate form. JA1180-81 "[I]ntermingl[ing]" assets

and using a supposedly-separate "company's profits for [one's] own purposes" are the *classic* examples of conduct warranting veil-piercing. *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848-49 (D.C. Cir. 2000).

This Court has similarly recognized that using state-owned company assets for state purposes makes the state responsible. *McKesson*, 52 F.3d at 352; *see also OI*, 73 F.4th at 173 (discussing Venezuela's use of PDVSA assets for foreign and domestic policy purposes). That is particularly true when the asset diversion harms corporate constituents—minority shareholders in *McKesson*; creditors here. As in *OI*, government insiders plundering a state-owned company to enrich themselves *favors* alter ego status because it is a failure on the part of the government to respect the separate existence of the entity that the counterparty thought they were contracting with. The people of Zimbabwe may have claims against kleptocrats or corrupt officials too— but that does not change the fact that Zimbabwe treated ZMDC's assets as its own. After all, Plaintiffs would far rather have developed their mining concessions and contributed to Zimbabwe's economy than have

to seek damages for a political decision by the Minister to strip Plaintiffs' concessions.

The same goes for the trial court's fraud and injustice findings. Fundamentally, state-owned companies' contract counterparties expect to be dealing with commercial entities with their own pool of assets against which to collect if they breach the contract. But here, in addition to the asset diversion discussed above, the Court found specific efforts to transfer ZMDC's assets to different state-owned entities to defraud ZMDC's creditors (including Plaintiffs). JA1182-83. That is a classic basis for alter ego liability: *Bancec* itself held that "Cuba cannot escape liability for acts in violation of international law simply by retransferring the assets to separate juridical entities." 462 U.S. at 633-34.

In short, all of the facts that the trial court found are classic examples of total, day-to-day domination, failure to respect corporate formalities, and asset dissipation to defraud creditors. Zimbabwe, in short, treated ZMDC assets as state assets to be dealt with as the Minister and others in power pleased. These are all precisely the

circumstances in which courts have previously found alter ego liability follows; the trial court trod no new ground.

**B.      Alter Ego Liability Does Not Turn on Whether Fraud Specifically Targeted the United States.**

Seizing on language in *Bancec* condemning "the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law," *Bancec*, 462 U.S. at 634, Defendants make a novel argument that only frauds directed at Americans matter, Br. at 23-25. International investors who come to the United States to enforce judgments against assets here are, on Defendants view of the world, out of luck if a state dissipates assets from the entity that owes them money. Defendants point to no court that has ever adopted this limitation, because there are none.

To the contrary, alter ego issues routinely arise in cases where the sole connection to the United States is judgment enforcement efforts. In *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, the plaintiff was a Canadian company seeking to enforce an award under a treaty between Canada and Venezuela. 932 F.3d 126, 132 (3d Cir. 2019). Other fraud-prong cases have involved disputes between an Argentine company and Turkmenistan. *Bridas S.A.P.I.C. v. Gov't of*

*Turkmenistan*, 447 F.3d 411, 417 (5th Cir. 2006). The idea that a state's fraud against its state-owned companies' investors only matters for alter ego jurisdictional purposes if it harms Americans is completely absent from any authority whatsoever.

The *only* authority Defendants point to is statutory interpretation of the Alien Tort Statute. There, the Supreme Court found no evidence that Congress had intended to create domestic jurisdiction over international-law torts outside the United States or the high seas. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013). Plaintiffs appear to contend that the same principle applies to the FSIA, but where the FSIA has nexus requirements, they are set forth explicitly. *See Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311, 1324 (11th Cir. 2018) (expropriation exception has a textual nexus requirement and courts cannot impose a higher one). The arbitration exception explicitly states what nexus is required, and Congress explicitly chose to include an extraterritorial "agreement or award" governed by a treaty like the New York Convention, in addition to domestic arbitration. 28 U.S.C. § 1605(a)(6)(B). Similarly, for the implied waiver exception, *Seetransport* and *Creighton* hold that a

Contracting State arbitrating in another Contracting State foresees entry of judgment based on an award in any Contracting State—that is, including the United States. Defendants' theory is baseless.

## C. Post-Breach Fraud Is Relevant to Alter Ego Status.

Finally, Zimbabwe contends that its post-breach dissipation of ZMDC's assets and fraudulent transfers are irrelevant. Br. at 26-27. Again, it has precious little authority to support this position; in the district court, its only authority on this point was a single unpublished trial court order. To the contrary, *Bancec* itself involved post-breach conduct, holding the state liable for setoff and counterclaims based on its liquidation of the state-owned entity plaintiff *after* the suit was filed. *Bancec*, 462 U.S. at 631. The Third Circuit has explicitly rejected Defendants' argument, holding that the alter ego inquiry considers all of the circumstances. *OI*, 73 F.4th at 171. Any other rule, it held, would "leave[] room for manipulation." *Id.* A time-of-judgment rule would allow an alter ego at the time of injury to escape liability through purported reforms even though it was acting fraudulently, unjustly, or as a single enterprise at the time. *Id.* And a time-of-injury rule would fail to protect against fraudulent transfers and other creditor-evasion

efforts. *Id.* (citing *Bancec*, 462 U.S. at 633, and *EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78, 84-85, 92-94 (2d Cir. 2015)).

That position is plainly the right one. An international investor contracts with a juridical entity because she expects that entity to be *an entity*. She does not expect its performance to be prevented by an outside puppetmaster that disregards corporate formalities. And she does not expect her remedy if it breaches to be frustrated by the state dissipating its assets, either on unrelated policy goals, rewarding cronies, or intentional fraudulent transfers to keep assets away from creditors. The Court must look at the full picture to see if the corporate form is being abused.

**III.  ZMDC Agreed to Service at Its *Domicilium Citandi* and Cannot Evade It by Withholding Formal Notice of Its Change of Address.**

Next, as the trial court correctly found, Plaintiffs properly served ZMDC. ZMDC agreed that "*documents in legal proceedings* or any written notices *may be served*" at its headquarters or such other address as it specified. JA281-82 § 12.8.1; JA298-99 § 10.9.1 (emphases added). It also agreed that "[a]ny notice given in terms of this MOU shall be in writing and shall if delivered by hand to a responsible person

during normal business hours at the physical address chosen as its *domicilium citandi et executandi* be deemed to have been duly received by the addressee on the date of delivery unless the contrary is proven." JA282 § 12.8.2; JA299 § 10.9.2. That is a special agreement for service. So, Plaintiffs served a responsible person at ZMDC's headquarters by hand during normal business hours. ZMDC's headquarters had moved between the time the MOUs were signed and service, but ZMDC's correspondence to Plaintiffs provided its new headquarters' address (and the move was widely known anyhow). JA157 ¶ 3, JA159.

Defendants try to contend that the provision is a mere notices provision and not an agreement to service, but the words of the agreement themselves belie that argument. The agreement uses the words "documents in legal proceedings" and "served." It is plainly a service provision, not a mere notice provision. That is reinforced still further by the reference to a "domicilium citandi et executandi"—quite literally, a domicile for service of a summons. *See Hay Management Consultants Ltd v. P3 Management Consultants (Pty) Ltd* [2004] ZASCA 116, [2005] 3 All SA 119 (SCA) para. 14 (S. Afr.) (translating the term as "a domicilium for service of process and writs of execution");

*Schimmelpennich v. Bayard*, 26 U.S. 264, 275 (1828) (Amsterdam merchant using the variant "domicilium citandi et exequendi" to designate agent for service of process). That stands in contrast to the 1995 California trial court case Defendants cite, which dealt with a provision for "any demand, notice or declaration" rather than referencing legal documents or service, a case that is itself in tension with this Circuit's precedent regarding near-identical language, which ZMDC does not cite. *See Angellino v. Royal Fam. Al-Saud*, 688 F.3d 771, 777 (D.C. Cir. 2012) (quoting *Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 251 (D.D.C. 2001)).

Defendants similarly try to claim that this action was not "in connection with" the MOUs. But an action to enforce an arbitration award expressly provided for in the MOUs is quite plainly "in connection with" the MOU, if that term even modifies "legal proceedings." Br. at 32.[6] The MOU is the basis for the liability. *Cf.*

---

[6] *See In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 655 (7th Cir. 2010) ("[R]elative and qualifying phrases, grammatically and legally, where no contrary intention appears, refer solely to the last antecedent.").

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("in connection with" is given a "broad construction"). This Court has held that an "in connection with" forum-selection provision "applies to claims arising from the Agreement *and* from its subject-matter or formation, not just claims connected to the 'contract.'" *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 878 (D.C. Cir. 2019). A judgment on an arbitration award for breach of the contract easily satisfies that test.

Finally, ZMDC contends that service was improper because it occurred at its new headquarters and it had not served a formal notice under the MOUs to change the address for service. That argument is meritless for numerous reasons.

To start, ZMDC does not dispute actual receipt, and the MOUs state—in the same section that discusses "documents in legal proceedings" being "served"—that "a written notice or communication actually received by one of the Parties from the other Party shall be adequate written notice or communication to such Party." JA282 § 12.8, JA299 § 10.9.

Regardless, as the District Court correctly found, ZMDC actually did notify Plaintiffs that it had moved (as anyone involved in mining in

Zimbabwe knew anyway): its correspondence with them listed its new headquarters address. JA157 ¶ 3, JA159. The MOUs do not specify any particular format for changes of address, so correspondence listing the new headquarters itself gives notice that the headquarters has moved.

Indeed, even when notice of a change of address does not strictly comply with a notices provision, a party that learns that its counterparty's address has changed "not only may but must send notice *** to the new or changed address." *Robbins v. S. Gen. Ins. Co.*, 243 A.2d 686, 688 (D.C. 1968). Indeed, because service on what is known to be an out-of-date address is unlikely to achieve notice, courts have held that a party with "actual knowledge" of the new address must serve notices there, even where the other party failed to supply the new address in the correct formal manner. *Ry. Mail Ass'n v. Moore*, 15 F.2d 547, 551 (4th Cir. 1926). The same rule applies here: Plaintiffs learned that ZMDC's address had changed, so it was not only proper but necessary so that ZMDC would receive actual notice that Plaintiffs serve ZMDC at its new address.

Finally, ZMDC in any event cannot rely on its own failure to give notice of change of address or maintain a "responsible person" at its

abandoned offices to defeat service, especially where it sent correspondence to Plaintiffs' Zimbabwean counsel listing the return address for him to respond to as the new headquarters. It is estopped, both by its affirmative representations and by its own violations that prevent compliance. *International Road*, 131 F. Supp. 2d at 251 (proper to serve Congo at its embassy, not at a subleased property that the embassy had refused to take possession of, because it would be "senseless" to serve an empty building); *see generally* 72 C.J.S. *Process* § 126 (collecting cases holding that parties who affirmatively represented their address were estopped from challenging service). When it comes to estoppel, equity treats as done that which ought to have been done: it is deemed to have given the formal notice it should have given.

## IV.   The Commissioner—A Regulatory Office—Is Part of the Zimbabwean State.

Defendants also briefly challenge the District Court's holding that the Commissioner—who submitted to arbitration by signing the ICC Terms of Reference and is liable for an arbitral costs award against the arbitration Respondents—is an office that regulates mining and thus part of the state, rather than an individual official. They do not contend

that the Commissioner's role is anything other than regulatory, but contend that the use of the word "he" in the Award means that the intent was to hold an individual official liable rather than his office. Even if that were true, it would not necessarily mean that the individual has common law immunity. *See Samantar v. Yousuf*, 560 U.S. 305, 315 (2010).

Regardless, the Commissioner is an office in the Ministry of Mines and Mining Development created by Section 343 of the Mines and Minerals Act 1961 c.21:05 (Zim.). In Zimbabwe, the Chief Mining Commissioner—like other offices in the ministry, such as the minister and the secretary—sues and can be sued in the name of the office, rather than the name of any particular incumbent. *E.g., African Consolidated Resources Plc v. Minister of Mines and Mining Development*, No. HC 1345/10, [2010] ZWHHC 57 (Zim.) (action brought against "The Chief Mining Commissioner"); *Marasha v. Shirihuru*, Nos. HH 565/15 & HC 9059/14, [2015] ZWHHC 656 (Zim.) (same). That is a tell-tale sign that "Chief Mining Commissioner" refers to a juridical person—an office or a corporation sole—rather than any particular individual.

## V. Defendants' Effort to Incorporate by Reference Arguments Below Is Improper.

Finally, Defendants purport to incorporate by reference the entirety of the District Court record. That is improper and waives any argument not developed in their opening brief. Indeed, most of their remaining arguments go to personal jurisdiction or whether Plaintiffs state a claim, which are outside the scope of the collateral order doctrine.

## CONCLUSION

For the foregoing reasons, the District Court's order denying the motions to dismiss the Amended Complaint should be affirmed.

Respectfully submitted,

STEPTOE LLP

By: /s/ Steven K. Davidson
Steven K. Davidson
1330 Connecticut Ave. NW
Washington, DC 20036
Phone: 202-429-3000
SDavidson@steptoe.com

*Counsel for Plaintiffs-Appellees*

Dated:      August 29, 2024

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND
## TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,678 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in fourteen point Century Schoolbook.

/s/ Steven K. Davidson
Steven K. Davidson

Dated:    August 29, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2024, a true and correct copy of this document is being filed and served electronically upon counsel of record registered with the Court's CM/ECF system.

/s/ Steven K. Davidson
Steven K. Davidson

# ADDENDUM OF STATUTES

# Table of Contents

**Statutes**                                                              **Page**

28 U.S.C. § 1605(a)(1)……………………………………………………A1

28 U.S.C. § 1605(a)(6)……………………………………………………A2

26 U.S.C. § 1608……………………………………………………………A3

## 28 U.S.C. § 1605

### § 1605(a)(1). General exceptions to the jurisdictional immunity of a foreign state

**(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--

**(1)** in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver . . . .

## 28 U.S.C. § 1605

### § 1605(a)(6). General exceptions to the jurisdictional immunity of a foreign state

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--

\* \* \*

**(6)** in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

## 28 U.S.C. § 1608
## § 1608. Service; time to answer; default

(a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

As used in this subsection, a "notice of suit" shall mean a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation.

A3

**(b)** Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

**(1)** by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

**(2)** if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

**(3)** if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

**(A)** as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

**(B)** by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

**(C)** as directed by order of the court consistent with the law of the place where service is to be made.

**(c)** Service shall be deemed to have been made--

**(1)** in the case of service under subsection (a)(4), as of the date of transmittal indicated in the certified copy of the diplomatic note; and

**(2)** in any other case under this section, as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed.

**(d)** In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.

**(e)** No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.