ORAL ARGUMENT NOT YET SCHEDULED

No. 24-7030

# In the United States Court of Appeals

# for the D.C. Circuit

ZIMBABWE MINING DEVELOPMENT CORPORATION; CHIEF MINING
COMMISSIONER, MINISTRY OF MINES OF ZIMBABWE; AND REPUBLIC
OF ZIMBABWE,

*Defendants - Appellants,*

v.

AMAPLAT MAURITIUS LIMITED AND AMARI NICKEL HOLDINGS
ZIMBABWE LIMITED,

*Plaintiffs-Appellees.*

_____

On Appeal from the United States District Court
for the District of D.C.
No. 1:22-cv-00058
Hon. Christopher Reid Cooper

## APPELLANTS' REPLY BRIEF

Quinn Smith
Katherine A. Sanoja
GST LLP
1111 Brickell Avenue, Suite 2715
Miami, FL 33131
O: 305-856-7723

*Attorneys for Defendants - Appellants*
Zimbabwe Mining Development Corporation, Chief Mining Commissioner,
Ministry of Mines of Zimbabwe, Republic of Zimbabwe

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES .......................................................... iii

GLOSSARY OF ABBREVIATIONS ................................................ v

APPELLANTS' REPLY BRIEF ...................................................... 1

   JURISDICTIONAL STATEMENT ................................................ 1

   SUMMARY OF ARGUMENT .......................................................... 1

   STATEMENT OF THE CASE ........................................................ 3

   STANDARD OF REVIEW ............................................................. 8

   ARGUMENT .................................................................................. 9

    I.   Amaplat should have cross-appealed because any application of the "arbitration exception" will enlarge Amaplat's rights and lessen those of ZMDC and the Commissioner .......................... 9

   II.   Amaplat's misguided attempt to reconstruct the implied waiver exception must fail.................................................................... 11

     A.   Amaplat's addition of the words "about the award" to the New York Convention is insufficient to create an implied waiver........ 12

     B.   Amaplat falls short in its attempt to explain away the position of the United States on any implied waiver in the New York Convention ............................................................................. 14

     C.   Amaplat has failed to rebut Appellants' analysis of Article XIV of the New York Convention........................................... 16

     D.   Amaplat does not fit its argument into the limited confines of an implied waiver in this Circuit ............................................. 16

     E.   The arbitration exception is still inapplicable ...................... 17

   III.   Amaplat eschews analysis of the statutory text of 9 U.S.C. § 207, opting to mischaracterize the argument as one regarding preemption ............................................................................. 18

   IV.   Amaplat has failed to support the District Court's finding that Zimbabwe is an *alter ego* of ZMDC.......................................... 19

     A.   Amaplat cannot defeat the presumption against extraterritoriality, especially since it did not fully respond to Appellants' argument ............................................................ 19

B.  Amaplat misapprehends the relevant timeframe for analysis of *alter ego* status ........................................................................... 21

C.  Amaplat has failed to support the District Court's finding on *alter ego* ................................................................................. 22

   1.  Amaplat has not rebutted Appellants' arguments regarding the misapplication of the proper standard .......................... 23

   2.  The application of the rather mundane factual findings falls far short of *alter ego* ......................................................... 23

V.  Service is still improper ........................................................... 24

VI.  Amaplat cannot avoid the Award at its discretion to mischaracterize the Commissioner ........................................... 25

CONCLUSION ................................................................................ 25

CERTIFICATE OF COMPLIANCE .................................................... 27

CERTIFICATE OF SERVICE ............................................................ 28

**Table of Authorities**

Page

**Cases:**

*Baird v. Palmer*
114 F.3d 39 (4th Cir. 1997) ........................................................ 9, 11

*Banco Nacional De Cuba v. Chase Manhattan Bank*
505 F.Supp. 412 (S.D.N.Y. 1980) ........................................... 22

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411 (5th Cir. 2006) ......... 20

*Comm'ns Imp. Exp. S.A. v. Congo*
757 F.3d 321 (D.C. Cir. 2014) .................................... 14, 17, 18

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*
932 F.3d 126 (3d Cir. 2019) ...................................... 20

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*
462 U.S. 611 (1983) ................................................ 19

*Freeman v. B & B Assoc.*
790 F.2d 145 (D.C. Cir. 1986) ............................... 9

*Hall St. Assocs. v. Mattel*
552 U.S. 576 (2007) ................................................ 18

*Jennings v. Stephens*
574 U.S. 271 (2015) ................................................ 9

*Khochinsky v. Republic of Poland*
1 F.4th 1 (D.C. Cir. 2021) ....................................... 16

*OI European Grp. B.V. v. Bolivarian Republic of Venezuela*
73 F.4th 157 (3d Cir. 2023) ................................... 22

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*
27 F.4th 771 (D.C. Cir. 2022) ............................... 10

*Roth v. King*
449 F.3d 1272 (D.C. Cir. 2006) ............................ 9

*Transamerica Leasing, Inc. v. La República de Venezuela*
200 F.3d 843 (D.C. Cir. 2000) .............................. 23

*United States v. Am. Ry. Express Co.*
265 U.S. 425 (1924) ............................................... 9

**Statutes:**

9 U.S.C. § 207 ................................................................... 10, 11, 17, 24

28 U.S.C. § 1605 ................................................................ 9

**Other:**

*Doraleh Container Terminal SA v. Republic of Djibouti*, Case No.
    23–7023, Opinion, p. 2 (D.C. Cir. July 30, 2024) .......................... 10

*In re Crystallex Intern. Corp.*, 11–14074, Certificate of Mailing (Bankr.
    Del. June 12, 2024) ...................................................... 20

*NextEra Energy Holdings B.V. v. Kingdom of Spain*, Case No. 23–7031,
    Amicus of United States of America (D.C. Cir. Feb. 2, 2023) ................ 15, 16

# Glossary of Abbreviations

| | |
|---|---|
| **FSIA** | Foreign Sovereign Immunities Act |
| **MOU** | Memorandum of Understanding |
| **ZMDC** | Zimbabwe Mining Development Company |

## JURISDICTIONAL STATEMENT

There is no meaningful dispute as to this Court's jurisdiction. Amaplat Brief, p. 2.

## SUMMARY OF ARGUMENT

A judgment creditor seeking to enforce a foreign, *ex parte* judgments on an arbitral award can travel under either an international arbitration treaty, such as the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), or a state statute that enforces foreign money judgments. Amaplat has tried to do both, and despite its attempts to undermine understanding of the issue with pages of overstated facts and unwarranted assumptions, Amaplat's brief contributes more confusion than clarity, failing as a matter of law and fact.

Amaplat pursues an argument that the District Court rejected but Amaplat failed to cross-appeal. This is Amaplat's misguided notion that 28 U.S.C. § 1605(a)(6), also known as the "arbitration exception," can apply as a basis to confirm a judgment against the instrumentality of a foreign state. The District Court correctly rejected this argument as plainly contrary to the statutory language, and any attempt to resurrect this argument would bring an arbitration-based waiver of

sovereign immunity while depriving Appellants of their defenses to confirmation of an arbitration award. This is more than sufficient to dismiss Amaplat's argument based on a failure to cross-appeal.

Amaplat's interpretation of 28 U.S.C. § 1605(a)(1), also known as the "implied waiver exception," does not fare much better. Amaplat requests this Court to implausibly add the words "about the award" to the New York Convention and directly contradict the position of the United States. Amaplat also fails to contradict Appellants' interpretation of Article XIV of the New York Convention or fit its argument into the three narrow categories of implied waiver that exist in this Circuit. Stated simply, Amaplat's arguments will set this Court against itself as well as the position of the parties to the New York Convention.

Amaplat avoids Appellants' arguments regarding the proper interpretation of 9 U.S.C. § 207, the statutory language that incorporated the New York Convention into Federal law and required the use of its text to any application of the New York Convention. Amaplat does not support the District Court's order. Instead, it incorrectly argues that this case deals with preemption, which is nothing more than a red herring.

On the issue of Zimbabwe as an *alter ego* of ZMDC, Amaplat does not explain why this Court should have anything to do with conduct alleged to have occurred completely outside of the United States with no attempt by any Appellant to use any element of our legal and economic system. There is a presumption against extraterritoriality that applies to the cause of action underlying any *alter ego* claim, which Amaplat hardly addresses.

Amaplat's other arguments do little to support the District Court's order. Amaplat does not reconcile the District Court's confusion of the applicable standard or its decision to rely on kinds of facts that this Court has rejected. The supposed facts showing an *alter ego* are underwhelming, and when applied by the District Court fall short of pleading a claim for *alter ego* liability.

Amaplat concludes with a spirited defense of service under agreements that ceased to exist over a decade ago, contradicting the arbitral award that confirmed the cancellation of those agreements. It seeks the same result in defining the Commissioner as an organ of the State and not an individual.

## STATEMENT OF THE CASE

Amaplat[1] has taken significant liberty with its statement of the case, drawing factual statements almost exclusively from submissions, not the District Court orders on appeal. Amaplat's assertions require some untangling.

Amaplat begins with a description of Zimbabwe's mining industry, relying on a document dated August 2, 2022 (JA 473) that does not describe the mining industry as "the most important one." *Compare* Amaplat Brief, p. 4 *with* JA 472. There is no mention of ZMDC as being controlled on a day-to-day basis by Zimbabwe. Appellants do not dispute the existence of the Zimbabwe Mining Development Corporation Act (the "ZMDC Act") or the State's ownership of mining deposits, which is common. JA 1154. Contrary to Amaplat's assertion,

---

[1]  Appellants refer to Appellees as "Amaplat" even though there are two appellees.

scholars do not refer to ZMDC as an "arm of the state." *Compare* Amaplat Brief, p. 4 *with* JA 670. The "scholars" unhelpfully analyze the timeframe from 2006 to 2009 (before the cancellation of the MOUs, JA 166) and diamond mining in Chiadzwa. JA 665. ZMDC does not dispute that Zimbabwe is the sole shareholder of ZMDC, although Amaplat describes it as the "Government," a capitalized, undefined term that is inaccurate. Amaplat Brief, p. 4.

Amaplat cites the ZMDC Act to argue that the Minister of Mines has "the absolute power to direct ZMDC's Board to do whatever the Minister deems 'to be requisite in the national interest.'" Amaplat Brief, p. 5, *citing* JA 486. There is no such "absolute power" in the statute. Rather, the Minister gives "directions of a general character[.]" *Id*. It is unclear what Amaplat means by "plenary control," but this language is not in the statute. *Compare* Amaplat Brief, p. 5 *with* JA 483. There are "removal powers," but not without cause. *Compare* Amaplat Brief, p. 5 *with* JA 483. The "approval" for investments and loans is subject to "directions given by the Minister," which are the same directions of "general character" described in Section 25. *Compare* Amaplat Brief, p. 6 *with* JA 486. There is no finding by the District Court, or authority offered, that these "directions," or any others, anything but those of a "general character." Amaplat Brief, pp. 5–6.

Amaplat exaggerates the experience of Mr. Moyo, who never claims to have "40 years of experience dealing with mining disputes." *Compare* Amaplat Brief, p. 6 *with* JA 393. Mr. Moyo only describes the terms of the ZMDC Act, providing his own characterization that comes with no authority. Amaplat Brief, p. 6; JA 395-399. Mr. Moyo relies on "notorious fact[s]" that consist of little more than

hearsay. Amaplat Brief, pp. 6–7; JA 400, JA 403. Or how things "appear to [him]," with nothing to support his conclusion. Amaplat Brief, p. 6, JA 401. The District Court did not cite to Mr. Moyo's declaration at all.

Amaplat overstates the significance of the 2017 Parliamentary Report. It deals with diamond mining, not platinum or nickel. *Compare* Amaplat Brief, p. 7 *with* JA 689. The problem with corporate governance comes from the Board of Directors of ZMDC (the "ZMDC Board") not being present in Chiadzwa during the Committee's visit. JA 704. This hardly seems indicative of poor corporate governance. And "political interference" derives from the lack of "legal framework" in the diamond sector. *Id*., p. 19. The Committee's concern with operational issues came from the "workload." *Id*. The District Court decided to "not rely" on the report. JA 1181.

Amaplat points to an article regarding gold mining to comment generally on the mining sector in 2008. Amaplat Brief, pp. 7–8, JA 713. There is no mention in the article of Zimbabwe turning to "international investors." Amaplat has offered no evidence, and cites none, about Amaplat's insistence on arbitration or its assertion regarding what "[w]ell-advised sovereigns have long known." Amaplat Brief, p. 8. One can only wonder how this would apply to non-signatories like Zimbabwe and the Commissioner. The District Court paid no heed to the report from the House of Representatives referenced by Amaplat.

Amaplat describes the chairman of the ZMDC Board as a "political ally," citing one news article that relates to a different entity (JA 729), and another news article from an unnamed source that casts aspersions without using the term "political

ally." JA 733. The next news article refers to a political faction that pre-dated the appointment (JA 748), and the other article does not mention ZMDC. JA 753. The article invoked by Amaplat has no mention of a "one-man board" (Amaplat Brief, p. 9) except for an article in a footnote—the article is no longer available. JA 767-768.

The following allegations occurred while ZMDC's CEO was in office. Amaplat Brief, p. 10. This individual testified for Amaplat in the arbitration, and Amaplat cites to no testimony or argument in the arbitration that Zimbabwe or ZMDC failed to respect any corporate form. The final citation in this section is to an article regarding diamond mining. JA 806. Amaplat's inclusion of letters pre-dating the arbitration show a dispute but nothing about a lack of corporate formalities. Amaplat Brief, pp. 10–11. Amaplat alleges no *alter ego* based on these documents.

Amaplat contends that their "investments were expropriated," something the Tribunal never found. *Compare* Amaplat Brief, p. 12 *with* JA 266. The other references do not match the allegations. The 2013 Parliamentary Committee report does not mention the award of diamond concessions at the Minister's direction. *Compare* Amaplat Brief, p. 12 *with* JA 880, JA 887. And Amaplat reiterates its complaints regarding ZMDC's diamond mining operations, all actions that occurred during the arbitration but resulted in no concerns placed before the Tribunal. Amaplat cites nothing in the report that demonstrates problems outside of a handful of diamond mines.

There are no "widespread reports regarding ZMDC's assets being used to benefit" insiders (Amaplat Brief, p. 13), just one report that mentions an adverse

opinion by ZMDC's auditor for failing to accurately ascribe a value to its ownership in certain joint ventures. JA 916. There is no evidence of some deal for Russian aircraft. JA 914, 921. Nor is there evidence that ZMDC awarded a concession to Zimbabwe's armed forces or if the supposed transaction violated any law. *Compare* Amaplat Brief, pp. 13-14 *with* JA 930.

The mention of sanctions refers to ZMDC acting "on behalf of the Government of Zimbabwe" to plan, coordinate, and implement mining projects. Amaplat Brief, p. 14. This is consistent with the actions of any corporate subsidiary. The other citations are irrelevant. The District Court chose not to rely on the 2017 to 2023 State Department Investment Climate Impact Reports. JA 1181. Amaplat cites the reports anyway.

Addressing the arbitration, footnote 2 is inaccurate. Amaplat Brief, p. 16. Zimbabwe is not avoiding payment. Rather, it has consistently alleged payment in the form of a substantial, growing setoff. *See, e.g., Elisabeth Marie Regina von Pezold, et al. v. Republic of Zimbabwe*, Case No. 23–7109, Reply Brief, p. 7 (D.C. Cir. May 17, 2024). There is no allegation that Zimbabwe had any role in the cancellation of the MOUs or any other fact relevant to the award's findings. JA 1146-1147.

Amaplat erroneously describes the post-award proceedings. The Commissioner did not file an action to enjoin enforcement of the award. *Compare* Amaplat Brief, p. 18 *with* JA 154. ZMDC did not receive notice of the Judgment. *Id*., ¶¶ 16–24. Amaplat does not allege that ZMDC was properly served with the Judgment.

The claimed defrauding of creditors involves citation to ZMDC's sale of assets, which is not asset-stripping. Amaplat Brief, pp. 19–20, *citing* JA 1138. If anything, the document shows Zimbabwe's lack of control over ZMDC. There is a "proposed plan" with no evidence that it has come to pass and a transfer that is not hidden and has every indication that it was for value. JA 1143. There is no allegation that Zimbabwe violated any applicable law in relation to the share transfer. In any event, the Belgian courts have already rejected the *alter ego* theory, a finding that Amaplat does not mention or contest. JA 1149-1150. And Amaplat has not included its *alter ego* theory in the Zambian court proceedings or Canadian court proceedings. JA 1148.

The remainder of Amaplat's statement of the case characterizes the proceedings below, matters best dealt with in the argument section that follows.

## STANDARD OF REVIEW

It does not appear that the parties are in dispute regarding the standard of review, despite the words Amaplat uses to begin its comments. Amaplat Brief, p. 29. There are findings of fact that the District Court deemed sufficient for the purposes of subject matter jurisdiction only. JA 1180. While Appellants do not stipulate to these facts for the purposes of liability, they do not seek to overturn any findings as being clear error. Appellants take issue with any use of certain exhibits as evidence to which Appellants objected: ECF 45–25, 26, 27, 41. Appellants made those objections to the District Court (JA 1167), and there was no ruling on these objections.

# ARGUMENT

## I. Amaplat should have cross-appealed because any application of the "arbitration exception" will enlarge Amaplat's rights and lessen those of ZMDC and the Commissioner

Amaplat begins by questioning the District Court's finding that the "arbitration exception" did not apply. Amaplat Brief, p. 31. This requires a cross-appeal that Amaplat did not file but contends was not mandatory. To determine the necessity of a cross-appeal, this Circuit applies the general rule set forth in *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924):

> [T[he appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below.

*Freeman v. B & B Assoc.*, 790 F.2d 145, 150–151 (D.C. Cir. 1986). This general rule does not apply merely to the counts enumerated in a complaint. *Jennings v. Stephens*, 574 U.S. 271 (2015). And an order granting immunity is not immediately appealable at all. *Roth v. King*, 449 F.3d 1272, 1282 (D.C. Cir. 2006), *citing Baird v. Palmer*, 114 F.3d 39, 43 (4th Cir. 1997).

To resolve the argument, the Court need look no further than the statutory text of the arbitration exception. The waiver of sovereign immunity contained therein only applies where a party seeks to "confirm an award made pursuant to such an agreement to arbitrate[.]" 28 U.S.C. § 1605(a)(6).

The text describes a kind of dispute that allows ZMDC and the Commissioner to respond to the confirmation of an award, triggering their rights under Article V

of the New York Convention. *See* 9 U.S.C. 207. No such rights exist in responding to a count to enforce a judgment, and if Amaplat can claim it filed an action to confirm an award without having to defend against the grounds for non-recognition in Article V, then Amaplat will have substantially expanded its rights at the expense of ZMDC and the Commissioner.

This is not a minor issue. Because neither ZMDC nor the Commissioner received notice of the Zambian confirmation proceedings, the Commissioner could never argue under Article V(1)(c) that the Award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration since the applicable clause did not bind him at all. The same is true of any argument by ZMDC or the Commissioner under Article V(1)(a) that the Award was invalid under Zimbabwean law, which is the law applicable to the contracts. JA 282; JA 299. The Commissioner also cannot raise the argument (JA 130) that he never gave his consent to be represented in the arbitration. *See, e.g., Doraleh Container Terminal SA v. Republic of Djibouti*, Case No. 23–7023, Opinion, p. 2 (D.C. Cir. July 30, 2024). None of these defenses are available under the Uniform Foreign-Country Money Judgments Recognition Act of 2011 (the "DC Judgment Enforcement Act"), § 15–364, which is sole basis for the relief sought in the Amended Complaint. D.E. 40, p. 18. In other words, resurrecting the arbitration exception limits the defenses of ZMDC and the Commissioner while expanding Amaplat's rights—precisely the wrong result.

Amaplat provides one inapposite citation on this point: *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 775 (D.C. Cir. 2022) *(P&ID II)*.

Amaplat Brief, p. 31. This case is unhelpful. Unlike here, the District Court never decided on the application of the arbitration exception. *P&ID II*, 27 F.4th at 774. There would have been nothing for any party to cross-appeal.

Finally, cross-appeal would not be available in any circumstance. The March 2023 Opinion effectively granted immunity to Appellants for the purposes of the arbitration exception. After that order, there was a remaining claim to enforce the judgment under the implied waiver exception, but there was no need to review the March 2023 Opinion on the arbitration exception before final judgment. Similar to other cases granting immunity, the finding was not appealable, even if Amaplat had filed a notice of cross-appeal. *See, e.g., Baird v. Palmer*, 114 F.3d at 43.

## II. Amaplat's misguided attempt to reconstruct the implied waiver exception must fail

Amaplat begins with an invocation of "decades of authority" purportedly warning sovereigns that "binding arbitration in another New York Convention state" means waiver of sovereign immunity from suits in the United States as to "the award and foreign judgments confirming it." Amaplat Brief, p. 32. Notably, there is no authority cited in these two paragraphs. The argument also overlooks the longstanding statutory mandate, in existence since the implementation of the New York Convention in the United States, that after three years all awards could be ignored in the United States since courts cannot enforce them. 9 U.S.C. § 207. Amaplat continues, offering no evidence as to the "expectations of international investors," but it is highly unlikely that any of them expect to enforce decade-old

awards or judgments using the New York Convention. The proposition also falls flat considering that Zimbabwe never signed anything, prevailed on the *alter ego* issue in Belgium, never faced an *alter ego* argument in Zambia, and is not dealing with an *alter ego* argument in Canada. Any expectation about the present judgment enforcement action would be implausible.

### A. Amaplat's addition of the words "about the award" to the New York Convention is insufficient to create an implied waiver

Amaplat does not engage with the policy underlying the "*Seetransport* theory" cited by the District Court. Appellants Brief, p. 13. Rather, Amaplat takes issue with Appellants' emphasis on the lack of any language in the New York Convention regarding judgments confirming awards. Amaplat Brief, p. 42. Amaplat argues that "[f]oreign sovereigns contemplate litigating *about the award* in Convention jurisdictions and that waives immunity *about the award*[.]" *Id*. Amaplat provides no textual basis for this argument, leaving the Court only with Appellants' arguments regarding the "fundamental policy" in the February 2024 Opinion for which Amaplat had no answer. And Amaplat does nothing to explain why foreign sovereigns bother to negotiate treaties regarding judgment enforcement—a strange pursuit if they all agreed with Amaplat that waiver already existed in the New York Convention. *See* Appellants Brief, p. 14.

Amaplat's theory is also far too broad to have consistent application, stretching to all types of litigation and conflicting with the FSIA. Amaplat's waiver would have existed since foreign sovereigns began ratifying the New York Convention in

1958, pre-dating immunity from attachment, subject to its own statutory scheme and certainly drafted as if immunity exists regardless of the New York Convention. Amaplat's waiver would also conflict with immunity for foreign officials. If the New York Convention waives immunity for litigation "about the award," then judgment creditors could hale foreign officials into court as parties under the argument that the claim is "about the award" and attempts to enforce it.

Adding the words "about the award" to the New York Convention are especially troubling in Amaplat's analysis of Article VII. Amaplat Brief, p. 43. Article VII expressly deals with conflicts between the New York Convention and "multilateral or bilateral agreements concerning the recognition and enforcement of arbitral awards entered into by the Contracting States[.]" New York Convention, art. VII(1). These are agreements related to "arbitral awards," not judgments. The remainder of the sentence preserves the right of "any interested party . . . to avail himself of an arbitral award in the manner and to the extent allowed by the law or the treaties of the country where such award is sought to be relied upon." *Id*. Again, this is only the award. It is plainly outside the text of the New York Convention to assume a state statute regarding judgment enforcement is a law or treaty that can enforce an arbitral award.

Any desired language regarding judgment enforcement is certainly part of international practice such that foreign states could adopt it. For example, the Interamerican Convention on Territorial Effectiveness of Foreign Arbitration Awards (the "Montevideo Convention") contains language regarding the

enforcement of judgments and arbitral awards. *See* Article 1, OAS T.S. 51, June 14, 1980.[2] Zimbabwe, Zambia, and the United States are not parties to the Montevideo Convention.

Amaplat confuses the issue with its citation to "alternative procedures" supposedly found in *Comm'ns Imp. Exp. S.A. v. Congo*, 757 F.3d 321 (D.C. Cir. 2014) *(Comimpex)*. Amaplat Brief, p. 43. The portions of *Comimpex* cited by Amaplat deal with the argument as to the preemptive effect of the Federal Arbitration Act. *Id*. But Amaplat declines to respond to Appellants' contention that the "New York Convention does not apply" to judgment enforcement. Appellants Brief, p. 22. This is a crucial distinction. Amaplat hangs its entire immunity argument on the premise that the New York Convention must apply. Amaplat Brief, pp. 40–42. This argument is incorrect. Amaplat can draw on either the New York Convention or a state judgment enforcement statute, but it cannot simultaneously apply both.

**B.** **Amaplat falls short in its attempt to explain away the position of the United States on any implied waiver in the New York Convention**

Amaplat describes the view of the United States in *P&ID II* as "tentative" that "does not purport to be a definitive statement of exactly what an implied waiver is." Amaplat Brief, pp. 37–38. This argument fails to deal with the statutory analysis conducted by the United States and the position of the United States and other foreign sovereigns as to any implied waiver in the New York Convention.

---

[2]    Available at http://www.sice.oas.org/dispute/comarb/intl_conv/caicmoe.asp

Indeed, the United States rejected the "floor" identified by Amaplat in pages 38–39 of its brief. *P&ID II* Amicus, pp. 10–14. But more importantly, the United States has dispelled any doubts as to its position in an *amicus* brief filed in *NextEra Energy Holdings B.V. v. Kingdom of Spain*, Case No. 23–7031, Amicus of United States of America (D.C. Cir. Feb. 2, 2023) (*NextEra*).

In *NextEra*, the United States was quite clear as to its view. It stated that "[b]ecoming a party to either the New York Convention or the ICSID Convention, without more, does not provide the necessary 'strong evidence' that a foreign state intended to waive its sovereign immunity in United States courts." *NextEra Amicus*, p. 20. The United States continued, affirming that the New York Convention does "not commit a foreign state to engage in arbitration and therefore they could not implicitly waive sovereign immunity for any enforcement action." *Id*. Notably, the use of the word "any" is as broad a word choice as possible. The United States went on to take the opposite side of Amaplat's arguments, stating that the "arbitration exception" displaces the "implied waiver" exception in cases dealing with the enforcement of New York Convention awards. *Id*., p. 22. *Compare* Amaplat Brief, pp. 37–39. This is a firm, considered interpretation of the text of the New York Convention, and Amaplat cannot escape its import—the New York Convention is not an implied waiver of sovereign immunity.

**C. Amaplat has failed to rebut Appellants' analysis of Article XIV of the New York Convention**

Appellants argued that Article XIV of the New York Convention bars a broader interpretation of the treaty than the United States applies to itself. Appellants Brief, p. 18. Amaplat responded by arguing about the FSIA. Amaplat Brief, p. 39, fn 4. This is a confusion of first principles. Appellants did not mention the FSIA in their argument. Rather, Appellants posited that treaty interpretation of Article XIV cannot deprive Zimbabwe of rights that the United States otherwise asserts. Canadian courts have nothing to say about this (*see, e.g.* Amaplat Brief, p. 39, fn 4), and Amaplat does not explain how the United States can deny the existence of an implied waiver for other countries while courts in the United States create one. Zimbabwe's argument stands unchallenged.

**D. Amaplat does not fit its argument into the limited confines of an implied waiver in this Circuit**

Amaplat never addresses head-on the three categories of implied waiver in this Circuit, even though Appellants referenced recent, binding precedent. Appellants Brief, pp. 19-20. Amaplat instead argued that Appellants were attempting to "muddy the waters" by citing to *Khochinsky v. Republic of Poland*, 1 F.4th 1, 8–9 (D.C. Cir. 2021). Amaplat Brief, p. 35. This argument is difficult to maintain when the United States cited the exact same case and its three categories of implied waiver when analyzing the lack of an implied waiver in the New York Convention. *NextEra Amicus*, pp. 19–20. *Khochinsky* is binding precedent on the categories of

implied waiver, and Amaplat has offered no compelling reason to depart from this recently decided case. As such, this Court should reverse since there is no category of implied waiver the covers Amaplat's arguments.

### E. The arbitration exception is still inapplicable

Misunderstanding this Court's ruling in *Comimpex*, Amaplat argues for an entirely novel and expansive interpretation of the arbitration exception that is at odds with the statutory text. Amaplat Brief, pp. 44–46. Where the arbitration exception applies to a request to "confirm an award," Amaplat sees "judgment recognition" as a way to "confirm an arbitral award governed by the [New York] Convention." Amaplat Brief, p. 45. This cannot be. The word "confirm" is a term of art in 9 U.S.C. § 207 to set the date for seeking enforcement of the award in the United States and the process by which a party challenging the award can assert its defenses under the New York Convention. The DC Judgment Enforcement Act contains no language regarding confirmation of an award, and Amaplat offers no basis to read "confirm an award" to mean recognize a judgment. The citation to *Comimpex* is particularly inapt since that case involved the enforcement of a judgment based on the foreign sovereign's express waiver of immunity, not the application of the New York Convention. *Comimpex*, 757 F.3d at 324.

Amaplat's other argument regarding "confirming awards *by any procedure*" is at odds with how Amaplat has plead its case. Amaplat Brief, pp. 45–46. Amaplat has one count in its Amended Complaint: recognition of a foreign judgment. ECF 40, p. 18; JA 224. It is not seeking to confirm an award. And there is little room to

argue that Congress intended "confirming awards" against foreign sovereigns to include state arbitration laws (the states cannot waive Appellants' immunity), contract law (parties cannot contract for different grounds of review, *see Hall St. Assocs. v. Mattel*, 552 U.S. 576 (2007)), judgment recognition (absence of the words "confirming an award"), or anything else (whatever this may mean). Amaplat Brief, pp. 45–46. The arbitration exception is plainly inapplicable.

### III. Amaplat eschews analysis of the statutory text of 9 U.S.C. § 207, opting to mischaracterize the argument as one regarding preemption

Appellants made a straightforward statutory argument, interpreting the text of Chapter 2 of the FAA as mandatory for any application of the New York Convention. Appellants Brief, p. 22–23. Instead of engaging with this argument, Amaplat changed the topic. It characterized the argument as one of preemption. Amaplat Brief, pp. 47–49. To be clear, preemption is not at issue. Appellants have never argued that the New York Convention preempts the DC Judgment Enforcement Act. Where a foreign state executes an independent waiver of sovereign immunity, it can be subject to an action enforcing the judgment based on that waiver. *See, e.g., Comimpex*, 757 F.3d at 325. But this is not our case. This Court must decide if the New York Convention can be enforced to find an implicit waiver without accepting the confines of Chapter 2. Amaplat has not addressed this argument at all, and the statutory language mandates that applying the New York Convention means taking all of it, including Chapter 2 of the FAA.

## IV. Amaplat has failed to support the District Court's finding that Zimbabwe is an *alter ego* of ZMDC

After losing in Belgium and not raising the argument in Zambia or Canada, Amaplat tries to transform a completely foreign dispute, governed by the laws of Zimbabwe, into a matter for the attention of the Federal courts. There is no legal basis for the Court to enter into this question, and the District Court's application of the facts do not support a finding of *alter ego*.

### A. Amaplat cannot defeat the presumption against extraterritoriality, especially since it did not fully respond to Appellants' argument

Appellants made two arguments on the application of *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) (*Bancec*), but Amaplat decided to treat them as one. Amaplat Brief, pp. 56–57. The first argument has a nationality component. The Supreme Court crafted the *Bancec* test using equitable principles to protect Americans that had suffered an international wrong. Appellants Brief, pp. 23–24. Appellants only ask the test be applied as drafted. *Id*. Amaplat does not dispute the equitable basis in *Bancec*. Rather, it offers two examples of cases for the notion that the regular occurrence of "alter ego issues" means that *Bancec* has expanded to protect non-Americans from losing money. These examples are not persuasive.

In *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, the plaintiff filed its arbitration after opening a Chapter 15 bankruptcy proceeding in Delaware. A United States trustee administers the estate, and even though the

plaintiff is a Canadian entity, it functions under the control of Americans, from counsel to the trustee. *See, e.g., In re Crystallex Intern. Corp.*, 11–14074, Certificate of Mailing (Bankr. Del. June 12, 2024). There is also a different interest at stake. Because the parties agreed to arbitration in the United States, they delegated enforcement powers to United States courts. *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 132 (3d Cir. 2019). This is thus a significant interest in the United States to enforce awards issued by tribunals seated in this country—an interest that dovetails with the equitable principles in *Bancec*.

Similarly, Amaplat's other citation deals with a case strongly linked to the United States. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411 (5th Cir. 2006). The parties agreed to arbitrate in the United States, relied only on law in the United States, and even offered to have their dispute governed by federal common law. *Id.* at 416, fn 5. It is doubtful that the Fifth Circuit could have refused to apply *Bancec* when the parties both requested it.

Turning to the second argument, the presumption against extraterritoriality, Amaplat does not offer a defense on the core argument. Amaplat instead seems to argue that Appellants are asserting that the FSIA does not apply extraterritorially. Amaplat Brief, pp. 57–58. But this is not the argument. Appellants were quite clear that the presumption against extraterritoriality goes to the cause of action. Appellants Brief, pp. 25–26. *Bancec* applied federal common law, which has no extraterritorial application. *Id*. Amaplat offered no rebuttal, and its references to the

arbitration exception and the implied waiver exception miss the mark. Appellants' argument applying the presumption against extraterritoriality remains untouched.

### B. Amaplat misapprehends the relevant timeframe for analysis of *alter ego* status

Appellants argue for little more than the relevant time frame for *alter ego* status as the facts supporting the underlying cause of action. Amaplat litigated for years on the principle that ZMDC followed corporate formalities and received the Award. Amaplat then waited almost a decade and returned to court seeking to convert a Zambian judgment into a DC judgment that deals solely with the facts that led to the Award. There is nothing unjust in requiring Amaplat to limit itself to the facts giving rise to the underlying cause of action.

As a matter of equity, like the equitable factors used in *Bancec*, Amaplat cannot obtain relief under one theory then change its mind a decade later to get a different result from the same set of facts. *Bancec* applied this same principle. Cuba could not use the benefits of the United States courts and financial system, but then escape liability. And Amaplat cannot obtain an award relying on corporate formalities then change its mind about those same findings a decade later once it decides to come to the United States for enforcement. Amaplat thus has no basis to argue about some sort of surprise that the entity is not an entity or a "puppetmaster" would prevent performance. Amaplat Brief, p. 59. Amaplat had former ZMDC employees as witnesses and never presented any of this evidence at the appropriate time.

Amaplat brings up meaningful points about the risks of States engaging in fraudulent transfers or dissipating assets after the date of the award. Amaplat Brief, pp. 58–59. But those are concerns for a different day. A creditor can always assert these claims at the post-judgment stage, which is precisely the path taken in one cited case. Amaplat Brief, pp. 58–59, *citing OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 162-63 (3d Cir. 2023). And the analysis from Appellants is not dissimilar to *Bancec*. The case was filed in 1961 and not adjudicated until 1980. The only relevant facts were from 1960 to 1962, with no mention of any facts thereafter. *Banco Nacional De Cuba v. Chase Manhattan Bank*, 505 F.Supp. 412, 423–424 (S.D.N.Y. 1980). The resolutions and government acts established liability on the claim at issue (set off) and were not part of a wide-ranging analysis of every action by Cuba that could have any relation to the banking sector. Amaplat undertook the same endeavor to establish liability against ZMDC, but simply chose not to name Zimbabwe. It should not be able change its mind now.

### C. Amaplat has failed to support the District Court's finding on *alter ego*

Relying almost exclusively on facts related to diamond mining, not platinum or nickel, Amaplat led the District Court astray, rewriting the basis for the Award and constructing a picture of ZMDC based largely on innuendo and hearsay. The facts do not support a finding that Zimbabwe was ZMDC's *alter ego*.

### 1. Amaplat has not rebutted Appellants' arguments regarding the misapplication of the proper standard

Appellants began their analysis of the application of the *Bancec* factors by first pointing out the District Court's erroneous construction of the legal standard. Appellants Brief, pp. 28–29. The District Court mixed the standards of "complete domination" and agency principles, making it impossible to follow the reasoning to the conclusion. *Id*. Amaplat chose not to challenge this argument.

Amaplat may consider this argument "quibbling" with the language in the February 2024 Order (Amaplat Brief, p. 53), but one verb cannot fix the District Court's failure to identify facts specific to ZMDC's conduct, as opposed to vague assertions regarding the mining industry generally. To adhere to binding precedent and apply ordinary agency principles, Amaplat must provide evidence that ZMDC consented to act on Zimbabwe's behalf and Zimbabwe exercised more control than voting as a shareholder or selecting the board of directors. Appellants Brief, p. 29, *citing Transamerica Leasing, Inc. v. La República de Venezuela*, 200 F.3d 843, 850 (D.C. Cir. 2000). ZMDC's actions must then be related to the substance of Amaplat's cause of action. *Id*. Amaplat has identified no such evidence specific to ZMDC or the cause of action.

### 2. The application of the rather mundane factual findings falls far short of *alter ego*

Appellants took issue with the District Court applying factual findings to Zimbabwe that are not grounds for a claim of *alter ego*. Appellants Brief, pp.

30–31. Amaplat responded by identifying "facts" that are an overstatement of the February 2024 Opinion. The District Court never found that the Board of Directors existed to "rubber-stamp the Minister's directives." *Compare* Amaplat Brief, p. 53 *with* JA 1180. There was no finding that "ZMDC resources" were used for "foreign policy," just projects on behalf of Zimbabwe, a normal activity of any subsidiary. *Compare* Amaplat Brief, p. 53 *with* JA 1180. Similarly, there was no finding of selling assets to defraud Amaplat. *Compare* Amaplat Brief, p. 55 *with* JA 1182.

Amaplat offers little to explain away the District Court's routine reference to binding precedent that looked at similar facts and reached the opposite conclusion. And Amaplat can hardly claim that it expected some pool of assets from which to collect against ZMDC. From all the evidence submitted, ZMDC canceled the concessions, meaning the same asset supposedly worth the amount of the Award was in ZMDC's possession. Amaplat can hardly place itself in the position of the plaintiff in *Bancec*, especially when it has never alleged that any of Appellants violated "international law" or that ZMDC is somehow escaping liability. Amaplat is free to seek enforcement of the Award in Zimbabwe. For reasons known only to it, Amaplat continues to wait on this course of action.

## V.   Service is still improper

Amaplat claims that this is an "action to enforce an arbitration award." Amaplat Brief, p. 61. Taken as a stipulation (or a Freudian slip), Appellants would certainly accept this argument, which can only lead to dismissal under 9 U.S.C. § 207. But Appellants offer no argument for how the MOUs, cancelled in 2010, can still

contain applicable terms. There is nothing to litigate in the MOUs or the Award, leaving only the Judgment whose terms do not include a special arrangement for service on ZMDC. And were the Court to analyze the text of the service provisions in the MOUs, it still does not reach judgments that can only come after the cancellation of the contracts at issue.

## VI. Amaplat cannot avoid the Award at its discretion to mischaracterize the Commissioner

Amaplat never sought correction or modification of the Award, which plainly describes the Commissioner as a person. Appellants Brief, p. 33-34. The Award hardly dealt with the Commissioner at all. *Id*. But the absence of facts alleged by Amaplat in the arbitration does not make the Commissioner liable for damages. Amaplat could have made its arguments in pages 65–66 to the arbitral tribunal, but it failed to do so. There is no basis on which to hold that the Commissioner is an office and therefore not immune from suit.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court, finding that ZMDC, the Commissioner, and Zimbabwe did not waive their sovereign immunity; that ZMDC and the Commissioner are not *alter egos* of Zimbabwe; and that the other reasons described herein merit reversal.

Respectfully submitted,

Dated: August 8, 2024                 By:  /s/ Quinn Smith

GST LLP
Quinn Smith
quinn.smith@gstllp.com
Katherine Sanoja
katherine.sanoja@gstllp.com
1111 Brickell Ave., Suite 2715
Miami, FL 33131
(305) 856-7723
Counsel for Defendants-Appellants

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **6,408 words**, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, **14-pt Times New Roman**, using TypeLaw.com's legal text editor.


Dated: August 8, 2024                    By:  /s/ Quinn Smith

## Certificate of Service

I hereby certify that I electronically filed the foregoing **APPELLANTS' REPLY BRIEF** with the Clerk of the Court by using the Appellate CM/ECF system on **August 8, 2024**. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: August 8, 2024          By: /s/ Quinn Smith